# Exhibit D

Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 1 of 218

# Exhibit 49

REPLY APP 00881

# InterExchange Au Pair USA Training Outline

Michael Gates
International Recruitment and
Placement Manager
mgates@interexchange.org
Skype: michaelgatesapusa

Marianna Breytman
International Recruitment
Coordinator
apdossier@interexchange.org
Skype: admissionsapusa

### About InterExchange
- Over 45 years of experience in the cultural exchange industry
- Non-profit organization
- Designated J-1 Visa sponsor
- One of the oldest au pair programs in the United States
- Based in New York, New York
- Visit us at www.interexchange.org

### InterExchange's Inbound Programs
*Work & Travel USA*: Brings international university students to the U.S. to fill short-term positions with resorts, restaurants and other seasonal businesses.

*Camp USA*: Allows young adults to experience the fun and adventure of working at an American summer camp.

*Career Training USA*: Facilitates young professionals and students to intern or train with U.S. businesses for up to 18 months.

### InterExchange's Outbound Programs
*Working Abroad:* Enables U.S. and Canadian citizens, ages 18-30, to enjoy diverse work experiences abroad.

*The Foundation:* Established in 2007 to provide grants to young Americans who wish to participate in meaningful work abroad experiences.
Many grant recipients volunteer in developing countries and often continue their humanitarian work with their future careers.
Over $300,000 awarded in grants to date.

REPLY APP 00882

InterExchange0008820

# InterExchange Au Pair USA Training Outline

### *Au Pair USA*
Member of the International Au Pair Association (IAPA)
One of the oldest au pair programs in the United States
Host families across the United States in over 50 different communities.

### Program Details
- Au pairs live with and work for an American Host Family

- 12-month program, au pairs may extend for 6, 9 or 12 months

- Weekly stipend of $195.75 paid by the Host Family

- Work up to 45 hours per week, no more than 10 hours per day

- Receive 1.5 days off per week, and one full weekend off per month

- Two weeks (11 days) of paid vacation

- Accident & Sickness Insurance provided by InterExchange

- Host family pays up to $500 for au pairs to take university courses

- Take college courses! Au pairs must complete 6 credits (academic courses only at accredited post-secondary institutions) in 12 months

- Orientation and Training Program in New York City!

- Monthly Cluster Meetings and cultural activities with a Local Coordinator (LC) and other au pairs

- One month to travel in the U.S. at the end of the program

- Year-round support from InterExchange staff and your LC

- AP cannot be charged deposits or bonds. AP cannot receive a bonus.

- AP must attend cluster meetings and complete education requirement

- AP must pay for:
  - Police report and doctor fees
  - Travel to and from the embassy
  - Visa interview fee
  - Transportation to and from the airport in New York
  - Baggage fees
  - Dinner during Orientation & Training week

### NOTES:

ATTORNEY EYES ONLY

REPLY APP 00883

# InterExchange Au Pair USA Training Outline

**Program Requirements**
- Must be between the ages of 18 and 26 upon arrival in the U.S.
- Have a high school **diploma**
- Speak conversational **English**
- Be **passionate** about working with children
- Have at least 200 hours of child care experience
- Provide two references from non-family members for at least 200 hours of child care experience.
- Provide one character/personal reference from non-family member
- Be an **experienced** driver with a valid driver's license
- **Non**-smoker
- Never married, no children of your own
- Pass a criminal background investigation = no criminal history
- Be in good physical and mental health
- No history of visa **denials** to the U.S.

**NOTES:**

**Program Procedures**
**Inquiry Process : Best Season: Fall-Spring**

Does the applicant meet program requirements?
- Age → *18-26*
- Child care experience → *Minimum 200 hours, preferred 500+ hours, with multiple children, in different settings/situations*
- English level → *Ask a few questions in English!*
- Driving → *At least 1 year of driving daily or weekly*
- High school diploma?
- No visa denials?
- Never married? No children?
- Any health problems? Existing illnesses? Smoking? History of abuse?

ATTORNEY EYES ONLY
REPLY APP 00884

# InterExchange Au Pair USA Training Outline

- No criminal record?
- Able to commit to 12-months → *There is no shorter program.*
- Proper motivations → *Not coming to the U.S. to party and travel. The program is fun but not always easy!*

**<u>Difficult Placements</u>**
Au pairs with the following qualities are **difficult** to match:
- Males (95% of au pairs are females)
- Smokers (not accepted)
- Non-drivers (not accepted)
- Inexperienced Drivers
    - not daily or weekly
    - driving less than 1 year
- Less than 500 hours of child care experience
    - Most au pairs have at least 1000!
- Poor English skills
    - 5-6 English will not be accepted
- Animal allergies (dogs and cats) or health problems
- Geographic preferences
- Strict family preferences

**<u>Easier Placements</u>**
Host Families in the United States **want**:
- At least 1000 hours of child care experience
- **Infant Qualified** or Experience with **Special Needs**
- Experienced Driver = 1+ years with license
- Daily/weekly driver
- Above 20 years old OR very mature 18-19
- Strong English skills
- Passion for working with children
- Applied early enough (3 months before availability dates)
- Applied before peak matching season, by June
- Good Videos

<u>Infant Qualified :</u> Au pair has at least two hundred hours of documented child care experience with children ages 0-24 months.
We always need au pairs who are Infant Qualified and prefer to work with babies!

<u>Special Needs:</u> Au pair has documented experience working with children that have special needs.
We always need au pairs who are qualified and willing to work with special needs children!

**<u>NOTES:</u>**

InterExchange0008823

# InterExchange Au Pair USA Training Outline

**Application Process**
**Best Season: Winter-Spring**

The Application Wizard
- Applicant completes Au Pair USA Application in Passport, online
- Your agency receives notification when this is completed.
- **You must then carefully review the application!**
  - Format and Comments
  - Inconsistent/Confusing Information
  - Au Pair should answer every question as completely as possible.
  - Review the General Health Section
  - Review The Program Questionnaire
  - The Dear Host Family Letter
  - Make sure all photos are appropriate!

Keys to a great video:
Au pairs should create a short video, 3-5 minutes in length and no more than 100MB in size. Families want:
- Appropriate and quiet music, decent lighting, a script or outline describing the au pair
- Being properly dressed during the video
- Helping around the house (chores related to childcare)
- Working with children, dressing them, playing with them, teaching them…
- Driving and parking a car
- Cooking and handling food
- Interacting and speaking English with other adults (like the parents of the children they babysit)

Your Role in the Application Process:
- IC schedules the in-person interview and selection test
- IC answers any questions the applicant has, conducts the interview and language evaluation, and administers the Booraem-Flowers selection test
- Au pair should have references and supporting documents completed before coming in for the interview

Before submitting an application to InterExchange:
Are all references and reports signed by you, the au pair, the reference provider, etc?

ATTORNEY EYES ONLY
REPLY APP 00886

# InterExchange Au Pair USA Training Outline

Does the au pair have at least 5 photos with children and a long Dear Host Family Letter?
Did the au pair fill out the Child Care Experience section completely?
Did the au pair create a video? If not, will he/she?
Does the au pair understand the matching process and what is expected of him/her by InterExchange?

Submitting Applications:
- Complete applications are made available to host families
- Au pairs missing a high school diploma can still apply, but cannot arrive until after graduating high school
- Incomplete applications are "On Hold" and not available to families.
- InterExchange sends an email requesting the missing information
- We must cancel applications in two weeks if they stay incomplete.
   **PLEASE do not send incomplete applications!**

**NOTES:**




**Placement Process**
**Best Season: Spring-Summer**

We match au pairs in two ways:
1. InterExchange Au Pair USA Program Specialist
2. Host Family Searches for Au Pairs in Passport

Program Specialist receives and reviews each host family application. They email the family instructions on how to use the matching system in Passport, and then call the family to explain the process and discuss the family's preferences.
Typical Host Family Preferences include:
1. Age
2. Pet Allergies
3. Country of Origin
4. Native Language
5. Driving Experience
6. Child Care Experience
7. Family Background of Au Pair
8. Sports, Hobbies, Interests and Future Goals of Au Pair

Recommended, Favorite, On-view?
1. Au Pairs that are Recommended/Family Favorites: This au pair is not on view with the family yet. The family can see the application but cannot contact him/her.

InterExchange0008825
**REPLY APP 00887**

# InterExchange Au Pair USA Training Outline

2. On-view: Au pair's contact details are exclusive to this family. Other families can see the au pair but cannot contact the au pair until he/she is released.

- Families can put their own au pairs on view or add them to their favorites list.
- Au pairs can only talk to one family at a time.
- If "on-view," other families can still see the au pair's application but cannot contact the au pair.
- Families have exclusive access to their "on-view" au pairs for 48-72 hours.
- If a HF does not request an interview, the au pair is released and made available again to other families.

Maximizing Visibility:
- Au pairs with a video show up first!
- Au pairs without a video show up after.
- Au pairs with the most recent updates show up higher than au pairs who have not logged in/updated their application recently.

Interviewing with Families:
- HF must interview AP at least once before matching.
- The au pair receives an email and Passport message about the interview request.
- The AP must respond to it from their Dashboard (Accept, Postpone/Reschedule, Reject the interview)
- You will see all au pairs "on-view" and all interview requests in your Dashboard.
- Au pairs should log in to Passport regularly to check messages and interview requests.
- Au pairs should respond promptly or a family may lose interest.
- Au pairs should practice interviewing with the IC in English, and remember to ask questions about the HF, their children, the community and why they are hosting an au pair.
- Au pairs should NEVER lie to HF! Americans value honesty. If an au pair is not a great driver, they should not exaggerate their experience.
- **NOTES:**




**Matching and the J-1 Visa**


- The au pair should confirm the match and arrival dates in Passport

REPLY APP 00888

# InterExchange Au Pair USA Training Outline

- InterExchange prepares documents in a Pre-Arrival Packet and sends them to the IC.
- As soon as you receive the packet, please give it to the au pair.
- Help the AP schedule the visa interview
- InterExchange pays the SEVIS Fee and sends the receipt in the "Pre-Departure Packet"
- Tell the au pair to schedule the interview IMMEDIATELY!
- Your Au Pair will need the SEVIS ID number and Passport information, and will fill out a DS-160 Visa Application Form
- The Au Pair pays for the visa appointment fee.
- You can access the au pair's important information from the Logistics Page in Passport.
- As soon as the appointment is booked, please update the **Visa Appointment Date in your Dashboard Module "Visas Pending"**
- After the visa appointment, please **update the visa status in the Logistics Tab OR Dashboard Module.** This will send message to the Logistics Coordinator
- If an au pair's visa is denied, please contact us immediately, send us the reason why and the name of the embassy/consulate general that the au pair visited.
- The au pair may reapply, but fewer than 25% of visa denials are overturned. The au pair is responsible for paying the fees again.

**NOTES:**




### The Pre-Departure Process : Preparing for the Year Ahead

- Au pairs will receive emails from our Participant Services Manager with important information and training materials.
- Au pairs will need to read the Au Pair Handbook, the Child Care Guide, Pre-Arrival Project and online "Know Before You Go Training" in Passport before arriving in New York.
- Au pairs should continue to regularly communicate with their host family!
- Have proper expectations. Practice driving, and be excited!
- Flights are booked **2 weeks** before the arrival date.
- Au pairs are responsible for all baggage fees on all flights.
- We will email you and the au pair the itinerary.
- Au pairs should be practicing their English and driving EVERY DAY!
- **Bad driving and English are the biggest reasons an au pair goes into transition and may be sent home.**

### Transitions

ATTORNEY EYES ONLY

REPLY APP 00889

# InterExchange Au Pair USA Training Outline

Transition Policies
- Au pairs have two weeks to be matched with a new family
- Au pairs must maintain contact with InterExchange during this time
- We will help find housing and make sure the au pair is always safe
- We will prepare a report for your agency and contact you if we need assistance
- Au pairs who cannot be rematched must return home at their own expense

**NOTES:**

## The Orientation & Training Program

**Arriving to Orientation**
Supershuttle : Au pairs can arrive to the *New Yorker Hotel* using Supershuttle!
- It costs approximately $20 plus $2 tip.
- Instructions are provided in the Pre-Departure Packet!
- This is safer and less expensive than a taxi cab.
- **NEVER accept a ride from a stranger**!

**Be Prepared!**
- Au pairs must read the Child Care Guide before arriving.
- Au pairs must complete the Child Care Test while on the plane.
- Au pairs should have their DS-2019 Form, Passport (with visa) and Pre-Arrival Packet on their person when going through immigration.
- Au pairs will need at least $200 to cover expenses such as baggage fees, dinners, the New York tour and souvenir shopping while in New York.

**Resources available in Passport:**
- Glossary of Passport Terms
- Photo Contact Sheet – New photos available to you
- PDF Packet of Pre-Departure Documents
- PDF Packet of Orientation & Training Workbook
- Updated list of International Departure Cities within Passport

**NOTES:**

REPLY APP 00890

Case No. 1:14-cv-03074-CMA-KMT Document 604-4 filed 04/27/18 USDC Colorado pg 12 of 219

# Exhibit 50

REPLY APP 00891



AU PAIR USA     H-2B VISA USA

CAMP USA     WORKING ABROAD

CAREER TRAINING USA     WORK & TRAVEL USA

February 22, 2012

To Whom It May Concern:

My name is Michael Gates and I am the International Recruitment and Placement Manager for InterExchange Au Pair USA. I am writing this letter on behalf of Cara International, an international exchange agency, which has agreed to be our international partner in the Republic of Ireland. InterExchange is one of the 12 federally regulated au pair sponsors designated by the United States Department of State to sponsor exchange visitors under J-1 visa status. InterExchange relies on a network of international partner organizations to interview and evaluate our au pair candidates in their home countries before they join the program.

InterExchange Au Pair USA has been cooperating with Cara International since 2008. Cara International has satisfied all of the tasks and responsibilities that are needed, including but not limited to:

- Assisting with the application process in Ireland
- Screening candidates through interviews and psychometric tests
- Gathering necessary documents and submitting complete applications
- Preparing au pair candidates for their visa interviews and arrival in the USA
- Acting as a liaison between our office and their candidates
- Providing valuable support and feedback when requested

InterExchange is a private, non-profit organization with 35 years of experience in international educational exchange. InterExchange is dedicated to promoting international understanding through intercultural, educational and work/training opportunities. Over the years thousands of young people have been placed both here and abroad in cooperation with international partner organizations and government agencies. Should you have any further questions or require any additional information, please do not hesitate to contact me directly at 917-305-5461 or through e-mail at this address: mgates@interexchange.org.

Sincerely,

Michael Gates
International Recruitment and Placement Manager
InterExchange Au Pair USA

161 Sixth Avenue, New York, NY 10013     TEL 212.924.0446     FAX 212.924.0575     www.InterExchange.org

InterExchange0010587

REPLY APP 00892

Case 1:14-cv-03074-CMA-KMT   Document 980-5   Filed 04/13/18   USDC Colorado   Page 13 of 218

# Exhibit 51

| To: | Julia Jakkaraju[jjakkaraju@lc.interexchange.org] |
|---|---|
| From: | Dina Nichols |
| Sent: | Mon 9/2/2013 7:46:42 PM |
| Importance: | Normal |
| Subject: | Re: Business trips |
| Received: | Mon 9/2/2013 7:46:42 PM |

Hi Julia,

That is a BIG NO NO!!!

Same rules apply so if a parent/s have to be gone overnight regardless of the number of nights, an au pair can only be responsible for the kids for no more than 10 hours per day. That includes night time sleeping hours.

So, they have to have back up childcare in place. Often it is a family member that may just come over to sleep so that can be considered the au pairs time off and non-responsible hours. Plus they still need the 1 1/2 days off per week.

The au pair should have known the circumstances before they left and said something at that point. It is a little hard to have a family come back if they are still gone.

If the family is still gone then I would suggest you either call them or e-mail them and let them know that for the duration of the trip they are going to have to make alternate plans for childcare so the au pair doesn't work more than her required hours/days. They will have to make it work even if they are not home. It clearly states in the host family book that they are not to be left alone with the kids for weekends, travel etc.

If they are home already then I would be sure to call and/or e-mail them and let them know that in the future this is a violation and they can't ever do this again. They also may want to be extra good to their au pair and give her some extra time off.

I hope that helps.


Dina Nichols
Local Coordinator InterExchange Au Pair USA
TEL 1.619.392.9288 EMAIL dnichols@lc.interexchange.org http://www.interexchange.org/aupairusa


Julia Jakkaraju , 9/2/2013 11:48 AM:

 Hi Dina,
Happy Labor Day :-) I hope you are having a great weekend with your family.
I have a question regarding Host Parents Business trips. An Au Pair contacted me saying that her HPs were on business trips for the past 7 days and she didn't get any time off or got to go out.
What are the rules when it comes to business trips? Can they actually leave the au pair alone for that long? If not, what should I do?

As always, thank you so much for your help :-)

Julia Jakkaraju
Local Coordinator
InterExchange Au Pair USA
Tel: 1.408.858.6318
Email:jjakkaraju@lc.interexchange.org
http://www.interexchange.org/aupairusa

CONFIDENTIAL

**REPLY APP 00894**

Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 15 of 218

# Exhibit 52

REPLY APP 00895

**To:**  REDACTED
Daly[cdaly@lc.interexchange.org]; Ekaterine Piccola[epiccola@interexchange.org]; Carol
**Cc:**
**From:** Victoria King
**Sent:** Thur 2/6/2014 9:54:04 PM
**Importance:** Normal
**Subject:** Re: Your Au Pair Search
**Received:** Thur 2/6/2014 9:54:05 PM

Hi ▮▮,

Thank you for explaining what was discussed during your conversation with Diana. After reviewing your family's weekly schedule, we've found that our program does not fit your family's child care needs. InterExchange and the U.S. Department of State permits au pairs to work up to 10 hours per day and up to 45 hours per week.

Although you stated that your au pair would only be asked twice per week to monitor the baby video until 1-2am, the time that she would would spend staying awake into the night, or "on call", would also have to be factored into her work hours. The only way she could be permitted to do this is if she is given an eight-hour break after being on duty, which would interfere with her weekday child care responsibilities.

I hope this information has been helpful. Please let me know if you have any questions!


Warm Regards,
Victoria



Victoria King | Placement Coordinator | Au Pair USA
TEL: 917.305.5408 | FAX: 212.924.8873 | EMAIL: vking@interexchange.org
161 Sixth Avenue, New York, NY 10013 | SKYPE: placement_victoria_apusa




On 2/5/14 3:25 PM, ▮▮▮▮ <    REDACTED    wrote:

> Diana misunderstood a lot of what was said I did not ask her to stay up every night. I told her that she would be asked 2/ weekly to monitor the baby video and if he got up she would rock him and put him back to sleep from 1-2am the time he wakes up. As my husband and I do the other 5 nights. I told her she would know in advance and it would apply for nights we had an urgent meeting in the morning.
>
> As for the cooking we told her 3/weekly she can cook for kids and add additional for us to eat because she loves cooking and would like to try it. I told her I share that interest and I would make for her and the whole family Asian cuisine that I can teach her too. Cooking is an event in our house not a chore. We have an urban greenhouse and grow sprouts and care about what we put in our bodies.
>
>
> It's unfortunate she feels that way but quite honestly she sounded Jaded about her excessive hours worked in her current situation.
>
> Here is an example of what I am looking for if you feel that is not an option for my family let me know and I will look else where:

CONFIDENTIAL                                    InterExchange0014979

**REPLY APP 00896**

Monday thru Friday6:00am Prepare Breakfast
6:30 Wake Up ████████ and get them dress
7am Eat breakfast
7:30 Take ████ School
8am to 2pm time off
2pm Pick Up ████
2:15PM  Pick up ████████
2:30 prepare light lunch for kids
3:00 playtime
4:00 clean up time
5:00 homework with ████
6:00 bath time both kids
7:30 put ████ sleep
8:00 Done with the day

2/week assigned to baby video to put ████ back to bed through this transition time of training. If he does gets up it's usually
    between 1-2am it's usually an hour. Temporary to sleep specialist comes and helps with this problem. If you get up
    we can trade hours out the following evening.

Saturday:

8am prepare breakfast and snacks
9am bath and dress them for the city
10am leave all of us to manhattan for service
12-1pm off for the rest of the day
(You will love being in the heart of the city)

Sunday:
Day off

Respectfully,

████████

On Feb 5, 2014, at 2:42 PM, Victoria King <vking@interexchange.org> wrote:

            Your Au Pair Search
Hello████

Hope all is well. I am writing in regards to your recent interview with Diana, an in-country au pair who was placed on
    view with your family yesterday. Diana has informed us that she has decided not to interview further
    with your family, though she found you to be a "really nice" family.

It is certainly unfortunate that Diana would prefer not to communicate with your family, and this is why I am following
    up with you. Diana told us that your family would require your au pair to cook dinner almost every night
    for the entire family. I would like to confirm that you are aware au pairs are only allowed to be given
    responsibilities and tasks that are directly related to caring for your children. It is permissible for your au
    pair to prepare dinner for your children, but she cannot be asked/expected to cook dinner or prepare
    meals for your entire family all the time. Au pairs may occasionally prepare meals for your entire family
    in the event that this is a responsibility that is shared by all of the adults living in your home on a regular
    basis.

Additionally, Diana mentioned that your children are on a sleep regimen, which is quite common. However, Diana told
    us that your children's sleep regimen would require your au pair to stay awake until 1am or 2am at
    night. After consulting our Program Manager, we've found that our program may not meet your current
    child care needs. Au pair hours are flexible and some au pairs may occasionally work overnight, but it is

unreasonable to require an au pair to work very late into the night on a daily, or even weekly, basis.

Please let me know if you have any questions or concerns about the State Department Au Pair Regulations or what household or child care tasks can and cannot be assigned to an au pair. If you would prefer to discuss this matter over the phone, I will be in the office today until 5pm.

I look forward to hearing from you soon.


Warm Regards,
Victoria

<image.png>
Victoria King | Placement Coordinator | Au Pair USA
TEL: 917.305.5408 | FAX: 212.924.8873 | EMAIL: vking@interexchange.org
161 Sixth Avenue, New York, NY 10013 | SKYPE: placement_victoria_apusa

REPLY APP 00898

InterExchange0014981

Case No. 1:14-cv-03074-CMA-KMT   Document 504-4   filed 04/27/18   USDC Colorado   pg 20 of 219

# Exhibit 53

## INTEREXCHANGE AU PAIR USA

### AU PAIR AGREEMENT

This agreement (herein the "Agreement" or "Main Agreement") describes the terms and conditions of my participation in InterExchange's Au Pair USA Cultural Exchange Program and its sponsorship of my J-1 Visa.

### Background

InterExchange is a designated sponsor of the Au Pair J-1 Visa Program administered by the U.S. Department of State's Bureau of Educational and Cultural Affairs (the "Program"). The Program allows foreign participants ("Participant" herein defined below) to enter the United States to work as Au Pairsso that the Participant may increase their understanding of American culture and society and enhances the American Host Family's knowledge of foreign cultures through an open interchange of ideas.

This J-1 Visa Program requires employment for Au Pair Participants as part of the Cultural Exchange Program so that cost and expenses incurred during the Participant's time in the U.S. may be offset by the Program Stipend paid by the Host Family.

Now having understood the background and nature of this Agreement and Program, InterExchange and I hereby agree to the following terms and conditions:

1. **Definitions**. I agree to the following definitions:

    a. **"Adjustment Period"** begins when an Au Pair (see definition) first arrives to live in a Host Family's (see definition) home and ends thirty (30) days after the Au Pair has been living in a Host Family's home. During this period, an Au Pair cannot Transition (see definition) to a Rematch (see definition) Host Family except, in rare cases, Au Pairs may be moved as required by InterExchange.

    b. An **"Applicant"** or **"Candidate"** is anyone who applies to the Au Pair USA Program about whom InterExchange has not yet determined his or her suitability for the Program.

    c. An **"Au Pair"** is a carefully screened Participant (see definition), who is between the ages of 18 and 26, is a secondary school graduate or the equivalent, and is proficient in spoken English. Au Pairs are Matched (see definition) with a Host Family for cultural exchange purposes. The Au Pair lives with and provides child care services to a Host Family for up to ten (10) hours a day and forty-five (45) hours per week over five and a half (5 ½) days per week per Program regulations. The Au Pair is provided numerous cross-cultural activities, including, without limitation, taking at least six (6) credit hours of educational course work at a U.S. educational institution while participating in the Au Pair USA Program.

    d. **"At-Will Employment"** means either the Host Family or the Au Pair may end the employment relationship between the two parties at any time.

    e. **"Culture Exchange Program"** is a non-immigrant program operated by the U.S. Department of State's Bureau of Education and Cultural Affairs that increases a Participant's understanding of American culture and society and enhances the Host Family's knowledge of foreign cultures through an open interchange of ideas between Au Pairs and Host Families and the communities in which they live.

    f. **"Extension"** is a period of time in which the U.S Department of State allows a one-time extension of the Au Pair Program for six (6), nine (9), or twelve (12) additional months contingent upon successful completion of the initial 12-month Program and subject to certain limitations.

    g. **"30-Day Travel/Grace Period"** is the 30-day cultural exchange travel or "grace" period to which Au Pairs are entitled upon successful completion of the requirements of the Au Pair USA Program. During this 30-day period, Au Pairs are not permitted to engage in any employment. Au Pairs are required to leave the U.S. before the end of this 30-day period.

    h. **"Host Family"** is a carefully screened family of U.S. citizens or legal permanent residents who participate in the Au Pair USA Program by matching with an Au Pair to utilize the Au Pair's child care services for cultural exchange purposes.

    i. **"In-Country"** means an Au Pair is already in the U.S. An In-Country Au Pair may be in the U.S. due to an Extension or Transition.

    j. **"Insurance"** is accident and sickness coverage from an insurance company authorized by InterExchange (or, in rare cases, an International Cooperator (see definition below)) that meets or exceeds U.S. Department of State requirements.

    k. **"International Cooperator"** or **"IC"** is an independent contractor that performs services for InterExchange including, without limitation, recruiting Au Pairs for the Program, assisting the Candidates and InterExchange with the application process and

InterExchange0048910

REPLY APP 00900

providing additional pre-arrival support after an Au Pair is matched with a Host Family.

l. **"J-1 Visa Sponsorship"** means a non-immigrant cultural exchange visa issued pursuant to 8 U.S.C. 1101(a)(15)(J).

m. **"Local Coordinator"** is the InterExchange independent contractor or representative who liaises with the Au Pair and Host Family in the Host Family community. The Local Coordinator provides information in compliance with InterExchange Au Pair USA rules and requirements and coordinates monthly gatherings for InterExchange Au Pairs in the cluster area.

n. **"Match"** is the process by which the Host Family chooses to host the Au Pair, who as a result of being matched receives sponsorship for cultural exchange purposes under a J-1 visa sponsored by InterExchange.

o. **"Orientation"** is the period of time during which Participants visit New York City to be trained by InterExchange and are provided detailed information about the Program before the Participants start employment as an Au Pair for Host Families.

p. **"Participant"** is a suitable and qualified Candidate who matches with a Host Family and takes part in the InterExchange Au Pair USA Program under the U.S. Department of State regulations and InterExchange's requirements.

q. **"Program"** or **"Au Pair USA Program"** or **"Au Pair USA"** means the Cultural Exchange Program as administered by InterExchange. The Program includes the initial twelve (12) month program, Transitions and Extensions.

r. **"Rematch"** is the process by which an in-country Au Pair is Matched to a Host Family other than the one to which he or she was originally Matched. Please see the definition of "Match."

s. **"Replacement"** is an Au Pair who replaces another Au Pair after a Host Family enters Transition.

t. **"Social Media"** means a wide range of new and evolving communication tools including, without limitation, multi-media and social networking websites such as MySpace, Facebook, Yahoo! Groups, Linkedin, Flickr and YouTube and other media or video sharing sites; Blogs; Wikis such as Wikipedia and any other site where text or photos can be posted; Sites and/or apps like Twitter on smart devices such as cell phones, digital tablets and similar communication devices.

u. **"Special Needs Child"** is a Host Family child with emotional, physical or psychological needs, as identified by the Host Family, that require additional child care services from an Au Pair other than child care services generally provided to Host Families.

v. **"Sponsor"** is a legal entity designated by the U.S. Department of State to conduct Cultural Exchange Programs under the J-1 Visa.

w. The **"Stipend"** is the minimum amount that the Host Family is required to pay the Au Pair pursuant to U.S. Department of State regulations and employment and labor laws of the U.S. The current minimum required weekly amount is one hundred ninety-five dollars and seventy-five cents ($195.75).

x. **"Suitable Candidate"** means a candidate who meets the Program requirements of the both the U.S. Department of State regulations and InterExchange guidelines.

y. **"Transition"** is the process by which a Host Family or Au Pair may either leave the Program or be Rematched with a new placement.

z. **"Withdrawal"** means that a Host Family or Au Pair voluntarily ends its relationship with InterExchange.

aa. **"3-Point Meeting"** is an optional meeting facilitated by a Local Coordinator or InterExchange to mediate differences between a Host Family and an Au Pair.

2. **Program Overview**. I understand and agree that InterExchange operates Au Pair USA solely as a Cultural Exchange Program. I acknowledge receipt of a copy of 22 CFR Part 62.31, the Wilberforce Brochure (see below, "Dispute Process") and the Department of State publication "The Au Pair Exchange Program" from InterExchange. I further understand and agree that any conflict between the cultural exchange purposes of the Au Pair USA Program and the child care services offered by me as an Au Pair shall be decided in favor of the cultural exchange purposes and regulations of the Program.

3. **Certification, Application, Interview & Selection**.

   a. **Certification**. I certify that I have not previously participated in an Au Pair program based in the U.S. within the last twenty-four (24) months.

   b. **Application**. I agree that I must submit a complete application to be considered as an Au Pair Candidate by InterExchange and a Host Family. I agree that the application process and information requested on the application are responsibilities that I must fulfill under my Agreement with InterExchange. I further understand and agree that all information submitted under this application and Agreement is for the sole purpose of determining my suitability for the Au Pair USA Program.

**InterExchange0048911**

c. **Background Investigation.** I understand and agree that I must successfully pass a background investigation that includes, without limitation, verification of school or high school diploma (minimally a secondary school or the equivalent); three, non-family related child care references; a criminal background check or its recognized equivalent; health screening report; and a psychometric personality test.

d. **Additional Information.** I agree that InterExchange may request, and I agree to supply, additional information other than the originally requested information for the purpose of making a final decision about my suitability for the Program.

e. **Read All Materials.** I certify that I have read and understood all application materials sent to me by InterExchange, including, without limitation, the InterExchange and U.S. Department of State rules and regulations required for me to participate in the Program.

f. **Interview.** I understand that an in-person interview conducted in English is a requirement that must be fulfilled as a condition of my application to the Au Pair USA Program. Further, I must be contacted by a potential Host Family by telephone prior to an agreement to a Match. As explained under Sections on Extensions and Transitions, I understand and agree that the requirements regarding Host Family interviews also apply to Extensions and Transitions for any potential Rematch Host Family.

g. **InterExchange Decision.** I agree that InterExchange makes the final decision about my participation in the Au Pair USA Program. I agree that InterExchange makes the final decision about approving my Match or Rematch with a Host Family. I understand and agree that all decisions are based on InterExchange's role as the Sponsor of my Cultural Exchange Program as set forth under this Agreement.

4. **Program.**

a. **Orientation.** I must attend the Orientation provided by InterExchange in New York City. I must not arrive before my scheduled arrival date for my Orientation.

b. **Training.** I agree to attend and engage in child development and child safety instructions provided by InterExchange to the best of my abilities. I understand and agree that I must successfully complete my training in the U.S. prior to starting my child care duties with the Host Family.

c. **Nature of Au Pair Work Performed.**

   i. **Host Family/Au Pair Agreement.** Prior to departure from my home country, I must enter into a signed written agreement with the Host Family. I understand the Host Family will provide an outline of my duties and schedule in the Host Family application, which may be amended from time to time, but shall in no way conflict with Program rules, regulations and the terms and conditions of this Agreement. I agree to read and understand the obligations expected of me by the Host Family as detailed through the Host Family application and the Host Family/Au Pair Agreement. I understand that the Host Family/Au Pair Agreement shall include, without limitation, the terms of this Agreement and that the Host Family must conform to the Fair Labor Standards Act. I understand that the agreement between the Host Family and me must be signed only after my Match or Rematch with the Host Family. I understand that InterExchange does not offer, nor am I a Participant in, an Educare program, and, therefore, I am not subject to any Educare requirements regarding the Host Family/Au Pair Agreement.

   ii. **Duties.** I understand that my duties shall only include child care and activities related to care of the children of my Host Family. I agree that I cannot be directly responsible for the care of any non-Host Family children. Child care may include, without limitation, active duties such as taking care of children as they play, preparing children's meals, driving children to school and activities, light cleaning of their rooms, assisting children with school assignments and doing the children's laundry as well as passive duties such as being present when the children are sleeping.

   iii. **Permissible Duties.** I am not obligated to perform heavy chores, including, without limitation, yard work, taking care of pets, window washing or scrubbing floors. If I choose to engage in heavy chores, I must follow the safety standards under Section 7 of this Agreement.

   iv. **Medication.** I must not administer any medicine or medical/therapeutic treatment to children.

   v. **Disciplining Children.** I agree that I am not permitted under any circumstances to physically discipline children in any way (e.g., hitting children or withholding food as punishment). The terms of this Agreement are to be enforced even if the Host Family requests that I discipline the children. If I have questions over appropriate behavior, I shall ask my Local Coordinator for guidance.

d. **Local Coordinator.** While I should seek general direction and advice about the Program from the Local Coordinator, I understand that InterExchange makes all final decisions. I agree that statements by the Local Coordinator are not binding on InterExchange unless confirmed in written policy and under the terms and conditions of this Agreement. If I have any questions or concerns regarding my Local Coordinator, I must contact an InterExchange manager directly.

e. **Au Pair's Age.** I can only begin the Program between the ages of eighteen (18) and twenty-six (26).

InterExchange0048912

REPLY APP 00902

f. **Age of Children.**

    i. I agree that InterExchange cannot place or allow me to remain as an Au Pair in a Host Family home with a child under the age of two (2) unless I have at least two hundred (200) hours of documented experience working with children under the age of two (2). I must promptly notify InterExchange if a child under the age of two (2) years is a member of or joins the household at any time during the Program.

    ii. **I agree that if there are any children under three (3) months old living in the home there must be a responsible adult (e.g., baby nurse, grandparents) in the home at all times and I cannot be left as the sole child care provider, even for a limited amount of time, including sleeping hours.**

g. **Special Needs Children**. I must inform InterExchange and the Local Coordinator about the new arrival or request for me to take care of a special needs child, which may include, without limitation, children with physical or mental disabilities. I understand that I must identify my prior experience, skills or training and willingness to care for special needs children if the circumstances arise in which I am to provide child care to special needs children.

h. **3-Day Settling In Period.** I understand that during the first three (3) days of my stay with the Host Family, a parent or another responsible adult (e.g., grandparents) must remain in the home to facilitate my adjustment into the Host Family, household and community. Failure of this condition by the Host Family must be immediately reported to InterExchange and the Local Coordinator.

i. **45-Hour Work Week.** I cannot provide more than ten (10) hours of child care services on any given day or more than forty-five (45) hours of child care in any one (1) week. Generally, I understand that the Host Family must arrange a consistent schedule of work hours per week to conform to Program requirements (e.g., if the Host Family schedules my hours from Monday through Saturday, this means I must work Monday through Saturday throughout the duration of my employment with the Host Family without variation), provided, however, that the Host Family and I may negotiate a mutually agreed upon change of schedule that does not violate this Agreement, U.S. Department of State regulations or employment and labor laws. I must be compensated at a weekly rate based on forty-five (45) hours per week and paid in conformance with the requirements of the Fair Labor Standards Act. I must notify InterExchange if the Host Family requires or asks me to work over forty-five (45) hours a week or more than ten (10) hour a day.

j. **Room and Board.** I understand that the Host Family must provide me with board and lodging. I further understand that lodging shall be limited to a private room set aside by the Host Family for the purpose of my lodging rather than a room used for other purposes (e.g., sharing the room with another Au Pair is not permitted and a Host Family cannot require me to sleep in a room that is used for laundry or family entertainment).

k. **Stipend**. I understand that my Stipend from the Host Family must meet the minimum requirement set by U.S. Department of State regulation, which may be amended from time to time. I agree to notify InterExchange if there is any problem with receiving my weekly Stipend. If paid by check, I agree to deposit or cash my Stipend within four (4) weeks of receiving the Stipend from the Host Family.

l. **Weekly Time Off**. I must receive a minimum of one and a half (1½) days off per week, in addition to one (1) complete weekend (Friday evening until Monday morning) off each month. I must notify InterExchange if the Host Family fails to provide me with time off.

m. **Vacation.** The Host Family must provide me two (2) weeks of paid vacation during the Program to be taken at a time mutually agreed upon between the Host Family and me. I must contact InterExchange if the Host Family fails to provide me with paid vacation. If joining the Host Family on vacation, I agree not to share lodging with any adult member of the Host Family or share a bed with anyone, including, without limitation, children.

n. **Education.**

    i. **Required Educational Courses**. I agree to follow the applicable U.S. Department of State education regulations for Au Pairs participating in the initial twelve (12) month Program. Specifically, I must enroll in and complete classes or programs offered by an accredited, post-secondary institution for at least six (6) semester hours of academic credit or its equivalent. I understand that the Host Family must facilitate my enrollment and attendance and pay the cost of such academic course work in an amount not less than five hundred dollars ($500) for a twelve (12) month Au Pair Program. The Host Family is not obligated to pay an amount greater than the five hundred dollars ($500). I understand that the Host Family is responsible for facilitating my transportation to such classes or programs.

    ii. **Educational Requirements After Transition**. If I am placed in Transition (See Transition below) before completing the educational requirements, I agree to complete the requirements with the new Host Family to whom I am Rematched as described in the sections on Required Educational Courses and Transition, including, without limitation, restarting the six (6) semester hours in the manner required by the U.S. Department of State. I understand that my new Host Family is only required to pay a pro rated amount of the five hundred dollars ($500) based on my remaining time in the Program, which shall mean a pro rated value equaling nine dollars and sixty-two cents ($9.62) per week in a standard fifty two (52) week Program (e.g., if Transition to a Rematch Host Family after twenty-five (25) weeks, then the Rematch Host Family will be required to pay two hundred fifty-nine dollars and seventy-four cents ($259.74) towards my educational courses).

**InterExchange0048913**

**REPLY APP 00903**

    iii. **Additional Cost of Courses**. I understand and agree that all additional costs of meeting the educational requirements of the Program are my responsibility.

    iv. **Optional Educational Courses**. If I complete the required number of credit hours in the manner required by InterExchange and U.S. State Department regulations, and there is an amount left over from the five hundred dollars ($500) contribution required of the Host Family, I, at my sole discretion, may elect to use the remaining balance to cover the cost of taking additional courses, provided, however, that the courses meet the academic requirements as set forth by InterExchange and the U.S. State Department. I understand that the Host Family is responsible for facilitating my transportation to and from the courses.

    v. **Driver's Education**. If required by the Host Family, I understand that I shall be responsible for taking a driver's education course, provided, however, that the Host Family pays for the cost of the driver's education course. If not required by the Host Family, I shall be responsible for the cost of the course if I elect to take a driver's education course.

o. **Cluster Meetings**. I agree to attend all monthly Cluster Meetings with the Local Coordinator. I understand that the Host Family must facilitate attendance and provide time off and transportation for the meetings.

p. **Insurance.**

    i. **Insurance**. I agree to the terms and conditions of the Insurance policy provided by the vendor authorized by InterExchange or the International Cooperator. I understand that InterExchange requires me to hold the Insurance policy through the authorized vendor solely for the purpose of ensuring the policy's compliance with U.S. Department of State regulations. I understand that neither InterExchange nor the International Cooperator are sellers or resellers of the Insurance. I understand that the Insurance arranged by InterExchange or the International Cooperator meets or exceeds Program regulation requirements, but is not comprehensive. For additional information about the Insurance policy from InterExchange, I agree to read the terms and conditions of the policy in the brochure and literature sent to me by InterExchange and by visiting InterExchange's web site. Except for the 30-Day Travel Period/ Grace Period Insurance, I understand that cost of the insurance policy is included in fees paid by the Host Family.

    ii. **30-Day Travel Period/Grace Period Insurance**. I agree to request and pay for the Insurance policy that covers the 30-Day Travel/Grace Period before the start of the 30-Day Travel/Grace Period.

    iii. **Supplemental Insurance**. I understand that the Insurance policy is limited to accident and medical sickness coverage and may have exclusions or limitations that may cause me to incur out of pocket expenses if I seek treatment for such exclusions or limitations. I agree to investigate and InterExchange strongly recommends that I obtain supplemental insurance to meet my medical and travel insurance needs above those covered by the InterExchange authorized Insurance policy for the duration of the Program.

    iv. **Automobile Insurance**. I understand that the Host Family must provide automobile insurance at the Host Family's sole cost if I use any of the Host Family's vehicles for work or personal use. I further understand that the insurance coverage shall not be less than the minimum mandatory insurance coverage required by law in the Host Family's state of residence. I agree that I am responsible for understanding the limitations of any insurance policy and the costs related to the policies.

q. **Passport.** I understand that I am responsible for obtaining a valid passport. I must keep my passport valid at least thirteen (13) months longer than the Program end date found on the DS-2019 form. If I lose my passport, I am responsible for replacing it at my own expense. I am solely responsible for safeguarding my passport and agree not to surrender it to any unauthorized person or entity. If I am in doubt about whether an organization should possess my passport, it is my duty to investigate.

r. **Visa**. I must complete all visa requirements in accordance with instructions provided by InterExchange and the U.S. government.

s. **Tax ID/Social Security Number**. I understand that I may need to secure either a tax payer id or social security number. I further understand that I must safeguard my personal information. If I am in doubt about whether an entity should possess my personal information, it is my duty to investigate.

t. **English**. I agree that my English language skills must be sufficient to communicate with the Host Family and during emergencies. I understand insufficient language skills may be a reason for my visa denial and/or my Program to end early.

u. **Failure to Return to the United States during Program Dates**. I understand that if I leave the U.S. at any time during my Program for any reason I must provide notice to InterExchange. Furthermore, I agree that my sponsorship will end if I fail to return to the U.S. or the Program within thirty (30) days.

v. **30-Day Travel/Grace Period**. I understand that upon successful completion of the Program I am permitted a 30-Day Travel/Grace Period during which I am allowed to travel within the United States. I understand that it is a violation of immigration law and Program regulations to conduct any form of employment (including working for my Host Family) during the 30-day Travel/Grace Period.

w. **Leaving Program Early or Overstaying 30-Day Travel/Grace Period.** If I leave the Program before the Program end dates or over-stay the 30-Day Travel or Grace Period, I forfeit my return flight, vacation time and unearned Stipend, and my insurance will

be cancelled. I understand that InterExchange will report any circumstances of the Program ending early and/or violation of immigration laws to the U.S. Department of State and/or the Department of Homeland Security.

x. **Leave U.S. At End Of Program. I will return to my home country or leave the U.S. at the end of my Program, which is defined by the end date of my DS-2019 form plus my 30-Day Travel/Grace Period or, if the Program ends early, the date that I am required to leave the U.S. under immigration law and InterExchange requirements.**

y. **Visa Requirements of Other Countries**. During the Program, I agree that it is my obligation to research and meet any visa requirements for countries to which I plan to travel.

5. **Employment & Sponsorship.**

   a. **Notice of At Will Employment**. I understand that my position as an Au Pair is At-Will Employment as defined under the Definitions Section.

   b. **No outside employment.**I must not work in any additional position, including, without limitation, volunteer or paid employment or internships, during the Program. I must only work with the Host Family that has been approved by InterExchange.

   c. **InterExchange is not an Employer or Employment Agency.** I agree that InterExchange is not my employer or an employment or staffing agency.

   d. **Sponsorship**. I agree that InterExchange solely functions as my J-1 Visa sponsor.

   e. **Best of Abilities**. I understand that keeping my J-1 Visa sponsorship is based on remaining in good status throughout the duration of the Program. To increase the chances of keeping my sponsorship, I have investigated the duties and functions of an Au Pair. I am willing and able to function as an Au Pair in every way, including physical and mental stamina. To further promote the cultural exchange ideals of the Program and act as an ambassador of my home country to the Host Family and Host Family's children, I agree to carry out my child care duties and other responsibilities to the best of the abilities and with due respect.

6. **Air Travel & Transportation.**

   a. **Travel**.

      i. I agree to allow InterExchange, its officers, affiliates, independent contractors, vendors, agents and employees to act on my behalf in arranging transportation to and from InterExchange designated locations.

      ii. I must be present in enough time for all flights or other transportation provided or arranged by InterExchange. I understand and agree that InterExchange is not responsible for providing alternative transportation. I agree to bear the cost of any fees or charges incurred as a result of any failure to follow these instructions.

      iii. I understand that flights will depart from and return to assigned airports, and that I am responsible for any flight or other supplemental transportation to reach the designated points of departure.

      iv. I agree to notify InterExchange of any deviation from the arrangements that InterExchange made on my behalf.

   b. **Transportation- Motor Vehicle**. If I am required to drive and given access to a motor vehicle, I understand that the Host Family must pay for gas used by me and maintain the motor vehicle in good working order when performing my duties or when driving to/from meetings and/or classes in fulfillment of Program requirements. I agree to report any concerns about the working condition of the motor vehicle to my Host Family immediately. I further understand that a motor vehicle may or may not be available.

7. **Safety, Problems & Emergencies.**

   a. **Precautions**.

      i. I am responsible for my personal health and safety needs while participating in the Au Pair USA Program. If I suffer from any health or other condition that would create a risk to others or me, I should not apply or participate.

      ii. I must take reasonable precautions to prevent injury or harm to myself or a third party or damage to the property of a third party or myself.

   b. I agree to the following:

      i. I must notify InterExchange in the manner required under Communications and Notification Section if I experience any serious medical, psychological or criminal incident.

      ii. **I must contact InterExchange immediately if the Host Family endangers my safety or the safety of others or acts in a manner that raises questions about my safety or those of others.**

**InterExchange0048915**

iii. **I must remain available and/or stay in contact (if contacted) by my Local Coordinator during any natural disaster or emergency. If I am unable to contact the Local Coordinator after my Local Coordinator contacts me, I must reach authorized staff at InterExchange to confirm my circumstances as soon as it is reasonably feasible to do so.**

iv. **Emergency Messaging.** In addition to following any emergency plan available to me from local authorities or the Host Family, if I supplied my mobile number,I agree to follow suggestions as may be sent through InterExchange emergency messaging, including, without limitation, emergency texts from InterExchange. If local authorities or the Host Family recommends actions that conflict with any messages sent via InterExchange emergency messaging, I shall follow the direction of the Host Family or local authorities as they may be better aware of local circumstances. I understand and agree that InterExchange is not obligated to provide me emergency messaging and that this is an additional service that InterExchange may provide to me as circumstances may permit.

v. I must immediately contact InterExchange if the Host Family requests that I engage in any illegal activities (e.g., illegal drugs).

c. **InterExchange.**

i. In circumstances involving my health and safety, I agree that InterExchange may discuss my circumstances with my family (e.g., my Host Family and actual family), emergency contacts, the International Cooperator, my insurance company, healthcare officials, law enforcement, the U.S. Department of State or any other critical party with a need-to-know.

ii. I agree that InterExchange, its officers, employees, independent contractors, vendors affiliates and agents or any Local Coordinator may, without liability, or expense to themselves (as explained in further detail under the Liability section), take whatever action they deem appropriate with regard to my health and safety and may place me in a hospital or health-related facility for medical services and treatment or, if no hospital or health-related facility is readily available, may place me in the care of a local medical doctor or health provider for treatment or service.

d. **InterExchange Health, Safety or Exploitation.**

i. I understand that in the event of an accident or serious illness that, in the judgment of InterExchange, prevents me from continuing my duties, I will end the exchange early and return home at my own expense.

ii. If InterExchange finds that I am subject to exploitative or other unreasonable circumstances or conditions in Host's household (e.g. failure to pay the appropriate weekly Stipend or to provide the agreed upon free time or educational benefits), InterExchange, at InterExchange's sole judgment, may immediately withdraw me from the household.

iii. I agree that any decision regarding my status as an Au Pair, dismissal, or replacement will be made at the sole discretion of InterExchange and shall be considered final.

e. **Emergency Plan.**

i. I must become aware of emergency plans set up by the Host Family and as issued by local authorities.

ii. In case of emergencies (e.g., hurricanes, earthquakes, fires, terrorist attacks), I agree to follow the emergency plan, if any, issued to me by InterExchange, the Host Family and local authorities. I agree that InterExchange is not obligated to provide an emergency plan and that this is an additional service that InterExchange may provide as circumstances may permit. I understand that the instructions provided to me from the Host Family and local authorities take priority over InterExchange instructions.

8. **Extensions & Transitions.**

a. **Extensions**. Extensions are explained in greater detail in the Extension Term Sheet found in Exhibit A and the clauses below. I understand that I must be eligible for the Extension upon submitting my application and that I must meet the requirements of the Program as follows:

i. If I wish to participate in the Extension Program, I must submit my application on or before InterExchange Au Pair USA's published Extension application deadline date which is found on InterExchange's website. I understand and agree that InterExchange cannot guarantee that the U.S. Department of State will approve my Extension request and that failure to meet the application deadline is an automatic disqualification.

ii. I understand that if my Extension is approved I will receive an updated DS-2019 form for participating in the Extension Program that reflects the updated Program dates. Although I will have a valid DS-2019 form, I understand that the J-1 Visa in my passport may have expired during the first 12-months of stay in the U.S. Therefore, I understand that InterExchange discourages me from traveling outside of the U.S. after the J-1 Visa expires because I may not be allowed re-entry into the U.S., and InterExchange has no jurisdiction over U.S. immigration personnel or their decisions.

iii. By signing this Agreement, I agree to the terms of the Extension Agreement if the following terms and conditions are met:

**InterExchange0048916**

a. Timely submission of my Extension application.

b. U.S. Department of State approval of my application.

c. My meeting the terms of this Agreement (including educational requirements).

d. The Host Family has paid all money owed and adhered to Program regulations including, without limitation, attendance at Host Family Day.

e. InterExchange's approval of the Host Family.

Except as set forth in the attached Extension Agreement, the general terms of this Agreement shall remain in effect and control.

iv. **Approval. I understand and agree that completion of the terms and conditions described in this section of the Agreement or in the Extension Term Sheet does not guarantee an Extension. I further understand that nothing in this Agreement implies or requires me to participate in an Extension. The terms and conditions described are effective only if I participate in an Extension Program.**

b. **Transitions**. After the initial adjustment time of one month following arrival, InterExchange has set up a Transition procedure regarding a possible breakdown in the relationship between the Host Family and me.

i. **Transitions-General Proceduree**. I agree to following:

a. The Host Family or I must communicate to InterExchange that there is a breakdown in the relationship between the Host Family and myself.

b. Upon becoming aware of a breakdown in the relationship, the Local Coordinator, at his or her discretion, may decide to mediate a meeting between the Host Family and myself.

c. If there is not a resolution of the problem(s) raised, the Host Family and I shall be placed into Transition, which shall mean for me either a Rematch or Withdrawal (see below) from the Program. During Transition, I may remain in residence with the Host Family for several weeks or be moved, if reasonably feasible, into temporary housing arranged by the Local Coordinator and authorized and approved by InterExchange. If I remain in residence with the Host Family, I may be asked to continue to fulfill my child care responsibilities. If I am asked to continue child care duties, I must receive the appropriate weekly Stipend and follow Program requirements and regulations until a new placement can be found. I understand InterExchange will make best efforts to move me from the Host Family as quickly as is reasonably possible so that I may continue, if possible, my Cultural Exchange Program. I understand that I may not arrange my own temporary accommodations and doing so may endanger my continued sponsorship.

d. I agree to fully cooperate with InterExchange during the Transition and not to involve outside parties.

ii. There are three outcomes that define the status of my continued involvement or lack therefore in the Au Pair USA Program:

a. **Transitions- Rematch.**

i. InterExchange will make reasonable attempts to locate a Rematch Host Family for me for up to two weeks during the Transition process. If after two (2) weeks, InterExchange cannot find a suitable Host Family for me. InterExchange may require me to return to my home country under the terms and conditions set forth in this Agreement. I understand and agree that any decision regarding my Program status shall be made at the sole discretion of InterExchange and shall be considered final.

ii. I agree to carefully consider the potential Rematch Host Family with whom I may be Rematched. I understand that my Rematch will possibly take me out outside of the area in which my existing Host Family resides.

iii. My Rematching shall comply with the remaining length of my original Program (e.g., If I have five (5) months left in the Program, then the Rematch contract length for me would be five (5) months).

iv. I agree that if a Rematch takes place, travel details will be organized by InterExchange and Local Coordinator working with the Host Family and me.

b. **Transitions – Withdrawal.** I may elect to withdraw from the Program. I understand that this Agreement must automatically terminate under the terms and conditions set forth in the Termination section of the Agreement. As explained in Sections 9 and 16, I agree that I am responsible for the cost of my airfare home and other costs incurred in the Program.

**InterExchange0048917**

REPLY APP 00907

c. **Transitions – Unsuitable or Lack of Suitable Placement**. InterExchange, at its sole discretion, may determine that I am unsuitable to remain in the Au Pair USA Program and/or no suitable placement is available after a reasonable time period has passed. I agree that I am responsible for the cost incurred in the Program.

9. **Fees, Expenses, Costs and Payment.**

   a. **Costs, Fees & Expenses**. I understand and agree that I am responsible for, without limitation, any educational cost and expenses above the amount that the Host Family is required to disburse; federal, state and local income taxes; withholding taxes; copayments and deductibles on the Insurance from the authorized vendor (Please see terms and conditions of Insurance policy coverage); the fee for my Insurance coverage during the 30-Day Travel/Grace Period; the cost of my return air flight (if applicable) under the conditions as described in this Agreement; all additional expenses of the Transitions including the education requirement as defined in this Agreement; damage to Host Family's car with the limitations as set forth in this Agreement; any driver's education course costs pursuant to the terms and conditions defined in this Agreement; any costs incurred by the Host Family or InterExchange regarding a change of sponsor as described below; any other costs related to me returning home early from the Program; any damages as described in this Agreement; the cost of any translations of application and background check costs; and any fees, costs and expenses not expressly covered under this Agreement.

   b. **Emergency Messaging Fee**. If I provide my mobile number for emergency contact (e.g., emergency texting) from InterExchange, I agree to assume all necessary charges per carrier fees for usage that may arise if InterExchange sends emergency messaging to me.

   c. **Payment**. I agree that the Credit Card Approval Form that I may sign for the purpose of paying any costs, fees and expenses described in Section 9 is incorporated into this Agreement in **Exhibit C**.

10. **Notice & Communications.**

    a. I must contact InterExchange by means of the contact information provided by InterExchange (e.g., telephone number or e-mail address). I must include InterExchange contact information in my address book to ensure receipt of communications from InterExchange. In the case of an emergency, safety or health issues, I agree to contact InterExchange immediately or as soon as it is reasonable under the circumstances. In addition, I agree to contact the Local Coordinator and InterExchange via the emergency contact information provided by InterExchange.

    b. InterExchange will contact me through the contact information that I provide to InterExchange, the Local Coordinator or Host Family. I agree to respond to communications from InterExchange in a timely manner. I understand that a failure to communicate with InterExchange may be a reason for withdrawal of InterExchange's Program sponsorship.

    c. **Emergency Messaging**. For the purpose of emergency messaging, I agree that InterExchange may contact me via text message and/or voice services through my mobile phone and/or by email.

    d. **Contact with Local Coordinator**. I understand that InterExchange's Local Coordinator will contact me and my Host Family within forty-eight (48) hours of my arrival to my Host Family. I also understand that InterExchange's Local Coordinator will visit my Host Family within two (2) weeks of my arrival. I understand that my Local Coordinator will call me twice monthly for the first two (2) months following a placement other than the initial placement for which I entered the U.S. I understand that my Host Family will also attend at least one of two Family Day Conferences sponsored by the Local Coordinator during the Program year. As stated in the Agreement above, I understand that I must also attend monthly cluster meetings with the Local Coordinator.

    e. **Student & Exchange Visitor Information System (SEVIS) Reporting**. I agree to provide notice to InterExchange about where I reside for the duration of the Program to ensure SEVIS and Au Pair status reporting requirements are met. I further agree to provide all relevant personal data for the purpose of InterExchange maintaining my record with SEVIS.

11. **Release, Intellectual Property, Social Media & Disrepute**

    a. **Release**

       i. I give permission to InterExchange to (i) take and retain any photographs (including group or Host Family photos), copies of images from passports, videos, audio recordings and other depictions of me (collectively, the "Reproductions") during activities associated with InterExchange; (ii) retain any Reproductions that Host Family submits to InterExchange, or that Host Family posts on any InterExchange-branded or InterExchange-affiliated media site, social networking site or video upload site or "channel" or blog, including, without limitation, Facebook, Linked-In, YouTube, Twitter, or any other electronic site; and (iii) publish, distribute and display, either in whole or in part, any Reproductions in any and all media throughout the world, including, without limitation, media sites, social networking sites, video upload sites or "channels," blogs, electronic postings, calendars, brochures, advertisements and other promotional materials.

       ii. I hereby waive compensation and any right to inspect or approve any such uses and Reproductions. I shall not submit any Reproduction unless I first obtained permission from each person whose name, image, voice, or likeness is included in the Reproduction, and each such person has granted me and InterExchange all copyright and other intellectual property rights, including renewal rights, necessary to use the Reproduction and his or her name, image, voice and likeness in it. I

InterExchange0048918

REPLY APP 00908

hereby release, discharge and agree to hold InterExchange harmless from any liability arising out of InterExchange's use of the Reproductions, including any blurring, distortion, alteration, optical illusion or use in composite form with other works. I hereby assign all copyright and other intellectual property rights, including renewal rights, to InterExchange, in any materials produced that are the subject of this Release.

b. **Use of InterExchange Intellectual Property.** If I desire to use InterExchange Intellectual Property for any reason, I shall contact InterExchange's Marketing Department to request permission. I shall not use InterExchange's Intellectual Property without having obtained prior written permission. InterExchange Intellectual Property shall mean, without limitation, InterExchange copyrights, trademarks and trade secrets, patents, online content appearing on InterExchange's website, Facebook and other Social Media content and marketing tools, marketing material and the application and other materials that I submitted to InterExchange.

c. **Disrepute.** I must not act in a manner that brings InterExchange, the Exchange Visitor Program, me, my country or the U.S. Department of State into notoriety or disrepute.

12. **Social Media Policy.** I understand and agree to the following terms when using Social Media:

a. I must respect privacy by not disclosing any information that could reasonably be considered identifying information, including, without limitation, social security numbers, tax payer identification numbers, full names, addresses (beyond web site or business addresses) and financial account information of anyone involved with the InterExchange Cultural Exchange Program.

b. I must not post any images of anyone without written documentation of their knowledge. I must also not post images of children without the permission and knowledge of their parents. I understand that posting these images may subject me to violation of not only privacy law, but also other international or U.S. federal, state and local laws.

c. I agree that my time and effort spent using Social Media should not interfere with meeting my requirements under my contract with InterExchange or duties or work commitments to my Host Family.

d. **I must not use Social Media in a way that will subject anyone to liability (criminal or civil) such as by posting obscene or illegal material or services or harassment of others. I must not engage in any activity that may result in legal action against InterExchange or those in a contractual or business relationship with InterExchange.**

e. I agree to use my common sense in all communications, particularly when using publically accessible Social Media platforms in a manner that may lead to disrepute. I understand that what I say or display online could potentially be harmful to InterExchange, others and myself.

f. If I have any questions about this policy, I must contact InterExchange for guidance.

13. **Privacy & Background Check.**

a. **Privacy.**

i. **InterExchange Privacy Policy.** By signing below, I accept and agree to be bound by InterExchange's Privacy Policy pursuant to InterExchange's Terms of Use located at www.InterExchange.org/terms-use, its Privacy Policy located at www.InterExchange.org/privacy-policy, my application and the terms and conditions set forth in this Agreement. I agree that I have read each of these documents, which (if applicable) are incorporated herein by this reference, as they form a legal agreement between InterExchange and myself regarding the Privacy Policy of the Program. I understand that in the event of any conflict between the application, this Agreement and those of the Terms of Use and Privacy Policy, the Terms of Use and Privacy Policy shall supersede with regard to the Privacy Policy.

ii. **Au Pair duty to provide privacy.** In addition to the specific requirement for Social Media listed under this Agreement, I understand and agree that I must protect the privacy of the Host Family. In addition, I agree to protect the privacy of any party in a relationship with InterExchange and/or Au Pair USA, including, without limitation, InterExchange staff and Local Coordinators. If I have questions about my duties under this clause of the Agreement, I shall contact the Local Coordinator and/or authorized InterExchange managers for guidance.

b. **Background Check.**

i. **InterExchange.** I agree that the **Background Information Usage Notice** is incorporated into this Agreement in **Exhibit B**. The Background Information Usage Notice authorizes InterExchange to obtain and use background information (e.g., police reports and child care references obtained by me) for the purpose of determining my suitability for the Au Pair USA Program. By signing this Agreement, I certify that I understand and agree to the purpose for which InterExchange procures the background information from me. By signing this Agreement, I further certify that I agree to the methods by which InterExchange procures the background information.

ii. **Host Family.** I understand and agree that the Host Family may request additional screening of me at the Host Family's own expense. I understand that the Host Family must conduct such investigation pursuant to the laws of the U.S. and state and local laws in which the Host Family resides.

**InterExchange0048919**

14. **Additional Agreement Terms.**

   a. **Entire Agreement.** I understand and agree that this Agreement contains the entire understanding of the parties with respect to the matters contained herein and supersedes any previous agreements (oral, written or otherwise) and may be altered or amended only by a written instrument duly executed by both parties hereto.

   b. **Documents Incorporated into Agreement.** I understand and agree that 22 CFR Part 62, the Wilberforce Brochure (see below, "Dispute Process"), the Extension Agreement (if applicable and as described in the Agreement), the Au Pair Handbook, and the Department of State publication "The Au Pair Exchange Program" from InterExchange are incorporated into this Agreement. With regard to the use of InterExchange's website located at www.InterExchange.org ("Site"), I understand and agree that I must follow terms and conditions of www.InterExchange.org/terms-use and www.InterExchange.org/privacy-policy, which are incorporated into this Agreement for the purpose of Privacy Policy and site use only rather than for the general terms and conditions of the Program. Unless required by law or regulation (e.g., required 22 CFR Part 62, Wilberforce, the Department of State or federal, state or foreign law) or involving InterExchange's Privacy Policy, if there is a conflict between this Agreement and other documents incorporated into this Agreement, the Agreement shall be controlling.

   c. **Agreement in English**. This Agreement and correspondence between InterExchange and myself shall be written in English. In the case of any disputes between InterExchange and myself, the language that shall govern interpreting this Agreement or any issue arising out of communications, including, but not limited to correspondence, shall be English. I am responsible for any cost associated with translation if any language other than English is required by me for any reason.

   d. **Assignment**. This Agreement is restricted solely to myself and shall not be assigned, transferred, encumbered, or subject to any third party agreement without the written consent of InterExchange. Any attempted assignment will be void and of no effect. InterExchange may assign this Agreement to a successor (whether by merger, a sale of all or a significant portion of its assets, a sale of a controlling interest of the company or otherwise), which agrees in writing to assume InterExchange's obligations under this Agreement.

   e. **Amendments**. I agree that InterExchange, at its sole discretion, may amend this Agreement, provided, however, that the amendment is in writing and InterExchange gives me thirty (30) days notice. I agree that any changes required by the U.S. Department of State or any other government entity with legal authority over InterExchange must be adhered to immediately without 30-days notice. I understand and agree that I cannot amend the Agreement.

   f. **Third Parties and Third Party Beneficiaries**. I understand and agree that the terms and conditions of this Agreement, expressed or implied, exist only for the benefit of the parties to this Agreement. No other person or entity will be deemed to be a third party beneficiary of this Agreement.

   g. **Waiver**. I agree that InterExchange's failure to enforce any provision of this Agreement shall not be construed as a waiver or limitation of InterExchange's right to subsequently enforce and compel strict compliance with each and every provision of this Agreement.

   h. **Void Provision**. I agree that if any provision of this Agreement is held to be void or contrary to law, such provision shall be construed as nearly as possible to reflect the intention of the parties, with the other provisions remaining in full force and effect.

   i. **Headings**. I agree that all headings are for purposes of convenience only and are not to be used in interpretation or enforcement of this Agreement.

   j. **Change of Sponsor**. I understand and agree that InterExchange is not required to facilitate a request to change sponsors during the Program. I understand and agree that if I terminate this Agreement or otherwise end my Program that I am to return to my home country rather than stay in the U.S. I agree that I shall owe InterExchange or Host Family for any costs and/or expenses incurred by either InterExchange or the Host Family due to a change of sponsor.

15. **Laws, Regulations & Culture**

   a. **U.S. State Department Regulations**. I acknowledge and agree that I am participating in a Cultural Exchange Program and agree to comply with all of the regulations published by United States Department of State under 22 CFR Sec. 62, which may be amended from time to time in the future.

   b. **Federal, state and local laws.** I must comply with federal, state and local laws of the U.S., including income tax filing requirements (see below), licensing for use of motor vehicles (and other motor vehicle requires described in this Agreement) and laws regarding alcohol and drug use (see below for further details). I am responsible for reading and carefully considering all materials made available to me that relate to safety, health, legal, environmental, political, cultural and religious customs and conditions in the U.S. I take full responsibility in the event that laws, regulations or customs are broken and for obtaining actual knowledge of these laws, regulation or customs.

   c. **Taxes**. I am hereby given notice that I may be considered, under most circumstances, a non-resident alien who is not subject to Social Security (FICA), Medicare, or federal unemployment (FUTA) withholding taxes. Under rare circumstances involving Participants who previously entered the U.S. under a J Visa program or as a student under the F Visa, I understand that I may be considered a resident immigrant for tax purposes and subject to paying Social Security (FICA), Medicare, or federal unemployment

InterExchange0048920

REPLY APP 00910

(FUTA) withholding taxes. I understand it is my responsibility to contact a tax professional to determine the extent (if any) of any taxes that I may owe. For more information, I understand that I should visit the IRS website and search for "Au Pair." Under all circumstances, I am subject to paying federal, state (if applicable) and local (if applicable) income taxes on my Stipend. This information is provided for notice purposes only, "as is" and is subject to change.

d. **Driving**. I agree to be responsible for determining whether I will be able to legally drive in the Host Family's state of residence. I acknowledge responsibility to conform to any and all state or local laws regarding my use of Host Family's automobile (if one is made available), including obtaining a local driver's license (if required) and any car insurance requirements. I agree to comply with requests made by Host Family for additional driving related education and instructions in compliance to the terms and conditions of this Agreement.

e. **Drugs and Alcohol**. I understand that the drug and alcohol laws of the U.S. may differ significantly from those of my home country even in the case of over the counter drugs and herbal remedies. I agree to investigate and follow all U.S. federal, state and local laws regarding drugs and alcohol.

f. **Cooperation with InterExchange**. I will cooperate fully with those supervising the Program on behalf of and in cooperation with InterExchange. I agree to abide by any reasonable instructions they may give me.

16. **Warranties, Liability, Indemnification & Act of God**

a. **No Guarantee of Match or Participation**. I agree that InterExchange neither guarantees a Match (or Rematch) nor participation in the Program.

b. **No Guarantee of Satisfaction or Suitability**. I agree that InterExchange neither guarantees satisfaction nor suitability with the Program or a Host Family.

c. **Information Provided "As Is" Without Warranty or Guarantees**. I agree that any information (e.g., tax and labor law requirements and emergency information and plans) communicated by InterExchange to me is provided "as is" without warranties or guarantees either expressed or implied that information is "up to date", correct and/or accurate.

d. **Participant General Liability**. I waive and release InterExchange from any and all claims for contract damages, torts arising out of or concerning my employment with the Host Family and any liability that I incur that arise out of or concerning my participation in the Program, including, without limitation, any lost, stolen or damaged property and/or any bodily injuries that harms a third party or me.

e. **Limitation of Liability**. If a court, government agency or legal authority finds that InterExchange has a duty under foreign or U.S. federal, state or local law, I understand and agree that InterExchange's liability (if any) shall be no greater than its role as a nonprofit Sponsor under the U.S Department of State regulations. I agree that nothing herein described in this paragraph or in the Agreement creates a duty or obligation under the law, and that the language written herein is provided solely for the purpose of limiting liability to InterExchange's role as my Sponsor. I further agree that InterExchange's liability is subject to the limitations set forth in separate paragraphs described in Section 16.

f. **Change of Sponsorship Costs**. In compliance with Section 14(j), I agree that I shall owe InterExchange for any costs and expenses that arise from a change of sponsor.

g. **Specific Liability**.

i. **Motor Vehicle**. If I have an accident while driving the Host Family's motor vehicle during work hours, I understand that I will not be liable and responsible for any cost and/or damages arising out of or concerning the repair of the motor vehicle, provided, however, that I did not violate any drug and/or alcohol laws while using the motor vehicle. If I violated any drug and/or alcohol laws while driving the motor vehicle, I am liable and responsible for damages and/or costs arising out of or concerning the accident. If there is damage to the Host Family motor vehicle during non-working hours, I am liable and responsible for one half (½) the costs and/or damages up to five hundred dollars ($500) per accident, provided, however, that I did not violate any drug and/or alcohol laws while driving the motor vehicle. If I violated drug and/or alcohol laws while driving the motor vehicle, I am liable and responsible for costs and/or damages arising out of or concerning any accidents involving drug and/or alcohol use by me. I understand that the five hundred dollars ($500) shall only be payable upon Host Family presenting proof of repair that shall include, without limitation, photos of the damaged and repaired vehicle. I agree that InterExchange is not liable for any damages or loses resulting from my use of the Host Family's or any other party's motor vehicle or transportation during my participation in the Program.

ii. **Expenses**. I am responsible for all my personal debts, including, without limitation, phone calls, gym memberships, and medical insurance co-pay. I agree that InterExchange shall not be liable for any personal bills incurred by me during the Program. I agree that I am responsible directly to the Host Family for all personal debts including without limitation, phone calls and gym memberships.

iii. **Transportation**. I agree not to hold InterExchange, its officers, affiliates, independent contractors, agents and employees liable for arranging transportation in the Program, and I agree not to hold any of them liable in connection with any loss, damage, personal injury, delay or expense suffered or incurred by me, resulting from any act or omission of any carrier,

**InterExchange0048921**

any member of the host family or any other body, corporate or non-corporate entity, in relation to transportation to and from and within the United States, my duties as an Au Pair or any other facility or service organized on my behalf.

    iv. **Specific Liabilities**. I agree that I am responsible, and that I shall hold InterExchange as not liable or responsible for any claims, liability, damages or costs incurred by reason of any breach, act, error, negligence or omission that arises out of or concerns, without limitation, the following:

        a. My performance of child care duties

        b. My disciplining children

        c. Decisions and actions carried out by the Host Family

        d. Section 7(c)(i) and (ii), which respectively address InterExchange discussing health and safety circumstances with third parties and taking action in case of health or safety emergencies. Although InterExchange may elect to act as set forth in Section 7(c)(i) and (ii), I agree that InterExchange is not liable if InterExchange fails to act. I agree that neither Section 7(c)(i) and (ii) nor any other term under the Agreement creates an affirmative duty, either expressed or implied, for InterExchange to act. In compliance with Section 7(c)(i) and (ii), I agree that InterExchange is not liable for acting on my behalf under the circumstances described in Section 7(c)(i) and (ii).

        e. Insurance (including car insurance for vehicles) or medical, dental and health care needs that I may have during the Program

        f. Alternative flights to and from the U.S.

        g. My failure to meet immigration status requirements while in Program (e.g., travel outside of U.S. with expired J-1 Visa)

        h. My failure to follow emergency, safety and problems rules suggested or required by InterExchange, the Host Family or local authorities

        i. My disclosure of information and/or documents to unauthorized parties (e.g., tax payer id number or passport)

        j. My failure to apply for and obtain necessary documentation and information as described in this Agreement

        k. Leaving the Program. If I leave the Program for any reason before my commitment is finished or over-stay my visa, I forfeit my return flight and any vacation time, unearned Stipend and my Insurance will be cancelled (and therefore I agree that I will be responsible for any medical costs or damages caused by my lack of Insurance coverage). I also agree that I will be liable for all costs and damages that are incurred or arise out of InterExchange acting to address my actions.

        l. Inadvertent disclosure to third parties in the course of conducting an investigation involving my well-being or suitability for the Program.

        m. Breaching any other term of this Agreement (e.g., failure to follow laws of the U.S. or guidance from states and local authorities).

        n. Violations of U.S. federal, state and local laws, regulations and customs

    h. **Act of God**. I agree that InterExchange and/or its officers, employees, independent contractors, Local Coordinators and agents are neither responsible nor liable for any events beyond their control, including, without limitation, Government restrictions that may interfere with or preclude operation of the Program; any events directly or indirectly caused by any intentional or negligent acts or omissions by the Host Family or those with whom Au Pair comes into contact as a consequence of participating in the Program; the necessity of returning me to my home country early or ending my program early due to health reasons, transportation (e.g., air travel); terrorism; wars; and natural disasters.

    i. **Indemnification**. I shall indemnify, without limitation, InterExchange, its officers, employees, agents, Local Coordinators, independent contractors, and organizations affiliated with InterExchange, against any loss or damage suffered by any of them, or any claims made against any of them as a result of any breach, act, error, omission or negligence by me during my participation in the Program and for the duration of my stay in the U.S.

17. **Dispute Process.**

    a. **Complaints Procedure.** I have the right to contact the U.S. Department of State regarding any serious allegation arising under the Wilberforce Anti-trafficking requirement as set forth in the Wilberforce brochure that I received from InterExchange or upon refusal of InterExchange to address claims. I also understand that allegations by third parties about my progress, well-being and suitability in the Program will be investigated by InterExchange. I understand that InterExchange will not divulge any background information about me other than the information required to conduct the investigation.

**InterExchange0048922**

b. In the event that I wish to lodge a complaint about any services provided by InterExchange, its suppliers, agent, representatives, independent contractors, vendors and/or affiliates (e.g., Insurance vendor, Host Family, Local Coordinators, International Cooperator, hotel or anyone in a relationship with InterExchange), I must first notify both my Local Coordinator and an authorized InterExchange manager in writing in order to give InterExchange the chance to rectify the problem.

c. I understand and agree this Agreement is governed by laws of the state of New York.

d. I agree that any controversy, dispute or claim arising out of or in connection with this Agreement, the relationship of the parties, or its interpretation, performance or nonperformance, or any breach thereof shall be determined solely in arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association.

e. **Cost of Arbitration**. In the event of arbitration as described in 17(d), I understand and agree that the non-prevailing party must reimburse the prevailing party for all reasonable attorneys' fees and costs resulting therefrom.

f. **Cost of Litigation**. In the event that a court or legal authority fails to enforce the arbitration clause set forth in 17(d), I understand and agree that the non-prevailing party shall reimburse the prevailing party for all reasonable attorneys' fees and costs resulting from the cost of the litigation, including, but not limited to any trial and/or appeals.

18. **Terms, Termination and Survivorship**

a. **Start Date**. I agree that this Agreement shall be effective as of the date of my submitting an application to the International Cooperator for the purpose of participating in the InterExchange Au Pair USA Program (the "Effective Date").

b. **End Date**. I agree that this Agreement shall automatically terminate at the end of the Au Pair USA Program for standard 12-month Programs, in-country placements, rematches or Extension Programs, whichever is latest, plus my 30-Day Travel/Grace Period. I understand and agree that the Agreement may automatically terminate once my Program with InterExchange ends, which may end at the end of my 30-Day Travel/Grace Period in the Program, or earlier subject to the terms and conditions of termination of the Agreement, whichever occurs first.

c. **Termination**. This Agreement may be terminated by InterExchange at any time and will terminate automatically if InterExchange ends its sponsorship of my J-1 Visa. Provided that I meet my obligations under this Agreement, I may terminate this Agreement by withdrawing from the Program and leaving the U.S., provided, however that I provide InterExchange with 2-weeks notice prior to termination.

d. **Survivorship**. I agree that any terms and conditions regarding definitions, liability, fees, privacy, releases, intellectual property, Social Media, reputation, confidentiality and expenses/costs shall survive the termination of this Agreement.

19. **Full Disclosure**. I am solely responsible for the full disclosure and accuracy of any information provided by me, my agent or a legal guardian. I confirm that the information I have provided is true, complete and accurate, and upon request I will provide any additional documentation necessary to participate in this Program. I agree to keep all information complete, fully accurate and up to date.

20. **Signature**. This Agreement must be signed by electronic signature under the procedures set forth in InterExchange's online Passport system.

---

**Exhibit A**

**Au Pair**

**Extension Term Sheet**

The following terms apply if and when my Cultural Exchange Program as an Au Pair is extended under the terms and conditions described in the Extensions section of the Main Agreement. I understand that neither InterExchange nor I shall be obligated to follow these additional terms and conditions unless and until the Extension is approved (e.g., by both InterExchange and the U.S. Department of State) and I accept the Extension pursuant to the terms and conditions set forth in the Main Agreement:

1. **Extension**. I agree to all terms and conditions of the InterExchange Au Pair USA Extension Program as mandated by the United States Department of State, other U.S. regulatory agencies and InterExchange.

2. **Extension Request Final Once Submitted**. I understand and agree that Extension requests are final and cannot be changed once submitted to the U.S. Department of State, but I understand that I may decide to withdraw my participation in the Program for any reason and at any time.

3. **U.S. State Department Determines Approval**. I agree that the Extension is at the sole discretion of the U.S. Department of State. I

**InterExchange0048923**

understand and agree that InterExchange cannot be held accountable for any delay or denial of the Extension by the U.S. Department of State.

4. **Au Pair Agreement Remains in Effect**. Unless expressly modified in this Extension Term Sheet, I agree to comply with the terms and conditions of the Main Agreement, which shall remain in effect for the duration of the Extension.

5. **Educational Requirement**. I agree to complete the required academic courses as follows during my Extension and, except for the number of credit hours, meet the requirements of Section 4(n) of the Main Agreement:

   a. I shall take the following credit hours:

      i. Three (3) semester hours for a six (6)-month extension

      ii. Six (6) semester hours for nine (9) and twelve (12)-month extensions.

   b. I will receive from the Host Family, if applicable, transportation to and from the place of instruction, and the Host Family shall make a tuition payment for the me as follows:

      i. Up to a maximum of two hundred fifty dollars ($250) for six (6) month extensions

      ii. Up to a maximum of five hundred dollars ($500) for nine (9) and twelve (12) month extensions.

   c. If a remaining balance is left from the tuition payment after I complete the requisite semester hours, I, at my sole election, may use the balance to take additional course work that meets the academic requirements of U.S. State Department regulations. I understand that the Host Family must provide me adequate time to attend courses at an accredited post secondary institution.

   d. **Failure To Meet Educational Requirement**. If I fail to meet the educational requirements as set forth by U.S. State Department regulations and InterExchange policy, I agree that I must pay for my return ticket to my home country.

6. **Paid Vacation**. I understand that I must receive the following paid vacation time from my Host Family:

   a. Six (6) Month Extension receives one (1) week paid vacation

   b. Nine (9) Month Extension receives one and a half (1½) weeks paid vacation

   c. Twelve (12) Month Extension receives two (2) weeks paid vacation

7. **Travel**.

   a. **Domestic Travel**. I understand and agree that my optional 30-Day Travel/Grace Period is a one-time component of this Cultural Exchange Program and can only be taken at the end of my Extension period.

   b. **Travel Abroad**. I understand that InterExchange recommends that I only return home or travel abroad during the time of my Extension with a visa that has not expired. Additionally, I agree that I am responsible for obtaining any necessary visas for each country that I intend to travel.

8. **J-1 Visa**. I understand I may not leave and re-enter the United States after the expiration date on my J-1 Visa without acquiring a new visa. I understand it is my responsibility to acquire this J-1 Visa at an American Embassy or Consulate outside the USA, and I cannot hold InterExchange liable if a new visa is not issued. There is no guarantee that I will receive a visa.

---

### Exhibit B

### Background Information Usage Notice

1. I understand that the purpose of this Background Information Usage Notice is to provide additional communication to me to ensure my awareness of why and how background information is provided to InterExchange.

2. As explained in the Main Agreement between InterExchange and myself, I understand that criminal records, child care references, school records and health information forms gathered by me and delivered to InterExchange via the International Cooperator are for the sole purpose of determining my suitability for the Program.

3. By signing the Main Agreement, I confirm that I agreed to assist InterExchange by providing the background information as requested. I hereby release InterExchange and any and all persons, business entities (e.g., International Cooperators) and governmental agencies (e.g., U.S. Department of State), whether public or private, from any and all liability, claims and/or demands, by me, my heirs or others making such claims or demands on my behalf, for gathering Background Information and/or providing an investigative report based on

**InterExchange0048924**

background information.

4. I understand that this Notice shall remain in effect for the duration of my association with InterExchange.

5. If I have questions about the background information and any reports derived from the background information, I must contact InterExchange management. I am entitled to a complete and accurate disclosure of the nature and scope of any investigation into my background of which I am the subject upon my written request to InterExchange, provided, however, requests are made in writing before the completion of the Program, or not longer than 12 months after, the background information is requested, whichever is shorter.

---

**Au Pair Candidate Signature:** /s/Lucie Vocetkova
**Time** & **Date:** 02/27/2012 3:24 PM (EST)
**IP Address:** 83.208.157.32

InterExchange0048925

REPLY APP 00915

Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 36 of 218

# Exhibit 54

REPLY APP 00916



**AU PAIR USA**

# Preliminary Questionnaire ☒ Do You Qualify to Be an Au Pair?

Au Pair Name:
LAST                          FIRST                          MIDDLE

Address:                                                    City:

State/Province:                        Postal Code:        Country:

Telephone: 011-                        Email:

*Before you complete the Au Pair USA application, please answer these questions to see if you qualify to be an au pair.*
*Please check True or False to the questions below:*

▸ I have never participated in an Au Pair program in the United States before.          ■ True  ■ False

▸ I am between the ages of 18 and 26.                                                   ■ True  ■ False

▸ I have a secondary school diploma.                                                    ■ True  ■ False

▸ I can commit myself to being an au pair for at least 12 months.                       ■ True  ■ False

▸ I have at least 250 hours of childcare experience.                                    ■ True  ■ False

▸ I have a full driving license.                                                        ■ True  ■ False

▸ I can swim.                                                                           ■ True  ■ False

▸ I do not smoke.                                                                       ■ True  ■ False

▸ I have no children of my own.                                                         ■ True  ■ False

▸ I have never been married.                                                            ■ True  ■ False

▸ I have never been treated for mental illness.                                         ■ True  ■ False

▸ I have never been convicted of a criminal offense.                                    ■ True  ■ False

▸ I do not hold US citizenship and my parents do not hold US citizenship.               ■ True  ■ False

▸ I have never been denied a visa to the United States before.                          ■ True  ■ False
  If you have, please provide the date and reason:

*If you answered **TRUE** to all of the above you are qualified to become an InterExchange au pair! Congratulations!*
*The next step is to fill in the application and contact your Agent to schedule an interview.*

*If you answered **FALSE** to any of the above, please contact your agency to discuss your eligibility.*

▸ **AVAILABILITY DATES**

*Please write the first and last date you are available to travel to the USA to take part in the Au Pair USA program. **You must allow at least three months between your first available date and last available date.** Please understand au pairs need 4 weeks to arrive in the US after matching with a family.*

I am available to arrive in the USA between:
                                        MM/DD/YYYY        and        MM/DD/YYYY

BELTRAN000477

Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 38 of 218

    **InterExchange**     AU PAIR USA  2010 Application to Become Au Pair – Part 1

# AU PAIR USA 

# Checklist for International Cooperators

**Au Pair Name:** _____ _____ _____
LAST                                        FIRST                                        MIDDLE

**Agency Name:** _____

*Before submitting an Au Pair Application to the New York office, please make sure it includes all of the following organized in the order below:*

☐ Copy of Au Pair's Home Country Driving License

☐ Copy of Au Pair's International Driving License (May be sent once au pair is matched)

☐ Copy of Au Pair's Passport

☐ Application (Part 1, Complete 5 pages)

☐ Signed Au Pair Agreement (Part 2, page 6)

☐ If Under 2, au pair has Childcare Reference(s) accounting for at least 200 hours with children ages 0–2

☐ Childcare Reference #1 with necessary original and translation (Verified by IC)

☐ Childcare Reference #2 with necessary original and translation (Verified by IC)

☐ Childcare references account for at least 250 hours of experience

☐ Character Reference with necessary original and translation (Verified by IC)

☐ Interview Report

☐ Au Pair Essay

☐ Au Pair Photo Album (Minimum 2 pages of photos; pictures with children, family and friends)

☐ Medical Report (Physician may not be related to candidate)

☐ Police Report (Titled in English, translation of any entries)

☐ Copy of Secondary School Education Diploma (Titled in English, e.g. High School Diploma)

☐ Personality Test (Boerum Flowers or CCAI) with score sheet

☐ 1 smiling passport-sized picture

*All references should be sent in native language with the translation attached.*

**All writing should be neat and legible in black ink!** *Please review the application and rewrite any forms that are not neat and legible before sending out this application. Candidates are encouraged to type documents whenever possible.*

*Au Pair USA cannot send incomplete applications to host families.* **Please do not submit incomplete applications to Au Pair USA.**

BELTRAN000478

   InterExchange

**AU PAIR USA**   2010 Application to Become Au Pair – Part 1

# AU PAIR USA
# Application to Become Au Pair

Family Name: _____   First Name: _____

Middle Name: _____   Gender: ☐ Male  ☐ Female

City: _____   Country: _____

Telephone: **011-** _____   Mobile Phone: **011-** _____
COUNTRY CODE·CITY CODE·PHONE NUMBER   COUNTRY CODE·PHONE NUMBER

Best time to call me is during my country's:   ☐ Morning  ☐ Afternoon  ☐ Evening

Email: _____   How often do you check this email?  ☐ Daily  ☐ Weekly  ☐ Rarely

Instant Messenger Account: _____   Type (AIM, Skype, Yahoo, etc.): _____

Date of Birth: _____   City of Birth: _____   Country of Birth: _____
MM/DD/YYYY

Country of
Legal Residence: _____   Country of
Citizenship: _____   Passport
Expiration Date: _____
MM/DD/YYYY

## ENGLISH SPEAKING EMERGENCY CONTACT

Family Name: _____   First Name: _____

Telephone: **011-** _____   Relationship to You: _____
COUNTRY CODE·CITY CODE·PHONE NUMBER

Native language: _____   Do you speak any other languages besides English?  ☐ Yes  ☐ No

If yes, please list language and ability:   Basic   Intermediate   Advanced   Fluent
☐   ☐   ☐   ☐
☐   ☐   ☐   ☐

## ▶ YOU AND YOUR FAMILY

Who do you presently live with? _____

If you have any siblings, please list their names and ages below:

Brothers: _____   Sisters: _____

Your father's occupation: _____   Your mother's occupation: _____

Describe the type of housework you do at home: _____

If you have a religion, please list here: _____

Do you practice your religion or attend religious services?  ☐ Weekly  ☐ Occasionally  ☐ Holy Days  ☐ Never

BELTRAN000479

InterExchange     **AU PAIR USA**  2010 Application to Become Au Pair – Part 1

## ‣ PREFERENCES AND CHILDCARE CHECKLIST

I have experience with children who are:  ☐ 0+ months† ☐ 12+ months† ☐ 2–6 years ☐ 6+ years
*(check all that apply)*  ☐ Twins ☐ With special needs (learning or other disabilities)

I would like to care for children who are:  ☐ 0+ months† ☐ 12+ months† ☐ 2–6 years ☐ 6+ years
*(check all that apply)*  ☐ Twins ☐ With special needs‡ (learning or other disabilities)

Please list the maximum number* of children you would care for: _____

*\* Families typically have 2–4 children*
*† You must have documented a minimum of 200 hours of childcare experience with children under 2 years of age to qualify for such a placement.*
*‡ You must have documented experience caring for special needs children to qualify for such a placement. Please fill out and include the Special Needs Information form (Part 2, page 15) and include reference in this application.*

Please check all experiences which you have had with infants, toddlers and children.

| Toddlers and older children: | | | Infants (0–24 months): | | | Other: |
|---|---|---|---|---|---|---|
| Meal preparation | ☐ Yes | ☐ No | Prepare baby bottles | ☐ Yes | ☐ No | _____ |
| Bathing | ☐ Yes | ☐ No | Changing diapers | ☐ Yes | ☐ No | _____ |
| Playing with children | ☐ Yes | ☐ No | Meal preparation | ☐ Yes | ☐ No | _____ |
| Helping with schoolwork | ☐ Yes | ☐ No | Bathing | ☐ Yes | ☐ No | _____ |
| Putting children to bed | ☐ Yes | ☐ No | Putting children to bed | ☐ Yes | ☐ No | _____ |
| Playing sports | ☐ Yes | ☐ No | | | | |
| Arts and crafts | ☐ Yes | ☐ No | | | | |

Do you have any professional childcare qualifications/training/diplomas or certificates, i.e. First Aid, CPR, etc.?  ☐ Yes ☐ No
If yes, please describe:

Please describe any talents or skills you have that would be useful when caring for children:

What activities (outdoors and indoors) would you like to do with the children in your host family?

Why should a family choose you as their au pair?

## ‣ YOUR CHILDCARE EXPERIENCE

*On the following page please list all the childcare experiences you have had over the past three years. Remember, you must have at least 200 hours of experience with children under the age of two if you want to be considered for placement with a host family with children under the age of two. We cannot count experience gained with family members. Types of experience may include employment, baby sitting, teaching, etc.*

*Example:*

| 2. TYPE OF EXPERIENCE: | Babysitting | | REFERENCE NAME: | The Martin Family |
|---|---|---|---|---|

‣ Information about the children:   ‣ When and how often did you take care of these children?

| NAMES OF THE CHILDREN | SEX | AGE WHEN STARTED | AGE WHEN STOPPED |
|---|---|---|---|
| Carly | M ☒ | 18 months | 30 months |
| Alicia | M ☒ | 3 years | 4 years |
| Tommy | ☒ F | 6 years | 7 years |
| | M F | | |

Started (month/year or dates): December 2008
Ended (month/year or dates): January 2009
Average number of times per week: 3
Average number of hours per day: 5
Total number of hours: 780
Were any of these children under the age of 2? ☒ Yes ☐ No
If yes, how many hours did you care for them? 390

‣ In the space below please describe your responsibilities and activities with the children

Made children breakfast and sent Tommy off to school. Played with Carly and Alicia during the day.
Fed them lunch. Went to park and played with their friends. Met Tommy after school and gave snacks.
Helped him with homework.

**REPLY APP 00920**

BELTRAN000480

InterExchange

**AU PAIR USA**  2010 Application to Become Au Pair · Part 1

*Please list in chronological order. If additional space is needed, attach another copy of this form.*

**1.  TYPE OF EXPERIENCE:** _____

▸ **Information about the children:**

| NAMES OF THE CHILDREN | SEX | AGE WHEN STARTED | AGE WHEN STOPPED |
|---|---|---|---|
| | M  F | | |
| | M  F | | |
| | M  F | | |
| | M  F | | |

▸ In the space below please describe your responsibilities and activities with the children

**REFERENCE NAME:** _____

▸ **When and how often did you take care of these children?**

Started (month/year or dates): _____

Ended (month/year or dates): _____

Average number of times per week: _____

Average number of hours per day: _____

Total number of hours: _____

Were any of these children under the age of 2?  ☐ Yes  ☐ No

If yes, how many hours did you care for them?

**2.  TYPE OF EXPERIENCE:** _____

▸ **Information about the children:**

| NAMES OF THE CHILDREN | SEX | AGE WHEN STARTED | AGE WHEN STOPPED |
|---|---|---|---|
| | M  F | | |
| | M  F | | |
| | M  F | | |
| | M  F | | |

▸ In the space below please describe your responsibilities and activities with the children

**REFERENCE NAME:** _____

▸ **When and how often did you take care of these children?**

Started (month/year or dates): _____

Ended (month/year or dates): _____

Average number of times per week: _____

Average number of hours per day: _____

Total number of hours: _____

Were any of these children under the age of 2?  ☐ Yes  ☐ No

If yes, how many hours did you care for them?

**3.  TYPE OF EXPERIENCE:** _____

▸ **Information about the children:**

| NAMES OF THE CHILDREN | SEX | AGE WHEN STARTED | AGE WHEN STOPPED |
|---|---|---|---|
| | M  F | | |
| | M  F | | |
| | M  F | | |
| | M  F | | |

▸ In the space below please describe your responsibilities and activities with the children

**REFERENCE NAME:** _____

▸ **When and how often did you take care of these children?**

Started (month/year or dates): _____

Ended (month/year or dates): _____

Average number of times per week: _____

Average number of hours per day: _____

Total number of hours: _____

Were any of these children under the age of 2?  ☐ Yes  ☐ No

If yes, how many hours did you care for them?

BELTRAN000481

Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 42 of 218

InterExchange | **AU PAIR USA** 2010 Application to Become Au Pair ⏐ Part 1

## ▶ DRIVING EXPERIENCE

Do you hold a full driving license?  ☐ Yes  ☐ No    Date you received license: _____
(MM/DD/YYYY)

When did you begin driving/learning to drive: _____
(MONTH)        (YEAR)

Do you have at least 50 hours of driving experience?  ☐ Yes  ☐ No

What access do you have to a car? (e.g. use family car, use own car, etc.)

How often do you drive?  ☐ Daily  ☐ Several times per week  ☐ Several times per month

Do you have experience driving a car with:  ☐ Automatic transmission  ☐ Stickshift (standard) transmission  ☐ Both

Do you have experience driving in: (Check all that apply)  ☐ The city  ☐ The country  ☐ On the motor-way  ☐ In the snow

Would you feel comfortable driving with children in the car?  ☐ Yes  ☐ No

Comments:

Have you ever been in an accident in which you were at fault?  ☐ Yes  ☐ No   If yes, please describe:

## ▶ EDUCATION

Do you have your country's equivalent of a secondary/high school diploma?  ☐ Yes  ☐ No

If Yes, what is this diploma called in your country? _____   Date received: _____
MM/DD/YYYY

If No, are you currently a secondary/high school student?  ☐ Yes  ☐ No

Have you completed or are you currently enrolled in university?  ☐ Yes*  ☐ No

If No, do you intend to further your education?  ☐ Yes*  ☐ No

*If Yes, please explain and provide any dates:

## ▶ EMPLOYMENT

Are you currently employed?  ☐ Yes  ☐ No    Below, list all jobs you have had in the last three years in chronological order:

| EMPLOYER | POSITION AND RESPONSIBILITIES | DATES |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

## ▶ YOUR INTERESTS AND SKILLS

Please check all that best describe your interests:

☐ Cooking    ☐ Photography    ☐ Movies/films    ☐ Sailing/boating    ☐ Music    ☐ Other (specify)
☐ Handicrafts    ☐ Artwork    ☐ Computers    ☐ Horseback riding    ☐ Drawing/painting
☐ Reading    ☐ Writing    ☐ Theater    ☐ Sports    ☐ Travel
☐ Winter sports    ☐ Swimming    ☐ Bicycling    ☐ Dancing    ☐ Hiking/camping

BELTRAN000482

**REPLY APP 00922**

Do you swim?    ☐ Yes   ☐ No      If no, are you willing to learn?    ☐ Yes   ☐ No

If yes, how well?    ☐ Beginner    ☐ Intermediate    ☐ Advanced    ☐ I have a Lifesaving Certificate in swimming (please attach certificate)

Would you feel comfortable being responsible for children while they are in a pool or at the beach?    ☐ Yes   ☐ No

List all sports and outdoor activities that you enjoy participating in and how often:

Do you play any musical instruments? What type of music do you enjoy?

Please describe any special skills, hobbies or training that you may have:

## ▸ GENERAL HEALTH AND WELL-BEING

Do you have any allergies?    ☐ Yes   ☐ No    If yes, please describe:

Can you live with pets?    ☐ Yes   ☐ No    If no, what pets are you not able to live with?

Do you have any dietary/food restrictions or do you follow a special diet (i.e. vegetarian)?    ☐ Yes   ☐ No
If yes, please describe:

If you have a dietary restriction, are you willing to handle or prepare this food as part of your duties?    ☐ Yes   ☐ No

Would you consider living with a host family that followed a special diet (e.g. vegetarian, kosher)?    ☐ Yes   ☐ No

Do you have any chronic health problems?
☐ Epilepsy    ☐ Asthma    ☐ Diabetes    ☐ Physical disabilities    ☐ Other      ☐ None

If yes, please describe:

Are you currently taking any medication?    ☐ Yes   ☐ No    If yes, for what?

Have you had an illness in the past five years which required hospitalization?    ☐ Yes   ☐ No    If yes, please describe:

Have you been treated in the past five years for any of the following?

☐ Eating disorder    ☐ Emotional problems    ☐ Depression    ☐ Seen a psychiatrist    If yes, please describe:

Do you smoke cigarettes?    ☐ Yes, regularly    ☐ Yes, occasionally    ☐ No

If you are a smoker, are you prepared to stop smoking?    ☐ Yes   ☐ No

If no, are you prepared to follow a host family's house rules which might include no smoking in the home or in front of the children?    ☐ Yes   ☐ No

BELTRAN000483

InterExchange

**AU PAIR USA** 2010 Application to Become Au Pair – Part 2

# Au Pair Agreement Form 

**Please read the following carefully and be sure you understand all issues. This is a legal and binding agreement that shall constitute part of your agreement with InterExchange Au Pair USA.**

1. I, an applicant to be an au pair in the program sponsored by InterExchange, Inc. Au Pair USA, agree that the terms and conditions set forth in the brochure, of which I have received a copy, this agreement and any published changes, shall constitute part of my agreement with InterExchange, Inc.

2. I confirm that I have investigated the duties and functions of an au pair and I am willing and able to function as an au pair in every way including physical and mental stamina, and have the ability to communicate in English with the family and any emergency services.

3. I will carry out my au pair and childcare duties and other responsibilities to InterExchange, Inc., and the host family to the highest standards and with due respect, and will take full advantage of the required educational and cultural opportunities in my community, as set out in the accompanying brochure.

4. I will return to my home country at the end of my stay, which is the termination date of my DS-2019 form + 30 days.

5. I will not accept any form of paid employment in the USA during my stay other than as an au pair with my host family.

6. I understand that flights will depart from and return to one of the designated airports, so that I am responsible for any flight or other transportation supplements. I must also pay my own way back to New York, Boston, Philadelphia or Washington D.C. at the end of the program in time for my return flight or I may chose to pay the appropriate flight supplement to fly home from a location other than those listed above.

7. I will cooperate fully with those super vising the program on behalf of and in cooperation with InterExchange, Inc. and I agree to abide by any reasonable instructions they may give me.

8. I agree to:
   • Be responsible for obtaining a valid passport and comply with all vaccination and immunization requirements.
   • Complete all visa requirements in accordance with the instructions.
   • Be present in good time for all flights or other transportation provided or arranged by InterExchange, Inc. InterExchange, Inc. will not provide or be responsible for alternative transportation.
   • Obey all U.S. federal, state and local laws including the United States Department of State regulations set forth for all host families and au pairs.
   • Be responsible for all my personal debts, including but not limited to phone calls, use of the host family car, gym memberships, medical insurance co-pays, etc., and in case of damage to the car will be liable for one half the damage up to $500.00 per accident.

9. I hereby warrant that the information I have given in the application for and at the interview is true and complete. Further, I agree that I will perform my duties as an au pair to the highest standards and indemnify, without limitation, InterExchange, Inc., its officers, employees, Agents, and organizations affiliated with it, against any loss or damage suffered by any of them, or any claims made against any of them as a result of any breach, act of omission or negligence by me during my participation in the program.

10. I further agree that InterExchange, Inc., its officers, affiliates, Agents and employees will act on my behalf in arranging transportation, in my placement as an au pair and in other services, and that I will not hold any of them liable in connection with any loss, damage, personal injury, delay or expense suffered or incurred by me, resulting from any act or omission of any carrier, any member of the host family or any other body, corporate or non-corporate entity, in relation to transportation to and from and within the United States, my duties as an au pair or any other facility or service provided on my behalf.

11. I understand that during the first three (3) days of my stay with the host family, a parent or another responsible adult shall remain in the home to facilitate my adjustment into the family, household and community. Failure of this condition by the host family will be immediately reported to InterExchange,Inc. and the local coordinator.

12. I understand that InterExchange, Inc.'s local coordinator will contact me and my host family within 48 hours of my arrival to my host family. I also understand that InterExchange, Inc.'s local coordinator will visit me and my host family within two weeks of my arrival to my host family. My host family will also attend at least one of two family day conferences sponsored by InterExchange, Inc. during the program year.

13. I agree that I must be contacted by a potential host family a minimum of two times by telephone prior to an agreement to match.

14. I understand that if a family has a child under three months old, there must be a responsible adult in the home and I cannot be left as the sole childcare provider even for a limited amount of time (including sleeping hours). Failure of this condition by the host family will be immediately reported to InterExchange, Inc. and the local coordinator.

15. I understand that I am to receive board and lodging from the host family, and shall occupy a separate room; and that the lodging arrangements must be approved by the local coordinator.

16. I understand that InterExchange has provided Medical Sickness Insurance that meets or exceeds the requirements set forth by the U.S. Department of State. I agree to the conditions set forth in the Insurance pamphlet provided, including all relevant fees.

17. I understand that if I leave the program for any reason before my commitment is finished or over-stay my visa, I forfeit my return flight and any vacation time, relevant bonuses or stipend owed, and my insurance will be cancelled. Notification of such circumstance will be reported to the U.S. Department of State and/or the Department of Homeland Security.

18. I hereby agree that InterExchange, Inc., its officers, employees, affiliates and Agents or any local coordinator may, without liability, or expense to themselves, take whatever action they deem appropriate with regard to my health and safety and may place me in a hospital or health-related facility for medical services and treatment or, if no hospital or health-related facility is readily available, may place me in the hands of a local medical doctor or health provider for treatment or service.

19. The applicable regulations require that au pair participants in the 12 month program enroll in and complete classes or programs offered by an accredited, post-secondary institution for six semester hours of academic credit or its equivalent. As a condition of program participation, host families must facilitate the enrollment and attendance of the au pair and pay the cost of such academic course work in an amount not to exceed $500 for a 12 month Au Pair program.

20. I understand that any dispute or claim arising out of or in connection with this agreement, the relationship of the parties, or with any beneficiary of this agreement; its interpretation, performance or non-performance, or any breach thereof shall be determined solely in arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association.

21. **45-HOUR AGREEMENT FOR THE HOST FAMILY AND AU PAIR.** The Au Pair Program regulations, issued by the United States Department of State, require that a written agreement between the au pair and the host family outlining that the au pair is to work a maximum of 10 hours of childcare on any given day, nor more than 45 hours of childcare in any one week has been signed by both. The au pair and host family hereby agree to limit the number of hours the au pair is obligated to provide childcare services to not more than 45 hours per week and to limit the number of hours the au pair may provide childcare on any given day to no more than 10 hours. I understand that I will be compensated at a weekly rate based on 45 hours per week and paid in conformance with the requirements of the Fair Labor Standards Act. I will receive a minimum of one and a half days off per week, in addition to one complete weekend (Friday evening until Monday morning) off each month. Further more I will receive two weeks of paid vacation to be taken at a mutually agreed upon time during my program.

AU PAIR'S SIGNATURE _____  DATE (MM/DD/YYYY) _____

PRINT NAME _____

BELTRAN000484

 **InterExchange**

# Childcare Reference

*Au Pair Instructions:* Please give this form to someone whose children you have cared for. This person cannot be a relative. You must include both the original reference and any translation in your application.

*Reference Instructions:* Please type or print in black ink. When writing dates, please specify month/day/year in this order. Please be honest in your assessment of this applicant's ability to care for children. This reference will be read by prospective American host families who may contact you for a reference. Return this completed Childcare Reference form to the applicant. You will be contacted by the agency to verify this reference.

*Thank you for taking the time to share your thoughts with us!*

Name of Applicant: _____   Years Known: _____

Name of Reference: _____   Occupation: _____

Telephone: **011-** _____   Email: _____
COUNTRY CODE⏐CITY CODE⏐PHONE NUMBER

Best way to reach you:  ☐ Phone  ☐ Email       Best time to reach you:  ☐ Morning  ☐ Afternoon  ☐ Evening
Are you related to the applicant?  ☐ Yes  ☐ No    Do you speak English?  ☐ Yes  ☐ No
                                                  If no, please complete this in your native language.

Please write down the sex and age of the children the applicant cared for (if in a group setting, please write the number of children and the age range):

| NAMES OF THE CHILDREN (IF A GROUP, PLEASE WRITE NUMBER OF CHILDREN) | SEX (M/F) | AGE OF THE CHILDREN WHEN STARTED | AGE OF THE CHILDREN WHEN STOPPED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

▶ **HOW DO YOU KNOW THIS APPLICANT?** (Check one of the following two categories and respond to the questions for that category)

☐ 1. Applicant has been au pair/nanny or baby sitter for my children

    a. How often did he/she babysit?  ☐ Daily  ☐ Weekly  ☐ Occasionally

    b. How long has he/she been caring for your children?  ☐ From _____ MM/DD/YYYY  to _____ MM/DD/YYYY  ☐ Ongoing

    c. Did the applicant live in your home?  ☐ Yes  ☐ No

☐ 2. Applicant has been employed/trained by
    (name of daycare center, nursery, kindergarten, camp, training program, teaching program)

    a. What is your relationship to the applicant?  ☐ Supervisor  ☐ Co-worker  ☐ Other, explain _____

    b. If at a school, name and length of course of study _____

    c. Describe course content studied by applicant and any diploma or certificate the applicant did/will achieve:

    d. How long have you employed this applicant?  From _____ MM/DD/YYYY  to _____ MM/DD/YYYY

    e. When the applicant cared for children was he/she  ☐ Solely responsible  ☐ Supervised  ☐ Both

BELTRAN000485

**AU PAIR USA** 2010 Application to Become Au Pair ⬥ Part 2

Childcare Reference (continued)

*Please answer the questions below:*

Please describe the applicant's childcare duties:

Please comment on any special skills/talents you observed in this applicant:

This applicant will be placed with an American host family for one year. Please comment on his/her ability to adapt to a new environment and culture, and how he/she might handle homesickness and stress.

Why would you recommend this applicant for placement as an au pair with an American host family?

SIGNATURE OF REFERENCE                          DATE (MM/DD/YYYY)

OFFICE USE ONLY (Do not write in the area below)

Comments:

My signature confirms that I have spoken with the reference listed above and have verified this information, including the accuracy of the translation,* if any.

International
Cooperator:

PRINT NAME                    SIGNATURE                         DATE (MM/DD/YYYY)

*Some referees providing references may not speak or write in English. In such cases, InterExchange allows the referee to ⬚ ll out this form in their native language which the au pair then translates. All translations are reviewed and verï ⬚ ed by the International Cooperator. Both the original language and translated references are sent to Au Pair USA.*

**REPLY APP 00926**

BELTRAN000486

 **InterExchange**

# Childcare Reference

*Au Pair Instructions:* Please give this form to someone whose children you have cared for. This person cannot be a relative. You must include both the original reference and any translation in your application.

*Reference Instructions:* Please type or print in black ink. When writing dates, please specify month/day/year in this order. Please be honest in your assessment of this applicant's ability to care for children. This reference will be read by prospective American host families who may contact you for a reference. Return this completed Childcare Reference form to the applicant. You will be contacted by the agency to verify this reference.

*Thank you for taking the time to share your thoughts with us!*

Name of Applicant: _____                    Years Known: _____

Name of Reference: _____                    Occupation: _____

Telephone: **011-** _____                    Email: _____
COUNTRY CODE⫶CITY CODE⫶PHONE NUMBER

Best way to reach you:   ☐ Phone  ☐ Email        Best time to reach you:   ☐ Morning  ☐ Afternoon  ☐ Evening

Are you related to the applicant?   ☐ Yes  ☐ No        Do you speak English?   ☐ Yes  ☐ No
If no, please complete this in your native language.

Please write down the sex and age of the children the applicant cared for (if in a group setting, please write the number of children and the age range):

| NAMES OF THE CHILDREN (IF A GROUP, PLEASE WRITE NUMBER OF CHILDREN) | SEX (M/F) | AGE OF THE CHILDREN WHEN STARTED | AGE OF THE CHILDREN WHEN STOPPED |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

▶ **HOW DO YOU KNOW THIS APPLICANT?** (Check one of the following two categories and respond to the questions for that category)

☐ 1. Applicant has been au pair/nanny or baby sitter for my children

    a. How often did he/she babysit?   ☐ Daily  ☐ Weekly  ☐ Occasionally

    b. How long has he/she been caring for your children?   ☐ From _____ MM/DD/YYYY _____ to _____ MM/DD/YYYY _____   ☐ Ongoing

    c. Did the applicant live in your home?   ☐ Yes  ☐ No

☐ 2. Applicant has been employed/trained by
    (name of daycare center, nursery, kindergarten, camp, training program, teaching program)

    a. What is your relationship to the applicant?   ☐ Supervisor  ☐ Co-worker  ☐ Other, explain

    b. If at a school, name and length of course of study

    c. Describe course content studied by applicant and any diploma or certificate the applicant did/will achieve:

    d. How long have you employed this applicant?   From _____ MM/DD/YYYY _____ to _____ MM/DD/YYYY _____

    e. When the applicant cared for children was he/she   ☐ Solely responsible  ☐ Supervised  ☐ Both

BELTRAN000487

Case No. 1:14-cv-03074-CMA-KMT   Document 988-5   filed 04/27/18   USDC Colorado   pg 49 of 219

**Childcare Reference** (continued)

*Please answer the questions below:*

Please describe the applicant's childcare duties:

Please comment on any special skills/talents you observed in this applicant:

This applicant will be placed with an American host family for one year. Please comment on his/her ability to adapt to a new environment and culture, and how he/she might handle homesickness and stress.

Why would you recommend this applicant for placement as an au pair with an American host family?

SIGNATURE OF REFERENCE                                    DATE (MM/DD/YYYY)

**OFFICE USE ONLY (Do not write in the area below)**

Comments:

My signature confirms that I have spoken with the reference listed above and have verified this information, including the accuracy of the translation,* if any.

International
Cooperator:

PRINT NAME                          SIGNATURE                          DATE (MM/DD/YYYY)

*Some referees providing references may not speak or write in English. In such cases, InterExchange allows the referee to ▯ ll out this form in their native language which the au pair then translates. All translations are reviewed and veri▯ ed by the International Cooperator. Both the original language and translated references are sent to Au Pair USA.*

**REPLY APP 00928**

BELTRAN000488

Case 1:14-cv-03074-CMA-KMT   Document 986-5 Filed 04/13/18   USDC Colorado   Page 49 of 219



**AU PAIR USA** 2010 Application to Become Au Pair — Part 2

# Character Reference



*Au Pair Instructions:* Please give this form to someone who knows you well. This person cannot be a relative. You must include both the original reference and any translation in your application.

*Reference Instructions:* Please type or print in black ink. Please be accurate in your assessment of this applicant. Your comments will be read by prospective American host families who may contact you for a reference. Please return this completed Character Referenc e form to the applicant. You will be contacted by the agency to verify this reference.

*Thank you for taking the time to share your thoughts with us!*

Name of Applicant: _____   Years Known: _____

Name of Reference: _____   Occupation: _____

Telephone: **011-** _____   Email: _____
COUNTRY CODE–CITY CODE–PHONE NUMBER

Best way to reach you:  ☐ Phone  ☐ Email      Best time to reach you:  ☐ Morning  ☐ Afternoon  ☐ Evening

Are you related to the applicant?  ☐ Yes  ☐ No     Do you speak English?  ☐ Yes  ☐ No
If no, please complete this in your native language.

How do you know this applicant?

Please describe personality and character of this applicant:

This applicant will be placed with an American host family as an au pair for one year. Please comment on his/her ability to adapt to a new environment and culture. How do you think he/she might handle homesickness and stress?

Do you feel the applicant would provide a host family with responsible and quality childcare?   ☐ Yes  ☐ No
Would you recommend this applicant for placement as an au pair with an American host family?   ☐ Yes  ☐ No
Please explain the reasons for your recommendation:

_____        _____
SIGNATURE OF REFERENCE                    DATE (MM/DD/YYYY)

**OFFICE USE ONLY (Do not write in the area below)**

Comments:

My signature confirms that I have spoken with the reference listed above and have verified this information, including the accuracy of the translation,* if any.

International
Cooperator: _____     _____     _____
            PRINT NAME                    SIGNATURE                    DATE (MM/DD/YYYY)

* Some referees providing references may not speak or write in English. In such cases, InterExchange allows the referee to  ll out this form in their native language which the au pair then translates. All translations are reviewed and verifi ed by the International Cooperator. Both the original  language and translated references are sent to Au Pair USA.

BELTRAN000489

Case No. 1:14-cv-03074-CMA-KMT    Document 980-5    filed 04/27/18    USDC Colorado    pg 51 of 219


## AU PAIR USA
# Special Needs Information



*If you have experience caring for children with special needs and you would like to be considered by a host family with a special needs child, please describe your experiences and reasons for wanting such placement. Please note, that you should also list your experience with any special needs child on Your Childcare Experience form (Part 1, page 3).*

I hereby state that the above is true.

AU PAIR'S SIGNATURE _____    DATE (MM/DD/YYYY) _____

PRINT NAME _____

BELTRAN000490

Case 1:14-cv-03074-CMA-KMT   Document 980-5   Filed 04/13/18   USDC Colorado   Page 51 of
218



# Creating Your "Dear Host Family" Letter 

*On a separate sheet of white paper, write or type your "Dear Host Family" letter describing you, your life, your family, your goals and achievements and your reasons for wanting to become an au pair. Describe the children you have cared for and the activities you have enjoyed with them. Since driving is very important to many American host families, please describe your driving experience and any driving lessons you may have had. Give as much detail as possible and present it thoughtfully, neatly and attractively. Please write your name and address at the top of each page. See below for some helpful information in preparing your "Dear Host Family" letter.*

## TIPS FOR WRITING YOUR LETTER

▸ Introduce yourself, where you were born and where you live now.

▸ Describe your family, including sisters and brothers and your parents' occupations.

▸ Describe your community and its location in your country
(for example: Langaryd is in the Southern part of Sweden, one hour from Gothenborg).

▸ Describe your driving history and experience. Driving is an important part of many American's daily life; au pairs must be comfortable driving.

▸ Describe the children you have cared for and the type of things you have done with them.

▸ Share your goals for the future.

▸ Share information about yourself and what you enjoy doing (hobbies, sports, music, the type of books you enjoy, etc.).

▸ Describe your interest in living in America and being part of an American family.

▸ Explain why you want to be an au pair and what you hope to gain from this experience.

▸ If English is not your native language and you are uncomfortable writing in English you might refer to an English translation dictionary for help. However, do not rely solely on the dictionary. We recommend you use words that you are most comfortable speaking.

▸ Address your letter to "Dear Host Family." Prospective host families will be reading your letter to understand more about you as an individual.

 InterExchange

# Your Photo Album 

*On several sheets of white or light-colored paper, securely attach photographs showing you and your family, friends and the children you have cared for in the past. Next to each picture, describe who is in the picture and what they are doing. Photos will not be returned to you. These photo pages will be electronically scanned and emailed to host families. Therefore, please use good quality photos and a dark pen, black is best. Use paper 21.5 cm x 28 cm (US Letter) and do not bind or cover the pages in plastic. (See sample photo pages below.)*

*Do not include photos of you in pubs and nightclubs, you and your friends with alcohol, people – especially you – in inappropriate clothing (tops with a deep neckline, very short and tight skirts, bikinis, etc.) or naked people.*

*Be creative and artistic with your photo album!*



Case 1:14-cv-03074-CMA-KMT Document 986-5 Filed 04/13/18 USDC Colorado Page 53 of 218

# Exhibit 55

REPLY APP 00933

Highly Confidential - Attorney's Eyes Only

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

_____

JOHANA PAOLA BELTRAN, ET AL.,   )

      Plaintiffs,,   ) Case No.

v.   ) 14-cv-03074-CMA-CBS

         )

INTEREXCHANGE, INC., ET AL.,   )

      Defendants.   )

_____   )


    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


    Videotaped oral deposition of MARK JAMES GAULTER, called by the Plaintiffs herein, held before a stenographic court reporter at the offices of Hilman Law Chambers, 197 Spadina Avenue, Suite 402, Toronto, Ontario, on Tuesday, the 9th day of May, 2017, at 9:00 a.m.



REPLY APP 00934

Highly Confidential - Attorney's Eyes Only

---

Page 2

1  A P P E A R A N C E S:
2  For Plaintiffs:
3  BOIES SCHILLER FLEXNER LLP
   BY:  Dawn L. Smalls, Esq.
4        Daniel R. Schwartz, Esq.
         575 Lexington Avenue
5        New York, NY 10022
         (212) 446-2300
6        dsmall@bsfllp.com
         dschwartz@bsfllp.com
7
8  For Defendant Expert International Group d/b/a
9  Expert AuPair and witness:
   BY:  BOGDAN ENICA, ESQ.
10       100 2nd Avenue S.
         Suite 302-S
11       St. Petersburg, FL 33701
         (727) 225-2649
12       bogdan@expertaupair.com
13
   For Defendant American Institute For Foreign
14 Study d/b/a Au Pair In America:
15 PUTNEY, TWOMBLY, HALL & HIRSON LLP
   BY: JOHN B. FULFREE, ESQ.     (telephone)
16       521 Fifth Avenue
         New York, NY 10175
17       (212) 682-0020
         jfulfree@putneylaw.com
18
19 For Defendant InterExchange, Inc.:
20 SHERMAN & HOWARD, L.L.C.
   BY: ALYSSA LEVY, ESQ.        (telephone)
21       633 17th Street
         Suite 3000
22       Denver, Colorado 80202
         (303) 299-8194
23       alevy@shermanhoward.com
24
   For Defendant Au Pair Care:
25

---

Page 3

1  BY: NATHAN HUEY, ESQ.        (telephone)
         555 17th Street, Suite 3400
2        Denver, CO 80202
         (303) 600-6842
3        nhuey@gordonrees.com
4
   For Defendants USAuPair, Inc., GoAuPair,
5  and Au Pair International:
6  WHEELER, TRIGG, O'DONNELL
   BY: NATALIE WEST, ESQ.       (telephone)
7        370 17th Street
         Suite 4500
8        Denver, Colorado 80202
         (303) 244-1918
9        west@wtotrial.com
10
   For Defendant Cultural Care
11
   CHOATE, HALL & STEWART
12 BY: LYNDSEY KRUZER, ESQ.     (telephone)
         Two International Place
13       Boston, Massachusetts 02110
         (617) 248-5221
14       lkruze@choate.com
15
16
17 ALSO PRESENT:
18 Ronald Eckstein, CIM, CCVS (Certified Legal
19 Videographer and Commissioner for Taking Affidavits)
20
21
22
23
24
25

---

Page 4

1          INDEX OF PROCEEDINGS
2
3  WITNESS:  MARK JAMES GAULTER:  SWORN
4  EXAMINATION                     PAGE
5    By Ms. Smalls                  10
6    By Mr. Enica                  206
7
8
9  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: N/a
10 INFORMATION TO BE SUPPLIED: 42, 205
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1          INDEX OF EXHIBITS
2  NO./ DESCRIPTION                PAGE
3  EXHIBIT 1 marked for identification:    14
4      Revised notice of 30(b)(6)
5      deposition of Defendant Expert
6      Group International d/b/a Expert
7      AuPair.
8  EXHIBIT 2 marked for identification:    26
9      Organization chart, Bates
10     ExpertAuPair000203
11 EXHIBIT 3 marked for identification:    39
12     Organization chart,  Bates
13     ExpertAuPair000202
14 EXHIBIT 4 marked for identification:    49
15     Host Family Application, Bates
16     ExpertAuPair000055-59
17 EXHIBIT 5 marked for identification:    67
18     International Representation and
19     Interviewer Agreement, Bates
20     ExpertAuPair000050-54
21 EXHIBIT 6 marked for identification:    78
22     Expert AuPair flyer, Bates
23     ExpertAuPair000151
24 EXHIBIT 7 marked for identification:   101
25     Depreciation and Amortization,

---



2 (Pages 2 to 5)

REPLY APP 00935

Highly Confidential - Attorney's Eyes Only

Page 18

1  probably the best answer to your question is I'm the
2  Responsible Officer for the au pair program, for a
3  J-1 exchange program.
4      Q.  Mm-hm?
5      A.  And therefore I feel that I am
6  qualified to testify.
7      Q.  Okay.  Thank you.
8      Number 4 relates to your relationship and
9  communications with the State Department and the
10  Department of Labour.  It has a number of subparts.
11      A.  Mm-hm.
12      Q.  If you haven't already, if you can
13  just take a moment to review that.
14      (witness perusing document)
15      A.  I think I'm more qualified than
16  anyone else in the organization to speak about this.
17      Q.  Mm-hm?
18      A.  That's not to say that nobody else
19  has spoken to the State Department, but I think I've
20  had the majority of communications over the ten
21  years.
22      Q.  Okay.  But you, appearing today on
23  behalf of Expert AuPair, feel that you are well
24  qualified to testify on communications that Expert
25  AuPair has had with the State Department and/or the

Page 19

1  Department of Labour?
2      A.  Yes.  And sorry to interrupt there,
3  but yes, I feel comfortable testifying.
4      Q.  Okay.
5      A.  Right.
6      Q.  Thank you.  Number 5 relates to your
7  relationship and communications with other sponsors,
8  including but not limited to the Alliance for
9  International Education and the International Au
10  Pair Association.  Is that a topic that you feel
11  qualified to testify to today?
12      A.  Yes, it is.  However, I would mention
13  we're not in the International Au Pair Association,
14  so that may not be an appropriate line of
15  questioning, but you're more than welcome to ask.
16      Q.  Okay?
17      A.  But I'm aware of any memberships like
18  that that we have.
19      Q.  Okay.  Thank you.
20      And the basis -- and what is the basis for
21  that qualification to testify?
22      A.  I would have -- well, I did sign the
23  cheque for the Alliance, which has an annual
24  membership fee.  And also, I believe I signed a
25  contract with them to become members.  But again,

Page 20

1  that's a belief, that's something that was maybe
2  five years ago.
3      Q.  Okay?
4      A.  And so I -- you know, I want to be
5  careful about when I'm telling you what I know and
6  when I'm telling you what I believe.
7      Q.  Right.  Thank you.  And that's
8  important.
9      So qualifying what you know and what you
10  believe --
11      A.  Mm-hm.
12      Q.  -- are important to do today.  And if
13  there's any item that you are not sure of or would
14  like to qualify, we can follow up --
15      A.  Right.
16      Q.  -- with afterwards --
17      A.  Yeah.
18      Q.  -- in terms of getting the
19  documentation or providing you an opportunity to
20  answer with certainty --
21      A.  Right.
22      Q.  -- any questions that we ask you
23  today.
24      And then number 6 has to do with the
25  market in which you operate, including any analysis

Page 21

1  of the compensation paid to childcare professionals
2  other than au pairs.
3      Are you qualified to testify on that
4  topic?
5      A.  I would say that I'm, again, as
6  qualified as anyone in the company, and I speak, I
7  guess, there as a parent.
8      Q.  I'm sorry?
9      A.  I speak largely as a parent there,
10  because I'm not sure that, if you asked me about the
11  end (sic) childcare professionals other than au
12  pairs in different markets other than
13  St.~Petersburg, I may -- I may struggle.
14      Q.  Okay.  You place au pairs beyond the
15  St.~Petersburg area.
16      A.  That's correct.
17      Q.  Is that correct?
18      A.  Yes.  Yeah.
19      Q.  What are your major markets?
20      A.  We have a reasonable number in the
21  D.C. area now.  New York, Tampa Bay.  I would... my
22  belief is that most of our au pairs are placed in
23  and around those cities.
24      Q.  Okay.
25      A.  Right.  So New York, that doesn't



REPLY APP 00936

Highly Confidential - Attorney's Eyes Only

Page 22

1 just mean the city, that means New Jersey, that
2 means -- and obviously D.C. doesn't mean the city
3 either.
4 Q. Okay. Are you familiar with the
5 market, the childcare markets, in the three primary
6 markets that you just identified, which are D.C.,
7 New York, and Tampa Bay?
8 A. I would say certainly Tampa Bay. But
9 the other markets, I would be -- I'd be less
10 inclined to speak with certainty. But I could, I
11 could hazard a guess. But it would be a guess and
12 it would be qualified.
13 MR. ENICA: And I don't want to interrupt.
14 Some of the information provided here we
15 will designate as "attorneys' eyes only."
16 For example going over the main market and
17 so on and so forth.
18 (Query by reporter)
19 Yes. I think this is okay with...
20 MS. SMALLS: Yes.
21 MR. ENICA: With you, opposing counsel.
22 MS. SMALLS: Yes.
23 Q. Okay. And then topic number 7 has
24 to -- touches on your document and your document
25 retention policies.

Page 23

1 A. Right.
2 Q. Is this a topic that you feel
3 qualified to testify to today?
4 A. Yes, absolutely.
5 Q. Okay. What did you do today to
6 prepare for today's deposition?
7 MR. ENICA: Objection.
8 A. Today? I spoke with Bogdan for five
9 minutes. I spoke to my wife for emotional support,
10 if you like. And I walked to the office.
11 Yesterday was the other time I prepared.
12 Q. Okay. Other than yesterday, did you
13 do any preparation for today's deposition?
14 A. I did -- I don't recall doing
15 anything. I've read the legal briefs, some of which
16 I understood, some of which I didn't. But I don't
17 recall, other than getting on the plane on Sunday --
18 I mean, it depends, what, what, what you mean by the
19 question -- the preparation would be minimal.
20 Q. Okay and --
21 A. And it was certainly yesterday.
22 Q. How much time did you devote
23 yesterday to prep for today's deposition?
24 A. I spent from about 9:30 yesterday
25 morning, just after, until lunchtime, had an hour

Page 24

1 lunch, and then I was preparing until about 5:15.
2 Q. Okay.
3 A. Right.
4 Q. Were there any documents that you
5 reviewed in preparation for today's deposition?
6 A. Yes. I reviewed some of the
7 documents that we submitted. You know, they had our
8 Bates numbers on them. And I believe there was one
9 document that InterExchange, or a different sponsor
10 but it was -- I think it was only one that I
11 reviewed that a different sponsor had submitted,
12 which could have been in our discovery or may not
13 have been. I mean, I didn't go through everything,
14 right.
15 Q. Do you recall what the specific
16 documents that you reviewed were?
17 A. I reviewed the contracts we have with
18 host families. I reviewed the contracts we have
19 with au pairs. And I reviewed... I'm trying to
20 give you a complete list. I looked at a few
21 specific employment contracts which were redacted.
22 And I think there was an e-mail from -- there was,
23 there was something about a meeting that happened in
24 2011 with the Department of State. Those are the
25 ones that come most easily to mind.

Page 25

1 Q. Okay. Thank you.
2 We're just lowering the blind in the
3 conference room. It's a bright sunny day in
4 Toronto.
5 Okay. So you testified that you're the
6 founder and CEO of Expert AuPair?
7 A. Yes.
8 Q. And you also testified that you
9 received official designation from the State
10 Department in May of 2007?
11 A. A designation, I don't know the
12 technical term of official designation, but
13 designation, yeah.
14 Q. Okay. And so once you received
15 official designation, how did you start your
16 business as a sponsor?
17 A. We published a website and waited and
18 hoped for calls to come in, and, I would say,
19 followed -- followed all leads more than you may
20 otherwise do. In other words, once you're starting,
21 you need people to come in.
22 Q. Okay.
23 A. Right.
24 Q. Why don't we start with Expert AuPair
25 today and then we'll also kind of look backwards



7 (Pages 22 to 25)

REPLY APP 00937

Highly Confidential - Attorney's Eyes Only

Page 26

1  just in terms of the structure.
2       A. It's up to you. Yeah.
3       Q. So the company as of today has how
4  many employees?
5       A. I believe nine. It might be ten.
6  Let me... we've got two part-time, right, so I think
7  it's nine. And so FTE would be probably 7, 7.4,
8  something like that.
9  EXHIBIT 2 marked for identification: Organization
10          chart, Bates ExpertAuPair000203
11  BY MS. SMALLS:
12       Q. For people on the phone, we just
13  admitted Exhibit No. 2, Expert AuPair Bates number
14  203.
15          Are you familiar with this document?
16       A. Yes, I am.
17       Q. What is it?
18       A. It is an organizational chart, a
19  historic one from 2015 on its face, but if you asked
20  me again when it was produced, that would be -- that
21  would be probably something I'd have to look up.
22       Q. Okay.
23       A. Right.
24       Q. Is this org chart reflective of
25  Expert AuPair's current structure?

Page 27

1       A. I would say that it is not. We've
2  added some staff people who've -- some people have
3  moved on. And I also delegated a lot more to, to
4  somebody who came in in 20--- I want to say 2015.
5  So after August.
6       Q. Okay. And who is that person?
7       A. Kathleen McCormick is her name. She
8  goes by "Katie."
9       Q. Okay. And what is her role?
10       A. She supervises the office, so she's
11  looking after everything while I'm here, for
12  example.
13       Q. Okay. Does she have a title?
14       A. She does. She's Chief -- well, she
15  goes by COO.
16       Q. We're going to go through this chart,
17  understanding that there have been some changes from
18  2015.
19       A. Yes, of course.
20       Q. Prior to August to today.
21       A. Yes.
22       Q. But can you walk us through each of
23  these roles? We can start with Rachel Gaulter. Who
24  is that, and what is her role within the company.
25       MR. ENICA: Just one correction. I think

Page 28

1       you said "prior to August." I think the
2       witness said after August. The changes
3       were after August.
4       MS. SMALLS: Yes.
5       Q. I was -- the notation on the document
6  says 2015 through August.
7       A. Yes.
8       Q. So which --
9       A. So that would be through to some
10  point in August. I mean --
11       Q. Right.
12       A. -- that would be potentially a
13  language issue.
14       Q. Right.
15       A. Right. So I can, I can happily walk
16  through everyone.
17       Rachel, and just for full declaration, is
18  my wife. She has -- she helps me occasionally to do
19  things like stuff envelopes, you know, with pay for
20  local representatives or whatever. But her
21  commitment is now maybe half an hour a month, right.
22  So she does -- she doesn't do much.
23       Morgan has been succeeded by somebody
24  called Faith. I forget her last name. But she now
25  does the training.

Page 29

1       Rachel McCarthy is now a full-time
2  position. When she -- when she was an intern,
3  obviously she was, you know, she was compensated
4  hourly, but now she is full-time.
5       Melissa Brady is now, she does most of the
6  collecting of family paperwork. She also serves as
7  a regional representative.
8       Ann Newsome still is a part-time trainer.
9  She's a school teacher full-time. She just comes in
10  to sort of explain the U.S. education system to au
11  pairs who obviously come from, you know, come from
12  different systems.
13       We have somebody called Paige, who does a
14  lot of the administrative work, and somebody called
15  Vina, who is -- she's paid hourly, however, she's
16  now up to like 37 hours a week, so she may become
17  full-time at some point.
18       Just trying to think if there's anyone
19  else. I think that's all.
20       Q. And what is your role as CEO?
21       A. At the moment, largely oversight,
22  making sure that -- making sure that the, if you
23  like, the books are balanced, the annual report goes
24  in, and to attend any deposition that's necessary.
25       Q. I think you said Katie McCormick --



8 (Pages 26 to 29)

Highly Confidential - Attorney's Eyes Only

---

Page 34

1     A. Mm-hm.
2     Q. -- is there anyone else at Expert
3 AuPair that you would deem part of your senior
4 leadership?
5     A. Let me, let me again be as precise as
6 I can. The delegation of somebody to be, I forget
7 what the word is, Assistant Responsible Officer --
8 it's ARO is the title -- and the ability to go into
9 SEVIS and make changes on the government database, I
10 believe, is a very large responsibility which we
11 have given to five or six at the moment. Right, so
12 there's an immense level of trust in our staff and I
13 think -- I think five or six Associate or Assistant
14 Responsible Officers.
15     And there's also a level of trust in
16 Rachel McCarthy who puts the -- or McCarty -- I
17 don't really know. A last name. I'm not sure if
18 it's got an "H" or not. That could be an error.
19 There's a degree of responsibility for her in
20 addition in that she prepares the invoices for host
21 families.
22     Q. Okay?
23     A. So there's some financial, you know,
24 delegation there, if you like.
25     And, again, Melissa, I would say, has a

---

Page 35

1 significant responsibility in dealing with the host
2 families before they arrive. Yeah.
3     Q. So, in terms of your organizational
4 structure --
5     A. Mm-hm.
6     Q. -- I understand that you have a great
7 level of trust that you placed in all of your
8 employees.
9     But in terms of your organizational
10 structure, who would you identify as the senior, the
11 senior leadership team at Expert AuPair?
12     A. I think in terms of organizational
13 structure you would have to say me, then Katie, then
14 the remainder. But again, I don't want to belittle
15 the contributions of everybody in the team.
16     Q. Does Expert AuPair have any
17 subsidiaries?
18     A. Yes. We have a -- there's a company
19 Expert AuPair (Canada) Limited.
20     Q. And what is the relationship of
21 Expert AuPair (Canada) Limited to Expert AuPair... I
22 just want to make sure I get the... to Expert Group
23 International, Inc.?
24     A. It's fully owned. So the American
25 company owns the Canadian company.

---

Page 36

1     Q. Okay. And what, what is the purpose
2 and mission of the Canadian company?
3     A. It's designed to place au pairs in
4 Canada. Yeah.
5     Q. Okay. And who has the
6 leadership of Expert AuPair Limited Canada (sic)?
7     A. That's -- let me be totally candid if
8 I can. We have not yet placed any au pairs in
9 Canada. So in terms of leadership, I'm -- I think
10 I'm named as the person in charge. I had to sign a
11 form saying that Expert AuPair (Canada) had
12 copyright permission to place -- sorry, to use the
13 name "Expert AuPair."
14     Q. Mm-hm.
15     A. But I would say that if we came back
16 in five years' time we may have a, you know, more
17 information there. But in terms of leadership,
18 it's -- it's owned by Expert AuPair.
19     Q. Okay. When was it incorporated or
20 formed?
21     A. I believe in about 2015.
22     Q. Okay. Is Expert AuPair (Canada)
23 Limited the only subsidiary of --
24     A. That's the only subsidiary; that's
25 the only, if you like, shares that we own in

---

Page 37

1 anything around the world. I think that's -- I
2 think that's a forthright answer.
3     Q. Okay.
4     A. Right.
5     Q. Does Expert Group International, Inc.
6 have any affiliates?
7     A. Can you define "affiliate"? Is
8 that -- it's just if you could -- again, I want to
9 be really careful.
10     Q. Well, for purposes --
11     A. Sorry, go ahead.
12     Q. Yeah. No, I was looking to see if --
13 we have in other documents but I was looking to see
14 if we had provided a definition that we could use
15 for purposes of this definition -- this deposition.
16     A. Mm-hm.
17     Q. But for purposes of my question --
18     A. Mm-hm.
19     Q. -- I would define "affiliates" of --
20 as other companies or entities in which you have a
21 relationship with or contract in your administration
22 of the au pair program.
23     A. Then I would say yes. We contract
24 with the hotel in which the au pairs stay in
25 training. And that's the Hotel Indigo Downtown

---



10 (Pages 34 to 37)

REPLY APP 00939

Highly Confidential – Attorney's Eyes Only

Page 38

1  St.~Pete.  It's quite nice, actually.
2       We contract with Secutive, or Global
3  Secutive, I believe their full name is.  They
4  provide health insurance for au pairs once they've
5  arrived.
6       We contract with STA Travel, who help us
7  to buy flights for them coming in.  We have loose
8  relationships with other travel providers.
9       We have 11 recruiting organizations
10  overseas, and I know this because I checked it
11  yesterday.  However, I would qualify that with
12  saying that some of them aren't active.  So some of
13  the contracts expired in January 2017 because we
14  have a three-year term on, I believe, all of them.
15  And they haven't been worth renewing.
16       So I can give as much information as I can
17  about the 11 without having notes, and -- if you
18  would like me to.
19       Q.  Okay.  Is there any other entity or
20  organization other than the vendors that you
21  outlined in terms of hotels, health insurance, and
22  then the 11 recruiting organizations that you just
23  mentioned?  Is there any other company or entity
24  that would qualify as an affiliate of Expert Group
25  International, Inc.?

Page 39

1       A.  I don't believe there is.
2       Q.  Okay.
3       A.  No, I can't, I can't -- I'm just
4  trying to think but I can't think of anything.
5       Q.  Okay.
6       (Counsel conferring)
7  EXHIBIT 3 marked for identification: Organization
8       chart,  Bates ExpertAuPair000202
9  BY MS. SMALLS:
10       Q.  You've given us org charts... sorry.
11       The prior org chart that we looked at was
12  for 2015.
13       A.  Mm-hm.
14       Q.  This is for 2014.  In the interest of
15  thoroughness, I just want to review year by year.
16       A.  Yes, absolutely.
17       Q.  And ensure that the org chart is
18  either reflective of how you described the
19  organization as it functioned in 2015 or note any
20  differences in personnel or differences in function.
21       MR. ENICA:  Just for the people on the
22       phone, I want to mention this was marked
23       as Exhibit 3.  And we are talking about
24       document Expert AuPair ending in 202.
25       That's the Bate number.

Page 40

1       MS. SMALLS:  Okay.  Thank you.
2       MR. ENICA:  You're welcome.
3       Q.  So in 2014, this chart notes Katie
4  McCormick as Client Services.  It has a number of
5  boxes without names.  And then an Anne Newsome, who
6  I believe was on the other chart as well as a
7  part-time trainer.
8       So can you tell me, one, what the -- when
9  it says "Legacy," what that means in the box?
10       A.  I believe when we produced this,
11  "legacy" meant a previous employee who was no longer
12  there.  However, Katie was included because she was
13  back, right.  So "legacy" would mean somebody who's,
14  who's left, and that would be why.
15       Q.  Okay.  So if I'm reading this chart
16  correctly, in 2014 the only two employees that you
17  had were Katie McCormick and Anne Newsome; is that
18  correct?
19       A.  No.  They would -- the legacy people
20  would have been employed at that time, in 2014.
21  However, they were not still present.  And my
22  understanding was that we could or should mark them
23  "legacy" because they weren't any longer involved at
24  Expert AuPair.
25       Q.  Okay.  So there were individuals

Page 41

1  actually in these roles?
2       A.  Yes.
3       Q.  It's just that the names have not
4  been provided?
5       A.  That is correct.
6       Q.  Okay.  So, under "Matching," who is
7  the employee that fulfilled that role in 2014?
8       A.  I cannot honestly tell you.
9       Q.  Okay?
10       A.  That would be a question that we can
11  tackle after the deposition much more approp--- and
12  similarly with the others, much more effectively
13  than at the moment.
14       Q.  Okay.  So can we agree that we
15  will -- I mean, I can spend the time to ask each
16  question or you can provide a chart that actually
17  has the names included.
18       MR. ENICA:  Okay.  Yeah.  Or we can
19       provide -- if you want to ask any specific
20       question of the client, if the witness
21       remembers, feel free to ask.  If you're
22       okay with us providing a chart that
23       includes the names of the legacy
24       employees, we can do that as well; it's up
25       to you.



Page 42

1    MS. SMALLS: Well, what I'm understanding
2    from the witness is, he does not recall.
3    And so the question is whether we spend
4    the time going through each box and he
5    answers: "I don't recall" or "I don't
6    know." I'm happy to do that.
7         Or we can just agree that after the
8    deposition you'll provide an updated chart
9    with the names included.
10    MR. ENICA: Yeah. That is agreeable, to
11    provide the updated charts after the
12    deposition.
13 --- REPORTER'S NOTE: Request for production
14    MS. SMALLS: Okay.
15    THE WITNESS: Yes, and just to confirm,
16    that's fine with me. I just don't want to
17    give you false information.
18    BY MS. SMALLS:
19    Q. No, that's fine. I'm just trying to
20 find out what the roles are.
21    A. Right.
22    Q. And who was working at Expert AuPair
23 and who were the full-time employees. So if we can
24 do that, I think that serves our purposes.
25    A. Okay.

Page 43

1    Q. I will ask, given the fact that these
2 were, these were active roles with active employees,
3 I'm going to ask you about each of the roles and
4 what those roles were responsible for.
5    A. Mm-hm.
6    Q. So it says, there's a box for
7 "Matching." What did the person that was
8 responsible for matching do?
9    A. They looked at the au pair
10 applications when they came in. And they looked at
11 the host families. They spoke to the host families.
12 They saw what sort of candidate the host family was
13 looking for, and to the extent possible, they --
14 they tried to match the au pairs. However, it's
15 always sort of harder because we have many more au
16 pairs than host families.
17    So that's what that person would do.
18    Q. Okay. So that, that position, the
19 matching position, interacts both with au pairs and
20 it interacts with host families seeking au pairs?
21    A. That would be correct, at that time,
22 yes.
23    Q. Okay. At some time did that change?
24    A. I think it would be more accurate now
25 to say we have two people who are doing some of the

Page 44

1    matching. And they're looking at au pair
2    applications. And we have one person and that would
3    be Melissa, who's largely concerned with making sure
4    the family applications are okay.
5        Q. Okay. So would it be accurate to say
6    that in 2014 there was one position that looked at
7    au pair applications and interacted with host
8    families seeking au pairs, and now that that
9    position has been split into two?
10       A. It would be accurate to say that one
11   person was matching people, but they would have had
12   the assistance of the admin assistant and the
13   intern, just looking at the chart, and there's some
14   conjecture there. But there would be -- in --
15   again, in one year, we have about 3,000 applications
16   for, you know, to be an au pair. So it takes time
17   to review them and look at them and work out, you
18   know...
19       And that figure is based on, I believe,
20   2015 to '16, right, January to January. And so
21   there's a lot of people that want to come on this
22   exchange.
23       Q. I'm sorry that I did not get that
24   right. So I'm going to ask it more generally.
25       A. Yes.

Page 45

1    Q. So how does a, how does a match
2 occur?
3    A. There are at least two ways. The
4 first is if somebody is, quote, "pre-matched." And
5 we use the word "pre-match" when we are given an au
6 pair and family combination. And that can happen
7 either from the au pair -- well, either. This is
8 only for two. It can happen from an au pair. It
9 can happen from a family that contact us. Or, in
10 rare situations, it can happen from one of our
11 overseas partners.
12    And I -- I mean, if you've spoken to
13 Christian Au Pairs, you know that they --
14    Q. Okay, sorry.
15    A. Yeah. Yeah, no problem.
16    Q. Let's close the window. It's just
17 getting warm in here.
18      (Discussion off the record)
19    (Reporter read back as requested)
20    A. Okay. So I'll follow as best I can.
21    So again, to follow that answer as best as
22 I can, there are, I believe there are, two overseas
23 partners who have sent us pre-matches. One would be
24 Christian Au Pairs, and one would be the partners in
25 Mexico. It's entirely possible that we've had one



12 (Pages 42 to 45)

Highly Confidential - Attorney's Eyes Only

Page 46

1  from a different country that I don't recall at the
2  moment.
3      Q.  Other than if a match is not a
4  pre-match?
5      A.  Mm-hm.
6      Q.  How does the match occur?
7      A.  Right.  We will send au pairs'
8  profiles to families.  And typically we will send
9  about three at a time.  That's the standard
10  procedure for the last few years, right.  So, you
11  know, unless the family says:  We want to see, you
12  know, ten, if they demand to see ten applicants,
13  we'll normally send three at a time.
14      Obviously we pick those that we believe
15  are most likely to match and most close to what the
16  family is looking for.
17      At that stage, the family will contact the
18  applicants in which they are interested.  They will
19  have a full discussion about where they live, what
20  it could be -- what sort of environment they're in.
21  And everything is then involved in the employment
22  contract as it's written.  And you have, I believe,
23  a copy of that.
24      And so they, they decide on all of their
25  issues relating to the au pair's visit.  So that may

Page 47

1  be, some au pairs will get, you know, access to
2  ridiculous sports cars.  Others will -- others will
3  live in a more sort of, if you like, mainstream U.S.
4  environment.
5      Q.  So for au pairs in families that are
6  not pre-matched, the process is that a family comes
7  to you with a set of qualities that they would like
8  to see in an au pair or their job requirements?
9      MR. ENICA:  Objection to the form.  And
10      can I instruct my client to listen to the
11      question first and then start answering?
12      I think he's getting over the question.
13          So if you can just listen to the
14      question fully and then start answering.
15      MS. SMALLS:  He's doing fine.
16      THE WITNESS:  That's a fair point.  I'm
17      sorry.  There's a lot going on.
18          Can you ask the question again?
19      Sorry.
20      BY MS. SMALLS:
21      Q.  Sure.  For families that are -- well,
22  actually, can you repeat the question, please.
23      (Reporter read back as requested)
24      MR. ENICA:  And I made my objection.
25      THE REPORTER:  Would you like me to read

Page 48

1      the objection?
2      MR. ENICA:  No.  I just renew my
3      objection.
4      A.  I would say that the family comes
5  with an application.  So they will tell us things
6  like where they are, what they, what they do, maybe
7  they have --
8      (Query by reporter)
9      With their application, which does not
10  contain, as far as I would say, qualifications, it
11  contains information about the family.
12      So I think your characterization is
13  slightly off, but the fact is that we want both au
14  pairs and host families to leave with, you know,
15  this cultural exchange experience which enriches
16  them.
17      And I think that by far the most important
18  thing that this does for the United States is, it
19  leaves people who -- sorry, it causes people who
20  when they leave the country, they say good things
21  about America.  And so we want both parties to be
22  happy.
23      Q.  So, going back to my question...
24      A.  Mm-hm.
25      Q.  Which was just, I'm trying to get to

Page 49

1  the matching process.
2      So the host family starts a Host Family
3  Application. Is that correct?
4      A.  That is correct.
5      Q.  And what's in the Host Family
6  Application?
7      A.  Their name.  Their address.  We ask
8  them lots of things like:  "What book is in your
9  cof -- on your coffee table," I seem to recall.  We
10  ask them about educational office -- options around.
11  We ask them lots of things that we designed to be
12  targeted to make sure that we get the au pairs
13  placed in a happy environment that they were
14  expecting.
15  EXHIBIT 4 marked for identification: Host Family
16      Application, Bates
17      ExpertAuPair000055-59
18      MS. SMALLS:  Okay.  I don't have it, so if
19      you read the Bates number.
20      MR. ENICA:  Okay.  So for the record, the
21      Plaintiffs' counsel introduced Exhibit 4,
22      which is document Bates number Expert
23      AuPair starting at 55 and ending with 59.
24      BY MS. SMALLS:
25      Q.  Okay.  Is this a sample of a Host



REPLY APP 00942

Highly Confidential - Attorney's Eyes Only

Page 50

1  Family Application?
2      A.  Yes.  I'm somewhat concerned that
3  there's a "P" where there should be a box, but I
4  believe this is an accurate document.
5      Q.  I'm sorry; you're concerned about
6  what?
7      A.  There's a "P" where there should be a
8  box on lines 4 and 5.
9      Q.  Oh.  I see.
10     A.  Mm-hm.
11     Q.  Can you go to, I think it's the
12  fourth page of the Host Family Application.  And I'll
13  direct you to the section that says "Desired au pair
14  characteristics."
15     A.  Okay.
16     Q.  Is that an opportunity for the host
17  family to identify characteristics including where
18  they might be from, whether they can swim or drive,
19  in their Host Family Application?
20     MR. ENICA:  Objection.
21     A.  I do not see these as requirements.
22  I see these as opportunities for a family to let us
23  know more about what sort of home they live in.
24     BY MS. SMALLS:
25     Q.  Well, if you can just read what that

Page 51

1  section says, "Desired au pair characteristics."  And
2  actually read the heading above "Desired au pair
3  characteristics" and what that says.
4      A.  Do you mean "Au pair qualifications".
5      Q.  That's correct.
6      A.  Yes.  So "Au pair qualifications" is
7  there.  And then it says:  (as read)
8          "Desired au pair
9          characteristics: non-smoking,
10         drives, swims, cooks, cleans,
11         specific gender" -- which is male
12         or female.  There's no 'or' in
13         there, just to be clear.  "Specific
14         nationality.  Specific second
15         language.  Our religion.
16         Non-smoking."
17         (Query by reporter)
18         "Our."  O-u-r, yes.  "Religion."  And
19         "Non-smoking."
20     BY MS. SMALLS:
21     Q.  So I'll ask you again, is this a
22  space or an opportunity for a host family in its
23  Host Family Application to note desired
24  characteristics from prospective au pairs?
25     A.  It's desired characteristics;

Page 52

1  however, that does not mean necessary
2  characteristics.
3      Q.  Do you use any notations that the
4  host family may make here under "Desired au pair
5  characteristics" to match with prospective au pair
6  candidates?
7      A.  I believe that we have two
8  qualifications that we insist on.  One is the right
9  to be placed with under-twos.  So you need 200 hours
10  of childcare experience to be placed with -- I'm
11  sorry, under-twos, yes.  So what they call the --
12         (Query by reporter)
13         Yes, and that is 200 hours with
14  under-twos.  So that's essential, and it's part of
15  our regulatory requirement.  The other thing we
16  insist on is, if a family needs a driver, we want to
17  see a driver's licence from overseas.
18         The others, I would say that -- let me
19  characterize it this way.  Families sometimes want
20  things that they don't really necessarily need.  So
21  your -- you can have an employee who is not -- not
22  an employee; you can have, you know, in our role,
23  you know, in any, in any job I've had at
24  universities and so on, you can have an employee who
25  was somehow not quite what you imagined you'd hire,

Page 53

1  or who you would imagine you'd hire, who ends up
2  being almost better than anyone you could expect.
3      When it comes to au pairs, you're spending
4  some time, you know, in this cultural exchange, you
5  imagine what sort of au pair you would like.  But
6  until you've actually spoken to them, you don't know
7  if you're right.
8      And so a lot of this is, it's desired.
9  But the driving is important because we need the au
10 pairs and families to be safe, we need the children
11 to be safe.  If the family has a pool, they may
12 actually insist on a swimmer.  That's completely
13 reasonable.  But the rest is, we've seen people pick
14 people that we never thought they would, and they've
15 had a great exchange, and the au pairs have got home
16 happy, which is what we care about.
17     Q.  So I'm going to ask my question
18 again, which is, is this a space or an opportunity
19 for host families in their Host Family Application
20 to indicate desired characteristics of potential au
21 pair candidates?
22     A.  This is what the family is telling us
23 that they desire.  It does not mean we can provide
24 it.  So many, many years ago, like eight years ago,
25 we had a family who -- I think they were Polish and



REPLY APP 00943

Highly Confidential - Attorney's Eyes Only

Page 114

1    Q.  So would you be comfortable with an
2  estimate of 40 au pairs as an increase between 2013
3  to 2015, including new au pairs and au pairs that
4  were extending a year, based on your rough estimate
5  that 30 percent of au pairs extend a year?
6    A.  Just give me a second, if you could.
7    Q.  Sure.
8    A.  40 is a number I could be vaguely
9  comfortable with.  But obviously this is without
10 having gone back and checked.  But 40 is about
11 right.
12   Q.  Is the number of extensions a number
13 that you maintain year by year?
14   MR. ENICA:  Object to form.  You may
15   answer if you understood.
16   A.  It's not a number that we maintain in
17 the normal course of business.  What we do is, I
18 have in the past looked at my e-mail account.  Each
19 time we extend an au pair, we get a notice from the
20 Department of State.  So therefore in Gmail I can
21 Google it and find out and just count manually.
22   Now, these numbers are slightly inaccurate
23 because some au pairs decide to extend but then
24 don't, so they've asked us to fill in the form and
25 then decide that they want to go home.  Others might

Page 115

1  change status.
2    So I would not -- when I say "30 percent,"
3  that's my best, you know, estimate based on, on
4  what's -- that's my best estimate based on what I've
5  seen historically.  I also would say that it tends
6  to be slightly cyclic; or it tends to vary, the 30
7  percent sometimes is 35, sometimes it's 25.
8    So I don't think you can project from this
9  the exact numbers in-country in any given year.
10   BY MS. SMALLS:
11   Q.  This interrogatory asked for the
12 number of au pairs sponsored each year by Expert.
13 Is that correct?
14   MR. ENICA:  I would have to object to the
15   form of the question, but you may answer
16   if you know.
17   BY MS. SMALLS:
18   Q.  Well, strike that.  Strike that.  I'm
19 going to read what it says. (as read)
20       "Based on the number of DS-2019
21       forms issued, the number of au
22       pairs sponsored each year by Expert
23       AuPair is as follows:"
24   So, if I'm understanding you correctly,
25 these numbers are limited to the number of DS-2019

Page 116

1  forms issued and that there are other au pairs
2  in-country that would not be encompassed by the
3  DS-2019 forms.  Is that correct?
4    A.  That is correct.  And again, to be
5  clear, this is, this includes all au pairs who enter
6  the United States.  It may not include people who
7  left after two weeks.
8    Q.  Right?
9    A.  Sorry.  Oh -- sorry.  It does include
10 people who left after two weeks.  It's the date of
11 entry into the United States.  So if they arrive on
12 January the 1st of, let's say, 2014, they would be
13 in the 163 number.  If they extended, they would not
14 be included in this number even though they were
15 present at some point during that year.
16   Q.  Is there a better count or accounting
17 that you have or are in possession of, of the number
18 of au pairs sponsored by Expert AuPair other than
19 what is provided here in this interrogatory?
20   A.  A better answer does not, does not
21 exist to the best of my knowledge.  What we're doing
22 here is we're using SEVIS, right?  So this is a
23 government database.  We know for a fact that these
24 figures are entirely accurate for what they are --
25 for exactly the reason or exactly the measure I've

Page 117

1  given you.
2    Now, SEVIS is, you know, that's been
3  around since 2002.  I've used it elsewhere as well
4  as Expert AuPair, and I think it was introduced
5  rapidly as a result of the Patriot Act, but it is,
6  as far as we are concerned, entirely reliable.
7    So an au pair cannot enter without us
8  issuing a form.  And once we issue the form and we
9  activate them, they would be on these -- on this
10 list.
11   Q.  Okay.  So I want to go back to my
12 initial question.  So from 2013 to 2015, there is an
13 increase of 22 au pairs that entered the company --
14 country and an additional number, a smaller number,
15 of au pairs, that extended their stay in the United
16 States for an additional year.  Is that correct?
17   A.  Again, I expect that you'll find 40,
18 about 40 more au pairs, which is an increase of
19 about 20 to 25 percent.
20   Q.  An increase of 40?
21   A.  Au pairs, which is an increase of
22 approximately, in the number of au pairs, 20 to 25
23 percent.
24   Q.  And in your number of 40, you're
25 including new au pairs?



30 (Pages 114 to 117)

Highly Confidential - Attorney's Eyes Only

Page 118

1    A.  I'm counting the new and I'm counting
2  the extensions.
3    Q.  Okay.  So for an increase of
4  approximately, understanding all these variables
5  that we've just discussed --
6    A.  Mm-hm.
7    Q.  -- an increase of 40 au pairs, your
8  compensation increased nearly $80,000 from 2013 to
9  2015?
10   MR. ENICA:  Object to the form.
11   BY MS. SMALLS:
12   Q.  Is that correct?
13   A.  It was not related to the actual
14  increase in numbers, it was related to the
15  complexity of the role.
16   Q.  Okay.  What --
17   A.  More travel, more -- sorry.  Go
18  ahead.
19   Q.  Well, I was just going to ask you,
20  what did you mean when you said the increase in
21  compensation was really related to the change in
22  complexity of the role?
23   A.  I think as companies like ours grow,
24  there is -- there are things that you do more of,
25  that consume more of your time.  Travel I've already

Page 119

1  mentioned, meetings, dealing with banks, dealing
2  with insurance companies, all these things take,
3  they take, they take a lot of work.
4    Q.  Okay.  I think we can break for
5  lunch.
6    THE VIDEOGRAPHER:  This is the
7    videographer on May the 9th, 2017, at
8    approximately 12:48 p.m.  We are now going
9    off the record.
10  --- Luncheon taken at 12:48 p.m.
11  --- Upon resuming at 1:27 p.m.
12   THE VIDEOGRAPHER:  This is the
13   videographer on May the 9th, 2017, at
14   approximately 1:28 p.m.  We are now back
15   on the record.
16   MS. SMALLS:  Great, thank you.
17   Q.  I want to ask you whether Expert
18  AuPair has entered into any agreements or
19  partnerships with other sponsor agencies.
20   A.  Other designated United States
21  sponsors.
22   Q.  That's correct.
23   A.  Is that what you mean?  Yes.
24   We have -- we have not, however, I want to
25  make sure my answer is very clear.  Before we were

Page 120

1  desig--- sorry, before Great Au Pair was designated,
2  they had a website which I believe -- well, we paid
3  for certain advertising on that website.  And we
4  paid to a company called InteliMark who are -- in
5  some sense, they were acting using the Web address
6  GreatAuPair.com but they were not designated.  And I
7  wouldn't know the relationship between InteliMark
8  and Great Au Pair.
9    In addition, before, before they were
10  designated, there was -- we had some matches which
11  were introduced as pre-matches from ProAuPair.
12   (Query by reporter)
13   ProAuPair.  And, but again, I think it's
14  important to note that neither of those entities was
15  designated at the time of any, any relationship.
16   Q.  So at the time of the relationship,
17  you were both -- both of the contracting entities
18  were not -- strike that.
19   With respect to the agreement with Great
20  Au Pair, or the arrangement with Great Au Pair,
21  during the time of that arrangement, was Great Au
22  Pair a designated sponsor?
23   A.  I recall that Great Au Pair were
24  designated, and then we had an e-mail either from
25  Great Au Pair or InteliMark, at about the same time,

Page 121

1  saying that the sponsorship program, because, again,
2  we were advertising on their site, so the
3  advertising relationship and that sort of -- that
4  relationship would not continue, I believe, past the
5  end of the month.  But -- it may not have been
6  exactly at the same time, but it was certainly, they
7  ended their program at almost exactly the same time
8  that they were designated.
9    Q.  And the primary substance of that
10  arrangement with Great Au Pair was to advertise for
11  Expert AuPair on their website?
12   A.  Yes.
13   MR. ENICA:  Object to form.  Sorry.
14   That's right.  I object to form, and now
15   you answer.
16   A.  Yes, but with the qualification that
17  I do not know if Great Au Pair are the same
18  organization as InteliMark, because I believe that
19  in their current format they use the address
20  GreatAuPairUSA.com.  And I believe Great Au Pair
21  is -- has a different site, but I could not tell you
22  the legal ownership or anything of that, of that
23  sponsor.
24   BY MS. SMALLS:
25   Q.  Okay.  Thank you.



REPLY APP 00945

Highly Confidential - Attorney's Eyes Only

---

Page 122

1    And you also mentioned that you had an
2 agreement or an arrangement with ProAuPair; is that
3 correct?
4    A.  Yes.  I do not believe that we ever
5 had a signed agreement.  And therefore I would be --
6 I don't believe it's in the -- in any disclosure.
7 But again, they applied for designation and that was
8 the end of our relationship.
9    Q.  So your relationship, the period of
10 your relationship was only before ProAuPair was
11 designated as a sponsor?
12    A.  Yes.
13    Q.  Is that correct?
14    MR. ENICA:  I object to form.  You may
15    answer.
16    A.  But the date of designation, we don't
17 get e-mails from the Department of State saying:  A
18 new sponsor has been designated.  However, it's my
19 complete belief that that relationship was not --
20 was over before designation.
21    BY MS. SMALLS:
22    Q.  And what in your recollection or
23 understanding, what was ProAuPair prior to its
24 designation as a sponsor from the United States
25 Department of State?

---

Page 123

1    A.  They were a company.  They were not
2 designated so -- they were a company.  I mean, I
3 don't quite know where you're going.  What you're
4 looking for.
5    Q.  For ProAuPair prior to its
6 designation as an official sponsor designated by the
7 Department of State, would they have been competing
8 with you as -- in your role as a sponsor that was
9 designated by the Department of State?
10    A.  I don't see that they would have
11 done, no.  I'm trying to think, and I -- I don't
12 know believe so, no.
13    Q.  Well, let me ask the question:  How
14 did the arrangement with ProAuPair come about?
15    A.  I recall, and this was 2008 or 2009,
16 I recall one of the -- we placed an au pair in
17 California, and then we started talking to Susan
18 Asay, who was the -- and again, I don't want to
19 mischaracterize her position, but I would imagine
20 you would call her a principal of, of ProAuPair.
21    And so we spoke, and it became... She had
22 an interest in placing au pairs from Germany and, I
23 believe, Hungary at the time and was very focussed
24 on candidates who maybe had more either
25 qualifications or, or, or experience working, I

---

Page 124

1 believe, with special-needs children.  Actually, I
2 think it was one, one of their major niche markets.
3    Q.  You mentioned that you came into
4 contact with Susan Asay because you placed an au
5 pair in California.  How did that come about?
6    A.  It's hard for me to respond
7 accurately because it was so long ago.  I believe
8 that she contacted us because her au pair wanted --
9 she wanted to hire an au pair.  And I think that is
10 what happened, and then she spoke to me, and that
11 was how it started.
12    Q.  When you say that she wanted to hire
13 an au pair --
14    A.  Right.
15    Q.  -- you mean for herself?
16    A.  For her own family, yes.
17    Q.  Okay.  And at that point, based on
18 your understanding, ProAuPair was not engaged in
19 sponsoring au pairs?
20    A.  ProAuPair was not a designated
21 sponsor organization and may not have existed, even.
22 I cannot tell you when it was founded.
23    THE REPORTER:  Exhibit 10.
24 EXHIBIT 10 marked for identification:  Agreement,
25    Bates ExpertAuPair026398-400

---

Page 125

1    BY MS. SMALLS:
2    Q.  Can you take a moment to review this
3 document?
4    (witness perusing document)
5    Okay.  Can you tell me what this is?
6    A.  It is my recollection that this was a
7 proposed agreement between ourselves and ProAuPair.
8 I do not believe it was ever signed.
9    Q.  Okay.  Do you know who drafted it?
10    A.  I would imagine it was -- it looks
11 like I did.
12    Q.  Okay.  Can you read item number 13
13 out loud?
14    A.  (as read):
15    "There are situations in which
16    PA" -- so that's ProAuPair -- "and
17    EAP may compete.  PA and EAP
18    recognize they are competitors."
19    Q.  Okay.  Can you explain how -- strike
20 that.
21    You previously mentioned that you are a
22 member of the Alliance?
23    A.  Yes.
24    Q.  When did you become a member of the
25 Alliance?

---



Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 67 of 219

# Exhibit 56

Case 1:14-cv-03074-CMA-KMT   Document 956-5   Filed 04/13/18   USDC Colorado   Page 68 of 218

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
-----------------------------x

JOHANA PAOLA BELTRAN, ET AL,

                 Plaintiffs,

        v.                    Civil Case No.
                              14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,

                 Defendants.

-----------------------------x


             CONFIDENTIAL VIDEOTAPED DEPOSITION
                     OF RUTH FERRY
                  NEW YORK, NEW YORK
                 Thursday, May 11, 2017




        Reported by:

        JEREMY RICHMAN

        JOB NO:   314334


                 MAGNA LEGAL SERVICES

           320 West 37th Street, 12th Floor

               New York, New York 10018

                  (866) 624-6221



| Page 2 |
|---|
| 1 |
| 2 |
| 3 |
| 4        May 11, 2017 |
| 5        9:11 a.m. |
| 6 |
| 7        CONFIDENTIAL VIDEOTAPED DEPOSITION |
| 8   of RUTH FERRY, held at the offices of Boies |
| 9   Schiller & Flexner, 575 Lexington Avenue, New |
| 10  York, New York, before JEREMY RICHMAN, a |
| 11  Shorthand Reporter and Notary Public of the |
| 12  State of New York |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 3 |
|---|
| 1 |
| 2   APPEARANCES: |
| 3 |
| 4   BOIES SCHILLER & FLEXNER |
| 5   Attorneys for plaintiffs |
| 6        575 Lexington Avenue |
| 7        New York, NY 10022 |
| 8   BY:   RANDALL JACKSON, ESQ. |
| 9        BYRON D.M. PACHECO, ESQ. |
| 10       (rjackson@bsfllp.com) |
| 11       (bpacheco@bsfllp.com) |
| 12 |
| 13  PUTNEY, TWOMBLY, HALL & HIRSON, LLP |
| 14  Attorneys for American Institute For Foreign |
| 15  Study, Inc., d/b/a  Au Pair in America |
| 16       521 Fifth Avenue |
| 17       New York, NY 10175 |
| 18  BY:   STEPHEN J. MACRI, ESQ. |
| 19       (smacri@putneylaw.com) |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 4 |
|---|
| 1 |
| 2   APPEARANCES (Continued): |
| 3 |
| 4   GIBSON DUNN |
| 5   Attorneys for American Institute For Foreign |
| 6   Study, Inc., d/b/a  Au Pair in America |
| 7        200 Park Avenue |
| 8        New York, NY 10166-0193 |
| 9   BY:  ERIC J. STOCK, ESQ. |
| 10       (estock@gibsondunn.com) |
| 11 |
| 12  SHERMAN & HOWARD |
| 13  Attorneys for defendant InterExchange |
| 14       633 Seventeenth Street, Suite 3000 |
| 15       Denver, CO 80202 |
| 16  BY:   JOSEPH H. HUNT, ESQ., via teleconference |
| 17       ALYSSA LEVY, ESQ., via teleconference |
| 18       (jhunt@shermanhoward.com) |
| 19       (alevy@shermanhoward.com) |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 5 |
|---|
| 1 |
| 2   APPEARANCES (Continued): |
| 3 |
| 4   NIXON SHEFRIN HENSEN OGBURN, P.C. |
| 5   Attorneys for 20/20, A.P.E.X. |
| 6        5619 DTC Parkway, Suite 1200 |
| 7        Greenwood Village, CO 80111 |
| 8   BY:  KATHLEEN E. CRAIGMILE, via teleconference |
| 9        (kcraigmile@nixonshefrin.com) |
| 10 |
| 11  BOGDAN ENICA, ESQ. |
| 12  Attorneys for defendant Expert Group |
| 13  International dba Expert AuPair |
| 14       111 Second Avenue NE, Suite 204 |
| 15       St Petersburg, FL 33701 |
| 16  BY:  BOGDAN ENICA, ESQ. |
| 17       (bogdane@hotmail.com) |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |



2 (Pages 2 to 5)

| Page 6 | Page 8 |
|---|---|
| 1 | 1 |
| 2  APPEARANCES (Continued): | 2      IT IS HEREBY STIPULATED AND AGREED |
| 3 | 3  by and between the attorneys for the respective |
| 4 | 4  parties herein, that filing and sealing be and |
| 5  GORDON & REES, LLP | 5  the same are hereby waived. |
| 6  Attorneys for Au Pair Care | 6      IT IS FURTHER STIPULATED AND AGREED |
| 7      555 Seventeenth Street, Suite 3400 | 7  that all objections, except as to form of the |
| 8      Denver, CO 80202 | 8  question, shall be reserved to the time of the |
| 9  BY:  PEGGY E. KOZAL, ESQ., via teleconference | 9  trial. |
| 10      (pkozal@gordonrees.com) | 10      IT IS FURTHER STIPULATED AND AGREED |
| 11 | 11  that the within deposition may be sworn to and |
| 12 | 12  signed before any officer authorized to |
| 13  CHOATE HALL & STUART | 13  administer an oath, with the same force and |
| 14  Attorneys for Cultural Care | 14  effect as if signed and sworn to before the |
| 15      2 International Place | 15  Court. |
| 16      Boston, MA 02110 | 16 |
| 17  BY:  JUSTIN J. WOLOSZ, ESQ., via | 17 |
| 18  teleconference | 18 |
| 19      (jwolosz@choate.com) | 19 |
| 20 | 20      - oOo - |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

| Page 7 | Page 9 |
|---|---|
| 1 | 1 |
| 2  APPEARANCES (Continued): | 2      THE VIDEOGRAPHER:  We are |
| 3 | 3  now on the record.  This begins |
| 4 | 4  DVD number one in the deposition |
| 5  WHEELER TRIGG O'DONNELL, LLP | 5  of Ruth Ferry in the matter of |
| 6  Attorneys for defendant Go Au Pair, Au Pair | 6  Johana Beltran, et al. V. |
| 7  International, and Agent Au Pair | 7  InterExchange, Inc., et al. |
| 8      370 17th Street, Suite 4500 | 8      Today is Thursday, May 11, |
| 9      Denver, CO 80202 | 9  2017, and the time is 9:11 a.m. |
| 10  BY:  NATALIE WEST, ESQ. | 10  This deposition is being taken at |
| 11      (West@wtotrial.com) | 11  575 Lexington Avenue, New York, |
| 12 | 12  New York, at the request of Boies |
| 13  PRESENT: | 13  Schiller & Flexner, LLP. |
| 14  ROBERT STEINKOPF, Videographer | 14      The videographer is Robert |
| 15 | 15  Steinkopf of Magna Legal |
| 16 | 16  Services, and the court reporter |
| 17 | 17  is Jeremy Richman of Magna Legal |
| 18 | 18  Services. |
| 19 | 19      Will counsel and all parties |
| 20 | 20  present state their appearances |
| 21 | 21  and whom they represent. |
| 22 | 22      MR. JACKSON:  Good morning. |
| 23 | 23  Randall Jackson of Boies Schiller |
| 24 | 24  & Flexner on behalf of the |
| 25 | 25  plaintiffs. |



3 (Pages 6 to 9)

Page 22

1
2  in a number of areas that are
3  described here?
4      A.   I did have -- I'm quite
5  familiar with the process, very
6  involved in the structure of setting
7  up recruitment, training, placement,
8  and supervision of au pairs.
9          Specifically, the placement
10  and supervision of au pairs falls
11  directly under my watch as the
12  director here in the U.S.
13          MR. MACRI:  Some of the
14      folks on the phone are asking for
15      the dial-in number to be sent by
16      email, please.
17          (An off-the-record
18      discussion was held.)
19      Q.   And topic four is your
20  relationship and communications with
21  the State Department and the
22  Department of Labor, including a
23  number of subcategories there.
24          Can you describe for us what
25  you did to prepare for your testimony

Page 23

1
2  on that topic?
3      A.   Well, as responsible
4  officer, I have a pretty thorough
5  relationship and communications with
6  the Department of State.  I'm their
7  primary point of contact, that, along
8  with any alternate responsible
9  officers within our division, I relate
10  to the Department of State directly,
11  not the Department of Labor.
12      Q.   Is it fair to say that
13  you're the most competent person at
14  your organization to talk about this
15  topic?
16      A.   Oh, absolutely.
17      Q.   All right.  What about topic
18  five, which is your relationship and
19  communications with other sponsors,
20  including your membership and
21  associations with other sponsors,
22  including, but not limited to, the
23  Alliance for International Education
24  and the International Au Pair
25  Association?

Page 24

1
2      A.   AIFS has been a longstanding
3  member of the Alliance for
4  International Education.  And I attend
5  their annual meetings and have
6  certainly met with program sponsors
7  there and met with program sponsors at
8  the Department of State.
9          Periodic meetings will occur
10  between the Department of State and
11  all program sponsors.  So I'm
12  certainly familiar with the sponsors.
13      I'm less familiar with the
14  International Au Pair Association.
15  While we're members, it is an
16  international group based outside the
17  company, and my colleague in London
18  would relate more closely to the
19  International Au Pair Association.
20      Q.   So with regard to, I guess,
21  the first part of this topic, would
22  you say that you're the most competent
23  person at your organization to talk
24  about this subject?
25      A.   Yes.

Page 25

1
2      Q.   But your colleague in London
3  would probably be the most competent
4  person with regard, just specifically,
5  to the International Au Pair
6  Association issue?
7      A.   Yeah.  I think I'm pretty
8  familiar, but yes, that's correct.  I
9  just don't have a direct relationship.
10      Q.   Right.  But based on your
11  work and your preparation, do you feel
12  competent to talk about that today?
13      A.   Yes, I do.
14      Q.   Okay.  So topic six would be
15  your analysis and identification of
16  the market in which you operate,
17  including any analysis of the
18  compensation paid to childcare
19  professionals, other than au pairs.
20  And that also includes several -- oh,
21  no.  It's independent.  Excuse me.
22          Can you just describe to us
23  what is sort of the basis of your
24  preparedness to talk about that today?
25      A.   Analysis of the compensation



7 (Pages 22 to 25)

REPLY APP 00951

Page 26

1
2  paid to childcare professionals, other
3  than au pairs.
4         To be honest with you, I'm
5  not sure what the second part of that
6  statement means, but maybe you could
7  clarify for me what you're asking in
8  the second part of that statement.
9      Q.   Well, I think the first part
10 is really the key here, which is the
11 company's analysis and understanding
12 of the market that you operate in.
13        And the second part is
14 talking about analysis of the
15 compensation paid to childcare
16 professionals who are not au pairs.
17     MR. MACRI:  We have an
18 objection as to foundation on the
19 second part of the inquiry.
20     MR. JACKSON:  Sure.
21     MR. MACRI:  Thank you.
22     A.   Okay.  You know, I have some
23 general knowledge of other -- you
24 know, where families might seek out
25 childcare options across the United

Page 27

1
2  States.
3      Q.   Okay.  Do you feel like
4  there's anyone at your organization
5  who would be more competent to talk
6  about that subject, generally, than
7  you?
8      A.   No.  I don't think so.
9      Q.   Okay.  And then the last
10 topic is your documents and document
11 policies, including documents that
12 relate to the topics we've already
13 described above --
14     A.   Mm-hmm.
15     Q.   -- the identity and location
16 of your ESI and ESI systems, your
17 document retention, destruction, and
18 disposition policies, practices, and
19 procedures, and your efforts to
20 preserve documents, data, and ESI
21 relevant to this case since
22 November 13, 2014.
23        Can you just describe to us
24 a little bit about the basis for your
25 competence to talk about that topic?

Page 28

1
2      A.   I have met with the chief
3  information officer.  And he and I
4  coordinated right after this
5  November 13, 2014 request to preserve
6  documents and every couple of months
7  remind our staff that we're still
8  under this order to preserve all
9  documents and retention.
10        I have a general knowledge
11 of our retention and destruction
12 policy, although it goes on for pages,
13 but, generally, we retain -- the
14 length of time we retain documents.
15        And I'm not fully aware of
16 all of the ESI systems, but have -- I
17 believe we provided a list or range
18 of, you know, databases and systems
19 that we use.
20     Q.   Okay.  Now, with regard to
21 any of the topics that we just went
22 over, when you had the conversations
23 with other people at your organization
24 about them, did you take any notes?
25     A.   No.

Page 29

1
2      Q.   Okay.  Now, just a flashback
3  to your role as director, can you tell
4  us a little bit about what you do,
5  what you do at the organization, very
6  generally, in a little bit more detail
7  than you previously described?
8      A.   Well, it might be best to
9  explain what -- what is under my
10 purview, if you will, my
11 responsibilities.  And that is,
12 generally, to oversee the circulation
13 and placement of -- circulation of au
14 pair applications to prospective
15 families for their selection, the
16 screening and vetting of the host
17 families, including their homes and
18 home environment, the logistics of
19 then arranging for the au pair to come
20 to the U.S., and the monitoring of the
21 placement, according to Department of
22 State regulations.
23        And so through that, I --
24 and then the safe transport home of
25 the international visitor, including



8 (Pages 26 to 29)

REPLY APP 00952

Page 30

1
2 any support services during the year
3 from medical, medical evac, to
4 questions that come up about traveling
5 outside of the country during their
6 visit to the U.S. and what the
7 implications are for Visas, but
8 depending on where they might be
9 traveling to or from.
10 And that operation is then
11 managed with a staff, not only in the
12 office, but a field employee network,
13 because we only place au pairs in
14 communities across the United States
15 where we have an employee locally in
16 the community to support the au pair
17 and the hosting family and monitor
18 according to Department of State
19 regulations and to ensure that we have
20 met the goals of this exchange
21 program, which is to provide an
22 exchange -- an educational and
23 emersion exchange that enable people
24 of two different countries to become
25 fully emersed together in the hopes

Page 31

1
2 that we might be -- this is soft
3 power -- that we might be having au
4 pairs go home to their home country at
5 the end of the year feeling that they
6 have had an improved relationship with
7 Americans.
8 Q. When you say soft power,
9 what do you mean by that?
10 A. Well, the U.S. government
11 looks at how are we going to engage in
12 people -- with people in other
13 countries in peaceful relations.
14 This is an ideal way to do
15 that. It's bringing people together
16 from different cultures in a very
17 intimate setting and allowing people
18 to get to know one another, share
19 their ideas, share their -- you know,
20 their knowledge of one another's
21 country, and, through that, become
22 friends and feel better about, you
23 know -- instead of the slogans when
24 you're, you know, marching down -- I
25 don't know -- the Champs-Elysees, you

Page 32

1
2 know, blasting the Americans for some
3 reason.
4 This is a way to kind of
5 instill positive relations between
6 people of the U.S. and other
7 countries. I think it's been very
8 successful.
9 Q. I'm going to use the
10 acronyms for the organizations we've
11 talked about. Would that be okay for
12 you if I use APIA and AIFS?
13 A. That's certainly acceptable.
14 Q. Thank you.
15 Can you describe in general
16 what the relationship is of APIA to
17 AIFS?
18 A. APIA is one program of the
19 American Institute for Foreign Study.
20 Q. How many programs are there?
21 A. I have to give you a count.
22 I think it's six.
23 Q. Can you describe for us a
24 little bit about what those other
25 programs are?

Page 33

1
2 A. Academic Year in America,
3 which is a high school inbound
4 program.
5 Thank you. This is much
6 easier.
7 Camp America, which is an
8 inbound summer program where students
9 are coming in to serve as camp
10 counselors in camps across the United
11 States.
12 The College Study Abroad
13 Program, which is Americans studying
14 abroad, usually, a semester or a year
15 abroad programs that include
16 partnerships with American
17 universities to provide their study
18 abroad activities.
19 And Summer Institute for the
20 Gifted, which is youth -- both
21 elementary day programs and summer
22 camp programs on university campuses
23 in the summertime for gifted children,
24 both Americans and international.
25 And then we have Cultural



9 (Pages 30 to 33)

REPLY APP 00953

Page 34

1
2    Services International, which is our
3    insurance services program.
4        Q.   Now, in terms of APIA's
5    work, is it just the au pair program,
6    or are there other components to the
7    business?
8        A.   I'm sorry.  In APIA's --
9    could you repeat that?
10       Q.   Sure.  APIA focuses on the
11   au pair programs you've been
12   describing?
13       A.   That's correct.
14       Q.   Are there other things that
15   APIA does?
16       A.   Just the au pair program.
17       Q.   And would you say -- in
18   terms of the percentage of AIFS's
19   work, what rough percentage would you
20   say is APIA?
21       A.   Of its work?
22       Q.   Mm-hmm.
23       A.   It's a lot of work.  I don't
24   know how to measure the percentage of
25   work, except to look at the staffing

Page 35

1
2    schedule and say, Well, there's more
3    staff here than there are down the
4    street.
5        Q.   Right.
6        A.   It's very complex.  There's
7    a lot of complex wheels.
8        Q.   No.  I understand.  I
9    totally understand.
10            Would you say that APIA is
11   the biggest program of AIFS?
12       A.   Well, it depends on how you
13   want to measure it.  If you're
14   measuring it in terms of, you know,
15   staff and staff support, it's probably
16   the biggest.
17       Q.   What about -- what are the
18   other ways that you might measure it?
19       A.   I suppose you could measure
20   it in revenues.  Then it's about -- I
21   don't know -- 20 percent.
22       Q.   And how big is the staff of
23   APIA?
24       A.   I have 33 full-time staff in
25   the Stamford office.  I have 192

Page 36

1
2    employees in the field, and I have
3    another eight employees involved in
4    the orientation program, six, eight.
5    That's right.
6        Q.   As a general matter, what
7    are those employees in the field
8    doing?
9        A.   They're -- well, they're the
10   ones that are fulfilling the
11   requirements of the Department of
12   State, in terms of interviewing the
13   hosting families, vetting the room for
14   the au pair -- prospective au pair,
15   contacting the au pair and the host
16   family at 48 hours, going out and
17   conducting an assessment of the
18   placement at two weeks, staying in
19   monthly contact with the host family
20   and the au pair, stepping back into
21   the placement if they are asked to
22   mediate a problem.
23            They are to fulfill the
24   cultural component of the program,
25   ensure that the cultural emersion for

Page 37

1
2    the au pair is going well, that she is
3    being exposed to activities within her
4    community.
5            She's learning about her
6    community, that she's registering for
7    classes, that she's participating in
8    those classes, that she's experiencing
9    America as a whole.
10            Go to a baseball game, you
11   know.  We're all going to a hockey
12   game on Friday night.  Let's do it.
13   So it's those activities.
14       Q.   At any given time,
15   approximately how many au pairs are
16   those 192 people in the field
17   responsible for?
18       A.   Well, it can range from two
19   or three, or it can be -- but on
20   average, it's about 24, 25.
21       Q.   So how many au pairs does
22   your organization typically have
23   placed with a host family at any given
24   time?
25       A.   Repeat that.



10 (Pages 34 to 37)

REPLY APP 00954

Case 1:14-cv-03074-CMA-KMT   Document 980-5   Filed 04/13/18   USDC Colorado   Page 75 of 218

# Exhibit 57

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - - - - - - - - - - - - - - - - - - - x

JOHANA PAOLA BELTRAN, et al.,

                 Plaintiffs,

                        Civil Case No.

   -against-          14-cv-03074-CMA-CBS


INTEREXCHANGE INC., et al.,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - x


       Videotaped oral deposition of
MICHAEL GATES, taken pursuant to Notice,
was held at the law offices of BOIES
SCHILLER & FLEXNER LLP, 575 Lexington
Avenue, New York, New York, commencing
July 28, 2017, 9:01 a.m., on the above
date, before Leslie Fagin, a Registered
Professional Reporter and Notary Public
in the State of New York.


          MAGNA LEGAL SERVICES
   320 West 37th Street, 12th Floor
     New York, New York 10018
       (866) 624-6221



REPLY APP 00956

| Page 2 | Page 4 |
|---|---|
| 1 | 1 |
| 2  APPEARANCES: | 2      THE VIDEOGRAPHER:  We are now on |
| 3 | 3  the record. |
| 4  BOIES SCHILLER FLEXNER LLP | 4      This begins DVD No. 1 in the |
| Attorneys for Plaintiffs | 5  deposition of Michael Gates in the |
| 575 Lexington Avenue | 6  matter of Johana Paola Beltran, et al., |
| 5      New York, New York 10022 | 7  v.  InterExchange, Inc., et al., in the |
| BY:    BYRON D.M. PACHECO, ESQUIRE | 8  United States District Court, for the |
| 6      JOSHUA J. LIBLING, ESQUIRE | 9  District of Colorado. |
| 7 | 10      Today is Friday, July 28, 2017. |
| CHOATE HALL & STEWART LLP | 11  The time is 9:01 a.m. |
| 8  Attorneys for the Witness | 12      This deposition is being held at |
| Two International Place | 13  575 Lexington Avenue, New York New York |
| 9      Boston, Massachusetts 02110 | 14  at the request of Boies Schiller Flexner |
| BY:    LYNDSEY M. KRUZER, ESQUIRE | 15  LLP. |
| 10      (Appearing via telephone.) | 16      The videographer is Robert |
| 11 | 17  Steinkopf of Magna Legal Services and |
| 12  NIXON SHEFRIN HENSEN OGBURN | 18  the court reporter is Leslie Fagin of |
| Attorneys for ProAuPair and International Au | 19  Magna Legal Services. |
| 13  Pair Exchange | 20      Will counsel and all parties |
| 5619 DTC Parkway #1200 | 21  present state their appearance and who |
| 14      Greenwood Village, Colorado 80111 | 22  they represent. |
| BY:    LAWRENCE STONE, ESQ. | 23      MR. LIBLING:  Good morning, Joshua |
| 15      (Appearing via telephone.) | 24  Libling, Boies Schiller Flexner, on |
| 16 | 25  behalf of plaintiffs. |
| 17  SHERMAN & HOWARD LLC | |
| Attorneys for InterExchange, Inc. | |
| 18      633 17th Street, Suite 3000 | |
| Denver, Colorado 80202 | |
| 19  BY:    BROOK COLAIZZI, ESQUIRE | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 3 | Page 5 |
|---|---|
| 1 | 1      M. Gates |
| 2  APPEARANCES: | 2      MR. PACHECO:  Byron Pacheco, also |
| 3 | 3  from Boies Schiller Flexner, on behalf |
| 4  GORDON & REES | 4  of the plaintiffs. |
| Attorneys for AuPairCare, Inc. | 5      MS. COLAIZZI:  Brook Colaizzi, |
| 5      555 17th Street #3400 | 6  Sherman Howard, on behalf of |
| Denver, Colorado 80202 | 7  InterExchange. |
| 6  BY:    NATHAN HUEY, ESQUIRE | 8      With me is Michael McHugh. |
| (Appearing via telephone.) | 9      MR. LIBLING:  There are also |
| 7 | 10  counsel on the phone whose appearances |
| 8 | 11  we will note at some other time. |
| 9 | 12  M I C H A E L   G A T E S,  called as a |
| ALSO PRESENT: | 13  witness, having been duly sworn by a |
| 10 | 14  Notary Public, was examined and testified |
| MICHAEL McHUGH | 15  as follows: |
| 11 | 16  EXAMINATION BY |
| ROBERT STEINKOPF, Videographer | 17  MR. LIBLING: |
| 12 | 18      Q.  Good morning, Mr. Gates. |
| 13 | 19      A.  Good morning. |
| 14 | 20      Q.  Have you been deposed before? |
| 15 | 21      A.  No. |
| 16 | 22      Q.  So basic ground rules, I will try |
| 17 | 23  not to talk over you.  If you could do the |
| 18 | 24  same and then we will get a clean record. |
| 19 | 25      If at any point you need a break, |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |



2 (Pages 2 to 5)

REPLY APP 00957

Page 22

1           M. Gates
2  host family's desire to take a vacation?
3           MS. COLAIZZI:  Object to form and
4  foundation.
5      A.  Could you repeat that, please.
6      Q.  Was it surprising to you that
7  InterExchange would be dealing with a
8  situation involving a specific host family's
9  desire to take a vacation?
10          MS. COLAIZZI:  Same objections.
11     A.  I'm not surprised that I would be
12  hearing of a host family wanting to go on
13  vacation.
14     Q.  Is that because that level of
15  involvement are -- let me rephrase that.
16         Do local coordinators, and I guess
17  the transition coordinating team, supervise
18  the relationship between au pairs and host
19  families closely?
20          MS. COLAIZZI:  Object to form.
21     A.  Local coordinators are in the
22  communities to support and assist the au
23  pairs and host families during their program
24  and they do have monthly contact as part of
25  the Department of State's au pair program

Page 23

1           M. Gates
2  regulations.
3      Q.  And whether it's through those
4  monthly contacts or otherwise, do they
5  closely supervise the relationship between
6  the au pair and the host family?
7           MS. COLAIZZI:  Object to form.
8      A.  The local coordinators check in
9  monthly.  The host families and the au pairs
10  have their individual relationships and I
11  guess I'm having trouble understanding the
12  word specific in this case.
13     Q.  I don't think I used the word
14  specific.
15     A.  I'm sorry, can you repeat the
16  question then.
17     Q.  Do local coordinators sometimes
18  have contact with the host families and au
19  pairs outside of the specific monthly
20  contacts?
21     A.  Yes.
22     Q.  And it doesn't surprise you that
23  local coordinators would be aware of vacation
24  schedules?
25     A.  No, it doesn't surprise me.

Page 24

1           M. Gates
2      Q.  Do you consider that part of their
3  responsibilities?
4      A.  I want to consider a local
5  coordinator's responsibility to know if a
6  family or an au pair are going on vacation,
7  in every situation, no.
8      Q.  In what situations is it part of
9  their responsibilities?
10     A.  It would be part of their
11  responsibilities if the, for whatever reason,
12  the vacation involved a situation like this,
13  for example, where maybe the au pair was
14  still being asked to work and perform his or
15  her regular duties for the host family while
16  the host family was not in the home.
17     Q.  Other than dealing with situations
18  along the lines we've been discussing, did
19  you have any other responsibilities as a
20  transitions coordinator?
21     A.  It's been a while.  I don't believe
22  so, but I honestly can't recall.
23     Q.  Did there come a time when you
24  ceased being a transitions coordinator?
25     A.  Yes, there did.

Page 25

1           M. Gates
2      Q.  When was that?
3      A.  That would have been April 2009.
4      Q.  What happened in April 2009?
5      A.  I was promoted to the program
6  manager position for Au Pair USA.
7      Q.  What were your responsibilities as
8  program manager for Au Pair USA?
9      A.  As the program manager, I was
10  tasked with promoting more support and
11  assistance to our network of international
12  cooperators, as well as more general support
13  to the Au Pair USA staff in performing their
14  duties.
15     Q.  What do you mean by Au Pair USA?
16     A.  I'm referring to the Au Pair USA
17  program for InterExchange.
18     Q.  What is the Au Pair USA program for
19  InterExchange?
20     A.  Au Pair USA is our inbound au pair
21  program offered by InterExchange.
22     Q.  Is Au Pair USA an InterExchange
23  program or is it a separate company?
24     A.  Au Pair USA is an InterExchange
25  program.

7 (Pages 22 to 25)



REPLY APP 00958

## Page 26

```
 1              M. Gates
 2      Q.  When you say that it's a program
 3  for inbound au pairs, is that the same as
 4  saying it's an international recruitment
 5  program or does it mean something else?
 6      A.  When I say inbound, I mean that
 7  international au pairs from around the world
 8  come to the United States to participate in
 9  this cultural exchange program.
10      Q.  Does the Au Pair USA program
11  recruit au pairs?
12      A.  We offer our programs through a
13  network of international cooperators.
14      Q.  So is the Au Pair USA program the
15  management and coordination group within
16  InterExchange that deals with international
17  coordinators?
18      A.  Can you repeat that.
19      Q.  Is the Au Pair USA program the
20  management and coordination group within
21  InterExchange that deals with international
22  cooperators?
23          MS. COLAIZZI:  Object to form.
24      A.  No.
25      Q.  So what does the Au Pair USA
```

## Page 27

```
 1              M. Gates
 2  program do then?
 3      A.  So the Au Pair USA program, the
 4  InterExchange staff that works on the Au Pair
 5  USA program worked with our international
 6  cooperators, local coordinators, host
 7  families and au pairs on the Au Pair USA
 8  program under InterExchange.
 9      Q.  You just said the staff of the Au
10  Pair USA program worked with groups of people
11  on the Au Pair USA program.  I'm trying to
12  understand what the Au Pair USA program does.
13      A.  The Au Pair USA program is the au
14  pair program offered by InterExchange under
15  the Department of State.
16      Q.  So who recruits au pairs for
17  InterExchange?
18          MS. COLAIZZI:  Object to form.
19      A.  Our international cooperators
20  promote and market the programs in their home
21  countries.
22      Q.  And does InterExchange promote and
23  market the program in any countries?
24      A.  Yes.
25      Q.  Which ones?
```

## Page 28

```
 1              M. Gates
 2      A.  It depends.  We do offer occasional
 3  marketing incentives with some of our
 4  international cooperators from time to time.
 5      Q.  So sometimes InterExchange will act
 6  directly to promote and market the program in
 7  coordination with international coordinators?
 8      A.  Correct.
 9      Q.  Does InterExchange ever do the same
10  thing solely on its own, without using an
11  international cooperator?
12      A.  Yes.
13      Q.  When does it do that?
14      A.  We have a front facing website and
15  people interested in our programs can visit
16  the website and submit an inquiry and I have
17  also offered webinars to our inquiries that
18  we receive to help them learn more about the
19  program.
20      Q.  Is the website within your
21  responsibilities as a program manager for Au
22  Pair USA?
23      A.  Can you be more specific?
24      Q.  As a program manager for Au Pair
25  USA, were you responsible for the content of
```

## Page 29

```
 1              M. Gates
 2  the public facing website?
 3      A.  Occasionally, I would review and
 4  edit and add some content, yes.  That was not
 5  part of my regular or general
 6  responsibilities, though.
 7      Q.  What were your regular or general
 8  responsibilities?
 9      A.  As the program manager, I would
10  answer questions from our international
11  cooperators, as well as the other staff in
12  the program and I would also fill in for
13  staff members who were out.
14      Q.  Were you involved in attempting to
15  get more international cooperators?
16      A.  Yes.
17      Q.  Does InterExchange have contracts
18  with its international cooperators?
19      A.  Yes.
20      Q.  Were you involved in negotiating or
21  agreeing to those contracts?
22      A.  Yes.
23      Q.  We will talk more about this, but
24  let's fill out the job history to the present
25  first.
```



8 (Pages 26 to 29)

REPLY APP 00959

Page 30

M. Gates

1     M. Gates
2     In April 2009, you became program
3 manager.
4     Is that still your title today?
5     A.  No.
6     Q.  When was the next change in your
7 title?
8     A.  I apologize, but I don't recall
9 specifically.  I believe it was 2013 I became
10 the international recruitment and placement
11 manager.
12     Q.  Are you still the international
13 recruitment and placement manager?
14     A.  No, this year, I received a new
15 title, the international relations manager.
16     Q.  That was in 2017?
17     A.  Correct.  I believe in March.
18     Q.  Did your responsibilities change
19 when you moved from a program manager to the
20 international recruitment and placement
21 manager?
22     A.  Yes.
23     Q.  How did your responsibilities
24 change?
25     A.  My responsibilities focused more on

Page 31

1 working directly with our international
2 cooperators and supporting and assisting au
3 pairs and host families in the matching
4 process.
5     Q.  Did your responsibilities change
6 when you went from international recruitment
7 and placement manager to international
8 relations manager?
9     A.  Yes.
10     Q.  How did your responsibilities
11 change?
12     A.  My responsibilities now focus more
13 on the international cooperators, providing
14 support and assistance to them and to au
15 pairs in the application process.
16     Q.  I don't understand how that differs
17 from your description of your role as an
18 international recruitment and placement
19 manager.
20     A.  It's a slight difference in that I
21 am not as directly involved in supporting and
22 assisting in the placement process with our
23 in-house team.
24     Q.  Are you drawing a distinction

Page 32

1     M. Gates
2 between the application process and the
3 placement process?
4     A.  Yes.
5     Q.  Can you please explain that
6 distinction?
7     A.  Sure.  So au pairs have to apply,
8 they have to meet all of the regulatory
9 eligibility requirements and we have to
10 receive their applications before we can
11 begin assisting them with matching with a
12 host family.
13     Q.  Is that the application process?
14     A.  That's the application process,
15 would be learning about the program, filling
16 out the application, providing all of the
17 other documents as are required by the
18 Department of State's au pair program
19 regulations.
20     Q.  Does InterExchange handle the
21 application process or do international
22 cooperators handle the application process?
23     A.  The international cooperators begin
24 the application process and provide the
25 majority of the support and assistance during

Page 33

1     M. Gates
2 the application process.  InterExchange
3 reviews and ensures that all of the
4 applications are complete and that they meet
5 all of the regulation requirements.
6     Q.  Does InterExchange or the
7 international cooperator make the final
8 decision about whether an au pair's
9 application is complete and meets the
10 regulation requirements?
11     A.  InterExchange.
12     Q.  Does an international cooperator
13 need to provide information about the program
14 to au pairs?
15     A.  It is part of their duty to answer
16 questions and help explain the program to
17 interested candidates.  A lot of candidates
18 might also have questions about the program
19 and want to know if they're eligible because
20 there are so many, again, strict rules and
21 regulations under the Department of State
22 that we have to follow and the au pairs need
23 to meet in order to be able to apply, we
24 don't want anyone to start applying and then
25 find out I'm going to be too old to get my



9 (Pages 30 to 33)

REPLY APP 00960

Page 34

1          M. Gates
2   visa or things like that.
3       Q.   Do international cooperators
4   sometimes advertise the program in their
5   countries?
6       A.   Yes.
7       Q.   Where do international cooperators
8   get their information about the program so
9   that they can successfully advertise it and
10  answer questions?
11      A.   All of our international
12  cooperators receive a copy of the Department
13  of State's au pair regulations and they also
14  do receive some information from me when we
15  begin our cooperation.
16      Q.   What sort of information do they
17  receive from you when you begin your
18  cooperation?
19      A.   I usually provide them with more of
20  the timeline and the -- the application
21  process, what they should expect with that,
22  so they can explain that to au pairs, how all
23  that works, how our online application works
24  and I also try to explain the Department of
25  State's au pair program regulations to them

Page 35

1          M. Gates
2   in a way that would be a little bit easier to
3   digest for our candidates, many of whom are
4   ESL speakers.
5       Q.   Do you provide information about
6   the costs of participating in the program for
7   au pairs?
8       A.   Yes.
9       Q.   Do you provide information to
10  international cooperators about the
11  compensation au pairs will receive for
12  participating in the program?
13      A.   We do discuss the minimum weekly
14  stipend with all of the international
15  cooperators, yes.
16      Q.   Do you provide information to
17  international cooperators about maximum hours
18  or -- about maximum hours?
19      A.   Yes.
20      Q.   Do you expect that international
21  cooperators will use this information as part
22  of recruiting au pairs?
23      A.   Are you talking specifically -- in
24  general, the information I provide?
25      Q.   Yes.

Page 36

1          M. Gates
2       A.   Yeah.
3       Q.   Now, more specifically, do you
4   expect that international cooperators will
5   use information about the costs of program in
6   recruiting au pairs?
7       A.   The information I provide to them,
8   again, I don't want any of our candidates or
9   applicants to be misled and I do provide the
10  information about all these regulatory
11  requirements for them to provide to any
12  inquiring applicants.
13      Q.   Specifically about the minimum
14  stipend, do you expect international
15  cooperators to provide that information in
16  some form to au pairs?
17      A.   Yes.
18      Q.   And is the same true for maximum
19  working hours?
20      A.   Yes.
21      Q.   When you tell international
22  cooperators about the weekly stipend, what do
23  you tell them?
24      A.   I tell the international
25  cooperators that all au pairs receive a

Page 37

1          M. Gates
2   minimum weekly stipend paid by the host
3   family.
4       Q.   Do you tell them that it's a
5   minimum weekly stipend?
6       A.   Yes.
7       Q.   Do you tell them that au pairs can
8   receive more?
9       A.   I tell them that if a host family
10  and an au pair discuss that and want to -- if
11  a host family would like to pay the au pair
12  more, that is their prerogative,
13  InterExchange's role is to make sure host
14  families are following the regulations and
15  the host family is paying at least the
16  minimum weekly stipend.
17      Q.   Has that always been the message
18  you delivered to international cooperators?
19      A.   I've always told international
20  cooperators that the host families do have to
21  pay their weekly stipend to the au pairs,
22  whether I specifically said -- used the same
23  words and language every time, I couldn't
24  say.
25      Q.   That's fair.  I want to ask a



REPLY APP 00961

Page 38

1           M. Gates
2   slightly more specific question.
3           Has it always been your message to
4   international cooperators that if host
5   families want to pay more than the weekly
6   minimum stipend, that's fine?
7       A.  I believe so, yes.
8       Q.  So you would not tell a host family
9   -- sorry, let me rephrase that.
10          You would not tell an international
11  cooperator that there was anything wrong with
12  a host family paying more than the minimum
13  weekly stipend?
14      A.  No.
15      Q.  Has a host family -- has an
16  international cooperator ever asked whether
17  the au pairs that they could recruit could
18  receive more than the minimum weekly stipend?
19      A.  Yes.
20      Q.  I take it from your prior answer
21  that you've told them that that is a
22  possibility?
23      A.  Yes.
24      Q.  That's always been your message to
25  international cooperators, that's not a new

Page 39

1           M. Gates
2   message?
3           MS. COLAIZZI:  Object to form.
4       A.  Again, I can't say what language I
5   specifically used, but if an au pair and a
6   host family do want to -- if they want to pay
7   more than the minimum weekly stipend, that's
8   not a problem.
9       Q.  Regardless of the specific language
10  you used, that's always been the message that
11  you conveyed to international cooperators?
12          MS. COLAIZZI:  Object to form.
13      A.  Yes.
14      Q.  I believe you said part of your
15  role, at least as a program manager, I don't
16  know if it continued to be your role, was to
17  answer questions that cooperators had?
18      A.  Yes.
19      Q.  Did that continue to be your role
20  in 2013 and 2017?
21      A.  Yes.
22      Q.  What kind of questions did
23  cooperators ask?
24      A.  I get a lot of questions about a
25  variety of topics.  For example, yesterday, I

Page 40

1           M. Gates
2   had a question from a cooperator about when
3   the au pair needs to apply for their visa,
4   what documents they need to bring with them
5   to the visa interview.  I've had questions
6   about what to do if another au pair's visa
7   appointment was delayed at the local embassy
8   in Durban, I believe, South Africa -- sorry,
9   I mumble a little bit.  Questions about does
10  this au pair meet eligibility requirements,
11  do you guys have your arrival dates for 2018
12  set, a lot of very general and very specific
13  questions.
14      Q.  Any other topics that frequently
15  come up that you can recall?
16      A.  That frequently come up, again, I
17  work with a lot of international cooperators
18  who all have different questions.  Topics
19  generally revolve around program requirements
20  and eligibility requirements and the
21  prearrival process, the matching process,
22  it's all -- I'm their information kiosk, if
23  you will.
24      Q.  So is it accurate to say that
25  within InterExchange, you are the primary

Page 41

1           M. Gates
2   source of information about the au pair
3   program for the international cooperators?
4       A.  I don't know if I would say or
5   agree with I'm the primary source.
6           I am their prime point of contact.
7   I do, again, provide them with the
8   regulations and they do have the rest of our
9   team, as well, for more specific information
10  about flight policies and things like that
11  and there is a lot of moving parts to the
12  program.  I am the primary point of contact,
13  though, if you will.
14      Q.  Is there a team that does the same
15  work that you do with international
16  cooperators?
17      A.  No.
18      Q.  So are you their sole point of
19  contact at InterExchange?
20      A.  No, the international cooperators
21  can contact anyone on our team with
22  questions.  I generally tell them that
23  they're welcome to contact me and I'm happy
24  to forward their messages on to any
25  coordinators that might be in a better



11 (Pages 38 to 41)

Page 42

```
 1              M. Gates
 2  position to answer their question.
 3      Q.  When you say they can contact
 4  anyone on our team, who do you mean by the
 5  team?
 6      A.  The team that works in the Au Pair
 7  USA program at InterExchange.
 8      Q.  How many people are in that team?
 9      A.  We have some seasonal staff.  I
10  have to picture the office.  Hold on one
11  second.  There are currently 12 of us in the
12  Au Pair USA program.
13      Q.  Of those 12, how many are permanent
14  as opposed to seasonal?
15      A.  We have 10.
16      Q.  Ten are permanent and two are
17  seasonal?
18      A.  Yes.
19      Q.  Do you lead that team?
20      A.  I do not lead that team.
21      Q.  Who does lead that team?
22      A.  Our direct supervisors -- my direct
23  supervisor is Michael McHugh and Michael
24  McHugh is our team leader, if you will.
25      Q.  Amongst that group of 12 people, do
```

Page 43

```
 1              M. Gates
 2  any of them report to you?
 3      A.  The international recruitment
 4  coordinator -- participant services
 5  coordinator reports to me.
 6      Q.  Are there people whose primary role
 7  is to deal with the international cooperators
 8  who do not report to you?
 9      A.  No.
10      Q.  And you report directly to Mr.
11  McHugh?
12      A.  Correct.
13      Q.  Since Mr. McHugh is in the room,
14  this may be a good time to ask, are you aware
15  that Mr. McHugh has already been deposed in
16  this action?
17      A.  Yes.
18      Q.  Have you spoken to Mr. McHugh about
19  his testimony?
20      A.  No.
21          MS. COLAIZZI:  I will instruct you
22      not to answer with respect to any
23      conversations involving attorneys.
24          THE WITNESS:  Okay.
25      Q.  Have you read any or all of Mr.
```

Page 44

```
 1              M. Gates
 2  McHugh's testimony?
 3      A.  No.
 4      Q.  Putting aside counsel, has anyone
 5  described to you what Mr. McHugh testified?
 6      A.  No.
 7      Q.  What did you do in preparation for
 8  today's deposition?
 9      A.  I met with counsel.
10      Q.  Did you do anything other than
11  meeting with counsel?
12      A.  No.
13      Q.  Did you review any documents?
14      A.  I reviewed some emails.
15      Q.  Do you recall approximately how
16  many?
17      A.  No.
18          THE WITNESS:  Can we take a break?
19          MR. LIBLING:  Absolutely.
20          THE VIDEOGRAPHER:  We are now off
21      the record.  The time is 9:56 a.m.
22          (Recess.)
23          THE VIDEOGRAPHER:  We are now on
24      the record.  The time is 10:11 a.m.
25      This begins DVD No. 2.
```

Page 45

```
 1              M. Gates
 2      Q.  Mr. Gates, before the -- do you
 3  have anything you want to change or correct
 4  about your testimony before the break?
 5      A.  No.
 6      Q.  Before the break, we were
 7  discussing the application process and you
 8  had previously drawn a distinction between
 9  the application process and the placement
10  process, do you recall?
11      A.  Yes.
12      Q.  Can you describe the placement
13  process for me, please?
14      A.  Sure.  So after an au pair submits
15  -- after the international cooperator submits
16  an au pair's application to us, we review it
17  and accept it into the matching process, if
18  it meets all of regulations and requirements
19  and it is complete and we have no further
20  questions in the application.
21          At that point, we publish the
22  application within our online matching system
23  and host families can review applications or
24  our program specialists will also actively
25  propose certain applications to host
```



## Page 46

1          M. Gates
2 families, as well.
3     Q.  As part of the matching process,
4 does InterExchange provide any information
5 about the au pair program to au pairs?
6     A.  Yes.
7     Q.  What information is provided as
8 part of the matching process?
9     A.  As part of the matching process, we
10 inform au pairs and host families that they
11 are required to have at least one telephone
12 interview or Skype interview, they need to
13 speak together at least once before agreeing
14 to match with one another.
15     Q.  Anything else?
16     A.  In terms of regulations, nothing is
17 coming to mind.
18     Q.  So all of the information that au
19 pairs have about the salary and working
20 requirements associated with the program,
21 they received through the application
22 process?
23     A.  They probably also can get
24 information, again, from our website, from
25 the international cooperator's website, but

## Page 47

1          M. Gates
2 they also receive a lot of information from
3 the -- in the application process, as well.
4     Q.  That information comes primarily
5 from the international cooperator?
6     A.  Information about the program will
7 come from the international cooperator,
8 whether it's verbal, over the phone or in
9 person, information presented on the websites
10 or marketing materials they may have created,
11 also from the application materials provided
12 by InterExchange and the information that we
13 provide to the au pairs are from our own
14 website and application process.
15     Q.  How involved is your team in
16 determining the content of the information
17 provided by international cooperators, as you
18 said, whether it's verbal, over the phone or
19 in person or on websites?
20     A.  It's very hard for me to be in
21 direct and complete control of all of these
22 international cooperators.  We do provide
23 them with the regulations and help them find
24 ways to explain them to au pairs and
25 applicants, but we do review their website

## Page 48

1          M. Gates
2 when they begin working with us.  I'm unable
3 to control every conversation, though,
4 unfortunately, I wish I had that type of
5 omnipresence, but...
6     Q.  We all do.
7     Do you have discussions with the
8 international cooperators about what should
9 be the content of their conversations with au
10 pairs, prospective au pairs?
11     A.  Yes.
12     Q.  Do you review materials that
13 international cooperators create, whether
14 that is website or otherwise?
15     A.  Yes.
16     Q.  How frequently do you review it?
17     A.  We review the website when they
18 begin working with us and international
19 cooperators will provide us with marketing
20 material when they create new marketing
21 material, as well.
22     Q.  Do you ensure that the marketing
23 materials that they create on their website
24 are accurate?
25     A.  We -- if I find information that

## Page 49

1          M. Gates
2 does not meet the Department of State's au
3 pair program regulations, sure, I let them
4 know that that should be modified.
5     Q.  What do you believe -- let me
6 rephrase that.
7     In your view, what would be
8 consistent with the au pair program's
9 regulations for international cooperators to
10 tell au pairs about the stipend?
11     A.  That they must receive a minimum
12 weekly stipend by their host family.
13     Q.  So if the information on a website
14 or in marketing materials didn't say that it
15 was a minimum weekly stipend, you would
16 correct it?
17     A.  Now, I would, yes.
18     Q.  Now, you would.  That implies there
19 was a time when you would not, is that right?
20     A.  If I saw that they had the weekly
21 stipend listed there, au pairs receive a
22 weekly stipend from the host family, then I
23 would not always say that's incorrect.
24     Q.  When did you start insisting that
25 international cooperators describe the



REPLY APP 00964

Page 50

```
 1            M. Gates
 2  stipend as a minimum?
 3       A.  I don't recall exactly.
 4       Q.  Do you recall approximately?
 5       A.  In the past several years.
 6       Q.  Was it after this lawsuit was
 7  filed?
 8       A.  I honestly can't say for sure.
 9       Q.  Do you think it was in 2015 or
10  later?
11            MS. COLAIZZI:  Object to form.
12       A.  I couldn't say, sorry, I don't want
13  to lie.  I'm not sure.
14       Q.   So in the past several years, you
15  changed your messaging, but prior to that,
16  you did not think it was inconsistent with
17  the au pair program regulations to describe
18  the stipend as 195.75 without designating it
19  a minimum, is that fair to say?
20       A.  I -- according to the regulations
21  and information we received from the
22  Department of State, I found that that was
23  not inconsistent, no.
24       Q.  Why, why change?
25       A.  Being more specific is -- I guess
```

Page 51

```
 1            M. Gates
 2  we changed to be a little bit more specific,
 3  but the regulations have not changed, they're
 4  still the same.
 5       Q.  Do you think there is a difference
 6  between telling an au pair that the stipend
 7  is 195.75 and telling an au pair that the
 8  minimum is a stipend of 195.75?
 9       A.  I couldn't speak for other people,
10  I'm not sure.
11       Q.  I asked whether you thought there
12  was a difference.
13       A.  A difference between this is a
14  minimum and this is the stipend?  I honestly
15  didn't think about it.
16       Q.  But at some point, you made a
17  change, so at some point, you thought about
18  it.
19            Do you think there is a difference
20  between saying the stipend is 195.75 and
21  between saying the stipend is a minimum of
22  195.75?
23       A.  There is a difference.
24       Q.  What is that difference?
25       A.  The difference is specifying that
```

Page 52

```
 1            M. Gates
 2  the weekly stipend, that that's a minimum.
 3       Q.  The difference is the minimum
 4  formulation implies that the stipend can be
 5  higher?
 6       A.  Yes, I don't think that saying -- I
 7  don't think omitting the word, minimum,
 8  implied that it couldn't be higher either,
 9  though.
10       Q.  How would you communicate to au
11  pairs that the stipend could be higher?
12       A.  We told au pairs they must receive
13  their weekly minimum stipend and we asked
14  them to inform us if their host family is not
15  paying the weekly minimum stipend.
16       Q.  But how did you inform au pairs
17  that their stipend could be higher than
18  195.75?
19            MS. COLAIZZI:  Object to form.
20       A.  I never actively would inform them
21  because that wasn't part of the -- I informed
22  them of what the Department of State's au
23  pair program regulation said.
24       Q.  Outside of Department of State
25  regulations, are international cooperators --
```

Page 53

```
 1            M. Gates
 2  are any other restrictions put on what
 3  international cooperators can say to au
 4  pairs?
 5       A.  I would imagine -- I would say that
 6  they should be restricted from saying
 7  anything blatantly false, like changing any
 8  of the information within our application
 9  materials or saying they don't need to do
10  something that's already been outlined.
11  Everything pretty much revolves around the
12  regulations.
13       Q.  Before we go into a document, I
14  never asked you what your role in the
15  placement process was?
16       A.  As the international recruitment
17  and placement manager, I would really work
18  with our program specialist to help them
19  identify candidates that might be good fits
20  for host families and provide them with any
21  support they needed, coordinating a lot more
22  with au pairs and international cooperators
23  and our program specialists.
24       Q.  Did that involve reaching out to
25  find a new au pair who is not in the
```



14 (Pages 50 to 53)

REPLY APP 00965

# Exhibit 58

REPLY APP 00966

```
                                                    Page 1

 1

 2    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
 3

      Civil Action No. 1:14-cv-03074-CMA-KMT
 4    - - - - - - - - - - - - - - - - - - - - - x
 5    JOHANA PAOLA BELTRAN, et al.,
 6                         Plaintiffs,
 7             - against -
 8    INTEREXCHANGE INC., et al.,
 9                         Defendants.
      - - - - - - - - - - - - - - - - - - - - - x
10

11                       January 26, 2018
                         8:15 a.m.
12

                         575 Lexington Avenue
13                       New York, New York

14

15        VIDEOTAPED DEPOSITION upon oral examination of

16    LAURA JULIANA CANO LIGARRETO, held at the above time

17    and place, taken before Brittany Saline, a

18    Professional Shorthand Reporter and Notary Public

19    of the State of New York, pursuant to the Federal

20    Rules of Civil Procedure, with written notice as

21    to time and place thereof.

22

23

24

25
```

REPLY APP 00967

Page 2

```
1
2  A P P E A R A N C E S :
3  BOIES SCHILLER & FLEXNER, LLP
      Attorneys for Plaintiffs and Witness
4  575 Lexington Avenue, 7th Floor
      New York, New York 10022
5
      BY: JOSHUA J. LIBLING, ESQ.
6        jlibling@bsfllp.com
7
8
9  CHOATE HALL & STEWART, LLP
      Attorneys for Defendant CULTURAL CARE, INC.
10 Two International Place
      Boston, Massachusetts 02110
11
      BY: KEVIN O'KEEFE, ESQ.
12       kokeefe@choate.com
      NATALIA SMYCHKOVICH, ESQ.
13       nsmychkovich@choate.com
14
15
16 ALSO PRESENT:
17 GEORGE LIBBARES, Videographer
18
19
20
21
22
23
24
25
```

Page 4

```
1
2          THE VIDEOGRAPHER:  Good morning.
3   We are now recording and on the record
4   at 8:15 a.m. on January 26th, 2018.
5   Please note that the microphones are
6   sensitive and may pick up whispering
7   and private conversations and cellular
8   interference.  Please turn off all
9   cell phones or place them away from
10  the microphones, as they can interfere
11  with the deposition audio.  Recording
12  will continue until all parties agree
13  to go off the record.
14      This is Video 1 in the deposition
15  of Laura Juliana Cano Ligaretto, taken
16  by counsel for the defendant --
17  defendants, in the matter of Johana
18  Paola Beltran versus InterExchange
19  Inc., et al., filed in the U.S.
20  District Court, District of Colorado,
21  case number 1:14-CV-03074-CMA-KMT.
22      This deposition is being held at
23  Boies Schiller & Flexner, located at
24  575 Lexington Avenue, New York, New
25  York.
```

Page 3

```
1
2          S T I P U L A T I O N S
3        IT IS HEREBY STIPULATED AND
4   AGREED TO, by and among counsel for
5   the respective parties hereto, that
6   the sealing and certification of the
7   deposition shall be and the same are
8   hereby waived;
9        IT IS FURTHER STIPULATED AND
10  AGREED that all objections, except as
11  to the form of the question, shall be
12  reserved to the time of the trial;
13       IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may
15  be signed before any Notary Public
16  with the same force and effect as if
17  signed and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 5

```
1
2        My name is George Libbares.  The
3   court reporter is Brittany Saline.
4   And we are here from Veritext New
5   York.
6        Counsel will now state their
7   appearances and the court reporter
8   will administer the oath.
9        MR. O'KEEFE:  Kevin O'Keefe and
10  Natalia Smychkovich, on behalf
11  defendant Cultural Care, Inc.
12       MR. LIBLING:  Joshua Libling on
13  behalf of plaintiffs and the witness.
14  L A U R A   J U L I A N A
15  C A N O   L I G A R R E T O, the witness herein,
16  having been duly sworn to tell the truth, the
17  whole truth, and nothing but the truth relating to
18  said matter, was examined and testified as
19  follows:
20  BY MR. O'KEEFE:
21      Q    Good morning.  Thank you for
22  coming in today.
23       MR. O'KEEFE:  Before we get
24  started, should we stipulate that
25  objections, except as to form and
```

2 (Pages 2 - 5)

REPLY APP 00968



**Page 94**

1    Laura Juliana Cano Ligarreto
2    [redacted]
24        MR. LIBLING:  Objection to form.
25    [redacted]

**Page 95**

1       Laura Juliana Cano Ligarreto
2    Q   Two hours per day?
3    A   Yes.
4    Q   And then what about weekends?
5    A   I also have different schedules
6  for weekends.
7    Q   Did you get a day and a half off
8  every weekend?
9    A   Yes.
10   Q   Or I should say, did you get a
11 day and a half off once per week?
12   A   Yes.
13   Q   Typically, how many hours would
14 you say you worked on a weekend?
15       MR. LIBLING:  Objection to form.
16   A   Fifteen.
17   Q   On every weekend?
18   A   Yes.
19   Q   One, five?
20   A   Both days.
21   Q   So if I'm tallying this up
22 correctly, your average week was
23 57-and-a-half hours?
24       MR. LIBLING:  Objection to form.
25   A   I was having my day and a half

**Page 96**

1        Laura Juliana Cano Ligarreto
2  off during the week mainly, not on the
3  weekends.
4    Q   So if we take away one day, which
5  you testified earlier is about
6  eight-and-a-half hours, that still gets us
7  to about 49 hours, isn't that --
8        MR. LIBLING:  Objection to form.
9    A   But it was a day and a half, so
10 it was eight from one day and probably four
11 from the next day.
12   Q   Do you have schedules and
13 calendar records for the entire time that
14 you were with the [redacted] family?
15   A   Not the entire time.
16   Q   Do you know when?  Are there any
17 periods that are missing that you know of?
18   A   No, I don't remember.
19   Q   Would you say you have records
20 for most of the time you were with the
21 [redacted] family?
22   A   Yes.
23   Q   And those were only in Colombia?
24   A   Yes.
25   Q   Did you travel with the [redacted]

**Page 97**

1        Laura Juliana Cano Ligarreto
2  family?
3    A   Yes.
4    Q   Like how many trips would you say
5  over the entire time?
6    A   Two.
7    Q   Two.
8        What were the -- what was the
9  first trip?
10   A   To London.
11   Q   How long, roughly?
12   A   Six days.
13   Q   And did you work when you were
14 there?
15   A   Yes.
16   Q   And did you have any time off
17 when you were in London?
18   A   Yes.
19   Q   What was the next trip?
20   A   Colombia.
21   Q   And how long?
22   A   Five days.
23   Q   Was it near Bogota or?
24   A   Yes.
25   Q   Did you see your family when you

25 (Pages 94 - 97)

REPLY APP 00969

Page 98

1      Laura Juliana Cano Ligarreto
2   were there?
3      A   Yes.
4      Q   Did you work, then, during that
5   trip?
6      A   Yes.
7      Q   Did the ██████ family ever travel
8   somewhere and invite you to come and not
9   have to work?
10     A   No.
11     Q   Did the ██████ family ever take
12  any trips without you?
13     A   Yes.
14     Q   And did they take -- it was a
15  daughter, right?
16     A   Yes.
17     Q   Did they take her with them?
18     A   Yes.
19     Q   And what did you do when they
20  were on those trips?
21     A   I traveled to Pennsylvania.
22     Q   And how many trips would you say
23  that they went on?
24     A   One.
25     Q   And for how long?

Page 99

1      Laura Juliana Cano Ligarreto
2      A   One week.
3      Q   Okay.  Any other weekend trips?
4      A   Nope.
5      Q   Did you -- do you recall --
6   turning back to Exhibit 3.  If you turn to
7   the second-to-last page, under "Final
8   Questions"?
9      A   (Perusing.)
10     Q   Do you recall seeing this
11  question before, "Your sponsor agency has
12  also asked whether you have any documents
13  relating to amounts paid to you and hours
14  that you worked"?
15     A   Can you repeat the -- the
16  question?
17     Q   Do you recall seeing this
18  question?
19     A   Oh, I don't remember.
20     Q   And when you completed this
21  survey that was November and you were still
22  in Colombia at that time?
23     A   Yes.
24     Q   Did Cultural Care pay you any
25  money when you were with the ██████ family?

Page 100

1      Laura Juliana Cano Ligarreto
2      A   No.
3      Q   Did they set the amount that the
4   Alfred family paid?
5          MR. LIBLING:  Objection to form.
6      A   Yes.
7      Q   They did set the amount?
8      A   Yes.
9      Q   Okay.  How did they set it?
10     A   Well, they always told me that I
11  was going to get paid 195.75 and couldn't
12  get paid more than that.
13     Q   Okay.  So maybe you misunderstood
14  the question.  The --
15         MR. LIBLING:  Objection to form.
16     Q   So Cultural Care did not set the
17  amount --
18         MR. LIBLING:  Objection to form.
19     Q   -- that the ██████ paid -- the
20  ██████ family paid you?
21     A   No.
22     Q   Okay.  When did Cultural Care
23  tell you that you could not be paid more
24  than 195.75?
25     A   The first meetings when I was

Page 101

1      Laura Juliana Cano Ligarreto
2   applying.
3      Q   Okay.  Did they tell you why?
4      A   No.
5      Q   Just that you couldn't?
6      A   (Indicating.)  Yes.
7      Q   Okay.  Did you think it was
8   problematic that the ██████ family paid you
9   more?
10     A   Yes.
11     Q   Why?
12     A   Because in the agency they told
13  me that I couldn't get more than that.
14     Q   Okay.  So why was it a problem?
15         MR. LIBLING:  Objection to form.
16     A   I don't really know.  I just
17  thought that it was going to be a problem
18  because they were paying me more than the
19  stipend.
20     Q   A problem with whom?
21     A   With the agency.
22     Q   Did Cultural Care ever say to
23  you, "Please tell us if you're being paid
24  more than this amount"?
25     A   No.

26 (Pages 98 - 101)

REPLY APP 00970

Page 102

Laura Juliana Cano Ligarreto

1
2    Q   Did Cultural Care ever say -- did
3 they explain that there would be negative
4 consequences if you were paid more than
5 195.75?
6    A   No.
7    Q   Okay.  But Cultural Care did
8 explain to you that based on your visa,
9 that the specific visa that you would be
10 traveling, you couldn't take any other
11 jobs?
12   A   Yes.
13   Q   So, in that sense, you couldn't
14 be paid separately for different work; is
15 that correct?
16   A   Yes.
17   Q   But, if I understand your
18 testimony correctly, Cultural Care told you
19 that you could not receive more than
20 195.75?
21   A   Yes.
22   Q   And did they say why not?
23   A   No.
24   Q   Did you ask why?
25   A   No.

Page 103

Laura Juliana Cano Ligarreto

1
2    Q   Did you try and figure out why
3 that was a -- a requirement when the ▮▮▮▮
4 family paid you more?
5       MR. LIBLING:  Objection to form.
6    A   Can you explain it?
7    Q   So Cultural Care told you that
8 you should not be paid more than 195.75 or
9 that it was -- or -- what did they say
10 exactly?
11   A   They say that I was going to work
12 45 hours and I was going to get paid 195,
13 not more and -- or less than that, even if
14 I wasn't working the 45 hours.
15   Q   So when the ▮▮▮▮ family started
16 paying you more, did you report that to
17 your LCC?
18   A   No.
19   Q   Okay.  Did you tell your LCC that
20 you were being paid this amount?
21   A   No.
22   Q   Did you tell anyone else?
23   A   No.
24   Q   Were you concerned that you were
25 being paid more than this amount, more than

Page 104

Laura Juliana Cano Ligarreto

1
2 the 195.75?
3    A   Yes.
4    Q   Okay.  Why were you concerned?
5       MR. LIBLING:  Objection to form.
6    A   Because I thought the rules for
7 the agency was that I had to get paid 195.
8    Q   Did you see that written down
9 anywhere?
10   A   Excuse me?
11   Q   Did you see that -- that rule
12 written down anywhere?
13   A   Well, that -- that was what all
14 the documents said, so I assumed that.
15   Q   Do you recall what documents said
16 that?
17   A   I had a contract.
18   Q   And the contract said you could
19 not be made more than 195.75?
20   A   No, the contract said I was going
21 to get paid exactly 195.75.
22   Q   Did it say those words exactly,
23 195.75?
24   A   Yes.
25      MR. LIBLING:  Objection to form.

Page 105

Laura Juliana Cano Ligarreto

1
2    Q   What other documents?
3    A   I don't really remember.  I have
4 all the documents they give me with all the
5 information for the program.
6    Q   Okay.  And just so I understand
7 this correctly, all the documents you have
8 say you will be paid exactly 195.75?
9       MR. LIBLING:  Objection to form.
10   A   Not all the documents, only the
11 contract.
12   Q   And what did the contract say
13 would happen if you were paid more than
14 that amount?
15   A   It didn't say anything about it.
16   Q   Okay.  And to be clear, the
17 contract didn't say you could not be paid
18 more than --
19      MR. LIBLING:  Objection to form.
20   Q   -- 195?
21   A   No, it didn't say that.
22   Q   It just said you will be paid
23 exactly 195.75.
24   A   Yes.
25   Q   When's the last time you looked

27 (Pages 102 - 105)

REPLY APP 00971

Case 1:14-cv-03074-CMA-KMT   Document 986-5   Filed 04/13/18   USDC Colorado   Page 92 of 218

# Exhibit 59

```
                                           Page 1

 1            IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF COLORADO

 2         Civil Action No.:  1:14-cv-03074-CMA-KMT

 3

 4   JOHANA PAOLA BELTRAN; et al.,

 5        Plaintiffs,

 6   vs.

 7   INTEREXCHANGE, INC.; et al.,

 8        Defendants.

 9   _____/

10

                         Worldgate Resort Hotel

11                       3011 Maingate Lane

                         The Board Room

12                       Kissimmee, Florida

                         February 2, 2018

13                       1:50 p.m. - 4:58 p.m.

14

15            VIDEOTAPED DEPOSITION OF

16               ESTAFANIA PINTO

17

18

19        Taken on behalf of the Defendant before Nancy N.

20   Foresteire, RPR, RMR, Notary Public in and for the State

21   of Florida at Large, pursuant to Notice of Taking

22   Deposition in the above cause.

23

24

25
```

REPLY APP 00973

Page 2

1  Appearances:
2     JOSHUA J. LIBLING, ESQUIRE
       Boies Schiller Flexner, LLP
3      575 Lexington Avenue
       New York, New York 10022
4      212-446-2300
       Jlibling@bsfllp.com
5        On behalf of the Plaintiffs and the Witness
6
       LYNDSEY M. KRUZER, ESQUIRE
7      Choate Hall & Stewart, LLP
       Two International Place
8      Boston, Massachusetts 02110
       617-248-4790
9      lkruzer@choate.com
         On behalf of Defendant Cultural Care, Inc.
10
11  Also Present:
       Mr. Rick Barnett, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
    Examinations                    Page
3
    DIRECT EXAMINATION BY MS. KRUZER      5
4
    ACKNOWLEDGMENT OF DEPONENT           135
5   ERRATA SHEET                         136
6
7            E X H I B I T S
8
    No.     Description          Page
9
    Exhibit 1   Consentimiento Para Unirse    14
10  Exhibit 2   Notice of Your Right to Join  15
              Lawsuit for Unpaid Wages
11  Exhibit 3   Application          44
    Exhibit 4   Survey              112
12  Exhibit 5   Survey              112
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  THEREUPON:
2        THE VIDEOGRAPHER:  Good afternoon.  We are
3   going on record at 1:50 p.m., on February 2nd,
4   2018.  This is Media Unit 1 in the video recorded
5   deposition of Estafania Pinto, taken by counsel
6   for defendant, in the matter of Johana Paola
7   Beltran, et al., v. Interexchange, Inc., et al.,
8   filed in the United States District Court for the
9   District of Colorado, Case Number
10  1:14-cv-03074-CMA-KMT.
11     This deposition is being held at Worldgate
12  Resort Hotel and Convention Center, located at
13  3011 Maingate Lane, Kissimmee, Florida 34747.
14     My name is Rick Barnett from the firm
15  Veritext and I'm the videographer.  The court
16  reporter is Nancy Foresteire, also from the firm
17  Veritext.  Now counsel and all present in the room
18  will now state their appearances and affiliations
19  for the record.
20     MS. KRUZER:  Lyndsey Kruzer on behalf of
21  defendant Cultural Care, Inc.
22     MR. LIBLING:  Joshua Libling, Boies Schiller
23  Flexner on behalf of plaintiffs and the witness.
24     THE VIDEOGRAPHER:  Will the court reporter
25  please swear in the witness, and then we may

Page 5

1   proceed.
2  THEREUPON:
3        ESTAFANIA PINTO,
4   a Witness herein, having first been duly sworn, was
5   examined and testified on her oath as follows:
6        THE WITNESS:  Yes, I do.
7        DIRECT EXAMINATION
8  BY MS. KRUZER:
9     Q    Good afternoon, Miss Pinto.  Have you ever
10  been deposed before today?
11    A    No.
12    Q    Since you haven't been deposed before, I'm
13  just going to go over a few basic ground rules for
14  today's deposition.  If you have any questions during
15  this period when I'm explaining the process, please feel
16  free to ask.  The first is that while we're on the
17  record today you must give verbal answers rather than
18  nods or head shakes so that the court reporter can
19  record what you're saying.  Does that make sense to you
20  today?
21    A    Yes.
22    Q    The second thing I ask is that you, please,
23  listen to each question before answering.  Your
24  attorney's probably asked you similar, but I ask you
25  because it's important for the court record that we

2 (Pages 2 - 5)

REPLY APP 00974



**Page 30**

(redacted)

**Page 31**

(redacted)

4  Q   How did you first learn about the au pair
5  program?
6  A   Because of a friend.
7  Q   Who is this friend?
8  A   Her name?
9  Q   Yes.
10  A   ▮▮▮
11  Q   What did ▮▮▮ tell you about the au pair
12  program?
13  A   Well, she told me that she was applying to,
14  and to go to United States and take care of, like, the
15  child, children of the family, and that you get to learn
16  English while you do this.  So that's what she told me.
17  And I thought it was good, so I applied for it.
18  Q   So ▮▮▮ was applying to the au pair program
19  when she told you about it?
20  A   Yes.
21  Q   Did she, ultimately, become an au pair?
22  A   Yes.
23  Q   Other than ▮▮▮, did you know anyone else
24  who had participated in the au pair program --
25  A   No.

**Page 32**

1  Q   -- at the time you applied?
2  A   No.
3  Q   After ▮▮▮ a told you she was applying and
4  told you about what she did about the program, what
5  steps did you take next?
6  A   From what I remember, I called Cultural Care
7  in Bogota.
8  Q   How did you find Cultural Care?
9  A   On the internet.  Like, I Google Cultural
10  Care of Colombia.  That's how I found it.
11  Q   Why did you select Cultural Care?
12  A   Because that's the company -- I mean, I went
13  to another one, but Cultural Care is, like, I thought,
14  yeah, it's a big company.  So I -- it was another small
15  companies in Colombia, but I thought it was better to go
16  to Cultural Care because it was big and have a lot of --
17  like, it was in a lot of cities in Colombia.  So that's
18  why I decided to go with Cultural Care.
19  Q   Did you speak with anyone from any other
20  sponsor agency?
21  A   Yeah, I went to another one, but I don't
22  remember the name.
23  Q   Do you remember where it was?
24  A   In Bogota.
25  Q   Do you remember -- strike that.

**Page 33**

1  Did you visit that other sponsor agency in
2  person?
3  A   Yes.
4  Q   And what do you remember about your visit?
5  A   Well, it, like, it was a guy, and he just
6  explain me how the program was.  And, yeah, I mean,
7  that's it.  He just gave me some papers and he explain
8  me how the program was going to be, like, how it was
9  going to be the match with the families, like, how is
10  the process to becoming an au pair it was going to be.
11  Q   Did you ask him any questions?
12  A   Yes.
13  Q   What did you ask him?
14  A   Like, what were the requirements.  Yeah, I
15  mean, things related to how it was the experience.
16  Like, what other au pairs say about it.  Yeah, how the
17  girls, like, what was the opinion of the girls after
18  they come off of the program, if they really learn the
19  language.  And, yeah, that's all I can remember.
20  Q   Did you apply with that other agency?
21  A   No.
22  Q   Why?
23  A   Because I decided to go with Cultural Care.
24  So, yeah, I just felt like, yeah -- I mean, I check that
25  one and Cultural Care, and then I just decided to go

9 (Pages 30 - 33)

REPLY APP 00975

Page 34

1 with Cultural Care.
2    Q    Did you visit the other agency before or
3 after you first contacted Cultural Care?
4    A    I don't remember.
5    Q    Going back, you said that you looked Cultural
6 Care up on the internet?
7    A    Yes.
8    Q    And then you made a phone call --
9    A    Yes.
10    Q    -- to Cultural Care?  What do you remember
11 about that phone call?
12    A    Well, I just call and ask them, like, how can
13 I apply to the program?  And they told me to go right to
14 the office so they can explain me in person.  That's
15 what I remember.
16    Q    Did you, in fact, visit the office?
17    A    Yes.
18    Q    Where was this office?
19    A    In Bogota.
20    Q    What do you remember about your visit to the
21 Cultural Care office?
22    A    That everything was pink.  There was a lot of
23 girls there.  Yeah.  And then I talked to one of the,
24 like, the secretaries there.  And she also was an au
25 pair, so she told me her experience and explain me about

Page 35

1 the program, like that.
2    Q    What do you remember her telling you about
3 the program?
4    A    That it was to come to United States to live
5 with a host family.  And yet you will be living with
6 them and taking care of their children.  And that also,
7 yeah, like, being in America with the family so you can
8 learn the language.  Yeah, that's it.
9    Q    Do you remember if you asked anyone at the
10 Cultural Care office any questions?
11    A    I think I did, but I don't remember exactly
12 what I asked them about.
13    Q    Do you remember if you discussed with anyone
14 in the Cultural Care office the number of hours of
15 childcare you would provide as an au pair?
16    A    She told me 45 hours.
17    Q    And do you remember if you discussed the
18 weekly stipend with anyone in the Cultural Care office
19 during that visit?
20    A    Can you rephrase, please.
21    Q    When you were an au pair, did you receive a
22 weekly payment from your host families?
23    A    Yes.  But sometimes they forget to pay me.
24 So sometimes it was after two weeks or it wasn't always
25 every week.  Sometimes, I have -- like, in the first

Page 36

1 family, sometimes I have to remember to my host mom to
2 pay me.
3    Q    Okay.  We'll discuss that more in a little
4 bit.
5    Okay.
6    Q    But do you understand when I refer to the
7 stipend that it refers to the weekly payment that you
8 would, in theory, receive from your host parents?
9    A    The statement is like the payment?
10    Q    The stipend.  Have you ever heard the word
11 stipend before?
12    A    No.
13    Q    What word did you use for the weekly payment
14 you received from your host family?
15    A    Just a payment.
16    Q    Just a payment?
17    A    Yes.
18    Q    Okay.  Do you remember discussing payments
19 from your host families with anyone in the Cultural Care
20 office during your first visit?
21    A    Well, it was never discussed, because they
22 told me it was 195 with 75 cents.  So it never got
23 discussed.  They just told me that.
24    Q    Who told you that?
25    A    The secretary at Cultural Care in Bogota.

Page 37

1    Q    And what exactly did she tell you?
2    A    That it was going to be $195 with 75 cents.
3    Q    You're saying she told you it would be $195
4 and 75 cents.  What were her exact words?
5    A    Sorry?
6    Q    What were her exact words, to the best of
7 your memory?
8    MR. LIBLING:  Objection to form.
9    THE WITNESS:  What I just said, that the
10 payment was going to be $195 with 75 cents.
11 BY MS. KRUZER:
12    Q    And how did this topic come up?
13    A    Well, they just say that when they explain
14 you the program.  So she just said.
15    Q    Before you visited the Cultural Care office,
16 did you know that you would receive a weekly payment
17 from a host family --
18    A    Yes.
19    Q    -- if you became an au pair?
20    A    Because I read the website, so I knew about
21 it.
22    Q    Did you ask if you could be paid more?
23    A    No.
24    Q    Did anyone ever tell you whether you could be
25 paid more?

10 (Pages 34 - 37)

REPLY APP 00976

Page 38

1   A   No.
2   Q   Did anyone ever tell you -- did anyone from
3   Cultural Care ever tell you that you could not be paid
4   more?
5   A   No, nobody told me.
6   Q   After visiting the Cultural Care office in
7   Bogota, what did you do next in terms of your au pair
8   application process?
9   A   Well, I had to, from what I remember, I had
10  to do a payment.  And then I start filling out the
11  application that the families will read, eventually.
12  But, also, we had to go to an interview first, before
13  the application, to see if we go apply.  Also, we have
14  to take some papers to show proof of childcare
15  experience and so they know who we are, and go to the
16  interview so they can check our level of things.
17  Q   Okay.  Do you remember in what month and year
18  you first visited the Cultural Care office?
19  A   I remember the year 2012.  No.  2013.  Sorry.
20  Yes.
21  Q   Do you remember if it was in the first half
22  of 2013 or the second half of 2013?
23  A   No.
24  Q   Do you remember when you first started your
25  application that you just referred to?

Page 39

1   A   No.
2   Q   Do you remember what year you started it in?
3   A   Yes, 2013.
4   Q   At some point, did you complete the
5   application?
6   A   The application we have to fill out?
7   Q   Yes.
8   A   Yes, I completed it.
9   Q   And what happened next?
10  A   Well, they -- I went to Cultural Care and
11  they check with me if everything was correct.  And then
12  they, like, they put your profile on line so families
13  can start reading about.
14

Page 40

1
8   MR. LIBLING:  Objection to form.
9   BY MS. KRUZER:
10  Q
17  Q   What were your goals in applying to be an au
18  pair?
19  A   Learn English.
20  Q   Anything else?
21  A   No.
22  Q   Were there any particular reasons you wanted
23  to learn English?
24  A   Well, because I always thought, like, it
25  would give you better opportunities to be bilingual.  So

Page 41

1   I just want to improve that.  It's hard to learn it when
2   you are living in a country where you don't have to
3   speak.  And I also decided to go with Cultural Care
4   because you actually live with a family that is native
5   American speakers.  So because, like, a lot of people
6   can go to live in another country, but they don't get
7   the fact that they can be talking with family every day.
8   Q   Did you know English before you applied to
9   the au pair program?
10  A   Yes, but I wasn't, like, fluent in English.
11  Q   At what age did you begin learning English?
12  A   Since I was -- like, they always gave us
13  English classes in school.  So I guess I, I was five
14  years old.
15  Q   Other than learning English, did you have any
16  other goals in joining the au pair program?
17  A   No.  That was my main goal.
18  Q   Did you have a specific desire to come to the
19  United States?
20  A   No.
21  Q   Were you hoping to stay in the United States
22  long-term when you applied to the au pair program?
23  A   No.
24  Q   You testified a moment ago that one of the
25  reasons you chose Cultural Care is because you'd have

11 (Pages 38 - 41)

REPLY APP 00977

Case No. 1:14-cv-03074-CMA-KMT Document 1042-4 filed 04/27/18 USDC Colorado page 99 of 218

# Exhibit 60

REPLY APP 00978

1

1         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

2

    Civil Action No. 1:14-cv-03074-CMA-KMT

3    _____

4           CONFIDENTIAL VIDEOTAPE DEPOSITION OF:

5    MICHELLE CAROLINA DEL POZO AGUILAR - February 5, 2018

6    _____

    JOHANA PAOLA BELTRAN; et al.,

7

    Plaintiffs,

8

    v.

9

    INTEREXCHANGE, INC.; et al.,

10

    Defendants.

11   _____

12

           PURSUANT TO NOTICE, the videotape deposition
13   of MICHELLE CAROLINA DEL POZO AGUILAR was taken on
    behalf of the Defendant American Cultural Exchange,
14   LLC, at 2580 East Harmony Road, Conference Room 4,
    Fort Collins, Colorado 80528, on February 5, 2018, at
15   10:12 a.m., before Lisa B. Kelly, Registered
    Professional Reporter, Certified Realtime Reporter,
16   and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25

# H+G

# Hunter + Geist, Inc.

303.832.5966    1900 Grant Street, Suite 1025     ■ www.huntergeist.com
800.525.8490    Denver, CO 80203           ■ scheduling@huntergeist.com

                Your Partner in Making the Record

**MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

_____

CONFIDENTIAL VIDEOTAPE DEPOSITION OF:
MICHELLE CAROLINA DEL POZO AGUILAR - February 5, 2018

_____

JOHANA PAOLA BELTRAN; et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.,

Defendants.

_____

PURSUANT TO NOTICE, the videotape deposition
of MICHELLE CAROLINA DEL POZO AGUILAR was taken on
behalf of the Defendant American Cultural Exchange,
LLC, at 2580 East Harmony Road, Conference Room 4,
Fort Collins, Colorado 80528, on February 5, 2018, at
10:12 a.m., before Lisa B. Kelly, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public within Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiffs:
    DAVID SELIGMAN, ESQ.
    ALEXANDER HOOD, ESQ.
    Toward Justice
    1535 High Street
    Suite 300
    Denver, Colorado 80218

For the Defendant American Cultural Exchange, LLC:

    KATHRYN A. REILLY, ESQ.
    Wheeler Trigg O'Donnell, L.L.P.
    370 17th Street
    Suite 4500
    Denver, Colorado 80202

Also Present:

    Houston Woodhouse, Videographer
    Deb Shaffer

---

**3**

I N D E X

EXAMINATION OF MICHELLE CAROLINA DEL POZO AGUILAR: PAGE
February 5, 2018

By Ms. Reilly                                         5, 156

By Mr. Seligman                                          148

                                                     INITIAL
DEPOSITION EXHIBITS:                               REFERENCE
Exhibit 1     Notice of Deposition of                     7
              Michelle Carolina Del Pozo
              Aguilar
Exhibit 2     Consent to litigation                       8
Exhibit 3     Document entitled "Notice of               19
              Your Right to Join Lawsuit
              for Unpaid Wages"
Exhibit 4     Document entitled "FLSA Opt-In             30
              Plaintiff Survey Responses"

Exhibit 5     Application                                 38

Exhibit 6     Au Pair Agreement                          55

Exhibit 7     Child Care Services Agreement              64

Exhibit 8     Training Verification Form                 73

Exhibit 9     Orientation Host Family & Au Pair          89

---

**4**

1        WHEREUPON, the following proceedings were
2    taken pursuant to the Federal Rules of Civil
3    Procedure.
08:36:46   4        *     *     *     *     *
5        MICHELLE CAROLINA DEL POZO AGUILAR,
6    having been first duly sworn, was examined and
7    testified as follows:
10:10:11   7        THE VIDEOGRAPHER:  We are on the record.
8    The time is 10:12 a.m., February 5th, 2018.
10:13:36   8
10:13:44   9        We are at the office of Evolution,
10:13:51  10    2580 East Harmony Road, Conference Room 4,
10:13:54  11    Fort Collins, Colorado 80528.
10:14:00  12        This case is being held in the United
10:14:04  13    States District Court of Colorado.  The caption is
10:14:06  14    Beltran, Johana Paola, et al., v. InterExchange, Inc.,
10:14:10  15    et al., Case Number 14-CV-03074-CMA-KMT.
10:14:17  16        My name is Houston Woodhouse.  I'm the
10:14:29  17    legal videographer today.  Our court reporter is Lisa
10:14:31  18    Kelly.  We are both representing Hunter & Geist,
10:14:34  19    Incorporated, Denver, Colorado.
10:14:38  20        At this time, starting with the
10:14:39  21    plaintiffs' counsel, state your name and who you
10:14:40  22    represent.
10:14:42  23        MR. SELIGMAN:  I'm David Seligman from
10:14:43  24    Towards Justice for Plaintiffs.
10:14:45  25

1 (Pages 1 to 4)

REPLY APP 00980

**MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

61

```
11:44:04   1    to make it more than once.
11:44:06   2        Q.  (BY MS. REILLY)  Did you understand,
11:44:11   3    based on this agreement with GoAuPair, that you
11:44:13   4    weren't supposed to work more than 45 hours a week?
11:44:16   5        A.  That I weren't supposed -- more than
11:44:21   6    45 hours a week, yes.
11:44:21   7        Q.  45 hours a week was the maximum you were
11:44:23   8    supposed to work?
11:44:25   9        A.  Yes.
11:44:34  10        Q.  If you turn to page -- I guess we're
11:44:37  11    already on page 3.  Do you see Section 3.6?  I'll let
11:44:42  12    you get there.  It's just below the chart.
11:44:48  13        Do you see where it says, 3.6, "I will
11:44:50  14    prepare a hard copy weekly hours and wages log of the
11:44:54  15    hours worked by day, stipend paid, vacation days used,
11:44:59  16    and educational financial contributions made"  do you
11:45:03  17    see that language?
11:45:04  18        A.  Yes.
11:45:05  19        Q.  Okay.  Did you do that?  Did you keep a
11:45:09  20    weekly log tracking your hours and stipend amount?
11:45:12  21        A.  No.
11:45:15  22        Q.  And if you look at the next sentence of
11:45:18  23    Section 3.6, where it says, "I will have the host
11:45:21  24    family agree to this by initialing the log."  That
11:45:25  25    didn't -- am I right, that didn't happen because there
```

---

62

```
11:45:27   1    was no log?
11:45:28   2        A.  What is initialing in the log?  What is a
11:45:31   3    log?
11:45:31   4        Q.  Sure.  So if you look at the first
11:45:33   5    sentence it says, "I will prepare a hard copy weekly
11:45:36   6    hours and wages log of the hours worked by day,
11:45:39   7    stipend paid, vacation days used, and educational
11:45:43   8    financial contributions made."  So that's the log.
11:45:46   9        And the question is, did the host family
11:45:49  10    ever sign the log?
11:45:50  11        A.  No.
11:45:51  12        Q.  Okay.  Did you keep anything remotely
11:45:54  13    like the log described in 3.6?
11:45:57  14        A.  No.
11:46:02  15        Q.  Did you write down, or otherwise
11:46:05  16    document, the hours that you were working each week
11:46:08  17    for the ███ family?
11:46:10  18        A.  The ███ family had -- how do you -- a
11:46:16  19    calendar, because their schedule varied.  So they just
11:46:21  20    put what were going to be my times of work.
11:46:24  21        Q.  And was that on the computer or was that
11:46:28  22    a document?  How was the calendar tracked?
11:46:30  23        A.  It was a notebook.
11:46:31  24        Q.  Notebook.  And did the notebook just list
11:46:39  25    the hours you were to work, or did it have any other
```

---

63

```
11:46:42   1    information in it?
11:46:46   2        A.  It was their schedule.
11:46:49   3    ████  ████████████████████████
           ████  ███████████████████
           ████  ████████████████████████
           ████  █████████████████████████
           ████  █████████████████████████
           ████  ████████████████████
11:47:10  10          .
           Q.  Got it.  We'll come back to that.
11:47:14  11        Was there any other -- other than the
11:47:21  12    calendar you just described, were there any other
11:47:24  13    documents that would have tracked the number of hours
                 of child care you provided --
11:47:29  15        A.  No.
11:47:29  16        Q.  -- every week?  That was it?
11:47:31  17        A.  Yes.
11:47:31  18        Q.  How about any documents that would have
11:47:34  19    recorded the amount -- the stipend amount you
11:47:37  20    received?
11:47:40  21        A.  I was paid in cash.
11:47:42  22        Q.  So were there any documents?  Did you
11:47:45  23    keep track of the stipend amounts, or did anyone else,
11:47:48  24    as far as you know?
11:47:49  25        A.  No.
```

---

64

```
           1        (Deposition Exhibit 7 was marked.)
11:48:25   2        Q.  Do you recognize this one?
11:49:06   3        A.  Yes.
11:49:07   4        Q.  What is it?
11:49:08   5        A.  Child care services agreement.
11:49:11   6        MS. REILLY:  And I'm sorry.  What number
11:49:13   7    are we on?  I missed it.
11:49:14   8        THE REPORTER:  7.
11:49:15   9        MR. SELIGMAN:  7.
11:49:17  10        Q.  (BY MS. REILLY)  Is this an agreement
11:49:19  11    that you signed?  I'll have you -- this isn't a trick
11:49:25  12    question, so you can flip to page 9.  There's a
11:49:28  13    signature there.
11:49:28  14        A.  Yes.
11:49:32  15        Q.  Is that your electronic signature on
                 page 9?
11:49:34  17        A.  Yes.
11:49:37  18        Q.  Do you recall what this agreement was
11:49:40  19    about?
11:49:43  20        A.  I don't remember.
11:49:44  21        Q.  Okay.  So just look at page 9.  Can you
11:49:47  22    see who else signed the agreement, other than you?
11:49:50  23        A.  ███████.
11:49:52  24        Q.  Is that your host family father?
11:49:53  25        A.  Yes.
```

16 (Pages 61 to 64)

**MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

65

11:49:54  1    Q.  Is this the agreement, between you and
11:49:56  2  your host family, regarding your au pair placement?
11:50:01  3    A.  I don't know.
11:50:06  4    Q.  If you look at page 9, next to your
11:50:08  5  electronic signature, do you see the date March 18,
11:50:11  6  2016?
11:50:11  7    A.  Yes.
11:50:13  8    Q.  And you can go back and look, if you
11:50:14  9  don't remember.  But the -- your agreement with
11:50:18  10  GoAuPair, we just looked at, was -- had a date of
11:50:21  11  February 2016.
11:50:22  12    A.  Uh-huh.
11:50:24  13    Q.  So do you agree that this host family
11:50:26  14  agreement was signed by you after the GoAuPair
11:50:30  15  agreement was signed by you?
11:50:35  16    A.  Yes.
11:50:38  17    Q.  Do you recognize that signature of ███
11:50:43  18  ███?  I know it's electronic, but --
11:50:48  19    A.  I don't know if that's his.
11:50:49  20    Q.  Okay.  I'm just wondering.  So let's go
11:50:51  21  through this agreement.  If you look at page 2, can
11:51:12  22  you describe what is on page 2?
11:51:16  23    A.  These are the schedule hours and the
11:51:18  24  description of duties and activities.
11:51:21  25    Q.  Okay.  And do you have an understanding

66

11:51:24  1  as to who came up with the content in that chart?
11:51:29  2    A.  I don't know.
11:51:32  3    Q.  Did you come up with it?
11:51:34  4    A.  I don't remember.
11:51:44  5    Q.  Do you recall receiving this information,
11:51:47  6  before you decided to match with the ███ family,
11:51:49  7  and getting a chance to see this detail?
11:51:51  8    A.  Before matching?
11:51:55  9    Q.  Uh-huh.
11:51:55  10    A.  I don't remember.
11:52:00  11    Q.  Is the work schedule described on page 2
11:52:04  12  consistent with what your work schedule for the ███
11:52:07  13  family ended up being?
11:52:08  14    A.  No.
11:52:10  15    Q.  How so?  How is it different?
11:52:13  16    A.  I was going to have off Saturday.  And,
11:52:18  17  again, my schedule will depend on their job schedule.
11:52:26  18    Q.  Okay.  So this schedule actually says
11:52:28  19  that you were supposed to work on Saturdays for four
11:52:30  20  hours.  So what ended up happening on Saturdays once
11:52:35  21  you got there?
11:52:38  22    A.  At first, I had them off.
11:52:44  23    Q.  And then at some point you started
11:52:45  24  working Saturdays?
11:52:47  25    A.  It varied.

---

67

11:52:49  1    Q.  Okay.  How about the description of
11:52:52  2  duties and activities that are described?  Is that
11:52:56  3  accurate, as to the child care services you, in fact,
11:52:59  4  provided for the ███ family once you arrived in the
11:53:02  5  United States?
11:53:08  6    A.  Most of it.
11:53:12  7

███████
████████████████
████████████████████
█████████
███████████
█████████████
██████████████████████

11:53:39  16    A.  Yes.
11:53:41  17    Q.  So this description of duties, who
11:53:44  18  decided what exactly you would be doing for the baby?
11:53:48  19    A.  Them.
11:53:49  20    Q.  And who is "them"?
11:53:50  21    A.  The ███ family.
11:53:52  22    Q.  And it wasn't you who decided exactly
11:53:55  23  what the job duties would be?
11:53:56  24    A.  No.
11:53:56  25    Q.  And it wasn't GoAuPair who decided what

68

11:53:59  1  the job duties would be?
11:54:00  2    A.  I don't know.
11:54:03  3    Q.  Do you believe it was the ███ family
11:54:05  4  who decided what exactly you would be doing at their
11:54:08  5  house?
11:54:09  6    A.  Mostly.
11:54:12  7    Q.  When you say "mostly," how is that not
11:54:15  8  the case?
11:54:16  9    A.  I don't know how GoAuPair worked with the
11:54:20  10  family arranging that.  I don't know.
11:54:23  11    Q.  Okay.  But as far as you're concerned, it
11:54:26  12  was the ███ family communicating to you what the
11:54:28  13  job duties were that you would be doing at their home?
11:54:31  14    A.  Yes.
11:54:31  15    Q.  And it was never GoAuPair who told you
11:54:33  16  what job duties you would be doing at the ███
11:54:36  17  family home; right?
11:54:37  18    A.  No.
11:54:45  19    Q.  And I just kind of -- I just asked you a
11:54:48  20  double negative, so let me ask it so the record is
11:54:51  21  clear; okay?
11:54:54  22    Did GoAuPair ever give you instructions
11:54:56  23  as to what your job duties would be at the ███
11:54:59  24  family home?
11:55:03  25    A.  Just generalities, like, you know, feed

---

17 (Pages 65 to 68)

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

---

### 69

11:55:08  1   the baby, take care of the baby. You know, just like
11:55:11  2   what is in the contract, like a GoAuPair should do
11:55:14  3   with the kids.
11:55:17  4       Q. Okay. I'm going to ask that again. So
11:55:20  5   in terms of what specifically you would be doing with
11:55:23  6   the ▇▇▇ family baby and what other duties you would
11:55:26  7   be doing in the Sowell family home --
11:55:28  8       A. Uh-huh.
11:55:30  9       Q. -- you just testified it was the ▇▇▇
11:55:33 10   family who gave you that instruction; correct?
11:55:35 11       A. Yes.
11:55:35 12       MR. SELIGMAN: Objection.
11:55:37 13       Q. (BY MS. REILLY) Did GoAuPair ever give
11:55:38 14   you specific instructions as to what duties you would
11:55:40 15   be performing in the ▇▇▇ family home?
11:55:41 16       MR. SELIGMAN: Objection.
11:55:42 17       A. No.
11:55:42 18       Q. (BY MS. REILLY) Okay. Back to the
11:55:56 19   stipend, page 4.
11:55:58 20       A. On this same one?
11:55:59 21       Q. Yeah. Same document. Let's start with
11:56:06 22   the very top of the page. Do you see Section 3 that
11:56:10 23   says "Compensation, Vacation & Education"? Are you
11:56:13 24   with me?
11:56:14 25       A. Yes.

### 70

11:56:14  1       Q. And you see Section 3.1, where it says,
11:56:17  2   "The host family agrees to pay the au pair at least
11:56:20  3   the minimum weekly stipend of 195.75"? Do you see
11:56:24  4   that?
11:56:26  5       A. Yes.
11:56:28  6       Q. And then below, about halfway down the
11:56:30  7   page, do you see where it says, "Stipend." And then
11:56:34  8   it says, "Weekly stipend is," and then the blank has
11:56:38  9   been filled in to say "$210." Do you see that?
11:56:41 10       A. Yes.
11:56:42 11       Q. Okay. And I'll represent to you I've
11:56:44 12   done some math, and 210 times 4 is 840; okay?
11:56:51 13       And so the 840 monthly stipend that
11:56:55 14   you've testified about, is that the same as this 210
11:56:59 15   weekly stipend amount that's in the contract?
11:57:01 16       MR. SELIGMAN: Objection.
11:57:02 17       A. I just know that I was paid 840 a month.
11:57:05 18       Q. (BY MS. REILLY) Let's go back to your
11:57:07 19   survey, okay, that you filled out and that's accurate.
11:57:09 20       A. Uh-huh.
11:57:17 21       Q. Okay. Turn to page 4. And do you -- and
11:57:24 22   I'll let you get there. Sorry.
11:57:26 23       A. 4. Okay.
11:57:27 24       Q. The very first question, where it says,
11:57:30 25   "What was the weekly stipend that you were paid by the

### 71

11:57:32  1   host family in U.S. dollars," do you see that
11:57:34  2   question?
11:57:35  3       A. (Nodded head up and down.)
11:57:35  4       Q. And what was your answer?
11:57:37  5       A. 210.
11:57:37  6       Q. Was that accurate?
11:57:39  7       A. It's an approximate.
11:57:41  8       Q. So it's not accurate?
11:57:45  9       A. I just divided 840. Because if it's
11:57:49 10   weekly, it was 210, an approximate.
11:57:52 11       Q. Okay. And so you just basically did what
11:57:55 12   I just did, right, which is the math. But your point
11:57:58 13   is you were paid monthly 840.
11:58:00 14       A. Yes.
11:58:00 15       Q. Right? And so now I understand it's an
11:58:03 16   approximate because months versus weeks, the math does
11:58:08 17   end up being a little bit different.
11:58:11 18       You don't need to respond to that. It's
11:58:14 19   math. We're back to math.
11:58:15 20       So I'm going to refer to the 840 to be
11:58:19 21   very precise; okay?
11:58:21 22       A. Okay.
11:58:21 23       Q. And I'm just trying to understand -- get
11:58:23 24   the most accurate information, not trap and certainly
11:58:25 25   not make anyone do math.

### 72

11:58:27  1       A. That's perfect. Thanks.
11:58:28  2       Q. But let me ask you this, just to make
11:58:30  3   sure that I get the exact correct survey response.
11:58:33  4       So am I right that when this question
11:58:36  5   says, "What was the weekly stipend that you were paid
11:58:38  6   by the host family," is it fair to say that you were
11:58:41  7   paid $840 per month, every month, by the ▇▇▇
11:58:45  8   family?
11:58:46  9       A. Yes.
11:58:46 10       Q. That's more accurate probably; right?
11:58:48 11       A. Yes.
11:58:49 12       Q. Okay. Thank you for your clarification,
11:58:50 13   and then we don't have to do math anymore.
11:58:53 14       A. Thank you.
11:58:57 15       Q. Okay. So going back to the contract,
11:58:58 16   though, the contract refers to a weekly stipend amount
11:59:01 17   of $210.
11:59:04 18       A. Uh-huh.
11:59:10 19       MR. SELIGMAN: Carolina, just because
11:59:12 20   there's a transcript, it's helpful to say yes or no.
11:59:12 21       A. Yes.
11:59:17 22       MS. REILLY: Thank you. That should have
11:59:18 23   been my job. And thank you, David, for doing that.
11:59:21 24       Q. (BY MS. REILLY) Were you, in fact, paid
11:59:27 25   by the Sowell family $840 in cash every month that you

---

18 (Pages 69 to 72)

Case No. 1:14-cv-03074-CMA-KMT   Document 1042   filed 04/27/18   USDC Colorado   pg 104
of 219

**MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc.**

73

```
11:59:31   1    were an au pair?
11:59:32   2        A.  Yes.
11:59:34   3        MR. SELIGMAN:  Sorry.  We're going to
11:59:36   4    want to mark as confidential -- I just want to flag
11:59:38   5    now -- everything having to do with the manner in
11:59:40   6    which she was paid.
11:59:43   7        MS. REILLY:  That's fine.
11:59:44   8        Q.  (BY MS. REILLY)  Did you ever receive any
11:59:57   9    additional money from the ████ family, beyond the
11:59:59  10    840 per month?
12:00:00  11        A.  No.
12:00:07  12        Q.  So back to training.  I know that in the
12:00:09  13    survey you said that you weren't provided any
12:00:13  14    training.  I'm going to show you a document now that
12:00:15  15    might refresh you.  Not a big deal; okay?  It's a long
12:00:18  16    time ago.
12:00:20  17        A.  Okay.
          18        (Deposition Exhibit 8 was marked.)
12:00:33  19        Q.  You can take a look at this.  And I
12:00:36  20    understand you might need to be refreshed.
          21        THE REPORTER:  Exhibit 8.
12:00:46  22        MS. REILLY:  You're catching on to my
12:00:48  23    ways.
12:00:48  24        Q.  (BY MS. REILLY)  And you just let me know
12:01:01  25    when you're ready.  Take as long as you want.
```

74

```
12:01:04   1        A.  Thanks.  Okay.
12:01:47   2        Q.  Okay.  Do you recognize this document?
12:01:48   3        A.  Yes.
12:01:49   4        Q.  And what is this document?
12:01:51   5        A.  Training verification form.
12:01:53   6        Q.  Is that your signature at the end?
12:01:56   7        A.  Yes.
12:01:57   8        Q.  And has your memory been refreshed now on
12:01:59   9    training?
12:02:01  10        A.  Yes.
12:02:03  11        Q.  Okay.  And so did you, in fact, complete
12:02:05  12    some training for the au pair program before leaving
12:02:08  13    Ecuador?
12:02:09  14        A.  An online training, yes.
12:02:13  15        Q.  Okay.  And does this verification form
12:02:15  16    relate to that online training that you did in
12:02:18  17    Ecuador?
12:02:18  18        A.  Yes.
12:02:19  19        Q.  And am I correct that this online
12:02:22  20    training that you did in Ecuador was the only training
12:02:26  21    that you received relating to the au pair program?
12:02:28  22        A.  Yes.
12:02:30  23        Q.  You didn't participate in any other
12:02:31  24    training in the United States, once you arrived?
12:02:34  25        A.  No.
```

75

```
12:02:42   1        Q.  I think that that gives me what I need
12:02:44   2    for the survey, but I'm going to take a quick look,
12:02:47   3    just to make sure we answer all the questions,
12:02:49   4    so . . .
12:02:49   5        A.  That's fine.
12:02:50   6        Q.  Okay.  Just to clarify this.  I think
12:03:10   7    this only changes one of the answers.  And so about
12:03:12   8    halfway down your survey page, on page 3 -- and I'll
12:03:16   9    let you get there.
12:03:18  10        A.  This one.  Okay.
12:03:21  11        Q.  Do you see the question, "Were you
12:03:22  12    required to receive training by your sponsor agency
12:03:25  13    prior to your placement with the host family"?
12:03:27  14        A.  Uh-huh.
12:03:28  15        Q.  After looking at this --
12:03:29  16        MR. SELIGMAN:  Yes?
12:03:29  17        Q.  (BY MS. REILLY) -- document, what is
12:03:30  18    your answer now?
12:03:33  19        A.  No.
12:03:37  20        Q.  Okay.
12:03:37  21        A.  If I would answer no?  No.  I would
12:03:40  22    answer yes.
12:03:42  23        Q.  Okay.  Let's try that again.  I think I
12:03:45  24    follow you, but let's try it again.  Let's just -- I'm
12:03:48  25    just going to ask you the question from the survey,
```

76

```
12:03:49   1    and then you testify with your accurate answer; okay?
12:03:52   2        A.  Okay.
12:03:53   3        Q.  Were you required to receive training by
12:03:55   4    your sponsor agency prior to your placement with the
12:03:58   5    host family?
12:03:59   6        A.  Yes.
12:04:01   7        Q.  And is that the online training referred
12:04:03   8    to in the training verification form that you received
12:04:07   9    in Ecuador?
12:04:08  10        A.  Yes.
12:04:09  11        Q.  Okay.  Done with that one.  Thank you.
12:04:15  12    Not done with training completely, though.  Do you
12:04:18  13    recall how long that training was?
12:04:21  14        A.  32 hours video --
12:04:23  15        Q.  Okay.
12:04:23  16        A.  -- five modules and a workbook.  Yes.
12:04:28  17        MS. REILLY:  Did you catch all that?
          18        THE REPORTER:  Uh-huh.
12:04:30  19        MS. REILLY:  Oh, very good.
12:04:33  20        A.  And certain exercises, yeah.
12:04:36  21        Q.  (BY MS. REILLY)  And were you paid for
12:04:38  22    any of the time you spent doing the 32 hours of online
12:04:41  23    training?
12:04:42  24        A.  No.
12:04:43  25        Q.  Do you recall what the content of the
```

19 (Pages 73 to 76)

REPLY APP 00984

MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.



**133**

14:11:04   1

**135**

14:13:39   1

14:14:38   19   Q.   And so did you reach out to GoAuPair
14:14:41   20   again?
14:14:41   21   A.   Yes.
14:14:42   22   Q.   When was that?
14:14:44   23   A.   That was in April, I will say, around
14:14:47   24   April, maybe the beginning.
14:14:50   25   Q.   And what did you communicate to GoAuPair

**134**

14:12:20   1   A.   No.
14:12:22   2   Q.   During this time period, did you ever
14:12:24   3   reach out to Ms. Coalson, or anyone at GoAuPair, and
14:12:28   4   let them know about these problems?
14:12:30   5   A.   Yes.
14:12:30   6

14:13:01   15   respond, or
Marylynn, when you let them know you wanted to
14:13:05   16   terminate the placement?
14:13:06   17   A.   They told me that I should try to make it
14:13:08   18   work; that I should try to communicate and work harder
14:13:11   19   to ameliorate the relationship with her.
14:13:17   20   Q.   And what happened after that
14:13:18   21   conversation?
14:13:21   22   A.   I told her -- I told them I was done.
14:13:26   23   Q.   And how did GoAuPair respond to that?
14:13:30   24   A.   They said okay.
14:13:34   25   Q.   And what happened next?

**136**

14:14:52   1   at that time?
14:14:53   2
14:15:05   6   Q.   And how did GoAuPair react?
14:15:10   7   A.   I don't remember.
14:15:15   8   Q.   Did you decide that you wanted to end the
14:15:18   9   placement at that time?
14:15:21   10   A.   She did.
14:15:24   11

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

REPLY APP 00985

MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.



**137**

14:16:13 1

**139**

14:18:45 1     A. Well, because I was about to finish the
14:18:48 2 program, like maybe three, two months before finishing
14:18:51 3 it, they told me I was not eligible for a re-match
14:18:57 4 with other family, so that was not an option. So the
14:19:04 5 only option was going back home.
14:19:07 6     Q. And you were set to go back home in June
14:19:10 7 otherwise?
14:19:11 8     A. Yes.
14:19:11 9     Q. And it's April?
14:19:12 10     A. (Nodded head up and down.)
14:19:14 11     Q. So did you immediately go back home?
14:19:16 12     A. No.
14:19:17 13     Q. What ended up happening?
14:19:19 14     A. I had one more class left from
14:19:23 15 Georgetown. So I told GoAuPair that I needed their
14:19:30 16 support, because if they send me back home, I was
14:19:33 17 going to lose all the program and all the money that I
14:19:36 18 invested in.
14:19:39 19     Q. So what happened?
14:19:41 20     A. They said, Oh, well, that's a shame. So
14:19:45 21 they told the family that if it was an urgent thing
14:19:50 22 for me to get out of the house, they needed to pay for
14:19:53 23 a hotel and give me $20 a day to eat and move and
14:20:00 24 everything.
14:20:03 25     Q. And did you end up leaving the house at

**138**

14:17:36 1

14:18:23 20     Q. And so we're in April now?
14:18:27 21     A. Yes.
14:18:28 22     Q. So what happened after that conversation?
14:18:33 23     A. After that conversation, we reached to
14:18:35 24 GoAuPair to see what was the process after that.
14:18:42 25     Q. And what was the process after that?

**140**

14:20:05 1 that point?
14:20:06 2     A. Say it again.
14:20:07 3     Q. So did you go to a hotel?
14:20:09 4     A. No.
14:20:09 5     Q. What happened?
14:20:12 6     A. I had two weeks of vacation, that they
14:20:15 7 are in the contract, that I didn't took. So I decided
14:20:18 8 to take those two weeks and go to D.C. and finish my
14:20:21 9 studies.
14:20:25 10     Q. And so where did you stay during those
14:20:27 11 two weeks?
14:20:28 12     A. In an Airbnb place.
14:20:30 13

14:20:36 17     Q. And during those two weeks, did you --
14:20:39 18 well, let me stop.
14:20:40 19     After those two weeks, did you go back to
14:20:42 20 Ecuador?
14:20:43 21     A. Yes.
14:20:43 22     Q. And were you paid by ▇▇▇ for those two
14:20:53 23 weeks?
14:20:53 24     A. No.
14:20:57 25     Q. So after you left the ▇▇▇ house and

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

REPLY APP 00986

MICHELLE CAROLINA DEL POZO AGUILAR - CONFIDENTIAL - 2/5/2018
Johana Paola Beltran, et al. v. Interexchange, Inc.



141

14:21:00  1   went up to D.C., did you ever receive any more stipend
14:21:03  2   money from the ▓▓▓ family?
14:21:05  3       A.  No.
14:21:08  4       Q.  Was there any period of time where you
14:21:10  5   were still living with the ▓▓▓ family but not
14:21:13  6   taking care of the baby anymore?
14:21:14  7       A.  A couple of days, yes.
14:21:22  8

14:22:03  23      Q.  So when is the last time he paid you?
14:22:05  24      A.  I don't remember.
14:22:09  25

142

14:22:12  1
14:22:24  4       Q.  Got it.  And did he tend to pay you the
14:22:26  5   same day every month?
14:22:27  6       A.  Yes.
14:22:28  7       Q.  What day was that?
14:22:29  8       A.  The 1st or 5.  Like around the first
14:22:33  9   days.
14:22:33  10

143

14:23:28

14:23:53  12      Q.  Am I right that GoAuPair did not decide
14:23:55  13  to terminate your placement at the ▓▓▓ house?
14:23:58  14      A.  No.
14:24:20

14:24:29  20      Q.  Congratulations.  That's awesome.
14:24:31  21      A.  Thank you.
14:24:34  22      Q.  So other than what we've already
14:24:38  23  discussed, the communications with Ms. Coalson, with
14:24:42  24  Marylynn Coalson, that we've talked about, did you
14:24:45  25  complain or share, about these bad experiences with

144

14:24:48  1   Mrs. ▓▓▓ with anyone else during the time you were
14:24:51  2   an au pair?
14:24:53  3       A.  That is not GoAuPair?
14:24:55  4       Q.  Correct.
14:24:56  5       A.  No.
14:24:57  6       Q.  Did you tell your family or your friends
14:24:59  7   back home, or anyone else, that you were having these
14:25:01  8   problems with Mrs. ▓▓▓?
14:25:04  9       A.  My mom, at the very last ending.
14:25:08  10      Q.  No one else, though?
14:25:09  11      A.  No.
14:25:13  12      Q.  And you had no other au pair friends in
14:25:15  13  the United States?
14:25:16  14      A.  No.
14:25:16  15      Q.  Did you keep a journal during your time
14:25:32  16  as an au pair?
14:25:34  17      A.  No.
14:25:37  18      Q.  Did you ever blog about your experiences
14:25:40  19  as an au pair?
14:25:41  20      A.  No.
14:25:41  21      Q.  How about Facebook entries about it?
14:25:43  22      A.  No.
14:25:46  23      Q.  Did you write letters to family or
14:25:48  24  friends about your au pair experience?
14:25:49  25      A.  No.

36 (Pages 141 to 144)

REPLY APP 00987

# Exhibit 61

REPLY APP 00988

Page 1

1                 UNITED STATES DISTRICT COURT

2                    DISTRICT OF COLORADO

3               Case No. 1:14-cv-03074-CMA-KMT

4

5    - - - - - - - - - - - - - - - - - X

6    JOHANA PAOLA BELTRAN, et al.,

7                         Plaintiffs,

8         v.

9    INTEREXCHANGE, INC., et al.,

10                        Defendants.

11   - - - - - - - - - - - - - - - - - X

12

13

14        VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

15                 MATILDA LOUISE PATRICK

16         Saturday, February 10, 2018, 4:05 p.m.

17                  Choate Hall & Stewart LLP

18                  Two International Place

19                Boston, Massachusetts 02110

20

21

22

23     --- Reporter: Kimberly A. Smith, CRR, CRC, RDR ---

24            Realtime Systems Administrator

25

REPLY APP 00989

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | Boies Schiller Flexner LLP |
| 4 | By: Byron D.M. Pacheco, Esq. |
| 5 | 575 Lexington Avenue |
| 6 | New York, NY 10022 |
| 7 | (212) 446-2300 |
| 8 | bpacheco@bsfllp.com |
| 9 | for the Plaintiffs and the Witness; |
| 10 | |
| 11 | Choate Hall & Stewart LLP |
| 12 | By: Timothy J. McLaughlin, Esq. |
| 13 | Two International Place |
| 14 | Boston, MA 02110 |
| 15 | (617) 248-5000 |
| 16 | tmclaughlin@choate.com |
| 17 | for the Defendant Cultural Care, Inc. |
| 18 | |
| 19 | Also Present: Shawn Budd, Videographer |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | WITNESS: Matilda Louise Patrick |
| 4 | |
| 5 | EXAMINATION        Page |
| 6 | By Mr. McLaughlin        6 |
| 7 | By Mr. Pacheco        146 |
| 8 | |
| 9 | EXHIBITS FOR IDENTIFICATION: |
| 10 | Patrick      Description        Page |
| 11 | Exhibit 1   Deposition notice        9 |
| 12 | Exhibit 2   11/11/17 Consent to Join      16 |
| 13 | Exhibit 3   CC00037417 - CC00037436      43 |
| 14 | Exhibit 4   CC00037441        103 |
| 15 | Exhibit 5   11/21/17 survey questionnaire   108 |
| 16 | Exhibit 6   11/27/17 survey questionnaire   137 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | Original exhibits retained by reporter to be |
| 25 | returned to Choate Hall & Stewart |

| | Page 4 |
|---|---|
| 1 | THE VIDEO OPERATOR: We are on the |
| 2 | record. This is the videographer speaking, Shawn |
| 3 | Budd, with Veritext Court Reporting. |
| 4 | Today's date is February 10, 2018, and |
| 5 | the time is 4:06 a.m. -- p.m. We are here in |
| 6 | Boston, Massachusetts to take the video deposition |
| 7 | of Matilda Louise Patrick, in the matter of Johana |
| 8 | Beltran, et al. vs. InterExchange, Inc., et al. |
| 9 | Would counsel please introduce |
| 10 | themselves. |
| 11 | MR. McLAUGHLIN: Tim McLaughlin from the |
| 12 | law firm of Choate Hall & Stewart, representing |
| 13 | defendant Cultural Care, Incorporated. |
| 14 | MR. PACHECO: Byron Pacheco from Boies |
| 15 | Schiller Flexner on behalf of the plaintiffs and the |
| 16 | witness. |
| 17 | THE VIDEO OPERATOR: And would the court |
| 18 | reporter please swear in the witness. |
| 19 | (The witness was duly sworn |
| 20 | by the court reporter.) |
| 21 | MR. McLAUGHLIN: Good morning, |
| 22 | Ms. Patrick. |
| 23 | THE WITNESS: Good morning. |
| 24 | MR. McLAUGHLIN: So, Ms. Patrick, before |
| 25 | we begin, counsel and I have reached several |

| | Page 5 |
|---|---|
| 1 | stipulations previously about international |
| 2 | depositions, so we're going to hopefully confirm |
| 3 | that those stipulations are still in place. |
| 4 | The first one is that we've previously |
| 5 | stipulated that today's deposition transcript and |
| 6 | recording will be usable in the Beltran litigation |
| 7 | in the same manner as if Ms. Patrick had been |
| 8 | deposed within the United States. |
| 9 | Counsel, any objection? |
| 10 | MR. PACHECO: No objection. |
| 11 | MR. McLAUGHLIN: We've similarly |
| 12 | stipulated that the deposition may be taken before a |
| 13 | stenographer and videographer physically located in |
| 14 | the United States, and that the stenographer may |
| 15 | administer the oath via the video feed. |
| 16 | Counsel, any objections? |
| 17 | MR. PACHECO: No objection. |
| 18 | MR. McLAUGHLIN: And finally, we've |
| 19 | previously stipulated that following review of this |
| 20 | transcript and the opportunity to -- for Ms. Patrick |
| 21 | to make corrections as permitted by United States |
| 22 | procedure, Ms. Patrick will then sign a certification |
| 23 | pursuant to 28 USC Section 1746, affirming that her |
| 24 | testimony is truthful. |
| 25 | Counsel, any objections? |

2 (Pages 2 - 5)

Page 34

1 BY MR. McLAUGHLIN:
2    Q. Ms. Patrick, do you remember how you first
3 heard of the au pair program?
4    A. Yes.
5    Q. Could you tell me how you first learned
6 about the au pair program.
7    A. From a poster displayed in school.
8    Q. What school was that?
9    A. It was primary school.
10    Q. So approximately how old would you have
11 been then?
12    A. How old are you in Grade 5? 12? 13, 12.
13    Q. What did you think of that poster?
14    A. I can't remember.
15    Q. Did the idea of being an au pair appeal to
16 you then?
17    A. Yes.
18    Q. Why was that?
19    A. It sounded like a fun gap year, something
20 different.
21    Q. What do you mean by a "gap year"?
22    A. A gap year is a year between high school
23 and university.
24    Q. Was that your thought: that you would be an
25 au pair and then go to university afterwards?

Page 35

1      MR. PACHECO: Objection.
2      THE WITNESS: Yes.
3 BY MR. McLAUGHLIN:
4 
12    Q. Were you an au pair anywhere else before
13 you became an au pair in the U.S.?
14    A. No.
15    Q. Did you know anyone else that had
16 participated in the au pair program?
17    A. No.
18    Q. So what led you then to apply to be an
19 au pair?
20    A. Something different.
21    Q. Did you only apply to be an au pair in the
22 U.S.?
23    A. Yes.
24    Q. Why did you choose to apply to be an
25 au pair in the U.S.?

Page 36

1    A. Because I wanted to go there.
2    Q. Is there anything in particular that piqued
3 your interest in the United States?
4      MR. PACHECO: Object to form.
5      THE WITNESS: No.
6 BY MR. McLAUGHLIN:
7    Q. What did you know about the United States
8 prior to coming to the U.S.?
9    A. Not much.
10    Q. Had you ever traveled here -- "here" being
11 the United States -- previously?
12    A. Yes.
13    Q. Where had you been?
14    A. A couple of different places.
15    Q. Where exactly?
16    A. I believe Florida and California.
17    Q. When you were applying to the au pair
18 program, did you have any thought of potentially
19 staying in the United States long-term?
20    A. No.
21    Q. Were you interested in the au pair gap year
22 as a cultural exchange experience?
23    A. That's what they advertised it as.
24    Q. Were you interested in that though?
25    A. Yes.

Page 37

1    Q. Were you hoping to travel during your time
2 as an au pair?
3    A. Yes.
4    Q. Had you made plans prior to coming to the
5 United States to be an au pair to travel to certain
6 places?
7    A. No.
8    Q. You just were generally interested in
9 traveling?
10    A. Yes.
11    Q. When you were applying to the program, were
12 you concerned about any downsides that may have been
13 associated with the program?
14      MR. PACHECO: Objection to form.
15      THE WITNESS: Yes.
16 BY MR. McLAUGHLIN:
17    Q. In your mind, what were those potential
18 downsides?
19    A. It could go wrong, and it was very low pay.
20    Q. When you say "it could go wrong," what do
21 you mean by that?
22    A. You could get matched with an awful family.
23    Q. If you hadn't known anyone who had been an
24 au pair previously, how did you come to that
25 knowledge?

10 (Pages 34 - 37)

REPLY APP 00991

Page 38

1    A. Sorry --
2        MR. PACHECO:  Objection, form.
3        THE WITNESS:  -- can you rephrase.
4  BY MR. McLAUGHLIN:
5    Q. Sure.  What's the basis of your
6  understanding that certain host family matches don't
7  go particularly well?
8    A. Wouldn't you be concerned going to another
9  country living with a complete random family?
10  Wouldn't you be concerned?
11    Q. But no one told you that, is what I'm
12  asking.
13    A. No.  Actually, Cultural Care told me about
14  a bad experience.
15    Q. When did Cultural Care tell you about a bad
16  experience?
17    A. Before I joined, at a meeting.
18    Q. Do you remember anything else about this
19  meeting?
20    A. Not particularly, no.
21    Q. The meeting was organized by Cultural Care
22  though?
23    A. Yes.
24    Q. Were other prospective au pairs in
25  attendance?

Page 39

1    A. Yes.
2    Q. How was the meeting organized?
3    A. By Cultural Care.
4    Q. Did a representative from Cultural Care,
5  for example, make a presentation?
6    A. Yes.
7    Q. Was there any other part of the meeting
8  other than a presentation from a Cultural Care
9  representative?
10    A. No.
11    Q. Was there an opportunity for prospective
12  au pairs to ask questions of Cultural Care?
13    A. Yes.
14    Q. Do you recall anyone in attendance asking
15  any questions?
16    A. Not particularly.  It was a while ago.
17    Q. Do you remember yourself asking any
18  questions?
19    A. Yes.
20    Q. What did you ask?
21    A. I asked in regards to the extended insurance
22  they offered and pushed on us if it covered
23  traveling home if ██████████.  And they
24  informed me, yes, which later turned out to be
25  false.

Page 40

1    Q. What do you mean by "they pushed insurance"?
2    A. They always pushed the more expensive
3  insurance and tried to give us examples of how
4  certain things weren't covered under the standard
5  insurance and how you should -- how we had to
6  purchase the more expensive one to be fully covered
7  and to be safe.  Otherwise, we weren't safe if we
8  didn't purchase the more expensive full coverage
9  extra.
10    Q. So you got the sense that they wanted you
11  to purchase the more comprehensive insurance?
12        MR. PACHECO:  Objection, form.
13        THE WITNESS:  Correct.
14  BY MR. McLAUGHLIN:
15    Q. A few minutes ago, you mentioned you were
16  aware of low pay before you applied to the au pair
17  program; is that right?
18    A. Yes.
19    Q. What did you know about the pay or stipend
20  associated with being an au pair?
21    A. I knew that it was $195.75, I believe.  And
22  that was it.
23    Q. You were told that was exactly what you
24  were going to be paid?
25    A. Yes.  Nothing more, nothing less.

Page 41

1    Q. Who told you that?
2    A. Cultural Care.
3    Q. Did that occur at this meeting we've been
4  discussing with the Cultural Care representative?
5    A. Yes.  She mentioned it.
6    Q. She mentioned it.  Is it your experience
7  that the stipend for being an au pair is $195.75,
8  no more or no less?
9    A. Correct.
10    Q. That's your personal experience?
11    A. Correct.
12    Q. Have you ever heard of an au pair being
13  paid a figure different than that weekly stipend
14  amount?
15    A. Yes.
16    Q. You have?
17    A. Yes.
18    Q. What was that other stipend amount that
19  you've heard?
20    A. I do not recall.
21    Q. Was it higher than $195.75 per week?
22    A. I don't believe so, no.
23    Q. If it wasn't higher, am I right to assume
24  that it was lower than $195.75 per week?
25    A. Yes.

11 (Pages 38 - 41)

REPLY APP 00992

Page 42

1 Q. And you think a fellow au pair told you
2 that they were being paid less than the $195.75?
3 A. Yes.
4 Q. Do you remember the name of this au pair?
5 A. No.
6 Q. When did you meet this au pair?
7 A. While I was in Denver.
8 Q. Denver. Would you have considered this
9 au pair a friend from your time in Denver?
10 A. No.
11 Q. Do you know which sponsor agency she worked
12 with?
13 A. No.
14 Q. So you don't know if she was associated
15 with Cultural Care as a sponsor agency?
16 A. I don't believe so, no.
17 Q. Do you remember when you decided to apply
18 to the au pair program?
19 A. Not the exact date, no.
20 Q. Do you remember approximately when you
21 applied?
22 A. Approximately 2014, most likely.
23 Q. Did you apply through any au pair sponsor
24 agencies other than Cultural Care?
25 A. No.

Page 43

1 Q. What made you choose to work with Cultural
2 Care as a sponsoring agency?
3 A. They were the only ones I had heard of.
4 MR. McLAUGHLIN: Ms. Patrick, I'd like
5 to draw your attention to what we'll be marking here
6 as Exhibit 3. And it's a document -- at the very
7 top it says, "Home: Matilda Patrick." The bottom
8 right-hand corner has numbers that end in 417. And
9 it's probably easiest to say that there's a picture
10 of you with three kids on the front page.
11 THE WITNESS: Yes.
12 (Patrick Exhibit 3 was marked
13 for identification.)
14 BY MR. McLAUGHLIN:
15 Q. Do you recognize this document?
16 A. Yes.
17 Q. What is this document then?
18 A. I believe it's my application.
19 Q. Do you see the section in the top right
20 part of the very first page where it says, "Why I
21 want to be an au pair"?
22 A. Yes.
23 Q. And there it says, "I love caring for
24 children and I love to travel, becoming an au pair
25 simply combines both of the things I love. I've

Page 44

1 been dreaming of becoming an au pair since I was
2 about ten years old, and I am so excited that now I
3 can make that dream a reality."
4 Did I read that right?
5 A. Yes.
6 Q. And was that statement true when you were
7 applying to be a Cultural Care au pair?
8 A. Yes. At the time.
9 Q. What's changed since --
10 MR. PACHECO: Objection, form
11 foundation.
12 BY MR. McLAUGHLIN:
13 Q. Has anything changed about that statement
14 since you applied to Cultural Care?
15 A. Sorry. Can you rephrase that.
16 Q. Sure. Do you still like caring for
17 children?
18 A. Yes.
19 Q. And do you still like to travel?
20 A. Yes.
21 Q. Were you interested at that time in
22 experiencing life living with an American family?
23 A. Yes.
24 Q. Was there any reason why you were
25 interested in living with an American family?

Page 45

1 A. Something different.
2 Q. If I can point you to, in that same
3 document, the page that ends in 429.
4 A. Yes.
5 Q. Once you're on that page, if I could direct
6 you to the bottom of the page where you're seeing
7 green if it's in color, "What would you like to
8 accomplish during your time as an au pair?"
9 A. Um-hum. Yes.
10 Q. Can you read just the first sentence of
11 that response.
12 A. "I would love to learn more about the
13 American culture."
14 Q. Is there any more of that sentence?
15 A. Oh, sorry. -- "while sharing some of the
16 Australian culture with you."
17 Q. Is it fair to say that at the time you
18 were applying, you were looking for a cultural
19 exchange as part of your au pair experience?
20 A. Yes.
21 Q. Would you have considered at that time
22 living with an American family to be a benefit of
23 the au pair program?
24 MR. PACHECO: Objection.
25 THE WITNESS: Yes.

12 (Pages 42 - 45)

REPLY APP 00993

# Exhibit 62

REPLY APP 00994

Page 1

                                    IN THE UNITED STATES DISTRICT COURT

                                    FOR THE DISTRICT OF COLORADO


JOHANA PAOLA BELTRAN;
et al.,

                    Plaintiffs,

                                            No.
            vs.                             1:14-cv-03074-CMA-KMT

INTEREXCHANGE, INC.; et al.,

                    Defendants.
_____/


            -- CONFIDENTIAL ATTORNEYS' EYES ONLY --


        VIDEOTAPED DEPOSITION OF LILIANA PAULIN LOZANO

            Playa del Carmen, Quintana Roo, Mexico

                    Wednesday, February 14, 2018










REPORTED BY:
LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

REPLY APP 00995

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF COLORADO
 3
   JOHANA PAOLA BELTRAN;
 4 et al.,
 5           Plaintiffs,
                    No.
 6       vs.       1:14-cv-03074-CMA-KMT
 7 INTEREXCHANGE, INC.; et al.,
 8           Defendants.
   _____/
 9
10
        -- CONFIDENTIAL ATTORNEYS' EYES ONLY --
11
12     Videotaped deposition of LILIANA PAULIN LOZANO,
13 taken on behalf of the Defendant, at the Grand Hyatt
14 Playa del Carmen Resort, la Avenida Esquina Calle 26,
15 Colonia Centro, Gonzalo Guerrero, Playa del Carmen,
16 Qunitana Roo, Mexico, beginning at 3:43 P.M. and ending
17 at 7:38 P.M., on Wednesday, February 14, 2018, before
18 Leslie Rockwood Rosas, RPR, CSR No. 3462.
19
20
21
22
23
24
25
```

Page 3

```
 1 APPEARANCES:
 2
 3 FOR THE PLAINTIFFS AND THE WITNESS:
 4    BOIES, SCHILLER & FLEXNER
 5    BY: JUAN P. VALDIVIESO, ESQ.
 6    1999 Harrison Street, Suite 900
 7    Oakland, California 94612
 8    (510) 874-1010
 9    Jvaldivieso@bsfllp.com
10
11 FOR CULTURAL CARE, INC.:
12    CHOATE, HALL & STEWART LLP
13    BY: TIM MCLAUGHLIN, ESQ.
14    Two International Place
15    Boston, Massachusetts 02110
16    (617) 248-5228
17    tmclaughlin@choate.com
18
19
20 Also Present:
21    Alejandro Montalvo, Videographer
22
23
24
25
```

Page 4

```
 1            I N D E X
 2
 3
 4 WEDNESDAY, FEBRUARY 14, 2018
 5
 6 WITNESS              EXAMINATION
 7 LILIANA PAULIN LOZANO
 8
 9  BY MR. MCLAUGHLIN          8, 138
10  BY MR. VALDIVIESO          134, 140
11
12 QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13         (NONE)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1         DEPOSITION EXHIBITS
 2         LILIANA PAULIN LOZANO
 3 NUMBER     DESCRIPTION          IDENTIFIED
 4 Exhibit 1   Amended Notice of Deposition,    11
 5         2.8.18
 6 Exhibit 2   Consent To Join, 11.2.17     16
 7 Exhibit 3   Notice of Your Right to Join    23
 8         Lawsuit For Unpaid Wages,
 9         11.2.17
10 Exhibit 4   Survey, Liliana Paulin      45
11         Lozano, 11.22.17
12 Exhibit 5   Survey, Liliana Paulin      53
13         Lozano, 11.27.17
14 Exhibit 6   Profile, Liliana Paulin,     59
15         CC00037275 - 289
16 Exhibit 7   Profile, ▮▮▮▮ family,      72
17         CC00037260 - 269
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

REPLY APP 00996



**Page 74**

1  to.  But certainly the next couple of pages.
2      A.  Yes.
3      Q.  And let me know when you're ready.
4      A.  I'm ready.  I know what it says.
5      ███████████████████████████████
   ██
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████
   █  ███████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ██████████████████████████
19      Q.  Let's go back to when you were first talking
20  with the ████████
21      A.  Uh-huh.
22      Q.  ████, the host mom, reached out to you via
23  email?
24      A.  Yes.
25      Q.  Do you remember how you responded to that email?

**Page 75**

1      A.  No, not really.  I mean, I told them, "Hey,
2  I" -- I probably told them, "I looked at your profile.
3  I'm interested.  Let's schedule a call."  And then
4  schedule a call.  And that was it.  A call -- a video
5  call.
6      Q.  Did you use Skype for that call?
7      A.  Yes.
8      Q.  Do you recall who set the call up?
9      A.  Sorry?
10      Q.  Do you know who set the call up -- who suggested
11  the call, the Skype call?
12      A.  It was probably ████.  I don't know.  Probably.
13  Yeah, I mean, they had to make sure.  It's, like, part of
14  the process.
15      Q.  Do you remember anything else that -- strike
16  that.
17      Who did you meet with virtually on that Skype
18  call?
19      A.  Everyone.
20      Q.  Who is "everyone"?
21      A.  ████████████████████████.  And the
22  dogs.
23      Q.  Let's focus on the humans for now.
24      Who is ████?
25      A.  The host dad.

**Page 76**

1  █
   ██ ████████████████████
   █  ████████████████████████████████
   █  ██████████████████████████████████████
   ████
   █  █████████████████████████████
   █  ████████
   █  ████████████████
   █  ██████████████████████████
   █  █████████████████████████████
   █  ████████████████████████████████████.
14      Q.  On that call, did the ██████ family tell you
15  what they were looking for in an au pair?
16      A.  Yeah, I think so.  I don't remember, to be
17  honest.
18      Q.  Do you generally remember what they told you?
19      A.  Just to -- technically, a repeat of what they
20  said in their profile, so -- I mean, I didn't go there
21  without knowing how the kids were, so --
22      Q.  What they told you on the call was more or less
23  what they --
24  ██████████████████████████████.
25      Q.  -- put in their profile?

**Page 77**

1      A.  It was going to be difficult.  "It's not going
2  to be easy.  Do you still want to come here?  I mean,
3  they are -- they have issues," and...
4  ██████████████████████████████████████
   ██████████████████████████
   █  ███████████████████████████████
   ██████████████████████████████████████
   ███████████████████████████████████.
10      MR. VALDIVIESO:  And, Counsel, I'm going to
11  designate this portion of -- well, I'm going to designate
12  the whole transcript confidential.  But especially when
13  we're starting to talk about individual children, I think
14  we should designate this attorneys' eyes only.
15      MR. MCLAUGHLIN:  I think that's fair.
16      Q.  At this time, what characteristics of a
17  potential host family mattered the most to you?
18      A.  I like it -- I liked it because they were old
19  enough to do things.  I mean, they weren't babies.  I
20  don't take care of the babies.  No babies.
21      Q.  Did the ████████ tell you where they lived?
22      A.  Yeah.
23      Q.  Where did the ██████ live?
24      A.  █████████████████████████
   ████████████████████████



1 ████████████████████████████

2 ████████████████████. And it says --

3 the address is San Diego.

4 Q. Had you heard of San Diego before you met the

5 ████████ family?

6 A. Not a lot. Just border city. And that's it.

7 Q. Once you started talking with the ████████

8 family, did you seek out additional information about

9 San Diego?

10 A. Yeah. I mean, my -- the -- my family will tell

11 me, "Don't go there." It's just, "Why are you going to

12 San Diego?" It's, like, "Ma, I don't go for the place.

13 I go for the family. I like them," so --

14 Q. Was your family worried about you going to

15 San Diego?

16 A. Yeah.

17 Q. Why were they worried about you going to

18 San Diego?

19 A. It's a border city with TJ.

20 Q. Because they were concerned about --

21 A. TJ. They were concerned about TJ, not

22 San Diego.

23 Q. They were concerned about Tijuana, not

24 San Diego?

25 A. Yeah.

1 Q. Other than talking with your host family about

2 potential safety concerns, did you otherwise learn

3 anything else about San Diego?

4 A. What do you mean?

5 Q. Did you, for example, search the internet to

6 learn about the City of San Diego?

7 A. Yeah, I believe so. I think so. I should have.

8 I wouldn't have gone like that, just...

9 Q. You would have gone and learned more about --

10 A. I'm pretty sure I Google it. I can't tell you I

11 did. But I'm pretty sure I did. I mean, I wouldn't -- I

12 had to. I had to.

13 Q. Did you have a sense at that time whether

14 San Diego was an expensive city to live in?

15 A. I didn't know that. I never heard there's -- I

16 didn't know California was that expensive.

17 Q. Do you know that California is that expensive

18 now?

19 A. Is it what?

20 Q. Do you know that California is an expensive

21 place to live now?

22 A. Oh, yeah.

23 Q. During your phone call with the ████████, did

24 you ask about the hours that you would be expected to

25 work?

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████

4 ███████████████████████

5 ██

6 ██████████████████████████████████

7 ██████████████

8 ███████████████████████████████

9 █████████████████████████████

10 ██████████████████████████████████

11 ████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████████████

14 Q. On the call with the ████████, did you ask what

15 your stipend would be?

16 A. I don't recall.

17 Q. Before coming to the United States, though, you

18 knew what your stipend would be?

19 A. The agency told me so --

20 Q. You never discussed that with the ████████

21 family?

22 A. When I was there, she asked me if -- if that was

23 enough. And she offered, like, "Hey, I think you don't

24 make enough. Tell me if you need more."

25 And we never talk about it anymore. I mean, I

1 never thought about it. I never -- I never want to ask

2 for more, because I didn't think I could get more. I

3 didn't know it was --

4 Q. From that conversation, did you get the sense

5 that ████ the host mom, thought you were underpaid?

6 A. Yes. She did tell me that.

7 Q. What was your response?

8 A. I don't recall. I don't recall.

9 Q. You didn't request more money, did you?

10 A. I didn't feel comfortable doing it. Because at

11 the training school they told us that we only can get

12 paid that amount of money. We couldn't get extra money.

13 Q. At training school they told you what,

14 precisely, about the stipend?

15 A. That that was the stipend and that I couldn't

16 get more. That I wasn't gonna get paid more than that.

17 Q. At the training school they told you that you

18 would never get paid more than $195.75 per week? Is that

19 your testimony?

20 MR. VALDIVIESO: Objection. Misstates the

21 witness' testimony.

22 If you want to review what the witness'

23 testimony was, you can ask the court reporter to read it

24 back to you.

25 Q. BY MR. MCLAUGHLIN: At the training school did

Page 82

1　they tell you you would never get paid more than $195 --
2　　A.　I couldn't get paid.　I couldn't get paid.
3　　Q.　Did they say why you couldn't get paid more than
4　$195.75 per week as a stipend?
5　　A.　I don't recall exactly.　But I wanted to -- I
6　felt it wasn't right for me to get more money.　So that I
7　only could get the 190.　And I felt -- I even felt bad
8　for getting 200 exactly, you know.
9　　Q.　Why -- why did you feel bad about receiving $200
10　per week?
11　　A.　Because I was told that I was only supposed to
12　get that.　No -- no more than that.
13　　Q.　Did you think someone would get in trouble if
14　you got paid more?
15　　A.　Yeah, I did think that.
16　　Q.　Who did you think was at risk for getting in
17　trouble?
18　　A.　Oh, no, no, no, sir.　What was the question?　I
19　thought I could get in trouble by getting -- receiving
20　more money.
21　　Q.　You thought you, as the au pair, could get in
22　trouble?
23　　A.　Yes.
24　　Q.　On the Skype call with the █████, did they
25　tell you anything about their house?

Page 83

1　████████████████████████
2　████████████████████
3　████████████████
4　██████████████████
5　████████████████
6　██████████████
7　██████████████████████████
8　██████████████████████████
9　██████████████████████████
10　██████████████████████████
11　██████████████████████
12　██████████████████
13　████████████████████
14　██████
15　██████████████████████
16　██████████████████
17　██████████████████
18　████████████████████
19　██████████████████
20　██████
21　██████████████

Page 84

1　██████████████
2　　Q.　Was there a computer in your room?
3　　A.　It was mine.
4　　Q.　You had your own computer?
5　　A.　My own computer, yes.
6　██████████████████
7　██████████████████████
8　████████████████████
9　██████████████████
10　████████████████████
11　██████████████████
12　██████████████████████
13　████████████████████████████
14　████████
15　██████████████████████████
16　██████████████████
17　　Q.　Do you recall how the █████ told you that --
18　do you recall -- strike that.
19　　　How did you find out that you had matched with
20　the █████ family?
21　　A.　It shows you the page.　Like, the profile shows
22　you when a family is interested and is looking at your
23　profile.
24　　Q.　When did you leave for the United States?
25　　A.　When did I leave to the United States or from

Page 85

1　the United States?
2　　Q.　From Mexico to the United States.
3　　A.　To the United States.　That date, the 28th or
4　27th.　28th of July.
5　　Q.　Of which year?
6　　A.　Wait.　2014 to 2016.　Let's see.
7　　Q.　You previously said you needed a visa to come to
8　the United States; is that correct?
9　　A.　Yes.　You need a special, specific visa to be an
10　au pair.
11　　Q.　Who handled the preparation of that au pair
12　visa?
13　　A.　Well, I went to the interviews.　And then I made
14　the schedule and everything.　I mean, I scheduled the
15　interviews and answered the survey and wrote the
16　questionnaire.
17　　Q.　Was Cultural Care in any way involved with
18　the --
19　　A.　I gave her --
20　　Q.　-- preparation?
21　　A.　-- the money to pay for it.　I believe so, if
22　I -- if I recall.　I -- I don't remember if I -- not --
23　to be honest, I don't remember if I gave them money or if
24　I paid directly to the -- because I'm pretty sure I paid.
25　I don't know.　It was a long time ago.　But I paid for

22 (Pages 82 - 85)

REPLY APP 00999

Case No. 1:14-cv-03074-CMA-KMT   Document 560-42   filed 04/27/16   USDC Colorado   pg 1
121 of 219

# Exhibit 63

REPLY APP 01000

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3

 4     JOHANA PAOLA BELTRAN, et al.,

 5            Plaintiffs,

 6     vs.                    CASE NO:  1:14-cv-03074-CMA-KMT

 7     INTEREXCHANGE, INC., et al.,

 8            Defendants.

 9     _____

10

11

12

13            The videotaped deposition of AURELIE-JULIETTE

14     THERESE RUEHL, taken by the attorney for the defendant,

15     commencing at approximately 9:00 a.m., on the 27th day of

16     February 2018, at 220 West Garden Street, Suite 801,

17     Pensacola, Florida, before Dana L. Jeffries, Registered

18     Professional Reporter and Notary Public in and for the

19     State of Florida at large.

20

21

22

23

24

25
```

REPLY APP 01001

Case 1:14-cv-03074-CMA-KMT Document 986-10 Filed 04/13/18 USDC Colorado Page 122 of 218

**Page 2**

1          APPEARANCES

2 FOR THE PLAINTIFFS:

        MICHAEL SCHAFLER, ESQUIRE

3         Boies, Schiller, Flexner

        725 S Figueroa Street

4         31st Floor

        Los Angeles, CA  90017

5

6 FOR THE DEFENDANT

  CULTURAL CARE INC.:   VIRGINIA SELDEN, ESQUIRE

7         Choate, Hall & Stewart

        Two International Place

8         Boston, MA  02110

9

Also present:     Steve Ford, Videographer

10

11       INDEX OF WITNESS

              PAGE NO.

12 AURELIE-JULIETTE THERESE RUEHL

13 Direct Examination by Ms. Selden     4

    Cross-Examination by Mr. Schafler    159

14 Redirect Examination by Ms. Selden    161

15

    Certificate of Oath         163

16   Certificate of Reporter       164

17

      INDEX OF EXHIBITS

18

PLAINTIFFS' NUMBER

19

None

20

   DEFENDANTS' NUMBER

21

   Exhibit 1  Notice of Deposition      6

22  Exhibit 2  Consent to Join Form     10

   Exhibit 3  Notice of Your Right to Join the

23         Lawsuit for Unpaid Wages    12

   Exhibit 4  Application         43

24  Exhibit 5  Questionnaire       64

25

**Page 3**

1       THE VIDEOGRAPHER: We're now on the record.

2 My name is Steve Ford representing Wierzbicki Court

3 Reporting. Today is Tuesday, February 27, 2018.

4 The time is approximately 8:56 a.m. central time.

5 This deposition is being held at Wierzbicki Court

6 Reporting located at 220 West Garden Street, Suite

7 801, Pensacola, Florida, and it's being taken by

8 counsel for the defense.

9       The caption of the case is Johana Paola

10 Beltran, et al. versus Interexchange, Inc., et al.

11 This case is filed in the United States District

12 Court for the District of Colorado. The case

13 number is 1:14-CV-03074-CAM-KMT (sic). The witness

14 is Aurelie Ruehl.

15       At this time will counsel state their

16 appearance for the record after which the court

17 reporter, Dana Jeffries, will swear the witness.

18       MS. SELDEN: Good morning. Virginia Selden

19 from Choate, Hall & Stewart, on behalf of Cultural

20 Care, Incorporated.

21       MR. SCHAFLER: Good morning. Michael

22 Schafler, Boies, Schiller, Flexner on behalf of Ms.

23 Ruehl, who is the deponent.

24       THE VIDEOGRAPHER: Put your mic on, please.

25 WHEREUPON,

**Page 4**

1     AURELIE-JULIETTE THERESE RUEHL

2 was called as a witness and, after having been first duly

3 sworn, testified as follows:

4       MS. SELDEN: Michael, I understand that in

5 our prior depositions we've agreed to reserve all

6 objections except as to the form of the question

7 until the time of trial and that all motions to

8 strike are also reserved until the time of trial.

9 Is that agreeable to you today?

10       MR. SCHAFLER: Yes, it is, and just to be

11 clear for the record, that means that I will just

12 simply state "objection" when I decide to object,

13 and that will preserve all objections.

14       MS. SELDEN: Yes.

15       DIRECT EXAMINATION

16 BY MS. SELDEN:

17   Q   Good morning.

18   A   Hi.

19   Q   Could you please state your full name for the

20 record?

21   A   Aurelie-Juliette Therese Ruehl.

22   Q   And if I say Ms. Ruehl, am I pronouncing that

23 correctly?

24   A   Yes.

25   Q   Thank you. Can you please state your address

**Page 5**

1 for the record?

2   A   █████████████████████████

3   ██████████████

4   Q   Have you ever been deposed before, Ms. Ruehl?

5   A   No.

6   Q   I'll start with a few basic ground rules

7 before we jump into the questions. Please respond to my

8 questions with verbal answers like yes or no rather than

9 nods or head shakes so the court reporter can make a

10 record.

11       Please listen to each of my questions before

12 answering. It's important that we don't speak over each

13 other. And please let me know if you don't understand a

14 question and I'll be happy to rephrase it. Do you

15 understand?

16   A   Uh-huh (affirmative), yes.

17   Q   And please let me know if you don't hear a

18 question clearly. We can ask the court reporter to read it

19 back. But if you don't ask for clarification, I'll assume

20 that you understood and heard the question.

21       And finally, please just let me know if you

22 need to take a break at any time. We're happy to do that.

23 I just ask that you answer any questions that are pending

24 before we take the break.

25   A   Okay.

2 (Pages 2 - 5)

REPLY APP 01002



**Page 94**

1    A   Right, about one or two, I would say for most
2 days.
3    Q   And when would you finish working in the
4 evening?
5    A   There wasn't an exact -- exact time, when I
6 felt I was done.
7 ████████
████████
████████
████████
████████
13    Q   It varied every day?
14    A   Yes.
15    Q   I believe you testified that you asked the
16 ████ family about their schedule when you were applying
17 for the program?
18    A   Yes.
19    Q   And they provided you with a schedule?
20    A   Not a set schedule.  They would talk about
21 their daily routine.
22    Q   During the time that you applied?
23    A   Yes.
24    Q   And did the schedule that you worked for the
25 Gibbs family line up with what you had discussed during the

**Page 95**

1 application process?
2        MR. SCHAFLER:  Objection.
3    A   There wasn't much discussion or much detail
4 given, so I would say yes.
5 BY MS. SELDEN:
6    Q   How many days per week did you care for the
7 children?
8    A   Usually Monday through Friday.  Sometimes
9 Saturday evening or Sunday, but it was rare, though.
10    Q   Sundays were rare?
11    A   Yes.
12    Q   Were Saturday evenings rare?
13    A   About once or twice a month maybe.
14    Q   And about how long on a Saturday evening
15 would you care for the children?
16    A   It depended.  I mean, I was the one at home
17 while the parents were out doing date night.
18    Q   And what about on Sundays?  Is there an
19 average amount of time you would work on Sundays?
20    A   Most Sundays is usually off for me.
21    Q   How many hours per day during the week Monday
22 through Friday were you on duty?
23    A   I'm not sure how to answer that.
24    Q   How often were you working?
25    A   ████████

**Page 96**

1 ████████
████████
████████
6    Q   But you weren't always working during that
7 time?
8    A   Right.
9    Q   How many hours per week did you typically
10 work with the ████ family?
11    A   It switched, changed.  About 35, I would say.
12    Q   Thirty-five on average?
13    A   I think so, yes.
14    Q   Did you ever work fewer than 35 hours?
15    A   Maybe.
16    Q   Do you recall when that would have happened?
17    A   No.
18    Q   Did you ever work more than 35 hours a week?
19    A   Yes.
20    Q   When did that happen?
21    A   The summer breaks.
22    Q   And what would your schedule be like in the
23 summer?
24    A   I worked the full 40, 45 hours a week.
25    Q   Did you ever work over 45 hours a week?

**Page 97**

1    A   There were a couple of weeks where the
2 schedule looked like I was going to work more than 45
3 hours, but I did tell them I wasn't going to.
4    Q   So did you ever work more than 45?
5    A   Not that I recall.
6 ████████
████████
████████
████████
████████
████████
████████
████████
████████
████████
████████
████████
19    Q   And so what was the solution?
20    A   She, I think, scratched two or three hours of
21 the -- of two days to make it under 45.
22    Q   So she was willing to accommodate you?
23    A   Yes.
24    Q   I believe you testified earlier that you had
25 an LCC during your time with the ████ family?

25 (Pages 94 - 97)

Page 98

```
1    A   Yes.
2    Q   And her name was Melissa?
3    A   Yes.
4    Q   How often -- strike that.
5        Did you meet with Melissa?
6    A   Yes.
7    Q   Did you meet with her in person?
8    A   Yes.
9    Q   How often did these meetings happen?
10   A   We had monthly au pair meetings that we had
11 to attend.  I didn't always see her.  I didn't go to every
12 month's meeting with my local child care coordinator.  We
13 were allowed to go to other meetings in the surrounding
14 areas.
15   Q   And did you go to other meetings in the
16 surrounding areas?
17   A   Yes.
18   Q   How often?
19   A   I would usually stick to my own meetings, but
20 about three out of the year, I would go to different ones.
21   Q   Why would you decide to go to a different
22 meeting?
23       MR. SCHAFLER:  Objection.
24   A   Because their meetings are really boring and
25 we went with our friends.
```

Page 99

```
1 BY MS. SELDEN:
2    Q   So you had friends that attended different
3 monthly meetings?
4    A   Right.
5    Q   And you would occasionally about three times
6 a year attend meetings with your friends?
7    A   Right.
8    Q   Was it always -- strike that.
9        What other LCCs did you meet?
10   A   I don't recall their names, but they're all
11 through Cultural Care.
12   Q   When you were working in the ▮▮▮ home, was
13 ▮▮▮ ever home?
14   A   Yes, sometimes.
15   Q   Because he worked from home, correct?
16   A   Yes.
17   Q   So some of the hours that you were on duty
18 ▮▮▮ was also in the home?
19   A   Yes.
20   Q   Do you know how often that happened?
21   A   No.
22   Q   Did you ever have weekends off?
23   A   Yes.
24   Q   How often?
25   A   About two or three times a month.
```

Page 100

```
1    Q   What would you do with your free time on the
2 weekend?
3    A   Sleep, meet with friends, go to church.
4    Q   Did you ever choose to spend any of the free
5 time with the ▮▮▮ -- with the ▮▮▮ family?
6    A   Yes.
7    ▮   ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11   Q   And did you consider that to be working time?
12   A   No.
13   Q   Why not?
14   A   Because it wasn't expected of me, but I
15 volunteered to do that.
16   Q   I believe you testified that there was a
17 weekly calendar; is that correct?
18   A   Yes.
19   Q   Who provided that calendar to you?
20       MR. SCHAFLER:  Objection.
21   A   The host parents.
22 BY MS. SELDEN:
23   Q   And did they provide you with a calendar
24 every week?
25   A   I believe so.  I don't recall.
```

Page 101

```
1    Q   Did Cultural Care ever provide you with a
2 calendar?
3    A   No.
4    Q   Did the host family set your schedule every
5 week?
6    A   Yes.
7    Q   Did Cultural Care ever set your schedule?
8    A   No.
9    Q   Who set your job duties?
10   A   Cultural Care.
11   Q   How did Cultural Care set your job duties?
12   A   They said what household duties I was allowed
13 to do, what I wasn't to do.  So --
14   Q   But when you were in the ▮▮▮ home --
15   A   Right.
16   Q   -- did the ▮▮▮ family ask you to do certain
17 duties?
18   A   The ones that were allowed by Cultural Care,
19 yes.
20   Q   Cultural Care never asked you specifically to
21 do certain child care duties for the ▮▮▮ family?
22       MR. SCHAFLER:  Objection.
23   A   I don't know how to answer that.
24 BY MS. SELDEN:
25   Q   Do you not understand the question?
```

26 (Pages 98 - 101)

REPLY APP 01004



Page 102

1   A   I guess not.
2

9       MR. SCHAFLER: Objection.
10   A
11 BY MS. SELDEN:
12

19       MR. SCHAFLER: Objection.
20   A
21 BY MS. SELDEN:
22   Q

24       MR. SCHAFLER: Objection.
25 BY MS. SELDEN:

Page 103

1   Q   Do you have any records of the job duties
2 that you were expected to perform for the ▇▇▇ family?
3   A   What do you mean?
4   Q   Did they ever write down those expectations?
5   A   I don't remember.
6   Q   Would those sort of job duties be included on
7 the weekly calendar?
8   A   No.
9   Q   So how did you know that you were expected to
10 do them?
11   A   I guess we talked about it.
12

18   Q   Did you have a driver's license when you were
19 an au pair?
20   A   Yes.
21   Q   Was it an international driver's license?
22   A   Yes.
23   Q   And did you have access to a car when you
24 were working with the ▇▇▇ family?
25   A   Yes.

Page 104

1   Q   Did you use the car to drive the children to
2 and from school?
3   A   I drove --
4       MR. SCHAFLER: Objection.
5   A   -- them around.
6 BY MS. SELDEN:
7   Q   Where would you drive them?
8   A   To their activities.
9   Q   How often were you expected to drive the
10 ▇▇▇ children to their activities?
11   A   Every day.
12   Q   Did you ever use the car personally?
13   A   Yes.
14   Q   When would you use the car?
15   A   During my off time.
16   Q   And did you ask the host parents for
17 permission every time you wanted to use the car?
18   A   Not every time.
19   Q   When would you ask them for permission?
20   A   On the weekends.
21   Q   Did they let you use the car on the weekends?
22   A   Sometimes.
23   Q   Did they ever tell you that you couldn't use
24 the car on the weekends?
25   A   Yes.

Page 105

1       MR. SCHAFLER: Objection.
2 BY MS. SELDEN:
3   Q   And why?
4       MR. SCHAFLER: Objection.
5   A   Because they needed it.
6 BY MS. SELDEN:
7   Q   How often would you use the car for personal
8 reasons?
9   A   I don't remember.
10   Q   Was it every week?
11   A   Yes.
12   Q   Every day?
13   A   I don't know.
14   Q   Did you pay to use the car?
15   A   I paid for gas.
16   Q   Did you pay for gas when you were taking the
17 children to other activities?
18   A   It was paid through the host family.
19   Q   And when you used the car for personal
20 reasons, did the host family pay for gas?
21   A   It was my money that I spent on my gas.
22   Q   So you paid for gas yourself?
23   A   Yes.
24   Q   Do you recall about how much a week you spent
25 on gas?

27 (Pages 102 - 105)

REPLY APP 01005



**Page 114**

1 Disney World?
2    A   Yes.
3    Q   How often?
4    A   I mean, during the day.
5    Q   Was it every day that you were there?
6    A   Yes.
7    Q   Did you receive your stipend that week?
8    A   Yes.
9
10
11
12
13
14
15
16
17
18
19
20
21       s.
22    Q   Were those vacations for you, or were you
23 working?
24    A   Neither or.
25    Q   What do you mean by that?

**Page 115**

1    A   I thought it wasn't vacation time for me, but
2 I also wasn't working a full workweek.
3    Q   Do you recall how many hours you would have
4 worked in Tennessee?
5    A   No.
6    Q   Was it fewer than 30?
7    A   I don't remember.
8    Q   Was it fewer than 45?
9    A   Yes.
10       MR. SCHAFLER: Objection.
11 BY MS. SELDEN:
12    Q   And were you paid your stipend for the weeks
13 in Tennessee?
14    A   I don't remember.
15    Q   Did those -- did that time in Tennessee count
16 towards your vacation time?
17    A   No.
18    Q   When did you go to South Carolina with the
19 Gibbs family?
20    A   I don't remember. It was -- I think it's
21 spring or summer break.
22    Q   Do you recall how long you were there?
23    A   About a week.
24    Q   And did that week count towards your personal
25 vacation time?

**Page 116**

1    A   No.
2    Q   Were you working with the ▮▮▮▮ family when
3 you were in South Carolina?
4    A   Yes.
5    Q   Were you working a full schedule?
6    A   I don't remember.
7    Q   And do you remember whether you received your
8 stipend that week?
9    A   I believe I did.
10    Q   Did the ▮▮▮▮ family, other than their trip
11 to California, ever take a trip where you didn't go along?
12    A   Yes.
13
14
15
16
17    Q   And do you remember where you -- whether you
18 received your stipend when they were somewhere else that
19 you were taking personal vacation?
20    A   I don't remember.
21    Q   Can you repeat that, please?
22    A   I said I don't remember.
23    Q   Did you ever travel without the family during
24 your time as an au pair?
25    A   During my vacation time.

**Page 117**

1       MR. SCHAFLER: Objection.
2 BY MS. SELDEN:
3    Q   Did you ever travel outside of your vacation
4 time?
5    A   No.
6    Q   And where did you go on your vacation?
7    A   I was with my former host family in Arkansas.
8    Q   Your high school exchange host family?
9    A   Yes.
10    Q   Did you visit them for both vacations?
11    A   I -- no. The one vacation I went to Germany.
12    Q   How many vacations did you take when you were
13 an au pair?
14    A   Two. One a year.
15    Q   And how long were those trips?
16    A   One was less than two weeks, and the other
17 one was less than that, too. I don't remember.
18    Q   Did you take any additional vacation days?
19    A   No.
20    Q   Did the ▮▮▮▮ family pay you a stipend?
21    A   Yes.
22    Q   What stipend amount did they pay you?
23    A   $200.
24    Q   Did you ever discuss the stipend amount with
25 the ▮▮▮▮ family?

30 (Pages 114 - 117)

REPLY APP 01006



Page 118

1      A     No.
2      Q     Do you know why they decided to pay you $200?
3            MR. SCHAFLER:  Objection.
4      A     No.
5 BY MS. SELDEN:
6      Q     And the host family paid the stipend to you,
7 correct?
8      A     Yes.
9      Q     Did Cultural Care ever pay you a stipend?
10     A     No.
11     Q     Did you ever ask the ███ family for more
12 money?
13     A     No.
14     Q     Why not?
15     A     Because at the meeting with Cultural Care in
16 Germany, they said all stipends would be $195.
17     Q     And you were receiving $5 more than that; is
18 that correct?
19     A     Well, if you want to be exact, it's $4.25,
20 yes.
21     Q     So you were receiving $4.25 more?
22     A     Yes.
23     Q     And did you ask the ███ family why they
24 decided to pay the $4.25 more?
25     A     No.

Page 119

1      Q     Did the ███ family ever pay you more than
2 $200 a week?
3      A     No.
4      [redacted]
11     Q     Did they ever give you any additional money
12 for your personal use?
13     A     No.
14     Q     Did the family ever pay for anything on your
15 behalf?
16           MR. SCHAFLER:  Objection.
17     A     What do you mean?
18 BY MS. SELDEN:
19     Q     You said they would reimburse certain
20 expenses related to the children?
21     A     Yes.
22     Q     Correct.  Did they ever reimburse any
23 personal expenses for you?
24     A     No.
25     Q     Did they ever pay -- strike that.

Page 120

1            Did you have any expenses, regular expenses
2 during your two years as an au pair?
3            MR. SCHAFLER:  Objection.
4      A     I mean, living expenses, yeah, like
5 toiletries, things like that.
6 BY MS. SELDEN:
7      Q     Did you have any other expenses?
8            MR. SCHAFLER:  Objection.
9      A     Not that I recall.  I had to pay for health
10 insurance.
11 BY MS. SELDEN:
12     Q     And you paid for that?
13     A     I did in the beginning, and eventually it was
14 too expensive.  I couldn't afford it.
15     Q     What happened?
16     A     I was uninsured.
17     Q     Do you recall how much you were paying for
18 health insurance?
19     A     About $200 a month.
20     Q     Do you believe that the ███ family paid you
21 everything that you were promised?
22           MR. SCHAFLER:  Objection.
23     A     I wasn't -- I don't know how to answer that.
24 BY MS. SELDEN:
25     Q     When you applied to the au pair program --

Page 121

1      A     Right.
2      Q     -- did you understand that you would receive
3 a weekly stipend?
4      A     Yes.
5      Q     And what did you understand that weekly
6 stipend to be?
7      A     $195.
8      Q     And 75 cents?
9      A     Yes.
10     Q     And do you believe that your host family owes
11 you any additional money?
12     A     Towards the end of my two years, yes.
13     Q     Why is that?
14     A     Because they deducted my pay by $100 for 10
15 weeks.
16     [redacted]

31 (Pages 118 - 121)

REPLY APP 01007

Page 122

```
 1   Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 2        MR. SCHAFLER: Objection.
 3   ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
 7   BY MS. SELDEN:
 8   Q    Do you believe you're owed money for your
 9   time working as a Cultural Care au pair?
10   A    Yes.
11   Q    Who do you believe owes you money?
12        MR. SCHAFLER: Objection.
13   A    Cultural Care.
14   BY MS. SELDEN:
15   Q    And what is the basis for that belief?
16   A    I signed the contract with Cultural Care.
17   Q    When did you sign a contract with Cultural
18   Care?
19   A    Before I came to the U.S.
20   Q    In Germany?
21   A    Yes.
22   Q    Did Cultural Care ever pay you anything?
23   A    No.
24   Q    Were you ever an employee of Cultural Care?
25        MR. SCHAFLER: Objection. I'm going to
```

Page 123

```
 1   instruct you not to answer that question based on
 2   it being a legal conclusion or calling for a legal
 3   conclusion and expert opinion.
 4        MS. SELDEN: I'll state again I'm not asking
 5   for an expert opinion or a legal conclusion but for
 6   the witness' opinion as a plaintiff in this
 7   lawsuit.
 8        MR. SCHAFLER: Whether she was an employee.
 9        MS. SELDEN: Uh-huh (affirmative).
10        MR. SCHAFLER: Okay. I'm instructing you not
11   to answer the question.
12   BY MS. SELDEN:
13   Q    How much money do you believe that Cultural
14   Care owes you?
15        MR. SCHAFLER: Objection.
16   A    Whatever I'm entitled to.
17   BY MS. SELDEN:
18   Q    And what do you feel you're entitled to?
19        MR. SCHAFLER: Objection.
20   A    Whatever seems fair.
21   BY MS. SELDEN:
22   Q    What seems fair to you?
23        MR. SCHAFLER: Same objection.
24   A    I don't know.
25   BY MS. SELDEN:
```

Page 124

```
 1   Q    But you do believe that Cultural Care owes
 2   you money?
 3   A    Yes.
 4        MR. SCHAFLER: Same objection.
 5   BY MS. SELDEN:
 6   Q    When did you come to that belief?
 7        MR. SCHAFLER: Objection.
 8   A    During my time as an au pair.
 9   BY MS. SELDEN:
10   Q    And did you discuss that belief with anyone?
11   A    Other au pairs.
12   Q    Which other au pairs?
13   A    I don't remember all of their names.
14   Q    Do you remember some of their names?
15   A    The five that I already mentioned. Other au
16   pairs working in my area.
17   Q    Did you ever discuss this with your LCC?
18   A    No.
19   Q    Did you ever discuss it with your host
20   family?
21   A    Not while I was an au pair.
22   Q    Have you discussed it with them since?
23   A    Yes.
24   Q    How many times have you had that discussion?
25   A    About once.
```

Page 125

```
 1   Q    And what did they say?
 2   A    They agreed that au pairs are underpaid and
 3   that it's hard for them to justify paying us more because
 4   they have the high agency fees that they pay every year.
 5   Q    But your host family -- well, continue.
 6   A    They're paying the agency a lot of money, so
 7   it totals a lot of money for the entire year, but we don't
 8   see all of it or even the majority of it so --
 9   Q    Your host family decided to pay you $200 a
10   week; is that correct?
11        MR. SCHAFLER: Objection.
12   A    Yes.
13   BY MS. SELDEN:
14   Q    Did your host family decide to pay you $200 a
15   week?
16   A    Yes.
17   Q    Cultural Care did not decide that you should
18   be paid -- did Cultural Care decide that you should be paid
19   $200 a week?
20        MR. SCHAFLER: Objection.
21   A    I don't think so.
22   BY MS. SELDEN:
23   Q    Do you believe that you were paid unfairly?
24   A    Yes.
25        MR. SCHAFLER: Objection.
```

32 (Pages 122 - 125)

REPLY APP 01008

Case No. 1:14-cv-03074-CMA-KMT   Document 681-1   filed 04/27/18   USDC Colorado   pg
130 of 219

# Exhibit 64

<pre>
 1                IN THE UNITED STATES DISTRICT CIRCUIT

 2                   FOR THE DISTRICT OF COLORADO

 3

 4   JOHANA PAOLA BELTRAN, et al.        ) CIVIL ACTION NO.
                                         ) 1:14-cv-03074-
 5                    Plaintiffs,        ) CMA-KMT
                                         )
 6            vs.                        )
                                         )
 7   INTEREXCHANGE, INC.; et al.,        )
                                         )
 8                    Defendants.        )
     _____)
 9

10

11

12              DEPOSITION OF VIKTORIIA MYSHCHENKO

13   taken on behalf of the Defendant Go Au Pair, taken at
     Island Court Reporting, 101 Aupuni Street, Suite 212,
14   Hilo, Hawaii 96720, commencing at 8:27 a.m. on March 7,
     2018, pursuant to Notice.
15

16   Before:  Wendy L. Graves, RPR, CSR 460

17

18

19

20

21

22

23

24

25
</pre>

H+G

Hunter + Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

Your Partner in Making the Record

■ www.huntergeist.com
■ scheduling@huntergeist.com

**VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN, et al.     ) CIVIL ACTION NO.
                                 ) 1:14-cv-03074-
            Plaintiffs,          ) CMA-KMT
                                 )
      vs.                        )
                                 )
INTEREXCHANGE, INC.; et al.,     )
                                 )
            Defendants.          )
_____  )

DEPOSITION OF VIKTORIIA MYSHCHENKO
taken on behalf of the Defendant Go Au Pair, taken at
Island Court Reporting, 101 Aupuni Street, Suite 212,
Hilo, Hawaii 96720, commencing at 8:27 a.m. on March 7,
2018, pursuant to Notice.

Before:  Wendy L. Graves, RPR, CSR 460

---

**2**

APPEARANCES
ON BEHALF OF THE PLAINTIFFS:
BOIES SCHILLER FLEXNER L.L.P.
BY:  JUAN P. VALDIVIESO, Attorney at Law
     SEAN PETTERSON, Attorney at Law
     (attorneys appearing by videoconference)
1999 Harrison Street, Suite 900
Oakland, California 94612


ON BEHALF OF THE DEFENDANTS AGENT AU PAIR, INC.,
AMERICAN CULTURAL EXCHANGE, LLC d/b/a GoAuPair, and AU
PAIR INTERNATIONAL INC.:
WHEELER TRIGG O'DONNELL L.L.P.
BY:  BRETT M. MULL, Attorney at Law
     (appearing by videoconference)
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5674

ALSO PRESENT:  Mary Marvin Porter, Videographer

---

**3**

CONTENTS

EXAMINATION                                          PAGE
     BY MS. MULL............................     6
     BY MR. VALDIVIESO......................   117

          EXHIBITS MARKED
DEPOSITION EXHIBITS                                  PAGE
Exhibit 1    Second Amended Notice of                 8
             Deposition of Viktoriia
             Myshchenko

Exhibit 2    Consent to Join dated                   10
             5/04/2015

Exhibit 3    Notice of Your Rights to                17
             Join Lawsuit for Unpaid
             Wages

Exhibit 4    "FLSO Opt-In Plaintiff Survey           23
             Responses" for Viktoriia
             Myshchenko

Exhibit 5    Letter to "Hello dear host              36
             family" from Viktoriia with
             attached Au Pair Application

Exhibit 6    Au Pair Agreement between               40
             Go Au Pair and Viktoriia
             Myshchenko dated 2/21/2015

Exhibit 7    Child Care Services Agreement           40
             with          Family dated
             May 7, 2015

Exhibit 8    Training Verification Form              40

Exhibit 9    Orientation Host Family &               40
             Au Pair dated 5/19/15

---

**4**

EXHIBITS (continued):
DEPOSITION EXHIBITS                                  PAGE
Exhibit 10   Child Care Services Agreement           40
             with          Family dated
             8/6/2015
Exhibit 11   Au Pair Agreement Extension             40
             Addendum

Exhibit 12   Child Care Services Agreement           40
             with          family dated
             1/12/2016

                    -oOo-

CONFIDENTIAL PORTION:  Page 73, Line 12
                    -oOo-

---

1 (Pages 1 to 4)

REPLY APP 01011

**VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**



**Page 97**

1  A.  This schedule isn't correct for any day of the
2  week.
3  **Q.  Okay.  So how did the schedules differ from**
4  **day-to-day?**
5
6
7
8  .
9  **Q.  Okay.  So about how many hours a day did you**
10  **work for the ▮▮▮▮ family?**
11  A.  Eight to nine hours a day.
12
13
14
15
16
17  **Q.  What were your -- I guess look at the next page,**
18  **please, 3 of 9 in Exhibit 10.  Do you understand who**
19  **checked the boxes in the duties and responsibilities**
20  **chart?**
21  A.  Yes.
22  **Q.  And who was that?**
23  A.  One of the host parents.
24  **Q.  Okay.  But not Go Au Pair?**
25  A.  No.

**Page 98**

1  **Q.  And are the check marks here -- are the**
2  **responsibilities that are listed consistent with what**
3  **your responsibilities actually were with the ▮▮▮▮**
4  **family?**
5  A.  Yes.
6  **Q.  And on the next page, Section 3.1, it says the**
7  **host family agrees to pay the au pair at least the**
8  **minimum weekly stipend of 195.75, correct?**
9  A.  Correct.
10  **Q.  And the amount filled in says $220 paid every**
11  **two weeks; is that correct?**
12  A.  I can explain how it is correct.
13  **Q.  Okay.**
14  A.  220, it was with gas mileage.  So my pay would
15  be actually 195.75, but they would also reimburse me for
16  gas right away.  And it was paid at first every two
17  weeks but then only once a month.
18  **Q.  Okay.  So you are saying that the weekly**
19  **stipend, 220, $220, included gas mileage?**
20  A.  Yes.
21  **Q.  Did that include times -- was that the number**
22  **whether you drove 50 miles or 10 miles each week?**
23  A.  If I would drive more, they would pay me more.
24  **Q.  If you drove less, would they pay you less?**
25  A.  I would not drive less ever.

**Page 99**

1  **Q.  Okay.  So how did you pay for gas?**
2  A.  Sometimes cash.  Sometimes my debit card.
3  **Q.  And you said that you were paid two weeks at**
4  **first, but then that changed?**
5  A.  Yes.  It was more convenient for both of us.
6  **Q.  Sorry.  What was that last part?**
7  A.  It was more convenient for me and my host mom to
8  pay me once monthly.
9  **Q.  Okay.  So when you were paid once monthly, how**
10  **much did they pay you at that time?**
11  A.  880.
12  **Q.  880.  And how did they pay you that?**
13  A.  Through an app.
14  **Q.  Electronically?**
15  A.  Yes.
16  **Q.  What was your first impression of the ▮▮▮▮**
17  **family?**
18  MR. VALDIVIESO:  Objection to form.
19  You may answer.
20
21
22
23
24
25  MR. VALDIVIESO:  Objection to form.

**Page 100**

1  You may answer, if you know.
2

25 (Pages 97 to 100)

REPLY APP 01012

Case No. 1:14-cv-03074-CMA-KMT Document 950-142 filed 04/27/18 USDC Colorado pg 134 of 219

VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.



101

1 ████████████████████████████
█
█
█
█
█
█
9   Q.  When you first started working with the ████
10  family, did you discuss ground rules and expectations?
11      A.  Yes.
12      Q.  And what were those?
13      A.  I could use car as much as I wanted.  I had no
14  curfew.  That was it.
15      Q.  Did you discuss what your work schedule would
16  be?
17      A.  We did not discuss it.  It would -- they needed
18  flexibility with that.  So sometimes it would change
19  same day.
20      Q.  Okay.  So did you discuss it on a weekly basis
21  or a daily basis?  How often?
22      A.  Daily basis.
23      Q.  And did you discuss the amount that you would be
24  paid?
25      A.  Yes.

102

1       Q.  What do you remember from that conversation?
2       A.  She told me that she would pay me 220, but also
3   like for gas.
4       Q.  So she said that she would pay you $220 and
5   money for gas?
6       A.  No.  220 includes money for gas.
7   ████████████████████████████
█
9       MR. VALDIVIESO:  Objection to form.
10      You may answer.
11  █
█
█
█
█
█
█
19      Q.  Did you continue to have conversations with LAR,
20  the LAR, Amanda, while you were working for the ████
21  family?
22      A.  I spoke to her once.
23      Q.  And what did you speak to her about?
24      A.  That I'm happy with this host family.
25      Q.  How often did you care for the children for the

103

1   ████████  family?
2       A.  Every day.
3       Q.  And you said that the schedule changed from week
4   to week, but -- sorry.  So how many hours on average per
5   week do you think you worked with the ████  family?
6       A.  On average, 45.  43 to 45.
7       Q.  Sorry.  What was that?
8       A.  43 to 45.
9       Q.  43 to 45.  Did you ever work more than 45 hours
10  a week?
11      A.  I would help them out, but I did not consider
12  that as work.
13      Q.  Did you ever work more than 10 hours per day?
14      A.  No.
15      Q.  Did you ever help them out for more than 45
16  hours a week?
17      A.  Yes.
18      Q.  And how often was that?
19      A.  Maybe once a month.
20      Q.  Even though you agreed not to work more than 45
21  hours a week?
22      A.  I did not consider it as work.
23      Q.  Did you have weekends off?
24      A.  Yes, for exception of a few.
25      Q.  Sorry.  What was that last part?

104

1       A.  For exception of maybe a couple.
2   ████████████████████████████
█
█
█
█
█
█
█
12      Q.  Okay.  Who set your job duties, who told you to
13  do certain tasks?
14      A.  Host family in accordance with Go Au Pair.
15      Q.  Sorry?
16      A.  In accordance with Go Au Pair regulations.
17      Q.  So your host family told you what you needed to
18  perform on a day-to-day basis?
19      A.  Yes.
20      Q.  Okay.  And your host family told you on a
21  day-to-day basis what your work schedule would be?
22      A.  Yes.
23      Q.  Did Go Au Pair tell you what your work schedule
24  would be on a day-to-day basis?
25      A.  No.

26 (Pages 101 to 104)

REPLY APP 01013

VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.



105

1    Q.  Did Go Au Pair ever supervise your work with the
2    ██████ family?
3    A.  Not that I am aware of.
4    Q.  Okay.  Did the LAR ever supervise your work with
5    the ██████ family?
6    A.  Not that I know of.
7    Q.  Do you have any written documents that show what
8    your schedule was with the ██████ family?
9    A.  No.
10    Q.  Do you have anything written that shows what
11    your hours were, what hours you logged?
12    A.  No.
13    Q.  Did the ██████ family pay for -- you had a
14    driver's license when you worked for the ██████ family,
15    correct?
16    A.  Yes.
17    Q.  Did you have a car to access when you worked
18    with the ██████ family?
19    A.  Yes.
20    Q.  For what purpose were you allowed to use the
21    car?
22    A.  For work and for personal use.
23    Q.  And you said that the ██████ family reimbursed
24    you for gas?
25    A.  Yes, for work-related driving.

106

1    Q.  Did the ██████ family provide you with a cell
2    phone?
3    A.  Yes.
4    Q.  Did they pay your monthly bill?
5    A.  Yes.
6    Q.  Were you allowed to call the Ukraine from your
7    cell phone that they provided?
8    A.  Through free services, like WhatsApp.
9    Q.  Were you allowed to text from that phone?
10    A.  Yes, to my friends, and I would communicate with
11    host parents a lot, too.
12    Q.  If you ever worked more than 45 hours a week,
13    did the host family pay you extra for that?
14    A.  No.  I did not work more than that.  I would not
15    consider that as work, so I would not be expected to get
16    paid.
17    Q.  Did the ██████ family pay for other
18    en██ ████████████████████████████████████
19    ██ ████████████████████████████████████
20    ██ ██████████████████████████
21    ██ ████████████████████████████████████
22    ██ ████████████████████████
23    ██ ████████████████████████████
24    ██ ████████████████████
25    ██

107

1    ██ ████████████████████████████████████
    ██ ████████████████████████████████
    ██ ████████████████████████████████████
    ██ ██████████████████████
    ██ ████████████████████████████████
    ██ ████████████████████████████████████████
    ██ ██████████████████████
9    MR. VALDIVIESO:  Can we go off the record just
10    briefly, please?
11    MS. MULL:  Sure.
12    THE VIDEOGRAPHER:  All right.  The time is
13    11:38.  We're now going off the record.
14    (Discussion off the record.)
15    (Recess taken.)
16    THE VIDEOGRAPHER:  We're going back on the
17    record.  The time is 11:45 a.m.
18    MS. MULL:  Q.  Viktoriia, did you ever make any
19    complaints about the ██████ family?
20    A.  No.
21    Q.  Can you please look at Exhibit 11, which is the
22    extension agreement?  Bates 7124 (sic).
23    A.  (Complies.)
24    Q.  Do you have that agreement in front of you?
25    A.  Yes.

108

1    Q.  Can you please look at page 9 of 12 of Exhibit
2    11?
3    A.  Yes.
4    Q.  Is that your signature on the extension
5    agreement?
6    A.  Yes.
7    Q.  So you chose to extend your placement for an
8    additional year after your first year?
9    A.  Yes.
10    Q.  Why?
11    A.  Because I liked the family and they liked me,
12    and we wanted to keep working together.
13    Q.  Okay.  Whose idea was it for you to extend?
14    A.  My host family asked me if I want to extend, and
15    I said yes.
16    Q.  Okay.  So you and the host family?
17    A.  Yes.
18    Q.  Not Go Au Pair?
19    A.  No.
20    Q.  And you extended for 12 months through May, the
21    beginning of May 2017; is that correct?
22    A.  That's correct.
23    Q.  Okay.  Can you please look at Exhibit 12, Child
24    Care Services Agreement 2016 with the Morrows?  Bates
25    71688.

27 (Pages 105 to 108)

REPLY APP 01014

# Exhibit 65

REPLY APP 01015

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3  _____

4           VIDEOCONFERENCE DEPOSITION OF:
              WENDY PAOLA RIVERA ARIAS
5                  March 22, 2018
   _____

6

   JOHANA PAOLA BELTRAN, et al.,
7
   Plaintiffs,
8
   v.
9
   INTEREXCHANGE, INC., et al.,
10
   Defendants.
11 _____

12
             PURSUANT TO NOTICE AND STIPULATION, the
13 videoconference deposition of WENDY PAOLA RIVERA ARIAS
   was taken on behalf of the Defendants at 1900 Grant
14 Street, Suite 1025, Denver, Colorado 80203, on
   March 22, 2018, at 6:37 p.m., before Tracy C. Masuga,
15 Registered Professional Reporter, Certified Realtime
   Reporter, and Notary Public within Colorado.
16

17

18

19

20

21

22   **H+G**

23

24   Hunter + Geist, Inc.

25
**303.832.5966**      1900 Grant Street, Suite 1025      ▪ www.huntergeist.com
**800.525.8490**      Denver, CO 80203                   ▪ scheduling@huntergeist.com

                      Your Partner in Making the Record

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____
VIDEOCONFERENCE DEPOSITION OF:
WENDY PAOLA RIVERA ARIAS
March 22, 2018
_____

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____

PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of WENDY PAOLA RIVERA ARIAS
was taken on behalf of the Defendants at 1900 Grant
Street, Suite 1025, Denver, Colorado 80203, on
March 22, 2018, at 6:37 p.m., before Tracy C. Masuga,
Registered Professional Reporter, Certified Realtime
Reporter, and Notary Public within Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiffs:
      SEAN A. PETTERSON, ESQ.
      Boies, Schiller & Flexner, L.L.P.
      575 Lexington Avenue
      7th Floor
      New York, New York 10022

For the Defendants:

      ALYSSA L. LEVY, ESQ.
      JOSEPH H. HUNT, ESQ.
      Sherman & Howard L.L.C.
      633 17th Street
      Suite 3000
      Denver, Colorado 80202

Also Present:

      James McKenzy, Interpreter

      Ms. Rivera Arias was located at 232
Coligni Avenue, New Rochelle, New York 10801,
914-844-9004.
      Mr. Hunt, Ms. Levy, Mr. McKenzy, and
Ms. Masuga, the court reporter, were located at
1900 Grant Street, Suite 1025, Denver, Colorado 80203,
303-832-5966.

      Mr. Petterson was located at 575
Lexington Avenue, 7th Floor, New York, New York 10022,
212-754-4272.

---

**3**

                    I N D E X
EXAMINATION OF WENDY PAOLA RIVERA ARIAS:        PAGE
March 22, 2018

By Ms. Levy                              4, 59, 61

By Mr. Petterson                            57, 60

                                           INITIAL
DEPOSITION EXHIBITS:                      REFERENCE
Exhibit 1   Consentimiento Para Unirse         16
            (Conforme al Codigo de los Estados
            Unidos (United States Code, USC)
            29, Section 216(b), by Wendy Paola
            Rivera Arias, 7/6/17
Exhibit 2   InterExchange Au Pair USA          16
            Pre-Application Information, 7/9/16

Exhibit 3   Au Pair Agreement with Wendy Paola  29
            Rivera Arias, 7/8/16

---

**4**

1     WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4          *    *    *    *    *
5     (Deposition Exhibits 1 through 3 were
6  marked.)
7     MS. LEVY:  All right.  Sean, before we
8  start, I would just ask if you could stipulate on the
9  record that the court reporter can swear in Ms. Rivera
10 over Zoom because we are in different locations.
11    MR. PETTERSON:  That works for us, yes.
12    MS. LEVY:  Great.
13    JAMES McKENZY,
14 having been first duly sworn to interpret verbatim
15 Spanish into English and English into Spanish, and
16    WENDY PAOLA RIVERA ARIAS,
17 having been first duly sworn to state the whole truth,
18 testified as follows:
19    (Interpreter's response to oath:  "To
20 the best of my ability, yes, I do.")
21    (Deponent's response to oath:  "I
22 swear.")
23         EXAMINATION
24 BY MS. LEVY:
25    **Q.  Okay.  Ms. Rivera, my name is Alyssa**

1 (Pages 1 to 4)

REPLY APP 01017

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



37

1  wanted -- want -- if they wanted them to.
2  Q.  Okay.  Like did InterExchange ever tell
3  you -- tell you personally which days that you had to
4  work?  Did that ever come from InterExchange, or was
5  it just the host family that you set the schedule
6  with?
7  A.  No.  It was a decision by the family.
8  Q.  Okay.  Thank you.  How many hours per
9  week did you work for your host family?
10  A.  Between 45 to 48.
11  Q.  And from what you said so far, is it --
12  would it be a correct statement that your hours were
13  about the same every day?
14  MR. PETTERSON:  Objection, misstates her
15  testimony.
16  A.  (In English)  Can you repeat?  I
17  don't --
18  Q.  (BY MS. LEVY)  That was a confusing
19  question.  I'm going to -- I'm going to ask that
20  differently.
21  Were your hours every Monday, were they
22  about the same?
23  A.  Yes.
24  Q.  And was it the same on Tuesday?  Were
25  your hours about the same every Tuesday?

38

1  A.  Tuesdays and Thursdays, almost -- almost
2  not -- not the same.  A half an hour or one hour less,
3  but not -- it wasn't always that way.
4  Q.  Okay.  On Wednesdays, were your hours
5  about the same every Wednesday?
6  A.  Mondays, Wednesdays, and Fridays, yes.
7  Q.  And you mentioned your hours were about
8  45 to 48.  When did you work over 45 hours?
9  MR. PETTERSON:  Objection.
10  A.  Well, I would finish out the schedule at
11  6 o'clock.  Some days it would be 5 o'clock.
12  Q.  (BY MS. LEVY)  Was there any -- anything
13  in particular that would cause you to work those extra
14  few hours each week?
15  MR. PETTERSON:  Objection.
16  
17  
18  
19  Q.  (BY MS. LEVY)  Did you ever, with your
20  host family, work more than ten hours a day?
21  A.  Yes.
22  
23  
24  
25  

39

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  MR. PETTERSON:  Objection.
18  
19  
20  
21  
22  
23  
24  Q.  When you were living with the
25  family, did you have any concerns or complaints about

40

1  the schedule that the        gave you?
2  A.  No.
3  Q.  I apologize if I already asked you this.
4  Before we -- you said that the        paid you $195.75
5  per week.
6  A.  Yes.
7  MR. PETTERSON:  Objection, that's not a
8  question.
9  Q.  (BY MS. LEVY)  Is that the amount the
10          paid you every week?
11  A.  Yes.  Sometimes 196.
12  Q.  Did they ever pay you more than 196?
13  A.  No.
14  Q.  Did InterExchange ever pay you your
15  weekly stipend?
16  A.  No.
17  Q.  Did the        ever give you any extra
18  money for any reason?
19  A.  Like what?
20  Q.  Did they ever give you any gifts?
21  A.  Yes.
22  Q.  What kind of gifts?
23  A.  For Christmas.
24  Q.  Did they ever give you any extra
25  spending money?

10 (Pages 37 to 40)

REPLY APP 01018

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**41**

1    A.  No.  I just had to say if I needed some
2  money for -- say for my personal things, if I needed
3  something.  No, but actually, it wasn't money.  I
4  would tell -- she asked me if I needed something and
5  for me to bring it to -- and she brought it to me.
6    Q.  What kinds of items did -- would --
7  well, let me back up.
8    Talking about the host mom?
9    A.  Yes.
10

**43**

1

**42**

1

**44**

11    Q.  Who told you what duties to perform for
12  your host family?
13    A.  The host family.
14    Q.  And by that, do you mean the mother and
15  the father?
16    A.  The mom.
17    Q.  Did InterExchange ever tell you what
18  duties to perform for the ████ family?
19    A.  In the documents and also when I arrived
20  with the coordinator.
21    Q.  Do you remember who your local
22  coordinator was?
23    A.  Eileen.  I don't remember the last name.
24    Q.  Did you meet with Eileen in person when
25  you lived with the ████ family?

11 (Pages 41 to 44)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



45

1    A.  Yes, like the third day.
2    Q.  **Did you meet with her more than one time**
3  **in person?**
4    A.  At the au pair meetings.
5    Q.  **Where did you meet with Eileen on the**
6  **third day?**
7    A.  At my host family's house.
8    Q.  **And what happened during that meeting?**
9    A.  She came to the house just to see where
10  I -- where I was staying, to see the family and to
11  know what they expected of me.

23    Q.  **Did the local coordinator help you with**
24  **that?**
25    A.  She just said that they had to be

46

1  patient with me because I had just recently arrived
2  and the child was just getting used to me.
3    Q.  **And correct me if I'm wrong.  Did you**
4  **say that Eileen told you what duties to perform with**
5  **your host family?**
6    A.  Yes.
7    Q.  **What did she tell you?**
8    A.  That she told me about the care -- how I
9  would care for the child and that I would also need to
10  help with some things in the house since I was now a
11  part of the family.
12    Q.  **Did she ever tell you anything specific**
13  **about how to care with the ▉▉▉▉ child -- care for**
14  **the ▉▉▉▉ child?**
15    MR. PETTERSON:  Objection.
16    A.  No, just what the documents had
17  already -- had told me, that I needed to be ready to
18  be able to feed the child and change the child, take
19  care of the child, and play with him.
20    Q.  **(BY MS. LEVY)  Did Eileen ever supervise**
21  **you taking care of the child?**
22    A.  No.
23    Q.  **Did anyone from InterExchange ever**
24  **supervise you while you were taking care of the child?**
25    A.  No.

47

1    Q.  **Besides -- we talked about some of the**
2

48

16    MR. PETTERSON:  Objection.

25    Q.  **(BY MS. LEVY)  Did your host family ever**

12 (Pages 45 to 48)

REPLY APP 01020

# Exhibit 66

REPLY APP 01021

```
                                                    Page 1

  1          UNITED STATES DISTRICT COURT

  2          FOR THE DISTRICT OF COLORADO

  3

     Civil Action Number:  1:14-CV-03074-CMA-KMT

  4

  5     *********************************************

        JOHANA PAOLA BELTRAN, et al.,

  6                  Plaintiffs,

        vs.

  7     INTEREXCHANGE, INC., et al.,

                     Defendants.

  8     *********************************************

  9

 10          DEPOSITION OF SIMONA GADIA, a witness called on

 11     behalf of the respective party, taken pursuant to the

 12     applicable provisions of the Massachusetts Rules of

 13     Civil Procedure, before William M. Jackson, Professional

 14     Court Reporter and Notary Public in and for the

 15     Commonwealth of Massachusetts, at the Law Offices of

 16     Choate Hall, International Place, Boston, Massachusetts,

 17     on March 26, 2018, commencing at 6:00 p.m.

 18

 19

 20

 21

 22

 23

 24
```

REPLY APP 01022

Page 2

1 APPEARANCES:

2

3 LAW OFFICES OF BOIES SCHILLER & FLEXNER, LLP

4    (By Dawn L. Smalls, Esquire)

5    575 Lexington Avenue - 7th Floor

6    New York, New York 10022

7    (617) 367-2900

8    On behalf of the Plaintiffs.

9

10 LAW OFFICES OF CHOATE, HALL & STEWART

11    (By Sam Rudman, Esquire)

12    Two International Place

13    Boston, Massachusetts 02110

14    (617) 574-1700

15    Srudman@choate.com

16    On behalf of the Defendant Cultural Care

17

18

19

20

21

22

23

24

Page 3

1            I N D E X

2

3 Simona Gadia            DIRECT

4 (By Mr. Rudman)            4

5

6

7        E X H I B I T S

8 No.      Description            Page

9 Exhibit 1   Notice            6

10 Exhibit 2   Consent to Join            10

11 Exhibit 3   Notice of Right to Join

12            Lawsuit for Unpaid Wages   15

13 Exhibit 4   Application            19

14 Exhibit 5   Responses 11-23-17      22

15 Exhibit 6   Responses 11-22-17      23

16

17

18

19

20

21

22

23

24

Page 4

1            PROCEEDINGS

2            THE VIDEOGRAPHER:  We are on the record.

3 This is the videographer, Don Budd with Veritext.  Today

4 is March 26, 2018.  The time is 6:03 p.m.  We are here

5 at the offices of Choate Hall, Boston, Massachusetts, to

6 take the Video Deposition of Simona Gadia in the matter

7 of Beltran, et al versus Interexchange.  Would counsel

8 introduce themselves.

9            MR. RUDMAN:  Sam Rudman from Choate Hall on

10 behalf of Cultural Care, Incorporated.

11            MS. SMALLS:  Dawn Smalls from Boies,

12 Schiller & Flexner, LLP, on behalf of the Plaintiffs.

13            THE VIDEOGRAPHER:  Would the court reporter

14 swear in the witness.

15            MS. SMALLS:  I think you are calling her

16 Simone and her name is Simona.

17            SIMONA GADIA

18 a witness called on behalf of the respective party,

19 having been duly sworn to tell the truth, was examined

20 and testified as follows:

21            DIRECT EXAMINATION

22 BY MR. RUDMAN:

23    Q.  Good evening.  I am Sam Rudman.  Have you ever

24 been deposed before?

Page 5

1    A.  Sorry.

2    Q.  Have you ever been deposed before?

3    A.  Can you repeat?  No.

4    Q.  So this evening when I ask you questions, will

5 you please give verbal answers rather than nodding or

6 shaking of your head?

7    A.  Yes, I can.

8    Q.  We have a court reporter here who is writing down

9 my questions and your answers.  So if you can let me

10 finish my questions before you start answering, that

11 will be great.  Is that all right?

12    A.  Yes.

13    Q.  If I ask you a question and you don't understand,

14 will you please let me know?

15    A.  Yes.

16    Q.  If you do not ask me to clarify one of my

17 questions, I will assume that you understand the

18 question.  Is that fair?

19    A.  Yes.

20    Q.  If at any time you want to take a break, will you

21 please let me know?

22    A.  Yes.

23    Q.  We can go off the record any time you like.

24    A.  Okay.

2 (Pages 2 - 5)

REPLY APP 01023



Page 18

1    Q.  When was that?

2    A.  July 2015.

3    Q.  You were living in Italy before you applied to

4    join the au pair program; is that correct?

5    A.  Correct.

6    ████████████████████████

     ███

     ██████████████████

     ██  ████████████

     ██  ██████████

     ██  ████████████████████████

     ██  ███████████

     ██  ███████

14         MS. SMALLS:  Objection.

15   ██████████████████████

     ██  ████████████████

     ██  █████████████████

     ██  ████████████

20   Q.  Were you an au pair in any other country before

21   you became an au pair in the United States?

22   A.  No.

23   Q.  How did you first learn about the au pair

24   program?

Page 19

1    A.  I was looking online which was the best way for

2    living in the United States and to find out about the

3    program.

4    Q.  You were living for the best way to live in the

5    United States?

6    A.  Yes.

7    Q.  Did you know anyone else that participated in the

8    au pair program before you applied?

9    A.  No.

10   Q.  At some point, you prepared an application to

11   become an au pair; is that correct?

12   A.  Yes.

13        MR. RUDMAN:  I am going to mark that

14   application as an exhibit now.  Look for it on the

15   computer and let us know when it is in front of you.

16        (Application was marked as Exhibit Number 4

17   for identification)

18   Q.  Just to make sure we are looking at the same

19   document, at the top left, does it say home, Simona

20   Gadia?

21   A.  Yes.

22   Q.  Do you recognize this as your application to be

23   an au pair?

24   A.  Yes.

Page 20

1    Q.  You wrote this application; is that correct?

2    A.  That's correct.

3    Q.  The information that you provided was true and

4    accurate?

5    A.  Yes.

6    Q.  One of the reasons that you applied to be an au

7    pair is because you wanted to live in the United States;

8    is that correct?

9    A.  That's correct.

10   Q.  You saw that as one of the key benefits as being

11   an au pair; is that correct?

12   A.  Yes.

13   Q.  What were the other key reasons that you wanted

14   to become an au pair?

15   A.  Because I wanted to spend some time with kids,

16   and because I thought it was a good idea to be able to

17   travel to the United States.

18   Q.  Any other reasons?

19   A.  No.

20   Q.  Before becoming an au pair, you already visited

21   the United States; is that correct?

22   A.  That's correct.

23   Q.  And you had a good experience on your prior

24   visits; is that correct?

Page 21

1    A.  Yes.

2    Q.  So you wanted to come back?

3    A.  Yes.

4    Q.  Were you hoping to stay in the United States long

5    term?

6    A.  Yes.

7    Q.  Did you understand that the au pair program was a

8    cultural exchange program?

9    A.  Yes.

10   Q.  Were you looking forward to the cultural exchange

11   experience that would come with being an au pair?

12   A.  Yes.

13   Q.  When you applied to be an au pair, did you

14   consider any other opportunities at that time?

15   A.  No.

16   Q.  How did you first learn about Cultural Care?

17   A.  Because you have education and I have an exchange

18   with them.

19   Q.  When did you first reach out to Cultural Care?

20   A.  It was January 2014.

21   Q.  Did you apply to be an au pair in January of

22   2015?

23   A.  No.  I just started application and I applied

24   again on May, 2015.

6 (Pages 18 - 21)

REPLY APP 01024

| Page 22 | Page 24 |
|---|---|
| 1 Q. I am going to mark as an exhibit now your survey | 1 A. How did you and the host family decide the amount |
| 2 responses. I am going to start by marking the answers | 2 of the weekly stipend? |
| 3 that you submitted on November 23, 2017. Let us know | 3 Q. Would you read your answer, please? |
| 4 when you have those in front of you. | 4 A. The Department of the United States decided the |
| 5 A. Do you know the name of the file? | 5 amount of the weekly stipend. |
| 6 MS. SMALLS: What are you trying to look up? | 6 Q. Did you mean to write that the United States |
| 7 MR. RUDMAN: PDF responses, dated 11-23-17. | 7 Department of State decided the amount of the weekly |
| 8 MS. SMALLS: Is this part of the file that | 8 stipend? |
| 9 you sent? I don't think she has the attachment. | 9 A. Yes. |
| 10 MR. RUDMAN: I didn't have it to send in | 10 Q. Going back to your initial meeting with Cultural |
| 11 that file. I said in that other document I marked as an | 11 Care -- sorry. |
| 12 exhibit is PDF of her survey responses. Do you want to | 12 After you reached out to Cultural Care, |
| 13 take a break and you can send it to her? | 13 did you eventually have a meeting with someone from |
| 14 MS. SMALLS: Yes. Let's go off record. | 14 Cultural Care? |
| 15 THE VIDEOGRAPHER: The time is 6:41. We are | 15 A. Yes. |
| 16 off the record. | 16 Q. Do you recall anything that was discussed at that |
| 17 (Whereupon a break was taken) | 17 meeting? |
| 18 THE VIDEOGRAPHER: Back on the record. | 18 A. It was a group meeting. They were showing the |
| 19 Standby. The time is 6:43. | 19 program. How many hours we have to work. How much we |
| 20 MR. RUDMAN: Mark these as Exhibit Number 5. | 20 are going to get paid. How much weeks vacation that you |
| 21 (Responses dated 11-23-17 was marked as | 21 have. They were showing us some pictures. |
| 22 Exhibit Number 5 for identification) | 22 Q. Do you recall who attended? |
| 23 Q. Ms. Gadia, are you looking at a document which at | 23 A. No. |
| 24 the top line, au pair, Simona Gadia, (11-23-17)? | 24 Q. Other than the topics that you just mentioned, do |

| Page 23 | Page 25 |
|---|---|
| 1 A. Yes. | 1 you remember anything else that you discussed with |
| 2 Q. Do you recognize the questions in this document? | 2 anyone from Cultural Care? |
| 3 A. Yes. | 3 A. We talked about the possibility of the rematch. |
| 4 Q. Do you recall whether you answered these | 4 Q. The possibility of the rematch? |
| 5 questions as part of your participation in the lawsuit? | 5 A. Yes. |
| 6 A. Yes. | 6 Q. What do you mean by that? |
| 7 Q. Do you recognize the bolded text as your answers? | 7 A. That the girl we spoke, she told me if you don't |
| 8 A. Yes. | 8 feel good with the family, I was able to change my |
| 9 Q. Were your answers true and accurate? | 9 family. |
| 10 A. Yes. | 10 Q. Got it. Any other topics discussed at that |
| 11 MR. RUDMAN: I am going to mark the next | 11 meeting? |
| 12 exhibit, Set of Answers that you submitted on November | 12 A. No. |
| 13 23, 2017. Exhibit 6. | 13 Q. Do you recall what was said about the amount of |
| 14 (Responses dated November 23, 2017 was | 14 the stipend? |
| 15 marked as Exhibit Number 6 for identification) | 15 A. That was $195.75. |
| 16 Q. Do you have those in front of you? | 16 Q. Was there any other discussion of the stipend |
| 17 A. Yes. | 17 amount? |
| 18 Q. So you filled out this survey two separate times; | 18 A. No. |
| 19 is that correct? | 19 Q. No one said it could not be more than $195.75? |
| 20 A. That's correct. | 20 A. No. They said the Department of the United |
| 21 Q. Taking a look at the November 22 answers first, | 21 States decided. |
| 22 would you please turn to Question Number 29? | 22 Q. So they didn't say anything else about it? |
| 23 A. Yes. | 23 A. No. |
| 24 Q. Would you read that question, please? | 24 Q. Did they discuss, did anyone from Cultural Care |

Veritext Legal Solutions

REPLY APP 01025

Page 26

1  discuss the exchange of the program?
2  A. Sorry?
3  Q. Did anyone from Cultural Care discuss the
4  cultural exchange elements of the program?
5  A. No.
6  Q. Did they discuss whether you would be integrated
7  into an American host family?
8  A. No.
9  Q. You understood that if you became an au pair, you
10  would be living with an American host family?
11  A. Yes.
12  Q. You viewed that as a desirable part of the
13  experience; is that correct?
14  A. Correct.
15  Q. Why did you want to live with an American host
16  family?
17  A. For experience. To see how an American family
18  lives. Live like American people.
19  Q. Did you know the host family would be providing
20  you with meals?
21  A. Yes.
22  Q. Did you view that as a benefit of the program?
23  A. Yes.
24  Q. You understood that they would be providing you

Page 27

1  with housing; is that correct?
2  A. Yes.
3  Q. You viewed that as a desirable part of the
4  program as well; is that correct?
5  A. Correct.
6  Q. You preferred the idea of living with a host
7  family to living alone in the United States; is that
8  correct?
9  A. That's correct.
10  Q. You found it helpful that you would have a place
11  to stay when you arrived?
12  A. Yes.
13  Q. Would it have been more stressful if you had to
14  go to the United States and find your own place to live?
15  A. Yes.
16  Q. It would have been more stressful if you had to
17  procure all of your own meals; is that correct?
18  A. That's correct.
19  Q. Did the stipend amount impact your decision to
20  try to become an au pair in the United States?
21  A. No.
22  Q. What was your plan for money in the United
23  States?
24  A. Trying to save the money for travel.

Page 28

1  Q. Did you bring any money with you?
2  A. Just a hundred Euro for the first week of the
3  training school.
4  Q. Did you visit or have conversations with other
5  sponsor agencies?
6  A. No. I had other application with other agency.
7  Then I found the family with Cultural Care.
8  Q. Do you recall what the other agency was?
9  A. I think it was Au Pair World.
10  Q. Sorry. Did you say Au Pair World?
11  A. Yes.
12  Q. Was that for a position in the United States?
13  A. Sorry?
14  Q. Was the potential application through Au Pair
15  World for a position in the United States?
16  A. Yes.
17  Q. Did you get far enough in the application process
18  to learn much about Au Pair World?
19  A. No.
20  Q. You ultimately chose Cultural Care because it
21  placed you with a host family first; is that correct?
22  A. That's correct.
23  Q. In terms of your application process, what
24  happened after you submitted the application that we

Page 29

1  looked at a little earlier?
2  A. The family was able to look at my file,
3  application, and be able to contact me by e-mail. I
4  spoke with five or six different families by e-mail.
5  Then the first family that contacted me was the one I
6  decided for first months, my first family.
7  Q. Is it fair to say, you e-mailed with several
8  families, but you only spoke with one family; is that
9  fair?
10  A. Yes.
11  Q. You spoke with that family over the phone?
12  A. Yes.
13  Q. Was that an interview?
14  A. Kind of interview.
15  Q. Can you describe what you remember about the
16  conversation?
17  A. The dad called me and he asked me about what kind
18  of food I like to eat, If I was able to drive.
19  Q. Did you ask any questions of the family?
20  A. No. Just by e-mail then, because when he called
21  me, I was not able to stay on the phone.
22  Q. What questions did you ask by e-mail?
23  A. Like what they like to do during the weekend or
24  the schedule for the week or like if they like to travel

8 (Pages 26 - 29)

REPLY APP 01026

# Exhibit 67

REPLY APP 01027

LENA GRUENWALD - 04/06/2018

```
 1    UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF COLORADO

 3    ---------------------------------------------------x
      JOHANA PAOLA BELTRAN, LUSAPHO HLATSHANENI,
 4    BEAUDETTE DEETLEFS, ALEXANDRA IVETTE GONZALEZ,
      JULIANE HARNING, NICOLE MAPLEDORAM, LAURA MEJIA
 5    JIMINEZ, and SARAH CAROLINE AZUELA RASCON,

 6                        Plaintiffs,

 7
                      -against-          Civil Action No:
 8                                       14-cv-03074-CMA-CBS

 9    INTEREXCHANGE, INC., USAUPAIR, INC., GREATAUPAIR,
      LLC, EXPERT GROUP INTERNATIONAL INC., d/b/a EXPERT
10    AUPAIR, EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
      CULTURAL HOMESTAY INTERNATIONAL, CULTURAL CARE,
11    INC., d/b/a CULTURAL CARE AU PAIR, AUPAIR INC.,
      AU PAIR INTERNATIONAL, INC., APF GLOBAL EXCHANGE,
12    NFP, d/b/a AU PAIR FOUNDATION, AMERICAN INSTITUTE
      FOR FOREIGN STUDY, d/b/a AU PAIR IN AMERICA,
13    AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GOAUPAIR,
      AGENT AU PAIR, A.P.E.X. AMERICAN PROFESSIONAL
14    EXCHANGE, LLC, d/b/a PROAUPAIR, 20/20 CARE EXCHANGE,
      INC., d/b/a THE INTERNATIONAL AU PAIR EXCHANGE,
15    ASSOCIATES IN CULTURAL EXCHANGE, d/b/a GOAUPAIR, and
      GOAUPAIR OPERATIONS, LLC,
16
                        Defendants.
17    ---------------------------------------------------x

18           EXAMINATION BEFORE TRIAL of the Plaintiff,

19    LENA GRUENWALD, taken by the Defendant, pursuant to

20    Court Order, held at the offices of Ogletree,

21    Deakins, Nash, Smoak & Stewart, P.C., 1745 Broadway,

22    22nd Floor, New York, New York 10019, on April 6,

23    2018, at 9:57 a.m., before a Notary Public of the

24    State of New York.

25    ***************************************************
```

REPLY APP 01028

LENA GRUENWALD - 04/06/2018          Pages 2..5

| | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S : |
| 2 | |
| 3 | BOISE SCHILLER FLEXNER LLP |
| 4 | Attorneys for Plaintiffs |
| 5 | 1999 Harrison Street |
| 6 | Oakland, California 94612 |
| 7 | BY: SEAN PETTERSON, ESQ. |
| 8 | |
| 9 | |
| 10 | |
| 11 | OGLETREE, DEAKINS, NASH, SMOAK, & STEWART, P.C. |
| 12 | Attorneys for Defendants |
| | AMERICAN INSTITUTE FOR FOREIGN STUDY, |
| 13 | d/b/a AU PAIR IN AMERICA |
| | 1745 Broadway |
| 14 | New York, New York 10019 |
| 15 | BY: CHRISTINA SCHMID, ESQ. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | S T I P U L A T I O N S |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | IT IS HEREBY STIPULATED AND AGREED by and |
| 7 | between the attorneys for the respective parties |
| 8 | herein, that filing, sealing and certification, |
| 9 | and the same are, hereby waived. |
| 10 | |
| 11 | IT IS FURTHER STIPULATED AND AGREED that |
| 12 | all objections except as to the form of the |
| 13 | question, shall be reserved to the time of the |
| 14 | trial. |
| 15 | |
| 16 | IT IS FURTHER STIPULATED AND AGREED that |
| 17 | the within deposition may be signed and sworn to |
| 18 | by an officer authorized to administer an oath, |
| 19 | with the same force and effect as if signed and |
| 20 | sworn to before the Court. |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | |
| 2 | L E N A   G R U E N W A L D,  the witness herein, |
| 3 | having been first duly sworn by a Notary Public of |
| 4 | the State of New York, was examined and testified as |
| 5 | follows: |
| 6 | EXAMINATION BY |
| 7 | MS. SCHMID: |
| 8 | Q.  State your name for the record, please. |
| 9 | A.  Lena Gruenwald. |
| 10 | Q.  State your address for the record, please. |
| 11 | A.  █████████████████████████████████████ |
| 13 | Q.  May I call you Lena? |
| 14 | A.  Sure. |
| 15 | Q.  As I said, my name is Christina Schmid.  I am |
| 16 | an attorney with Ogletree Deakins, and we represent |
| 17 | American Institute For Foreign Study, which today I |
| 18 | will refer to as APIA or Au Pair in America. |
| 19 | Do you understand that you are testifying |
| 20 | today in connection with a lawsuit? |
| 21 | A.  Yes. |
| 22 | Q.  Have you ever testified in a deposition or a |
| 23 | trial before? |
| 24 | A.  No. |
| 25 | Q.  So the court reporter just swore you in and |

| | Page 5 |
|---|---|
| 1 | L. GRUENWALD |
| 2 | that means that any testimony today that you give |
| 3 | will be under oath. |
| 4 | Do you understand that? |
| 5 | A.  Yes. |
| 6 | Q.  Is there any reason why you would not be able |
| 7 | to testify truthfully today? |
| 8 | A.  No reason. |
| 9 | Q.  Are you taking any medications? |
| 10 | A.  No. |
| 11 | Q.  So as you know a court reporter is here and |
| 12 | she is taking down everything that both you and I |
| 13 | are saying.  So that means it is best for her if we |
| 14 | each allow each other to finish what we are saying |
| 15 | before the other speaks.  So I would just ask that |
| 16 | you let me finish my question before you answer, and |
| 17 | I will do my best to allow you to finish your answer |
| 18 | before I follow up with another question. |
| 19 | Do you understand? |
| 20 | A.  Okay. |
| 21 | Q.  Also, for that reason, we would ask that you |
| 22 | give only verbal answers. |
| 23 | A.  Yes. |
| 24 | Q.  So the court reporter can't record any nods |
| 25 | of the head or head shakes.  So we would just ask |

REPLY APP 01029



Page 86

L. GRUENWALD

2  they both located in Virginia?
3     A.  Yes.
4     Q.  Did you want to stay in Virginia on your
5  rematch?
6     A.  I did, yes.
7     Q.  Did your application to rematch say that you
8  wanted to stay in Virginia?
9     A.  No, it did not.
10    Q.  Why didn't it?
11    A.  So I had no influence on that.  At first they
12  opened the search nationwide to increase the chances
13  of me finding a new family, and only after I sent my
14  counselor multiple emails saying I am not happy with
15  the choices I am getting here with Chicago she
16  finally limited my search to this area, which also
17  included Maryland, southern Virginia, which still
18  was not the area I wanted to go to.
19    Q.  When you say "they," who do mean?
20    A.  My counselor, she had the power to talk to
21  APIA and let them narrow down my search radius.
22    Q.  In your rematch application, did it contain
23  an explanation of why you were leaving your first
24  family?
25    A.  Yes, it did.

Page 87

L. GRUENWALD

2     Q.  Who wrote that explanation?
3     A.  My counselor, she set it up initially and
4  then she submitted to headquarter.
5     Q.  Did you agree with that explanation?
6     A.  I did not.
7     Q.  Were you allowed to change that explanation?
8     A.  I wasn't allowed either.
9     Q.  Did you try to send that explanation?
10    A.  I did.  I tried to send my counselor an
11  email.  I sent an email to the program manager and
12  they both refused to change that application.
13

23    Q.  How did you learn that it was not one of your
24  duties?
25    A.  I already knew what the duties included.

Page 88

L. GRUENWALD

2  Just because I informed myself before even starting
3  the job as an au pair.  Then I double checked that
4  information on Au Pair in America's website.
5     Q.  What did it say on Au Pair in America's
6  website?
7     A.  That light housework is included in my
8  duties, but that includes rather cleaning up after
9  the kids and myself and not doing housework in
10  general.
11

21         MS. SCHMID:  Objection.
22

Page 89

L. GRUENWALD

2

11         MS. SCHMID:  Objection.
12

21    Q.  Earlier you testified that you tracked your
22  hours in a document you received from APIA.
23         Do you recall that testimony?
24    A.  Yes.
25    Q.  Can you explain to me how you got a copy of

REPLY APP 01030

Page 90

L. GRUENWALD

1  this document?

2  A. You mean the actual book?

3  Q. Yes, please.

4  A. So the first family they had already received
5  a package before my arrival. That package included
6  this journal. Then my host mom presented it to me
7  asking me to please track my hours in there. So
8  it's visible for her and her husband and for me in
9  the kitchen so we can all see what my hours were so
10  they were not exceeded. The second family was
11  different. They didn't have that book at all. I
12  was the one who requested that book by asking the
13  host mom about it. She didn't know anything about
14  it. I asked her to please contact the counselor.
15  She then sent her a copy of that book.

16  Q. When you were in Germany applying to be in
17  the Au Pair in America program, did they say
18  anything to you about the role of the counselor?

19          MS. SCHMID: Objection.

20  A. It was presented as a 24/7 assistance. I
21  know that didn't include the counselor's work only.
22  I know that there was an emergency line too, but I
23  was to receive help and support from that counselor.
24  So, yeah, I knew about it in Germany.

25

Page 91

L. GRUENWALD

1

2  Q. Do you recall earlier you testified that you
3  received gifts from your first host family?

4  A. Yes.

5  Q. Did you ever give them gifts in return?

6  A. I did, yes.

7          MR. PETTERSON: No further questions.

8          MS. SCHMID: I just have a couple of
9  follow-up questions.

10  CONTINUED EXAMINATION BY

11  MS. SCHMID:

12  Q. When you attended APIA's orientation, do you
13  recall any APIA representative discussing APIA
14  program guidelines with you?

15  A. Not in particular.

16  Q. During the orientation, did the APIA
17  representative tell you that the host family would
18  set the specific responsibilities and duties that
19  you would be responsible for while living with the
20  host family?

21  A. Yes.

22  Q. Was it during the orientation that you
23  learned which duties and responsibilities were
24  appropriate within the program guidelines?

25  A. Yes.

Page 92

L. GRUENWALD

1

2  Q. Was it your understanding at that time that
3  those duties and responsibilities could differ
4  depending on the needs of the specific host family?

5  A. More so in that way that they could ask me do
6  less than those listed responsibilities are but they
7  cannot exceed them.

8  Q. Was it your understanding that depending on
9  the needs of the family you might be asked to do
10  certain activities with the children that you might
11  not be asked to do with another host family?

12  A. Yes.

13  Q. Was it your understanding at that time that
14  you might be asked to do certain chores around the
15  house by one host family that another host family
16  might not ask you to do?

17  A. Yes, but still within the limits of those
18  regulations.

19  Q. By "regulations," are you referring to
20  guidelines set by APIA?

21  A. Yes.

22  Q. But was it your understanding that within the
23  program guidelines the duties might differ depending
24  on the needs of the particular host family?

25  A. Yes.

Page 93

L. GRUENWALD

1

2          MS. SCHMID: Okay. I have nothing
3  further and again I appreciate your time
4  today. Thank you very much.

5          (Time Noted: 12:36 p.m.)

6

7          _____

8                 LENA GRUENWALD

9

10  Subscribed and sworn to before me

11  this ___ day of _____, 2018.

12  _____

13  Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

REPLY APP 01031

Case No. 1:14-cv-03074-CMA-KMT   Document 560-1   filed 04/27/18   USDC Colorado   pg
153 of 219

# Exhibit 68

REPLY APP 01032

# EXHIBIT A

REPLY APP 01033

# Are You Coming To The United States Temporarily To Work Or Study?

**We Are Confident That You Will Have An Interesting And Rewarding Stay. However, If You Should Encounter Any Problems, You Have Rights And You Can Get Help!**

## You Have the Right to:

- Be treated and paid fairly;
- Not be held in a job against your will;
- Keep your passport and other identification documents in your possession;
- Report abuse without retaliation;
- Request help from unions, immigrant and labor rights groups and other groups; and
- Seek justice in U.S. courts.

**These rights, and others, are explained in this pamphlet.**

✂ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─

**If you are mistreated or your rights are violated, call these toll-free numbers:**

**National Human Trafficking Resource Center's 24 Hour Toll-Free Hotline**
**1-888-373-7888**

(Run by a non-governmental organization)

**Trafficking in Persons and Worker Exploitation Task Force Complaint Line**

(Monday — Friday, 9am-5pm Eastern Time)
**1-888-428-7581**

(Run by the U.S. Department of Justice)

**If you are in immediate physical danger, Call 911**

REPLY APP 01034                                                    1

For more on your rights to be treated and paid fairly at work, see page 5

For more on your right not to be held in a job against your will, see page 7

This pamphlet was created as a result of

a U.S. Federal law, Public Law 110-457.

The U.S. Government has issued this

pamphlet to honor the rule of law and

uphold the dignity of all who come to

this country. The U.S. Government

is committed to combating human

trafficking and labor rights violations.



## REMEMBER!!
## There Are Ways to Protect Yourself

- Keep your passport in a safe, easily accessible place at all times;
- Keep copies of your passport, visa, and employment contract in your home country with relatives or friends;
- Always have the phone number of your home country's embassy;
- Keep this pamphlet handy so that you can refer to it once you are in the United States;
- Keep a record of all the days and hours that you work, and the amount and date of each payment that you receive; and
- **Call the National Human Trafficking Resource Center Hotline at 1-888-373-7888** (24 hours) or the **Trafficking in Persons and Worker Exploitation Task Force Complaint Line at 1-888-428-7581** (weekdays 9am-5pm Eastern Standard Time) if you need help.

2

REPLY APP 01035

# An Overview of the Nonimmigrant Visa Process

**What is a nonimmigrant visa?**

A nonimmigrant visa is a U.S. government document that permits individuals who travel to the United States to request entry for a particular purpose; for example, to work or to study.

The nonimmigrant visa process involves two important steps:

**TIP**

Before you travel to the United States, **make two copies** of all important documentation, especially your passport (with visa), your contract, and your identity documents. Give one set of these copies to someone you trust in your home country. When you arrive in the United States and receive an I-94, make one copy of the I-94 in case you lose the original. Keep these documents in a safe place.

1. Applying for the visa at the appropriate U.S. embassy or consulate abroad; and

2. Presenting the visa to an immigration inspector at a U.S. port of entry.

**What are the important parts of my documentation?**

1. <u>The visa</u>. It is located in your passport and shows your picture and visa expiration date. If your visa expires, you cannot reenter the United States on that visa until it is renewed.

- If you have an employment-based visa, the visa will include the name of the employer who is sponsoring you to work in the United States.

- Your temporary work visa **does** not **give you permission** to work for **any** employer that you choose—it is permission to work **only** for the employer listed on your visa application. In rare cases, it may be possible to change employers.

- This does not mean you have to continue to work for your employer if the employer is abusing or exploiting you.

2. <u>The I-94 Card</u>. This is a white card provided to you when you enter the United States. Your I-94 card shows the period of time that you are allowed to remain in the United States.
**Do not lose this card!**

**TIP**

Once you arrive in the U.S., **keep your passport and other travel documents in a safe place where you can access it at all times!** It is illegal for your employer to take your passport away from you!

# Your Workplace Rights in the United States

There are several protections that are specific to the type of visa you receive. These are outlined below by visa category.

### A-3, G-5, and B-1 domestic employee visas

- If you work for a diplomat (A-3 visa) or a representative of an international organization (G-5 visa), or if you are a domestic employee holding a B-1 visa, your employer must provide you with an employment contract that complies with U.S. law.
- The contract must include the following provisions:
  - An agreement by your employer not to keep your passport, employment contract, or other personal property from you;
  - An agreement by your employer to abide by all laws in the United States;
  - An explanation of how much you will be paid for your work, as well as how frequently you will be paid; and
  - A description of your work duties, weekly work hours, holidays, sick days, and vacation days.
- Make sure that you understand the terms of the contract. If you cannot understand the language in which the contract is written, ask someone you trust to read the contract to you in a language that you understand. **Do not sign anything that you do not understand!**
- When you apply for the visa, a U.S. Consular Officer will meet with you and confirm that your contract complies with U.S. law. Do not hesitate to ask the U.S. Consular Officer any questions. Your employer is not supposed to be present when you meet with the Consular Officer.
- If you sign a contract that violates your rights, or if your employer does not do what the contract says, call the hotlines listed in this pamphlet immediately. They can help you find a lawyer who can help explain your rights in this situation.

### H-1B and H-1B1 visas for performing services in specialty occupations

- If you are coming to the United States to perform services in a specialty occupation or as a fashion model, please refer to www.Travel.State.gov for more information regarding your rights and ability to change employers.

### H-2A temporary agricultural worker visas

- If you are a temporary agricultural worker, you must receive a written description of the terms of your employment no later than the first day of work. This document must contain detailed information about the benefits, wages, housing, work duration, and transportation benefits that your employer will

REPLY APP 01037

provide.

- You are entitled to payment at or above a wage that is set by the government. This rate applies whether you are paid hourly or by piece rate.

- You do not have to pay either U.S. social security taxes or fees to a labor recruiter in your home country.

- Your employer must provide clean and safe housing at no charge.

- Your employer must reimburse you for transportation costs from your country to your place of employment, but only after you complete half the contract period; and your employer must pay for your return transportation costs for your trip home after completion of the contract.

- You are entitled to guaranteed work for at least 3/4 of the number of workdays stated as the contract period unless you are displaced by a U.S. worker during the first half of the contract period.

### H-2B temporary non-agricultural worker visas

- If you are a temporary non-agricultural worker, you are entitled to payment at or above the prevailing wage, which will be at least the federal, state, or local legal minimum wage, but may be higher.  This rate applies whether you are paid hourly or by piece rate.

- Your employer must provide return transportation costs for your trip home if your work ends or you are dismissed for business reasons unrelated to job performance before the end of your contract.

- You are usually entitled to terms and conditions of employment that are normal for similarly employed U.S. workers in the area.

- You should never have to pay fees to a labor recruiter in your home country.

### J-1 exchange visitor visas

- Unless your exchange program is sponsored by the  Federal government, the program must be a minimum of three weeks duration.  The Form DS-2019, the basic document required to apply for a J visa, reflects the category of exchange and the program dates.  Depending on the category of exchange, there may be other documents and/or contracts which cover the terms of your exchange program.

- Your sponsor's advertisements must be accurate and explain all costs, conditions, and restrictions of the exchange program. Your sponsor must also give you an orientation and provide you with information about:

  - the J-1 program and a description of the specific program in which you are participating and its rules;

- — travel and entry into the United States;
- — housing;
- — fees, and costs, including living expenses, healthcare, and insurance costs;
- — life and customs in the United States;
- — local resources;
- — your sponsor's address and the name and phone number of the person responsible for you in the United States;
- — contact information for the Exchange Visitor Program Services of the Department of State; and
- — The Department of State's Exchange Visitor Program brochure;

- If you are entering on a Summer Work Travel program and do not have pre-placed employment, your sponsor must assist you in locating employment if you have not found employment within the first week following your arrival,  and insure that you receive pay and benefits commensurate with those offered to your American counterparts.

- If your J-1 visa is for a training and internship program:

  - — Your sponsor must interview you in person, by telephone or by web camera;
  - — Your sponsor must have a Training/Internship Placement Plan (Form DS-7002) in place before your visa paperwork is submitted.  This Form includes a written statement of any stipend you will be paid, and a summary of the training objectives of the program.
  - — Your sponsor must give you a written statement of the costs and fees you will have to pay, and an estimate of living expenses in the United States.
  - — Your training/internship must be at least 32 hours per week; and
  - — If your training/internship is in agriculture, your working conditions and wages must meet strict federal requirements for agricultural workers.

- Your sponsor must assure that you have medical insurance coverage, though your sponsor need not provide or pay for this coverage.

- If you work in the United States, you should apply for and receive your own Social Security number, and your employer must report all tax withholdings using this number.

- If you are bringing your spouse or minor children with you on a J-2 visa, they may apply for work authorization only if the income is not necessary to support you.

**For more information on visa categories and U.S. entry procedures, see the Web site of the U.S. Department of State:**

**www.Travel.State.gov**

REPLY APP 01039

# Your Rights Regardless of Visa Status

There are also many rights you have regardless of your visa status. If any of these rights are violated, you can report the violations to a government enforcement agency. In most cases, you can also bring a lawsuit to attempt to recover your losses, without fear of being punished.

## 1. Your Right Not to Be Retaliated Against
- It is unlawful for your employer to try to punish you, for example, by threatening to report you to immigration or the police if you try to enforce your rights! If your employer threatens you at any time, **seek help immediately. Remember, your safety comes first!**

## 2. The Right to Be Paid
- You have the right to get paid for **all work you do, in the same manner as U.S. workers.**
- You have the right to earn at least the federal legal minimum wage, $7.25 per hour, in the same manner as U.S. workers. Also check
    - The minimum wage for the **state** in which you work. If that wage is higher, you have the right to be paid the higher amount.
    - Your employment contract, which may obligate your employer to pay a higher amount.
- Most workers in the United States are entitled to overtime pay of one and a half times the amount of their wage for any hours worked over 40 hours per week. For example, if your regular wage rate is $10 per hour, your employer may be required to pay you $15 for each hour you work above 40 hours in a single week.
- If your employer takes money from your paycheck, this is called a deduction. Many deductions are illegal if they diminish your legal wage rate. For example, an employer usually may not deduct for housing (with some visa classifications, housing must be provided free of charge), most uniforms, safety equipment, or recruitment fees.

**TIP**

Make sure to keep a written record of **all the time that you work.** Get a notebook and write down all of the days and hours that you worked, how much you were paid, the days you received a payment, any deductions taken from your paycheck, and the reasons for those deductions.

## 3. Your Right Not to be Discriminated Against
- As an employee, you have the right to not be treated differently or badly at work because of your gender, race, national origin, color, religion, or disability.

- Your employer should pay the same amount to each worker for the same work and offer each worker the same job opportunities no matter what the worker's gender, race, national origin, color, religion, or disability.

- Your employer can't make you speak only in English at work unless there is an important business reason to require English.

### 4. Your Rights as a Woman Worker

- Your employer **MAY NOT** treat you differently or badly because you are a woman or you are pregnant – this is sex discrimination. Whether you are a woman or a man, your employer **MAY NOT** sexually harass you. Your employer should never:

  **TIP**

  Keep a detailed record of every inappropriate comment and/or action your employer takes against you and write down the names and phone numbers of any witnesses.

  — Demand that you perform sex acts;

  — Touch you in a sexual manner; or

  — Say or yell sexual or offensive comments.

### 5. Your Right to a Healthy and Safe Workplace

- All employees have a right to safe and clean working conditions:

  — **Housing**: If your employer provides housing, it should be clean, safe, and in a sturdy structure.

  — **Bathrooms**: Bathrooms should be clean and accessible.

  — **Potable Water**: If you work in agriculture, in most cases, you have the right to receive clean water to drink and to wash your hands.

  — **Illness or Injury on the Job**: If you are injured or get sick at work you may seek medical treatment. In most cases, you will receive free medical treatment and part of the wages lost while injured.

- If you are working with or around **pesticides or dangerous chemicals:**

  — You have a right to wash your hands in clean water after handling the pesticides/chemicals. You are entitled to training on pesticide safety during the first 5 days of work.

  — Your employer must tell you where and when pesticides were sprayed to avoid accidental exposures. Workers and others must not be in an area where pesticides are being applied.

  — If you mix or apply pesticides that require you to use protective equipment (like coveralls or a mask or respirator), your employer must give you

**C A U T I O N !**
**Your employer cannot force you to do something or go somewhere, even back to your home country, by withholding your pay.**

**REPLY APP 01041**

equipment that is clean and in good condition.

- **Medical Emergencies**: In the case of an emergency, call **911** and ask for an ambulance.

  - Your expenses may be paid for, so you should tell your employer as soon as possible so the employer can file the necessary paperwork.

  - When you are at the doctor or clinic, ask for copies of the paperwork regarding your illness or injury.

## 6. Your Right to Join a Union and Bargain Collectively

- With few exceptions, all workers in the United States have a right to form and join a union, regardless of their immigration status under federal law. Your employer cannot take action against you for doing so. This means you can:

  - Join with other workers to improve wages and working conditions;

  - Attend public speeches, rallies, and demonstrations; and

  - Join a union or other worker organization.

## 7. Your Right to More Protections Under State Law

- Call the hotlines listed in this pamphlet for a referral to organizations that can tell you about your rights in the state where you are working.

## 8. Your Right to Leave an Abusive Employment Situation

- You do not have to stay in your job if your employer is abusing you.

- But, if you came to the United States on an employment-based visa and you leave your employer, your visa status will no longer be valid. However, depending on the type of visa you have, you may be able to change visa categories or employers. You may also be able to remain in the United States legally to pursue a legal claim.

- You may also make a formal complaint or file a lawsuit against your employer while you are still working. There are severe penalties for an employer who tries to punish workers because they pursue their rights.

- If you are experiencing problems with your current employer, contact the hotlines listed in this pamphlet. They will be able to connect you

**TIP**

You have rights in the United States and no one can take those rights away from you. There are hundreds of organizations that can help. Don't be afraid to ask for help to protect your rights.

with a local organization that can speak with you about your options.

REPLY APP 01042

# Human Trafficking

### 1. What is human trafficking?

Human trafficking is among the most terrible workplace abuses that an individual in the United States could encounter. Human trafficking occurs whenever a person is recruited, transported, or kept against his or her will for purposes of exploitation. For a full definition of human trafficking, please see www.state.gov/j/tip (see Legislation—Trafficking Victims Protection Act). The following are some warning signs that may indicate human trafficking:

### Threats and Fear:

Employers, and people who help employers, may use threats and other intimidating acts to make you and other workers feel too afraid to try to leave. For example:

- Beatings, physical abuse, or sexual abuse;

- Threats of beatings, physical abuse, or sexual abuse;

- Locking in or restraining a worker;

- Threats of harm to the worker or the worker's family if the worker tries to leave, complain of mistreatment, report the situation to authorities, or seek help;

- Threats of being deported or arrested, or of being turned over to police for trying to leave, complain, report, or seek help for the worker's situation;

- The employer, or someone working with the employer, has harmed or threatened other workers who have tried to leave, complain, report, or seek help; or makes threats that any worker who tries to escape will be found and brought back.

### Rules and Controls:

Employers, and people who help them, may use rules and controls to make it harder for you and other workers to leave, complain about mistreatment, or seek help. For example:

- Rules against leaving the workplace, or strict rules about where you can go when not working;

- Rules against holding onto your own passport, visa, birth certification, or other identification documents;

- Denial of adequate food, sleep, or medical care; or

- Preventing or restricting you from communicating freely with family, other workers, or others outside the workplace.

### Deception and Lies:

Employers, and people who help them, may also use deception and lies. For example:

**REPLY APP 01043**

- False promises about working conditions, living conditions, or pay;
- Telling you that you have no rights;
- Telling you that you will not be believed if you try to seek help; and
- Instructing you to lie about their identity.

**TIP**

**Before leaving for the United States**, talk with migrant worker organizations or former migrant workers for names and numbers of persons or organizations you can contact if you have problems or questions when you are in the United States.

**2. What should I do if these things are happening to me?**
- If any one of these things is happening to you or you are in a dangerous situation, **get help immediately** by calling 911, the National Human Trafficking Resource Center (1-888-373-7888), or the Trafficking in Persons and Worker Exploitation Task Force Complaint Line (1-888-428-7581)**.** They can help refer you to a local organization that help victims of human trafficking in your area.
- If you are in physical danger, you should call **911** to reach the Police. If you call the police, show them this pamphlet and tell them about the abuse that you have suffered.

**3. Will I be deported if I report the abuse?**
There are programs to protect people who report abuse. You should not be afraid to seek help even if you have immigration concerns. You should consult with an immigration attorney who does not work for your employer. The hotline can help you find someone to consult.
- If you believe you may be a victim of human trafficking or of another serious crime, including rape or sexual assault, you may be entitled to a different nonimmigrant visa, like a T visa (for trafficking victims) or a U visa (for victims of other serious crimes). These visas were created to provide protection for certain crime victims worried about their immigration status.  Many people are unfamiliar with these visas and you may need to tell people assisting you about them.

**4. What services are available for victims of human trafficking?**
- If you are a victim of trafficking in the United States, you may be eligible for benefits, services, and immigration remedies under federal or state programs.
- Many organizations can help you access these services, which include medical care, mental health care, housing, dental care, legal advocacy for immigration and other legal needs, employment assistance, and public benefits.

Case 1:14-cv-02074-CMA-KMT   Document 1042-4   Filed 04/27/18   USDC Colorado   pg 166 of 219

# Know Your Rights
## Call one of the hotlines listed in this pamphlet if you need help

You are receiving this pamphlet because you have applied for a nonimmigrant visa to work or study temporarily in the United States. The purpose of this pamphlet is to help you understand your rights when you arrive in the United States. Even though you will be living in the United States only temporarily, you will still have many of the basic workplace rights that U.S. citizens and residents have.

This pamphlet gives an overview of your basic workplace rights. Understanding your rights will help you to protect yourself from abuse. Keep this pamphlet with you in the United States in case you need to reach someone for help.

This pamphlet was also created to help you protect yourself against the most serious abuses, such as human trafficking. Human trafficking is a form of modern-day slavery where an employer or other individual, through physical or psychological abuse, causes an individual to feel that he or she is not free to leave the situation. **Recognizing that you are in an abusive employment situation is the first step toward getting help.**

If you arrive in the United States and have problems at work, you should seek help immediately. Do not believe your employer if he or she says that you do not have legal rights in the United States. Do not accept legal advice from your employer, contractor, or recruiter. Only an attorney representing you should give you legal advice.

If you believe your rights are being violated, the hotlines listed in this pamphlet can help you reach local organizations that can provide further assistance. **Do not be afraid to contact these organizations! They are here to help you.**

This pamphlet is not a substitute for legal advice. There are many different types of temporary work and educational visas, and you should not be afraid to ask for more information about your visa.

### IF YOUR RIGHTS ARE VIOLATED, CALL THESE TOLL-FREE NUMBERS:

**National Human Trafficking Resource Center**
**1-888-373-7888**
**(24 hours)**

**Trafficking in Persons and Worker Exploitation Task Force Complaint Line**
**1-888-428-7581**
**(Monday — Friday, 9am-5pm Eastern Time)**

12    **REPLY APP 01045**

# Exhibit 69

REPLY APP 01046

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

    Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

    Defendants.

---

## DECLARATION OF Cathy Caramelo

---

I, Cathy Caramelo, declare as follows:

1.    My name is Cathy Caramelo and I am over the age of 18.

2.    I was an au pair for Cultural Care for two-and-a-half years from 2012 to 2014.

3.    When deciding whether to participate in the program, I met with Cultural Care representatives in Brazil, who told me that the stipend was $195.75 a week for up to 45 hours of work, although they told me most au pairs didn't work 45 hours. They also told me that I would just be responsible for childcare. They also said that I would have a car for my use, that I would travel with the family and see different places, and that I would be able to take whatever classes I wanted. They made participating in the au pair program sound very dreamy.

4.    Upon my arrival in the United States, I was required to attend training in New York. I was not paid for this time.

5.    During my time as an au pair I worked for one host family and cared for 1 year old girl.

6.    The host mom had epilepsy and I was told that she could not be alone with the child. Because of that, I had to care for the host mother almost as much as I cared for the child. I drove her everywhere, helped her run errands, and did other tasks as needed. This was very hard for me as I was not a nurse and when I signed up for the program, I was told that I would only be caring for a child.

7.    My first year I was paid a weekly stipend of $195.75. I had no access to a

car.

8.    In my second year, my host family put the girl in school. However, the family said that I still had to work 45 hours and asked me to clean the house and do other chores to make up the time.

9.    In the second year, my host family raised my weekly salary by $20-$30 to compensate me for the extra duties. However, Cultural Care found out about the extra money and told the host family that it was not allowed to pay more than $195.75 a week. After that, and for the rest of my time as an au pair, my salary stayed at $195.75 per week, with my host family occasionally giving me $10 gift cards as a way of compensating me for the extra work.

10.    Cultural Care knew about the extra work, and the duties beyond childcare but did nothing to address either issue.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.


Dated: June _01_, 2017

CATHY CARAMELO

2

**REPLY APP 01048**

# Exhibit 70

REPLY APP 01049

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, *ET AL.*

     Plaintiffs,

v.

INTEREXCHANGE, INC., *ET AL.*

     Defendants.

---

## DECLARATION OF LINDA ELIZABETH

---

I, Linda Elizabeth, declare as follows:

1.     My name is Linda Elizabeth and I am over the age of 18.

2.     I was an au pair for Cultural Care from 2007 to 2008 in Pennsylvania, and from 2013 to 2015 in Texas.

3.     Before I met with Cultural Care representatives to discuss participation in the program, I saw posters in Germany that advertised the stipend as a set amount.

4.     During the orientation and recruitment meeting in Germany I was told that the stipend was a set amount.

5.     Upon arrival in the United States in 2007, I attended training in New York. I was not paid for this time.

6.     When I participated in the au pair program in 2007, I was initially paid around $139 per week, which increased to $159 per week by the end of my time as an au pair in 2008.

7.     During this time, I was responsible for two sets of twins, one set that was 2 years old, and one set that was 3 months old.

8.     When I returned in 2013 to participate in the program a second time, I was paid $195.75 per week.

9.     Again, during the orientation and recruitment meeting in Germany I was told that the stipend was a set amount.

10. Upon my return to the United States, I was required to again attend training in New York. I was not paid for this time.

11. I worked for two families during this period. From 2013 – 2014, I worked for a host family in Murphy, Texas. During this time, I cared for twins a few months old and, sometimes, a four year old.

12. I worked for a second family from 2014 – 2015. The family was initially located in Dallas and then moved to Plano Texas during my time with them. During this time I cared for 13-month old twins but also was required to do a lot of duties outside of childcare, including heavy cleaning and preparing boxes for the move.

13. For the Dallas/Plano family I worked an average of 50 hours per week and the family paid me $9/hour for every hour above 45 hours. If I worked fewer than 45 hours in a week, the family required me to make up the time. This was the case even when the reason I worked fewer hours was due to a holiday or because the family went on vacation without me.

I solemnly affirm under the penalties of perjury that the contents of this

Declaration are true and correct to the best of my knowledge.


Dated: June _1_, 2017

LINDA ELIZABETH

REPLY APP 01051

# Exhibit 71

REPLY APP 01052



**J-1 Visa Basics**
Facts & Figures
About J-2 Visa
Other U.S. Student Visas
Common Questions

**Programs**

**Participants**
How to Apply
Current Participants
Participant Experiences
Common Questions for Participants
Videos

**Program Sponsors**
Become a Sponsor
Current Sponsors
How to Administer a Program
Common Questions for Program Sponsors

**Host Families/Employers**
For Host Families
For Employers
For Schools
Common Questions for Host Families/Employers

**RESOURCES**
SEVIS login
SEVIS Manual (PDF)
SEVIS Training Videos
DS-2019
Regulations and Compliance Administration
Contacts
About Us
Get Adobe Reader

REPLY APP 01053



# Common Questions for Program Sponsors

## Program Sponsors

- **Common Questions for Program Sponsors**
- Become a Sponsor
- Current Sponsors
- How to Administer a Program
- Designated Sponsor List By Country

🐦 Tweet

## Common Dilemmas ＋

## Designation & Requirements ⊖

Does the State Department recommend any of its Exchange Visitor Program designated sponsors? ＋

How can my organization apply for designation as an Exchange Visitor Program sponsor? ＋

What are some of the responsibilities and obligations of the State Department-designated Exchange Visitor Program sponsors? ⊖

The State Department-designated sponsors are responsible for all aspects of the exchange program, including screening and selecting of foreign national participants and monitoring the participants throughout their exchange visitor program in the United States. These sponsors can explain their program requirements and how their program works. For more information on sponsors' responsibilities and obligations, please visit the Sponsors main page.

Who are the State Department-designated Exchange Visitor Program sponsors? ＋

## Important Documents ＋

## SEVIS ＋

---

**J-1 Visa Basics**
- Facts & Figures
- About J-2 Visa
- Other U.S. Student Visas
- Common Questions

**Programs**

**Participants**
- How to Apply
- Current Participants
- Participant Experiences
- Common Questions for Participants
- Videos

**Program Sponsors**
- Become a Sponsor
- Current Sponsors
- How to Administer a Program
- Common Questions for Program Sponsors

**Host Families/Employers**
- For Host Families
- For Employers
- For Schools
- Common Questions for Host Families/Employers

**RESOURCES**
- SEVIS login
- SEVIS Manual (PDF)
- SEVIS Training Videos
- DS-2019
- Regulations and Compliance Administration
- Contacts
- About Us
- Get Adobe Reader

---

**U.S. Department of State     Bureau of Educational and Cultural Affairs**

FOIA    Privacy Notice    Copyright Information

  

**REPLY APP 01054**

# Exhibit 72

REPLY APP 01055

# NYC Au Pair Orientation & Training

**Logistics** ............................................................................. *2*
- Hotel Information
- Safety
- Roommates & Hotel Amenities

**Arriving at Orientation** ................................................................. *4*
- Arrival Schedule
- Au Pairs Traveling Together
- Super Shuttle Van Service
- Hotel Check In

**Orientation Schedule** ................................................................. *5*

**Contacting Au Pairs** ................................................................. *6*

**Welcome Gifts** ................................................................. *7*
- What & Where to Send Them

**Orientation Meals** ................................................................. *7*

**Orientation Workshops** ................................................................. *8*
- Program Rules, Regulations & Guidelines
- Working with Older Children
- Child Safety, First Aid & CPR
- Driving in the USA
- Early Childhood Development
- Cultural Exchange
- Domestic Travel

**Au Pair Free Time** ................................................................. *16*
- New York City Tour

**Traveling to Host Families** ................................................................. *17*
- Host Family Pick Up
- Train Travel
- Bus Travel
- Airplane Travel
- Hotel Car Service

**Missed Orientation** ................................................................. *20*
- Missed Orientation Form

**Additional FAQ** ................................................................. *23*

1

InterExchange0028522



REPLY APP 01056

## Orientation Logistics

Orientation is held at the famous **New Yorker Hotel** in midtown Manhattan. It is only 3 blocks to the Empire State Building and 8 blocks to Times Square!

The New Yorker Hotel
481 Eight Avenue (at 34th Street)
New York, NY 10001

Phone Number: 212-971-0101

You can learn more about the hotel by following this link: http://newyorkerhotel.com

The neighborhood is filled with 24-hour shops, restaurants and tourist sites. The A/C/E subway lines stop directly outside the hotel's main entrance.

**Hotel Safety**

Providing au pairs with a safe and secure program year in the USA is one of our top priorities and begins the moment au pairs arrive in New York City for their Orientation and Training Program.

During their week in New York, au pairs stay in the recently renovated New Yorker Hotel in the center of Manhattan where guest security is at its best. In addition to an onsite 24/7 team of security personnel, the hotel is monitored by a state of the art camera surveillance and motion detector system. InterExchange Au Pair USA staff is available around the clock should any emergencies arise and all au pair arrivals, departures and itineraries are closely monitored.

As part of the training week, in accordance with the NYPD's Crime Prevention Unit's recommendations, Au Pair USA has developed a safety workshop to raise awareness of personal safety both in NYC and throughout the program, making the year ahead a pleasant and safe experience.

When sightseeing in NYC, au pairs can feel secure in knowing that, although you have to use your common sense just like in any other big city in the world, crime rates are well below that of many other major cities. New York City's post 9/11 counter-terrorism program has become one of the most sophisticated in the world, leading the way in crime and terrorism prevention.

2

**InterExchange0028523**

REPLY APP 01057

**Roommates**

Au Pairs are roomed with a fellow au pair of the same gender, 2 au pairs per room. To encourage them to start speaking in English they are normally roomed with an au pair who does not speak their native language.

**Hotel Amenities**

The New Yorker Hotel is the state of the art hotel and includes the following amenities:
- Free Internet Wi-fi
- Gym, hairdryers, safes and mini fridges
- Onsite Concierge and Transportation Desk
- 2 onsite restaurants
- Coffee Shop

3

InterExchange0028524

REPLY APP 01058

## Arriving at Orientation

### Arrival Schedule

All au pairs arrive on Monday of Orientation Week. Arrivals begin in the early morning and end late at night. Those flying from South America, Asia & South Africa tend to have flights that arrive early in the day, while those arriving from Europe tend to arrive in the evening.

Once an au pair lands they will need to clear customs and immigration. It takes on average about 3 hours for an au pair to land, clear immigration and arrive at the New Yorker Hotel.

### Au Pairs Traveling Together

Those au pairs that are traveling on the same flight and/or connecting flight to NYC are notified of this via email the week before their departure.

### Transportation to the New Yorker Hotel

Au pairs are given detailed instructions about how to take the Super Shuttle Van service to the hotel. These instructions are given to them both in their native language at their final meeting with their International Cooperator and in written form from us in their Au Pair Handbook and in their Pre Departure email.

Super Shuttle operates all day and all night and is the safest, cheapest way to get to the hotel. Depending on the airport it will cost between $15-17 to get to the New Yorker Hotel. Supershuttles can be pre-booked and paid for by au pairs and/or host families—but it is not necessary.

You can learn more about the Super Shuttle here: http://www.supershuttle.com

### Hotel Check-In

Upon arrival at the New Yorker Hotel au pairs are greeted by a representative from Au Pair USA. The representative will check the au pair in, provide them with materials for class, answer any questions and assist in solving any problems that might have arisen in their travels.

4

**InterExchange0028525**

**REPLY APP 01059**

## Orientation Schedule

Orientations begin each day at 8:30 AM and continue through until 5:30 PM. Attending Orientation is a State Department mandated aspect of the au pair program. During Orientation an au pair will learn skills in Childhood Development, Care & Safety to better prepare them in caring for their host children. They will also spend time learning about US culture, methods for handling culture shock and will begin building a strong support system of other au pairs they meet to support them throughout the coming year.

### Monday

- Au Pairs arrive to U.S. (NYC)
- Rest and Sightsee (at leisure)

### Tuesday

- Welcome, Program Rules, Regulations & Keys to a Successful Year
- Culture Shock
- Working with Children Ages 7 and Up
- Optional Tour of NYC

### Wednesday

- First Aid, CPR & Child Safety

### Thursday

- Driving in the USA
- Early Childhood Development
- Cultural Exchange
- Domestic Travel Instructions

### Friday

- Travel to Host Families

5

**InterExchange0028526**

## Contacting Au Pairs

Host Families will receive an email from InterExchange confirming their au pair's arrival. Keep in mind au pairs are arriving at all times during the day and night and the final confirmation might not come until Tuesday morning. Included in this email will be the au pair's room number.

To telephone your au pair directly, dial the hotel's phone number (212-971-0101) and then provide the hotel operator with your au pair's room number. Au pairs are able to receive phone calls directly in their rooms, but are unable to make outgoing calls. In order to telephone host families, au pairs will need to use a phone card and one of the many pay phones located throughout the hotel.

The hotel does have free Wi-Fi and if your au pair has a laptop you will also be able to communicate with them via email. If your au pair does not have a laptop with them and you still want to email them, you can send an email directly to the hotel and they will print and deliver this message to your au pair.

To email your au pair via the hotel, you will want to write your au pair's name and room number in the email subject heading. Send your message to: guest@nyhotel.com

6

**InterExchange0028527**

## Welcome Gifts

If a Host Family wishes to send a small gift or "welcome" package to their Au Pair while at the hotel please remind them the smaller (or more edible!) the better as the Au Pairs already have overstuffed suitcases. A "welcome" card, handwritten note or pictures drawn by the children are always appreciated.

The majority of host families do not send their Au Pair a gift, nor do the Au Pairs seem to expect them. If however a host family does send a gift, please have them follow these directions:

**Suggestions on gifts:**
- Starbucks Gift Card (There is one located across the street from the hotel)
- Fruit Baskets, such as Edible Arrangements  (http://ediblearrangements.com)
- Phone Card
- Gourmet Chocolates
- Nice Journal & Pen

**Where to send a gift:**

Option 1 (Preferable)

Directly to the hotel:
Au Pair's Name/InterExchange Au Pair USA/Check In Date
The New Yorker Hotel
481 8th Avenue
New York, NY 10001

Option 2

Directly to our office (Must be received *before* Monday of Orientation week):
InterExchange Au Pair USA/Joanna Lehmann
161 Sixth Ave, Floor 10
New York, NY 10013

## Orientation Meals

Au pairs will receive vouchers for breakfast Tuesday—Friday and lunch Tuesday—Thursday. Dinner is included in the optional NYC tour offered Tuesday evening.

Located within the hotel are 2 restaurants including one, which operates 24 hours a day. The hotel is also surrounded by hundreds of restaurants, shops and drug stores, many of which operate 24 hours a day.

7

InterExchange0028528

# Orientation Workshops

## Program Rules, Regulations & Culture Shock

At the Program Rules & Regulations workshop au pairs are welcomed to the USA, participate in icebreakers and get extensively schooled in the program rules. Au pairs have already been thoroughly versed about what encompasses their program by their international cooperator and through their required program reading material, but the session provides them with an opportunity to ask questions and get further details on health insurance, paying taxes, educational requirements, documents, transitions and many more important aspects of the program.

Tips on building positive, professional relationships with their host family are stressed. A wide range of topics is discussed such as first encounters, appropriate working attire and American family life.

The workshop also provides an introduction to life in the USA, providing au pairs with valuable insights into the American lifestyle and culture to assist in a smooth transition. Topics touch on everything from tipping and standard etiquette to friendships and dating.

8

InterExchange0028529

REPLY APP 01063

## Working with Older Children

Knowing physical, emotional and social developmental milestones are critical to evaluating and meeting a child's needs. The Working with Older Children workshop, led by a New York State teacher, helps au pairs understand these personality changes, intellectual and physical growth and effects of peer groups on the school age child. Through roll playing, group discussion and activities prompted by the Au Pair USA Orientation Manual au pairs develop methods to effectively handle discipline, homework help and communication challenges that might arise during their year.

### Personality Changes & Support Them
- Decision making choices
- Mood swings
- Changes in personality between girls and boys
- Self-esteem

### Intellectual Growth & How to Encourage
- Increased need stimulation and more detailed information at school and home.
- Specific interests develop which are unique to each child.
- Intellectual growth supported and encouraged by caregivers.
- Appropriate projects, learning materials, etc. essential for age and stage of development

### Peer Group Influence
- Peer pressure
- Choices made to deal with peers
- Encouragement with decisions relating to peers
- Positive reinforcement

### Physical Growth
- Need for physical activity on a regular basis
- Development of large-muscle coordination
- Physical activity as a release from stress and frustration.
- Physical activity provides interaction with others.

### Discipline
- Set limits, establish routines…allow for flexibility
- Give either/or choices for improper behavior
- Include children's opinions and feelings in resolving of conflicts
- Work together to solve problems and review results
- Other possible suggestions for discipline control

9

InterExchange0028530

**Importance of Play**
- Establishes respect for rules
- Sets goals
- Competition situations
- Physical coordination benefits
- Helps children make decisions and choices when playing with others
- Need for independence from care-giver
- Role of au pair in children's play

**Special Problem Child Care Situations**
- ADD—Attention Deficit Disorder
  - Slow learners
  - Methods needed to deal with situations

**Conflict Resolution**
- Open communication
- Ask for information and/or things that you are unsure about
- Work together to come up with effective, positive ways to handle children
- Talk regularly to parents about how everything is "shaping up"

10

InterExchange0028531

REPLY APP 01065

## Child Safety, First Aid & CPR

Our 8-hour workshop in childcare safety and first aid is taught by, Red Cross Authorized Provider, Lifesaving Enterprises (http://lifesavingenterprises.com ) a dynamic team of high-energy instructors that believe in a fully hands on approach to learning.

**Modeling Safe Behavior**
- Importance of being a role model.
- Positive behavior & attitude.

**Recognizing Emergencies**
- What is an emergency?
- Deciding To Act
- Emergency Action Steps—Check-Call-Care
- When To Call
- Getting help by calling 911 (How to Call)
    - *Skill Check: Calling 911*
- Good Samaritan Laws

**Preventing Disease Transmission**
- First Aid Supplies
- Hand Washing

**Checking Victims**
- Checking a conscious child or infant victim
- **S.A.M.P.L.E Survey**
    - Signs & Symptoms
    - Allergies/Asthma
    - Medications
    - Past History
    - Last Meal/Last Beverage
    - Event
- When & How to Move a Victim

**Conscious Choking of a Child**
*Hands on Practical: CPR Children Dummies - Clearing the Blocked Airway*
- Signs of Respiratory Distress
- Preventing Choking
- Asthma Inhaler
- Clearing the Blocked Airway of a Child w/ Abdominal Thrusts

**Conscious Choking Infant**
*Hands on Practical: Clearing an infant's airway*

**Practical CPR**
*Hands on Practical: CPR for the Child & Infant*

11

InterExchange0028532

- Unconscious Respiratory
- Cardiac Emergencies
- CPR for the Child/Adult
- CPR for the Infant

**Heimlich Procedure**
*Hands on Practical: Heimlich*

**First Aid**
- Recognizing & Caring for a Victim in Shock

**Bleeding You Can See**
*Hands on Practical: Bandaging an injury*
- How to Control External Bleeding
- Abrasions, Punctures, Lacerations (When are stitches needed?), Avulsions & Amputations

**Bleeding You Can Not See**
- Recognizing Internal Bleeding
- Caring for the Victim

**Burns**
- Caring for Burns

**Injuries to Muscles, Bones & Joints**
*Hands on Practical: Applying a Sling*
- Fractures, Sprains & Stains

**Head, Neck & Back Injuries**
*Hands on Practical: In-Line Stabilization*
- Minimizing Movement of a Child or Infant Suspected of Having a Spinal Injury

**Facial Injuries**
- Eye, Nose, Tooth & Mouth Injuries

**Punctures**
- First Aid & Signs of Infection

**Impaled Objects**
- First Aid & Caring For

**Amputations**
- First Aid & Caring For

**Eye Injuries**

12

InterExchange0028533

**Prevention is Key**
- Sudden Infant Death Syndrome

**Safety at Home: Infants & Children**
- Baby & Toddler Proofing
- Hazard Hunting—*Hands on Activity*
- Fire Safety—Caring for Burn Injuries, creating an escape plan
- Poisoning
- Carbon Monoxide Poisoning
- Toy Safety
- Crossing the Street!
- Cooking
- Electrical Burns
- Defensive Driving
- Car Seats/Booster Seats
- School Buses
- Personal Safety

**Water Safety**
- "Super" Vision In & Around Water

**Recognizing Illness & Caring for an Ill Child/Infant**
- Fainting, Seizures
- Diabetic Emergencies—Hypo/Hyperglycemia
- Type 1 Insulin Dependent Diabetic/Type 2 Non-Insulin Dependent Diabetic
- Allergic Reaction: Review Assistance with Self Administration of an Epi-Pen
- Stinger Removal—Bites
- Lyme Disease & West Nile
- Fever Head Related Emergencies
- Cold Related Emergencies
- Vomiting—Diarrhea

**Medication Dosage**
- Label Reading
- Prescription and/or OTC

**Sunburn Prevention**

**Storm Safety**

**Bites**
- Animal Bites
- Human Bites

**Wild Animals in the USA**

13

InterExchange0028534

REPLY APP 01068

- Rabies
- Snake Bites
- Spider Bites
- Stingers

**Poisons**
- Ways it Can Enter the Body
- Poison Control Center
- Solid Forms, Liquid Forms, Spray Form & Invisible Forms
- Poisoning Prevention
- Poison Look-A-Likes

**Nature**
- Poison Ivy
- Poison Oak
- Tick Removal

**Child Abuse**
- Shaken Baby Syndrome
- "Patient Contract" for Your Temper

## Driving in the USA

Au pairs are provided with an overview of need to know laws, regulations and procedures that they will encounter when driving throughout the USA.

**Driver's License**
- The International License
- Obtaining an American License

**Accidents**
- What do to
- Financial Responsibility

**Universal Rules**
- Drinking & Driving
- Seatbelts, Cell Phones, Car Seats, School Zones, etc

**Smart Drivers**
- Weather Conditions
- Gas Stations
- Car Insurance
- Speeding Tickets

14

InterExchange0028535

REPLY APP 01069

### Early Childhood Development

Understanding how young children grow and learn is an extremely important part of working with children. The Early Childhood Development workshop provides au pairs with a definition of what is "normal" behavior with the goal of providing them with the knowledge to effectively care for their young children through the early stages of life. The workshop begins with the physical, social and emotional needs of children in the infant stage and concludes with those in the preschool age.

**Infant/Baby Development** (through 1 year)
- Thinking Like a Baby
- What a Baby Need From His Caregiver
- How Babies Learn in the First Year
- How Babies Communicate
- Singing, Talking, Interacting with Babies Throughout the Day
- Physical, Emotional & Intellectual Changes from 0—1 Year of Age

**Toddlers; Ages 1-3**
- Growth & Development Stage
- Lots of Movement, Supervision Needed
- What is a Toddler?
- Physical, Intellectual, Social/Emotional Development of Toddlers

**Preschoolers; Ages 3-5**
- What You Can Expect From a Preschooler at This Stage
- Physical, Intellectual & Social Growth
- Varied Scenarios of Children Engaged in Conflicts With Caregivers, & How To Handle

### Cultural Exchange

Au pairs arrive in the country with hopes, dreams and fears of their year abroad. Through an open discussion au pairs are given tips on how to achieve those dreams, manage their fears and help everyone have their best year possible.

### Domestic Travel

Getting ready to say goodbye to their newfound friends at orientation and hello to their new family can be an exciting yet stressful time for the au pairs. Together with our Orientation & Logistic teams the au pairs are prepared for their next step in their au pair adventure—meeting their host families.

15

**InterExchange0028536**

REPLY APP 01070

## Au Pair Free Time

### Optional New York City Tour $30

This 3 hour walking tour of New York City's most famous sites is offered Tuesday evening. Sites include: Times Square, Empire State Building, Trump Tours, St. Patrick's Cathedral, Central Park, etc. The tour also includes both dinner and a subway ride lesson.

### Evenings in NYC

The majority of au pairs arrive in New York with a long list of activities they want to do, see and experience during their week. The remaining few that are unsure are provided with an array of suggested itineraries from Au Pair USA.

### Visiting Family & Friends

Many au pairs have family and/or friends in the NYC metro area. Au pairs are welcome to visit with them in the evenings of orientation week, however they are not allowed to leave Manhattan nor stay overnight at the homes of their friends.

16

InterExchange0028537

## Traveling to Host Families

Au pairs that live locally and are being picked up are free to depart as of 6:00 PM on Thursday of Orientation Week. Au pairs that will be traveling by bus, train or airplane depart on Friday of Orientation Week. Unfortunately due to State Department regulations early departures are not allowed. Prior to an au pair arriving in their host family's home they have to have completed the mandated number of training hours. Departing any earlier will not allow them to fulfill this requirement.

Official hotel check out time is 12:00 PM on Friday of Orientation Week. Au Pairs are not allowed to stay in the hotel additional nights. If however an au pair has a late flight, pick up, etc luggage storage is available in the hotel.

### Host Family Pickup

Au Pairs are free to be picked up by local families as of 6:00 PM on Thursday of Orientation Week. Host Families need to contact our logistics department (logistics@interexchange.org ) detailing us of their intentions and we will forward the information onto the Au Pair.

For ease of locating the au pair we advise one of two scenarios, if the au pair is being picked up on Thursday Night, a host family may ask the au pair to wait in his/her room until they call and tell them they are there to pick them up. Or give the au pair a 30-60 minute window during which to expect them and ask them to wait in the coffee shop area of the hotel's main lobby.

In a host family's email to our logistics department they can give us specifics and we will pass these on to the au pairs *(for example: I'm Agneiska's host mom, I will be picking her up Thursday night at 8, she should wait for me in the coffee shop, my cell phone # is 9\*\*-3\*\*-8\*\*\*)*

There are paid parking lots within the vicinity of the Hotel New Yorker. Host Families are also able to park directly in the pickup/drop-off lane directly in front of the hotel for a quick pick up.

### Train Travel

Train tickets must be booked for Friday of Orientation Week. We strongly recommend booking the au pair's travel through our travel agent at Globe Travel Service. Our consultant, Elaine Messier, can be reached by calling 1-800-892-9385. All tickets arranged through Globe Travel Service will be automatically forwarded to our office, giving a host family one less thing to arrange.

17

InterExchange0028538

If a host family does not book through Globe Travel, they must email a copy of the au
pair's itinerary to logistics@interexchange.org .

WE STRONGLY ADVISE THAT HOST FAMILIES ALWAYS BUY
REFUNDABLE/TRANSFERABLE TICKETS IN CASE THEIR AU PAIR'S TRAVEL
IS UNEXPECTEDLY DELAYED!

Penn Station is a major hub of Amtrak's east coast operations and is an easy 5-minute
walk from the New Yorker Hotel. Thursday of Orientation Week our Logistics Team will
escort au pairs traveling by train to Penn Station to show them around and pick up their
boarding passes.

Getting to Grand Central Station will require a taxi ride. Grand Central Station is not
recommended.

Keep in mind that many of the au pairs will be traveling with large bags and suitcases.
We do not recommend having au pairs take commuter and mass transit trains. These
operations can be very confusing and intimidating to young travelers especially during
rush hour! If a host family must have their au pair use one of these means to travel, we
will certainly prepare her/him for the journey.


**Bus Travel**

Bus tickets must be booked for Friday of Orientation Week. Port Authority is the major
bus terminal in NYC and is located on 8th Ave and 42nd. Getting to Port Authority Bus
Terminal will require a taxi ride. Port Authority is also a very large multilevel system that
is not easy to navigate. Keep in mind that many of the au pairs will be traveling with
large bags and suitcases. We do not recommend having au pairs take commuter and mass
transit buses. These operations can be very confusing and intimidating to young travelers
especially during rush hour! If a host family must have their au pair use one of these
means to travel, we will certainly prepare her/him for the journey.

There are a few bus systems that operate in and around Penn Train Station that are a short
5-minute walk from the hotel. These buses are much preferable than to those, which
depart the Port Authority.

If a host family arranges for their au pair to travel by bus to their home, they must email a
copy of the itinerary to logistics@interexchange.org .

WE STRONGLY ADVISE THAT HOST FAMILIES ALWAYS BUY
REFUNDABLE/TRANSFERABLE TICKETS IN CASE THEIR AU PAIR'S TRAVEL
IS UNEXPECTEDLY DELAYED!

18

**InterExchange0028539**

REPLY APP 01073

**Airplane Travel**

Airplane tickets must be booked for Friday of Orientation Week. We strongly
recommend booking an au pair's travel through our travel agent at Globe Travel Service.
Our consultant, Elaine Messier, can be reached by calling 1-800-892-9385. All tickets
arranged through Globe Travel Service will be automatically forwarded to our office,
giving a host family one less thing to arrange.

If a host family does not book through Globe Travel, they must email a copy of the
itinerary to logistics@interexchange.org .

WE STRONGLY ADVISE THAT HOST FAMILIES ALWAYS BUY
REFUNDABLE/TRANSFERABLE TICKETS IN CASE THEIR AU PAIR'S TRAVEL
IS UNEXPECTEDLY DELAYED!

New York City has three airports (JFK, LGA, Newark) all about equal distance from the
New Yorker Hotel.

Super Shuttle is a convenient and affordable shuttle bus service from the New Yorker
Hotel to all of the NYC Metropolitan Airports (JFK, LGA, Newark). Host Families have
the option of booking and prepaying for this service online ahead of time. If they do not
pre-book it, our Logistics Team will make a reservation for the au pair and the au pair
will be responsible for paying for the service. If a host family does book this shuttle on
behalf of their au pair please forward the booking confirmation to our Logistics
Department.

You can check out Super Shuttle's NYC Service at:
http://www.supershuttle.com/htm/cities/nyc.htm

As you may know, many airlines have implemented the new policy of charging fees for
checking-in luggage on domestic flights. In most cases, these fees will be charged at the
airport when the au pair checks-in.

InterExchange views these charges as part of the domestic travel cost for au pairs and, as
such, will address them in the following ways:

* Upon arrival at their Host Family's home, au pairs should be reimbursed by their Host
Family for any baggage fees paid out of pocket for checking-in two normal sized pieces
of luggage.

* Families may request proof of payment from the au pair.

* Any additional fees for overweight luggage or extra pieces of luggage are the au pair's
responsibility and do not have to be reimbursed by the Host Family.

We regret if this adds any unforeseen costs to the au pair program. We believe that a

19

InterExchange0028540

young person traveling abroad for 12 months will need at least two pieces of luggage to
be appropriately prepared.

**Hotel Car Service**

Within the hotel is located New Yorker Rides. A safe, dependable car service
company. They are very familiar with the Au Pair USA program and will be happy to
assist host families in making reservations for travel to the airport and/or their
home.

For more information:
http://www.newyorkerrides.com
(646)293-1658 x1658
info@newyorkerrides.com

# Missed Orientation

Au Pairs normally arrive on Monday of Orientation week in time for their first class on
Tuesday morning. However, occasionally an Au Pair will arrive late to Orientation due to
flight issues. Due to strict government regulations, we need to insure that all of our au
pairs receive the correct information from our agency. When this occurs we require the
Local Coordinator to make up the missed session with the Au Pair.

Local Coordinators will be sent a *Missed Orientation Training Form* that states
everything that needs to be reviewed with the Au Pair. The form then needs to be signed
by both the Local Coordinator and the Au pair and then mailed back to InterExchange.
All of the information can be found in their Orientation Handbook, Host Family Au Pair
Handbook and the Child Care Handbook.

Missed Orientation Forms are also available from the Local Coordinator Resource Center
located on NING.

20

InterExchange0028541

REPLY APP 01075

## InterExchange Au Pair USA
## Missed Orientation Form

*If an au pair has arrived late due to flight delays it is the Local Coordinator's responsibility to review the missed material with the au pair. Failure to do so is a direct violation of the Federal Government Au Pair Regulations and could result in the Au Pair's program being terminated. He/she would also be required to return home at his/her own expense.*

Au Pair Name:_____   Arrival Date:_____

Address:_____   Local Coordinator (or IEX rep.):_____

**Instructions: Please check off sections completed by au pair (with the help of Local Coordinator or InterExchange Representative).**

- Basic customs and social issues (i.e. 21 to drink, drinking and driving laws, etc.)
- Au Pair USA Program rules and regulations:
  - Non-immigrant exchange visitor J1 visa.
  - Au Pair cannot work anywhere else with visa.
  - 12 months to work for host family—13th month is only intended for domestic travel. 13th month is inferred on visa and is 30 days after visa ends.
  - Hours allowed to work up to (**45 hours per week/10 hours per day**).
  - Vacation time allowed (1 and 1/2 days off per week, one complete weekend per month, 2 weeks paid vacation for year).
  - Stipend is $195.75 per week.
- ❑ Visa information (the "entry permit")
  - ❑ Visa is not valid without SEVIS DS 2019 form.
  - ❑ Note expiration date (after it passes, Au Pair can not longer re-enter the country)
  - ❑ Responsibility of au pair to find out needed visas for travel during year, (travel with family or on own).
  - ❑ Exit/re-entry rules during 12 months as au pair.
- ❑ DS-2019 (the "work permit")
  - ❑ Must always be up to date
  - ❑ Only allows work as an Au Pair, once it expires Au Pair has 30 days to leave the country.
- ❑ I-94 Card (the proof that au pair came through a legal port of entry)
  - ❑ $360 &4 plus months of headache to replace
- ❑ Educational Component Information
  - ❑ 6 credits (points); Higher than a high school level & at an accredited institution (University, Community College, College or Junior College)
  - ❑ 6 credits = 60 hours = 2 classes normally; Normal BA degree—120 credits/4 years
  - ❑ REQUIRED: If you do not complete—can not keep $500, can not extend, will not get a Completion Certificate (often needed for university enrollment) or bonus, might not be able to get a US visa in the future (Government usually requires the Completion Certificate/Proof of Successful Completion before the will issue a new student/tourist visa)

21

InterExchange0028542

- ❑ $500 from family; About $500 needed from you (budget $10 a week from your paycheck)
- ❑ Local Coordinator's role to Au Pair during year.
  - ❑ Cluster Meetings
- ❑ Basic common sense issues, i.e. phone usage in host family home, phone cards, Internet usage and attitude.
- ❑ Tips for a successful year.
- ❑ How to work out problems.
  - ❑ One-month, no-move policy.
  - ❑ Transition- *and how to avoid it if possible.*
- Immediate expulsion from program if specific behavior is exhibited from au pair (i.e. corporal punishment with host children, disregard of American laws, child neglect, "outside" employment, disregard of specific Au Pair USA rules, regulations and policies.
- Au Pair Rights: to be paid on time, to help with housework as a family member but not a servant, etc.
- Accident and Sickness Insurance coverage (AIG Assist and Travel Insurance Services). Review "Summary of Coverage" and basic information.
  - Finding a Doctor
  - Difference between Doctor's Office & Hospital/Emergency Room
  - $30 Co-pay (doctor) $250 deductible (hospital)
  - Not covered: Dental, Vision & Pre-existing Conditions
- Sex—Protection, Planned Parenthood, etc.
- Social Security Card information (Au Pair has already filled out application for it and has in her/his possession)
- Culture Shock (adapting to a new culture, homesickness, related issues and best ways to overcome difficulties).
  - Cultural Differences explored.
  - Ideas given to help alleviate culture shock.
- School-Age Children Workshop Information:
  - Interacting with children in daily life routines, etc.
  - Children's Behavior (and discipline techniques).
  - Problem-solving with children.
  - The importance of "Play".
  - Child Development and Peer Group Influence.
  - Au Pair's Role in Children's Daily Life.

Au Pair's Signature:_____

Local Coordinator, or IEX Representative's Signature:_____

Date:_____

22

InterExchange0028543

## Additional FAQ

**Will the au pairs have Internet access during Orientation?**
If an au pair arrives with a personal laptop there is free Wi-Fi in all the hotel rooms. There are also several Internet cafes nearby for those who did not bring a personal computer.

**Does a host family need to pay their au pair a stipend during Orientation Week?**
No

**Do repeat au pairs have to attend orientation again?**
Yes. Au pairs that were au pairs in the USA 2+ years ago are still required to participate in orientation again.

**If an au pair has friends and/or family in the NYC area, can they spend a few days with them directly following orientation and before continuing on to their host family's home?**
No, all au pairs should be with their host families as of Friday to begin their working year.

**Can an au pair remain an additional night or two in the New Yorker Hotel?**
No, all au pairs must travel to their host family's homes on Friday of Orientation Week.

**If an au pair forgot something at the hotel, whom should she contact?**
They will need to contact the hotel's lost and found department. They can email them at: lostandfound@nyhotel.com

23

**InterExchange0028544**

**REPLY APP 01078**

# Exhibit 73

REPLY APP 01079

Page 292

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 14-cv-03074-CMA-CBS

_____

JOHANA PAOLA BELTRAN, ET AL.,

         Plaintiffs,

vs.

INTEREXCHANGE, INC., ET AL.,

         Defendants.

_____

VOLUME II

VIDEOTAPED DEPOSITION OF

ELIZABETH H. NEWLON, Ph.D.

March 9, 2018

DENVER, COLORADO

9:08 A.M.

Magna Legal Services
866-624-6221
www.magnals.com

REPLY APP 01080



## Page 293

```
 1              The videotaped deposition of
 2   ELIZABETH H. NEWLON, Ph.D., taken before Leeann
 3   Stellor, a Registered Merit Reporter, Certified
 4   Realtime Reporter, and a Notary Public in and for the
 5   County of Summit and the State of Colorado, at 1200
 6   Seventeenth Street, Suite 3000, Denver, Colorado, on
 7   Friday, March 9, 2018, at the hour of 9:08 a.m.,
 8   pursuant to Notice.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 294

```
 1   APPEARANCES:
 2
 3      BOISE, SCHILLER, FLEXNER, L.L.P.
        BY: SEAN P. RODRIGUEZ, ESQ.
 4         1999 Harrison Street
           Suite 900
 5         Oakland, California 94612
           (510) 874-1000
 6         sodriguez@bsfllp.com
           appeared on behalf of the Plaintiffs
 7      BOISE, SCHILLER, FLEXNER, L.L.P.
        BY: BYRON D.M. PACHECO, ESQ.
 8         575 Lexington Avenue
           New York, New York 10022
 9         (212) 446-2300
           appeared on behalf of the Plaintiffs
10
        CHOATE, HALL & STEWART, LLP
11      BY: LYNDSEY KRUZER, ESQ.
           SAMUEL RUDMAN, ESQ.
12         Two International Place
           Boston, Massachusetts 02110
13         (617) 248-5221
           lkruze@choate.com
14         srudman@choate.com
           appeared on behalf of Cultural Care
15
        CHOATE, HALL & STEWART, LLP
16      BY: MICHAEL GASS, ESQ.
           Two International Place
17         Boston, Massachusetts 02110
           (617) 248-5000
18         pgass@choate.com
           appeared by telephone on behalf of
19         AuPairCare, Inc.
20      LEWIS, ROCA, ROTHGERBER, CHRISTIE
        BY: DIANE HAZEL, ESQ.
21         1200 17th Street
           Suite 3000
22         Denver, Colorado 80202
           (303) 628-9527
23         dhazel@lrrc.com
           appeared on behalf of Cultural
24         Care
25
```

## Page 295

```
 1   APPEARANCES CONTINUED:
 2
 3      SHERMAN & HOWARD, L.L.C.
        BY: BROOKE A. COLAIZZI, ESQ.
 4         633 17th Street
           Suite 3000
 5         Denver, Colorado 80202
           (303) 299-8194
 6         bcolaizzi@shermanhoward.com
           appeared by telephone on behalf of
 7         InterExchange, Inc.
 8      WHEELER, TRIGG, O'DONNELL
        BY: NATALIE WEST, ESQ.
 9         370 17th Street
           Suite 4500
10         Denver, Colorado 80202
           (303) 244-1983
11         west@wtotrial.com
           appeared by telephone on behalf of
12         USAuPair, Inc., GoAuPair, and Au Pair
           International
13      EXPERT AUPAIR
        BY: BOGDAN ENICA, ESQ.
14         100 2nd Avenue S.
           Suite 3025
15         St. Petersburg, Florida 33701
           (727) 225-2649
16         bogdan@expertaupair.com
           appeared by telephone on behalf of
17         Expert AuPair
18      PUTNEY, TWOMBLY, HALL & HIRSON, L.L.P.
        BY: ROBERT M. TUCKER, ESQ.
19         521 Fifth Avenue
           New York, New York 10175
20         (212) 682-0020
           rtucker@putneylaw.com
21         appeared by telephone on behalf of
           American Institute of Foreign Study
22
23
24   ALSO PRESENT: Michael Wickham, Videographer
25
```

## Page 296

```
 1              I N D E X
 2
     DEPOSITION WITNESS:                    PAGE
 3   ELIZABETH H. NEWLON, Ph.D.
 4   Examination by Mr. RODRIGUEZ            298
 5
     PLAINTIFFS' DEPOSITION EXHIBITS MARKED:
 6   NO.      DESCRIPTION              PAGE
 7   Exhibit 11  July 31, 2017 Expert Report of   312
                 Elizabeth H. Newlon, Ph.D.
 8
     Exhibit 12  Thousand Oaks Residential Care Home  421
 9               I, Inc. versus Commissioner of
                 Internal Revenue - Decision
10
     Exhibit 13  Cultural Care Au Pair Agreement with  440
11               Camilla Macchiavelli September 26,
                 2017
12               CC00033089 -33090
13
     PLAINTIFFS' DEPOSITION EXHIBITS PREVIOUSLY MARKED:
14   NO.      DESCRIPTION              PAGE
15
     Jordan        December 26 - 27, 2013 e-mails from  435
16   Exhibit 28   Goran Rannefors to David Widerberg
                  and others
17
18
19
20
21
22
23
24
25
```



REPLY APP 01081

Page 321

1    Q.   Is it?
2    A.   I believe so.
3    Q.   What about Au Pair Foundation?
4    A.   Yes.
5    Q.   Well, let me direct your attention up to
6  paragraph 2, please.  Perhaps if you --
7    A.   Okay.
8    Q.   -- read that silently to yourself, it
9  will refresh your recollection.
10   A.   That's right.  Yeah, Au Pair
11 International, Au Pair -- no, they are not part of
12 it.
13   Q.   Okay.  I'd like to draw your attention
14 down to paragraph 3, last line after the semicolon.
15 I believe it to say that says you reviewed --
16   A.   Uh-huh.
17   Q.   -- among other things, documents and
18 declarations produced in this matter by?
19   A.   The other defendants, yeah.  I was
20 looking up there, and I had thought that was the
21 list.  It is paragraph 2.
22   Q.   So am I correct that there are two
23 defendants in this list for whom you are not
24 offering opinions, but whose materials you reviewed?
25   A.   Yes.

Page 322

1    Q.   Okay.  And why did you select those
2  particular two defendants out of the nine for whom
3  you are not offering opinions?
4    A.   I'm sorry, could you repeat that
5  question?
6    Q.   Yeah.
7         I see that you considered
8  materials by two defendants that were not part of
9  the Six Defendants for whom you offer an opinion; is
10 that right?
11   A.   Yes.
12   Q.   How did you decide to review materials
13 from those two defendants, but not from the rest of
14 the nine for whom you are not offering an opinion?
15   A.   I can't recall at the moment.  It -- it
16 may be there was a document cited that I -- I have
17 cited to, but right now I can't recall.
18   Q.   Do you believe that documents provided --
19 strike that.
20        Do you believe that documents
21 produced by defendants for whom you are not
22 providing an opinion are relevant to your opinion?
23   A.   Typically, no, since I am just focusing
24 on the Six Defendants.  But since the Six Defendants
25 are sponsor agencies, as well as are the other nine,

Page 323

1  there are some documents that may be relevant.
2    Q.   And how do you determine whether the
3  document's relevant or not?
4    A.   I would have to look at the document and
5  think about it.
6    Q.   Is there any -- is it the case that
7  someone else with the same expertise as you could
8  look at a document and make a different relevance
9  decision?
10   A.   That's possible.
11   Q.   Are there any objective criteria that you
12 can provide me that guides whether a document is
13 relevant?
14   A.   Well, if it speaks to a hypothesis that I
15 have and it provides an evidentiary support to that
16 and it -- it relates directly to what I'm
17 considering, those kind of issues would be
18 indicative of a relevant document.
19   Q.   And tell me first, how do you determine
20 whether -- strike that.
21        How do you -- how do you know
22 whether something is an issue that you're
23 considering?
24   A.   Well, it's going to be a part of what I
25 am asked to consider or think about by the

Page 324

1  defendants.
2    Q.   A moment ago I believe you also said that
3  you determine whether a document supports a
4  hypothesis.  Do you also consider a document
5  relevant if it undermines a hypothesis?
6    A.   Yes.
7    Q.   I'd like to turn your attention to
8  Footnote 10 at the bottom of page 3, and I see that
9  there's a -- a website cited.  The domain name is
10 AmazonAWS.com.  Do you have an understanding of what
11 AmazonAWS.com is?
12   A.   Not off the top of my head, no.
13   Q.   Okay.  It's then "/files/Au-Pair-USA."
14        Do you have an understanding of
15 what the "Au Pair USA" in that URL indicates?
16   A.   It is possibly USAuPair, one of the
17 defendants.
18   Q.   Okay.
19   A.   But it could be the USAupair program as
20 well.
21   Q.   Fair to say then you, sitting here today,
22 don't have an understanding of the providence of the
23 document at that AmazonAWS.com site?
24   A.   I cannot remember as I sit here right
25 now, no, but I can get a copy of it.  We have all of



REPLY APP 01082

1  these saved.
2      Q.  It would have been saved from
3  AmazonAWS.com, though, correct?
4      A.  Correct.
5      Q.  I'd like to turn your attention to
6  paragraph 10.  That's moving forward to page 4.  It
7  begins, "In addition, plaintiffs allege that
8  au pairs are compensated based on a presumed 45
9  hours of childcare assistance per week, irrespective
10 of how much compensable childcare assistance each
11 individual au pair actually provided."
12         Did I get that right?
13     A.  Yes.
14     Q.  Now, is it your understanding that
15 plaintiffs merely allege that au pairs are
16 compensated based on a presumed 45 hours, or is it
17 your understanding that that is, in fact, a
18 regulatory requirement?
19         MS. KRUZER:  Objection.  Form.
20     A.  What I am saying there is that plaintiffs
21 allege that au pairs must always be compensated as
22 if they worked 45 hours.
23     Q.  Uh-huh.
24     A.  So that would include overtime and -- and
25 other calculations that ostensibly were not

1  included in the calculation performed by the
2  regulatory group that set the original stipend.
3      Q.  Explain it to me.  I don't understand the
4  relevance of, for example, overtime there.
5      A.  So what I'm saying is the plaintiffs
6  allege -- it is my understanding that the plaintiffs
7  allege that the au pairs should have been paid --
8  will -- will always be paid as if they -- they are
9  working 45 hours.  So even if they worked less than
10 that, they will get, say, overtime based on five
11 hours after January 1st, 2015.  And that's -- that's
12 what I'm saying, is that they allege as if -- that
13 they have to be compensated as if they worked 45
14 hours.
15     Q.  You testified earlier that you have
16 reviewed State Department regulations, correct?
17     A.  Yes.
18     Q.  Okay.  Do you recall anything in those
19 regulations that stated that au pairs must be
20 compensated based upon a 45-hour workweek?
21     A.  I have seen the notifications and I
22 understand the calculation of the stipend.  It
23 includes 45 hours in it.  But there is a legal issue
24 here as to if you have damages based on wage and
25 hour violations, whether at federal or state levels,

1  whether they have to be paid at 45 hours, as if they
2  worked 45 hours.
3      Q.  You just said that's a legal conclusion,
4  right?
5      A.  Right.
6      Q.  Okay.  So you're not offering an opinion
7  on that, correct?
8      A.  No, I'm not.
9      Q.  Okay.  Now, stepping back and as a matter
10 of general business practices, is it unusual for
11 people to be paid a fixed salary that does not vary,
12 regardless of the number of hours they work?
13         MS. KRUZER:  Objection.  Form.
14     A.  Is it unusual in the economy, the broad
15 economy?
16     Q.  Yes.
17     A.  No.  There's quite a few people that are
18 paid as salaried individuals, yes.
19     Q.  And so does it strike you as -- as
20 particularly odd that a group of childcare workers
21 might be paid what is effectively a salary versus
22 what is a hourly wage?
23         MS. KRUZER:  Objection.  Form.
24         MR. RODRIGUEZ:  No, that's fair.
25     Q.  Do you agree with me that one can think

1  of compensation based on a particular formula that
2  does not vary from pay period to pay period as a
3  salary?
4      A.  Yes.
5      Q.  Okay.  And does it strike you as at all
6  unusual that childcare providers would be paid on a
7  salary versus strictly on an hours-worked basis?
8          MS. KRUZER:  Objection.  Form.
9      A.  I think there's a varied range of ways
10 that people are compensated for providing services,
11 including childcare.
12     Q.  So -- so it is not always the case that
13 one must calculate hours to calculate what one
14 should have been paid; is that right?
15     A.  It depends on what's agreed upon and --
16 but it isn't unusual for an employer and employee to
17 agree on --
18         (Telephone interruption.)
19         THE WITNESS:  Do we need to find out
20 who that was?
21         MR. RODRIGUEZ:  We can do it at a
22 break.  It's okay.  Thank you.
23     A.  So, I'm sorry, could you repeat your
24 question again?
25     Q.  Yeah.



REPLY APP 01083

| Page 329 | Page 331 |
|---|---|

**Page 329**

1       MR. RODRIGUEZ:  Would -- would the
2   reporter please read back the question.
3           (Record read.)
4       A.   It depends on what the terms and
5   conditions of employment were.
6       Q.   Terms and conditions of employment may be
7   determined by a private contract, correct?
8       A.   Yes.
9       Q.   They may also be determined by regulatory
10  requirements, correct?
11      A.   Correct.
12      Q.   Do you know who Stanley Colvin is?
13      A.   Yes.
14      Q.   Who is he?
15      A.   He was a former employee of the
16  Department of State, and he had worked in a capacity
17  that allowed him to have knowledge about how some of
18  the policies at issue here were determined.
19      Q.   Do you have an understanding of the
20  circumstances under which Mr. Colvin's employment
21  with the Department of State were terminated, was
22  terminated?
23      A.   No.
24      Q.   Do you have an understanding of what
25  Mr. Colvin's role was at the Department of State?

**Page 330**

1       A.   I do, but I can't remember it off the top
2   of my head.
3       Q.   Do you have any understanding as to
4   whether Mr. Colvin was responsible for any legal
5   interpretations while at the Department of State?
6       A.   I cannot recall.
7       Q.   And do you recall how long ago
8   Mr. Colvin's employment with the Department of State
9   was terminated?
10      A.   No, I'm not sure.
11      Q.   Paragraph 15, page 5.  Second sentence,
12  "Sponsor" -- "Sponsor agencies are responsible for
13  communicating and enforcing the DOS rules for the
14  program."
15          Did I get that right?
16      A.   Yes.
17      Q.   And is that a background fact that is
18  important for your opinion?
19      A.   Yes.
20      Q.   Okay.  Now, if one is responsible for
21  enforcing rules, is that generally a factor that
22  supports a finding of --
23          (Telephone interruption.)
24      Q.   I'll start again.
25          If one is responsible for

**Page 331**

1   enforcing rules, is that a factor that typically
2   weighs in favor of a joint employment finding?
3       A.   It depends on where the -- what the
4   source of the rules are.
5       Q.   Why is that?
6       A.   Because if it's the companies, let's say,
7   an entity who's being considered as possible
8   employer, if it's the entity's policies, their own
9   individual rules that they've come up with and
10  they're enforcing those, that's different from if
11  they are required to do it by, say, a regulatory
12  body as part of conforming to being in a program,
13  such as the government program for the exchange
14  program.
15      Q.   You also agree with me that sponsors are
16  in a business that involves being part of a program,
17  correct?
18      A.   They run a business providing access to
19  the federally regulated program, yeah.
20      Q.   And if a business enforces rules against
21  someone who is an hourly worker, for example, that
22  is a finding that weighs in favor of joint
23  employment, does it not?
24      A.   Again, if it's not their own rules.  If
25  it's the rules that they're required to communicate

**Page 332**

1   as well as make sure that there's conformance to
2   those regulations, that's not necessarily a
3   conclusion of joint employment.
4       Q.   You said "not necessarily."
5           My question was whether it's a
6   factor that weighs in favor of a conclusion of joint
7   employment?
8       A.   That -- I would say it depends on the
9   situation.
10      Q.   What sort of facts about the situation
11  would be relevant?
12      A.   So could you repeat the question again?
13  Not this one, about what facts, but the -- the prior
14  question that this builds upon.
15          MR. RODRIGUEZ:  If I can ask the
16  reporter to do it.  My realtime's not working.
17          MS. COURT REPORTER:  It's not?
18          MR. RODRIGUEZ:  Would you go ahead
19  and read it back.
20          (Record read.)
21      A.   And what is the factor that --
22      Q.   Okay.
23      A.   I'm -- it's we're so many steps away from
24  it.  I just want to make sure I get that right.
25      Q.   Sure.

**MAGNA**
LEGAL SERVICES

REPLY APP 01084

Page 333

1    So I asked you whether enforcing
2 rules, in connection with someone who is an hourly
3 worker, was a factor weighing in favor of joint
4 employment?
5    A.    It -- it can be a factor in favor if it's
6 a direct control over that person that has to do
7 with policies of the actual entity that's directing
8 that control.
9    Q.    So let's focus first on policies of the
10 entity that's directing that control.
11    Is it your opinion that if the
12 policies are not entirely formed by the entity that
13 is exercising control, that that enforcement does
14 not matter?
15    A.    I -- what I'm saying is that you have to
16 consider the purpose, the economic purpose of what
17 they are actually doing.  And in my report that I
18 discuss extensively, if there is a control over a
19 program, so they're trying to control over
20 participation in a government program that they have
21 been designated as essentially an extension of the
22 Department of State, they're controlling that
23 program, not the individual hourly worker.
24    So it -- it really goes -- you
25 know, your question is very broad.  And so each case

Page 334

1 has a specific set of facts that relate to it that
2 can create a division in economic incentive to
3 control that essentially says there's really no
4 purpose to them directly controlling the actual
5 employment relationship in this case that exists
6 between the host family and the au pair.
7    Q.    Okay.  Now, you said a moment ago that, I
8 think it's fair to say, that you consider the
9 defendants to be extensions of the Department of
10 State; is that right?
11    A.    That's -- they're designated to run a
12 program for them.
13    Q.    As part of their business, correct?
14    A.    I think that is the majority of their
15 business.
16    Q.    And so if one agrees to terms that
17 involve control over an employee in order to conduct
18 one business -- one's business, do you think that --
19 strike that.  That was very convoluted.  Let me try
20 again.
21    Would it be a legal conclusion to
22 consider the defendants an extension of the
23 Department of State?
24    A.    I think it's my attempt to interpret
25 their -- their relationship to the Department of

Page 335

1 State as designated sponsors.
2    Q.    Well, as designated sponsors, the
3 defendants run a business, correct?
4    A.    Correct.
5    Q.    And as part of their business, I believe
6 it's your testimony that they provide matching
7 services?
8    A.    Correct.
9    Q.    To whom do they provide matching
10 services?
11    A.    They provide essentially a platform where
12 au pairs, who qualify for the program, can meet and
13 interact with host families that are interested in
14 hosting an au pair in the program.
15    Q.    Host families are also the defendants'
16 customers, correct?
17    A.    Yes.
18    Q.    And you would agree with me, would you
19 not, that firms generally have a reputational
20 interest in ensuring that their customers have a
21 good experience, correct?
22    A.    Yes.
23    Q.    Okay.  So now ensuring that one's
24 customer has a good experience implies -- do you
25 agree with me that the more control a firm has over

Page 336

1 its product or service, the better they can protect
2 that reputational interest?
3    MS. KRUZER:  Objection.  Form.
4    A.    In a general economic sense, yes.
5    Q.    And so in a general economic sense
6 businesses have an incentive to exercise more
7 control over their product or service rather than
8 less, correct?
9    A.    I would say typically.
10    Q.    Is there a particular reason why that
11 reasoning would not apply to the au pair industry?
12    A.    I did not say it didn't apply to the
13 au pair industry, but I think it does in the sense
14 that I don't agree that the product is the au pair's
15 childcare.  They're not providing their employees to
16 the host family.  They're providing -- providing
17 access to the program.  That's the service they
18 provide, and that's what they have to have control
19 over.
20    Q.    Providing service to the program --
21    A.    Access.
22    Q.    Access.
23    A.    Sorry.
24    Q.    How -- how is that the same as managing a
25 matching platform?



12 (Pages 333 to 336)

REPLY APP 01085

Page 421

1    aggregated information for because he didn't use any
2    information other than that.
3            With respect to the stipends, he
4    used his results from the survey. And I have -- I
5    know that the defense have put forward a critique of
6    that with LaRocca's (ph) testimony, so that's not
7    something I'm going to testify about.
8            But I did criticize him the fact
9    that he does not include other benefits in his
10   calculations. And that -- also that implicitly that
11   the -- at least for the state-level claims, the
12   value of that housing they received could be
13   included in that.
14           THE WITNESS: Are we -- are we going
15   to eat around noon?
16           MS. KRUZER: It's almost 12:30, so
17   when you're at a good stopping point.
18           MR. RODRIGUEZ: This is going to be
19   real fast.
20           MS. KRUZER: Okay. Sure.
21           (Exhibit No. 12 was marked.)
22   Q.   I have marked as Newlon Exhibit 12 a case
23   called Thousand Oaks Residential Care Home One, Inc.
24   versus Commissioner of Internal Revenue.
25           Dr. Newlon, are you familiar with

Page 422

1    this case?
2    A.   Yes.
3    Q.   In what capacity are you familiar with
4    it?
5    A.   I testified quite a few years back now,
6    five years back, on it.
7    Q.   For whom did you testify?
8    A.   For the IRS.
9    Q.   And what was the IRS' goal in this case?
10   A.   It was -- as I understood it, the goal
11   was to determine whether the Fletchers had
12   accurately estimated their income.
13   Q.   And to collect more money from the
14   Fletchers, correct?
15   A.   Correct.
16   Q.   And what did you conclude?
17   A.   I concluded that they had not accurately
18   estimated their income.
19   Q.   How did you reach that conclusion?
20   A.   I used a Bureau of Labor Statistics and
21   other benchmarks to determine what managers for a
22   facility like they had, a residential care facility,
23   would have hypothetically made during the period
24   when they claimed that they were earning the money
25   that they were reporting to the IRS.

Page 423

1    Q.   Do you agree with me that residential
2    care facilities can have very different kinds of
3    operations?
4    A.   Yes.
5    Q.   Did you consider that residential care
6    facilities can have very different kinds of operations,
7    in reaching your conclusions in this case?
8    A.   I believe I considered -- I'd have to go
9    back and look at exactly what I considered, but I
10   did consider that there was a distribution of
11   results that appeared in the data.
12   Q.   Are you familiar with this specific
13   document marked as Exhibit 12?
14   A.   I have seen it, yes.
15   Q.   What is it?
16   A.   It's the decision, I believe, from the --
17   the case.
18   Q.   I'd like you to turn to what's numbered
19   page 5 in the bottom right, and then you'll see in
20   the bottom right quadrant of this page there's a --
21   an asterisk 5 in bold.
22   A.   Okay.
23   Q.   Do you -- do you recall this particular
24   passage?
25   A.   Not off the top of my head, no.

Page 424

1    Q.   Would you like to take a moment and
2    review it?
3    A.   Yes.
4            (Witness peruses document.)
5    A.   Okay.
6    Q.   Does that refresh your recollection?
7    A.   Yes. Not to the details, but generally
8    what I did.
9    Q.   Certainly. So can you describe to me
10   what you did generally?
11   A.   I used information from the case that was
12   reported in their taxes about how much they worked
13   and the type of work they did, and then I applied
14   information that -- data I -- I pulled from the
15   Bureau of Labor Statistics, the Occupational
16   Employment Statistics survey data.
17           So I had to then -- because the
18   dates were limited, I had to deflate back to 1973.
19   So -- and then I used that as a benchmark to say how
20   much they would have made. I also did some
21   adjustments, you know, to reflect California.
22   Q.   Let's start with the records of how much
23   the Fletchers worked and how much they were paid.
24           Was it the IRS' contention in this
25   case that the Fletchers had misreported how much



34 (Pages 421 to 424)

REPLY APP 01086

Page 425

1    they worked and how much they were paid?
2        A.   That's my understanding now, yes.
3        Q.   Okay.  So did you accept their false
4    statements as a starting point for your analysis?
5        A.   No.
6        Q.   Okay.  So you, in fact, didn't actually
7    consider records of how much the Fletchers worked?
8        A.   I considered what they -- they reported
9    that they worked.
10       Q.   And then how did you determine a --
11   determine the delta between what they should have
12   been paid, in your estimation, and what they were
13   actually paid?
14       A.   I'll double check.
15            (Witness peruses document.)
16       A.   I used what he reported himself to say
17   how much he worked.
18       Q.   So you, in fact, did accept the records
19   that were falsified, correct?
20       A.   I didn't say they were falsified.
21       Q.   Falsely reported?
22       A.   No.  It was the amount he was claiming he
23   had earned, not the number of hours or amount of
24   hours he worked.
25       Q.   The IRS was not questioning the number of

Page 426

1    hours he actually worked?
2        A.   I -- I don't recall.  That's not my
3    understanding at this time.  But my understanding is
4    they were questioning whether he had earned as much
5    as he claimed he had earned.
6        Q.   So let's go to the second paragraph under
7    this asterisks 5 on page 5, as numbered in the
8    bottom right.  It says, "Dr. Newlon used labor rates
9    from the Bureau of Labor Statistics, Occupational
10   Employment Statistics program."
11            Do you recall whether those
12   statistics were differentiated on the number of
13   hours worked?
14       A.   I -- as -- as I'm sitting here, I cannot
15   recall whether they're restricted to full-time
16   employment, but I believe they are.
17       Q.   Full-time employment, though, can mean
18   different things at different facilities, correct?
19       A.   I think there's a general understanding
20   of what full time means.  Maybe not the exact cutoff
21   in other cases, like worked on that has been a
22   question.  Is it 35 hours or 30 hours?  But it's
23   generally not 25 percent of your time.  That's
24   usually -- you know, that would be, what, 25 percent
25   of 40 hours.

Page 427

1        Q.   So -- so the --
2        A.   It would be 10 hours a week.
3        Q.   The specific number of hours worked then
4    doesn't matter for a full-time employee?
5        A.   In this -- specific to this case, most
6    managers of a facility would be salaried.  So in
7    this case I think there is an expectation that when
8    you're working 25 percent, that you're not making a
9    full salary.
10       Q.   And if I were accurate in characterizing
11   the result of the 45 hours times relevant minimum
12   wage as a salary, would you then agree with me that
13   just as in this case you do not need to know the
14   specific number of hours worked to determine how
15   much the worker should have been paid?
16       A.   Could you repeat that, just the first
17   part actually?
18            MR. RODRIGUEZ:  Would the reporter
19   mind.
20            (Record read.)
21            MS. KRUZER:  Objection.  Form.
22            MR. RODRIGUEZ:  I'll re-ask.
23       Q.   If I were correct in characterizing
24   au pair wages as a salary, then would you agree with
25   me that just as in this case about the Fletchers,

Page 428

1    you would not need to know the specific number of
2    hours worked to determine what they should have been
3    paid?
4        A.   What I'm pausing on is that as I
5    calculated in here for Mr. Fletcher, that if he's
6    working 25 percent of the time he -- I wouldn't
7    expect him to get a full salary.  So -- but in this
8    case there's a question that's been raised by the
9    plaintiffs and posed to the judge that should
10   au pairs be paid as if they worked 45 hours.
11            So -- but taking just straight
12   from what you said, I disagree that if they're
13   salaried you don't need to consider their hours,
14   because they may be salary but part time so they
15   would not make as much.
16       Q.   What if the employment contract said that
17   you were paid this salary regardless the number of
18   actual hours worked?
19       A.   In that kind of case, then you wouldn't
20   consider the hours, yes.
21            MR. RODRIGUEZ:  I'm ready for lunch,
22   if that's okay with everyone else.
23            THE WITNESS:  All right.
24            THE VIDEOGRAPHER:  This is the end of
25   recording 2.  We are off the record at approximately



35 (Pages 425 to 428)

Page 429

1   12:35 p.m.
2           (Whereupon, a lunch break was had
3           from 12:35 p.m. to 1:13 p.m.)
4       THE VIDEOGRAPHER:  This is recording
5   3, volume 2.  We are on the record at approximately
6   1:13 p.m.
7           EXAMINATION (CONTINUED)
8   BY MR. RODRIGUEZ:
9       Q.  Dr. Newlon, may I direct your attention
10  back to Exhibit 11, that's your merits report, and
11  specifically page 17.
12      A.  Yeah.
13      Q.  Back at the romanettes under paragraph
14  44, romanette 5.  Would you please explain to me
15  what romanette 5 means?
16      A.  As I interpret it is that the au pair's
17  childcare work was an integral part of the sponsors'
18  business.
19      Q.  And so having childcare work be an
20  integral part of a firm's business makes it more
21  likely that the firm is a joint employer with
22  respect to childcare; is that right?
23      A.  Yes.
24      Q.  Now, it's your opinion that the family is
25  the employer, correct?

Page 430

1       A.  Yes.
2       Q.  Do you believe that the family's business
3   is childcare?
4       A.  No.
5       Q.  Do you agree with me that childcare is an
6   integral part of the defendants' business, in the
7   sense that that is the service they're ultimately
8   selling?
9       A.  I don't think that's the service they're
10  selling.
11      Q.  I understand that you opine that the
12  service they're selling is a matching platform,
13  correct?
14      A.  No.  What I said, the service they're
15  providing or selling is visa sponsorship and
16  matchmaking, matching.
17      Q.  But not childcare?
18      A.  No, they're not -- they're not providing
19  their employees that provide childcare.  So
20  they're -- they're providing participation in the
21  program.
22      Q.  And that program has, as its primary
23  component, work, does it not?
24      A.  One of the things, I mean, in addition to
25  being a cultural exchange.

Page 431

1       Q.  So if I'm matching an au pair and a
2   family for the purpose of promoting cultural
3   exchange and providing childcare work, you believe
4   that childcare work in that situation is not an
5   integral part of the business?
6       A.  I think it's not the actual service that
7   they're receiving money from.  It's not -- it's
8   similar, as I say in the report, to a nanny
9   placement agency.  They're -- they're matching
10  families with nannies, but they're not providing the
11  childcare.  The nannies are.
12      Q.  Well, but romanette 5 is about whether
13  childcare work is an integral part of the business.
14  You agree with me, do you not, that childcare work
15  is integral to the defendants' business?
16      A.  In the sense that it has to be
17  provided -- I mean, the au pair, that's part of what
18  the au pair offers the host family, yes, but not
19  what the sponsors are offering.
20      Q.  Let's move down to romanette 7.
21  Romanette 7 refers to employer functions.  What are
22  employer functions?
23      A.  These are the functions that we went over
24  earlier.  I took them to be the functions that were
25  listed in the handbook.  If you go back to paragraph

Page 432

1   41, they're the hiring, supervision, timekeeping,
2   payroll, those kind of things.
3       Q.  Okay.  Is insurance an employer function,
4   providing insurance?
5       A.  Possibly, yes.
6       Q.  Is providing -- strike that.
7           Are there any other employer
8   functions you can think of besides what's listed in
9   paragraph 42 and insurance provision?
10      A.  I mean, there's termination.  There's --
11  but I think, you know, just general functions as
12  well as, say, determining a schedule or things like
13  that.
14      Q.  You are aware, are you not, that at least
15  some of the defendants offer insurance to the
16  au pairs?
17      A.  Yes.
18      Q.  And that is a factor that tends to favor
19  a joint employer finding, correct?
20          MS. KRUZER:  Objection to the extent
21  it calls for a legal conclusion.
22      A.  It's one of the factors that are
23  considered, yes.
24      Q.  And -- and when I said employment, joint
25  employment finding a moment ago, did you understand



REPLY APP 01088

Page 433

1  me to mean in the economic sense?
2      A.   No, I understood that to be in the legal
3  sense.
4      Q.   Okay.  Well, then let me -- let me try
5  again.
6          Do you understand that -- you
7  consider provision of insurance to be an economic
8  factor that tends to support the economic conclusion
9  that a firm is a joint employer?
10     A.   It would depend, I think, on the
11  underlying reasons why that firm was purchasing
12  the -- the insurance and paid for it.
13     Q.   What if the au pair pays the defendant
14  the insurance?
15     A.   I think that would be more similar to
16  a -- an employee with an employer.
17     Q.   Okay.  And I think we already discussed
18  termination today.  But what is the -- what is the
19  effect of terminating an au pair on the childcare
20  services that the au pair provides a host family?
21     A.   They -- they end.
22     Q.   I'd like you to turn to the appendix of
23  your merits report.  Appendix A, which I believe is
24  your class certification opening report; is that
25  right?

Page 434

1      A.   Yes.
2      Q.   On page 6, paragraph 17 you provide here,
3  I believe, a summary of the defendants' defenses,
4  correct?
5      A.   Uh-huh.
6      Q.   Are those defenses at all relevant to
7  your opinion on the merits?
8      A.   Let me review those.
9          (Witness peruses document.)
10     A.   What was your question with respect to my
11  merits report?
12     Q.   Are those defenses listed at paragraph 17
13  of your opening class certification report at all
14  relevant to your opinion on the merits?
15     A.   They don't affect my opinion, no.
16     Q.   Are they relevant?
17     A.   I think -- I think of it the other way,
18  that my opinions are relevant to the defenses in the
19  sense that, you know, they may or may not support
20  them.
21     Q.   So your opinions should then match up to
22  a defense.  Is that your testimony?
23     A.   No, that's not what I'm saying at all.
24     Q.   I'm going to hand out what has been
25  previously marked in this action as Jordan

Page 435

1  Exhibit 28.  Jordan Exhibit 28 bears the Bates
2  No. CC00009209.
3          Now, Dr. Newlon, have you seen
4  Jordan Exhibit 8 -- 28 before?
5      A.   No, I have not.
6      Q.   I would like to refer you to you the
7  e-mail from Goran Rannefors at the bottom of the
8  page.
9          First of all, do you know who
10  Goran Rannefors is?
11     A.   No, I do not.
12     Q.   I will represent to you that Goran
13  Rannefors is an executive of one of the defendants.
14  Would you kindly read Mr. Rannefors' e-mail to
15  yourself.
16     A.   Sure.
17          (Witness peruses document.)
18     A.   All right.  I'm done.
19     Q.   I want to focus your attention on the
20  line that says, "A lot of extra cost to HF without
21  making a" -- "making a nickel more."
22          I will just refer to you that "HF"
23  there refers to host family.  Do you understand why
24  Mr. Rannefors would care whether an increased
25  au pair stipend is an extra cost to the host family,

Page 436

1  without making one of the defendants a nickel more?
2          MS. KRUZER:  Objection.  Calls for
3  speculation as to what Mr. Rannefors was thinking.
4      A.   I can only guess about what he meant
5  here.  You know, I -- as -- as -- I -- I really don't know
6  what he's considering under that statement.  Clearly
7  if the host families pay more, they're not going to
8  make more.  That's what I've been arguing all along,
9  that their -- their profitability does not matter --
10  does not rise or fall necessarily with the stipend
11  amount.
12     Q.   But I believe your testimony is also that
13  defendants are indifferent to the stipend amount,
14  correct?
15          MS. KRUZER:  Objection.
16  Mischaracterization.
17     A.   I didn't say that they were indifferent.
18  What I was saying is that if a -- if a host family
19  negotiates a higher stipend with their au pair, it
20  doesn't affect their profitability.
21     Q.   Isn't that the same as economic
22  indifference?
23     A.   It's not exactly the same thing, no.
24     Q.   Why not?
25     A.   Because you can have a different



37 (Pages 433 to 436)

REPLY APP 01089

Case 1:14-cv-03074-CMA-KMT   Document 966-5   Filed 04/13/18   USDC Colorado   Page 210
of 218

# Exhibit 74

REPLY APP 01090

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CULTURAL CARE, INC. <br> d/b/a CULTURAL CARE AU PAIR,  ERIN <br> CAPRON, and JEFFREY PENEDO, <br><br>         Plaintiffs, <br><br> v. <br><br> OFFICE OF THE ATTORNEY GENERAL <br> OF THE COMMONWEALTH OF <br> MASSACHUSETTS, and <br> MAURA T. HEALEY, IN HER CAPACITY <br> AS ATTORNEY GENERAL OF THE <br> COMMONWEALTH OF MASSACHUSETTS, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO. 1:16-cv-11777-IT |

## JOINT STATEMENT PURSUANT TO LOCAL RULE 16.1

Pursuant to Local Rule 16.1 and the Court's Notice of Scheduling Conference dated

September 16, 2016 (Doc. No. 10), Plaintiffs Cultural Care, Inc. d/b/a Cultural Care Au Pair

("CCAP"),  Erin Capron, and Jeffrey Penedo (collectively, "Plaintiffs"), and Defendants Office

of the Attorney General of the Commonwealth of Massachusetts, and Maura T. Healey, in Her

Capacity as Attorney General of The Commonwealth of Massachusetts ("Defendants")

(collectively, the "Parties"), having conferred, submit the following Joint Statement:

## I.    Preliminary Statement

Plaintiffs filed this case on August 31, 2016.  The Complaint alleges that CCAP is one of

sixteen private entities designated nationwide by the United States Department of State ("DOS")

as a "Sponsor" of a cultural exchange program pursuant to which young foreign nationals come

Case 1:14-cv-03074-CMA-KMT   Document 960-5   filed 04/24/18   USDC Colorado   pg 2
of 219
Case 1:16-cv-11777-IT   Document 42   Filed 10/17/16   Page 2 of 8

to the United States for a period of one to two years for the purpose of residing with an American

Host Family and participating directly in their home life, while providing limited childcare

services, and fulfilling an educational requirement. Complaint, ¶ 1. Plaintiffs allege that in

exchange for room and board, and the cultural experience of living in the United States and

participating in the home life of the Host Families, the *au pairs* assist with childcare and receive

a stipend as directed by the DOS. *Id.* Plaintiffs allege that CCAP contracts with qualified Host

Families across the United States to match them with appropriate *au pair* applicants; provides *au

pair*s with child development and child safety instruction before they join their Host Families as

required by the DOS Regulations; requires Host Families to enter into contracts with the *au pairs*

and to provide them with a weekly stipend (regardless of hours actually worked, up to a

maximum of 45 hours per week and 10 hours per day) in an amount set by the DOS; monitors

the *au pair*'s experience and wellbeing through personal contact at frequent intervals throughout

the Program; and reports to the DOS regarding Host Families' and *au pairs*' satisfaction with the

Program, and any problems that developed during the Program. Complaint, ¶ 2. Plaintiffs allege

that CCAP, like other Sponsors, performs these services pursuant to contracts with, and for a fee

charged to, the Host Families. *Id.*

The primary substantive issue raised in the complaint is whether federal preemption

prohibits the Massachusetts Domestic Workers Bill of Rights (the "MA Act"), M.G.L. c. 149, §

190, and the accompanying Regulations propounded by the Office of the Attorney General of the

Commonwealth of Massachusetts, 940 CMR 32.00 et seq. (the "MA Regulations"), from being

applied to the federal *au pair* cultural exchange program. The complaint seeks both a

declaratory judgment and injunction to prohibit application of the MA Act and MA Regulations

against Plaintiffs.

Defendants believe that plaintiffs have failed to state any plausible claim for relief and that their claims for field preemption, conflict preemption, and preemption under the Commerce Clause of the U.S. Constitution should be dismissed under Fed. R. Civ. P. 12(b).

Defendants have executed a Waiver of Service of the Summons. (Doc. No. 7.) As a result, their deadline to answer or move pursuant to Fed. R. Civ. P. 12(b) is November 8, 2016. There are no pending motions at this time.

## II. Motion to Dismiss

Defendants intend to file a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b) on November 8, 2016. After conferring, and in light of Plaintiffs' desire to have this matter determined as soon as possible (as discussed more fully below), the Parties jointly request that the Court adopt the following schedule with respect to that motion, which includes granting leave to reply:

| Event | Proposed Date |
|---|---|
| Defendants' Motion to Dismiss | November 8, 2016 |
| Plaintiffs' Opposition | November 29, 2016 |
| Leave to File Reply Granted and Reply in Support of Motions to Dismiss | December 15, 2016 |

The Parties request that the Motion to Dismiss be heard at the Court's earliest convenience after filing of Defendants' Reply brief.

III.    **Balance of Proposed Schedule**

*A.    Plaintiffs' Position*

Plaintiffs contend that discovery is not necessary in this case in order for the Court to determine, as a matter of law, whether the MA Act or the MA Regulations are preempted by the Fulbright-Hays Act.   Plaintiffs also request that this matter be determined as promptly as reasonably possible.   The MA Act and MA Regulations are in effect now.   Pursuant to the most recent Department of State Notification sent to Sponsors of the *au pair* program like Cultural Care, the weekly stipend rate for participants in the *au pair* cultural exchange program working any number of hours from zero to the 45-hour Program maximum is $195.75.   The MA Regulations set the "wage" for a live-in "domestic worker" working a 45-hour week with a single occupancy room at $445.40 per week.   The Defendants stated in a written communication that they would "offer a transition period" during which they would not enforce the MA Regulations with respect to the *au pair* program.   That transition period expires on September 1, 2017, however, which means that Host Families entering into one-year contracts with *au pairs* right now will be affected by the Defendants' enforcement, which Plaintiffs contend is preempted.

In light of the foregoing, if there is to be discovery in this case, Plaintiffs request the following expedited schedule:[1]

| Event | Plaintiffs' Proposed Date |
|---|---|
| Scheduling Conference | October 24, 2016 |
| Initial Disclosures | October 31, 2016 |
| Deadline for Serving All Written Discovery Requests | November 7, 2016 |

---

[1] Plaintiffs do not believe that expert disclosures or discovery will be necessary in this case.

| Event | Plaintiffs' Proposed Date |
|---|---|
| Completion of All Depositions | December 1, 2016 |
| Motions for Summary Judgment | January 10, 2017 |
| Oppositions to Motions For Summary Judgment | January 31, 2017 |
| Replies in Support of Motions for Summary Judgment | February 14, 2017 |

In addition, if Defendants do not address the issue of preemption in their motion to dismiss, Plaintiffs propose (notwithstanding the deadline set above) that they be permitted to submit a motion for summary judgment on this issue on the following schedule:

| Event | Plaintiffs' Proposed Date |
|---|---|
| Plaintiffs' Motion for Summary Judgment | November 15, 2016 |
| Defendants' Opposition to Motion for Summary Judgment | December 6, 2016 |
| Plaintiffs' Reply in Support of Motion for Summary Judgment | December 20, 2016 |

**B.    *Defendants' Position:***

Defendants agree with Plaintiffs that the Complaint presents questions of law that can be decided by the Court without the benefit of discovery.  Accordingly, they intend to file a Motion to Dismiss that relies on federal and state laws and regulations, other official public records and matters susceptible to judicial notice, and documents referred to in or attached to the Complaint. Defendants further believe that, in the interest of judicial economy and consistent with the Court's inherent power to manage civil proceedings on its docket, the Court should refrain from setting deadlines for initial disclosures and discovery in this case unless and until it denies

Defendants' motion to dismiss.  In the event that occurs, Defendants respectfully propose that the Court enter a discovery schedule with the following deadlines:

.

| Event | Defendants' Proposed Deadlines for Discovery in the Event the Court Denies Their Motion to Dismiss |
|---|---|
| Initial Disclosures | 14 days following ruling |
| Deadline for Serving All Written Discovery Requests | 45 days following ruling |
| Completion of All Depositions | 90 days following ruling |
| Motions for Summary Judgment | 120 days following ruling |
| Oppositions to Motions For Summary Judgment | As provided in Local Rule 56.1 |
| Replies in Support of Motions for Summary Judgment | As provided in Local Rule 56.1 |

## IV.    Additional Discovery Matters

To the extent that discovery will proceed, the parties agree to the following:

Fact Depositions

Plaintiffs agree to the default Local Rule limit of ten (10) fact depositions.  For depositions taken pursuant to Rule 30(b)(6), every seven hours of testimony will count as one fact deposition.  Depositions of third parties will count towards the limitation on fact depositions.

Interrogatories

Each Party shall be limited to twenty-five (25) interrogatories.

Requests for Admission

Each Party shall be limited to twenty-five (25) requests for admission.

Requests for Production

Each Party may serve two (2) sets of requests for production.

**V.      Proceedings in Front of Magistrate**

The Parties have filed their Notice of Refusal to Consent to Magistrate Judge (Doc. No. 8).

**VI.     Settlement Proposals**

The Parties state that they have exchanged the settlement proposals set forth in Local Rule 16.1(c) and the Court's Scheduling Order, and that they have been unable to resolve this matter.

**VII.    Certifications Pursuant to L.R. 16.1(d)(3)**

The Parties are attaching certain of the certifications required by L.R. 16.1(d)(3) as Exhibit A to this Joint Statement, and will promptly file the remaining certifications with the Court.

Dated:  October 17, 2016

Respectfully submitted,

/s/ *Joan A. Lukey*
Joan A. Lukey
joan.lukey@choate.com
Justin J. Wolosz
jwolosz@choate.com
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Telephone:  (617) 248-5000
Fax:  (617) 248-4000

*Attorneys for Plaintiff Cultural Care, Inc.*
*d/b/a Cultural Care Au Pair, Erin Capron, and*
*Jeffrey Penedo*

/s/ *Robert E. Toone*
Robert E. Toone
robert.toone@state.ma.us
Elizabeth A. Kaplan
elizabeth.kaplan@state.ma.us
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
McCormack Building, 20th floor
Boston, MA  02108
Telephone:  (617) 963-2178

*Attorneys for Office of the Attorney General of the*
*Commonwealth of Massachusetts, and Maura T.*
*Healey, in Her Capacity as Attorney General of*
*The Commonwealth of Massachusetts*

7761735