# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

    Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

    Defendants.

**DEFENDANT GO AU PAIR'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 886]**

Defendants American Cultural Exchange, LLC d/b/a Go Au Pair and Go Au Pair Operations LLC (together, "Go Au Pair") submit this sur-reply in opposition to Plaintiffs' Motion for Partial Summary Judgment ("Motion" or "Pls.' MSJ") [ECF No. 886].[1]

## INTRODUCTION

Once again, Plaintiffs use a strategy of misdirection and mischaracterization to mask the deficiencies in their claims against Go Au Pair. While they finally try to support their joint-employer claim against Go Au Pair with evidence relevant to it (which they previously failed to do), that effort still falls short. The few stray comments Plaintiffs cherry-pick from a handful of documents do not prove—and cannot given Go Au Pair's undisputed business practices, which Plaintiffs have never addressed—that it exerts the requisite control over Plaintiffs' employment to make it their joint employer.

Plaintiffs' effort to salvage their claim for unpaid training and to avoid their burden

---

[1] Plaintiffs' Reply in Further Support of its Motion [ECF 985] is cited as "Pls.' Reply." Go Au Pair's Motion for Summary Judgment [ECF 884] and it Response to Plaintiffs' Motion [ECF 933] are respectively referred to herein as "GAP MSJ" and "GAP Resp."

of actually proving their wage-and-hours claims is also futile. The FLSA is clear: it does not apply to "services . . . performed in workplace within a foreign country" and, thus, provides no right to compensation for unpaid training Plaintiffs undisputedly attended in their home countries. 29 U.S.C. § 213(f). And Plaintiffs' attempt to shoehorn Go Au Pair's agreement with au pairs (or with host families) into a "reasonable agreement" under the FLSA's implementing regulations—a new argument—ignores the actual language of those contracts and that the relevant agreement under the regulations, if any, would be the au pairs' contract with their host families specifying their stipend amount and work schedule. Plaintiffs' Motion should be denied.

## **ARGUMENT**

### I. PLAINTIFFS' NEW ARGUMENTS AND EVIDENCE DO NOT ESTABLISH THAT GO AU PAIR IS THEIR JOINT EMPLOYER

#### A. DOS Has Not Determined that Defendants Are Au Pairs' Employers

Plaintiffs claim for the first time that the Department of State ("DOS") website "describes each Sponsor [i.e., Defendants] as an 'employer'" (Pls.' Reply 15) based on the following frequently asked question that pertains to all J-1 visa exchange programs:

> How can I work for an employer other than the program sponsor?
>
> A J-1 holder may only perform the activity listed on his/her Form DS-2019, or as provided for in the regulations for the specific category for which entry was obtained and with the approval of the Sponsor's Responsible or Alternate Responsible Officer.

(*Id.* (citing Pls.' Reply App. 1053-54).) This is not a categorical statement that all program sponsors, or specifically Au Pair Program sponsors, are employers of the exchange participants they sponsor. Some exchange-visitor programs, such as the trainee program, have sponsors that directly employ exchange visitors (*e.g.*, ExxonMobil, Ernst

2

& Young, and Microsoft). *See* https://j1visa.state.gov/participants/how-to-apply/sponsor-search/?program=Trainee (listing designated trainee-program sponsors) (last visited Apr. 30, 2018). Other sponsors merely assist participants in obtaining employment through host organizations (or families, as is the case with the Au Pair Program).

### B.     Power to "Hire" Au Pairs

Plaintiffs now argue that Go Au Pair "hires" au pairs because it allegedly "create[s] the applications for prospective au pairs," screens au pairs according to its "own" criteria, and "go[es] above and beyond the DOS regulations by requiring other quality indicators." (Pls.' Reply 17-18.) These new factual claims are also meritless.

First, Plaintiffs mischaracterize Go Au Pair's role in the application process. All exchange-program sponsors "must establish and [use] a method to screen and select prospective exchange visitors to ensure that they are eligible for program participation." 22 C.F.R. § 62.10(a). The "17-point application process" to which Plaintiffs refer is just that—the process by which Go Au Pair confirms, based on information provided by program applicants, that each applicant satisfies the DOS eligibility criteria.[2] While Go Au Pair's application process includes steps not specified by DOS, i.e., the applicant's "Letter to potential Host Families" and completion of a personality test (Pls.' App. 997, ECF 886-5), these additional materials are not determinative of the applicant's program eligibility. Instead, they are merely passed on to host families as further indicators of the prospective au pair's personality and potential fit within the family unit, which the host family may wish to consider when choosing their au pair. (*See* Ex. A, Kapler Dec. ¶ 4.)

