1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

---

DEPOSITION OF: NAYARA CALVO GOMEZ - March 26, 2018

---

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.

---

      PURSUANT TO NOTICE, the deposition of NAYARA CALVO GOMEZ, via Zoom Conference, was taken on behalf of the Defendant, InterExchange, Inc., at 1900 Grant Street, Suite 1025, Denver, Colorado 80203, on March 26, 2018 at 9:05 a.m., before Tracy R. Stonehocker, Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

H+G

Hunter + Geist, Inc.

303.832.5966  
800.525.8490

1900 Grant Street, Suite 1025  
Denver, CO 80203

■ www.huntergeist.com  
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT 4

Page 9

Q. And just to clarify, are you saying the wages the au pairs are paying or the wages the au pairs are paid?
A. Yeah, the salary they are paid or all the wages they are not paying for.
Q. I'm sorry, could you repeat that one more time?
A. Yes, for what I read, it's about the salary that they are paying to au pairs. It's below the average that you should pay to a worker in the United States.
Q. And you lived with a family in Baltimore, Maryland, correct?
A. What?
Q. You lived with a family in Baltimore, Maryland; is that correct?
A. Yeah, I was with a family in Baltimore, yes.
Q. Do you know if this lawsuit has anything to do with the amount of money you were paid by the family that you lived with?
MR. LIBLING: Objection to form. You can answer.
Q. (BY MS. LEVY) You can answer the question.

Page 10

A. What did you say if this lawsuit has to be with the money that I was receiving for this family?
Q. Yes. Do you know if the lawsuit has anything to do with the amount of money that you were paid by the family that you lived with?
A. No.
Q. When you first came to the United States for the au pair program, what did you believe that you were going to be paid by the family that you lived with?
A. $200 a week.
Q. And before learning of this lawsuit, did you have any concerns about the payment?
A. Well, it didn't seem fair for the amount of work that I was doing. But that was what I was told -- when I accept to be an au pair.
Q. When you signed the form that we just pulled up on the screen, where were you living?
A. In Baltimore.
Q. And where do you live now?
A. In Baltimore.
Q. And how long have you lived in Baltimore?
A. Since 2011.

Page 11

Q. And you lived with the -- sorry if I mispronounce the family's name. It's Moonaz-Mooney?
A. I wasn't living with them in the house. They provide me another house they have.
Q. Can you explain that? Where was the house?
A. It was on the same street. They have two houses there. But this house, there were certain requirements for have an au pair, so they didn't fill out the requirements, so they offer me another house they have on the same street and I was having a room and I was sharing the house with somebody else who was living there.
Q. Who were you sharing the house with?
A. It was -- at the beginning it was a guy who was a teacher. They were renting one room for this person. And later it was a girl that it was -- a nanny.
Q. Was the nanny for the same family or a different family?
A. Different family.
Q. Was she an au pair?
A. No. She was -- she was American nanny.
Q. And how far away from the Moonaz-Mooney's house was the room that you lived in?

Page 12

A. Ten minutes walking.
Q. Were you able to come and go as you pleased in this -- was it an apartment that you lived in?
A. It was like a row house.
Q. Okay. Were you able to come and go in the row house as you pleased?
A. What do you mean?
Q. Could you -- were there any rules or curfew or could you go to the house and leave the house when you wanted?
A. Yes.
Q. When you wanted?
A. Yes. When I wanted.
Q. And did you extend with your host family for a second year?
A. Yes.
Q. Do you still communicate with your host family?
A. No.
Q. And where are you from originally outside the United States?
A. I'm from Spain.
Q. Have you discussed this lawsuit with anyone from your host family?

3 (Pages 9 to 12)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

### Page 21

1  A. To the agency in Spain.
2  Q. Do you remember how you paid them?
3  A. It was a transfer, a bank transfer.
4  Q. And was this before you came to the
5  United States as an au pair?
6  A. Yes, before I could join the program.
7  Q. You were living in Spain when you
8  started the matching process to be an au pair; is that
9  right?
10  A. Yes.
11  Q. And I understand from what you've said
12  so far that you -- you met your family online; is that
13  right?
14  A. Yes.
15  Q. Can you tell me a little bit more about
16  that? How you came to meet each other online?
17  A. I just post my profile and they contact
18  me and we start to talk about a little bit and they
19  like me and I like them, so they -- they arrange
20  everything, and after three months, I believe, I just
21  decided to go and start the program.
22  Q. How did you communicate with them
23  online?
24  A. Through this website.
25  Q. Did you e-mail with them?

