**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

        Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

        Defendants.

---

**DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY D/B/A AU PAIR IN AMERICA'S MOTION TO DECERTIFY THE COLLECTIVE ACTION**

---

Defendant, American Institute for Foreign Study, d/b/a Au Pair in America ("APIA"), respectfully submits its Motion to Decertify the Collective Action (hereinafter "Motion"). APIA adopts and incorporates, as if fully set forth herein, (i) Defendants' Brief in Opposition to Plaintiffs' Motion for Rule 23 Class Certification ("Joint Brief") (Dkt. # 603) and (ii) APIA's Supplemental Opposition to Motion for Class Certification (Dkt. # 605.)

## I. CERTIFICATE OF CONFERRAL

Pursuant to D.C.COLO.LCivR 7.1(a), the undersigned certifies that he conferred with counsel for Plaintiffs and that they oppose the relief requested herein.

## II. INTRODUCTION

As liability necessarily depends on the varied circumstances encountered by each au pair in her specific residence and actual hours of work, Plaintiffs cannot meet their burden of proof because they cannot demonstrate that au pairs are similarly situated.

Accordingly, APIA respectfully requests that this Court decertify this matter as an FLSA collective action, dismiss the improperly joined FLSA Plaintiffs' claims without prejudice, and sever any remaining named-Plaintiffs' claims.

### III.  ARGUMENT

**A.   LEGAL STANDARD:** In *Thiessen v. Gen. Elec. Capital Corp.*, the Tenth Circuit approved a two-step process for determining whether putative FLSA class members are similarly situated.  267 F.3d 1095, 1105 (10th Cir. 2001), *cert. denied* 536 U.S. 934 (2002).  Initially, the court must determine whether the plaintiff has asserted "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* at 1102. After discovery concludes, the court uses a stricter standard to determine whether plaintiffs are, in fact, similarly situated.  *Thiessen*, 267 F.3d at 1103. These factors include: the disparate factual and employment settings of the individual plaintiffs; the various defenses available to defendant that appear to be individual to each plaintiff; as well as fairness and procedural considerations. *Id.* at 1103 (citing *Vaszlavik v. Storage Tech. Corp.,* 175 F.R.D. 672, 678 (D. Colo. 1997)).

Plaintiffs therefore must produce evidence that they are similarly situated in an amount sufficient to demonstrate "***liability on a class-wide basis***."  *Thiessen*, 267 F.3d at 1103 (emphasis added).  As explained below, the totality of evidence adduced through discovery demonstrates dissimilarity in the terms and conditions that each Plaintiff encountered in her specific and unique host residence. For these reasons, this case is inappropriate for collective action treatment.

2

## B. THE OPT-IN PLAINTIFFS ARE NOT SIMILARLY SITUATED

### 1. Opt-in Plaintiffs Had Disparate Terms and Conditions of "Work"

There is no factual dispute that each au pair was matched with a different host family, which paid weekly compensation directly to her. Thus, each au pair had an unrelated "worksite" and each had a unique "employer."[1] As a matter of law, each host family remained the legal "employer-in-fact" because they, *not* APIA, tendered weekly payments to their au pair. It also cannot be disputed that the individual host family, and *not* APIA, independently determined the two most critical "employment" factors associated with liability in any FLSA collective action – actual hours "worked" and actual compensation paid each week. As each host family has sole discretion to determine these critical "employment" factors with their au pair, Plaintiffs cannot demonstrate that each au pair was similarly situated for purposes of liability. For the same reasons, Plaintiffs cannot demonstrate common "employment" conditions subject to APIA control. In each and every case, the host family independently controlled the actual weekly cash payments, the actual level of additional monetary benefits, and the actual hours that the au pair assisted with child care in their residence.[2]

---

[1] As the indisputable employer-in-fact, the host family – not APIA – must maintain any legally-required records concerning hours and compensation. DOL WHD Field Operations Handbook § 30a09.

