IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN; et al.

      Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.

      Defendants.

**GO AU PAIR'S MOTION TO DECERTIFY PLAINTIFFS' FLSA COLLECTIVE ACTION**

Defendants American Cultural Exchange, LLC d/b/a Go Au Pair, and Go Au Pair Operations LLC (together, "Go Au Pair"), submit this Motion to Decertify Plaintiffs' FLSA Collective Action ("Motion"). Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel certifies that they conferred with counsel for all Plaintiffs. Plaintiffs oppose this Motion.

## INTRODUCTION

In conditionally certifying this collective action, the Court recognized that further "discovery might bolster existing evidence of material differences between the Plaintiffs and putative class members." (Sec. Am. Order at 9, ECF 569.) Discovery has confirmed those differences, thus showing that Plaintiffs are not "similarly situated" under the FLSA. The 159 opt-in plaintiffs asserting claims against Go Au Pair were employed by roughly 244 host families in 35 states. They worked varying hours for varying amounts of pay, all set by different employers (i.e., their host families). In fact, the opt-in plaintiffs' contracts with their host families reflect over 100 different hours-and-stipend combinations and show that over 11% of opt-ins agreed to a weekly stipend of more than $200 and about

37% agreed to an anticipated schedule of no more than 40 hours per week. They had unique working experiences, participated in the Au Pair Program[1] at different times over a nine-year span, and signed different agreements with Go Au Pair and their host families.

Given these fundamental differences, Plaintiffs are not "similarly situated." The evidence shows numerous, legally significant disparities in their work experiences, which impact any determination of Go Au Pair's liability for alleged FLSA violations, as well as any calculation of Plaintiffs' damages. Their claims are not subject to classwide resolution but, instead, require hundreds of personalized inquiries and evidentiary showings that will overwhelm trial on the merits. Plaintiffs' FLSA claims should therefore be decertified.

## **LEGAL STANDARD**

The FLSA authorizes collective actions only when the complaining employees are "similarly situated" and have timely opted-in to the lawsuit. 29 U.S.C. § 216(b). While courts liberally grant "conditional" certification of such actions to facilitate early notice to potential class members, the Court must re-evaluate the propriety of a collective action under a stricter standard after the close of discovery. *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102-03 (10th Cir. 2001). At this second stage, Plaintiffs must prove they are in fact "similarly situated" to other class members by a preponderance of the evidence. *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3d Cir. 2012).

Because the Court's second-stage determination requires examination of the factual record, Plaintiffs cannot satisfy their burden by merely alleging they are subject to a common policy in violation of the FLSA. Instead, they must show they are similarly

---

[1] The "Au Pair Program" refers to the United States Department of State ("DOS") au pair exchange-visitor program.

2

situated in that their liability and damages claims can be tried on a classwide basis. *See Zavala*, 691 F.3d at 538 (decertification warranted when alleged common scheme was "of minimal utility in streamlining resolution" of case and "[l]iability and damages still need[ed] to be individually proven").[2] Three factors inform this inquiry: (1) the disparate factual and employment settings of each plaintiff; (2) the extent to which the defendant's defenses are individual to each claimant; and (3) fairness and procedural considerations inherent in trying a collective action. *Theissen*, 267 F.3d at 1102-03. Claimants are not "similarly situated," and thus decertification is warranted, when the evidence reveals material and "legally significant differences" among opt-ins that effectively preclude classwide adjudication of liability and damages. *Mathis*, 2014 WL 4428171, at *2.[3]

## ARGUMENT

### I. THE AU PAIRS' DISPARATE FACTUAL AND EMPLOYMENT SETTINGS SHOW THEY ARE NOT SIMILARLY SITUATED

#### A. The Evidence Shows that Go Au Pair Did Not Implement a Single, Common Policy that Establishes a Violation of the FLSA

Plaintiffs maintain they are "similarly situated" because Go Au Pair allegedly required that all au pairs be paid $195.75 per week for up to 45 hours of work. (Pls.' Mot. for Cond. Cert. 8, ECF 330.) They claim that because of this "policy," they were paid less

