Case 1:14-cv-03074-CMA-KMT Document 1073-18 Filed 05/09/18 USDC Colorado Page 1 of 6

# EXHIBIT Q

1

```
 1              IN THE UNITED STATES DISTRICT CIRCUIT

 2                    FOR THE DISTRICT OF COLORADO

 3

 4    JOHANA PAOLA BELTRAN, et al.        ) CIVIL ACTION NO.
                                          ) 1:14-cv-03074-
 5                 Plaintiffs,            ) CMA-KMT
                                          )
 6          vs.                           )
                                          )
 7    INTEREXCHANGE, INC.; et al.,        )
                                          )
 8                 Defendants.            )
      _____)
 9

10

11

12              DEPOSITION OF VIKTORIIA MYSHCHENKO

13    taken on behalf of the Defendant Go Au Pair, taken at
      Island Court Reporting, 101 Aupuni Street, Suite 212,
14    Hilo, Hawaii 96720, commencing at 8:27 a.m. on March 7,
      2018, pursuant to Notice.
15

16    Before:  Wendy L. Graves, RPR, CSR 460

17

18

19

20

21

22

23

24

25
```

H+G

Hunter+Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

Case No. 1:14-cv-03074-CMA-KMT Document 1085-28 filed 05/23/18 USDC Colorado pg 3 of 6
VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

## 81

1  A. Yes.
2  Q. About halfway down it says, "Please discuss any
3  limits on food and how the au Pair Should be feeding the
4  children."
5     Next to that it says, "More healthy food; make
6  good choices." Did the host family decide that?
7  A. Yes, they did.
8  Q. The next describes, "Please describe any limits
9  on watching TV."
10     Then it says, "Weekends okay; during school
11  days, no TV." Did the host family decide that?
12  A. Yes.
13  Q. And the next one it says, "Please describe any
14  limits regarding gaming systems."
15     It says, "Good balance. Gaming time is a
16  reward." Did the host family decide that?
17  A. Yes.
18  Q. So the host family decided all of the content in
19  the orientation agreement; is that right?
20     MR. VALDIVIESO: Objection to form.
21     MS. MULL: Q. If you are not sure, we can go
22  through them all.
23  A. Yeah, that's what I'm doing.
24  Q. Okay.
25  A. Yes. Host family decided.

## 82

1  Q. Okay. And on page 3 of 7, it says, "Please
2  describe the host family's instruction for transporting
3  children."
4     It says, "Written schedule." What's the written
5  schedule, do you know?
6  A. It would rely on a schedule that I would work.
7  So if they have to be in school at 8:00, then we would
8  leave the house at 7:30, for example.
9  Q. Right. Was that a written schedule or was that
10  something you talked about each week?
11  A. I don't remember.
12  Q. What were your first few weeks like with the
13  ▮▮▮▮ family?
14     MR. VALDIVIESO: Objection to form.
15     THE WITNESS: Um --
16     MS. MULL: Q. You can answer, if you
17  understand.
18  A. It was just adjusting to work schedule and
19  getting used to it.
20  Q. When did you start providing direct care to the
21  children --
22  A. Since day one.
23  Q. -- for the ▮▮▮▮ Day one?
24  A. Yeah.
25  Q. During the first few weeks with the ▮▮▮▮

## 83

1  family, what were your interactions with the LAR?
2  A. I do not remember.
3     MR. VALDIVIESO: Objection to form.
4     MS. MULL: Q. Do you remember having any
5  interactions with the LAR in your first week, other than
6  the orientation agreement?
7  A. I do not remember.
8  Q. How often did you take care of the ▮▮▮▮
9  children?
10  A. Every day.
11  Q. How many days a week?
12  A. Five. Sometimes six, if I would work on
13  Saturday.
14  Q. How many hours per day, on average?
15  A. On average, it would be nine hours per day, if
16  it's Monday through Friday schedule.
17     If it's Monday through Saturday schedule, it
18  would be different.
19  Q. Okay. But on average how many hours a week did
20  you work?
21  A. 45.
22  Q. Did you ever work more than 10 hours per day?
23  A. No.
24  Q. Did you ever work more than 40 hours in a week
25  for the ▮▮▮▮ family?

