1

```
 1           IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 14-cv-03074-CMA-KMT
 3
     _____
 4
                   VIDEOCONFERENCE DEPOSITION OF:
 5                     WENDY PAOLA RIVERA ARIAS
                           March 22, 2018
 6   _____

     JOHANA PAOLA BELTRAN, et al.,
 7
     Plaintiffs,
 8
     v.
 9
     INTEREXCHANGE, INC., et al.,
10
     Defendants.
11   _____

12
                    PURSUANT TO NOTICE AND STIPULATION, the
13   videoconference deposition of WENDY PAOLA RIVERA ARIAS
     was taken on behalf of the Defendants at 1900 Grant
14   Street, Suite 1025, Denver, Colorado 80203, on
     March 22, 2018, at 6:37 p.m., before Tracy C. Masuga,
15   Registered Professional Reporter, Certified Realtime
     Reporter, and Notary Public within Colorado.
16
```

H+G

Hunter + Geist, Inc.

303.832.5966    1900 Grant Street, Suite 1025    www.huntergeist.com
800.525.8490    Denver, CO 80203                 scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**EXHIBIT 2**
**RESTRICTED-ATTORNEY EYES ONLY**

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**Page 25**

```
 1   choose your family?
 2          MR. PETTERSON: Objection.
 3      A. Yes.
 4      Q. (BY MS. LEVY) You said you interviewed
 5   with the [  ] family by Skype; is that right?
 6      A. Yes.
 7      Q. And how many times did you communicate
 8   with them by Skype?
 9      A. Twice.
10      Q. And the first time you talked to the
11   host family, who was part of the interview?
12      A. It was me, the parents, and the child.
13      Q. And the second time, was it just the
14   host mom?
15      A. Yes.
16      Q. Was anyone from the -- from ISC Colombia
17   participating in the Skype interviews with the family?
18          MR. PETTERSON: Objection.
19      A. No.
20      Q. (BY MS. LEVY) Was anyone from
21   InterExchange participating in those interviews?
22      A. No.
23      Q. Could you have said no if you were not
24   interested in going to live with the [  ] family?
25      A. I could have, yes.
```

**Page 26**

```
 1      Q. Okay. And during the Skype interview
 2   with the [  ] either the first time or the second
 3   time, did you talk about how much you would be paid?
 4      A. No.
 5      Q. When did you first learn how much your
 6   host family was going to pay you each week?
 7      A. When they offered me the program.
 8      Q. And at the time you talked with the host
 9   family on Skype, were you okay with the amount that
10   you understood you would be paid?
11          MR. PETTERSON: Objection.
12      A. Yes.
13      Q. (BY MS. LEVY) And what was that amount?
14      A. 195.75. $195.75.
15      Q. Did you ever ask your host family to pay
16   you more than that amount per week?
17      A. No.
18      Q. During the Skype interview with the
19   [  ] either the first or the second one, did you
20   talk about what you would be doing with the children?
21      A. Yes.
22      Q. And what did you discuss?
23      A. They told me that the child was in day
24   care, but I would be preparing breakfast, lunch, and
25   dinner for the child and doing the laundry for the
```

**Page 27**

```
 1   child and organizing his room and playroom.
 2      Q. And were those the duties that you
 3   actually performed when you lived with the [  ]
 4      A. Yes.
 5      Q. And also during the Skype interview, did
 6   your host family tell you how many hours per day you
 7   would be working?
 8      A. Yes.
 9      Q. Okay. What did they tell you?
10      A. They said that the child would be in day
11   care Monday, Wednesdays and Fridays for three hours a
12   day. I would be working before that, starting from
13   7:00 to 9:00, and then go and pick up the child at
14   11:45, and from -- from the day care, and then on
15   Tuesday -- and then I would work until 6 o'clock.
16          And then on Tuesdays and Thursdays, I
17   would work the full day with the child from 7:00 to
18   6:00 p.m.
19      Q. Were those the hours that you ended up
20   working?
21      A. Sometimes. Sometimes I would finish up,
22   say, a half-hour or an hour before.
23      Q. Before you matched with the [  ] family,
24   did you communicate with other families?
25      A. Yes.
```

