IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.

    Plaintiffs,

v.

INTEREXCHANGE, INC., et al.

    Defendants.

_____

**DEFENDANT EXPERT AUPAIR'S MOTION TO DECERTIFY PLAINTIFFS'
FLSA COLLECTIVE ACTION**
_____

Defendant Expert Group International, Inc. d/b/a Expert AuPair ("Expert AuPair"), hereby moves for decertification of the Plaintiffs' FLSA class conditionally certified on June 9, 2017. As grounds therefore, Expert AuPair state:

**CERTIFICATE OF CONFERAL**

In compliance with D.C.COLO.L.CivR 7.1(a), counsel for Expert AuPair conferred with Plaintiffs' counsel, and the Plaintiffs oppose the requested relief.

**INTRODUCTION**

On June 9, 2017, this Court conditionally certified two classes against Expert AuPair comprised of all "current and former *au pairs* for whom Defendant Expert Group International Inc., d/b/a Expert Au Pair, was a J-1 Visa Sponsor" and [a]ll current and former *au pairs* for whom Defendant Expert Group International Inc., d/b/a Expert Au Pair, was a J-1 Visa Sponsor and who were

1

not paid overtime for hours worked in excess of 40 in a week for work performed after January 1, 2015."

After conducting discovery on the members of the conditionally certified class it is obvious that collective treatment of Plaintiffs' claims is inappropriate. The opt-in plaintiffs showed that have little in common: they worked in different states; they worked in different individual households; they worked for different employers; they received different amounts of money for their work; they worked a different number of hours; they performed different duties. The only things that Plaintiffs have in common are the fact that they were all foreign nationals on a J-1 visa; the fact that they were not supervised by Expert AuPair; and the facts that they did not inform Expert AuPair of the actual number of hours worked, the actual tasks performed or the amount of money received.

To date, only 27 former au pairs opted into the Conditional Class. However, out of the 27 names, Expert AuPair cannot identify two of the class members. It appears that one of opt-ins was not sponsored by Expert AuPair and another one was not part of the Au Pair program, but rather an Educare Program participant. [Gaulter Decl. ECF No. 978-1 ¶4].

Expert AuPair took six depositions and received written discovery from six opt-ins. In addition, Expert AuPair obtained written discovery and deposed the named plaintiff, Nicole Mapledoram.

As explained in detail below, discovery in this case highlighted the dissimilar experiences of the opt-in class members with respect to the number of

2

hours worked, the amount of money received, other benefits received, duties, responsibilities, and working conditions. The discovery shows the individualized nature of the conditional class members' claims and accordingly, the Court should decertify this class.

## LEGAL STANDARD

It is the Plaintiffs' burden to show that their claim should proceed collectively. Bayles v. Am. Med. Response, 950 F. Supp 1053, 1067 (D.Colo. 1996). See also Reab. V. Elec. Arts, Inc. 214 F.R.D. 623, 627 (D.Colo. 2002). The FLSA only allows for collective actions where the complaining employees are "similarly situated." 29 U.S.C. § 216(b).

After the discovery is concluded "trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer v. Wal-Mart Stores, Inc.,* 454 F. 3d 544 (6th Cir. 2006). Courts must consider three primary factors at the decertification stage to determine if the individuals who opted in are similarly situated: (1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to defendant which appear to be individualized to each plaintiff; and (3) fairness and procedural considerations. *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).[1]

---

[1] The fourth *Thiessen* factor refers to ADEA filings and it is not applicable to this case.

