# EXHIBIT 10

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

---

*Confidential Video Deposition of Ivette Alexandra Gonzalez*

*September 28, 2016*

---



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig Reporting

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:14-cv-03074-CMA-KMT
 3    _____

 4    JOHANA PAOLA BELTRAN, et al.,

 5         Plaintiffs,

 6    vs.

 7    INTEREXCHANGE, INC.; et al.,

 8         Defendants.
      _____
 9
                   CONFIDENTIAL VIDEO DEPOSITION OF
10                    IVETTE ALEXANDRA GONZALEZ

11                     September 28, 2016
      _____
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:
                SABRIA McELROY, ESQ.
 3              LAUREN E. LOUIS, ESQ. (appearing by phone)
                Boies Schiller & Flexner, LLP
 4              401 East Las Olas Boulevard, Suite 1200
                Fort Lauderdale, Florida 33301
 5              Phone:  954-356-0011
                Emails: smcelroy@bsfllp.com
 6                      llouis@bsfllp.com

 7    ON BEHALF OF AU PAIR INTERNATIONAL, INC., AMERICAN
      CULTURAL EXCHANGE, AND AGENT AU PAIR:
 8              KATHRYN A. REILLY, ESQ.
                Wheeler Trigg O'Donnell, LLP
 9              370 17th Street, Suite 4500
                Denver, Colorado 80202
10              Phone:  303-244-1800
                Email:  reilly@wtotrial.com
11
      ON BEHALF OF AUPAIRCARE, INC.:
12              PEGGY E. KOZAL, ESQ.
                Gordon Rees Scully Mansukhani, LLP
13              555 17th Street, Suite 3400
                Denver, Colorado 80202
14              Phone:  303-534-5160
                Email:  pkozal@gordonrees.com
15
      ON BEHALF OF APF GLOBAL EXCHANGE, NFP,
16    AND AMERICAN INSTITUTE FOR FOREIGN STUDY:
                LAWRENCE L. LEE, ESQ.
17              Fisher & Phillips, LLP
                1801 California Street, Suite 2700
18              Denver, Colorado 80202
                Phone:  303-218-3663
19              Email:  llee@laborlawyers.com

20    ON BEHALF OF A.P.EX. AMERICAN PROFESSIONAL
      EXCHANGE AND 20/20 CARE EXCHANGE, INC.:
21              MICHAEL DREW, ESQ. (appearing by phone)
                Nixon Shefrin Hensen Ogburn, P.C.
22              5619 DTC Parkway, Suite 1200
                Greenwood Village, Colorado 80111
23              Phone:  303-773-3500
                Email:  mdrew@nixonshefrin.com

24


25
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 3

```
 1     APPEARANCES (CONTINUED):

 2     ON BEHALF OF EXPERT GROUP INTERNATIONAL:
               BOGDAN ENICA, ESQ. (appearing by phone)
 3             Bogdan Enica, Attorney at Law
               111 2nd Avenue NE, Suite 900
 4             St. Petersburg, Florida 33701
               Phone:  727-225-2649
 5             Email:  bogdane@hotmail.com

 6     ON BEHALF OF EURAUPAIR INTERCULTURAL CHILD CARE:
               MARTHA L. FITZGERALD, ESQ. (appearing by phone)
 7             Brownstein Hyatt Farber Schreck
               410 17th Street, 22nd Floor
 8             Denver, Colorado 80202
               Phone:  303-223-1100
 9             Email:  mfitzgerald@bhfs.com

10     ON BEHALF OF CULTURAL CARE, INC.:
               LYNDSEY M. KRUZER, ESQ. (appearing by phone)
11             Choate Hall & Stewart, LLP
               Two International Place
12             Boston, Massachusetts 02110
               Phone:  617-248-5000
13             Email:  lkruzer@choate.com

14             and

15             JAMES E. LYONS, ESQ.
               Lewis Roca Rothgerber Christie, LLP
16             1200 17th Street, Suite 3000
               Denver, Colorado 80202
17             Phone:  303-628-9545
               Email:  jlyons@lrrc.com
18
       Also Present:  Jerry DeBoer, Videographer
19                     Anabel Cuadros Yeiser, Interpreter
                       Marcela Salazar
20                     Bill Kapler

21

22

23

24

25
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 4

```
 1              PURSUANT TO WRITTEN NOTICE and the appropriate

 2    rules of Civil Procedure, the confidential video

 3    deposition of IVETTE ALEXANDRA GONZALEZ, called for

 4    examination by Defendant GoAuPair, was taken at the

 5    offices of Wheeler Trigg O'Donnell, LLP, 370 17th Street,

 6    Suite 4500, Denver, Colorado, commencing at 9:09 a.m. on

 7    Wednesday, September 28, 2016, before Deborah A.

 8    VanDemark, RPR, CRCR, and Notary Public in and for the

 9    State of Colorado.

10                          I N D E X

11    EXAMINATION:                                      PAGE

12         By Ms. Reilly                                  7

13                                                    INITIAL
14    EXHIBITS:                                      REFERENCE

15       100    Declaration of Ivette Alexandra          36
                Gonzalez Cortes
16
         101    Au Pair Payment Verification Form        46
17              signed by Ms. Gonzalez on 9/6/14

18       102    GoAuPair Au Pair Agreement,              51
                GAP_00000940-943
19
         103    Department of State Au Pair Exchange     52
20              Program Regulations, GAP_00000916-918

21       104    Letter from Ms. Gonzalez to Host         56
                Family, GONZALEZ000572-573
22
         105    GoAuPair Written Agreement,              77
23              GONZALEZ000972-973

24       106    GoAuPair Written Agreement Signed by     78
                Ms. Gonzalez, GONZALEZ000645-646
25
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 5

| 1 | | | INITIAL |
| | EXHIBITS: | | REFERENCE |
| 2 | | | |
| 3 | 107 | GoAuPair Orientation Packet, GONZALEZ000482-488 | 101 |
| 4 | 108 | GoAuPair Grievance Policy, GONZALEZ001214-1215 | 107 |
| 5 | | | |
| 6 | 109 | GoAuPair Survey completed by Ms. Gonzalez, GAP_00003919-3921 | 118 |
| 7 | 110 | Notes made by Amanda Gray, GAP_00003925-3926 | 148 |
| 8 | | | |
| 9 | 111 | Email chain between Ms. Gonzalez and Ms. Hardman with attached text messages from Ms. Sanders, | 159 |
| 10 | | GONZALEZ000728-733 | |
| 11 | 112 | Email chain between Ms. Gonzales and Ms. Hardman regarding rematch, | 160 |
| 12 | | GONZALEZ001221-1223 | |
| 13 | 113 | Email to Ms. Zapata from Ms. Gonzalez dated 2/2/15, GONZALEZ000743 | 161 |
| 14 | | | |
| 15 | 114 | Email to Ms. Gonzalez from Ms. Gray dated 2/17/15, GONZALEZ001254 | 162 |
| 16 | 115 | Email chain between Ms. Gonzalez and Ms. Hardman with attached letter from | 169 |
| 17 | | Ms. Sanders, GONZALEZ001266-1268 | |
| 18 | 116 | GoAuPair Survey completed by Ms. Gonzalez, GAP_00003922-3924 | 175 |
| 19 | | | |
| 20 | 117 | Email chain between Ms. Gonzalez and Ms. Moore, GONZALEZ000759-760 | 180 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 6

```
 1               P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  We are on the record at
 3    9:09 on September 28, 2016.  Will the reporter please
 4    swear in the interpreter.
 5                    ANABEL CUADROS YEISER,
 6    having been first duly sworn, testifies to translate the
 7    questions asked and the answers given to the best of
 8    their ability:
 9               THE VIDEOGRAPHER:  We are at 370
10    17th Street, Suite 4500, Denver, Colorado.  We are here
11    for the video deposition of Ivette Alexandra Gonzalez in
12    the matter of Johana Paola Beltran, et al. versus
13    InterExchange, Inc., et al. in the United States District
14    Court for the District of Colorado, Case Number
15    1:14-cv-03074-CMA-KMT.  The videographer is Jerry DeBoer,
16    and the court reporter is Debbie VanDemark from
17    Stevens-Koenig Reporting.
18               Will counsel please state their
19    appearances beginning with plaintiffs' counsel.
20               MS. McELROY:  Sabria McElroy from Boies
21    Schiller & Flexner for the plaintiff.
22               MS. REILLY:  Katie Reilly on behalf of
23    GoAuPair, Agent Au Pair, and Au Pair International.
24               MS. KOZAL:  Peggy Kozal on behalf of
25    AuPairCare.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 7

 1                    MR. LEE:  Larry Lee here on behalf of AIFS

 2    for APF.

 3                    THE VIDEOGRAPHER:  And counsel on the

 4    phone?

 5                    MR. DREW:  This is Mike Drew.  I represent

 6    A.P.EX and 20/20 Care Exchange.

 7                    MS. KRUZER:  This is Lyndsey Kruzer.  I

 8    represent Cultural Care.

 9                    MS. LOUIS:  Lauren Louis with Boies

10    Schiller on behalf of plaintiff.

11                    MR. ENICA:  And Bogdan Enica on behalf of

12    Expert Group International doing business as Expert

13    AuPair.

14                    MS. FITZGERALD:  Martha Fitzgerald on

15    behalf of EurAupair.

16                    MS. REILLY:  Also let the record reflect

17    with me today is Bill Kapler from GoAuPair.

18                    THE VIDEOGRAPHER:  Will the reporter

19    please swear in the witness.

20                    IVETTE ALEXANDRA GONZALEZ,

21    having been first duly sworn, was examined and testified

22    as follows:

23                         EXAMINATION

24    BY MS. REILLY:

25              Q.   Good morning, Ms. Gonzalez.  I'm Katie

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 8

1    Reilly, and I represent GoAuPair, Agent Au Pair, and

2    Au Pair International in the lawsuit.  Ms. Gonzalez, why

3    did you join this lawsuit?

4              A.    Because I thought that the salary was not

5    fair.

6              Q.    And what was not fair about it?

7              A.    It was not fair to work 9 hours a day and

8    receive that salary having personal needs.

9              Q.    Did you know what the salary would be

10   before you entered the au pair program?

11             A.    Yes, of course, but in Colombia that's a

12   lot of money.

13             Q.    What do you think GoAuPair did wrong?

14             A.    I think introducing the girls to the

15   United States without knowing how is the life here, how

16   it is, how the money is here, and if that money really

17   works here for our personal needs.

18             Q.    The salary you received was paid by your

19   host family, right?

20             A.    Yes.

21             Q.    And it was your host family who decided

22   how much to pay you?

23             A.    I'm not sure I understand the question

24   because there's two parts here.  GoAuPair in Colombia

25   told me the salary, and they told me that the family

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 9

 1   already know -- or already knew the salary, but here --

 2   and nonetheless here in the U.S. the services were

 3   ratified at $200 with Amanda that was here.

 4         Q.    What do you mean ratified?

 5         A.    Amanda accepted the $200.

 6         Q.    Amanda accepted the $200, but it was the

 7   Sanders who decided the $200, correct?

 8               MS. McELROY:  Object, mischaracterizes

 9   testimony.  You can answer.

10         A.    The Sanders put the $200, but Amanda wrote

11   them down when I arrived to the United States.

12         Q.   (By Ms. Reilly)  Did GoAuPair ever lie to

13   you about anything?

14               MS. McELROY:  Objection, foundation.

15         A.    I'm not sure that I have to answer that

16   question.

17         Q.   (By Ms. Reilly)  You do have to answer that

18   question.

19         A.    No, they didn't lie because in reality

20   they told me the salary that it was going to be, no more

21   or less.  It was what it was.

22         Q.    Have you ever been deposed before?

23         A.    No, never.

24         Q.    Okay.  So I'm going to go over just some

25   ground rules for today's deposition.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 10

 1           A.   Thank you very much.

 2           Q.   So first you have to give verbal answers,

 3    which you've been doing a good job of so far.  Verbal

 4    answers means with words and not just by shaking the head

 5    or making hand gestures, so using words so that the court

 6    reporter can make a record.  And if you don't understand

 7    a question that I'm asking, just let me know.  And I'm

 8    happy to rephrase it.

 9           A.   Yes.  Thank you.

10           Q.   And if you do not ask me to rephrase it, I

11    will assume that you understood my question, okay?  If

12    you need a break at any point, just let us know.  As long

13    as a question isn't pending, we can take a break.

14           A.   Thank you.

15           Q.   Other than today -- or other than this

16    case, have you ever given sworn testimony in the form of

17    an affidavit or in court?

18           A.   No, not in court.

19           Q.   And have you taken any medication within

20    the last 24 to 48 hours that would impair your ability to

21    remember things today or give testimony?

22           A.   No, no.

23           Q.   Did you prepare for today's deposition?

24           A.   No.

25           Q.   Did you meet with your lawyer in advance

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 11

1    of the deposition to talk about the deposition?

2                (Mr. Lyons joined the proceedings.)

3                A.   Yes, I did talk to my lawyer obviously

4    about this deposition in the terms -- obviously very

5    general terms about what was going to happen.

6                Q.   And I'm not going to ask you today about

7    anything you've discussed with your lawyer, okay?  Did

8    you meet with your lawyer in person?

9                A.   Yes.

10               Q.   And when was that?

11               A.   On Monday.

12               Q.   And who was that that you met with,

13   Sabria?

14               A.   Yes.

15               Q.   If you could give a louder answer.

16               A.   (In English)  Yes, yes.

17               Q.   Any other lawyer?

18               A.   Lauren.

19               Q.   Lauren Louis?

20               A.   Yes, ma'am.

21               Q.   And was Lauren on the phone?

22               A.   No, in person.

23               Q.   And where did you meet?

24               A.   In Miami.

25               Q.   Was any other lawyer present?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                           September 28, 2016

Page 12

```
 1              A.    No, ma'am.
 2              Q.    Okay.  And did you review any documents to
 3    prepare for today's deposition?
 4              A.    Yes, of course.
 5              Q.    Which ones?
 6              A.    The statements that I have given them.
 7              Q.    You mean your declaration?
 8              A.    Yes.
 9              Q.    Your discovery responses?
10              A.    Uh-huh.
11              Q.    The complaint that's been filed in this
12    case?
13              A.    Yes, ma'am.
14              Q.    Anything else?
15              A.    No, ma'am.
16              MS. McELROY:  Can we take a short break?
17              THE VIDEOGRAPHER:  Going off the record.
18    The time is 9:23.
19              (Recess taken from 9:23 a.m. to 9:33 a.m.)
20              THE VIDEOGRAPHER:  We are back on the
21    record.  The time is 9:33.
22              Q.    (By Ms. Reilly)  Ms. Gonzalez, do you have
23    any corrections you'd like to make to your testimony?
24              A.    Yes.
25              Q.    What is that?
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 13

1          A.   In the question where you asked me if --
2    about the life.

3          Q.   Okay.  What's the correction?

4          A.   What I wanted to say is that in general
5    terms sometimes I feel it was a lie.

6               MR. LYONS:  I'm sorry.  Sometimes I what?

7               THE INTERPRETER:  I feel it was a lie.

8               MR. LYONS:  All right.  Thank you.

9          Q.  (By Ms. Reilly)  And what caused you to
10   change your testimony from 20 minutes ago during the
11   break to now?

12         A.   Because I was nervous.  And I was thinking
13   about the cash, the cash alone.  I wasn't thinking on the
14   entire experience.

15         Q.   But after the break you have other things
16   on your mind?

17              MS. McELROY:  Objection, form.

18         A.   I'm not sure if I have to answer that
19   question, but --

20         Q.  (By Ms. Reilly)  I'll strike that question.
21   So what -- what's your new answer to the lie question?

22              MS. McELROY:  Objection, form.

23         A.   Then change the question.

24         Q.  (By Ms. Reilly)  How did GoAuPair lie to
25   you?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 14

```
 1              A.   They should have told me that in Colombia
 2    that they were going to leave me alone, alone when I was
 3    here.  When I was here, I was in a cultural exchange.
 4                   THE DEPONENT:  (In English) I don't
 5    believe you are very good.
 6                   MS. McELROY:  Object to translation.
 7                   MS. KOZAL:  Why don't we have the witness
 8    repeat her answer, and then we have it translated again
 9    because I'm sure you don't recall exactly what she just
10    said, fair?
11                   MS. SALAZAR:  I do recall what she just
12    said.
13                   MS. REILLY:  Good.
14                   MS. SALAZAR:  She said that when she was
15    in Colombia they never told her that she would be left
16    here alone.  She felt very alone here.  She came here to
17    work.  She was here working.  She didn't come here on a
18    cultural exchange.
19              Q.   (By Ms. Reilly)  Any other lies that
20    GoAuPair told you?
21              A.   In Colombia they told me I would be
22    accompanied by a local, a local person.  But just being
23    here I didn't feel that real company.  I felt -- I felt
24    with the family that I was alone.  I was in a job.  And
25    they have told me that I was in a cultural exchange, and
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 15

 1   it was not a job.

 2                   THE DEPONENT:  (In English)  I don't know

 3   if that is good.

 4                   MS. McELROY:  Object to translation.

 5                   MS. SALAZAR:  When I was in Colombia, they

 6   told me that there would be a local coordinator here, but

 7   once I arrived here I didn't have that local coordinator.

 8   I was alone.

 9                   THE DEPONENT:  (In English)  No.  I have.

10          A.   I did have coordinator, but I didn't feel

11   that the agency was accompanying me during this whole

12   process in the United States.

13          **Q.   (By Ms. Reilly)  Is that accurate?**

14                   MS. McELROY:  Object.

15          A.   No, no, not really.  What you're saying is

16   not what I'm trying to say.

17                   MS. REILLY:  Let's go off the record for

18   one second.

19                   MR. LEE:  Good idea.

20                   THE VIDEOGRAPHER:  Going off the record.

21   The time is 9:39.

22          (Recess taken from 9:39 a.m. to 9:48 a.m.)

23                   THE VIDEOGRAPHER:  We are back on the

24   record.  The time is 9:48.

25          **Q.   (By Ms. Reilly)  Ms. Gonzalez, what is your**

Johana Paola Beltran, et al. vs.        **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.        **September 28, 2016**

Page 16

```
 1    current address?

 2             A.    78th Street, Number 5825, Bogota,

 3    Colombia.

 4             Q.    How long have you lived there?

 5             A.    All my life.

 6             Q.    Do you live there with your family?

 7             A.    At this moment, no.

 8             Q.    Where does your family live?

 9             A.    In Zipaquira.  It's a small town next to

10    the city.

11             Q.    Okay.  So other than when you were in the

12    United States, you've lived at that address your entire

13    life?

14             A.    Yes, ma'am.

15             Q.    And do you have any plans to move?

16             A.    Yes.

17             Q.    Where?

18             A.    I would like to go to Europe some day.

19             Q.    Do you have a plan to go to Europe?

20             A.    Yes.

21             Q.    What will you do there?

22             A.    If I can, study.

23             Q.    Have you applied for any programs to study

24    in Europe?

25             A.    No, ma'am.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 17

1          Q.    Are you married?

2          A.    No, ma'am.

3          Q.    Do you have any children?

4          A.    No, ma'am.

5          Q.    And where were you born?

6          A.    In Bogota, Colombia.

7          Q.    Other than Colombia and the United States,

8    have you spent any other time in any other country?

9          A.    No, ma'am.

10         Q.    Can you go through your education

11   experience with us?

12               MS. McELROY:  Objection, form.

13         Q.    (By Ms. Reilly)  I'm going to strike that.

14   Did you graduate from high school?

15         A.    Yes, of course.

16         Q.    What year?

17         A.    2005.

18         Q.    And what was your high school name?

19         A.    It was Colegio Las Mercedes.

20               THE INTERPRETER:  I think there was a

21   problem with the question.

22               MS. REILLY:  Sure.

23               THE INTERPRETER:  Did you say her name or

24   the name of the school?

25         Q.    (By Ms. Reilly)  What's the name of your

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 18

1    high school?

2           A.    Colegio Las Mercedes.

3           Q.    Did you go to college?

4           A.    Yes.

5           Q.    Did you graduate from college?

6           A.    Yes, of course.

7           Q.    Which university?

8           A.    University Pedagogica Nacional Colombia.

9           Q.    What year?

10          A.    2012.

11          Q.    And what degree did you obtain from your

12    college?

13          A.    A bachelor's in sports.

14          Q.    Do you have any other degrees?

15          A.    Not at the moment.

16          Q.    Are you currently enrolled in school?

17          A.    No, ma'am.

18          Q.    Are you currently working?

19          A.    Yes, ma'am.

20          Q.    What is your job?

21          A.    I am a professor of artistic gymnastics.

22          Q.    Where do you teach?

23          A.    In the public school.

24          Q.    What are the ages of the children you

25    teach?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                         September 28, 2016

Page 19

```
 1              A.   6 to 9.
 2              Q.   And how long have you been in that
 3   position?
 4              A.   Since before I left to the United States.
 5   I was there a year and a half, and then after I arrived
 6   from the United States I've been there now.
 7              Q.   And what is your salary in that job?
 8              A.   I don't know the amount in dollars.
 9              Q.   Pesos are fine.
10              A.   3,300,000.
11              Q.   Is that per week or per month?
12              A.   By month with a contract of services
13   rendered.
14              MS. McELROY:   Object to translation.
15              Q.   (By Ms. Reilly)  How many hours a week do
16   you work in your current position?
17              A.   7.
18              Q.   7 hours per week?
19              A.   No, per day.
20              Q.   How many days per week?
21              A.   Four.
22              Q.   Have you received the same salary since
23   you began working in that job in 2012?
24              A.   No.
25              Q.   Can you go through the different salaries
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 20

```
 1    you've made at that job?
 2              MS. McELROY:   Object to form.
 3         A.   I think that that's a personal question.
 4         Q.   (By Ms. Reilly)  You need to answer.
 5         A.   Okay.  Would you please repeat the
 6    question?
 7         Q.   Sure.  Starting in 2012 when you started
 8    with the gymnastics teaching, what have your wages been?
 9         A.   In 2012 in December I graduated.  In 2013
10    I started working.  At that time my salary was 2 million
11    pesos.  Then in 2014 my salary was 1,400,000, and then
12    after I came back from the United States my salary was
13    raised.
14         Q.   To 3,300,000?
15         A.   Yes, ma'am.
16         Q.   In 2013 when you were receiving 2 million
17    pesos, how many hours a week did you work?
18         A.   Per day or per week?
19         Q.   Both.
20         A.   Per day I was working around 8, and I was
21    working Monday through Friday.
22         Q.   In 2014 when you were making 1,400,000,
23    how many hours per day and per week?
24         A.   The same.
25         Q.   So now you're working less and making
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                  September 28, 2016

Page 21

 1    more?

 2                    MS. McELROY:  Objection, form.

 3            A.    Fortunately.

 4            Q.  (By Ms. Reilly)  Okay.  Why did -- do you

 5    have an understanding as to why your employer is paying

 6    you more now since your return from the United States?

 7                    MS. McELROY:  Objection.

 8            A.    No.

 9            Q.  (By Ms. Reilly)  Has your English improved?

10            A.    Yes.

11            Q.    Have you acquired any other skills that

12    make you more valuable in your position since returning

13    from the United States?

14                    MS. McELROY:  Objection.

15            A.    No.

16            Q.  (By Ms. Reilly)  Are your job duties the

17    same now that they were before leaving for the United

18    States?

19            A.    Yes.

20            Q.    How?

21            A.    I have to comply with the same objectives,

22    the contractual objectives.  The only difference is now

23    they pay per hour -- I mean per session, per session.

24            Q.    What does that mean, "per session"?

25            A.    A session is two hours of class.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 22

1    Q.   Before were you paid per hour instead of

2    per session?

3         A.   No, no.  Before they paid me that salary

4    it was a basic salary.

5    Q.   So it was not tied to the exact number of

6    hours you worked?

7         A.   No, not before, only that I make the

8    accounting.  And it was 8 hours per day.

9    Q.   That's your own math?

10        A.   Yes.

11   Q.   Have you held any other positions of

12   employment from 2013 through present other than the

13   gymnastics teacher and being an au pair?

14        A.   Yes, ma'am.

15   Q.   What?

16        A.   I work for a gym.

17   Q.   What do you do for the gym?

18        A.   I'm instructor.

19   Q.   Is that a position you currently hold?

20        A.   Not at this time.  I resigned last -- a

21   week before last.

22   Q.   What period of time were you working for

23   the gym?

24        A.   I work from August of this year.

25   Q.   What was your -- what wages were you paid

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 23

1    for that job?

