# EXHIBIT 26

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CULTURAL CARE, INC.<br>d/b/a CULTURAL CARE AU PAIR,  ERIN<br>CAPRON, and JEFFREY PENEDO,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE ATTORNEY GENERAL<br>OF THE COMMONWEALTH OF<br>MASSACHUSETTS, and<br>MAURA T. HEALEY, IN HER CAPACITY<br>AS ATTORNEY GENERAL OF THE<br>COMMONWEALTH OF MASSACHUSETTS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

This is an action in equity seeking injunctive and declaratory relief relating to the

Massachusetts Domestic Workers Bill of Rights (the "MA Act"), M.G.L. c. 149, § 190, and the

accompanying Regulations propounded by the Office of the Attorney General of the

Commonwealth of Massachusetts, 940 CMR 32.00 et seq. (the "MA Regulations"), which

together form part of Massachusetts' labor laws.  Plaintiff Cultural Care, Inc. d/b/a Cultural Care

Au Pair, and *au pair* Host Family members Jeffrey Penedo and Erin Capron, seek an injunction

against application of these labor laws to the federal cultural exchange program established

under the Fulbright-Hays Act pursuant to which *au pairs* become cultural exchange visitors on

J-1 exchange visas to the Commonwealth of Massachusetts ("Massachusetts") and nationwide.

Plaintiffs further seek a declaratory judgment that any interpretation of the MA Act and MA

MOVANTS' APP 00096

Regulations that applies them to a federal cultural exchange program conflicts with, and is preempted by, federal law as a matter of both conflict and field preemption.

**The Parties**

1.  Plaintiff Cultural Care, Inc. d/b/a Cultural Care Au Pair ("CCAP") is incorporated in Massachusetts and has its principal place of business in Cambridge, Massachusetts. CCAP is one of sixteen private entities designated nationwide by the United States Department of State ("DOS") as a "Sponsor" of a cultural exchange program (the "*Au Pair* Cultural Exchange Program" or the "Program") pursuant to which young foreign nationals come to the United States for a period of one to two years for the purpose of residing with an American Host Family and participating directly in their home life, while providing limited childcare services, and fulfilling an educational requirement. *See* 22 CFR § 62.4(h)(4). In exchange for room and board, and the cultural experience of living in the United States and participating in the home life of the Host Families, the *au pairs* assist with childcare and receive a stipend as directed by the DOS. CCAP functions across state lines in interstate commerce, subject to regulation and oversight by the DOS, in order to help effectuate the Program. The Program could not function without the existence of private commercial entities like CCAP.

2.  CCAP contracts with qualified Host Families across the United States to match them with appropriate *au pair* applicants; provides *au pairs* with child development and child safety instruction before they join their Host Families as required by the DOS Regulations; requires Host Families to enter into contracts with the *au pairs* and to provide them with a weekly stipend (regardless of hours actually worked, up to a maximum of 45 hours per week and 10 hours per day) in an amount set by the DOS; monitors the *au pair*'s experience and well-being through personal contact at frequent intervals throughout the Program; and reports to the

MOVANTS' APP 00097

DOS regarding Host Families' and *au pairs*' satisfaction with the Program, and any problems that developed during the Program. 22 CFR § 62.31. CCAP, like other Sponsors, performs these services pursuant to contracts with, and for a fee charged to, the Host Families.

3. Plaintiffs Jeffrey Penedo and Erin Capron (together the "Host Family Plaintiffs") each reside in eastern Massachusetts and host in their respective homes an *au pair* placed by CCAP. (Collectively, CCAP and the Host Family Plaintiffs are referred to hereafter as "Plaintiffs.") The *Au Pair* Cultural Exchange Program provides cultural benefits to the Host Families as well as to the *au pairs*, by providing the families with the opportunity to interact in a multicultural home environment with young guests from other countries. Individuals such as Ms. Capron and Mr. Penedo are sometimes referred to in the DOS Regulations as "Host Parents," *see, e.g.*, 22 CFR § 62.31(h)(1)-(2). The Host Families pay the stipends to the *au pairs* and determine the *au pairs'* childcare schedules within the weekly and hourly limits specified by the DOS.

4. Defendants, the Office of the Attorney General of the Commonwealth of Massachusetts and incumbent Attorney General Maura T. Healey named in her official capacity (together, the "MA OAG"), have their principal office in Boston, Massachusetts. The MA OAG has enforcement authority over Massachusetts wage and hour laws, including the MA Act, and propounded the MA Regulations "to interpret, enforce, and effectuate the purposes of" the MA Act. The MA OAG does not have authority to administer or set requirements for federal cultural exchange programs established by Congress under the Fulbright-Hays Act.

