Case No. 1:14-cv-03074-CMA-KMT Document 1095-3 filed 08/08/18 USDC Colorado pg 1 of 264

# APPENDIX C

Elina Lubnevska 3/15/2018

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO

2    - - - - - - - - - - - - - - - - - - - -x
     JOHANA PAOLA BELTRAN, et al,

3

            Plaintiffs,

4

5    -against-      Civil Action No.
                  1:14cv-03074-CMA-KMT

6

     INTEREXCHANGE, INC.; et al,

7

            Defendants.

8    - - - - - - - - - - - - - - - - - - - -x

9

                 1745 Broadway

10               New York, New York

11               March 15, 2018
                 9:46 a.m.

12

13

14    EXAMINATION BEFORE TRIAL of ELINA LUBNEVSKA, the

15    Non-Party Witness herein, held at the above-mentioned

16    time and place, pursuant to Notice, before Angela Arena,

17    a Notary Public in and for the State of New York.

18

19

20

21

22

23

24

25

Elina Lubnevska  3/15/2018

**A P P E A R A N C E S :**

BOIES SCHILLER FLEXNER LLP
 Attorneys for Plaintiffs
 575 Lexington Avenue
 New York, New York 10022

BY:  DAWN L. SMALLS, ESQ.

NO FIRM NAME
 Attorneys for Defendants
 111 Second Avenue NE, Suite 900
 St. Petersburg, Florida 33701
BY:  BOGDAN ENICA, ESQ.

**A L S O   P R E S E N T :**

LAURA REBINOVS - Interpreter

THOMAS DEVINE - Videographer

Page 2

---

1    THE VIDEOGRAPHER:  Good morning.  We are
2   going on the record at 9:46 a.m. on March 15th,
3   2018.  We are taking the deposition of Elina
4   Lubnevska in the matter of Johana Paola Beltran et
5   al V Interexchange, Inc., et al, in the US
6   District Court of the District of Colorado, Civil
7   Action Number 1:14-cv-03074-CMA-KMT.
8    We are at 1745 Broadway, New York, New
9   York.  My name is Thomas Devine and I am the video
10  specialist with Deitz Reporting.  The court
11  reporter is Angela Arena, also with Deitz
12  Reporting.
13    At this time, I would ask the attorneys to
14  introduce themselves for the video record.  Please
15  state your name, the firm with which you are
16  affiliated, and whom you represent, after which
17  the court reporter can swear in the witness and we
18  can proceed.
19    MR. ENICA:  My name is Bogdan Enica and I
20  am representing Expert Group International doing
21  business as Expert Au Pair.
22    MS. SMALLS:  Dawn Smalls from Boies,
23  Schiller & Flexner, LLP on behalf of the
24  plaintiffs.
25    THE VIDEOGRAPHER:  Thank you.

Page 3

---

1   L A U R A   R E B I N O V S ,
2   serving as a LATVIAN interpreter,
3   having been duly sworn by the Notary Public,
4   translated the questions and answers as follows:
5   E L I N A   L U B N E V S K A ,
6   the Non-Party Witness herein,
7   having been duly sworn by the Notary Public,
8   was examined and testified through the interpreter as
9   follows:
10  EXAMINATION BY
11  MR. ENICA:
12    **Q.    Please state your name for the record.**
13    A.    Elina Lubnevska.
14    **Q.    Please state your address for the record.**

17    MR. ENICA:  Good morning, everybody.  As I
18  mentioned, my name is Bogdan Enica.  I want at the
19  beginning to put on the record that we will
20  conduct this deposition in English.
21    We do have an interpreter that is on
22  standby.  If the witness feels at any time that
23  she needs the help of an interpreter, she is more
24  than welcome to ask the help of the interpreter.
25  How do you prefer that I address you?

Page 4

---

1    THE WITNESS:  Just Elina is okay.
2    **Q.   Elina, okay.  Elina, thank you for being**
3   **here today.  Have you ever been deposed before?**
4    A.   Excuse me?
5    **Q.   Have you ever been in a setting like this?**
6    A.   No, no, it's first time.
7    **Q.   Have you ever been in a civil action, like**
8   **a trial, like in court before?**
9    A.   No.
10    MR. ENICA:  Then I will tell you what the
11  rules of this deposition are.
12    THE WITNESS:  Okay.
13    MR. ENICA:  Again, if you don't understand
14  anything, let me know and I will repeat it.
15    THE WITNESS:  Okay.
16    MR. ENICA:  First, the court reporter
17  administered an oath, which means you are required
18  to swear that you will tell the truth, the whole
19  truth and nothing but the truth.
20    So this deposition today is a process that
21  takes place in a private setting, but you would
22  answer the questions in the same way that you
23  would answer in front of a judge or a jury.
24    THE WITNESS:  Okay.
25    MR. ENICA:  I will ask questions and you

Page 5

---

Elina Lubnevska  3/15/2018

| | |
|---|---|
| 1 will give answers. We do have a court reporter | 1 objections. |
| 2 here and the court reporter will write everything | 2 Unless your counsel advises you not to |
| 3 down. | 3 answer the question, you would be expected to |
| 4 That's why I would like, if possible, to | 4 answer the question, even if your counsel objects |
| 5 let me finish the question before answering, so | 5 to form, for example. |
| 6 she can write down both the question and the | 6 THE WITNESS: Okay. |
| 7 answer. | 7 Q. Are you under the influence of any |
| 8 Also, if possible, I would like you to | 8 substance or medication that may impair your ability to |
| 9 verbalize your answer. Say yes, no, maybe, I | 9 tell the truth today? |
| 10 don't know. | 10 A. No. |
| 11 THE WITNESS: Okay. | 11 Q. Did you prepare for today's deposition? |
| 12 MR. ENICA: Thank you. This would make it | 12 A. Yes. |
| 13 easier to create the record. | 13 Q. How did you prepare? |
| 14 THE WITNESS: Okay. | 14 A. Yesterday I just talked with Dawn and I |
| 15 MR. ENICA: Perfect. If you give me an | 15 read the answers which I gave to you, and I just took a |
| 16 answer to a question, I will assume that you | 16 good sleep so I can be refreshed to answer your |
| 17 understood the question. | 17 questions. |
| 18 THE WITNESS: Okay. | 18 Q. Do you remember for how long was your |
| 19 MR. ENICA: And that the answer that you | 19 preparation yesterday, the meeting with counsel, and any |
| 20 give me is the complete and truthful answer. | 20 other preparation except the sleep part? |
| 21 THE WITNESS: Okay. | 21 A. I guess, like, a half an hour. Just, I |
| 22 MR. ENICA: If you don't understand the | 22 walked through the information. |
| 23 question, let me know. | 23 Q. Did you check or review any documents in |
| 24 THE WITNESS: Okay. | 24 preparation for today? |
| 25 MR. ENICA: I will try to speak slowly. | 25 A. Yes, I did, the form which we gave to you |
| Page 6 | Page 8 |
| 1 THE WITNESS: Yeah, and clearly. | 1 that I just read. That form. |
| 2 MR. ENICA: I will do my best. Sometimes I | 2 Q. When you say the form, you're referring to |
| 3 can't, but I will do my best. Again, if I can't, | 3 the answers for the interrogatories in the request for |
| 4 you can ask me to rephrase or ask for the | 4 production? If I show you, will you recognize it? |
| 5 interpreter's help. | 5 A. Can you translate that? |
| 6 If she doesn't understand me either, I will | 6 Q. Was that the form? |
| 7 definitely rephrase. If you want to take at any | 7 MS. SMALLS: I think you need to show it to |
| 8 time a break, let me know. We can take. | 8 her. |
| 9 THE WITNESS: Okay. | 9 MR. ENICA: I will mark it as an exhibit |
| 10 MR. ENICA: The only request I have is that | 10 and we will start with one. |
| 11 if I ask the question, you would answer the | 11 (Form was marked Defendant's Exhibit 1 for |
| 12 question before you take a break, okay? | 12 identification, as of this date.) |
| 13 If you want, again, I don't mind taking | 13 Q. We marked the document as Exhibit 1. Is |
| 14 breaks for whatever reason, for the sake of having | 14 this the document -- |
| 15 us be the procedure, if you can limit the breaks | 15 A. Yes, it is. |
| 16 to ten minutes without any hard count would be | 16 Q. So this is the document that you referred |
| 17 perfect. | 17 to as a form that you consulted? |
| 18 THE WITNESS: Okay. | 18 A. Yeah. |
| 19 MR. ENICA: I hope we will finalize this by | 19 Q. Did you consult or review any other |
| 20 shortly after noon, so we will not take a lunch | 20 documents in preparation for today? |
| 21 break. If it takes longer, we will discuss about | 21 A. No. This was the one, yeah. |
| 22 taking the lunch break. | 22 Q. Since we have that document in front of us, |
| 23 THE WITNESS: Okay. | 23 I'm going to ask you some questions regarding the |
| 24 MR. ENICA: I will ask questions, as I | 24 document. |
| 25 said. You will answer and your counsel may make | 25 Prior to yesterday, have you seen this |
| Page 7 | Page 9 |

Elina Lubnevska  3/15/2018

document?
A.    Yes.
Q.    Do you remember when you saw this document for the first time?
A.    It was when I signed it, maybe the day before. So I read it and signed.
I don't remember exactly the day, but I guess it was the day which I signed.
Q.    So the signature on the last page of the document is your signature?
A.    Yes.
Q.    You signed this document?
A.    Yes.
Q.    By yourself?
A.    Yes.
Q.    When you signed this document, you understood that you made a declaration under the penalty of perjury?
A.    Yes, I did.
Q.    All the information in this document is truthful and correct?
A.    Yes, it is.
Q.    I would point you to -- well, the document is not numbered, but if you go four pages from the back where it says request for production right there, I think

Page 10

it's page number six, I would point your attention to number one under request for production.
Can you read that for the record, by any chance?
A.    All documents identified or referenced within your answer to any interrogatory.
Q.    Perfect. So when we are saying answers to interrogatory, we refer to the answers to number one in the same document; was that your understanding?
A.    No.
Q.    It's number one --
A.    Number one.
Q.    -- because the production is number two.
A.    It's for -- yes, it's for this (indicating).
MS. SMALLS:  Interrogatory is a legal term.
MR. ENICA:  Yes. That's why I'm trying to determine when she read this term interrogatory, she referred to the word interrogatory here or what was her understanding?
THE WITNESS:  Can you interpret?
(Translated.)
A.    Yes, yes.
Q.    So when you answer this question number one under request for production, and it says documents

Page 11

identified or referenced in your answer to any interrogatory, you refer basically to number one; would that be accurate?
A.    Yes, yes.
Q.    So did you use any document whatsoever to answer any of the questions posed in number one, interrogatories?
A.    Seven, which is when you participated in the au pair program. I checked in my bank account when I had those payments and when I flew to United States.
So I can remember exactly when it was, because the visa and the passport which I have, I don't have that passport anymore.
So I just checked my bank account to find out the date when I flew to United States and when I flew back to Latvia.
Q.    So just to be clear, it was information that you found in the bank account, the date when you purchased the ticket?
A.    Yeah. It was for when I flew to America. I just had this payments in airport when I took the coffee and things like that.
So I knew that was the date because otherwise I don't remember what was the exact date. When I flew back, I had -- I guess it was also that I bought

Page 12

the ticket.
This was the -- also, again, I had the purchases in the airport, so I knew what was the date.
Q.    So when you bank account, you mean more like a card, credit card or debit card?
A.    It's my credit card.
THE INTERPRETER:  Statements, bank account statements.
THE WITNESS:  Yes.
Q.    Anything else, any other document that you --
A.    For the first one, yes.
Q.    Everything under one, yes. We will go on to two.
A.    There wasn't any other documents. All those other things I just remembered. So for example, in the six where describe your schedule, I just sit down and think through all of those duties which I had and what approximately was the time. So that's -- I haven't any document --
THE INTERPRETER:  Reference.
A.    Reference to.
Q.    So do you remember if you had, like, any employment, or any other type of contract with Ron Garcia and Nicole Garcia?

Page 13

Elina Lubnevska  3/15/2018

| Page 14 | Page 16 |
|---|---|

**Page 14**

1     A.   I had a contract, but I don't have it

2 anywhere because I didn't think that I would need it

3 again.

4     So I guess maybe that the family possibly

5 had it, the second copy, but for me, I don't have it

6 anymore. I don't remember exactly what was in that

7 contract either.

8     **Q.   Do you remember if you received that**

9 **contract from the family by e-mail or if they mailed it**

10 **to you?**

11     A.   I don't remember exactly, but I think there

12 was Expert Au Pair send me contract, which was -- I think

13 was or maybe through mail.

14     I know the -- I mailed it back with the

15 mail, not e-mail, but mail, but I don't remember exactly

16 what -- how it happened.

17     I know that Expert Au Pair gave to the

18 family contract, and then they gave it to me, and both

19 sides sign it and send back to where it should be. I

20 just don't remember exactly how it was.

21     **Q.   Okay. Fair enough. I don't want you to**

22 **say something that you don't remember. Just stating that**

23 **you don't remember on the record, please, is enough.**

24     **What I'm going to do, I'm going to put this**

25 **document aside for a moment and I'm going to show you a**

**Page 16**

1     A.   Yes, yes.

2     **Q.   Do you remember what the handwritten**

3 **information was?**

4     A.   I remember some, but I don't remember

5 everything. For example, the hours, I don't remember

6 what they put in.

7     **Q.   My question is not exactly what was**

8 **written, but if you remember, like, the section where it**

9 **was handwritten information, if you can identify it.**

10     A.   Okay. So --

11     **Q.   You mentioned the hours section?**

12     A.   Yes, the hours section and this first

13 section, the child's name and date of birth, last name.

14 I guess there was some duties also write down.

15     I don't remember what exactly, but I think

16 there was. Salary also I think was filled. Then the

17 bathroom. There was one of the box was checked.

18     I don't remember if it was the private or

19 share because we moved and I had in the first place where

20 we lived. I have the private bathroom. After that I

21 have shared bathroom.

22     So I don't remember which box, but there

23 was at the car there was filled out, that I will have a

24 car, but I don't. There was what color, year. There

25 was that.

| Page 15 | Page 17 |
|---|---|

**Page 15**

1 **different document, but we will return to this.**

2     A.   Okay.

3     MR. ENICA: We will mark that document as

4 Exhibit 2.

5     (Employment Contract was marked Defendant's

6 Exhibit 2 for identification, as of this date.)

7     **Q.   I want you to take a look at the document**

8 **and let me know when you're done.**

9     A.   Okay.

10     **Q.   Does the document marked as Exhibit 2 look**

11 **familiar to you?**

12     A.   It looks like it was the contract which we

13 had. It's similar. I remember this table was like that

14 at some point.

15     I don't know if it's -- it looks pretty the

16 same, but I don't remember the information what was

17 there, but it's the form. It looks the same.

18     **Q.   Correct. Now the contract that you**

19 **referenced in your answer before was a contrat that was**

20 **filled in?**

21     A.   Yes.

22     **Q.   Is that correct?**

23     A.   Yes.

24     **Q.   So you said it looked the same, but it had**

25 **handwritten information on it; would that be correct?**

**Page 17**

1     There was a phone that they gave me so I

2 can call the house parents if something happen to the

3 children. There was written down that I can't do the

4 international call or something. So it was just between

5 us to communicate if I need to.

6     Six, I don't remember if there was

7 something on there, but vacation also I don't remember if

8 there was something. Yeah, here I don't remember.

9     **Q.   Do you know who would have filled in the**

10 **information?**

11     A.   I don't remember exactly. I guess maybe it

12 was the family, but I can't answer that. I don't

13 remember because I got the contract and everything was

14 filled out. I just needed to sign it.

15     **Q.   Do you remember if it was signed already by**

16 **the family when you got it?**

17     A.   I don't remember if I signed first or the

18 family signed first. I don't remember that.

19     **Q.   But at one point you had a contract that**

20 **was signed by both you and the family?**

21     A.   Yes, yes, yes.

22     **Q.   Do you remember discussing with the family**

23 **about any of the terms of the contract? This is the**

24 **legal way of speaking.**

25     **Let's say any of the things that you just**

Elina Lubnevska  3/15/2018



1 mentioned, like hours of work, access to the car or
2 anything like that?
3          MS. SMALLS:  Objection.
4          MR. ENICA:  Let me rephrase.
5     Q.     Do you remember talking to the family about
6 any of the information that was handwritten in the
7 contract?
8     A.     We actually -- with the family, we talked I
9 guess once or twice with Skype.  So we basically -- we
10 didn't talk all the hours or something.
11          When I sign it, I thought it will be how I
12 sign it, and I just asked about the car, how it work,
13 because it was important that I can get somewhere.
14          They told that I will have access to the
15 car, which will be not my car, but when it will be free,
16 then I can take it and drive around it.  That's what I
17 remember what we discussed.
18          Other things I just signed.  I guess it was
19 information was filled out, and yeah, I just didn't think
20 that we need to talk through that again.
21     Q.     So do you remember how many hours was the
22 total number of hours under --
23     A.     Contract.
24     Q.     Yes.
25     A.     In the table on the first page, that's the

                              Page 18

1 thing I don't remember, but I remember how I worked, how
2 many hours I worked.
3          Actually, what was written down there, I
4 don't remember.  I guess it was that the minimum,
5 45 hours.  The maximum, actually, I think it was written
6 down there, but I'm not so sure again.
7     Q.     But when you're referring to the maximum
8 45 hours, where do you get that information?
9     A.     Because before I read the information and
10 federal home page about that program, that there is a
11 limitation, the hours you can take to do the childcare,
12 how many hours you've worked.
13          So I get the information from the official
14 federal home page and of course here in the contract when
15 I got it there was write down that au pair may not work
16 more than ten hours in a day and 45 hours in a workweek,
17 but reality wasn't like that.  I need to work more.
18     Q.     We'll get there.  I'm asking questions a
19 little bit out of sequence, because you referred to the
20 documents and I thought we can use the documents.
21          I'm going to ask back more questions about
22 your background and it will feel more natural.  So I'm
23 sorry if it felt like we started off by looking at
24 documents, but we will slow it down.
25          So you mentioned the court reporter asked

                              Page 19

1
11     Q.     For how long are you in the states?
12     A.     Right now?
13     Q.     Correct.
14     A.     I flew here on the 14th March.  It was the
15 14th?  March 13th I flew out of Latvia and yes, here I
16 was after the midnight of 13th.  So it was already
17 March 14th.
18     Q.     When are you going back?
19     A.     March 16th.  What day is today?
20          THE INTERPRETER:  March 15th, Thursday.
21     A.     It's March 16th tomorrow.  Tomorrow evening
22 I will go back.
23     Q.     Thank you.  That's really short.
24     A.     Yes, it's short.
25     Q.     Do you have an e-mail address?

                              Page 20

1     A.     Yes, I do.
19     Q.     What is your understanding why you are here
20 today?
21     A.     When I got this information that there is
22 this lawsuit about this program, about au pairs in
23 America, I just felt I want to participate, because
24 actually -- it wasn't what I was expected of this
25 program.

                              Page 21

Elina Lubnevska  3/15/2018

| | |
|---|---|
| 1        I thought it will be basically the cultural<br>2 exchange program and then I will help the family to take<br>3 care of the child.  But when I came here it's -- I<br>4 realized it's just work.<br>5        It's just simply, like, job, and there<br>6 wasn't any cultural part of that.  I was working more<br>7 hours than I needed, and so after a while -- at first I<br>8 thought maybe it's just the beginning, so but after that<br>9 I just realized I'm working 11 hours per day.<br>10        I don't have any time.  I don't have free<br>11 days.  I just have free Sundays and Saturdays.  I needed<br>12 to go to college, which there was a certain point which I<br>13 need to get.  So I was just overworked.<br>14        I had really wanted that experience, the<br>15 cultural experience, and I didn't have it.  It just felt<br>16 not fair, and so that's the thing why I wanted to<br>17 participate with this lawsuit.<br>18        Because I think -- because I understand<br>19 this would be all about cultural exchange, and we can<br>20 talk with the family, and that I can tell family about<br>21 Latvia and Latvian culture.<br>22        And they will introduce me with American<br>23 culture, but I just worked there and we didn't have talks<br>24 or something.  They just go to work and came back, and<br>25 that was, like, I just saw them for a few minutes or so. | 1 stuff by myself.  Yeah, that was hard part, too, because<br>2 I just thought the person should check me, how I'm doing,<br>3 what's happening.<br>4        Maybe I need to change the family or<br>5 something because in other cases for some other girl<br>6 would be in a more harder situation than I was.<br>7        I think it's not good for the girls if no<br>8 one checks what's happening.  Then it's just -- it's just<br>9 not safe and that's any ways so.<br>10        It's -- I just didn't feel that there was<br>11 support enough from the Expert Au Pair, which I thought<br>12 there should be.  In the beginning I just thought that<br>13 there will be support, that the agency will be like --<br>14 they would --<br>15        THE INTERPRETER:  Support.<br>16      A.    Support for me if something doesn't go how<br>17 it should.<br>18      **Q.**    **Do you remember the name of the person?**<br>19      A.    I don't remember the name, but I guess I<br>20 have it in my cell phone to contact, but I don't remember<br>21 right now if it's --<br>22        THE INTERPRETER:  If you need.<br>23      A.    If you need I can check.<br>24      **Q.**    **I will tell you a name and you tell me if**<br>25 **you recognize it.  It's Isabelle Fuerta.** |
| Page 22 | Page 24 |
| 1      **Q.**    **What was the name of your host family?**<br>2      A.    It was Garcia, Nicole Garcia and Ron<br>3 Garcia.<br>4      **Q.**    **Did you have a labor representative or**<br>5 **someone from Expert Au Pair that was in touch with you on**<br>6 **a regular basis?**<br>7      A.    Yes.  I had, but the thing was that the<br>8 person came once to visit me and I couldn't talk private<br>9 with person.<br>10        She wanted to -- she talked with me and<br>11 also with the host mom.  It was from -- it was beginning<br>12 of my exchange program.  It was, like, second month or<br>13 so.<br>14        After that they didn't contact me, or<br>15 didn't check how I'm feeling, or how I'm doing, what's<br>16 happening.  That was very hard part, too, because I felt<br>17 that Expert Au Pair will be, like, my agents, that they<br>18 will check how I'm going --<br>19        THE INTERPRETER:  How I'm doing.<br>20      A.    How I'm doing, yes.  So I just thought that<br>21 somebody should contact more often, not only once.  So I<br>22 thought that this Expert Au Pair, like the agency, they<br>23 will give me some support and help me.<br>24        But then the reality I just felt like I'm<br>25 alone, I need to do all those -- deal with all those | 1      A.    Yes.<br>2      **Q.**    **It might have been?**<br>3      A.    It might have been.  It should be.<br>4      **Q.**    **Basically, what you're saying is that you**<br>5 **felt abandoned?**<br>6      A.    Yes.<br>7      **Q.**    **That expert Au Pair offered no support, no**<br>8 **supervision?**<br>9      A.    Yes, yes.<br>10      **Q.**    **You said that a person, a local**<br>11 **representative, only contacted you once?**<br>12      A.    Yes.<br>13      **Q.**    **And never e-mailed after that point?**<br>14      A.    Yes.<br>15      **Q.**    **You mentioned that you looked at the**<br>16 **program and at one point you realized you were working 11**<br>17 **hours a day and this is more of a work program rather**<br>18 **than cultural exchange?**<br>19      A.    Yes.<br>20      **Q.**    **If I correctly do the math, but if I'm**<br>21 **incorrect you will correct me, 11 hours a day five days**<br>22 **week would be 55 hours?**<br>23      A.    55 hours, yes.  Sometimes it was even more<br>24 if the family didn't came back to the home in the time.<br>25        So I start working at 7:00 a.m. and then I |
| Page 23 | Page 25 |

Elina Lubnevska  3/15/2018

1  worked until 6:00 p.m., sometimes 6:30 p.m.
2      **Q.    You are not supposed to work more than**
3  **45 hours?**
4      A.    Yes, and that's the thing why.  I just
5  thought okay, it's not fair enough.  It's just why I
6  should do that.
7          The family paid me a little bit more, like
8  $30 more per week, because they felt okay, if you're not
9  okay with working more, we maybe try to get some other
10  help or something.
11         They just thought that it will be more
12  complicated and so I agreed after while.  I just realized
13  I don't have time for myself, and yeah.
14         And of course if the lady, it was Isabelle,
15  I guess if she would contact me more I would talk with
16  her.  Of course, when I signed the contract, it's the one
17  thing, but when you are exactly in the --
18         THE INTERPRETER:  Exact environment.
19      A.    Okay.  Exactly in that situation where you
20  are together with the family.  Of course you don't want
21  to be rude or something.  I just wanted -- I wanted to be
22  helpful.
23         So I -- at that time I just -- of course
24  again if Isabelle would contact me more, we should talk
25  those things through and she could do an --

Page 26

1          THE INTERPRETER:  Remind.
2      A.    Remind me that I don't need to work so much
3  and maybe we would decide that I need to change family or
4  something.
5          So that was the part from the Expert Au
6  Pair side.  I think that there wasn't enough support.  I
7  just felt I am by myself with the family and I need
8  to deal with it by myself.
9      **Q.    Did you tell them that you were working**
10  **more than 45 hours?**
11      A.    Expert Au Pair?
12      **Q.    Right.**
13      A.    No, I didn't.
14      **Q.    So I'm just trying to understand.  What**
15  **you're saying is that when you arrived at the house, the**
16  **family told you that the schedule, actually it's not**
17  **going to be what they wrote down on the paper, but it's**
18  **going to be way more?**
19         MS. SMALLS:  Objection.
20         MR. ENICA:  Do you want me to rephrase?
21         MS. SMALLS:  She said she doesn't remember
22  what was on the paper.
23         MR. ENICA:  Right, okay.
24         MS. SMALLS:  So the way you rephrased the
25  question.

Page 27

1          MR. ENICA:  That's very fair.
2      **Q.    So what you're telling me -- strike.**
3          **Is it correct to assume that when you**
4  **arrived at your host family they presented you with a**
5  **schedule that was 11 hours a day, 55 hours a week?**
6          MS. SMALLS:  Objection.
7      **Q.    I want to know when it happened, like you**
8  **arrived in their house and they said from now on you work**
9  **this, or you started with 45 and you worked to 55?**
10  **That's what I'm trying to do.**
11      A.    I said I don't remember what was here in
12  the contract, but I guess because here I write down that
13  I can't work more than 45 hours, so I guess there was
14  45 hours I would work.
15         But when I went to the family in the first
16  week before I started to take care of child, that host
17  mom, just we go for a walk.
18         She told me that I should work 45 hours,
19  but in that case they need to find someone, other
20  babysitter, for the extra time because they can't get so
21  back to the home at the early time.
22         So they asked me if I'm okay to work extra,
23  but that they would pay me extra, but when I realized --
24  I agreed.
25         At that part I agreed and I told -- I don't

Page 28

1  remember all the conversation exactly, but I had this
2  feeling that the host mom told me that I will get more
3  money.
4          So I agreed, but then it was only $30 more
5  per week more.  So it's pretty the same.  After a while I
6  said to -- I just go through the routine and I felt like
7  I am stuck in the situation, and how I can get out.
8          So I just went back to my country.  I told
9  them that's enough for me.  If the representative would
10  contact me more or more than once, if she do that
11  regularly, then I think that I would change the host
12  family, but after the six months I was just depressed,
13  and I was overworked, and I just went back to my home.
14      **Q.    But this conversation did you have with**
15  **your host when she proposed something was not when the**
16  **local representative, I missed her name, the local**
17  **representative was there, right?  Was it a different**
18  **time?  Would that be accurate?**
19      A.    It was a different time.
20      **Q.    So the local representative or somebody**
21  **from Expert Au Pair was not there at the time?**
22      A.    No.
23      **Q.    So you mentioned that you left after six**
24  **months?**
25      A.    Yes.

Page 29

Peterson Reporting Video & Litigation Services

8 (26 - 29)

Elina Lubnevska  3/15/2018

Q. So do you remember exactly how many months you stayed? I know you said you looked at your credit card statement for the charges.

A. Yeah. So I write down here. So it was May -- so I worked au pair from November of 2011 until May approximately 2012.

Q. You mentioned nobody from the agency contacted you to ask how you were doing and you didn't contact the agency either to say that you wanted to change the family?

A. Yes.

Q. So would it be accurate to assume that the agency didn't know that you worked 55 hours?

A. I guess so. I don't know if the host family talked to the agency, that I have some contact between them, the host family between the Expert Au Pair.

I don't know that. Usually we didn't talk a lot with the family either. So I don't know if there was relations between family and Expert Au Pair, what they talked, what kind of information they exchanged.

Q. How old was the child or the children that you took care of?

A. He was two years old and then he turned three years old. He was born in 2009 and -- so she was.

Q. So it's approximately?

Page 30

A. It's approximately, yeah. It was two at first. He was two and then he turned three years old.

Q. You mentioned that you went to college or a school here in the United States?

A. Yes.

Q. Do you remember the name of the school?

A. It was Prince George Community College next to the Washington, DC.

Q. Do you remember the name of the course that you took?

A. It was -- I don't remember exactly.

Q. I don't need to know exactly.

A. It was English learning and reading for the adult program or something.

MR. ENICA: I will mark that as Exhibit 3.

(Prince George's Community College Certificate was marked Defendant's Exhibit 4 for identification, as of this date.)

Q. This is a form that was produced by your counsel yesterday?

A. Yes.

Q. Yesterday. The name on the top of the document, is that the name of the community college that you attended?

A. Yes.

Page 31

Q. Would you say that you improved your English by attending this college?

A. No. It was just a waste of time.

Q. How come?

A. Because we actually didn't learn something new. We just talk how we talk there and it was like chatting and nothing more.

I just -- after when I finish this program I realized that my English is good enough so I could -- at that moment I just thought that I need to improve my English.

But then I realize it would be better if I choose some other program, which would be not language, but something different. There you would improve your language more than in this language course.

Q. Going back to your work as an au pair, can you tell me roughly what were the tasks? I know that you mentioned some tasks in the document that we will go over, but just some of what you remember. Can you tell me what the tasks were?

A. When I write down all those tasks, I just sit down and tried to remember everything, and exactly what I needed to do and so.

But if I need to -- I need to tell you exactly from what I remember basically?

Page 32

Q. What you remember is fine.

Page 33

Elina Lubnevska  3/15/2018

4    Q.    How would they supervise you?
5    A.    Basically, they just told me that they
6    wanted to teach the child some numbers, teach him
7    letters, read him books, do some art works, go for a
8    walk.
9         They just told me and I just did it, and
10   they write down what kind of meals I need to prepare for
11   the child and to give him.  So that was basically they
12   told me what I should need to do and I did.
13        I did what they told me.  That's all.  They
14   didn't supervise me like watch over what I'm doing or
15   something.  I just did --
16        THE INTERPRETER:  Due diligence.
17   Q.    But were they evaluating your work?  Let's
18   say at the end of the week, were you discussing what was
19   your performance, or did they ever evaluate your work?
20   A.    When I told them that I will go back to my
21   home, then I told them -- they told me that I did a great
22   work, that I do the correct and that was the only time
23   when they tell me that I'm doing well.
24        But after the week they just gave me that
25   money in the cash and then the Saturdays, the host mother

Page 34

1    but if you want, I think it's a natural time to take a
2    break if you feel like it.
3         THE WITNESS:  No.
4    A.    Also, I want to tell you, you asked me
5    before if the Expert Au Pair, the last question was?
6         MR. ENICA:  Court reporter, can you read
7    it?
8    A.    About the Expert Au Pair supervisor.  That
9    was other thing.  When I participated in this program
10   before, I thought that it will be like Expert Au Pair do
11   all those things, they deal with the money or something
12   like that, but then I just realized that I am with the
13   family, and I'm just with the family.
14        Again, I just thought that I will be
15   more -- I will have more contact with the agency, that
16   they supervise me, check how I'm doing, maybe check the
17   family, how the family feels.
18        Because in the -- not only the au pair,
19   those girls need to be checked.  Maybe even family need
20   to be checked if everything is okay, but I forget --
21        (Translated.)
22   A.    Forget it.  I get confused between two
23   languages.
24   Q.    I understand.  So you're saying that none
25   of that happened, they didn't deal with the money, they

Page 36

1    took me to get college to take the course.  That was all
2    communication between us.
3    Q.    But Expert Au Pair or Isabelle did not
4    supervise you?
5    A.    No.
6    Q.    Would that be correct?
7    A.    No, she didn't.  Expert Au Pair either.
8    Q.    You mentioned that you received $225; would
9    that be correct?
10   A.    Yes.  Maybe it's -- I'm pretty sure that
11   was the sum.  Maybe it was $220, but I think it was $225,
12   because it was $30 more than the minimum amount.  I
13   remember there was --
14        THE INTERPRETER:  Like, without, like,
15   any -- the whole sum.
16   Q.    Round sum?
17   A.    Round sum.  It was round sum and so it was
18   $225 I'm pretty sure.
19   Q.    Do you remember who was paying you?
20   A.    Rob Garcia.  Mostly he paid us.  One or a
21   few times the host mom Nicole paid me, but it was mostly
22   Ron just gave me money on Fridays.
23   Q.    Rob Garcia is the host father?
24   A.    Host father, yes.
25   Q.    We will take a look at the document again,

Page 35

1    didn't supervise you.  Nothing that you just said
2    actually happened in reality?
3         MS. SMALLS:  Objection.  That's not what
4    she said.
5    Q.    You said that you thought that they would
6    supervise you, deal with the money --
7    A.    To deal with things, yes, yes.
8    Q.    Nothing like that happened?
9    A.    That way so they didn't -- when I was in
10   the family, then I realized that it's different, which I
11   was thinking before the program.
12   Q.    Right.
13   A.    Before the program I thought the agency
14   would be supporting me, that maybe they would pay to the
15   credit card, or to my credit card.
16        So it will be like everything would be
17   documented and it would be official, but they -- the
18   family paid me in cash, so I can't give you the record
19   what was the amount of the money.
20        For example, Latvia is not -- it doesn't
21   happen that you just -- if you pay someone, you pay to
22   the account, the bank account, so you can see what was
23   there, the amount of the money.
24        If you work, you need to do those things,
25   like, officially, so there is record.  That was new for

Page 37

Peterson Reporting Video & Litigation Services          10 (34 - 37)

Elina Lubnevska 3/15/2018

1 me, too. So I just didn't know that it will be like
2 that.
3     Q.    So going back, just to make it clear, you
4 said you had some expectations?
5     A.    Yes.
6     Q.    Those things did not actually happen in
7 reality?
8     A.    Yes.
9     Q.    Whatever you expected?
10     A.    Yes.
11     Q.    You felt alone with the family, or felt
12 that the family are the only ones who are paying you,
13 supervising you?
14     A.    Yes.
15         MS. SMALLS:  Objection.
16     A.    I felt like that, too.  As I told you
17 before, I felt that agency will be more involved in this
18 process.
19     Q.    I understand.
20         MS. SMALLS:  Can I just?  Because we have
21 done it a few times where you're summarizing what
22 she's saying, but not exactly how she's saying it.
23         I will continue to object, but if I can
24 just ask you to hold --
25         MR. ENICA:  Right.

Page 38

1         MS. SMALLS:  -- to what she is actually
2 saying.  If you want to ask a different question,
3 then you can ask that.
4         But to use it in the I'm repeating what
5 you're saying and then not to accurately reflect
6 what she said --
7         MR. ENICA:  I think that's a good comment.
8 If you feel that I said something else than what
9 you said, just tell me that's not what I said.
10         THE WITNESS:  Okay.
11         MR. ENICA:  Don't be shy.
12         THE WITNESS:  Okay.
13     Q.    I want to make sure, because you stopped at
14 one point to talk to the interpreter and you didn't
15 continue.
16         So you told me what I understood to be your
17 expectations, but then you stopped.  So I didn't
18 understand.  Those things happened or didn't?
19     A.    Okay.
20     Q.    But again, if you feel that I summarized
21 something else than what you told me, don't be shy.  Tell
22 me that is not what I said.
23     A.    Okay.
24     Q.    So are we good so far?
25     A.    We are good.

Page 39

1     Q.    I will point you back to the document
2 marked as Exhibit 1 and one, two, three, four, five, six,
3 seven, page seven, there are a few questions on page
4 seven.  They start with number two and they end with
5 number seven.
6     A.    Yes.
7     Q.    For each of the questions you do have an
8 objection after which you are mentioning that you will
9 produce any relevant, nonregulation documents responsive
10 to this request, after reasonable search; would that be
11 accurate?
12         MS. SMALLS:  Objection.
13     Q.    I'm just reading what's written after each
14 question.  I'm reading, subject to the forgoing
15 objections, plaintiff will produce any relevant,
16 non-privileged documents for this request after
17 reasonable search.
18     A.    Maybe I can take a break?  I can talk with
19 Dawn, because it just -- it wasn't clear to me.
20     Q.    We can take a break.  Remember we wanted to
21 have the answer.  I didn't have an answer on the table,
22 but is there anything that I can clarify?
23     A.    Maybe you can repeat the question.
24     Q.    Okay.  That's why I'm saying it's not a
25 question on the table.  I just asked you to look at what

Page 40

1 you're saying in response to every question from
2 two-to-five, but --
3         MS. SMALLS:  If I can make a suggestion?
4         MR. ENICA:  Sure.
5         MS. SMALLS:  I think you're asking her --
6         MR. ENICA:  To take a look.
7         MS. SMALLS:  But I think you're asking her
8 to interpret legal responses prepared by her
9 attorneys.  There is a separate question about
10 what you asked for and whether she has them.
11         So if you can distinguish those two things,
12 I think this will help her rather than asking her
13 to interpret the language.
14         MR. ENICA:  Absolutely.
15         MS. SMALLS:  And responses provided by her
16 attorneys.
17         MR. ENICA:  Absolutely.
18         MS. SMALLS:  That's why I think we are
19 getting into some confusion, so I don't know if
20 your purpose is to ask her to step in the shoes of
21 lawyers and provide her answer to that, or if your
22 question is whether she has any documents that are
23 interrogatories.
24         If your question is about whether she has
25 any documents, it would be a lot clearer if you

Page 41

Elina Lubnevska  3/15/2018

1    ask that question.
2           MR. ENICA:  I just wanted to avoid an
3    objection from you for a foundation.
4           MS. SMALLS:  I will waive that.  I don't
5    understand the basis of that, but I think it is an
6    unreasonable expectation for her to interpret the
7    responses prepared by her attorneys.
8           MR. ENICA:  Correct.
9           MS. SMALLS:  But if you want to ask her
10   specifically about the documents requested and
11   whether she has them, that is something that she
12   can and is prepared to answer.
13          MR. ENICA:  I understand that.  What I want
14   her is to read this and to tell me if she
15   understands anything out of it.
16          I think that is reasonable.  It's a
17   document she signed under oath.
18          MS. SMALLS:  Correct.
19          MR. ENICA:  Yes.  Then we will get, maybe,
20   some other questions that will span from this
21   answer.
22          Maybe she doesn't understand.  Then I'm not
23   going to ask further questions.  It depends.  My
24   only request that she reads this and if she tells
25   me that she understands.

Page 42

1    A.    Yes to what Dawn says.  Just ask those
2    questions.
3           THE INTERPRETER:  In more simple way.
4    A.    A more simple way, because otherwise, I get
5    confused.
6    Q.    Absolutely.  I just want you to read this
7    sentence for every paragraph.  No, I don't have a
8    question.  I just want you to read it.
9    A.    Okay.
10   Q.    And to tell me if you see there.
11   A.    Okay.  After that I just want to take a
12   break.
13   Q.    My question is still not answered, but we
14   can take a break if you want, okay?  We can take a break
15   if you want right now.  I'm okay with waiving the rule.
16   If you want a break, we can take a break.
17          Again, I don't have a question about this
18   specific wording of this question necessarily.  I just
19   want to you to confirm that you see the question and the
20   answer for every other question from two-to-six.
21   A.    From two-to-six?
22   Q.    Correct.
23   A.    Okay.  I will read it.
24   Q.    Yes.
25   A.    Okay.  You can ask now.  I read it.

Page 43

1           MR. ENICA:  We can take a break.
2           THE WITNESS:  Okay, good.
3           THE VIDEOGRAPHER:  Thank you.  The time now
4    is approximately 10:58 a.m. We are going off the
5    record.
6           (Discussion held off the record.)
7           THE VIDEOGRAPHER:  The time now is
8    approximately 11:15 a.m. We are back on the
9    record.  It is the beginning of media two.
10   Q.    So I will point you back to the same --
11   back where we were before the break.  I am going to start
12   with question number four, and I am going to tell you
13   what we meant by question number four.  Just let me now
14   if your understanding is the same.
15   A.    Yes.
16   Q.    So question number four was a request that
17   you produce any documents that you might have where we
18   can see the number of hours you worked apparently, daily,
19   weekly, monthly, or yearly.  Was that your understanding
20   when you read question number four?
21   A.    So I didn't write those answers because my
22   attorneys did that, and I give all documents which I had.
23   Also, I filled this out.
24          So they just explained to me that I need to
25   provide the documents, which I have, and if I have

Page 44

1    something, and I did.  So that's my answer.
2    Q.    Okay, good enough.  Do you remember how
3    many documents you provided?
4    A.    So I send those -- I sent two documents, I
5    guess, the certificate of education program.
6    Q.    You are referring to exhibit number four?
7    A.    Yes, four, and also I send from my bank --
8           THE INTERPRETER:  The statement.
9    A.    Bank statement, the amount of money which I
10   transferred to PayPal to pay Expert Au Pair.  I guess it
11   was exactly to mark I paid this fee, which I need to pay
12   before attending to the program.
13          So those was two documents I think I
14   resolved.  I didn't have a lot of -- for example, I
15   didn't have this contract anymore so I just gave what I
16   have.
17   Q.    So, before answering this document, I
18   understand that your attorney answered on your behalf,
19   and it's fine.  That's the way it worked, but before that
20   did you have a chance to read this document?
21   A.    This one?
22   Q.    The one without the answers.
23          MS. SMALLS:  Objection.
24   A.    I don't.  Again, this was in December.  I
25   guess when I filled it and I filled out, the answers

Page 45

Elina Lubnevska  3/15/2018

1  which I needed to fill out attorneys gave me, which
2  information I need to provide.
3         So I filled it and attorneys filled the
4  other information, which is what they can answer.  I just
5  filled everything which I need to fill in.
6    Q.   I completely understand that.  My question
7  is not about what's filled in here.  If your attorneys
8  filled it in, perfectly fine.
9    A.   Yes.
10    Q.   My question is did you read this document
11  prior to being filled in?
12    A.   Yes, I did.  Of course I read it.  Then
13  I -- of course.
14    Q.   I'm going to come back to this question,
15  number four on the part requesting documents from you.
16  Again, I'm not going to hold you to the answer.
17         The answer is in legal terms that a
18  layperson may not understand.  That's fine.  What I'm
19  asking you right now is if you do have any documents
20  reflecting the hours that you worked as an au pair,
21  either on a daily basis, weekly basis, or monthly basis,
22  or any basis?  I understand you told me you don't have
23  the contract.
24    A.   So you're asking me if I have a document
25  which provided that information, how many hours I worked?

Page 46

1  something.  They just give me cash.  So as I told you
2  before, I can't show you the payment, because they just
3  paid me in cash.
4         If it would be in the bank account, then I
5  can show you, but in was just the cash without any
6  receipts or something.
7         MR. ENICA:  I will show you one more
8  document and we are going to enter it as Exhibit
9  5.
10         (Consent to Join was marked Defendant's
11  Exhibit 5 for identification, as of this date.)
12    Q.   I will ask you if you recognize that
13  document that we marked?
14    A.   Yes, I do.
15    Q.   Can you describe for the record the
16  document?
17    A.   This document I had sent to me through
18  e-mail.  It was -- it was the information that I can join
19  to this lawsuit, and to do so I need to fill out this
20  consent to join form.  So I did and I send it back to the
21  au pair action, that e-mail.
22    Q.   So this would be a scanned form that you
23  scanned and sent back to them?
24    A.   Yes.  I printed this out.  Then I took a
25  photo and just send back to e-mail.

Page 48

1    Q.   Correct.
2    A.   No.  I don't have those kind of documents.
3  There was only the contract, but as I told you, again,
4  there wasn't --
5         THE INTERPRETER:  The actual information.
6    A.   The actual information about the hours.  So
7  I don't have any other documents.  I just -- what I had I
8  sent.
9    Q.   Okay, that's fine.  I understand that.  But
10  I just want to make sure that we look at this and we
11  don't have -- I understand that you don't have it.
12         There is nothing wrong with that.  I'm not
13  trying to trick you.  I just want to make sure that we
14  looked at the question the same way and we have the same
15  understanding of the question.
16    A.   Okay.
17    Q.   You mentioned that you were paid cash;
18  would that be correct?
19    A.   Yes.
20    Q.   The host family would not provide, like, a
21  pay stub, or a pay slip at the same time with cash, or
22  any other document like a paper document with the cash;
23  would that be accurate?
24         (Translated.)
25    A.   No, they didn't give me any receipt or

Page 47

1    Q.   Do you remember approximately when you
2  signed this document?
3    A.   That was the date which is there, that
4  October 29th of 2017.
5    Q.   So it was in October of last year?
6    A.   Yes.
7         MR. ENICA:  I have no other questions about
8  this document.  Let's mark this.
9         (The Au Pair Exchange Program was marked
10  Defendant's Exhibit 6 for identification, as of
11  this date.)
12    Q.   I will give it to you.  I want you to take
13  a look at it.
14         MS. SMALLS:  Do you want her to read the
15  entire document?
16         MR. ENICA:  No, I'm not going to ask
17  questions about the document.  My question is if
18  she recognizes the document or if she ever saw the
19  document.
20         MS. SMALLS:  I just want to make that
21  clear, because it's taking me a while to read it.
22  If you want her to sit there and read the entire
23  document, or if you want --
24         MR. ENICA:  No.  Just take a look at it.
25  It was produced in the litigation and I don't know

Page 49

Elina Lubnevska  3/15/2018

1  if she saw it before.  The questions are going to
2  be very basic about the document.
3  **Q.    I will start with my basic questions about**
4  **the document.**
5  A.    Okay.
6  **Q.    Do you recognize the document?**
7  A.    I don't recognize exactly this document,
8  because it's like some booklet or something.
9  **Q.    I apologize.  It was --**
10  A.    Because what is this?
11  **Q.    It was a threefold-brochure that was**
12  **copied, and it was produced in this form, but it was**
13  **actually printed on both sides and folded in three**
14  **sections.**
15  A.    Sent to the au pairs?
16  **Q.    If you don't recognize it, it's fine.**
17  A.    I don't recognize it.
18  **Q.    We will just move on.**
19  A.    I didn't have it.
20  MS. SMALLS:  That's it.
21  MR. ENICA:  We will move on.  I don't need
22  you to recognize it.
23  MS. SMALLS:  If you don't know the document
24  or haven't seen it.
25  **Q.    That's the document question again.  I'm**

Page 50

1  **not trying to trick you.  I really didn't know if they**
2  **gave it to you.  If you don't recognize it, we will go to**
3  **the next one.**
4  **If I ask you in a few words to describe**
5  **what you believed before coming to the United States that**
6  **an au pair is, would you be able to do it?**
7  A.    Yes.  So I find out about this program in
8  internet, about the au pairs, and this cultural exchange
9  program, and as I told you before, before I --
10  THE INTERPRETER:  Applied.
11  A.    Applied to this program, I thought this --
12  I just will help the family to take care of the child,
13  but basically it is cultural exchange program.
14  So I will live together with the host
15  family.  They will share some -- we will have some talks.
16  We will go somewhere.
17  We will do some cultural things together and at
18  I was -- I really wanted to share about Latvian culture,
19  about -- to introduce to the family.
20  So we have this both ways, we have this
21  cultural exchanging.  So that was the thing which I
22  thought is the --
23  THE INTERPRETER:  Primary.
24  A.    Primary, and that taking the care of the
25  child is the second place, which is help out the family,

Page 51

1  and then you as family together, you go do things and
2  just like the family that United States.  So did I answer
3  your question?
4  **Q.    Yes, thank you.  Now I have a theoretical**
5  **question.  I understand your situation.  I understand**
6  **that you are here and you worked 55 hours?**
7  A.    Yeah.
8  **Q.    Do you think that it was possible for you**
9  **to do what you just told me, to be an au pair as you**
10  **thought it would be, if the number of hours per week**
11  **would have been, let's say, 45 instead of 55?**
12  MS. SMALLS:  Objection.
13  A.    With that family or in general in this
14  program?  How do you think?
15  **Q.    I would say in general.**
16  A.    In general.
17  MS. SMALLS:  Can you rephrase the question?
18  **Q.    You told me what your idea of an au pair**
19  **was.**
20  A.    Yes.
21  **Q.    Then I understand that once you arrived at**
22  **the Garcia family --**
23  A.    Yes.
24  **Q.    -- things changed, because you had to work**
25  **55 hours not 45.**

Page 52

1  A.    Yes.
2  **Q.    What I'm asking is if you were required to**
3  **work 45 hours, if you would have been allowed to change**
4  **the family, do you think it's possible that everything**
5  **you told me before that you had in mind about the**
6  **cultural exchange and everything would have happened?**
7  A.    I think yes, but if the family would be
8  changed, because that particular family, there wasn't
9  interest to do things together.
10  There was working also long hours.  There
11  was all the time tired and so on.  So if the family would
12  be changed for me, and if I would work not more than 45
13  hours, then I think it would be possible also after I
14  do --
15  INTERPRETER:  Educational something.
16  A.    So the credits points, which is I needed to
17  take, after that would be over, then I would have two
18  free days, maybe even more, if I need to work 45 hours.
19  But also, I thought that 45 hours is the
20  talk that in some cases this is a cultural exchange
21  program.  There is 45 hours; that's the top.  You maybe
22  can take care of the child even more hours.
23  So I also read in the internet that there
24  is girls who get great families.  They need to -- even I
25  had one girl, which I met, and we talked about her

Page 53

Elina Lubnevska  3/15/2018

1 experience.
2         She basically just took the -- when she was
3 au pair, she needed to take care of about, I think, two
4 children, but it wasn't that she needed to stay all the
5 time in the house.  She just needed to take those
6 children to daycare, take back.
7         Other times she just to go around in the
8 city and do the things to be with the family, go to
9 church, or things like that.  She had a good experience
10 and I thought that that's the thing, how it should be,
11 that the 45 is the top, but it's not just 45 like work,
12 like a job.
13         I thought that it's -- it should be like a
14 cultural exchange and if you ask me, if I think it would
15 be possible if au pair contact me more and we change the
16 different family and there would be --
17         THE INTERPRETER:  Conditions.
18     A.    Conditions.  Then I think yes, it would be
19 possible.  If there would be support from the agency, if
20 they took after -- look after me, and we discussed that,
21 and to do something.
22         So because after those six months I was so
23 tired.  I was even depressed.  I even didn't want to talk
24 or do something.  I just wanted to go back home because I
25 didn't have the support.

Page 54

1     Q.    Okay.  Well I forgot to ask you a question.
2 What city or what area were you placed in, what state?
3     A.    That's interesting, too.  At first I was
4 placed to Maryland and Annapolis and I was only there
5 with the family for approximately one month.
6         After that the family moved to the
7 countryside to Owing, also in Maryland.  So there, I
8 can't get even more anywhere because there wasn't public
9 transportation and I hadn't the car.
10         So I was in the countryside with a little
11 child and in the house by myself.
12     Q.    Do you know by any chance if they had an au
13 pair prior to you or after you?
14     A.    Yes, they did.  I don't remember if they
15 have one or two au pairs before me, but they had some.
16 Also, I think it was -- okay, that I don't remember.
17         But after me, when I told them that I am
18 going back home, they had another girl there.
19     Q.    You don't know if there was -- that was
20 through Expert Au Pair?
21     A.    I don't remember exactly, but I think it
22 was from Expert Au Pair.
23         MR. ENICA:  I have no further questions for
24 you, so we are done.  If Dawn has any questions to
25 redirect, she will ask you.  If not, you will be

Page 55

1 asked to read or waive, and that's it.
2         MS. SMALLS:  You're done?
3         MR. ENICA:  I am done with all my
4 questions.  Wasn't I quick?
5 EXAMINATION BY
6 MS. SMALLS:
7     Q.    I want to refer you back to Exhibit 2.
8 Counsel for Expert Au Pair asked you a number of
9 questions about this document.
10         What I want to -- and you testified that
11 you thought it was very similar to the document that you
12 reviewed and signed?
13     A.    Yeah.
14     Q.    What I want to ask you is if you remember
15 if this is the exact document that you reviewed and
16 signed?
17     A.    No, I don't remember that it was exact,
18 because there was that kind of information, but I
19 can't --
20         THE INTERPRETER:  Confirm.
21     A.    Confirm.  That's all the information is the
22 same.
23     Q.    So in terms of --
24     A.    Because I just don't remember.  If I would
25 have that contract then I can -- I can --

Page 56

1         THE INTERPRETER:  Compare.
2     A.    Compare.
3     Q.    So the thing that you specifically
4 testified about in terms of there being a checkbox about
5 there being a car --
6     A.    Yeah.
7     Q.    -- and about the bathroom, those are things
8 that you specifically remember?
9     A.    Yes.
10     Q.    But point-by-point on this document you
11 don't recall whether this is the exact document that you
12 were provided?
13     A.    Yes, I don't remember that.  That was the
14 contract, because yeah, this is some things that I
15 definitely remember that there was that, but I can't
16 confirm that that all is the same, because I don't
17 remember.
18     Q.    Right.
19     A.    Yes.
20     Q.    Right, you talked about the local care
21 coordinator for Expert Au Pair?
22         MR. ENICA:  Objection.  It's called local
23 representative.
24         MS. SMALLS:  Okay, thank you.
25         MR. ENICA:  You're welcome.

Page 57

Elina Lubnevska  3/15/2018

1    Q.   So you talked about the local
2  representative for Expert Au Pair and you said you did
3  not remember her name?
4    A.   Yeah.
5    Q.   Is that correct?
6    A.   I don't remember.  Yes, I have it in my
7  phone, my contacts, but I -- exactly I don't.  It was
8  like Isabelle or something, but I have this information,
9  this contact in my phone.  I can't confirm that it was --
10  I don't remember, like, exactly.
11    Q.   So the name that counsel for Expert Au Pair
12  provided to you sounded right, but you don't know that
13  that is the name of the local representative?
14    A.   Yes.
15    Q.   You said that the local representative from
16  Expert Au Pair only came to meet with you once --
17    A.   Yes.
18    Q.   Is that correct?
19    A.   That's correct.
20    Q.   How long did she stay?
21    A.   It was approximately 30 minutes or so.
22    Q.   What did she do when she came?
23    A.   She just -- we sat together with my host
24  mom and she just talk if the family is okay.  She asked
25  my host mom if I am okay, if it's a good match, but it

Page 58

1  was at the beginning of the au pair program, so.
2       This time I even can't -- couldn't answer
3  the questions, but basically she just came to introduce
4  herself and just asked some questions, but I don't
5  remember what exactly it was.
6       Like, it was just checking if the match is
7  okay.  So it was, like, after one month or so when I was
8  being placed with the family.
9    Q.   Did you ever hear from her again?
10    A.   No.
11    Q.   Did she check and make sure that you were
12  working no more than ten hours a day?
13    A.   No.
14    Q.   If she had checked in with you more than
15  just that one time, would you have told her that you were
16  working more than ten hours a day?
17    A.   Yes, I would, if we would have more --
18       THE INTERPRETER:  Contact, communication.
19    A.   Yeah.  If we would have some communication,
20  then of course I would do it, tell her.  Then we can talk
21  through all the issues, but because she didn't contact
22  me, she -- I just saw her once, so of course it's just.
23    Q.   So counsel for Expert Au Pair said to you
24  that you never told the expert au pair that you were
25  working more than 45 hours.

Page 59

1       You said no, but you would have told Expert
2  Au Pair that you were working more than 45 hours if this
3  person reached out to you more than once; is that
4  correct?
5    A.   Yes, that's correct.  I would tell her
6  everything that was happening, but she just didn't
7  contact me.
8       I just didn't have the feeling that I can
9  call her, or write e-mail, or something, that she just
10  came on, said hi and introduced herself and.
11    Q.   If she had been in contact with you and you
12  felt that you had communication with Expert Au Pair,
13  would you have considered staying in the program and
14  switched host families?
15    A.   Yes.
16       MR. ENICA:  Objection.
17    A.   Yes.
18    Q.   So you still sought the cultural exchange
19  that you sought when you originally entered the program?
20    A.   Yes, I did.  I just -- at that point when I
21  went back, I just was too tired at that point.
22       I just didn't want to deal with all those
23  things, but if that representative, local representative,
24  would contact me, then of course we can change that.  We
25  can change family.  So then I would be --

Page 60

1       THE INTERPRETER:  Would like to or want to.
2    A.   Then I would like to change the family and
3  to try to get out of the program, that the cultural idea,
4  not to have a job like sheep working horses.
5    Q.   Counsel also asked you, counsel for Expert
6  Au Pair, also asked you about when you learned that you
7  would be working more than 45 hours, and you talked about
8  a walk that you took with the host mom where she said
9  that she needed more assistance than the 45 hours; is
10  this correct?
11    A.   Yes.
12    Q.   Did he tell you that she needed more than
13  45 hours before you arrived in the United States?
14    A.   No.  That was when I was there, when I was
15  already in the United States.  I think it was the first
16  week we should just go for a walk.
17       Then she introduced me with the situation
18  and kindly asked me if I can work more, but then at this
19  point I didn't think that it would be all time.
20       She told me that they would pay me extra.
21  I thought if it was extra, maybe it would be good.  So
22  comparing those hours, but the money wasn't enough there
23  for that kind of work.
24       Also, it was just too hard.  So my hours
25  with a two-year old child and staying all by myself with

Page 61

Elina Lubnevska  3/15/2018

the child in the house, it was very hard.

Q.    Would you have matched with that family if you had understood that you would have -- you would be in a house with two-year old all day with no adult interaction, in a house with no cash?

A.    No, I wouldn't.  I would want to do another family, but I didn't know that before, because the -- I know what was in the employment contract, and it's okay.

Because there wasn't those long hours and there was filled out that I will have a car.  I will have my own bedroom and that I can have food, which I want, that I can freely eat what I want.

But there was some restrictions, too.  I couldn't drink tea because they told me it's expensive.  I couldn't have some other foods.

Just what was there, I just ate that, and then they just didn't bought the tea, for example.  I told them I want some tea.  They told me I need to buy the tea by myself, so I did.

I bought the food, which I needed to buy myself, which I wanted to eat or drink tea or something.  First, there was different rules in the house, which I didn't expect.  For example, that I can't heat the room in a comfortable temperature, because they told me electricity is too expensive.

Page 62

For me, it was like okay, what's the deal with that, because I am here.  I am living in this family.  I have my room and I am shivering there and I had to heat it up.

The house father told me no, you can't.  Please don't heat that room, because it's too expensive.  So it was just -- it was a very bad experience with that family.

I said all the time in the house and even in all those hours I couldn't bring up the temperature in the house, because they had something on the heating --

THE INTERPRETER:  Switch.

A.    Switch.  So when they came back, if they were cold they just hired the temperature, but that was all the time in the house and I was cold.

The child's room was warmer, but I stayed in the basement room and it was cold for example.  So all those things, it wasn't great.

Q.    So they would keep the house at a temperature that you thought was cold during the day?

A.    Yes.

Q.    And then when they got home, they would raise the temperature so that they would be comfortable?

A.    Yeah, sometimes it was like that.

MR. ENICA:  Can I object to this line of

Page 63

questioning?  I think we are focusing on the FLSA issues.

The only reason, if you go there, then I will go there and you will object.

MS. SMALLS:  That's fair.

Q.    So I want to go back to the conversation that you had with the host mom about the hours.  What I want to ask you is did you feel that you had the ability to say no to learning, once you were in the United States, about what her requests and what her expectation was of you about the extra hours that she wanted you to work?

MR. ENICA:  I object to form.  You can answer.

A.    I understood the question.

THE INTERPRETER:  So saying of courtesy, being polite.  Is that what you mean?

THE WITNESS:  It's polite.

THE INTERPRETER:  Being afraid to decline?

THE WITNESS:  No.  I will try by myself.

A.    When we had the talk, the host mom, I tried to, like, politely ask me if it would be okay.  She didn't tell me that you need to do those hours, that she let me know that it would be hard for them to look for another babysitter.

Page 64

So it was like -- it wasn't like she didn't force me to do those hours, but in the way she just nicely asked me, would you be okay.  The host mom told she will feel better that there will be only one babysitter who stays with her child.

At that point, I didn't know that those hours would be all the time.  I realized that later, after the while, that it was all the time, at least 55 hours per week.

Q.    Did you feel like you were a member of the family?

A.    No.

Q.    Did you feel misled about the terms or conditions of the program or your employment?

MR. ENICA:  I object to the form.

A.    Can you repeat?

Q.    Sure.  Did you feel that the terms or conditions of your participation in the au pair program were misrepresented to you?

A.    Yes.

MR. ENICA:  And note my objection.

Q.    You testified that before you came to the United States that you had a certain expectation about what Expert Au Pair would do; is that correct?

A.    Yes.

Page 65

Elina Lubnevska  3/15/2018

| | |
|---|---|
| 1 Q. Can you tell me again what your expectation | 1 role in supervision of both you and the host family? |
| 2 was prior to coming to the United States about what | 2 MR. ENICA: Object to form. |
| 3 Expert Au Pair would do? | 3 A. I thought that's the role in the agency, |
| 4 MR. ENICA: Are you trying to clarify? We | 4 that they take care of those things, that they check how |
| 5 can read the record if you want to. | 5 the au pair are feeling, how they are doing, how the |
| 6 MS. SMALLS: No. I'm laying the foundation | 6 family is -- how the match is made, is it okay. |
| 7 for -- | 7 I felt the agency wasn't the part of this |
| 8 A. Can you repeat? | 8 program, like, before I went to United States, I thought |
| 9 Q. Sure. You testified earlier that prior to | 9 the agency would take the bigger role. |
| 10 coming to the United States you thought Expert Au Pair | 10 MS. SMALLS: That's all I have. |
| 11 would handle the money? | 11 MR. ENICA: I have some redirect. I know I |
| 12 A. Yeah. | 12 said we were done, but I'm just going to clarify |
| 13 Q. Why did you think that? | 13 some questions that your attorney asked. |
| 14 A. Because I assumed that because I thought | 14 THE WITNESS: Okay. |
| 15 that was an agency. I read the information about au pair | 15 EXAMINATION BY |
| 16 program in general, what is it, and how to be -- how it | 16 MR. ENICA: |
| 17 needed to be about cultural exchange and all. | 17 Q. You mentioned earlier in your testimony |
| 18 As I understood, the Expert Au Pair will be | 18 today that the family provided you with a phone so you |
| 19 my agency. Also, it was from my perspective it was -- I | 19 can call them if something happened with the child, or |
| 20 was, like, with this agency and they put me to match with | 20 you said something along those lines. Can you remind me? |
| 21 this family and how to explain? | 21 A. Yes. So they gave me a phone in case if |
| 22 So I just know the agency who pays the | 22 they need to contact me. At first in the first two weeks |
| 23 money, who do all those changes. So with the family I | 23 or so they called me in the lunch break, asked me how I'm |
| 24 have this experience, cultural experience, family | 24 doing. |
| 25 bonding, and things like that, that I don't need to feel | 25 It was, like, for the first week, or first |

Page 66 | Page 68

| | |
|---|---|
| 1 like the family is my employer. | 1 two weeks, or so. Also, yes, they gave me the phone so I |
| 2 I just thought that those are things the | 2 can call them. |
| 3 agency take care of. I just thought that family is | 3 It wasn't a phone, because there was no |
| 4 important, cultural exchange, and cultural. | 4 landline phone in the house. So they gave me -- if there |
| 5 THE INTERPRETER: Experience. | 5 is some emergency with something, I can call them or |
| 6 A. Experience, and that I would be like a part | 6 something. |
| 7 of the family member. But in this case, it felt like | 7 Q. Okay. But you mentioned they didn't allow |
| 8 they are my employer, because they paid me money and | 8 that you call the international number? |
| 9 their attitude was different. | 9 A. Yes, they didn't allow that. I have my own |
| 10 If it's normal, it would be host family who | 10 computer with me, so I just contact to my husband, and my |
| 11 you live together. It just felt like they pay me the | 11 friends, and my family through Skype with my computer. |
| 12 money and there isn't that bonding or something. | 12 Q. But going back to the phone, were you |
| 13 Q. So I want to distinguish between what you | 13 allowed to use the phone to call local numbers or |
| 14 thought prior to coming to the United States and when you | 14 toll-free numbers? |
| 15 signed up for the program, and what your experience was | 15 A. I don't remember exactly how it was, but |
| 16 when you got to the United States. | 16 they told me the phone is just for the case that we need |
| 17 So prior to coming to the United States, | 17 to contact. |
| 18 you did not think the host family was your employer; is | 18 So I don't call somewhere so this isn't |
| 19 that correct? | 19 like -- if there would be some extra charges or |
| 20 A. Yeah. I just thought the agency is the | 20 something, then they want -- they don't want this. |
| 21 employer. | 21 So it was like that. Of course I can't |
| 22 Q. Okay. | 22 remember exactly what they told us, but I can tell you |
| 23 A. Because that's through the agency. | 23 how I did. |
| 24 Q. Because you thought the agency was your | 24 Q. Sounds good. The reason why I'm asking |
| 25 employer, did you think they would take a more active | 25 those questions is because you mentioned that you have |

Page 67 | Page 69

Elina Lubnevska  3/15/2018

1 right now in your phone the phone number for the local
2 representative.
3     A.    Yeah.
4     Q.    So I was wondering why would you have it
5 right now in your phone?
6     A.    Because I had this e-mail address, which is
7 in my Google account.  I just put down those contacts
8 with the local representative number, and the e-mail
9 address, and now it just integrated to my phone.
10    Q.    So basically you had both the e-mail
11 address and the phone number for your local
12 representative?
13    A.    Yes.
14    Q.    You mentioned she did not reach out to you
15 more than once throughout your entire stay; would that be
16 correct?
17    A.    Yes, that's correct.
18    Q.    Was there anything stopping you reaching
19 out to her by calling her or e-mailing her?
20    A.    Because at first I thought it's her
21 responsibility.  It's her job to call me, and write me,
22 and check if everything is okay.
23        When the time go past, I just -- I just
24 even didn't have this feeling that -- I even -- for some
25 case, I even forgot that I have this option to call that

Page 70

1 representative, because she didn't contact me.
2        And it was -- in some cases, it just fell
3 out of my mind that I have some local representative to
4 check in and contact.  So it would just go like that.
5     Q.    You never contacted Expert Au Pair on
6 either their toll-free number or their e-mail address;
7 would that be accurate?
8     A.    Excuse me?
9     Q.    Did you ever contact the agency, the
10 headquarters, either at their phone number, which is a
11 toll-free number, or their e-mail address; is that
12 correct?
13    A.    So you're asking me if I contacted Expert
14 Au Pair?
15    Q.    Correct.
16    A.    No, I didn't.  I just know that when I told
17 the family that I will go back to my home country, then
18 the family contacted Expert Au Pair, because, I guess, it
19 was they needed the next au pair to bring to the United
20 States.
21    Q.    But you had access to your e-mail in your
22 room; would that be correct?
23    A.    Yes, I did.
24    Q.    So it was nothing stopping you from
25 e-mailing them that; would that be correct?

Page 71

1     A.    Physically, no, but as I told you, I just
2 didn't have this feeling the agency have this -- that it
3 do their best to help me feel comfortable.
4        They told me that this local representative
5 was the person which I need to contact in some cases, and
6 the Expert Au Pair, I haven't had -- Expert Au Pair just
7 bring me to this training, do the contract.  After this I
8 went to the family and their local representative and I
9 even --
10        THE INTERPRETER:  I didn't have, like, that
11 thought in my mind.
12    A.    So I can call or write to the Expert Au
13 Pair headquarters.
14    Q.    So I assume the answer is not what I have
15 to ask the question.  Did you tell Expert Au Pair, or
16 your local representative, for example, that you're
17 buying tea by yourself?
18    A.    No, because as I told you, I didn't have
19 the support from Expert Au Pair or local representative,
20 if they were to contact me and ask me how I'm doing, what
21 is the downside of this family and my --
22        THE INTERPRETER:  Matched something.
23    A.    So if -- I got lost from this.
24    Q.    That's fine.
25    A.    You understood?

Page 72

1     Q.    I understood.  Your counsel asked if the
2 terms and conditions of the program were misrepresented
3 to you, what do you understand, and you said yes.
4        What's your understanding of terms and
5 conditions of the program, are those the terms and
6 conditions that you read on the government website, or
7 the terms and conditions for Expert Au Pair, for example?
8 I'm just trying to clarify your answer.
9     A.    First of all, I had this contract and I
10 signed it.  I thought that there will be that what I
11 signed for, that's what will be happening, and it wasn't.
12 It was different.
13    Q.    I understand.  So you feel that the family
14 misrepresented in the contract the number of hours that
15 they wanted you to work, for example?
16        MS. SMALLS:  Objection.
17    A.    That's not what I'm saying.
18    Q.    You can explain.
19    A.    You can ask the question again?
20    Q.    You felt that the family misrepresented --
21        MS. SMALLS:  Objection.
22    Q.    -- in the employment contract the terms and
23 the conditions of your employment?
24        MS. SMALLS:  That's not what she said.
25        MR. ENICA:  Okay.

Page 73

Elina Lubnevska  3/15/2018

A.   I got confused.

Q.   I'm trying to see what are the terms and conditions that were misrepresented to you and you pointed me to the employment contracts.  Are we on the same page?

A.   Yes, so far.

Q.   So you feel that the terms and conditions in the employment contract were misrepresented to you?

A.   Yes.

Q.   Which terms and conditions in the employment contract?  Let's put it this way, the ones filled in by hand or something, or the ones that are written?

A.   I will check.

Q.   If you want to be even clearer, you can tell me approximately the section.  For example, I'm just going to give you an example, don't say that necessarily, but you can say --

MS. SMALLS:  Why don't you let her --

Q.   Right.  You can explain.  You understood?

A.   I understood.  So the hours was represented wrong.  I guess the contract was okay.  There wasn't more than 45 hours, and of course there wasn't this car that I will have.  This car, I can use the car when I need, and that was right down there.  That didn't happen.

Page 74

About the duties, I don't remember exactly, but there wasn't filled out all those duties which I had when I was at the host family.

This was just, if I remember correctly, it was write down doing childcare and nothing specific, but when I went to this family, there was that I knew to teach the numbers, read out books, and do a lot of things, and do the dishes, and do the laundry.  So the contrat was different from reality.

Q.   I understand.

A.   This was sent me through Expert Au Pair, I guess, confirmed that it looked okay, but if the local representative or Expert Au Pair would check in, everything is, like, in the correct function, for example, then I could say that no, there is -- in reality, things happen differently from which I signed the contract.

Q.   I understand.  Your counsel asked a question about what you thought before you came to the United States and after.

I think you said it, you realized after coming to the United States not the agency, but the family, was your employer because they were paying you?

A.   Yes.

Q.   You mentioned something about the money?

Page 75

MS. SMALLS:  Objection.  That's not what she said.

Q.   I misunderstood the money part.  Can you repeat that?

A.   Exactly which part?

Q.   You said the family was paying you and I'm just trying to -- my memory.  If you want, we can read back your answer.

(The requested portion was read back by the reporter.)

MR. ENICA:  So just to clarify for the witness, when the court reporter said it's 'something' -- I think the court reporter was --

THE COURT:  She said 'something.'

MR. ENICA:  Never mind.

Q.   Before coming here you thought the agency is going to handle the money and the agency is going to take care of everything, but once you arrived here realized actually the family is your employer and they are the ones paying the money?

A.   Actually, I didn't understand even after I came here.  It's before I came to the United States.  I thought that was cultural exchange program that agency make match with the family.

So I just took -- I just thought that the

Page 76

agency do all the paperwork, all the legal things, and that the family -- I just will have cultural experience.  Did I answer your question?

Q.   Correct.  The first part.

A.   The first part and the second part?

Q.   The second part.  You came here and realized the family are your employers, and the agency didn't do what they were supposed to do; would that be what you said?

A.   Yes.  When I went to United States then I realized from this family the attitude is like the family is the family, and the employer is the employer.

These things were mixed together, so the family felt like employer, but I thought that that should be organized by agency, because it's agency.  Did I answer?  It's just confusing you.

Q.   I don't want to confuse you further, so I will not ask you any further.  I understand what you're saying.  I really don't want to confuse you further.  Did you have an agency in Latvia that helped you with the program?

A.   No.

Q.   So you applied directly with Expert Au Pair?

A.   Yes.  I just find Expert Au Pair agency on

Page 77

Elina Lubnevska  3/15/2018

1 the internet, so the matching and document filing
2 happened very fast.
3      I had one or two interviews with my host
4 family. I signed the contract and get my visa to come to
5 United States.
6      MR. ENICA: Okay. No further questions.
7      MS. SMALLS: Great.
8      MR. ENICA: Are you going to read, waive?
9      MS. SMALLS: I think she will want to
10 review it and so I think she would have the chance
11 to review it and see if there are any errors or
12 anything else.
13      So we will do that and we will send -- then
14 she will certify and sign that it's correct.
15      MR. ENICA: Thank you.
16      (Continued on next page to accommodate the
17 jurat.)
18
19
20
21
22
23
24
25

Page 78

1      THE VIDEOGRAPHER: Thank you all very much.
2 This concludes the March 15th, 2018 videotaped
3 deposition of Elina Lubnevska.
4      The time now is 12:11. We are off the
5 record and finished with the day. There are two
6 media units to this deposition. Thank you all.
7      (TIME NOTED: 12:11 p.m.)
8
9
10
     ELINA LUBNEVSKA
11
Subscribed and sworn to
12
before me this     day
13
  of     , 2018.
14
15
     NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

Page 79

1      INDEX TO TESTIMONY
2
EXAMINATION OF ELINA LUBNEVSKA
3
EXAMINATION BY       PAGE
4 Bogdan Enica, Esq.     4
5 Dawn Smalls, Esq.     56
6 Bogdan Enica, Esq.     68
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 80

1
     INDEX TO EXHIBITS
2
DEFENDANT'S
3 EXHIBITS    DESCRIPTION      PAGE
  1.    Form      9
4
5 2.    Employment Contract    15
6
  4.    Prince George's
7      Community College Certificate   31
8
  5.    Consent to Join    48
9
10 6.    The Au Pair Exchange Program   49
11
12
13
14
15   *Exhibit 1 was not provided to the Reporter
16   at the conclusion of the deposition.
17
18
19
20
21
22
23
24
25

Page 81

Elina Lubnevska 3/15/2018

TO BE PRODUCED/INSERTED

| DESCRIPTION | PAGE/LINE |
|---|---|
| None. | |

Page 82

CERTIFICATE

I, ANGELA ARENA, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That, ELINA LUBNEVSKA, the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am no way interested in the outcome of this matter, which was taken on this 15th day of March, 2018.

_____
ANGELA ARENA

Page 84

QUESTIONS MARKED FOR A RULING

| QUESTIONING ATTORNEY | PAGE/LINE |
|---|---|
| None. | |

Page 83

**\*\*CONFIDENTIAL\*\***

*BELTRAN*

*VS.*

*INTEREXCHANGE*

<u>**Deposition**</u>

*JESSICA PARDIM ARAUJO*

*03/22/2018*

_____

*AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03074-CMA-KMT

VIDEO DEPOSITION OF JESSICA PARDIM ARAUJO
**CONFIDENTIAL**
March 22, 2018

JOHANA PAOLA BELTRAN; et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC.; et al.,

Defendants.

APPEARANCES:

TOWARDS JUSTICE
   By Alexander Hood, Esq.
   1535 High Street
   Suite 300
   Denver, Colorado 80218
   720.239.2602
   Alex@towardsjustice.org
   Appearing on behalf of Plaintiffs

BOGDAN ENICA, PC
   By Bogdan Enica, Esq.
   111 Second Avenue NE
   Suite 900
   St. Petersburg, Florida 33701
   727.388.3472
   bogdane@hotmail.com
   Appearing on behalf of Defendant
   Expert Group International, Inc.,
   d/b/a Expert AuPair

Also Present:
   Monika Cary, Videographer

Page 2

1        Pursuant to Notice and the Federal Rules of

2   Civil Procedure, the video deposition of JESSICA

3   PARDIM ARAUJO, called by Defendant Expert Group

4   International, Inc., d/b/a Expert AuPair, was taken

5   on Thursday, March 22, 2018, commencing at 9:07 a.m.,

6   at 216 16th Street, Suite 600, Denver, Colorado,

7   before Pamela J. Hansen, Certified Shorthand

8   Reporter, Registered Professional Reporter, Certified

9   Realtime Reporter and Notary Public within Colorado.

10              * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              I N D E X

2   VIDEO DEPOSITION OF JESSICA PARDIM ARAUJO

3   EXAMINATION                    PAGE

4   MR. ENICA                      5

5   MR. HOOD                       83

6   MR. ENICA                      84

7

8           INDEX OF EXHIBITS

9                           INITIAL
    DESCRIPTION                 REFERENCE
10

11  Exhibit 1   Expert AuPair's        10
               Interrogatories, Requests for
12             Production, and Requests for
               Admission to FLSA Opt-In
13             Plaintiffs

    Exhibit 2   Beltran v InterExchange:   11
14             Expert AuPair's Opt-In
               Plaintiff Discovery Requests
15             (December 8, 2017)

16  Exhibit 3   Employment Contract,       17
               8/26/2016
17
    Exhibit 4   Employment Agreement, 2/1/17   21
18
    Exhibit 5   Employment Agreement,      73
19             1/22/2016

20  Exhibit 6   Consent to Join            54

21  Exhibit 7   AuPair Agreement          57

22

23

24

25

Page 4

1              * * * * * * *

2           P R O C E E D I N G S

3        THE VIDEOGRAPHER:  We're on the record at

4   9:07 a.m.  Today is March 21st, 2018.  This begins

5   the videotaped deposition of Jessica Pardim Araujo

6   taken by the defendant in the matter of Johana Paola

7   Beltran versus Interchange Inc., et al.

8        We are located at 216 16th Street, Suite

9   600, Denver, Colorado.

10        The court reporter is Pam Hansen.  The

11  videographer is Monika Cary.

12        Counsel will introduce themselves and the

13  parties they represent, beginning with plaintiff's

14  counsel first.

15        MR. HOOD:  Alexander Hood from Towards

16  Justice for the plaintiff.

17        MR. ENICA:  Bogdan Enica, representing

18  Expert Group International, doing business as Expert

19  AuPair.

20        THE VIDEOGRAPHER:  Will the court reporter

21  please swear in the witness.

22        JESSICA PARDIM ARAUJO,

23  having been first duly sworn, was examined and

24  testified as follows:

25

**CONFIDENTIAL**

**Page 5**

1  EXAMINATION
2  BY MR. ENICA:
3  **Q  Good morning, Jessica.**
4  A  Good morning.
5  **Q  As I stated, my name is Bogdan, and I will**
6  **be taking the deposition today.**
7  A  Okay.
8  **Q  Before going any further, we have a couple**
9  **of what's called stipulations.**
10  A  Uh-huh.
11  **Q  It's matters that we agreed with your**
12  **counsel.**
13  A  Uh-huh.
14  **Q  And the first one refers to the**
15  **objections.  I'll let my counsel put the stipulation**
16  **on the record, my colleague put the stipulation on**
17  **the record.**
18  MR. HOOD:  Sure.  Prior to going on the
19  record, defense counsel and I stipulated that I could
20  preserve any objections by simply saying the word
21  "objection" and nothing more.
22  Is that correct?
23  MR. ENICA:  That's correct.
24  MR. HOOD:  Great.
25  MR. ENICA:  Okay.

**Page 6**

1  **Q  (BY MR. ENICA)  And we -- we are also**
2  **trying to be out of here at a reasonable time so we**
3  **don't have to break for lunch, so I would appreciate**
4  **if we keep limiting breaks as close as possible to 10**
5  **minutes or less.**
6  MR. HOOD:  And Jessica, I -- I told
7  defense counsel that -- that you'd like to get out of
8  here as quickly as possible and probably would not
9  like to take a lunch, but I didn't actually have a
10  chance to check in with you.  But does that -- does
11  that sound okay?
12  THE DEPONENT:  That's fine.
13  MR. HOOD:  Okay.
14  **Q  (BY MR. ENICA) Okay.  Perfect.  So have**
15  **you ever been deposed before, Jessica?**
16  A  No.
17  **Q  Okay.  Have you ever been involved in a**
18  **lawsuit before?**
19  A  No.
20  **Q  Okay.  So I'm going over the rules of**
21  **deposition today.  Let me know if you don't**
22  **understand anything.**
23  A  Okay.
24  **Q  Okay.  This setting is a formal setting.**
25  **This is a legal proceeding, so you'll be answering**

**Page 7**

1  **questions today as you would answer in front of a**
2  **jury or a judge.  You are under oath.  The court**
3  **reporter administered an oath, which means that you**
4  **are to answer the questions truthfully and**
5  **completely.**
6  **Again, during the deposition I'll ask**
7  **questions, and I will -- I would like you to answer**
8  **the questions.  Your counsel may make objections by**
9  **stating the word objection.  However, unless**
10  **specifically you're instructed not to answer, you are**
11  **to answer the question.**
12  **We can take breaks at any point.  My**
13  **request is that you answer a question that was posed**
14  **to you prior to taking a break.  If you do not**
15  **understand any question, please ask for a**
16  **clarification or ask me to rephrase.**
17  **If you answer a question, I would assume**
18  **that you understood the question and that the answer**
19  **is the correct, truthful and complete answer.  Is**
20  **that okay?**
21  A  Uh-huh.
22  **Q  Okay.  We do have a court reporter here,**
23  **and she's writing down everything that we say.**
24  **Unfortunately it is hard for her to write down head**
25  **nods, hand gestures, or mm-hmm, uh-huh.  I would**

**Page 8**

1  **appreciate if you can give your answers in a verbal**
2  **form.  For example --**
3  A  Okay.
4  **Q  -- right.  An okay or a yes is preferable,**
5  **or a no or an I don't know.**
6  **I would also like you to wait until the**
7  **question is done before starting your -- your answer.**
8  **Again, if the question is too long and you feel that**
9  **you're lost, please ask me to rephrase.  I will try**
10  **and do the same.  I will try to answer -- to wait**
11  **until your answer is done, and only then pose the**
12  **next question.  Is that clear so far?**
13  A  Yes.
14  **Q  Okay.  Are you under the influence of any**
15  **substance or medication that may impair your ability**
16  **to tell the truth today?**
17  A  No.
18  **Q  Did you prepare for today's deposition?**
19  A  Yes.
20  **Q  How did you prepare?**
21  A  I talked to my lawyer.  That was all.
22  **Q  Excuse me?**
23  A  I'm sorry.  I talked to my lawyer.
24  THE REPORTER:  Yes, please keep your voice
25  up.

| Page 9 | Page 11 |
|---|---|

**Page 9**

1    Q    (BY MR. ENICA)  And when did you talk to
2  your lawyer?
3    A    Yesterday.
4    Q    Do you remember when approximately
5  yesterday?
6    A    Around noon, I think.
7    Q    Do you remember for how long that you
8  talked to your lawyer yesterday?
9    A    A couple of hours -- minutes.  A couple of
10  minutes.
11    Q    Except for the preparation yesterday, did
12  you prepare for this deposition at any other time?
13    A    No.
14    Q    Did you check or review any documents in
15  preparation for today's deposition?
16    A    No.
17    Q    Do you remember if you have any documents
18  in your possession from the time you were an au pair,
19  documents related to the numbers of -- the number of
20  hours you worked or the stipend that you received?
21    A    Yes.
22    Q    Do you have those documents with you here
23  today?
24    A    No.
25    Q    Did you produce any of these documents to

**Page 10**

1  your attorney to give to us, the other side lawyers?
2    A    No.
3    Q    Is there a reason for you not producing
4  those documents?
5    A    No.
6    MR. ENICA:  Okay.  I would like to mark an
7  exhibit at this point.
8    MR. HOOD:  Thank you.
9    (Exhibit 1 marked.)
10    Q    (BY MR. ENICA)  And I would like you to
11  take a look at the document, and once you are done,
12  just look up.
13    A    (Deponent examined exhibit.)
14    THE DEPONENT:  How much --
15    MR. HOOD:  You can't ask me questions.
16    Q    (BY MR. ENICA)  You can ask me if you have
17  something that you're not clear about.
18    MR. HOOD:  Yeah.
19    A    So -- so this means I need to -- I guess I
20  don't understand the document.  This means I need to
21  give you the documents I have, with schedule and
22  everything?  Is that what that means?
23    Q    (BY MR. ENICA)  Well, what I just want you
24  to do is just to look at the document and then I'll
25  ask questions.  Just try and briefly look --

**Page 11**

1    A    Okay.
2    Q    -- at the document, and then I'll...
3    A    (Deponent examined exhibit.)
4    Q    So have you seen this document before?
5    A    No.
6    MR. ENICA:  Okay.  I am going to enter
7  Exhibit 2.
8    (Exhibit 2 marked.)
9    Q    (BY MR. ENICA)  And Exhibit 2 is an email.
10  It has lots of email addresses here at the top.  But
11  what I want to focus your attention is on the list of
12  names in the lower part of the -- of the email, of
13  the first page of the email, and I want you to tell
14  me if you recognize your name there.
15    A    Yes.
16    Q    Can you point for the record where your
17  name is.
18    A    It's the third name.
19    Q    And that is the correct spelling of your
20  name?
21    A    Yes.
22    Q    Okay.  We will take at one point a break,
23  and I am going to talk to your counsel about this,
24  but we'll just move forward for now.
25    A    Okay.

**Page 12**

1    Q    So whenever it's a natural break, we'll --
2  we'll address that.
3    A    Uh-huh.
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22    Q    Okay.  And do you know why you're here
23  today?
24    A    Yes.
25    Q    What is your understanding?

**CONFIDENTIAL**

## Page 13

1  A   I am here because I am a part of the
2  au pair wage, because of the low wage of payment for
3  au pairs.
4      Q   And what is an au pair?
5  A   An au pair is a -- how to explain it --
6  it's a person that comes here from another country to
7  work as a nanny, I would say.  Take care of the kids,
8  and exchange cultural --
9      THE REPORTER:  I'm sorry, I couldn't hear.
10  A   Exchange -- exchange of culture.  And --
11  yeah, we work as a nanny.
12     Q   (BY MR. ENICA)  And were you an au pair
13  yourself?
14  A   I didn't understand.
15     Q   Were you an au pair yourself?
16  A   Yes.
17     Q   Do you remember the period of time when
18  you were an au pair?
19  A   January the 31st, 2016 until January 30th,
20  2018.
21     Q   So you were an au pair for two years --
22  A   Yes.
23     Q   -- would that be accurate?
24     And during this time, January 31st, 2016
25  to January 30th, 2018, were you with the same host

## Page 14

1  family, or did you change host families?
2  A   I changed.
3      Q   Do you remember approximately when you
4  changed host families?
5  A   I arrived at my last host family on
6  August 31st, 2016.
7      Q   This was your second host family, correct?
8  A   Yes.
9      Q   So you worked for your first family
10  approximately January 31st, 2016 to August 31st the
11  same year, 2016?
12  A   Until one week before the date.  I arrived
13  at the new host family at that date.
14     Q   Okay.  And you were with your new host
15  family between January and August -- sorry -- between
16  August 2016 and January 2018, correct?
17  A   Yeah.  Yes.
18     Q   And do you remember the last name of the
19  family?
20  A   Which family?
21     Q   Of your second host family.
22  A   Carminati.
23     Q   And do you remember, by any chance, the
24  last name of your first host family?
25  A   It was a really hard one.  I --

## Page 15

1      Q   If you are to look at some documents that
2  you have at home, would you be able --
3  A   Yes.
4      Q   -- to find this information?
5      And do you remember if you had a local
6  representative or a local representative or a person
7  from an agency that -- from the agency from Expert
8  AuPair that you were in touch with?
9  A   For a while, yes.
10     Q   For a while?  Okay.
11     Do you -- do you remember her or his name?
12  A   I know I arrived in Colorado.  I had lots
13  of different representatives for -- one would stay
14  for a month, one would stay for weeks, and then for a
15  while I didn't have a representative at all.  So I
16  don't remember their names.  I didn't have any -- a
17  lot of contact with them.  I remember the last one,
18  that is Jessica.  Jessica House was the one I had
19  more contact.
20     Q   And you said for a period of time you
21  didn't have any?
22  A   No.
23     Q   Do you remember how long, approximately?
24  A   I think it was one or two months.
25     Q   And what did you do during these two

## Page 16

1  months where you had no local representative?
2  A   Nothing.
3      Q   Were you still working for --
4  A   Oh, yes.
5      Q   Okay.  So you -- you kept working --
6  A   Uh-huh, yes.
7      Q   -- for the host family?
8      And do you remember which host family was
9  that?
10  A   Carminati.
11     Q   Do you remember approximately how many
12  hours a day were you -- sorry, a week were you
13  working for this host family, for the Carminati host
14  family?
15  A   Sometimes -- sometimes less than 45, but
16  most part of the time it was 45 hours exactly.
17     Q   Did you have what's called an employment
18  contract with the Carminati family?
19  A   Yes.
20     Q   And do you know, by any chance, if you
21  have this contract at home or if you are able to
22  locate it, if you would be able to locate it?
23  A   I think so.
24     Q   And do you know, by any chance, if it was
25  only one or two contracts?

<table>
<tr><td>

Page 17

1    A    One for the first year, and one for my
2  extension with the family.
3    Q    And when you say "one for the first year,"
4  you're still referring to the Carminati family?
5    A    Yes.
6    Q    Okay.  And I'm just trying to understand.
7  The time spent with the Carminati family was less
8  than two years, correct?
9    A    Yes.
10    Q    So you had a contract for the first year,
11  and then a contract for the remaining six months, or
12  the other way around?
13    A    The other way.
14    Q    So you had the contract until your first
15  year finished?
16    A    Yes.
17    Q    And then your second contract was for the
18  full year.
19    A    Yes.
20    Q    And would this contract specify the number
21  of hours that you worked?
22    A    I'm not sure.
23    Q    Okay.
24        (Exhibit 3 marked.)
25    Q    (BY MR. ENICA)  And I would like you to

</td><td>

Page 19

1  page, where it says Maria Vittoria G. Carminati --
2    A    Yes.
3    Q    And where it says Date of Employment,
4  08/26/16, and then the hours on the first page.
5        Do you have any idea who filled in this
6  information?
7    A    I'm sorry, where are the hours you're
8  seeing?
9    Q    The hours and the day, where it says Start
10  time, and then 6:15, and then underneath it says 7:45
11  and --
12    A    Okay.  Could you repeat the question.
13    Q    Do you have any idea who filled in this
14  information?
15    A    Probably the host mom.
16    Q    Okay.  Would the contract that you have at
17  home or that you -- you would be able to find at home
18  be similar with this one, or you cannot say at this
19  point?
20    A    Yes, it's similar.
21    Q    Similar.  If you look at the contract
22  right now, would you say that this is the correct
23  number of hours that you are required to work, the
24  one that's on the first page under Terms of
25  Employment, 1.1 Hours?

</td></tr>
<tr><td>

Page 18

1  take a look at the document marked Exhibit 3, and
2  tell me if you recognize it.
3    A    (Deponent examined exhibit.)
4    Q    Do you recognize the document?
5    A    Yes.
6    Q    How would you describe the document?
7    A    It's employment contract from my second
8  host family.
9    Q    Okay.  This is the same family that we
10  referred before as Carminati family?
11    A    Yes.
12    Q    Okay.  So --
13    A    I'm sorry.
14    Q    That's okay.
15        So this would be the contract for the
16  first half of year or for the second year?
17    A    First half of year.
18    Q    First half of the year.  And I know it has
19  three signature pages.  Would you say that you signed
20  this contract before accepting employment -- before
21  accepting a position with the Carminati family?
22    A    Yes.
23    Q    Okay.  And as we look at the contract, we
24  see that there are some information that are filled
25  in, it looks by computer.  For example, on the first

</td><td>

Page 20

1    A    No.
2    Q    Okay.  Then explain that.
3    A    My time -- my schedule was completely
4  different than this one.  I never worked these hours.
5  I didn't have a fixed schedule, so it was not like
6  this one.
7    Q    Okay.  But this is the schedule that you
8  agreed with the family --
9    A    Yes.
10    Q    -- prior to your moving in with them?
11    A    Yes.
12    Q    Okay.  Did you ever let the agency know,
13  let Expert AuPair know that your schedule changed?
14    A    No.
15    Q    No, okay.  And would -- would you say that
16  in reality, you were working more hours than the ones
17  specified here in Exhibit 3 or less?
18    A    No, I never worked more than 45 hours with
19  the Carminati family.  It was always the 45 hours.
20  Never more.
21    Q    Okay.  I understand.  My question is, do
22  you think that you worked more than the hours that
23  are mentioned here, or just different times?
24    A    Just different times.
25    Q    Just different times.

</td></tr>
</table>

**CONFIDENTIAL**

Page 21

1    A    Yes.

2    Q    Would you keep track of the hours worked?

3    A    Sometimes.

4    Q    Okay.  And would you have at home any

5  document that show the number of hours worked in a

6  week, or some notes that you made regarding the

7  number of hours, or anything like that?

8    A    I'm not sure if I still have it.

9    Q    Okay.  I am going to introduce another

10  exhibit.  We'll mark it -- I'm going to mark it as

11  Exhibit 4.

12        (Exhibit 4 marked.)

13    Q    (BY MR. ENICA)  I want you to take a look

14  at it and let me know when you're done.

15    A    (Deponent examined exhibit.)

16    Q    Do you recognize this document?

17    A    Yes.

18    Q    And how would you describe this document?

19    A    It's my employer contract with the

20  Carminati family for my second year as an au pair.

21    Q    Okay.  So do you know who wrote the

22  information that's handwritten on the first page,

23  which is the name of the family, your name, some

24  hours, and the changes?

25    A    The host mom.

Page 22

1    Q    The host mom.  And coming back to the

2  hours, the Hours section, would you say that these

3  hours are accurate of your working with the family in

4  the second year?

5    A    No.

6    Q    Do you know why would you -- would she put

7  inaccurate hours on the contract?

8    A    Some -- some days I would work in this

9  schedule that's shown here.  Or some days I wouldn't.

10  Would just change the -- the time I was working.

11    Q    Okay.  So you don't know why you would

12  have here a set schedule when the schedule actually

13  was not set, correct?

14    A    Yes.

15    Q    I'm showing you this exhibit.  This is

16  from the agency's records.  So this is a document

17  that was sent in exactly this form to Expert AuPair.

18    A    Uh-huh.  Okay.

19    Q    Have you ever informed Expert AuPair that

20  your schedule changed?

21    A    No.

22    Q    Okay.  Now, would you say that you worked

23  more or less hours than the hours mentioned here?

24    A    Some weeks less, some weeks the amount.

25    Q    Okay.

Page 23

1    A    It wasn't a fixed schedule, so...

2    Q    And we are referring to Exhibit 4, the

3  document marked Exhibit 4; is that the right number?

4    A    Yes, 4.

5    Q    Okay.  So you testified sometimes you

6  would work less than the number of hours here,

7  sometimes more, but the compensation would be the

8  same?

9    A    Yes.

10    Q    And what was your -- the compensation that

11  you received from the host family?

12    A    195.75.

13    Q    And who would pay you the 195.75?

14    A    The host mom.

15    Q    How would she pay you?

16    A    As a -- I'm sorry, how is it called --

17  bank transfer.

18    Q    Okay.

19        THE REPORTER:  I'm sorry, I didn't hear

20  that.

21        THE DEPONENT:  Directly deposited.

22    Q    (BY MR. ENICA)  That was my fault because

23  I was talking at the same time.

24        So she would direct deposit in your

25  account 195.75 every week?

Page 24

1    A    Every week.

2    Q    Now, we are still looking at Exhibit 4,

3  and if you look at the second page, there is a

4  portion where it says 1.3, Duties.  It's in the

5  middle of the page.

6        Do you know who filled in the information

7  that's handwritten in 1.3?

8    A    The host mom.

9    Q    The host mother.  And by looking at the

10  description of the duties mentioned here at 1.3,

11  would this description be accurate?

12    A    With all the duties I had to, you mean?

13    Q    If we are looking at the -- the duties

14  here --

15    A    Okay.

16    Q    -- did you have to perform all these

17  duties, more, less, sometimes more, sometimes less?

18    A    More.

19    Q    Okay.  Is any of the duties here that you

20  were not required to perform?

21    A    Could you repeat.

22    Q    Any of the duties that is mentioned here

23  you were not required to perform?  I'll just give you

24  an example.  I'm not trying to influence you.

25    A    Uh-huh.

**CONFIDENTIAL**

Page 25

1    Q    For example, you can say, I was not
2    required to drive children and it's written here,
3    driving children.
4    A    Oh.
5    Q    So it's just an example.  It's -- that's
6    my question, is anything that's written here that you
7    were actually not required to do?
8        MR. HOOD:  Objection.
9    Q    (BY MR. ENICA) You may answer.
10   A    No.
11   Q    So you are required to perform all the
12   tasks that are mentioned here?
13   A    Yes.
14   Q    Okay.  Were you required to perform
15   additional tasks?
16   A    Yes.
17   Q    Okay.  Can you tell me what additional
18   tasks you were required to perform.
19   A    So I need to answer before I ask for a
20   break?
21   Q    If you can.  If you know.
22   A    Can we take a break then?
23   Q    You don't know what additional tasks?  I
24   said if you know.  If you know what additional tasks
25   you are required to perform, then let me know and

Page 26

1    then we can take a break.  If you don't know or you
2    can't remember, we can definitely take a break now.
3    A    Some house -- some house duties, like dish
4    washer, sometimes take the car to the -- to fix.
5    Sometimes it's stuff that wasn't for -- it wasn't for
6    my -- it wasn't a request for an au pair to do.  I
7    think that's it.
8    Q    Okay.  So if you want to take a break, we
9    can take a break.
10   A    Yes, please.
11       THE VIDEOGRAPHER:  We're off the record at
12   9:40 a.m.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  The corrected date of
15   this videotape is March 22nd, 2018.
16       We are on the record at 10:04 a.m.
17       MR. HOOD:  What are the -- what are the
18   exhibit numbers, Bogdan?  Oh.
19       Plaintiff will stipulate that Exhibits 3
20   and -- I'm sorry -- 3 and 4 are authentic and
21   accurate representations of her contract -- contracts
22   with the respective host families.
23       Also, the plaintiff would like to mark her
24   testimony -- can we go off the record for a second.
25       THE VIDEOGRAPHER:  We're off the record at

Page 27

1    10:05 a.m.
2        (Discussion off the record.)
3        THE VIDEOGRAPHER:  We're on the record at
4    10:06 a.m.
5        MR. HOOD:  We'd just like to mark the
6    entire deposition as confidential.
7        Thanks, Bogdan.
8        MR. ENICA:  Thank you.
9    Q    (BY MR. ENICA)  So we're back from the
10   break.  And we'll start where we stopped before the
11   break.
12       MR. HOOD:  Actually, could we go off the
13   record?
14       MR. ENICA:  Yes.
15       MR. HOOD:  I just got an email.
16       THE VIDEOGRAPHER:  We're off the record at
17   10:07 a.m.
18       (Discussion off the record.)
19       THE VIDEOGRAPHER:  We're on the record at
20   10:08 a.m.
21   Q    (BY MR. ENICA)  So we'll pick up where we
22   left off.
23   A    Okay.
24   Q    You were mentioning a few other duties
25   that were not in the contract, which is Exhibit 4,

Page 28

1    which is your second contract with your -- with the
2    Carminati family.
3    A    Okay.
4    Q    And my question for you is, for performing
5    these additional duties were you paid extra?
6    A    No.
7    Q    Okay.  Have you ever informed Expert
8    AuPair that you are performing additional duties?
9    A    No.
10   Q    Okay.  If you look at the contract, right
11   after the part where it's handwritten, there is an
12   explanation of the duties that you are required to
13   perform; is that correct?
14   A    I'm sorry, could you ask again.
15   Q    If you look at the contract, at Page 2 of
16   Exhibit 4, exactly the page with the duties in the
17   middle --
18   A    Uh-huh.  Yes.
19   Q    -- you would see 1.3, Duties, and then a
20   typed paragraph, a handwritten paragraph and then a
21   typed paragraph.  The second typed paragraph
22   describes the duties that you are -- duties that you
23   are permitted to perform and duties that you are not
24   permitted to perform.
25   A    Yes.

**CONFIDENTIAL**



Page 29

1    **Q**   **Okay. Did you read this prior to signing**
2 **the contract?**
3    A   Yes.
4    **Q**   **Okay. Did your host family ever offer**
5 **additional compensation for the additional duties?**
6    A   No.
7    **Q**   **So you testified earlier that the number**
8 **of hours is inaccurate on the first page of this**
9 **contract, and we are referring again as Exhibit 4.**
10 **Is that correct?**
11    A   Yes.
12    **Q**   **Is there anything else, except the number**
13 **of hours and the duties, which is inaccurate or has**
14 **to be supplemented?**
15    MR. HOOD: Objection.
16    **Q**   **(BY MR. ENICA) Okay. Withdrawn. Let me**
17 **rephrase that.**
18    **Let's look at the first page of the -- of**
19 **Exhibit 4. Except the number of hours, is there**
20 **anything else which is inaccurate?**
21    MR. HOOD: Objection.
22    A   No.
23    **Q**   **(BY MR. ENICA) Okay. By looking at Page**
24 **2 of the same agreement, you testified that the**
25 **duties are inaccurate and you are required to do more**

Page 30

1 **than the duties described here; is that correct?**
2    MR. HOOD: Objection.
3    **Q**   **(BY MR. ENICA) You may still answer.**
4    A   Yes.
5    **Q**   **So that is correct?**
6    A   Yes.
7    **Q**   **Is there anything inaccurate on the second**
8 **page of the contract?**
9    MR. HOOD: Objection.
10    A   Besides the duties, no.
11    **Q**   **(BY MR. ENICA) Okay. If you look at the**
12 **last paragraph, actually the last sentence, it says,**
13 **The appropriate stipend will be paid every, and there**
14 **is a marking on two weeks.**
15    MR. HOOD: Objection.
16    **Q**   **(BY MR. ENICA) Would that be accurate?**
17    MR. HOOD: Objection.
18    A   No.
19    **Q**   **(BY MR. ENICA) Okay. So are you**
20 **testifying that you were paid weekly?**
21    A   Yes.
22    **Q**   **Okay. So two weeks would be inaccurate?**
23    A   Yes.
24    **Q**   **Okay.**
25    MR. HOOD: Objection to the previous

Page 31

1 question. I'm sorry.
2    **Q**   **(BY MR. ENICA) Okay. Going to the third**
3 **page, is there anything on the third page that was**
4 **inaccurate?**
5    A   No.

Page 32

## Page 33



## Page 34

A   Yes.

Q   Were you terminated from your position?

A   I don't understand.

Q   Were you fired --

A   No.

Q   -- by the Carminati family?

A   No.

Q   Okay.  You mentioned earlier that the schedule would change.

A   Yes.

Q   Do you know who would make the changes?

A   The host mom.

Q   And how often would she make the changes?

A   Every week.

Q   Would she inform you of the changes?

A   Sometimes.

Q   How would she do that?  How would she let you know that she changed the schedule?

A   She would just tell me.

Q   Verbally?

A   Verbally, yes.

## Page 35

1   Q   Would she inform Expert AuPair of the
2   changes?
3   A   No.
4   Q   I'm going to move to your first contract
5   with the Carminati family, which is Exhibit 3, and
6   more or less we'll go over the same questions.
7   A   Okay.
8   Q   Okay.  So looking back at the table
9   showing start time and end time and the hours here,
10  would you say they are accurate?
11  A   No.
12  Q   Except the number of hours or the times in
13  the table, is there anything inaccurate on the first
14  page?
15  A   No.
16  Q   Going to the second page, referring to the
17  Duties section, which is 1.3 --
18  A   Excuse me.  I'm sorry?
19  Q   I'm looking on the second page at the
20  Duties section, which is 1.3 Duties.
21  A   Okay.
22  Q   Would you say that these duties are
23  accurate?
24  A   No.
25  Q   Would there be additional duties?

## Page 36

1   A   Yes.
2   Q   Can you give me an example of additional
3   duties you were required to perform.
4   A   Take the car to the car shop to fix it.
5   Make dinner for the entire family.  I -- I don't
6   remember everything.
7   Q   Do you think that you should have been
8   compensated for the additional tasks?
9   A   No.
10  Q   How come?  Why not?
11  A   Because the most part was favors I did to
12  the family.
13  Q   Do you think you should be -- you should
14  have been compensated more for the tasks mentioned
15  under Duties?
16  A   Yes.
17  Q   Those tasks were not favors?
18  A   No.
19  Q   So which specific tasks do you think you
20  should be compensated more for performing, if you
21  look at the list, including the ones you just
22  mentioned?  Can you point them out to me.
23      MR. HOOD:  Objection.
24      You want me to say it?
25  Q   (BY MR. ENICA)  Yes.

Case No. 1:14-cv-03074-CMA-KMT   Document 1054   Filed 06/20/18   USDC Colorado   Page 34 of 264

1    A    Everything that's included here.
2  Everything that was to do with the kids and taking
3  care of the kids.
4    Q    Do you think that the au pair program is a
5  cultural exchange program or a work program?
6    A    Work program.
7    Q    But though you were willing to perform
8  tasks for free for your host family?
9    A    Some favors.
10    Q    Were they doing any favors in exchange for
11  you?
12    A    No.
13    Q    Did you improve your English while in the
14  United States in the au pair program?
15    A    Yes.
16    Q    Okay.  Did you have a chance to explore
17  American culture while you were here in the au pair
18  program?
19    A    Not really.
20    Q    Did you make any friends, American
21  friends, while here on the au pair program?
22    A    American friends?
23    Q    Uh-huh.
24    A    No.
25    Q    Did you make any friends at all?

1    A    Right, not American.
2    Q    Okay.
3    A    Yeah, I did make friends.  Not American
4  ones.
5    Q    Okay.  You mean other au pairs?
6    A    Yes.
7    Q    Okay.  I'm looking back at Exhibit 3, Page
8  2.  At the bottom of the page it says Stipend.
9    A    Okay.
10    Q    The amount is 195.75 per week.
11    A    Okay.
12    Q    And then the last sentence, it -- it
13  states that it's paid every two weeks.  Would that be
14  accurate?
15    A    No.
16    Q    So how often was it paid?
17    A    Weekly.
18    Q    Do you remember what your days off were
19  during the time you worked for the Carminatis?
20    A    I didn't have a fixed day off.  It would
21  change every week.
22    Q    And you testified your host mother would
23  inform you verbally about the changes every week?
24    A    Yes.
25    Q    Was it any form of written schedule in

1  existence?
2    A    I'm sorry?
3    Q    Was it any form of written -- written
4  schedule that existed at any time?
5    A    Showing my schedules?
6    Q    Correct.
7    A    Yes.
8    Q    In writing in any form?
9    A    Online.
10    Q    Online.  Can you elaborate on that.
11    A    It was in Google Calendar.
12    Q    And was the Google Calendar shared with
13  you?
14    A    It was at the au pair email that the
15  family provide to me.
16    Q    So the family created an email address for
17  you?
18    A    Yes.
19    Q    And just to make it clear for the record,
20  every time we refer to "the family," we are referring
21  to the Carminatis for now.
22    A    Okay.
23    Q    So they created an email address for you;
24  that's your testimony?
25    A    The email already existed for the other au

1  pairs.
2    Q    So they give you access to an email
3  address?
4    A    Yes.
5    Q    And the email address is -- had access to
6  a Google Calendar?
7    A    Yes.  It was connected to the Google
8  Calendar.
9    Q    Okay.  So when would you check the
10  calendar?  Would it be at the beginning of the week,
11  or it would change from --
12    A    Every day.
13    Q    And you did not share this calendar with
14  your personal email address?
15    A    No.
16    Q    And you didn't print it out either, right?
17    A    No.
18    Q    Could you access the calendar, let's say,
19  on your phone?
20    A    The calendar is not on my phone anymore.
21    Q    Okay.  My question was if you could access
22  it on your phone back then?
23    A    Oh, yes.  I'm sorry.
24    Q    Would you be able to access it now on your
25  phone?

Page 41

1    A    No.

2    Q    Why not?

3    A    Because I don't have access to the email

4 anymore because I don't work for the Carminatis

5 anymore, so I don't think I should use the calendar.

6    Q    Okay.  So you do think you should -- you

7 don't think you should --

8    A    I don't work for them anymore, so I

9 don't -- I can't access anymore.

10        THE REPORTER:  I'm sorry, you can't what?

11    A    I can't access the email anymore.

12    Q    (BY MR. ENICA)  Because the password

13 changed or what happened?

14    A    Because I don't work for the family

15 anymore.

16    Q    Right.

17    A    So I don't think it would be something

18 good to do, access the email since I don't work for

19 them anymore.  It's a private au pair email just for

20 au pairs, and I'm not their au pair anymore.

21    Q    But you didn't try and access it, right?

22    A    No.  Since I left the family, I deleted it

23 and I never opened it anymore.

24    Q    Okay.  So you don't know for sure that

25 they changed the password --

Page 42

1    A    I don't know.

2    Q    -- or anything like that?

3        So if required by the Court, you could

4 access it and access your old schedule?

5        MR. HOOD:  Objection.

6    A    If -- I have the email and the password,

7 but I don't -- I don't use it.  I don't know if they

8 change.  I never tried -- since I left the family, I

9 never tried to open the email anymore.  I deleted on

10 my phone, so...

11    Q    (BY MR. ENICA)  But you still have them?

12        MR. HOOD:  Objection.

13    Q    (BY MR. ENICA)  You said at the beginning

14 of the sentence you still have the email and the

15 password.

16    A    I know the email and the password, but I

17 never access anymore since I left the family.

18    Q    Okay.  Is there any way -- any other way

19 you can access your work schedule for the period that

20 you worked -- you worked for the Carminatis?

21    A    No.

22    Q    Okay.  I'm going to the third page in the

23 contract and the one that starts with Pay day.  Pay

24 day.

25    A    Okay.

Page 43

1    Q    It states here, the third sentence, The au

2 pair must be paid at least 195.75 per week and

3 payment should be documented.

4    A    Okay.

5    Q    Were you documented -- documenting receipt

6 of the payment from the family in any way?

7    A    I have it in my bank account.

8    Q    If I go down to the Privileges, it says

9 that host mom will provide bus pass.

10    A    Okay.

11    Q    What was the purpose for which you would

12 require a bus pass?

13    A    I never received any bus passes.

14    Q    You never.

15        Did you have a private bedroom?

16    A    Yes.

17    Q    And did you have a private bathroom?

18    A    In this contract, for the first six

19 months, yes.

20    Q    I'm going to the next page that starts

21 with Car --

22    A    Uh-huh.

23    Q    -- make/model.

24    A    Okay.

25

Page 44

7    Q    I'm going to the next page, and I'm going

8 to ask you about vacation again.

9    A    Okay.

10    Q    Do you remember taking any vacation when

11 you worked for this host family the first time?

12    A    Yes.

13    Q    Do you remember for how long did you take

14 a vacation?

15    A    I took two weeks of vacation.

16    Q    And was that paid?

17    A    Yes.

18    Q    Who was supervising you?  Who was

19 supervising your work?

20        MR. HOOD:  Objection.

21    A    You mean -- I didn't understand.

22 Supervising during my time worked, during the day?

23    Q    (BY MR. ENICA)  Yes.

24    A    No one.

25    Q    Were you accountable to anybody for the

Page 45

1  quality of your work?
2      A    I don't understand.
3      Q    Okay.  I can go back to duties, but I
4  think the easier is if you tell me roughly what
5  were -- what was your schedule in a day, in a regular
6  day.
7      A    You want me to describe my day?
8      Q    Yeah.  The part where you're working for
9  the --
10     A    Okay.



Page 46

17     Q    Would you have any discussion with your
18  host mother or your host father on how the -- about
19  the quality of the child care provided or how things
20  are going?  Like any evaluation or anything of
21  that -- of that sort?
22     A    She would give me feedbacks when it was
23  needed.
24     Q    Who would give you feedback?
25     A    The host mom.

Page 47

1      Q    And can you give me an example of feedback
2  that she would give you.
3      A    I -- once she said I -- she liked the way
4  how I would deal -- how I deal with the kids.  Once
5  she said that it was better if we try another way,
6  like as a type of -- if I try another way to deal
7  with the kids.
8          Sometimes she would say, Let's try it this
9  way.  This way I don't think it's good.  Sometimes
10  she would say, Yeah, I like this way.  Let's keep
11  doing on -- doing that.
12     Q    Okay.  Was at any point anybody from
13  Expert AuPair giving you feedback on your work?
14     A    No.
15     Q    The Google Calendar that you mentioned,
16  you mentioned that you accessed it daily?
17     A    Yes.
18     Q    Was that shared at any point with Expert
19  AuPair?
20     A    Yes.
21     Q    Okay.  When did you share that with Expert
22  AuPair?
23     A    It wasn't me.  It was the host mom.
24     Q    You think the host mom shared it with
25  Expert AuPair?

Page 48

1      A    No, she did.  We received an email from
2  Expert AuPair saying that they wanted to know about
3  she -- they wanted a copy of the au pair schedule of
4  all the families.  So she shared it -- the calendar
5  with Expert AuPair.
6      Q    Okay.
7      A    With the -- the local coordinator,
8  actually.
9      Q    And do you know if she shared just the
10  calendar for one day or in a continuous basis?
11     A    For the month.
12     Q    Oh, for one month.
13     A    Wait.  I'm not sure, actually.  I think it
14  was for the month.  I'm not sure.  Or for the week,
15  I'm not sure.
16     Q    Okay.  Except that instance when she
17  shared that calendar with Expert AuPair, did you or
18  her -- do you have any -- any knowledge -- okay,
19  strike that.
20          Except for that instance, did you ever
21  share your calendar with Expert AuPair?
22     A    No.
23     Q    Are you aware of any other instance when
24  the host mother shared her -- the calendar -- your
25  calendar with Expert AuPair?

Case No. 1:14-cv-03074-CMA-KMT   Document 1095-134   filed 06/20/18   USDC Colorado   pg 37
of 264

| Page 49 | Page 51 |
|---|---|

**Page 49**

1    A    No.

2    Q    And I'm referring to the work calendar,
3  just to make sure.

4    A    Yes.

5    Q    Now, you mentioned that you worked for
6  another family prior to moving to the Carminatis.

7    A    Yes.

8    Q    Would that be accurate?

9         Do you remember the name of that family,
10  last name?

11    A    It was a hard name.  I'm sorry.  It was an
12  Indian name because it was an India family.  Pry- --
13  I don't remember.

14    Q    That's fine.  I'm not trying to trick you.
15  I just want to know what you remember.  So if you
16  don't remember, it's fine.

17         And do you remember if you had a contract
18  with -- let's call it the first family.

19    A    Okay.

20    Q    So do you remember if you had a contract
21  with the -- with the first family?

22    A    Yes.

23    Q    And are you in possession of that
24  contract?

25    A    No.

**Page 50**

1    Q    So if you go home and look, you wouldn't
2  be able to find it in your email or anywhere else?

3    A    My email, yes.

4    Q    So you should be able to find it in an
5  email?

6    A    Yes.

7    Q    How about the contracts that were entered
8  here as Exhibit 3 and 4, do you have copies of these
9  contracts?

10    A    Yes.

11         MR. HOOD:  Can we go off the record for
12  one second.

13         THE VIDEOGRAPHER:  We're off the record at
14  10:40 a.m.

15         (Discussion off the record.)

16         (Recess taken.)

17         (Exhibit 5 marked.)

18         THE VIDEOGRAPHER:  This begins Tape 2.  We
19  are on the record at 10:57 a.m.

20    Q    (BY MR. ENICA)  So we are back on the
21  record.  And right before break we looked at Exhibit
22  3 and 4.  These are both contracts between you and
23  the Carminati family, both signed by Maria Vittoria
24  Carminati, which you testified was your host mother.

25    A    Yes.

**Page 51**

1    Q    Would that be correct?

2    Q    Except the use of the car, did you receive
3  any other benefits from the Carminati family?

4    A    No.

5    Q    Any other monetary benefits?  Any other
6  sums of money whatsoever?

7    A    No.

**Page 52**

2    Q    And do you know if they complied with --
3  complied with their obligation to pay for your
4  educational expenses?

5    A    Could you ask again.

6    Q    Do you know if they paid for your
7  educational expenses?

8    A    They did, yes.

9    Q    Do you know how much they paid?

10    A    For the first year, it was 100 -- $120 for
11  the first year.  And for the second year, I don't
12  remember.  I -- probably the same amount, but I'm not
13  sure.

14    Q    And did you attend classes at the
15  community college or a school?

16    A    ESL classes at community college.

17    Q    ESL?

18    A    ESL, English as a second language.

19    Q    And the answer would be accurate for both
20  the years?

21    A    Yes.

22    Q    How about the ESL classes, did they help
23  improve your English?

24    A    Yes.

25    Q    Did you make any American friends during

Page 53

1  the ESL classes?
2      A    They don't have Americans in ESL classes.
3  It's only --
4          THE REPORTER:  I'm sorry, I didn't hear
5  the end.
6      A    It's only for immigrants.  It's not for
7  Americans.
8      Q    (BY MR. ENICA)  Did you make any friends?
9      A    Yeah.  Yes.
10     Q    I only have a couple of background
11  questions.  Usually I ask them at the beginning, but
12  I wanted to get the documents out of the way.
13     A    Okay.
23     Q    Brazil.  And except the two ESL classes,
24  did you take any other courses while in the United
25  States?

Page 54

1      A    No.
2          MR. ENICA:  I am going to mark another
3  document as Exhibit 6.
4          (Exhibit 6 marked.)
5      Q    (BY MR. ENICA)  And I would like you to
6  take a look at the document and let me know when
7  you're done.
8      A    (Deponent examined exhibit.)
9          Okay.
10     Q    Do you recognize this form?
11     A    Yes.
12     Q    How would you describe this document?
13     A    It's a consent to join the au pair wage --
14  I'm sorry, the -- I don't know how to explain --
15  the -- to join the case for what the au pair wage
16  would be.
17     Q    Okay.  And did you sign this document?
18     A    Online signing.
19     Q    Electronically?
20     A    Electronic -- electronic.  Sorry.
21     Q    Okay.  Do you remember when approximately?
22     A    No, I don't remember when.
23     Q    Okay.  If I pointed to the date of
24  October 25th, 2017, does that sound right?
25     A    Makes sense.

Page 55

1      Q    Makes sense.  Okay.  And if I'm looking on
2  this page, it says that, I agree to -- I hereby
3  consent, agree and opt-in to become a Plaintiff in
4  this action, and then it gives a long number, to
5  recover unpaid wages from my current and former visa
6  sponsor.
7      A    Yes.
8      Q    Who is your visa sponsor?
9      A    Expert AuPair.
10     Q    Expert AuPair.  And did Expert AuPair ever
11  pay you wages?
12     A    No.
13     Q    Okay.  But you would like to recover wages
14  from Expert AuPair; is that correct?
15     A    Yes.
16     Q    Did you ever work for Expert AuPair?
17     A    For Expert AuPair?
18     Q    Correct.
19     A    Yes.  Expert AuPair is my -- was my
20  employer.
21     Q    When was Expert AuPair your employer?
22     A    When I decide to come here as an au pair,
23  Expert AuPair was my sponsor.
24     Q    Okay.
25     A    And marked as my --

Page 56

1          THE REPORTER:  I'm sorry, I couldn't hear
2  that.
3      Q    (BY MR. ENICA)  I'm sorry?
4      A    And marked as my -- as my employer.
5      Q    And marked as your employer?
6      A    Yes.
7      Q    What does it mean marked as your employer?
8      A    When I decide to become an au pair, served
9  as my sponsor, and -- my sponsor and my employer.  I
10  was hired by Expert AuPair for -- for a family.
11     Q    You were hired by Expert AuPair?
12     A    As an au pair, yes, to work for a family.
13     Q    Do you have an employer/employee agreement
14  with Expert AuPair?
15     A    I have an au pair agreement with Expert
16  AuPair.
17     Q    Okay.  And do you have it with you?
18     A    I think it's the email that Alex sent to
19  you, that I sent to him.
20     Q    Okay.
21         MR. HOOD:  Can we go off the record?
22         THE VIDEOGRAPHER:  We're off the record at
23  11:05 a.m.
24         (Discussion off the record.)
25         THE VIDEOGRAPHER:  We're on the record at

Page 57

11:16 a.m.

2  Q   (BY MR. ENICA)  Okay.  So during the break
3  we printed out the document that your counsel emailed
4  me?

5  A   Yes.

6  Q   And we are going to mark it as Exhibit 7.

7      (Exhibit 7 marked.)

8  A   Okay.

9      MR. HOOD:  I have it.

10     THE DEPONENT:  Thank you.

11  Q   (BY MR. ENICA) So before the break, you
12  were referring to an employment -- strike that.

13     Before the break, you were referring to an
14  agreement between you and your sponsor.

15  A   Yes.

16  Q   Is the document marked as Exhibit 7 the
17  document that you are referring to?

18  A   Yes.

19  Q   Okay.  So is this document, in your
20  opinion, an employment agreement?

21     MR. HOOD:  Objection.

22  A   I don't know.

23  Q   (BY MR. ENICA)  Okay.

24     MR. ENICA:  Can we go back on the record
25  and read the question that I posed before the break

Page 58

1  regarding who was your employer.

2      (Record read as follows:

3          QUESTION:  You were hired by Expert
4  AuPair?

5          ANSWER:  As an au pair, yes, to work
6  for a family.

7          QUESTION:  Do you have an
8  employer/employee agreement with Expert AuPair?

9          ANSWER:  I have an au pair agreement
10  with Expert AuPair.

11         QUESTION:  Okay.  And do you have it
12  with you?

13         ANSWER:  I think it's the email that
14  I sent to you, because I sent to him.)

15  Q   (BY MR. ENICA)  Thank you.  So I'm going
16  to renew my question.

17  A   Okay.

18  Q   Were you hired by Expert AuPair?

19  A   Yes.

20  Q   Okay.  And do you have an agreement
21  stating that you are hired by Expert AuPair?

22     MR. HOOD:  Objection.

23  A   I have the au pair agreement and the au
24  pair agreement says that Expert AuPair is my sponsor
25  here.

Page 59

1  Q   (BY MR. ENICA)  Correct.  Is there -- in
2  your mind, is there a difference between sponsor and
3  employer?

4      MR. HOOD:  Objection.

5  A   I understand that I'm hired for Expert
6  AuPair.  The family is my employer -- my employer,
7  but they only pay the amount that the Expert AuPair
8  say they have to.

9  Q   (BY MR. ENICA)  Okay.  We're -- we're not
10  talking about the payment yet.  I'm just trying to
11  figure out who your employer was.

12  A   Okay.

13  Q   So you're saying that the family was the
14  employer, but you are hired by Expert AuPair?  Is
15  that what you said?

16     MR. HOOD:  Objection.

17  A   Yes.  For me, it works this way.  I'm
18  here, and Expert AuPair is my sponsor.  And they --
19  they brought me here, they hired me, and then I work
20  for a family here.

21  Q   (BY MR. ENICA) So I'm just trying to wrap
22  my mind around it.  You said that Expert AuPair --

23  A   I'm sorry.

24  Q   -- you're saying that Expert AuPair hired
25  you to work for the family?

Page 60

1  A   Yes.

2  Q   But Expert AuPair never --

3  A   Sorry.

4  Q   But Expert AuPair never paid you, for
5  example?

6  A   No.

7  Q   Is that correct?

8      Would you expect that Expert AuPair pay
9  you if they hired you?

10     MR. HOOD:  Objection.

11  A   No, because the -- the family will be my
12  employer.  The family will pay me for my work because
13  I work for the family, but I work for the family
14  through Expert AuPair.

15  Q   (BY MR. ENICA)  How is that through Expert
16  AuPair?  What's the -- what's Expert AuPair's role?

17  A   I'm only here because the agency is my
18  sponsor.  When I got a visa, I got Expert AuPair
19  named in my visa saying they're my sponsors here and
20  they are responsible for me here.

21  Q   So what you're telling me is that Expert
22  AuPair is your visa sponsor?

23  A   It's my --

24     MR. HOOD:  Objection.

25     You can answer.  I'm sorry.

**CONFIDENTIAL**

Page 61

1    A    It's my sponsor.  It's responsible for me
2    here.  It's the agency who will decide if I can or
3    not become an au pair.  So, yeah.
4    Q    (BY MR. ENICA)  What do you mean they are
5    responsible for you?
6    A    If something happen, if I have some
7    problems with the family, if I have some problem in
8    the United States, the agency is responsible for me.
9    Q    Responsible in any way is what's your
10   understanding?
11   A    I'm sorry?
12        MR. HOOD:  Objection.
13   Q    (BY MR. ENICA)  What is your understanding
14   of the word responsible?
15        MR. HOOD:  Objection.
16   A    They will -- they will help you -- they
17   will help me, they will do whatever they can to
18   help me if something happened between me and the
19   family.  If we have some trouble, or if something
20   happens with me.  In case, for example, if I get in
21   an accident or something, the agency is my
22   responsible here.
23   Q    (BY MR. ENICA)  Okay.  So what you mean,
24   they are responsible to help you if you need that, if
25   you need help?

Page 62

1    A    Yes.
2    Q    Now, you produced a document that we
3    marked as Exhibit 7, correct?
4    A    Yes.
5    Q    And did you have a chance to read this
6    document prior to signing it?
7    A    Yes, a long time ago.
8    Q    Okay.  Is there anywhere in this document
9    specified that Expert AuPair is your employer or --
10   strike that.
11       Is there anywhere in the document stating
12   that Expert AuPair hires you?
13       MR. HOOD:  Objection.
14   A    I'm not sure.  It's been a long time since
15   I read this document.  Almost three years ago.
16   Q    (BY MR. ENICA)  Okay.  Do you mind taking
17   a few minutes and take a look at the agreement and --
18   A    Sure.
19       (Deponent examined exhibit.)
20       Okay.
21   Q    Did you have a chance to review it?
22   A    Yes.
23   Q    Can you point me to any paragraph stating
24   that Expert AuPair would hire you.
25       MR. HOOD:  Objection.

Page 63

1    A    No.
2    Q    (BY MR. ENICA)  Can you tell me where your
3    understanding that Expert AuPair hires you comes by
4    looking at this contract?
5        MR. HOOD:  Objection.
6    A    Could you --
7    Q    (BY MR. ENICA)  If you look at this
8    contract --
9    A    Uh-huh.  Okay.
10   Q    -- where does your understanding come that
11   Expert AuPair hires you?
12       MR. HOOD:  Objection.
13   A    On the whereas, A --
14   Q    (BY MR. ENICA)  Yes.
15   A    Do you want me to read it or --
16   Q    Yes, please.
17   A    Expert AuPair is the desi- -- designated
18   sponsor for the au pair program as defined in the
19   rules prescribed by the United States --
20       THE REPORTER:  Again, just slow down.  I'm
21   having trouble understanding you.
22   A    I'm sorry.  It's because my throat hurts,
23   so I can't talk louder.
24       Expert AuPair is the designate --
25   designated sponsor for the au pair program as defined

Page 64

1    in the rules prescribed by the United States
2    Department of State.  Jessica Pardim Araujo applies
3    to be an au pair, in an au pair program administered
4    by Expert AuPair.
5        Wait a minute.  I have to find the place.
6        Is there a -- where it says the au pair
7    program sponsor.
8    Q    (BY MR. ENICA)  Okay.  So it says that it
9    is -- it is a sponsor?
10   A    Yes.
11   Q    So in your understanding, being a sponsor
12   means hiring you?
13       MR. HOOD:  Objection.
14   A    It's more like being responsible for me
15   and taking care over me.
16   Q    (BY MR. ENICA)  Okay.
17   A    And -- yeah, that's it.
18   Q    Okay.  You mentioned that mostly when you
19   were working for the Carminati family you worked 45
20   hours a week; is that correct?
21   A    Yes.
22   Q    Were there weeks when you worked less than
23   45 hours?
24   A    Sometimes.
25   Q    Do you know approximately how many weeks



Page 65

1  where you worked less than 45 hours?
2      A   I don't know.
3      Q   What is the lowest number of hours that
4  you worked for the Carminati family?
5      A   30.
6      Q   Okay.  But without looking at the
7  schedule, it's impossible for you to say now how many
8  weeks you worked 45 and how many you worked less;
9  would that be accurate?
10     A   Yes.  But even the calendar, I don't have
11  this part anymore.
12     Q   Can you get that?
13     A   So before, the family had two au pairs,
14  for the first six months.  So a couple of weeks I
15  would work less than 45 hours, but this part of the
16  calendar, it's -- it doesn't exist anymore.
17     Q   How do you know?
18     A   Because it was deleted for the mom for the
19  first six months.
20     Q   Okay.
21     A   I only have -- I -- I am not sure because
22  it's been a long time since I saw the schedule, but I
23  think there's only showing schedule for the last
24  three or four months.
25     Q   When is the last time when you saw -- when

Page 66

1  you saw the schedule?
2      A   My last day of work.
3      Q   Okay.  So you are not sure if that
4  schedule shows anything prior, let's say four months
5  from that date when you saw it?
6      A   Yes.
7      Q   That question is super complicated.  I can
8  ask again if you like.
9      A   Yes, that's it.
10     Q   So the host mother was deleting the
11  calendar from time to time?
12     A   I think so.
13     Q   And --
14     A   I am not sure.
15     Q   And do you know the name of the other au
16  pair that was there when you -- for the first six
17  months of you being with the Carminatis?
18     A   Yes.

Page 67

10     Q   Okay.  Just to clarify the question, both
11  of you were working in the morning and in the
12  evening, and the children were either in day care or
13  school during the day; would that be accurate?
14         MR. HOOD:  Objection.
15     A   I didn't understand.
16     Q   (BY MR. ENICA)  Okay.  Maybe I'm wrong.
17  I'm just doing it from my memory.  I think you
18  testified that you would wake up early in the
19  morning, and then work in the morning, and then drop
20  off the kids at school or day care.  Would that be
21  accurate?
22         MR. HOOD:  Objection.
23     A   Yes.  Yes.  As I said before, in a normal
24  day that I would work all day, it would work like
25  that, in a normal day.

Page 68

1      Q   (BY MR. ENICA)  Okay.  What's other than a
2  normal day?
3      A   When it was -- the two au pairs was
4  working so one would work in the morning, the other
5  one would work in the afternoon or we would do
6  overnight if it was needed to.
7      Q   Okay.  So how -- how would that happen?
8  Let's say the first example you gave me, one would
9  work in the morning, the other one would work in the
10  afternoon?
11     A   Yes.
12     Q   Would that be decided on a weekly basis
13  based on the Google calendar?
14     A   The host mom decided who will work in the
15  morning, who will work that afternoon, who would do
16  overnight.  The host mother would decide that.
17     Q   Okay.  So let's say Chloe was scheduled to
18  work in the morning.  What would you do in the
19  morning, then?
20     A   I was off, not working.
21     Q   Okay.  And would it be accurate to say
22  that in that case probably you would start working in
23  the afternoon?
24     A   Yes.
25     Q   And during this time when both you and

| Page 69 | Page 71 |

**Page 69**

1 Chloe were working there, you said that 45 hours a

2 week was the maximum number of hours you worked?

3    A    Yes.  I never worked more than 45 hours

4 for the Carminati family.

5        Q    Okay.  But you wouldn't be able to point

6 me to any material indicating specifically how many

7 hours you work -- you worked in every week?

8    A    No.

9        Q    You mentioned something -- something about

10 overnight work.

11    A    Yes.

**Page 71**

2        Q    Did you ever post online any testimonials

3 about your experience as an au pair?

4    A    Not as an au pair, but for me living in

5 the United States in my first year, I did a post on

6 my Facebook, a private post.

7        Q    Was it like a positive post, describing a

8 positive experience?  Was it describing a positive

9 experience, or it was describing a negative

10 experience?

11    A    Both.

12        Q    Do you remember what was positive about

13 it?

14    A    I grew up a lot when I came to the United

15 States.  I learned how to be patient, more patient.

16 I learned that sometimes you just have to lower your

17 head and listen.  Even if you're right, you're not.

18 Sometimes you just need to be quiet.  Things like

19 that.

20        Q    Okay.  And what are the negative parts, if

21 you remember?

22    A    Basically the same thing.  Sometimes you

23 need to be quiet while someone is screaming at you.

24 Sometimes you can't answer even if you want to.

25        Stay away from the family.  It's really

**Page 70**

**Page 72**

1 hard.  I'm sorry, that was my family.

2        Q    Do you want to take a break?

3    A    Yes.

4        Q    Okay.

5        THE VIDEOGRAPHER:  We're off the record at

6 11:37 a.m.

7        (Discussion off the record.)

8        (Recess taken.)

9        THE VIDEOGRAPHER:  We're on the record at

10 11:47 a.m.

11        MR. HOOD:  An ongoing issue in this case

12 is the scope of questions that should be permitted

13 during the opt-in depositions.  Plaintiff's position

14 continues to be that with the opt-in deposition,

15 hours worked and rate of pay are -- are the two

16 issues, and questions probative to those issues are

17 appropriate.

18        Defendant's counsel's questions

19 immediately preceding this break from -- from my

20 perspective were -- were merely foundational

21 questions, asking about documents that may or may not

22 exist, but continuing to ask questions about -- of

23 this -- regarding personal experiences during the

24 time as an au pair, I believe would be inappropriate

25 and would necessitate me to instruct my client not to

Case No. 1:14-cv-03074-CMA-KMT   Document 704   Filed 08/28/18   USDC Colorado   Page 43 of 264

## Page 73

1 answer.

2     MR. ENICA: Okay. I think also, if we get

3 there, I would appreciate if you could make an

4 objection and we can address it at that time, if --

5     MR. HOOD: Absolutely.

6     MR. ENICA: -- if such a -- if such a

7 question arise.

8     MR. HOOD: And to be clear, I don't think

9 the questioning this far was inappropriate. I'm just

10 saying we're walking up to the line.

11     MR. ENICA: Okay. Thank you.

12     Q   (BY MR. ENICA) I'm going to go back to

13 Exhibit 6. And this is your consent to join.

14     A   Yes.

15     Q   And you said you signed it electronically.

16 Do you remember if you were in the United States when

17 you signed this contract electronically?

18     A   Yes, I was.

19     Q   Okay. Did you talk to anybody about it?

20     A   Yes.

21     Q   Okay. Other -- to any other au pairs?

22     A   No.

23     Q   Okay. During a previous break your

24 counsel produced the document that I think you

25 forwarded and we marked as Exhibit 5. So I think you

## Page 74

1 have it in front of you, Exhibit 5. We didn't have

2 time to talk about it so far, but we can go back to

3 it.

4     Well, I apologize, you didn't have it.

5 Now you have it.

6     And this is the -- strike that.

7     Can you take a look at the document?

8     A   Yes.

9     Q   Is this the document that you produced?

10     A   Yes.

11     Q   And can you explain for the record what

12 the document is.

13     A   It's an employment contract for my first

14 host family.

15     Q   Okay. And I don't see your name on this

16 contract.

17     A   I'm sorry, this is the one they sent to

18 me. It is not the one that I sent it back with my

19 name and my signature, but this is the contract.

20     Q   Okay. So that was my question. You did

21 add your name and you signed --

22     A   Yes.

23     Q   -- a version of this contract?

24     A   Yes.

25     Q   Okay. And if I'm looking at the first

## Page 75

1 page, I can see under Terms of Employment, hours,

2 there is a table --

3     A   Yes.

4     Q   -- showing start time and end time for

5 every day from Monday to Friday, and nothing is

6 filled in for Saturday and Sunday.

7     A   Yes.

8     Q   Would the schedule be reflective of the

9 hours you worked for this family, if you remember?

10     A   I don't remember. I do remember I never

11 worked on weekends.

12     Q   Okay. So you do remember having the

13 weekends off --

14     A   Yes.

15     Q   -- but you can't say.

16     If you remember, was this family also

17 using a Google calendar or some other type --

18     A   No.

19     Q   -- of calendar?

20     Do you remember if they paid you cash

21 or --

22     A   Check.

23     Q   They paid you by check?

24     Do you remember how often?

25     A   Whenever she wanted.

## Page 76

1     Q   Okay. Because if I look at the second

2 page of the contract, it says weekly.

3     A   No.

4     Q   I'm not trying to trick you. I'm just

5 trying to get the right answer. So it wasn't weekly?

6     A   No.

7     Q   Okay.

8     A   Sometimes biweekly.

9     Q   Sometimes biweekly. But the amount

10 biweekly would include pay for two weeks --

11     A   Yes.

12     Q   -- which means the amount here multiplied

13 with two?

14     A   Yes.

15     Q   Would that be correct?

16     And do you know if this family contributed

17 in any ways to your education?

18     A   No.

19     Q   And did you take any vacation while you

20 were working for this family?

21     A   No.

22     THE REPORTER: Remember to let him finish.

23     THE DEPONENT: I'm sorry.

24     Q   (BY MR. ENICA) When you left this family,

25 you mentioned it was a week in between leaving this

**CONFIDENTIAL**

| Page 77 |
|---|
| 1 family and finding the next host family; would that |
| 2 be accurate? |
| 3     A   When I left the house, yes. |
| 4     Q   Yes. Do you remember how you found the |
| 5 second family? |
| 6     A   Through Expert AuPair. |
| 7     Q   Okay. Do you remember the process? |
| 8     A   They were sending my profile to families |
| 9 so the families could contact me and then we could |
| 10 talk. |
| 11     Q   Okay. So you had a chance to talk to this |
| 12 family prior to accepting the employment contract |
| 13 with them? |
| 14     A   Yes. |
| 15     Q   I apologize. When I'm saying "this |
| 16 family," I'm referring to the Carminatis. |
| 17     A   Yes. |
| 18     Q   So you had a chance to talk to them? |
| 19     A   Yes. |
| 20     Q   Okay. Have you ever complained about the |
| 21 numbers of hours you worked, either to Expert AuPair |
| 22 or the Department of State? |
| 23     A   For the first family, yes. |
| 24     Q   For the Carminatis. |
| 25     A   No. |

| Page 78 |
|---|
| 1     Q   Would you recommend the au pair program to |
| 2 somebody who wants to have a cultural exchange in the |
| 3 United States? |
| 4     A   No. |
| 5     Q   I only have a couple of questions |
| 6 regarding Exhibit 1. I just want to take a quick |
| 7 look at the documents requested here. I know that a |
| 8 part of -- we looked at some documents today, and you |
| 9 produced some documents today by email. |
| 10     A   Yes. |
| 11     Q   But I want to make sure that there are no |
| 12 other documents that you have in your possession, or |
| 13 if you have other documents in your possession, you |
| 14 are going to send them to your counsel so they can |
| 15 send it to us in rather the near future. |
| 16     A   Okay. |
| 17     Q   Okay? So the request for production |
| 18 starts on Page 5. There are no numbers, but it's in |
| 19 the lower part of the page. |
| 20     A   Okay. |
| 21     Q   Okay. Now, I would probably advise you to |
| 22 ignore the first one because you did not answer |
| 23 interrogatories. |
| 24     A   Okay. |
| 25     MR. HOOD: Objection. |

| Page 79 |
|---|
| 1     Q   (BY MR. ENICA) Okay. I withdraw that. |
| 2 Your -- let's take a look at Requests 1 to 8, and |
| 3 then when you're done, let me know if you think that |
| 4 you have any documents in your possession that are |
| 5 responsive to any requests from 1 to 8. |
| 6     A   Okay. |
| 7     (Deponent examined exhibit.) |
| 8     Okay. Could you explain this to me? |
| 9     Q   (BY MR. ENICA) Yes. By reading the |
| 10 Requests 1 to 8, do you think that you have any |
| 11 documents in your possession, which means not here |
| 12 but at home or maybe by checking your email, that |
| 13 would answer these requests? If you need more |
| 14 specific, I can be, but -- |
| 15     A   The No. 6, is there any social media |
| 16 postings that describe or reflect your experiences as |
| 17 an au pair. |
| 18     Q   Okay. I understand there is a social |
| 19 media posting. I won't go there. So we can -- |
| 20     A   Text message, emails, appointment books, |
| 21 files, notes, diaries, calendars -- |
| 22     Q   About the numbers of -- the number of |
| 23 hours you worked or the amount of money that you |
| 24 received. |
| 25     A   Oh, okay. No. No. |

| Page 80 |
|---|
| 1     Q   Okay. So you do not have any of the |
| 2 documents mentioned here in your possession or you |
| 3 can't get any of the documents by checking your |
| 4 email, for example, or your phone? |
| 5     A   Correct. |
| 6     Q   Okay. So you mentioned the only way you |
| 7 could get those calendars would be by accessing an |
| 8 email address which does not belong to you but was |
| 9 created by the host family, correct? |
| 10     A   Exactly. |
| 11     Q   And you did not ask them for the |
| 12 permission to access those calendars; would that be |
| 13 correct? |
| 14     A   Exactly. |
| 15     Q   Okay. If -- well, let's stay at Exhibit |
| 16 1. If you look at Exhibit 1, Page 3, see where it |
| 17 says Interrogatories? |
| 18     A   Okay. |
| 19     Q   Have you answered those questions prior to |
| 20 today? It's questions from 1 to 9. |
| 21     A   Today? |
| 22     MR. HOOD: Objection. |
| 23     Q   (BY MR. ENICA) Prior to today, did you |
| 24 answer these interrogatories? |
| 25     MR. HOOD: Objection. |

| Page 81 | Page 83 |
|---|---|

**Page 81**

1    A    No.  I'm sorry, you mean an interrogatory

2 or just answer randomly?

3    Q    (BY MR. ENICA)  In the interrogatory form,

4 in this form that I presented here, except of today,

5 did you answer these questions?

6         MR. HOOD:  Objection.

7    A    When I joined the lawsuit, yes, but I

8 don't know if this is what you're asking.  I didn't

9 understand.

10    Q    (BY MR. ENICA)  Well, these were provided

11 to you on December 8.  So after December 8, have you

12 answered these interrogatories?

13         MR. HOOD:  Objection.

14    A    Oh, no.

15    Q    (BY MR. ENICA)  Okay.  Well, I'm almost

16 done.  I want to take you back in time to your first

17 family.

18    A    Okay.

19    Q    And you told me that at one point that

20 employment got terminated.

21    A    Yes.

22    Q    That you didn't work for them anymore;

23 would that be accurate?

24    A    Yes.

25    Q    So who terminated your employment?

**Page 82**

1    A    Me.

2    Q    Yourself.  It was not Expert AuPair who

3 terminated?

4    A    No.  I -- I asked to change families.

5    Q    Okay.

6         MR. ENICA:  Okay.  I have no further

7 questions.

8         Oh.  We should put your address on the

9 record.

10    Q    (BY MR ENICA)  So what is your current

11 address?

12         MR. HOOD:  Could I -- could I just ask

13 that you read it to her and maybe say, Is that your

14 current address?  I'm --

15         THE DEPONENT:  Please.

16         MR. HOOD:  -- okay with a leading question

17 on the address.  She doesn't know it off the top of

18 her head.  Or she could read it.

████████████████████████████████████████

████████████████████████

21         MR. ENICA:  Okay.  Now, any redirect?

22         MR. HOOD:  I -- I may, if I could just

23 have 5 minutes.

24         MR. ENICA:  Okay.

25         THE VIDEOGRAPHER:  We're off the record at

**Page 83**

1 12:01 p.m.

2         (Recess taken.)

3         THE VIDEOGRAPHER:  We're on the record at

4 12:08 p.m.

5              EXAMINATION

6 BY MR. HOOD:

7    Q    All right.  Hi, Jessica.  I'm just going

8 to ask you a couple questions and then we can get out

9 of here.  Okay?

10    A    Okay.

11    Q    Could Expert AuPair send you home or

12 terminate your visa any time while you were an

13 au pair?

14         MR. ENICA:  I object.

15    A    Yes.

16         MR. HOOD:  I'm just trying to -- what's

17 the basis of your objection?

18         MR. ENICA:  You're asking for speculation.

19 I object to the form.

20    Q    (BY MR. HOOD)  Was it your understanding

21 that Expert AuPair could send you home at any time

22 while you were an au pair?

23    A    Yes.

24    Q    What was your wage while you were an au

25 pair?

**Page 84**

1         MR. ENICA:  I object.

2         MR. HOOD:  What's the basis for your

3 objection?

4         MR. ENICA:  The word "wage".  I would call

5 it stipend, but you can go ahead and --

6    Q    (BY MR. HOOD)  How much were you paid per

7 week while you were an au pair?

8    A    195 and 75.

9    Q    $195.75?

10    A    Yes, $195.75.

11    Q    And how frequently were you paid that?

12    A    Weekly.

13    Q    And who set that payment amount?

14    A    Expert AuPair.

15         MR. HOOD:  That's all I have.

16         MR. ENICA:  Okay.  I will have a redirect.

17              EXAMINATION

18 BY MR. ENICA:

19    Q    Okay.  You mentioned you were paid -- just

20 in the questions you answered before, you mentioned

21 you were paid weekly?

22    A    Yes.

23    Q    However, your testimony is that with your

24 first family you were not paid weekly.

25    A    Yeah, the first family, no.

**CONFIDENTIAL**

Page 85

1  Q.  Okay.

2  A  But for the last family, yes.  I spent

3 more time with them.

4  Q  So would you give counsel another answer

5 if asked how often were you paid?

6  A  Okay.  For the first family I was paid

7 biweekly.  For the second family I was paid weekly.

8  Q  Okay.  Just to make the record clear.

9  A  Okay.

10  Q  Now, you testified that it was your

11 understanding that Expert AuPair could send you home?

12  A  Yes.

13  Q  What are you basing this understanding on?

14  A  At any time.  If this --

15  THE REPORTER:  I'm sorry.

16  A  At any time.  I said at any time.  I'm

17 sorry.

18  Q  (BY MR. ENICA)  That's okay.

19  A  So if -- if the -- if the family would say

20 something for the agency, and even if they agreed or

21 not, they could send the au pair back home.

22  Q  So you mean if the family would fire you,

23 Expert AuPair could send you home?

24  A  Not fire.  If they complain about

25 anything, and they didn't even listen to us, they

Page 86

1 could send us home at any time.

2  Q  When you say "they," you're referring to

3 whom?

4  A  Expert AuPair.

5  Q  So can you repeat that using Expert AuPair

6 instead of "they"?

7  A  Okay.  If the -- if the family -- if the

8 family had some problem or the au pair had some

9 problem, like me, I got in a rematch --

10  THE REPORTER:  I'm sorry, you got in what?

11  A  Rematch.  It's how it's called when we go

12 -- change -- go for another family.  And I

13 didn't find -- and I didn't find a family right away,

14 I would be sent back home, even if it wasn't my fault

15 that we got in rematch.

16  Q  (BY MR. ENICA)  I understand.  So what

17 you're saying to me is that Expert AuPair could send

18 you home if you didn't have an employer and you

19 couldn't find a new family for a certain period of

20 time; would that be correct?

21  A  If I couldn't find another family.

22  Q  Okay.  How about let's say you were

23 working for your second family --

24  A  Yes.

25  Q  -- and you were happy and your family was

Page 87

1 happy, could Expert AuPair just send you home, in

2 your understanding?

3  A  I think so.

4  Q  Okay.  Why would they do that?

5  A  Well, this is my sponsor here.

6  Q  I understand.

7  A  So if they just decided they don't want to

8 be my sponsor anymore, who would be my sponsor here?

9 They would just send me home.  They have this power.

10 They're my sponsors.

11  Q  Is that specified anywhere in the contract

12 that we just looked that you have with Expert AuPair?

13  A  I am not sure.

14  Q  So you're not sure actually if they had

15 this power?

16  A  I don't -- it's been a long time since I

17 read the contract and the last time I read just the

18 part that you asked me for.

19  Q  Okay.  So you're not exactly sure if they

20 had this power?

21  A  I can read the contract if you want to.

22  Q  That's --

23  A  I can look it up.  Because I don't

24 remember -- I read this contract three years ago, so

25 I don't remember what is here.

Page 88

1  Q  But still, you said it right now, your

2 understanding --

3  A  Yes.

4  Q  -- that they had the power at any time --

5  A  They do.  They're my sponsor.  They are my

6 sponsor.  They're responsible for me here.  If they

7 just decided they don't want to be my sponsor

8 anymore, my visa, it's not worth anything.

9  Q  Okay.  Could they do that?

10  A  They had -- they have the power.  That's

11 what I'm saying, they are my sponsors.  They are

12 responsible for me.  They brought me here.  In my

13 visa they have their name.  They are my sponsors.  If

14 they say, No, I don't want to be her sponsor anymore,

15 what can I do?

16  Q  Okay.  Are you aware of any case of when

17 any au pair agency decided not to be the sponsor of

18 an au pair?

19  A  Yes.

20  Q  Okay.  What case is that?

21  A  It was -- it was another agency.  It's not

22 Expert AuPair.

23  Q  Okay.  And so it was a case when both the

24 au pair and the family were happy with each other but

25 the agency --

**\*\*CONFIDENTIAL\*\***

| Page 89 | Page 91 |
|---|---|

**Page 89**

1    A    I'm not sure if they're happy, but what I
2 know is the au pair don't even had a -- didn't even
3 have a chance to find another family.  The agency
4 just decide to send them home.
5    Q    Okay.  But the family fired the au pair
6 first, right?
7    A    The family was abusive.
8    Q    Okay.  So the au pair decided they don't
9 want to be with an abusive family, I assume, right?
10    A    Who would like to be with an abusive
11 family?
12    Q    Is that a yes or a no?
13    A    Yes.
14        MR. HOOD:  Objection.
15    Q    (BY MR. ENICA) Okay.  So you mentioned
16 that the amount of stipend or pay was set up by
17 Expert AuPair?
18    A    Yes.
19    Q    What made you believe that?  What makes
20 you believe that?
21    A    Before I applied to be an au pair, I look
22 up a lot of agencies and websites, and what we --
23 what I saw is the -- is that the au pair is set to
24 receive 195 and 75 -- $195.75 a week.  And the --
25 this is -- this is what the agency says, and this is

**Page 91**

1        MR. HOOD:  Objection.
2    Q    (BY MR. ENICA)  This is how you know,
3 right?
4    A    Yes, but anyone has access to that.
5    Q    Okay.  There is no other way of -- for you
6 to know that Expert AuPair tells their families to
7 pay 195.75?
8    A    The host family.
9    Q    Okay.  Did the host family ever tell you
10 that --
11    A    She always says she couldn't pay more
12 because the amount was 195 and 75.
13    Q    Okay.  And which host family was that?
14    A    Carminati family.
15    Q    Okay.  Are you aware of any other
16 employers (sic) earning more than 195.75?
17    A    Not that I'm aware of.  Wait, wait.  Yes,
18 I know one au pair that receives more.  But that's in
19 her agreement with her host family.
20    Q    Does she have a sponsor?
21    A    Yes.
22    Q    Is she sponsored by Expert AuPair?
23    A    No.
24    Q    So she does have a sponsor and receives
25 more?

**Page 90**

1 what they tell the family, and this is why the family
2 pay us this -- just this amount.
3    Q    Okay.  When you said you looked online,
4 you looked specifically at the Expert AuPair website?
5    A    Yes.
6    Q    And do you remember --
7    A    I sent an email to them, too.  I talked to
8 Kimberly at the time.
9    Q    Okay.  And how do you know this is what
10 they say the family -- they tell the family?
11    A    Because if you go on the website of the
12 Expert AuPair, they have, like, host family part and
13 au pair parts, and then you can --
14        THE REPORTER:  The host family --
15    A    The host family, they have like a host
16 family part of the website and then au pair part.
17 And if you go in the host family part, they say that
18 the amount to pay for your au pair, it's $75 -- 70 --
19 $195.75 weekly.
20    Q    (BY MR. ENICA)  Okay.
21    A    And that's it.
22    Q    Okay.  So you are basing your testimony on
23 what you have read on the Expert AuPair website aimed
24 towards the host families -- on the Expert AuPair
25 website part aimed towards the host families?

**Page 92**

1    A    Yes.
2    Q    Okay.
3    A    It's her agreement with her host family.
4    Q    Okay.
5    A    They just decided to -- they thought it
6 was unfair.
7    Q    Okay.  And what stopped you from making an
8 agreement with your host family?
9    A    She doesn't -- she doesn't accept that.
10 Actually, I -- I never asked.  Once I asked, but I
11 asked for extra hours, because I send money back home
12 every month, so I thought more would be better.
13        So I asked her if I could do extra jobs
14 and she'd pay more.  She said she couldn't because
15 with my visa and the agency, they don't accept that.
16    Q    So you asked your family for additional
17 money.  Did you ask Expert AuPair ever for additional
18 money?
19    A    No.
20    Q    Okay.
21        MR. ENICA:  Okay.  No further.
22        MR. HOOD:  Okay.  Nothing -- nothing
23 further from me.
24        THE VIDEOGRAPHER:  This concludes our
25 proceedings.  We are off the record at 12:16 p.m.

## Page 93

1    (The following was not on the videotape.)

2    MR. HOOD:  We intend to have the plaintiff

3  read the transcript and verify -- and verify her

4  testimony.

5    (The deposition concluded at 12:16 p.m.,

6  March 22, 2018.)

7    * * * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 94

1    I, JESSICA PARDIM ARAUJO, do hereby certify

2  that I have read the foregoing transcript and that

3  the same and accompanying amendment sheets, if any,

4  constitute a true and complete record of my

5  testimony.

6

7

8    _____

9    Signature of Deponent
     ( ) No Amendments
10   ( ) Amendments Attached

11   Acknowledged before me this

12   _____ day of _____, 20___.

13

14   Notary Public: _____

15   My commission expires _____

16   Seal:

17

18

19

20

21

22

23

24

25

## Page 95

1  STATE OF COLORADO )

2             )  ss.    REPORTER'S CERTIFICATE

3  COUNTY OF DENVER )

4    I, Pamela J. Hansen, do hereby certify that

5  I am a Registered Professional Reporter and Notary

6  Public within the State of Colorado; that previous to

7  the commencement of the examination, the deponent was

8  duly sworn to testify to the truth.

9    I further certify that this deposition was

10 taken in shorthand by me at the time and place herein

11 set forth, that it was thereafter reduced to

12 typewritten form, and that the foregoing constitutes

13 a true and correct transcript.

14   I further certify that I am not related to,

15 employed by, nor of counsel for any of the parties or

16 attorneys herein, nor otherwise interested in the

17 result of the within action.

18   In witness whereof, I have affixed my

19 signature this 30th day of March, 2018.

20   My commission expires September 3, 2018.

21

22   _____

23   Pamela J. Hansen, CRR, RPR, RMR
     216 - 16th Street, Suite 600
     Denver, Colorado  80202

24

25

## Page 96

1  AB COURT REPORTING & VIDEO
   216 - 16th Street, Suite 600
2  Denver, Colorado  80202

3
   March 30, 2018

4
   Dawn L. Smalls, Esq.
5  Boies Schiller & Flexner, LLP
   575 Lexington Avenue, 7th Floor
6  New York, New York 10022

7  Re:  Video Deposition of JESSICA PARDIM ARAUJO
            Beltran vs. Interexchange
8        Civil Action No. 1:14-cv-03074-CMA-KMT

9  The aforementioned deposition is ready for reading
   and signing.  Please attend to this matter by
10 following BOTH of the items indicated below:

11 _____ Call 303-296-0017 and arrange with us to read
         and sign the deposition in our office.
12
   _XXX_ Have the deponent read your copy and sign
13      the signature page and amendment sheets, if
        applicable; the signature page is attached.
14
   _____ Read the enclosed copy of the deposition and
15      sign the signature page and amendment
        sheets, if applicable; the signature page is
16      attached.

17 _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

18 _____ By _____ due to a trial date of _____

19 Please be sure the original signature page and
   amendment sheets, if any, are SIGNED BEFORE A NOTARY
20 PUBLIC and returned to AB Court Reporting for filing
   with the original deposition.  A copy of these
21 changes should also be forwarded to counsel of
   record.  Thank you.

22 AB COURT REPORTING & VIDEO

23

24 cc:  All Counsel

25

Page 97

```
 1   AB COURT REPORTING & VIDEO
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4

 5
              JESSICA PARDIM ARAUJO
 6               March 22, 2018
              Beltran vs. Interexchange
 7          Case No. 1:14-cv-03074-CMA-KMT

 8

 9   The original deposition was filed with

10   Bogdan Enica, Esq., on approximately the

11   30th day of March, 2018.

12   _____ Signature waived.

13   _____ Signature not requested

14   _____ Unsigned; signed signature page and
            amendment sheets, if any, to be filed at
15          trial.

16   _XXX_ Unsigned; original amendment sheets and/or
           signature pages should be forwarded to AB Court
17         Reporting to be filed in the envelope attached
           to the sealed original.

18

19

20   Thank you.

21   AB COURT REPORTING & VIDEO

22   cc:  All Counsel

23

24

25
```

- AMENDMENT SHEET -

Video Deposition of JESSICA PARDIM ARAUJO
March 22, 2018
Beltran vs. Interexchange
Civil Action No. 1:14-cv-03074-CMA-KMT

The deponent wishes to make the following changes in
the testimony as originally given:

Page  Line        Should Read        Reason

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

Signature of Deponent: _____

Acknowledged before me this _____ day of

_____, 20__.

(seal)      Notary's signature _____

            My commission expires _____.



ADVANCED REPORTING SOLUTIONS

801-746-5080 | office@advancedrep.com | advancedrep.com
SALT LAKE | 159 West Broadway, Broadway Lofts, Suite 100 | Salt Lake City, Utah 84101
PROVO | 3507 North University Avenue, Suite 350-D | Provo, Utah 84604
ST. GEORGE | 20 North Main Street, Suite 301 | St. George, Utah 84770

REPORTING SOLUTIONS
ADVANCED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN, et     )
al,                          )
                             )
     Plaintiffs,             )
                             )
vs.                          )
                             ) Civil Action No.
                             ) 1:14-cv-03074-CMA-KMT
INTEREXCHANGE, INC., et      )
al,                          )
                             )
     Defendants.             )

DEPOSITION OF IRED SEVILLA

March 23, 2018 * 10:03 a.m.

Advanced Reporting Solutions
 243 East 400 South, B101
 Salt Lake City, Utah 84111

Reporter:  Tamra J. Berry, CSR, RPR

Page 2

```
1          A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3          SEAN PHILLIPS RODRIGUEZ
           BOIES SCHILLER & FLEXNER, LLP
4          Attorneys at Law
           1999 Harrison Street, 9th Floor
5          Oakland, California  94612
           Tel:  510.874.1000
6          srodriguez@bsfllp.com
7
   FOR THE DEFENDANTS:
8
           BOGDAN ENICA
9          Attorney at Law
           111 Second Avenue NE, Suite 900
10         St. Petersburg, Florida
           Tel:  727.388.3472
11         bogdane@hotmail.com
12
13
                  -oOo-
14
            I N D E X
15 IRED SEVILLA:                           PAGE
16    Examination by Mr. Enica.....................4
      Examination by Mr. Rodriguez................44
17
      Further Examination by Mr. Enica............45
18
19
20
21
22
23
24
25
```

Page 3

```
1                 -oOo-
2
            E X H I B I T S
3
   NUMBER           DESCRIPTION            PAGE
4
   Number 1    Consent to Join form.................8
5
   Number 2    The Employment Contract.............12
6
   Number 3    Plaintiff's Responses and Objections...17
7
   Number 4    E-mail 10/17/13.....................25
8
   Number 5    E-mail 9/16/13......................29
9
   Number 6    E-mail 12/9/13......................37
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            P R O C E E D I N G S
2
              IRED SEVILLA,
3
4    called as a witness, being first duly sworn,
5        was examined and testified as follows:
6
7                 EXAMINATION
8  BY MR. ENICA:
9     Q.    Good morning.
10    A.    Morning.
11    Q.    My name is Bogdan Enica, and I will be
12 conducting the deposition today.  I'm an attorney for
13 Expert Group International doing business as Expert
14 AuPair.
15         How would you like me to address you
16 today?  We'll do appearances, but usually we do this
17 before.
18    A.    I'm just Ired.
19    Q.    Okay.  Ired.
20    MR. ENICA:  So let's do appearances.
21    MR. RODRIGUEZ:  Sean Rodriguez, Boies
22 Schiller & Flexner, for the witness.
23    Q.    (BY MR. ENICA)  If you can spell your name
24 for the record.
25    A.    Ired, I-r-e-d.  Sevilla, S-e-v-i-l-l-a.
```

Page 5

```
1     Q.    And if you can, tell us the address where
2  you reside.
3     A.    12708 South City Heights Drive in
4  Riverton, Utah.
5     Q.    Perfect.  Have you ever been deposed
6  before, Ired?
7     A.    No, I haven't.
8     Q.    Have you ever been involved in a lawsuit
9  or a legal proceeding before?
10    A.    No, I haven't been involved.
11    Q.    So I am going to give you a brief
12 description of what's going to happen here today, and
13 I'm going to tell you what the rules are so this way
14 we can do it fast and smooth and be here and out of
15 here in approximately three hours.
16    A.    That's good.
17    Q.    Okay.  So we do have a court reporter
18 here.  We introduced everybody at the beginning, but
19 not the court reporter.
20         What the court reporter does, she takes
21 down everything that I say, everything that you say,
22 and any objections or questions at the end your
23 counsel might have.  And in order to make her job
24 easier, it would be good, if, for example, you would
25 answer verbally rather than a hand gesture or a head
```

Page 6

1  nod.
2      A.    Okay.
3      Q.    It would be better if you would answer --
4  if you would wait until I finish my question to start
5  your answer.
6      A.    Okay.
7      Q.    And I will try and do the same.  I will
8  try and wait until you've finished your answer before
9  posing the next question.
10     A.    Okay.
11     Q.    Okay.  If you don't understand the
12  question, please tell me.  You can ask me to
13  rephrase, and I will try to work with you and make
14  sure that you understand it.  If you answer a
15  question, I will assume that you've understood the
16  question and that the answer that you're giving is
17  the complete and truthful answer to that question.
18     A.    Okay.
19     Q.    So you are required to tell the truth.
20  It's a judicial proceeding.  We do not have a judge
21  here or a jury, but it's the same type of proceeding
22  in terms of telling the truth.  They have the same
23  requirements.
24     A.    Okay.
25     Q.    As I mentioned before I will ask

Page 7

1  questions; you will be required to answer the
2  questions.
3      A.    Yes.
4      Q.    Your counsel may make objections.
5  Probably most of the time you will be required to
6  answer even if your counsel makes an objection.
7      A.    Okay.
8      Q.    Unless your counsel instructs you not to
9  answer a question, then you would be answering the
10  question.
11     A.    Okay.
12     Q.    Okay.  Are you under the influence of any
13  substance or medication that that may impair your
14  ability to tell the truth today?
15     A.    No.  I'm not under the influence of any
16  medication.
17     Q.    Did you prepare for today's deposition?
18     A.    Yes.  I am ready and prepared.
19     Q.    And how did you prepare for today's
20  deposition?
21     A.    I just met with my lawyer representative,
22  nothing else.
23     Q.    Okay.  Do you remember when you met with
24  counsel?
25     A.    Just this morning.

Page 8

1      Q.    Do you remember for how long,
2  approximately?
3      A.    Maybe one hour.
4      Q.    In preparation for today's deposition, did
5  you review any documents?
6      A.    I did not review any documents.
7      Q.    Okay.  What I'm going to do, I'm going to
8  mark an exhibit.  Which means we will put a number on
9  this document, and we refer to the document as
10  "Exhibit Number" and the corresponding number.  So
11  this one is going to be Exhibit Number 1.
12         (EXHIBIT NUMBER 1 WAS MARKED.)
13     Q.    (BY MR. ENICA)  And I'm going to ask you a
14  few questions regarding Exhibit Number 1.
15     A.    Okay.
16     Q.    You can take a moment and look at the
17  document and let me know when you're done.
18     A.    Okay.
19     Q.    So do you recognize this document?
20     A.    Yes, I do.  I recognize it.
21     Q.    Can you tell for the record what the
22  document is?
23     A.    The consent to join the lawsuit.
24     Q.    Okay.  And what lawsuit is this pertaining
25  to?

Page 9

1      A.    Can you repeat the question?
2      Q.    What lawsuit?  You said "consent to join
3  the lawsuit."  I'm just referring to the lawsuit,
4  what lawsuit?
5      A.    The lawsuit for unpaid wages.
6      Q.    Okay.  And in your case, do you know who
7  the defendant is?
8      A.    Yes.  Boies Schiller & Flexner.
9      Q.    That would be your counsel.  I understand
10  the legal terms.  My fault.  Who are you suing?
11     A.    Oh, I am suing the au pair agency in this
12  case, Expert AuPair.
13     Q.    And that would be the Expert of
14  International doing business as Expert AuPair; is
15  that correct?
16     A.    Yes.
17     Q.    And why are you suing Expert AuPair?
18     A.    Why?
19     Q.    Correct.
20     A.    For unpaid wages.
21     Q.    So do you think that Expert AuPair should
22  pay you wages?
23     A.    Should pay, not -- should have paid at the
24  moment when I worked for the agency.
25     Q.    So you think that Expert AuPair should

Page 10

1  have paid you wages?
2     A.    Yes.
3     Q.    And what was your position while you were
4  working for the agency?
5     A.    I was an au pair for Expert AuPair.
6     Q.    And were you paid any wages by Expert
7  AuPair?
8     A.    I was paid by the host family.
9     Q.    Right.  But my question was were you paid
10  any wages by Expert AuPair?
11    A.    No.  I wasn't paid by Expert AuPair.
12    Q.    Now, if I'm looking back at the form,
13  there is a field --
14    A.    Yeah.
15    Q.    -- titled "Signature."
16    A.    Okay.
17    Q.    Is that your electronic signature?
18    A.    Yes, it is my signature.
19    Q.    Okay.  Do you remember signing --
20  electronically signing this form?
21    A.    Yes, I do remember.
22    Q.    Do you know approximately when you signed
23  this form?
24    A.    Hum --
25    Q.    Well, I'll point to the document.  It's

Page 11

1  not a tricky question.  It has a date --
2     A.    Okay.
3     Q.    -- on the right-hand side.
4     A.    Just -- yeah, that's the date, July 2017.
5     Q.    So that sounds --
6     A.    Yes.
7     Q.    -- right?  I'm not trying to trick you.
8     A.    Okay.
9     Q.    I just want to make sure we have the right
10  document in front of us.
11          So except for today's deposition, did you
12  do anything else to prepare for this lawsuit?
13    A.    I did not.
14    Q.    Did you provide any written discovery, any
15  answers to questions or any documents?
16    A.    No, I did not.
17    Q.    Did you search for any documents in your
18  possession in regard to this lawsuit?
19    A.    No, I did not.
20    Q.    Well, I'll ask you if you remember, but
21  again there are some dates on the form as well.
22    A.    Okay.
23    Q.    So the question is:  Do you remember the
24  dates where you were in the au pair program?
25    A.    Yes.  In August 2013 until December 2013.

Page 12

1     Q.    Okay.  So the dates on the form are
2  accurate?
3     A.    They look good.
4     Q.    And you mentioned that you were paid by
5  your host family.  What was the name of your host
6  parents?
7     A.    The family name is Patel.
8     Q.    Patel?
9     A.    And the father's name was Jignesh Patel,
10  and the mother's name was Miki Patel.  J-i-g-n-e-s-h.
11    Q.    And you only had one host family for
12  the --
13    A.    Yes, only one host family.
14    Q.    Because it's only one, can we refer to
15  them either as the host family or the Patels?
16    A.    Yes.
17    Q.    But it has the same meaning?
18    A.    Yes.
19    Q.    Is that okay with you?
20    A.    Yes.
21          MR. ENICA:  I'm going to mark another
22  document, and I'm going to mark it as Exhibit
23  Number 2.
24          (EXHIBIT NUMBER 2 WAS MARKED.)
25    Q.    (BY MR. ENICA)  And just to let you know,

Page 13

1  those documents that are marked right now are going
2  to remain with the court reporter and will be part of
3  this deposition.
4     A.    Okay.
5     Q.    They will be attached to the transcript.
6  So this is a document that Expert AuPair received and
7  archived.  Are you familiar with this document?
8     A.    Yes.
9     Q.    Okay.  If we look at the last page where
10  it says "au pair signature," would that be your
11  signature?
12    A.    Yes, it is my signature.
13    Q.    Are you in possession of a copy of this
14  document?
15    A.    I do not have a copy of this.
16    Q.    Were you at any point in possession of a
17  copy of this document?
18    A.    Yes.  At some point I was.
19    Q.    If I'm looking at the first page where it
20  says "Date Employment Commenced" --
21    A.    Uh-huh (affirmative).
22    Q.    -- there's a date.  Do you know who wrote
23  that date in there?
24    A.    No, I don't.
25    Q.    When is the first time that you received

Page 14

1  this contract, if you remember?  Approximately which
2  year was that?
3       A.    2013.
4       Q.    Uh-huh (affirmative).
5       A.    Sometime in July when we started doing
6  paperwork for employment.
7       Q.    Okay.  It was there when you started doing
8  paperwork?
9       A.    Uh-huh (affirmative).
10      Q.    Did you contact Mr. Patel prior to
11 starting to do paperwork?
12      A.    I was always contacted by Expert AuPair,
13 and they were the -- how do you say -- the contact
14 between the host family and me.
15      Q.    Okay.
16      A.    So I was always talking to Expert AuPair,
17 and they would be in contact with the host family.
18 They would send me any documents or anything
19 necessary.
20      Q.    Okay.  So basically what you're saying is
21 that Expert AuPair found the Patels for you --
22      A.    Yes.
23      Q.    -- to be your employer?
24      A.    Yes.
25      Q.    So just very briefly, you applied with

Page 15

1  Expert AuPair?
2       A.    Yes, I did.  I applied with them.
3       Q.    And then they found the Patels?
4       A.    Yes.
5       Q.    And then were you ever in touch with the
6  Patels prior to signing this contract?
7       A.    Yes, I was.  We did -- we were in contact
8  before just to see if we were a match, a good match.
9       Q.    Okay.  And when you received this
10 contract, it was already filled in with names and
11 hours on the first page?
12      A.    Yes, it was.  Uh-huh (affirmative).
13      Q.    And you don't remember -- strike that.
14            Did you receive this contract from Expert
15 AuPair or from the Patels, if you remember?
16      A.    I received this from the -- from Expert
17 AuPair.
18      Q.    And do you remember if it was signed by
19 the Patels when you received it?
20      A.    I do -- I don't remember if it was already
21 signed, but they did send it to me for me to sign
22 after reviewing.
23      Q.    Okay.  And you reviewed the contract?
24      A.    Yes.
25      Q.    And then you signed and sent the copy back

Page 16

1  to Expert AuPair or to Patel?
2       A.    To Expert AuPair.
3       Q.    And the document in front of you looks
4  like the copy you sent back to Expert AuPair, right?
5       A.    Yes.
6       Q.    If we look on the second page, there are
7  three titles involved.  One is children, the other
8  one duties, and the third one remuneration?
9       A.    Uh-huh (affirmative).
10      Q.    By looking at duties, would you say that
11 the duties mentioned here reflect the duties you were
12 required to perform as part of your job in providing
13 for the Patel family?
14      A.    Yes, they do.
15      Q.    Do you think there were any additional
16 duties?
17      A.    No.
18      Q.    Would you say that any of the duties here
19 were not actually applicable?
20      A.    Oh, yeah, they look like what I performed
21 for the Patels.
22      Q.    Okay.  Going down, it says, "The employer
23 agrees to pay" -- under salary.
24      A.    Yes.
25      Q.    "The employer agrees to pay the au pair

Page 17

1  the salary of $200 per week."
2            Was that accurate?  Did you receive the
3  amount of $200 from the Patels?
4       A.    I honestly don't remember, and I don't
5  have any documents about it.  But if it is there on
6  the contract, that should have been the amount I got
7  per week.
8       Q.    Okay.  On the next line it says, "Payment
9  will be Friday."  And then the following line it
10 says, "Payment will be made by," and there is a cross
11 next to the word "check."  Do you remember if you
12 were paid by check or cash?
13      A.    I did -- I was paid by check on Fridays.
14      Q.    If you are to go home and take a look at
15 your bank statement, would you be able to confirm
16 that the amount was $200?
17      A.    Yes, I can go back and confirm that.
18            (EXHIBIT NUMBER 3 WAS MARKED.)
19      Q.    (BY MR. ENICA)  I would like you to take a
20 look at the document and let me know when you're
21 done.
22            Okay.  Have you seen this document before?
23      A.    Yes.
24      Q.    Is the signature on the last page your
25 signature?

Page 18

1    A.    It is my signature.
2    Q.    Okay.  And do you understand that by
3  signing this document, it has the same value as
4  signing it under oath, correct?
5    A.    Yes, I do.
6    Q.    Now, if you'd go to page 5.
7    MR. RODRIGUEZ:  What is the paragraph
8  number?
9    MR. ENICA:  Paragraph number 4.
10    MR. RODRIGUEZ:  Okay.
11    Q.    (BY MR. ENICA)  Subsection A, it's asking
12  the amount that you were paid for that week's work.
13  And you mentioned $180?
14    A.    Yes.
15    Q.    How do you explain the discrepancy?
16    A.    Because I do not remember how much I was
17  paid at the moment.
18    Q.    Okay.  But this is a declaration that you
19  took under oath.  You understand that?
20    A.    Right.
21    Q.    So you are swearing that you are -- you
22  were paid $180?
23    A.    Yes.
24    Q.    Would you like to change your testimony
25  based on the information given to you today?

Page 19

1    A.    I know that I was paid between 180 and
2  200, but I don't remember what was the exact amount.
3    Q.    Okay.  Did you review your bank statements
4  before answering this question?
5    A.    No, I did not.
6    Q.    Okay.  But you could have?
7    A.    I could have, yeah.
8    Q.    Okay.  Did you review your bank statements
9  in preparation for today?
10    A.    No, I haven't.
11    Q.    Since we have this document, very briefly
12  if you'd look at page -- I think it's 6.  It says,
13  "Request for Production."
14    A.    Uh-huh (affirmative).  Yes.
15    Q.    Have you looked for any of the documents
16  mentioned in the request for production?
17    A.    No, I haven't looked for any document.
18    Q.    Okay.  And I will have the same question
19  about the last page, the request for admission.  It
20  says, "I received $180 in weekly payments from my
21  host family."
22        I just want to make sure the same
23  statement you made previously applied, which is you
24  did not look at your statements so you didn't know
25  exactly how much you received?

Page 20

1    A.    That's right.  I did not look at my
2  statements, and I'm not sure of the exact amount.
3    Q.    Okay.
4    MR. RODRIGUEZ:  Just pause and give me a
5  second to make an objection, okay?
6    THE WITNESS:  Okay.
7    MR. ENICA:  Did you want to make an
8  objection now?
9    MR. RODRIGUEZ:  We're okay.  Thank you.
10    Q.    (BY MR. ENICA)  Let's go back to
11  Exhibit 2.  Exhibit 2 is titled "Employment
12  Contract," and I'm on the first page.  We're looking
13  under the title "Terms of Employment."  Hours, there
14  is a table showing the number of hours.
15    A.    Okay.
16    Q.    Would you say that the number of hours of
17  work mentioned in this table are accurate?
18    A.    No, they're not.
19    Q.    Okay.  How would they differ from the
20  actual number of hours that you are required to work?
21    A.    They say they start at 6:00 a.m. and
22  time -- oh, okay.  The end time was around 10:00.
23    Q.    Okay.  So the end time was not 8:00 p.m.
24  as written in the table?
25    A.    No, it wasn't.

Page 21

1    Q.    But it was 10:00 p.m.?
2    A.    Yes.
3    Q.    Other than that, would you say the rest is
4  pretty much accurate?
5    A.    Yes, it is.
6    Q.    You mentioned that you signed the last
7  page of this contract?
8    A.    Yes.
9    Q.    And sent it to Expert AuPair --
10    A.    Yes.
11    Q.    -- correct?
12        Did you inform Expert AuPair that your
13  schedule changed and it was 10:00 p.m., instead 8:00
14  p.m.?
15    MR. RODRIGUEZ:  Objection,
16  mischaracterizes.
17    THE WITNESS:  No, I never informed Expert
18  AuPair.
19    Q.    (BY MR. ENICA)  So did Expert AuPair know
20  that your end time was 10:00 p.m. rather than 8:00
21  p.m.?
22    A.    No.  I never mentioned that to them.
23    Q.    Okay.  If you look right underneath, there
24  is a note and there is a bolded paragraph.  And it
25  says, "Au pairs may not work more than ten hours in

Page 22

1  any day or 45 hours in any work week."
2      A.    Uh-huh (affirmative).
3      Q.    Would you say you were working more than
4  45 hours per work week?
5      A.    Yes, I was.
6      Q.    And did you inform Expert AuPair of the
7  fact that you were working more than 45 hours per
8  week?
9      A.    I did not inform Expert AuPair.
10     Q.    Have you at any point told your employer
11 that you are not to work more than 45 hours a week?
12           MR. RODRIGUEZ:  Objection to the extent it
13 seeks a legal conclusion.
14           THE WITNESS:  I did not inform my
15 employer.
16     Q.    (BY MR. ENICA)  Let me rephrase it.  Have
17 you ever informed the Patels, your host family, that
18 you are not supposed to work more than 45 hours per
19 week?
20     A.    No, I did not inform the Patels.
21     Q.    I am moving to page 3 of the contract.  It
22 starts with "Deductions."  And I'm looking under
23 paragraph 5 or section 5, which says "Car."
24           "The au pair" -- and then there is an
25 "X" -- "will have access to a car."

Page 23

1            Did you have access to a car?
2      A.    Yes, I did have access to a car.
3      Q.    Was the car provided by the host family?
4      A.    Yes, it was.
5      Q.    Were you allowed to drive the car for your
6  personal reasons or just in connection with your
7  child care duties?
8      A.    I was allowed to drive it for my personal
9  use as well.
10     Q.    Were you required to pay any amount in
11 exchange for using the car for personal use?
12     A.    No, I wasn't.
13     Q.    Did you have insurance?
14     A.    On the car?
15     Q.    Yes.
16     A.    I believe I did, yeah.
17     Q.    And who was providing the insurance?
18     A.    The Patels.
19     Q.    Okay.  I'm going to move to the next page,
20 and I'm going under "Phone Privileges."  It says,
21 "Long distance calls are to be paid by the employer."
22           Have you ever made a long distance call?
23     A.    I never did make a long distance call.
24     Q.    And I'm going down to "Education
25 Expenses."  Are you aware or do you know if the

Page 24

1  Patels paid anything toward your education expenses?
2      A.    I'm sorry could you repeat that?
3      Q.    Are you aware if the Patels paid anything
4  toward your educational expenses?
5      A.    No.  They did not pay anything for my
6  education.
7      Q.    I'm going down the contract.  Did you have
8  unlimited use of Internet and computer?
9      A.    Yes, I did.
10     Q.    Did you have your own computer?
11     A.    Yes.
12     Q.    So the Patels did not provide you with a
13 computer?
14     A.    No.  The computer was mine.
15     Q.    Okay.  But you had access to the Internet?
16     A.    Yes, I did.
17     Q.    Were you required to pay for that?
18     A.    No.
19     Q.    I'm moving to the next page.  Did you take
20 any vacation while you were working for the Patels?
21     A.    No, I did not.
22     Q.    I think we are done with this exhibit.
23 Was the schedule ever changing?
24     A.    No.
25     Q.    Okay.  And who was evaluating your

Page 25

1  performance while performing job care with the Patel
2  family?
3      A.    I never received any information that
4  anyone was taking a look at my performance or
5  anything.
6      Q.    Okay.  You never had a performance
7  evaluation with your employer?
8      A.    I did not.
9            (EXHIBIT NUMBER 4 WAS MARKED.)
10     Q.    (BY MR. ENICA)  And I'd like you to do the
11 same thing, take a look and let me know when you're
12 done.
13     A.    Okay.
14     Q.    Do you recognize this document?
15     A.    No, I don't.
16     Q.    What's your e-mail address?
17     A.    That is my e-mail address,
18 iredalejandra@hotmail.com.
19     Q.    The e-mail address on top of Exhibit 4 --
20     A.    Uh-huh (affirmative).
21     Q.    -- following the word "to" is your e-mail
22 address?
23     A.    It is my e-mail address.
24     Q.    Okay.  But you don't recognize this
25 document?

Page 26

1    A.    I don't.
2    Q.    So therefore, you cannot say if you ever
3 received this document or not?
4    A.    I cannot say I ever received it.
5    Q.    Did you ever receive any message
6 whatsoever from the e-mail address on the first line
7 belonging to Jignesh Patel, which is Patel --
8    A.    I cannot say.  I cannot say.  I could
9 have.
10    Q.    You cannot say if you ever received any
11 e-mail from Jignesh Patel?
12    A.    Oh, yes.  From Jignesh Patel, I did.  I
13 cannot say from that exact e-mail account because I
14 don't remember.
15    Q.    Okay.  Do you have any reason to believe
16 that Jignesh Patel had multiple e-mail accounts?
17    A.    I don't have any reason.
18    Q.    So not only the e-mail, but you said
19 you're not familiar with the content -- with the
20 attached documents either.  So let me clarify.  The
21 document is an exhibit, and it is composed of a cover
22 e-mail and three attachments?
23    A.    Yes.
24    Q.    Okay.  You mentioned you're not familiar
25 with this exhibit, which means you're not familiar

Page 27

1 with the e-mail nor the attached documents.  Would
2 that be correct?
3    A.    Correct.
4    MR. RODRIGUEZ:  And just to be clear, I
5 think you said three attachments.  It's two
6 attachments but three documents total, including the
7 e-mail.
8    MR. ENICA:  Correct.
9    Q.    (BY MR. ENICA)  Okay.  Well, just by
10 looking at it, the first document following the
11 e-mail says, "Performance evaluation for au pair Ired
12 Sevilla."
13    By looking at it, would you remember
14 having a performance evaluation done by
15 Jignesh Patel?
16    A.    I don't remember having a performance
17 evaluation.
18    Q.    Now, if you look at the second page, do
19 you remember ever having a revised schedule?
20    A.    I don't remember having a revised
21 schedule.
22    Q.    And just to make sure, you're saying you
23 don't know if you received this e-mail.  You're not
24 saying you never received this e-mail; is that right?
25    A.    Correct.  I don't know if I received it.

Page 28

1 I don't know if I didn't see it, I mean, or didn't
2 receive it.
3    Q.    Okay.  Is it possible to, say, go home and
4 access your computer to search for this e-mail?
5    A.    I could, but I'm pretty sure I don't have
6 so old e-mails from 2013.
7    Q.    Did you remember ever having a performance
8 evaluation conducted by Expert AuPair?
9    A.    I don't remember ever having any
10 performance evaluation.
11    Q.    If we take the term "performance
12 evaluation" out of the context of this document, did
13 Mr. Patel or Mrs. Patel ever approach you to talk to
14 you about the quality of your work?
15    And let me clarify.  When I say
16 "Mr. Patel," I refer to Jignesh Patel.  And when I
17 say "Mrs. Patel," I refer to his wife.
18    A.    Yes.  They could have at some point, but I
19 honestly don't remember.
20    Q.    Were they happy with your performance of
21 child care related services?
22    A.    Help me with my performance?
23    Q.    Were they happy --
24    A.    Happy.
25    Q.    -- with your performance?  Yes.

Page 29

1    A.    As far as I know, they were happy with my
2 performance.
3    Q.    So I think the documents that we looked
4 over indicated that you are an au pair --
5    A.    Yes.
6    Q.    -- for the Patel family?
7    A.    Yes.
8    Q.    What is an au pair?  What is your
9 understanding of the word "au pair"?
10    A.    My understanding of the word "au pair"
11 would be like a cultural exchange.
12    Q.    Okay.  And do you remember what type of
13 Visa you had when you were a cultural exchange in
14 this country?
15    MR. RODRIGUEZ:  Objection to the
16 characterization.
17    THE WITNESS:  I believe it was a J-1 Visa.
18    Q.    (BY MR. ENICA)  And do you know who your
19 sponsor was for the J-1 Visa?
20    A.    The Patel family.
21    (EXHIBIT NUMBER 5 WAS MARKED.)
22    Q.    (BY MR. ENICA)  And I would like you to
23 take a look at it and then let me know --
24    A.    Okay.
25    Q.    -- do you recognize this document?

Page 30

```
1       A.    Yes.
2       Q.    Okay.  So if you were to go home right now
3  and check in your computer, would you be able to find
4  a copy of this document?
5       A.    I don't know.  It might be there.
6       Q.    It might be there.  Can you describe this
7  document for the record?
8       A.    It is some questions asked by Expert
9  AuPair to me during my time as an au pair.
10      Q.    Okay.  So this -- I don't want to
11 mischaracterize it.  But I think it's an e-mail sent
12 from you to Meave Treacy.
13      A.    Uh-huh (affirmative).
14      Q.    And you are telling Meave that you're --
15 you're responding to her questions in her e-mail
16 which is below.
17      A.    Correct.  She asked a couple of questions,
18 and I'm answering them.
19      Q.    And there is a question here, "Are you
20 ever working over 45 hours per week?"
21      A.    Yes.
22      Q.    Do you see that?
23      A.    I answered, "No."
24      Q.    And you answered, "No."
25            Was that the accurate answer at the time?
```

Page 31

```
1       A.    Yes, it was.
2       Q.    Okay.  The reason I'm asking is you just
3  testified when we looked at Exhibit 2, that you were
4  working more than 45 hours a week.
5       A.    Yes.
6       Q.    And you're testifying right now that the
7  correct answer was that you were working -- you are
8  not working over 45 hours a week.
9            MR. RODRIGUEZ:  Objection,
10 mischaracterizes.
11           MR. ENICA:  Okay.  Let's try again.
12      Q.    (BY MR. ENICA)  When we looked at
13 Exhibit 1 --
14      A.    Uh-huh (affirmative).
15      Q.    -- you mentioned that you worked more than
16 45 hours a week.
17      A.    Yes.
18      Q.    When you look at Exhibit 5, you answered
19 "no," to the question, "Are you ever working over
20 45 hours per week?"
21      A.    Yes, I did.  And that was the right answer
22 at the moment.
23      Q.    Okay.  So should we go back to Exhibit 1?
24 Because then your answer to the question referring to
25 Exhibit 1, if you worked more, is not accurate
```

Page 32

```
1  anymore, correct?
2       A.    Well, it depends on the time.
3       Q.    Okay.
4       A.    Uh-huh (affirmative).
5       Q.    So what you mean is at times you were
6  working more hours and at times you were working less
7  hours?
8       A.    Sometimes I was working 10 hours a day.
9  Sometimes I might be working 9 hours a day.  But it
10 wasn't written anywhere; it wasn't documented.
11      Q.    Okay.  So your testimony is that at the
12 time when you sent this message in September --
13      A.    Uh-huh (affirmative).
14      Q.    -- by the date of the message, you never
15 worked, ever, more than 45 hours a week?
16      A.    I might have some days, but maybe for some
17 special occasion.
18      Q.    Okay.  I'm just looking at your answer.
19      A.    Yeah.
20      Q.    Because you said "no," and you said the
21 answer was accurate at that time.  I'm trying to
22 determine, what's the meaning?
23      A.    Yeah, no problem.
24      Q.    Okay.  So going back to Exhibit 5.
25      A.    Yes.
```

Page 33

```
1       Q.    Is this answer still accurate, the "no"
2  answer to the question, "Are you ever working over
3  45 hours a week?"
4       A.    At the time of the e-mail, it was the
5  accurate answer.
6       Q.    Which means that at the moment you were
7  placed at the Patels until the date of the e-mail,
8  you never worked more than 45 hours a week?
9       A.    I suppose not, yeah.
10      Q.    Okay.  Now, let's go back to Exhibit 2.
11 Because when you mentioned hours of work in
12 Exhibit 2, you didn't qualify it as to any times.
13 You told me that it's inaccurate; the time should be
14 10:00 p.m.
15      A.    Uh-huh (affirmative).
16      Q.    And that you worked more than 45 hours a
17 week.
18      A.    Okay.
19      Q.    Now, we determined for at least a period
20 of time, you did not work more than 45 hours a week.
21      A.    Okay.
22      Q.    Okay.  So can you tell me for how long or
23 what was the period of time for which you worked
24 45 hours a week?
25      A.    I can't say because, as I said, it was not
```

Page 34

1  documented anywhere.  We were not writing down times
2  as to when I started and when I was done.  So it
3  depended on children, if they went to bed later or if
4  they went to bed on time.  My schedule was based on
5  the kids.
6       Q.    Okay.  And you were not keeping track of
7  your schedule?
8       A.    Nobody was keeping track of my schedule.
9       Q.    Right.  The question was about you.
10      A.    No.
11      Q.    Okay.  I'm still a bit confused.  So if
12  you are not keeping track of your schedule, how did
13  you know that you never worked more than 45 hours a
14  week on the date of this e-mail?
15      A.    Because kids went to bed around 10:00 at
16  night.  And if I started working at 6:00 in the
17  morning, that's obviously like 10 hours a day.
18      Q.    Correct.
19      A.    Yes.
20      Q.    That would make it more than 45 hours a
21  week?
22      A.    Yes.
23      Q.    I'm referring to Exhibit 5 where it says,
24  "Are you ever working more than 45 hours a week," and
25  you said "No."

Page 35

1       A.    I know I said "No," but it could have been
2  because at the moment I wasn't working 45 hours a
3  week or -- I don't know.  I can't say; I don't
4  remember.
5       Q.    Do you know if Meave sent you more e-mails
6  asking you if you're working over 45 hours a week?
7       A.    I don't remember.  We were in constant
8  e-mail communications, but I don't remember all the
9  e-mails that we exchanged.
10      Q.    Do you still have the e-mails from her?
11      A.    I'm not sure.  I would have to check my
12  computer.
13            MR. ENICA:  Okay.  Now I have to
14  apologize.  Maybe we can take a quick break?
15            MR. RODRIGUEZ:  Yeah.
16            (Break taken from 10:55 to 11:01 a.m.)
17      Q.    (BY MR. ENICA)  We're back on the record.
18  We're still at Exhibit 5.
19      A.    Okay.
20      Q.    I'm looking at Exhibit 5, one, two, three,
21  four paragraphs from the bottom.  "Did you get 36
22  continuous hours."  This is bolded.  This is the
23  question.  And your answer is "I get Saturday off."
24  And it says attached to the copy is a copy of the
25  schedule.

Page 36

1       A.    Okay.
2       Q.    Okay.  The reason why I wanted a break, I
3  wanted to see if I could find the copy of the
4  schedule in our files.
5       A.    Uh-huh (affirmative).
6       Q.    And I couldn't.  So do you know if it was
7  a copy of the schedule attached to this e-mail?
8       A.    I guess if I -- I guess it was there.  I'm
9  not sure.  I don't remember.
10      Q.    Okay.  Well, it seems like there --
11      A.    It seems like it was.
12      Q.    So what schedule is this?  Strike that.
13            The schedule attached is not the first
14  page from the employment contract, correct?
15      A.    It could have been.  I don't know.
16      Q.    Okay.  You don't know "The weekly schedule
17  for Ired Sevilla doc," what that document could have
18  been, right?
19      A.    I don't.
20      Q.    Are you aware of ever creating a schedule
21  for your work?
22      A.    I remember the one on the contract.
23  That's the only one I remember.
24      Q.    Okay.  So you don't remember any other
25  schedule other than on the front of the contract?

Page 37

1       A.    No.
2       Q.    Okay.  Do you think if you would go home
3  and look for this specific file, would you be able to
4  find it in your computer?
5       A.    I don't know.  But I can look for it.
6       Q.    I mean if it exists?
7       A.    Exactly.
8       Q.    But you could look for it?
9       A.    Yes, I could.
10            (EXHIBIT NUMBER 6 WAS MARKED.)
11      Q.    (BY MR. ENICA)  And I would like you to
12  take a look and let me know when you're ready.
13      A.    Okay.
14      Q.    Do you recognize this document?
15      A.    No, I don't.
16      Q.    Okay.  If you'd look at the top of the
17  document where it says "Dr. Jignesh Patel."
18      A.    Uh-huh (affirmative).
19      Q.    The name is a little bit different than
20  the one in Exhibit 4.
21      A.    Okay.
22      Q.    But would you recognize that it is the
23  same e-mail address?
24      A.    Yes, it is the same.
25      Q.    Okay.  And do you see your name in the

Page 38

```
1    carbon copy field?
2         A.    Yes, my name is there.
3         Q.    And is that your correct e-mail address?
4         A.    It is, yes.
5         Q.    So do you remember receiving this e-mail?
6         A.    I don't remember ever getting this.
7         Q.    Okay.  Did you receive any other e-mails
8    from mark@expertaupair.com, if you remember?
9         A.    Yes, I remember talking to Mark and Meave
10   from Expert AuPair.
11        Q.    And when you say "talking," you mean
12   corresponding by e-mail?
13        A.    Corresponding by e-mail, correct.
14        Q.    So you remember exchanging e-mails with
15   Meave and --
16        A.    Correct, yes, I do.
17        Q.    -- Mark?
18              So can you think of any specific reason
19   why this e-mail wouldn't reach you?
20        A.    No, I don't.  I just don't recognize it.
21   I might have not read it.
22        Q.    Okay.  But if you are to go back home and
23   search for this e-mail, if this e-mail exists do you
24   think you'd be able to find it?
25        A.    If it's there, yes.
```

Page 39

```
1         Q.    Okay.  Now, since this is the first time
2    you might -- since this might be the first time of
3    looking at the e-mail, I'd like you to read it.  And
4    then I'll ask you a couple of questions.
5         A.    Yes, I did read it.
6         Q.    Oh, you read it already?
7         A.    Uh-huh (affirmative).
8         Q.    What it says here in number 4 --
9         A.    Uh-huh (affirmative).
10        Q.    -- is that the host family has allowed you
11   to keep a laptop worth 1,100 as a gift.
12        A.    Yes.
13        Q.    Would that be accurate?
14        A.    It is accurate.
15        Q.    So the family gifted you a laptop?
16        A.    During my time there, yes.
17        Q.    And you kept the laptop after you left the
18   family?
19        A.    I did.
20        Q.    Okay.  Now, going backwards unfortunately.
21   So one says, "The contract was terminated with mutual
22   agreement."
23        A.    Uh-huh (affirmative).
24        Q.    What does that mean?
25        A.    That we talked and we terminated the
```

Page 40

```
1    contract upon an agreement.
2         Q.    Okay.  Who is we?
3         A.    Jignesh Patel and me.
4         Q.    So Jignesh Patel, Dr. Jignesh Patel and
5    yourself talked and decided to terminate this?
6         A.    Yes.  We did talk and terminate the
7    contract.
8         Q.    And what happened afterwards?
9         A.    After we terminated the contract, I left
10   the host family's home.
11        Q.    Did you keep working as an au pair?
12        A.    No.
13        Q.    Okay.  And you said -- I don't remember if
14   you said that, so I'm going to ask you again.
15              Did you take any vacation while you were
16   working for the Patel family?
17        A.    No, not any vacation.
18        Q.    But they paid two weeks upon your
19   departing from their family, right?
20        A.    I don't remember.  But I could look it up
21   if it's necessary.
22        Q.    Have you ever complained to Mr. or Mrs.
23   Patel, to Expert AuPair, or to the Department of
24   State about the amount that you were paid?
25              MR. RODRIGUEZ:  Objection, compound.
```

Page 41

```
1              THE WITNESS:  I never object.
2         Q.    (BY MR. ENICA)  Okay.  I'll break it down
3    in pieces.  Have you ever complained about the amount
4    you received on a weekly basis to your host family
5    which was Mr. and Mrs. Patel?
6         A.    No, I did not complain.
7         Q.    Okay.  Have you ever complained to Expert
8    AuPair about the same thing?
9         A.    I never complained.
10        Q.    Have you ever complained to the Department
11   of State?
12        A.    I never complained.
13        Q.    Okay.  Have you ever complained about the
14   number of hours that you worked?
15        A.    No, I did not never complain to the Patels
16   or to Expert AuPair.
17        Q.    How about the Department of State?
18        A.    No, I never did.
19        Q.    In your opinion was Meave -- and when I
20   say "Meave," I mean the person that you were in touch
21   with at Expert AuPair -- or Mark -- and again when I
22   say "Mark," I mean the person that you were in touch
23   with.  Were either Meave or Mark aware that you
24   worked more than 45 hours a week?
25        A.    No, they weren't aware.
```

Page 42

1    Q.    Did you have anybody else at Expert AuPair
2  that you were in touch with?
3    A.    No.
4    Q.    And the location of your placement was in
5  Florida, right?
6    A.    Yes, it was.
7    Q.    You mentioned that you were paid by check
8  by Mr. Patel?
9    A.    Yes.
10    Q.    Do you remember if it was a personal check
11  coming out from his account?
12    A.    I don't remember.
13    Q.    Do you remember if it was a business check
14  belonging, let's say, to Expert AuPair?
15    A.    No, I don't remember.
16    Q.    When we talked about the au pair program,
17  you mentioned you believed it was an intercultural
18  exchange program.  I know this program has an
19  educational component.  Did you go to school as part
20  of the educational component while you were here in
21  the au pair program?
22    A.    No, I did not go to school.
23    Q.    Again I don't want to relate this to the
24  immigration stages or anything else.  But is there a
25  specific reason why not?

Page 43

1    A.    I just didn't have the time.  I mean, my
2  time there was so short.
3    Q.    Okay.  Did you make any friends while you
4  were here as an au pair?
5    A.    Yes.
6    Q.    Did you improve your English while you
7  were here as an au pair?
8    A.    Yes.
9    Q.    Did you learn anything about the American
10  society that you didn't know before coming to the
11  United States?
12    A.    No.
13    Q.    Nothing?
14    A.    Not really.
15    Q.    What does that mean "not really"?
16    A.    I didn't learn anything specific that I
17  didn't know before about the American society.  I did
18  learn from the Patels since they are from India.
19    Q.    Well, I don't want to put words in your
20  mouth, but did you learn that America is a melting
21  pot or not?
22          Can I take a break?
23          MR. RODRIGUEZ:  Yes.
24          (Break taken from 11:14 to 11:38 a.m.)
25

Page 44

1                  EXAMINATION
2  BY MR. RODRIGUEZ:
3    Q.    Ms. Sevilla, have you searched for bank
4  records of checks from the Patels?
5    A.    Yes, I did.
6    Q.    And what did you find?
7    A.    I couldn't find anything because the
8  account is closed.
9    Q.    Have you had a chance to search your
10  e-mail since the last question Mr. Enica asked you?
11    A.    Yes, I did search my e-mail.
12    Q.    And what did you find?
13    A.    Just two e-mails that I sent out.  But I
14  don't have any received, because I deleted
15  everything.
16    Q.    When did you delete them?
17    A.    I'm not sure.  I don't know.
18    Q.    Before or after July of last year?
19    A.    Probably before July of last year.
20          MR. RODRIGUEZ:  Okay.
21          Pending any questions from Mr. Enica, I
22  have nothing further.
23          MR. ENICA:  Okay.  Just a quick one to
24  clarify.
25

Page 45

1              FURTHER EXAMINATION
2  BY MR. ENICA:
3    Q.    Do you have a gmail account?
4    A.    Yes, I do.
5    Q.    Okay.  So the e-mail account that you
6  checked right now during the break was a gmail
7  account?
8    A.    No, it wasn't.
9    Q.    Okay.  Do you have multiple e-mail
10  accounts?
11    A.    Yes, I do.
12    Q.    Can you tell me what e-mail accounts you
13  have?
14    A.    I have iredalejandra@hotmail.com,
15  iredalejandra@yahoo.com, and iredalejandra@gmail.com.
16    Q.    And which ones of these three accounts did
17  you search during the break?
18    A.    iredalejandra@hotmail.com.
19    Q.    Is there any reason why you didn't search
20  the other two?
21    A.    Because I don't use them at all.
22    Q.    And just to clarify for the record, you
23  mentioned that you searched your e-mails during the
24  break.  And what you searched for were documents
25  mentioned on Exhibit 3?

Page 46

1    A.   No.

2        MR. RODRIGUEZ:  I can represent that she

3 searched for documents that were e-mails to or about

4 Expert AuPair.  That's broader than the request.

5        THE WITNESS:  Yes.

6    Q.   (BY MR. ENICA)  So just to confirm, you

7 searched for e-mails that were to or from Expert

8 AuPair?

9    A.   Exactly, yes.

10    Q.   Okay.  How about e-mails from your host

11 family?

12    A.   Correct too.

13    Q.   Also e-mails from or to?

14    A.   From or to the Patels.

15    Q.   Any of the Patels?

16    A.   No.

17    Q.   Just Jignesh Patel?

18    A.   From the Patels in general.

19    Q.   And you were only able to find the e-mails

20 that you testified about earlier?

21    A.   Yes.

22    Q.   And except the bank statements that are

23 not in existence anymore, there is no other place

24 where you could find that information?  For example,

25 a printout of the statements that you might have at

Page 47

1 home or something similar?

2    A.   No.

3    Q.   And you didn't save those bank statements

4 in PDF form in your computer?

5    A.   No, I didn't.

6    Q.   And you did not use those statements in

7 preparing tax returns or those statements to third

8 parties?

9    A.   No, I didn't.

10        MR. ENICA:  I have no further questions.

11        MR. RODRIGUEZ:  Thank you.

12        THE REPORTER:  I need to get your orders

13 on the record, please.  Would you like a regular, a

14 mini and/or electronic?

15        MR. RODRIGUEZ:  I'm fine with electronic.

16        MR. ENICA:  I think you already have our

17 order from the office.  But, yes, we do electronic.

18        THE REPORTER:  Read and sign?

19        MR. RODRIGUEZ:  Yes, we'll read and sign

20 electronically also.

21        (Concluded at 11:43 a.m.)

Page 48

REPORTER'S CERTIFICATE

STATE OF UTAH        )
                     ) ss.
COUNTY OF SALT LAKE  )

     I, Tamra J. Berry, Registered Professional Reporter in and for the State of Utah, do hereby certify:

     That prior to being examined, the witness, IRED SEVILLA, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

     That said deposition was taken down by me in stenotype on March 23, 2018, at the place therein named, and was thereafter transcribed and that a true and correct transcription of said testimony is set forth in the preceding pages;

     I further certify that, in accordance with Rule 30(e), a request having been made to review the transcript, a reading copy was sent to Mr. Rodriguez for the witness to read and sign and then return to me for filing with Mr. Enica.

     I further certify that I am not kin or otherwise associated with any of the parties to said cause of action and that I am not interested in the outcome thereof.

     WITNESS MY HAND AND OFFICIAL SEAL this 3rd day of April, 2018.

                  Tamra J. Berry, RPR, CSR

Page 49

Case:  Beltran, et al. v. Interexchange, et al.
Case No.:  1:14-cv-03074-CMA-KMT
Reporter:  Tamra J. Berry
Date taken:  March 23, 2018

WITNESS CERTIFICATE

    I, IRED SEVILLA, HEREBY DECLARE:

    That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof; that with these corrections I have noted this transcript truly and accurately reflects my testimony.

PAGE-LINE          CHANGE/CORRECTION          REASON

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  No corrections were made.
_____  I, IRED SEVILLA, HEREBY DECLARE THAT THE FOREGOING IS TRUE AND CORRECT.

                  IRED SEVILLA
SUBSCRIBED and SWORN to this _____ day of _____, 2018, at _____

1

1

2                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
3

4      Civil Action No. 1:  14-cv-03074-CMA-KMT

5

6      _____

7                                           )
       JOHANA PAOLA BELTRAN;  et al.         )
8                                           )
                       Plaintiffs,           )
9                                           )
       v.                                    )
10                                           )
       INTEREXCHANGE, INC.;  et al.          )
11                                           )
                       Defendants.           )
12     _____)

13

14              Deposition upon oral examination

15                           of

16                  MS CHARLOTTE WOOLGAR

17                           on

18              Tuesday, March 27th, 2018

19              commencing at 10.00 am

20

21                       Taken at:

22              Bournemouth Marriott Hotel

23        105 St Michael's Road, Bournemouth,  BH2 5DU

24                   UNITED KINGDOM

25

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1
 2                         A P P E A R A N C E S
 3
 4     On behalf of the Plaintiffs:
 5
 6              BOIES SCHILLER FLEXNER LLP
 7              1999 Harrison Street, Suite 900
 8              Oakland, CA 94612
 9              Phone:  510-874-1000
10
11                 BY:   MR.  SEAN PHILLIPS RODRIGUEZ
12
13
14     On behalf of the Defendants:
15
16              BOGDAN ENICA, ESQ.
17              111 Second Avenue NE, Suite 900
18              St. Petersburg, FL 33701
19              Phone:  727-388-3472
20
21                 BY:   MR.  BOGDAN ENICA
22
23     Court reporter:
24              Ms Sara Buzuk
25              Marten Walsh Cherer
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

3

1

2                              I N D E X

3

4       Witness:

5       Ms Charlotte Woolgar

6

7       Examination:                              Page number:

8

9       Examination by Mr. Enica                      5

10      Examination by Mr. Rodriguez                 64

11      Further examination by Mr. Enica            71

12

13                    --------------------------------

14

15

16

17

18

19

20

21

22

23

24

25

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

4

1

2                    I N D E X   O F   E X H I B I T S

3

4      Letter                                    Page number

5

6      Woolgar Exhibit 1                              10

7      Woolgar Exhibit 2                              13

8      Woolgar Exhibit 3                              16

9      Woolgar Exhibit 3A                             21

10     Woolgar Exhibit 4                              20

11     Woolgar Exhibit 4A                             22

12     Woolgar Exhibit 5                              29

13     Woolgar Exhibit 6                              38

14     Woolgar Exhibit 7                              48

15     Woolgar Exhibit 8                              51

16     Woolgar Exhibit 9                              56

17     Woolgar Exhibit 10                             64

18

19

20

21

22

23

24

25

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2            (On the record at 9.57 am)

 3              MS CHARLOTTE WOOLGAR

 4              having duly affirmed

 5      was examined and did testify as follows:

 6              BY MR. ENICA:

 7          Q.      Good morning.   My name is Bogdan

 8      Enica and I represent Expert AuPair and I'll be

 9      conducting the deposition today.   How do you want

10      me to address you?

11          A.      Charlotte.

12          Q.      Charlotte.   So, Charlotte, have you

13      ever been deposed before?

14          A.      No.

15          Q.      Okay.   Have you ever been involved

16      in a lawsuit or a court proceeding before?

17          A.      No.

18          Q.      Okay.   Then I'm going to explain

19      the rules of the deposition today.   So you'll let

20      me know at the end if you understood what are the

21      rules.   It's not very complicated.   I'm going to

22      ask questions; you're going to provide answers.

23      As you are under oath today, you will provide

24      truthful answers to the best of your recollection.

25      We do have a court reporter here.   The court
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                          WOOLGAR - ENICA

2    reporter is going to write down everything we say.

3    Therefore, it is important that we observe a few

4    rules.  First, I would like you to wait until I

5    pose a question in order to give me the answer and

6    I will try and do the same.  I'll try until you

7    give an answer until I pose the next question.

8    This will allow the court reporter to write down

9    everything we say.  Second, I would like your

10   answers to be verbal, in terms of a yes, no, or

11   something verbal, rather than a hand gesture or a

12   head shake.  If you answer a question, I would

13   assume that you understood the question.  If you

14   don't understand the question, if you have any --

15   if something is not clear about the question,

16   please ask me to rephrase or please ask for

17   clarifications.  Again, once we put an answer on

18   the record, we assume that that's the correct and

19   truthful answer.  If you want to take a break at

20   any time, we can take a break, just let us know,

21   or if you are uncomfortable for any reason, if

22   it's too hot, too cold or anything, let us know

23   and we'll take a break.  My only request is that

24   if I pose the question already, you would answer

25   the question before we take a break.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2           A.     Okay.

 3           Q.     Okay.  And you have counsel here.

 4    Your counsel may object to some of the questions I

 5    pose, though you are to answer the questions

 6    unless your counsel specifically advises you not

 7    to answer the questions.

 8           A.     Okay.

 9           Q.     Okay.  So are the rules clear?

10           A.     Yes.

11           Q.     Perfect.  And are you under the

12    influence of any substance or medication that may

13    impair your ability to tell the truth today?

14           A.     No, I am not.

15           Q.     Perfect.  Did you prepare for the

16    deposition today?

17           A.     Yes.

18           Q.     How did you prepare for the

19    deposition?

20           A.     I prepared by meeting my counsel.

21           Q.     How else --

22           A.     How else?

23           Q.     -- did you prepare?

24           A.     That's it really.

25           Q.     Did you review any documents in
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                      WOOLGAR - ENICA

 2    preparation for today?

 3              A.      No.

 4              Q.      What is your current address,

 5    Charlotte?

 6              A.      11, Ross Road, Ringwood, BH24 1XG.

 7              Q.      And what is your email address?

 8              A.      It's my full name,

 9    charlottewoolgar@gmail.com

10              Q.      Would it be the proper email

11    address in order to reach you?

12              A.      Yes.

13              Q.      And do you know why you're here

14    today?

15              A.      Yes.

16              Q.      Why are you here today?

17              A.      To help in determining the case.

18              Q.      Okay.  And what case are you

19    referring to?

20              A.      The case between au pairs and au

21    pair agencies.

22              Q.      Okay.  But you're specifically here

23    to discuss about one au pair agency.  Right?

24              A.      Expert AuPair, yeah.

25              Q.      And why are you suing Expert
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2    AuPair?

3              A.      I don't really understand the

4    question.

5              Q.      Why are you suing Expert AuPair,

6    meaning -- you mentioned something about a lawsuit

7    between au pairs and Expert AuPair.

8              A.      Yeah.

9              Q.      And are you one of those au pairs

10   involved?

11             A.      Yes.

12             Q.      And you understand that you are a

13   plaintiff against Expert AuPair?

14             A.      Yes.

15             Q.      Which means that you are suing

16   Expert AuPair.

17             A.      Right.

18             Q.      Right?

19             A.      Okay, yeah.  What's the question?

20             Q.      The question was why are you suing

21   Expert AuPair?

22             A.      I'm in the class action lawsuit

23   because I do not believe that it's lawful the

24   amount I was paid.

25             Q.      So it's about the amount that you

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2    are paid?

3           A.      Yes.

4           Q.      And I'm going to mark a document as

5    an exhibit.  This is going to be Exhibit 1.

6                   (Woolgar Exhibit 1 marked for

7    identification)

8                   BY MR. ENICA:

9           Q.      Do you recognize this exhibit?

10          A.      Yes.

11          Q.      And can you describe this document

12   for the record?

13          A.      It's the consent to join and opt

14   into the lawsuit.

15          Q.      Okay.  In order to become a

16   plaintiff.  Is that correct?

17          A.      Yes.

18          Q.      And did you sign this document?

19          A.      Yes, I did.

20          Q.      Do you remember approximately when

21   you signed this document?

22          A.      Well, from looking at it, I can

23   see, but -- yeah, so --

24          Q.      So was it around December last

25   year?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA
 2          A.      Yes.
 3          Q.      Okay.  And you mentioned that you
 4    are suing Expert AuPair because you don't believe
 5    the amount you were paid is lawful.  Is that
 6    accurate?
 7          A.      I said that I'm involved in the
 8    lawsuit because I don't think that the amount I
 9    was paid and the hours that I worked were lawful.
10          Q.      What's your -- what's the
11    difference between being involved in a lawsuit and
12    suing somebody?
13          A.      Just a word.
14          Q.      Okay.  But in your understanding is
15    it the same?
16          A.      Well, I mean, I would say that
17    suing them would be the person that started the
18    lawsuit but now I am a plaintiff as well, yeah.
19          Q.      Okay.  And what amount do you
20    believe it is lawful to be paid for working as au
21    pair?
22                  MR. RODRIGUEZ:  I object to the
23    extent it calls for a legal conclusion.  You may
24    answer.
25          A.      The minimum wage at least.
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

12

1                    WOOLGAR - ENICA

2              BY MR. ENICA:

3         Q.      So you believe you are paid less

4    than the minimum wage?

5         A.      Yes, I believe that.

6         Q.      You mentioned the word au pair.

7         A.      Yes.

8         Q.      What is an au pair in your

9    understanding?

10        A.      An au pair is somebody that looks

11   after children.

12        Q.      That would be your full answer?

13        A.      Yeah.

14        Q.      And were you an au pair?

15        A.      Yes.

16        Q.      In which country?

17        A.      The United States.

18        Q.      And do you remember approximately

19   the time when you were an au pair in the United

20   States?

21        A.      Yes.

22        Q.      And what would be the time?

23        A.      July 2016 to May 2016 -- 2017.

24   Sorry.

25        Q.      I'm going to mark another document

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

13

1

2   as Exhibit 2.  This is a document that your

3   counsel provided on your behalf.

4                    (Woolgar Exhibit 2 marked for

5   identification)

6                    BY MR. ENICA:

7          Q.      I would like you to take a look at

8   the document and let me know what you are ready.

9          A.      Okay.  (After a pause)  Okay.

10         Q.      Have you seen this document before?

11         A.      I don't remember ever seeing it.

12         Q.      Okay.  But it was produced by you?

13         A.      It was produced by me?

14         Q.      Correct.

15         A.      This piece of paper was given --

16         Q.      Correct.  If you look at the bottom

17  right-hand, these are numbers.  If you see your

18  name here, before the number --

19         A.      Yes.

20         Q.      -- those are documents produced by

21  you.

22         A.      Okay.  So I don't remember it being

23  sent to me but yes.

24         Q.      So this is the first time you're

25  looking at the contents of this document.  They

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

<pre>
 1                    WOOLGAR - ENICA

 2      don't look familiar at all?

 3           A.      It looks familiar.  I received lots

 4      of pieces of paper similar to this so I don't

 5      remember this one exactly.

 6           Q.      Okay, but are you familiar with the

 7      content of this document?

 8           A.      The content?  What they've written?

 9           Q.      Yes.

10           A.      I don't remember it but --

11           Q.      Okay.  Can you say if you saw the

12      content of this document before or if you ever

13      read it before, if you remember?  If you don't,

14      that is fine.

15           A.      I don't remember reading it before

16      but I could have but I don't remember reading it.

17           Q.      Okay.  You mentioned you are an au

18      pair between July 2016 and May 2017.

19           A.      Yes.

20           Q.      Do you remember the state in which

21      you were an au pair, or states?

22           A.      I was in Alaska and Florida.

23           Q.      And how many families did you work

24      for?

25           A.      Three families.
</pre>

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2          Q.       And out of the three families how

3    many were in Alaska and how many in Florida?

4          A.       Two families in Alaska and one

5    family in Florida.

6          Q.       Okay.   I'm going to hand you

7    another document and I'm going to mark it as

8    Exhibit 3.

9                    (Woolgar Exhibit 3 marked for

10   identification)

11                  BY MR. ENICA:

12         Q.       I want you to take a look at the

13   document and let me know when you have done.

14         A.       (After a pause)  Okay.

15         Q.       Have you seen this document before?

16         A.       Yeah.

17         Q.       And if you turn to the last page,

18   is that your signature?

19         A.       This is the last page.

20                  MR. RODRIGUEZ:   It looks like it's

21   missing the signature page.

22                  MR. ENICA:  I do apologise.  I will

23   give it to your counsel and then pass it to you.

24                  MR. RODRIGUEZ:   Shall we just mark

25   it as 3A or 3B?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                         WOOLGAR - ENICA

1

2                  MR. ENICA:  Correct.  Let's mark it

3     as 3A.

4                  (Woolgar Exhibit 3A marked for

5     identification)

6          A.      Yes, this is my signature.

7                  BY MR. ENICA:

8          Q.      Was that page attached to the

9     document we marked as Exhibit 3?

10         A.      Yes.

11         Q.      So is Exhibit 3 your declaration

12    that you made under oath?

13         A.      Yes.

14         Q.      Okay.  I want you to turn to the

15    last page of Exhibit 3, not the 3A.

16         A.      Yes.

17         Q.      I look at question number 2.

18         A.      Yes.

19         Q.      Can you read the answer for the

20    record?

21         A.      The answer to question 2 is "I

22    worked 45+ hours a week during my time as an au

23    pair.  On 0 occasions, I worked less than 45 hours

24    a week".

25         Q.      Is that still accurate?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                          WOOLGAR - ENICA

2              A.      Yes.

3              Q.      Were there any occasions when you

4       worked more than 45 hours a week?

5              A.      Yes.

6              Q.      Do you remember for which one of

7       the families you worked more than 45 hours a week

8       on at least one occasion?

9              A.      For every family.

10             Q.      For every family.  I'm going to ask

11      you to turn to page number 5.  The pages are not

12      numbered but you can count until page number 5.

13                     MR. RODRIGUEZ:  Is there a

14      paragraph number?

15                     BY MR. ENICA:

16             Q.      Paragraph number 4?

17             A.      Okay.

18             Q.      Okay.  So in paragraph number 4

19      there's some dates listed with amounts that you

20      were paid.

21             A.      Yes.

22             Q.      Can you see that on the page?

23             A.      Yes.

24             Q.      Did you use any document in order

25      to remember these amounts?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

18

```
 1                    WOOLGAR - ENICA

 2          A.      Yes.

 3          Q.      And what document was that?

 4          A.      My notes.

 5          Q.      Did you keep notes regarding the

 6   amounts that you received every week?

 7          A.      I wrote this, yes.

 8          Q.      Do you still have the notes?

 9          A.      Yes.

10          Q.      Did you produce the notes?

11          A.      I wrote them, yes.  I wrote them.

12          Q.      Did you produce them in this

13   litigation?  Did you give us a copy or --

14          A.      I'm not sure if I did or not.

15          Q.      The reason I'm asking is because we

16   were not able to locate the notes so I just want

17   to know if you produced them.

18          A.      Okay.

19          Q.      If you are not sure --

20                  MR. RODRIGUEZ:  If you'll give me

21   one second, I can actually give you the Bates

22   number.

23                  MR. ENICA:  So they were produced?

24                  MR. RODRIGUEZ:  I recall them.  I

25   can give you the Bates number.
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2                    MR. ENICA:   That's fine.  We can do

3        it on a break.

4                    BY MR. ENICA:

5        Q.        Okay.  We'll refer back to this

6        document a little bit later but for now I don't

7        want to address this document.  You mentioned you

8        worked for two families in Alaska and one family

9        in Florida.

10       A.        Yeah.

11       Q.        Can you state chronologically the

12       last name for each one of them?

13       A.        Yes.  So the first family I worked

14       for was the Daulas, D-A-U-L-A, the second family I

15       worked for was the Hartys, H-A-R-T-Y, and the

16       third family was the Leonis, L-E-O-N-I.

17       Q.        Do you remember why you decided to

18       become an au pair?

19       A.        Yes.  I wanted to become an au pair

20       to be able to travel mostly.

21       Q.        That was the main or only reason

22       for becoming an au pair?

23       A.        That was my only reason really.

24       Q.        And do you remember how you

25       selected the agency, Expert AuPair?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

2    A.    First I found the family, the
3  Daulas, and they lived in Alaska, and Expert
4  AuPair was the only agency available to go to
5  Alaska with.
6        Q.    Okay.  So you found the family by
7  yourself?
8        A.    Yes.
9        Q.    How did you find them?
10       A.    On a website.
11       Q.    Do you remember the website name?
12       A.    Yes, aupair.com
13       Q.    So you went to aupair.com and you
14  found this family?
15       A.    Yes.
16       Q.    What happened afterwards?  Did you
17  discuss anything regarding the conditions of your
18  employment with them prior to contacting Expert
19  AuPair?
20       A.    Yes.
21       Q.    What specifically did you discuss
22  with them?
23       A.    We discussed whether it would be
24  possible, how would the visa work, my hours, my
25  pay.  We discussed finding an agency, tasks that I

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

1

2    would be doing in the house.

3          Q.    Okay.  I'm going to mark the next

4    document as Exhibit 4.

5                (Woolgar Exhibit 4 marked for

6    identification)

7                BY MR. ENICA:

8          Q.    I would like you to take a document

9    and let me know when you're ready.

10         A.    (After a pause)  Okay.

11         Q.    Do you recognize this document?

12         A.    Yes.

13         Q.    Is the name on the first page your

14   name?

15         A.    Yes.

16         Q.    Do you know who filled in the names

17   on the first page?

18         A.    No.

19         Q.    Is it you who filled in the names?

20         A.    No.

21         Q.    If I look at the last page, I don't

22   see your signature.  Do you remember if you ever

23   signed this contract?

24         A.    I don't have the last page again, I

25   don't think.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2                    MR. ENICA:  Off the record.

3                        (Off the record)

4                          (On the record)

5                    BY MR. ENICA:

6          Q.     Exhibit 4A?

7                    MR. RODRIGUEZ:  Why don't we go

8    ahead and mark 3A and 4A before we lose track or

9    before I lose track.

10                       (Woolgar Exhibit 4A marked for

11   identification)

12                   BY MR. ENICA:

13         Q.     Do you remember ever signing this

14   document?

15         A.     I don't remember doing it.

16         Q.     Okay.  But you saw this document

17   prior to obtaining --

18         A.     Yes.

19         Q.     I just want to make the record

20   clear so I'm going to ask the question again.

21         A.     Yes.

22         Q.     You saw this document prior to

23   travelling to the United States?

24         A.     Yes.

25         Q.     And are the hours mentioned on the

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                    WOOLGAR - ENICA

1

2    first page the hours that you negotiated with the

3    family?

4                    MR. RODRIGUEZ:  Object to the form

5                    BY MR. ENICA:

6        Q.    I'm going to rephrase.  Are the

7    hours on the first page the hours that you had

8    previously discussed with the family?

9        A.    No.  They changed.

10       Q.    Okay.  How did they change?

11       A.    Before the agency and after I

12   started working for the family they also changed

13   from this time, from this piece of paper.  So,

14   before I had the agency, we discussed about 30

15   hours, after the agency, they gave me these hours,

16   and then after I started working for the family,

17   again, I worked different hours to this.

18       Q.    Okay.  So you worked different

19   hours than the ones in the contract?

20       A.    Yes.

21       Q.    Did you ever amend or change the

22   contract?

23                    MR. RODRIGUEZ:  Object to the

24   extent it calls for a legal conclusion.

25                    BY MR ENICA:

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2          Q.       You may answer.

3          A.       Sorry.  What was the question?

4          Q.       Did you ever amend or change this

5    contract in order to reflect the actual hours you

6    were required to work?

7                    MR. RODRIGUEZ:  Same objection.

8          A.       No, I never changed the contract.

9                    BY MR. ENICA:

10         Q.       Now, English is your mother tongue.

11   Is that correct?

12         A.       Yes.

13         Q.       Okay.  If you look at the first

14   page of the contract, the last paragraph, the

15   first sentence --

16         A.       Yes.

17         Q.       -- can you read it for the record?

18         A.       "The Au Pair may not work more than

19   10 hours in any day, or 45 hours in any work

20   week".

21         Q.       Correct.  But you are testifying

22   here today that you did work more than 45 hours a

23   week?

24         A.       Yes, that's true.

25         Q.       And do you know who provided a

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

Case No. 1:14-cv-03074-CMA-KMT Document 1005-104 filed 06/26/18 USDC Colorado pg 88 of 264

1               WOOLGAR - ENICA

2      template for this contract?

3              A.      Expert AuPair.

4              Q.      Did you ever inform Expert AuPair

5      that you were working more than 45 hours a week?

6              A.      After I left the family, yes, I

7      informed them

8              Q.      So your answer is yes, you informed

9      them, after you left the family.  Is that correct?

10             A.      Yes.

11             Q.      Okay.  While you were with the

12     family, did you ever inform them that you were

13     working more than 45 hours a week?

14             A.      Not that I remember.

15             Q.      If we go to page 2, under paragraph

16     1.3 --

17             A.      Yes.

18             Q.      -- "Duties", do you know who wrote

19     those duties in?

20             A.      I don't know.

21             Q.      Would it be Expert AuPair or the

22     host family?

23             MR. RODRIGUEZ:   Objection.

24     Foundation.

25             BY MR. ENICA:

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2          Q.      Go ahead.

3          A.      I really don't know who wrote it. I

4    assume it was the family but I don't know.

5          Q.      Fair enough.  And are these the

6    duties that you discussed with the host family?

7          A.      Yes, they are.

8          Q.      Were you required to perform

9    exactly the same duties for the other families

10   that you worked for in the United States?

11         A.      No.

12         Q.      Did you actually perform these

13   duties?

14         A.      Some of them, yes.

15         Q.      Did you perform more duties than

16   the ones listed here?

17         A.      Yes.

18         Q.      Can you give me an example of

19   something that you remember that is not mentioned

20   here?

21         A.      Cleaning the kitchen.

22         Q.      Was cleaning the kitchen considered

23   a childcare related duty which means were you

24   cleaning after the child?

25         A.      I don't consider myself cleaning

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2        after the child, I consider myself cleaning after

3        the whole family.

4                Q.      I'm going to move to the next page

5        and I will look at the first line, "Pay day will

6        be Friday".

7                A.      Yes.

8                Q.      Do you know who wrote Friday?

9                A.      No, I don't know who wrote Friday.

10               Q.      Okay.  The second line says that

11       the payment will be made by bank transfer.  Is

12       that correct?

13               A.      Yes.

14               Q.      Did you receive payment by bank

15       transfer?

16               A.      I can't remember 100 per cent but I

17       think I probably did.

18               Q.      Okay.  And who made those payments?

19               A.      John Daula.

20               Q.      Was he ever late in making payments

21       to you?

22               A.      I can't remember.

23               Q.      If I go down on the page where it

24       says 2, and then 2.1, "Car" --

25               A.      Yes.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                        WOOLGAR - ENICA

2            Q.      -- it says "The au pair will have

3    access to a car".  Did you have access to a car

4    while you were working for this family?

5            A.      No.  I didn't have a driving

6    license for Alaska.

7            Q.      Okay.  The question is if you had

8    access to a car.

9            A.      No.

10           Q.      Did you attempt to obtain a

11   driver's license in Alaska?

12           A.      Yes, I did try, yes.

13           Q.      And then I'm off to the next page

14   where it says "2.2 Phone Privileges".

15           A.      Yes.

16           Q.      And it's written -- it's

17   handwritten that the "Host family will assist Au

18   Pair with adding her phone to family wireless

19   plan".  Did they add your phone to their wireless

20   plan?

21           A.      Yes, they provided me with a plan.

22   I don't know if it was on their plan or my own

23   plan.

24           Q.      Were you required to pay for the

25   plan?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                           WOOLGAR - ENICA

2               A.       No.

3               Q.       Did this family contribute to your

4        educational expenses in any ways?

5               A.       No.

6               Q.       Did you take any vacation while you

7        were working for them?

8               A.       No.

9               Q.       Okay.  I'm going to mark the next

10       document.  Can we go off the record for a second?

11                       (Off the record at 10.31 am)

12                       (On the record at 10.33 am)

13                       BY MR. ENICA:

14              Q.       We can go back on the record and

15       mark the next document as Exhibit 5.

16                       (Woolgar Exhibit 5 marked for

17       identification)

18                       BY MR. ENICA:

19              Q.       Charlotte, I would like you to take

20       a look at the document and let me know when you're

21       ready.

22              A.       Okay.  (After a pause)  Okay.

23              Q.       Do you recognise the document?

24              A.       Yes.

25              Q.       Do you remember ever signing this

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                      WOOLGAR - ENICA

 2      document?

 3            A.      Again, I don't remember signing it.

 4            Q.      Okay.  Do you remember agreeing to

 5      the terms included in this document?

 6            A.      Yes.

 7            Q.      Okay.  How did you find this host

 8      family?  Was it Expert AuPair or was it yourself?

 9            A.      I found them

10            Q.      You found them  How did you find

11      them?

12            A.      On the same website as the first

13      family, aupair.com

14            Q.      You testified about the previous

15      family that prior to contacting the agency you

16      discussed with them about various things.

17            A.      Yes.

18            Q.      Do you remember, regarding your

19      employment with the Harty family, what did you

20      discuss with them prior to informing Expert AuPair

21      that you want to be placed with them?

22            A.      I discussed with them similar

23      things to the first family, the hours, the pay,

24      the duties.

25            Q.      And are the hours mentioned on the
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                              WOOLGAR - ENICA

1

2      first page of the document the hours that you

3      discussed with them?

4               A.      I don't remember exactly what I

5      discussed with them before we contacted the

6      agency.

7               Q.      But are these the hours that you

8      agreed to work for them?

9               A.      These are the hours I agreed to

10     work for them after we contacted the agency.

11              Q.      So is it possible that the hours

12     changed from before contacting the agency until

13     after you contacted the agency?

14              A.      Yes, it's possible that they

15     changed.

16              Q.      Okay.   And why were they changed?

17              A.      Because the agency has the 45-hour

18     of working week.

19              Q.      The agency has what?

20              A.      The agency has -- so you have to

21     work 45 hours for the week.

22              Q.      So it is your understanding that

23     the agency wants you to work --

24              A.      Yes.

25              Q.      -- 45 hours?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

32

                              WOOLGAR - ENICA

1

2          A.        Yes.

3          Q.        Okay.  But if you look at the

4    contract --

5          A.        Yes.

6          Q.        -- that you have in front of you,

7    and you testified that you believed the template

8    was provided by the agency --

9          A.        Yes.

10         Q.        -- it says the Au Pair may not work

11   more than 45 hours.  Is that correct?

12         A.        Yes, it says that, yes.

13         Q.        But your understanding is still

14   that they want you to work 45 hours?

15         A.        Yes.

16         Q.        I'm going to move to page 2, 1.3,

17   "Duties".  Are these the same duties as the ones

18   mentioned in the previous contract, Exhibit 4?

19         A.        They aren't the exact same duties.

20         Q.        They are different duties?

21         A.        Some of them are different, yes.

22         Q.        And who decided on these duties?

23         A.        The family.

24         Q.        Would it be the same duties as you

25   had with the next family?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1

2          A.     With the third family?

3          Q.     Yes.

4          A.     No, it's not the same.

5          Q.     And do you know who filled in this

6    portion here?

7          A.     I don't know who filled out the

8    document.

9          Q.     Now, if I look at the 1.4.1

10   section, "Stipend", it says "The Host Family agree

11   to pay the Au Pair a weekly stipend of $200 per

12   week".

13         A.     Yes.

14         Q.     Were you actually paid 200 per

15   week?

16         A.     I believe I was, yes.

17         Q.     I'm not trying to trick you in any

18   way but, if I'm going back to Exhibit 1, the last

19   page --

20         A.     This page, yes.

21         Q.     -- the last page of Exhibit 1, the

22   last page of the document --

23         A.     Yes.

24         Q.     -- the last page of the --

25                MR. RODRIGUEZ:   That is Exhibit 1

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2       or --

 3                    MR. ENICA:  I apologise.  It is

 4       Exhibit 3.  So the last page of Exhibit 3, the

 5       first paragraph --

 6            A.      Yes.

 7            Q.      -- it says I received $195.75 in

 8       weekly payments for from my host family.  No

 9       more".

10            A.      Yes, it says that.

11            Q.      Okay.  So looking at both

12       statements, which one is correct?  Did you receive

13       200 or 175?  Again, it is not a trick question.

14       I'm just trying to figure it out.

15            A.      From the Harty family I received

16       $200 a week.  From the other families I received

17       $195.75.

18            Q.      Okay.  So I'm still on Exhibit 3.

19            A.      Yes.

20            Q.      I think that was page 5, paragraph

21       4.

22            A.      Yes.

23            Q.      In the middle of the page it says

24       "Monday October 3rd - Started working for Harty".

25            A.      Yes.
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                      WOOLGAR - ENICA

 2            Q.      And then you listed payments as

 3      391.50.

 4            A.      Yes.

 5            Q.      Are those payments accurate?

 6            A.      No.

 7            Q.      Okay.  Well, I don't need this

 8      exhibit anymore so we're going back to the

 9      contract.

10                    MR. RODRIGUEZ:  This is Exhibit 5?

11      BY MR. ENICA:

12            Q.      We are going back to Exhibit 5, if

13      possible, yes.  I'm looking at 2.2.  This is on

14      page 4.

15            A.      Yes.

16            Q.      It is "Phone privileges".

17            A.      Yes.

18            Q.      Were you able to use the family's

19      phone?

20            A.      Yes, I was.

21            Q.      Were you able to make long-distance

22      calls?

23            A.      I didn't make long-distance calls.

24            Q.      Okay.  Were you required to pay for

25      using the phone?
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

1
2          A.      No, I don't think so, no.

3          Q.      Did you ever work more than 45

4    hours a week for this family?

5          A.      Yes, I did.

6          Q.      So the schedule on the first page

7    was not accurate for the situations where you

8    worked more than 45 hours a week.  Is that

9    correct?

10         A.      No, the hours stated on the first

11   page aren't correct.

12         Q.      So that's not the actual hours

13   worked?

14         A.      No.

15         Q.      That is what you're saying?

16         A.      Yes.  They are not the hours that I

17   worked.

18         Q.      Okay.

19         A.      Mostly.

20         Q.      Have you ever changed or amended

21   this contract to reflect the actual hours that you

22   were working?

23                 MR. RODRIGUEZ:  Objection to the

24   extent it calls for a legal conclusion.

25         A.      I didn't change the contract.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                          WOOLGAR - ENICA

                    BY MR. ENICA:

          Q.      Now, I know some time passed but
    would you be able to tell me the difference
    between these hours and the actual hours worked?

          A.      Well, the difference between these
    hours and the actual hours I worked was always
    different so every day was different and every
    week was different so I can't remember exactly
    what I worked.

          Q.      Okay. Fair enough. On a regular
    weekday while working for this family --

          A.      Yes.

          Q.      -- during your working hours were
    you the only childcare provider in the household?

                    MR. RODRIGUEZ:  Object to the form

                    BY MR. ENICA:

          Q.      Which I can clarify if you don't
    understand. Was it a stay at home mother or
    another childcare provider at the same time while
    you were providing childcare?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                            WOOLGAR - ENICA

5              Q.    Okay.  We are done with Exhibit 5

6       and I'm going to mark the next exhibit as Exhibit

7       6.

8                    (Woolgar Exhibit 6 marked for

9       identification)

10                   BY MR. ENICA:

11             Q.    I would like you to take a look and

12      let me know when you have.

13             A.    (After a pause)  Okay.

14             Q.    Do you recognize this document?

15             A.    Yes.

16             Q.    And how would you describe it?

17             A.     It's the contract that the agency

18      gave me and Todd Leoni.

19             Q.    Can you repeat the last part?

20             A.     It's the contract that the Expert

21      AuPair agency gave to Todd Leoni and then to me.

22             Q.    So when you're saying that the

23      agency gave to Todd Leoni, were you part of the

24      transaction?  Did you know for a fact that the

25      agency gave this contract to Todd Leoni?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2          A.       Todd told me that the agency gave

 3     him the contract.

 4          Q.       Okay.  So if I'm asking you to look

 5     at the times on the first page, is it your

 6     understanding -- sorry.  I apologize.  The hours

 7     on the first page, is it your understanding that

 8     the times on the table are filled in by the

 9     agency?

10          A.       I don't know who filled it out.

11          Q.       Okay.  Did you write your name on

12     the first page?

13          A.       No.

14          Q.       Is it your understanding that the

15     agency wrote your name there?

16          A.       I don't know whose writing it is on

17     the document.

18          Q.       Did you sign it on the last page?

19          A.       Yes, I signed it on the last page.

20          Q.       Okay.  So this is actually a

21     contract that came from you, the document that you

22     have in front of you.  Would that be accurate?

23                   MR. RODRIGUEZ:  Object to the form

24          A.       It came from my emails, yes, as a

25     copy.
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2              BY MR. ENICA:

 3              Q.      So this is the document that you

 4      provided Expert AuPair with.  Would that be

 5      accurate?

 6              A.      No.

 7              Q.      Are the hours mentioned on the

 8      first page, as start time and end time, accurate

 9      for the amount of hours you worked for this

10      family?

11              A.      No, the hours stated on the

12      contract are not accurate to what I worked.

13              Q.      Okay.  Did you find this family

14      yourself?

15              A.      Yes, I did find the family.

16              Q.      Do you remember how you found this

17      family?

18              A.      The same as the first two families,

19      on aupair.com

20              Q.      Okay.  Do you remember if you

21      discussed with them before contacting Expert

22      AuPair?

23              A.      Yes, I discussed lots of things

24      with them before I contacted the agency.

25              Q.      Okay.  Can you -- do you remember
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                        WOOLGAR - ENICA

 2      if you discussed about hours of work?

 3              A.      Yes, we discussed hours of work.

 4              Q.      Do you remember if you discussed

 5      pay, the amount of pay?

 6              A.      I don't remember what we discussed

 7      about pay.

 8              Q.      I'm going to ask you to take a look

 9      at the hours on the first page that Expert AuPair

10      provided.  Do you have any idea how many hours per

11      week are mentioned here in the contract?

12              A.      You want me to count the hours

13      written down here?

14              Q.      If you can, yes.  You can take your

15      time.  It's not a rush.

16              A.      (After a pause)  Written on this

17      contract is 31 and a half hours, I believe.

18              Q.      31 and a half.  Right?

19              A.      Yes.

20              Q.      Okay.  Well, I can't say if that's

21      accurate but it sounds more or less like right.

22      So you mentioned that the agency gave Todd Leoni

23      this contract with 31 and a half hours on it.

24      However, you testified earlier that it was your

25      understanding that the agency wants you to have 45
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

42

1                    WOOLGAR - ENICA

2     hours in each contract. Is that accurate?

3                    MR. RODRIGUEZ:   Objection.

4     Misstates.

5          A.      No.   The agency gave this contract

6     to Todd Leoni. I don't know whether it was filled

7     in or it could have been blank and I was given it

8     to sign.

9                    BY MR. ENICA:

10         Q.      Right.   When you look at one of the

11    previous contracts --

12         A.      Yes.

13         Q.      -- you testified that the agency

14    wanted 45 hours in the contract. They didn't want

15    less.  Is that accurate?

16         A.      Yes.

17         Q.      Okay.   However, this contract has

18    31.5, you say?

19         A.      Yes.

20         Q.      Would that change your opinion that

21    the agency wanted 45 hours in it?

22                    MR. RODRIGUEZ:   Objection to the

23    characterization as opinion.

24         A.      What was the question?

25                    BY MR. ENICA:

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
1                    WOOLGAR - ENICA

2          Q.      Would it change your testimony

3    stating that Expert AuPair wanted 45 hours in

4    their contract?

5          A.      No, it doesn't change my testimony.

6          Q.      How many hours did you actually

7    work for the Leoni family?

8          A.      Actually, I just worked 24 hours a

9    day, 24/7.

10         Q.      So you worked more than 45 hours a

11   week?

12         A.      Yes.

13         Q.      Did you inform the agency that the

14   hours on the contract were not accurate?

15         A.      I informed them at the end of my

16   employment.

17         Q.      So while working for the Leoni --

18   how many months did you work for the Leonis?  Do

19   you remember?  I think it's mentioned in Exhibit 3

20   if you want to refresh your memory.

21         A.      From my memory, I worked for him

22   for around three months.

23         Q.      And during this time -- you said

24   you only informed the agency at the end of your

25   employment that you worked more than 45 hours.
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2          A.     Yes.

 3          Q.     Do you remember when at the end of

 4   your employment?

 5          A.     I sent them an email probably the

 6   day that I left his house.

 7          Q.     Okay.  Now, I'm going to the second

 8   page on Exhibit 6.  Under 1.3, "Duties" --

 9          A.     Yes.

10          Q.     -- do you know who wrote these

11   duties here?

12          A.     I don't know for sure who wrote

13   these duties, no.

14          Q.     Okay.  Are these the duties that

15   you discussed with him prior to contacting Expert

16   AuPair?

17          A.     Yes, they are the duties that I

18   discussed prior to contacting Expert AuPair, yes.

19          Q.     And are they the same duties as for

20   the previous -- any of the previous families?

21          A.     They aren't the same duties as the

22   previous families.

23          Q.     Okay.  Now, do you remember if you

24   took any vacation while working for this family?

25          A.     I did take a vacation when working
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2      for the family.

 3              Q.      You did?

 4              A.      I did.

 5              Q.      Do you remember how long?

 6              A.      Just for a couple of days.  I don't

 7      remember exactly.

 8              Q.      And did they pay for your vacation?

 9              A.      I don't think so, no.

10              Q.      Okay.  I'm going to go back to

11      Exhibit 3, page 5, paragraph 4.  If I look at the

12      bottom of it --

13              A.      Yes.

14              Q.      -- it starts with "March 14th -

15      Started working for Leoni".

16              A.      Yes.

17              Q.      Then I have the payments.  I can

18      see that all the payments are 195.75 without any

19      exception.

20              A.      Yes.

21              Q.      Okay.  You just mentioned that you

22      took at least a couple of days' vacation for which

23      you were not paid.  Was that vacation after May

24      30?

25              A.      I don't remember when my vacation
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                      WOOLGAR - ENICA
 2    was.  I definitely did have vacation after May 30
 3    but I may have had a couple of days during the
 4    time with him which would be my accrued annual
 5    leave.
 6            Q.      So were all these payments 195.75
 7    or at least one of them was smaller than 195.75?
 8            A.      I think they were all 195.75
 9    probably.
10            Q.      Okay.  So this means that you were
11    paid for those days of vacation.
12            MR. RODRIGUEZ:  Objection to form
13            A.      I was paid every week 195.75 and
14    then maybe I took a vacation but I can't remember
15    when or for how long.
16            BY MR. ENICA:
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com



1                  WOOLGAR - ENICA

23          Q.    Okay. Well, I guess we'll come

24      back to this contract but I just want to go ahead

25      with the next exhibits. That is a document

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

48

1              WOOLGAR - ENICA

2    produced by you.

3              (Woolgar Exhibit 7 marked for

4    identification)

5         A.   Yes.

6         Q.   So you're familiar with the

7    document?

8         A.   Yes.

9         Q.   Okay.  Just two questions about

10   this letter.  In the third paragraph -- let's

11   describe the letter for the record.  Who is this

12   letter from?

13        A.   This is a letter, I believe, from

14   John Daula to Expert AuPair Agency.

15        Q.   Okay.  So in the third paragraph he

16   is mentioning that he was driving you to the

17   store.

18        A.   Yes.

19        Q.   Would that be accurate?  Would he,

20   let's say, drive you to the store if you ever need

21   to go to the store?

22        A.   No.  He drove me one time to the

23   store.

24        Q.   Okay.  He would drive you anywhere

25   else if you need to go anywhere?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2           A.      No.

 3           Q.      Okay.  Would the family provide any

 4    way for you to travel outside of the house?

 5           A.      No, I didn't have any means of

 6    transport and basically I stayed in the house 24/7

 7    except to take care of the children when the

 8    mother would take me in her car with the children.

 9           Q.      Okay.  If you look at the last

10    paragraph, there's a sentence that starts with

11    "According to the guidance already provided" and

12    he is complaining about you breaching a contract.

13    Correct?

14           A.      I'm sorry.  What was the question?

15           Q.      Can you look at that paragraph that

16    I'm mentioning?  It says "According to the

17    guidance already provided".  It starts like that.

18    It's in the middle of the paragraph, a sentence.

19           A.      (After a pause)  I have read it.

20           Q.      Do you see?

21           A.      I've read it, yes.

22           Q.      Okay.  So I didn't pose a question

23    yet but let's do that.  What is he talking about

24    in that sentence?

25                    MR. RODRIGUEZ:   Object to the form
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                          WOOLGAR - ENICA

2            A.      I don't know what you want to know.

3                    BY MR. ENICA:

4            Q.      What is he referring to in that

5    sentence?

6            A.      When he says "According the

7    guidance already provided, she will be in breach

8    of contract for not working these two weeks", that

9    sentence?

10           Q.      Correct.

11           A.      So he sent an email -- so they gave

12   me the notice, which is two weeks' notice, and

13   then they told me and they told the agency via

14   email that I did not need to work those two weeks

15   and then, when I decided to leave, he changed his

16   mind and said he wanted me to work and he didn't

17   want me to have the two weeks free, as he had

18   earlier stated.

19           Q.      Okay.  So did you take those two

20   weeks as vacation?

21                   MR. RODRIGUEZ:  Object to the form

22           A.      No.

23                   BY MR. ENICA:

24           Q.      Strike that.  Let's make it clear.

25   Did you take two weeks of vacation while you were

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA
 2    working for this family?
 3         A.    No, I didn't take any vacation
 4    while working for them.
 5         Q.    Did you take any vacation at the
 6    end of your employment with them?
 7         A.    No.  Maybe one week where I was not
 8    working between families but it was not vacation.
 9         Q.    When they say the Daula family,
10    were they compensating you for that week?
11         A.    No.
12         Q.    Okay.  That is that exhibit.  The
13    next is Exhibit 8.
14               (Woolgar Exhibit 8 marked for
15    identification)
16         A.    (After a pause)  Okay.
17         Q.    Are you familiar with this
18    document?
19         A.    No.
20         Q.    Have you seen it before?
21         A.    No.
22         Q.    Okay.  Just for the record, this
23    was produced approximately two months ago.  It has
24    Bates numbers so it was produced to your counsel.
25    A few questions regarding this document.
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

52

1          WOOLGAR - ENICA

2          A.      Yeah.

3          Q.      On the second paragraph, the

4    author, which is I think Alan Harty, states that

5    you contacted them via Facebook.  Would that be

6    accurate?

7          A.      I found the family on aupair.com

8    and I took their names from that and contacted

9    them on Facebook, yes.

10          Q.      Okay.  And my second question was

11    related to that.  He is saying "We had not yet

12    begun a search for an au pair or begun working

13    with an agency prior to her first contact".  That

14    is the third paragraph in the middle.

15          A.      What's the question?

16          Q.      So the question was they had a

17    profile on aupair.com?

18          A.      Yes, they did.

19          Q.      And this is how you found them?

20          A.      Yes.

21          Q.      Okay.  On the last page --

22          A.      Yes.

23          Q.      -- the first full paragraph, the

24    last sentence says "Charlotte would decline to

25    accompany us even though this was during her paid

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                         WOOLGAR - ENICA

 1
 2     working hours" and it's talking about them going
 3     outside or something like that.
 4                         MR. RODRIGUEZ:  Object to the form
 5             A.     So what's the question?
 6                    BY MR. ENICA:
 7             Q.     The question is not yet.  I am just
 8     describing for the record what the letter says.
 9     Would you remember of any instance as the one
10     described here when during your working hours you
11     would decline to take part in an activity?
12                         MR. RODRIGUEZ:  Move to strike the
13     preamble and object to the form
14             A.     No, that didn't happen.
15                    BY MR. ENICA:
16             Q.     Whilst you were working for all
17     these three families, who was evaluating the
18     quality of your childcare services?
19             A.     Several people.
20             Q.     Can you mention them?
21             A.     The parents of the family, the
22     local coordinator for the agency especially, and
23     the agency themselves as well.
24             Q.     When you mean the agency
25     themselves, what are you referring to?  Are you

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                      WOOLGAR - ENICA
 2      referring to a certain person?
 3              A.      I would receive emails from the
 4      agency and also there was a local coordinator who
 5      lived in the area that I lived in and we would
 6      have meetings.
 7              Q.      Okay.  I was referring to the
 8      quality of your childcare services.
 9              A.      Yes.
10              Q.      Would you receive emails from the
11      agency regarding the quality of your childcare
12      services?  Is this what you testified?
13              MR. RODRIGUEZ:  Object to the form
14              BY MR. ENICA:
15              Q.      You said -- we can go back on the
16      record and read your answer read back.  Can you go
17      back and read her answer?
18         (The court reporter read back as requested)
19              BY MR. ENICA:
20              Q.      So were those meetings about the
21      quality of the childcare services you provided?
22              A.      The meetings with the local
23      coordinator were about lots of things including
24      that, yes.
25              Q.      Okay.  So how was the local
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2    coordinator evaluating the childcare services you

 3    were providing?

 4              A.    I don't know what procedures they

 5    had but they would just ask me questions.

 6              Q.    And do you remember what kind of

 7    questions they would ask?

 8              A.    I don't remember exactly.  They

 9    just asked me lots of different things about my

10    whole experience.

11              Q.    Okay.  But I'm referring

12    specifically to the quality of the childcare

13    services, not to any other aspects of your

14    experience as an au pair.

15              A.    Okay.

16              Q.    Correct?  So referring specifically

17    to the childcare that you provided, do you

18    remember any question that any of the local

19    coordinators have asked you about that?

20              MR. RODRIGUEZ:   Object to the form

21              A.    I don't remember exactly what I was

22    asked in the meetings, no.

23              BY MR. ENICA:

24              Q.    But you remember discussing the

25    quality of your childcare services in the
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2     meetings?

3                    MR. RODRIGUEZ:  Same objection.

4          A.      I don't remember what we discussed.

5                    BY MR. ENICA:

6          Q.      Okay.  Except the local --

7     I think you called it a local coordinator.

8          A.      Yes.

9          Q.      Except the local coordinator, was

10    anybody else from the agency interested in the

11    quality of the childcare services you provided

12    from what you know?

13                   MR. RODRIGUEZ:  Object to the form

14         A.      I don't remember.  I would receive

15    emails from the agency and I can't remember

16    exactly what they would ask me.

17                   BY MR. ENICA:

18         Q.      I am going to mark a new exhibit.

19    That will be Exhibit 9.

20                   (Woolgar Exhibit 9 marked for

21    identification)

22         A.      (After a pause)  Okay.

23                   BY MR. ENICA:

24         Q.      This is a document that you

25    produced.  The first page was produced twice, once

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                           WOOLGAR - ENICA

2       with your name filled in and once without your

3       name filled in.  Do you recognise this document?

4                   A.      Yes.

5                   Q.      And how would you describe this

6       document, for the record?

7                   A.      As the agreement between myself and

8       Expert AuPair Agency.

9                   Q.      Okay.  And do you remember ever

10      signing this agreement?

11                  A.      I don't remember signing it, no.

12                  Q.      Do you remember agreeing to the

13      terms of this agreement?

14                  A.      I don't remember it happening.  I

15      assume I agreed to it, yes.

16                  Q.      I will point you to page 3 of the

17      document, page 2 of the contract, which has the

18      Bates number Woolgar 15, a number of zeros and

19      then 15.

20                  A.      Okay, yes.

21                  Q.      Under title "Working conditions",

22      paragraph 8, can you read it for the record?

23                  A.      "Working conditions"?

24                  Q.      Paragraph 8.

25                  A.      Paragraph 8?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

1

2          Q.        Yes.

3          A.        "If the childcare provided is of

4    insufficient quality, as judged by the Host

5    Family, Expert AuPair may take action, assigning

6    Charlotte Woolgar to a new Host Family or, in more

7    serious cases, withdrawing her from the Au Pair

8    program".

9          Q.        Okay.  So, based on this paragraph,

10    who was to judge the quality of your childcare

11    services?

12          A.        From this paragraph, the host

13    family would be judging the childcare.

14          Q.        Have you ever had any meetings with

15    any of your host families to discuss the quality

16    of the childcare services you provided?

17          A.        No.

18          Q.        You mentioned for your last, let's

19    call it host family, host father, that you had

20    duties including driving, furniture shopping, et

21    cetera.

22          A.        Yes.

23          Q.        Is that correct?

24          A.        Yeah.

25          Q.        Did you ever inform Expert AuPair

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                    WOOLGAR - ENICA

1

2    about these duties?

3            A.     I informed Expert AuPair about my

4    duties when I left the house of Todd Leoni.

5            Q.     In your last day of employment?

6            A.     Yes.

7            Q.     Did you have -- I think you called

8    it a local coordinator.  Did you have a local

9    coordinator while you were working for Todd Leoni?

10           A.     Yes.

11           Q.     I would call it the Leoni family

12   but I just mean Todd Leoni.

13           A.     Right.

14           Q.     Do you remember ever meeting with

15   your local coordinator while working for the Leoni

16   family?

17           A.     Yes.

18           Q.     And during those meetings did the

19   local coordinator ever attempt to evaluate the

20   quality of the childcare services you provided?

21           A.     I don't remember what we talked

22   about.

23           Q.     Are you aware that the au pair

24   program in the United States has an educational

25   component?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2            A.      Yes.

 3            Q.      Were you required to go to school

 4     or to a college in order to satisfy that

 5     educational component?

 6            A.      Sorry.  Could you repeat that?

 7            Q.      Were you required to attend school

 8     or college in order to satisfy the educational

 9     component?

10            A.      Yes.  It was my belief if I didn't

11     complete the educational component, then my visa

12     would be revoked.

13            Q.      And did you complete the

14     educational component?

15            A.      I can't remember if I completed it

16     but I started it.

17            Q.      So you attended an educational

18     institution?

19            A.      Yes.

20            Q.      Okay.  Do you know who paid for you

21     attending the educational institution?

22            A.      I went --

23            Q.      Strike that.  I'm sorry.  Do you

24     know who paid the tuition for that?

25            A.      It was free in Alaska and I think I
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

61

                    WOOLGAR - ENICA

1

2       attended one class in Miami and I can't remember

3       if I paid for it or if Todd Leoni paid for it.

4               Q.      Is it possible that you paid for it

5       out of your own money?

6               A.      Yes, I believe I paid for it and I

7       don't remember if he reimbursed me or not.

8               Q.      Would you say that you know more

9       about the United States culture now than you knew

10      before going on the au pair program?

11              A.      No.

12              Q.      Would you say that the au pair

13      program is a cultural exchange program or a work

14      program?

15                      MR. RODRIGUEZ:   Object to the form

16              A.      I would say that it's a work

17      program

18                      BY MR. ENICA:

19              Q.      Regardless of the program being a

20      work program or an educational exchange program,

21      would you say that your understanding of the

22      United States improved in any ways after taking

23      part in the program?

24              A.      No.  I have lived in America before

25      I went there this time.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                         WOOLGAR - ENICA

2        Q.      Aside the working component, do you

3   see any advantages for the au pair program?

4               MR. RODRIGUEZ:  Object to the form

5        A.      I see it as a way to travel to a

6   new country to work there and to be able to stay

7   there for a longer time than a holiday.

8               BY MR. ENICA:

9        Q.      You worked for three families while

10  in the United States and you testified here today

11  that you worked a certain number of hours which --

12  I'll stop there.  Who was keeping time?

13            MR. RODRIGUEZ:  Object to the form

14      A.     Who was keeping time?

15            BY MR. ENICA:

16      Q.     Correct.  Were you keeping track of

17  your time or was the family keeping track of your

18  time, generally speaking?

19            MR. RODRIGUEZ:  Same objection.

20  Ambiguous.

21      A.     Of my working time or --

22            BY MR. ENICA:

23      Q.     Correct.

24      A.     I kept track of my time.  I don't

25  know what the families did.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                        WOOLGAR - ENI CA

 1

 2          Q.      Okay.  So when you testified that

 3    you worked a certain number of hours, that's based

 4    on your keeping track of the time?

 5          A.      Yes.

 6          Q.      Did you keep track of the time in

 7    any written form?

 8          A.      I probably did at the time keep it.

 9    I probably threw it away.

10          Q.      And do you remember if you kept

11    track of time for each one of the families that

12    you worked for?

13          A.      Yes, I probably did, yeah.

14          Q.      And you don't have any of those

15    documents anymore?

16          A.      No.

17          Q.      Were you aware if any of the

18    families were also keeping track of the time that

19    you worked?

20          A.      I don't -- well, not that I know.  I

21    don't know what they did really.

22          Q.      Was Expert AuPair keeping track of

23    your time?

24          A.      No, definitely not.

25          Q.      Did you know about this lawsuit

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2       while you were in the United States?

3            A.     No.  I may have learned about it in

4       the last few weeks of being there.

5            Q.     Okay.  And how did you find out

6       about joining this lawsuit?

7            A.     I believe I received an email.

8                   MR. ENICA:  Okay.  I have no

9       further questions.

10                  MR. RODRIGUEZ:  I'm going to ask

11      some questions.  Let's take a quick break, please.

12                  THE WITNESS:  Okay.

13              (Off the record at 11.28 am)

14               (On the record at 11.39 am)

15      (Woolgar Exhibit 10 marked for identification)

16                  BY MR. RODRIGUEZ:

17           Q.     Ms Woolgar, do you recognize the

18      document that the court reporter has marked as

19      Exhibit 10?

20           A.     Yes, I recognize it.

21           Q.     What is it?

22           A.     I believe it's my notes from my

23      computer writing down what I was paid.

24           Q.     Please turn to Exhibit 3 and then,

25      looking at paragraph 4 --

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - RODRIGUEZ

2        A.      Yes.

3        Q.      -- on what I believe is page 5, is

4    there any relationship between the document marked

5    as Exhibit 10 and your responses to paragraph 4 on

6    Exhibit 3?

7                MR. ENICA:  I object to form

8                BY MR. RODRIGUEZ:

9        Q.      Please answer.

10       A.      Yes.  So I think I wrote down my

11   answer to question 4 based on my notes.

12       Q.      Your notes in Exhibit 10?

13       A.      Yes.

14       Q.      Ms Woolgar, you testified earlier,

15   I believe, that you discussed hours and pay with

16   the Daulas before contacting Expert AuPair.

17       A.      Yes.

18       Q.      Did I get that right?

19       A.      Yes, that's correct.

20       Q.      And what were the hours and pay you

21   discussed with the Daulas before contacting Expert

22   AuPair?

23       A.      So before contacting Expert AuPair

24   I talked to them on line on Skype and we discussed

25   me working around 30 to 35 hours a week for them

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                         WOOLGAR - RODRIGUEZ

1

2    for around $1,200 a month.

3              Q.       How did it happen that the pay you

4    discussed, $1,200 a month, became approximately

5    $200 a week?

6              A.       So we met without the agency.  We

7    found Expert AuPair Agency after we decided to

8    match and then the family contacted the agency and

9    they got back to me telling me that that was the

10   norm wage and they were going to pay me that.

11             Q.       When you say they got back to you,

12   who got back to you?

13             A.       The family told me that they had

14   spoken to the agency and they had said that 195.75

15   was the normal wage that everyone received.

16             Q.       When you say they said 195.75 was

17   the normal, who was the "they" in that clause?

18             A.       So the Daulas spoke to the agency

19   and then the Daulas, they told me that the agency

20   had said it was 195 as the standard wage.

21             Q.       You testified earlier that the

22   hours on various schedules were not the actual

23   hours you worked.

24             A.       Yes.

25             Q.       Is that right?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                    WOOLGAR - RODRIGUEZ

1

2          A.        Yes.

3          Q.        Were the hours you worked for the

4    Daulas less than 45 hours a week?

5          A.        No, they weren't, no.

6          Q.        Did you ever work less than 45

7    hours a week for the Harty family?

8          A.        No.

9          Q.        Did you ever work less than 45

10   hours a week for the Leoni family?

11         A.        No, I didn't, no.

12         Q.        Did you have insurance while you

13   were in the United States?

14         A.        Yes, I had medical insurance

15   provided by Expert Au Pair.

16         Q.        Did you pay for that medical

17   insurance directly?

18                   MR. ENICA:   Object to the form

19         A.        No, I didn't pay for it.

20                   BY MR. RODRIGUEZ:

21         Q.        Who paid for it?

22         A.        I believe Expert AuPair paid for

23   it.

24         Q.        How did you get to the United

25   States?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                    WOOLGAR - RODRIGUEZ

1
2          A.      By plane.
3          Q.      Who arranged the flights to the
4    United States?
5                  MR. ENICA:   Object to form
6          A.      Expert AuPair arranged the flights.
7                  BY MR.  RODRIGUEZ:
8          Q.      Did you have any role in selecting
9    the flights?
10         A.      No, I didn't.  I was allowed a
11   location to choose from a couple of airports to
12   fly from.
13         Q.      Did you go to any training in the
14   United States held by Expert AuPair?
15         A.      Yes, I went to training for five
16   days.
17         Q.      What do you recall from that
18   training?
19         A.      I recall I was with a group of
20   other au pairs and the agency discussed legal
21   things with us.
22         Q.      Such as?
23         A.      Such as that we weren't to refer to
24   them as our employer and they told us that several
25   times, that we weren't allowed to refer to them as

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                        WOOLGAR - RODRIGUEZ

1

2      our employer, we weren't allowed to write it down

3      anywhere, and that we had to refer to the family

4      as our employer.

5              Q.      Approximately how many au pairs are

6      you familiar with from your time in the United

7      States?

8              A.      I know closely around 20 but I met

9      more than that.

10             Q.      Did you discuss pay with any of the

11     au pairs that you know from the United States?

12                     MR. ENICA:   Object to the form.

13     Lack of foundation.

14             A.      Yes, we discussed how much we were

15     getting, yes.

16                     BY MR. RODRIGUEZ:

17             Q.      Are you aware of any au pairs that

18     were paid more than approximately $200 a week?

19             A.      No, I'm not aware of any that were

20     paid more than $200 a week.

21             Q.      Do you know whether all of the au

22     pairs you've spoken with about pay were Expert

23     AuPair au pairs?

24             A.      Most of them were from Expert

25     AuPair, yes.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                        WOOLGAR - RODRIGUEZ

1

2          Q.      Earlier, you mentioned that you may

3    have taken some more detailed notes about your

4    work.  Do you recall that?

5          A.      Yes.

6          Q.      I believe you testified that the

7    notes were likely destroyed.  Is that right?

8          A.      Yes.

9          Q.      Do you know whether they would have

10   been destroyed before or after approximately July

11   2017?

12         A.      I definitely had thrown them away

13   before that.

14         MR. RODRIGUEZ:  Pending any

15   questions from Mr. Enica, I have nothing further.

16         A.      Okay.

17         BY MR. ENICA:

18         Q.      Okay.  I do have some

19   clarifications.  I will start from the last

20   question that my colleague asked and go towards

21   the first questions.

22         A.      Okay.

23         Q.      You mentioned that you know

24   approximately 20 au pairs.

25         A.      Yes.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA
 2          Q.      And most of them are Expert AuPair.
 3   Do you know approximately how many are Expert
 4   AuPair, like half, more than half?
 5          A.      Probably just two of them are not
 6   from Expert AuPair.
 7          Q.      And do you know how many hours were
 8   these au pairs working?
 9          A.      A lot, the same as me really, more
10   than 45 hours.
11          Q.      And how did you meet these au
12   pairs?
13          A.      I met some of them in the training
14   week at Expert AuPair in Florida.  I met some of
15   them just from -- there's au pair forums and
16   things like that on the internet.
17          Q.      So you met them in person, the ones
18   that you said from au pair forums?
19          A.      Yes, I met them in person, yes.
20          Q.      And most of them were Expert AuPair
21   au pairs, the ones that you met on the au pair
22   forums?
23          A.      So most of the people that I met
24   were from the training and then I met a couple of
25   people that were from the forums that were from
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                        WOOLGAR - ENICA

2    different agencies and a couple of them were with

3    Expert AuPair as well.

4              Q.      Okay.  So let's focus on the ones

5    that you met on the forums.

6              A.      Yes.

7              Q.      You said out of those a few of them

8    were with other agencies and a few of them with

9    Expert AuPair?

10             A.      Yes.

11             Q.      Do you know if approximately half

12   of them were with Expert AuPair or more or less?

13             A.      So I think I know probably 15

14   people from the agency, around 15, when I did the

15   training.  I probably met five people --

16             Q.      Okay.  One second.  I will stop you

17   there.  I'm not talking about the training.

18   So let's take all those training, the au pairs

19   that you met in training, out.

20             A.      So --

21             Q.      I'm only talking about the au pairs

22   that you met through forums, as you mentioned.

23             A.      Yes.  So I probably met around five

24   people from on line, five au pairs.

25             Q.      Five au pairs?  Do you know how

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

1

2      many out of them were with Expert AuPair?

3             A.       I think probably two of them were

4      from Expert AuPair and three of them not.

5             Q.       Okay.  Now, you mentioned that you

6      met the other au pairs through the training week.

7             A.       Yes.

8             Q.       Okay.  None of them had a chance to

9      start working for their host family in the

10     training week.  Would that be accurate?

11            A.       That's correct, yes.

12            Q.       So they wouldn't know how many

13     hours that they are actually working.  Is that

14     accurate?

15            A.       That's accurate, and then I would

16     talk to them over the internet since then.

17            Q.       Okay.  You -- my colleague asked

18     you what you remember about the training and you

19     remembered about some legal things.

20            A.       Aha.

21            Q.       Do you remember if anything else

22     was discussed during training?

23            A.       Mostly things about taxes, au pair

24     law.  There was one day of like training about

25     children, the basics about children and first aid.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2          Q.      So how many days did you say the

3    training was?

4          A.      Five days.

5          Q.      So, out of the five days, how many

6    days did you discuss about taxes?

7          A.      I think one day.

8          Q.      One full day about taxes?

9          A.      I think one full day and then

10   another day where it was reiterated.

11         Q.      Okay.  How many days out of the

12   five days did you discuss about the au pair law?

13         A.      I think one day.

14         Q.      One full day?

15         A.      Yes.

16         Q.      Was it the same day that you

17   discussed about taxes?

18         A.      No, it was a separate day, and then

19   I think they reiterated it again on the last day.

20         Q.      Okay.  And how many hours

21   approximately you discussed about the au pair law?

22         A.      I can't remember exactly but a

23   couple of hours a day.

24         Q.      Right.  You mentioned you discussed

25   about the au pair law one day.  It wasn't one full

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

2    day?   Sorry.

3         A.     So we did like 9.00 to 5.00,

4    I think, for each day and there was lots of things

5    discussed on each day.

6         Q.     Okay.  So it is my understanding

7    from your answer that you discussed a full day

8    about the au pair law.  Is my understanding

9    correct?

10        A.     Yes.

11        Q.     So from 9.00 to 5.00 you discussed

12   about the au pair law?

13        A.     Including other things as well,

14   yes.

15        Q.     Okay.  What other things would you

16   discuss in the day that was dedicated to the au

17   pair law?

18        A.     Visas.

19        Q.     Okay.  What else?

20        A.     Things related to visas.  I don't

21   remember exactly.

22        Q.     That's fair enough.  Now, when you

23   say au pair law, what do you actually mean?

24        A.     They gave us a document called au

25   pair law and we discussed that.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

76

                    WOOLGAR - ENICA

1

2          Q.      For the whole day?

3          A.      For -- yes, for a long period of

4    time, yes.

5          Q.      Okay.  Going back to taxes, you

6    mentioned that you discussed about taxes.  Was it

7    also approximately one day?

8          A.      It was a few hours of one day, yes.

9          Q.      A few hours of one day.  Do you

10   remember what else did you discuss that day for

11   the remainder of the time?

12         A.      Again, things about visas,

13   education.

14         Q.      Okay.  And do you remember what did

15   you discuss about taxes for a few hours?

16         A.      Just what we would need to do in

17   the future.

18         Q.      And do you remember, by any chance,

19   what you would need to do?

20         A.      No.  Just like when we would need

21   to do it, the things that we would need.

22         Q.      My apologies.  "When we would need

23   to do it", what does "it" refer to?

24         A.      When we would need to file taxes

25   and what we would need to do that.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1              WOOLGAR - ENICA

2          Q.     Did you file taxes?

3          A.     Yes.

4          Q.     You mentioned you had training for

5     five days.

6          A.     Yes, I think so, yes.

7          Q.     So if we take out one day that you

8     discussed about the au pair law and one day that

9     you discussed about the taxes, do you remember

10    what you discussed in the remaining three days?

11         A.     So one day was about children and

12    then another -- I think either the same day or

13    another day was first aid, a training course with

14    the fire department for maybe one hour, and we had

15    I think one free day.  One free day --

16         Q.     So the training was not five days.

17    One free day means the training was four days.

18         A.     I think we had some training in the

19    morning and then we were allowed to be free for

20    the rest of the day.

21         Q.     So you had like half a day off?

22         A.     Half a day.

23         Q.     So the training was four days and a

24    half?

25         A.     Four and a half.

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

WOOLGAR - ENICA

 1

 2      Q.      Okay.  You said something about the

 3  fire department.

 4      A.      Yes.

 5      Q.      Were you required to go to the fire

 6  department?

 7      A.      Yes, for about an hour or less to

 8  learn infant first aid.

 9      Q.      First aid.  And was it the

10  fire -- where was the rest of the training taking

11  place?

12      A.      In an office.

13      Q.      Okay.  And was the fire department

14  far away from the office?

15      A.      I think so.  I can't remember.

16      Q.      Okay.  So I'm trying to figure out

17  the training.  You testified you discussed one day

18  about au pair law, one day about taxes, one day

19  about children and approximately one hour about

20  first aid.  You said it may be even less.

21      A.      Yes.

22      Q.      Do you remember what did you

23  discuss in the remaining one day and a half -- I

24  apologise -- one day and a few hours?

25      A.      I think the contracts, things like

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                    WOOLGAR - ENICA

 2      that.

 3              Q.      Okay.  But discussing the contracts

 4      was not part of the au pair law discussion?

 5              A.      No, the au pair law wasn't the

 6      contracts, no.

 7              Q.      And when you say the contracts,

 8      what do you mean?

 9              A.      For example, the contract with the

10      family.

11              Q.      The contract with the family, the

12      ones similar --

13              A.      Yes.

14              Q.      -- to the ones we marked today as,

15      let's say, Exhibit 5?

16              A.      Yes.

17              Q.      Do you remember what did you

18      discuss about these contracts?

19              A.      I don't remember exactly, no.

20              Q.      At that point, did you have a

21      signed contract between you and your host family?

22              A.      I can't remember.  I can't

23      remember.

24              Q.      You mentioned that you had medical

25      insurance while you were in the United States.  Do
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

                              WOOLGAR - ENICA

1

2        you remember what type of insurance was that?

3              A.       Medical insurance.  That's all

4        I remember.

5              Q.       Was it travel insurance?

6              A.       It was -- I don't think so.

7              Q.       Okay.

8              A.       I think it was just medical

9        insurance.

10             Q.       Do you know what you would be

11       insured against, what risks?  What would it cover?

12             A.       Illness.

13             Q.       Okay.  Did you have any other

14       medical insurance except the one provided by

15       Expert AuPair?

16             A.       The agency asked me to obtain extra

17       insurance for a pre-existing medical condition

18       that I had.

19             Q.       So my question is the same.  Did

20       you have a different policy except the one

21       provided by Expert AuPair?

22             A.       Yes, I had a different policy that

23       I was required by Expert AuPair to buy.

24             Q.       Okay.  So you had a different

25       policy?  The answer is yes?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1                    WOOLGAR - ENICA

2               MR. RODRIGUEZ:   Objection.

3          A.    I had --

4               BY MR. ENICA:

5          Q.    I understand that -- you keep

6    repeating that Expert AuPair required you to have

7    it.  I'm not understanding if you actually

8    purchased it.

9               MR. RODRIGUEZ:   Same objection.

10          A.    I purchased extra insurance under

11   the --

12               BY MR. ENICA:

13          Q.    Okay.  And --

14               MR. RODRIGUEZ:  I'm sorry.  I don't

15   think she was finished.

16          A.    I purchased extra insurance that

17   Expert AuPair told me I needed to get in order to

18   get a visa.

19               BY MR. ENICA:

20          Q.    Okay.  And who paid for it?

21          A.    I paid for it.

22          Q.    You mentioned during the deposition

23   today that at least for one of the families during

24   the week you took a couple of days of vacation.

25   Do you remember that?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
 1                      WOOLGAR - ENICA

 2          A.     Yes.   During my last family

 3    employment, yes.

 4          Q.     Okay.  Would you say that you

 5    worked 45 hours in that specific week when you

 6    took the two days of vacation?

 7          A.     Yes.

 8          Q.     Okay.  My colleague asked you about

 9    your discussions with the Daula family.

10    Were you part of their conversation with Expert

11    AuPair where they were advised to increase the

12    number of hours to 45?

13                 MR. RODRIGUEZ:  Object to the form

14          A.     I was not there during the

15    conversation but the Daulas had told me what they

16    had said.

17                 BY MR. ENICA:

18          Q.     Did you object in any ways to

19    modifying the contract that you had with the

20    Daulas?

21                 MR. RODRIGUEZ:  Object to the

22    question.

23                 BY MR. ENICA:

24          Q.     I'm going to rephrase.  Did you

25    object in any ways to modifying the understanding
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

83

1                    WOOLGAR - ENICA

2    that you had with them regarding the number of

3    hours?

4                    MR. RODRIGUEZ:  Same objection.

5            A.      I'm sorry.  I don't understand the

6    question.

7                    BY MR. ENICA:

8            Q.      You testified that you agreed with

9    them to work 30 to 35 hours a week for a payment

10   of $1,200 a month.  You also testified that they

11   told you that after meeting or discussing with

12   Expert AuPair they decided to increase the number

13   of hours to 45 while reducing the payment to

14   195.75.

15           A.      Yes.

16           Q.      That would be different than what

17   you initially discussed with them

18           A.      Yes.

19           Q.      Did you object in any ways to them

20   modifying these terms?

21           A.      I told the family that I wasn't

22   happy but there was nothing that they could do

23   about it.

24           Q.      Did you tell the agency that you

25   are not happy?

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

Case No. 1:14-cv-03074-CMA-KMT   Document 1104   filed 06/06/2018   USDC Colorado   pg 147
of 264
Case 1:14-cv-03074-CMA-KMT   Document 1104-1   filed 06/06/2018   USDC Colorado   Page 147
of 264

84

1                          WOOLGAR - ENICA

2              A.      No.

3              Q.      When you initially discussed the

4       payment of $1,200 a month, would that include room

5       and board?

6              A.      Would it include?

7              Q.      Room and board, accommodation and

8       meals?

9              A.      Before I went, yes, it included

10      room and board.  When I arrived, they didn't get

11      me food.

12             Q.      So you arrived and met with the

13      Daulas prior to contacting Expert AuPair?

14                     MR. RODRIGUEZ:   Objection.

15             A.      I didn't meet them before, no.

16                     BY MR. ENICA:

17             Q.      Okay.  I'll clarify my question.

18      You mentioned that your understanding with them

19      was that they would pay you $1,200 a month.   As

20      part of that understanding, were they required to

21      provide anything else to you?

22             A.      A room to live in.

23             Q.      How about meals?

24             A.      And, yes, food.

25             Q.      So you remember specifically

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

85

```
 1                    WOOLGAR - ENICA

 2      discussing with them about room and food?

 3           A.      I don't remember discussing it with

 4      them, no, but I think it was just assumed.

 5                    MR. ENICA:   Okay.  Unless my

 6      colleague has any re-direct questions, I have no

 7      further questions.

 8                    MR. RODRIGUEZ:   I do not.  Thank

 9      you very much for your time.

10                    MR. ENICA:   Read or waive.  I think

11      you will read but we need to put it on the record.

12                    MR. RODRIGUEZ:   We will read and

13      sign.

14                    MR. ENICA:   That concludes the

15      deposition.

16           (The deposition was concluded)

17           (Off the record at 12.01 pm)

18

19

20

21

22

23

24

25
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1
2                 CERTIFICATE OF COURT REPORTER
3
4              I, Sara Buzuk, Court Reporter, do hereby
5      certify that I took the stenotype notes of the
6      foregoing deposition and that the transcript
7      thereof is a true and accurate record.
8              I further certify that I am neither
9      counsel for, related to, nor employed by any of
10     the parties to the action in which this deposition
11     was taken, and that I am not a relative or
12     employee of any attorney or counsel employed by
13     the parties hereto, nor financially or otherwise
14     interested in the outcome of the action.




                ................................

19              Sara Buzuk
20
21
22
23

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1

2                    CERTIFICATE OF WITNESS

3

4              I, CHARLOTTE WOOLGAR, am the witness in

5    the foregoing statement under oath.  I have read

6    the foregoing statement and, having made such

7    changes and corrections as I desired, I certify

8    that the transcript is a true and accurate record

9    of my responses to the questions put to me on

10   Tuesday, March 27, 2018.

11

12

13              Signed ....................

14              Charlotte Woolgar

15

16

17              Dated this ....... day of ....... 2018.

18

19

20

21

22

23

24

25

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

```
1

2                              ERRATA

3

4        (Please make any amendments or corrections on the

5         errata sheet and not on the original deposition)

6

7               CORRECTION                        PAGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22        -----------------              --------------

23        Signature                      Date

24

25
```

MARTEN WALSH CHERER LTD.
LONDON, ENGLAND
Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864
(Out-of-hours tel. 01144 (0) 7833 467869)
www.depositioncenter.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 14-cv-03074-CMA-KMT

_____

JOHANA PAOLA BELTRAN; et al.            )
                                        )
                Plaintiffs,             )
                                        )
                                        )
                -v-                     )
                                        )
INTEREXCHANGE, INC.; et al.             )
                                        )
                Defendants.             )
_____)

DEPOSITION UPON ORAL EXAMINATION

of

**MS. COURTNEY LOUISE FLYNN**

on

Wednesday, March 28th, 2018

commencing at 1.14pm

Taken at:

The Varsity Hotel
One Queen Square,
Liverpool L1 1RH
United Kingdom

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

2

```
 1

 2

 3                    A P P E A R A N C E S

 4

 5    On behalf of the Plaintiffs:

 6             BOIES SCHILLER FLEXNER LLP

 7             1999 Harrison Street, Suite 900

 8             Oakland, CA 94612

 9             BY:  MR. SEAN PHILLIPS RODRIGUEZ

10

11    On behalf of the Defendants:

12             BOGDAN ENICA, ESQ.

13             111 Second Avenue NE, Suite 900

14             St Petersburg, FL 33701

15             BY: MR. BOGDAN ENICA

16

17    Court Reporter:

18             Mr. Shola McGregor

19

20

21

22

23

24

25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

1

2                          I N D E X

3      Witness:

4      Ms. Courtney Flynn

5

6      Examination:                        Page No:

7      By Mr. Enica                            4

8      By Mr. Rodriguez                       61

9

10     _____

11                     EXHIBIT INDEX

12

13     Number:          Description:          Page:

14       1        Employment Contract          16

15       2         Interrogatories            27

16       3         Au Pair Agreement          51

17       4         Consent to join           56

18

19

20

21

22

23

24

25

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

| | FLYNN - ENICA |
|---|---|
| 1 | FLYNN - ENICA |
| 2 | |
| 3 | **MS. COURTNEY LOUISE FLYNN** |
| 4 | having duly sworn, |
| 5 | was examined and did testify as follows |
| 6 | |
| 7 | THE COURT REPORTER: Could all |
| 8 | counsel in the room introduce themselves for the |
| 9 | record, please? |
| 10 | MR. RODRIGUEZ: Sean Rodriguez, |
| 11 | Boies Schiller Flexner, for the witness. |
| 12 | MR. ENICA: Bogdan Enica for Expert |
| 13 | Group International, doing business as Expert |
| 14 | AuPair. |
| 15 | THE COURT REPORTER: Thank you.  We |
| 16 | are on the record at 1pm. |
| 17 | |
| 18 | **EXAMINATION BY MR. ENICA** |
| 19 | |
| 20 | Q.    How would you prefer that I address |
| 21 | you, Ms. Flynn or Courtney? |
| 22 | A.    Courtney is fine. |
| 23 | Q.    Perfect.  Thank you.  Can you, |
| 24 | please, state your full name and current address |
| 25 | for the record? |

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

5

```
 1                      FLYNN - ENICA
 2          A.     Yes.  It is Courtney Louise Flynn
 3  ████████████████████████████████████████████████
 4  ████████████████
 5          Q.     We do have a court reporter here,
 6  so he is going to write down everything you say.
 7          A.     Uh-huh.
 8          Q.     That is why it is important, first,
 9  to wait for my question to finish before you give
10  an answer, and I will try and do the same.
11          A.     That is fine.
12          Q.     Second, keep an eye on him.  If you
13  see that he struggles, you may need to repeat.
14          A.     Yes, that is fine.
15          Q.     Is English your first language?
16          A.     Yes.
17          Q.     Perfect.  Have you ever been
18  deposed before?
19          A.     No.
20          Q.     Have you ever been involved in a
21  lawsuit before?
22          A.     No.
23          Q.     So you understand that today you
24  have to tell the truth, the whole truth and
25  nothing else but the truth?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

6

                        FLYNN - ENICA

1                A.      Yes, of course.

2        Q.      And you will do it at the best of

3    your abilities, exactly as you would do it in a

4    court of law?

5        A.      Yes.

6        Q.      Okay.  As we started, I am going to

7    pose some questions and you are going to give me

8    some answers.

9        A.      Okay.

10       Q.      If you do not understand the

11   questions, let me know and then I will try to

12   rephrase the question.

13       A.      Okay.

14       Q.      Your counsel present here may have

15   objections to my questions.  However, unless your

16   counsel advises you not to answer the question,

17   then you are to answer the question even if your

18   counsel makes an objection.

19       A.      Okay.

20       Q.      If you want to take a break, let us

21   know.  If your phone rings we will take a break.

22       A.      Yes, that was fine.

23       Q.      Otherwise, I would prefer that you

24   answer the question that I pose before we take a

25

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
                        FLYNN - ENICA
 1
 2     break.
 3            A.     Uh-huh.
 4            Q.     We will try and be around two
 5     hours, maybe less, maybe more but, you know, not
 6     longer than that --
 7            A.     That is fine.
 8            Q.     -- so we do not keep you here for
 9     long.  Are you under the influence of any
10     substance or medication that would impair your
11     ability to tell the truth today?
12            A.     No.
13            Q.     Why are you suing Expert AuPair?
14            A.     Why --
15            Q.     -- are you suing Expert AuPair.
16            A.     For underpaying the minimum wage.
17            Q.     Did they ever pay you anything?
18            A.     Well, they are the one that set the
19     contract to my family in the United States and
20     told them how much they were to pay.
21            Q.     Okay.  My question was did they
22     ever pay you anything?
23            A.     No.
24            Q.     But you are suing them for your
25     family underpaying you, is that correct?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2              MR. RODRIGUEZ: Objection to the
 3    form.
 4         A.    Yes.
 5
 6    BY MR. ENICA:
 7         Q.    Are you suing your host family as
 8    well?
 9         A.    No.
10         Q.    Why not?
11         A.    Because they are not the ones that
12    set the contract.
13         Q.    But they are the ones that pay you,
14    right?
15         A.    Yes.
16         Q.    So, do you believe they still owe
17    you money?
18         A.    No.
19         Q.    Do you believe that you are owed
20    more money?
21         A.    Sorry, do you mean my family or do
22    you mean Expert AuPair?
23         Q.    Your family.
24         A.    My family?  No, my family do not
25    owe me any money.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2         Q.     Okay.  So you would expect Expert
 3    AuPair to pay you for the work that you did for
 4    your family, your host family?
 5         A.     No.  What I am stating is that in
 6    the contract, Expert AuPair wrote the contract and
 7    gave it to my family and told them how much they
 8    were to pay me.  My family went by what they were
 9    told.  They had never had an au pair before, they
10    had never been in this situation so they expected
11    the agency, as did I, to tell them what they had
12    to pay me, which is what they did.  In the
13    contract I have, it states how much they are to
14    pay me, so that is why.
15         Q.     But you think that you were
16    underpaid?
17         A.     Uh-huh.
18         Q.     Okay.  So, then why shouldn't your
19    family pay you the difference?
20         A.     Because it was Expert AuPair's
21    fault that I was underpaid.
22         Q.     Okay.  Basically, you are saying
23    Expert AuPair because it was their fault of your
24    being underpaid?
25         A.     Uh-huh.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2          Q.      Do you think they owe you money?
 3          A.      Uh-huh.
 4          Q.      How much do you think they owe you?
 5                  MR. RODRIGUEZ: Objection to the
 6    extent it calls for a legal conclusion.
 7          A.      Off the top of my head, I couldn't
 8    say.
 9                  THE COURT REPORTER: I am sorry to
10    interrupt.  Could I ask you to give verbal answers
11    rather than a nod or a "uh-huh" or "uh-uh".
12                  THE WITNESS: Yes.
13                  THE COURT REPORTER: Thank you.
14                  MR. RODRIGUEZ: Also, let's just
15    slow down a little bit so I have time to object
16    and he has time to get everything right.
17                  THE WITNESS: Okay.  Can you say the
18    question again, please?
19                  MR. ENICA: Can we see the question
20    back?
21       (The court reporter read back as requested)
22                  THE WITNESS: As I said prior, off
23    the top of my head I couldn't say.  I am not a
24    citizen of the United States, I do not know the
25    minimum wage that it should have been five years
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA

 2   ago.  It was a long time ago. .

 3

 4   BY MR. ENICA:

 5        Q.     So you think you should be paid

 6   based on the minimum wage?

 7        A.     Yes.

 8        Q.     Your family shouldn't pay the

 9   difference between what they paid and the minimum

10   wage, this is what you are saying?

11             MR. RODRIGUEZ: Objection.

12        A.     Yes.

13

14   BY MR. ENICA:

15        Q.     Why not?

16        A.     Because, as I said prior, that in

17   the contract that they were told how much to pay

18   me.  The agency is supposed to be there to help me

19   and the family and by advising the family as to

20   what to pay, which is what they did via the

21   contract.

22        Q.     I am trying to think of an example.

23   (Pause)  Just an example, right; you go into the

24   store and you are purchasing a product that is £7,

25   but the cashier tells you, by mistake, it is £3.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                  FLYNN - ENICA
 2   Who do you think should cover the difference, you
 3   that purchased the product for £7 or the cashier
 4   who told you by mistake it is £3?
 5             MR. RODRIGUEZ: Objection.
 6   Incomplete hypothetical and calls for a legal
 7   conclusion.
 8        A.    I do not understand what you are
 9   trying to say.
10
11   BY MR. ENICA:
12        Q.    I am saying you go into a store and
13   there is a product and the value of the product
14   and the price is £7.
15        A.    Okay.
16        Q.    When you are going to pay, the
17   cashier tells you by mistake it is £3.  You pay
18   £3, then later on you realise it is £7.  Who
19   should ----
20        A.    I realise or the cashier realises?
21        Q.    Let's say both of you.
22        A.    Well, that is not my fault.  I am
23   being told by somebody else to pay that amount, so
24   that is what I am doing, which is exactly the same
25   as what my family did with Expert AuPair.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2          Q.      So you think you shouldn't pay the
 3    difference of £4, it is the cashier who should pay
 4    the difference?
 5          A.      Yes.
 6                  MR. RODRIGUEZ: Objection to the
 7    form.
 8
 9    BY MR. ENICA:
10          Q.      Did you provide any services for
11    Expert AuPair?
12          A.      No.
13          Q.      Did they benefit in any ways from
14    you being an au pair?
15          A.      As far as I am aware, my family
16    were paying Expert AuPair an amount of money for
17    becoming the agency.
18          Q.      Just to make it clear, when you say
19    your family you mean your host family?
20          A.      Uh-huh.
21          Q.      Do you want, from now on, every
22    time we say "family", to mean host family?
23          A.      Uh-huh.  Yes, that is the family
24    that I was working for.
25                  MR. RODRIGUEZ: Please, remember
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

14

```
 1                    FLYNN - ENICA
 2    "yes" or "no".
 3                    THE WITNESS: Sorry.
 4
 5    BY MR. ENICA:
 6            Q.      Did you pay any money to Expert
 7    AuPair?
 8            A.      I didn't.
 9            Q.      Did you pay for your flight to the
10    United States?
11            A.      Yes, and return.
12            Q.      How did you find your family?
13            A.      Through a friend.
14            Q.      Was it before or after you
15    contacted Expert AuPair?
16            A.      I met with my family and then my
17    family found Expert AuPair.
18            Q.      So your host family found Expert
19    AuPair?
20            A.      Yes.
21            Q.      You already contacted your family
22    prior to them contacting Expert AuPair?
23            A.      Yes.
24            Q.      Did you meet them in person prior
25    to them contacting Expert AuPair?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

15

```
 1                     FLYNN - ENICA
 2          A.      Yes.
 3          Q.      Did you discuss with them the
 4    conditions of your future employment?  When I say
 5    "with them", I mean your host family.
 6                  MR. RODRIGUEZ: Objection to the
 7    form.
 8          A.      Before or after meeting with Expert
 9    AuPair?
10
11    BY MR. ENICA:
12          Q.      Before.
13          A.      No.
14          Q.      Did you discuss with your family
15    the conditions of your employment after they met
16    with Expert AuPair?
17          A.      No, it was just in the contract.
18    We just went off what was in the contract.  I
19    didn't really discuss it with them as such, but I
20    was just given the contract, as were they.
21          Q.      So you had no -- strike that.  You
22    did not negotiate the contract?
23                  MR. RODRIGUEZ: Objection.
24
25    BY MR. ENICA:
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                      FLYNN - ENICA
 2          Q.     Is this what you are saying?
 3          A.     Yes.  As far as I was aware I had
 4   no right to faith with them.  It was an
 5   opportunity for me.
 6          Q.     Okay.  Let's take a look at the
 7   contract.  I am going to mark it as an exhibit and
 8   we are going to take a look at it.  We are going
 9   to mark it as exhibit 1.  I would like you to take
10   a look at every page of the document and then let
11   me know when you are done.
12               (Exhibit 1 so marked)
13          A.     Okay.
14          Q.     Do you recognise this document?
15          A.     Yes.
16          Q.     If you turn on to the fourth page,
17   which is the last page of the document, at the end
18   of the document.  Is that your signature?
19          A.     Yes.
20          Q.     Can you read for the record the
21   paragraph above your signature?
22          A.     "I, the au pair, have read this
23   contract, understand the terms and conditions, and
24   agree to abide by them as witnessed by my
25   signature.  I have spoken with the employer via
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2   telephone and agreed verbally to these conditions
 3   of my employment.  I have read the employer's
 4   application and all pre-departure orientation
 5   information."
 6          Q.      Is that accurate?
 7                  MR. RODRIGUEZ: Objection to the
 8   form.
 9          A.      Is what accurate, what I have just
10   read?
11
12   BY MR. ENICA:
13          Q.      Yes.  It says "I, the au pair", so
14   did you read this contract and understand its
15   terms and conditions etcetera?
16          A.      Yes.
17          Q.      Did you speak with your employer
18   via telephone and agreed verbally to the
19   conditions, prior to signing the contract?
20          A.      No, I didn't use the telephone to
21   speak to them about it.
22          Q.      Okay.  Did you speak in person
23   about the terms?
24          A.      No.
25          Q.      So you never agreed verbally to the
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2   conditions of the employment, with your employer?
 3           A.      No.
 4           Q.      So the statement that you signed
 5   here in 2011 is inaccurate?
 6           A.      I wouldn't say it is inaccurate, I
 7   just didn't -- we didn't exactly talk about it.
 8   It was just that was what it was, if that makes
 9   sense.
10           Q.      I am just looking at the words on
11   the paper.  Is this paragraph accurate?
12           A.      It is accurate, but I didn't
13   specifically say to them "this is what is going to
14   happen", nor did they.  We had the contract in
15   front of us and the contract was agreed.  It
16   wasn't discussed.
17           Q.      So you agreed to the terms and
18   conditions of this contract --
19           A.      Yes, by signing it we did.
20           Q.      -- without discussing the terms and
21   conditions with your employ, that is what you are
22   saying?
23                   MR. RODRIGUEZ: Objection to the
24   extent it calls for a legal conclusion.
25           A.      I can't even remember.  I am trying
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2   to think.  You know, it was five years ago.  It
 3   was a very long time ago.  As far as I am aware,
 4   that I can remember, I didn't talk to them about
 5   it.
 6
 7   BY MR. ENICA:
 8           Q.    I believe it is seven years ago.  I
 9   might be wrong?
10           A.      Oh my goodness.  Is it?
11           Q.      The date on the contract is 2011?
12           A.      Oh, it is.  It is 2018.  Goodness
13   gracious me.  I am so sorry, yes.
14           Q.      Which means it is completely
15   understandable.  I am just trying to ----
16           A.      It was a very long time ago.  I
17   remember meeting with the agency in Tampa airport,
18   but there is so much went on between me starting
19   the contract and me actually arriving in the
20   United States, it is such a long time ago and for
21   me to remember that is -- off the top of my head,
22   from what I can remember, no we didn't, but ----
23           Q.      Okay.  We will come back to the
24   contract now that we have it marked as an exhibit.
25   I will refer to it as exhibit 1.  Do you remember
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2    how many hours you worked, on average, per week,
 3    for the host family in the United States when you
 4    were an au pair?
 5           A.     Roughly, on a day-to-day basis, was
 6    from 7.30 in the morning, when they would go to
 7    work, to 5.30-6.00 in the evening.
 8           Q.     Would it be every day?
 9           A.     Monday to Friday.
10           Q.     Would that be -- I am trying to
11    calculate from 7.30 in the morning until 5.30 in
12    the evening, that is approximately 10 hours a day.
13    Would that be accurate?
14           MR. RODRIGUEZ: Objection.
15           A.     If that is what you say, then yes.
16           Q.     You said 6.30 ----
17           A.     5.30-6.00, dependent on traffic.
18           Q.     Okay.  So that would be more than
19    10 hours a day?
20           A.     Yes.
21    ████       █████████████████████████
22    ███████████████████████████████████
23    ███████████████████████████████
24    ████       ████████████████████████
25    █████    ████████████       █████████████
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com



FLYNN - ENICA

        Q.      So if my math is correct, that
would be more than 50 hours a week?

        A.      Okay.

        Q.      Would that be accurate?

        A.      Yes.

        Q.      I am not sure if my maths ----

        A.      If it is times by -- yes, of
course, 50.

        Q.      So it is at least 50?

        Q.      So you would say that on average

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2   you would work for a week, about 55 hours?
 3            A.     Yes.  I would say about 55.
 4            Q.     I didn't want to put a number ----
 5            A.     No, no.  That is fine.  As you said
 6   it I went to say it, so that is fine.
 7            Q.     I am going to mark another document
 8   as exhibit 2 and I am going to ask you the same
 9   thing, to look over each page of the document and
10   then let me know when you are done.
11                 (Exhibit 2 so marked)
12            A.     Can I ask why it says that on them,
13   because I did answer these questions?
14            Q.     Can you repeat that?
15            A.     Do you see here where it says that
16   I declined to respond?  I did answer them.
17                 MR. RODRIGUEZ: I am going to ask
18   that that line of questioning not be pursued on
19   grounds of attorney-client privilege.
20
21   BY MR. ENICA:
22            Q.     I am not going to ask you why you
23   didn't answer the ones that are not answered.
24            A.     That is fine.  I just didn't
25   understand why it said that.  That was all.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2          Q.      You can discuss with your counsel.
 3   I am not going to refer to those right now.
 4          A.      That is fine.  I thought it was
 5   something that I had done.  That was all.  Perhaps
 6   I had just missed something out.  (Pause for
 7   reading)  Ready.
 8          Q.      Do you recognise the document?
 9          A.      Yes.
10          Q.      If you turn to the last page, is
11   this your signature?
12          A.      Yes.
13          Q.      Do you understand the meaning of
14   this page?
15          A.      Yes, because my mother went through
16   it with me because my mother is a lawyer.
17          Q.      Okay.  The meaning of this page is
18   -- it basically states that the answers given are
19   given under oath?
20          A.      Yes.
21          Q.      Which means that you swear that the
22   answers are true and accurate?
23          A.      Okay.
24          Q.      This is the same understanding you
25   have, right?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2          A.     Yes.
 3          Q.     If you look on the page prior to
 4   your signature page, request number 2, can you
 5   read your answer for the record?
 6          A.      "I worked 47.5 hours a week during
 7   the time as an au pair.  On no occasions I worked
 8   less than 45 hours a week."
 9          Q.     Okay.  This testimony you gave
10   under oath contradicts with the testimony you give
11   today under oath --
12                 MR. RODRIGUEZ: Objection.
13
14   BY MR. ENICA:
15          Q.      -- and I am going to explain why.
16   Because today you testified that you worked more
17   than 50 hours on a regular basis and 55 hours on
18   average, under oath, while in your interrogatories
19   you are saying that you worked 47.5 hours, so from
20   my point of view this is a discrepancy.  How would
21   you explain it?
22                 MR. RODRIGUEZ: Objection to the
23   form.
24          A.     When calculating that one I said to
25   you that of a weekend I was there to do what I
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2   needed to do.  I was not paid for the weekend.
 3   The weekend was classed as my time off.  As the
 4   contract states, Saturday and Sunday I was
 5   supposed to be off.  You understand?
 6
 7   BY MR. ENICA:
 8           Q.    I am listening.
 9           A.    So, as far as -- the 55 hours was
10   including the weekends, but I was not paid of a
11   weekend.  I am going to say the 47.5 hours was a
12   rough estimation as I spoke to -- who did I speak
13   to?
14           MR. RODRIGUEZ: I am going to
15   instruct the witness not to discuss any
16   conversations with counsel.
17           THE WITNESS: Okay.  I spoke to
18   somebody, anyway.  I made a rough estimation as to
19   how many hours I worked.  You have to understand
20   this was a long time ago.  I didn't keep a
21   calendar, I didn't keep a diary, I didn't keep
22   anything like that, so as far as I am concerned it
23   was a rough estimation and that probably does go
24   against me in some instances because it is under
25   oath, but it was an estimation on my part.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
1                      FLYNN - ENICA

2

3    BY MR. ENICA:

4         Q.    Okay.  You estimated 47.5 when you

5    filled in this.  Today, excluding the weekends, I

6    still didn't understand the explanation about the

7    weekends but I will ask questions about it.

8    Excluding the weekends, you said 10 to 10.5 hours

9    a day, which would be more than 50?

10        A.    To which I did state that I had

11   worked no less than 45 a week.

12        Q.    Correct.

13        A.    As I say, it was a rough estimation

14   on my part.

15        Q.    Okay.  Today you said it is more

16   than 50, excluding the weekend?

17        A.    Just say 50, if you exclude the

18   weekends.

19        Q.    Just say 50.  So between the amount

20   of hours you stated today and the amount of hours

21   you stated under oath in the document, which one

22   would be the correct one?

23             MR. RODRIGUEZ: Objection.

24   Misstates.

25        A.    You know what, between 47.5 and 50.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

                    FLYNN - ENICA

BY MR. ENICA:

1    Q.    Okay.

2    A.    It varied.  No two days are the
     same.  You cannot ----

3    Q.    Sorry, I didn't want to interrupt
     you.

4    A.    No, it is fine.  I am trying to
     explain to you that sometimes they did come in at
     5-5.30.  Sometimes they came in at 6.00, as I did
     state to you previously, dependent on traffic.

5    Q.    So it could be 47.5?

6    A.    Roughly.  It is around that
     bracket, 47.5 to 50.  There is, what, two hours
     difference.  It is a rough estimation on my part.

7    Q.    Okay.  Could it be 45.5?

8    A.    No.  They were never in before
     5-5.30 daily.

9    Q.    So it was always more than 45?

10   A.    Yes.

11   Q.    I would like you to look back at
     exhibit 1 and the last paragraph under 1.1 hours.

12   A.    Okay.

13   Q.    Where it says "please, note".  Can

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                      FLYNN - ENICA
 2     you read the first sentence for the record,
 3     please?
 4              A.      "Au pairs may not care for a child
 5     under the age of two without 200 hours of
 6     documented infant care experience."
 7              Q.      Maybe I misstated something.
 8              A.      What did you say, sorry?
 9              Q.      1.1, "Hours".  The last paragraph
10     it says "please, note".  It is right before ----
11              A.      Sorry.  I have got dyslexia.  I
12     misread that.  "Au pairs may not work more than 10
13     hours a day, or 45 hours a week.  They must have
14     at least 1.5 full consecutive days off a week and
15     they must have at least one free weekend a month."
16              Q.      Okay.  It says au pair may not work
17     more than 45 hours a week.
18              A.      Okay.
19              Q.      You are saying that this is what
20     Expert AuPair said?
21              A.      Yes.
22              Q.      This was in your contract to the
23     host family?
24              A.      Yes.
25              Q.      And still you work more than 45
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2   hours a week?
 3           A.    I was a 19 year old girl, you know.
 4   I was on my own.  I do not know what you want me
 5   to say.
 6           Q.    If you told Expert AuPair that you
 7   are working more than 45 hours a week.
 8           A.    I tried speaking to Expert AuPair.
 9   They were so MIA.  They were useless.
10           Q.    They were so, excuse me?
11           A.    They were useless.  They never got
12   in touch with me, they -- when I did try and ring
13   them -- sorry.
14              (Witness becoming upset)
15              MR. RODRIGUEZ: Okay.  We can take a
16   break any time you want.
17              THE WITNESS: Please.
18            (Off the record at 1.31pm)
19           (Back on the record at 1.38pm)
20
21   BY MR. ENICA:
22           Q.    Before the break I was asking you
23   if you told Expert AuPair that you were working
24   more than 45 hours.  Can you repeat your answer,
25   or summarise?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2          A.      Yes.  When I started it was pretty
 3     much the hours that are on the contract, so it was
 4     7.30 to 4.30.  Then, within a matter of weeks, it
 5     started getting later and later, which is when I
 6     told you it was about 5.30-6.00.  When I tried to
 7     contact Expert AuPair, their phones rang out.
 8     Multiple times I had e-mailed them and I had not
 9     had a response.  Towards the middle, towards the
10     end of my contract time with my host family I had
11     difficulty with them and I could not get in touch
12     with Expert AuPair to help me.  As a 19 year old
13     girl who has no familiarity with Texas in her
14     life, I expected Expert AuPair to be there for me
15     as somebody for me to be able to say "I do not
16     know what to do.  You know, you are meant to be on
17     my side, help me".  They were nowhere to be seen.
18     Let's put it this way, I felt completely fobbed
19     off by them.  I just felt like it was, "She is
20     there, they have paid their money.  Off she goes".
21     That was the way it felt to me.  As far as I am
22     concerned, as a 19 year old girl in a foreign
23     country, with nobody on her side, who am I to
24     argue?  I can't say to my family, "No, you are not
25     doing that".  I live with them, I am with them 24
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                      FLYNN - ENICA
 2     hours a day.  What am I meant to do?  Does that
 3     make sense?
 4            Q.     Yes.  Normally I would summarise,
 5     but I think you put it well on the record.
 6            A.     Okay.  Thank you.
 7            Q.     Let's stay with exhibit 1, the
 8     employment contract.  Right after the paragraph
 9     that you read, we have a paragraph 2, titled
10     "duties".
11            A.     Yes.
12            Q.     Here it says "list duties below"
13     and then there are some duties that are listed?
14            A.     Yes.
15            Q.     Were these your duties while being
16     an au pair in the States?
17            A.     Yes.
18     ██         ████████████████████████
19     ██████████████
20     ██         ████████████████████████
21     ███████████████████    ███████████
22     ███████████████    ██████████
23     ██████████████████████████
24     █████████████████    ██████████████
25     ████████████████    ███████████████
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

FLYNN - ENICA

1

2

3

4

5

6          Q.      You came prior to your contract

7      ending?

8          A.      No, no, no.  When the contract

9      finished I didn't extend it, is what I am trying

10     to say.  Sorry, I should have worded that

11     differently.

12         Q.      No, I understood.

13         A.      Okay.

14         Q.      Put exhibit 1 on the side for a

15     second.  Let's step back; did you prepare for

16     today's deposition?

17         A.      Yes.

18         Q.      When did you prepare?

19         A.      I met with my lawyer.

20         Q.      Okay.  When was that?

21         A.      This morning.

22         Q.      For how long, approximately?

23         A.      And hour and a bit, an hour and a

24     half, something like that.

25         Q.      Did you review any documents during

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2     your preparation for today?
 3              A.      No.
 4              Q.      Did you review any documents in
 5     response to the requests in exhibit 2?  Exhibit,
 6     at page 6, it has a request for production of
 7     documents.  It is the sixth page.  I apologise,
 8     there are no numbers on the pages.
 9              A.      Oh this one, request for
10     production.  What was your question, sorry?
11              Q.      If you review any documents in
12     response to this request?
13              A.      No, I didn't review any document.
14              MR. ENICA: Can we take a small
15     break?
16              MR. RODRIGUEZ: Of course.
17              (Off the record at 1.44pm)
18          (Back on the record at 1.46pm)
19
20     BY MR. ENICA:
21              Q.      We are staying on the same document
22     and I am looking at page 5, which is the previous
23     page.
24              A.      Yes.
25              Q.      Under number 4 there is -- number 4
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2    has sub A, B, C, D, E and F.
 3            A.     Yes.
 4            Q.     Subparagraphs.  Did you review any
 5    documents in preparing the answers to those
 6    paragraphs?
 7            A.     No, I didn't need to.
 8            Q.     So it was based on your memory?
 9            A.     Yes.  That was 100% what I had put
10    there.
11            Q.     So you did receive $200 a week?
12            A.     Yes.
13            Q.     If I look at exhibit 1, which is
14    the contract on the bottom of the first page, it
15    says "the employer agrees to pay the au pair a
16    salary of $195.75".
17            A.     Okay.
18            Q.     You are stating that regardless of
19    this, the employer paid you $200?
20            A.     He rounded it up to the nearest
21    100.  It is not hard to see.
22            Q.     Did he ask permission from Expert
23    AuPair?  When I say "he", I am referring to your
24    ----
25            A.     No.  Matthew -- that is nothing to
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2   do with me.  They are supposed to be working
 3   together.
 4          Q.     Who is they?
 5          A.     Expert AuPair and my family were
 6   supposed to -- this was nothing to do with me,
 7   whether he discussed that with them or not.
 8          Q.     Okay, because this is a contract
 9   that you signed.
10          A.     Okay.
11          Q.     This contract changed and you
12   testified that your opinion is this contract came
13   from Expert AuPair?
14          A.     It did.
15          Q.     I just want to find out if you know
16   if Expert AuPair changed this contract in any
17   ways, or it was the family's decision to change
18   it?
19                 MR. RODRIGUEZ: Objection to form to
20   the extent it calls for legal conclusions.
21          A.     As far as I am aware, no I do not
22   know that he had any contact with them, but as far
23   as I am aware I think he just rounded it up to the
24   nearest hundred, to make it an equal amount for
25   him going out each week.  That was my knowledge of
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

36

```
 1                    FLYNN - ENICA
 2    the situation.
 3
 4    BY MR. ENICA:
 5          Q.     I am still looking at the same
 6    exhibit 1 and here, on the top, the top paragraph,
 7    it doesn't have a paragraph, it is right under the
 8    employment contract.
 9          A.     Yes.
10          Q.     It is your name, which is typed and
11    it says -- referred to as "the au pair"?
12          A.     Yes.
13          Q.     What is your understanding of what
14    is an au pair?
15          A.     An au pair is somebody from, as I
16    take it, out of the country, who goes and stays in
17    another country to take care of children.  Some
18    people may refer to it as a cultural excursion,
19    but as far as I was concerned it was not very
20    cultural.  It was a different country, but I
21    didn't really get to see very much, so -- it was
22    an experience, let's put it that way.
23          Q.     Why you decided to become an au
24    pair?
25          A.     Honestly?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                   FLYNN - ENICA

 2    ████    ████

 3    ████    ████████████████

 4             MR. ENICA: Can we go off the record

 5    for a second?

 6                (Off the record at 1.50pm)

 7             (Back on the record at 1.51pm)

 8             THE WITNESS: Sorry, I had forgotten

 9    where we were.  Can you tell me where we are up

10    to?

11

12    BY MR. ENICA:

13        Q.      You answered.

14        A.      Okay, that is fine.

15        Q.      The next question I think we

16    touched on, but do you remember the dates where

17    you were an au pair in the United States?

18        A.      I think I went back I want to say

19    end of October, beginning of November, something

20    like that.  I flew in.  I think it was the end of

21    October, beginning of November, somewhere around

22    there, 2011.

23        Q.      When you ----

24        A.      I flew to the States to become an

25    au pair and then I left in the September 2012,
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
1                    FLYNN - ENICA
2     somewhere around there.
3          Q.    Okay, so it is 2011-2012 would be
4     accurate?
5          A.    Yes.
6          Q.    You mentioned you didn't want to
7     renew your stay as an au pair, I think?
8          A.    Yes.
9          Q.    Did you try and become an au pair
10    in a different country?
11         A.    No.
12         Q.    You say it was an experience?
13         A.    Yes.
14         Q.    Did you learn anything new about
15    the United States by being an au pair there for a
16    year?
17         A.    No.  The only thing I really
18    learned about was Judaism, because they were a
19    Jewish family.  That was the only thing I learned
20    different.
21         Q.    Would you recommend the programme
22    for a 19 year old who wants to go to the United
23    States?
24         A.    I have multiple times, to many
25    friends, but the patient exactly something that
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
1                    FLYNN - ENICA
2    you would go "ooh" because it is very very low and
3    it is difficult to live off such a small amount.
4    I have one friend who has done it and three
5    friends who have said no.
6            Q.     Do you remember where was your host
7    family located?
8            A.     Dallas.
9            Q.     Dallas, Texas.  Do you remember how
10   many kids they had?
11           A.     Two.  They still do.
12           Q.     They are all grown up now?
13           A.     Oh yes.  I see them every year.  We
14   are still very close.
15           Q.     That wasn't part of the initial
16   line of questioning, but I am curious.  You
17   mentioned that you had some disagreement with them
18   and you left?
19           A.     I had some?
20           Q.     You had some disagreement and you
21   left.
22           A.     Yes -- well, no, I didn't leave.  I
23   had a disagreement with them, which made me not
24   renew my contract, which made me then proceed to
25   go home when the contract had ended.  It didn't
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

FLYNN - ENICA

2  make me leave.

9   Q.   I know that we looked today over
10  the duties mentioned here.
11  A.   Yes.
12  Q.   You explained a little bit about
13  it.  Who was evaluating the quality of your work?
14  A.   Who was --
15  Q.   -- evaluating the quality of your
16  work.
17  A.   I don't quite understand.  Can you
18  rephrase it?  Evaluating as in what?
19  Q.   Was anybody ever evaluating the
20  quality of your services?
21  A.   I didn't give them a reason to.  As
22  far as they were concerned I was doing what I
23  needed to be doing, so there was no reason for
24  anybody to evaluate what I was doing.
25  Q.   Was anybody saying at one point you

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2    did a good job or you did a bad job, or anything
 3    like that?
 4          A.    The only thing we had a
 5    disagreement on, which is what I touched on
 6    briefly, was the fact that they expected me to go
 7    to different groups and things outside of the
 8    community, without a car.  As you full well know,
 9    in the contract it does state that I was going to
10    buy my own car, but realistically, on a wage as
11    low as it was on, I do not know how they expected
12    that.  So, it is either they supply me with a car
13    and help me get to these places, or I don't go.
14    It is as simple as that.  That was the slight
15    disagreement we had.
16
17
18
19
20
21
22
23
24
25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

FLYNN - ENICA



 10          Q.       Going back to childcare services,
 11    they never complained about the quality of the
 12    childcare services?
 13          A.       I never gave them a reason to
 14    complain about it, so no.
 15          Q.       Was Expert AuPair ever evaluating
 16    your childcare services that you ----
 17          A.       They were never there, so no.
 18          Q.       I wanted to rephrase, but you
 19    understood the question I guess.
 20          A.       That is fine.  You can rephrase if
 21    you want.
 22          Q.       If Expert AuPair ever evaluated the
 23    quality of the childcare services you provided?
 24          A.       No.  They were never there, so no.
 25          Q.       You mentioned that your schedule

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2   changed after the first couple of weeks?
 3            A.      Yes.
 4            Q.      Who changed the schedule?
 5            A.      Nobody discussed it, it just
 6   changed.  They just started to come home later.
 7            Q.      When you say "they", you mean ----
 8            A.      The parents.
 9            Q.      So, Expert AuPair was not involved
10   in the change of schedule, is that correct?
11                    MR. RODRIGUEZ: Objection to the
12   form.
13
14   BY MR. ENICA:
15            Q.      Okay.  Was Expert AuPair involved
16   in this change of schedule?
17                    MR. RODRIGUEZ: Same objection.
18            A.      I never informed them of it.  I am
19   unsure if my family informed them, but I didn't.
20
21   BY MR. ENICA:
22            Q.      You mentioned earlier, when you
23   discussed about payments, that he rounded to $200
24   and you mentioned the name and I missed that name?
25            A.      Matthew.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
 1                    FLYNN - ENICA
 2          Q.     Who is Matthew?
 3          A.     He was the father.
 4          Q.     So he was the host father?
 5          A.     Yes.
 6          Q.     He was the only person that paid
 7    you for your whole stay as an au pair?
 8          A.     Yes.
 9          Q.     So Expert AuPair never paid you?
10          A.     No.
11          Q.     Did you receive any additional
12    money from the host family during your stay in the
13    United States, except the $200 a week?
14          A.     If I babysat outside of working
15    hours, then yes.
16          Q.     How much would you receive if you
17    -- how much did you receive if you babysat?
18          A.     It varied.
19          Q.     Was it based an hourly payment, or
20    ----
21          A.     It was normally about $8-10 an
22    hour, which is normal for a babysitter.
23          Q.     You mentioned earlier about working
24    in the weekends?
25          A.     Yes.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
                        FLYNN - ENICA
 1
 2         Q.      Would that working in the weekends
 3    qualify as babysitting?
 4         A.      No.  They were in the house.
 5         Q.      So what would it be, babysitting?
 6         A.      Babysitting is if they went out to
 7    dinner or they went out or an event, or if it was
 8    I was in the house alone with the children.
 9         Q.      How often would it happen?
10         A.      Every other weekend.  They had a
11    busy schedule.
12         Q.      Would they pay you by cheque or
13    cash, the amount for your babysitting?
14         A.      For a weekend?
15         Q.      Yes, for a weekend.
16         A.      Cash.
17         Q.      Do you have any record of how much
18    did you receive in cash from them for the duration
19    of your stay in the United States?
20         A.      How would I?  How would I have any
21    record of that?
22         Q.      The answer to my question usually
23    is you have or your do not?
24         A.      When somebody gives you cash in
25    hand you have no record of that, so I do not
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
1                        FLYNN - ENICA
2      understand the question.
3                    MR. RODRIGUEZ: If I may, he is
4      going to ask the questions.  Please, just give an
5      answer and not in the form of a question to him.
6                    THE WITNESS: Okay.
7
8      BY MR. ENICA:
9           Q.     Thank you.  So the answer is no?
10          A.     No.
11          Q.     Did your host family provide you
12     with room and board?
13          A.     Yes.
14          Q.     Did they provide you with three
15     meals a day?
16          A.     Two.
17          Q.     Were you required to pay for your
18     third meal?
19          A.     If I wanted it, yes, but I didn't
20     really eat through the day, so -- I didn't have
21     time.
22          Q.     Except the money they paid for your
23     babysitting services and your $200 a week, did you
24     receive any other money from your host family?
25          A.     No.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                     FLYNN - ENICA
 2          Q.      Did you receive any benefits from
 3     them?
 4                  MR. RODRIGUEZ: Objection.  Vague.
 5          A.      Benefits as in, like, healthcare?
 6     I think I got health insurance.  Did I?  I can't
 7     remember.  I think I was added on to their health
 8     insurance, if that is classed as a benefit, but
 9     apart from that I am not sure.
10
11     BY MR. ENICA:
12          Q.      Did they provide you with any
13     gifts?
14          A.      On my birthday, yes, but apart from
15     that, no.
16          Q.      Christmas?
17          A.      I wasn't there for Christmas.  I
18     went home.
19          Q.      You mentioned that Expert AuPair
20     was not much in touch with you, would that be
21     correct?
22          A.      Yes.
23          Q.      But do you remember the name of the
24     local representative?
25          A.      Mark.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                      FLYNN - ENICA
 2          Q.     Were you in touch with anybody else
 3     at Expert AuPair, except Mark?
 4          A.     There was a lady, but I can't
 5     remember her name.  I think I exchanged three
 6     e-mails with her and we were supposed to meet, and
 7     it never happened.
 8          Q.     Do you know where this lady was
 9     located?
10          A.     I have no idea.  I couldn't tell
11     you.  I can't remember her name.  As I say, it was
12     a very long time ago, so ----
13          Q.     But do you know if she was in Texas
14     or she was in ----
15          A.     She was in Florida, I think.
16          Q.     Florida?
17          A.     Yes, I think she was in Florida.
18          Q.     Do you remember Mark's last name?
19          A.     It began with a G.
20          Q.     That is fine.
21          A.     No, sorry.
22          Q.     During your stay in the United
23     States, were you in contact with other au pairs,
24     either through Expert AuPair or other agencies?
25          A.     They tried to get me in touch with
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2     one au pair, but it didn't work.
 3             Q.     Okay.  When you say "they", you
 4     mean the host family?
 5             A.     No, Expert AuPair.
 6             Q.     So Expert AuPair was trying to put
 7     you in contact with another au pair?
 8             A.     Yes, who was in Dallas.
 9             Q.     Why did it not work?
10             A.     Because when she was free I was not
11     and when I was free she wasn't.  Then she
12     organised something to do, like rock climbing or
13     something I think it was and I don't do things
14     like that, so just situations like that.  It
15     wasn't anything bad, it just didn't work.
16             Q.     When you said "she organised things
17     like rock climbing" ----
18             A.     It was a young girl.
19             Q.     You are referring to the other au
20     pair?
21             A.     Yes.
22             Q.     Did you take any vacation while you
23     work as an au pair?
24             A.     Just to come home for Christmas.
25             Q.     Did your host family pay for your
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

50

```
 1                    FLYNN - ENICA
 2    vacation time during your Christmas vacation?
 3            A.     I can't remember.
 4            Q.     Except coming for Christmas, did
 5    you take any other vacation?
 6            A.     No.
 7            Q.     Did you travel to any other
 8    country?
 9            A.     No.
10            Q.     Do you know how long was that
11    vacation, over Christmas?
12            A.     I think it was, like, nine days,
13    with a weekend in the middle of it, so seven
14    working days.
15            Q.     So except the seven working days,
16    did you take any other vacation?
17            A.     No.  I took one sick day.
18            MR. ENICA: We can go off the record
19    for a second.
20               (Off the record at 2.06pm)
21              (Back on the record at 2.06pm)
22
23    BY MR. ENICA:
24       ■        ■■■■■■■■■■■■■■■■■■■■■
25       ■     ■■     ■■■■■■■■■■■■■■■■
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                        FLYNN - ENICA

 2    ████████        ████████████████████████████

 3    █████████████████████

 4         Q.     That clarifies it.  I am going to

 5    mark the next document as exhibit 3.

 6                  (Exhibit 3 so marked)

 7         A.     God, I don't even remember this

 8    document it is that long ago.

 9         Q.     Just to let you know that even if

10    you talk to your counsel or to yourself, the court

11    reporter is going to write down what you say.

12                  MR. RODRIGUEZ: It is best just to

13    wait for him to ask a question.  (Pause for

14    reading)  Is this the complete document that was

15    produced?

16                  MR. ENICA: Yes.  It has Bates

17    numbers on the bottom.

18                  MR. RODRIGUEZ: Right.  It just says

19    21 pages, so I was just wondering if there were

20    additional pages in this document.

21                  MR. ENICA: Oh, it is possible that

22    the whole document was produced.

23                  MR. RODRIGUEZ: Okay.  That is fine.

24                  MR. ENICA: Actually, yes, the whole

25    document was produced.  It was the whole ----
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

52

```
 1                    FLYNN - ENICA
 2              MR. RODRIGUEZ: Thank you.
 3
 4   BY MR. ENICA:
 5        Q.    I am going to represent to you that
 6   there are several documents together.
 7        A.    Okay.
 8        Q.    Do you recognise any of the pages
 9   of this document?
10        A.    I will be honest, I forgot I even
11   signed this up -- did this.  I really forgot doing
12   this, until I just read it.  It is so me how
13   I have written it, but yes.  I don't remember it.
14        Q.    When you say "it is so me", which
15   pages are you referring to?
16        A.    This is page 6 on this one, but it
17   is clearly not.
18        Q.    You can read the Bates number, the
19   one that says "Expert AuPair" and it has a longer
20   number?
21        A.    059726.  I have written there:
22   "Because I love being with children I wouldn't
23   class it as a job, I enjoy it that much."  I still
24   work with children to this day.
25        Q.    If I go a page before that, which
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
1                    FLYNN - ENICA
2     is 59725.
3            A.     Okay.
4            Q.     And I am looking at the schedule,
5     where it says "ideal job description"?
6            A.     Yes.
7            Q.     This is what you filled in as being
8     your ideal schedule, would that be correct?
9            A.     Yes.
10           Q.     Would it still be the ideal
11    schedule today?
12           A.     Well, I work eight hours a day now
13    so it is only an extra hour.
14           Q.     I am going to point you to the
15    first page of the document and that is titled "au
16    pair agreement"?
17           A.     Yes.
18           Q.     I have to apologise for the quality
19    of the document, I think the scanners back then
20    were a little bit poor quality, or the fax.  Under
21    "working conditions", which is the third bolded
22    title, it says:  "If the childcare I provide is of
23    insufficient quality as judged by the host family,
24    Expert AuPair will review this complaint", among
25    oh things.  Do you see where it says that?
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                    FLYNN - ENICA
 2         A.      Yes.
 3         Q.      Have you ever had the expectation
 4   that Expert AuPair would judge the quality of your
 5   childcare services provided?
 6         A.      Can you say that again?
 7         Q.      Have you ever had the expectation
 8   that Expert AuPair and not the host family would
 9   judge the quality of the childcare services
10   provided by you?
11         A.      Yes.  I thought that they would be
12   on my side for, obviously, my reasons, but I also
13   thought that they would -- if my host family
14   weren't happy with something or if something
15   wasn't to their expectation, that Expert AuPair
16   would then either guide me in the right direction
17   or speak to me or whatever -- is that answering
18   your question correctly?
19         Q.      Somehow.
20         A.      I think I understood.
21         Q.      Did it happen like this?
22         A.      No.  The only person I met from
23   Expert AuPair was Mark, and that was in Tampa
24   airport.
25         Q.      So nobody was there to supervise
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

                        FLYNN - ENICA

1   you?

2          A.     No, nobody came from Expert AuPair.

3          Q.     I do not want to judge you, I am

4   just going to ask the question.  It is just a

5   question.  If you go to page 722, the fourth

6   paragraph says:  "I am required to be in contact

7   with a local representative every month."  Were

8   you in contact with a local representative every

9   month?

10         A.     No.

11         Q.     Were you in contact with the local

12  representative at least every other month?

13         A.     In the first, say, three to four

14  months I had contact and then that was it until

15  the month prior to me going home and Mark e-mailed

16  me and said, "Are you renewing or are you going

17  home?"  Does that answer your question?

18         Q.     Yes.  Have you ever tried to

19  contact Mark, by yourself?

20         A.     Since being an au pair?

21         Q.     No, since you met him in Tampa

22  airport.

23         A.     Yes, we did speak for the first

24  couple of months and then, as I say, the last

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                   FLYNN - ENICA
 2   e-mail I got was it not to say August -- beginning
 3   of September, end of August and he said to me,
 4   "Are you going home or are you renewing?"  I was
 5   like, "No, I am going home".  That was the last
 6   time I spoke to him.
 7          Q.     When you say you spoke, you mean
 8   ----
 9          A.     E-mailed.
10          Q.     I need to give the question.  When
11   you said spoke you meant e-mailed?
12          A.     Yes.
13          Q.     I am going to mark the next
14   document as exhibit 4.
15                 (Exhibit 4 so marked)
16          A.     Okay.
17          Q.     Do you recognise this document?
18          A.     It doesn't look anything like this
19   on my computer, but I did read that bit.
20          Q.     When you mentioned you read that
21   bit, because the court reporter cannot see ----
22          A.     Sorry, the top bit.  What is it
23   called at the top?  What would you call that?  I
24   do not know what you would call it.  The
25   paragraphs at the top, with the numbers, I
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1                      FLYNN - ENICA
 2    remember reading that and then obviously I filled
 3    it out, but it didn't like this on my computer.
 4    That is all I said.
 5            Q.      Do you remember signing this
 6    document?
 7            A.      Yes.
 8            Q.      Electronically?
 9            A.      Yes.
10            Q.      Do you remember approximately when
11    you signed it?  You can look at the date of the
12    document, if it is right?
13            A.      It says to and from, but -- I see,
14    date 2017, yes.
15            Q.      So was it approximately September
16    of 2017?
17            A.      Yes, it was last year.
18            Q.      How did you find out about this
19    action?  How did you find out about this lawsuit?
20            A.      I was contacted.
21            Q.      You were contacted by whom?
22            A.      The solicitors, the lawyer.
23            Q.      Did you receive an e-mail or ----
24            A.      Yes, I received an e-mail from
25    them.
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**



1       FLYNN - ENICA

2   Q.  I only have a couple more questions

3 about the duties and then I will just take a quick

4 look, but we are more or less done.

5   A.  Okay.

6   Q.  You mentioned you took care of a

7 baby.  Did your childcare related duties change

8 throughout your year as an au pair?

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com



**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com



**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

1                       FLYNN - RODRIGUEZ

8               MR. ENICA: If we can take a break

9  so I can take a look.

10             *(Off the record at 2.22pm)*

11          *(Back on the record at 2.26pm)*

12

13           **EXAMINATION BY MR. RODRIGUEZ**

14

15        Q.    Ms. Flynn, please turn back to

16  exhibit 3. This is the document that says "au

17  pair agreement" at the top. I would like you to

18  turn to the Bates ending in 722. The second full

19  paragraph at the top of the page, ending in Bates

20  722 -- I am sorry, the third full paragraph: "I

21  am required to be in contact with the local

22  representative every month. If I do not hear from

23  the local representative in any given month, I

24  will notify head office by e-mail that the local

25  representative has not contacted me." Did I get

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

                    FLYNN - RODRIGUEZ

that right?

          A.      Yes.

          Q.      Do you have an understanding of who
the local representative referred to in this
paragraph is?

          A.      I can't remember her name, but it
was included in the e-mails that I had sent over
to you.  It was the lady who was involved in the
e-mails, talking about the other au pair from
Peru.

          Q.      How many times were you in contact
with that woman?

          A.      I want to say three times, max.

          Q.      This last clause of the paragraph:
"I will notify head office by e-mail that the
local representative has not contacted me."  Did
you ever notify Expert AuPair's head office that
the local representative had not contacted you?

          A.      Well, I think Mark was head office.
I did speak to Mark on the telephone about it
because as far as I was concerned, nobody was kind
of bothering with me.  I did contact Mark via
telephone.  One of the times I actually got
through and spoke to him about it and he did say

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

```
1                    FLYNN - RODRIGUEZ
2    somebody would be in contact with me and nobody
3    ever did.
4                    MR. RODRIGUEZ: That is all I have.
5                    MR. ENICA: No further questions
6    from my side.
7              (Deposition concluded at 2.28pm)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

64

```
 1
 2              CERTIFICATE OF COURT REPORTER
 3
 4              I, Shola McGregor, Court Reporter,
 5    do hereby certify that I took the stenotype notes
 6    of the foregoing deposition and that the
 7    transcript thereof is a true and accurate record
 8    transcribed to the best of my skill and ability.
 9              I further certify that I am neither
10    counsel for, related to, nor employed by any of
11    the parties to the action in which this deposition
12    was taken, and that I am not a relative or
13    employee of any attorney or counsel employed by
14    the parties hereto, nor financially or otherwise
15    interested in the outcome of the action.
16
21    Shola McGregor
22
23
24
25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
**www.depositioncenter.com**

65

```
 1

 2                    CERTIFICATE OF WITNESS

 3

 4              I, COURTNEY FLYNN, am the witness

 5     in the foregoing statement under oath.  I have

 6     read the foregoing statement and, having made such

 7     changes and corrections as I desired, I certify

 8     that the transcript is a true and accurate record

 9     of my responses to the questions put to me on

10     Wednesday, March 28th, 2018.

11

12

13

14

15

16             Signed ..........

17             Courtney Flynn

18

19             Dated this .... day of .... 2018

20

21

22

23

24

25
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

```
 1

 2

 3                              ERRATA

 4      (Please make any amendments or corrections on the

 5       errata sheet and not on the original deposition)

 6    CORRECTION                                        PAGE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    _____        _____

24

25    Signature                       Date
```

**MARTEN WALSH CHERER LTD.**
**LONDON, ENGLAND**
**Tel. 01144 (0) 20 7067 2900  Fax: 01144 (0) 20 7831 6864**
**(Out-of-hours tel. 01144 (0) 7833 467869)**
www.depositioncenter.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

JOHANA PAOLA BELTRAN; ET AL.  )
                                )
        PLAINTIFFS,      )
                                )
V.                     ) CIVIL ACTION NO.
                                ) 1: 14-cv-03074-
INTEREXCHANGE, INC.; ET AL.  ) CMA-KMT
                                )
        DEFENDANTS.      )
_____)

VIDEOTAPED DEPOSITION OF LARA SHALAINE BERGMANN

FRIDAY, MARCH 30, 2018

REPORTED BY SHARON D. ALLEN, C.S.R. NO. 10752

Lara Bergmann  3/30/2018

**Page 2**

1  VIDEOTAPED DEPOSITION OF LARA SHALAINE BERGMANN, TAKEN

2  ON BEHALF OF THE DEFENDANTS, AT 1:15 P M , FRIDAY, MARCH

3  30, 2018, AT 21550 OXNARD STREET, THIRD FLOOR, WOODLAND

4  HILLS, CALIFORNIA, BEFORE SHARON D  ALLEN, C S R

5  NO  10752

6

7  APPEARANCES OF COUNSEL:

8

9  FOR THE PLAINTIFFS:

10    BOIES SCHILLER FLEXNER LLP
      BY: JUAN P  VALDIVIESO, ESQ
11    1999 HARRISON STREET
      SUITE 900
12    OAKLAND, CALIFORNIA 94612
      510 874 1000
13    JVALDIVIESO@BSFLLP COM

14

15  FOR THE DEFENDANTS:

16    BOGDAN ENICA, PC
      BY:  BOGDAN ENICA, ESQ
17    111 SECOND AVENUE NE
      SUITE 900
18    ST  PETERSBURG, FLORIDA 33701
      727 388 3472
19    BOGDANE@HOTMAIL COM

20

21  ALSO PRESENT:

22    JOSEPH FERNANDEZ, VIDEOGRAPHER

23

24

25

**Page 3**

1            I N D E X

2

3  WITNESS        EXAMINATION        PAGE

4  LARA SHALAINE BERGMANN

5    BY MR. ENICA          6, 77

6    BY MR. VALDIVIESO     62, 80

7

8

9            E X H I B I T S

10

11  NO.   PAGE    DESCRIPTION

12  EX 1  11      RESPONSES AND OBJECTIONS TO
                  INTERROGATORIES, REQUESTS FOR
13                PRODUCTION AND REQUESTS FOR
                  ADMISSION
14
15  EX 2  21      CONSENT TO JOIN LAWSUIT

16  EX 3  23      LETTER TO LARA-SHALAINE
                  BERGMANN FROM CHRISTINE AND
17                STEVEN MAXWELL, 8/25/10

18  EX 4  26      EMPLOYMENT CONTRACT, 8/25/10

19  EX 5  39      EMPLOYMENT CONTRACT, 10/1/11

20  EX 6  56      AU PAIR EXTENSION AGREEMENT,
                  9/15/11
21

22

23

24

25

**Page 4**

1        WOODLAND HILLS, CALIFORNIA;

2        FRIDAY, MARCH 30, 2018; 1:15 P.M.

3

4      (The court reporter's read on and read off

5        pursuant to Federal Rules of Civil procedure

6              was waived by counsel.)

7

8        THE VIDEOGRAPHER:  We are on the record.

9  The time on the record is 1:15 p m.  Today's date is

10 March 30, 2018, and time is -- sorry.

11      My name is Joseph Fernandez contracted by

12 Peterson Reporting, Video and Litigation Services.

13 The court reporter today is Sharon Allen of Personal

14 Court Reporters.

15      This begins the videotaped deposition of

16 Lara Bergmann testifying in the matter of Johana

17 Paola Beltran, et al., versus Interchange, Inc., et

18 al. -- I'm sorry, Interexchange, Inc., et al., in

19 the United States District Court for the Central

20 District of California [sic], Case No. 1: 14cv03074-

21 CMA-KMT taken at 21550 Oxnard Street, Woodland

22 Hills, California.  Video and audio recording will

23 be taking place unless all counsel agrees to go off

24 the record.

25      Would all present please identify

**Page 5**

1  themselves beginning with the witness.

2      MR. ENICA:  Let's go off the record for a

3  second.

4      Just to correct, it's in the District of

5  Colorado.

6      THE VIDEOGRAPHER:  The time is 1:16 p m.

7  We're off the record.

8       (Discussion held off the record.)

9      THE VIDEOGRAPHER:  The time is 1:16 p m.

10 We're back on the record.

11      Actually, sorry.  In the United States

12 District Court for the District of Colorado.

13      Would counsel please identify yourselves

14 and state whom you represent.

15      MR. VALDIVIESO:  Juan Valdivieso, Boies,

16 Schiller and Flexner on behalf of Ms. Bergmann and

17 the plaintiffs.

18      MR. ENICA:  Bogdan Enica on behalf of

19 Expert Group International doing business as Expert

20 AuPair.

21      THE VIDEOGRAPHER:  The court reporter may

22 now swear in the witness.

23 \\\

24 \\\

25 \\\

Lara Bergmann  3/30/2018

1　　　　LARA SHALAINE BERGMANN,
2　　having been first duly sworn by the reporter,
3　　　was examined and testified as follows:
4
5　　　　　　　EXAMINATION
6　BY MR. ENICA:
7　　Q　Good afternoon.
8　　A　Good afternoon.
9　　Q　Would you please spell your name for the
10　record.
11　　A　L-a-r-a and then new word S-h-a-l-a-i-n-e
12　and last name is Bergmann, B-e-r-g-m-a-n-n.
13　　Q　And how do you prefer that I would address
14　you?
15　　A　Lara is fine.
16　　Q　Lara.  Okay.  And can you please tell us
17　your address, where you reside?
18　　A　My home address is 9740 Zelzah Avenue,
19　Z-e-l-z-a-h, Avenue, Apartment No. 135, 91325,
20　Northridge, California.
21　　Q　Thank you.  Have you ever been deposed
22　before?  Have you ever been deposed before?
23　　A　Would you mind explaining what deposed
24　means, please?
25　　Q　Absolutely.

Page 6

1　you give me is the whole truth and nothing but the
2　truth.
3　　A　Okay.
4　　Q　We don't have a judge nor a jury here today
5　but this is still a court proceeding.  So you would
6　be required to answer the questions in the same
7　manner as you would answer if a judge or a jury
8　would be present here.
9　　A　Okay.
10　　Q　And as we started, I'm going to ask
11　questions and you're going to answer the questions.
12　Your counsel here may make objections.  And unless
13　specifically advised not to answer a question, you
14　are to answer the question even if your counsel
15　objects to the form, foundation or any other
16　objection he may want to raise regarding that
17　question.
18　　A　Okay.
19　　Q　Are you under the influence of any
20　medication that would impair your ability to tell
21　the truth today?
22　　A　No.
23　　Q　Did you prepare for today's deposition?
24　　A　Yes.
25　　Q　How did you prepare?

Page 8

1　　　　Have you ever -- was your deposition ever
2　taken before?
3　　A　No, it hasn't.
4　　Q　Were you ever part of a lawsuit before?
5　　■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
6
7　　Q　As part of that were you required to
8　testify in front of a court reporter?
9　　A　Yes.
10　　Q　So you may be familiar with the presence of
11　a court reporter here.  However, I'm going to go a
12　little bit over the rules of this proceeding today.
13　　　　Because the court reporter is here and
14　she's writing down everything we say, it is
15　important that you verbalize your answers.  And it
16　is also important that you wait until both I pose
17　the question in order to give me an answer.  This
18　way we make it easier for the court reporter to
19　write everything down.
20　　　　Is that clear?
21　　A　Yes, that is clear.
22　　Q　Perfect.  If there is anything you don't
23　understand, as you just did, ask me to rephrase, ask
24　me to clarify.  If you answer a question, I would
25　assume that you understood it and that the answer

Page 7

1　　A　I read through the questions that were
2　being sent to me in regard to the court case, and I
3　thought about my time as an au pair to refresh my
4　memory.  I think that's it.
5　　Q　That's okay.  Okay.  Did you meet with your
6　counsel in preparation for today?
7　　A　We did not meet.
8　　Q　Did you speak on the phone with your
9　counsel?
10　　A　Yes, I did.
11　　MR. VALDIVIESO:  I'm going to instruct the
12　witness not to reveal any communications between
13　myself and the witness.
14　　　　Just keep that in mind as he asks you any
15　further questions.
16　BY MR. ENICA:
17　　Q　Okay.  Can you tell me when you spoke on
18　the phone with your counsel?
19　　MR. VALDIVIESO:  You may answer the
20　question.
21　　THE WITNESS:  We talked on the phone
22　yesterday as well as shortly before the meeting.
23　BY MR. ENICA:
24　　Q　Do you remember for how long you were on
25　the phone yesterday?

Page 9

Lara Bergmann  3/30/2018

1   A   I don't remember.
2   Q   Can you tell me approximately?  Let's say
3   was it more than an hour or less than an hour?
4   A   Less than an hour.
5   Q   Was it more than an hour or less than an
6   hour today?
7   A   Less than an hour.
8   Q   Did you -- you mentioned you read some
9   questions.
10      Were these questions prepared by your
11  counsel or questions that you received from us?
12   A   I believe they were sent by the law agency.
13  I'm not too sure who the --
14      MR. VALDIVIESO:  Could we go off the record
15  a second?
16      MR. ENICA:  Yes.
17      THE VIDEOGRAPHER:  The time is 1:22 p.m.,
18  and we're off the record.
19      (Discussion held off the record.)
20      THE VIDEOGRAPHER:  The time is 1:26 p.m.
21  We're back on the record.
22  BY MR. ENICA:
23   Q   Okay.  Have you reviewed any documents in
24  preparation for today?
25   A   Yes.  I received a document.

Page 10

1   Q   There was only one document that you
2   reviewed in preparation for today?
3   A   Yes.
4   Q   And can you describe what this document
5   was?
6   A   It was a Word document where simple
7   questions like duration of my stay as well as who
8   was my host family as well as what pay I received
9   and which form of pay.
10   Q   And when did you review this document?
11   A   I don't know.
12   Q   Was it this week?
13   A   No.  It was earlier than this week.
14   Q   Was it this month?
15   A   It was earlier than this month.
16   Q   Was it this year, if you remember?
17   A   If it was, it was close to the beginning of
18  the year.  If not, towards the end of last year.
19   Q   So that was the only document that you
20  reviewed to prepare for today, that document?
21   A   Correct.
22   Q   So I'm going to mark Exhibit 1.
23      (Whereupon Defendant's Exhibit No. 1
24      was marked for identification by the
25      deposition officer and attached hereto.)

Page 11

1   BY MR. ENICA:
2   Q   You're going to get a copy of Exhibit 1 and
3   I'd like you to take a look at it, look at every
4   single page, and when you're done, look up and let
5   me know you're done.
6      Okay.  So if I'm looking at the last page
7   of the document that we marked as Exhibit 1, is that
8   your signature?
9   A   Yes, it is.
10   Q   And does this verification page refer to
11  the rest of the document that's Exhibit 1?
12   A   Yes, it is.
13   Q   So you understand the meaning of signing
14  the verification page in regards to the document?
15   A   Yes.
16   Q   So it means that you signed the document
17  under oath?
18   A   Yes.
19   Q   Okay.  Now, there are no page numbers, but
20  I'm going to count the pages so we can both talk
21  about the same page.  So if you turn to Page 4 --
22      Before that, actually, this document has
23  three types of requests that we made to you.  And
24  one is called interrogatories and starts with
25  Page 4.  If you can turn to Page 4, it starts with

Page 12

1   I. Interrogatories.  The top of the page is No. 10,
2   "Plaintiff objects," and then it has "I.
3   Interrogatories."
4      That is the first type of request that we
5   had and basically it is a number of questions that
6   we wanted you to answer.  The second type of request
7   that we had is Requests for Production, which starts
8   at Page 6.  And the third type of request that we
9   had starts at Page 8, and it's called Requests for
10  Admission.
11      Since you signed this and you testified
12  that you understood that you answered under oath,
13  I'm going to go over the answers with you a little
14  bit if it's okay.
15   A   Okay.
16   Q   So I'm turning to Page 4 to Page 5.  It
17  starts with Interrogatory No. 4.  So Question No. 4
18  on top of the page.  However, if I go after the
19  first bolded paragraph -- your answers are in bold
20  while the questions are in regular.
21   A   Correct.
22   Q   Correct.  And it's asking the amount that
23  you were paid for that week's work and you put $220.
24   A   Correct.
25   Q   Would that be accurate, that you were paid

Page 13

Lara Bergmann  3/30/2018

| | |
|---|---|
| 1 $220 per week for your time as an au pair? | 1 questions in the Word document. |
| 2 A Yes, that is correct. | 2 Q Now, if I move to the next page, it says |
| 3 Q And the method by which you were paid, you | 3 Requests for Production. Our question, our request |
| 4 mentioned Chase Quickpay. Would that still be | 4 is "All documents identified or referenced in your |
| 5 correct? | 5 answer to any interrogatory." |
| 6 A Yes, correct. | 6 Can you see that? It's No. 1. |
| 7 Q Can you explain for the record what the | 7 A Um-hum. Yes. |
| 8 Chase Quickpay is? | 8 Q And your answer is "Subject to the |
| 9 A It is an online version to be paid through | 9 foregoing objections, plaintiff will produce any |
| 10 the account of Chase. So it automatically gets wire | 10 relevant, non-privileged documents responsive." |
| 11 transferred from the host parents' account to my | 11 A Correct. |
| 12 account. | 12 Q Have you produced the documents that you |
| 13 Q Okay. So it's a type of wire transfer? | 13 reviewed in answering the interrogatories? |
| 14 A Correct. | 14 A I have not produced them. |
| 15 Q Which you received the money electronically | 15 Q Why not? |
| 16 in your account? | 16 A Because I don't have a printer at home. |
| 17 A Yes. | 17 Q Do you still have these documents? |
| 18 Q Okay. And if I go under E, you mentioned | 18 A In an online version. |
| 19 that you have a downloadable file? | 19 Q Okay. I'm going to put Exhibit 1 on the |
| 20 A Yes. | 20 side for a bit. We may be looking at it again in |
| 21 Q Have you reviewed this downloadable file in | 21 the future. |
| 22 preparing these answers? | 22 Before marking the next exhibit, why are |
| 23 A Yes. | 23 you here today? |
| 24 Q And the next question, F, your answer is | 24 A Because I have received an e-mail -- |
| 25 "Yes, I have documentation." | 25 MR. VALDIVIESO: I'm going to object. To |

Page 14 Page 16

| | |
|---|---|
| 1 A Yes. | 1 the extent you received an e-mail from counsel, I'm |
| 2 Q Have you reviewed this documentation in | 2 going to instruct you not to reveal any contents of |
| 3 preparing these answers? | 3 that e-mail. |
| 4 A Yes. | 4 THE WITNESS: Okay. |
| 5 Q Now, I'm going to come back to what I asked | 5 BY MR. ENICA: |
| 6 you earlier. I asked if you reviewed any documents | 6 Q Okay. So why are you here today? You can |
| 7 in preparation for today. And you mentioned that | 7 tell me I received an e-mail from my counsel, and |
| 8 you reviewed one document, which was a Word | 8 I'm not going to pursue that because your counsel |
| 9 document. I asked you if you reviewed anything | 9 advised you not to answer any questions about it. |
| 10 else, and you said no. | 10 A Because au pairs have been paid less than |
| 11 A That was in combination with this document. | 11 minimum wage for their work. |
| 12 Q Okay. So when you referred to the Word | 12 Q Okay. So why are you suing Expert AuPair? |
| 13 document, was the Word document a Word version of | 13 A Because Expert AuPair has given the |
| 14 these questions that you have in front of you? | 14 recommendation of an amount that is less than |
| 15 A Yes. | 15 minimum wage. |
| 16 Q And apart from the actual Word document, | 16 Q Given the recommendation to whom? |
| 17 what other documents did you review? | 17 A To the families who go with the program. |
| 18 A I looked back into my e-mails as far as I | 18 Q Are you aware of several of these families? |
| 19 could in order to answer the questions off the Word | 19 A Yes, I am aware of multiple au pair |
| 20 document. | 20 families. |
| 21 Q So you reviewed your e-mails? | 21 Q And they were all given recommendations by |
| 22 A As far as I could. | 22 Expert AuPair? |
| 23 Q Did you review this downloadable file that | 23 A Some of them. Others went with different |
| 24 you mentioned here? | 24 au pair agencies. |
| 25 A Yes, in combination with answering the | 25 Q Are you suing other au pair agencies? |

Page 15 Page 17

Lara Bergmann  3/30/2018

| | |
|---|---|
| 1  A   I am. | 1  BY MR. ENICA: |
| 2  Q   How many families are you aware of that | 2  Q   You can answer. |
| 3  were given recommendations by Expert AuPair? | 3  A   It was publicized on the website as a |
| 4  A   At least five of the girls that have been | 4  recommendation, and when the family agreed to the |
| 5  in the program with me. | 5  contract, it was as a -- it was in a written form in |
| 6  Q   The question is how many families do you | 6  the contract. |
| 7  know? | 7  Q   And when you say in the contract, what |
| 8  A   I don't know them personally. | 8  contract are you referring to? |
| 9  Q   Okay.  So how many -- | 9  A   The family had to sign a contract in order |
| 10      So you don't know actually any family that | 10  to allow an au pair into their family. |
| 11  was told by Expert AuPair to pay a certain amount? | 11  Q   I apologize.  I'm confused. |
| 12      MR. VALDIVIESO:  Objection to form. | 12      The family had to sign a contract.  A |
| 13  BY MR. ENICA: | 13  contract with you or a contract with Expert AuPair? |
| 14  Q   You may answer. | 14  A   With Expert AuPair. |
| 15  A   I know that the families abide by the | 15  Q   So you saw this recommendation in a |
| 16  recommendations of Expert AuPair. | 16  contract between the family and Expert AuPair? |
| 17  Q   I understand.  That wasn't the question. | 17  A   I did not see it.  But on the website it |
| 18  A   Would you mind rephrasing the question? | 18  was marked that the minimum wage an au pair has to |
| 19  Q   The question was how many families do you | 19  receive is 195.75. |
| 20  know, that you personally know, that were advised by | 20  Q   So you saw on the website saying that the |
| 21  Expert AuPair to pay a certain amount? | 21  minimum au pair should receive is $195.75, |
| 22  A   One. | 22  correct? |
| 23  Q   So that would make it singular, one family? | 23  A   Right. |
| 24  A   Yes.  Correct. | 24  Q   Apart from the website, have you seen |
| 25  Q   And what was the name of this family, the | 25  anywhere else a certain amount that Expert AuPair |
| Page 18 | Page 20 |

| | |
|---|---|
| 1  last name? | 1  was advising the families to pay? |
| 2  A   Maxwell. | 2  A   I don't know. |
| 3  Q   And where were you part of that | 3  Q   Have you seen on the website or anywhere |
| 4  conversation or have you seen any documentation | 4  else stating that the amount is a maximum? |
| 5  proving that Expert AuPair advised them to pay a | 5  A   It is not the maximum. |
| 6  certain amount? | 6  Q   Why do you believe it is not the maximum? |
| 7  A   Yes, I have. | 7  A   Because I received more than the minimum |
| 8  Q   Were you part of the conversation? | 8  amount that an au pair should be getting. |
| 9  A   It has not been a conversation.  It was a | 9  Q   I'm going to mark the next document as |
| 10  written form. | 10  Exhibit 2. |
| 11  Q   Okay.  So have you seen correspondence in | 11      (Whereupon Defendant's Exhibit No. 2 |
| 12  which Expert AuPair was advising them to pay a | 12      was marked for identification by the |
| 13  certain amount? | 13      deposition officer and attached hereto.) |
| 14  A   Yes, I have. | 14  BY MR. ENICA: |
| 15  Q   Do you have this correspondence in your | 15  Q   And I'm going to ask you to take a look at |
| 16  possession? | 16  the document and let me know when you're done. |
| 17  A   I do not. | 17      Do you recognize this document? |
| 18  Q   Have you ever had this correspondence in | 18  A   Yes. |
| 19  your possession? | 19  Q   Okay. |
| 20  A   It was an online form where I saw it, and I | 20  A   I recognize this document. |
| 21  believe the family has gotten it in a printed form. | 21  Q   Do you know what this document represents? |
| 22  Q   And do you remember what was it?  Was it an | 22  A   A consent to join. |
| 23  e-mail?  A letter? | 23  Q   And to join what? |
| 24      MR. VALDIVIESO:  Objection to form. | 24  A   That the law firm of Boies, Schiller, |
| 25  \\\ | 25  Flexner and towards justice will represent me in the |
| Page 19 | Page 21 |

Lara Bergmann  3/30/2018

1  action and consent to the attorney fee arrangement
2  described in the notice of your right to join
3  lawsuit for unpaid wages.
4      Q    Would it be accurate if I would say this is
5  your consenting to join the lawsuit against Expert
6  AuPair?
7      A   Yes.
8      Q   Are you also suing your host family?
9      A   No, I am not.
10     Q   Why not?
11     A   Because they have only agreed to the
12  recommendation of Expert AuPair.
13     Q   Do you believe they underpaid you?
14     A   Yes, I believe so.
15     Q   How much do you believe you should have
16  been paid?
17     A   At least --
18         MR. VALDIVIESO:  Objection to form.
19         THE WITNESS:  At least minimum wage.
20  BY MR. ENICA:
21     Q   You think you were not paid minimum wage?
22     A   I have not been paid minimum wage.
23     Q   Have you been offered accommodations and
24  meals for your duration of your stay in the au pair
25  program?

Page 22

1      A   Yes.
2      Q   Was your host family deducting the value of
3  accommodations and meals from your salary?
4         MR. VALDIVIESO:  Objection to form.
5         THE WITNESS:  No, they did not.
6  BY MR. ENICA:
7      Q   Think back to Exhibit 2.  Do you know
8  approximately when you signed this document?
9      A   I do not know.
10         MR. VALDIVIESO:  Thank you.
11         MR. ENICA:  I'm marking the next document
12  as Exhibit 3.
13         (Whereupon Defendant's Exhibit No. 3
14         was marked for identification by the
15         deposition officer and attached hereto.)
16  BY MR. ENICA:
17     Q   Take a look at it and let me know if you
18  recognize it.
19     A   I do not clearly remember this document.
20     Q   Okay.  But it looks familiar in any way?
21     A   Yes.
22     Q   Do you have any reason to believe that you
23  did not receive this document?
24     A   No.
25     Q   If you don't clearly remember, I'll just

Page 23

1  start with more generic questions.
2      A   Okay.
3      Q   Did Expert AuPair recruit you for the au
4  pair program to the United States?
5         MR. VALDIVIESO:  Objection to form.
6         THE WITNESS:  No, they did not recruit me.
7  BY MR. ENICA:
8      Q   So how did you and the Maxwells get in
9  contact?
10     A   Through greataupair.com.
11     Q   Greataupair.com is a website?
12     A   Correct.
13     Q   All right.  Have you ever worked for Expert
14  AuPair?
15     A   I have not.
16     Q   So I want to take you back when you met
17  this family on greataupair.com and prior to
18  contacting Expert AuPair.
19     A   Okay.
20     Q   Did you discuss with them about the amount
21  of money that you would be paid?
22     A   I did not.
23     Q   Okay.  Did you discuss with them about the
24  number of hours that you were going to work?
25     A   I did not.

Page 24

1      Q   Did you discuss with them about the duties
2  that you were going to fulfill while in the United
3  States?
4         MR. VALDIVIESO:  Objection to form.
5         THE WITNESS:  I did not.
6  BY MR. ENICA:
7      Q   Do you remember what you discussed with
8  them prior to contacting Expert AuPair?
9      A   Yes, I do.
10     Q   Can you tell us?
11     A   We talked about the location of where I
12  would be living, how old ▮▮ -- the host child
13  was, about my expectations as well as their
14  expectations.
15     Q   And what were your expectations?
16     A   To come to the United States to be part of
17  a family, take care of their son and to get to know
18  the American culture.
19     Q   Okay.  Now, just to make it clear for the
20  record, is ▮▮ their son?
21     A   Yes.
22     Q   And you mentioned that you discussed how
23  old is the son?
24     A   Yes.
25     Q   What was the purpose of you finding out how

Page 25

Lara Bergmann  3/30/2018

Page 26

1  old is the son?
2      A   Because each child has a different
3  developmental stage.  And therefore, I had to adapt
4  to the developmental stage of their son.
5      **Q   So it has to do with the childcare duties**
6  **that you were required to perform while in the**
7  **United States?**
8      A   Correct.
9          MR. VALDIVIESO:  Objection to form.
10 BY MR. ENICA:
11     **Q   So about the age of the child, did you**
12 **discuss anything else about duties,**
13 **childcare-related duties that you might have while**
14 **in the United States?**
15     A   No.
16     **Q   Okay.  I'm going to mark a new document as**
17 **Exhibit 4.**
18         (Whereupon Defendant's Exhibit No. 4
19         was marked for identification by the
20         deposition officer and attached hereto.)
21         MR. VALDIVIESO:  Thank you.
22         THE WITNESS:  Thank you.
23 BY MR. ENICA:
24     **Q   You might want to take a quick look and let**
25 **me know when you're done.**

Page 27

1      **Do you recognize the document?**
2      A   Yes, I do.
3      **Q   Can you describe the document for the**
4  **record?**
5      A   It is a contract that entails the terms of
6  employment, the information about the child, my
7  duties, the salary, the accommodations, privileges,
8  the restrictions as well as the signature of both
9  parents.
10     **Q   Okay.  So who are the parties to the**
11 **contract?  Who is this contract between?**
12         MR. VALDIVIESO:  Objection to form, calls
13 for a legal conclusion.
14 BY MR. ENICA:
15     **Q   Who are the parties in this contract?**
16     A   Both parents as well as Expert AuPair.
17     **Q   So what you're saying is this contract**
18 **between the parents and Expert AuPair?**
19         MR. VALDIVIESO:  Objection to form.
20         THE WITNESS:  Correct.
21 BY MR. ENICA:
22     **Q   Okay.  Maybe my question wasn't clear.  I'm**
23 **going to repeat it just to make sure you understood.**
24     **You're saying this is a contract between**
25 **the parents, and when I say the parents, I mean the**

Page 28

1  host family parents, and Expert AuPair?
2          MR. VALDIVIESO:  Objection to form.
3          THE WITNESS:  From my understanding, yes.
4  BY MR. ENICA:
5      **Q   Okay.  You are not a party to this**
6  **contract?**
7      A   I have not signed this contract.
8      **Q   Okay.  You don't remember ever signing this**
9  **document?**
10     A   I think I signed it, but not this document
11 that I have in front of me.
12     **Q   Okay.  So what you're saying is that**
13 **Exhibit 4 is a document that doesn't have your**
14 **signature on it?**
15     A   Correct.
16     **Q   But did you ever sign a similar document?**
17     A   Yes, I did.
18     **Q   And can you look at the first page where it**
19 **says -- the second sentence, I would say also the**
20 **second paragraph, "This documents serves."  It**
21 **starts with "This document serves."**
22         **Can you read this for the record, please?**
23     A   "This document serves as a childcare
24 employment contract between Christine and Steve
25 Maxwell, hereafter referred to as the employer, and

Page 29

1  Lara-Shalaine Bergmann, hereafter referred to as the
2  au pair."
3      **Q   Okay.  So after reading this would you**
4  **still maintain your statement that this is an**
5  **agreement between the host parents and Expert**
6  **AuPair?**
7      A   No.
8      **Q   Okay.  Let's do it again.**
9          **So how would you describe this document for**
10 **the record?**
11     A   It is a contract between the host family
12 and me as an au pair.
13     **Q   Okay.  And do you know who wrote in the**
14 **handwritten part of this document?**
15     A   I don't know.
16     **Q   So if we turn to Page 2, Duties.  Is it you**
17 **that filled in where it says "List Duties Below"?**
18     A   No.
19     **Q   Is it possible that it was the host mother**
20 **or the host father?**
21     A   Yes.
22         MR. VALDIVIESO:  Objection to form.
23 BY MR. ENICA:
24     **Q   Is it possible that it was somebody with**
25 **Expert AuPair?**

Lara Bergmann  3/30/2018

**Page 30**

1  A  Yes.
2  Q  But you don't know if it was either or?
3  A  No.
4  Q  Are these the duties that you discussed
5  with the host family?
6  A  Yes.
7  Q  So if this was written by somebody from
8  Expert AuPair, they would have had these duties from
9  your host family.  Would that be accurate?
10    MR. VALDIVIESO:  Objection to form.  Sorry.
11    THE WITNESS:  Yes.
12    MR. VALDIVIESO:  And I'm just going to ask
13  that I be given an opportunity to object.  So leave
14  a little bit of a gap between his question and your
15  answer so we don't give the court reporter a hard
16  time speaking over each other, please.
17    THE WITNESS:  Okay.
18    MR. VALDIVIESO:  Thank you.
19  BY MR. ENICA:
20  Q  I'm looking at the same page, 3.1, Salary.
21  And there is an amount here, $220.
22  A  Yes.
23  Q  I would have the same question.  Do you
24  know who wrote that amount there?
25  A  No.

**Page 31**

1  Q  Is it the amount that you negotiated with
2  your host family?
3    MR. VALDIVIESO:  Objection to form.
4    THE WITNESS:  No.
5  BY MR. ENICA:
6  Q  What was the amount that you negotiated
7  with your host family?
8    MR. VALDIVIESO:  Objection to form.
9    THE WITNESS:  I did not negotiate any
10  monetary compensation.
11  BY MR. ENICA:
12  Q  Okay.  You testified before that you saw a
13  website where it said the minimum is 195 -- $195.75?
14  A  Yes.
15  Q  How come you are receiving $220 instead of
16  $195.75?
17  A  I don't know.
18  Q  So your testimony today is you never
19  discussed this amount with your host family?
20    MR. VALDIVIESO:  Objection to form,
21  mischaracterizes the witness's testimony.
22    THE WITNESS:  Correct.
23  BY MR. ENICA:
24  Q  Do you know if this is an amount that was
25  set by Expert AuPair?

**Page 32**

1    MR. VALDIVIESO:  Objection to form.
2    THE WITNESS:  I don't know.
3  BY MR. ENICA:
4  Q  I'm going back to the first page and taking
5  a look at your -- strike that.
6    Let's stay at duties.  Were these duties
7  accurate and reflective of your job as -- strike.
8    Are these duties accurate and reflective of
9  the activities that you actually performed at your
10  host family?
11    MR. VALDIVIESO:  Objection to form.
12    THE WITNESS:  No.
13    MR. VALDIVIESO:  If you got the objection,
14  it was in between the question and answer.  I tried
15  to object to form.
16  BY MR. ENICA:
17  Q  Were you going to perform more duties, less
18  duties or different duties?
19  A  More duties.
20  Q  More duties.  Can you give me an example of
21  duties that are not mentioned here?
22  A  As time went on, I had to take him to more
23  activities than listed on the list as well as
24  occasionally I cleaned the parents' laundry.  I also
25  cooked for the family.

**Page 33**

1  Q  And who decided that you had to perform
2  these additional duties?
3  A  I don't know.
4  Q  Who told you that you have to perform these
5  additional duties?
6  A  It was an unsaid -- an unsaid comment.
7  They just left the laundry basket there or just put
8  the groceries there.  So as I was cooking for ▮▮▮
9  it extended.  So I had to cook for the family on
10  occasion.
11  Q  How often would that happen?
12  A  Two to three times a week at the most.
13  Q  And did you inform Expert AuPair of this
14  fact?
15  A  I did not.
16  Q  Now I'm going back to the first page and
17  looking a little bit at the schedule.
18    Was this schedule -- is this schedule
19  accurate?
20  A  No.
21  Q  Was your schedule for more or less hours
22  than mentioned here?
23  A  More than hours -- more than the hours
24  mentioned in the contract.
25  Q  How many hours do you think you worked per

Lara Bergmann  3/30/2018

week while working as an au pair?
1  A   Roundabout 47.5 hours.
2  A   Roundabout 47.5 hours.
3  Q   So if we look at the schedule here, would
4  you say that the workday would extend towards the
5  end or the towards the beginning, if it's clear what
6  I'm trying to say?
7      MR. VALDIVIESO:  Objection to form.
8      THE WITNESS:  Both.
9  BY MR. ENICA:
10  Q   Did you inform Expert AuPair that you were
11  working more than 45 hours a week?
12  A   I don't know.
13  Q   I don't know how to interpret your "I don't
14  know."  You don't remember or you informed them and
15  you don't know if that constituted proper
16  information?  I don't know what that means.
17     MR. VALDIVIESO:  Objection to form.
18     THE WITNESS:  I don't know if I have
19  informed them on a written form.  I did talk to my
20  local coordinator, but there were some weeks where I
21  worked exactly the 45 hours and some exceeded the 45
22  hours.  And when it was a lot more, then I talked to
23  my coordinator.  But it dissolved automatically.
24  They were aware that I worked more than 45 hours.
25  BY MR. ENICA:

Page 34

1  Q   When you say "they"?
2  A   My host family.
3  Q   How about Expert AuPair, were they aware
4  that you were working more than 45 hours?
5  A   I don't know.
6  Q   Did you have access to a car when you were
7  an au pair?
8  A   Yes.
9  Q   Did you use the car?
10  A   Yes.
11  Q   Were you required to pay for using the car?
12     MR. VALDIVIESO:  Objection to form.
13  BY MR. ENICA:
14  Q   Yeah.  Sorry.
15  A   Yes.
16  Q   How much would you pay for per cents or per
17  mile?
18  A   I paid for the gas.
19  Q   You were required to pay for the gas.  The
20  question was, I apologize if it was not clear, if
21  you were required to pay for the car?
22  A   No.
23  Q   And did you have access to Internet while
24  you were working as an au pair?
25  A   Yes.

Page 35

1  Q   Were you required to pay for the Internet?
2  A   No.
3  Q   Were you provided with three meals a day?
4  A   Yes.
5  Q   And were you provided with the
6  accommodations mentioned in the contract?  It's 4.2
7  at Page 61222.
8  A   Partially.
9  Q   Partially.  Can you explain that?
10  A   This contract applies to the house setting
11  off the first accommodations.  Afterwards we moved.
12  So this does not apply to the second way of living.
13  Q   Okay.  So regarding the first house, would
14  it be accurate, the accommodations set in 4.0?
15  A   Yes.
16     MR. VALDIVIESO:  Are you referring to 4.1
17  or 4.2?
18     MR. ENICA:  4.2.
19     MR. VALDIVIESO:  Okay.
20  BY MR. ENICA:
21  Q   But since your counsel mentioned it, is
22  that the same question about the 4.1, is that the
23  accommodation regarding 4.1?
24  A   Yes.
25  Q   You mentioned that you are aware of other

Page 36

1  au pairs?
2  A   Yes.
3  Q   Do you know if their duties were exactly
4  the same as your duties?
5  A   I don't know.
6  Q   Do you know if they received $220 a week as
7  well?
8  A   I don't know.
9  Q   Were you ever fired from this --
10  A   No.
11  Q   -- position?
12     What was your understanding who could fire
13  you, the host family or Expert AuPair?
14     MR. VALDIVIESO:  Objection to form.
15     THE WITNESS:  Both parties.
16  BY MR. ENICA:
17  Q   When you say "both parties," you mean?
18  A   The host family as well as Expert AuPair.
19  Q   So it was your understanding that Expert
20  AuPair could fire you even if your host family was
21  happy with you?
22  A   Yes.
23  Q   And sitting here today, that is still your
24  understanding?
25  A   Yes.

Page 37

Lara Bergmann  3/30/2018

| | |
|---|---|
| 1  Q   Was it any instance -- and I'm just | 1  Q   And can you describe this document for the |
| 2  referring to the dates in the contract at | 2  record? |
| 3  Exhibit 4 -- when the family evaluated the quality | 3  A   It is an employment contract that starts on |
| 4  of the childcare services provided by you? | 4  October 1, 2011 between Christine and Steven Maxwell |
| 5     MR. VALDIVIESO:  Objection to form. | 5  as well as me as an au pair and it entails the same |
| 6     THE WITNESS:  Could you repeat that | 6  items as terms of employment, the duties, |
| 7  question, please? | 7  accommodations, privileges, the restrictions, the |
| 8  BY MR. ENICA: | 8  benefits as well as the signatures of both parents |
| 9     Q   Absolutely.  I know that you had two | 9  as well as me as an au pair. |
| 10  different contracts because you decided to extend | 10    Q   You remember signing this agreement? |
| 11  with them. | 11    A   Yes, I do. |
| 12        Would that be accurate, for the same | 12    Q   And would it be accurate to say that at the |
| 13  family? | 13  time of signing this agreement you were already with |
| 14    A   I don't know. | 14  the host family for almost a year? |
| 15    Q   You don't remember extending your program? | 15    A   Yes. |
| 16    A   I did extend, but I don't know if I signed | 16    Q   Okay.  Do you know who filled in the |
| 17  a separate contract. | 17  handwritten part of this? |
| 18    Q   Okay.  That's fine.  So let's say for the | 18    A   I don't know. |
| 19  first year then while you were an au pair before | 19    Q   Do you know who presented this agreement to |
| 20  your extension. | 20  you for signature? |
| 21        Was it any instance during the first year | 21    A   I don't know. |
| 22  where the family evaluated the quality of the | 22    Q   Would you recognize your employer's |
| 23  childcare provided by you? | 23  handwriting if you see it? |
| 24    A   I don't know. | 24    A   No. |
| 25    Q   Did they ever say anything about your work? | 25     MR. VALDIVIESO:  Objection to form. |
| Page 38 | Page 40 |
| 1  A   I believe they were happy with my work. | 1  BY MR. ENICA: |
| 2  Q   Did they ever tell you that? | 2    Q   When you signed this agreement, you |
| 3  A   Yes. | 3  mentioned -- sorry.  I apologize.  Strike. |
| 4  Q   Do you remember how many times? | 4        You mentioned that you moved from one house |
| 5  A   A lot of times. | 5  to another.  We called the first one the first |
| 6  Q   Did Expert AuPair ever evaluate the quality | 6  house, and let's call the next one the second house. |
| 7  of the childcare you provided? | 7        Were there only two houses where you stayed |
| 8  A   I don't know. | 8  as an au pair? |
| 9  Q   Did they ever tell you how happy they were | 9    A   Yes. |
| 10  with your services? | 10    Q   Do you remember at the time of signing this |
| 11  A   Would you mind repeating that question? | 11  agreement were you at the first house or the second |
| 12  Q   Yes.  You said the family told you a lot of | 12  house? |
| 13  times they were very happy with your services. | 13    A   I don't remember. |
| 14        Did Expert AuPair tell you the same thing? | 14    Q   If you look on the first page, and I'm |
| 15  A   No. | 15  looking at the hours, 1.1, you have 8:00 to 5:00. |
| 16  Q   Never? | 16        Would those start and end times be |
| 17  A   No. | 17  accurate? |
| 18  Q   I'm going to mark the next document, which | 18    A   No. |
| 19  is Exhibit 5. | 19    Q   Would you say that you worked more every |
| 20     (Whereupon Defendant's Exhibit No. 5 | 20  day or less than the times mentioned here? |
| 21     was marked for identification by the | 21    A   More. |
| 22     deposition officer and attached hereto.) | 22    Q   Were you ever required to work on a |
| 23  BY MR. ENICA: | 23  Saturday or Sunday? |
| 24  Q   Do you recognize this document? | 24    A   I don't remember. |
| 25  A   Yes. | 25    Q   Were you ever required to babysit at night? |
| Page 39 | Page 41 |

Lara Bergmann  3/30/2018

1   A   Yes.
2   Q   Were you compensated for babysitting at
3   night in addition to the amount of money paid
4   through this contract?
5   A   No.  Hours usually shifted.
6   Q   Were you keeping track of your hours?
7   A   Yes.
8   Q   How were you keeping track of your hours,
9   what was the tangible form?
10   A   A piece of paper.
11   Q   Do you still have that piece of paper?
12   A   I don't.
13   Q   Do you remember when you destroyed that
14   piece of paper?
15   MR. VALDIVIESO:  Objection to form.
16   THE WITNESS:  Shortly thereafter.
17   BY MR. ENICA:
18   Q   Do you remember how many hours you were
19   working every week?
20   A   Around about 47.5 hours.
21   Q   And I know we asked the same questions
22   regarding the previous contract, but I'm going to
23   ask again referring to this contract as well.
24   Did you inform your family that you were
25   working more than 45 hours a week?

Page 42

1   different than your duties in the first year?
2   A   I don't know.
3   Q   Were the duties in the second year the same
4   as the duties in the first year?
5   A   No.
6   Q   Were they different?
7   A   Yes.
8   Q   Why were they different?
9   A   Because ▇▇▇ was older as well as the
10   activities changed that ▇▇▇ attended.
11   Q   Were you still required in the second year
12   to perform duties that were not mentioned in your
13   contract?
14   A   Yes.
15   Q   Can you mention some of those duties?
16   A   Washing parents' laundry, cleaning up more
17   than is mentioned on the bottom as well as still
18   cooking.
19   Q   And you said more than is mentioned on the
20   bottom.  Do you mind reading the portion you're
21   referring to?
22   A   "Please note:  These duties may include,
23   but not limited to, washing children's laundry,
24   straightening children's rooms, bathing children,
25   and cleaning children's play areas."

Page 44

1   A   Yes.
2   Q   And were they aware?
3   A   Yes.
4   Q   Did you inform Expert AuPair that you were
5   working more than 45 hours a week?
6   A   I don't know.
7   Q   So you don't know if they were aware?
8   A   No.
9   Q   If I'm looking at the second page at the
10   duties, I see some handwritten duties here.
11   Do you know who wrote the handwritten part
12   of the duties?
13   A   I don't know.
14   Q   If I'm comparing these duties with the
15   duties in the first contract, I consider some of
16   them changed.  And you're free to do the same.
17   MR. VALDIVIESO:  Sorry.  Was there a
18   question, Counsel?
19   MR. ENICA:  No.  I see the witness is
20   looking.  So I don't want to interrupt.
21   Q   The question is do you know why the duties
22   changed?
23   A   Because of the change of ▇▇▇ age.
24   Q   So would it be accurate to say because the
25   child was older, your duties in the second year

Page 43

1   Q   And your remuneration in the second year
2   stayed the same, $220 every -- $220 per week paid
3   every other week?
4   A   Correct.
5   Q   So you were paid $440 every time?
6   A   Correct.
7   Q   Who was paying you?
8   A   Christine Maxwell.
9   Q   Was she the host mother?
10   A   Yes.
11   Q   Did Expert AuPair ever pay you?
12   A   No.
13   Q   If I'm looking at 4.1 in Exhibit No. 5,
14   would it be accurate as to the accommodations that
15   you were offered while you were an au pair?
16   A   Yes.
17   Q   I'm looking at 4.2, and I have the same
18   question, would that be accurate?
19   A   No.
20   Q   Can you explain?
21   A   After we had moved, I shared the bathroom
22   with ▇▇▇ the child.
23   Q   And just to get a clear record, do you know
24   approximately when you moved within your two years
25   with this family?

Page 45

Peterson Reporting Video & Litigation Services          12 (42 - 45)

Lara Bergmann  3/30/2018

| | |
|---|---|
| 1   A   I don't know.  I don't know. | 1       MR. VALDIVIESO:  As long as my objection is |
| 2   Q   I'm looking for a rough approximation. | 2   noted on the record. |
| 3   Would it be -- if you can give me a season or | 3       MR. ENICA:  Sure. |
| 4   something. | 4       MR. VALDIVIESO:  And you acknowledged that |
| 5   A   It was during spring. | 5   I didn't waive it. |
| 6   Q   So you came in the United States in autumn? | 6       MR. ENICA:  I do acknowledge you didn't |
| 7   A   Correct. | 7   waive it. It's normal.  It's okay. |
| 8   Q   Would that be the spring just following | 8   Q   Could you use the phone for your personal |
| 9   that autumn -- | 9   purposes for making local calls? |
| 10   A   No. | 10   A   Yes. |
| 11   Q   -- or the following spring? | 11   Q   Were you required to pay for that? |
| 12   A   The following spring. | 12   A   No. |
| 13   Q   And was the new house bigger or smaller? | 13   Q   Were you required to pay for long distance |
| 14   A   I don't know. | 14   calls? |
| 15   Q   But in terms of a bedroom, you were still | 15   A   Yes. |
| 16   provided with your own bedroom? | 16   Q   In the United States? |
| 17   A   Yes. | 17   A   No. |
| 18   Q   In both the first and the second house? | 18   Q   So were you required to pay for long |
| 19   A   Yes. | 19   distance United States calls? |
| 20   Q   Was Expert AuPair aware of the fact that | 20   A   No. |
| 21   you moved? | 21   Q   I'm looking at a page ending in 42, the |
| 22   A   I don't know. | 22   Bates number on the corner, 61242, and I have here a |
| 23   Q   Did they come to inspect the second house? | 23   paragraph called "Disciplinary Procedures." |
| 24   A   I don't know. | 24       I want you to take a look at it, and then |
| 25   Q   Do you remember seeing an inspector from | 25   I'm going to have some questions.  Oh.  I apologize. |
| Page 46 | Page 48 |

| | |
|---|---|
| 1   Expert AuPair inspecting the house? | 1       So at the bottom of the paragraph we have a |
| 2   A   I did not. | 2   procedure.  It says "Firstly, Verbal Warning. |
| 3   Q   And I used the word inspector as vague.  I | 3   Secondly, Written Warning.  Thirdly, Contact the au |
| 4   mean any person would be an inspector if they're | 4   pair's LR for further Grievance procedures." |
| 5   inspecting.  I don't want put a uniform on the | 5       I'm just reading from the document. |
| 6   person. | 6   A   Correct. |
| 7       Was that your understanding? | 7   Q   Do you know what LR stands for? |
| 8   A   Yes. | 8   A   I don't know. |
| 9       MR. VALDIVIESO:  I'm going to object to the | 9   Q   Have you ever read this document at the |
| 10   form of that belatedly. | 10   time you were an au pair? |
| 11   BY MR. ENICA: | 11       MR. VALDIVIESO:  Objection to form. |
| 12   Q   We have to give him some time to object. | 12   BY MR. ENICA: |
| 13       Did you have access to a car during your | 13   Q   I will rephrase. |
| 14   second year with the family? | 14       Had you read this document when you signed |
| 15   A   Yes. | 15   it? |
| 16   Q   Were you required to pay for the car? | 16   A   Yes. |
| 17   A   No. | 17   Q   And what was your understanding at that |
| 18   Q   Did you have access to a phone? | 18   time who would give you the verbal warning mentioned |
| 19   A   Yes. | 19   here? |
| 20       MR. VALDIVIESO:  I would object to the | 20       MR. VALDIVIESO:  Objection to form. |
| 21   question to form on the -- related to the car. | 21       THE WITNESS:  The host family. |
| 22       But you can continue with the next | 22   BY MR. ENICA: |
| 23   question. | 23   Q   And who would give you the second warning? |
| 24       MR. ENICA:  I'll give you time to object if | 24   A   Potentially both parties, the host family |
| 25   you want. | 25   as well as Expert AuPair. |
| Page 47 | Page 49 |

Lara Bergmann  3/30/2018

1    Q   You said potentially.  What does it mean
2  potentially both parties?
3    A   That in the case if disciplinary action
4  were to be required, that the host family would
5  reach out to Expert AuPair and then both parties
6  would contact me in a written form.
7    Q   I understand.  Thank you for your
8  clarification.
9        But if we look at the same paragraph, for
10  example, the reasons why you could have been fired
11  were -- I'm looking at "B, job incompetence."
12       MR. VALDIVIESO:  Objection to form.
13       THE WITNESS:  Correct.
14  BY MR. ENICA:
15    Q   Would it be possible for Expert AuPair to
16  evaluate your job incompetence without an evaluation
17  from your host family first?
18    A   Would you mind rephrasing it?
19    Q   Yes. I'm sorry.  No, I don't mind
20  rephrasing.
21       Would it be possible for Expert AuPair to
22  evaluate your competence or incompetence for this
23  job without receiving the information from your host
24  family?
25       MR. VALDIVIESO:  Objection to form.

Page 50

1  specifically I want you to look at.  It's Page
2  No. 6.
3        We're on the bottom side of the page where
4  it says "Requests for Production."
5        And I know that we discussed about No. 1.
6  So I'm not going to ask questions about the first
7  request.  I'm going to ask about the second request.
8        Do you have any communications sent to you
9  or given to you by Expert AuPair regarding the
10  program?
11    A   I don't know.
12    Q   Then I'm going to move to the third
13  request.  Do you have any communications with your
14  family regarding number of hours you worked,
15  compensation, schedule, au pair duties or this
16  lawsuit?
17    A   I don't know.
18    Q   Did you search for it?  I apologize.
19  Strike that.
20        Did you search for any documents responsive
21  to this question?
22    A   Yes.
23    Q   Did you -- as a result of your search, did
24  you find any documents?
25    A   I don't know.

Page 52

1  BY MR. ENICA:
2    Q   Layman words, how would Expert AuPair know
3  if you were incompetent or competent?
4    A   By visiting me at the job site.
5    Q   Okay.  Did they visit you at the job site?
6    A   No.
7        MR. VALDIVIESO:  Before we go to the next
8  exhibit, do you think we can take a short break?
9        MR. ENICA:  I don't mind.  Actually, I want
10  to go back to Exhibit 1.  If you want to take a
11  break now, we can take a break now.  I only have two
12  questions about Exhibit 1.
13       MR. VALDIVIESO:  I'd like to take a break
14  now for personal reasons.  Thank you.
15       THE VIDEOGRAPHER:  The time is 2:32 p.m.,
16  and we're off the record.
17       (Recess taken.)
18       THE VIDEOGRAPHER:  This marks the beginning
19  of Media No. 2 of the video recorded deposition of
20  Lara Bergmann.
21       The time 2:41 p.m., and we're back on the
22  record.
23       MR. ENICA:  Thank you.
24    Q   I would like you to take a look at
25  Exhibit 1 again, and I'm going to tell you something

Page 51

1    Q   When did you search for the documents?
2    A   I don't know.
3    Q   Was it this week?
4    A   No.
5    Q   Was it this year?
6    A   I don't know.
7    Q   Was it in the last two years?
8    A   Yes.
9    Q   Was it after -- was it after the date on
10  Exhibit 2?  It's the one entitled "Consent to Join,"
11  I think, at the bottom of the pile.  And next to
12  your signature there is a date.
13    A   Yes.
14    Q   Was it around September 2017?
15    A   Yes.
16    Q   And going down on the page, No. 4 relates
17  to documents affecting the hours you worked as an
18  au pair.
19        Did you search for such documents?
20    A   No.
21    Q   Going back -- going down the page, No. 5,
22  any amount -- any documents reflecting the stipend
23  you received.
24        Did you search for any such documents?
25    A   Yes.

Page 53

Lara Bergmann  3/30/2018

**Page 54**

1    Q   Did you -- as a result of your search, did
2  you find any documents?
3    A   Yes.
4    Q   Do you still have those documents?
5    A   They are saved online.
6    Q   They're saved online in a location where
7  you have access.  Would that be correct?
8    A   Yes.
9    Q   I might have asked this before, and I
10  apologize if I did.  But did you produce those
11  documents?
12    A   I did not.
13    Q   Now I'm moving to the last page of this
14  document.  And I'm looking at the second question
15  and your answer.  Your answer says "I worked 45
16  hours a week during my time as an au pair.  On rare
17  occasions, I worked less than 45 hours a week."
18    A   Correct.
19    Q   Would this be an accurate answer to the
20  question?
21    A   Correct.
22    Q   You testified today that you worked 47.5
23  hours?
24    A   Correct.
25    Q   Which one would be correct, 45 or 47.5?

**Page 55**

1    A   47.5.
2    Q   Have you worked less than 45 hours a week?
3    A   On very rare occasions.
4    Q   How would you define rare occasions?
5    A   Two to three times a year.
6    Q   Did you take any vacation while you were an
7  au pair in the United States?
8    A   Yes.
9    Q   Do you remember how many weeks of vacation?
10    A   I don't remember.
11    Q   Do you remember approximately when you took
12  vacations?
13    A   I took a travel month at the end of my
14  au pair program.
15    Q   Except the travel month at the end of your
16  au pair program, did you take any other vacation?
17    A   Yes.
18    Q   Can you tell me about that?  Was it in one
19  instance or multiple instances?
20    A   One instance.
21    Q   Can you tell me, if you remember, when it
22  was and for how long?
23    A   I don't remember.
24    Q   But do you remember if it was one week, two
25  weeks or a month?

**Page 56**

1    A   I don't remember.
2    Q   Was it during your first year or second
3  year?
4    A   During my first year.
5    Q   Do you know if your host family paid you
6  for any of -- strike that.
7       For the vacation you took during your first
8  year, did your host family pay you for that time?
9    A   I don't remember.
10    Q   How about for the travel month, were you
11  paid for that time?
12    A   I was not.
13    Q   Do you remember if you took any paid
14  vacation at all in your second year?
15    A   I don't remember.
16    Q   This is Exhibit 6, and I want you to take a
17  look at the document and let me know when you're
18  done.
19       (Whereupon Defendant's Exhibit No. 6
20       was marked for identification by the
21       deposition officer and attached hereto.)
22  BY MR. ENICA:
23    Q   Do you recognize this document?
24    A   Yes, I do.
25    Q   On the third page of the document it says

**Page 57**

1  au pair's signature with a name.
2       Is that your signature?
3    A   Yes, it is.
4    Q   Are you familiar with the terms of this
5  agreement?
6    MR. VALDIVIESO:  Objection to form.
7  BY MR. ENICA:
8    Q   Are you familiar with the terms of this
9  agreement?  Okay.  If it's unclear, just ask me to
10  clarify it.
11    A   Could you clarify it?
12    Q   Absolutely.  Do you know who the parties to
13  this agreement are?
14    MR. VALDIVIESO:  Objection to form.
15    THE WITNESS:  Expert AuPair as well as
16  myself.
17  BY MR. ENICA:
18    Q   That's not the question.  You put it in a
19  question form.  I just want to make sure.
20    A   Expert AuPair as well as myself.
21    Q   Thank you.
22       And do you know just very basic what this
23  agreement refers to?
24    A   To my extension year as an au pair.
25    Q   So it says here on the first page that you

Lara Bergmann  3/30/2018

1  extended for nine months.
2        Would that be accurate?
3    A  Yes.
4    Q   Okay.  And did you agree to this agreement
5  when you signed it?
6    A  Yes.
7    Q   Were you already with your host family when
8  you received this agreement from Expert AuPair?
9    A  Could you repeat the question?
10    Q   Were you already with your host family when
11  you received this extension agreement --
12    A  Yes.
13    Q   -- from Expert AuPair?
14    A  Yes.
15    Q   I'm looking at the fourth paragraph saying
16  "My childcare duties may include the following."
17  This is the start of the paragraph.  Can you see it?
18    A  Yes.
19    Q   And it says if I am asked to perform
20  services that are not childcare related or if I am
21  asked to care for another family's child/children, I
22  will notify my local representative."
23        Can you see where I'm reading that?
24    A  Yes.
25    Q   Okay.  You testified today that you were

Page 58

1    A  I don't remember.
2    Q   If you look at Page 2 of the document, the
3  one with Bates Nos. ending in 1236.  The first
4  sentence says "I am entitled to two weeks of paid
5  vacation in the year that I am in the United
6  States."
7        Now, I am fully aware that you testified
8  earlier that this agreement only covers nine months
9  and not a year.  The question is by looking at this
10  document helps you remember if you took any vacation
11  within this nine months or how we called it before,
12  in the second year in the United States?
13    A  I took my vacation after the nine months as
14  the travel month.
15    Q   Okay.  Was that the paid vacation mentioned
16  here?
17    A  I don't remember.
18    Q   Well, I don't have any other questions for
19  now.  I just request that we take a break, five
20  minutes or less, I'll take a look over my notes.
21  And then if I have any questions, I will ask more
22  questions.  If not, my colleague, your counsel, may
23  ask questions as well.
24        Okay?
25    A  Okay.

Page 60

1  required to perform services that were not childcare
2  related.  Would that be accurate?
3    A  Partially.  I was not required to.  It was
4  unwritten.
5    Q   You were not required to in writing, this
6  is what you mean?
7    A  Correct.
8    Q   Did you notify local representative?
9    A  I don't remember.
10    Q   Okay.
11        MR. VALDIVIESO:  I'm going to object to
12  form on that last question.
13        MR. ENICA:  Okay.
14    Q   Do you know what a local representative is?
15    A  Yes.
16    Q   Who was the local representative?
17    A  A person that was supposed to be there if I
18  had any problems with the host family.
19    Q   Did you ever contact them?
20    A  I don't remember.
21    Q   Did they ever contact you?  And when I say
22  "they," I mean local representative because there
23  are multiple and I don't know the gender.  So that's
24  why we refer to the local representative as they.
25        So did they ever contact you?

Page 59

1        THE VIDEOGRAPHER:  The time is 2:57 p.m.
2  We're off the record.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  The time is 2:59 p.m.
5  We're back on the record.
6  BY MR. ENICA:
7    Q   We discussed today about you being an au
8  pair in the United States.
9        What is your understanding what is an
10  au pair?
11    A  An au pair is a person who comes from a
12  different country and takes care of a family that
13  lives in the United States, of a child of the family
14  who lives in the United States.
15    Q   Did the au pair program benefit you any in
16  way?
17        MR. VALDIVIESO:  Objection to form.
18        THE WITNESS:  Yes.
19  BY MR. ENICA:
20    Q   Would you recommend the au pair program to
21  other foreign persons that are willing to come to
22  the United States to take care of children of
23  American families?
24    A  Yes.
25    Q   No further questions.

Page 61

Lara Bergmann  3/30/2018

1  　　Just one more thing I want to put on the
2  record.  After your counsel asks questions, I might
3  have some redirect.  So I might have one or two
4  questions related to his questions.
5  　　A  Okay.
6  　　THE VIDEOGRAPHER:  Counsel, if you could
7  put your microphone on for me.  Thank you.
8
9  　　　　EXAMINATION
10  BY MR. VALDIVIESO:
11  　　Q  If we could go to Exhibit 4.  Do you
12  remember, Ms. Bergmann, that Mr. Enica was asking
13  you about who had written the handwritten portion of
14  the contract?  Do you remember that?
15  　　A  Yes, I remember.
16  　　Q  I just have some follow-up questions
17  relating to that.
18  　　Do you know where the typewritten
19  information from the contract came from?
20  　　A  Expert AuPair.
21  　　Q  What is your basis for that knowledge?
22  　　A  Because the host family agreed upon going
23  with Expert AuPair as their representative and the
24  contract -- so the only source that they would have
25  this document from would be Expert AuPair since they

Page 62

1  did not go with any other au pair agencies.
2  　　Q  And if you go to Page, if you look on the
3  bottom right, it's 61223.  And if you look at No. 9
4  at the bottom of the page.
5  　　Do you see that?
6  　　A  Yes.
7  　　Q  Could you read No. 9 into the record,
8  please?
9  　　A  "Benefits Offered by Expert AuPair:
10  Medical insurance for 12 months of basic coverage.
11  Optional upgraded coverage for the 13th month of
12  au pair's time in the United States."
13  　　Q  Did Expert AuPair provide those items
14  listed under No. 9?
15  　　A  Yes.
16  　　Q  And looking at No. 12 on Page 61224, do you
17  see that?
18  　　A  Yes.
19  　　Q  Could you read the first sentence after
20  No. 12 into the record, please?
21  　　A  "Termination of this agreement requires
22  written notification with a full explanation and
23  must be submitted in writing to both the local
24  representative and to the corporate office of Expert
25  AuPair."

Page 63

1  　　Q  And you testified earlier that you had an
2  understanding as to what a local representative is;
3  is that right?
4  　　MR. ENICA:  I object.  I don't think she --
5  BY MR. VALDIVIESO:
6  　　Q  Did you testify -- sorry.  Strike that.
7  　　Do you know what a local representative is?
8  　　A  Yes.
9  　　Q  What is a local representative?
10  　　A  A person that should be the communicator
11  between myself as an au pair as well as the agency
12  and should step in if there are any problems between
13  myself and the au pair agency.
14  　　Q  And how do you know that?
15  　　A  Because we went to au pair -- to a training
16  program, and that's where they told us if you have
17  any problems, that we can contact the local
18  representative.
19  　　Q  When you say "they," who are you referring
20  to?
21  　　A  The people that trained us.
22  　　Q  Who are those people?
23  　　A  Employees of Expert AuPair.
24  　　Q  How do you know that?
25  　　A  Because they welcomed us into the au pair

Page 64

1  program, they picked us up from the airport and
2  guided the whole training that we were in before we
3  arrived at the host family.
4  　　Q  Going to Exhibit 6.  Do you remember
5  receiving Exhibit 6 from anybody?
6  　　A  I don't remember.
7  　　Q  I just have a question on Page 2 of that
8  document.  Do you see the item -- the last item in
9  bold before a series of bullets, do you see that?
10  　　A  Yes.
11  　　Q  Could you read that out loud, please, the
12  bold?
13  　　A  "Completion deposit."
14  　　Q  Do you remember if you paid -- strike that.
15  　　Do you know what a completion deposit is?
16  　　A  Yes, I do know what is.
17  　　Q  What is a completion deposit?
18  　　A  After we successfully completed the
19  program, the amount that I've paid to Expert AuPair,
20  which was $450, be received after we completed our
21  entire program.
22  　　Q  And do you recall if you, in fact, paid a
23  $450 deposit to Expert AuPair?
24  　　A  Yes, I paid to Expert AuPair.
25  　　Q  Do you recall when you made that payment?

Page 65

Lara Bergmann  3/30/2018

1    A   I don't remember.
2    Q   Do you recall if it was before you came to
3 the United States?
4    A   I don't remember.
5    Q   Did you -- did Expert AuPair -- strike
6 that.
7        Was that completion deposit ever returned
8 to you at the end of the program?
9    A   Yes, it was.
10   Q   And who returned that deposit to you?
11   A   I don't remember.
12   Q   Do you recall if the host family returned
13 that deposit to you?
14   A   No, they did not.
15   Q   Do you recall testifying earlier in
16 response to some of Mr. Enica's questions relating
17 to the use of a cell phone during your time as an
18 au pair?
19       MR. ENICA:  Object to form.
20       THE WITNESS:  Yes.
21 BY MR. VALDIVIESO:
22   Q   Mr. Enica asked you some questions about
23 long distance phone calls; is that right?
24   A   Yes.
25   Q   And I think Mr. Enica asked you about long

Page 66

1 distance phone calls, and I think he specified --
2 his question related to the phone calls to the
3 United States.
4        Do you remember that?
5    A   Yes.
6    Q   Were you -- did you make any phone calls
7 using that phone outside of the United States?
8    A   I did not.
9    Q   Did you understand if you had a
10 responsibility -- strike that.  Sorry.
11       I don't have -- sometimes in these
12 depositions there is a -- I can look at the
13 transcript.  I apologize.  I can't look at what was
14 said and correct me if I'm wrong if I'm
15 mischaracterizing what was said.
16       But I believe you testified that you did
17 not have the responsibility for paying for long
18 distance phone calls within the United States?
19   A   Correct.
20   Q   Did you have an understanding whether you
21 had a responsibility for paying for long distance
22 phone calls outside of the United States?
23       MR. ENICA:  I object to form.  It's a
24 hypothetical.
25       THE WITNESS:  Yes, it is written in the

Page 67

1 contract.  Should I look it up?
2        MR. ENICA:  I trust you.
3 BY MR. VALDIVIESO:
4    Q   So what was your understanding as to the
5 responsibility relating to long distance phone calls
6 outside of the United States?
7    A   Could you repeat the question?
8    Q   Sorry.  What was your understanding of your
9 responsibility for paying for long distance phone
10 calls outside of the United States?
11   A   It was documented in the contract that I
12 was required to pay a certain amount in order to do
13 phone calls outside of the United States.
14   Q   If we could take out Exhibit 4 again.  Turn
15 to Page 61222, which is the third page of that
16 document, and if you see the last typewritten line
17 there that starts with the word "Long."
18       Do you see that?
19   A   Yes.
20   Q   Could you read that sentence into the
21 record, please.
22   A   "Long distance calls are to be paid for by
23 the au pair," in parenthesis, "the employer."
24   Q   And is there a word in that sentence that
25 was circled?

Page 68

1    A   "The au pair."
2    Q   And what, if anything, does the circling
3 indicate to you?
4    A   It clearly shows who is responsible for
5 paying the amount.
6    Q   And what is your understanding as to who is
7 responsible for paying the amount?
8    A   Myself as an au pair.
9    Q   Underneath there, underneath the
10 typewritten, do you see some handwritten text that
11 follows?
12   A   Yes.
13   Q   And what is represented by the handwritten
14 text?
15   A   Calls to Germany from land lines 25 cents
16 per minute.  Calls to Germany from my mobile phone
17 are 14 cents per minute.  Skype, free.
18   Q   And is that what you were referring to
19 earlier when you were testifying it was set forth in
20 the contract as to who was responsible for paying --
21   A   Yes.
22   Q   -- for international calls?
23   A   Yes.
24   Q   And I believe Mr. Enica asked you about the
25 use of the car for -- you talked about it for both

Page 69

Peterson Reporting Video & Litigation Services          18 (66 - 69)

Lara Bergmann  3/30/2018

**Page 70**

1 your first year and also your second year.
2     Do you remember that?
3   A   Yes.
4   Q   For the first year Mr. Enica asked you if
5 you needed to pay for the car, and I believe that
6 you answered you were required to pay for the gas
7 for the car; is that correct?
8   A   That's correct.
9   Q   And I believe Mr. Enica asked you for the
10 second year whether you had to pay for the car.
11     Do you remember that question?
12   A   Yes.
13   Q   I don't believe Mr. Enica asked you if you
14 had to pay for gas for that second year if you used
15 the car. I'm just going to clarify for the record
16 were you required to pay for gas also that second
17 year?
18   A   Yes, I was.
19   Q   Very early on in your testimony Mr. Enica
20 asked you a question have you ever worked for Expert
21 AuPair.
22     Do you remember that question?
23   A   Yes.
24   Q   Do you remember what your answer was?
25   A   That I do not work for Expert AuPair.

**Page 71**

1   Q   What did you understand Mr. Enica to mean
2 when he asked that question?
3     MR. ENICA:  Object to form. I'm objecting
4 on the record.
5     MR. VALDIVIESO:  Actually, I'm going to
6 rephrase my question in response to the objection.
7   Q   Did you have an understanding as to what
8 Mr. Enica meant when he asked that question?
9     MR. ENICA:  That's even worse. Objection.
10 I'm sorry. I'm not sure if the witness understands.
11 I'm going to object.
12     You may answer if you understand the
13 question.
14 BY MR. VALDIVIESO:
15   Q   So my question is -- and he can object, but
16 if you understand the question, you may answer it.
17     Did you have an understanding as to what
18 Mr. Enica meant -- strike that.
19     Did you understand -- strike that.
20     What, if anything, did you understand
21 Mr. Enica to mean when he asked you that question?
22     MR. ENICA:  I'll enter my objection.
23     THE WITNESS:  When he asked me that
24 question, I thought he was asking if I was directly
25 employed by Expert AuPair, let's say if I were to

**Page 72**

1 work in the office or facilities or be on -- be
2 exactly under Expert AuPair.
3 BY MR. VALDIVIESO:
4   Q   During your time as an au pair, did you
5 come across any people that you understood to be
6 employees of Expert AuPair?
7   A   Yes.
8   Q   And could you tell us who, if any, of those
9 people you have in mind?
10   A   I very vividly remember a Mark that picked
11 me up from the airport that dropped us off at the
12 hotel. At the training, I'm pretty sure her name
13 was Kathy. There were several others that the names
14 I don't remember.
15   Q   Do you know if -- well, strike that.
16     I think you mentioned a training; is that
17 right?
18   A   Yes.
19   Q   When did that training take place?
20   A   Right after we arrived to the United States
21 we were transported to Tampa, Florida where we
22 received a training by Expert AuPair.
23     THE VIDEOGRAPHER:  I'm sorry.
24 Ms. Bergmann, would you mind answering towards the
25 camera? I'm getting a profile. Thank you.

**Page 73**

1 BY MR. VALDIVIESO:
2   Q   How long did the training last, if you
3 remember?
4   A   I don't remember the exact duration of the
5 program.
6   Q   Do you remember if you were paid during the
7 time that you were in the training?
8   A   I was not paid.
9     MR. VALDIVIESO:  And actually, if you
10 object on asked and answered grounds, I'll actually
11 withdraw my questions. But at this point I'm not
12 remembering exactly what was covered in your
13 questioning. Please let me know if I've asked. We
14 don't need to cover old ground.
15   Q   Do you remember the topics that were
16 covered during the training?
17   A   Briefly, topics like the childcare Safety
18 as well as American -- the American culture as well
19 as anything we needed to know about our stay in
20 America.
21   Q   And if you look at Exhibit 4, do you know
22 if any of the items that appear in Exhibit 4 were
23 covered in the training?
24     MR. ENICA:  Object to form.
25     THE WITNESS:  I don't remember.

Lara Bergmann  3/30/2018

BY MR. VALDIVIESO:
1 BY MR. VALDIVIESO:
2    Q   If you look at Page 2 of Exhibit 4, under
3 No. 2 do you see where it says "Please note"?
4    A   Yes.
5    Q   Could you read that into the record,
6 please?
7    A   "Please note:  These duties may include,
8 but are not limited to, washing children's laundry,
9 straightening children's rooms, bathing children,
10 and cleaning children's play areas."
11    Q   Was that information ever conveyed to you
12 anywhere other than in this agreement?
13    A   Yes, during the training.
14    Q   And who conveyed this information to you
15 during the training?
16    A   I don't remember.
17    Q   Do you remember if it was conveyed --
18 strike that.
19       Was it con- --
20       Do you recall in what context in the
21 training it was conveyed to you?
22    A   I don't remember.
23    Q   So you told us earlier that there was
24 certain information that was conveyed to you at the
25 training.  You listed certain things that were

Page 74

1 conveyed to you.
2       Who -- who were the people that were
3 conveying information to you during training?
4    A   One of the persons was Kathy Denver, and
5 the other people I don't remember.
6    Q   Do you remember how many people --
7 different people conveyed information to you during
8 the training?
9    A   I don't remember.
10    Q   Do you -- do you know whether the people
11 that were conveying information to you during
12 training were affiliated with any organizations?
13       MR. ENICA:  Object to form.
14       THE WITNESS:  Yes.  They were affiliated
15 with Expert AuPair.
16 BY MR. VALDIVIESO:
17    Q   How do you know that?
18    A   Because that was the au pair agency I
19 signed up with to come to America.
20    Q   Other than the people that -- strike that.
21       Other than people presenting information at
22 the training, who else was in attendance at the
23 training?
24    A   Several other au pairs.
25    Q   Other than the people presenting and the

Page 75

1 other au pairs, was there anyone else at the
2 training?
3    A   I don't remember.
4    Q   Was the information relating to duties that
5 you said was conveyed to you at the training on
6 Page 2 of Exhibit 4, do you recall if that was
7 conveyed to you by other au pairs that were
8 participating in the training?
9       MR. ENICA:  Object to form.
10       THE WITNESS:  I don't remember.
11 BY MR. VALDIVIESO:
12    Q   Do you remember for sure that
13 information was conveyed to you by someone during
14 the training?  Is that right?
15    A   Yes, correct.
16    Q   Can you explain what you mean by travel
17 month?
18    A   At the end of our program after my year and
19 nine months I had the opportunity to stay in the
20 United States for a longer period of time that I did
21 not stay with the host family.
22    Q   You did not stay with the host family
23 during that time?
24    A   I did not.
25    Q   Did you perform any childcare duties for

Page 76

1 the host family during that time?
2    A   No.
3    Q   Did you receive any compensation from the
4 host family during that time?
5       MR. ENICA:  Object to form.
6       THE WITNESS:  I don't remember.
7       MR. VALDIVIESO:  I don't have any further
8 questions.
9
10       FURTHER EXAMINATION
11 BY MR. ENICA:
12    Q   Unfortunately, I do have some follow-up on
13 what my colleague asked.
14       You testified that there were several
15 people at the training, and you mentioned Mark, who
16 picked you up from the airport, and the person by
17 the name Kathy.
18    A   I think it slipped.  I'm not sure if her
19 last name is Denver, but I'm almost certain her name
20 is Kathy.  It's been a long time since I met those
21 two people.
22    Q   Okay.  Was any part of the training
23 performed, let's say, at the firehouse or in a
24 hospital?
25    A   No.

Page 77

Lara Bergmann  3/30/2018

**Page 78**

1  Q   Do you remember if any part of the training
2  was performed either by a nurse or a firefighter?
3  A   We received children's CPR training that
4  was -- we were -- so the training was not
5  facilitated by Expert AuPair but Expert AuPair
6  brought us to the training.
7  Q   Can you repeat that?  I apologize.
8  A   So in order to be an au pair we had to get
9  CPR certified.  And Expert AuPair brought us to the
10  training.
11  Q   So they physically took you to a place
12  where you had the training?
13  A   Yes.
14  Q   And the people who performed the training,
15  let's call it the trainers, were not Expert AuPair
16  employees.  Is that your understanding?
17  A   Correct.
18  Q   Just one clarification regarding the
19  contract, which is Exhibit 4.  My colleague asked
20  you about the typewritten information in Exhibit 4.
21  Just to make sure we have the same understanding, my
22  understanding of typewritten information is printed
23  information because they didn't use a typewritten
24  but more like a printer.  I just want to make sure
25  we have the same understanding.

**Page 79**

1  Do you have the same understanding when
2  they refer to typewritten information, they refer to
3  printed information?
4  A   Correct.
5  Q   Were you required to pay -- strike that.
6  You mentioned that a person by the name
7  Mark drove you to a hotel?
8  A   Correct.
9  Q   From the airport?
10  A   Correct.
11  Q   Were you required to pay for the hotel?
12  A   I was not.
13  Q   Were you required to pay anything for the
14  training?
15  A   I was not required to pay.
16  Q   You mentioned when we arrived in the United
17  States, Mark drove us from the airport to the hotel,
18  or something along those lines.
19  Who is "we"?
20  A   Myself and another au pair.
21  Q   You arrived together?
22  A   Yes.
23  MR. ENICA:  And I have no further
24  questions.
25  \\\

**Page 80**

1  FURTHER EXAMINATION
2  BY MR. VALDIVIESO:
3  Q   I actually have one follow-up question
4  that's justed limited to what Mr. Enica just asked
5  you.
6  You testified that you were required to
7  go -- strike that.
8  That you -- that you received CPR training;
9  is that right?
10  A   Correct.
11  Q   Did the training program -- strike that.
12  Was the CPR training, did that comprise the
13  entirety of the training or were there other
14  portions of the training?
15  A   There were other portions of the training.
16  Q   So just to be clear, was -- I think you
17  testified that the CPR portion of the training was
18  not conducted by Expert AuPair?
19  A   Correct.
20  Q   The other portions of the training other
21  than the CPR training, did you understand them --
22  who did you understand to be conducting that part of
23  the training?
24  A   Expert AuPair.
25  MR. VALDIVIESO:  I have no further

**Page 81**

1  questions.
2  MR. ENICA:  I'm good as well.  I'm not sure
3  about the rules in California.  But normally we put
4  on the record that she would like to read and sign
5  or waive the right to read and sign.
6  MR. VALDIVIESO:  Are we on the record
7  still?  Can we go off the record?
8  MR. ENICA:  Let's get off the record.
9  THE VIDEOGRAPHER:  The time is 3:28 p.m.,
10  and we're off the record.
11  (Recess taken.)
12  THE VIDEOGRAPHER:  The time is 3:33 p.m.,
13  and we're back on the record.
14  MR. VALDIVIESO:  So we will read and sign.
15  And also wanted to leave on the record that
16  we will perform a search for documents relating to
17  wages and hours and we'll produce those.
18  DEPOSITION OFFICER:  How would you like to
19  handle the original for signing?
20  MR. ENICA:  We can just get an electronic.
21  DEPOSITION OFFICER:  You can't for signing.
22  Did you want to order a copy?
23  MR. VALDIVIESO:  A paper copy?
24  MR. ENICA:  Can we get off the record for a
25  second?

Lara Bergmann  3/30/2018

1     THE VIDEOGRAPHER:  The time is 3:24 p.m.,
2 and we're off the record.
3     (Discussion held off the record.)
4     THE VIDEOGRAPHER:  The time is 3:35 p.m.,
5 and we're back on the record.
6     MR. VALDIVIESO:  So we will purchase a copy
7 of the transcript and read and sign.
8     THE VIDEOGRAPHER:  This conclude today's
9 videotaped deposition of Lara Bergmann.  The total
10 number of media used was two, and the time is
11 3:35 p.m.
12     We're off the record.
13
14   (Whereupon the deposition proceedings of
15   LARA SHALAINE BERGMANN were adjourned
16     for the day at 3:35 p.m.)
17       --o0o--
18
19
20
21
22
23
24
25

Page 82

1 STATE OF CALIFORNIA    )
2 COUNTY OF LOS ANGELES  ) ss.
3     I, Sharon D. Allen, C.S.R. No. 10752,
4 in and for the State of California, do hereby
5 certify:
6     That prior to being examined, the
7 witness named in the foregoing deposition was by me
8 duly sworn to testify the truth, the whole truth and
9 nothing but the truth;
10     That said deposition was taken down by
11 me in shorthand at the time and place therein named,
12 and thereafter reduced to typewriting under my
13 direction, and the same is a true, correct and
14 complete transcript of said proceedings;
15     That if the foregoing pertains to the
16 original transcript of a deposition in a Federal
17 Case, before completion of the proceedings, review
18 of the transcript {X} was { } was not required.
19     I further certify that I am not
20 interested in the event of the action.
21     Witness my hand this_____ day of
22 _____, _____.
23     _____
24     Certified Shorthand Reporter
25

Page 84

1 STATE OF CALIFORNIA    )
2 COUNTY OF VENTURA    ) ss.
3
4
5
6     I, the undersigned, hereby certify under
7 penalty of perjury under the laws of the State of
8 California that the foregoing testimony is true and
9 correct.
10     Executed this _____ day of
11 _____, 20_____, at _____,
12 California.
13
14
15     _____
16     LARA SHALAINE BERGMANN
17
18
19
20
21
22
23
24
25

Page 83

Patricia Parra  4/3/2018

1                  UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3             CIVIL ACTION NO. 1:14-cv-03074-CMA-KMT

4

5     ---------------------------------------x

6     JOHANNA PAOLA BELTRAN, et al.,

7                        Plaintiffs,

8             vs.

9
      INTEREXCHANGE, INC. et al.,
10
                       Defendants.
11    ---------------------------------------x

12

13              DEPOSITION OF PATRICIA PARRA

14                     APRIL 3, 2018

15                      9:10 A.M.

16

17

18

19

20    REPORTED BY: LORI N. LEWKOWITZ

21

22

23

24

25

Patricia Parra  4/3/2018

| 1 | T R A N S C R I P T of the stenographic notes of |
| 2 | the videotaped proceedings in the above-entitled matter as |
| 3 | taken by and before LORI N  LEWKOWITZ, a Certified Court |
| 4 | Reporter and Notary Public of the State of New Jersey, held |
| 5 | at the REGUS NEW JERSEY CARNEGIE CENTER, 103 Carnegie |
| 6 | Center Drive, Suite 300, Princeton, New Jersey 08540, on |
| 7 | Tuesday, April 3, 2018, commencing at approximately 9:10 |
| 8 | a m , pursuant to notice |

Page 2

---

### I N D E X

| WITNESS | PAGE |
| PATRICIA PARRA | 6 |

EXAMINATION BY   DIRECT  CROSS  REDIRECT  RECROSS

MR  CHOUDHRY        6        87

MR  PACHECO        73

### E X H I B I T S

NUMBER        DESCRIPTION            PAGE

DEFENDANT'S

1   Consent to Join document                  9

2   Expert Au Pair's Interrogatories Requests
    for Production And Admission to FLSA Opt-In
    Plaintiffs document                        10

3   Email chain                               11

4   Employment contract dated 8/12, 2013      23

(Exhibits attached )

Page 4

---

A P P E A R A N C E S:

BOIES SCHILLER FLEXNER, LLP
Attorneys for Plaintiffs
    575 Lexington Avenue
    New York, New York 10022
BY:  BYRON D.M. PACHECO, ESQ.
    (212) 446-2300
    Bpacheco@bsfllp.com

WARD DAMON, ESQS.
Attorneys for Defendants
    4420 Beacon Circle
    West Palm Beach, Florida 33407
BY:  LABEED A. CHOUDHRY, ESQ.
    (561) 842-3000
    Lchoudhry@warddamon.com

ALSO PRESENT:
    ROBERT BEHRENS, Videographer

Page 3

---

THE VIDEOTAPE OPERATOR:  The time on the record is 9:10 a m.  Today's date is Tuesday, April 3rd, 2018.  My name is Robert Behrens, contracted by Peterson Recording Video and Litigation Services.  The court reporter today is Lori Lewkowitz of Peterson Reporting located at 530 B Street, Suite 350, San Diego California 92101.

This begins the videotape deposition of Patricia Parra testifying in the matter of Beltran versus Interchange in the United States District Court for the District of Colorado, Civil Action No. 1:14-cv-03074-CMA-KMT.

This is taken at 103 Carnegie Center Drive Princeton, New Jersey.  The video and audio recordings will take place at all times during the deposition unless all counsels agree to go off the record.  The beginning and end of each DVD will be announced.

Will counsel please identify yourselves and state whom you represent?

MR. CHOUDHRY:  Labeed Choudhry representing Expert Group International, doing business as Expert Au Pair.

MR. PACHECO:  Byron Pacheco from Boies, Schiller, Flexner on behalf of the plaintiffs and

Page 5

Patricia Parra  4/3/2018

1   the witness.
2        THE VIDEOTAPE OPERATOR:  The court
3   report will now swear in the deponent.
4
5   P A T R I C I A   P A R R A,
6        residing at 10 Hagemount Avenue,
7        Hightstown, New Jersey 08520, called as a
8        witness, having been first duly sworn by
9        the Notary Public of the State of New
10       Jersey, was examined and testifies under
11       oath as follows:
12
13  DIRECT EXAMINATION
14  BY MR. CHOUDHRY:
15       Q.   Good morning, I'd normally butcher your
16  last name.  May I call you Patricia?
17       A.   Yes.
18       Q.   Patricia, have you ever when deposed
19  before?
20       A.   No.
21       Q.   So, I'm going to go over the ground
22  rules of taking a deposition so this goes as
23  smoothly as possible.
24       A.   Uh-huh.
25       Q.   I'm noting you are doing it already.

Page 6

1   A.   No.
2        Q.   So, you understand that right now in
3   your deposition it would seem as if you are before a
4   judge or jury.  The testimony you are giving can be
5   used in that proceeding.
6        A.   Yes.
7        Q.   Now I have to ask you this but are you
8   under the influence of any substance or medication
9   that may impair your ability to tell the truth
10  today?
11       A.   No.
12       Q.   This deposition today, did you prepare
13  for it?
14       A.   Yes.
15       Q.   How did you prepare for it?
16       A.   I talk to a lawyer.
17       Q.   Other than talking to a lawyer, did you
18  do anything else?
19       A.   No.
20       Q.   How long did you talk to your lawyer?
21       A.   About an hour.
22       Q.   When was that?
23       A.   Last night.
24       Q.   Did you review any documents?
25       A.   Yes.

Page 8

1   You are nodding to answer my questions.
2        A.   Yes.
3        Q.   While I understand what that means,
4   your attorney understands what that means, it will
5   be on video but not good on the court reporter's
6   written record.  If I ask a question, please respond
7   verbally.  Second thing, allow me to finish asking
8   my question before you answer.  Sometimes you know
9   what my question is, where I'm heading to, but
10  please let me finish the question and then please
11  respond.
12       A.   Okay.
13       Q.   At the same time if you are in the
14  middle of answering a question, and you take a
15  moment to pause, think, take a drink of water and if
16  I go on to my next question ask me to stop so you
17  can complete your question, okay?
18       A.   Okay.
19       Q.   I have a tendency to talk really fast.
20  If you don't know, you don't understand my question
21  I'll assume you've understood it.  If you are
22  confused in any way, let me know.
23       A.   Okay.
24       Q.   Have you ever been involved in a court
25  proceeding before?

Page 7

1        Q.   What documents were those?
2        A.   The document when you asking part of
3   the process.
4        Q.   Anything else?
5        A.   That's it.
6        Q.   So, I may have a copy of that.  I want
7   to confirm that's the document you reviewed.
8        A.   Uh-huh.
9        Q.   We are going a little bit out of order.
10       MR. CHOUDHRY:  Can we mark this as
11  Defendant's 1?
12            (Consent to Join document was
13            received and marked as
14            Defendant's Exhibit 1, for
15            identification, as of this date.)
16  BY MR. CHOUDHRY:
17       Q.   Please take a look at that document
18  that's been handed to you and let me know when
19  you've finished reviewing it.
20       A.   I've finished.
21       Q.   Is this the document you were referring
22  to reading yesterday?
23       A.   Yes.
24       Q.   No other documents?
25       A.   No.

Page 9

Peterson Reporting Video & Litigation Services          3 (6 - 9)

Patricia Parra  4/3/2018

1  MR. CHOUDHRY:  I'm going to hand you
2  another document.  We'll mark that as Defendant's
3  No. 2.
4  (Expert Au Pair's
5  Interrogatories Requests for
6  Production And Admission to FLSA
7  Opt-In Plaintiffs document was
8  received and marked as Defendant's
9  Exhibit 2, for identification, as of
10  this date.)
11  BY MR. CHOUDHRY:
12  Q.  Please let me know when you've had a
13  chance to review that document.
14  A.  Uh-huh.
15  Q.  You don't have to go through every
16  page.  Have you seen this document before?
17  A.  No.
18  Q.  Did you know that you were supposed to
19  look for documents and answer certain questions
20  prior to coming to the deposition today?
21  A.  No.
22  MR. CHOUDHRY:  Counsel, at this point I
23  have to make the statement on the record that we
24  reserve the right to reopen this deposition upon
25  production of the documents requested in

Page 10

1  production, the answers to the interrogatories and
2  answers to the request for admissions and we may be
3  seeking attorney costs for additional expenses.
4  MR. PACHECO:  I want to note that for
5  defendant Expert Au Pair, your co-counsel,
6  Mr. Enica, requested a specific group of au pair
7  deponents to respond to these requests,
8  interrogatories and requests for productions.
9  The witness was not among that group of
10  people that was requested to fill these out.  We
11  provided responses from the ones that he did
12  request.  I believe there may be some stipulation
13  that he entered into with my colleague about which
14  au pairs were to respond to these.
15  So we can talk off the record about
16  whether she's -- it's one of the ones he stipulated
17  to, but my understanding is that he requested a
18  group.  She was not part of that group and so that's
19  why no responses exist.
20  MR. CHOUDHRY:  We can go off the record
21  one second?  I want to get this document on the
22  record.  This is an email.  Can you mark that as
23  Defendant's Exhibit No. 3?
24  (Email chain was received and
25  marked as Exhibit 3, for

Page 11

1  identification, as of this date.)
2  BY MR. CHOUDHRY:
3  Q.  There is a whole bunch of items on the
4  top.  There is a list of names.  Do you recognize
5  your name?
6  A.  Yes.
7  Q.  Where is that name?
8  A.  The third from bottom up.
9  Q.  Okay.
10  THE VIDEOTAPE OPERATOR:  The time is
11  9:20 a.m. we are going off the record.
12  (Discussion held off the
13  record.)
14  THE VIDEOTAPE OPERATOR:  The time is
15  9:21 a.m. and we are back on the record.
16  MR. PACHECO:  I want to note that
17  Exhibit 3, which was just provided to me which is
18  an email dated November 21, 2017, I've just
19  discussed with opposing counsel and we will look
20  further to see whether there is any additional
21  communications about this witness and her discovery
22  applications.
23  MR. CHOUDHRY:  Correct.
24  BY MR. CHOUDHRY:
25  Q.  Can you please, unfortunately these

Page 12

1  pages are not numbered, but if you can turn to the
2  fifth page in that document.
3  A.  Okay.
4  Q.  And I believe that's correct, request
5  for production should say on the bottom.
6  A.  Admission.
7  Q.  There we are.  Request No. 2 asked for
8  all communications with or documents given or sent
9  to you by Expert Au Pair or any other entity related
10  to the au pair program.
11  Would you have documents that would
12  fall in that category?
13  A.  No.
14  Q.  So, any emails or letters that were
15  sent to you by Expert Au Pair, would they be --
16  A.  Letters?  It was four years ago.  So I
17  moved.  I don't usually keep stuff.  I should clean
18  my mailbox every year because I don't like clutter
19  so I don't have anything.
20  Q.  If you could turn to the next page,
21  please.  Request No. 3, "All communications with
22  your host family or host families before, during or
23  after your time as an au pair related to your hours,
24  compensation, schedule or au pair duties or this
25  lawsuit."

Page 13

Peterson Reporting Video & Litigation Services

4 (10 - 13)

Patricia Parra  4/3/2018

| | |
|---|---|
| 1       Would you have any of documents that | 1    address? |

Would you have any of documents that
2   fall in this category?
3      A.   Same, no.
4      Q.   I just have to go through them.  Let me
5   know if the answer is the same.  No. 4, "All
6   documents reflecting the hours you worked as an
7   au pair, whether on a daily, weekly or monthly or
8   other basis."
9      A.   No.
10      Q.   No. 5, "All documents reflecting the
11   amount or payment of the stipend or any other money,
12   payments received from your host family or host
13   families during your time as an au pair."
14      A.   I do have the bank statements.
15      Q.   No. 6, "All documents including, but
16   not limited to counters, diaries, notes, files,
17   appointment books, emails, text messages and social
18   media postings that describe or reflect your
19   experience as an au pair."
20      A.   No.
21      Q.   No. 7, "All testimonials published on
22   any website regarding social media regarding Expert
23   Au Pair or the au pair program."
24      A.   No.
25      Q.   "Not including communications involving

Page 14

1   your lawyers, all communication with any other
2   person about this lawsuit or your decision to
3   participate in the lawsuit."
4      A.   No.
5      Q.   So, other than bank statements, you
6   don't have any other documents related --
7      A.   No.
8      Q.   -- to the Expert Au Pair program?
9      A.   I was an au pair four years ago, so I
10   didn't save anything.
11      Q.   What is your current address?
12      A.   10 Hagemount, H-a-g-e-m-o-u-n-t --
13      Q.   Hagemount?
14      A.   -- Avenue.
15      Q.   Where?
16      A.   Hightstown, H-i-g-h-s-t --
17      Q.   Hightstown?
18      A.   Hightstown, New Jersey.
19      Q.   ZIP code?
20      A.   08520.
21      Q.   Do you have an email address?
22      A.   Yes.
23      Q.   What is that?
24      A.   Pahparra@gmail.com.
25      Q.   How long have you had this email

Page 15

1   address?
2      A.   I don't remember, you know.
3      Q.   Would it be more than five years?
4      A.   No.
5      Q.   Did you have this email address while
6   you were in the au pair program?
7      A.   Yes.
8      Q.   Let's go back to Exhibit No. 1, the
9   year of consent that you signed that you reviewed
10   yesterday.
11      A.   Uh-huh.
12      Q.   Did you review it prior to executing
13   it?
14      A.   Sorry.
15      Q.   When you initially received it, did you
16   review it?
17      A.   Yeah, yes.
18      Q.   I cut you off, go ahead.
19      A.   Yes, yes.
20      Q.   Okay.  Did you discuss it with anyone,
21   other than your attorneys?
22      A.   No.
23      Q.   Where were you when you executed it?
24      A.   I don't remember.
25      Q.   That would be back in July 6, 2017?

Page 16

1      A.   Yes.
2      Q.   What made you execute this consent to
3   join?
4      A.   When I read about a lawsuit, what is
5   about, I wanted to be part of it.
6      Q.   What did you read about the lawsuit?
7      A.   I really thought it was about like how
8   the au pairs go out to au pairs and they tell us
9   that the minimum wage was one thing and not actually
10   true and I felt a bit used.  So I just wanted to be
11   part of it.
12      Q.   Okay.  You have to break that down
13   briefly.  One of the things you talked about was
14   wage and what were the other things?
15      A.   I just like I -- I -- lawsuit to learn
16   that the minimum wage that the agent says was not
17   the truth what is paid in the country.
18      Q.   Let me stop you so I understand what
19   you are saying.  You are saying that you read that
20   the minimum wage, that the agencies were saying was
21   not the true minimum wage in the country?
22      A.   Yes.
23      Q.   Where did you read that?
24      A.   I learn in the lawsuit.  It was lawsuit
25   was about.

Page 17

Patricia Parra  4/3/2018

| | |
|---|---|
| 1    **Q.**  You did you read the complaint in the | 1  au pair? |
| 2  lawsuit? | 2    **A.**  I was an au pair from July 2013 until |
| 3        MR. PACHECO:  Objection. | 3  July 2014. |
| 4    **Q.**  Go ahead if you understand. | 4    **Q.**  Just one year? |
| 5    **A.**  I don't remember. | 5    **A.**  Yes. |
| 6    **Q.**  You don't remember where you read it? | 6    **Q.**  Where were you an au pair? |
| 7    **A.**  No. | 7    **A.**  I was an au pair in Illinois, |
| 8    **Q.**  Was it a newspaper? | 8  Pennsylvania and New York. |
| 9    **A.**  No. | 9    **Q.**  Illinois, Pennsylvania and New York? |
| 10    **Q.**  Was it a document provided by your | 10    **A.**  Yes. |
| 11  attorney? | 11    **Q.**  Was that with three different families? |
| 12    **A.**  I don't remember. | 12    **A.**  No, two different families, but they |
| 13    **Q.**  Okay.  So, the wage thing, what else? | 13  moved. |
| 14    **A.**  And the conditions.  I wanted to be | 14    **Q.**  Which family moved? |
| 15  part of it. | 15    **A.**  First I was in a family in Illinois and |
| 16    **Q.**  What? | 16  they moved to Pennsylvania.  I was there for two |
| 17    **A.**  Au pair conditions.  I wanted to be | 17  months and then I went to a family that was in |
| 18  part of it. | 18  Chicago and they went into New York.  I was with |
| 19    **Q.**  What about the au pair condition? | 19  this family for the rest of the program. |
| 20    **A.**  Just au pair program, the way it's | 20    **Q.**  The family that was in Illinois that |
| 21  saying, because once you are in your country and you | 21  moved to Pennsylvania, do you remember their name? |
| 22  learn about it they sell you in a way, but once you | 22    **A.**  I don't remember. |
| 23  are actually living au pair, you say that it's not | 23    **Q.**  Do you recall how long you worked for |
| 24  the way they are selling that to you when you are in | 24  them? |
| 25  the country. | 25    **A.**  Two months. |
| Page 18 | Page 20 |
| 1    **Q.**  Okay.  So, if I understand correctly, | 1    **Q.**  Total? |
| 2  you are saying what was told to you about the | 2    **A.**  Total, yes. |
| 3  au pair program did not reflect the reality of the | 3    **Q.**  The other family, I'm assuming, was for |
| 4  au pair program? | 4  ten months? |
| 5    **A.**  Yes. | 5    **A.**  Yes. |
| 6    **Q.**  How did you learn about this lawsuit? | 6    **Q.**  Do you recall the name of the second |
| 7    **A.**  I don't remember.  I don't remember. | 7  family? |
| 8    **Q.**  Did someone email you?  Did someone | 8    **A.**  Anna Whitt, W-h-i-t-t. |
| 9  call you? | 9    **Q.**  Whitt? |
| 10    **A.**  I don't remember. | 10    **A.**  Yes. |
| 11    **Q.**  So, in your understanding, what is an | 11    **Q.**  Got it.  Why did you leave the first |
| 12  au pair? | 12  family after two months? |
| 13    **A.**  An au pair is a care give provider that | 13    **A.**  We had a rematch.  They expect me to |
| 14  also living with the family. | 14  drive further than I have first agreed. |
| 15    **Q.**  Is the au pair program a work program | 15    **Q.**  How long -- how far did you agree to |
| 16  or a cultural exchange program? | 16  drive initially? |
| 17        MR. PACHECO:  Objection to form. | 17    **A.**  I driving into town to drop kids in |
| 18    **Q.**  Go ahead if you understand. | 18  school and they wanted to drive from Indiana to |
| 19    **A.**  Work program. | 19  Pittsburgh, was like an hour drive. |
| 20    **Q.**  Is there any cultural component to it? | 20    **Q.**  And the second family, what happened at |
| 21    **A.**  Yes. | 21  the end of the ten months? |
| 22    **Q.**  What would be the cultural component of | 22    **A.**  We had a good relationship but they |
| 23  it? | 23  move to New York and they didn't have a room for |
| 24    **A.**  You are living out of the country. | 24  myself of there.  I had to share a room with the |
| 25    **Q.**  During what time periods were you an | 25  girls.  So after ten months the residence was not |
| Page 19 | Page 21 |

Patricia Parra  4/3/2018

| | |
|---|---|
| 1  working. | 1  A.  Employment contract. |
| 2  **Q.  After the New York family you didn't** | 2  **Q.  And am I correct in assuming that this** |
| 3  **participate in the au pair program anymore?** | 3  **is the employment contract with the first family?** |
| 4  A.  No. | 4  A.  Second family.  I never got one with |
| 5  **Q.  Do you recall the name of your local** | 5  the first family. |
| 6  **representative?** | 6  **Q.  Never had a written --** |
| 7  A.  I don't remember. | 7  A.  Not that I remember. |
| 8  **Q.  Was it the same local representative** | 8  **Q.  So, as you can see from this document a** |
| 9  **during your time with both families?** | 9  **lot of it is typed up or already there, but there is** |
| 10  A.  I don't remember. | 10  **a number of items that looked like they are written** |
| 11  **Q.  How often did you communicate with your** | 11  **in.** |
| 12  **local representative?** | 12  A.  Yes. |
| 13  A.  Like I think you communicate like three | 13  **Q.  Do you know who wrote those in?** |
| 14  time entire year. | 14  A.  I did. |
| 15  **Q.  This was an in-person meeting?** | 15  **Q.  You did?** |
| 16  A.  We had one person meeting when I arrive | 16  A.  Yes. |
| 17  in the house and after that really didn't have | 17  **Q.  Okay.  So, the date, name of the** |
| 18  communication. | 18  **parties, the times?** |
| 19  **Q.  So, the three times that you met him,** | 19  A.  Yes. |
| 20  **one was first time and then was --** | 20  **Q.  You wrote those all in?** |
| 21  A.  Yes.  Two were in person when you | 21  A.  Yes. |
| 22  arrive in the first family. | 22  **Q.  Let's go to the terms of employment,** |
| 23  **Q.  Okay.** | 23  **the hours.  It says start time is 8:00 a.m. and end** |
| 24  A.  And when I arrive in the second family | 24  **time is a 5:00 p.m. from Monday through Friday.** |
| 25  they just check in, see how I'm doing. | 25  A.  Yes. |
| Page 22 | Page 24 |

| | |
|---|---|
| 1  **Q.  Besides the two times when you first** | 1  **Q.  Friday and Saturday off?** |
| 2  **moved into the families, were there any other** | 2  A.  Yes. |
| 3  **communications by phone?  Via email?** | 3  **Q.  Were those your hours with the second** |
| 4  A.  Once I started my rematch they wanted | 4  **family?** |
| 5  it coordinator-ship.  She ask me to help me to find | 5  A.  Only for the first month. |
| 6  your family, but other than that I don't remember | 6  **Q.  And what happened after the first** |
| 7  having contact with anybody. | 7  **month?** |
| 8  **Q.  How did you contact you to find the** | 8  A.  They had another person that happened |
| 9  **new family?** | 9  in the weekend and this person had to go and I was |
| 10  A.  Email. | 10  working most of the weekends. |
| 11  **Q.  Would you still have that email?** | 11  **Q.  This was in addition to working during** |
| 12  A.  I don't think so. | 12  **the week?** |
| 13  MR. CHOUDHRY:  Please mark this as | 13  A.  Yes. |
| 14  Defendant's Exhibit No. 4. | 14  **Q.  You would -- what were your hours** |
| 15  (Employment contract dated | 15  **during the weekend?** |
| 16  8/12, 2013 was received and marked as | 16  A.  During the weekend, so during the week |
| 17  Defendant's Exhibit 4, for | 17  I drop the kids in school in the morning and pick |
| 18  identification, as of this date.) | 18  them up in the afternoon.  It would be like two, |
| 19  BY MR. CHOUDHRY: | 19  three hours a day.  And the weekends I work like for |
| 20  **Q.  Please let me know when you've had a** | 20  like on Saturday I'm not sure something, around like |
| 21  **chance to review that document.** | 21  8:00 a.m. until 6:00 p.m. and same on Sunday. |
| 22  A.  (Nods) | 22  **Q.  So, let me write that and make sure I** |
| 23  **Q.  Do you recognize this document?** | 23  **ask the appropriate questions.  Let me back up a** |
| 24  A.  Yes. | 24  **little bit.  During the first month when the person** |
| 25  **Q.  What is this document?** | 25  **that was working during the weekends was there, did** |
| Page 23 | Page 25 |

Patricia Parra  4/3/2018



1  you still just do what you described earlier, that
2  is, pick the kids up and drop them off and that was
3  it?
4      A.   No.
5      Q.   What was your responsibilities during
6  the first month?
7  ██████████████████████████████
8  ██  ████████████████████████
9  ██  ████████████████████████
12     Q.   What did you do after 5:00 p.m.?  That
13  was your time then?
14     A.   After 5:00 p m. I usually -- I don't
15  really remember.  I think I just go to the room.  I
16  don't remember.
17  █████████████████████████████
18  ██  █████████████████
19  ██  ████████████████████████
20  ██  █████████████████████
21  ██  ██████████
23     Q.   During the weekend, that would be the
24  end of your responsibilities?
25     A.   Yes.

Page 26

1      Q.   On any date did you work more than 10
2  in any day?
3      A.   In the weekends sometimes.
4      Q.   What about more than 45 hours in any
5  week?
6      A.   There was not often, but it did happen.
7      Q.   Do you recall how often?
8      A.   Maybe once a month.
9      Q.   Did you keep your written schedule
10  anywhere or I mean -- backtrack a little bit.  Did
11  you keep track of the hours you worked?
12     A.   No.
13     Q.   Was it because it was the same schedule
14  everyday basically.
15     MR. PACHECO:  Objection to form.
16     A.   Basically the same.
17     MR. PACHECO:  You can answer.
18     Q.   To be clear, unless he instructs you
19  not to answer --
20     A.   Uh-huh.
21     Q.   -- you still have to go ahead and
22  answer.  He is going to make his objections.  If
23  there is discussion, we'll have it unless he
24  instructs you.
25     A.   Yes.

Page 27

1      Q.   You've been doing it already, but you
2  want to be clear.  Do you know if this contract was
3  provided to Expert Au Pair?
4      A.   I don't know.
5      Q.   Did you provide it to Expert Au Pair?
6      A.   I don't remember.
7      Q.   Did you tell Expert Au Pair when your
8  schedule changed?
9      A.   No.
10     Q.   Did you ever inform Expert Au Pair that
11  you were working more than ten hours in any given
12  day?
13     A.   I don't remember.
14     Q.   Did you ever tell Expert Au Pair you
15  were working more than 45 hours any --
16     A.   I don't remember.
17     Q.   Did you ever reach out to Expert
18  Au Pair during your time as an au pair?
19     A.   I don't remember.
20     Q.   Did you ever call them?  Email them?
21     A.   I might have, but not called.
22     Q.   So, how did Expert Au Pair know to
23  rematch you after the first family?
24     A.   Sorry.
25     Q.   How did Expert Au Pair know to rematch

Page 28

1  you after the first family moved?
2      A.   Oh, because the family was working
3  with -- contact them and say I was not working.
4      Q.   Do you know who they contacted?
5      A.   I don't remember.
6      Q.   Let's, so this is the second family
7  contract, correct?
8      A.   Yes.
9      Q.   Let's go back to the first family
10  briefly.  What was your schedule like for the first
11  family?
12     A.   First family was normal, I believe.
13  I'm not sure, but something like 8:00 to 5:00 or
14  8:00 6:00.
15     Q.   Was that from Monday through Friday?
16     A.   Yes.
17     Q.   Nothing during the weekends?
18     A.   No.
19     Q.   Same schedule throughout?
20     A.   Yes.
21     Q.   What sort of responsibilities did you
22  have when you were working with them?
23  ██████████████████████████████
24  ██  ██████████████████████
25  ██  ██████████████████████

Page 29

Patricia Parra  4/3/2018



2   Q.   Do you recall how much you were paid by
3   the first family?
4   A.   I was paid $197.75 per week.
5   Q.   One ninety --
6   A.   Minimum $197.75 per week.
7   Q.   How were you paid?
8   A.   I don't remember.
9   Q.   Do you remember if it was by check?
10  Cash?  Wire transfer?
11  A.   I don't remember.
12  Q.   Were you paid every week or every other
13  week?
14  A.   Every week.
15  Q.   What about the second family, how much
16  were you paid?
17  A.   Two hundred.
18  Q.   How were you paid by the second family?
19  A.   Direct deposit.
20  Q.   How did you arrive at this $200 figure
21  with the second family?
22  MR. PACHECO:  Objection to form.
23  A.   Because the minimum was 197 and they
24  went to 200 is easier to pay me.
25  Q.   They didn't want --

Page 30

11  Q.   Did you have any sort of bus pass?
12  A.   No.
13  Q.   How would you get around when you
14  needed to get around for your own personal needs to
15  go shopping or business needs?
16  A.   I would get a bus.
17  Q.   Let's turn to the second page of that
18  document. No. 2 "Duties." Did you write that in?
19  A.   Yes.
20  Q.   Can you just read that to make sure
21  that I understand what it says?
22  A.   "Wash the kids, feed, shower, change
23  diapers, et cetera."
24  Q.   That is what your responsibilities
25  entailed when you worked for the second family?

Page 32

1   A.   The 197 was just our number and they
2   wanted it to be an even number.  They went up to
3   200.
4   Q.   They told you this?
5   A.   Yes.
6   Q.   So, the family decided to do that?
7   A.   Yes.
8   Q.   Do you receive any other compensation
9   from the first family?
10  A.   No.
11  Q.   Birthday present?  Christmas present,
12  Easter present?
13  A.   No.
14  MR. PACHECO:  Objection to form.
15  Q.   What about the second family, anything
16  other than the $200 a week?
17  MR. PACHECO:  Objection.
18  A.   No.
19  Q.   Did you have the use of a car when you
20  were with the first family?
21  A.   No.
22  Q.   What about the second family?
23  A.   No.

Page 31

1   A.   Basically.
2   Q.   Did you ever have to do anything beyond
3   what is described in those duties?
4   A.   I would do like anything related to the
5   kids, but this is a summarize.
6   Q.   Did you have to do anything not related
7   to the kids?
8   A.   No.
9   Q.   Whenever it came to duties that were
10  not listed here, can you describe some of the things
11  you had to do that were not listed here?
12  A.   Like go places with them, do their
13  laundry, take to doctor appointments, take to
14  birthday parties.
15  Q.   Who would tell you about these events
16  or appointments?
17  A.   The family.
18  Q.   They would tell you what time it is and
19  how to get there?
20  A.   Yes.
21  Q.   Let's go through remuneration, salary.
22  It says here that payday will be Saturday, was that
23  accurate?
24  A.   Yes.
25  Q.   And next it says "Payment will be made

Page 33

Patricia Parra  4/3/2018

1  by cash." You already testified that was not
2  accurate?
3     A.  Yes, that was like the first month it
4  was payment, cash first month and he told me it was
5  easier to do direct deposit so he changed that.
6     Q.  Let's go to the page after, next page,
7  two pages over where it says "phone privileges" on
8  the top.
9     A.  Yes.
10    Q.  What does -- what is written there?
11    A.  You have as my phone to choose voice
12 data and text.
13    Q.  Okay.  Free to use.  What does that
14 mean?
15    A.  They gave me a phone to use while I was
16 working with them.
17    Q.  Do you recall what phone it was?
18    A.  I don't remember.
19    Q.  It was a Smart Phone?
20    A.  Yes.
21    Q.  Was it an iPhone or one of the Android
22 phones?
23    A.  It was an iPhone.
24    Q.  Was it, if you recall, a new phone or
25 used phone?

Page 34

1     A.  I don't remember.
2     Q.  The number that was your number for
3  that phone, do you still have that number?
4     A.  No.
5     Q.  Did you use that phone just for your
6  au pair duties or personal use as well?
7     A.  Personal use as well.
8     Q.  Do you recall how much that iPhone
9  cost?
10    A.  I don't know.
11    Q.  What happened to the iPhone at the end
12 of the au pair program?
13    A.  I give it back to the family.
14    Q.  This phone was with you the entire ten
15 months?
16    A.  Yes.
17    Q.  Do you recall if it was a current phone
18 for that time or was it an older model?
19    A.  It was an older model.
20    Q.  Do you remember which model?
21    A.  No.  Actually, I remember she had the
22 newest model and she was talking how she liked the
23 model I had because she had that.  I know it was
24 older.
25    Q.  The previous model?

Page 35

1     A.  Yes.
2     Q.  The data and the phone and voice and
3  everything was paid by the family?
4     A.  Yes.
5     Q.  Going back to a previously question I
6  asked you, what did the family give you anything,
7  you know, birthday present?  Easter present?
8  Christmas present?  I also meant to include things
9  like a Smart Phone or any of other use, did they
10 perhaps give you a computer to use?
11    A.  No.
12    Q.  Anything else?
13    A.  No.
14    Q.  Let's go to the next page, talks about
15 vacation.  Did you take a vacation during the
16 au pair program?
17    A.  No.
18    Q.  Never?
19    A.  No.
20    Q.  Did you tell Expert Au Pair --
21    A.  Yes.
22    Q.  -- you never took a vacation?
23    A.  Yes.
24    Q.  When did you tell them that?
25    A.  A month before I left the family I told

Page 36

1  them that I didn't have no vacation and asked what
2  could they do about it and they told me because I --
3  they couldn't because my program was ending and I
4  lost my time to have a vacation.
5     Q.  Did you ask for vacation from the host
6  family?
7     A.  I don't remember.
8     Q.  Did you, during your time as an au pair
9  before that one month prior to ending of the
10 practice, did you want to take a vacation?
11    A.  Yes.
12    Q.  Did you tell anyone that you wanted to
13 take a vacation?
14    A.  I was plan to taking my vacation like
15 end of the program, like a break.
16    Q.  Did you tell anyone at the beginning of
17 the program that's how you wanted to structure your
18 vacation?
19    A.  No.  By the -- I didn't know at the
20 time how I wanted to structure my vacation.
21    Q.  When did you decide you wanted to take
22 your vacation at the end of the program?
23    A.  I don't remember.
24    Q.  But it was sometime during the middle
25 of the au pair program?

Page 37

Peterson Reporting Video & Litigation Services     10 (34 - 37)

Patricia Parra  4/3/2018

| | |
|---|---|
| 1   A.  Yes, I guess. | 1   agency.  So I just applied to them to have more |
| 2   **Q.  Did you take any classes while you were** | 2   chances. |
| 3   **in the au pair program?** | 3   **Q.  You applied for Expert Au Pair so you** |
| 4   A.  No. | 4   **would have --** |
| 5   **Q.  Did you apply for any classes while you** | 5   A.  Yes. |
| 6   **were in the au pair program?** | 6   **Q.  -- a greater --** |
| 7   A.  Yes. | 7   A.  Yes. |
| 8   **Q.  Where at?** | 8   **Q.  -- chance of book becoming an au pair?** |
| 9   A.  It was like a community college. | 9   A.  Exactly it was. |
| 10   **Q.  In which city?** | 10   **Q.  How did you find Expert Care?** |
| 11   A.  Chicago. | 11   A.  It was the only agency that had like a |
| 12   **Q.  Was that with the first family or** | 12   physical person close to me. |
| 13   **second --** | 13   **Q.  They had a physical person located in** |
| 14   A.  Second family. | 14   **Brazil?** |
| 15   **Q.  What became of that application?** | 15   A.  Yes. |
| 16   A.  I don't remember.  I don't remember | 16   **Q.  What city in Brazil?** |
| 17   what happen. | 17   A.  Bauru, B-a-u-r-u. |
| 18   **Q.  Let's go back to the very beginning.** | 18   **Q.  But after a few months of trying to be** |
| 19   **How did you find out about au pair program?** | 19   **placed with Cultural Care you were unsuccessful?** |
| 20   A.  I was looking for like cheap and the | 20   A.  Yeah, I was not. |
| 21   program seemed nice so I apply for that. | 21   **Q.  Somebody else was also interested in** |
| 22   **Q.  What were you doing when you were** | 22   **the au pair program told you about Expert Au Pair?** |
| 23   **looking for the internship?** | 23   A.  Yes. |
| 24   A.  I was Googling ways to spend year | 24   **Q.  Do you recall who that was?** |
| 25   abroad. | 25   A.  No, I don't remember. |
| Page 38 | Page 40 |
| 1   **Q.  Let me go further back, some basic** | 1   **Q.  Was this person -- did this person ever** |
| 2   **questions.  Where are you from originally?** | 2   **become an au pair?** |
| 3   A.  I'm from Brazil. | 3   A.  I believe so. |
| 4   **Q.  What is the highest level of education** | 4   **Q.  Did she become an au pair with Expert** |
| 5   **you've completed?** | 5   **Au Pair?** |
| 6   A.  I had some college but I never finished | 6   A.  I don't know. |
| 7   it. | 7   **Q.  This person, did you speak to her in** |
| 8   **Q.  Was that in Brazil?** | 8   **person or via phone?  Email?** |
| 9   A.  Yes. | 9   A.  I don't remember. |
| 10   **Q.  Was it while you were in college that** | 10   **Q.  Was this person Brazilian?** |
| 11   **you were looking to study abroad?** | 11   A.  Yes. |
| 12   A.  Yes. | 12   **Q.  Before you applied with any au pair** |
| 13   **Q.  How did you hear about Expert Au Pair?** | 13   **agency, Cultural Care or Expert Au Pair, what did** |
| 14   A.  It was indication for something about | 14   **you understand the au pair program to be?** |
| 15   it.  I don't remember who.  I was first -- | 15   A.  I understand the au pair program was |
| 16   **Q.  Go back a little bit.  What was the** | 16   Interexchange program. |
| 17   **first thing you said?** | 17   **Q.  An interchange program?** |
| 18   A.  I was first looking with Cultural Care | 18   A.  Yes. |
| 19   C-o-u -- | 19   **Q.  What did that mean?** |
| 20   **Q.  Cultural Care?** | 20   A.  That means you to go a country and live |
| 21   A.  Cultural Care.  And I was in the | 21   with the family and you be part of the family and |
| 22   process of a couple of months.  A family never | 22   they are able to give you room and payment to help |
| 23   contacted me.  And somebody like that was that was | 23   them with their kids. |
| 24   also interested in being an au pair, she just | 24   **Q.  That's basically what you did when you** |
| 25   mentioned to me about Expert Au Pair, her mother | 25   **were in America?** |
| Page 39 | Page 41 |

Patricia Parra  4/3/2018

1      MR. PACHECO:  Objection.
2      A.   Once I was in America I saw that it was
3   more working than exchanging.
4      Q.   If you could be a bit more specific
5   though, what did you expect from the au pair program
6   before you came to America as opposed to what you
7   actually experienced in the au pair program, other
8   than the work was more than you expected?
9      A.   How do I explain?  It was so long ago.
10  When you think about coming here it was like you --
11  they tell that you like you have part of the family.
12  You are going -- you going to be -- you hanging out
13  with the family that's yours.  So you have
14  responsibility, yes, but you know you going to have
15  time to enjoy the now country and learn and enjoy
16  the experience and once it I was an au pair working
17  and I -- I was working and I had to worry about the
18  kids and the kids were always my priority, of
19  course.  I didn't have as many time to myself or as
20  much money as I thought it would be.  So it was all
21  work exchange.
22     Q.   Let's go to the money portion.  Were
23  you told by anybody how much you would be paid?
24     A.   Yes.
25     Q.   Who told you?

Page 42

1      A.   The agency.
2      Q.   Which agency was that?
3      A.   Both agencies actually.
4      Q.   What did they tell you?
5      A.   So they didn't say like a minimum of
6   $197.75 and that's usually for four, five hours a
7   week.
8      Q.   You were told you would be paid about
9   197 a week for 45 hours?
10     A.   Yes.
11     Q.   You knew that before you came to
12  America?
13     A.   Yes.
14     Q.   So, my understanding you would be paid
15  a minimum 197 a week.  Did you have an understanding
16  you could be paid more than that?
17         MR. PACHECO:  Objection.
18     A.   No.
19     Q.   But you were paid more than that?
20     A.   Yes, $3 more than that.
21     Q.   What was the application process like
22  with Expert Au Pair?
23     A.   I don't remember much really, had like,
24  you know, line application with a live person,
25  experience person, child-related questions.

Page 43

1      Q.   Child-related questions.  So there was
2   an line application and you filled out these
3   questions or you answered these questions?
4      A.   Yes.
5      Q.   What was the follow-up to that?
6      A.   Then somebody from the agent called me.
7      Q.   Somebody from the agency people?
8      A.   Yes.  And they -- my English
9   interpreter check my English level.
10     Q.   Okay.
11     A.   I really don't remember how follow up.
12  I think after that my pre file was available for
13  families to see.
14     Q.   Eventually the first family --
15     A.   Talk to me.
16     Q.   The first family contacted you
17  directly?
18     A.   I don't know how that works.  I think
19  the agency gave us then your profile and if they
20  like you they contact the agency and ask for my
21  email address and contact me through my email.
22     Q.   They eventually contacted you through
23  via email directly?
24     A.   Yes.
25     Q.   Do you recall was that at that email

Page 44

1   address?
2      A.   I don't remember.
3      Q.   Do you recall what email address you
4   had prior to that Gmail address?
5      A.   No.
6      Q.   So, the family emailed you.  How they
7   got your information, do you recall when that was?
8      A.   I believe was March or April 2013.
9      Q.   Did you have subsequent email
10  communications with him?
11     A.   Yes.
12     Q.   What did you email about?
13     A.   By myself about their family, just get
14  to know each others.
15     Q.   Did you ask them any questions?
16     A.   Just about the kids, like how old are
17  the kids, what the kids like and things like that.
18     Q.   Did they ask you any questions?
19     A.   Yes, ask about me, my family, what I do
20  in life, why I wanted to go there.
21     Q.   Did you ask them about what sort of
22  work you would have to do?
23     A.   Yes.
24     Q.   And how much --
25     A.   Yes.

Page 45

Patricia Parra  4/3/2018

1      Q.   -- you would be paid?  What did they
2  respond?
3      A.   They told me that take care of the
4  kids, like be friends with the kids, take kids to
5  school and things like that.
6      Q.   What about the pay?
7      A.   I never asked about that because both
8  of sides we believe that, you know, I didn't -- I
9  didn't ask about payment because that was, believe
10  that was what the agency would do it.
11      Q.   The agency would?
12      A.   We would be the one responsible for
13  telling about payments and things more in the
14  contract and like that.
15      Q.   It was your understanding that the
16  agency was responsible for the payment?
17      A.   No, for the payment, but for how much
18  would be paying.
19      Q.   I see.
20      A.   They said it was off the program like
21  the line would be given by the agents.
22      Q.   Your understanding was that the
23  guidelines for payment would be given by the agency?
24      A.   Yes, for the payment.  The contract
25  things would be given by the agent.

Page 46

1      Q.   Let's go to the contract real quick.
2  Let's go to the last page.  Does this state who the
3  contract is between or the parties signed this
4  contract?
5      A.   Yes.
6      Q.   Who were the parties that signed this
7  contract?
8      A.   Me and Colette.
9      Q.   You and Colette.  Did Expert Au Pair
10  sign this contract?
11          MR. PACHECO:  Objection.
12      A.   No, but they gave you a contract.
13      Q.   The gave you the form.  You filled out
14  everything and signed it, right?
15          MR. PACHECO:  Objection.
16      A.   Yes.
17      Q.   Filling out included the $200 per week
18  portion on Page 2?
19      A.   Yes.
20      Q.   So, there was no amount that was
21  already filled in.  That was filled in after you and
22  the host family met and talked?
23          MR. PACHECO:  Objection.
24      A.   Once I went to the host family it was
25  already stipulated.

Page 47

1      Q.   What was already stipulated?
2      A.   The amount was already stipulated.
3      Q.   The amount was not actively --
4      A.   Was stipulated before I started work
5  with them.
6          MR. CHOUDHRY:  Let's take a break.
7          THE VIDEOTAPE OPERATOR:  The time is
8  10:04 a.m. we are going off the record.
9          (Recess.)
10          THE VIDEOTAPE OPERATOR:  The time is
11  10:13 a.m.  We are back on the record.
12  BY MR. CHOUDHRY:
13      Q.   During your time with the au pair
14  program, were you able to experience the
15  United States?
16          MR. PACHECO:  Objection to form.
17      Q.   I'll rephrase it.  Did you do any
18  sightseeing?  Any shopping?  Did you make any
19  friends?
20      A.   Yes.
21      Q.   The friends that you made, were they
22  American or were they --
23      A.   Brazilian.
24      Q.   Were they part of the au pair program?
25      A.   Mostly, yes.

Page 48

1      Q.   How did you meet them?
2      A.   Friends that had a friend that knew
3  people that were in the same city and they gave you
4  contacts.
5      Q.   The same city?
6      A.   Like friends from Brazil and new people
7  in the same city in U.S. I was and they share
8  contact and friends, new friend and the group just
9  grew.
10      Q.   Friends told you about other friends
11  and the group just grew?
12      A.   Yes.
13      Q.   And did you improve your English while
14  you were an au pair?
15      A.   Yes.
16      Q.   At the end of your au pair program and
17  I believe the family moved to New York and they
18  didn't have an extra room for you, did you consider
19  trying to rematch with another family?
20      A.   Yes.
21      Q.   And what came of that?
22      A.   I didn't find any other family.
23      Q.   What did do you after that?
24      A.   I just left the program.
25      Q.   Before you were placed with a family,

Page 49

Peterson Reporting Video & Litigation Services          13 (46 - 49)

Patricia Parra  4/3/2018

| | |
|---|---|
| 1 did you receive any training? | 1    Q.   So, these hours in your employment |
| 2    A.   Not before. | 2 contract, how were those hours arrived at? |
| 3    Q.   Did you receive any training? | 3    A.   Sorry? |
| 4    A.   Yes. | 4    Q.   How did you come up with those hours? |
| 5    Q.   What sort of training did you receive? | 5    A.   Those were the hours they needed me. |
| 6    A.   There was like one week in Pittsburgh | 6    Q.   So this is what the hours that the |
| 7 basic child care and things like that.  I don't | 7 mother of Colette said? |
| 8 remember how the contents of the training. | 8    A.   Yes. |
| 9    Q.   Was it a classroom training or was it | 9    Q.   And the duties, is that also what |
| 10 like, you know, you were sitting and somebody was | 10 Colette, the mother said that your duties would be? |
| 11 talking to you? | 11    A.   Yes. |
| 12    A.   Yes. | 12    Q.   And that payday will be Saturday, who |
| 13    Q.   Okay.  Was there any sort of practical | 13 decided that? |
| 14 or hands-on training? | 14    A.   I don't remember. |
| 15    A.   Only the CPR. | 15    Q.   The phone privilege, who decided you |
| 16    Q.   Anything else? | 16 would have a phone? |
| 17    A.   No, the rest was talking. | 17    A.   Colette. |
| 18    Q.   So, you learned how to do CPR? | 18    Q.   Do you know if Expert Au Pair had any |
| 19    A.   Yes. | 19 input about the hours you worked? |
| 20    Q.   Any first aid? | 20       MR. PACHECO:  Objection. |
| 21    A.   Sorry. | 21    A.   They kind of did because here they say |
| 22    Q.   First aid? | 22 like what I can -- hours I can't work, you know. |
| 23    A.   No, it was only CPR that I remember.  I | 23    Q.   I understand the ten hours a day and 45 |
| 24 believe it was only CPR. | 24 hours workweek, I'm talking about the actual |
| 25    Q.   It could have been first aid?  You just | 25 timeframe 8:00 a.m. to 5:00 p.m. |
| Page 50 | Page 52 |

| | |
|---|---|
| 1 don't remember? | 1    A.   No, that was the work the family need. |
| 2    A.   Yes, it could be, but I only remember | 2    Q.   And the phone issue, did they, Expert |
| 3 the CPR part. | 3 Au Pair, have any input whether you have a phone or |
| 4    Q.   Understood.  When you are with the host | 4 what phone you would have? |
| 5 family, the first or second family, was your | 5       MR. PACHECO:  Objection. |
| 6 performance evaluated? | 6    A.   I don't remember.  I don't know. |
| 7    A.   No. | 7    Q.   The duties listed in No. 2, did Expert |
| 8    Q.   Did anybody tell you you were doing a | 8 Au Pair have any input or was Expert Au Pair part of |
| 9 good job?  Bad job? | 9 the conversation about what duties you to would |
| 10    A.   No. | 10 have? |
| 11    Q.   The host family never commented on your | 11       MR. PACHECO:  Objection to form. |
| 12 work? | 12    A.   They told me what I could not do. |
| 13    A.   No.  I guess I was doing well.  Nobody | 13    Q.   What you could not do? |
| 14 say anything. | 14    A.   Yes.  And what I should do.  I did |
| 15    Q.   Were you supervised in any way? | 15 training in Florida, they said usually au pair is |
| 16    A.   No, not really. | 16 that, that, and that and calculated the chores. |
| 17    Q.   So, other than just telling you at the | 17    Q.   But the actual duties listed here, that |
| 18 beginning that, you know, these are your hours, pick | 18 was discussed between you and Colette? |
| 19 up the kids, drop off the kids, that's all you have | 19    A.   I don't remember.  I think so, yes. |
| 20 to do, were there any other instructions given to | 20    Q.   Did you meet other -- you may have |
| 21 you during the course of the program? | 21 answered this already.  Did you meet other au pairs |
| 22       MR. PACHECO:  Objection to the form. | 22 while you were part of the au pair program? |
| 23    Q.   Any instructions given to you by the | 23    A.   Yes. |
| 24 host family how to take care of the kids? | 24    Q.   How did you meet them? |
| 25    A.   No. | 25    A.   Friends in common share contact |
| Page 51 | Page 53 |

Patricia Parra  4/3/2018

1  information.
2      Q.   Did you talk with them and discuss the
3  au pair program with them?
4      A.   We didn't spend time on that.
5      Q.   What sort of things would you do when
6  you would spend time with them?
7      A.   Go out, walk in the city, go shopping.
8      Q.   Did you ever discuss the duties they
9  were performing?
10     A.   Sometimes.
11     Q.   What sort of duties were they
12 performing?
13     A.   Mostly same as I was doing, take care
14 of the children.
15     Q.   What about the pay, did you ever
16 discuss pay with anybody?
17     A.   No.
18     Q.   Never?
19     A.   No.  We all knew like how much we were
20 getting paid, so.
21     Q.   Do you know if anybody was getting paid
22 anything more?
23     A.   No.
24     Q.   Do you know if anybody was getting paid
25 more than the minimum like you were?  The 200?

Page 54

1      Q.   As long as you were in the house you
2  ate what the family was eating?  Is that a fair
3  statement?
4      A.   Yes.
5      Q.   Did you ever spend the entire weekends
6  out of the house?
7      A.   I don't remember.  I don't remember.  I
8  don't think so.  I work like most of the weekends,
9  so.
10     Q.   That was in addition to working during
11 the week?
12     A.   Yes.
13     Q.   I think we spoke about this briefly,
14 but let me touch back again.  Were there any weeks
15 you worked more than 45 hours?
16     A.   I believe so.  At some point happen,
17 yes.
18     Q.   I might have asked this before as well,
19 did you ever inform Expert Au Pair that you had been
20 working more than 45 hours a week?
21     A.   No, but I do have to mention that once
22 you contact in the training and from the start they
23 do tell you that they, coordinator in the area going
24 to contact you and check in every month.  I never
25 had nobody checking in on me.  So just let you know.

Page 56

1      MR. PACHECO:  Objection to form.
2      A.   Mostly not.
3      Q.   You said "mostly not?"
4      A.   Yes, like everybody that commented,
5  payments they are being paid, the minimum, so.
6      Q.   So, to the best of your knowledge you
7  were the only one being paid $200 a week?
8      A.   Exactly.
9      Q.   The time that you spent with the host
10 family, they housed you?
11     A.   Sorry.
12     Q.   They provided you a room?
13     A.   I had a room.
14     Q.   You had a room?
15     A.   Yes.
16     Q.   What about meals, how were they
17 handled?
18     A.   I just eat whatever was in the fridge.
19     Q.   So, the host family provided you with
20 meals?
21     A.   I was working, yes.
22     Q.   Was that all true during the weekends?
23     A.   I was working in the house yes.  If I
24 was out of the house I had to buy my own food, but
25 as long as I was in the house --

Page 55

1      Q.   You were told a coordinator would
2  contact you every month?
3      A.   Yes.  She should see if you need
4  something, how the program was doing and even if
5  some people, like they have meetings with the
6  au pairs and that never happened to me, so.
7      Q.   Let me back up a little bit.  You said
8  that some people had a meeting with the coordinator
9  and you never had one?
10     A.   Not in my area.  But all au pairs in
11 other cities in different agencies would have like
12 this monthly meeting that once I start being
13 au pair, before I sign up, the agents I was believe
14 that was a rule to have somebody checking you
15 monthly and I never had that happen.
16     Q.   Let me make sure I understood that.  So
17 you inform me that before you started the au pair
18 program you were told or you understood that
19 au pairs would have somebody meet with them monthly
20 to check up on --
21     MR. PACHECO:  I object.  She said
22 during the training she was informed.
23     A.   Yes.
24     Q.   During the training you were informed
25 that an au pair would -- a coordinator would reach

Page 57

Patricia Parra  4/3/2018

| | |
|---|---|
| 1  to you monthly? | 1    A.  Yes. |

1  to you monthly?
2    A.  Yeah.  I had a coordinator that was in
3  the area and like every month they would call you or
4  mail you or, you know, how you do doing, how the
5  program was doing for you.
6    Q.  You also commented that you knew or I'm
7  trying to understand what you exactly said about
8  something about other agencies having a coordinator
9  and in-person meetings.
10    A.  Some agencies with more au pairs in
11  other city they have a monthly meeting so the
12  au pairs can get to know each other and make
13  friends.
14    Q.  Some of the bigger agencies in the
15  bigger city would all get together in the month and
16  have meetings?
17    A.  Yes.
18    Q.  How did you learn about this?
19    A.  I, like I said before, I close --
20  before I was Expert Care.
21    Q.  Cultural Care mentioned that's what
22  they did?
23    A.  Yes, and I was in the training.  Expert
24  mentioned we had area coordinator.  She would be
25  checking on us.

Page 58

1    Q.  So, it was your understanding that the
2  coordinator would check in with you.  Was there ever
3  an understanding you could contact a coordinator?
4    A.  The -- I understanding there was not
5  going to be needed.  He would be checking.  That was
6  her job.
7    Q.  Were you ever told to contact Expert
8  Au Pair should this situation or with the host
9  family change?
10    A.  Only case of emergencies if I really,
11  really need.  They were there if I needed help.
12    Q.  So, if I remember correctly, the first
13  host family, they had one three year old?
14    A.  Yes.
15    Q.  And second host family, they had two
16  children.  How old were they?
17  █████████████████████████
18    Q.  Five year old and a one year old.
19    A.  Yes, first family was three children.
20    Q.  Oh.
21    A.  Two boys were older.  I didn't care for
22  as much.  They were 13.
23    Q.  So, three children?
24    A.  Yes.
25    Q.  And two children?

Page 59

1    A.  Yes.
2    Q.  The other au pairs you spoke to during
3  the program, did they have a similar number of
4  children they were taking care of?
5    A.  All over the place.  Some were one,
6  some were four.
7    Q.  The ones that had more children, did
8  they have more work?
9    A.  Yes.
10    Q.  It seems like an obvious question, but
11  I have to ask it.
12    A.  Yes.
13    Q.  The one with just one child, that was
14  obviously not as much work?
15    A.  Same timeframe, so in the end --
16    Q.  Perhaps they were working the same
17  hours, but during those hours they had to do a lot
18  more?
19    A.  Yes.
20    Q.  Would that be an accurate statement?
21    A.  Yes.  Depends on the child.
22    Q.  If we go to the third page of the
23  employment contract under "accommodation, bathroom,"
24  it says "shared with other family member."  What is
25  written?

Page 60

1    A.  Other family.
2    Q.  All of the family?
3    A.  Yes.
4    Q.  Do you know if all au pairs had their
5  own private room and bathroom?
6    A.  Not that I know of.
7    Q.  Do you know au pairs that had access to
8  a car?
9    A.  Yes.
10    Q.  Let me back up a little bit because I'm
11  not sure I understood your testimony earlier about
12  that point.  You said that you left the second
13  family because they wanted you to drive more than
14  you were willing to drive.
15    A.  That was uncomfortable, yes.
16    Q.  Just to be clear, did that mean that
17  you were driving for them before or you were not
18  driving?
19    A.  No, I was not driving at all.
20    Q.  I wanted to be clear.  During your time
21  with the host family, did Expert Au Pair ever give
22  you any instructions?
23    MR. PACHECO:  Objection.
24    A.  Contract.
25    Q.  Let me make that question a bit more

Page 61

Patricia Parra  4/3/2018

1  clear if that would be helpful.  Did they ever tell
2  you, you know, be at this location at this time for
3  this appointment?
4      A.  No.
5      Q.  Did they ever tell you tomorrow you
6  have to make sure you do the laundry?
7      A.  No.
8      Q.  Did they ever tell you, you know, you
9  have to take -- you can't take next Sunday off
10  because there is an event coming up?
11      A.  No.
12      Q.  All of your duties and your hours, they
13  were set by the host family?
14      A.  Yes.
15          MR. PACHECO:  Objection.
16      A.  Yes, but following the guidelines of
17  Expert Au Pair.
18      Q.  Who was following the guidelines of
19  Expert Au Pair?
20      A.  The family.  They would ask me anything
21  within the guidelines.
22      Q.  Do you know what specific guidelines
23  you are referring to?
24      A.  Child care, the timeframe.  Couldn't
25  work more than certain hours.  I couldn't do

Page 62

1  au pair they tell you that they $197.75 is how much
2  you going to get paid.  They never let you know that
3  you could be paid more or you know, that your state
4  has a minimum wage different so, you know.
5          In your country might send a lot but
6  once you come here and you are living this country
7  you see that that is not a lot and see other people
8  around here that work here, you know, they make
9  double what you make and that's just not fair
10  because you are working as much as anybody else in
11  this country.  Even if you not fixing you still here
12  working for American people.
13      Q.  If I understand correctly, what you
14  want to come out of this lawsuit is to make sure
15  that the au pair companies, they tell au pairs like
16  yourself before you become an au pair that the 197
17  or whatever that amount is, that's the minimum and
18  that you could get more?  Is that accurate?
19          MR. PACHECO:  Objection.
20      A.  That's not a fair minimum.
21      Q.  So, you want the au pair companies to
22  tell you that the 197 is not a fair minimum amount?
23          MR. PACHECO:  Objection.
24      Q.  I'm trying to make sure I understand
25  what you are looking for at the end of the day, what

Page 64

1  anything not child-related and things like that.
2      Q.  So, within that framework the family
3  decided what?  You would do what hours you would
4  work?
5      A.  Basically those limitations, yes.
6      Q.  Do you know whose -- how Expert Au Pair
7  arrived at these limitations?
8          MR. PACHECO:  Objection.
9      A.  I don't.
10      Q.  So, we talked a little bit about the
11  Exhibit 1, your intent to join this lawsuit.  What
12  do you hope to gain from this lawsuit?
13          MR. PACHECO:  Objection to form.
14      A.  I just want the regulations to be fair,
15  I guess.
16      Q.  Which regulations?
17      A.  The wage for au pairs.
18      Q.  The wage?
19      A.  Yes.
20      Q.  I want the wage to be fair.
21      A.  Yes.
22      Q.  Is that what you are saying?
23      A.  Yes.
24      Q.  What would that entail?
25      A.  So, once you start a process with the

Page 63

1  you would like to see happen.
2      A.  I just want to see happen au pairs
3  being paid a fair amount of money for their work.
4      Q.  What is that fair amount?
5          MR. PACHECO:  Objection.
6      A.  Minimum wage of the state they are
7  working.
8      Q.  You testified a few moments ago that
9  197 sounds like a lot for somebody living in another
10  country, but when you come here it's not that much
11  and other people are making double what you make.
12  Is that accurate?
13          MR. PACHECO:  Objection.
14      A.  Yes.
15      Q.  Do you know if those people that are
16  getting double they are also, for lack of a better
17  term, getting free housing and food?
18          MR. PACHECO:  Objection to form.
19      A.  It's not free housing.  We are working
20  for the family.  There is no free and some people
21  may, I don't know.
22      Q.  What I mean by free housing, that was
23  not the most accurate term.  The housing is included
24  as part of what you are getting in return for
25  working.  Is that correct?

Page 65

Patricia Parra  4/3/2018

1    MR. PACHECO:  Objection.
2    A.  You are working for that.
3    **Q.  Is there a value associated with that?**
4    **Meaning, if you had to work for somebody and then**
5    **find separate housing you would have to pay more for**
6    **that, correct?**
7    MR. PACHECO:  Objection.
8    A.  I don't know.
9    **Q.  You are saying you don't know?**
10   A.  The family is being benefited.  They
11   have somebody in their house to care for their kids.
12   They are being benefit.
13   **Q.  Isn't it true you are also being**
14   **benefited, at the very least being paid --**
15   MR. PACHECO:  Objection to form.
16   **Q.  -- and having a place to stay?  Having**
17   **food?**
18   MR. PACHECO:  Objection.
19   A.  Yes.
20   **Q.  I'm almost done with my questions.**
21   **I'll take a few moments to review my notes.  We**
22   **should be almost done.**
23   THE VIDEOTAPE OPERATOR:  The time is
24   10:37 a m.  We are going off the record.)
25   (Recess.)

Page 66

1    program.
2    **Q.  You said earlier that the local**
3    **representative was supposed to reach out to you**
4    **every month and they didn't, correct?**
5    A.  Correct.
6    **Q.  Do you know if you had an obligation to**
7    **reach out to Expert Au Pair or the local coordinator**
8    **every month if they didn't reach out to you first?**
9    A.  I don't know.
10   **Q.  I may have asked this as well but I'll**
11   **ask again to make sure we understood each other.**
12   **Did you receive any other money from the host family**
13   **besides the second family, the $200 a week and the**
14   **first family the 197 amount?**
15   A.  Yes.
16   **Q.  Okay.**
17   A.  But when you went out for buying crafts
18   like I would buy stuff for the kids and they would
19   reimburse me later.
20   **Q.  You would give a receipt and they gave**
21   **money back to you?**
22   A.  Yes.
23   **Q.  Anything else?**
24   A.  No.
25   **Q.  Say for example your schedule shows**

Page 68

1    THE VIDEOTAPE OPERATOR:  The time is
2    10:50 a m.  We are back on the record.
3    BY MR. CHOUDHRY:
4    **Q.  Would you recommend the au pair program**
5    **to anyone else?**
6    A.  No.
7    **Q.  Do you know if anyone that entered the**
8    **au pair program after you left the program?**
9    A.  Sorry.
10   **Q.  Do you know if anyone left the program**
11   **after you left, entered the au pair program after**
12   **you left the program?**
13   A.  I don't know.  I don't know.
14   **Q.  Has anyone asked you about the au pair**
15   **program whether they should join or not after you**
16   **left the au pair program?**
17   A.  Not really.
18   **Q.  I may have asked this question before**
19   **but I'm going to reask it just to make sure I cover**
20   **it.  What was your impression of the au pair program**
21   **after you finished it?**
22   MR. PACHECO:  Objection to the form.
23   A.  My impression was that it's just work a
24   lot and you just in a position of the host family.
25   So it was more like a work program than exchange

Page 67

1    that you work 8:00 to 5:00 during the weekdays,
2    **right?**
3    A.  Yes.
4    **Q.  But you had to be there on the weekends**
5    **like you said you were there often?**
6    A.  Yes.
7    **Q.  Did they pay you anything extra for**
8    **being there on the weekends?**
9    A.  Like I said, when I was working
10   weekends and during the week it was one hour --
11   **Q.  You have to repeat that.**
12   A.  When I was working during the weekends
13   during the week I would only work like hour in the
14   morning and hour in the afternoon just getting the
15   kids ready for school and dropping them off.
16   **Q.  If you had to work during the weekends**
17   **you work less during the week.  Is that an accurate**
18   **statement?**
19   A.  Yes.
20   **Q.  What were you doing with your free**
21   **time?**
22   A.  I don't remember.
23   **Q.  But would it be a fair statement to say**
24   **that that time was your own?**
25   A.  No, because let's say one day the girl

Page 69

Patricia Parra  4/3/2018

1  got sick during school.  I had to go pick her up and
2  stay with her.  So I had to have time free, but I
3  also had to make my phone call.  If something
4  happened to the girl or they need me for something I
5  was accessible for them.
6      **Q.  So, you had to be accessible to them?**
7      A.   Exactly.
8      **Q.  But that didn't mean you were tied to**
9  **the house, correct?**
10     MR. PACHECO:  Objection.
11     **Q.  Meaning you could leave the house?  You**
12 **could go explore if you wanted to?  You could take**
13 **classes?  It's just that you had to be on call?**
14     A.   As long as I'm not far.  Not far side
15 of town.
16     **Q.  As long as it was not far?**
17     A.   Exactly.
18     **Q.  I see.  I want to clarify something**
19 **that we discussed earlier.  When we discussed about**
20 **the host family setting your hours with the duties,**
21 **you said that was within the guidelines?**
22     A.   Yes.
23     **Q.  How did the host family know what the**
24 **guidelines were?**
25     MR. PACHECO:  Objection.

Page 70

1      A.   The kids get sick or they had like a
2  meeting that goes longer.  I cannot just leave the
3  kids my time is up, I going to leave the kids and go
4  do whatever because I had to care for the kids.  If
5  they needed me longer I couldn't just walk away.
6      **Q.  Would that be -- say that was during**
7  **the middle of the week.  Would that mean you would**
8  **work less during the rest the week or keep to your**
9  **normal schedule during the rest of the week?**
10     A.   I keep to my schedule.
11     **Q.  Did you ever tell the host family**
12 **during the week that you were working the 45 hours a**
13 **week?  You were working more than 45 hours that**
14 **week?**
15     A.   No.
16     **Q.  The ten hours a day and 45 hours a week**
17 **requirement, did the host family -- let me**
18 **strike that.  The guidelines you said the host**
19 **family asked you to work between, how did the host**
20 **family know about these guidelines?**
21     MR. PACHECO:  Objection to form.
22     A.   I don't believe that before they join
23 the program the Expert Au Pair part we then show the
24 guideline point.
25     **Q.  It's your understanding that there is a**

Page 72

1      A.   Here they said work from Monday through
2  Sunday.
3      **Q.  I mean, say, for example, if they had**
4  **said work from Tuesday to Saturday, would that have**
5  **been okay as well?**
6      A.   I think so.
7      **Q.  We talked briefly about this but I'm**
8  **not sure I understand your answer correctly.  I want**
9  **to make sure about that.  Did you ever work more**
10 **than ten hours in any day?**
11     A.   I don't remember.
12     **Q.  What about working more than 45 hours**
13 **in a week?**
14     MR. PACHECO:  Objection.
15     A.   Sometimes.
16     **Q.  Despite your contract saying you**
17 **couldn't work more than 45 hours a week?**
18     MR. PACHECO:  Objection.  Form.  Asked
19 and answered.
20     MR. CHOUDHRY:  Let me rephrase that a
21 little bit.
22     **Q.  Were you asked to work more than the**
23 **schedule there?  How would that come about?  Would**
24 **the host mother say I need you more this weekend as**
25 **well or you could stay later tonight?**

Page 71

1  **conversation between the host family and Expert**
2  **Au Pair about the guidelines?**
3      A.   Exactly.
4      **Q.  Were you a part of that conversation?**
5      A.   No.
6      **Q.  So that's an assumption, if you will?**
7      A.   Yes.
8      **Q.  So, the weeks you worked more than 45**
9  **hours a week, was it always an unusual situation?  A**
10 **meeting ran long or a child got sick?**
11     A.   I remember, yes.
12     **Q.  Was there ever a time they asked if you**
13 **could work longer?  The host family?**
14     A.   I don't remember.
15     MR. CHOUDHRY:  Okay.  I have no further
16 questions.  Byron, do you have any?
17     MR. PACHECO:  Yes, I have a few
18 questions.
19 CROSS-EXAMINATION
20 BY MR PACHECO:
21     **Q.  First of all, Patricia, thank you for**
22 **being with us here this morning.  Can you retrieve,**
23 **I believe it's Exhibit 3, which is an email dated**
24 **November 21, 2017.**
25     A.   Right.

Page 73

Patricia Parra 4/3/2018

1     Q.   At the top of that email do you see the
2 name "B. Enica?"
3     A.   Yes.
4     Q.   Do you know who that is?
5     A.   No.
6     Q.   And then do you see the 2 box beneath
7 that?
8     A.   Yes.
9     Q.   Do you see a number of names in this 2
10 field?
11     A.   Yes.
12     Q.   I want you to just look through the two
13 names and tell me whether you see my name, Byron
14 Pacheco. While you are looking, I want you to tell
15 me whether you see bsfllp.com.
16     A.   So many names. I don't see your name.
17 I don't see your name. What else you asked?
18     Q.   Bsfllp.com?
19     A.   No, I can't find it.
20     Q.   Okay. Thank you for reviewing that.
21     MR. PACHECO: I just want to represent
22 to counsel that there are no plaintiff's counsel on
23 this email and the earliest email that plaintiff's
24 counsel has mentioned Ms. Parra is deposition
25 January 1 -- sorry, December 1, 2018, I believe and

Page 74

1 in that email Mr. Enica requested a deposition of
2 Ms. Parra, but did not request documents. The
3 documents you provided has no plaintiff's counsel
4 including myself or anyone from my firm in the 2
5 field on this email. We can discuss off the
6 record.
7     MR. CHOUDHRY: We can discuss off the
8 record because I don't know if the 2 field is --
9     MR. PACHECO: Maybe.
10     MR. CHOUDHRY: -- fully encompassing.
11 There is a lot of counsels on this case and it may
12 have cutoff at a certain point.
13     MR. PACHECO: May be incomplete, but
14 I'm putting on the record our names are not on this
15 document.
16     MR. CHOUDHRY: All right. We'll
17 discuss that part of it off the record and figure
18 out if the request for property sent to you or not.
19 We'll deal with it accordingly.
20     MR. PACHECO: Thank you.
21 BY MR. PACHECO:
22     Q.   Patricia, you testified earlier today
23 that one of your host families paid you $200. Is
24 that right?
25     A.   Yes.

Page 75

1     Q.   Was that the first or second family?
2     A.   Second.
3     Q.   Do you negotiate that amount?
4     A.   No.
5     Q.   Can you tell us why did the host family
6 pay you $200 as opposed to $197.75?
7     A.   It was easier for them.
8     Q.   At no point did you ask them to pay you
9 $4.25 more?
10     A.   No.
11     Q.   Is there any reason you never asked
12 them to pay you more money?
13     A.   Because I didn't know I could.
14     Q.   You testified earlier today that you
15 attended an in-person Expert Au Pair training in
16 Saint Petersburg, Florida. Is that right?
17     A.   Exactly.
18     Q.   Can you tell us how long that training
19 was? How many hours?
20     A.   Five days full time. We only had to
21 break for lunch.
22     Q.   Can you estimate the number of hours
23 you spent excluding lunch?
24     A.   Let's see, six hours or something like.
25 We started -- we started 9:00 in the morning and it

Page 76

1 was over usually around 5:00. So 9:00 to 5:00 and
2 one hour for lunch.
3     Q.   How many hours would you estimate in
4 total over the five days?
5     A.   So, it was at least 30 hours.
6     Q.   At least 30 hours?
7     A.   Yes.
8     Q.   Is that correct?
9     A.   Yes.
10     Q.   Did Expert Au Pair pay you for those 30
11 hours?
12     A.   No.
13     Q.   Did your host family pay you for those
14 30 hours?
15     A.   No.
16     Q.   Did anybody pay you for those 30 hours?
17     A.   No.
18     Q.   Can you retrieve Exhibit 4? This is a
19 document entitled "Employment Contract." Let me
20 know when you have it.
21     A.   I have it.
22     Q.   Earlier today Expert Au Pair's lawyer
23 asked you several questions about this document
24 including about the handwritten text that's
25 throughout the document. Do you remember those

Page 77

Patricia Parra  4/3/2018

1   questions?
2       A.   Yes.
3       Q.   You confirmed for him that the
4   handwritten text in the fill-in-the-blank parts --
5   fill-in parts of the document is your handwriting.
6   Is that correct?
7       A.   Yes.
8       Q.   Is all of this, all of the handwritten
9   writing in this document your handwriting?
10      A.   But the signature in the end, Colette
11  sign it, of course.
12      Q.   So, on the last page of the document
13  underneath "general terms," can I direct you there?
14      A.   Uh-huh.  Yes.
15      Q.   There is two fill in the blanks there.
16  Did you fill in those blanks?
17      A.   Yes.
18      Q.   And there is also some typewritten text
19  in this document.  Is that correct?
20      A.   Yes.
21      Q.   Did you type any of this text?
22      A.   No.
23      Q.   Can you turn to the second page of the
24  document?
25      A.   Sure.

Page 78

1       Q.   Can you squirrel further down this
2   page?  The very bottom?
3       A.   Uh-huh.
4       Q.   "Please note, au pairs must be paid at
5   least $197.75 per week and payment should be
6   documented," unquote.  Do you see that?
7       A.   Yes.
8       Q.   Is that the amount that you were
9   referring to earlier today when you say you received
10  some sort of minimum payment?
11      A.   Yes.
12      Q.   But your host family paid you $200, at
13  least one of them.  Is that right?
14      A.   Yes.
15      Q.   Can you turn to the, I believe it's the
16  second to last page of the document.  This is Item
17  10, "Disciplinary procedures/termination of
18  contract."  Are you on that page?
19      A.   Yes.
20      Q.   Towards the bottom of the page just
21  above the No. 11, "addenda," it reads "Termination
22  of this agreement requires written notification with
23  a full explanation and must be submitted in writing
24  to both the local representative and corporate
25  office of Expert Au Pair."  Do you see that

Page 80

1       Q.   Underneath "duties" there is something
2   that states, "Please note these duties may include
3   but not are not limited to watching children,
4   laundry, straightening children's room, bathing
5   children and cleaning children's play areas.  Only
6   child care duties are allowable.  For example,
7   'children laundry' is acceptable but 'laundry' is
8   not."  Do you see this on the page?
9       A.   Yes.
10      Q.   Did you type that?
11      A.   No.
12      Q.   The things that are listed in that
13  text, are those consistent with the things that you
14  did in either of your host family homes?
15      A.   Yes.
16      Q.   Do you know who typed this text on this
17  document?
18      A.   I believe it was Expert Au Pair.
19      Q.   Do you believe your host family typed
20  it?
21          MR. CHOUDHRY:  Objection to form.
22      A.   No.
23      Q.   Do you know whether your host family
24  typed it?
25      A.   No, they didn't.

Page 79

1   sentence?
2       A.   Yes.
3       Q.   Based on that sentence, what is your
4   understanding of how you would end your time with
5   the host family?
6       A.   I had to contact Expert Au Pair before
7   getting to any into any agreement.
8       Q.   Is it fair to say in that statement you
9   have to contact both the local representatives and
10  the corporate office of Expert Au Pair?
11      A.   Yes.
12      Q.   Is that correct?
13      A.   That's right there.
14      Q.   Goes on to say quote, "Both parties
15  must give the standard two weeks' notice of
16  termination.  Fees are charged as owed but not
17  reconciled by the au pair may be deducted from the
18  final paycheck."  Do you see that?
19      A.   Yes.
20      Q.   Did I read that accurately?
21      A.   Yes.
22      Q.   Who do you understand to have written
23  the sentences that I've just read in this document?
24          MR. CHOUDHRY:  Objection to form.
25      A.   Expert Au Pair.

Page 81

Patricia Parra  4/3/2018

1    Q.   Why do you believe Expert Au Pair wrote
2   those sentences?
3       MR. CHOUDHRY:  Objection to form.
4    A.   Because they gave me the contract.
5    Q.   Based on reading this last sentence, do
6   you have any understanding of whether your host
7   family could deduct money from your final paycheck?
8       MR. CHOUDHRY:  Objection to form.
9    A.  Yes.
10    Q.   What is that understanding?
11    A.   That if it has some fee charge that I
12   had to pay for some reason they could deduct that
13   from my final paycheck.
14    Q.   Who do you understand to be telling
15   your host family that they can deduct something from
16   your final paycheck?
17       MR. CHOUDHRY:  Objection to form.
18    A.   Expert Au Pair.
19    Q.   Who do you believe to be telling your
20   host family that?
21       MR. CHOUDHRY:  Objection to form.
22    A.   Expert Au Pair.
23    Q.   Why do you believe that?
24       MR. CHOUDHRY:  Objection to form.
25    A.   Because, again, they gave us the

Page 82

1   contract, so I believe they wrote that.
2    Q.   Just so we are clear, your
3   understanding, the typewritten text in this document
4   was written by Expert Au Pair.  Is that fair?
5    A.   Yes.
6       MR. CHOUDHRY:  Objection to form.
7    Q.   Earlier today Expert Au Pair's attorney
8   asked you questions about the specific duties that
9   you performed at each of your host family homes.  Do
10   you remember those questions?
11    A.   Yes.
12    Q.   I also would like to ask you about your
13   testimony where I believe you said that you
14   performed duties that were within the guidelines of
15   Expert Au Pair, but were assigned to you by the host
16   family.  Is that an accurate characterization --
17    A.   Yes.
18    Q.   -- of your testimony?
19    A.   Exactly.
20    Q.   As an au pair with Expert Au Pair,
21   could you have washed the host mother's car?
22    A.   No.
23    Q.   Why not?
24    A.   Because it was not within my -- within
25   my Expert Au Pair.

Page 83

1    Q.   As an au pair with Expert Au Pair,
2   could you have given the host father a haircut?
3    A.   No, I could not.
4    Q.   Why not?
5    A.   Because, again, it was not within the
6   guidelines of Expert Au Pair.
7    Q.   How do you know that?
8    A.   Because that was in the contract and
9   they throw that in the training.
10    Q.   What did they tell you in the training
11   about the guidelines?
12    A.   The guidelines had to be everything
13   child-related, but not outside spectrum.
14    Q.   You said earlier the training was at
15   least 30 hours.  Is that right?
16    A.   Exactly.
17    Q.   What would have happened if your host
18   family demanded you give the host father a haircut?
19       MR. CHOUDHRY:  Objection to the form.
20    A.   I would contact Expert Au Pair and ask
21   to explain to the family why I could not do that.
22    Q.   Do you have any understanding what
23   would happen after you made that contact to Expert
24   Au Pair to complain?
25    A.   I believe they would contact the family

Page 84

1   or maybe have a meeting to explain to them clearly
2   what are and were not my duties.
3    Q.   What if the host family refused Expert
4   Au Pair's instruction and continued to tell to you
5   do this anyway?
6       MR. CHOUDHRY:  Objection.
7    Q.   Do you know what would happen?
8       MR. CHOUDHRY:  Objection to form.
9    A.   The family would be left out of the
10   program.
11    Q.   Do you know what would happen to you in
12   that situation if the family were left out of the
13   program?
14       MR. CHOUDHRY:  Objection to form.
15    A.   Expert Au Pair would try to find me a
16   family.
17    Q.   Can I direct your attention to
18   Exhibit 4 one more time, please?
19    A.   Sure.
20    Q.   I'm on the first page.  Let me know
21   when you get there.
22    A.   Okay.
23    Q.   Middle of the page it says No. 1,
24   "Terms of employment."  Underneath that it says
25   "Hours," and it says quote, "The workweek shall be

Page 85

Patricia Parra  4/3/2018

1 from Monday through Sunday."  Do you see that
2 sentence?
3     A.  Yes.
4     Q.  Did I read that correctly?
5     A.  Yes.
6     Q.  What is your understanding of what that
7 sentence means?
8     A.  That I work from Monday through Sunday.
9     Q.  Does Monday to Sunday include all days
10 of the week?
11     A.  Yes.
12     Q.  Did you write that sentence?
13     A.  No.
14     Q.  Did your host family write that
15 sentence?
16     A.  No.
17     Q.  Who do you believe wrote that sentence?
18         MR. CHOUDHRY:  Objection to form.
19     A.  Expert Au Pair.
20     Q.  Why do you believe Expert Au Pair wrote
21 that sentence?
22         MR. CHOUDHRY:  Objection to form.
23     A.  They deal with the contract.
24     Q.  When you say us, who are you referring
25 to?

Page 86

1     A.  My host family and I.
2     Q.  One more question.  This contract
3 covers your second host family.  Is that right?
4     A.  Exactly.
5     Q.  I want to make sure on your testimony.
6 Did you testify earlier today that you did not have
7 a contract with your first family?
8     A.  I don't remember.  I don't remember
9 having no contract with them.
10     Q.  You may have had a contract, you just
11 don't remember --
12     A.  Yes, I don't remember.
13     Q.  Do you have any memory of signing any
14 document that looks similar to Exhibit 4, prior to
15 beginning with your first host family?
16     A.  No.  Not prior.
17         MR. PACHECO:  That's all I have.
18         MR. CHOUDHRY:  I have a few follow-up
19 questions.
20 REDIRECT EXAMINATION
21 BY MR. CHOUDHRY:
22     Q.  The training that you had in Saint
23 Petersburg, do you recall what that training was
24 for?
25     A.  Was for prepare us to be an au pair.

Page 87

1     Q.  Can you be a bit more specific than
2 that?
3     A.  Child care.  Like child care about --
4 that's basically I take care of children and how to
5 deal with situations and you know, basically child
6 care with kids.
7     Q.  Do you recall during that training if
8 you were ever taken to a fire station or a hospital?
9     A.  Yes, fire station.
10     Q.  And how long was that for?
11     A.  I don't remember, maybe two hours.
12     Q.  What did you learn there?
13     A.  CPR.
14     Q.  I believe I asked earlier, but you
15 don't recall receiving any first aid training?
16     A.  No, I don't recall.
17     Q.  Let's go to Exhibit 4, talking about
18 that.  This contract is between the host family and
19 yourself, correct?
20     A.  Yes.
21     Q.  Expert Au Pair is not a party to this
22 contract, correct?
23         MR. PACHECO:  Objection.
24     A.  I could not start working without
25 signing this contract and I couldn't with another

Page 88

1 contract and they gave that to us.  I write part,
2 but they are part because they gave us the contract.
3     Q.  Let's go to the top of the contract
4 where it says, I'll read it.  "This document serves
5 as a child care employment contract between Colette
6 Mamut."
7     A.  Yes.
8     Q.  "Hereafter referred to as" quote, "The
9 employer," unquote and that's you?
10     A.  Yes.
11     Q.  "Hereafter referred to as," quote, "the
12 au pair."
13     A.  Yes.
14     Q.  What was your understanding of that
15 paragraph?
16     A.  My I understand is I going to be
17 working for Colette and her family as an au pair.
18     Q.  So, Colette and her family would be
19 hiring you as an au pair?
20         MR. PACHECO:  Objection to the form.
21     A.  They would be hiring me, yes, but after
22 being cleared by the Expert Au Pair.
23     Q.  Expert Au Pair?
24     A.  And the family, yes.
25     Q.  And the family would hire you?

Page 89

Patricia Parra  4/3/2018

A.   I was hired already.  Expert brought me
here and find me the family.  That was there to find
me a family.
    **Q.   This contract though, is accurate to
say that Colette hired you as an au pair, correct?**
        MR. PACHECO:  Objection to form.
    A.   Like I said, I could not start working.
Expert Au Pair would not let me work for Colette
without me signing this contract.  So I ask mainly
between me and Colette writing part of it because
they would not allow me to start working without
both of us signing it.
    **Q.   I understand you signed this contract.
You started working for Colette?**
    A.   Yes, it was with Colette.
    **Q.   Let's go to the second page.  Towards
the bottom of the portion that your counsel read out
it says "Au pairs must be paid at least $197.75 per
week."  What do you understand that to mean?**
    A.   I understand that au pairs must be paid
at least $197.75 per week.
    **Q.   Do you know what "at least" means?**
    A.   At least means at least.
    **Q.   Meaning it could be more than that?**
    A.   It could, but nobody pay attention to

Page 90

that.  Why would anybody pay more than the minimum?
    **Q.   This family did?**
    A.   Yeah.
    **Q.   Let's go back to the first page, "The
terms of employment, the hours."  Your counsel read
out a sentence where it said "The workweek shall be
from Monday until Sunday."  But beneath that it has
a grid where it says "days, start time, end time,
start time, end time."  And then goes from Monday
all of the way to Sunday, but all of Saturday and
Sunday is crossed off, correct?**
    A.   Yes.  For this contract, yes.
    **Q.   So, from this schedule it would appear
that you would not be working Saturday or Sunday?**
    A.   But like I said that changed later and
I was available from Monday to Sunday.
    **Q.   But from this schedule you are off on
Saturday and Sunday?**
    A.   Yes, because in the paper it was, but
it was not the truth of the case.
    **Q.   So, when you were asked to work
Saturday and Sunday, did you tell Colette my
contract says I'm off Saturday and Sunday?**
    A.   I did not remember in the contract
explain.

Page 91

    **Q.   Did you ever tell Expert Au Pair -- let
me back up a little bit.  After you signed this
contract with Colette, did you give this contract to
Expert Au Pair?**
    A.   I don't remember, but I believe so.
    **Q.   The first time you were asked to work
Saturday or Sunday, did you tell Expert Au Pair that
despite what it says in my schedule I'm working
Saturday or Sunday?**
    A.   No.
        MR. CHOUDHRY:  I have no further
questions at this time.  However, as discussed
before, we will be keeping this deposition open
until the issue of the discovery is resolved.
        MR. PACHECO:  For the record, we object
to keeping the deposition open as I noted.  Exhibit
3, I believe, it was on the face, it does not
contain plaintiff's counsel and we will confirm
further off line about this deposition.
        MR. CHOUDHRY:  Okay.  At this time you
have an opportunity to read or waive.  I'm assuming
your counsel will make that termination.
        MR. PACHECO:  We'll read this one.
There my be some typographical corrections that we
need to make here and there.

Page 92

        MR. CHOUDHRY:  Thank you very much for
your time.  We are done for the day.
        THE VIDEOTAPE OPERATOR:  This ends the
deposition of Patricia Parra.  The time is 11:20
a m.  We are going off the record.
            (Whereupon, the witness was
        excused and the proceeding was
        concluded at 11:20 a m.)

Page 93

Peterson Reporting Video & Litigation Services          24 (90 - 93)

Patricia Parra  4/3/2018

```
 1      WITNESS CERTIFICATION
 2
 3    I have read the foregoing transcript of my testimony and
 4    find it to be true and accurate to the best of my knowledge
 5    and belief.
 6
 7
 8           _____
 9              WITNESS
10
11
12
13    Sworn and subscribed to before me on
14    this _____ day of _____, 2018.
15
16
17    _____
18          NOTARY PUBLIC
19
20    My Commission Expires _____
21
22
23
24
25
```

Page 94

```
 1        C_E_R_T_I_F_I_C_A_T_E
 2
 3
 4      I, LORI NOEL LEWKOWITZ, a Certified Court Reporter
 5    and Notary Public of the State of New Jersey, certify that
 6    the foregoing is a true and accurate transcript of the
 7    stenographic notes of the deposition of said witness who
 8    was first duly sworn by me, on the date and place
 9    hereinbefore set forth.
10
11      I DO FURTHER CERTIFY that I am neither a relative,
12    nor employee, nor attorney or counsel to any parties
13    involved; that I am neither related to any of the parties
14    to this action by blood or by marriage, and that I am not
15    financially interested in this matter.
16
17
18         ---------------------------
19         LORI NOEL LEWKOWITZ, C.C.R.
           N.J. C.C.R. No.: XI02229
20
21
22
23
24
25
```

Page 95