---

[2] Notably, the DOS-specified application criteria include "references, interviews, personality tests, and training" (Pls.' Reply 19). *See* 22 C.F.R. §§ 62.31(d)(5)-(6), (g).

3

Second, Plaintiffs incorrectly claim that prior childcare experience is a sponsor-specific criteria that "go[es] above and beyond" DOS regulations. (Pls.' Reply 17-18.) All exchange-program sponsors must ensure that the program to which an exchange-visitor has applied "is suitable to [his or her] background, needs, and <u>experience</u>." 22 C.F.R. § 62.10(a)(1) (emphasis added). Requiring previous childcare experience to participate in the Au Pair Program is inherent in that regulatory mandate.

The bottom line is that the undisputed facts—that Go Au Pair recruits program participants, screens them for DOS eligibility criteria, and exercises some discretion over the steps in its application process—do not amount to the "hiring" of an employee. (GAP MSJ 14 n.7; GAP Resp. 5-7.)

### C. Power to "Fire" Au Pairs

Unable to prove their initial termination allegations (*compare* Pls.' MSJ 11, *with* GAP Resp. 7-8), Plaintiffs now raise a new argument—that Go Au Pair's authority to terminate an au pair's participation in the Au Pair Program under DOS regulations (*i.e.*, what Plaintiffs call "terminating her visa") is the equivalent of a right to fire au pairs (Pls.' Reply 32). But the two actions are different animals. Indeed, terminating an au pair's program participation may be dictated by circumstances that are unrelated to his or her employment by the host family or the services provided to them (*e.g.*, if the au pair violates the terms of his or her visa by engaging outside employment). *See* 22 C.F.R. §§ 62.16(b), 62.40(b) (exchange-visitor's participation in program subject to termination if he or she engages in unauthorized employment). Plaintiffs cite no authority for finding that an exchange-program sponsor has the power to "fire" program participants from

4

their employment simply because it has the regulatory authority (and obligation) to take a separate and distinct action that inevitably impacts that employment. Nor do they respond to authority counseling against such a conclusion. (*See* GAP Resp. 8 & n.12.)

Further, Go Au Pair's agreement with au pairs does not show, as Plaintiffs suggest, that it maintains wide-ranging discretion to terminate an au pair's employment with his or her host family.[3] Pursuant to that agreement, au pairs acknowledge that their <u>participation in the Au Pair Program</u> will be terminated under certain circumstances, several of which are expressly dictated by DOS regulations. (*See* Pls.' App. 2419-21 (AP Agmt.), ECF 886-38.) The agreement thus advises them of the consequences of certain conduct and secures their reciprocal acknowledgement of those consequences. As a practical matter, however, any decision to end the au pair's placement necessarily originates with the host family, provided that the au pair has not broken the law or violated the conditions of his or her visa. (*See* Defs.' App. 740-41 (Kapler Dec.), ECF 861-10; *cf.* Pls.' App. 1017 (LAR Manual) (stating that if a host family is willing to continue with an au pair despite presence of a safety concern, Go Au Pair will require written statement to that effect), ECF No. 886-5.) Plaintiffs provide no evidence to the contrary and, thus, their "argument has more to do with theory than reality." *See Jean-Louis Metro. Cable Comm'ns, Inc.*, 838 F. Supp. 2d 111, 124 (S.D.N.Y. 2011) (putative

---

[3] Nor does that agreement provide that "not smoking" is a condition of the au pair's continued employment with a host family. (*See* Pls.' Reply 37.) Instead, au pairs agree not to smoke in their host family's home or car or, <u>if</u> they have represented to the host family they are not a smoker, not to smoke while in the United States. (Defs.' App. 785 (AP Agmt. ¶ 2.7), ECF 861-11; Pls.' Reply App. 679 (AP Agmt.), ECF 986-4.) If the au pair violates this policy, his or her placement is terminated only if the host family decides to do so. (Ex. A, Kapler Dec. ¶¶ 6-8.)

5

employer's limited right take action that could effectively end employment did not equate to power to fire or indicate joint employment).

### D. Providing DOS-Required Training for Au Pairs

While Plaintiffs' Motion correctly recognized that Go Au Pair provides training to au pairs in conformance with DOS requirements, Plaintiffs now assert that Go Au Pair's training exceeds them because its au pairs "'receive training on safety following U.S. guidelines.'" (*Id.*) DOS regulations mandate that au pairs "receive not less than eight hours of <u>child safety instruction</u>." 22 C.F.R. § 62.31(g)(1) (emphasis added). Thus, Plaintiffs' "evidence" is not proof that Go Au Pair's training exceeds DOS requirements.