### Page 22

1  A. Yes.
2  Q. Did you ever do a Skype conversation?
3  A. Yes, I did.
4  Q. How many times did you talk with them
5  through Skype?
6  A. Three times, maybe.
7  Q. And in those conversations, who was part
8  of the Skype conversation?
9  A. The whole family.
10  Q. Who was in the family?
11  A. It was a little girl, the mother and the
12  father.
13  Q. So after you had the Skype conversations
14  with them, the Moonaz-Mooney family asked you to be
15  their au pair; is that right?
16  A. Yes.
17  Q. And did you want to be their au pair?
18  A. Yes.
19  Q. And could you have said no if you did
20  not want to be their au pair?
21  A. Yes.
22  Q. When you agreed to be their au pair, and
23  come live with them, did you already know about
24  going -- you were going to go through the
25  InterExchange program?

### Page 23

1  A. Yes, I know that I was going to go
2  through that program.
3  Q. At what point, when you were talking
4  with the host family, did you understand that you
5  would be going through the InterExchange program?
6  A. At the end when we decide that was a
7  good match. At that time, they arrange everything.
8  And they told me that they found InterExchange, so it
9  was at the end.
10  Q. When you talked with the Moonaz-Mooney
11  family, was InterExchange ever a part of those
12  conversations?
13  A. No.
14  Q. Was anyone from the agency in Spain ever
15  a part of those conversations?
16  A. No.
17  Q. During either the e-mails or the Skype
18  conversations you had with the Moonaz-Mooney family,
19  did you talk about how much you would be paid?
20  A. No, we didn't. Only at the end.
21  Q. Can you tell me more about that, at the
22  end you talked about it?
23  A. Yes, when I -- when I decide to be their
24  au pair, and they found the InterExchange, they send
25  me -- we talk about the conditions.

### Page 24

1  Q. At that point, did you talk to the
2  family about how much you would be paid as their au
3  pair?
4  A. Yes.
5  Q. And what did they tell you?
6  A. They will pay me $200. That was what it
7  was said for the program.
8  Q. And were you okay with that amount?
9  A. Yes.
10  Q. Did you ever ask your host family to pay
11  you more than that amount per week?
12  A. No. But they did pay me $25 extra.
13  They said that was for food because they never cover
14  my food spending -- expenses. So they did pay me 25
15  more because they didn't pay for my food.
16  Q. So did they pay you 225 a week?
17  A. Yes.
18    MR. LIBLING: Objection to form.
19  Q. (BY MS. LEVY) During those Skype
20  interviews that you had with the family, did you talk
21  about what you would be doing with the children?
22  A. Yes.
23  Q. And what did you talk about?
24  A. She explained me that -- that I will
25  have to do activities with them. Bring their -- yeah,

6 (Pages 21 to 24)

**25**

1  bring them to activities and their schedule, a little
2  bit. And what was going to be my schedule. Pretty
3  much that.
4      Q. And what kind of activities did you talk
5  about that you would be doing with the children?
6      A. Activities. Every day I will drive them
7  to the museum or the library or to any kid activities
8  that was happening in the city.
9      Q. And what did they tell you your schedule
10 would be like?
11     A. It was -- it was changing, but mostly
12 it was between 9:00 to 5:00, sometimes 10:00 to 6:00.
13 And it was going to be eight hours a day and work
14 Saturdays in the morning.
15     Q. And when you lived with the host family,
16 were those the duties that you actually performed?
17     A. Yes.
18     Q. Before you matched with the
19 Moonaz-Mooney family, did you communicate with any
20 other families?
21     A. Yes, one more.
22     Q. Can you tell me about that?
23     A. It was a family from London, but it
24 didn't work out. I don't know. I wasn't happy with
25 the arrangement they were offering.

**26**

1      Q. Was that through InterExchange or a
2  different sponsor?
3      A. That was through the Spanish agency.
4      Q. Okay. Was that through InterExchange?
5      A. No.
6      Q. Okay. I'm going to pull up another
7  document on your screen.
8      A. Okay.
9      Q. Can you see that on your screen?
10     A. Yes.
11     Q. I'm going to scroll this so you can see
12 it. It's long, so let me know if you would like to
13 see each page or if you recognize it just by the first
14 few pages. Do you need to see the first page again?
15     A. Oh.
16     Q. Does this document look familiar?
17     A. I'm not sure. I'm sorry, it's just too
18 many years. I don't remember exactly the whole thing.
19     Q. Okay. It says this is the au pair
20 agreement for Nayara Calvo Gomez, do you see that?
21     A. Yes.
22     Q. And then on the first page, also, it
23 says the agreement was signed June 7 of 2011.
24     A. Okay.
25     Q. Does that sound familiar to you?