[2] *See* Ferry Decl. (Dkt. # 605-3), Ex. D, at AIFS0003216 ("family is free to pay anything above stipend amount"); AIFS0003302 ("Any additional payments/bonuses/gifts over the weekly stipend are completely up to you"); AIFS0003465 ("Host families have the option to pay more than the minimum standards but under no circumstance may the host family pay less than the minimum nor may the family have the au pair provide more than 45 hours per week […] of child care services"); AIFS0003172 (vacation beyond two weeks may be agreed upon by host family and au pair); AIFS0003173 (in response to host family

3

There is substantial evidence of "dissimilarity" demonstrating numerous families regularly provided a stipend of more than $195.75 per week and/or paid additional compensation, and many required far fewer than 45 hours of weekly assistance.[3] The most significant of these "dissimilar" factors is program participants retained and routinely exercised discretion on the weekly number of childcare assistance hours. Plaintiffs have conceded 45 hours of weekly assistance was *not* uniformly mandated by APIA, as each host family/au pair pairing retained discretion and controlled the actual hours of service "up to" the DOS-established maximum of 45 weekly hours. (Dkt. # 565, at 33.)

In fact, au pairs who resided with families with school-age children, stay-at-home parents, and/or additional childcare assistance commonly provided far fewer than 45 hours of weekly assistance.[4] Additional critical factors that created "dissimilar" circumstances include the following: relative ages of the children; daily periods when the

---

question about a gift, community counselor suggests a gift "based on [your] individual budget[]").

[3] Ferry Decl. (Dkt. # 605-3), Ex. D, at AIFS0003412 ($220.75 weekly stipend); AIFS0007834 (host parent pays for additional language courses); AIFS0003322 ($200 per month Uber allowance); AIFS0003346 (additional time off/extra paid vacation days); AIFS0003174 ($200 bonus, and $75 in gift cards); AIFS0003493 (cell phone and gift card); AIFS0003284 ($200 birthday present); AIFS0007039 ("won't need as many hours" because child in school); AIFS0008420 (anticipated schedule is 5 hours on Monday through Friday and "as needed" on Saturday; off on Sunday); AIFS0007125 (au pair "will work very few hours"); AIFS0003266 (only works four days per week); AIFS0008444-45 ("does not really need" much childcare assistance and "does not work very many hours…[.]"); AIFS0003284 (au pair typically works 33 hours, 4 days per week). Macri Decl. (Dkt. # 861-1), Ex. B at 120:10-24, 145:5-18, and 149:1-10 (received $200 weekly stipend, $200 cash gift, $100 for gas, a Kindle, a watch, and other items and gift cards).
[4] *See* AIFS0007039 ("won't need as many hours" because child will be in school); AIFS0007789 (anticipated schedule is only 5 hours on Monday and "some hours" on Saturday); AIFS0009841 (fewer than 35 hours per week); AIFS0003266 (only works four days per week); AIFS0003284 (au pair typically works 33 hours, 4 days per week).

au pair was relieved of direct supervision responsibilities (*e.g.*, after transporting children to sports or an activity); whether both parents were employed; whether parent(s) worked from home; and whether any other adult family member resided/regularly visited. These unique circumstances, determined by each au pair's individual residential conditions, require case-by-case analysis and eliminate the possibility of similar situations.

Plaintiffs' contentions regarding the alleged failure to pay overtime, and the alleged inappropriate credits taken by host families for room and board expenses they indisputably paid, suffer from the same deficiencies. Even if one Plaintiff somehow received a weekly amount below a "living wage" (because her host family somehow wrongfully took credit for payment of all her actual living expenses), it would not dictate the same conclusion for all other members of the putative class. For the same reasons, even if one Plaintiff was actually entitled to and did not receive overtime, it is not possible to reach a common conclusion, because actual hours of weekly assistance varied from residence to residence and, thus, from au pair to au pair.