---

[2] *See also Mathis v. Darden Rests.*, No. 12-61742-CIV, 2104 WL 4428171, at *2 (S.D. Fla. Sept. 1, 2014) ("[T]he Court must determine whether, based on the particular facts . . . , the similarities among the putative class members are sufficient so that it is more practical, efficient, and fair to proceed as a collective action . . . ."); *Pfohl v. Farmers Ins. Grp.*, No. 03-cv-3080 DT (RCX), 2004 WL 554834, at *9 (C.D. Cal. Mar. 1, 2004) ("[W]hile a policy or plan may be relevant to the inquiry of certification, it cannot be the sole factor in light of the other issues [requiring individualized inquiry] under the FLSA.").

[3] *See also, e.g., Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-76 (7th Cir. 2013); *Rindfleisch v. Gentiva Health Servs.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014); *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053, 1067 (D. Colo. 1996).

than minimum wage (excluding a credit for room and board) and did not receive overtime pay for hours worked in excess of 40 per week. (*Id.* 2.) But this "policy" is a fiction.

The uncontroverted evidence shows that Go Au Pair does not have, and did not implement, any policy "setting" au pairs' stipends or hours, as each au pair's host family determines the amount of the stipend and how many hours the au pair actually works. (Go Au Pair's Mot. for Summ. J. ("GAP MSJ") 3-4, 13-15, ECF 884.) Pursuant to the DOS regulations and its specific guidance on the required minimum stipend amount, Go Au Pair repeatedly advised host families they must pay a <u>minimum</u> weekly stipend of $195.75 and that au pairs may work a <u>maximum</u> of 45 hours per week. (*Id.*; Defs.' MSJ App'x 738-39 (Kapler Dec.), ECF 861-10.) That is, Go Au Pair's only "policy" was to inform host families of the DOS-directed minimum and maximum parameters for au pairs' stipends and hours. That practice does not on its face show that any au pair's stipend violated the FLSA, as there are various stipend-and-hours combinations host family could (and did) choose (and to which au pairs have agreed) that produce an hourly rate consistent with the FLSA, even under Plaintiffs' incorrect view of the law.[4] Thus, Plaintiffs cannot show they are "similarly situated" based on Go Au Pair's implementation of a "single, FLSA-violating policy," as no such policy exists. *See Frye v. Baptist Mem'l Hosp.*, 495 F. App'x 669, 673 (6th Cir. 2012) (policy that did not on its face violate the FLSA did not establish common theory of violation that rendered plaintiffs "similarly situated").

---

[4] Even if the cost of room and board could not lawfully be counted as compensation (it can), the available evidence still indicates that several opt-ins cannot prove an FLSA violation. (*See, e.g.*, Ex. A, Pillay Written Agmt. (agreement to work 25 hours per week for stipend of $195.75, or $7.83 per hour); Ex. B, Coehlo Written Agmt. (agreement to work 23 hours per week for stipend of $200, or $8.70 per hour); Ex. C, Chiper Written Agmt. (agreement to work 23.5 hours per week for stipend of $200, or $8.51 per hour).)

4

### B. The Evidence Shows that Plaintiffs' Work Experiences Differed in Legally Significant Ways

To prove their FLSA claims, each opt-in Plaintiff must show, at a minimum, that:

- Go Au Pair is their joint employer (it is not);
- They each made below federal minimum wage, which requires converting their actual weekly stipend into an hourly rate based on the number of hours each Plaintiff actually worked per week; and
- They are entitled to overtime pay, which requires evidence showing that each Plaintiff actually worked over 40 hours in a week.

The available evidence reveals material factual differences among the Plaintiffs' employment settings that preclude proving these claims with classwide evidence.