## 84

1  A. You said 40?
2  Q. Sorry. 45. Sorry.
3  A. Um, no.
4  Q. And how often did you work on the weekends --
5  A. It would be --
6  Q. -- with the ▮▮▮▮ family?
7  A. It would be every other weekend, except like one
8  full weekend per month.
9  Q. What were you doing -- what were your
10  responsibilities when you were watching the children?
11  A. Supervising, playing with them, doing homework,
12  like keeping them safe, break up the fights if they
13  fight, keeping them like fed, yeah.
14  Q. Were you responsible for any chores, cleaning?
15  A. Yes. I was responsible for keeping their rooms
16  clean and organized and kitchen area.
17  **Q. And who told you what your job responsibilities**
18  **were each week?**
19  **A. Host mother.**
20  **Q. And did Go Au Pair tell you what your job**
21  **responsibilities were going to be from week to week?**
22  **Did the LAR?**
23  **A. No.**
24  **Q. And you said that the work schedule, that was**
25  **set by the host family; is that correct?**

21 (Pages 81 to 84)

Case No. 1:14-cv-03074-CMA-KMT  Document 1085-28  filed 05/23/18  USDC Colorado  pg 4 of 6

VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

85

1  A. Yes.
2  Q. Go Au Pair didn't decide your work schedule, did
3  they? Other than not more than 45 hours a week.
4  A. Yes, they did not.
5  Q. Did Go Au Pair ever supervise your work?
6  A. No.
7  Q. Did the Local Area Representative supervise your
8  work with the ▇▇▇ family?
9  A. I believe she was communicating to the ▇▇▇
10 family, but she never was physically present to
11 supervise me during work.
12 Q. Okay. When you were with the ▇▇▇ family,
13 did you have access to a car?
14 A. Mostly for driving children.
15 Q. Okay. Did you obtain a driver's license, an
16 international driver's license or a driver's license for
17 the U.S.?
18 A. I obtained Virginia driver's license, yeah.
19 Q. And you said that you were -- you said the car
20 was limited to taking care of the children?
21 A. Yes. I could use it for personal use, not too
22 far, with some limitations.
23 Q. Okay. And did the ▇▇▇ family provide you
24 with a cell phone?
25 A. Yes.

86

1  Q. And did they pay your monthly bills for the cell
2  phone?
3  A. Yes.
4  Q. Were you allowed to call home on your cell
5  phone?
6  A. I had personal phone. For that matter I had
7  personal phone from Ukraine which I used for
8  communicating with my family. But they did -- host
9  family let me use the phone to communicate with my
10 friends in the United States. If I wanted to with my
11 family through like Viber or WhatsApp, which is free.
12     As well, I used the phone to work for work a
13 lot, because they would communicate with me about
14 children and schedule.
15 Q. Did the ▇▇▇ family pay for any entertainment
16 outside of the home like movies, shopping?
17 A. No.
18 Q. Did you travel with the ▇▇▇ family?
19 A. No.
20     MR. VALDIVIESO: Objection. Asked and answered.
21     MS. MULL: Q. Did you ever ask for more than
22 $195.75 from the ▇▇▇ family?
23 A. No.
24 Q. Did you ever discuss why you were paid that
25 amount with the ▇▇▇ family?

87

1  A. No.
2  Q. Did the family, the ▇▇▇ family, ever give
3  you additional money?
4  A. No.
5  Q. So they never paid you any other amount, other
6  than 195.75?
7  A. They would reimburse me for gas.
8  Q. Did they give you money for gifts, for your
9  family?
10 A. No.
11 Q. Do you believe that the ▇▇▇ family paid you
12 everything they promised to?
13 A. Yes.
14 Q. Did you do any course work when you were living
15 at the ▇▇▇ family?
16 A. No.
17 Q. So other than taking care of the children, what
18 else did you do while you were living with the ▇▇▇
19 family?
20 A. I would do my own school work, because I was
21 involved in online education back from Ukraine. I would
22 improve my English by myself. I would -- that's it, I
23 guess. I would communicate with my friends.
24 Q. Okay. Did you meet up with friends?
25 A. Yes.