**Page 28**

```
 1      Q. How many other families?
 2      A. Six.
 3      Q. Did you talk with any of those families
 4   in Skype?
 5      A. With four -- with four, and the other
 6   two families by email, and then the match was
 7   canceled.
 8      Q. And in any of those Skype conversations
 9   or emails, was InterExchange part of that
10   conversation?
11      A. No.
12      Q. Okay.
13          MR. PETTERSON: Is this a good time for
14   a break?
15          MS. LEVY: Yeah. I was just thinking
16   the same thing. All right. Why don't we take -- does
17   ten minutes sound okay to both of you?
18          THE DEPONENT: Okay.
19          MR. PETTERSON: Yeah.
20          MS. LEVY: Okay. So let's come back at
21   9:58 your time.
22          MR. PETTERSON: Okay.
23          MS. LEVY: Okay. All right. We'll see
24   you in ten minutes.
25          (Recess taken, 7:47 p.m. to 7:59 p.m.,
```

7 (Pages 25 to 28)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

Page 29

1 after which Mr. Hunt was not present.)
2   Q. (BY MS. LEVY) I'm going to show you one
3 more document. Do you recognize this document?
4   A. Yes.
5   Q. Do you need me to scroll through it?
6   A. Yes.
7   Q. And this will be Exhibit 3. Tell me if
8 I'm going too quickly.
9     Ms. Rivera, is that your electronic
10 signature at the bottom of this document on page 7?
11  A. Yes. I did that through the Internet.
12  Q. I'm going to turn your attention to
13 page -- this is Bates numbered page 48929 from
14 InterExchange. Ms. Rivera, did you read this
15 agreement before you signed it?
16  A. Yes.
17  Q. Did anyone assist you with reading it?
18  A. No.
19  Q. Okay. And do you see here it says,
20 "Compensation. Weekly stipend." And it says, "I
21 understand that I must be paid by the Host Family at
22 least the minimum U.S. Department of State mandated
23 Weekly Stipend . . . ." Do you see that?
24  A. Yes.
25  Q. And did you understand that when you

Page 30

1 read it?
2   A. Yes.
3   Q. You arrived in the United States for the
4 au pair program in October 2016; is that right?
5   A. Yes.
6   Q. And did you go to training when you
7 arrived in the United States?
8   A. Yes.
9   Q. Was that in New York City?
10  A. Yes.
11  Q. What sort of training did you do in
12 New York?
13  A. Well, it was a two-day training. The
14 first day they gave us a book about cultural norms or
15 practices in the United States that was -- which would
16 be different than the countries we came from. And
17 then the second day we had CPR, or cardiopulmonary
18 resuscitation, training.
19  Q. Did you do any training in Colombia
20 before you came to the United States as an au pair?
21  A. Like training for what?
22  Q. Any sort of training online or first
23 aid.
24  A. No.
25     MR. PETTERSON: Objection.

Page 31

1   Q. (BY MS. LEVY) And after training in
2 New York City, you went to go meet your host family?
3     MR. PETTERSON: Objection.
4   A. Yes. It was after that.
5   Q. (BY MS. LEVY) Did the parents in the --
6 of the host family that you lived with, did they work?
7   A. Yes.
8   Q. Did they both work?
9   A. Yes.
10  Q. Did they work in the home or outside the
11 home?
12  A. One worked in the home and the other
13 outside the home.
14  Q. When the one --
15     Which parent worked at home?
16  A. The father.
17  Q. And when the father was working, was he
18 involved in -- did he help with child care, or was he
19 just working while he was -- while he was at home?
20     MR. PETTERSON: Objection.
21  A. Just working.
22  Q. (BY MS. LEVY) And what -- between what
23 hours was he just working at home?
24  A. From like 10:00 to 5:30 or 6:00.
25 Sometimes even later because his work also had to --

Page 32

1 he had to think about the California time.
2     THE INTERPRETER: Correction.
3   A. In his work he had to think about
4 California time.
5   Q. (BY MS. LEVY) And during those hours,
6 were you -- or let me back up.
7     How many hours a day did the host mother
8 work outside the home?
9   A. She would leave about 8 o'clock and get
10 back about 5:00 to 6:00.
11  Q. Were there any other adults that lived
12 in the home?
13  A. No.
14  Q. Were you -- or how many kids did you
15 take care of for the ▮▮▮ family?
16  A. One.
17  Q. And how old was the child?
18  A. When I started, one year and ten months.
19  Q. And you mentioned that -- was it -- was
20 this child a boy or a girl?
21  A. Boy.
22  Q. And you mentioned that this boy went to
23 day care; is that right?
24  A. Yes.
25  Q. And this was from -- this was three days