[2] *See* Ex. 3 28:22-24 where the plaintiff is describing a "walk" with the host mother and the newly negotiated hours of work and payment, that were never brought to Expert AuPair's attention: "So they [the Host Family] asked me if I'm okay to work extra, but that they would pay me extra, but when I realized -- I agreed." See also Ex. 4 30:7-34 where the plaintiff is describing negotiating with

3

While Expert AuPair maintains that it is not the au pairs' employer (*see* Expert AuPair's Motion for Summary Judgment, ECF No. 866), this case should not proceed as a collective action due to the au pairs not being "similarly situated" when it comes to their "employment". Not only that the au pairs worked at different locations through the United States, while having different employers and different supervisors; but the circumstances are different for each individual au pair and her/his host family. It is actually the host family who paid the au pairs and took decisions regarding every single aspect of au pair's "employment." In most, if not all, cases, neither the au pairs nor the host families informed Expert AuPair as to the actual number of hours worked, the job responsibilities or the au pair's performance.

## ARGUMENT

**INDIVIDUAL INQUIRY IS NECESSARY WITH RESPECT TO ALL CLASS CLAIMS ASSERTED AGAINST EXPERT AUPAIR.**

**A. THERE ARE DISPARATE FACTUAL AND EMPLOYMENT SETTINGS**

In order for the Plaintiffs to be "similarly situated" for the purposes of § 216(b) of the FLSA they should experience similar factual and employment circumstances. This is not the case here. Each one of the opt-in class members worked on a different employment setting, with a different host family who set up an individualized schedule.

**I. The number of hours worked varied between au pairs.**

As showed below, the number of hours worked claimed by each one of

4

the opt-ins is different and vary greatly between 30 hours/week and 168 hours/week.

For example some of the au pairs that were deposed claimed that they worked: 30, 45, 55, 65 and 168 hours per week as showed below.

> **Q. Were there weeks when you worked less than 45 hours?**
> A. Sometimes.
> **Q. What is the lowest number of hours that you worked for the Carminati family?**
> A. 30.

Ex. 1 64:18-25, 65:1-5

> **Q. How many hours do you think you worked per week while working as an au pair?**
> A.  Roundabout 47.5 hours.

Ex. 2 33:22-25

> **Q.     If I correctly do the math, […], 11 hours a day five days week would be 55 hours?**
> A.     55 hours, yes.  Sometimes it was even more if the family didn't came back to the home in the time. So I start working at 7:00 a.m. and then I worked until 6:00 p.m., sometimes 6:30 p.m.

Ex. 3 25: 20-25, 26:1

> **Q.    How many hours did you actually  work for the ▓▓▓ family?**
> A. Actually, I just worked 24 hours a day, 24/7.

Ex. 4 43:6-9.

Working more than 45 hours per week is contrary to the Department of State Regulations governing the J-1 visa for au pairs. 22 C.F.R. 62.31(c)(2). It is also a breach of the Employment Contracts that would have a typed clause limiting the number of hours worked to 45 hours per week and 10 hours per day. *See* Ex. 8. However, this did not stop some of the opt-ins from requesting to work an increased number of hours from their host families. "Once I asked, but I asked

5

for extra hours, because I send money back home every month, so I thought more would be better." Ex.1 92:10-12. Such requests were always addressed to the host family and not to Expert AuPair which shows the unique nature of the au pair - host family relationship. Also negotiations regarding the schedule and the number of hours of worked always took place directly between the au pair and the host family.[2]

## II. The duties and working conditions varied among au pairs

Each host family is required to fill in an "Employment Contract" with their au pair, mentioning the specific duties and responsibilities for the au pair. It is not a surprise that it is virtually impossible to find two identical contracts. As the testimony shows, the schedules submitted by host families and au pairs to Expert AuPair at the beginning of the program often changed. As a result, the au pairs ended up working a totally different number of hours, and performing completely different tasks without informing or obtaining any type of approval from Expert AuPair. This is not surprising. As au pairs are entrusted to take care of children, the duties assigned at the beginning of the contract change as the child ages or the parents are going back to work.

Not only that Expert AuPair does not maintain a record of the schedule and duties, but also these duties differ even for the same au pair. The au pair program is a cultural exchange program aimed at giving young people from

---

[2] *See* Ex. 3 28:22-24 where the plaintiff is describing a "walk" with the host mother and the newly negotiated hours of work and payment, that were never brought to Expert AuPair's attention: "So they [the Host Family] asked me if I'm okay to work extra, but that they would pay me extra, but when I realized -- I agreed." See also Ex. 4 30:7-34 where the plaintiff is describing negotiating with the host family about "the hours, the pay, the duties."