2         A.   4 hours, 25,000 pesos.

3         Q.   **Was that per week or per day?**

4         A.   Per day.

5         Q.   **Were you teaching students in that job?**

6         A.   No.  It's instruction of the machines.

7         Q.   **Were you teaching adults?**

8         A.   I don't know if you call them classes.

9    They're accompaniment.

10        Q.   **Training, personal training?**

11        A.   Yes, personal training.

12        Q.   **Other than that job and the other jobs**

13   **we've discussed, have you been employed by any other**

14   **employer since 2013?**

15        A.   No, ma'am.

16        Q.   **Have you applied to any positions?**

17        A.   Yes, of course.

18        Q.   **Which ones?**

19        A.   I've tried to apply on ships.

20        Q.   **For what position?**

21        A.   A caregiver or a personal trainer --

22             THE INTERPRETER:  Excuse me.  The

23   interpreter needs repetition or explaining.

24        A.   Animador is like an animator that does

25   recreation for children in an event or adults that

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 24

```
 1    typically handles a microphone.

 2                    MS. McELROY:  Object to translation.

 3            Q.  (By Ms. Reilly)  Have you been offered any

 4    positions with a cruise line?

 5                    MS. McELROY:  Objection.

 6            A.   No, not yet.

 7            Q.  (By Ms. Reilly)  Do the -- do the positions

 8    with the ships require proficiency in English?

 9                    MS. McELROY:  Objection, form.

10            A.   Of course.

11            Q.  (By Ms. Reilly)  How much do those

12    positions pay that you've applied to with the ships?

13            A.   It depends on the company, but normally

14    it's between $1,000 and 2,000.

15            Q.   Per week?

16            A.   No, the month.

17            Q.   And how many hours do you have to work for

18    the ship positions?

19                    MS. McELROY:  Objection.

20            A.   I don't know because it depends on the

21    ship.

22            Q.  (By Ms. Reilly)  Do you have an idea of the

23    range?

24            A.   8 hours.

25            Q.   Five days a week?
```

Johana Paola Beltran, et al. vs.                          Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                         September 28, 2016

Page 25

 1                    MS. McELROY:  Objection.

 2            A.   I believe it's more.

 3            Q.   (By Ms. Reilly)  How many days a week do

 4    you understand you would have to work with the ship

 5    positions?

 6            A.   I don't know that.  It depends on the

 7    events.

 8            Q.   Okay.  Do those ship positions provide you

 9    with free room and board?

10            A.   Of course.

11            Q.   Do they provide you with health insurance?

12                    MS. McELROY:  Objection.

13            A.   For everyone -- everything, even for the

14    family.

15            Q.   (By Ms. Reilly)  Is that important to you?

16                    MS. McELROY:  Objection.

17            A.   Not really, but it's important because if

18    something gets to happen to me, I have -- I have an

19    insurance that covers my life.

20            Q.   (By Ms. Reilly)  What is your understanding

21    of the United States au pair program?

22                    MS. McELROY:  Objection, form.

23            A.   There is a program where girls come from

24    other countries, and it's an intercultural exchange.  And

25    the family, American, receives them.  And they're part of

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                     September 28, 2016

Page 26

1    that family.
2                    Q.   (By Ms. Reilly)  And what is the purpose of
3    the program?
4                         MS. McELROY:  Objection.
5                    A.   I don't recall it at this time.
6                    Q.   (By Ms. Reilly)  Do you have an
7    understanding of what the purpose of the au pair program
8    is?
9                    A.   Yes, of course.
10                   Q.   And what is that understanding?
11                        MS. McELROY:  Object to translation.
12                   A.   I don't understand.
13                   Q.   (By Ms. Reilly)  Sure.  I'll ask again.  Do
14   you have an understanding of what the purpose of the
15   United States au pair program is?
16                        MS. McELROY:  Object.
17                   A.   To offer intercultural exchange for girls
18   from other countries.
19                   Q.   (By Ms. Reilly)  And do you know who the
20   Department of State is?
21                   A.   Yes, of course.
22                   Q.   And do you know what their role is with
23   respect to the United States au pair program?
24                        MS. McELROY:  Objection.
25                   A.   I don't know it very well.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 27

1          Q.   (By Ms. Reilly)   What do you know about the

2     Department of State?

3               MS. McELROY:   Objection.

4          A.   They're the ones that regulate the

5     program.

6          Q.   (By Ms. Reilly)   Do you know how they

7     regulate the program?

8               MS. McELROY:   Objection.

9          A.   No, I don't have the slightest clue.

10          Q.   (By Ms. Reilly)   Have you ever seen

11     regulations issued by the Department of State about the

12     au pair program?

13          A.   No.

14          Q.   How did you first learn about the United

15     States au pair program?

16          A.   It's a very popular program with the girls

17     in Colombia.  I had spoken with a friend that had gone to

18     Holland like an au pair, and she told me the agency which

19     she had gone there were other countries and that it was a

20     good opportunity to get deeper in English.  Then I

21     went -- I'm sorry.  I called to Lina Maria, which is a

22     person in Colombia in charge of giving information about

23     this program in the agency.  And she told me everything

24     about the program.  Then I got motivated in October and I

25     paid and I started.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 28

1      Q.    What's the name of your friend who was an

2    au pair in Holland?

3          A.    Swan.

4          Q.    Is that her full name?

5          A.    No, that's the name I know for her, Swan.

6          Q.    And do you know if she was an au pair with

7    GoAuPair?

8              MS. McELROY:   Objection.

9          A.    I have no idea.

10          Q.    (By Ms. Reilly)  Do you know if she used

11    the same agency in Colombia that you used, Intercambio?

12          A.    Yes.

13          Q.    Was she the one who suggested that you

14    call Intercambio?

15          A.    Yes.

16          Q.    Did you talk to any other au pairs before

17    you reached out to Intercambio?

18          A.    Yes.

19          Q.    And who were those au pairs?

20          A.    Some girls that used to play with me in

21    the ultimate Frisbee team.

22          Q.    And where had they served as au pairs?

23          A.    United States.

24          Q.    And did they use Intercambio?

25              MS. McELROY:   Objection.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 29

1          A.    No, ma'am.

2          Q.   (By Ms. Reilly)   Which agency did they go

3    through?

4                MS. McELROY:   Objection.

5          A.    Cultural Care.

6          Q.   (By Ms. Reilly)   And their names?

7          A.    Vanessa and Natalia.

8          Q.    And what did Vanessa tell you about her

9    au pair experience with Cultural Care?

10               MS. McELROY:   Objection.

11         A.    Her in general terms said she had learned

12   English, but it was hard.

13         Q.   (By Ms. Reilly)   What was hard?

14         A.    The hard part was that the family

15   sometimes did not understand her.   And she would tell me

16   that the transportation was difficult, that I needed to

17   know how to drive because if not I was going to die in

18   the U.S.

19         Q.    And did you know how to drive before the

20   program?

21         A.    I took a class, yes.

22         Q.    In Colombia?

23         A.    In Colombia.

24         Q.    You get your license?

25         A.    Yes.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 30

1        Q.   Other than the class, did you ever do any

2  driving in Colombia?

3        A.   No.

4        Q.   Have you ever owned a car?

5        A.   No.

6        Q.   How was Swan's experience being an

7  au pair?

8            MS. McELROY:  Objection.

9        A.   She only gave me the name of Intercambio

10  because she told me in Holland everything was different.

11        Q.  (By Ms. Reilly)  Did she share any

12  complaints with you about the au pair program in Holland?

13            MS. McELROY:  Objection.

14        A.   Yes.

15        Q.  (By Ms. Reilly)  What did she tell you?

16        A.   That she had to have available time a lot

17  of the times.

18        Q.   What does that mean?

19            MS. McELROY:  Objection.

20        A.   She had to be available many times, but

21  she didn't tell me more because she -- well, she stayed

22  in Holland.

23        Q.  (By Ms. Reilly)  And Holland is different

24  than the United States program?

25        A.   Yes, the pay, everything, and the

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 31

1    transportation.  She doesn't need a car.

2              Q.    Did Vanessa tell you anything about the

3    pay for the United States au pair program?

4              A.    Yes.

5              Q.    What did she tell you?

6              A.    That they would pay 195.90 -- or 5 per

7    week.

8              MS. McELROY:  Objection to translation.

9              Q.    (By Ms. Reilly)  195.75 per week; is that

10   correct?

11             A.    In reality she told me that they paid

12   around that.  I don't remember exactly if it was a point

13   more or a point less, but it's around there.

14             Q.    Did she complain about that amount?

15             MS. McELROY:  Objection.

16             A.    We never really talked about the expenses

17   or anything like that.

18             Q.    (By Ms. Reilly)  Do you remember if she

19   complained to you about the wages she received in the

20   au pair program in the United States?

21             MS. McELROY:  Objection.

22             A.    No, she would talk to me about other

23   things.

24             Q.    Did Natalia complain to you about the

25   stipend for the United States au pair program?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 32

 1              MS. McELROY:  Objection.

 2         A.   She didn't talk much about it.

 3         Q.  (By Ms. Reilly)  Did she tell you that she

 4    had a positive experience being an au pair in the United

 5    States?

 6         A.   I don't know if it was everything positive

 7    because she would tell me like goods things, bad things,

 8    so-so things.

 9         Q.   What made you decide to finally call -- or

10    to call Intercambio?

11         A.   The paperwork was a little bit easier and

12    because Swan had told me that she had had that experience

13    in Holland.  And she told me that over there were more

14    countries, and I could decide over there what country --

15    I mean, they just have more options.

16         Q.  (By Ms. Reilly)  And the paperwork was

17    easier than what?

18         A.   Solely because, you know, Lina Maria would

19    call.  She would send paperwork, you know.  She would

20    correct it, and Lina Maria also offered closer -- a

21    closer deal.  So that --

22              MS. McELROY:  Object to translation.

23         A.   -- gave me a better comfort.

24              MS. McELROY:  Object to translation.

25         A.   Or trust.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                      September 28, 2016

Page 33

1          Q.   (By Ms. Reilly)  Did you contact any

2   agencies other than Intercambio during the 2013

3   timeframe?

4          A.    To contact them to immediately sign up,

5   no.  But for information, yes.

6          Q.    Who else did you contact?

7          A.    Cultural Care I saw on the page, the

8   webpage.  The others were -- another one called American

9   Au Pair, but I didn't -- I didn't -- I didn't like the

10  person that offered that information.  And I went to

11  another gathering, but I'm not sure what organization was

12  that.  Because in Colombia they do a gathering, but they

13  don't necessarily tell you you are going to go with this

14  agency.  They tell you about the advantages of being an

15  au pair and all that.

16         Q.    At that gathering did they -- were there

17  any statements made about how much stipend you would

18  receive as an au pair?

19              MS. McELROY:  Objection.

20         A.    Yes, and all the same.

21         Q.   (By Ms. Reilly)  And what was the statement

22  made at the gathering?

23         A.    That they would say 195 and change per

24  week and that you had to work up to 9 hours.  But there

25  were families that didn't necessarily need the 9 hours,

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 34

1    that that was sometimes; and that I had the opportunity

2    to study; and I had the opportunity to have a car, to

3    move around; that I had the opportunity to get to see the

4    United States; that I would have the opportunity to have

5    two weeks paid for the family.

6                    MS. McELROY:  Object to translation.

7                    THE INTERPRETER:  I asked for

8    clarification.  What was dos semanas, and she said two

9    weeks paid on vacation.

10            A.    Two weeks of vacation.  And I also -- I

11   had the opportunity with the families, travel with the

12   vacation with the families, or it was a cool opportunity

13   to get to know the United States.

14           Q.  (By Ms. Reilly)  Just like you were told

15   that you might be able to work less than 9 hours a day,

16   did anyone ever tell you in 2013 that you might be able

17   to get paid more than 195.75?

18                   MS. McELROY:  Objection to form, object to

19   translation.

20                   THE INTERPRETER:  Will you repeat the

21   question?

22           Q.  (By Ms. Reilly)  Were you ever told in 2013

23   by anyone that you could make more than 195.75 possibly?

24                   MS. McELROY:  Object to form, object to

25   translation.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 35

```
 1              THE INTERPRETER:  195.75.

 2              THE DEPONENT:  (In English)  2000 what?

 3    Sorry.

 4         A.   Will you repeat the question?

 5         Q.  (By Ms. Reilly)  Were you ever told in 2013

 6    you might be paid more than 195.75 by your host family?

 7              MS. McELROY:  Object to form.

 8         A.   No, never.

 9         Q.  (By Ms. Reilly)  Were you ever told whether

10    the Department of State played any role in determining

11    the 195.75 stipend?

12              MS. McELROY:  Objection, object to

13    translation.

14         A.   No, no, I had no idea.

15         Q.  (By Ms. Reilly)  Sitting here today, do you

16    have any understanding about the Department of State's

17    role in setting the 195.75 stipend?

18              MS. McELROY:  Objection, object to

19    translation.

20         A.   I don't know why they want that salary,

21    determined that salary, is that salary.

22              MS. McELROY:  Object to translation.

23         Q.  (By Ms. Reilly)  Do you have any

24    understanding sitting here today as to whether the

25    Department of State sets the 195.75 stipend?
```

Johana Paola Beltran, et al. vs.        **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.        **September 28, 2016**

Page 36

```
 1                    MS. McELROY:  Objection, object to
 2    translation.  Katie, can we go off the record for a
 3    minute?
 4                    MS. REILLY:  Sure.
 5                    THE VIDEOGRAPHER:  Going off the record.
 6    The time is 10:30.
 7             (Recess taken from 10:30 a.m. to 10:58 a.m.)
 8             (Exhibit 100 was marked.)
 9                    THE VIDEOGRAPHER:  We are back on the
10    record.  The time is 10:58.
11                    MS. REILLY:  I first want to make a record
12    of the fact that 30 minutes ago there was a break called
13    to determine the correct interpretation of the word
14    "stipend" into Spanish, and the parties have all agreed
15    that the word "stipend" is understood by Ms. Gonzalez and
16    will be used in English when referring to the weekly
17    stipend at issue in this case; is that correct?
18                    MS. McELROY:  That's correct.
19                    MS. REILLY:  I also want to make a record
20    that this deposition has been going for two hours and
21    more than one hour of it has been unplanned breaks.  And
22    I have a concern as to what is happening during these
23    lengthy breaks, particularly as the first lengthy break
24    resulted in a change of testimony.  And the second
25    30-minute break was about figuring out a single --
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.                        Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 37

 1  translation of a single word.  So for us to get through

 2  this deposition in a timely manner, we're going to have

 3  to cut the long breaks or at least have them be planned.

 4  Does that work for everyone?

 5              MR. LEE:  Yes.

 6              MS. McELROY:  And we agree with cutting

 7  long breaks, and we hope the translation issues will go

 8  more smoothly.  But we want to state that the reason --

 9  the primary reason for the long breaks has been the issue

10  with translation and the confusion that that's caused.

11              MS. REILLY:  Well, the first break was

12  not.  It was -- there was a change in testimony that had

13  nothing to do with the translation issue, but we can go

14  back on the record and get going.

15              Q.  (By Ms. Reilly)  Ms. Gonzalez, can you

16  please look at Exhibit 100 and tell me if you recognize

17  this document?

18              A.  Yes.

19              Q.  Okay.  And if you turn to the second page,

20  is that your signature?

21              A.  Yes, ma'am.

22              Q.  And did you carefully review this document

23  before signing it?

24              A.  Yes, ma'am.

25              Q.  Okay.  And is every statement in this

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 38

1    declaration accurate?

2                A.   Yes, ma'am.

3                Q.   In Paragraph 2 do you see the final

4    sentence that you were advised by the representative of

5    Intercambio that as an au pair for either sponsor you

6    would be paid a $195.75 weekly stipend and would be

7    expected to work for 45 hours per week?

8                A.   Yes.

9                Q.   And did you understand these words in

10   English when you signed this declaration?

11               A.   Yes.

12               Q.   Okay.  So you understand the word "weekly

13   stipend" and are comfortable using that language in this

14   deposition today?

15               A.   You mean weekly payment?

16               Q.   Yes, weekly stipend.  If I use the word

17   "stipend," do you understand what I mean?

18               A.   Yes.

19               Q.   Do you have an understanding as to whether

20   the 195.75 weekly stipend is a minimum set by the

21   Department of State?

22                    MS. McELROY:  Objection.

23               A.   No.

24               Q.   (By Ms. Reilly)  You, in fact, received

25   more than 195.75, correct?

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                              September 28, 2016

Page 39

```
 1                A.    Yes, 200.

 2                Q.    Did you decide in October 2013 that you

 3      wanted to participate in the au pair program?

 4                A.    Yes, ma'am.

 5                Q.    What was the most important factor in your

 6      decision to participate in the au pair program?

 7                A.    To have an intercultural exchange in the

 8      United States and get to know another culture.

 9                Q.    Were you hoping to improve your English

10      skills?

11                MS. McELROY:  Objection.

12                A.    Yes, of course.

13                Q.    (By Ms. Reilly)  Was it important for you

14      to live with a host family?

15                A.    Well, the program offered it.  It was what

16      the program offered.

17                Q.    Would you have been interested in the

18      au pair program if you did not have the opportunity to

19      live with a host family?

20                MS. McELROY:  Objection.

21                A.    I haven't really thought about it.

22                Q.    (By Ms. Reilly)  Sitting here now, would

23      you have been interested in joining the au pair program

24      if it hadn't included living with a host family?

25                MS. McELROY:  Objection.
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                September 28, 2016

Page 40

```
 1              A.   Well, yes.
 2              Q.   (By Ms. Reilly)  And did the amount of the
 3    weekly stipend influence your decision to become an
 4    au pair?
 5              A.   No, not entirely.
 6              Q.   Did it influence it somewhat?
 7              MS. McELROY:  Objection.
 8              A.   Not entirely was the dollar amount.  It
 9    was to get to know a culture outside of Colombia.
10              Q.   (By Ms. Reilly)  Would you have joined the
11    au pair program if the stipend was $150 a week?
12              MS. McELROY:  Objection.
13              A.   Yes, because I didn't understand -- in
14    Colombia that's good money, but in the United States I
15    had no idea.
16              Q.   (By Ms. Reilly)  Okay.  Knowing what you
17    know now, would you be -- would you have been willing to
18    participate in the au pair program if the stipend was
19    just $150 a week?
20              MS. McELROY:  Objection.
21              A.   No.
22              Q.   (By Ms. Reilly)  Were there any other
23    benefits other than the ones we discussed already that
24    you were looking to obtain from the au pair program?
25              A.   No.
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                         September 28, 2016

Page 41

1          Q.    What was the name of the person you

2    communicated with at Intercambio?

3          A.    Lina Maria.

4          Q.    Did you communicate with anyone else at

5    Intercambio other than Lina Maria?

6          A.    Not really.  They work with Freddy also,

7    so it was sometimes Freddy would answer.  Sometimes Lina

8    would answer, but Lina was the one that gave all the

9    information.

10          Q.    Earlier you testified about lies.  Was

11    Lina the one who lied to you?

12               MS. McELROY:  Objection.

13          A.    I didn't know what it was to be in the

14    United States and have a cultural experience, and I

15    didn't know about the money -- that that money was not

16    enough to live.  And I didn't know that the family -- at

17    some point I was going to have complications with that

18    family.

19          Q.    (By Ms. Reilly)  That's not my question.

20    My question was earlier you testified about lies.  Was it

21    Lina Maria who lied to you?

22               MS. McELROY:  Objection.

23          A.    It's not that I can say that there was

24    lies.  It's just that when I arrived here, when I had the

25    experience, that I saw -- that's when I realized it was

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 42

```
 1    not all a cultural exchange.
 2            Q.  (By Ms. Reilly)  Okay.  Do you think anyone
 3    from GoAuPair actually lied to you?
 4                MS. McELROY:  Objection.
 5            A.   No, because in Colombia I did not speak to
 6    an agent from GoAuPair, anyone from the United States.
 7            Q.  (By Ms. Reilly)  Which sponsor agencies did
 8    Intercambio have relationships with?
 9                MS. McELROY:  Objection.
10            A.   I don't know which ones, but they offered
11    me two.
12            Q.  (By Ms. Reilly)  Which ones?
13            A.   EurAupair and GoAuPair.
14            Q.   Did they tell you -- did Intercambio tell
15    you there was any difference between the two programs,
16    EurAupair and GoAuPair?
17            A.   Never.
18            Q.   Did you apply to both?
19            A.   Yes, ma'am.
20            Q.   Did you complete your applications with
21    both EurAupair and GoAuPair?
22            A.   Yes, ma'am.
23            Q.   And when you completed your application,
24    did you understand there was any difference between
25    EurAupair and GoAuPair?
```

Johana Paola Beltran, et al. vs.                          Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                    September 28, 2016

Page 43

```
 1              A.   Basically, they were asking for the same
 2   thing, experience with kids, speak English, fill out some
 3   paperwork like psychological things, something like that.
 4   And that was it basically, but -- and the medical also,
 5   both.  But of both of them, it would seem like GoAuPair
 6   was more rigorous.
 7              Q.   What do you mean by "more rigorous"?
 8              A.   Like more paperwork.
 9              Q.   Did you apply to any other agencies other
10   than GoAuPair and EurAupair at any point?
11              A.   No, ma'am.
12              Q.   When you applied, did you apply to
13   GoAuPair and EurAupair at the same time?
14              A.   Yes.
15              Q.   Did you meet in person at Intercambio when
16   you applied to EurAupair and GoAuPair?
17              MS. McELROY:  Objection.
18              A.   I don't know if you're referring to when I
19   paid or when I received the information.
20              Q.   (By Ms. Reilly)  Can you walk me through
21   the timeline with Intercambio?
22              MS. McELROY:  Objection.
23              A.   Yes.  I called Lina Maria, and I said that
24   I wanted to be an au pair because I had the English.  And
25   she told me how much the stipend was and what the au pair
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 44

1   had to have, the requirements basically.  I understood

2   that I had their requirements.  I gather the money, and I

3   decided to go to the offices of Lina from Intercambio.

4   That was in October, and I paid in October that

5   interchange -- exchange.  They told me, We work with two

6   agencies, but you can solicit to both and see so that you

7   can get a family from either -- both.

8        Q.   How much money did you pay for Intercambio

9   in October of 2013?

10       A.   Three amounts.  The first amount -- can I

11  say it in pesos?

12       Q.   Yes, si.

13       A.   1,800,000 and something.

14       Q.   Is that the total?

15       A.   No, no.  I'm sorry.  The first amount was

16  1 million, and the second amount when I provided all the

17  paperwork, when I had all the paperwork, I gave 800 and

18  change.  And the last amount, that's when I found the

19  family.  And that was 1,200,000, and that money of

20  1,200,000 was temporary because I had to do the program.

21  And when I would finish my year and I was here in

22  Colombia they were going to give me back the 1,200,000.

23       Q.   Did you get that money back?

24       A.   No, ma'am.

25       Q.   Let's start with the 1 million in October.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 45

1    Who did that money get paid to?

2                    MS. McELROY:  Objection.

3            A.    To Intercambio.

4            Q.   (By Ms. Reilly)  And what was the purpose

5    of that payment?  What was it for?

6            A.    To initiate the process.

7            Q.    And was that for EurAupair and GoAuPair

8    applications?

9            A.    I paid the agency, and I didn't know what

10   money was going to whom, what was going over here and

11   what was going over there.

12           Q.    Okay.  And the 800,000 and change, when

13   all the paperwork was completed, what was the purpose of

14   that payment?

15                    MS. McELROY:  Objection.

16           A.    Those were costs of the program that in

17   there were the administrative expenses that they talked

18   about.

19           Q.   (By Ms. Reilly)  When was that payment

20   made?

21           A.    I did the first payment in October.  I

22   don't know.