## Jurisdiction and Venue

5. Jurisdiction vests in the federal courts pursuant to 28 U.S.C. § 1331 because this case, which alleges federal preemption by virtue of the Mutual Educational and Cultural

MOVANTS' APP 00098

Exchange Act of 1961, 22 U.S.C. § 2451 et seq. (the "Fulbright-Hays Act"), and the Commerce

Clause, Article 1, Section 8, Clause 3 of the United States Constitution, arises under the

Supremacy Clause, Article VI, Clause 2 of the United States Constitution. To the extent any

Count is deemed not to present a federal question, this Court has supplemental jurisdiction

pursuant to 28 U.S.C. § 1367(a).

6.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because

Defendants reside here.

### Federal Legislation and Legislative History

7.       In 1961, during the administration of President John F. Kennedy, the United

States Congress enacted the Fulbright-Hays Act, 22 U.S.C. § 2451 et seq. The Statement of

Congressional Purpose for the Fulbright-Hays Act is as follows:

> The purpose of this chapter is to enable the Government of the United
> States to increase mutual understanding between the people of the United States and
> the people of other countries by means of educational and cultural exchange; to
> strengthen the ties which unite us with other nations by demonstrating the
> educational and cultural interests, developments, and achievements of the people of
> the United States and other nations, and the contributions being made toward a
> peaceful and more fruitful life for people throughout the world; to promote
> international cooperation for educational and cultural advancement; and thus to assist
> in the development of friendly, sympathetic, and peaceful relations between the
> United States and the other countries of the world.

22 U.S.C. § 2451. Congress was thus clear that exchange visitors would enter the United

States, not as immigrants or employees, but as visitors in furtherance of mutual

understanding and the development of better relations between the United States and other

countries. Further evidence of this intent is that exchange visitors receive J-1

nonimmigrant *exchange visitor* visas, as opposed to nonimmigrant *worker* visas, such as

H-1B visas.

- 4 -

MOVANTS' APP 00099

8.      The Fulbright-Hays Act was designed to provide the legislative authority

necessary for establishment of educational and cultural exchanges.  In the words of  Assistant

Secretary of State Brooks Hays in a letter to Congress:

> The Department has long had the conviction that educational and cultural
> exchange is one of the most important and effective means available to this
> Nation in our continuing struggle to build a peaceful world in which freedom and
> justice under law will be the lot of all mankind. This conviction is shared by the
> President and his administration. In order to carry out these programs effectively
> and to achieve the maximum impact, the executive branch must have a sound base
> of legislative authority from which to operate.

House Report No. 1094 at 2775 (August 31, 1961).

9.      In ensuing years, various educational and cultural exchange programs were

authorized by Congress in furtherance of the Congressional objectives of strengthening the ties

that unite the United States with other nations and increasing mutual understanding between the

people of the United States and the people of other countries through educational and cultural

exchanges.  Although the exchanges clearly are not work programs, participants are to receive

some income in the form of stipends or grants; and such income, like all earned income in the

United States, is subject to taxes.  With regard to the *Au Pair* Cultural Exchange Program, the

payments are made pursuant to contracts between Host Families and the *au pairs*, which are not

contracts of employment.  These small payments will not necessarily be sufficient to cover all

personal expenses; and Program recruitment information and materials are required to make it

clear to prospective exchange visitors that their stipend might not cover all of their expenses and

that they should bring additional personal funds.  *See* 22 CFR § 62.9(d)(3).

10.     In 1986, Congress authorized a pilot *au pair* program under the Fulbright-Hays

Act pursuant to which young foreign men and women, in a defined age category, could come to

the United States to continue their educations, immerse themselves as members of U.S. families,

and serve as "*au pairs,*" or persons "on a par" with family members.  The pilot program

MOVANTS' APP 00100

furthered the missions and objectives of the Fulbright-Hays Act, and, at the same time, met a

growing need for affordable childcare precipitated by the entry of more women into the work

force.  The program is designed such that, "foreign nationals are afforded the opportunity to live

with an American Host Family and participate directly in the home life of the Host Family,"

while providing childcare services and pursuing "not less than six semester hours of academic

credit or its equivalent."  22 CFR § 62.31(a).

    11.    In 1997, Congress extended the pilot program into a permanently authorized *au

pair* cultural exchange program.  *See* P.L. 105-48 of the 105th Congress.

    12.    Initially, the United States Information Agency ("USIA"), a federal agency

devoted to public diplomacy, was charged with administering the *Au Pair* Cultural Exchange

Program.  Upon the dissolution of the USIA in 1999, the cultural exchange programs, including

the *Au Pair* Cultural Exchange Program, were transferred to the DOS and were administered by

a newly created Under Secretary of State for Public Diplomacy and Public Affairs.