### E. Allegedly Moving Au Pairs between Host Families

Plaintiffs' new allegation that sponsors "retain discretion to remove au pairs from their homes and place them with a different family" is baseless. As Go Au Pair has repeatedly shown, decisions to end a placement are made by host families and au pairs.[4] (GAP MSJ 14-15; GAP Resp. 8.) In the event a host family or au pair terminates a placement early, Go Au Pair will facilitate the au pair's efforts to rematch with a new host family, provided the au pair is eligible to and chooses to do so.[5] (GAP MSJ 14 n.8.)

---

[4] Indeed, Plaintiffs offer no proof that Go Au Pair has ever unilaterally "removed" an au pair from a host family placement. The two instances they cite as evidence that au pairs were denied the opportunity to rematch after "being removed from her host family" involved instances in which either the host family or the au pair chose to end the placement without involvement from Go Au Pair. (*See* Pls.' Reply App. 987 (Aguilar Dep. 142:22-143:11) (admitting that host mother ended placement), 687-88 (email) (admitting that au pair decided to leave host family).)

[5] Au pairs may not be eligible for a rematch if, for instance, they only have a short amount of time left on their visas or they have violated the rules and regulations of the Au Pair Program. (Ex. A, Kapler Dec. ¶ 9.) That such instances occur reflects, at most, discretion over au pairs' continued participation in the Au Pair Program, not their

6

The "rematching" process operates in the same manner as the initial match process, such that any host family's offer of a new placement (and employment), and the au pair's acceptance of it, are wholly within those parties' discretion. (*See* Ex. B, Gonzalez Dep. 157:6-159:6 (describing rematch process and explaining that Go Au Pair personnel "weren't really involved" in). Thus, that some au pairs rematch with new families, or that Go Au Pair enables that process, does not equate to the reassignment (or "moving") of au pairs to new worksites. (Pls.' Reply 31.) There is, in fact, no evidence that Go Au Pair ever "assigned" an au pair to a host family, either initially or for a rematch.

### F.     Supervision of Au Pairs

Plaintiffs' Motion relied solely on Go Au Pair's regulatory obligations to monitor au pairs and host families through monthly or quarterly contact as evidence that Go Au Pair supervises au pairs. Plaintiffs now argue that Go Au Pair's training materials for its Local Area Representatives ("LAR") somehow show that its regulatorily-required monitoring of au pairs reflects employer-type control over au pairs.[6] (Pls.' Reply 30.) This argument fails for two reasons. First, that Go Au Pair provides instructions to LARs on how to fulfill their regulatorily-defined functions is not probative of whether Go Au Pair is a joint employer of au pairs. Second, those instructions do not show that Go Au Pair supervises au pairs' work or that it exerts control over their working conditions beyond enforcing the specific requirements set by DOS. (*See* Pls.' App. 1013-14

---

employment, and, thus, Go Au Pair's control over them as exchange visitors, not as employees. (*See* GAP Resp. 16-17 (explaining distinction between program participation and the au pair's employment with his or her host family).)

[6] Plaintiffs made a similar argument in their Motion as to other Defendants, but they cited no evidence to support that claim against Go Au Pair. (Pls.' MSJ 9 & n.15.)

7

(explaining regulatory requirements for monthly contact), ECF 886-5.)

## II.   THE FLSA DOES NOT APPLY TO AU PAIRS' ATTENDANCE AT TRAINING IN A FOREIGN COUNTRY

To save their claim for unpaid training, Plaintiffs confuse two conceptually distinct minimum-wage claims: (1) one for unpaid services and (2) one for reimbursement of expenses that, if not reimbursed, drop a worker's pay below minimum wage. Plaintiffs assert only the former—they seek payment of federal minimum wage for time spent attending training in their home countries. (Third Am. Compl. ¶ 362, ECF 983; Pls.' MSJ 22.) That claim falls squarely within the FLSA's foreign exemption because they seek compensation for "services" (i.e., attendance at training) that were "performed in a workplace within a foreign country" (*i.e.*, the au pair's home country). 29 U.S.C. § 213(f).