**27**

1          MR. LIBLING: Objection to form.
2      A. Yeah, I -- I did sign some documents. I
3  don't remember exactly if it was this one. So I don't
4  say -- I did or I didn't, I'm not sure really. I did
5  sign documents and they did send me the information.
6      Q. (BY MS. LEVY) Okay. This one says it
7  was signed by you on June 7, 2011 and I want to show
8  you on the third page of this document, this is Bates
9  name InterExchange 49105. It says, "The stipend" --
10 see under W here, it says, "The stipend is the minimum
11 amount that the host family is required to pay the au
12 pair pursuant to the U.S. Department of State
13 regulations and employment and labor laws of the U.S.
14 The current minimum required weekly amount is
15 $195.75." 195.75. Do you see that on there?
16     A. Yes, I do.
17     Q. And I represent that that is your
18 electronic signature on there. Would you -- did you
19 read the agreement before you signed it?
20     A. Yes, probably I read it.
21     Q. And did you understand the agreement
22 before you signed it?
23         MR. LIBLING: Object to form.
24     A. Yeah, I do know that I was going to get
25 paid that amount a week.

**28**

1      Q. (BY MS. LEVY) I want to ask you about
2  the training you mentioned when you first came to the
3  United States. You arrived in the U.S. for the au
4  pair program in August 2011; is that right?
5      A. Yes.
6      Q. And the training that you went to, was
7  that in New York City?
8      A. Yes.
9      Q. And that was before you went to meet
10 your host family?
11     A. Yes.
12     Q. And what sort of training did you get?
13     A. It was about first aid and they were
14 talking about how to do my job as an au pair, and
15 things that could happen during the experience and it
16 was just to meet everybody there and have an
17 introduction.
18     Q. Can you explain a little bit more
19 when -- about what you mean when you say how to do
20 your job?
21     A. Yes, they were explaining that the hours
22 that I will have to do, they also give us a course in
23 case we were going to take care of babies, how to do
24 it properly. And talk about how it was going to be
25 the experience. The things that we have to do, that

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**Page 29**

we have to give classes. Just to clarify a little bit everything.
Q. And this was for all the au pairs that were doing the training, right?
A. Yes.
Q. It wasn't specific to you with your host family?
A. Excuse me?
Q. Was it specific to you with your own host family or was it for all of the au pairs?
A. It was for all the au pairs.
Q. And how many hours was the training?
A. I don't remember exactly the hours, but it was a whole day. Maybe eight hours. I'm not sure exactly.
Q. Did it start in the morning?
A. Yes.
Q. And did it go 'til the afternoon?
A. Yes.
Q. And was it one day or more than one day?
A. It was more than one day.
Q. Do you know how many days the training was?
A. I'm not sure, but maybe it was like three or four days we stay there.

**Page 30**

Q. So was it three or four days from the morning until the afternoon, does that sound correct?
A. Yes. But also we did some activities, some excursions to go around New York.
Q. Was that during the day that you did excursions?
A. Yes.
Q. How many hours a day do you think you did the excursions?
A. How many hours? I'm not sure. I did stay for one or two hours.
Q. Okay. Were you paid for the hours that you did the training?
A. No.
Q. Did you do any training in Spain before you came to the United States?
A. No.
Q. So after you did the training in New York City, you went to go meet your host family?
A. Yes.
Q. Did both of the parents in your host family work?
A. Yes.
Q. Did they work in the home or outside the home?

**Page 31**

A. The father outside home and the mother inside.
Q. How many hours a day was the dad outside the home working?
A. Around nine hours.
Q. When did he leave for work in the morning?
A. Yeah, he leave for work early. I never saw him in the morning.
Q. What time did you arrive at the home in the morning?
A. The schedule was changed, but usually between 9:00 and 10:00.
Q. You would arrive at the home around 9:00 or 10:00 or you would leave --
A. Yes.
Q. Okay.
A. I would arrive.
Q. And what about the host mother, what time did she start working?
A. Just right away after I get to the home.
Q. Was that the same schedule, Monday through Friday?
A. Yes, but it was changing sometimes.
Q. What kind of changes were there?

**Page 32**

A. Maybe one hour before or one hour later or things like that.
Q. And then what time would the host father come home from work in the evening?
A. Usually 5:00 or 6:00.
Q. And how -- what time did the host mother stop working in the evening?
A. Around that time too.
Q. Can you still hear us?
A. Yeah, that's not me.
Q. Okay.
    MR. LIBLING: There's fire trucks going past my window. Sorry.
Q. (BY MS. LEVY) When the host mother was at home working, was she helping with the children ever during the day?
A. I was always out with the kids. So I -- she didn't want to have the kids around the home because she was working and that wasn't working, so I was always outside doing activities with groups or moms or nannies.
Q. Did you have any personal time during the day?
A. Not really.
Q. Were there any other adults other than

---

8 (Pages 29 to 32)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

EXHIBIT 4

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

Page 33

1  you, the host mom and the host dad -- well, I guess
2  you didn't live in the home. Were there any other
3  adults that lived in the home besides the host mom and
4  the host dad?
5  A. No.
6  Q. And how many children did you take care
7  of for your host family?
8  A. Two.
9  Q. And how old were they?
10  A. The girl was three and the baby was a
11  newborn.
12  Q. Did the -- did the three-year-old girl
13  attend daycare or school?
14  A. Yeah, she was going to a school maybe
15  three hours a day.
16  Q. And what hours -- what time did she go
17  to school in the morning or what time did she go to
18  school?
19  A. It was in the morning. I don't remember
20  the time. It was early in the morning and then I
21  would pick her up -- I'm not sure if it was 1:00.
22  Sometimes I think it was 1:00. Sometimes it was
23  later, 3:00.
24  Q. Did you take the little girl to school
25  in the morning?