### 2. Individual Liability Determinations Are Inescapable

#### a. Hours and Compensation Vary Plaintiff-by-Plaintiff

Unlike most putative FLSA collective actions, none of the Plaintiffs shared the same "work site," none of the Plaintiffs reported to the same "supervisor," and none of the Plaintiffs provided services according to uniform "shifts" or schedules. Accordingly, Plaintiffs cannot be "similarly situated" and any liability determination requires an individual analysis of each Plaintiff's compensation and hours worked.

It is well settled that, in order to establish liability (not simply damages), Plaintiffs

5

bear the burden of proving: (1) that their total compensation fell below the minimum wage rate for all hours actually worked; and (2) that they actually worked and were not compensated for hours in excess of the threshold for overtime wages. *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 578 (N.D. Cal. 2016), *on reconsideration in part,* 2017 WL 897338 (N.D. Cal. Mar. 7, 2017).

Estimates and/or assumptions about time worked cannot suffice to meet this burden; the FLSA and its regulations mandate a judicial analysis of the actual number of hours worked. *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1313 (10th Cir. 2011); *Rojas v. Westco Framers, LLC*, 2016 WL 8540842, at *3 (D. Colo. July 25, 2016). Contrary to Plaintiffs' contentions, neither the amount of the minimum weekly payment nor the amount of scheduled/permissible weekly work is relevant. *Id.* Specifically, the *Chavez* court held that there is no liability, "if the employee does not actually work the requisite number of hours in a week, regardless of whether the employee is compensated as though he or she did work." 630 F.3d 1300, 1313 (10th Cir. 2011).

Based on evidence gleaned from au pair depositions, the liability factors vary starkly across the putative class. Most significantly, the putative class includes au pairs for whom there can be no liability whatsoever (neither minimum wage nor overtime), regardless of the Court's ruling on appropriate room and board credits. Plaintiff Arias testified she received $195.75 per week and that she provided only 25 hours of assistance per week.[5] Plaintiff Ouwerkerk testified she received $250.00 per week and that she

---

[5] Deposition of Liliam Arias ("Arias Dep."), Movant's App. pp. 7-9 and 11, at 24:13-14, 26:4-16, 28:7-18, 30:20-22; 38:18-19.

provided just 22.5 hours of assistance per week.[6] Plaintiff Fusete testified she received $300 per week and that she provided 40 hours of assistance per week.[7] In each case, the au pair received compensation in excess of the minimum wage – exclusive of any credit for room/board. Accordingly, none "worked" compensable "overtime" and each received compensation in excess of the federal minimum hourly wage as follows: Arias--$7.83 per hour; Ouwerkerk – $11.11 per hour; and Fusete – $7.50 per hour.

Department of State regulations expressly discuss only the provision of a private bedroom. 22 C.F.R. 62.31(e) (6). If the Court does not allow a room credit, and allows only the permissible credit for weekly board ($76.12), then the number of Plaintiffs for whom there is no liability increases significantly. In addition to the three Plaintiffs discussed above, the application of the board credit alone will result in no possible liability for the following Plaintiffs: Mason;[8] Kivdeo;[9] Dion,[10] Hardman;[11] and Gruenwald.[12] Accordingly, under these parameters, there will be no liability for nearly fifty percent (8 of 18) of the au pairs APIA deposed.

---

[6] Deposition of Cara Ouwerkerk ("Ouwerkerk Dep."), Movant's App. pp. 32 and 35, at 42:4-7, 55:12-14.
[7] Deposition of Beatriz Fusete ("Fusete Dep."), Movant's App. p. 59, at 37:21-23, 38:3-6.
[8] Deposition of Robin Mason ("Mason Dep."), Movant's App. pp. 80-81 and 84, at 25:4-22, 28:17-29:12, 38:5-11.  ($200 per week for 34 weekly hours with her first family and $195.75 per week for 25 weekly hours with second family).
[9] Deposition of Jessica Kivedo ("Kivedo Dep."), Movant's App. pp. 103 and 109, at 29:4-6, 50:10-14.  ($197 per week for 35 weekly hours).
[10] Deposition of Erika Dion ("Dion Dep."), Movant's App. p. 139, at 39:8-17.  ($250 per week for between 30 and 35 weekly hours).
[11] Deposition of Amanda Hardman ("Hardman Dep."), Movant's App. pp. 169 and 174, at 60:2-14, 80:11-17.  ($200 per week for between 25 and 30 weekly hours)
[12] Deposition of Lena Gruenwald ("Gruenwald Dep."), Movant's App. p. 219, at 43:10-15. ($195.75 weekly for between 30 and 35 weekly hours).