#### 1. Plaintiffs worked for roughly 244 different employers

Plaintiffs worked in disparate employment settings for roughly 244 different host families from 35 states over a span of nine years. (Ex. D, Kapler Dec. ¶ 4.) Plaintiffs do not claim Go Au Pair was their direct employer; in fact, they admit they were interviewed for a position, hired, and employed by their individual host families. (GAP MSJ 13-15.[5]) They also admit each host family decided what specific tasks they performed and under what conditions. (*Id.* 15-16.[6]) Some host families even gave au pairs family-specific training manuals that described in detail the au pair's duties and the family's expectations. (Ex. E, Tuk Dep. 70:3-19; Ex. F, Au Pair Handbook; *cf.* Ex. G, host family email.) Each Plaintiff was thus subject to unique polices set by different decision makers. Employees are not similarly situated in such circumstances. *See Zavala*, 691 F.3d at 538 (affirming

---

[5] (*See also, e.g.*, Ex. H, Xueting Dep. 42:19-44:6, 46:9-21; Ex. E, Tuk Dep. 50:8-18, 53:13-19,115:20-117:17; Ex. I, Balta Dep. 47:19-48:25.)

[6] (*See also, e.g.*, Ex. E, Tuk Dep. 123:14-124:7; Ex. M, Vilain Dep. 134:23-135:24; Ex. Q, Myshchenko Dep. 84:17-85:6.)

decertification when plaintiffs, who claimed defendant was their joint employer, worked in 180 different locales in 33 states for 70 different contractors); *Mathis*, 2014 WL 4428171, at *4 (plaintiffs not similarly situated when they "worked across numerous locations, experienced varying policies and practices, and engaged in disparate working conduct").

### 2. Plaintiffs worked varying hours set by different employers

There is no dispute that each individual host family determines the actual number of hours their au pair will work on a weekly basis. (GAP MSJ 3-4, 13-15; Go Au Pair's Resp. to Pls.' Mot. for Partial Summ. J. ("GAP MSJ Resp.") 14, ECF 933.) That is, each Plaintiff's hours were set by a different employer, and those hours varied according to the host families' unique schedules and needs. Plaintiffs report working less than, more than, and exactly 45 hours per week.[7] Some opt-ins appear to have participated in the DOS-defined EduCare program (Ex. D, Kapler Dec. ¶ 8), which imposes a 30-hour per week limit on participating au pairs' hours, 22 C.F.R. § 62.31(j)(2). And some opt-ins admit they did not work more than 40 hours per week.[8] (*See* Ex. K, Zhang Dep. 77:23-78:1 (40 hours per week on average); Ex. N, Meyer Dec. ¶ 5 (identifying opt-ins who reported working 40 hours or less per week in response to discovery).) This alone shows Plaintiffs are not similarly situated. *See Rindfleisch*, 22 F. Supp. 3d at 1303 (plaintiffs not similarly situated when some opt-ins "did not actually work overtime hours").

---

[7] (*See* Ex. J, Zuleta Dep. 66:23-67:1 (30, 35 hours per week); Ex. K, Zhang Dep. 77:23-78:1 (40 hours per week); Ex. L, Cardozo Dep. 111:15-18 (45 hours per week); Ex. M, Vilain Dep. 78:19-79:3 (85 hours per week).)

[8] Analysis of Plaintiffs' agreements with their host families shows that opt-in au pairs were scheduled to work 40 hours or less per week in over one-third of placements involving the opt-in Plaintiffs. (Ex. D, Kapler Dec. ¶ 7.) Further, only about 39% of opt-ins reported working over 40 hours per week in response to discovery. (*Id.* ¶ 9; *see also* Ex. P, Stipulation on Opt-In Discovery.)

Moreover, in addition to hours' variation across Plaintiffs, individual Plaintiffs report inconsistency in their own schedules. Many Plaintiffs' work hours changed on a weekly or even daily basis. (Ex. O, Bogert Dep. 84:1-4 (varied week to week); Ex. I, Balta Dep. 54:8-55:7 (schedule was "always different").) Others reported significant events that altered their host families' needs and, thus, the number of hours they worked. (Ex. M, Vilain Dep. 95:2-13, 100:12-19 (hours increased after host mother gave birth to a third child during her placement).) Au pairs also acknowledge material changes in their hours when they moved from one host family to another. (Ex. H, Xueting Dep. 93:25-94:12, 112:20-113:2 (average of 45 hours per week with first two families, and 35 hours per week with third family); Ex. M, Vilain Dep. 78:19-79:3, 133:23-25 (85 hours per week with first family, and 35 hours per week with second family).)