88

1  Q. What did you do with them?
2  A. All types of things. We would go for coffee.
3  We could go to a house party. We would go to a movie.
4  Q. And you said that you were doing online courses?
5  A. Yeah.
6  Q. So were you doing course work when you were
7  living with the ▇▇▇ family?
8  A. Yes, during my off time.
9  Q. I'm sorry. What was that?
10 A. Yeah, when I was off of work.
11 Q. What classes were you taking online?
12 A. I was taking financial accounting classes.
13 Q. Did the ▇▇▇ family pay for that?
14 A. No.
15 Q. Who paid for your courses?
16 A. My own family.
17 Q. Your family in the Ukraine?
18 A. Yeah.
19 Q. Were you aware that the Go Au Pair program
20 allowed you to take courses that would be financed by
21 the host family?
22 A. Yes, but that was only for courses in the United
23 States.
24 Q. Okay. Did you travel by yourself at all in your
25 spare time when you were living with the ▇▇▇

22 (Pages 85 to 88)

Case No. 1:14-cv-03074-CMA-KMT   Document 1073-13   filed 05/23/18   USDC Colorado   pg 5 of 6

Case 1:14-cv-03074-CMA-KMT   Document 1085-28   filed 09/05/18   USDC Colorado   Page 5 of 6

VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

101

1  Q. Is that because you were Vegan and they weren't?
2  A. Yes. Sometimes I would buy my own food if it's
3  around.
4  Q. Did you ever go out to eat with the
5  family?
6  A. Yes.
7  Q. And did the parents pay for that?
8  A. Yes.
9  Q. When you first started working with the
10 family, did you discuss ground rules and expectations?
11 A. Yes.
12 Q. And what were those?
13 A. I could use car as much as I wanted. I had no
14 curfew. That was it.
15 Q. Did you discuss what your work schedule would
16 be?
17 A. We did not discuss it. It would -- they needed
18 flexibility with that. So sometimes it would change
19 same day.
20 Q. Okay. So did you discuss it on a weekly basis
21 or a daily basis? How often?
22 A. Daily basis.
23 Q. And did you discuss the amount that you would be
24 paid?
25 A. Yes.

102

1  Q. What do you remember from that conversation?
2  A. She told me that she would pay me 220, but also
3  like for gas.
4  Q. So she said that she would pay you $220 and
5  money for gas?
6  A. No. 220 includes money for gas.
7  Q. What were your first few weeks like with the
8  family?
9  MR. VALDIVIESO: Objection to form.
10 You may answer.
11 THE WITNESS: Fun.
12 MS. MULL: Q. How many kids did the
13 family have?
14 A. Four.
15 Q. And how old were they when you started? You can
16 give an estimate.
17 A. Eight and -- youngest one was eight, I believe,
18 and oldest was 14.
19 Q. Did you continue to have conversations with LAR,
20 the LAR, Amanda, while you were working for the
21 family?
22 A. I spoke to her once.
23 Q. And what did you speak to her about?
24 A. That I'm happy with this host family.
25 Q. How often did you care for the children for the

103

1  family?
2  A. Every day.
3  Q. And you said that the schedule changed from week
4  to week, but -- sorry. So how many hours on average per
5  week do you think you worked with the family?
6  A. On average, 45. 43 to 45.
7  Q. Sorry. What was that?
8  A. 43 to 45.
9  Q. 43 to 45. Did you ever work more than 45 hours
10 a week?
11 A. I would help them out, but I did not consider
12 that as work.
13 Q. Did you ever work more than 10 hours per day?
14 A. No.
15 Q. Did you ever help them out for more than 45
16 hours a week?
17 A. Yes.
18 Q. And how often was that?
19 A. Maybe once a month.
20 Q. Even though you agreed not to work more than 45
21 hours a week?
22 A. I did not consider it as work.
23 Q. Did you have weekends off?
24 A. Yes, for exception of a few.
25 Q. Sorry. What was that last part?

104

1  A. For exception of maybe a couple.
2  Q. Okay. And what did your child care
3  responsibilities include?
4  A. Supervision. Homework. Driving to activities
5  and from activities. Driving to school from school.
6  Meal preparation. To make sure that they organize their
7  rooms, help them.
8  Q. Did you ever do other chores?
9  A. Yes. I did vacuum a lot, because they had pets
10 and fur was everywhere. I did laundry. I did
11 dishwasher.
12 Q. Okay. Who set your job duties, who told you to
13 do certain tasks?
14 A. Host family in accordance with Go Au Pair.
15 Q. Sorry?
16 A. In accordance with Go Au Pair regulations.
17 Q. So your host family told you what you needed to
18 perform on a day-to-day basis?
19 A. Yes.
20 Q. Okay. And your host family told you on a
21 day-to-day basis what your work schedule would be?
22 A. Yes.
23 Q. Did Go Au Pair tell you what your work schedule
24 would be on a day-to-day basis?
25 A. No.