8 (Pages 29 to 32)

EXHIBIT 2
RESTRICTED-ATTORNEY EYES ONLY

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

Page 33

1  a week that he went to day care?
2     A. Yes.
3     Q. What time did you drop him off at day
4  care?
5     A. 9:00 a.m.
6     Q. And you picked him up at 11:45; is that
7  right?
8     A. No, because the day care was 15 minutes
9  away, so I -- I got there at 12:00.
10    Q. Were you solely responsible for the
11 child while you were in the home when the father was
12 working there?
13    A. Yes.
14    Q. Was there any time when -- during the
15 father's work hours that the child was there and you
16 were not responsible for him?
17    A. Always when he was working, but
18 sometimes he would take a rest for five minutes, I
19 would say hello to him, and then he would just go
20 back.
21    Q. Did the ▮▮▮ family give you a schedule
22 every week?
23    A. No. Almost always it was the same. It
24 didn't change.
25    Q. When you first started, did you get a

Page 34

1  schedule?
2     A. No.
3     Q. How did you know what your schedule
4  would be when you first started?
5     A. We tried some trials and error, and
6  we -- she would say, "Okay. Start at 7:30. No,
7  better start at 7 o'clock," and then we ended up with
8  a schedule.
9     Q. And it was the same schedule every week?
10    A. Yes.
11    Q. How many weeks were you figuring out a
12 schedule before you had your set schedule?
13    A. Four weeks.
14    Q. Did anyone from InterExchange ever give
15 you a weekly schedule when you lived with the ▮▮▮
16 family?
17    A. No.
18    Q. Did you ever keep any sort of a record
19 of the schedule that you had?
20    A. Something in writing, you mean?
21    Q. Yes.
22    A. Yes, at the beginning.
23    Q. And where -- where is that written
24 schedule now?
25       MR. PETTERSON: Objection.

Page 35

1     A. I don't know.
2     Q. (BY MS. LEVY) You mentioned your
3  schedule before. Did you work five days a week every
4  week?
5     A. Yes.
6     Q. Was that Monday through Friday every
7  week?
8     A. Yes.
9     Q. And did you work Saturday or Sunday?
10    A. Can you repeat?
11    Q. Did you work Saturday or Sunday?
12    A. Once or twice in a year.
13    Q. And are you referring to the whole
14 weekend, or a certain day on the weekend that you only
15 worked once or twice in the year?
16    A. One of those days.
17    Q. So did you work -- can you clarify for
18 me, did you usually work on Saturday, or did you
19 usually have Saturday off?
20    A. No, I had Saturdays off.
21    Q. And did you usually work on Sundays, or
22 did you have Sundays off?
23    A. Sundays were free or off. I just told
24 you that it was like two days in the whole year that I
25 might have worked on one of those days.

Page 36

1     Q. Okay. And who decided which days -- who
2  decided your schedule?
3     A. It was based on the work schedule of the
4  parents, and we just decided that that would be Monday
5  through Friday, so that was my work, Monday through
6  Friday.
7     Q. So was it the mother and the father of
8  the host family, are you saying, that decided your
9  schedule?
10    A. Yes.
11    Q. Okay. Did InterExchange ever tell you
12 which days or hours to work?
13    A. InterExchange decided on one complete
14 weekend a month, and the rest was based on the
15 schedule we made.
16    Q. Can you explain what you mean by
17 "InterExchange decided on one complete weekend a
18 month"?
19    A. InterExchange -- InterExchange says that
20 the au pair has the right to a full weekend once a
21 month. But, again, it depends on the family, what
22 schedule that they will have for the au pair.
23    Q. Okay.
24    A. So some families could want the au pair
25 to work like three weekends in a month if they

9 (Pages 33 to 36)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT 2**
**RESTRICTED-ATTORNEY EYES ONLY**