6

another countries the opportunity to experience American life by living with and being a part of an American family. (*see.* 22 C.F.R § 62.31(a)), therefore calculating the number of hours worked can be only done by individualized inquiry. *See also Espinoza v. County of Fresno*, 290 F.R.D. 494, 501 (E.D. Cal. 2013).

As discovery shows, the tasks performed by au pairs varied between host families from dressing up children and changing the dippers to being a taxi driver, a cleaner, or a party planner. And the most important part, Expert AuPair was never informed of these tasks.

> **Q. [W]ere you required to perform additional tasks?**
> A. Yes.
>
> **Q. Okay. Can you tell me what additional tasks you were required to perform.**
> A. Some house -- some house duties, like dishwasher, sometimes take the car to the -- to fix. Sometimes it's stuff that wasn't for -- it wasn't for my -- it wasn't a request for an au pair to do. I think that's it.

Ex. 1 25:14-18, 26:3-7

> **Q. Did you have more than the duties mentioned here?**
>
> A. Let's put it this way, I did more than just caring for the baby. I didn't just do lighthouse keeping, either. Yes, they had a housekeeper every month, but it was me on top of the house; hoovering, cleaning. It was like I was a maid in the house. […]

Ex. 7 31:18-25, 32:2-5

> **Q. […] Can you tell me what the tasks were?**
>
> A.  So I needed to -- when the child woke up, I needed to dress him, wash him, help him to brush the teeth. Then I prepared the breakfast for him.  Basically all the meals I prepared for him. I did some letters, numbers. We did some activity. We would go outside to play outside and

7

Case 1:14-cv-03074-CMA-KMT Document 1085-37 filed 05/23/18 USDC Colorado pg 8 of 15

spend time there. So I needed to do the child's laundry. I needed to do the dishes, keep the house tidy. So it wasn't only that taking care of the child. It was, like, part of that, but I guess because it was child clothes I need to do. So basically it was everything. When he gets sick, I also need to give him medication and I take care of him, do the potty training, which I did good, but when the family came back for the weekend they just again put diaper on and the next week I need to teach him again. So it was like, it felt weird why they put the diaper on if I already teach him how to use the potty. So I just did everything like a mother does for the child. So I just spent all the time with him. We do some drawings and that's all.

Ex. 3 33:2-23

**Q. By looking at duties, would you say that the duties mentioned here reflect the duties you were required to perform as part of your job in providing for the ▮▮▮▮ family?**
A. Yes, they do.

**Q. Do you think there were any additional duties?**
A. No.

Ex. 5 16:10-21

**Q. Can you explain how you were taking care of the children while they were not living with you?**
A. I was more employed as Todd ▮▮▮▮ assistant rather than to look after the children. However, I did travel to the mother's house to look after the children. I looked after them outside of the house and in Todd ▮▮▮▮ house when they were there.

**Q. And what other duties would you perform as his assistant?**
A. So I would be, I guess, a taxi driver, a cleaner, a party planner, food shopping, any kind of shopping, furniture shopping, you know, food delivery.

Ex. 4 47:8-22

**Q. What was your responsibilities during the first month?**

A. The first month I would stay with the girl, wake up, making the breakfast. The younger one was not going to school. I would drop the older one at school and I would just stay with the young girl during the day.

8

Ex. 6 26:5-16

Au pairs in the United States are supposed to perform up to 45 hours of childcare per week. 22 C.F.R. 62.31(c)(2).