23           Q.    The second payment?

24           A.    I don't remember exactly the date or the

25   day, but I did pay it.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 46

```
 1                Q.    How did you pay the second payment?

 2                A.    The three of them in a bank.

 3                Q.    And did you write a check, pay cash?  How

 4     did you pay?

 5                A.    I took the cash to the bank.

 6                Q.    All three payments were paid in cash to

 7     the bank?

 8                A.    Yes, ma'am.

 9                Q.    And did someone from Intercambio go with

10     you to the bank?

11                A.    Never.

12                Q.    Okay.  In whose account did you deposit

13     the money at the bank?

14                      MS. McELROY:  Objection.

15                A.    The Intercambio.

16                Q.    (By Ms. Reilly)  Okay.  Did you ever pay

17     any additional amounts to GoAuPair other than those three

18     payments you paid to Intercambio?

19                      MS. McELROY:  Objection.

20                A.    No, never.

21                      MS. REILLY:  We're at 101?

22                (Exhibit 101 was marked.)

23                Q.    (By Ms. Reilly)  Do you recognize this

24     document?

25                A.    Yes, ma'am.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 47

1    Q.    And do you see at the top it's called
2  Au Pair Payment Verification Form?
3           A.    Yes, ma'am.
4           Q.    Is that your signature at the bottom of
5  the page?
6           A.    Yes, ma'am.
7           Q.    And you'll see that there are two amounts
8  listed on the right.
9           A.    Yes, ma'am.
10          Q.    A 300-dollar program fee and a 300-dollar
11 add-on airfare?
12          A.    300 -- oh, yes, I see that, that it says
13 that.
14          Q.    And it says the total payment made to
15 GoAuPair is $600 at the bottom of the page.
16          A.    Yes.
17          Q.    Did you pay GoAuPair $600?
18               MS. McELROY:   Objection.
19          A.    I did do this, but I don't remember at
20 what point I had to pay this, if it was -- what date it
21 was.  This was the last one I made -- I gave, yes,
22 because it was in the six months, and I acquired the
23 family by that time.  So that must have been the cash
24 that I gave them, the million 200.
25               Q.  (By Ms. Reilly)  But the million 200 you

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 48

1    testified was a deposit that you would get back, correct?

2              A.   Yes, ma'am.

3              Q.   But these amounts are not deposits as

4    listed on this sheet that you signed?

5                   MS. McELROY:  Objection.

6              A.   This document was sent to me by Lina.

7    Lina told me to write the 300.

8              Q.  (By Ms. Reilly)  Is this accurate?

9                   MS. McELROY:  Objection.

10             A.   I put it there because Intercambio told me

11   to write there 300 and 300.

12             Q.  (By Ms. Reilly)  Is it accurate?

13                  MS. McELROY:  Objection.

14             A.   It's my handwriting, yes.  It's my

15   handwriting.

16             Q.  (By Ms. Reilly)  When you made the three

17   deposits to Intercambio's bank account, did you receive a

18   receipt from the bank?

19                  MS. McELROY:  Objection.

20             A.   Yes, of course.

21             Q.  (By Ms. Reilly)  Do you have a copy of

22   those receipts?

23             A.   I do have saved the last one.

24             Q.   Have you provided that to your counsel?

25             A.   Yes, of course.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 49

```
 1              Q.   And what's the name of the bank that you
 2    made the deposits?
 3              A.   Bancolombia.
 4              Q.   Just to clarify, the third payment of
 5    1,200,000 pesos, you understood that was a completion
 6    deposit?
 7                   MS. McELROY:  Objection.
 8              A.   I don't understand.
 9              Q.   (By Ms. Reilly)  You understood you would
10    receive the 1,200,000 pesos upon completion of the
11    au pair program?
12              A.   Yes, yes, that cash was going to be given
13    back to me.
14              Q.   How many times did you meet Lina Maria
15    Patel (sic) in person in 2013 and '14?
16              A.   Perhaps three times.  I'm not really sure,
17    around three times.
18              Q.   Did you understand that she was a
19    representative of GoAuPair?
20              A.   She work for Intercambio and tourism, not
21    exactly said anything about au pair.  She worked for the
22    agency that represented those agencies.
23              Q.   Did you ever meet anyone from GoAuPair in
24    2013 or the winter of 2014?
25                   MS. McELROY:  Objection, form.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 50

```
 1              A.   No, no.  Lina.

 2              Q.  (By Ms. Reilly)  Lina was an employee of

 3    Intercambio.  Did you meet any employee of GoAuPair in

 4    2013 or the winter of 2014?

 5                   MS. McELROY:  Objection, form.

 6              A.   Somebody that would tell me I am a

 7    representative of GoAuPair, no.  Lina was -- she was the

 8    person that represented or the person that worked in

 9    Intercambio that gave me that information.

10              Q.   Who paid for your flight to the United

11    States?

12                   MS. McELROY:  Objection.

13              A.   I'm not sure.  I suppose that it was the

14    family.

15              Q.  (By Ms. Reilly)  Other than the three

16    payments we discussed, did you incur any other costs in

17    connection with applying for the au pair program?

18              A.   No.  That was all I paid on that agency.

19              Q.   Did you have any other costs in connection

20    with the au pair program participation?

21              A.   Of course, the visa, the international

22    license, the national license.  That's it.

23              Q.   How much did you pay for the visa?

24              A.   About 250,000 pesos.

25              Q.   And how much for the international
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 51

1   driver's license?

2          A.   Around 200, 220, around 200.

3          Q.   Were you told that it was a requirement to

4   be able to drive of the au pair program?

5          A.   Yes, ma'am.

6          Q.   Who told you that?

7          A.   Lina Maria.

8          Q.   And how much did you pay for the national

9   license, the national driver's license?

10          A.   About 150, 120, 150.  I'm not exactly

11   sure.

12          Q.   Any other costs that you incurred to

13   participate in the au pair program?

14          A.   No, ma'am.

15          (Exhibit 102 was marked.)

16          Q.   Do you recognize this document?

17          A.   Yes, ma'am.

18          Q.   And is this your handwriting on the first

19   page with your name?

20          A.   Yes, ma'am.

21          Q.   And is it your signature on the last page?

22          A.   Yes, ma'am.

23          Q.   And what is this document?

24          A.   The document of agreement, what I have to

25   do to be an au pair.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                            September 28, 2016

Page 52

1            Q.   If you could turn to the second page.  Do
2     you see the first sentence, "I agree my weekly stipend
3     will be no less than 195.75 per week"?
4            A.   Yes, I do see.
5            Q.   And was that your understanding when you
6     joined the au pair program, that you would be paid at
7     least 195.75 a week?
8            A.   Yes, ma'am.
9            Q.   And the second part of that sentence says
10    that you would receive that amount in exchange for
11    working up to 10 hours per day for a maximum of 45 hours
12    per week.  Do you see that?
13           A.   Yes, ma'am.
14           Q.   And was that your understanding when you
15    joined the au pair program, that you could work no more
16    than 45 hours per week?
17           A.   Yes, ma'am.
18                MS. REILLY:  Mark this exhibit, please.
19                (Exhibit 103 was marked.)
20                MS. REILLY:  And I'm just going to make a
21    record of the fact that some of the exhibits that we're
22    showing the witness have been marked "Highly
23    Confidential, Attorney Eyes Only."  We are changing the
24    designation of these documents to "Confidential."
25           A.   So I can see them?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 53

```
 1              Q.  (By Ms. Reilly)  Yes.
 2              MR. LYONS:  103 and 104?
 3              MS. REILLY:  103 and 102 have been changed
 4    to "Confidential."
 5              Q.  (By Ms. Reilly)  Do you recognize this
 6    document?
 7              A.   I don't recognize this title here.  I
 8    don't remember seeing this title.  I do recognize this
 9    page and the third one.
10              Q.   And are you pointing to the U.S.
11    Department of State regulations as being something you
12    recognize?
13              MS. McELROY:  Objection.
14              A.   Yes, ma'am.
15              Q.  (By Ms. Reilly)  And do you recall when you
16    received this document, the Department of State
17    regulations?
18              MS. McELROY:  Objection.
19              A.   The truth is I don't remember.  I don't
20    remember.  Lina Maria was the one that -- who -- or the
21    one that sent it.  But when I arrived to the United
22    States, they did send it to me.
23              Q.  (By Ms. Reilly)  Do you recall if you read
24    this document, the Department of State regulations,
25    before coming to the United States?
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 54

```
 1              A.   Really I don't remember.
 2              Q.   Do you recall if you ever went to the
 3    Department of State website before coming to the United
 4    States?
 5              A.   No, no, ma'am.  I don't remember.
 6              Q.   Going back to Exhibit 102, which is the
 7    au pair agreement, when you became an au pair, did you
 8    have any understanding about the types of activities you
 9    could or could not do as an au pair?
10              MS. McELROY:  Objection.
11              A.   Yes, ma'am.
12              Q.  (By Ms. Reilly)  What was your
13    understanding?
14              MS. McELROY:  Objection.
15              A.   I had to do everything to help out for the
16    baby, clean around the baby, everything that was focused
17    on the child.
18              Q.  (By Ms. Reilly)  What -- sorry.
19              A.   I knew that I had to be available or do
20    the requirements of the family, like the schedule of the
21    family.  I also knew that I had to take perfect care of
22    this child.  I also knew that before I would become an
23    au pair I had to do some training.  Basically, that's it.
24              Q.   And were there any tasks that you were not
25    allowed to do as part of the au pair program for the host
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 55

 1   family?

 2           A.   Well, what tasks?  Can you change the

 3   question?

 4           Q.   Sure.  Were there any kinds of tasks

 5   around the host family's house that you were not supposed

 6   to do?

 7           A.   According to what I understood in Colombia

 8   and when I started being an au pair, I had to take care

 9   of the girl and anything that had to do with the boy.

10   But I could not, say, clean the house or things that had

11   to do with the parents.  Or I had to say personal things

12   that I had to do like always keep my area clean.  Well, I

13   had to also take care of the activities of the kids, like

14   the laundry, like cook for the kid, but never for the

15   family.

16           Q.   So what you're saying, do you see that

17   it's listed in the agreement under duties?

18           MS. McELROY:  Objection.

19           A.   Yes, yes, they're there.

20           Q.   (By Ms. Reilly)  So what's listed here as

21   duties is what you could or could not do.  Was this your

22   understanding when you joined the au pair program?

23           A.   Yes, of course.

24           Q.   And was this list of what you could and

25   couldn't do consistent with the work that you did for the

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                            September 28, 2016

Page 56

```
 1    Sanders family?

 2              A.   Yes.

 3              (Exhibit 104 was marked.)

 4              Q.  (By Ms. Reilly)  Do you recognize this

 5    document?

 6              A.   Yes.

 7              Q.   What is it?

 8              A.   This is the letter for the family.

 9              Q.   Is this a letter that you wrote?

10              A.   Yes.

11              Q.   And what was the purpose of this letter?

12              A.   Introduce myself.

13              Q.   And were the statements in this letter

14    accurate?

15              A.   I suppose they are.  I did it, yes.

16              Q.   And do you see in the second paragraph you

17    give your reasons for why you want to participate in the

18    au pair program?

19              A.   Yes.

20              Q.   And were those accurate?  Were these

21    reasons that you listed the reasons that you were

22    interested in becoming an au pair?

23              A.   Fortunately, yes.

24              Q.   You wanted to travel and experience

25    another culture?
```

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                        September 28, 2016

Page 57

```
 1              A.   Yes, ma'am.
 2              Q.   You wanted to deepen your studies in
 3    English and sports?
 4              A.   Yes, ma'am.
 5              Q.   And you wanted to meet a new family?
 6              A.   Yes.
 7              Q.   And did all of those things happen through
 8    your au pair experience with the Sanders family?
 9              A.   Not all of them.
10              Q.   Were you able to travel and experience
11    another culture?
12              A.   Yes, of course.  I was in the United
13    States.
14              Q.   And through your au pair experience were
15    you able to deepen your studies in English?
16              A.   Not in the way I would have liked.
17              Q.   Did your English improve as a result of
18    your experience in the United States?
19              A.   With everyday practice, yes.
20              Q.   And were you able to meet a new family as
21    a result of your au pair experience?
22              A.   I don't understand.
23              Q.   In your letter you said, "I want as an
24    au pair to meet a new family, which I convey many
25    teachings and values me."  And did that happen with your
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 58

```
 1   experience with the au pair program?

 2            A.   Meet a new family different from mine,

 3   yes.

 4            Q.   When you joined the au pair program, did

 5   you understand that the host family would be providing

 6   you with meals?

 7            A.   Yes, I understood it.  But when I was

 8   here, I had several issues with that subject of food.

 9   Ms. Sanders would always buy the groceries, but sometimes

10   she would forget to --

11            THE INTERPRETER:  The interpreter needs

12   clarification.  I asked for clarification on what going

13   to mercado meant, and it meant going to buy my food.

14            Q.  (By Ms. Reilly)  So what were the issues

15   you had with Ms. Sanders regarding food?

16            A.   Sometimes I would be left -- I didn't

17   have -- since I didn't have a car, I had to walk up until

18   the closest store that I would find.

19            THE VIDEOGRAPHER:  Counsel, 5 minutes

20   until media change.

21            Q.  (By Ms. Reilly)  Are you okay?

22            MS. McELROY:  We have to take a break.

23       (Ms. Gonzalez left the proceedings.)

24            MS. REILLY:  Going off the record.

25            THE VIDEOGRAPHER:  This is the end of
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 59

```
 1   Media Number 1.  Going off the record.  The time is

 2   11:50.

 3              (Recess taken from 11:50 a.m. to 12:39 p.m.)

 4              THE VIDEOGRAPHER:  We are back on the

 5   record.  The time is 12:39.  This is the beginning of

 6   Media Number 2 in the deposition of Ivette Alexandra

 7   Gonzalez.

 8              Q.  (By Ms. Reilly)  So, Ms. Gonzalez, you were

 9   starting to tell us about some issues you had with the

10   Sanders about food.  Can you tell us what complaints you

11   had with the Sanders about food?

12              A.  Sometimes she would forget about my food.

13   I understand that it was because she was a very busy

14   person, but I had to go get my food at the nearest store,

15   the closest store, sometimes walking because I didn't

16   have a car and with my money.

17              Q.  Did you eat food that was different than

18   the food the Sanders family ate?

19              A.  Yes.

20              Q.  And how was it different?

21              A.  They had a very balanced diet.  They would

22   drink a milk that I don't even know what brand it was.

23   But I drink a different milk, for example.  And I cook my

24   own things.  So we didn't share the same diet all the

25   time.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 60

1          Q.    Did the Sanders family offer you their

2     food?

3          A.    Initially, but then Mrs. Sanders would

4     only cook for them.  And then, for example, they would

5     order food to be delivered to the house for them but

6     never for me.  So I had to prepare my own food.

7          Q.    Did you ever make a complaint about the

8     food to anyone from GoAuPair?

9          A.    No.  The reality is I didn't because I

10    thought that was the American culture.

11         Q.    Did the Sanders ever purchase groceries

12    for you when they went grocery shopping?

13         A.    Yes, they would buy my groceries separate.

14         Q.    When you decided to join the au pair

15    program, did you consider the fact you would be living

16    with the host family and getting food from the host

17    family to be a benefit of the program?

18              MS. McELROY:  Objection, form.

19         A.    Yes, I thought that was a benefit of the

20    program.

21         Q.  (By Ms. Reilly)  So after you completed the

22    GoAuPair and EurAupair applications, how did the matching

23    process work?

24              MS. McELROY:  Objection.

25         A.    The families I don't really remember how

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 61

1    or -- but I think there were three perhaps that wrote me

2    before the Sanders did.  They would write me to the

3    email.  GoAuPair would send me like -- I don't know, but

4    like -- I don't know how to say it, but like a format

5    where the families would say, you know -- and they would

6    tell me like such-and-such family wants to get in touch

7    with you.

8           Q.   (By Ms. Reilly)  Okay.  So are we talking

9    now just about GoAuPair families, not EurAupair?

10          A.   I never got a call from EurAupair.

11          Q.   So you never talked to any EurAupair

12   family at any point?

13          A.   Not that I remember.

14          Q.   Did EurAupair accept your application?  Do

15   you remember?

16          A.   I suppose that, yes.

17          Q.   But you never heard from any EurAupair

18   host family?

19          A.   No.  I would get more from GoAuPair.

20          Q.   Did you get any from EurAupair?

21          A.   No, not that I remember, no.

22          Q.   Okay.  So for GoAuPair, how would you hear

23   from a host family?

24          A.   Can you change the question?  I don't

25   understand it.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 62

1          Q.   Sure.   What was your first interaction

2    with host families through GoAuPair?

3          A.   The first one, they wrote me.   And we had

4    an appointment via Skype.   And she told me, I am

5    selecting from seven girls.   If I am interested in you, I

6    will let you know.   I will write you.   And if not, I will

7    also let you know that I'm not interested.

8          The second family wrote me so that we

9    would be interviewed through Skype, and I thought it was

10   disrespectful because they did not comply with the agreed

11   upon time.   And I had to ask for permission at work for

12   that one appointment, and I told Lina Maria that I don't

13   believe that this family should take advantage of the

14   time of this people -- of us.   I'm sorry.

15         And finally, I talked with that family,

16   and then they later told me that they did not want an

17   au pair anymore.   They were going to get out of the

18   program.   I did know that another family got to me, but

19   at that time I was in conversations with the familia

20   Sanders, and it was the same way.   They sent me an email,

21   and I did the interview via Skype.

22         Q.   The families who sent you an email, had

23   you chosen them, or did they choose you?

24         A.   I would have liked to choose them myself,

25   but they chose me.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                September 28, 2016

Page 63

1           Q.   And was it GoAuPair or Intercambio who

2    chose which host families would talk to you, or was it

3    the host families who decided?

4                MS. McELROY:  Objection, form.

5           A.   No, I don't understand.

6           Q.   (By Ms. McElroy)  Do you have any

7    understanding as to whether the three host families who

8    emailed you had picked you to talk to?

9           A.   Can you change the question around,

10   please?

11          Q.   Sure.  When the host families contacted

12   you, did they send information about themselves?

13          A.   Yes, of course.  Them -- they will -- I

14   would get an email that would come from GoAuPair, and

15   then afterwards the families themselves would contact

16   me -- or they would write me to my personal email.

17          Q.   When the host families wrote you, did they

18   copy anyone from GoAuPair on the email to you?

19          A.   I don't remember.

20               THE INTERPRETER:  I need to get another

21   pen.  I'm sorry.

22          Q.   (By Ms. Reilly)  When you spoke to the host

23   families on Skype, was anyone from GoAuPair present?

24          A.   Never.

25          Q.   Was it up to you whether to actually talk

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 64

1    to one of these host families on Skype?  Could you have

2    said no?

3                    MS. McELROY:  Objection, form.

4             A.   Yes, of course.  But I did need to find

5    the family, so I had to speak with all of them.

6             Q.   (By Ms. Reilly)  But GoAuPair and

7    Intercambio didn't force you to talk to any particular

8    host family, correct?

9             A.   No, no, ma'am.

10            Q.   And when you received the emails from the

11   host families, did they send you information about

12   themselves and their kids?

13            A.   Yes, ma'am.

14            Q.   And would you review that information

15   before deciding to have a Skype call?

16            A.   Yes, of course.

17            Q.   Were there any important factors about the

18   host family when you were deciding whether to have a

19   Skype call?

20                    MS. McELROY:  Objection.

21            A.   Yes.

22            Q.   (By Ms. Reilly)  And what were those

23   factors?

24            A.   I wanted a family where there wouldn't be

25   a lot of kids or too many kids.  Basically that's all I

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                    September 28, 2016

Page 65

 1   was looking for.

 2            Q.   Did you have Skype interviews with all

 3   three families with GoAuPair?

 4                 MS. McELROY:  Objection.

 5            A.   With the first one that I told you, yes.

 6   The second one and the third one I didn't.  And with the

 7   Sanders.

 8            Q.  (By Ms. Reilly)  So a total of three Skype

 9   calls?

10            A.   (In Spanish)  Si.

11            Q.   And what happened with the first family

12   that you had the Skype call with?

13                 MS. McELROY:  Objection.

14            A.   No, nothing.  Like I told you, she was

15   deciding between the seven au pairs.  And I don't really

16   know who she chose.

17            Q.  (By Ms. Reilly)  And was there any

18   discussion of the weekly stipend on that first call with

19   the host family?

20            A.   The -- no.  There wasn't -- I didn't do it

21   because Lina Maria was very specific about telling me

22   that they knew how much they were going to pay me.  And

23   she told me that the most important thing was the

24   experience with the kids, nothing about the payments,

25   nothing about the accommodation, nothing about the food

**Johana Paola Beltran, et al. vs.**
**Interexchange, Inc., et al.**

**Confidential Video Deposition of Ivette Alexandra Gonzalez**
September 28, 2016

Page 66

```
 1   because they already had that clear.
 2           Q.   Did Lina Maria tell you that you could not
 3   ask about the weekly stipend on your Skype calls?
 4           A.   Not that I couldn't.  It's that they
 5   already knew it, and the most important thing was the
 6   kids.
 7           Q.   Did you ask any questions during the Skype
 8   calls about the hours you would be working?
 9           A.   Neither because I -- they already knew the
10   maximum hours.
11           Q.   Did you ask any questions about the work
12   schedule to any of the three families that you had Skype
13   interviews with?
14           A.   Yes, ma'am.
15           Q.   What do you remember about those
16   conversations?
17           A.   I don't remember specifically what they
18   told me because it was a long time ago, but I -- but one
19   of them I remember that she told me that I had to pick up
20   the kid at school, for example, and take her to the
21   gymnastics class.  That's what I remember best.
22           Q.   Do you remember any conversation with the
23   Sanders about the work schedule?
24           A.   Yes, with them, yes.
25           Q.   What?
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 67

1              A.    I do remember that Mrs. Sanders was very
2       specific that she needed a person that would collaborate
3       with her in the mornings because she worked at a news
4       channel, and she needed somebody but really early and
5       that had availability of time.
6              Q.    What was your reaction to the early
7       morning issue?
8              A.    For me it was normal.  It was a job.
9              Q.    Do you remember any other discussion about
10      your work schedule that you had with the Sanders on that
11      Skype interview?
12             A.    Not really.
13             Q.    Any discussion of the weekly stipend
14      either with the Sanders or any of the three Skype calls?
15                   MS. McELROY:  Objection, form.
16             A.    Like I told you earlier, I did not ask
17      anything with respect to that because Lina Maria told me
18      they already know that and, you know, the most important
19      thing are the kids.
20             Q.  (By Ms. Reilly)  How long was your
21      conversation with the Sanders, approximately?
22             A.    I don't remember.  It was not short, but I
23      don't remember the total time.
24             Q.    Do you think it was over an hour?
25             A.    I believe that it was over there, around

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 68

 1    an hour, around there.

 2              Q.   Who from the Sanders family was on the

 3    call?

 4              A.   Mr. Monte, Mrs. Sanders, the mother of

 5    Mrs., and the girl, of course.

 6              Q.   And how about on your side?  Who was there

 7    with you?

 8              A.   My mom, and my three sisters.  Even my dog

 9    was there.

10              Q.   Was anyone on that Skype call other than

11    your family and the Sanders family?

12              A.   Not that I remember.

13              Q.   And was that the only Skype call you had

14    with the Sanders family?

15              A.   Yes, ma'am.

16              Q.   What did you think of them based on that

17    Skype call?

18              MS. McELROY:  Objection.

19              A.   That it was an excellent family.

20              Q.   (By Ms. Reilly)  What happened in the

21    matching process after the Skype call?

22              MS. McELROY:  Objection.

23              A.   Could you repeat the question?

24              Q.   (By Ms. Reilly)  Yes.  What happened next

25    in the matching process after the Skype call?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 69

1              MS. McELROY:  Objection.

2         A.   Mrs. Sanders was selecting between another

3    girl, another au pair.  She sent me an email that said I

4    would be part of the family, and then afterwards Lina

5    contacted me and said that the Sanders had taken that

6    decision that I was the one.  And we started the process

7    of the visa and payment of the million 200.

8         Q.   (By Ms. Reilly)  When the Sanders -- when

9    Mrs. Sanders sent you an email saying that they had

10   chosen you, did they copy anyone from GoAuPair or

11   Intercambio on that email?

12        A.   No, I couldn't tell you.  I don't know.

13        Q.   Was the decision to extend an au pair

14   position to you made by the Sanders family, or was it

15   made by GoAuPair or --

16              THE INTERPRETER:  The interpreter needs

17   repetition.  Was the decision what?

18        Q.   (By Ms. Reilly)  Was the decision to offer

19   you an au pair position with the Sanders made by the

20   Sanders family, or was that decision made by Intercambio

21   or GoAuPair?

22              MS. McELROY:  Objection.

23              THE INTERPRETER:  By whom?

24              MS. REILLY:  By Intercambio or GoAuPair.

25              THE VIDEOGRAPHER:  Counsel, your

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 70

1    microphone has come off.

2              A.   I don't understand the question.

3              Q.   (By Ms. Reilly)  Is it your understanding

4    that it was the Sanders family who chose for you to be

5    their au pair?

6              A.   Yes, ma'am.

7              Q.   Okay.  And did you have a choice as to

8    whether you would accept their offer to be their au pair?

9              A.   Yes, of course.

10             Q.   And you decided yes?

11             A.   Yes, I decided to be with the Sanders

12   family.

13             Q.   And why did you decide to accept their

14   offer?

15             A.   Like I told you, I thought they were an

16   excellent family.  And I really focused my attention on

17   them, especially because Don Monte was working in

18   fitness.  That caught my attention.

19             MS. REILLY:  Excuse me.  Someone on the

20   phone, if you can mute your line.  We're getting some

21   nice music, but it's a little distracting.  Thank you.

22   Nope.  It's back.  It appears to be jazz whoever appears

23   to be listening to --

24             MS. KOZAL:  I wonder if it's someone's

25   phone on hold.

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                          September 28, 2016

Page 71

```
 1                    MS. REILLY:  Oh, no.
 2                    MS. KOZAL:  Do you want me to send out an
 3   email?
 4                    THE VIDEOGRAPHER:  Would you like to go
 5   off the record, Counsel?
 6                    MS. REILLY:  I guess so.
 7                    THE VIDEOGRAPHER:  Going off the record.
 8   The time is 1:08.
 9             (Discussion off the record.)
10                    THE VIDEOGRAPHER:  We are back on the
11   record.  The time is 1:10.
12                    MS. KOZAL:  Let's go back off the record.
13                    THE VIDEOGRAPHER:  Going off the record.
14   The time is 1:10.
15             (Discussion off the record.)
16                    THE VIDEOGRAPHER:  We are back on the
17   record.  The time is 1:14.
18        Q.  (By Ms. Reilly)  Did you feel any pressure
19   from either Intercambio or GoAuPair to choose the Sanders
20   family?
21                    MS. McELROY:  Objection.
22        A.   No, no pressure, no.
23        Q.  (By Ms. Reilly)  That decision was
24   completely up to you?
25        A.   Yes.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 72

1          Q.   On the call with the Sanders did you ask

2    any questions about food?