    13.    The DOS promulgated regulations regarding such programs, including the *Au

Pair* Cultural Exchange Program (the "DOS Regulations"), which regulate the roles and

obligations of both the Host Families and the Sponsors.  *See* 22 CFR Part 62, "Exchange Visitor

Program."  In describing the purpose of the DOS Regulations, the DOS reiterated the

Congressional intent underlying the Fulbright-Hays Act:  "The purpose of the Fulbright-Hays

Act is to increase mutual understanding between the people of the United States and the people

of other countries by means of educational and cultural exchanges . . . to assist the Department of

State in furthering the foreign policy objectives of the United States."  *See* 22 CFR § 62.1

MOVANTS' APP 00101

Case No. 1:14-cv-03074-CMA-KMT   Document 896-109   filed 06/06/18   USDC Colorado   pg 140
of 331
Case 1:16-cv-11777-IT   Document 34   Filed 08/31/16   Page 7 of 23

14.     Pursuant to 22 CFR § 62.1(b), the Secretary of State "facilitates activities
specified in the Fulbright-Hays Act, in part, by designating public and private entities to act as
sponsors" for the Exchange Visitor Program, including the *Au Pair* Cultural Exchange Program.

15.     As noted above, *au pairs*, who travel to the United States on a J-1 visa or
otherwise obtain J status, are foreign nationals who come to the United States for the purpose of
residing with an American Host Family, such as the Host Family Plaintiffs, and participating
directly in their home life, while providing limited childcare services, and fulfilling an
educational requirement. *See id*. at § 62.4. To qualify for J status in the *Au Pair* Cultural
Exchange Program, the visitor must have a residence in a foreign country which s/he has no
intention of abandoning and must be a "bona fide student" or similar person "who is coming
temporarily to the United States as a participant in a program designated by the Director of the
United States Information Agency" for such enumerated purposes as "studying" and
"observing." *See id*. at § 62.2, incorporating 8 U.S.C. § 1101(a)(15)(J). *Au pairs* are welcomed
to the United States by a DOS letter informing them that they are "among many young adult
exchange visitors serving as [their] country's citizen ambassador in the United States." *See*
Exhibit A.

16.     In accord with the Congressional mandate in the Fulbright-Hays Act, the DOS has
administered the *au pair* program as a cultural exchange program, not a work program,
notwithstanding that the Department of Labor – which is not the agency charged with
administering the program – has proclaimed that the program includes an employment
component as between the *au pair* and the Host Family. For example, in July of 2013, then
Deputy Assistant Secretary for Private Sector Exchange Robin Lerner wrote the following to the

MOVANTS' APP 00102

Sponsors of the various Exchange Visitor Programs, including the *Au Pair* Cultural Exchange

Program:

> As our newest improvements take hold, we must all remain mindful of the true purpose of the Exchange Visitor Program. In accordance with the Fulbright-Hays Act of 1961, these cultural, educational and professional exchanges are intended to build mutual understanding between Americans and people of other countries. … By bringing people together to share perspectives and experiences, we enable them to break down barriers, and our national security and prosperity are strengthened – at home and abroad.
> …Through Exchange Visitor Program sponsor designation, you are entrusted to implement a cultural exchange program. Success in advancing U.S. public diplomacy goals, as all programs in the Exchange Visitor Program are intended to do, is best achieved through careful planning and execution of the cultural component of your exchange.

*See* Exhibit B hereto.

17.     Were the DOS as the sole agency responsible for overseeing Fulbright-Hays Act

programs ever to treat the *Au Pair* Cultural Exchange Program as a work program, or to abrogate

its responsibility to other federal or state agencies, which it has not done, such action would be

beyond the DOS' authority under the Fulbright-Hays Act. Only Congress can modify the

purpose of the Fulbright-Hays Act programs and convert the *Au Pair* Cultural Exchange

Program from an exchange visitor program into a work program subject to state labor laws.

18.     "Domestic Workers" under the MA Act and MA Regulations are hourly

employees. Participants in the *Au Pair* Cultural Exchange Program are not hourly employees.

Rather, Host Families, such as the Host Family Plaintiffs, are required to compensate the *au

pairs* "at a weekly rate" designated by the DOS. Regardless of the number of hours worked in a

week, from zero to the Program maximum of 45, the DOS-designated stipend must be paid.

While the weekly stipend is computed by multiplying 45 hours times the federal minimum wage,

and deducting a 40% room and board credit as set by the Department of Labor (*see* DOS-

disseminated "Fact Sheet: Au Pair Stipend, 3/14/97," a true and accurate copy of which is

MOVANTS' APP 00103

appended hereto as Exhibit C), that computational method has not converted the *au pairs* into hourly workers. They are entitled to the stipend regardless of the number of hours worked, if any, below the 45 hour program maximum. Further evidence that the *au pairs* are not hourly workers is this: The more education-intense "EduCare" subset of the *Au Pair* Cultural Exchange Program sets the participants' maximum childcare hours at two-thirds the level of other *au pairs*, *i.e.*, 30 as compared with 45, but sets the EduCare stipend at three-quarters, not two-thirds, the level of other *au pairs*. 22 CFR § 62.31(j).