To avoid the FLSA's plain language, Plaintiffs resort to word play. First they claim that Go Au Pair's position "ignores" case law requiring reimbursement for "mandatory outlays"—*i.e.*, expenses—"incurred abroad," although their claim—compensation for services performed abroad—is an entirely different minimum-wage claim. (Pls.' Reply 44 (emphasis added).) They then misrepresent the one case they cite, claiming it held that "mandatory pre-employment services undertaken abroad must be compensated" if the employee's wages ended up "below the minimum wage once in the United States." (*Id.* (citing *De Leon-Granados v. Eller & Sons Trees, Inc.*, 581 F. Supp. 2d 1295, 1310 (N.D. Ga. 2008)) (emphasis added).) But the plaintiffs in *De Leon-Granados* did not seek compensation for services undertaken in another country—as Plaintiffs do here—but, rather, reimbursement for expenses incurred abroad. 581 F. Supp. 2d at 1307. As the court explained in that case, the alleged FLSA violation—failure to reimburse the

8

plaintiffs' during their first workweek—occurred while they were working in the United States, such that section 213(f) did not apply. *Id.* at 1310. There is no basis for extending that rationale to a claim for unpaid services performed abroad, as doing so runs counter to the FLSA's express limitations. *See Zahourek v. Arthur Young & Co.*, 750 F.2d 827, 828-29 & n.* (10th Cir. 1984) ("[W]hen clearly expressed Congressional intent exists, as in . . . [the fact that] 29 U.S.C. § 213(f) of the [FLSA] provid[es] for no extraterritorial application, courts should be loath to circumvent such intent.").

Accordingly, Plaintiffs FLSA claim for unpaid training fails as a matter of law.

### III.  NEITHER FLSA REGULATIONS NOR THE AU PAIR AGREEMENT PROVIDE A STATUTORY RIGHT TO COMPENSATION FOR TIME NOT WORKED

Abandoning their initial argument—that 22 C.F.R. § 62.31(j) (the DOS stipend regulation) "provides [the] agreement" contemplated by 29 C.F.R. § 785.23 (the "DOL Regulation")—Plaintiffs now argue that Go Au Pair's standard contracts constitute a "reasonable agreement" that allegedly entitles them to statutorily-required compensation for 45 hours of work, even if they admittedly worked less than that. (*Compare* Pls.' MSJ 5-6, *with* Pls.' Reply 11.) This new argument is equally meritless.

Go Au Pair's contracts with host families and au pairs do not fall within the parameters of the DOL Regulation. First, unlike agreements confronted by other courts, Go Au Pair's contracts do not state that au pairs will be paid for an assumed 45 hours of work or otherwise reflect an agreement that 45 hours is a proper estimate of the time au pairs will need to complete assigned tasks.[7] Instead, they clarify that au pairs will receive

---

[7] *See, e.g.*, *Barraza v. Pardo*, No. 15-13660, 2016 WL 4435617, at *3 (11th Cir. Mar. 10, 2016) (reasonable agreement under § 785.23 precluded recovery of additional

9

a flat weekly stipend of at least $195.75 in exchange for "up to a maximum of 45 hours of child care" per week. (Pls.' App. 2426 (HF Agmt.), ECF 886-39; *accord* Pls.' Reply App. 677 (AP Agmt.), ECF 986-4.) Second, the relevant agreement under the DOL Regulation, if any, is that between the host families and au pairs, as it is that agreement which specifies the stipend amount and the anticipated number of hours the au pair will actually be expected to work (GAP MSJ 13-16; GAP Resp. 19). *See* 29 C.F.R. § 785.23 (a "reasonable agreement" must "take[] into consideration all of the pertinent facts").

Moreover, Plaintiffs offer no authority demonstrating that the parties' "reasonable agreement" can override the express limits of the FLSA to provide a statutory cause of action for greater or different compensation than what is mandated by that statute. There is good reason for this—if an employer fails to "adhere to the plain terms of [a] contract, [the employee's] remedy must be found somewhere other than in a minimum wage [or overtime] claim." *Barraza v. Pardo*, No. 15-13660, 2016 WL 4435617, at *3 (11th Cir. Mar. 10, 2016). The FLSA simply provides no right of action for minimum-wage or overtime pay for time not actually worked. (*See* GAP Resp. 18 n.23.)

## CONCLUSION

Go Au Pair thus respectfully requests that the Court deny Plaintiffs' Motion.