Page 34

1  A. Sometimes I will do it and other times
2  their mother will do it.
3  Q. And while the little girl was at school,
4  were you taking care of the newborn?
5  A. Yes.
6  Q. When was the baby born? Was it while
7  you lived there?
8  A. It was -- it was maybe after a month I
9  got -- I arrived there.
10  Q. And was the mother helping to care for
11  the newborn?
12  A. Well, she have to work, but she would
13  leave me the milk and I will take care of him.
14  Q. When did the mother start working again
15  after the baby was born?
16  A. A week, maybe two weeks maximum.
17  Q. Did she help at all with the newborn
18  during the day while she was at home taking breaks
19  from work or taking any time off work?
20  A. Yeah, sometimes she will come and -- but
21  I was always outside, so -- but, yeah, sometimes she
22  was around, she will help with the baby.
23  Q. What were your duties with respect to
24  the baby?
25  A. Feed him, clean him, give him baths, and

Page 35

1  I would bring him to the library, to activities for
2  babies.
3  Q. And what about the three-year-old, what
4  were your duties with the three-year-old?
5  A. Play with her, feed her, give her a
6  bath. Yeah. Also they want them to speak Spanish, so
7  I would have to always speak in Spanish with them and
8  try to teach her.
9  Q. Were you in charge of the three-year-old
10  and the baby at the same time?
11  A. Yes.
12  Q. So when you would pick up the little
13  girl from school, what would you do with the little
14  girl and the baby in the afternoons?
15  A. Depends if there was any activity, I
16  will go there to a museum or library or to the park.
17  Always doing some activity with them.
18  Q. Which days was the little girl in school
19  for three hours?
20  A. I don't know. I don't remember the
21  days.
22  Q. Do you remember how many days a week it
23  was?
24  A. Maybe three. Three days, four. I'm not
25  sure.

Page 36

1  Q. Ms. Gomez, we've been going about an
2  hour, so I want to ask if you need a break at this
3  point, to take a few-minute break?
4  A. No.
5  Q. No?
6  A. I'm good.
7  Q. Okay. Did you spend time with other au
8  pairs?
9  A. Yes, I did.
10  MR. LIBLING: Objection to form.
11  A. Yes, I did.
12  Q. (BY MS. LEVY) Can you tell me about
13  that?
14  A. There was this group, it was like a
15  coordinator in Baltimore, put in contact all the au
16  pairs that were in Baltimore, so we have like a group
17  for meetings or to hang out. So I would spend time
18  with them sometimes.
19  Q. Okay. For the schedule that your family
20  gave you, did they ever write it down for you?
21  A. Yes.
22  Q. And was that written on paper or was it
23  electronic?
24  A. She give me a print book with all the
25  expectations and the schedule and -- yeah. Just that.

9 (Pages 33 to 36)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

EXHIBIT 4

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

**37**

1  Yes.
2      Q. Do you still have that book?
3      A. Probably, yeah.
4      Q. All right. I'm going to ask you to look
5  for that book and to please give that to your
6  attorney. Okay?
7      A. Uh-huh. Okay.
8      Q. Thank you. Did anyone from --
9      A. Oh --
10     Q. I'm sorry. Go ahead.
11     A. No. No. Sorry. You can go.
12     Q. Did you have more to say?
13     A. No, no, no.
14     Q. Did anyone from InterExchange ever give
15 you a weekly schedule when you lived with your host
16 family?
17     A. No.
18     Q. The schedule that you think you may
19 still have, was it -- was it recorded each week?
20     A. What do you mean?
21     Q. Was the schedule written down each week
22 or was it written down just in the beginning?
23     A. That was just for the beginning, for the
24 first time that I arrive. The changes, she will tell
25 me, you know, when -- maybe it's one day in advance.

**38**

1      Q. Okay. But it was kind of the base for
2  your schedule and maybe there were a few variations?
3      A. Yes.
4      Q. Did you always work on Saturday morning?
5      A. Yes. Sometimes I would work Sunday --
6  Saturday night because they want to go to a date or
7  something. Or on Sunday, so they will change it.
8      Q. Did you work on Sundays?
9      A. Yes.
10     Q. How often did you work on Sundays?
11     A. It wasn't that often. Just when they
12 want to do something.
13     Q. How many hours do you think you worked
14 on Sundays when you did work?
15     A. Around four or five hours.
16     Q. And if you worked on Sundays, did you
17 have any time off on Saturdays?
18     A. Yes.
19     Q. And if you worked on Saturday nights,
20 how many hours were you working on Saturday night?
21     A. The same because they always have to
22 give me 45 hours, so I always worked 45 hours for
23 sure.
24     Q. Did you ever work more than 45 hours?
25     A. Yes.