As each au pair had a different host family with specific needs, and unique methods of compensation, then any liability determination unavoidably requires an individual analysis of the actual weekly hours each assisted with childcare. The FLSA does not provide for a permissible substitute and, thus, class-wide analysis of liability is not possible in this case. It is also significant to acknowledge that the overwhelming majority of evidence of "hours worked" derived from nothing more than Putative Plaintiffs' estimations, vague memories, and highly unreliable survey results.[13]

If au pairs are "employees," then it is inarguable that they would be classified as domestic workers whose actual time worked would be extremely difficult to calculate. The cultural exchange program is expressly intended to integrate the au pair in the daily life of an American family, which includes significant leisure activities. Unlike a worker in a non-residential facility, the au pair does not "punch-out" before consuming a snack, watching a favorite TV show, or participating in family game night. Thus, myriad factors determine and affect how much time an individual au pair has "worked." Additional factors include the amount of sleep/personal time and whether the au pair was required to be "on call" while children engaged in supervised activities. Several au pairs testified that they would not be performing "work" if, for example, they were reading while a parent played with the children in the same room.[14]  One au pair testified that she added five hours to the average "hours worked" in her survey response because she changed her mind about

---

[13] *See*, *e.g.*, Kivedo Dep., Movant's App. pp. 110 and 114, at 56:15-22; 72:2-4; Dion Dep., Movant's App. p. 139, at 40:3-13.
[14] Dion Dep., Movant's App. p. 139, at 40:3-13; Kivedo Dep., Movant's App. p. 110, at 56:15-22.

what constituted "work" during the intervening two months.[15]

Several au pairs estimated "hours worked" solely on the general family schedule -- i.e., when the children were in school and when the parents returned home from work. While one au pair admitted that the schedule changed "from week to week," the weekly estimated hours remained the same.[16]  It cannot be denied that family schedules change regularly—parents return early from work, parents lose or change their job, grandparents visit.  In each such instance, the au pair necessarily assisted for fewer hours and her typical "schedule" varied.  As one au pair admitted, there was nothing that documented a reduction of hours when her schedule changed and she did not actually provide assistance during one of her scheduled hours.[17] For all of these reasons, there is no reliable common proof of the hours each au pair actually "worked."

Deposition testimony and ancillary evidence also establish inconsistencies in the amount each host family paid their au pair.  The au pairs testified they were paid varying stipend amounts, ranging from $170 per week to $250 per week.[18] Moreover, of the 181 APIA California host families who responded to Plaintiffs' survey, 70.72% recalled providing a weekly stipend above $195.75, while 13.26% recalled providing a weekly

---

[15] Deposition of Vicki Trudel ("Trudel Dep."), Movant's App. p. 255, at 22:8-22.
[16] Deposition of Eileen Geoffroy ("Geoffroy Dep."), Movant's App. p. 296, at 40:13-14.
[17] Geoffroy Dep., Movant's App. p. 295, at 36:11-15
[18] Deposition of Carolina Ortega ("Ortega Dep."), Movant's App. p. 327, at 68:19-21; Deposition of Alina Guzema ("Guzema Dep."), Movant's App. p. 350, at 22:7-13; Deposition of Grace Probyn ("Probyn Dep."), Movant's App. p. 384, at 37:9-21; Deposition of Liliam Arias ("Arias Dep."), Movant's App. p. 408, at 24:13-14; Mason Dep., Movant's App. p. 84, at 38:5-10; Kivedo Dep., Movant's App. p. 103, at 28:14-15; Trudel Dep., Movant's App. p. 259, at 38:9-12; Ouwerkerk Dep., Movant's App. p. 32, at 42:6-7; and Dion Dep., Movant's App. p. 135, at 23:10-14.