Still further, there is no consistency among Plaintiffs in how they determined what time qualified as "work," which raises individual questions about whether the hours they report are compensable time under the FLSA. Because au pairs live with host families, only some of the time they are in the home or with the family constitutes "hours worked." The Au Pair Program is first and foremost a cultural-exchange program that is designed to foster the au pair's participation in the host family's life. *See* 22 C.F.R. §62.31(a). Some au pairs chose to spend their free time with their host families, or to help out around the house, and did not consider that time to be "work." (Ex. O, Bogert Dep. 131:7-14; Ex. Q, Myshchenko Dep. 103:4-22, 119:6-17.) Others have since decided that time helping the family or doing "favors" was "work." (*See* Ex. R, Gonzalez Dep. 109:9-111:6.) And others admit they did not really know when they were "working" or not. (*See* Ex. I, Balta

7

Dep. 76:25-78:19.) Thus, each Plaintiff's daily routine with his or her family, as well as his or her relationship with the host family and motivations for spending time with them, factor heavily into each Plaintiffs' determination of how many hours they worked.

### 3. Plaintiffs received varying stipends set by different employers

The stipend each au pair received also requires an individualized inquiry, as they did not uniformly receive a stipend of exactly $195.75. In fact, even individual au pairs report that their stipend varied from one family to the next or from year to year with the same family. (Ex. H, Xueting Dep. 95:12-14 ($200 stipend with first and second host families), 115:6-12 ($250 stipend with third host family); Ex. S, Mamane Dep. 114:21-115:12 ($200 stipend the first year and $250 the second).)

Additionally, au pairs' compensation included other benefits, such as computers and wifi, cars, gas money, and phones.[9] This compensation will have to be considered individually to determine whether au pairs are entitled to further pay under the FLSA, and how much. *See Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 578, 586 (N.D. Cal. 2016) (decertifying FLSA class, in part, because individualized issues related to class members' various forms of additional compensation, including, bonuses, scholarships, awards, additional salaries, per diems, room and board "will make classwide treatment of Plaintiffs' claims virtually impossible").

In sum, the evidence shows wide variation in Plaintiffs' hours, stipends, and other material aspects of their employment settings, such that Plaintiffs cannot be deemed "similarly situated" with respect to their minimum-wage and overtime claims. Their

---

[9] (*See, e.g.*, Ex. J, Zuleta Dep. 71:17-72:1 (family paid for cell phone, cell phone service, and car for personal use); Ex. H, Xueting Dep. 102:6-8 (family provided laptop).)

disparate factual and employment settings heavily favor decertification.

## II. GO AU PAIR'S INDIVIDUALIZED DEFENSES AGAINST CLASS MEMBERS' CLAIMS SUPPORT DECERTIFICATION

### A. Go Au Pair Is Entitled to Prove It Is Not a Joint Employer

Contrary to Plaintiffs' contentions, Go Au Pair's regulatory obligations are not alone enough to make it Plaintiffs' joint employer. (GAP MSJ Resp. 3-4; Go Au Pair's Reply in Supp. of Mot. for Summ. J. ("GAP MSJ Reply") 6-8, ECF 1002.) Nor do its business practices—which cede maximum control of the employment relationship to host families and au pairs—support a classwide determination that it is Plaintiffs' joint employer. (GAP MSJ 12-17; GAP MSJ Resp. 5-17; GAP MSJ Sur-Reply 3-7, ECF 1065.) While Go Au Pair believes the summary judgment record disproves Plaintiffs' joint-employer claim, any lingering doubt about this question can only be resolved on the basis of each au pair's individual circumstances.[10] *See, e.g., Sanchez v. Simply Right, Inc.*, No. 15-cv-974-RM-MEH, 2017 WL 2222601, at * 6 (D. Colo. May 22, 2017) (joint employer analysis required evaluation of facts "relevant to a <u>particular</u> plaintiff" (emphasis added)); *Zavala v. Wal-Mart Stores*, No. 03-5309, 2010 WL 2652510, at *4-5 (D.N.J. June 25, 2010) (individualized questions relevant to defendant's status as plaintiffs' joint employer warranted decertification of FLSA class), *aff'd*, 691 F.3d 527 (3d Cir. 2012).