26 (Pages 101 to 104)

Case No. 1:14-cv-03074-CMA-KMT   Document 1073-28   filed 05/23/18   USDC Colorado   pg 6 of 6

VIKTORIIA MYSHCHENKO - 3/7/2018 - CONFIDENTIAL
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

117

1    A.  It was including gas, so I wasn't making 220.  I
2    was making 195.75, and other money were reimbursement
3    for gas that I would spend by myself.
4        Q.  What are the damages that you are seeking in
5    this lawsuit?
6        A.  I don't understand the question.
7        Q.  How much do you believe you are owed?
8        A.  I do not know.
9        Q.  Do you have an estimate?
10       A.  No.
11       Q.  Okay.  But you believe that someone owes you
12   money for being an au pair, additional money?
13       A.  Go Au Pair agency specifically, that is what my
14   belief is, owes me money.
15       Q.  Okay.  Why do you think Go Au Pair owes you more
16   money?
17       A.  Because it wasn't followed by federal
18   regulations in accordance to ROH.
19       Q.  What regulations are you referring to?
20       A.  Minimum wage.
21          MS. MULL:  Okay.  That's all I have got, Juan.
22          MR. VALDIVIESO:  I just have a few follow-up
23   questions.  I will be quick.
24              EXAMINATION BY MR. VALDIVIESO
25          MR. VALDIVIESO:  Q.  Can you go back to Exhibit

118

1    4, please?  It's the survey response.  I'm on page 1, on
2    the second job end of date.  Do you see that?
3        A.  I see that.
4        Q.  Do you see where it says, "5-3-2017,"
5    parenthesis, "might be mistyped by plaintiff," end
6    parentheses, do you see that?
7        A.  I see that.
8        Q.  Do you recall ever writing in your survey
9    response, "may be mistyped by plaintiff"?
10       A.  No, I did not write that.
11       Q.  Okay.  Do you know who wrote that?
12       A.  I don't.
13       Q.  Okay.  And then if you go to page 2, the very
14   last line, do you see that?
15       A.  Page 2, last line, yes.
16       Q.  And that says, parentheses -- in the second
17   column it says, "Plaintiff did not answer," close
18   parentheses.  Do you see that?
19       A.  Yes.
20       Q.  Do you recall writing "Plaintiff did not answer"
21   in response to any of the survey questions?
22       A.  No.
23       Q.  Do you believe this document is actually the
24   responses to your survey questions?
25       A.  Yes, because the answers I wrote I wrote myself.

119

1        Q.  The answers that were in parentheses you do not
2    recall writing yourself?
3        A.  No, I did not write those answers myself.
4        Q.  And you don't know who wrote those?
5        A.  I do not know.
6        Q.  Okay.  I believe Miss Mull asked you if you ever
7    worked more than 45 hours per week with the ▮▮▮▮
8    family, and you responded that you sometimes helped them
9    out.  Do you recall that answer?
10       A.  Yes.
11       Q.  What types of things would you do to help them
12   out?
13       A.  Work at night, stay longer during the evening
14   after hours, and stay with kids so that parents can go
15   out, for example.
16       Q.  And that was in addition to the 45 hours?
17       A.  Yes.
18          MS. MULL:  Object to form.
19          MR. VALDIVIESO:  I don't have any further
20   questions.
21          MS. MULL:  Okay.  I don't think I need a
22   response.  So subject to the stipulation we agreed to
23   earlier about confidentiality, I think we're all set.
24          MR. VALDIVIESO:  Okay.
25          THE VIDEOGRAPHER:  We are now going off the

120

1    record.  The time is 12:04, and this concludes the
2    videotaped deposition of Viktoriia Myshchenko.
3          THE REPORTER:  Juan, do you need a copy of the
4    transcript?
5          MR. VALDIVIESO:  Yes, please.
6          (Whereupon, the deposition concluded at
7    12:04 p.m.)
8                      -o0o-