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

37

1  wanted -- want -- if they wanted them to.
2      Q.  Okay.  Like did InterExchange ever tell
3  you -- tell you personally which days that you had to
4  work?  Did that ever come from InterExchange, or was
5  it just the host family that you set the schedule
6  with?
7      A.  No.  It was a decision by the family.
8      Q.  Okay.  Thank you.  How many hours per
9  week did you work for your host family?
10     A.  Between 45 to 48.
11     Q.  And from what you said so far, is it --
12  would it be a correct statement that your hours were
13  about the same every day?
14         MR. PETTERSON:  Objection, misstates her
15  testimony.
16     A.  (In English) Can you repeat?  I
17  don't --
18     Q.  (BY MS. LEVY)  That was a confusing
19  question.  I'm going to -- I'm going to ask that
20  differently.
21         Were your hours every Monday, were they
22  about the same?
23     A.  Yes.
24     Q.  And was it the same on Tuesday?  Were
25  your hours about the same every Tuesday?

38

1      A.  Tuesdays and Thursdays, almost -- almost
2  not -- not the same.  A half an hour or one hour less,
3  but not -- it wasn't always that way.
4      Q.  Okay.  On Wednesdays, were your hours
5  about the same every Wednesday?
6      A.  Mondays, Wednesdays, and Fridays, yes.
7      Q.  And you mentioned your hours were about
8  45 to 48.  When did you work over 45 hours?
9         MR. PETTERSON:  Objection.
10     A.  Well, I would finish out the schedule at
11  6 o'clock.  Some days it would be 5 o'clock.
12     Q.  (BY MS. LEVY)  Was there any -- anything
13  in particular that would cause you to work those extra
14  few hours each week?
15         ' MR. PETTERSON:  Objection.
16     A.  It was sometimes when maybe she would
17  get home a little later, and also he would be working
18  a little later, the father.
19     Q.  (BY MS. LEVY)  Did you ever, with your
20  host family, work more than ten hours a day?
21     A.  Yes.
22     Q.  Which days was that?
23     A.  Some Tuesdays or Thursdays.
24     Q.  Can you tell me what --
25         And Tuesdays and Thursdays were the days

39

1  that he was not at day care; is that right?
2      A.  Yes.
3      Q.  And what did you do with him when -- the
4  child when he was not in day care, specifically on
5  Tuesdays and Thursdays?
6      A.  I would take him to the library or a
7  place where the kids play.  It's called Park Place.
8  Or some -- or a park, depended -- depending.
9  Depending on the weather.
10     Q.  And what were your hours on the Tuesdays
11  and Thursdays?
12     A.  Usually it was 7:00 a.m. to 6:00 p.m.
13     Q.  Did you get any sort of a break from --
14  during the day from the father?  Did he help with the
15  child care at all during the day on Tuesdays or
16  Thursdays?
17         MR. PETTERSON:  Objection.
18     A.  At the most, it was 20 minutes that he
19  was with the child.  But that was -- that was very
20  rare for him to do that.
21     Q.  (BY MS. LEVY)  Were you expected to be
22  on call to take care of the child?
23     A.  No.
24     Q.  When you were living with the [redacted]
25  family, did you have any concerns or complaints about

40

1  the schedule that the [redacted] gave you?
2      A.  No.
3      Q.  I apologize if I already asked you this.
4  Before we -- you said that the [redacted] paid you $195.75
5  per week.
6      A.  Yes.
7         MR. PETTERSON:  Objection, that's not a
8  question.
9      Q.  (BY MS. LEVY)  Is that the amount the
10  [redacted] paid you every week?
11     A.  Yes.  Sometimes 196.
12     Q.  Did they ever pay you more than 196?
13     A.  No.
14     Q.  Did InterExchange ever pay you your
15  weekly stipend?
16     A.  No.
17     Q.  Did the [redacted] ever give you any extra
18  money for any reason?
19     A.  Like what?
20     Q.  Did they ever give you any gifts?
21     A.  Yes.
22     Q.  What kind of gifts?
23     A.  For Christmas.
24     Q.  Did they ever give you any extra
25  spending money?