Expert AuPair specifically informs both the au pairs and the host families on the restrictions associated to the J-1 exchange visitor status. Apart from informing the participants on the requirements of the program Expert AuPair maintain monthly contact with the au pairs inquiring onto the number of hours worked. None of the Opt-in Plaintiffs informed Expert AuPair of the fact that they are working more than the allowed 45 hours/week. *See* Ex. 8

### III.  The stipend received varied among au pairs

While Expert AuPair is a DOS designated sponsor, it is undisputed that it does not pay the au pairs. It is the host family's responsibility to pay the au pairs on a weekly basis. Expert AuPair is not required to monitor the amount each family pays their au pair, beyond the inquiry that the minimum stipend was paid. Therefore without having an obligation to inform Expert AuPair on the actual amount paid, the host families and au pairs decide on the amount of compensation and the method of payment. Testimony shows that the amounts varied between $180 and $225 per week with additional amounts between $8-$10 per hour for babysitting.

**Q. So […] you were paid $180?** A. Yes.

Ex. 5 41:2-9

A. The [$]197 was just our number and they wanted it to be an even number.  They went up to [$]200.

Ex. 6 30:24-25

9

> A. From the ▮▮▮ family I received $200 a week. From the other families I received $195.75.

Ex. 4 34:17

> A. Round sum. It was round sum and so it was $225 I'm pretty sure.

Ex. 3 35:18

> A. It was normally about $8-10 an hour, which is normal for a babysitter.

Ex. 7 44:11-12

### IV. Expert AuPair did not recruit the majority of Opt-in Plaintiffs

Out of the 27 members, Expert AuPair did not recruit the majority of au pairs. These au pairs found their host families and negotiated the terms of their contracts prior to initiating contact with Expert AuPair. Some of the class members were able to find a second and even a third family by themselves, without the involvement of Expert AuPair.

> Q. How did you find your family?
> A. Through a friend.
> Q. Was it before or after you contacted Expert AuPair?
> A. I met with my family and <u>then</u> my family found Expert AuPair.

Ex. 7 14:12-14

> Q. And do you remember how you selected the agency, Expert AuPair? [▮▮▮]
> A. First I found the family, the ▮▮▮, and they lived in Alaska, and Expert AuPair was the only agency available to go to Alaska with.
> Q. Okay. So you found the family by yourself?
> A. Yes.

Ex. 4 20:2-15

> Q. Okay. How did you find this host family? Was it Expert AuPair or was it yourself? [▮▮▮]
> A. I found them.

10

Ex. 4 30:7-9

> Q. Okay. Did you find this family yourself? 
> A. Yes, I did find the family.

Ex. 4 40:13-99

> Q. Did Expert AuPair recruit you for the au pair program to the United States?
> A. No, they did not recruit me.

Ex. 2 24:3-6

**V. Expert AuPair is unaware of the specific conditions of employment and the amounts received by the conditional class members.**

As discovery showed over and over, Expert AuPair was unaware of actual number of hours worked or the tasks performed by the au pairs.

> Q. Did you inform the agency that the hours on the contract were not accurate?
> A. I informed them at the end of my employment.

Ex. 4 43:13-16

> Q. So did Expert AuPair know that your end time was 10:00 p.m. rather than 8:00 p.m.?
> A. No. I never mentioned that to them.

Ex. 5 21:19-22

> Q. [D]id you ever inform Expert Au Pair that you had been working more than 45 hours a week?
> A. No […].

Ex. 6 56:18-25

> Q. Did you tell them that you were working more than 45 hours? […]
> A. No, I didn't.

Ex. 3 27:9-13

11

While Expert AuPair was able to conduct discovery on a relatively small percentage of the class members, individualized inquiry is necessary in order to determine the actual schedules, the duties performed and the amounts received by each one of the class members.

### B. DEFENSES AVAILABLE IN EACH INDIVIDUAL CASE

To prevail in their FLSA claim, Plaintiffs have to show the number of hours they worked and the amount they received as compensation. The proceedings should allow Expert AuPair disapprove the allegations. The total amount received by au pairs on a monthly basis varies considerably.