3          A.   Not that I remember.  Like I told you

4    earlier, Lina Maria told me that they had that clear, the

5    food, the lodging, all that.

6          Q.   Did you ask any questions about house

7    rules?

8          A.   No, ma'am.

9          Q.   Did you ask any questions about driving?

10         A.   Yes, ma'am.

11         Q.   What was discussed about driving?

12         A.   I don't remember exactly the question, but

13   it was around if I could drive.  And she told me that I

14   could use her car.

15         Q.   Was there any discussion about a curfew?

16         A.   In that call by Skype I don't remember.

17         Q.   And who handled the preparation of your

18   visa?

19              MS. McELROY:  Objection.

20         A.   Lina Maria told me in general terms how it

21   was, that one should fill out the form on the page.  But

22   I was the one that got to do the visa -- I mean, get the

23   visa.  I did it.

24         Q.   (By Ms. Reilly)  So you handled the visa

25   application process yourself?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 73

 1                    MS. McELROY:  Objection.

 2              A.   I paid.  I did everything, but the only

 3      thing that Lina Maria did was give me the format for the

 4      SEVIS and a letter from the GoAuPair to take to the

 5      embassy.

 6              Q.  (By Ms. Reilly)  Did you learn anything

 7      about rules or restrictions that applied to your visa?

 8                    MS. McELROY:  Objection.

 9              A.   All of a sudden I read it, but I don't

10      remember.

11              Q.  (By Ms. Reilly)  Did you learn that one of

12      the conditions of your visa was that you could not do any

13      work outside the childcare for the family?

14              A.   I did learn that.  I did know that, that I

15      couldn't work anywhere else, that the visa was

16      specifically to be an au pair and nothing else.

17              Q.   Did you understand it was a restriction of

18      your visa that you could not work more than 45 hours a

19      week?

20              A.   Like an au pair?  Yes, ma'am.

21              Q.   And you never did work more than 45 hours

22      a week as an au pair, right?

23              A.   I don't know if it was work time or social

24      time with the family.

25              Q.   You understand that your visa restriction

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 74

1    said you couldn't work more than 45 hours a week, right?

2           A.   Yes, ma'am.  But there were some moments

3    when Mrs. Sanders needed more time, but I guess they

4    would consider that time of socialization or help her

5    because I was part of her family.

6           Q.   Did you work more than 45 hours a week for

7    the Sanders or not?

8                MS. McELROY:  Objection.

9           A.   But if you ask me if I consider that work,

10   I would say that, yes.

11          Q.   (By Ms. Reilly)  So you think you worked

12   more than 45 hours a week for the Sanders?

13          A.   If I consider, like I told you, at the

14   time of the -- like I told you, if I consider the time

15   and where the favors where she would ask me to take care

16   of the child, say, when she had to talk on the phone,

17   well, yeah.

18          Q.   So that's your definition of work,

19   correct?

20          A.   Work was when I was with the child.

21          Q.   Did you ever work more than 45 hours a

22   week?

23               MS. McELROY:  Objection.

24          A.   That was not during -- within the schedule

25   that I had.  But if she asked me a favor to care for the

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 75

1   child, then I had.

2           Q.  (By Ms. Reilly)  How many times did you

3   work more than 45 hours a week for the Sanders?

4                MS. McELROY:  Objection.

5           A.   I would believe that it was around three

6   times.

7           Q.   Can you look at Exhibit 100?  It's in

8   there.  Declaration.  If you could look at Number 8, the

9   second sentence.  Do you see where you stated under oath,

10  "I always worked 45 hours a week"?  Is that true?

11          A.   Like I was telling you, it is correct.

12  But if you ask me or if I start to analyze the favors

13  that I did for her and that I was caring for the child,

14  then that was work.

15          Q.   So is this accurate or not?

16                MS. McELROY:  Objection.

17          A.   Like I told you, I work 45 hours because

18  they were on the schedule.  But when you ask me about the

19  favors that I did when she had to do things and I had to

20  take care of the child, that was work.

21          Q.  (By Ms. Reilly)  I asked you how much you

22  worked.  To be clear for the record, is your testimony

23  that you worked more than 45 hours a week three different

24  times?

25                MS. McELROY:  Objection.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 76

 1              A.    Yes.

 2              Q.   (By Ms. Reilly)  So your statement that you

 3      always worked 45 hours per week is incorrect?

 4                   MS. McELROY:  Objection.

 5              A.    It's not incorrect.  It is correct in the

 6      sense that they did have 45 hours on the schedule, yes.

 7      But if I start to think all the favors that I did for

 8      her, when I would take care of the child, that would have

 9      been work.

10              Q.   (By Ms. Reilly)  When you applied for your

11      visa, did you ever visit the embassy?

12              A.    Yes, ma'am.

13              Q.    Did you meet with a councilor officer?

14              A.    Yes, ma'am.

15              Q.    Were you asked what your reason was for

16      going to the United States?

17              A.    Yes, of course.

18              Q.    What did you tell the officer?

19              A.    That I was in an exchange program,

20      GoAuPair.  And they asked me what the family do, and I

21      told them.

22              Q.    What was your plan for money when you went

23      to the United States?

24                   MS. McELROY:  Objection.

25              A.    You mean the cash or the money that I was

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                              September 28, 2016

Page 77

 1    going to receive as an au pair?

 2              Q.  (By Ms. Reilly)  Well, did you bring money

 3    with you when you went to the United States?

 4              A.  Yes, ma'am.

 5              Q.  Okay.  How much money did you bring with

 6    you?

 7              A.  $200.

 8              Q.  And did you plan to spend your stipend

 9    money or to save it?

10              MS. McELROY:  Objection.

11              A.  To be honest, I don't remember whether I

12    had thought of spending the money or not.  I didn't know

13    what was going to happen, a call or something, that I may

14    need it.

15              (Exhibit 105 was marked.)

16              Q.  (By Ms. Reilly)  Do you recognize this

17    document?

18              A.  Yes, ma'am.

19              Q.  And what is this?

20              A.  The agreement like with the family.

21              Q.  We actually have a signed version, so let

22    me --

23              MS. KOZAL:  There was some right here.  Is

24    this --

25              MS. REILLY:  Okay.  Where did that come

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 78

1    from?

2                    MS. KOZAL:  Underneath.  So it looked to

3    me it's the same thing, but I think it may be different.

4                    MS. REILLY:  Gotcha.  That should have

5    been appended.  Thanks.  So this is part of the exhibit

6    actually.  Well, we can just mark it as another exhibit.

7    It was not appended.

8                    (Exhibit 106 was marked.)

9                    MS. REILLY:  So we'll mark the dark one as

10   106.

11        Q.  (By Ms. Reilly)  And we are using both of

12   these because one of them is very easy to read, but the

13   darker one has what I believe is your signature on the

14   second page.  Is that your signature?

15        A.  Yes, ma'am.

16        Q.  So taking a look at these, can you see

17   that 106 is simply a signed version of Exhibit 105?

18        A.  Yes.

19        Q.  When did you receive this document?

20        A.  I don't remember the exact date or day

21   exactly, but I did know when there was that match that I

22   had with the family when they were looking for me and all

23   that.

24        Q.  And you signed this before coming to the

25   United States, correct?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                            September 28, 2016

Page 79

1          A.   Yes, ma'am.

2          Q.   And the date you signed it was actually

3    June 4th or 9th, 2014.  I can't read it, but maybe you

4    can on your -- next to your signature.

5          A.   Yes.

6          Q.   Can you make out that date?  What is that

7    date?

8          A.   It says here that 4th of June.

9          Q.   June 4th?

10         A.   Of 2014.

11         Q.   And do you recognize the signature of

12   Mrs. Sanders?

13              MS. McELROY:  Objection.

14         A.   I did not see her sign this document, but

15   I suppose that is her signature.

16         Q.  (By Ms. Reilly)  From living with her, are

17   you generally familiar with her handwriting?

18         A.   Yes, so-so.

19         Q.   And do you recognize her handwriting on

20   the first page of the exhibit?

21              MS. McELROY:  Objection.

22         Q.  (By Ms. Reilly)  You can look at 105 now

23   from the cleaner version.

24         A.   Like I told you, I didn't see her write in

25   here, but I suppose it's hers.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 80

 1          Q.   Do you recognize her handwriting?

 2               MS. McELROY:  Objection.

 3          A.   I'm not expert in handwriting.  I don't

 4    know.

 5          Q.  (By Ms. Reilly)  Well, when you saw this

 6    and signed it in June 2014, did you understand that

 7    Mrs. Sanders had filled this out?

 8               MS. McELROY:  Objection.

 9          A.   Well, I suppose.  But I cannot really say

10    it was Mrs. Sanders.

11          Q.  (By Ms. Reilly)  I understand.  What did

12    you think back in June 2014?  What was your understanding

13    as to who wrote this?

14               MS. McELROY:  Objection.

15          A.   I wasn't seeing if it was Mrs. Sanders or

16    not.  I was looking at their requirements, what the

17    family was wanting.

18          Q.  (By Ms. Reilly)  But you understood this to

19    show what the family wanted, correct?

20               MS. McELROY:  Objection.

21          A.   Yes, of course.

22          Q.  (By Ms. Reilly)  And you didn't understand

23    things like the work schedule, the vacation days, weekly

24    stipend amount to have been filled in by Intercambio,

25    correct?

Johana Paola Beltran, et al. vs.          Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                    September 28, 2016

Page 81

1              MS. McELROY:  Objection.

2        A.   I don't know who filled this out.  Simply

3   they send it to me, and I signed it as part of the

4   procedure.

5        Q.  (By Ms. Reilly)  You understood, though,

6   that this would be the work schedule -- that would be

7   your work schedule in the Sanders house, right?

8        A.   Yes, correct.  That's what I understood

9   when I saw this.

10        Q.   And this is what the Sanders were

11   expecting from you?

12            MS. McELROY:  Objection.

13        A.   Yes, I suppose that it was because she

14   told me that I had to work early, early.

15        Q.  (By Ms. Reilly)  And these are early hours

16   in the work schedule, right?

17        A.   Yes, ma'am.

18        Q.   And when you saw this written agreement,

19   did you have a problem with any of the terms?

20            MS. McELROY:  Objection.

21        A.   In that moment, no.  It was when I went to

22   au pair -- when I was an au pair.

23        Q.  (By Ms. Reilly)  So the work schedule

24   that's set forth in this written agreement, did this end

25   up being consistent with the hours that you worked at the

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 82

 1    Sanders?

 2                    MS. McELROY:   Objection.

 3           A.   No.  This changed.

 4           Q.  (By Ms. Reilly)  How did it change?

 5           A.   It was not at 3:00 in the morning.  It was

 6    at 4:00 a.m.  And it was from 4:00 and from 1:00 or 2:00.

 7    And it would change depending on the needs of lady

 8    basically, of the Mrs.

 9           Q.   Would the schedule be set every week?

10           A.   Yes, ma'am.  She had a big schedule, a

11    chart.  And she would write in the time to begin and the

12    time to end.

13           Q.   And how about the curfew?  Here it says

14    there's a weekday curfew of 9:00 p.m.  Is that what ended

15    up happening?

16           A.   Not always was it 9:00 p.m.  That would

17    change depending on the schedule that I had, but I did

18    have a time to come in at curfew.

19           Q.   Was that on the board as well?

20           A.   No, no, no.  She would -- she had told me.

21    She told me that I had to arrive 6 or 8 hours before -- 6

22    or 7, I'm sorry, 6 or 7 hours before I had to take care

23    of the child because she needed to see that I was well

24    rested to take care of the child.

25           Q.   Was there any curfew for days that you

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 83

1   were not taking care of the child?

2           A.   No.  On my free days she wouldn't give me

3   a curfew, but for the days that I did have to work -- on

4   Monday, for example, there was a curfew.

5           Q.   Did you ask Intercambio any questions

6   about this agreement before signing it?

7           A.   Not that I remember really.

8           Q.   Going back quickly to your declaration,

9   Exhibit 100, Number 4, do you see where it says,

10  "GoAuPair matched me with a family in Maryland"?

11          A.   (In English)  Yes, yes.

12          Q.   We talked about the Sanders chose you.

13  You decided to accept with the Sanders.  What did

14  GoAuPair do?

15          MS. McELROY:  Objection.

16          A.   Before I went back to Colombia, Lina

17  Maria, as their representative of all this, was the one

18  that prepared all the papers, got all the papers ready,

19  all this.  And then over here in the United States the

20  first representative that showed up at the house was

21  Amanda.

22          Q.   (By Ms. Reilly)  And who is Amanda?

23          A.   The local representative.

24          Q.   And by the time you met Amanda, you had

25  already been matched with the Sanders family, correct?

Johana Paola Beltran, et al. vs.                                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                    September 28, 2016

Page 84

 1              A.   Yes, because I was already in their home

 2     with them right there.

 3              Q.   **Before you went to the United States, did**

 4     **you do any training for the au pair program?**

 5              A.   Yes, ma'am.

 6              Q.   **And what training did you do?**

 7              A.   It was online.  It was by computer, all of

 8     it.  Well, it was all online.  And it talked about how

 9     you had to put the chair, that the chair was an important

10     thing here in the United States.  And it talked about how

11     it was supposed -- you were supposed to bathe a child.  I

12     don't remember everything that it said, but those are

13     some of the things that come to my mind.

14              Q.   **And where did you watch the online**

15     **training programs?**

16              A.   In my home.

17              Q.   **And how many days did it take you to get**

18     **through the training?**

19              A.   I don't remember, but it was more than

20     eight.

21              Q.   **And how many hours a day would you spend**

22     **on the training?**

23              A.   I cannot tell exactly how many, but I can

24     say that it was around 1:30 -- I'm sorry, 1 and a half

25     hours or 2 or sometimes 3.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**Confidential Video Deposition of Ivette Alexandra Gonzalez**
September 28, 2016

Page 85

1  Q.   Do you know how many total hours you spent

2  on the training?

3      A.   The total, no.  But I did have to spend

4  more time on it because I had to translate some words

5  that I did not understand, so it did take me a little bit

6  longer.

7      Q.   And did you have to complete any tests as

8  part of this training?

9      A.   Yes, of course.  They did send me some

10  tests like an evaluation.

11  Q.   And did you complete the tests?

12  A.   All of them, yes.

13  Q.   Was it your understanding that you had to

14  get certain scores on the tests to be able to participate

15  in the program?

16  A.   Yes, ma'am.  That's what Lina had told me,

17  and I also realize that.

18  Q.   And did you pass the test the first try?

19  A.   I don't remember any of those tries.

20  Q.   Did you ultimately pass the test?

21  A.   Yes, because I was an au pair.

22  Q.   But do you remember passing the tests?

23  A.   Well, I suppose that I did because I was

24  an au pair.

25  Q.   Yeah.  And I'm asking you about what your

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 86

1    memory is.  Do you remember passing the test?

2          A.    Well, yes.

3                Q.    And did you receive any payment for the

4    time you spent on the training?

5          A.    Never.

6                Q.    Did you ask Intercambio to pay you for the

7    time you spent on the training?

8                A.    No, because I thought that was a part of

9    the normal process.

10               Q.    And was the training -- do you remember if

11   it was focused specifically on GoAuPair or whether it was

12   more general childcare skills?

13               A.    I do not remember exactly, but I do know

14   that that training was from GoAuPair.  The books were

15   from GoAuPair, and it was specific to GoAuPair.

16               Q.    And did you attend any training in the

17   United States?

18               A.    Never.

19               MS. REILLY:  So this is a good time for a

20   break.  Can we take just like a 10-minute break?

21               THE VIDEOGRAPHER:  Going off the record.

22   The time is 1:47.

23               (Recess taken from 1:47 p.m. to 2:05 p.m.)

24               (Mr. Lyons left the proceedings.)

25               THE VIDEOGRAPHER:  We are back on the

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                            September 28, 2016

Page 87

1    record.   The time is 2:05.

2                MS. REILLY:   So here are my concerns:

3    It's after 2:00.   We've been on the record for only three

4    hours due to multiple lengthy breaks taken by the

5    plaintiffs.   And now just before 2:00 p.m. there was a

6    production of -- a supplemental production of documents

7    from Plaintiff Gonzalez that we understand was provided

8    to plaintiffs' counsel either Monday or yesterday that

9    could have been and should have been produced to us in

10   advance of the deposition, that we're now in a position

11   of needing to review and assess whether we need to ask

12   additional deposition questions based on those documents.

13               So I guess we're looking at a situation

14   where we either need to go very late this evening or go

15   for a couple more hours and resume tomorrow morning,

16   which let me see -- so before assessing that, I'd like to

17   hear from the videographer, the court reporter, and the

18   interpreter whether they're even available to go late

19   tonight.

20               THE VIDEOGRAPHER:   I'm able to.   As far as

21   tomorrow, I do not know what the schedule is.   But I'm

22   available to go with the rest of you this evening.

23               MS. REILLY:   And are you available to go

24   this evening?   By late I think it's -- you know, the rate

25   we're going, it could be 9 or 10:00 p.m.   You would?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                      September 28, 2016

Page 88

1                    THE REPORTER:  I would prefer to do it

2     tonight.

3                    MS. REILLY:  And how about you?

4                    THE INTERPRETER:  I would prefer to do it

5     tonight.

6                    MS. REILLY:  Okay.  So here's what I

7     suggest:  I suggest that we go for another couple of

8     hours.  And to the extent that the witness can give

9     succinct answers to the questions that are being asked

10    and we can make some gains with the timing, I think we

11    see where we are at 5:00 and make a decision as to

12    whether we can finish tonight or resume tomorrow.

13                    MS. McELROY:  With respect to the timing,

14    we're around 3 hours.  We have 7 hours total.  So I don't

15    expect we'd be going all night.

16                    MS. REILLY:  The rate we're going, though.

17                    MS. McELROY:  But we've covered 3 hours in

18    5 hours, correct?  So I don't think we'd be here until

19    10:00.  With the documents, we would suggest you take

20    some time to -- like I said, they're all documents that

21    were in GoAuPair's possession or forms they've seen

22    before.  It's like her Social Security application.

23    There's, as you said, less than a hundred pages.  We

24    would suggest you take some time to print them, or we

25    could email them to you.  You could look through them

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 89

 1   quickly and see if you think that they are documents you

 2   need to review that would change your questions.

 3              MS. REILLY:  Well, for the record, why

 4   weren't they produced today -- until today more than

 5   halfway through the deposition?

 6              MS. McELROY:  I'm not going to respond to

 7   that.  But I'm going to say if you want to take some time

 8   to review them now, we think that's the best --

 9              MS. REILLY:  So plaintiffs have no reason

10   that they want to offer to this group of people as to why

11   documents for today's deposition are being produced today

12   at 2:00 p.m. during the deposition?

13              MS. McELROY:  I'm not going to discuss

14   that on the record.  We spoke off the record.  I'm not

15   going to discuss that.

16              MS. REILLY:  Okay.  Well, I'm going to

17   continue with the questioning I'm doing now.  At 5:00 we

18   can reassess.  At that point depending on how much

19   progress I've made with the deposition, I will consider

20   reviewing the supplemental production and seeing if we

21   can all get it done tonight.  But I think we need to keep

22   going forward and see how it goes.

23              MS. McELROY:  Okay.

24              MS. REILLY:  Can I see the documents that

25   were just produced?  I would like to ask the witness when

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 90

 1   they were produced.

 2                MS. KOZAL:  Yeah.  There are several

 3   written in Spanish.

 4                MS. REILLY:  We do not need to mark these

 5   as an exhibit right now.

 6        Q.  (By Ms. Reilly)  Ms. Gonzalez, the defense

 7   counsel just received this additional production of

 8   documents for you.  You're welcome to flip through.  My

 9   only question for you about the documents is:  When did

10   you produce them to your lawyers?

11        A.   I gave them to her initially last year to

12   Alex.

13        Q.   Last year?

14        A.   And this year perhaps 15 days ago I sent

15   them to the email of Sabria.

16        Q.   Thank you.

17                MS. KOZAL:  Sent them by email?

18        Q.  (By Ms. Reilly)  15 days ago did you send

19   them by email?

20        A.   Uh-huh.

21        Q.   And who was it you sent them to 15 days

22   ago?

23        A.   To my attorney, Suri (sic).

24        Q.   I'm sorry.  The name of the attorney?

25        A.   Sabria.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 91

 1              MS. REILLY:  So Counsel, again, I'll give

 2     you an opportunity.  Is there anything you want to say on

 3     the record why you waited to produce documents that were

 4     emailed to you 15 days ago and today halfway through our

 5     deposition?

 6              MS. McELROY:  We produced them when we

 7     could.

 8              MR. LEE:  I'm sorry.  I didn't hear that.

 9              MS. McELROY:  I said we produced them when

10     we were able to produce them.

11              MR. LEE:   Thank you.

12              MS. REILLY:  Are there any other documents

13     in your possession that have not been produced that will

14     be produced either later today or in the future?  Because

15     that's relevant to whether we're just going to stop the

16     deposition now or continue it.

17              MS. McELROY:  There's nothing I'm aware of

18     right now that we plan to produce, but discovery is

19     ongoing.  So if we receive additional documents or come

20     across additional documents that we think are relevant,

21     then we would obviously produce them.

22              MS. REILLY:  But you're not expecting

23     another supplemental production at this point?

24              MS. McELROY:  No.  I would just like to

25     note for the record this is the most recent production of

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 92

1    several productions we made for this plaintiff.  The

2    first of which occurred I believe well over a month ago.

3    Hundreds of pages were produced last week as soon as we

4    were able.  And like I said before, we produced these 75

5    pages, which were in GoAuPair's possession for the most

6    part, as soon as we were able to.

7              MS. REILLY:  Well, I'd also like to say

8    that a representation was made in the hallway that they

9    were received by plaintiffs' counsel yesterday.  And the

10   witness has now said they were produced in electronic

11   format 15 days ago.  So I'm very concerned about knowing

12   what's really going on with the documents.

13             Also again, it just doesn't make sense for

14   us to go on with this deposition if there is going to be

15   another stack of documents that were sent to Boies

16   Schiller that have now been produced -- reproduced this

17   evening or tomorrow.  We have an international plaintiff

18   here.  It's going to be very difficult for us to take

19   this deposition again.  So we need to get to the bottom

20   of what's going on with the documents.

21             MS. McELROY:  As I said, we're not

22   expecting any additional supplemental records.  As I said

23   in the hallway, we produced them when we could and we

24   produced the file.

25             MS. REILLY:  But you've offered no reason

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 93

1    as to why there was a two-week delay for 75 pages that

2    were produced electronically 15 days ago, not one day

3    ago, as was represented?

4                    MS. McELROY:  Yes.  I said we produced

5    them when we could.  We produced them when we were able

6    to produce that file of documents.

7                    MS. REILLY:  Would anyone else like to

8    make a record on this?  This has been an ongoing issue.

9                    MS. KOZAL:  Yeah.  Counsel, to be clear,

10   we were outside in the hall 10 minutes ago and asked you

11   the question about when the documents were given to you.

12   You indicated to us that the documents were given to you

13   by hand by the plaintiff yesterday.

14                   MS. McELROY:  She provided me hard copies

15   of the documents yesterday.  The file we were able to

16   view yesterday.  We produced them when we could.  I'm not

17   saying that she's incorrect in her testimony about

18   sending the documents several weeks ago.

19                   MS. KOZAL:  Very different stories.

20                   MS. McELROY:  If you want to discuss --

21   that is not a very different story.  I said I received

22   the hard copy documents from her yesterday, and we

23   produced the file of documents when we could.