19.     The method of calculating the weekly stipend, which was determined by the DOS, has remained constant throughout the history of the *Au Pair* Cultural Exchange Program. Because the DOS chose to tie the amount of the stipend to the Fair Labor Standards Act ("FLSA") (*see* 22 CFR § 62.31(j)(1)), which provides both nationwide consistency for the Program and convenience for the DOS, the DOS changes the amount of the stipend whenever Congress increases the minimum wage. On each such occasion, the DOS has issued Notices to the Sponsors to be passed on to the Host Families, stating the new stipend amount. *See, e.g.,* Exhibit D hereto, June 14, 2007 "Notice: Federal Minimum Wage Increase." Exhibit D is the most recent such Notice. Were the federal minimum wage at any point to be inconsistent with the Congressional intent of a cultural exchange program, the use of the federal minimum wage would be beyond DOS's authority under the Fulbright-Hays Act and would be unlawful. Notwithstanding that the FLSA requires that employers pay workers the higher of federal and state minimum wages, at no time has the DOS issued a Notice indicating that state labor provisions apply to the *Au Pair* Cultural Exchange Program, which involves Host Families as contrasted with "employers" and visitors as contrasted with "workers." Were it to do so, the DOS would be exceeding its authority under the Fulbright-Hays Act, which contemplates a

MOVANTS' APP 00104

uniform national cultural exchange program that is not a work program and that provides Host

Families with an opportunity to open their homes to young cultural exchange visitors.

20.     Further evidence that the DOS does not treat the *Au Pair* Cultural Exchange

Program as a work program can be found in the DOS-imposed *au pair* eligibility requirements.

Several such requirements, while permissible for cultural exchange visitors, would likely be

impermissible for workers under federal and state labor laws.  For example, the DOS requires

Sponsors to ensure that all *au pair* participants (i) are between the ages of 18 and 26; (ii) are

capable of participating in the program as evidenced by the satisfactory completion of a physical

without regard to reasonable accommodation, and (iii) have undergone a background

investigation that includes a personality profile based upon a psychometric test designed to

measure differences in characteristics among applicants against those characteristics considered

most important to successfully participate in the *au pair* program.  *See* 22 CFR § 62.9(d)(4), and

(6).

21.     Similarly, Host Families are subjected to requirements that would be suspect or

impermissible for imposition on employers, but are permissible for cultural exchange hosts.  For

example, Host Parents must either be U.S. citizens or permanent legal residents, and must be

fluent in spoken English.  22 CFR § 62.31(h)(1)-(2).

22.     In addition, the DOS imposes obligations on both the Sponsors and the Host

Families that are unrelated to work requirements, *e.g.*, the Host Families must facilitate the

enrollment and attendance of *au pairs* in accredited U.S. post-secondary institutions and pay the

cost of such academic course work up to a specified amount, *id.* at § 62.31(k)(1), and the

Sponsors, who are materially regulated by the DOS, must provide local counselors to monitor

each *au pair* and Host Family at least monthly via personal contact and to report unusual or

MOVANTS' APP 00105

serious situations.  *Id*. at § 62.31(l).  Further, Sponsors are not required to instruct Host Families relating to maintenance of time sheets or similar records, and Host Families are not required to maintain hourly time records, or to report time actually worked.  Among other reporting requirements, the Sponsors' reporting requirements to the DOS relate to the Program's cultural exchange objective, including a summation of the results of annual satisfaction of all Host Families and *au pairs*.  *Id*. at § 62.31(m).

23.     At no time has Congress suggested that it intended for the labor laws of individual states to interfere with a consistent national cultural exchange program, nor has it abrogated its initial principle that "a positive U.S. Government program promoting educational and cultural cooperation is essential to the welfare of the American people."  House Report No. 1094 at 2760 (August 31, 1961).  The Fulbright-Hays Act and the authorizing statute for the permanent *Au Pair* Cultural Exchange Program remain good and valid law.  Only Congress has the power to alter the Fulbright-Hays Act and the authorizing statute.  Even the DOS cannot lawfully implement changes that are contrary to the Congressional intent behind the Fulbright-Hays Act and the *Au Pair* Cultural Exchange Program.

24.     Since the inception of the *Au Pair* Cultural Exchange Program, the Program has provided cultural benefits for both *au pairs* and Host Families, and has offered Host Families nationwide a more affordable childcare option as an additional benefit to encourage participation in a program that requires a significant investment in time and resources to deliver a meaningful cultural experience for both the *au pairs* and the Host Families themselves.

25.     In addition to the impropriety of applying labor laws to a cultural exchange program, the imposition of different, conflicting, and burdensome requirements by individual states would severely undermine and indeed destroy all or a substantial part of the *Au Pair*