---

compensation because "the contract reasonably anticipated that 48 hours per week would be sufficient for [plaintiff] to complete" her work); *Garofolo v. Donald B. Heslep Assocs. Inc.*, 405 F.3d 194, 200 (4th Cir. 2005) (agreement "acknowledge[ed] that 40 hours a week was a reasonable estimate of the hours worked"); *Rudolph v. Metro. Airports Commision*, 103 F.3d 677, 683 (8th Cir. 1996) (agreement "dictate[d] the amount of time [plaintiffs] were to spend on [required tasks]"); *Roemer v. City of Dayton*, 496 F. Supp. 2d 873, 882 (S.D. Ohio 2007) (agreement under § 785.23 is useful "because it reflects consensus among the parties" regarding how much time will be "devoted to activities that could be deemed compensable work").

10

| | |
|---|---|
| Dated: May 1, 2018. | Respectfully submitted, |

                                              *s/ Kathryn A. Reilly*
Kathryn A. Reilly
Brett M. Mull
V. William Scarpato III
Natalie West
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:  Reilly@wtotrial.com
          Mull@wtotrial.com
          Scarpato@wtotrial.com
          West@wtotrial.com

Attorneys for Defendants Agent Au Pair, Inc., American Cultural Exchange, LLC d/b/a Go Au Pair, Go Au Pair Operations LLC, and Au Pair International Inc.

## **CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on May 1, 2018, I electronically filed the foregoing DEFENDANT GO AU PAIR'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 886] with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record:

                                              *s/ Claudia Jones*

11

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

        Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

        Defendants.

**DECLARATION OF BILL KAPLER IN SUPPORT OF GO AU PAIR'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

    I, Bill Kapler, declare as follows:

    1.    My name is Bill Kapler. I am over the age of 18, and I make this declaration based upon personal knowledge.

    2.    I am the manager of both American Cultural Exchange, LLC and Go Au Pair Operations, LLC (together, "Go Au Pair"), defendants in the above-captioned action. Go Au Pair is one of 16 designated sponsors of the United States Department of State's ("DOS") J-1 visa au pair exchange program ("Au Pair Program").

    3.    Given my responsibilities with Go Au Pair, I am familiar with all processes it uses to administer its program in compliance with DOS regulations governing the program, as well as DOS's oversight procedures and guidance on regulatory compliance.

    4.    As an exchange-program sponsor, Go Au Pair must establish and use "a method to screen and select prospective exchange visitors to ensure that they are eligible for program participation" and that the "exchange visitor's background, needs,

and experience" are "suitable" to the Au Pair Program. 22 C.F.R. § 62.10(a). To comply with this mandate, Go Au Pair uses a 17-point application process through which it documents each applicant's satisfaction of the DOS-specified eligibility criteria. Go Au Pair's application process includes certain materials not expressly required by DOS, namely a photo collage and letter to potential host families, a personality test, and any documentation necessary to support the applicant's representations as to additional skills, such as driving ability or first aid training. Go Au Pair does not, however, screen program applicants for any additional eligibility criteria. The additional application materials it requests are used solely to provide host families with additional information relevant to the applicant's personality, skills, and fit with the family unit, which information they may wish to consider when choosing their au pair.

5. While Go Au Pair strives to ensure that host family placements are successful, early terminations do occur. The decision to terminate an au pair's host-family placement early is wholly within the discretion of the host family and/or the au pair, provided that both the au pair and the host family have complied with the rules and regulations governing the program.

6. While there are many reasons why host families terminate placements early, recurring situations include the host family's dissatisfaction with the au pair's child care services (including safety concerns), personality differences, and issues related to au pairs smoking in host families homes and cars or in the presence of their children, particularly when au pairs have stated in their applications that they do not smoke.

7. Because these instances occur, Go Au Pair advises prospective au pairs

up front that their participation in the Au Pair Program will be terminated if they fail to provide safe and adequate child care or if they are caught smoking in their host family's home or in the presence of their host family's children. Go Au Pair also warns prospective au pairs that, if they have represented themselves to be a non-smoker, their participation in the program will be terminated if they are caught smoking while they are in the program.

8. Go Au Pair, however, does not monitor au pairs for such conduct or supervise their provision of child care services. Thus, as a practical matter, Go Au Pair is made aware of problems arising from these issues only if the au pair's host family complains to Go Au Pair. If that occurs, Go Au Pair's policies do not dictate that the au pair's placement is terminated; rather, early termination remains in the discretion of the host family and au pair.

9. When early terminations occur, Go Au Pair will assist the au pair in locating a new placement if he or she is eligible to rematch with another host family. Au Pairs are not eligible for a rematch if they have endangered a child's safety, have violated the rules and regulations governing the program, or have a limited amount of time left on their visa.