**39**

1      Q. How often did you work more than 45
2  hours?
3      A. Not very often. It was mostly if he was
4  late because of work or he couldn't get home in time.
5  That didn't happen a lot, but it did happen.
6      Q. So if you worked over 45 hours, was it
7  about -- how many hours over 45 do you think you
8  worked if you worked over 45?
9      A. I'm not sure.
10     Q. Do you think it was more than 46?
11     A. Yes. It was more than 46. Especially
12 if we go on vacation, when I used to go on vacation
13 with them.
14     Q. Were your hours the same when you went
15 on vacation with them?
16     A. No. They were always changing.
17     Q. Were you expected to be on call for your
18 host family at times when you were not normally
19 scheduled to work for them?
20     A. Yes.
21     Q. And under what circumstances?
22     A. Because they need me, something came up
23 and they need me. They would actually get angry if I
24 wasn't able to answer.
25     Q. Would they call you when you were at

**40**

1  your brownstone?
2      A. Just on my free time, my free days.
3  Could be a Saturday or a Sunday.
4      Q. Did you ever work more than 10 hours a
5  day?
6      A. No, I don't think so.
7      Q. Did you ever complain or tell your
8  concerns to your host family about the schedule they
9  gave you?
10     A. Yes, I did.
11     Q. And what did they say to you?
12     A. Well, they were not very happy about it.
13 So -- but I just have to do what they say.
14     Q. When did you have a conversation with
15 them about your schedule?
16     A. When? I don't remember exactly a month,
17 but I do remember there was a time that it was
18 constantly changing and I have to arrange with my
19 classes, too, so I couldn't really do everything. So
20 it was when I was doing my classes, my -- for the
21 program.
22     Q. Do you remember how many months after
23 you started that was?
24     A. No, I remember it was during the time
25 that I did the course, but I don't remember exactly

10 (Pages 37 to 40)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

41

1 the time or the day.
2 Q. Do you remember if it was in the winter
3 or the summer?
4 A. No.
5 Q. Did you have more than one conversation
6 with your host family about your schedule?
7 A. I have -- yes, I have one or twice.
8 Q. Do you know how far apart those
9 conversations were?
10 A. No, I'm not sure.
11 Q. What happened when you brought up your
12 concerns to your host family the second time?
13 A. They were a little abrasive with me, so
14 I just -- I didn't do anything about it.
15 Q. Can you tell me exactly what your
16 concern or your complaint was?
17 A. I felt I was doing a lot. They were
18 asking too much for what they were giving back. It
19 was a lot of demands.
20 Q. And when they paid you the $200 each
21 week, how were you paid?
22 A. It was a transfer, bank transfer.
23 Q. And what about the $25?
24 A. They were included in the transfer too.
25 Q. Did you ever have any conversations with

---

42

1 your host family after you started in the United
2 States about the weekly amount?
3 A. Conversations about the money? Well,
4 they knew that I thought it was not well paid. But
5 that was the arrangement, so it was not much to say.
6 Q. How did they know that you knew it was
7 not well paid?
8 A. What? Can you repeat that?
9 Q. You -- I believe you just said they
10 knew -- that you knew it was not well paid. Is that
11 what you said or is that not what you said?
12 A. Yes, that's what I said. And they knew
13 it, too. But that was part of the program.
14 Q. How did they know that? Or, I'm sorry,
15 let me ask you a different question. Why do you think
16 that they thought that?
17 A. Well, because a regular nanny, you pay
18 no more than $15 and they were paying me $4, so
19 there's a big difference there.
20 Q. Who decided the amount that you would be
21 paid each week?
22 A. The agency, the program.
23 Q. And when you say that, do you mean the
24 agency in Spain or InterExchange?
25 A. Yeah, InterExchange set the amount.

---

43

1 Q. Who decided the 225 amount?
2 A. What?
3 Q. Who decided the $225 amount that you
4 received in your bank account each week?
5 MR. LIBLING: Objection to form.
6 A. The family decide to give me $25 more
7 because they were not paying for my food, and they
8 were supposed to do that. So I would have to use my
9 salary to buy my food every week.
10 Q. (BY MS. LEVY) Could you eat any food at
11 the family's home when you were over there with the
12 children?
13 A. Yes.
14 Q. Did you ever eat dinner with the family?
15 A. Yes.
16 Q. How often did you eat dinner with the
17 family?
18 A. Maybe once a week.
19 Q. What about breakfast, did you eat
20 breakfast over there?
21 A. No.
22 Q. Or did you eat lunch over there?
23 A. No.
24 Q. What did you do when you were with the
25 children all day? Where did you eat lunch?