stipend above $200. Macri Decl. at ¶ 6. There is also substantial evidence that host families provided au pairs with extra money for performing certain chores, even when performed simultaneously with childcare. This evidence of additional compensation includes the following: $100 when mother was out of town; $15 per hour for performing extra chores; $100 weekly for household chores; extra pay for weekend babysitting; extra pay for additional hours; and between $50 and $100 weekly for performing additional tasks.[19] Finally, many au pairs admitted receipt of various other monetary benefits, including the following: a free cell phone; a fully-paid phone plan; gift cards; cash gifts; personal use of the family automobile with fully paid gas; payment for personal travel expenses; and personal use of the host family's internet.[20]

These extra payments varied dramatically from au pair-to-au pair and preclude a finding of similarly situated compensation circumstances. As the total compensation each au pair received in any given week is dramatically dissimilar, proceeding as a collective action is not appropriate.

---

[19] Deposition of Ephiphanie Gomes ("Gomes Dep."), Movant's App. p. 437, at 58:6-10; Deposition of Lisley Diaz ("Diaz Dep."), Movant's App. p. 484, at 49:4-18; Fusete Dep., Movant's App. p. 293, at 21:5-25; Deposition of Maidelyn Barrera ("Barrera Dep."), Movant's App. p. 515, at 41:6-12; Probyn Dep., Movant's App. p. 385, at 37:7-11; Ouwerkerk Dep., Movant's App. pp. 32-33, at 45:18-46:11; Gruenwald Dep., Movant's App. pp. 219-20, at 45:21-46:7.

[20] Fusete Dep., Movant's App. p. 55, at 22:16-19, 23:17-24; Geoffroy Dep., Movant's App. p. 293, at 26:12-18; 27:6-8; Deposition of Nora Raak ("Raak Dep."), Movant's App. p. 546, at 66:1-23; Mason Dep., Movant's App. p. 84, at 39:9-40:9; Trudel Dep., Movant's App. p. 264, at 58:14-19; Dion Dep., Movant's App. p. 136, at 26:12-14; Deposition of Santos Daniela Lemus Trigueros ("Trigueros Dep."), Movant's App. p. 590, at 66:21-68:15; Deposition of Lisley Georgia ("Georgia Dep."), Movant's App. p. 622, at 55:14-56:7.

### b. Joint Employment Analysis Varies Plaintiff by Plaintiff.

Plaintiffs have offered no proof that, subsequent to placement, APIA exercised control over any critical factor in the host family-au pair relationship. Instead, each host family retained independent discretion over the critical aspects (hours, compensation, and payment) of any "employment" relationship.

Joint employment liability requires an individual evaluation of the circumstances "relevant to a particular plaintiff," rather than an aggregated analysis of all such evidence involving all plaintiffs' interactions with the putative joint employer. *Sanchez v. Simply Right, Inc.*, 2017 WL 2222601, at *6 (D. Colo. May 22, 2017). In *Sanchez*, the court noted that most of the evidence relied upon by plaintiffs had "no relevance to any of the other plaintiffs" because the cited events "did not happen to them." 2017 WL 2222601, at 6. For the same reasons, APIA cannot be a joint employer of any specific Plaintiff, unless an individualized assessment of Plaintiff-specific evidence demonstrates otherwise.