### B. Go Au Pair Is Entitled to Prove that Individual Plaintiffs Received a Lawful Stipend

Plaintiffs must prove they were paid a stipend that does not conform to the FLSA.

---

[10] Material differences in au pairs' experiences impact the joint-employer analysis, such that Plaintiffs are not similarly situated. For example, refuting Plaintiffs' allegations that Go Au Pair "set" their stipends, some Plaintiffs expressly admit they discussed the amount of the stipend with their host family and together agreed on a different amount. (*See* Ex. T, Aguilar Dep. 42:6-44:11; Ex. S, Mamane Dep.114:21-116:10.)

(Certain Defs.' Mot. for Summ. J. ("Defs.' MSJ") 42, ECF 860.) That showing requires an individualized inquiry into the propriety of any credit for au pairs' room and board, the stipend the au pair received, and the hours he or she worked.

### 1. Au pairs' compensation includes the cost of room and board

To prove they received less than federal minimum wage, Plaintiffs must rebut the presumption that the reasonable cost of room and board may be included in their total compensation. (Certain Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' MSJ Reply") 24-25, ECF 988.) Plaintiffs' basis for excluding those costs from their compensation on a classwide basis fails on its merits because they have not shown (and cannot show) that such compensation is inconsistent with the FLSA simply because living with a host family is a required aspect of the Au Pair Program. (*Id.*; *see also* Defs.' MSJ 42-46.)

To the extent doubt remains as to whether au pair's compensation lawfully includes the cost of room and board, resolving that question must account for each Plaintiff's unique circumstances. In particular, critical to this determination is whether free, on-site room and board primarily benefits the employee. (Defs.' MSJ 45; Defs.' MSJ Reply 25 n.14.) Courts have found that providing such facilities primarily benefits the employee—and is thus not a burden imposed on him or her for the employer's convenience—when evidence shows that the availability of such facilities was a "main attraction in accepting" employment. *See Roces v. Reno Hous. Auth.*, No. 15-cv-408-RCJ-WGC, 2018 WL 1512598, at *12, *appeal docketed*, No. 18-15525 (D. Nev. Mar. 27, 2018). Here, at least some Plaintiffs have admitted that living with a host family was one of the reasons they chose to participate in the Au Pair Program. (Ex. U, Bohorquez

Dep. 36:6-20, 56:16-21; Ex. I, Balta Dep. 26:20-27:4; Ex. V, Gonzalez Au Pair Interview.) Thus, making this assessment for each Plaintiff requires an individualized inquiry.

### 2. Liability and damages for Plaintiffs' minimum-wage and overtime claims requires individualized inquiries

Plaintiffs' minimum-wage claims turn on whether their weekly stipends (and any additional compensation) fell below the federal hourly minimum-wage rate; thus, those claims can be resolved only by comparing the actual stipend (plus other compensation) received with the actual number of hours worked, as that is the only way to determine their actual hourly rates. *See Senne*, 315 F.R.D. at 578. Determination of that hourly rate—which likely varied on a week-by-week basis—is also necessary to calculating Plaintiffs' individual damages.

Here, however, the lack of records showing how many hours each Plaintiff worked on a weekly basis,[11] coupled with wide variation in hours (and stipends or other compensation) among Plaintiffs and within their own placements, precludes any simple, classwide calculation of each Plaintiff's hourly rate.[12] *See Espenscheid*, 705 F.3d at 773-74; *Senne*, 315 F.R.D. at 578, 586. Rather, each Plaintiff must present his or her own evidence to establish how many hours he or she worked on a weekly basis, and Go Au Pair is entitled to challenge the accuracy of that proof with any conflicting evidence. In fact, the available evidence reveals frequent inconsistencies in the number of hours Plaintiffs claim to have worked on a weekly basis, which inconsistencies raise fact

---

[11] Au Pairs have uniformly admitted they do not have any records documenting their hours. (*See, e.g.*, Ex. X, Bao Dep. 96:3-5; Ex. J, Zuleta Dep. 81:1-5; Ex. O, Bogert Dep. 135:15-17; Ex. K, Zhang Dep. 47:14-21; Ex. M, Vilain Dep. 72:10-13.)