10 (Pages 37 to 40)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

EXHIBIT 2
RESTRICTED-ATTORNEY EYES ONLY

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

Page 41

1     A. No. I just had to say if I needed some
2 money for -- say for my personal things, if I needed
3 something. No, but actually, it wasn't money. I
4 would tell -- she asked me if I needed something and
5 for me to bring it to -- and she brought it to me.
6     Q. What kinds of items did -- would --
7 well, let me back up.
8     Talking about the host mom?
9     A. Yes.
10     Q. And what kind of items did she ask you
11 if you needed or did you tell her that you needed?
12     A. She would ask me, even at the beginning
13 there, if I needed something like toothpaste or soap.
14     Q. So your host mom would give you these
15 types of items?
16     A. Yes.
17     Q. Did they ever take you shopping for
18 clothes?
19     A. Yes.
20     Q. And did they buy you clothes?
21     A. Once. It was a winter jacket.
22     Q. Did they give you any other gifts for a
23 birthday or any other holiday?
24     A. No.
25     Q. Did you have a computer to use at the

Page 42

1 [redacted] home?
2     A. No.
3     Q. Did you have a cell phone?
4     A. Yes.
5     Q. Was it your cell phone or the host
6 family's cell phone?
7     A. Theirs.
8     Q. Did they have any rules about using the
9 cell phone?
10     A. No, except no international calls.
11     Q. Were you able to make personal calls?
12     A. Yes. And the Internet service, one
13 gigabyte of service.
14     Q. Did you have a car to drive when you
15 lived with the [redacted]
16     A. Like in my free time, you mean?
17     Q. In general, when you -- when you lived
18 with them, when you would go to the library or the
19 park with the little boy, did you have a car to drive?
20     A. Yes, for the first ten months.
21     Q. And what happened after the first ten
22 months?
23     A. After those first ten months, then
24 they -- then they stopped paying the insurance for me.
25     Q. Did you ever pay for the insurance on

Page 43

1 the car?
2     A. No. I didn't drive anymore.
3     Q. In the first ten months that you had the
4 car, did you pay for any insurance on the car?
5     A. No.
6     Q. And in those first ten months that you
7 had the car, did you use the car for personal use?
8     A. Yes. Very little.
9     Q. How much is a little? About how many
10 hours a week?
11     A. Some Mondays, and I would say that I
12 borrowed it four times a month.
13     Q. Did you take any trips with your host
14 family?
15     A. No.
16     Q. Did your -- for your -- for the car, did
17 the host family give you gas money?
18     A. Yes.
19     Q. And could you use this gas money when
20 you used the car on your personal trips, too?
21     A. Yes, but it wasn't much.
22     Q. Did you ever take any trips or vacations
23 on your own without your host family?
24     A. Yes.
25     Q. Where did you go?

Page 44

1     A. My first trip, I went to France. Then
2 the second trip to Colombia.
3     Q. Did your host family pay for anything on
4 either of these trips?
5     A. No.
6     Q. How long did you go to France for?
7     A. One week.
8     Q. And how long did you go back to Colombia
9 for?
10     A. One week.
11     Q. Who told you what duties to perform for
12 your host family?
13     A. The host family.
14     Q. And by that, do you mean the mother and
15 the father?
16     A. The mom.
17     Q. Did InterExchange ever tell you what
18 duties to perform for the [redacted] family?
19     A. In the documents and also when I arrived
20 with the coordinator.
21     Q. Do you remember who your local
22 coordinator was?
23     A. Eileen. I don't remember the last name.
24     Q. Did you meet with Eileen in person when
25 you lived with the [redacted] family?

11 (Pages 41 to 44)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

### Page 45

1  A. Yes, like the third day.
2  Q. Did you meet with her more than one time
3  in person?
4  A. At the au pair meetings.
5  Q. Where did you meet with Eileen on the
6  third day?
7  A. At my host family's house.
8  Q. And what happened during that meeting?
9  A. She came to the house just to see where
10 I -- where I was staying, to see the family and to
11 know what they expected of me.
12       In fact, there was a problem with the
13 host dad, and -- but my English wasn't so good at that
14 time to talk to them.
15 Q. What was the problem with the host dad
16 when you arrived at the ▮▮▮▮ home?
17 A. He first thought that I wasn't able to
18 communicate very well with the child.
19 Q. And did you resolve that problem?
20 A. Yes. Yes, we did, and we just knew that
21 dealing with the child, we just had to take one step
22 at a time, step-by-step.
23 Q. Did the local coordinator help you with
24 that?
25 A. She just said that they had to be