Some Plaintiffs have no record of how much cash they received on a weekly basis but they were paid well above $200/week. For example Courtney Flynn was paid "$8 - $10/hour extra" for babysitting every other the weekend. Ex. 7 44:21-22. Based on her testimony, every other week, Courtney Flynn would receive approximately $200 + ($9.00 x 8hours x 2days) = $344/week which corresponds to $7.64/hour based on 45 hours worked per week, plus accommodation and meals.

As discovery revealed, some of the opt-in plaintiffs did not work more than 40 hours/week. As showed below, Erick Kovolos, for example, worked 37 hours a week and, therefore, cannot invoke the overtime provision of the FLSA. *See* Ex. 8.

12

1.1 Hours

The work week shall be from Monday until Sunday. The Au Pair is employed to work in the Host Family's home according to the following schedule:

| Day | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Start time | 7a | 7a | 7a | 7a | 7a | | |
| End time | 9a | 12p | 9a | 9a | 9a | | |
| Start time | 3p | 3p | 3p | 3p | 3p | | |
| End time | 6p | 8p | 6p | 8p | 11p | | |

Please fill in a start time and an end time for every day. If nothing is filled in, the period is

The class conditionally certified against Expert AuPair includes all au pairs who were not paid overtime for hours worked in excess of 40 in a week for work performed after January 1, 2015; which therefore would exclude au pairs that worked less than 40 hours/week.

Even if we consider that au pairs have a generic job description and ignore the obvious differences between the plaintiffs, it is still not enough to allow for this action to proceed collectively as long as Expert AuPair's defenses are individualized. *See* Green v. Harbor Freight Tools USA, Inc. 888 F. Supp. 2d 1088, 1098 (D. Kan. 2010.). Indeed, Expert AuPair claims that one class member was not sponsored by Expert AuPair; that another one is an Educare participant; that one class member worked 37 hours per week; and one received $7.34 per hour in addition to being provided with room and board. Considering the limited discovery conducted in this case, the examples below are sufficient to demonstrate the need for asserting individual defenses for each individual case. *Morisky v. Pub Service Elec. And Gas Co.,* 111 F. Supp. 2d 493 (D. N.J. 2000); *Basco v. Wal-Mart Sores Inc.,* 2004 U.S. Dist. LEXIS 12441 (E.D. La. 2004)

13

**C. PROCEDURAL CONSIDERATIONS**

Fairness and procedural consideration weight in favor of decertification. Courts consider the objectives of a collective action (1) to lower the costs to the plaintiffs through pooling of resources; and (2) to limit the controversy to one proceeding.

Regarding limiting the controversy to one proceeding, the Court should have available enough data to be able to adjudicate the case on a class-wide basis. As shown above, such data does not exist. As such, there is no class-wide data source to use in proving liability. *See In re Bank of Am. Wage & Hour Empl. Litig.* 286 F.R.D. 572, 593 (D. Kan. 2012). As such, pursuing this case as a collective action would create multiple "mini-trials" in order to address the specific situations for each au pair.

## CONCLUSION

For the reasons stated above, Expert AuPair respectfully requests that the Court determine that collective treatment is inappropriate and decertify the FLSA class asserted against Expert AuPair.

Dated this 9th day of May 2018.

Respectfully submitted,

*s/Bogdan Enica*
Bogdan Enica, Esq.
111 Second Avenue NE, Suite 204
St Petersburg, FL 33701
Phone: 727-388-3472
bogdane@hotmail.com
ATTORNEY FOR DEFENDANT EXPERT GROUP INTERNATIONAL INC. D/B/A EXPERT AUPAIR

Case No. 1:14-cv-03074-CMA-KMT Document 1085-37 filed 05/23/18 USDC Colorado pg 15 of 15

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2018, I electronically filed the foregoing *Defendant Expert Aupair's Motion to Decertify Plaintiffs' FLSA Collective Action* with the Clerk of Court using the CM/ECF system which sends notification of such filing to all counsel of record.

                                        s/Bogdan Enica
                                        Bogdan Enica, Esq.