24                   MS. REILLY:  Larry, are you all set?

25                   MR. LEE:  This has been a pattern

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 94

 1   throughout all these depositions, and the spirit of

 2   corporation by the plaintiffs' side through their counsel

 3   has been consistently inconsistent with providing

 4   documents in a timely manner even within a reasonable

 5   time period for these well-noticed depositions.

 6              MS. KOZAL:  Katie, you may want to ask her

 7   if she gave a copy of those documents by hand.

 8              MS. REILLY:  I'm about to.

 9          Q.  (By Ms. Reilly)  Ms. Gonzalez, did you

10   provide a hard copy version of this stack of documents to

11   your lawyers yesterday?

12          A.   Will you repeat that question again?

13          Q.   Sure.  Did you provide a paper copy of

14   this stack of documents to your lawyer yesterday?

15          A.   I did send her the email again yesterday.

16          Q.   You just sent the same email, the same

17   email you had sent about 15 days ago?

18          A.   Yes, ma'am.

19          Q.   Thank you.  Okay.  So we'll keep going,

20   and we'll revisit a lot of issues around 5:00.  So let's

21   move to when you first arrived in Maryland.

22          A.   Yes, ma'am.

23          Q.   What was it like when you first met the

24   family?

25              MS. McELROY:  Objection.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 95

1              A.   Well, in the airport.  Is that where they
2    pick me up?
3              Q.  (By Ms. Reilly)  Yes.  I mean, when did you
4    first meet the host family in Maryland?
5              A.   It was in July.
6              Q.   And those first days with the Sanders,
7    what was your first impression of the family?
8              A.   It was good.  It was good.  They were good
9    overall.
10             Q.   And about how old is their child or was
11   their child when you were the au pair?
12             A.   She was four months.
13             Q.   And her name?
14             A.   Naomi.
15             Q.   And approximately how old were Mr. and
16   Mrs. Sanders?
17             A.   Mrs. Sanders was about 40.  Don Monte I
18   don't know really.
19             Q.   You talked about Mrs. Sanders' work
20   schedule.  Can you talk about Mr. Sanders' work schedule?
21             MS. McELROY:  Objection.
22             A.   Mr. Monte also worked in the mornings, but
23   he didn't work at 4:00 a.m.  He would leave around 5:00
24   or 5:30.  And then he would come back around 7:00, and
25   that's what I can say in general because sometimes he

Johana Paola Beltran, et al. vs.       Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                             September 28, 2016

Page 96

1    would go out and then come back.

2          Q.   (By Ms. Reilly)  How about on the weekends?

3    Did either of them work on the weekends?

4          A.   No.  Sometimes seldomly Mrs. had to do the

5    news on Saturdays.

6          Q.   And how was the living situation for you?

7               MS. McELROY:  Objection.

8          A.   In general?

9          Q.   (By Ms. Reilly)  Yes.

10         A.   They had a bedroom for me and a private

11   bath for me, and the environment in general was safe.

12         Q.   How was your bedroom?

13              MS. McELROY:  Objection.

14         A.   It was big.  It had a closet, and a bed,

15   and a TV.  That was in general terms.  And the bathroom

16   was a private bathroom, and it was nice.  It was pretty.

17         Q.   (By Ms. Reilly)  How did your room at your

18   host family's house compare to your room at home?

19              MS. McELROY:  Objection.

20         A.   Well, it's just that it was pretty.  It

21   was much -- it was pretty.  It was another country, and

22   it was a family that had means to have a beautiful house.

23         Q.   Was it a large house?

24         A.   Yeah.

25         Q.   There was a pool?

Johana Paola Beltran, et al. vs.          Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                     September 28, 2016

Page 97

```
 1           A.   Yeah.

 2           Q.   Was the pool nice?

 3                MS. McELROY:  Objection.

 4           A.   I never used it much.

 5           Q.   (By Ms. Reilly)  Do you know how to swim?

 6           A.   Yes, I do swim.

 7           Q.   Why didn't you ever use it?

 8           A.   Because I was by myself, and I didn't feel

 9   comfortable swimming by myself.

10           Q.   Were you allowed to use the pool if you

11   wanted to?

12           A.   Yes, of course.

13           Q.   And how about the town, Finksburg, right?

14           A.   It was a town in the middle of nowhere for

15   me.

16           Q.   How far was it from Baltimore?

17           A.   About an hour, I think, I believe.

18           Q.   And how far from Washington, D.C.?

19           A.   A little bit farther.  I'm not exactly

20   sure how far, but yes, farther.

21           Q.   How far was the closest grocery store?

22           A.   Walking it was about 27 or so minutes.

23           Q.   And how did this town compare to your

24   hometown?

25           A.   I live in a city, so this was a new
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 98

1   experience for me.

2           Q.   When you were applying for the au pair

3   program, did you prefer to be in a city or a small town?

4           A.   To be honest, I didn't understand how the

5   situation was in the United States, the houses, you know.

6   I just didn't know what the difference was.

7           Q.   And when you first got to the Sanders'

8   house in the first week or two, did you have a

9   conversation with them about ground rules?

10          A.   No, until Amanda arrived.

11          Q.   So before Amanda arrived, was there anyone

12  else providing childcare to the baby?

13               MS. McELROY:  Objection.

14          A.   Yes, ma'am.  There was a private nanny

15  that would take care of the child until I arrived.

16          Q.  (By Ms. Reilly)  And once you got there,

17  did the nanny train you?

18          A.   Yes, ma'am.

19          Q.   How long was the nanny there with you?

20          A.   Perhaps it was a week.  I don't remember

21  exactly, but it was about a week.

22          Q.   What hours did you work that first week

23  when the nanny was there?

24          A.   From 4:00 to 1:00 or 2:00.

25          Q.   Is that it?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 99

```
 1              A.   Yes.  4:00 a.m. I mean.

 2              Q.   Five days a week?

 3              A.   Yes.

 4              Q.   And what would you do during those hours?

 5              A.   She would basically explain to me how the

 6   schedule of the baby worked, how I had to prepare the

 7   bottle.  And that's it, and it was playing with the girl.

 8              Q.   Was it a good baby?

 9              A.   Excellent.

10              Q.   So Amanda Gray.  And what was her

11   position, as you understood it?

12              A.   LAR.

13              Q.   Local area representative, LAR?

14              A.   Yes, ma'am.

15              Q.   And she worked with GoAuPair?

16              A.   Yes, ma'am.

17              Q.   And you mentioned -- so she came to the

18   house at some point?

19              A.   Yes, the first day that I started working

20   as an au pair.

21              Q.   And what was her job, as you understood

22   it?

23              A.   She was the intermediary between the

24   family and myself.  And she was the one that had to be

25   looking out, you know, for me, looking out for the
```

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                         **September 28, 2016**

Page 100

1   family, sort of integrate all the girls in the area.  She

2   was the person with which I had to have communication

3   with.

4            Q.   And about how old was she?

5                 MS. McELROY:  Objection.

6            A.   I have no idea.

7            Q.  (By Ms. Reilly)  Can you describe her?

8   What was her personality like?

9                 MS. McELROY:  Objection.

10            A.   She was really kind.

11            (Mr. Lee left the proceedings.)

12            A.   She always tried to talk to us, integrate

13   us.  And she would always ask how we were doing in

14   general.  Yes, that's it.  I don't remember anything

15   else.

16            Q.  (By Ms. Reilly)  And was she the first

17   person you met from GoAuPair?

18            A.   The only one, yes.

19            Q.   Do you feel like she did a good job?

20                 MS. McELROY:  Objection.

21            A.   I believe that, no, that her work was not

22   sufficient, I feel.

23            Q.  (By Ms. Reilly)  How so?

24            A.   Because I felt that if I would give her a

25   complaint, say, from the family, she was going to go tell

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 101

1    on me.  And I didn't want to create that bad vibe in

2    between the Sanders family and myself.  I prefer to many

3    times just reserve my comments before I would tell her.

4              Q.   And did you feel like that the entire

5    au pair experience?

6              A.   Yes, ma'am.

7              (Mr. Lee joined the proceedings.)

8              Q.   The first meeting in person happened at

9    the Sanders house, is that right, with Amanda Gray?

10             A.   Yes, ma'am.

11             (Exhibit 107 was marked.)

12             Q.   You recognize this document?

13             A.   Yes, ma'am.

14             Q.   Earlier you gave testimony about a meeting

15   with the host family where Amanda Gray was recording what

16   was said.  Do you remember saying that?

17                  MS. McELROY:  Objection.

18             A.   Did she tape it?  No, I didn't say that.

19             Q.   (By Ms. Reilly)  Try again.  Well, strike

20   that.  On page 1 and 2 do you know whose handwriting that

21   is?

22                  MS. McELROY:  Objection.

23             A.   The Mrs.

24             Q.   (By Ms. Reilly)  Oh, Mrs. Sanders?

25             A.   In what page?  I'm sorry?

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                              September 28, 2016

Page 102

1        Q.   Sure, first page.  Do you recognize the

2   handwriting?

3              MS. McELROY:  Objection.

4        Q.   (By Ms. Reilly)  On the first page?

5        A.   I don't.  I don't.  I don't remember this

6   handwriting.

7        Q.   What do you remember about the meeting

8   with Amanda Gray and the Sanders at the Sanders' house?

9        A.   It was where it was defined how much they

10  were going to pay me, how often they were going to pay

11  me, in what way they were going to do it, what benefits

12  they were going to give me, for example, the cell phone.

13  They talk about also that she was going to offer to me

14  the car for personal needs that I did have.  We talked

15  about the curfew, and we talked about -- I don't remember

16  more, but those were the main things that I remember.

17       Q.   If you turn to the last page, is that your

18  signature?

19       A.   Yes, ma'am.

20       Q.   And is that the Sanders' signature,

21  Patrice Sanders' signature above yours?

22             MS. McELROY:  Objection.

23       A.   Well, yes, she did sign that day.  We

24  signed.

25       Q.   (By Ms. Reilly)  Did you and Ms. Sanders

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 103

 1    sign this document after the conversation that you just

 2    described?

 3              A.   Yes, ma'am.

 4              Q.   And as you were having that conversation,

 5    was someone writing things down in this document?

 6              A.   Yeah, what is she called?  Amanda.

 7              Q.   So Amanda was writing.  The handwritten

 8    sections are Amanda?

 9              A.   Yes, she's the one that was writing, and

10    she was asking and then also writing.

11              Q.   So she was asking questions, and then

12    would Mrs. Sanders give the answers?

13              A.   She would ask us, and she was responding.

14              Q.   And when Amanda was writing down, was it

15    information being provided by Mrs. Sanders and you?

16              MS. McELROY:  Objection.

17              A.   Yes, we were talking about this.

18              Q.   (By Ms. Reilly)  And Amanda's role, though,

19    in the conversation was to take notes?

20              MS. McELROY:  Objection.

21              A.   No, no.  Her role was not to take notes.

22    Her role was -- she was giving us an orientation.  She

23    was going through this form with us, you know, and

24    asking.

25              Q.   (By Ms. Reilly)  Okay.  So on the stipend

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                            September 28, 2016

Page 104

```
 1    there's a blank here, and Amanda wrote in $200.

 2            A.   Yes, ma'am.

 3            Q.   Is that what Mrs. Sanders said when she

 4    was asked what the stipend would be?

 5            MS. McELROY:   Objection.

 6            A.   Yes, ma'am.

 7            Q.  (By Ms. Reilly)  And it looks like it was

 8    decided you would be paid every two weeks?

 9            A.   Yes, ma'am, she said it.

10            Q.   When you say "she said it," was that

11    Mrs. Sanders?

12            A.   Yes, ma'am.

13            Q.   And you'd be paid through a bank?

14            A.   Yes, ma'am.

15            Q.   And again, was that Mrs. Sanders who said

16    it would be through a bank?

17            A.   Yes, ma'am.

18            Q.   So on the next page with childcare, so

19    there was a discussion of discipline, which didn't happen

20    because Naomi was a baby?

21            A.   Uh-huh.

22            Q.   And below there's a question second to

23    last.  "Were there any limits that the au pair should

24    set?"  And it looks like tummy time to be done daily.

25            A.   I'm sorry.  What is tummy time?
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 105

```
 1              Q.    Do you recall discussing tummy time?

 2              A.    No.

 3              Q.    So going to the next page, house rules, it

 4    says, "Is there a curfew on weekdays, workdays?"  And it

 5    says, "Use best discretion.  Remember that she has to be

 6    up at 4:00 a.m."  Is that something that Mrs. Sanders

 7    said?

 8              A.    Yes, she told me that I had to work at

 9    4:00 a.m. and that she had to make sure that I had slept

10    to get up early and all that.

11              Q.    On the cell phone on the next page it

12    said, "Will get a cell phone soon."  And is that

13    something Mrs. Sanders said during that meeting, that you

14    will be getting a cell phone soon?

15              A.    Yes, but I thought erroneously that she

16    had just given it to me.  But then at the end she charged

17    me for it, so she didn't really give it to me.

18              Q.    Did you lose the phone that was given to

19    you?

20              A.    Yes, ma'am.

21              Q.    And did the host family give you another

22    one after you lost the first phone?

23              A.    No, ma'am.

24              Q.    And did the Sanders pay for your cell

25    phone bill before you lost the phone?
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                         September 28, 2016

Page 106

 1                    A.    I don't really know because they had a
 2    plan, so I don't know.
 3                    Q.    But you didn't pay your own cell phone
 4    bill, correct?
 5                    A.    I did pay but at the end.
 6                    Q.    Leaving aside the deduction for the phone
 7    itself, did you ever pay for cell phone service when you
 8    were living with the Sanders?
 9                    A.    No, no, ma'am.
10                    Q.    And do you remember Ms. Sanders saying
11    during this meeting that the host parents would pay the
12    cell phone bill?
13                    A.    Yes, she did speak all about the phone.
14                    Q.    And when you had your cell phone, were you
15    able to send text messages on it?
16                    A.    Yes, ma'am.
17                    Q.    Okay.  Were you able to make calls to home
18    either through your phone or Skype?
19                    A.    Yes, ma'am.
20                    Q.    And what did you do -- use after you lost
21    your cell phone?
22                    A.    My family had sent me -- initially when I
23    started the program my family had sent me a phone, and I
24    used it.
25                    Q.    And who paid the phone bill for that

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                         September 28, 2016

Page 107

 1    phone?

 2            A.    My aunt.

 3            Q.    And do you remember approximately when you

 4    lost the cell phone the Sanders gave you?

 5            A.    I'm not sure.  It was around December or

 6    November.

 7            Q.    How long was this meeting with Amanda

 8    Gray?

 9            A.    I don't remember how long.

10            Q.    And on the last page do you see your

11    initials saying that you received the grievance policy?

12    It's on the top of the last page.

13            A.    Is the question that these are my

14    initials?

15            Q.    Yes.  And you signed those initials?

16            A.    Yes, ma'am.

17            Q.    And did you actually receive a copy of

18    GoAuPair's grievance policy at that meeting?

19            A.    I don't believe so.

20            Q.    Do you remember discussing the grievance

21    policy at that meeting at all?

22            A.    No, not really.  I don't know what you're

23    talking about.

24            Q.    Sure.

25            (Exhibit 108 was marked.)

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 108

1        Q.   So this is a document that you produced in
2   this case.
3            A.   Is this document the summary of this other
4   one, or what is this?
5        Q.   So the -- on the orientation form you
6   signed your initials saying that you had reviewed and
7   discussed the grievance policy, and then I'm showing you
8   a document that you produced from your files that is the
9   GoAuPair grievance policy to see if this helps you
10  remember what you looked at at that meeting.
11           A.   I don't remember having reviewed this at
12  any point.  In this precise moment I don't remember.
13       Q.   Did you understand after that meeting with
14  Amanda Gray that you had an obligation to report problems
15  about your au pair experience to her?
16           A.   Yes, ma'am, I did have that understood.
17       Q.   So after that meeting, how -- did your
18  work schedule remain the same as what you described?
19           MS. McELROY:  Objection.
20           A.   Yes, ma'am.  But like I told you,
21  sometimes Mrs. Sanders would change it.  But it was
22  always to start in the morning, but she changed.
23       Q.   (By Ms. Reilly)  So it always started in
24  the morning.  Was it always five days of work a week?
25           A.   Like she would tell you to change it.  So

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                          September 28, 2016

Page 109

1    sometimes I was working on a Saturday, for example.

2            Q.    Did you ever work six days a week?

3            A.    Yes, ma'am, yes.

4            Q.    Did you ever work seven days a week?

5            A.    No, no.  The Sundays never, no one ever

6    touched, no.

7            Q.    Did you ever work more than 8 hours a day?

8            A.    Yes, she would take 9 or 10.

9            Q.    Did you ever work more than 10 hours a

10   day?

11           A.    Like I had told you initially, she would

12   ask sometimes for favors.  But it was to care for the

13   child, so that was work really.

14           Q.    And what kind of favors would she ask for?

15           A.    For example, I need to get a call.  So I

16   need you to be with Naomi because I can't be talking on

17   the phone and be with Naomi.  Or, for example, I need you

18   to be with Naomi because I have to organize like

19   decorating the house for Christmas, like that, things

20   like that.

21           Q.    And how often would that happen?

22           A.    Not all the time, but -- not all the time,

23   but one time I did -- she did call me that I needed to

24   socialize more with the family, that I needed to spend

25   more time with the family.  But I did understand that to

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                              September 28, 2016

Page 110

1    help around when she needed to cook or like just help her

2    out, you know, to be with the kid.  And that was work.

3    And so I told her, "If you need me, I need you to tell me

4    specifically what do you need from me?"  Then I could

5    help her.

6          Q.   So about on average how many hours a week

7    on top of your work schedule were you asked to do favors

8    like this?

9          A.   I cannot tell you an average.  I cannot

10   tell you all the days or all the weeks, you know.  But

11   there were some times.

12         Q.   Before you testified you think there were

13   three times that you worked more than 45 hours a week

14   when you took into account the favors, right?

15              MS. McELROY:  Objection.

16         A.   Like I told you, yes, there were specific

17   times, three times that I remember specifically.  But,

18   you know, there were other times.  And, you know, they

19   were all there.  And I'm not saying it was all day, but

20   there were specific moments that I remember most.

21         Q.   (By Ms. Reilly)  Are we talking minutes a

22   week or hours a week that this would happen?

23              MS. McELROY:  Objection.

24         A.   Well, sometimes it was hours.  Sometimes

25   it was minutes, 15 minutes, 10 minutes, half an hour.

Johana Paola Beltran, et al. vs.                        Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                           September 28, 2016

Page 111

1          Q.   (By Ms. Reilly)  And did you record the

2    amount of time you were spending working and doing these

3    favors for the Sanders?

4          A.   Well, I didn't because it was supposed to

5    be that I was part of the family.  And since I was part

6    of the family, you do that.  You're supposed to do that.

7          Q.   So you have no way of going back and

8    recreating how much time you were actually spending

9    working for the Sanders?

10              MS. McELROY:  Objection.

11         A.   No, I don't have that information, no.

12         Q.   (By Ms. Reilly)  Did you ever complain to

13   Amanda Gray about the fact that Mrs. Sanders was asking

14   you to do favors outside the scheduled work schedule?

15         A.   No.  What happened was that I understood

16   that I was part of the family, and as a part of the

17   family you do those things.

18         Q.   So were you unhappy about doing those

19   extra things for the Sanders at the time?

20         A.   Yes, because I did not believe that I was

21   taken as part of the family.  But I wanted to have a good

22   relationship with them, so I did it as a way of being

23   part of the family.

24         Q.   What made you feel like you were not part

25   of the family?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                      September 28, 2016

Page 112

 1                A.   Because one day Mrs. Sanders emphatically

 2     told me, This is not a game.  This is a job.

 3                Q.   When was that?

 4                A.   I don't remember, but she told me.

 5                Q.   Was it at the beginning or towards the end

 6     of your experience there?

 7                A.   I believe it was about half there.

 8                Q.   And what led up to her making that

 9     comment?

10                MS. McELROY:  Objection.

11                A.   I don't remember exactly.

12                THE VIDEOGRAPHER:  Counsel, 5 minutes

13     until media change.

14                Q.   (By Ms. Reilly)  Did Mrs. Sanders pay you

15     $200 every two weeks like it says in the agreement we

16     just looked at?

17                A.   Yes, she was very good in making the

18     payments on time.

19                Q.   And how would she get the money to you?

20                A.   In a check.

21                Q.   Okay.  And would she pay you every week or

22     every other week?

23                A.   Every two weeks.

24                Q.   Every two weeks.  And where would you

25     deposit the check?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 113

1              A.    Bank of America.

2              Q.    **Do you still have that account open with**

3    **Bank of America?**

4              A.    I don't know.

5              Q.    **Do you have copies of the checks that you**

6    **received from the Sanders?**

7              A.    No, not really.

8              Q.    **Do you have any records as to what was**

9    **paid to you while you were an au pair?**

10             A.    No, what is here.  I don't have anything

11   else.

12             Q.    **And those checks always came from the**

13   **Sanders family; is that correct?**

14             A.    From Ms. Patrice.

15             Q.    **You never received a check from GoAuPair?**

16             A.    At the end of the program I did receive a

17   check from GoAuPair when I was in Colombia, but that

18   didn't serve me.

19             Q.    **Other than that last payment that was made**

20   **to you in Colombia, did you ever receive any payment of**

21   **any kind from GoAuPair?**

22             A.    At the end when -- until they solved the

23   payment problem in June, July I -- the agency of

24   Intercambio, they told me GoAuPair would transfer the

25   money to them in Colombia so that the agency Intercambio

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 114

```
 1   would give it to me.
 2          Q.   And that was money that the Sanders family
 3   owed you that they hadn't been able to get to you for the
 4   last two weeks, correct?
 5                MS. McELROY:  Objection.
 6          A.   Yes, they weren't able to give it to me,
 7   but it was not complete.  It was not complete.
 8                MS. REILLY:  So let's break.
 9                THE VIDEOGRAPHER:  This is the end of
10   Media Number 2.  Going off the record.  The time is 2:59.
11          (Recess taken from 2:59 p.m. to 3:08 p.m.)
12          (Mr. Lee and Ms. Salazar are not present.)
13                THE VIDEOGRAPHER:  We are back on the
14   record.  The time is 3:08.  This is the beginning of
15   Media Number 3 in the deposition of Ivette Alexandra
16   Gonzalez.
17          Q.   (By Ms. Reilly)  So back to the work
18   schedule and the board that Patrice would write your
19   weekly work schedule on.  Was it always Patrice who
20   decided what your schedule would be for that week?
21          A.   She's the one that would write on the
22   board.  I don't know what decision she would take with
23   her husband, but she's the one that would write.
24          Q.   But the decision on what your work
25   schedule would be was made by the Sanders family; is that
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 115

1     correct?

2                    MS. McELROY:  Objection.

3               (Mr. Lee joined the proceedings.)

4          A.   You're talking about when I was actually

5     working, correct?

6          Q.  (By Ms. Reilly)  Yes.

7          A.   Mrs. Sanders was the one that would write

8     in there, but I don't know what decisions she had made

9     with her husband or both of them decided before she would

10    actually write on there.

11         Q.   Correct.  But it was the Sanders, Mr. and

12    Mrs. Sanders, who determined your work schedule every

13    week, correct?

14                   MS. McELROY:  Objection.

15              (Ms. Salazar joined the proceedings.)

16         A.   Yes, I would imagine that in between them

17    they would talk about that schedule.

18         Q.  (By Ms. Reilly)  But it wasn't Amanda Gray

19    who was determining your work schedule?

20                   MS. McELROY:  Objection.

21         A.   No, no, it wasn't her because she wasn't

22    living with us.

23         Q.  (By Ms. Reilly)  And it was no one from

24    GoAuPair who was setting your weekly work schedule?

25                   MS. McELROY:  Objection.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 116

 1              A.   No, they were not the ones that

 2   determined, but I had to follow those rules because from

 3   the very beginning in that meeting with Amanda it was

 4   defined.  So we determined what the working schedule was

 5   going to be.  And Amanda wasn't there to write it, but

 6   she was -- she knew what the work schedule was like.

 7              Q.  (By Ms. Reilly)  But she didn't --

 8              A.   In general terms.

 9              Q.   But Amanda did not decide what your work

10   schedule was going to be ever?

11              MS. McELROY:  Objection.

12              A.   No, no.  It was of the Sanders family that

13   took those decisions about the schedule.

14              Q.  (By Ms. Reilly)  And it was the Sanders

15   family who decided when and how much to pay you, correct?

16              MS. McELROY:  Objection.

17              A.   They were the ones who said 200, yes, and

18   that it was going to be every two weeks.  They were the

19   ones that said that.

20              Q.  (By Ms. Reilly)  And did the Sanders family

21   ever pay you more when you worked beyond the set work

22   schedule?