MOVANTS' APP 00106

Cultural Exchange Program.  Were Host Families required to bear the costs of delivering a
meaningful cultural experience to a visitor living as a member of their family and at the same
time meet all of the labor code requirements of state laws like the MA Act and MA Regulations,
such that the weekly stipend of $195.75 would be converted to hourly wages amounting to
$445.50 for a 45 hour week, the Program would be economically infeasible for the Host Family
Plaintiffs and for many, and probably most, Host Families.  This is especially the case when the
Host Family considers that it is generally not even receiving a trained and experienced childcare
provider and when the Host Family factors in the $500 educational payment requirement to the
*au pairs* and the additional fee to Sponsors.  Thus, the Host Families who most need an
affordable childcare option to consider taking on the cultural exchange costs and duties of the
program would be denied that option, as well as being denied the benefits to their family from
the cultural exchange nature of the Program.  In addition, a state-by-state program would likely
(i) lead to "forum shopping" by prospective *au pairs*, which is contrary to Congressional intent,
depriving prospective Host Families in states with less generous labor codes of the cultural,
screening and economic benefits of the *Au Pair* Cultural Exchange Program; and (ii)
discriminate against or excessively burden interstate commerce.  Further, the cultural and
educational opportunities for *au pairs* in higher minimum wage states like Massachusetts will
become far more limited.

26.     If the Host Family Plaintiffs were to be required to abide by Massachusetts state
labor code requirements including the MA Act and the MA Regulations, they would be
economically compelled to leave the *Au Pair* Cultural Exchange Program in favor of affordable
options.  The model for the *Au Pair* Cultural Exchange Program would cease to be viable.  Host

- 12 -

MOVANTS' APP 00107

Families would lose both the cultural exchange benefits of the Program and an affordable childcare option.

27.     Because many, and probably most, Host Families will be unable or unwilling to pay a fee to the Sponsor in addition to the wage and education requirements and substantially higher State-imposed payments under state labor codes, CCAP and other State Department-designated Sponsors will suffer material economic injury and in some instances will not be able to survive as on-going commercial enterprises.

### Massachusetts Statutory and Regulatory History

28.     The Massachusetts legislature enacted the MA Act, M.G.L. c. 149, § 190, as part of the Commonwealth's labor code, and directed that the Massachusetts Attorney General "enforce this section and . . . promulgate rules and regulations necessary for enforcement." M.G.L. c. 149, § 190(o).  In accordance with that directive, in the summer of 2015 the OAG propounded the MA Regulations, 940 CMR § 32.  The MA Act and MA Regulations relate exclusively to the labor code and "domestic workers" and have nothing to do with cultural exchanges or exchange visitors.  Host Families, including the Host Family Plaintiffs, invest time and effort in treating their au pairs like family members who are guests in their home.  They do so in order to enhance the cultural aspect of the exchange for both the families and the *au pairs*, but little incentive exists for investing such emotional capital if the *au pairs* hold the status and involve the cost of laborers.

29.     Because CCAP has never considered participants in the *Au Pair* Cultural Exchange Program to be "domestic workers," CCAP has also never considered the MA Act to apply to *au pairs*.  However, in or about the Spring of 2015, before the issuance of the final MA Regulations, the MA OAG called in CCAP for the first of two meetings to discuss the

MOVANTS' APP 00108

implementation of the MA Act and the MA Regulations.  In the first meeting, the MA OAG
suggested to CCAP for the first time that the participants in the *Au Pair* Cultural Exchange
Program could be considered "domestic workers," which would suggest that Host Families are
employers.  The MA OAG further suggested that Sponsors should be considered non-exempt
"placement agencies" – and therefore potentially also employers – under the MA Act and the
MA Regulations.  The meeting terminated without clarity as to whether the MA OAG ultimately
would, or would not, interpret the MA Act as applying to CCAP.

30.     The interpretation suggested by the MA OAG in the Spring of 2015, would
interfere with the Congressional intent to implement a viable cultural exchange program,
consistent in its operations across all state lines.  By treating *au pairs* as "domestic workers"
rather than exchange visitors, the MA OAG's interpretation of the MA Act and MA Regulations
would purport to turn a cultural exchange program into a Massachusetts-specific work program,
and in so doing would impose obligations on the Host Families and the Sponsors that would be
contrary to the Fulbright-Hays Act, the authorizing act for the *Au Pair* Cultural Exchange
Program, and the DOS Regulations.  For example, instead of serving as their *au pair*'s quasi-
familial "Host Parents," the Host Family Plaintiffs would become their *au pair*'s employer, an
entirely different and less gratifying relationship, subject to far higher and less predictable
weekly compensation obligations and onerous recordkeeping and reporting requirements (*see*
940 CMR § 32.04).  Instead of functioning as the liaisons between prospective *au pairs* and Host
Families with consistent requirements across all state lines, Sponsors would be deemed
unlicensed "placement agencies" and therefore potentially "employers." This would be so even
though the DOS created the category of Sponsors as one separate and distinct from the category

MOVANTS' APP 00109

of "staffing/employment agencies" (*see* 22 CFR Part 62, § 62.2) and even though the Department

of Labor has limited the "employment relationship" with *au pairs* to the Host Families.