10. I declare under penalty of perjury that the foregoing is true and correct. Executed on April 30, 2018.

_____
Bill Kapler

# EXHIBIT B

## (HOST FAMILY NAME REDACTED)

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

*Confidential Video Deposition of Ivette Alexandra Gonzalez*

*September 28, 2016*



**Stevens-Koenig Reporting**

700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 157

1    MS. McELROY: Objection.
2    A. Well, no, they didn't tell me go, you
3 know, to the side of the [redacted]. I said I was the one
4 that I do not want to continue with [redacted]. I
5 need to change families.
6    Q. (By Ms. Reilly) And it was your decision
7 to try a rematch?
8    A. Yes, ma'am.
9    Q. And that decision was not made by
10 GoAuPair?
11    A. No. It was not GoAuPair's decision. It
12 was my decision to change families.
13    Q. And GoAuPair provided you with the
14 policies and helped you set up the rematch process?
15    MS. McELROY: Objection, form.
16    A. Yes, they did attach those documents that
17 I at this moment don't remember exactly what they were.
18 But it was in reference to the rematch.
19    Q. (By Ms. Reilly) When you were going
20 through the rematch process and talking to the host
21 families, GoAuPair wasn't part of that?
22    MS. McELROY: Objection.
23    A. Well, I mean, GoAuPair was the one that
24 was sending me this type of information, you know, that
25 link, the same link that was happening when I first

Page 158

1 initiated the process.
2    Q. (By Ms. Reilly) Right, but they weren't
3 telling you which host family to talk to?
4    A. No, no, no. They were just sending
5 me -- I was receiving all the families and families.
6    Q. And then you would talk directly with the
7 family without any involvement by GoAuPair?
8    MS. McELROY: Objection.
9    A. The family would contact me through the
10 agency.
11    Q. (By Ms. Reilly) Well, your conversations
12 with the host family didn't include GoAuPair, though, did
13 they?
14    A. Well, they weren't really saying GoAuPair,
15 GoAuPair. But I knew those families were coming from
16 GoAuPair because --
17    Q. Right, but no one -- no one from GoAuPair
18 was on the emails between you and these host families
19 during the rematch process?
20    A. They would arrive (sic) these emails from
21 GoAuPair, but there wasn't a certain name of somebody
22 there.
23    Q. Was anybody from GoAuPair on the Skype
24 call with the family you had the Skype call with?
25    A. No, ma'am.

Page 159

1    Q. And did GoAuPair play any role in telling
2 you you should or shouldn't move forward with any
3 particular host family?
4    MS. McELROY: Objection, form.
5    A. No, no, no. I would simply receive the
6 links. They weren't really involved in all of this.
7    Q. (By Ms. Reilly) And Crystal Hardman, had
8 you dealt with her at all before this January 2015
9 timeframe?
10    A. I don't recall.
11    MS. REILLY: So let's take a break.
12    THE VIDEOGRAPHER: Going off the record.
13 The time is 5:13.
14    (Recess taken from 5:13 p.m. to 5:34 p.m.)
15    THE VIDEOGRAPHER: We are back on the
16 record. The time is 5:34. This is the beginning of
17 Media Number 4 in the deposition of Ivette Alexandra
18 Gonzalez.
19    (Exhibit 111 was marked.)
20    MR. KAPLER: What number is this guy?
21    MS. REILLY: 111.
22    Q. (By Ms. Reilly) So I'm showing you this
23 document so that you can take a look at the last couple
24 pages and tell me if these are the text messages with
25 Mrs. [redacted] that you testified about previously.

Page 160

1    A. Yes, ma'am.
2    Q. Did you provide your address as to where
3 you were staying after you left the [redacted]' house to
4 GoAuPair?
5    A. I don't remember if I gave it to
6 Crystal -- I mean Amanda, Amanda.
7    (Exhibit 112 was marked.)
8    Q. This is Exhibit 112. If you look at the
9 second email from you to Crystal Hardman, do you see
10 where you sent her the address as to where you were
11 staying after the [redacted]?
12    A. Yes.
13    Q. And are you -- do you have an
14 understanding as to whether the [redacted] tried to mail you
15 your final stipend check to this address in Westminster?
16    MS. McELROY: Objection.
17    A. I don't know.
18    Q. (By Ms. Reilly) Okay. Looking at that
19 address now in Westminster, can you tell that it's
20 actually incomplete?
21    A. Yes.
22    Q. And did anyone tell you that the check
23 that was mailed to this address never made it and was
24 returned to the [redacted]?
25    MS. McELROY: Objection, form.