---

44

1 A. I will buy something outside or I will
2 make something at home and bring with me.
3 Q. Did InterExchange ever pay you your
4 weekly stipend?
5 A. My what?
6 Q. Did InterExchange ever pay you your
7 weekly stipend?
8 A. What is that?
9 Q. The amount that you were paid each week,
10 you said you received an amount electronically from
11 your host family?
12 A. Yes.
13 Q. Did InterExchange ever pay you an amount
14 for each week?
15 A. Oh, no.
16 MR. LIBLING: Objection to form.
17 Q. (BY MS. LEVY) Other than the $25, did
18 your host family ever give you extra money for
19 anything?
20 MR. LIBLING: Objection to form.
21 A. They gave me $500 for my class, my
22 classes at the college.
23 Q. (BY MS. LEVY) Did they give you money
24 for any other reason?
25 A. No.

11 (Pages 41 to 44)

**45**

1   Q. Did they ever give you any gifts?
2   A. Yes, they gave me one gift.
3   Q. What was the gift that they gave you?
4   A. The mother bought a scarf for me.
5   Q. Did they ever give you any art supplies
6 to use?
7   A. Yeah, probably for play with the kids
8 and playing with them, yes.
9   Q. What kind of art would you make?
10   A. I will make painting with -- what is the
11 name. Pastels.
12   Q. Did you ever make any art or pastel
13 painting that were not with the children?
14   A. Yes.
15      MR. LIBLING: Objection to form.
16   Q. (BY MS. LEVY) Did you use those supplies
17 that you received from the family to make that art?
18   A. Part, yeah. Some I will buy myself.
19   Q. Did you have a computer to use when you
20 were out there?
21   A. Yeah. Yes. But it was my own computer.
22   Q. Was there wifi in the brownstone you
23 lived in?
24   A. Yes.
25   Q. Who paid for the wifi?

**46**

1   A. The family pay.
2   Q. Did you have a cell phone when you were
3 an au pair?
4   A. Yes.
5   Q. Was it your cell phone or the host
6 family's cell phone?
7   A. It was my phone but it was their SIM.
8 The SIM, it was from their plan.
9   Q. Did they -- did the host family have any
10 rules about using the cell phone?
11   A. About using the cell phone?
12   Q. Yes. Did they have any rules?
13   A. No.
14   Q. Were you able to make personal calls on
15 the cell phone?
16   A. Yes.
17   Q. Did you have a car to drive when you
18 were with the au pair -- when you were an au pair?
19   A. Yes.
20   Q. And was that for driving the children?
21   A. Yes.
22   Q. And could you use it for personal trips
23 also?
24   A. Yes, sometimes.
25   Q. Did your host family give you gas money?

**47**

1   A. They usually try to always leave gas in
2 the car, but if I didn't have gas, I will put it in
3 myself.
4   Q. And who paid for the gas when you put it
5 into the car yourself?
6   A. Myself.
7   Q. Did you ever ask them for money for
8 that?
9   A. No, I didn't.
10   Q. You mentioned taking trips with the host
11 family. Where did you go?
12   A. We went to Ocean City once. We went to
13 Philadelphia, to their parents' house. I went with
14 the mom for work, New Jersey. Philadelphia a lot.
15 But at some point I just decide not to go with them
16 any more, so, yes, I did some trips, but at some point
17 I refused to go on vacations with them.
18   Q. Were these vacations during the week or
19 on the weekend?
20   A. During the week or weekend.
21   Q. What did they say when you told them you
22 were not coming on the vacation during the week?
23   A. They were not happy about it, but, you
24 know, they want me to go with them, but I -- it wasn't
25 like a big conflict. They just didn't like it,

**48**

1 but. . .
2   Q. Why did you not want to go on the
3 vacation with the family?
4   A. Because I was working a lot during the
5 vacations. I mean, they were putting like spend time
6 with the family, but it was too many hours with the
7 kids.
8   Q. When you did go on vacation with them,
9 how did you -- what was the first place that you said?
10 Did you say Cincinnati?
11   A. We went to Philadelphia a lot and Ocean
12 City to --
13   Q. When you went to Ocean City, how did you
14 get there?
15   A. In car. By car.
16   Q. And when you went to Philadelphia, how
17 did you get there?
18   A. By car, too.
19   Q. And when you went with them on New
20 Year's Eve, where did you go?
21   A. Oh, it was for New Jersey.
22   Q. How did you get there?
23   A. I think we drived (sic) there too. We
24 drive.
25   Q. Did you ever fly on a plane for a