Plaintiffs' testified that, subsequent to host family placement, the level of involvement with APIA's community counselors varied on an au pair-by-au pair basis. With respect to the frequency of contact with community counselors, Plaintiffs testified as follows: contacts and communications occurred "[n]ot very frequently" (Gruenwald Dep., Movant's App. p. 221, at 51:14-22); contact occurred approximately four times during the placement year (Kivedo Dep., Movant's App. p. 105, at 37:23-25); and, in only one case, contact occurred regularly and included a period of residence with the community counselor. (Gomes Dep., Movant's App. pp. 429 and 438-39, at 28:15-29:10, 65:2-66:8.)

Plaintiffs' testimony regarding whether APIA was involved when establishing the

11

amount of the weekly stipend also varied on a plaintiff-by-plaintiff basis. Some Plaintiffs testified that APIA informed them that a host family could not pay more than the minimum weekly stipend.[21] Others acknowledged that a host family could have paid more than the minimum weekly stipend.[22] Another admitted to individual negotiation and that APIA was not involved in the process.[23]

For all of these reasons, APIA's post-placement involvement is dissimilar from au pair-to-au pair, and joint employment cannot be determined on a collective basis.

### C. ASSUMING *ARGUENDO* THAT DISPARATE CIRCUMSTANCES DID NOT IMPACT LIABILITY ON A PLAINTIFF-BY-PLAINTIFF BASIS, THERE IS NO FEASIBLE COLLECTIVE TRIAL PLAN BECAUSE OF DAMAGE VARIANCES

As Plaintiffs have not provided, and cannot provide, a feasible and reliable method for computing damages, which would account for all relevant differences in weekly hours of assistance between putative class members, this case cannot proceed as a collective action. APIA should be permitted to defend its interests by showing that it did not jointly employ any au pair, and that host families paid au pairs at or above the federal minimum wage. When viewed collectively, significant fairness and procedural considerations undermine the advantages of proceeding as a collective action and require decertification of the putative class.

Courts consider whether the benefits of collective action are outweighed by any unfairness or case management difficulties imposed by a collective action upon either

---

[21] Gruenwald Dep., Movant's App. p. 222, at 55:9-56:21; Trigueros Dep., Movant's App. p. 587, at 56:6-10.
[22] Kivedo Dep., Movant's App. p. 104, at 30:10-31:1.
[23] Mason Survey, Ex. 4 to Dep. Question 29, Movant's App. p. 641-47. (Mason Dep. 14:11-13, Movant's App. p. 78.)

plaintiffs or defendants. *See, e.g., Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873, at *9 (W.D. Pa. Dec. 20, 2011). See, also, Briggins v. Elwood TRI, Inc., 882 F. Supp. 2d 1256, 1279 (N.D. Ala. 2012) ("Fairness and procedural considerations do not focus only on the benefits to the plaintiffs, however.") As such, courts must balance the following factors: reduced litigation costs to individual plaintiffs; the potential effects that final certification may have on the fairness of the adjudication; and concerns of manageability and judicial efficiency. *Camesi*, 2011 WL 6372873, at *9.

When applying this balance to the instant case, any benefit derived from a collective action is virtually eliminated by the necessity for individualized assessment of the two most critical FLSA trial issues—liability and damages. Specifically, it is an inescapable reality that tens of thousands of different "employers in fact" independently controlled actual hours "worked" and actual compensation received. While the DOS regulations enunciate parameters for the au pair program, there is no evidence of commonality among the specific terms and conditions faced by au pairs after placement in distinct residences. Unlike any other certified collective action under the FLSA, APIA does not pay the au pairs, there are no common work site(s), there are no common managers/supervisors who assign and direct daily tasks, and there are no common work schedules. For all of these reasons, there are no common working conditions and this action cannot be tried collectively by representative testimony.

FLSA claims are determined by actual hours worked, not upon scheduled or even agreed-upon hours of work. *Chavez*, 630 F.3d at 1313. Each of the deposed opt-in Plaintiffs provided evidence of disparity in weekly hours. Each acknowledged that her

13

actual hours were contingent upon circumstances that were both varied and unique to the host family's specific schedules and family needs.