[12] Plaintiffs' contracts with their host families reflect over 106 combinations of hours and stipends for the 310 placements involving the 159 opt-ins. (*See* Ex. D, Kapler Dec. ¶ 7.)

issues that must be resolved through individualized evidentiary hearings. For example:

- Six weeks into her placement, Plaintiff Gonzalez said she was working an average of 40 hours a week, but she now claims she worked 45 hours every week. (*Compare* Ex. R, Gonzalez Dep. 118:24-119:19, *and* Ex. W, Gonzalez Dep. Ex. 109, *with* Pls.' MSJ App'x 3260 (Gonzalez Dec. ¶ 8), ECF 886-53.)

- Six weeks into her extension placement, opt-in plaintiff Caroline Vilain said she was working 55 hours per week, but she now claims to have worked 85 hours or more per week during that placement. (Ex. M, Vilain Dep. 79:4-81:1.)

- Under her contract with her host family, opt-in plaintiff Kairina Rujano Bao was scheduled to work 25 hours per week; she now claims she worked 55 hours per week. (*Compare* Ex. Y, Written Agmt., *with* Ex. X, Bao Dep. 81:8-10.)

This conflicting evidence further reveals the need for decertification. *See Mathis*, 2014 WL 4428171, at *3 ("Decertification may be appropriate where contradictory testimony indicates that collective treatment . . . would demand so much individual inquiry that the purpose behind collective action would be eviscerated.").

Plaintiffs' overtime claims turn on the same individualized fact issues. Discovery shows that some Plaintiffs did not work over 40 hours per week. (*See* Argument § I.B.2.) Those Plaintiffs cannot prove any overtime violations. Moreover, because calculating overtime damages requires a factual determination of how many overtime hours each Plaintiff worked on a weekly basis, damages cannot be easily calculated by feeding undisputed information into a mathematical formula. Rather, individualized fact findings are needed to determine each Plaintiff's damages.

As a result of these individualized issues (which necessitate individualized defenses), collective treatment of Plaintiffs' minimum-wage and overtime claims is inappropriate. *See Espenscheid*, 705 F.3d at 773-75 (affirming decertification of collective action when proving the number of hours each plaintiff worked, as necessary

to determine plaintiff's hourly rate, required individualized evidence, such that determining damages would "require 2,341 separate evidentiary hearings").

### C. Some Au Pairs Must Arbitrate Their Claims against Go Au Pair

Some au pairs must submit their dispute with Go Au Pair to binding arbitration. *Cf. Abdulina v. Eberl's Temp. Servs., Inc.*, No. 14-cv-00314-RM-NYW, 2015 WL 4624251, at *3 (D. Colo. Aug. 4, 2015) (noting plaintiffs who executed arbitration agreement may not be appropriate class members and argument is appropriately raised in second stage of decertification analysis). Beginning in early 2015, all au pairs signed an Au Pair Agreement with Go Au Pair that contains an arbitration clause covering Plaintiffs' FLSA claims. (Ex. D, Kapler Dec. ¶ 10 & Ex. 1 (AP Agmt.).) Au pairs subject to those mandatory arbitration provisions should not be included in the FLSA class.

### D. Some Plaintiffs' Claims Are Barred by the Statute of Limitations

Certain opt-in Plaintiffs are subject to a statute of limitations defense. Notably, the statute of limitations continues to run for each non-named plaintiff (i.e., opt-in plaintiffs) until he or she consents to join the action as a party plaintiff. *See* 29 U.S.C. § 256; *Blake v. Hewlett-Packard Co.*, No. 4:11–CV–592, 2013 WL 3753965, at *4 (S.D. Tex. July 11, 2013). Thus, this defense requires an individualized analysis of when each au pair participated in the program and when they filed their opt-in notices.