### Page 46

1  patient with me because I had just recently arrived
2  and the child was just getting used to me.
3  Q. And correct me if I'm wrong. Did you
4  say that Eileen told you what duties to perform with
5  your host family?
6  A. Yes.
7  Q. What did she tell you?
8  A. That she told me about the care -- how I
9  would care for the child and that I would also need to
10 help with some things in the house since I was now a
11 part of the family.
12 Q. Did she ever tell you anything specific
13 about how to care with the ▮▮▮▮ child -- care for
14 the ▮▮▮▮ child?
15      MR. PETTERSON: Objection.
16 A. No, just what the documents had
17 already -- had told me, that I needed to be ready to
18 be able to feed the child and change the child, take
19 care of the child, and play with him.
20 Q. (BY MS. LEVY) Did Eileen ever supervise
21 you taking care of the child?
22 A. No.
23 Q. Did anyone from InterExchange ever
24 supervise you while you were taking care of the child?
25 A. No.

### Page 47

1  Q. Besides -- we talked about some of the
2  duties that you performed with your host family, such
3  as taking the child to day care or taking him to the
4  park or the library. You mentioned a few things.
5      Can you -- can you explain what your
6  other duties were with the host family?
7  A. After I had a problem with them, then I
8  ended up having to cook for them, breakfast --
9  breakfast and dinner.
10 Q. After what problem?
11 A. Well, I can tell you that one time
12 during my free time, I had a -- I had a scratch that
13 happened on the car, and they -- the host family
14 wanted me to pay that -- that all back, and my
15 coordinator said that the agency couldn't help me with
16 that.
17      So then I came to an agreement with the
18 family that I would cook for them. Yeah, that I would
19 cook for them, and that would be part of paying them
20 back.
21 Q. How long were you cooking breakfast and
22 dinner for them?
23 A. Six months.
24 Q. Who were you cooking -- was this Monday
25 through Friday?

### Page 48

1  A. Yes.
2  Q. Who were you cooking breakfast for?
3  A. My host and host mom.
4  Q. And were you also cooking dinner for
5  both your host mom and your host dad?
6  A. Yes.
7  Q. Were you also cooking dinner for --
8  breakfast and dinner for the child?
9  A. Yes.
10 Q. Was it the same breakfast and dinner
11 that you cooked for the parents and the child?
12 A. The breakfast was -- was different. The
13 dinner was the same.
14 Q. And did you -- did you agree to this
15 arrangement, or did they ask you to do this?
16      MR. PETTERSON: Objection.
17 A. I felt obligated that I had to do this
18 because -- I understood if I was in an accident, I
19 would only have to pay $500, but then my coordinator
20 said, well, it depended on what the host family said.
21      And they told me that, "Well, this
22 wasn't your car, and you should be responsible," but I
23 didn't know how I would be able to pay them back
24 $2,300.
25 Q. (BY MS. LEVY) Did your host family ever

12 (Pages 45 to 48)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT 2**
**RESTRICTED-ATTORNEY EYES ONLY**

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

| 49 | 51 |
|---|---|

49

1  ask you to perform any duties that concerned you in
2  any way?
3      A.  You mean for money?  For money, like to
4  pay back that money or what?
5      Q.  To take care of the child or otherwise
6  in the home.
7      A.  No, just -- just cooking for them.
8      Q.  Did you take classes when you lived with
9  the ▇▇▇ family?
10     A.  Yes.
11     Q.  How many classes did you take?
12     A.  English.
13     Q.  Was it one class?
14     A.  No.  There was 72 hours.
15     Q.  Did that amount to six credits, or do
16 you know?
17     A.  I just did those hours.
18     Q.  Other than Eileen, your local
19 coordinator, did you meet with any other people from
20 InterExchange when you lived with the ▇▇▇ family?
21     A.  I saw another coordinator, but -- but
22 she was the coordinator that worked alongside Eileen
23 during those meetings.
24     Q.  Did you ever talk with the other
25 coordinator?

50

1      A.  No.
2      Q.  How did your host family pay you your
3  weekly stipend?
4      A.  Through the bank account.
5      Q.  Was it an electronic payment?
6      A.  Yes.
7      Q.  And do you -- who sent you the
8  electronic payment?
9      A.  From my host mom.
10     Q.  Did you keep records of those payments
11 from your host mom?
12     A.  I suppose so, that the bank has that.
13     Q.  Do you still have access to those
14 records?
15     A.  Yes.
16     Q.  Okay.  I would ask that you give those
17 records to your lawyers.
18         MS. LEVY:  And, Sean, I request that you
19 produce those records to us immediately.
20         MR. PETTERSON:  We'll take it under
21 advisement.
22     Q.  (BY MS. LEVY)  Other than the weekly
23 stipend, did your host mom or your host dad give you
24 money on any other occasion?
25     A.  No.