23              A.   One time.

24              Q.   What was that?

25              A.   One time they had to go to some race of

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 117

1  sorts like a marathon, and I had to take care of the

2  child.  I believe it was more than 4 hours, and the lady

3  gave me $20.

4          Q.    And had you already worked 45 hours that

5  week?

6          A.    Yes, ma'am.

7          Q.    So that was beyond the 45 hours?

8          A.    (In Spanish)  Si.

9          Q.    Is that one of the three times you

10  remember working more than 45 hours?

11          A.    Yes, ma'am.

12          Q.    And what are the other two times?

13          A.    The other one I remember exactly was at

14  Christmas time, not on Christmas Day exactly.  It was in

15  the holiday season, say, in which the house was being

16  decorated.  She asked me to care for the child.  But like

17  I told you earlier, I was part of the family.  So then I

18  suppose it was okay because I was part of the family even

19  though it was extra work.

20          Q.    How many hours that time?

21          A.    I don't remember, but it was more than one

22  hour, much more.

23          Q.    Much more than one hour?

24          A.    A little bit more than one hour.

25          Q.    And you had already worked 45 hours that

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 118

```
 1    week?
 2              A.    If I am remembering it with such intensity
 3    is because surely I have worked more than the 45 hours
 4    already.
 5              Q.    Some weeks you only worked 40 hours,
 6    right?
 7              A.    Yes, yes, usually, yes.
 8              Q.    Usually you only worked 40 hours?
 9              A.    Yes -- oh, no, 45.
10              Q.    But sometimes you worked only 40 hours per
11    week, correct?
12              A.    No, no, no.  45 hours.
13              Q.    You never worked 40 hours?
14              A.    I don't believe so, no.
15              MS. McELROY:  I think the people on the
16    phone can't hear us right now.  I know Lauren can't.
17              MS. REILLY:  Can folks on the phone hear
18    now?
19              MS. LOUIS:  Yeah.
20              MR. DREW:  Yeah, I can.
21         (Exhibit 109 was marked.)
22              MR. KAPLER:  What is this?
23              MS. REILLY:  This is Exhibit 109.
24              Q.  (By Ms. Reilly)  Do you remember taking a
25    GoAuPair survey 6 months into your au pair experience?
```

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                              **September 28, 2016**

Page 119

```
 1                 A.    I do remember a questionnaire, survey.
 2     But I don't remember exactly what it said.
 3                 Q.    Well, in the first section where it says,
 4     "Audit Schedule," do you see where it says, "How many
 5     hours per week on average did you work?"  And it says,
 6     "40 hours."
 7                 A.    Yes, but I don't recall if I did fill it
 8     out.  I do remember a questionnaire, but I don't remember
 9     exactly what I filled out.
10                 Q.    Okay.  Well, when you filled out the
11     survey, did you answer the questions truthfully?
12                 MS. McELROY:  Objection.
13                 A.    Yes, yes, I did fill it out with the truth
14     at that time.
15                 Q.    (By Ms. Reilly)  So at the time of this
16     survey you were working on average 40 hours a week?
17                 MS. McELROY:  Objection.
18                 A.    If I did -- I suppose if I put that at
19     that time I was working 40 hours.
20                 Q.    (By Ms. Reilly)  At the bottom of this page
21     the last question says, "Please explain positive services
22     and/or suggested improvements."  You see that?
23                 A.    (In English)  I see.
24                 Q.    And do you see your answer is, "The agency
25     has always taken special attention with me"?
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 120

 1            A.   Yes.  But since, you know, this was at the

 2    beginning of the program, I didn't know what was going to

 3    happen.

 4            Q.   Was it true when you said it?

 5            MS. McELROY:   Objection.

 6            A.   Yes, in that moment it was truth because

 7    Amanda had made some invitations to some gatherings with

 8    the other girls.  And, yes, because she called me at that

 9    time that if I was doing okay.  But then I did at that

10    time see that everything was okay.

11            Q.  (By Ms. Reilly)  And going to the second

12    page where it says, "Satisfaction, Host Family," the last

13    question in that section.  Do you see where it says,

14    "Please explain positive experiences and/or suggested

15    improvements"?  And it says, "Please describe your

16    experience with your host family."  Do you see that?

17            A.   (In Spanish)  Si.

18            Q.   And it says your response is, "I love my

19    family because help me every day.  They understand that

20    it is a program of cultural exchange."  Do you see that?

21    Was that accurate at the time you said it?

22            A.   Well, I don't remember exactly what I

23    wrote.  I cannot tell you this is exactly what I wrote.

24    But I do know that at that moment it was the beginning of

25    the program, and I felt great with them.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 121

1    Q.    So my only question is:  At the time you

2    filled out this survey were these statements accurate?

3              MS. McELROY:  Objection.

4         A.    At that moment, yes, I felt comfortable

5    with this family.

6         Q.  (By Ms. Reilly)  And you felt like you were

7    having a good cultural exchange experience?

8              MS. McELROY:  Objection.

9         A.    At that moment, yes, because I felt like I

10   was getting to know people from other countries.

11        Q.  (By Ms. Reilly)  And you felt like the

12   family was trying to learn your language?

13             MS. McELROY:  Objection.

14        A.    Don Monte.

15        Q.  (By Ms. Reilly)  And that's the host

16   father?

17        A.    Yeah.

18        Q.    And you felt the Sanders family was

19   bringing you a lot of opportunities for your personal

20   growing?

21             MS. McELROY:  Objection.

22        A.    Yes, because I would see the work of

23   Mrs. Sanders and the work of Mr. Monte, and I would see

24   that they had very good positions.  And some day I wanted

25   to be like that and have an excellent position just like

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 122

1   them.

2          Q.   (By Ms. Reilly)  So say more about

3   Mr. Sanders was trying to learn Spanish.

4                MS. McELROY:  Objection.

5          A.   I spoke to the little girl everything in

6   Spanish.  And they both liked it, especially Mr. Sanders

7   because he would ask me, How do you say this or that or

8   such thing.  And when the housekeeping lady latina would

9   arrive, he would tell her, hola, how are you in Spanish.

10         Q.   (By Ms. Reilly)  And before the question we

11  just looked at, there are five questions that you

12  actually answered with a number with 4 being high, good

13  score.  And if you could just take a minute and look at

14  those and tell me if that was accurate at that point in

15  time.

16         A.   What happened was that I gave them a very

17  good score on this because I was well.  I mean, this was

18  the beginning of the program.  Everything was perfect.

19         Q.   How long -- how many months into your

20  experience did the experience remain positive?

21               MS. McELROY:  Objection.

22         A.   I think that at the middle of this process

23  is where some things started happening.

24         Q.   (By Ms. Reilly)  What happened?

25         A.   That, for example, Mrs. Sanders would tell

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                    September 28, 2016

Page 123

1    me I need from you more time.  And Mr. Sanders would say,

2    Help Patrice because Patrice -- I don't know how to say

3    in Spanish, but I know how to say it in English.  It was

4    easy -- fussy.

5            Q.   Fussy.  English.

6            A.   It was fussy.

7            Q.   I got it.  How was Mrs. Sanders fussy?

8                 MS. McELROY:  Objection.

9            A.   No, I don't know why them over there, you

10   know, Mrs. -- Mr. Sanders would tell this to me like in a

11   joke, but I -- but I knew that she was very controlling

12   when it came to the time.

13           Q.   (By Ms. Reilly)  How was she controlling

14   about time?

15           A.   For example, with the girl she had to

16   write -- for example, she had to write down exactly the

17   time that she was eating, exactly the time that we were

18   going to, you know, change the diaper, exactly the time

19   that we were going to do X.

20           Q.   So during this first part of the

21   experience when it was going well were you meeting other

22   au pairs in the area?

23                MS. McELROY:  Objection.

24           A.   Yes.

25           Q.   (By Ms. Reilly)  And how many au pairs did

Johana Paola Beltran, et al. vs.                 Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 124

```
 1    you meet --

 2                    MS. McELROY:  Objection.

 3              Q.  (By Ms. Reilly)  -- during your au pair

 4    experience?

 5              A.   Perhaps four -- well, several.  I mean

 6    several.  But you mean close to me?  One.

 7              Q.   Who was close to you?

 8                    MS. McELROY:  Objection.

 9              A.   One girl that worked for Cultural Care.

10    Her name is Joyce.

11              Q.  (By Ms. Reilly)  Where did she live?

12                    MS. McELROY:  Objection.

13              A.   Baltimore.

14              Q.  (By Ms. Reilly)  How did you meet her?

15              A.   One of the girls who was an au pair from

16    GoAuPair introduced me to her.

17              Q.   Which one?

18              A.   Alona.

19              Q.   And where did Alona live?

20              A.   I don't recall the name of the town.

21              Q.   Did Amanda Gray introduce you to other

22    au pairs?

23              A.   Yes, of course during the gatherings.

24              Q.   What -- what were the gatherings?

25              A.   It was like going to eat something, just
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 125

```
 1   basically like that, get together, go eat something,
 2   talk.  That was it.
 3          Q.   How many times did that happen while you
 4   were an au pair?
 5          A.   I don't remember exactly how many times I
 6   got together with them, to be honest.
 7          Q.   More than five?
 8          MS. McELROY:  Objection.
 9          A.   I couldn't really tell you or tell you
10   exactly more than five or less than five, but I did get
11   together with them.
12          Q.   (By Ms. Reilly)  What did you do with the
13   other au pairs other than the eating gatherings?  Were
14   there any other activities?
15          MS. McELROY:  Objection.
16          A.   No, not that I recall, no.
17          Q.   (By Ms. Reilly)  How often did you see
18   Amanda Gray?
19          A.   I would only see her in those -- in those
20   gatherings.  I don't remember if those gatherings are
21   once a month or twice a month, but I did see her there in
22   the gatherings.  That's it.
23          Q.   Did you feel like Amanda Gray was pretty
24   far removed from what was happening in your host house?
25          MS. McELROY:  Objection.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 126

```
 1                A.   Would you change the question?  Because
 2      I'm not sure I understood it.
 3                Q.   (By Ms. Reilly)  How often did you interact
 4      with Amanda Gray?
 5                A.   Well, it was in the gatherings.  I would
 6      see her, and she would ask me, How are you?  About a
 7      car -- at some point she was asking me about a car.
 8                Q.   And what was your transportation situation
 9      when you were living with the Sanders?
10                A.   It was horrible.
11                Q.   What was it?
12                A.   Not to have a car.
13                Q.   Did you have a bike?
14                A.   No.
15                Q.   Did you ask for a bike?
16                A.   No.
17                Q.   Why not?
18                A.   Well, it was that -- it really wasn't
19      useful to have a bicycle when you're in the middle of
20      nowhere.
21                Q.   Was -- did you ever ask to use the
22      Sanders' car?
23                A.   Yes, ma'am.
24                Q.   And what did they say?
25                A.   Well, initially Mrs. Sanders, she even
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                         September 28, 2016

Page 127

```
 1   paid me a driving class because she was really nervous
 2   that I was Columbian, I didn't know the rules of
 3   Maryland.  But finally one day she told me, Alexandra, I
 4   cannot give you my car because that is my car.  And then
 5   if something happens to the car, I won't be able to
 6   transport myself.  So I understood from that point that
 7   she was never going to give it to me.
 8        Q.   When was that?
 9        A.   I don't recall exactly at the month.
10        Q.   Early, middle, or late?
11             MS. McELROY:  Objection.
12        A.   I believe it was in the middle of the
13   whole program.
14        Q.   (By Ms. Reilly)  So you said Mrs. Sanders
15   paid for a driving class for you?
16        A.   Yes, ma'am.
17        Q.   Where was that?
18        A.   At the beginning of the program.
19        Q.   And where?  Where was the driving class?
20        A.   I'm not sure.  I'm not sure if it was
21   Westminster.  I believe it was.
22        Q.   How far away from your house driving
23   distance?
24        A.   No, not really far.
25        Q.   And who would drive you to the driving
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                    September 28, 2016

Page 128

1    classes?

2              A.    Mr. Sanders -- no, no, no, no.   Wait.

3    Mr. -- Mrs. Sanders sometimes and other times Mr. Monte.

4    They would take turns.

5              Q.    Did you complete the class?

6              A.    Yes, ma'am.

7              Q.    And did you obtain a special license or

8    certificate from the class?

9              A.    I had to pay for my own salary a type of

10   certification about drugs or something that I had taken a

11   class, and I had the certificate.

12             Q.    Okay.   When did you complete the class?

13             MS. McELROY:   Objection.

14             A.    That was at the beginning, but I don't

15   exactly remember the month.

16             Q.  (By Ms. Reilly)  Did you take any other

17   classes of any kinds other than the driving class while

18   you were living with the Sanders?

19             A.    Oh, yes, yes, ma'am.   I did the English

20   class at the college.   She paid for the -- how do you say

21   the class?   And I paid for my own books.

22             Q.    How much did the books cost?

23             A.    $100.

24             Q.    Where was the class?

25             A.    Carroll Community College.

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                    September 28, 2016

Page 129

 1              Q.    How often did the class meet?
 2              A.    Two times a week, and every time that I
 3    would go it was 2 hours.
 4              Q.    How did you get back and forth?
 5              A.    Mrs. Sanders would take me, and the sir
 6    would return me.
 7              Q.    And when you had gatherings with the other
 8    au pairs, how would you get to and from those?
 9              A.    Mrs. Sanders would take me, but Alona
10    would bring me back.
11              Q.    And how far away from you did Alona live
12    by car?
13              A.    I don't really know, honestly.
14              Q.    And did you -- did you do fun things on
15    the weekends?
16              MS. McELROY:  Objection.
17              A.    I consider this to be personal things.  I
18    don't know if I have to respond about this things.
19              MS. REILLY:  So this is the essential
20    allegation -- the essential complaint is she was told
21    that this would be a cultural exchange program, and it
22    turned out to be a work program.  So we are entitled to
23    explore the cultural exchange component of the
24    experience, and that's what my questions are designed to.
25    They're not designed to harass, and there's no basis for

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 130

 1    an objection.

 2                    MS. McELROY:  Well, to the extent, you

 3    know, the magistrate's preliminary ruling was that

 4    questions about their personal time are off limits, they

 5    don't have to answer.  So to the extent you're asking

 6    about time she wasn't working, that's not related to the

 7    au pair program.  And she doesn't have to answer.

 8                    MS. REILLY:  Then if that's your question,

 9    we're going to have to possibly leave the deposition open

10    and call the court.  That issue actually was not before

11    the judge.  That conference was addressing the tax return

12    issue, and there were frankly inappropriate comments that

13    were brought up by plaintiffs' counsel during the call

14    that were not addressed by defense counsel.  And that

15    stray segment -- or sentence fragment that is quoted in

16    the motion for protective order is far from a binding

17    court order and will be challenged by the defendants.

18                    So to be clear, are you instructing the

19    witness that she cannot testify as to anything about any

20    aspect of her au pair program experience beyond the hours

21    she was working for the host family?

22                    MS. McELROY:  I'm instructing her that she

23    does not have to answer questions about her personal time

24    if she was not working during that time and how she spent

25    her personal time.  She can choose to answer if she wants

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 131

1    to.

2                    Do you want to answer this question?

3                    MS. REILLY:  What legal basis is there for

4    this idea of, Do you want to answer a question?  There's

5    either an instruction not to answer, or there's an

6    objection and she answers.  Those are the two options.

7    So if you want to instruct her not to answer, that's

8    fine.  And we can have it out with the judge.  But this

9    letting her choose whether or not to answer is not --

10   that's not recognized.  There's no legal basis for such

11   an instruction, and that's not -- it's not going to

12   happen that way.  If you want to instruct her not to

13   answer, we can fight it out later.  And we can leave the

14   deposition open.

15                   MS. McELROY:  Based on my understanding,

16   based the judge's preliminary ruling, she does not have

17   to answer questions about her personal time.  So --

18                   MS. REILLY:  Is there an instruction,

19   Counsel, not to answer?

20                   MS. McELROY:  No.  My instruction to her

21   is that she does not have to answer.

22                   MS. REILLY:  Let's take a break.

23                   THE VIDEOGRAPHER:  Going off the record.

24   The time is 3:42.

25                   (Recess taken from 3:42 p.m. to 4:15 p.m.)

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                           September 28, 2016

Page 132

1             THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 4:15.
3             Q.  (By Ms. Reilly)  So, Ms. Gonzalez, one of
4    the things you said earlier today is that you had
5    expected that the au pair program would be a cultural
6    exchange program, and it ended up being just a work
7    program.
8             A.  Yes, ma'am.
9             Q.  So I'd like to ask you some questions
10   about what activities you did outside of taking care of
11   the baby to understand whether, in fact, you did get
12   cultural exchange benefits.
13            MS. McELROY:  Objection.
14            A.  Yes, ma'am.
15            Q.  (By Ms. Reilly)  So on the weekends when
16   you were living with the Sanders would you leave the
17   house on the weekends?
18            MS. McELROY:  Objection.
19            A.  Yes, ma'am.
20            Q.  (By Ms. Reilly)  Every weekend?
21            MS. McELROY:  Objection.
22            A.  Yes, all of them.
23            Q.  (By Ms. Reilly)  And what type of
24   activities would you do on the weekends when you weren't
25   at the Sanders house?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                  September 28, 2016

Page 133

 1                    MS. McELROY:  Objection.

 2            A.    Due to the fact I depended on the car of

 3    the people that were willing to help me, I would do the

 4    activities that they wanted to do.

 5            Q.   (By Ms. Reilly)  And who were these people?

 6    Were they au pairs?

 7                    MS. McELROY:  Object.

 8            A.    The majority of them, yes.  But there was

 9    one person that helped me tremendously, tremendously in

10    the United States.

11            Q.   (By Ms. Reilly)  And who is that?

12            A.    Maria.  She was my college classmate.  And

13    she was married, that she had a family.  And she would

14    take me to her house so I could eat Latin food and to be

15    with her and go to church.

16            Q.    And did she have kids?

17            A.    Yes, three.

18            Q.    How old were they?

19            A.    Well, at that time the smallest one was a

20    year and a half.  The next one was 8, and the next one

21    was 10.

22            Q.    And would she come pick you up on the

23    weekends?  Is that how you would get to her house?

24                    MS. McELROY:  Objection.

25            A.    Always her husband would pick me up.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 134

1          Q.   (By Ms. Reilly)  And how far away did they

2     live by car?

3          A.   About 10 minutes.

4          Q.   At what point in your experience did you

5     first meet her at school?

6          A.   Well, it was within a few days of

7     studying.

8          Q.   Okay.  And she was not an au pair?

9          A.   No, she was never an au pair.

10         Q.   Where was she from?

11         A.   Argentina.

12         Q.   When you signed on to the au pair program,

13    you wanted to learn more about American culture, right?

14         A.   Yes, ma'am.

15         Q.   Were there any particular activities that

16    you wanted to do when you were here?

17         A.   Yes, ma'am.

18         Q.   What kind of activities?

19         A.   I wanted to go to a gym of gymnastics and

20    see how the American gymnasts prepared.

21         Q.   Did you get to do that when you were

22    living with the Sanders?

23         A.   Never.

24         Q.   Did you research whether there were any

25    gymnastic facilities nearby?

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                                       September 28, 2016

Page 135

1          A.    Yes, ma'am.

2          Q.    And what did you find?

3          A.    There were some places where they would

4    practice gymnastics for kids.

5          Q.    And did you ever go to those?

6          A.    Never.

7          Q.    Other than the gymnastics, were there any

8    other cultural activities that you had hoped to do in the

9    United States before you came?

10          A.    Meet people from other countries.

11          Q.    And did you get to do that when you were

12    living with the Sanders?

13          A.    Yes, with the au pairs and --

14          Q.    Okay.  Did you ever run into any issues

15    with the Sanders about your curfew?

16          A.    Yes.

17          Q.    What was the first issue you had with the

18    Sanders about curfew?

19          A.    Well, one day I couldn't -- well, the

20    person that had taken me couldn't bring me back at that

21    one given time and at that time.  So then he told me it

22    has to be the next day.  And I said, Well, okay then,

23    because I didn't really have anybody else to pick me up.

24          Q.    Did you ask the Sanders to come pick you

25    up?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 136

1            A.    No.

2            Q.    Why not?

3            A.    Because I knew that Mrs. Sanders was very

4    strict about the hours and with the time that I was

5    using.  And I didn't want to put her through that burden

6    of having to go pick me up because I knew that I would

7    arrive and I would arrive before so I could start my work

8    on time.

9            Q.    Were you ever late for work?

10           A.    Never.

11           Q.    How many times did you break the curfew?

12           A.    The one that I just told you, and the

13   second one where the ma'am threw me out of the house.

14           Q.    Only those two times?

15           A.    Yes, ma'am.

16           Q.    Other than curfew, did you have any other

17   complaints or fights with the Sanders before

18   January 24th?

19                 MS. McELROY:  Objection.

20           A.    I wouldn't call them complaints.  They

21   were like some alerts.  For example, she didn't like for

22   me to arrive late because the dogs would bark.  And then

23   they would wake her up type of thing.  Basically it was

24   that I arrived on time, but she didn't want me to arrive

25   later because of the matter of the dogs barking and then

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                    September 28, 2016

Page 137

 1    the dog -- the door making a noise.

 2              Q.  (By Ms. Reilly)  Anything else?

 3              A.   No, ma'am, not that I remember.

 4              Q.   And did you ever report any complaints to

 5    Amanda Gray about the Sanders before January 24th?

 6              A.   I did report to her about the matter of

 7    the car, and I did say that Mrs. Sanders wouldn't give me

 8    the car.  And so then Amanda in a gathering told me, "I'm

 9    going to speak with her again, Alexandra."  And then she

10    called me and then she said, "Alexandra, you have your

11    driver's license.  Are you driving?"  I said, "No, no.

12    Leave it like that.  My friends are going to help me.

13    Just leave it like that."  I was exhausted of telling

14    Patrice and Amanda about it, and I understood that she

15    said that she wasn't going to give it to me because it

16    was the only car that she had.

17              Q.   Did you think Amanda had the power to

18    force Patrice to give you the car?

19              MS. McELROY:  Objection.

20              A.   No, not force; but, yes, to explain to

21    her, hey, she needs that car.  She lives in the middle of

22    nowhere.

23              Q.  (By Ms. Reilly)  Did you ever travel either

24    with the Sanders family or otherwise when you were an

25    au pair?

Johana Paola Beltran, et al. vs.                          **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                                          September 28, 2016

Page 138

```
 1                    MS. McELROY:  Objection, form.

 2          A.   Yes, I did travel.

 3          Q.   (By Ms. Reilly)  Where did you go?

 4          A.   Las Vegas.

 5          Q.   Was that with your family for the

 6     holidays?

 7          A.   Yes, ma'am.

 8          Q.   How long did you go?

 9          A.   Two weeks.

10          Q.   Other than your trip to Las Vegas, did you

11     go anywhere outside Finksburg while you were living with

12     the Sanders?

13          A.   Yes, the surroundings, Washington,

14     Annapolis, Philadelphia.

15          Q.   Anywhere else, New York?

16          A.   No, no, not New York, not at that time, I

17     didn't.

18          Q.   How many times did you go to Washington?

19          A.   I don't really remember.  I believe it was

20     more than three.

21          Q.   How about Annapolis?

22          A.   One time.

23          Q.   And Philadelphia?

24          A.   One time.

25          Q.   Did the Sanders ever give you any gifts?
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                    September 28, 2016

Page 139

1          A.   Yes, ma'am.

2          Q.   **What did they give you?**

3          A.   Mr. Sanders, when I initiated the program,

4    he was really happy as of how I worked with the girl.

5    And he gave me $100 to give to my family back in

6    Colombia.  Mrs. Sanders gave me some clothing, like

7    sports, on my birthday.

8          Q.   **Anything else, any other gifts?**

9          A.   Not that I remember.  And I'm remembering

10   they did go to the Bahamas, and they brought me like a

11   little wallet.