      31.     In several material respects, the MA OAG's proposed interpretation of the MA

Act's requirements contradicts existing DOS requirements, including without limitation:

      (a)     Under the MA Act "an individual who performs services [of a
domestic nature in a household] for an employer for … compensation" is a
"domestic worker" (*see* 940 CMR § 32.02*)*, whereas *au pairs* in the *Au
Pair* Cultural Exchange Program are "exchange visitors" (*see* 22 CFR
§ 62.2);

      (b)     a "domestic worker" shall be compensated under the MA Act at
overtime rates for all hours over 40 hours per week (*see* 940 CMR
§ 32.03(3)), whereas *au pairs*, who are not hourly workers, are limited to
45 hours of work per week, and do not receive overtime for the hours
beyond 40 (*see* 22 CRF § 62.31 (a), and Exhibit C);

      (c)     *au pairs* would be compensated under the MA Act for all time that
they are required to be on premises or to be on duty, absent a contrary
written agreement (*see* 940 CMR § 32.03), whereas under the DOS
Regulations *au pairs* receive a guaranteed weekly stipend without regard
to hours actually worked (see 22 CFR § 62.31(j));

      (d)     an employer under the MA Act is entitled to a credit for food and
beverages actually provided against the established wage in the amount of
$1.25 for breakfast, $2.25 for lunch and $2.25 for dinner  (*see* 940 CMR
32.03((5)(b), and a credit for lodging of $35 per week for a single
occupancy room (*id.* at (5)(c)), whereas a Host Family is entitled under the
DOS Regulations to a room and board credit of 40% of the stipend paid
(*see* Exhibits C and D, and DOL Field Assistance Bulletin No. 2015-1,
appended as Exhibit E);

      (e)     the Massachusetts minimum wage, which applies under the MA
Act, is $10 per hour as of January 1, 2016 and will increase in 2017 to $11
per hour, whereas the federal minimum wage, which DOS has chosen to
use in calculating the amount of the weekly stipend, has been $7.25 per
hour since July 24, 2009; and

      (f)     the MA Act imposes strict recordkeeping requirements on the
"employer" – which would include the Host Family and may include a
non-exempt "placement agency" – including records of wages and hours
to be maintained for three years, time sheets completed, and provision of
notice of all applicable state and federal laws relating to "domestic
workers" (*see* 940 CMR § 32.04), whereas under the DOS Regulations

MOVANTS' APP 00110

neither the Host Family nor the Sponsor has timekeeping reporting requirements.  Rather, the Sponsor is responsible for reporting to the DOS information confirming that the program is meeting its cultural and educational objectives, including annual reports summarizing "activities in which exchange visitors were engaged" and "a description of the cross-cultural activities the sponsor provided for its exchange visitors during the reporting year."  *See* 22 CFR § 62.15(a).

32.     The most recent DOS Notification to Sponsors sets the weekly stipend rate for participants in the *Au Pair* Cultural Exchange Program working any number of hours, from zero to the 45 hour Program maximum, at $195.75.  The MA Regulations set the "wage" for a live-in "domestic worker" working a 40 hour week with a single occupancy room at $445.40 per week.

33.     In August of 2015, the MA OAG held a second meeting with CCAP representatives relating to the OAG's intended application of the MA Act and MA Regulations to CCAP as, in the words of the MA OAG, a "placement agency."  In so doing, the MA OAG confirmed its intention to apply the MA Act and MA Regulations to CCAP's *Au Pair* Cultural Exchange Program, thereby converting the Host Families, including the Host Family Plaintiffs, into "employers" within the meaning of the MA Act and MA Regulations, and the *au pairs* into "domestic workers."  In a written communication thereafter, the MA OAG stated that it would "offer a transition period until September 1, 2017," while CCAP attempted to work with the DOS and the Massachusetts legislature to "clarify the rules governing cultural exchange programs and participants."

34.     CCAP has not been successful in its efforts to obtain clarification from the Massachusetts legislature.  The DOS has declined to engage in any substantive discussion with a single Sponsor regarding the *Au Pair* Cultural Exchange Program

35.     Host Families enter into one year contracts with their *au pairs* several months in advance of the start date.  Contracts relating to the period beginning in September of 2016, which have already been executed, will be affected by the MA OAG's intention to apply the MA Act

MOVANTS' APP 00111

Case No. 1:14-cv-03074-CMA-KMT   Document 880-1   filed 02/16/18   USDC Colorado   Page 150
18 of 24
Case 1:16-cv-11777-IT   Document 34   Filed 08/31/16   Page 17 of 23

and the MA Regulations to the *Au Pair* Cultural Exchange Program, the Host Families, and

CCAP beginning in September of 2017.  With contracts now being signed that will extend

beyond the date of the MA OAG's stated intention to commence enforcement, Plaintiffs must

seek relief through the courts to avoid the injuries described herein.

## Count I:   Preemption (Fulbright-Hayes Act)

## (Injunctive Relief)

36.     Plaintiffs incorporate all allegations in this Complaint as if set forth in their

entirety in this Count.

37.     Insofar as they relate to the *Au Pair* Cultural Exchange Program, the MA Act and

MA Regulations are preempted by the Fulbright-Hays Act, the permanent authorization act for

the *Au Pair* Cultural Exchange Program, and the current DOS Regulations, all pursuant to the

Supremacy Clause of the United States Constitution, Article VI, Clause 2.