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

Page 49

1  vacation with the family?
2      A.  No.
3      Q.  When you went to these different cities
4  in the car, did you ever pay for gas money?
5      A.  No.
6      Q.  Did you pay for anything on the trips
7  with the family?
8      A.  No.
9      Q.  Did you take any trips on your own
10 without the family?
11     A.  Yes.
12     Q.  Where did you go?
13     A.  I went to Philadelphia and to New York
14 and also to Portland.
15     Q.  Did you say Poland or Portland?
16     A.  Portland, sorry.
17     Q.  Portland.
18     A.  Oregon.
19     Q.  And did your host family pay for
20 anything on those trips that you took without them?
21     A.  No.
22     Q.  Did your host family or InterExchange
23 provide you with a log of any type to write in?
24     A.  I don't think so, no.
25     Q.  Who told you what duties to do for your

Page 50

1  host family?
2          MR. LIBLING:  Objection, form.
3      A.  The family.
4      Q.  (BY MS. LEVY) Did InterExchange ever
5  tell you what duties to perform for your host family?
6          MR. LIBLING:  Objection to form.
7      A.  Well, they told me that I have to take
8  care of the kids.  Probably some light cleaning, too.
9  And I don't remember anything else.
10     Q.  (BY MS. LEVY) And when InterExchange
11 told you to take care of the kids and do the light
12 cleaning, were those instructions they gave to all of
13 the au pairs or was it specific to your host family?
14     A.  To everybody.
15     Q.  Did anyone from InterExchange supervise
16 you while you were taking care of the host family's
17 children?
18         MR. LIBLING:  Objection to form.
19     A.  We have like a coordinator in the area
20 that if -- that I could talk to her if I have any
21 problem.
22     Q.  (BY MS. LEVY) Did the local -- sorry.
23 Go ahead.
24     A.  Sorry.  She was organizing meetings in
25 her house, also for the au pairs.

Page 51

1      Q.  Did the local coordinator ever supervise
2  you taking care of the host family's children?
3      A.  No.
4          MR. LIBLING:  Objection to form.
5      Q.  (BY MS. LEVY) Other than the duties that
6  we've already talked about with your host family, what
7  were your other duties?
8      A.  Mostly it was just take care of the
9  kids, clean up sometimes the dishes or around the
10 house.  They did ask me to paint the house.  I did
11 paint the house.  But, yeah, it was mostly that.
12     Q.  Were you doing the dishes for the
13 children?
14     A.  For the whole family.
15     Q.  And when you painted the house, were you
16 helping the family or were you doing that on your own?
17     A.  I was doing it on my own.
18     Q.  Where in the house were you painting?
19     A.  I paint their basement and also the
20 house that they provide me.
21     Q.  Did you do any laundry for the children?
22     A.  Yes, and for the whole family.
23     Q.  And did you clean up after the children?
24     A.  Yeah, after playing, I clean up
25 everything.

Page 52

1      Q.  Did your host family ever ask you to
2  perform any duties that concerned you in any way?
3      A.  No.
4      Q.  You mentioned taking classes when you
5  were with the host family.  How many classes did you
6  take?
7      A.  It was two times a week and the
8  course -- I think it was the course was -- I'm not
9  sure.  I think it was three months.  It was to learn
10 English.
11     Q.  Did you choose those classes?
12     A.  Yes.
13     Q.  Do you know whether you took six credits
14 of classes?
15     A.  I do remember that InterExchange asked
16 me about the document proving that I took those
17 classes to meet the requirements to stay another year,
18 so it was all correct.
19     Q.  Did you take any classes the second year
20 you were with your host family?
21     A.  Yes.  I take a course, a Java course,
22 training, teacher training.
23     Q.  Do you know how much credits that was?
24     A.  It wasn't any credit.  It was
25 independent at school.

13 (Pages 49 to 52)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

EXHIBIT 4

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

### 57

1  Q. (BY MS. LEVY) Ms. Gomez, the electronic
2  payment that you received from your family each week,
3  do you know who specifically sent that to your bank
4  account?
5  A. It was the mother. We have an account,
6  a joint account, so it was her account, but I was --
7  it was my account, but she was the -- how would you
8  say? The first -- it was her account, but I was
9  joining it.
10  Q. Was all of the money in that account for
11  you?
12  A. Yes.
13  Q. Could you access it at any time?
14  A. Only to my account, but also it was her
15  name, but not to her personal, of course.
16  Q. But the account that was set up for you,
17  could you access the money?
18  A. Yes.
19  Q. Do you still have access to that bank
20  account?
21  A. No. I close it.
22  Q. Did you keep any records of those
23  payments that you received from your host family?
24  A. No.
25  Q. Did you keep any records of the hours

### 58

1  that you worked with the host family?
2  A. No.
3  Q. Ms. Gomez, do you believe your host
4  family owes you money?
5  A. Officially, they don't because they pay
6  me what it was stipulated. Morally, yes.
7  Q. And why is that?
8  A. Because I was working a lot. And, well,
9  I never refused anything they asked me. I was very
10  open and flexible.
11  Q. Have you calculated how much money you
12  believe you're owed?
13  MR. LIBLING: Objection to form.
14  A. I don't understand the question.
15  Q. (BY MS. LEVY) Have you ever calculated,
16  come up with a certain amount that you believe you are
17  owed?
18  A. No.
19  Q. Do you believe InterExchange owes you
20  money?
21  MR. LIBLING: Objection to form.
22  A. No, they don't owe me any money.
23  Q. (BY MS. LEVY) Did you make any --
24  besides the complaints and the concerns that we
25  already talked about, that you made to your host