Courts have not hesitated to decertify collective actions for the sole reason that plaintiffs have not advanced a viable trial plan. Issues of disparate weekly work hours and compensation cannot be ignored or simply be put off in the hope that the parties may later be able to devise some method of trying the case on a representative basis. *See e.g., Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013); *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006) (holding no collective treatment because the "need for individualized determinations to resolve the claims of each plaintiff" would create an unmanageable trial).

In *Espenscheid*, the Seventh Circuit affirmed decertification of an FLSA collective action because determining damages would have "require[d] 2341 separate evidentiary hearings." 705 F.3d at 776. The court concluded that determining damages required individualized inquiries because the employees varied in how many hours they worked and how they recorded time. *Id.* After considering deposition testimony, the court held that the matter could not be tried with representative evidence because "some, maybe many, of the [employees] may not work more than 40 hours a week and may even work fewer hours; others may work more than 40 hours a week." *Id.* at 773. Such variances rendered damage calculations incapable of class treatment. *Id.*

In the instant case, each Plaintiff had a different employer in fact, each provided different number of hours of weekly childcare assistance, and each varied in how/whether they recorded actual hours of family assistance. With respect to weekly hours, there is

absolutely no common thread of facts—several Plaintiffs testified they provided 25 or fewer hours of weekly assistance; others testified that they provided fewer than 30 hours per week;[24] some others that they provided fewer than 35 hours per week;[25] several that they provided approximately 40 hours per week;[26] and a few testified that they provided more than 40 hours of weekly assistance.[27] It also is essential to note that these amounts were simply guesses by Plaintiffs, derived from their general schedule.[28] As there is neither representative evidence nor any ability to present common facts about the actual number of weekly childcare hours, an individualized assessment of damages is necessary and decertification is proper.

## IV. CONCLUSION

Plaintiffs have not met – and cannot meet – their burden of proof for an FLSA collective action. Any efficiencies associated with a collective action are overshadowed by the due process and manageability concerns arising from the highly dissimilar evidence associated with Plaintiffs' liability contentions and damages claims. For these reasons, APIA respectfully requests an Order (1) decertifying this matter as a collective action under the FLSA, (2) dismissing the improperly joined FLSA Plaintiffs' claims without prejudice, and (3) severing any remaining named Plaintiffs' claims.

---

[24] Arias Dep., Movant's App. pp. 408-10 and 412, at 24:13-14, 26:4-16, 28:7-18, 30:20-22; 38:18-19; Ouwerkerk Dep., Movant's App. pp. 32 and 35, at 42:4-7, 55:12-14.
[25] Mason Dep., Movant's App. pp. 80-81 and 84, at 25:4-22, 28:17-29:12, 38:5-11.
[26] Fusete Dep., Movant's App. p. 59, at 37:21-23, 38:3-6; Dion Dep., Movant's App. p. 139, at 39:8-17.
[27] Trigueros Dep., Movant's App. p. 586, at 53:15-20.
[28] Kivedo Dep., Movant's App. p. 114, at 72:2-4; Geoffroy Dep., Movant's App. p. 296, at 38:16-22.

Respectfully submitted this 9th day of May, 2018.

> OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
>
> <u>/s/ Stephen J. Macri</u>
> Stephen J. Macri
> Robert M. Tucker
> 1745 Broadway, 22nd Floor
> New York, NY 10019
> (212) 492-2071
> Email:  stephen.macri@ogletree.com
>              robert.tucker@ogletree.com
>
> ***Attorneys for American Institute for Foreign Study d/b/a Au Pair in America***