Determining whether limitations should be equitably tolled also calls for an individualized analysis. Under the equitable-tolling doctrine, the Court may, in its discretion, extend statutes of limitations on a case-by-case basis to prevent inequity. *Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1181 (D. Colo. 2012). *Id.*

That doctrine, however, "should be invoked sparingly," and "applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Id.* Generally, "potential plaintiffs are presumed to be aware of the facts and circumstances of their employment . . . and it is those facts and circumstances that allegedly form the basis of each plaintiff's FLSA claim . . . . [T]heir claims accrue when they gain knowledge of these facts." *Avendano v. Averus, Inc.*, No. 14-cv-01614-CMA-MJW, 2015 WL 1529354, at *9 (D. Colo. Mar. 31, 2015). Whether the statute of limitations has run or is tolled must be determined with respect to each au pair based on their particular circumstances.[13] *Blair v. TransAm Trucking, Inc.*, 2018 WL 1523101, at *27 (D. Kan. Mar. 28, 2018).

### III. FAIRNESS AND PROCEDURAL CONSIDERATIONS FAVOR DECERTIFICATION

The primary purposes of § 216(b) collective actions are (1) to lower costs to the plaintiffs through pooling resources, and (2) to limit the controversy to one proceeding that efficiently resolves common issues of law and fact arising from the same alleged activity. *See, e.g. Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012). But, decertification is warranted where, as here, "the facts are so individualized, it would be impossible to proceed . . . using representative testimony." *Id.*; *Blair*, 2018 WL 1523101, at *28. As courts recognize, while proceeding as a collective action may lower costs to plaintiffs, the necessary individualized analysis for every aspect of the case contravenes the policy to promote judicial economy. *Id.*

---

[13] Similarly, five au pairs attempted to opt into this class after the opt-in deadline passed (*see* ECF 809, 901, 920), or did not sign a notice of consent to join (*see* ECF 708 (no notice for opt-in Dallacqua)). These au pairs are not proper opt-in plaintiffs.

Here, Plaintiffs can prove liability and damages for their wage and hour claims, if at all, only through hundreds of individualized evidentiary showings. Consequently, adjudicating this case on a classwide basis is neither efficient nor economical, as it would require "individualized evidence, individualized liability determinations, and individualized damage determinations." *See Mathis*, 2014 WL 4428171, at *5; *see also, e.g.*, *Espenscheid*, 705 F.3d at 773-75; *Bayles*, 950 F. Supp. at 1067.

Further, Plaintiffs cannot avoid this problem by proposing that all Plaintiffs are entitled to be paid minimum-wage and overtime for exactly 45 hours of work per week, as they suggest doing in the summary judgment motion. (*See* Pls.' Mot. for Partial Summ. J. ("Pls.' MSJ") 5-6, ECF 886.) Not only is such a proposal inconsistent with the FLSA (GAP MSJ Resp. 18-19; GAP MSJ Sur-Reply 9-10), it is unfair to both Go Au Pair <u>and</u> the au pair class members. Compensating au pairs for 45 hours of work when they worked less (sometimes significantly less) "would confer a windfall" on those au pairs, while an au pair who claims to have worked significantly more than 45 hours per week would be undercompensated by that same award. *See Espenscheid*, 705 F.3d at 774 (affirming decertification); *Mathis*, 2014 WL 4428171, at *5 ("collective adjudication [under the FLSA] would not be fair or manageable" when it could not "not account for material distinctions in [d]efendant's liability to different [plaintiffs]" and they "would not receive recoveries based on their individual experiences").  Thus, fairness and procedural considerations also favor decertification.

## **CONCLUSION**

Go Au Pair requests that the Court decertify this FLSA collective action.

15

Dated: May 9, 2018.

Respectfully submitted,

*s/ Natalie West*
Kathryn A. Reilly
Brett M. Mull
V. William Scarpato III
Natalie West
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:  Reilly@wtotrial.com
          Mull@wtotrial.com
          Scarpato@wtotrial.com
          West@wtotrial.com

Attorneys for Defendants Agent Au Pair, Inc., American Cultural Exchange, LLC d/b/a Go Au Pair, Go Au Pair Operations LLC, and Au Pair International Inc.

## **CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on May 9, 2018, I electronically filed the foregoing GO AU PAIR'S MOTION TO DECERTIFY PLAINTIFFS' FLSA COLLECTIVE ACTION with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record:

*s/ Claudia Jones*