51

1      Q.  And you said you do not have records of
2  the hours that you worked with your host family?
3      A.  No, I don't have it.
4      Q.  We have asked through your attorney that
5  you search for any documents in connection with this
6  lawsuit.  Have you searched for any documents?
7          MR. PETTERSON:  Objection.
8      A.  What do you mean, searching for them?
9  You want to know if I have some?
10     Q.  (BY MS. LEVY)  Do you have any documents
11 in connection with this lawsuit?
12     A.  Yes, emails.
13     Q.  What types of emails?
14     A.  The documents, like when we would --
15 were asked to come here, and also the documents
16 regarding the suit.
17     Q.  Do you have any documents that are not
18 emails from your attorney?
19     A.  No.
20     Q.  Do you remember when you first started
21 getting emails from your attorney about this lawsuit?
22     A.  Yes.
23     Q.  When was that?
24     A.  At the middle of the year last year.
25         MR. PETTERSON:  Are we coming to a point

52

1  of pause?  Are you almost done?
2          MS. LEVY:  I'm -- I'm getting close to
3  finished.
4      Q.  (BY MS. LEVY)  But if -- Ms. Rivera, if
5  you need a break, we can take a break after we finish
6  this question.  Do you need a break?
7      A.  Yes.
8      Q.  Okay.  Let me -- let me just finish this
9  one question that we're in the middle of, and then
10 we'll take a break, okay?
11     A.  Okay.
12         MR. PETTERSON:  Was there a question
13 pending?
14         MS. LEVY:  You know what?  I don't know
15 if there -- I can't remember if there's one pending
16 right now, but I -- if you don't mind, I would like to
17 finish just one or two more questions before we take a
18 break.
19         MR. PETTERSON:  Okay.
20     Q.  (BY MS. LEVY)  Ms. Rivera, on the first
21 document that we looked at tonight, it was your opt-in
22 form, and it was dated July 6 of 2017.  Does that
23 sound right to you?
24     A.  Yes.
25     Q.  Do you think you started receiving

13 (Pages 49 to 52)

EXHIBIT 2
RESTRICTED-ATTORNEY EYES ONLY

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**61**

```
 1              EXAMINATION
 2   BY MS. LEVY:
 3       Q.  Were you -- were you required to eat
 4   dinner with the family?
 5       A.  No. No. I made the dinner, and we all
 6   sat down to eat it.
 7           MS. LEVY: Sean, are you done?
 8           MR. PETTERSON: I'm done. Can we talk
 9   on the phone for a second after this, Alyssa?
10           MS. LEVY: Yes. All right. I would
11   request that Ms. Rivera has -- she did mention that
12   she has bank records, and we -- we do need those to
13   show the payments from her host mom, so I request that
14   we leave this deposition open until we can get those
15   bank records.
16           MR. PETTERSON: Are we on the record
17   still?
18           MS. LEVY: Yes.
19           MR. PETTERSON: Okay. Yeah, I will
20   discuss with -- here internally and we'll get back to
21   you. I note your request.
22           MS. LEVY: Okay. Thank you.
23           WHEREUPON, the within proceedings were
24   adjourned at the approximate hour of 9:40 p.m. on the
25   22nd day of March, 2018.
```

**62**

I, WENDY PAOLA RIVERA ARIAS, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached   ( ) Yes   ( ) No

_____
WENDY PAOLA RIVERA ARIAS

The signature above of WENDY PAOLA RIVERA ARIAS was subscribed and sworn or affirmed to before me in the county of _____, state of _____, this _____ day of _____, 2018.

_____
Notary Public
My Commission expires:

Johana Paola Beltran 3/22/18 (tcm)

**63**

REPORTER'S CERTIFICATE
STATE OF COLORADO      )
                       ) ss.
CITY AND COUNTY OF DENVER )

I, TRACY C. MASUGA, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public 19924005553, State of Colorado, do hereby certify that previous to the commencement of the examination, the said WENDY PAOLA RIVERA ARIAS was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 26th day of March, 2018.

My commission expires April 24, 2020.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

16 (Pages 61 to 63)