12         Q.   **Did you go to the Bahamas with them?**

13         A.   I would have liked to, but no.

14         Q.   **So how long was that trip?**

15         A.   Around three days.

16         Q.   **Did they bring Naomi?**

17         A.   No.

18         Q.   **Who took care of Naomi?**

19         A.   The grandma.

20         Q.   **Did you work at all during that time that**

21   **they were gone?**

22         A.   I worked on it through what was Friday.

23   Then the grandma came in and took care of the girl.

24         Q.   **So you got your normal weekly stipend that**

25   **week?**

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 140

```
 1          A.   Well, yeah.
 2          Q.   Did you ever eat out at restaurants with
 3   your family?
 4          A.   Yes, one time -- no, twice.
 5          Q.   When you ate out with the family, would
 6   they pay for your food?
 7          A.   Yes.
 8          Q.   Did you complete the English class that
 9   you took?
10          A.   Yes, ma'am.
11          Q.   Was it helpful for improving your English?
12          A.   Grammatically all of a sudden, yes.
13          Q.   And did you take any other English classes
14   other than that one class?
15          A.   I couldn't.
16          Q.   Why not?
17          A.   I would have liked to, but Mrs. Sanders
18   just simply didn't have the time to take me to the
19   classes.
20          Q.   Did you ask her if you could take another
21   class?
22          A.   Yes.
23          Q.   And she said no?
24          A.   She didn't emphatically tell me no.  She
25   simply would give me excuses like the little girl doesn't
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 141

1    like the car.  It's complicated.  She never really said

2    no, but I felt like she was avoiding the whole situation.

3    So I understood.

4              Q.    Did you join any organizations while you

5    lived with the Sanders?

6              A.    No.

7              Q.    Did your au pair experience help you

8    improve your childcare skills?

9              A.    Not really because I already had a ton of

10   experience.

11             Q.    Okay.  Did you have extensive experience

12   taking care of kids outside your family?

13             A.    I don't understand.

14             Q.    Before your au pair experience, did you

15   have experience taking care of children outside your

16   family?

17             A.    Yes.

18             Q.    Including babies?

19             A.    Yes, ma'am.

20             Q.    Were you ever a nanny?

21             A.    Well, in Colombia I was a caregiver but

22   not like a nanny.

23             Q.    When were you a caregiver?

24             A.    I don't remember exactly the year.  But,

25   for example, my friends required that somebody would take

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 142

1    care of the child.  And then I would care for him, yeah.

2              Q.    Did you keep a journal when you were an

3    au pair with the Sanders?

4              A.    No, ma'am.

5              Q.    Did you keep a blog online?

6              A.    No, no, no, ma'am, no.

7              Q.    Do have you a Facebook account?

8              A.    Yes, of course.

9              Q.    What's your user name on Facebook?

10             A.    Alexandra Gonzalez.

11             Q.    Did you write letters or emails to family

12   and friends while you were living with the Sanders?

13             A.    Yes.

14             Q.    And what did you tell family and friends

15   about your experience with the Sanders?

16                   MS. McELROY:  Objection.

17             A.    The messages that I would leave them in

18   general terms was that I was doing okay.

19             Q.  (By Ms. Reilly)  Did you share your

20   complaints about the Sanders with any family or friends

21   the year you were living with the Sanders?

22             A.    I would call my mom.

23             Q.    Is your mom the only person you would talk

24   to about the problems you were having with the Sanders?

25             A.    Her and in the United States Joyce and

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 143

1    Maria also.

2         Q.    Would you send -- ever send emails to

3    Joyce or Maria or your mother about your complaints of

4    the Sanders family?

5              MS. McELROY:  Objection, form.

6         A.    No, I would call them.

7         Q.   (By Ms. Reilly)  So tell me about the

8    second curfew incident with Mrs. Sanders.  What happened?

9              MS. McELROY:  Objection.

10        A.    I knew they had a family event, and

11   Mr. Monte had a birthday on Saturday.  You know, having

12   considered that they had requested my help -- not at that

13   specific moment of the party, but in general that they

14   would always tell me.  And for having a good living

15   relationship with Mrs. Sanders, I wrote her a text.  I

16   asked her if it would be to attend the birthday party of

17   Joyce.  And she said, Yeah, it's okay.

18              And then Joyce pick me up.  I went to her

19   house, and we celebrated Joyce's birthday with the rest

20   of the au pairs.  And then at the next day she sent me a

21   message saying, Alexa, be careful with the road.  And I

22   said, Yes, yes.  I'm in the house with my friend, and I

23   said that I was going to arrive late.  And I asked if it

24   would be if it was around 11:00 or 11:30, and she said

25   it's okay.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 144

```
 1                  I didn't -- I arrived at their house
 2    around 11:30 or so.  And I fixed up myself, you know,
 3    took a shower.  And then I went up before I would start
 4    work.  And she told me, Alexandra, I need to speak with
 5    you.  And I said, yes, Madam.  And she said, You're not
 6    following the house rules.  I have to speak with Amanda.
 7    I said, Okay, yes, ma'am.  But I don't have a car.  I
 8    depend entirely on the people that come and pick me up,
 9    my friends.  And she couldn't.  She simply couldn't
10    before.
11                  And I wrote you that I was going to arrive
12    late, and she told me -- I don't understand this in
13    English -- whatever.  Then she started yelling at me.
14    What she told me I don't remember.  She would yell and
15    yell.  And then she arrive and told me, Call somebody to
16    come and pick you up and get out of here.  I understood
17    that I should leave that house.  I was really nervous.  I
18    was just crying inconsolably.
19                  I went down to my bedroom.  And when I was
20    going down to the bedroom, she crashed the door behind
21    me.  I grabbed all my things as quickly as I could
22    because I was extremely nervous about this hysterical
23    woman, and I called Maria.  And I said, "Maria, this
24    woman has kicked me out of the house."  That's what I
25    understood.  "And I need you to pick me up right now."
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 145

1    She wasn't able to pick me up.

2                I called the housekeeping lady that works

3    with Mrs. Sanders, and she picked me up right away.  I

4    went out, you know, took all my things in bags because

5    they wouldn't just fit in my suitcase.  And I handed the

6    key in front of her, and she didn't say anything.  I

7    grabbed and pulled out my things all the way to the door.

8    And sir told me, "Alexandra, don't go."  And I said, "No,

9    more, no more.  She told me that I should leave.  I go.

10   I grab my things."

11               And it was a horrible cold outside.  And I

12   went down with all this bags, and they live on sort of a

13   hill.  And I threw, you know, everything to roll down

14   until I arrived down.  And my friend took a little bit

15   longer.  And when she arrived, I went to Maria's house.

16   And that is where I called Amanda.

17        Q.    (By Ms. Reilly)  So backing up a little,

18   Joyce lived with a host family, right?

19        A.    Yes, ma'am.

20        Q.    So you spent the night before the Saturday

21   birthday party at Joyce's house?

22        A.    No, in Joyce's house it was a party.

23        Q.    Okay.  So when -- where were you the

24   Saturday morning when the exchange with Mrs. Sanders was

25   happening about the transportation to the house?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 146

 1                    MS. McELROY:  Objection.

 2             A.    In Joyce's house.

 3             Q.   (By Ms. Reilly)  So was Joyce -- was it her

 4    host family who was supposed to give you a ride?

 5             A.    That family car was in possession of

 6    Joyce, and they would give her a car.

 7             Q.    And is Joyce the one who finally brought

 8    you to the Sanders that day?

 9             A.    No, another au pair offered because

10    Joyce's mom definitely didn't let her use that car

11    because of the weather.

12             Q.    It was snowing that morning?

13             A.    It had snowed the night before, and the

14    roads were icy.

15             Q.    Were you on the schedule to work that

16    Saturday?

17             A.    Yes, ma'am.

18             Q.    And what time were you supposed to start

19    work that day?

20             A.    1:00 p.m.

21             Q.    And was there supposed to be a party at

22    the house for Mr. Sanders' birthday?

23             A.    Yes, ma'am.

24             Q.    So when you left, was the party happening?

25                    MS. McELROY:  Objection.

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                    **September 28, 2016**

Page 147

 1              A.   The guests were arriving.

 2              Q.  (By Ms. Reilly)  Okay.  When you had the

 3     fight with Mrs. Sanders before you packed up, were there

 4     guests there yet?

 5              A.   No, no, no.  When I had that fight, it was

 6     not any guests there.

 7              Q.   And when you were leaving, did you see the

 8     guests on your way out?

 9              A.   Yes, one or two.

10              Q.   And did you exchange words with Mr. or

11     Mrs. Sanders in front of the guests on your way out?

12              A.   With Don Monte when he told me on the way

13     out, "Don't go."

14              Q.   How about Mrs. Sanders?

15              A.   No, no, I guess she didn't care.  I don't

16     know.

17              Q.   So going back before that fight, did you

18     tell Amanda that you wanted to extend with the Sanders

19     family?

20              A.   Yes, ma'am.

21              Q.   And when was that?

22              A.   Like in -- in January -- no.  It was

23     between January and February.  I'm not sure exactly what

24     month.

25              Q.   Well, you left the Sanders house on

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 148

 1    January 24th, right?

 2              A.   Yes, ma'am.

 3              Q.   And so did you request to extend with the

 4    Sanders family before that fight in January?

 5              A.   Yes, ma'am.

 6              Q.   And why did you want to extend?

 7              A.   Because I wanted to know if perhaps they

 8    could find another family, but in the next year I was --

 9              Q.   Did you tell Amanda that you wanted to

10    extend and stay with the Sanders family for another year?

11              A.   I don't remember.

12              (Exhibit 110 was marked.)

13              Q.   So if you look on the -- I'll represent

14    that this is -- these are the notes from Amanda Gray.  If

15    you look on the second page, in the second row, do you

16    see the note that says, "November 18, 2014"?  You see

17    that?

18              A.   (Nodding head.)

19              Q.   It says, "I spoke to Alexa.  She said she

20    is very happy."  To the best of your memory, were you

21    happy with the au pair situation in November 2014?

22              A.   I don't think I would have been that

23    happy.

24              Q.   And it says, "She said she loves her

25    family and the baby so much she wants to extend for

Johana Paola Beltran, et al. vs.        Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                        September 28, 2016

Page 149

1    another year."  Do you remember telling Amanda that?

2            A.   I did tell Amanda that I love that girl.

3    And I was really, really -- I felt I was really close to

4    the little girl.  And if I wouldn't leave from that

5    house, it would be because I adored that child.

6            Q.   Do you remember asking Amanda in

7    November 2014 about extending with the Sanders family?

8            A.   I did tell her about the extension, yes.

9    But I don't recall if it was November exactly, but I did

10   tell her that.

11           Q.   And did you ever talk to the Sanders about

12   extending for another year?

13           A.   No, I never did tell them that.

14           Q.   If you go to the bottom row and see the

15   date there, January 2015.  It's this one.

16           A.   Uh-huh.

17           Q.   So this one says that, "Amanda received a

18   call from Alexa.  Well, she said it was Alexa, but it

19   didn't sound like her."  If you go down, "She said she

20   wanted to ask about the extension process."  Do you

21   remember talking to Amanda in January very shortly before

22   the fight with the Sanders about extending for another

23   year?

24           A.   No.

25           Q.   Okay.  In January 2015 were you

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 150

1    considering extending with another family possibly?

2              A.    When I arrived from Las Vegas, yes.

3              Q.    When was that?

4              A.    I arrived from Las Vegas around the first

5    weekend in January.

6              Q.    Okay.  And at that point what was your

7    plan about extending?

8              MS. McELROY:  Objection.

9              A.    When I wanted another year was like I told

10   you, perhaps I had the chance to be with another family,

11   perhaps I had the chance to get another car -- or get a

12   car and get to see more things once I had the car.

13             Q.    (By Ms. Reilly)  And did you tell the

14   Sanders that you were thinking of matching with another

15   family?

16             A.    No, no, I never told them that.

17             Q.    So after you left the Sanders house, did

18   you understand that the Sanders decided to terminate your

19   au pair position with them?

20             (Ms. Salazar left the proceedings.)

21             A.    I was the one that finished with them.

22             Q.    So you made the decision to terminate

23   being an au pair?

24             A.    Of them, yes.

25             Q.    And did you communicate that decision to

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 151

1   GoAuPair?

2          A.   Yes, ma'am.

3          Q.   Did you understand that the Sanders family

4   would accept you back into the house after the fight if

5   you wanted to go?

6          A.   Yes, ma'am.

7          Q.   But you decided not to go back?

8          A.   No, because I was afraid of that lady.

9          Q.   Because of the one fight?

10              MS. McELROY:   Objection.

11         A.   Because she yelled at me.

12         Q.   (By Ms. Reilly)   During that fight that you

13   told me about?

14         A.   Yes, ma'am.

15         Q.   So after you left the Sanders' house, were

16   you staying with Maria for several days?

17         A.   Yes, ma'am.

18         Q.   And how long did you stay with her?

19         A.   Until February 10th.

20         Q.   And what happened on February 10th?

21         A.   I went back to Colombia.

22         Q.   Who paid for your flight?

23         A.   My friends.

24         Q.   Which ones?

25         A.   Maria and a friend of hers.

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                          September 28, 2016

Page 152

```
 1              Q.   Did Maria ask you to leave her house?

 2              A.   No.

 3              Q.   So after you left the Sanders' house, did

 4   you try to rematch with another family?

 5              A.   Yes, ma'am.

 6              Q.   And what happened?

 7              A.   The majority of them wouldn't accept me

 8   because I didn't have a driver's license.

 9              Q.   Well, you had an international driver's

10   license, right?

11              A.   Yes, ma'am.

12              Q.   And you had taken the driving class in

13   Maryland?

14              A.   Yes, ma'am.

15              Q.   So what was it that you were missing that

16   they wanted?

17              A.   The driver's license from here in the U.S.

18              Q.   And did any of the host families express

19   interest in having you as an au pair?

20              A.   Yes.

21              Q.   Who?

22              A.   A Jewish family, but I don't remember

23   exactly where they were.

24              Q.   Anyone else?

25              A.   Some of them wrote me.  I don't remember
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 153

```
 1    exactly where they were from.  Yeah, one was from Miami

 2    that I remember.  Other families as well, but I don't

 3    remember where they were from.

 4            Q.    Did you have Skype calls with any

 5    families?

 6            A.    With the Jewish family, yes.

 7            Q.    What happened on that call?

 8                  MS. McELROY:  Objection.

 9            A.    They would ask me normal things, you know,

10    like about me.  They would -- they gave me their working

11    schedules, which I don't remember at this time.  They

12    talked to me about the food.  Yes, there was something

13    they did ask me about the driver's license, yes.  But I

14    didn't have it, so --

15            Q.    (By Ms. Reilly)  Did you like them?

16            A.    Really no.

17            Q.    Why not?

18            A.    Because I looked on the map, and they

19    lived very far away from everything.  And they said that

20    possibly I wouldn't have access to a vehicle all the

21    time.  So then I didn't want to go through the same thing

22    again.

23            Q.    So did you decide to stop talking to that

24    family?

25            A.    No, no.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 154

```
 1            Q.   What happened?
 2            A.   They found somebody else.
 3            Q.   Did they invite you to be an au pair in
 4   their home?
 5            A.   No, no.  They were in that process of
 6   interviewing, right.
 7            Q.   Did anyone else -- did you Skype with
 8   anyone else?
 9            A.   No, not that I remember.
10            Q.   Did you have a phone conversation with
11   anyone else?
12            A.   No, not that I remember.
13            Q.   Did anyone else -- any other host family
14   express interest in you, but you decided it wasn't a good
15   opportunity?
16                 MS. McELROY:  Objection, form.
17            A.   No.  For example, the family in Miami I
18   thought they were great.  But because I didn't have a
19   driver's license, no, no, they didn't accept me, no.
20            Q.   (By Ms. Reilly)  You said that after you
21   got to Maria's house after the fight I think you called
22   Amanda Gray?
23            A.   Can you repeat that again?  I'm sorry.
24            Q.   Sure.  After you left the Sanders' house,
25   did you call Amanda Gray?
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                                    September 28, 2016

Page 155

```
 1                 A.   Yes, ma'am.
 2                 Q.   And did you tell her the story of what had
 3    happened?
 4                 A.   I remember that I told my friend, Please
 5    talk to her and tell her that I am in your house.  I was
 6    crying inconsolably still, and I couldn't even grab the
 7    phone because -- so I asked her to say please -- tell her
 8    that I'm here and that Mrs. Sanders, well, kicked me out.
 9    Then afterwards I did speak to her.
10                 Q.   That same day?
11                 A.   I don't remember.
12                 Q.   And when you talked to her, did she say or
13    do anything to help you?
14                 MS. McELROY:   Objection.
15                 A.   Yes, ma'am.
16                 Q.   (By Ms. Reilly)  What happened?
17                 A.   She told me that I had to write her, to
18    Crystal, and tell her all the situation that had
19    happened.  I did do it.  I'm not sure who it was, if it
20    was her or Amanda.  I don't really remember.  But they
21    sent me some attachments of some documents, like the
22    policy type of thing.  So then I waited.  That lady
23    Crystal would respond to see what the process was.
24    Something else I forgot to tell you that Amanda wrote me
25    saying that what I understood to be that I was the one
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 156

1    that left the house on my own will and that we could

2    possibly solve all this together.  But I said, No, I have

3    to leave.

4               (Mr. Lee and Ms. Kozal left the proceedings.)

5          A.   I want to leave.  I want to change

6    families.

7          Q.   So that was your decision?

8          A.   Yes, mine.

9          Q.   It was not GoAuPair's decision?

10         A.   No.  It was my decision to leave, to leave

11   from that house, do a rematch.  That's what I'm trying to

12   say here.

13         Q.   So to be clear, it was your decision both

14   to leave the Sanders house --

15              MS. McELROY:  Objection.

16         A.   I didn't say I leave the house.  She kick

17   me out of the house.  But taking that into consideration,

18   I did not want to continue with that family.  I wanted a

19   rematch.

20         Q.   (By Ms. Reilly)  Okay.  So it was your

21   decision not to continue as an au pair with the Sanders

22   family?

23         A.   Yes, ma'am.  It was my decision.

24         Q.   And GoAuPair played no role in that

25   decision?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 157

 1              MS. McELROY:  Objection.

 2        A.   Well, no, they didn't tell me go, you

 3   know, to the side of the Sanders.  I said I was the one

 4   that I do not want to continue with Patrice Sanders.  I

 5   need to change families.

 6        Q.   (By Ms. Reilly)  And it was your decision

 7   to try a rematch?

 8        A.   Yes, ma'am.

 9        Q.   And that decision was not made by

10   GoAuPair?

11        A.   No.  It was not GoAuPair's decision.  It

12   was my decision to change families.

13        Q.   And GoAuPair provided you with the

14   policies and helped you set up the rematch process?

15              MS. McELROY:  Objection, form.

16        A.   Yes, they did attach those documents that

17   I at this moment don't remember exactly what they were.

18   But it was in reference to the rematch.

19        Q.   (By Ms. Reilly)  When you were going

20   through the rematch process and talking to the host

21   families, GoAuPair wasn't part of that?

22              MS. McELROY:  Objection.

23        A.   Well, I mean, GoAuPair was the one that

24   was sending me this type of information, you know, that

25   link, the same link that was happening when I first

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 158

 1    initiated the process.

 2              Q.  (By Ms. Reilly)  Right, but they weren't

 3    telling you which host family to talk to?

 4              A.   No, no, no.  They were just sending

 5    me -- I was receiving all the families and families.

 6              Q.   And then you would talk directly with the

 7    family without any involvement by GoAuPair?

 8              MS. McELROY:  Objection.

 9              A.   The family would contact me through the

10    agency.

11              Q.  (By Ms. Reilly)  Well, your conversations

12    with the host family didn't include GoAuPair, though, did

13    they?

14              A.   Well, they weren't really saying GoAuPair,

15    GoAuPair.  But I knew those families were coming from

16    GoAuPair because --

17              Q.   Right, but no one -- no one from GoAuPair

18    was on the emails between you and these host families

19    during the rematch process?

20              A.   They would arrive (sic) these emails from

21    GoAuPair, but there wasn't a certain name of somebody

22    there.

23              Q.   Was anybody from GoAuPair on the Skype

24    call with the family you had the Skype call with?

25              A.   No, ma'am.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 159

1          Q.   And did GoAuPair play any role in telling

2    you you should or shouldn't move forward with any

3    particular host family?

4                MS. McELROY:  Objection, form.

5          A.   No, no, no.  I would simply receive the

6    links.  They weren't really involved in all of this.

7          Q.  (By Ms. Reilly)  And Crystal Hardman, had

8    you dealt with her at all before this January 2015

9    timeframe?

10               A.   I don't recall.

11               MS. REILLY:  So let's take a break.

12               THE VIDEOGRAPHER:  Going off the record.

13   The time is 5:13.

14          (Recess taken from 5:13 p.m. to 5:34 p.m.)

15               THE VIDEOGRAPHER:  We are back on the

16   record.  The time is 5:34.  This is the beginning of

17   Media Number 4 in the deposition of Ivette Alexandra

18   Gonzalez.

19          (Exhibit 111 was marked.)