38.     The MA Act and MA Regulations are in conflict with, and/or stand as an obstacle

to the accomplishment and execution of, the full purposes and objectives of Congress as set forth

in the Fulbright-Hays Act and in the permanent authorization act for the *Au Pair* Cultural

Exchange Program.  Further, the goals and objectives of the *Au Pair* Cultural Exchange

Program, as set forth above, are inconsistent with the MA OAG's goals and objectives in seeking

to extend state labor legislation to a federal cultural exchange program.  Hence, conflict

preemption precludes application of the MA Act and the MA Regulations to CCAP and its Host

Families including to the Host Family Plaintiffs.

39.     In addition, Congress intended in enacting the permanent authorization act for the

*Au Pair* Cultural Exchange Program to occupy the field with regard to the terms and conditions

of that Program.  The federal interest embodied in the Fulbright-Hays Act and the programs

MOVANTS' APP 00112

enacted pursuant to it, *i.e.*, in fostering "a peaceful world in which freedom and justice under law

will be the lot of all mankind," precludes enforcement of state labor laws that defeat

Congressional intent.  Hence, field preemption separately and additionally precludes application

of the MA Act and the MA Regulations to CCAP and to the Host Family Plaintiffs.

40.      Plaintiffs will suffer irreparable harm if the MA Act and the MA Regulations are

applied to them and to the *au pairs* residing with the Host Family Plaintiffs.  The balance of

harms favors Plaintiffs, particularly given that cultural exchange visitors to the United States are

not domestic workers.  Plaintiffs are entitled to an order enjoining the MA OAG from enforcing

the MA Act and the MA Regulations against, or applying them to, CCAP and its Host Families

including the Host Family Plaintiffs.

### Count II: Preemption (Fulbright-Hays Act)

### (Declaratory Relief)

41.      Plaintiffs incorporate all allegations in this Complaint as if set forth in their

entirety in this Count.

42.      As noted above, the MA Act and the MA Regulations are in conflict with, and/or

stand as an obstacle to the accomplishment and execution of, the full purposes and objectives of

Congress as set forth in the Fulbright-Hays Act and in the permanent authorization act for the *Au*

*Pair* Cultural Exchange Program.  Further, the goals and objectives of the *Au Pair* Cultural

Exchange Program, as set forth above, are inconsistent with the MA OAG's goals and objectives

in seeking to extend state labor legislation to a federal cultural exchange program.

43.      In addition, as noted above Congress intended in enacting the permanent

authorization act for the *Au Pair* Cultural Exchange Program to occupy the field with regard to

the terms and conditions of that Program.  The federal interest embodied in the Fulbright-Hays

MOVANTS' APP 00113

Case No. 1:14-cv-03074-CMA-KMT Document 886-1 Filed 06/06/18 USDC Colorado Page 152
of 324
Case 1:14-cv-03074-CMA-KMT Document 833-1 Filed 02/16/18 USDC Colorado Page 19 of 24
Case 1:16-cv-11777-IT Document 34 Filed 08/31/16 Page 19 of 23

Act and the programs enacted pursuant to it, *i.e.*, in fostering "a peaceful world in which freedom and justice under law will be the lot of all mankind," precludes enforcement of state labor laws that defeat Congressional intent. Hence, field preemption separately and additionally precludes application of the MA Act and the MA Regulations to CCAP and its Host Families including the Host Family Plaintiffs.

44. Because the MA Act and the MA Regulations are already in effect and the MA OAG has stated its intention to commence enforcement at a date certain within the current *au pair* contract period, an actual controversy exists between Plaintiffs and the MA OAG, such that this matter is now justiciable pursuant to 28 U.S.C. § 2201. CCAP and the Host Family Plaintiffs are entitled to a declaration that the Fulbright-Hays Act and the permanent authorization act preempt the application of the MA Act and the MA Regulations to CCAP and its Host Families including the Host Family Plaintiffs.

<u>**Count III: Preemption (Commerce Clause)**</u>

<u>**(Injunctive Relief – CCAP)**</u>

45. CCAP incorporates all allegations in this Complaint as if set forth in their entirety in this Count.

46. As a private entity Sponsor, CCAP places *au pairs* with Host Families and maintains a network of Local Childcare Consultants in states geographically distributed across the United States. As such, CCAP participates in the *Au Pair* Cultural Exchange Program as a commercial business engaged in interstate commerce.

47. The Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3, protects the right to engage in interstate and foreign commerce free of undue burden, interference, or discrimination by state governments.

MOVANTS' APP 00114

48.     The MA Act and the MA Regulations impose undue burdens on interstate and foreign commerce, and discriminate against CCAP as a Massachusetts-based Program Sponsor with significant business in Massachusetts, by (1) interfering with CCAP's ability to conduct business in Massachusetts in full compliance with the DOS Regulations because of inconsistent Massachusetts requirements; (2) imposing additional and excessive costs for administering the Program in Massachusetts; and (3) adversely impacting, if not eliminating, CCAP's ability to conduct business in Massachusetts because of the excessive costs imposed on potential Host Families.