### 59

1  family, did you make any other complaints or concerns
2  to your host family?
3  A. Complaints? What do you mean by
4  complaints? If I told them that I wasn't happy with
5  the situation?
6  Q. Yes. That would be a type of complaint.
7  Did you bring up any other -- did you have any other
8  conversations with your host family about concerns
9  other than the ones we already talked about?
10  A. I don't remember. I mean, I do complain
11  sometimes about it, but I don't remember exactly. I
12  did complain about paying the taxes, the amount of the
13  taxes. I thought it was expensive for what I was
14  making. And it was my responsibility to pay for that.
15  I don't remember exactly what complaints.
16  Q. Did you make any complaints or have any
17  concerns that you told to InterExchange while you were
18  an au pair?
19  A. No.
20  Q. Did you make any complaints or tell any
21  concerns to any United States government agency about
22  your experience as an au pair?
23  A. No.
24  MS. LEVY: Can we take just a
25  five-minute break and let me see if I have any more

### 60

1  questions? But I may be finished. Right now it is
2  12:53 your time. Let's go back on the record at
3  12:58. Okay. We're going to take a five-minute
4  break.
5  THE DEPONENT: Okay.
6  (Recess taken, 10:53 a.m. to 10:58a.m.)
7  Q. (BY MS. LEVY) Ms. Gomez, can you hear me
8  again?
9  A. Yes, I can hear you.
10  Q. Okay. All right. I have just a few
11  more questions to follow up on what we already talked
12  about today.
13  A. Okay.
14  Q. You mentioned that you learned of the
15  lawsuit against InterExchange on Facebook. Can you
16  tell me a little more about that?
17  A. I just saw the post and I click and I
18  read a little bit and I decide to join.
19  Q. Do you remember what the post was?
20  A. No, I don't remember exactly.
21  Q. Do you remember who put the post on
22  Facebook?
23  A. I don't remember exactly.
24  Q. Do you remember if it was another au
25  pair that put the post on Facebook?

15 (Pages 57 to 60)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

EXHIBIT 4

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

Page 65

1  really appreciate your time. Joshua, do you have any
2  questions?
3          MR. LIBLING: Just very, very quickly.
4              EXAMINATION
5  BY MR. LIBLING:
6      Q.  Was the $25 a week enough to cover your
7  weekly food expenses?
8      A.  No.
9      Q.  And did your host family ask you to
10 paint their property?
11     A.  To pay the what?
12     Q.  To paint their basement in the house you
13 were living in.
14     A.  Yes. They asked me.
15         MR. LIBLING: No further questions.
16 Thank you.
17             EXAMINATION
18 BY MS. LEVY:
19     Q.  Ms. Gomez, just a few more questions.
20 Did you ever ask your host family for more than the
21 $25 a week?
22     A.  No. I didn't ask for the 25 either.
23 They offer me that.
24     Q.  And when they asked you to do the
25 painting in the house, did you say no?

---

Page 66

1      A.  No. I say yes.
2          MS. LEVY: All right. No further
3  questions from me. Joshua, do you have any more?
4          MR. LIBLING: No. We're done.
5          MS. LEVY: Okay. Thank you very much,
6  Ms. Gomez.
7          THE DEPONENT: Thank you.
8          MS. LEVY: That's it, Josh.
9          MR. LIBLING: Thanks, Ms. Gomez. We
10 really appreciate your time.
11         WHEREUPON, the within proceedings were
12 concluded at the approximate hour of 11:11 a.m. on the
13 26th day of March, 2018.

---

Page 67

I, NAYARA CALVO GOMEZ, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached   ( ) Yes   ( ) No

_____
NAYARA CALVO GOMEZ

The signature above of NAYARA CALVO GOMEZ was subscribed and sworn to or affirmed before me in the county of _____, state of _____, this _____ day of _____, 2018.

_____
Notary Public
My Commission expires:

Johana Paola Beltran, 3/26/18 (tds)

---

Page 68

REPORTER'S CERTIFICATE
STATE OF COLORADO    )
                     ) ss.
CITY AND COUNTY OF DENVER )

I, TRACY R. STONEHOCKER, Certified Realtime Reporter, Registered Professional Reporter and Notary Public ID 19924009337, State of Colorado, do hereby certify that previous to the commencement of the examination, the said NAYARA CALVO GOMEZ was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.
       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.
       IN WITNESS WHEREOF, I have affixed my signature this 29th day of March, 2018.

       My commission expires June 12, 2020.

__X__  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

---

17 (Pages 65 to 68)