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2018, I electronically filed the foregoing **DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY D/B/A AU PAIR IN AMERICA'S MOTION TO DECERTIFY THE COLLECTIVE ACTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

| | |
|---|---|
| **Adam A. Hubbard** | aahubbard@hollandhart.com |
| **Alexander Neville Hood** | alex@towardsjustice.org |
| **Alyssa Lauren Levy** | alevy@shermanhoward.com |
| **Bogdan Enica** | bogdane@hotmail.com |
| **Brett Michelle Mull** | mull@wtotrial.com |
| **Brian Alan Birenbach** | brian@rietzlawfirm.com |
| **Brooke A. Colaizzi** | BColaizzi@shermanhoward.com |
| **Byron Pacheco** | bpacheco@bsfllp.com |
| **Chanda Marie Feldkamp** | cfeldkamp@kellywalkerlaw.com |
| **David Meschke** | dmeschke@bhfs.com |
| **Dawn Smalls** | DSmalls@BSFLLP.com |
| **Diane Rebecca Hazel** | dhazel@lrrc.com |
| **Eric Jonathan Stock** | estock@gibsondunn.com |
| **Harvey J. Wolkoff** | harvey.wolkoff@ropesgray.com |
| **Heather Fox Vickles** | hvickles@shermanhoward.com |
| **James Edward Hartley** | jhartley@hollandhart.com |
| **James Michael Lyons** | jlyons@lrrc.com |
| **Jennifer Arnett Roehrich** | jarnett-roehrich@grsm.com |

| | |
|---|---|
| **Jessica Lynn Fuller** | jfuller@lrrc.com |
| **Joan A. Lukey** | joan.lukey@choate.com |
| **Jonathan S. Bender** | jsbender@hollandhart.com |
| **Joseph B. Cartafalsa** | joseph.cartafalsa@ogletreedeakins.com |
| **Joseph H. Hunt** | jhunt@shermanhoward.com |
| **Joshua James Libling** | jlibling@bsfllp.com |
| **Juan Pablo Valdivieso** | jvaldivieso@bsfllp.com |
| **Justin J. Wolosz** | jwolosz@choate.com |
| **Kathleen E. Craigmile** | kcraigmile@nixonshefrin.com |
| **Kathryn A. Reilly** | reilly@wtotrial.com |
| **Kevin Patrick O'Keefe** | kokeefe@choate.com |
| **Lawrence Daniel Stone** | lstone@nixonshefrin.com |
| **Lyndsey Marie Kruzer** | lkruzer@choate.com |
| **Martha Louise Fitzgerald** | mfitzgerald@bhfs.com |
| **Martin Jose Estevao** | mestevao@armstrongteasdale.com |
| **Matthew Lane Schwartz** | mlschwartz@bsfllp.com |
| **Meshach Yustine Rhoades** | mrhoades@armstrongteasdale.com |
| **Michael T. Gass** | mgass@choate.com |
| **Natalie Elizabeth West** | west@wtotrial.com |
| **Nathan Andrew Huey** | nhuey@gordonrees.com |
| **Peggy E. Kozal** | pkozal@gordonrees.com |
| **Peter Murray Skinner** | pskinner@bsfllp.com |

| | |
|---|---|
| **Randall Wade Jackson** | **rjackson@bsfllp.com** |
| **Raymond Myles Deeny** | **rdeeny@shermanhoward.com** |
| **Robert M. Buchanan , Jr** | **rbuchanan@choate.com** |
| **Sabria Alexandria McElroy** | **smcelroy@bsfllp.com** |
| **Samuel Newland Rudman** | **srudman@choate.com** |
| **Sean Phillips Rodriguez** | **srodriguez@bsfllp.com** |
| **Sigrid Stone McCawley** | **smccawley@bsfllp.com** |
| **Susan M. Schaecher** | **sschaecher@fisherphillips.com** |
| **Susan Penniman Klopman** | **sklopman@hklawllc.com** |
| **Thomas Baker Quinn** | **tquinn@gordonrees.com** |
| **Vance Orlando Knapp** | **vknapp@armstrongteasdale.com** |
| **William James Kelly, III** | **wkelly@kellywalkerlaw.com** |

/s/ Stephen J. Macri
Stephen J. Macri