20               MR. KAPLER:  What number is this guy?

21               MS. REILLY:  111.

22          Q.  (By Ms. Reilly)  So I'm showing you this

23   document so that you can take a look at the last couple

24   pages and tell me if these are the text messages with

25   Mrs. Sanders that you testified about previously.

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 160

```
 1              A.   Yes, ma'am.
 2              Q.   Did you provide your address as to where
 3    you were staying after you left the Sanders' house to
 4    GoAuPair?
 5              A.   I don't remember if I gave it to
 6    Crystal -- I mean Amanda, Amanda.
 7              (Exhibit 112 was marked.)
 8              Q.   This is Exhibit 112.  If you look at the
 9    second email from you to Crystal Hardman, do you see
10    where you sent her the address as to where you were
11    staying after the Sanders?
12              A.   Yes.
13              Q.   And are you -- do you have an
14    understanding as to whether the Sanders tried to mail you
15    your final stipend check to this address in Westminster?
16              MS. McELROY:  Objection.
17              A.   I don't know.
18              Q.   (By Ms. Reilly)  Okay.  Looking at that
19    address now in Westminster, can you tell that it's
20    actually incomplete?
21              A.   Yes.
22              Q.   And did anyone tell you that the check
23    that was mailed to this address never made it and was
24    returned to the Sanders?
25              MS. McELROY:  Objection, form.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 161

1              A.   Amanda did tell me that there was an error

2    in the address.  I don't know if the check went back to

3    the Sanders.  I don't know.

4              Q.  (By Ms. Reilly)  Okay.  But you didn't

5    receive a stipend check when you were staying with Maria,

6    correct?

7              A.   No.

8              Q.   And were you waiting on that final stipend

9    check for the last two weeks of work with the Sanders?

10             A.   Yes, so that I could support myself in

11   those days.

12             Q.   Right.  And what day of the week did

13   Mrs. Sanders usually give you the check for the weekly --

14   for the stipend?

15             A.   I don't know if you're asking me normally

16   when.

17             Q.   Yes, normally.

18             A.   From Fridays.

19             Q.   But you didn't get the check on this

20   Friday because you were at Joyce's birthday party?

21             MS. McELROY:  Objection.

22             A.   I don't remember why exactly she didn't

23   give me a check, but she didn't give it to me.

24             Q.  (By Ms. Reilly)  Okay.

25             (Exhibit 113 was marked.)

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 162

1      Q.   113, do you recognize this document?

2      A.   Yes, ma'am.

3      Q.   And this is from February 2, 2015?

4      A.   Well, yes, I suppose.

5      Q.   What day did you fly back to Colombia?

6      A.   The 10th.

7      Q.   February 10th?

8      A.   Yes, ma'am.

9      Q.   So can you read me this email to Lina?

10     And I will hear the translation.

11     A.   Hello.  How are you Lina?  I am in

12     rematch.  That's because the ma'am with the mom of the

13     baby kicked me out of the house, and she yell at me.

14     Therefore, I decide to do a rematch.  Now I'm in the

15     house of an Argentinian family that I met at the college

16     waiting for finding another family.

17     Q.   Thank you.  That was my only question

18     about that.

19          (Exhibit 114 was marked.)

20     Q.   114.  So before we look at this, you flew

21     back to Colombia on February 10th, correct?

22     A.   Yes.

23     Q.   And your friends helped you pay for the

24     airfare?

25     A.   Yes, ma'am.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 163

1         Q.    Did you tell GoAuPair that you were

2    leaving the country before you flew back to Colombia?

3         A.    They had -- well, Crystal had told me that

4    the time for rematch was up.  And then I said, Crystal, I

5    need to go back but tried to say on the message, Are you

6    going to pay for the ticket?  And she responded to me

7    very decently that she could find a ticket for me, but I

8    had to pay it.  So then I understood that they didn't

9    really care.  Therefore, I tried to find the flight as

10   soon as I could because I didn't want any immigration

11   problems or anything like that.  They found a cheap

12   ticket for me, and I left just like that.

13        Q.    When you said "they didn't care," who did

14   you mean?

15        A.    I was referring specifically to Crystal

16   because Crystal knew, number one, that I didn't have any

17   cash because they didn't really give me the last check.

18   And the second thing she told me, well, I had to pay for

19   the ticket.  So in reality they didn't care.

20        Q.    Did you ask GoAuPair to help you find

21   housing after you left the Sanders house?

22        A.    No, because fortunately I was able to get

23   housing with Maria.

24        Q.    Other than not paying your return air

25   flight to Colombia, do you think GoAuPair did anything

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 164

 1    else wrong during that rematch period?

 2                    MS. McELROY:   Objection.

 3           A.    Yes, ma'am.

 4           Q.   (By Ms. Reilly)   What?

 5           A.    They should have looked for a place for

 6    me.  Well, independently of whether I was staying with

 7    Maria or not, they should have.  They should have taken

 8    care of where I was actually staying.  The other, that

 9    them independently of that Mrs. Sanders would have

10    returned with the wrong address or whatever, they should

11    have helped me with that money that she owed me.

12                    The next is that them having taken in

13    consideration my situation where I was leaving the house

14    not just because I wanted, say, but it was because the

15    actual ma'am of the house kicked me out.  They should

16    have bought me a ticket.  And the other that I thought it

17    was terrible at this moment that that woman has another

18    au pair when she was the one that irresponsibly yelled at

19    me and kicked me out of the house.

20           Q.   How do you know she has a new au pair?

21           A.    Because the kids from that area -- the

22    au pairs from the area were, you know, having a tab on me

23    and checking on me.  And one of them told me like when I

24    was already back in Colombia, she told me she has another

25    au pair from Africa.  And I said, How -- how can this be

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                            September 28, 2016

Page 165

1    possible when she was the one that yelled at me?  Then

2    she can yell to any other au pair then, and GoAuPair does

3    not do any single thing about that attitude of that lady.

4            Q.    Anything else?

5            A.    Yes.  Independently of the check did not

6    arrive at the given time, Crystal had many months.  And

7    she was always like with all this excuses saying, I did

8    send it to you.  And the last person who helped me and

9    the one that should have taken this case from the very

10   beginning was Tanna Wilson.  She was the only one that

11   responded to the money at the end.

12           Q.    Do you understand that after the check

13   didn't make it to you at your friend's house that

14   GoAuPair mailed through regular mail the check and your

15   Social Security card to Colombia?

16                 MS. McELROY:  Objection.

17           A.    That's what they say.

18           Q.  (By Ms. Reilly)  Did you ever receive that

19   from them?

20           A.    Never.  The only thing I was able to

21   receive from GoAuPair was a check that says GoAuPair, and

22   it was a money that I didn't understand why it was so

23   little either.

24           Q.    Was that the check you received through

25   FedEx?

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 166

1              A.   Yes, ma'am.

2              Q.   And you couldn't deposit it in your bank?

3              A.   Yes, ma'am, because the procedure is

4    different in Colombia.

5              Q.   So you went back and told AuPair that you

6    couldn't deposit it, correct?

7                   MS. McELROY:  Objection.

8              A.   Yes, ma'am.  I did tell Crystal that that

9    was not valid in Colombia.

10             Q.   (By Ms. Reilly)  Then did you discuss with

11   Crystal or Tanna possibly they would wire the money to

12   you in Colombia?

13                  MS. McELROY:  Object to form.

14             A.   I don't remember.  The wire transfer was

15   done but not in my account.  It had to be Intercambio

16   that finally gave me the money, but I know that it was

17   GoAuPair that sent the cash to Intercambio.

18             Q.   (By Ms. Reilly)  So how can you say

19   GoAuPair didn't help you get the money?

20                  MS. McELROY:  Objection.

21             A.   Well, it wasn't GoAuPair directly because

22   of all this ordeal.  It was like GoAuPair sent it -- they

23   never sent it to my account directly.  They sent it

24   through, you know, the account of Intercambio people.

25   And the ones from Intercambio were finally the ones that

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 167

1  gave me the money, but I know that it was GoAuPair that

2  sent that money.

3          Q.  (By Ms. Reilly)  And they did that at your

4  request because you didn't want to incur the fees -- you

5  would have been charged if they had wired the money

6  directly to your account, right?

7              MS. McELROY:  Objection.

8          A.  I don't remember that part really.

9          Q.  (By Ms. Reilly)  Okay.  So 114, this is an

10  email from Amanda Gray to you.  And it's on February 17,

11  2015.  And the subject is, Are you okay?  You flew back

12  to Colombia on February 10th.  When did you tell GoAuPair

13  that you had left the country?

14          A.  Well, that I would remember -- you know, I

15  don't remember ever sending them an email saying I have

16  left, but I did call Intercambio.  And I said, I'm here

17  in Colombia, and I told them everything that happened.

18          Q.  That's once you were already in Colombia,

19  though?

20          A.  Yes, that was in Colombia.

21          Q.  Before flying back, did you email anyone

22  from GoAuPair your flight itinerary?

23          A.  No, nothing.  I didn't even have the

24  itinerary because my friend bought it.  And I simply

25  arrived to the airport and, chow, you know, show the

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 168

 1    passport.

 2              Q.   And the email says, "Hi, Alexa.  Your

 3    friends sent me a text to let me know she asked you to

 4    leave her home."  Do you see that?  Did anyone ask you to

 5    leave Maria's home?

 6              A.   No, no.  I had to left right then like

 7    that.  I have to leave.

 8              Q.   Did you ever receive your Social Security

 9    card to this day?

10              A.   No, ma'am.

11              Q.   Do you believe you are owed any amount

12    today by the Sanders family?

13              MS. McELROY:   Objection.

14              A.   Yes, ma'am.

15              Q.   (By Ms. Reilly)  How much?

16              A.   Well, I don't know if they should have

17    first -- I don't know.  They should have returned to me

18    the part about the school if I did not maybe receive it.

19    It would have been 400 less like 161.  That's what was

20    remaining.

21              Q.   Okay.  Just to be clear, for the school

22    piece, what amount do you think you're owed for that?

23              A.   Well, it was $500 that from the very

24    beginning Intercambio offered.  I only took 150 because

25    that's what was used to pay the school for me.  So where

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 169

```
 1   was the rest?
 2           Q.   Okay.  And then the $161, that's what you
 3   did receive in your final stipend paycheck, correct?
 4           A.   Yes, ma'am.
 5           Q.   How much do you think is owed to you by
 6   the Sanders family for your last weekly stipend check?
 7           A.   It would have been 400 less 161.  I don't
 8   have a way to do the math right now.
 9           Q.   Fair enough.  115.
10           (Exhibit 115 was marked.)
11           Q.   So do you see that this email chain
12   concerns that 161-dollar check?
13           A.   Yes, ma'am.
14           Q.   Have you seen this email chain before?
15           A.   Yes, ma'am.
16           Q.   And going back to the letter from
17   Mrs. Sanders to Crystal and the cell phone bill, did you
18   see this before today?
19           A.   Yes, ma'am.
20           Q.   So do you understand why the check from
21   the Sanders was for 161 rather than the normal 400?
22           A.   Yes, of course.  But I thought it was
23   unfair.
24           Q.   Okay.  So do you see that there was a
25   209-dollar charge for the lost phone?
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**Confidential Video Deposition of Ivette Alexandra Gonzalez**
September 28, 2016

Page 170

```
 1              A.   Yes, yes, I know that I lost the phone.
 2   But because she was going to take from -- according to
 3   what I understood from her in the United States, she was
 4   going to take the money from my schooling because I
 5   finally, you know, before this whole series of events I
 6   paid at the school.
 7              Q.   Back to the phone.  You see from this
 8   phone bill that Mrs. Sanders was actually charged $209
 9   for the lost phone.  You see that?
10              MS. McELROY:  Objection.
11              A.   Yes, I do see it.  But the question is:
12   Why did she take from my money, from my salary?  And why
13   didn't she take it from my scholarship money?
14              Q.   (By Ms. Reilly)  And then in addition to
15   the $209, she also subtracted $30, which was the cost of
16   the canceled check sent to that incomplete Westminster
17   address, correct?
18              MS. McELROY:  Objection.
19              A.   Yes, I do know that also.  But I believe
20   it was unfair.
21              Q.   (By Ms. Reilly)  But you acknowledge you
22   gave the wrong address, right?
23              MS. McELROY:  Objection.
24              A.   Yes, yes, I do.  I did give her the wrong
25   address, well, because it wasn't my home.  And I wasn't
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 171

1    exactly sure of that address.  Yes, I gave it to her.

2             Q.  (By Ms. Reilly)  When you were in the

3    United States before you left for home, did you contact

4    any lawyers about this check issue?

5             A.   No.

6             Q.   Do you remember telling GoAuPair that you

7    were -- you would need to get legal help to get the

8    check?

9             A.   Yes, I did, I did.  In some moment at some

10   point I did mention something legal.

11            Q.   But you didn't actually speak with a

12   lawyer during that January, February 2015 timeframe?

13                 MS. McELROY:   Objection.

14            A.   I did see this petition, this lawsuit in

15   Facebook.  That was in December, but I subscribed to it.

16   I am here.  Since February when this happened I contacted

17   the attorneys' group, and I started this process.

18            Q.  (By Ms. Reilly)  Got it.  So you first saw

19   the Facebook page about the lawsuit in December 2014?

20            A.   2014.

21            Q.   Okay.  And you first reached out to the

22   lawyers about this lawsuit in February 2015?

23            A.   Yes, ma'am.

24            Q.   And was that when you were back in

25   Colombia?

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 172

 1          A.   No.  I signed everything right here, and

 2   then I left.

 3          Q.   **Was that Towards Justice you were speaking**

 4   **with?**

 5          A.   Here in Colorado, yes.

 6          Q.   **Do you remember the name of the lawyer?**

 7          A.   Alex.

 8          Q.   **And how did you come across the Facebook**

 9   **page in December?**

10          A.   There's a lot of complaints from the

11   au pairs in Facebook, and one girl -- I'm not sure who --

12   put the complaint, the lawsuit, in the group of Colombian

13   au pairs.

14          Q.   **Do you know any of the other named**

15   **plaintiffs in this lawsuit?**

16          A.   I do know one.  That's because when the

17   process started I look for her.  It was a girl named

18   Johana.

19          Q.   **Beltran?**

20          A.   Yes, Johana.

21          Q.   **Have you ever met her in person?**

22          A.   Never.

23          Q.   **You didn't know her before the lawsuit?**

24          A.   No, no, no.

25          Q.   **Have you spoken to any other au pairs who**

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                          September 28, 2016

Page 173

 1   are considering joining the lawsuit?

 2            A.    The majority of them are afraid.

 3            **Q.    Afraid of what?**

 4            A.    I don't know.  I feel like they think that

 5   if they go back to Colombia they'll never get a visa

 6   again.

 7            **Q.    So these are au pairs who are currently in**

 8   **the country?**

 9                   MS. McELROY:  Objection.

10            A.    Some of them.

11            **Q.    (By Ms. Reilly)  I apologize if I asked**

12   **this already.  I'm tired.  Have you had any contact with**

13   **any member of the Sanders family since you left the**

14   **house?**

15            A.    Mr. Sanders when I was here, he sent me a

16   message with a bunch of pictures from the girl telling me

17   that I did a good job and that they did indeed miss me.

18   That's it.

19            **Q.    When was that?**

20            A.    That's when I was in the process of the

21   rematch and finding other families.

22            **Q.    Nothing since then?**

23            A.    No, ma'am.

24            **Q.    Did you provide that email to your**

25   **lawyers?**

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

**Confidential Video Deposition of Ivette Alexandra Gonzalez**
September 28, 2016

Page 174

 1          A.   No, it wasn't an email.

 2          Q.   **What kind of message was it?**

 3          A.   It was a phone message.

 4          Q.   **Okay.  And did you provide your attorneys**

 5   **with phone -- with any phone messages?**

 6          A.   Of that?

 7          Q.   **Of anything.**

 8          A.   Yes, yes.  I did save the one from

 9   Mrs. Patrice at that moment.

10          Q.   **Other than the text messages from**

11   **Mrs. Sanders that we looked at, did you provide any other**

12   **text messages to your lawyers in this case?**

13               THE INTERPRETER:  Through their lawyers

14   what?

15               MS. REILLY:  In this case.

16          A.   No, no, ma'am.

17               THE VIDEOGRAPHER:  Counsel, your notepad

18   is covering your microphone.

19               MS. REILLY:  My apologies.

20          Q.   **(By Ms. Reilly)  Do you recall filling out**

21   **a survey for GoAuPair after you were back in Colombia?**

22          A.   Yes, ma'am.

23          Q.   **And was that in May 2015?**

24          A.   Yes, perhaps.

25          Q.   **Okay.  116.**

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                        September 28, 2016

Page 175

 1                     (Exhibit 116 was marked.)

 2              Q.    Did you talk to anyone about how you would

 3     respond to this survey before you filled it out?

 4                     MS. McELROY:  Objection.

 5              A.    No, ma'am.

 6              Q.    (By Ms. Reilly)  And did you provide

 7     truthful and accurate information in response to the

 8     survey?

 9              A.    Yeah.

10              Q.    So on the questions, "How many days per

11     week did you work more than 10 hours per day?"  And you

12     said one.

13              A.    Well, at that point I probably remembered

14     that it was one.  But like I told you earlier, I'm

15     counting out the favors, you know, if I'm going to start

16     counting them because that one day was the day that the

17     ma'am gave me the cash.

18              Q.    So you meant just one day, not one day per

19     week?

20                     MS. McELROY:  Objection.

21              A.    No, I said one day.

22              Q.    (By Ms. Reilly)  Yeah, you meant one day

23     total, correct?

24              A.    I'm not sure why I wrote a 1.  But it does

25     state here per week, correct.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 176

```
 1              Q.   Right.  But you just testified -- it
 2    sounds like you thought it meant total.
 3              A.   Like I told you, yes, with the one day I
 4    remember that she paid me.  But if we're going to take
 5    into account all the favors, then it was then like
 6    perhaps once per week.
 7              Q.   But in May 2015 when you filled this out,
 8    you could only think of one day total where you had
 9    worked more than 10 hours during your au pair service
10    with the Sanders?
11              MS. McELROY:  Objection.
12              A.   Yes, I did think on that day, yes.
13              Q.   (By Ms. Reilly)  On the second page it
14    says, "Questions added for 2013 audit."  The last one
15    there it says, "How will your au pair experience help you
16    in the future after the program is over?"  You see where
17    I am?
18              A.   (In English)  Uh-huh.
19              Q.   You said, "Unfortunately, I did not finish
20    the program but definitely experience helped me value my
21    profession, my family, and my future."  So how did the
22    au pair experience help you?
23              MS. McELROY:  Objection.
24              A.   In that moment and until now I appreciate
25    my family, my profession, and the future that is ahead of
```

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                              September 28, 2016

Page 177

 1    me.

 2              Q.   (By Ms. Reilly)  And your au pair

 3    experience helped with that?

 4                   MS. McELROY:  Objection, form.

 5              A.   The experience working in the United

 6    States made me be stronger.

 7              Q.   (By Ms. Reilly)  Do you understand that one

 8    of the claims you've asserted in the case is that there

 9    is an agreement among the 15 sponsors who administer the

10    au pair program?

11              A.   What agreement?

12              Q.   Do you know anything about an agreement

13    among the sponsors?

14              A.   I don't know what agreement you're talking

15    about.

16              Q.   Do you know who the 15 sponsor agencies

17    are in the United States?

18                   MS. McELROY:  Objection.

19              A.   What are you talking about, the program?

20              Q.   (By Ms. Reilly)  No.  Like GoAuPair,

21    EurAupair.  Do you know other --

22              A.   Oh, yes.

23              Q.   Which other ones?

24              A.   American Cultural, Great Au Pair, Cultural

25    Care.  At this moment I only remember those five.

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 178

1        Q.    Okay.  And other than GoAuPair, do you

2   personally know any employee of any of those other

3   agencies?

4        A.    You talking about employees or au pairs,

5   or are you talking about just people or --

6        Q.    Not au pairs, employees of those agencies

7   other than GoAuPair.

8             MS. McELROY:  Objection.

9        A.    No, no, I don't know anybody.

10       Q.   (By Ms. Reilly)  So do you have any

11  knowledge regarding any agreement of any kind that those

12  agencies have with one another?

13            MS. McELROY:  Objection.

14       A.    No, no, no, I don't, ma'am.

15       Q.   (By Ms. Reilly)  Are you aware of any

16  au pair who has received more than $200 as their weekly

17  stipend?

18            MS. McELROY:  Objection.

19       A.    I was the one that received the most.

20       Q.   (By Ms. Reilly)  Do you know of any au pair

21  who received more than you?

22       A.    No.

23       Q.    How many au pairs have you discussed the

24  weekly stipend with?

25       A.    Well, when we -- you know, you talk about

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 179

1    with the other au pairs, then they all complain about the

2    same thing.

3                Q.    How many au pairs have told you how

4    much -- the amount of their weekly stipend that they

5    received?

6                A.    Well, a lot really.  I don't know how

7    many.

8                Q.    Okay.  Could you tell me just sitting here

9    today what other au pairs you know and what -- strike

10   that.

11               Sitting here -- sitting here now, can you

12   tell me every au pair whose weekly stipend you know?

13                    MS. McELROY:  Objection.

14               A.    There were a lot of the ones that I spoke

15   with in the United States -- I mean, some of the ones I

16   spoke.  But there's a ton of them in the Facebook page

17   that speak and say that stipend is a misery.

18               Q.  (By Ms. Reilly)  Can you list any names of

19   au pairs right now --

20                    MS. McELROY:  Objection.

21               Q.  (By Ms. Reilly)  -- whose stipend amount

22   you know?

23                    MS. McELROY:  Objection.

24               A.    I did obviously know the ones in the area

25   like Alona, Andrea.  How did you call this other one,

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                          September 28, 2016

Page 180

1    Alejandra?  And Joyce from Cultural Care.  I did speak

2    with other girls that we chat via Facebook.  One is

3    Johana from GoAuPair also.  Another girl whose name is

4    Dayanna that is from Great Au Pair that also talks about

5    it.

6              Q.   (By Ms. Reilly)  And for each one of those

7    people, how -- what is the amount of the weekly stipend

8    they received?

9              A.   195 and change.

10             Q.   For all of them that you listed?

11             A.   Yeah, yeah.

12             Q.   But you received something different?

13             A.   Yeah, yeah, that's why I told you I was

14   the one that received the most.

15             (Exhibit 117 was marked.)

16             Q.   117.  Let me know when you're ready to --

17             A.   Yeah.

18             Q.   Do you recognize this email?

19             A.   Let me see.  Yes.

20             Q.   Who is Ms. Jasmine Moore?

21             A.   That lady, that lady was -- it's just that

22   I'm a little bit confused.  This was from -- let me see.

23             Q.   Let's go off the record.  Let's go off the

24   record for just two minutes so -- I'm going to talk to

25   the client, and we're wrapping up.  So you take a minute

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                            September 28, 2016

Page 181

1  and read this.  We'll come back on, and I think we're 5

2  minutes away from finishing.

3                    THE VIDEOGRAPHER:  Going off the record.

4  The time is 6:27.

5                    (Recess taken from 6:27 p.m. to 6:33 p.m.)

6                    THE VIDEOGRAPHER:  We are back on the

7  record.  The time is 6:33.

8        Q.  (By Ms. Reilly)  When you were with the

9  Sanders family, did GoAuPair ever supervise or provide

10  feedback regarding the childcare services you were

11  providing to the Sanders family?

12                    MS. McELROY:  Objection, form.

13        A.  Amanda was the one that called me, and

14  she -- she would tell me that Mrs. Patrice was very happy

15  with the job that I was doing with the baby girl.

16        Q.  (By Ms. Reilly)  But it was Mrs. Sanders

17  who was actually supervising the work you were doing with

18  the baby?

19                    MS. McELROY:  Objection.

20        A.  Well, both of them, the mom and the dad.

21  But the ones that they would call was Mrs. Patrice, and

22  Patrice said that it was all right.

23        Q.  (By Ms. Reilly)  This email, Exhibit 117,

24  so who is Jasmine Moore?

25        A.  I did write this, but I don't really

Johana Paola Beltran, et al. vs.                    Confidential Video Deposition of Ivette Alexandra Gonzalez
Interexchange, Inc., et al.                                                           September 28, 2016

Page 182

```
 1   remember why.
 2            Q.   Do you remember how you found Jasmine
 3   Moore?
 4            A.   No, ma'am.
 5            Q.   Did you -- this is from 2016.  After
 6   coming back to Colombia, did you ever apply to any other
 7   au pair program?
 8            A.   I don't remember really.
 9            Q.   Do you know if this email exchange was
10   through an agency?
11                 MS. McELROY:  Objection.
12            A.   I don't know.  I don't remember.  I should
13   have written this, but I don't know.  I don't recall.
14            Q.   (By Ms. Reilly)  Do you remember going to
15   Intercambio or another agency and going through the whole
16   application process again?
17                 MS. McELROY:  Objection, form.
18            A.   No.
19            Q.   (By Ms. Reilly)  You would remember that,
20   right?
21                 MS. McELROY:  Objection.
22            A.   Yes, obviously.
23            Q.   (By Ms. Reilly)  Have you made any attempts
24   to find a position in the United States since you've been
25   back in Colombia?
```

Page 183

```
 1              A.   Yes, yes.
 2              Q.   And what have those been, those attempts?
 3              A.   Well, one like I told you was to work on
 4    ships.
 5              Q.   Anything else?
 6              A.   And some others and another one is to work
 7    again like an au pair but not through an agency, not
 8    au pair, not au pair, like a nanny but not any agency
 9    involvement.
10              Q.   And what -- under what visa program would
11    you do that?
12              A.   No, the idea is to just test my abilities,
13    you know.  Well, there is things that are not really part
14    of my plans of like.  They're things like a chance
15    perhaps, if you're able -- if it's able -- like perhaps
16    somebody would look at my abilities, and then they would
17    give me a legal job in here, like a -- but it's not
18    really part of my plans for life or -- no.
19              Q.   Was the information in the top email from
20    you to Jasmine Moore accurate?
21              MS. McELROY:  Objection.
22              A.   It's just that I honestly can't recall.  I
23    mean, I perhaps did write this, but I don't remember the
24    reasons why.
25              Q.   (By Ms. Reilly)  That's not my question.
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 184

1  Sitting here now, are the statements you made in this

2  email to Jasmine Moore accurate and truthful?

3           A.   I don't really remember, and I don't know

4  why I don't remember.  I honestly don't remember.

5           Q.   It doesn't really matter if you don't

6  remember.  Just looking at these statements, are they

7  accurate?

8           A.   Well, separate -- I don't really know why

9  I wrote -- why I wrote that, that I did help my friend

10 with four kids.  But yes, yes, this information is

11 accurate indeed.

12          Q.   Okay.  We are done.  Thank you.

13          A.   Okay.

14          THE VIDEOGRAPHER:  This is the end of

15 Media 4 of 4.  Going off the record.  The time is 6:40.

16          MS. McELROY:  We don't have anything.

17               *  *  *  *  *  *  *

18          (WHEREUPON, the foregoing deposition was

19 concluded at the hour of 6:40 p.m.  Total time on the

20 record was 6 hours and 23 minutes.)

21

22

23

24

25

Johana Paola Beltran, et al. vs.                    **Confidential Video Deposition of Ivette Alexandra Gonzalez**
Interexchange, Inc., et al.                                                          **September 28, 2016**

```
 1              I, IVETTE ALEXANDRA GONZALEZ, the deponent in

 2   the above deposition, do hereby acknowledge that I have

 3   read the foregoing transcript of my testimony, and state

 4   under oath that it, together with any attached Amendment

 5   to Deposition pages, constitutes my sworn testimony.

 6
        _____ I have made changes to my deposition
 7
        _____ I have NOT made any changes to my deposition
 8

 9                          _____

10                          IVETTE ALEXANDRA GONZALEZ

11
             Subscribed and sworn to before me this _____
12
     day of _____, 20_____.
13
             My commission expires:  _____.
14

15
                            _____
16                          NOTARY PUBLIC

17

18

19

20

21

22

23

24

25
```

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Confidential Video Deposition of Ivette Alexandra Gonzalez
September 28, 2016

Page 186

```
 1                  CERTIFICATE OF DEPOSITION OFFICER

 2    STATE OF COLORADO                )

 3    CITY AND COUNTY OF DENVER        )

 4              I, Deborah A. VanDemark, a Registered

 5    Professional Reporter and Notary Public within and for

 6    the State of Colorado, commissioned to administer oaths,

 7    do hereby certify that previous to the commencement of

 8    the examination, the witness was duly sworn by me to

 9    testify to the truth in relation to matters in

10    controversy between the said parties; that the said

11    deposition was taken in stenotype by me at the time and

12    place aforesaid and was thereafter reduced to typewritten

13    form by me; and that the foregoing is a true and correct

14    transcript of my stenotype notes thereof.

15              That I am not an attorney nor counsel nor in any

16    way connected with any attorney or counsel for any of the

17    parties to said action nor otherwise interested in the

18    outcome of this action.

19              My commission expires:  March 4, 2017.

20

21                      _____

                        DEBORAH A. VANDEMARK
22                      Registered Professional Reporter
                        Colorado Realtime Certified Reporter
23                      Notary Public, State of Colorado

24

25
```