49.     The MA Act and the MA Regulations impose a clearly excessive burden on the *Au Pair* Cultural Exchange Program in Massachusetts, relative to the putative local benefit. Indeed, the MA Act and the MA Regulations are likely to lead to the unintended consequence of fewer, if any, positions being available in Massachusetts for young foreign nationals who had hoped to participate in the Program within the Commonwealth.

50.     The MA Act and the MA Regulations establish requirements that will unlawfully compel prospective CCAP Host Families, against their preferences, to turn instead to the employment of actual domestic workers, rather than cultural exchange *au pairs*.  This will materially adversely affect CCAP's business.

51.     CCAP will suffer irreparable harm if the MA Act and the MA Regulations are applied to it and to its Host Families.  The balance of harms favors Plaintiffs, particularly given that cultural exchange visitors to the United States are not domestic workers.  CCAP is therefore entitled to an order enjoining the MA OAG from enforcing the MA Act and the MA Regulations against it and its Host Families including the Host Family Plaintiffs.

MOVANTS' APP 00115

## Count IV:   Preemption (Commerce Clause)

## (Declaratory Relief – CCAP)

52.     CCAP incorporates all allegations in this Complaint as if set forth in their entirety in this Count.

53.     The MA Act and the MA Regulations are in conflict with, and/or stand as an obstacle to the accomplishment and execution of, the Commerce Clause.  Further, the MA OAG's goals and objectives in seeking to extend state labor legislation to commercial Sponsors of a federal cultural exchange program are inconsistent with the Commerce Clause.

54.     The MA Act and the MA Regulations impose undue burdens on interstate and foreign commerce, and discriminate against CCAP as a Massachusetts-based Program Sponsor with significant business in Massachusetts, by (1) interfering with CCAP's ability to conduct business in Massachusetts in full compliance with the DOS Regulations because of inconsistent Massachusetts requirements; (2) imposing additional and excessive costs for administering the Program in Massachusetts; and (3) adversely impacting, if not eliminating, CCAP's ability to conduct business in Massachusetts because of the excessive costs imposed on potential Host Families.

55.     The MA Act and the MA Regulations impose a clearly excessive burden on the *Au Pair* Cultural Exchange Program in Massachusetts, relative to the putative local benefit. Indeed, the MA Act and the MA Regulations are likely to lead to the unintended consequence of fewer, if any, positions being available in Massachusetts for young foreign nationals who had hoped to participate in the Program within the Commonwealth.

56.     Because the MA Act and the MA Regulations are already in effect and the MA OAG has stated its intention to commence enforcement at a date certain within the current *au*

MOVANTS' APP 00116

*pair* contract period, an actual controversy exists between CCAP and the MA OAG, such that this matter is justiciable now pursuant to 28 U.S.C. § 2201.  CCAP is entitled to a declaration that application of the MA Act and the MA Regulations to CCAP and its Host Families including the Host Family Plaintiffs is preempted by the Commerce Clause.

## Prayers for Relief

In reliance upon all of the foregoing, Plaintiffs pray:

1.     For an order enjoining the MA OAG from seeking to apply, and from enforcing, the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations, against CCAP and CCAP's Host Families, including the Host Family Plaintiffs, on the ground that the Fulbright-Hays Act and the permanent authorization act preempt any such application or enforcement;

2.     For a declaratory judgment that the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations are preempted by the Fulbright-Hays Act and the permanent authorization act insofar as there is any attempt to apply them to, or enforce them against CCAP and CCAP's Host Families, including the Host Family Plaintiffs;

3.     For an order enjoining the MA OAG from seeking to apply, and from enforcing, the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations, against, CCAP and CCAP's Host Families, including the Host Family Plaintiffs, on the ground that the Commerce Clause preempts any such application or enforcement;

4.     For a declaratory judgment that the Massachusetts Domestic Workers Bill of Rights and the supporting MA OAG Regulations are preempted by the Commerce Clause insofar as there is any attempt to apply them to, or enforce them against, CCAP and CCAP's Host Families, including the Host Family Plaintiffs; and

MOVANTS' APP 00117

5.     For such other and further relief as this court deems appropriate.

Dated:  August 31, 2016                    Respectfully submitted,

                                           /s/ *Joan A. Lukey*
                                           Joan A. Lukey
                                           joan.lukey@choate.com
                                           Justin J. Wolosz
                                           jwolosz@choate.com
                                           CHOATE HALL & STEWART LLP
                                           Two International Place
                                           Boston, Massachusetts  02110
                                           Telephone:  (617) 248-5000
                                           Fax:  (617) 248-4000

                                           *Attorneys for Plaintiff Cultural Care, Inc.*
                                           *d/b/a Cultural Care Au Pair*

7727826v1

**MOVANTS' APP 00118**