Case No. 1:14-cv-03074-CMA-KMT   Document 1104-2   filed 08/20/18   USDC Colorado   pg 1
of 264

# APPENDIX E

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

Civil Action No. 14-cv-03074-CMA-KMT
3    _____

4

    DEPOSITION OF:  ALEJANDRA MARCELA GRACIA VASQUEZ
5                        March 6, 2018
    _____
6

JOHANA PAOLA BELTRAN, et al.,
7

Plaintiffs,
8

v.
9

INTEREXCHANGE, INC., et al.,
10

Defendants.
11   _____

12           PURSUANT TO NOTICE, the deposition of
    ALEJANDRA MARCELA GARCIA VASQUEZ, via Zoom Conference,
13   was taken on behalf of the Defendant, InterExchange,
    Inc., at 1900 Grant Street, Suite 1025, Denver,
14   Colorado 80203, on March 6, 2018 at 9:03 a.m., before
    Tracy R. Stonehocker, Certified Realtime Reporter,
15   Registered Professional Reporter and Notary Public
    within Colorado.
16

17

18

19

20

21

22   **H+G**

23

24   Hunter + Geist, Inc.

25

303.832.5966    1900 Grant Street, Suite 1025    ■ www.huntergeist.com
800.525.8490    Denver, CO 80203                ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

DEPOSITION OF:  ALEJANDRA MARCELA GRACIA VASQUEZ
March 6, 2018
_____

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____
        PURSUANT TO NOTICE, the deposition of
ALEJANDRA MARCELA GARCIA VASQUEZ, via Zoom Conference,
was taken on behalf of the Defendant, InterExchange,
Inc., at 1900 Grant Street, Suite 1025, Denver,
Colorado 80203, on March 6, 2018 at 9:03 a.m., before
Tracy R. Stonehocker, Certified Realtime Reporter,
Registered Professional Reporter and Notary Public
within Colorado.

**2**

A P P E A R A N C E S
For the Plaintiffs:
    JOSHUA LIBLING, ESQ.
    Boies Schiller Flexner L.L.P.
    575 Lexington Avenue, Fl 7
    New York, New York  10022
    (Via Zoom Conference)

For the Defendant, InterExchange, Inc.:

    BROOKE A. COLAIZZI, ESQ.
    Sherman & Howard, L.L.C.
    633 17th Street, Suite 3000
    Denver, Colorado  80202

**3**

I N D E X
EXAMINATION OF ALEJANDRA MARCELA GARCIA VASQUEZ:   PAGE
March 6, 2018
By Ms. Colaizzi                                        5
                                                  INITIAL
DEPOSITION EXHIBITS:                            REFERENCE

Exhibit 1  Opt-in Consent Form                         6
           (Consentimiento Para Unirse)
Exhibit 2  InterExchange Au Pair USA                  13
           Pre-Application Information

Exhibit 3  Alejandra Marcela Garcia Vasquez           31
           General Information Sheet
Exhibit 4  Au Pair Agreement,                          4
           Alejandra Marcela Garcia Vasquez

Exhibit 5  Plaintiff Alejandra Marcela Garcia         49
           Vasque's Responses and Objections to
           Defendant InterExchange, Inc.'s
           Interrogatories, Requests for Production,
           and Requests for Admission to FLSA Opt-in
           Plaintiffs

**4**

1        (Deposition Exhibit Numbers 1 through 5
2    were marked.)
3        WHEREUPON, the following proceedings
4    were taken pursuant to the Federal Rules of Civil
5    Procedure.
6        *    *    *    *    *
7        MS. COLAIZZI:  Before we get started,
8    just for the record, I assume that we both stipulate
9    to the court reporter swearing in Ms. Garcia?
10       MR. LIBLING:  Absolutely.
11       MS. COLAIZZI:  Okay.  Ms. Garcia, do you
12   prefer Garcia as opposed to Vasquez?
13       THE DEPONENT:  Yeah, I prefer Garcia.
14       MS. COLAIZZI:  Okay.  Thank you.  Are
15   you ready to proceed?
16       THE DEPONENT:  Yeah, I'm ready.
17       MS. COLAIZZI:  Before we swear you in,
18   I'm Brooke Colaizzi.  I'm the lawyer for InterExchange
19   and I'll be asking you the questions today.
20       *    *    *    *    *
21        ALEJANDRA MARCELA GARCIA VASQUEZ,
22   having been first duly sworn to state the whole truth,
23   testified as follows:
24        (Deponent's reply to oath:  Yeah.)
25

1 (Pages 1 to 4)

Case 1:14-cv-03074-CMA-KMT   Document 1095-1   Filed 06/06/20   USDC Colorado   Page 4 of 264

ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

5

1              EXAMINATION
2 BY MS. COLAIZZI:
3       Q.  Good morning.  Ms. Garcia.
4       A.  Good morning.
5       Q.  You are located in Colombia, correct?
6       A.  Yeah, I'm in Colombia.
7       Q.  Okay.  As we go through today, if you
8 cannot hear me or need me to repeat anything, please
9 let me know.  Okay?
10      A.  Okay.
11      Q.  Okay.  And your attorney has said to me
12 that you are comfortable proceeding in English; is
13 that correct?
14      A.  Yeah, that is correct.  It's not
15 perfect, but I understand most of the time.
16      Q.  If there's any question you don't
17 understand.  Please let me know.  Okay?
18      A.  Okay.
19      Q.  Have you ever gone through this
20 deposition process before?
21      A.  No.
22      Q.  Okay.
23      A.  I haven't.
24      Q.  Because we're doing this by computer,
25 please try very hard to let me finish my question

---

6

1 before you start answering, and I will let you answer
2 before I ask my next question.  Is that okay?
3      A.  Okay.
4      Q.  Okay.
5      A.  It's okay.
6      Q.  Your attorney may object to certain
7 questions that I ask.  He'll say something like
8 "objection."  Unless he tells you not to answer the
9 question, you'll need to go ahead and answer even if
10 he objects.  Okay?
11      A.  Okay.
12      Q.  Okay.  I'm going to be showing you some
13 papers on the computer screen, so if you can't see
14 them, let me know.  Okay?
15      A.  Okay.
16      Q.  Okay.  Can you see the document on the
17 screen?
18      A.  Yeah, I can see it.
19          MS. COLAIZZI:  Mr. Libling, can you see
20 the document on the screen?
21          MR. LIBLING:  I can.
22      Q.  (BY MS. COLAIZZI) Okay.  For the record,
23 this document is -- was presented to us as the opt-in
24 form from Ms. Garcia.  Ms. Garcia, do you recognize
25 this document?

---

7

1      A.  Yeah, I recognize.
2      Q.  Okay.  And at the bottom, is that your
3 electronic signature on the document?
4      A.  Yeah.  Yeah, it's mine.
5      Q.  Okay.  And did you understand this
6 document to be your joining of the lawsuit against
7 InterExchange?
8      A.  Yeah.
9      Q.  Okay.
10     A.  I understand.
11     Q.  How did you first learn about the
12 lawsuit?
13     A.  How was -- sorry?
14     Q.  How did you first learn about the
15 lawsuit against InterExchange?
16     A.  Was -- I learned here no -- with some
17 friends that they told me about this program and they
18 told me that -- about this for friends that are here
19 in my country, in Colombia.
20     Q.  So if I understand, you have friends
21 from Colombia who told you about this lawsuit?
22     A.  Yeah.  Because they -- they did that
23 same process like me.
24     Q.  Meaning they signed a form like Exhibit
25 1, the consent form on the screen?

---

8

1      A.  Yeah.
2      Q.  Were you still living in the United
3 States when you found out about the lawsuit?
4      A.  Yeah, I -- I was living in the United
5 States.
6      Q.  Okay.  And what is your understanding of
7 what the lawsuit is about?
8      A.  About -- what do you mean -- about --
9 that we are doing right now?  About this process?
10     Q.  Yes.
11     A.  That it is that we -- that -- because
12 when I'm -- when I was in the United States, and I was
13 with -- as an au pair, they turned -- they turned me
14 some kind of rules that I have to do with the families
15 and over there, but when I start to work or be an au
16 pair, it was kind of different.
17     Q.  What was different about working as an
18 au pair from what you were told?
19     A.  Because most of the time they told me
20 you don't have to work more than 45 hours per week or
21 10 hours per day, but I usually, most of the time,
22 worked more than those hours.
23     Q.  When you say they told you, who are you
24 talking about?  Who told you wouldn't have to work
25 more than 45 hours?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

9

1  A. My local coordinator that they know --
2 she knows that -- those rules also and they knew that
3 we don't have to work more than 45 hours, but with the
4 family, they told me that they have to work a lot and
5 that I have to help them with the kids, and work more
6 than --
7  Q. You lived with two families in the
8 United States; is that correct?
9  A. Yeah, that is correct.
10  Q. And the first family lived in the state
11 of New York?
12  A. Yeah, it was in New York.
13  Q. And the second family lived in Georgia?
14  A. It was in Georgia, yeah.
15  Q. Do you know whether or not this lawsuit
16 has anything to do with the amount of money you were
17 paid by the two families you lived with?
18  A. Both families -- they usually pay me 200
19 and they -- and the program said that if they pay me,
20 it was 195.75, but they pay me -- both families they
21 pay me 200.
22  Q. Okay. We'll talk a little bit more
23 about that in a little while. Okay?
24  A. Okay.
25  Q. When you first came to the United

10

1 States, what did you believe you were going to be paid
2 by the family that you were going to be living with?
3  A. Pay -- the base pay was 195.75, but more
4 than it's the pay or so that's more than 10 hours per
5 week or per day or 45 per week.
6  Q. How did you first learn about the au
7 pair program?
8  A. How I learn about the au pair program,
9 from a friend because she told me that this program
10 would be very good for me.
11  Q. Had this friend been an au pair in the
12 United States?
13  A. She was an au pair in the United States.
14  Q. Do you know if she was sponsored by
15 InterExchange when she was an au pair?
16  A. I think so. I think she was in the
17 InterExchange also.
18  Q. After she told you about the program,
19 did you do anything to get more information about the
20 program?
21  A. I went to another agency here in my
22 country, in my city, to get more information and they
23 told me same things like my friend.
24  Q. Do you know if the agency you went to
25 worked only with InterExchange or did they work with

11

1 other au pair sponsors too?
2  A. No, I don't know.
3  Q. Okay. How did you decide to apply with
4 InterExchange?
5  A. Because those -- those kind of things
6 that they -- this -- my friends, they tell me that
7 you'll be okay to learn to improve, to visit for me.
8 That's why I decide to become an au pair.
9  Q. Okay. Why did you pick InterExchange to
10 go through as opposed to another sponsor?
11  A. Sorry. I don't understand.
12  Q. Okay. Let me try again. Do you know
13 that there are multiple -- let me back up. Do you
14 know that there's different companies that sponsor au
15 pairs to come to the United States?
16  A. Yeah.
17  Q. Okay.
18  A. I know.
19  Q. How did you decide on InterExchange?
20  A. I decide InterExchange because of my
21 friends, because my friends -- I did the process in
22 the -- in the same company like my friends.
23  Q. Did your friend have any complaints or
24 concerns about the au pair program that she shared
25 with you?

12

1  A. No. I don't know because, you know,
2 we're different families.
3  Q. Sure. Did your friend tell you anything
4 about how much you would be paid as an au pair?
5  A. She told me, yeah.
6  Q. What did she tell you?
7  A. She told me about the pay that would be
8 $200 and also she start the process.
9  Q. I'm sorry, say that one more time, she
10 what?
11  A. She did the process first, then me.
12  Q. So she was an au pair before you, is
13 that what you're saying?
14  A. Yeah.
15  Q. Okay.
16  A. Yeah.
17  Q. I'm going to pull up a document. Okay?
18  A. Okay.
19  Q. Bear with me for a second, please.
20  A. Okay.
21  Q. Bear with me just a second. I'm going
22 to have the video guy come in. We'll pick up with the
23 questions in just a second.
24  A. Okay.
25  Q. Ms. Garcia, what did you hope to get out

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 1:14-cv-03074-CMA-KMT Document 1095-1 Filed 06/06/20 USDC Colorado Page 6 of 264

ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**13**

1  of the au pair program?
2      A. Can you repeat?
3      Q. Sure. What -- what were you wanting to
4  get out of the au pair experience?
5      A. I wanted to take care of kids. I wanted
6  to improve the language, to learn about the culture
7  and also with the kids while I was take care of them.
8      Q. Okay. I think I got it now.
9  Ms. Garcia, can you see the document on the screen?
10      A. Yeah, I can see it.
11      Q. I'm scrolling to the very -- just for
12  the record, the document on the screen is
13  InterExchange 44966 through 449670.
14      MR. LIBLING: I don't have an objection
15  to the document being used this way, but just for the
16  record, I think it's important to note that a portion
17  of the document is visible at any one time.
18      MS. COLAIZZI: Understood, I'm happy to
19  scroll to any portion of the document that either you
20  or Ms. Garcia request, so or if you need time to read
21  it, let me know and we can scroll down.
22      MR. LIBLING: That's fine. I just
23  wanted the record to be clear.
24      MS. COLAIZZI: Sure.
25      Q. (BY MS. COLAIZZI) Ms. Garcia, I

---

**14**

1  scrolled to the bottom of the document, is that your
2  signature?
3      A. Yeah, it's my signature.
4      Q. Okay. And I'm scrolling back up to the
5  top of the document. Ms. Garcia, do you remember this
6  document?
7      A. Yeah. I remember.
8      Q. Do you remember where you were, what
9  country you were in when you received this document?
10      A. I was in Colombia.
11      Q. Okay.
12      A. Before to go to the USA.
13      Q. Before you went to the United States?
14      A. Yeah.
15      Q. You signed the document in Colombia; is
16  that correct?
17      A. Yeah, I signed in Colombia.
18      Q. Did you read this document before you
19  signed it?
20      A. I tried to read it, but my English at
21  the time wasn't very good, so I -- I didn't read
22  it -- if I read, I didn't understand.
23      Q. Did you ask anyone in Colombia to help
24  you read this document?
25      A. I asked and they -- and they told me

---

**15**

1  that -- that that document is about -- has everything
2  about the InterExchange au pair program that talks
3  about how it will be my duty over there, how much they
4  are going to pay me, how -- what I'm going to do over
5  there. If I'm going to study. They explained about
6  that.
7      Q. Okay.
8      A. And I signed.
9      Q. Did anyone read it to you?
10      A. Yeah. Someone would read it to me.
11      Q. Who was the someone who read it to you?
12      A. It was a person that were in that in
13  Colombia.
14      Q. Ms. Garcia, can you see the document on
15  the screen?
16      A. Yeah, I see it.
17      Q. For the record, this document is Bates
18  labeled InterExchange 44898 through 44906.
19  Ms. Garcia, have you seen this document before?
20      A. Yeah.
21      Q. Is this the application that you
22  submitted for the au pair program?
23      A. It's my application, yeah.
24      Q. Did you complete this application
25  yourself?

---

**16**

1      A. I completed it, yeah.
2      Q. Did anybody have to help you complete
3  it?
4      A. Someone else help to complete it. Also
5  in the same -- in the same place where I signed that
6  document.
7      Q. The agency in Colombia?
8      A. Yeah. The agency in Colombia.
9      MR. LIBLING: Brooke, just so I don't
10  have to say this every time, should we just agree that
11  with each document, everything we said about the last
12  document about you being willing to scroll and only a
13  portion being visible on the screen is true and then I
14  won't say this again?
15      MS. COLAIZZI: That's fine. If you
16  prefer that I scroll through it when I put it up, I'm
17  happy to do that. Just let me know.
18      MR. LIBLING: I understand you've made
19  that offer. Thank you.
20      MS. COLAIZZI: Thank you.
21      Q. (BY MS. COLAIZZI) Ms. Garcia, while you
22  were in Colombia, did you have any conversations with
23  any InterExchange employees in the United States?
24      A. To go through as an au pair?
25      Q. Yes. Before you came to the United

---

4 (Pages 13 to 16)

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

17

1 States?
2     A. No.
3     Q. Okay.
4     A. No, I hadn't.
5     Q. Tell me about the process that you went
6 through to match with your first host family, the one
7 that lived in New York.
8     A. The process was long. It was long to
9 get a family in New York. Because I -- with -- I
10 think like match with my family in New York, but the
11 process with my host family in New York was that it
12 was we had an interview first with them by Skype, like
13 two or three interviews, and after that they decide to
14 choose me.
15     Q. So I want to make sure I understood.
16 You interviewed with your New York family two or three
17 times by Skype?
18     A. Yeah. It was by Skype.
19     Q. Okay. When you had those interviews,
20 who took -- who took part in the interview from the
21 host family?
22

---

18

1     Q. During those interviews, was anyone from
2 the agency in Colombia participating?
3     A. No.
4     Q. Was anybody from InterExchange in the
5 United States participating in those interviews?
6     A. No, just the family and me.
7     Q. And you said that the host family in New
8 York chose you; is that correct?
9     A. Yeah. It's correct.
10     Q. Did you want to go live with that host
11 family when they chose you?
12     A. Yeah, I wanted.
13     Q. Could you have said no if you didn't
14 want to live with that host family?
15     A. I -- I don't -- I'm not really sure
16 because people, for example, in the agency they told
17 me if the family -- if the family choose you, you have
18 to say yes, but I said, yes because it's a good
19 family. They always tell me, but actually that host
20 family was excellent family. It was a good family.
21 I'm not complaining for them. I am complain for the
22 second one.
23     Q. Okay.
24     A. I think they didn't know about the
25 rules.

---

19

1     Q. We'll talk about each of the families.
2 So we'll get to the second family. Okay?
3     A. Okay.
4     Q. During those Skype interviews with your
5 New York host family, did you talk about how much you
6 would be paid?
7     A. We didn't talk -- I don't remember to
8 talk about how much they would pay.
9     Q. Okay.
10     A. We didn't talk -- we didn't talk.
11     Q. You didn't talk?
12     A. About the -- how much they would pay me.
13     Q. Okay. During those Skype interviews,
14 did you talk about what you would be doing with the
15 children?
16     A. Yeah. We talk about --

---

20

15     Q. During those Skype interviews, did they
16 tell you how many hours per day you would be working?
17     A. No. We didn't talk about that.
18     Q. Okay. And did you first arrive in the
19 United States in April 2016?
20     A. Yeah. No, but I -- I arrive, but -- as
21 an au pair was like I arrive 2016. But I had been in
22 the United States before on vacation.
23     Q. Okay. But for purposes of being an au
24 pair, it was April 2016; is that correct?
25     A. Yeah, that is correct.

---

5 (Pages 17 to 20)

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



21

1    Q.   Did you go to training in New York
2    before going to live with your host family in New
3    York?
4    A.   Yeah.  Yeah.  I was in training.
5    Q.   Did you do any training in Colombia
6    before going to the United States to be an au pair?
7    A.   Training -- the only thing that I did
8    here was like first aid.  I was the training with
9    they --
10   Q.   I'm sorry, can you say that one more
11   time.  The first training was what?
12   A.   First aid.
13   Q.   First aid?
14   A.   Yeah.
15   Q.   And that was in Colombia?
16   A.   That was in Colombia, yeah.  It was in
17   Colombia.
18   Q.   Was that required to be an au pair?
19   A.   Yeah, it was.

23

1    or did they change?
2    A.   They changed.  It was an irregular
3    schedule.
4    Q.   While you were living with your host
5    family in New York, were there any weeks you worked
6    more than 45 hours?
7    A.   One time, I worked more than 45 hours.
8
9
10
11
12   Q.   So if I understand you, one week during
13   your time with the host family in New York you worked
14   more than 45 hours; is that correct?
15   A.   Yeah.  That's correct.
16   Q.   With your host family in New York, did
17   you ever work more than 10 hours per day?
18   A.   No, but usually more than 10 hours per
19   day, no.
20   Q.   The schedule that your host mom gave you
21   on Google calendar, did it say which days that week
22   you were going to be needed to work?
23   A.   Yeah, that's a -- which days and the
24   time.  It said everything.
25   Q.   Okay.  Did you ever have any concerns or

22

1    Q.   Did the family give you a schedule each
2    week?
3    A.   Yeah, each week they always gave me a
4    schedule.
5    Q.   Was it -- was it on paper?
6    A.   It was in a computer in -- I'm sorry,
7    Google calendar.
8    Q.   And who gave you the schedule?  Who in
9    the host family gave you the schedule?
10   A.   My house mom.
11   Q.   Did anyone from InterExchange ever give
12   you a weekly schedule while you were living with your
13   family in New York?
14   A.   No.  No one.
15   Q.   Did you keep any records or papers of
16   your weekly schedules with your family in New York?
17   A.   No, I didn't.
18   Q.   How many hours per week did you work
19   with your host family in New York?
20   A.   I think -- I never counted the hours,
21   but it was -- for maximum 45 per week because my
22   schedule was pretty easy.  It was like I start to work
23   from 6:00 a.m. to 9:00 a.m. and then after that, it
24   start again at 12:00 to 5:00 or 6:00 p.m.
25   Q.   Were your hours about the same every day

24

1    complaints about any of the schedules given to you by
2    your New York host family?
3    A.   No.  I -- I didn't have any complaints
4    with the schedule.
5    Q.   You said earlier that your New York host
6    family paid you $200 per week; is that correct?
7    A.   Yeah.  It's correct.
8    Q.   Was that true every week that you lived
9    with them?
10   A.   Yeah.  It's true.
11   Q.   Did they ever give you extra money for
12   any reason?
13   A.   No, they didn't give me extra money.

6 (Pages 21 to 24)

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



25

27

1   your host family pay any part of that trip?
2       A.   They -- they gave me -- that was like a
3   gift because they paid me to fly.
4       **Q.   They paid you what?**
5       A.   They pay me one of those trips.
6       **Q.   Did they pay for the whole trip?**
7       A.   No, whole trip, but they pay me for the
8   fly, to take a fly or the train.
9       **Q.   Where did you go on that trip?**
10      A.   I went to Chicago and Niagara Falls.
11      **Q.   Chicago and where?**
12      A.   Niagara Falls.
13      **Q.   Can you say that again?**
14      A.   Niagara Falls.
15      **Q.   Niagara Falls?**
16      A.   Niagara Falls.

23      **Q.   Did your host family pay for any other
24   part of that – of those trips to Chicago and Niagara
25   Falls?  Can you hear me?**

26

28

2       **Q.   Okay.  Did you take classes while you
3   were living with the host family in New York?**
4       A.   Yeah, I did.
5       **Q.   How many classes did you take?**
6       A.   Two classes.  Through InterExchange.
7       MS. COLAIZZI:  Joshua, I'm sorry, if
8   you're typing, is there any way you can mute your
9   phone?  It's coming through pretty loud.
10      MR. LIBLING:  Sorry.
11      MS. COLAIZZI:  Thank you.
12      **Q.   (BY MS. COLAIZZI) I'm sorry, Ms. Garcia,
13   you said you took two classes in New York?**
14      A.   Yeah.  Classes for English.
15      **Q.   And did you pick those classes?**
16      A.   Yeah, I did.
17      **Q.   Did your New York host family send you
18   on a trip around the United States at the end of your
19   time there?**
20      A.   Send me on a trip?  No.
21      **Q.   Did you – did you travel at the end of
22   your time with your New York host family?**
23      A.   If I travel -- I travel on the United
24   States by myself.
25      **Q.   Okay.  Did you pay for that trip or did**

1       A.   Now I can hear you.
2       **Q.   Do you want me to repeat the question?**
3       A.   Yeah, please.

9       **Q.   Was there an InterExchange local
10   coordinator in New York that you met when you lived
11   with that host family?**
12      A.   The name of my local coordinator?
13      **Q.   Yeah.  Do you remember who it was?**
14      A.   I think the name was Ridi, but I don't
15   remember her last name.
16      **Q.   Does Ridi Ader sound correct?**
17      A.   Yeah.  I think so.
18      **Q.   Did you meet her in person during your
19   time in New York?**
20      A.   Yeah, I did.
21      **Q.   How many times did you meet her in
22   person?**
23      A.   One time per month.  It was a cluster
24   meeting that monthly.
25      **Q.   Where did those cluster meetings take**

7 (Pages 25 to 28)

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

29

1   place?
2        A. It was in different places. One of
3   those was in her house and -- local coordinator house
4   and other one was in restaurants or bars.
5        Q. Did you ever meet with her at your host
6   family's home?
7        A. Yeah.
8        Q. How many times?
9        A. One time. The -- when I arrive to New
10  York, that time.
11       Q. What happened during that meeting with
12  her when you -- in your host family's home?
13       A. It was like -- like a meeting that they
14  say that if I knew the rules from the program, that I
15  have to talk with -- with a family, if I have any
16  problem at all with them, to talk with the local
17  coordinator. It was a conversation like that.
18       Q. Other than your local coordinator, when
19  you were living with your host family in New York, did
20  you have meetings with any other persons from
21  InterExchange?
22       A. No. No one in New York.
23       Q. You said that you were paid $200 a week.
24  Did the host family pay you $200 a week or did the
25  money come from somebody else?

---

30

1        A. Yeah. No, from the host family.
2        Q. And who gave you directions as to how to
3   take care of the children of your New York host
4   family?
5        A. Directions, when I arrived in New York,
6   it still was the last au pair that they had, and I was
7   with her for three or four days and she gave me some
8   directions to take care of the kids in New York.
9        Q. After that -- after that au pair left,
10  did you get directions from anyone as to how to care
11  for the children?
12       A. Maybe sometimes with the host mom or the
13  host dad. No one else.
14       Q. Did your New York host family ever ask
15  you to perform any duties that you thought were
16  inappropriate or wrong in some way?
17       A. No. They didn't.
18       Q. We've been going for a little while, are
19  you okay or do you need a break?
20       A. No, I'm okay.
21       Q. Okay. Let me know if you need a break.
22  We can take one at any time.
23       A. Okay.
24       Q. You decided to stay in the au pair
25  program beyond your first year; is that correct?

---

31

1        A. Yeah, it's correct.
2        Q. But you went to live with a different
3   family, correct?
4        A. No. I wanted to live with the New York
5   family. The situation was that they were from -- they
6   were to leave to Germany, the second year when I
7   wanted to stay with them, so the reason I decide to
8   stay with another family.
9        Q. Okay. I'm going to show you one more
10  document.
11       A. Okay.
12       Q. Can you see the document on the screen?
13       A. Yeah, I see it.
14       Q. Okay. It's long. I'm happy to scroll
15  through it if you want me to. Let me go to the very
16  bottom. For the record this is InterExchange 48308 to
17  48339. Ms. Garcia, what you're seeing on the screen
18  is the very last page of the document. Is that your
19  electronic signature?
20       A. Yeah, it's mine.
21       Q. Okay. I'm going to go back up to the
22  very top. Do you remember this document?
23       A. I think so. Yeah.
24       Q. Do you remember where you were when you
25  signed it? Were you in Colombia or in the United

---

32

1   States?
2        A. I know when I -- I signed everything
3   here in Colombia. I know that I didn't sign nothing
4   in United States.
5        Q. Okay. Did you read this document before
6   you signed it?
7        A. It was like another document that you
8   showed me before that someone can read that one.
9        Q. So did somebody read this document for
10  you?
11       A. Yeah.
12       Q. How did you match with your second host
13  family, the one who lived in Georgia?
14       A. That was -- was something similar with
15  my host family in New York. They saw my profile, I
16  saw their profile. We have an interview by Skype. We
17  talk a little bit about everything. We matched.
18       Q. How many Skype interviews did you have
19  with your Georgia host family?
20       A. I think two or three interviews with
21  them. I think so. Yeah.

---

8 (Pages 29 to 32)

ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



33

1    Q.  Did anyone from InterExchange
2  participate in those interviews?
3    A.  No.  Just they and me.
4    Q.  And did the Georgia host family pick you
5  to be their au pair or did you pick them?  How did
6  that work?
7    A.  Yeah, they pick me.
8    Q.  And did you want to go live with them
9  when they picked you?
10    A.  Yeah.
11    Q.  During the Skype interviews with your
12  second host family, did you talk about how much you
13  would be paid?
14    A.  We talk about that, yeah.
15    Q.  What did you talk about?
16    A.  We talk about that -- that they -- that
17  they would pay me what they would pay through the
18  program, but also they will have to work a lot.  Maybe
19  they would pay me more than -- more than the base pay.
20    Q.  Did you talk about a specific dollar
21  figure that you would be paid during those Skype
22  interviews?
23    A.  No, we didn't talk about that.
24    Q.  When did you find out how much your
25  second host family was going to be paying you each

34

1  week?
2    A.  The first week when I arrived with them,
3  it was that we talk about that -- about how much they
4  pay me and we said we can -- they said that they would
5  pay me 200 per week also.
6    Q.  Were you okay with that?
7    A.  Yeah, everyone -- we're okay with that.
8    Q.  Did you ask either host family that you
9  lived with to pay you more than $200 per week?
10    A.  No.  I didn't ask.

35

11    Q.  And were those the duties that you
12  actually had to perform when you lived with your host
13  family in Georgia?
14    A.  Yeah.
15    Q.  Was that a yes, I'm sorry?
16    A.  I performed it over there?  Is that what
17  you mean?

36

23    Q.  During your Skype interviews with the
24  Georgia host family, did they tell you how many days a
25  week you would be working?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

37

1    A.  Yeah, they told me that I would be
2  working whole week and I would have only one day free
3  per week and one -- one weekend off per month.
4    Q.  When you say you only had one day off
5  per week, was it only one day, was it a day and a
6  half, what do you recall?
7    A.  It was one day.  One -- for example, it
8  was one day and a half, yeah.  It was one day and a
9  half.  Saturday in the morning and Sunday whole day.
10   Q.  Okay.  During your Skype interviews with
11 your Georgia host family, did they tell you how many
12 hours per week you would be working?
13   A.  We talk about the general rules that we
14 have to work 45 hours per week.  We talk only about
15 that.
16   Q.  Okay.  Did you talk about how many hours
17 per day you would be working?
18   A.  They knew, also, that I had to work only
19 10 hours per day.  And they already remind --
20   Q.  I'm sorry, what was the last that you
21 said?
22   A.  No, they also knew about the -- that I
23 have to work 10 hours per day and they -- they told me
24 that.
25   Q.  Okay.  Did you keep any records of how

---

38

1  many hours you worked with your Georgia host family?
2    A.  No.
3    Q.  Did your Georgia host family give you a
4  schedule every week?
5    A.  Yeah, they gave me a schedule.
6    Q.  Was it on paper or on computer?
7    A.  In a computer in the same one like my
8  first host family in New York, like calendar -- Google
9  calendar.
10   Q.  And did your schedule tell you which
11 days you needed to work each week?
12   A.  Yeah.
13   Q.  And did it tell you how many hours you
14 needed to work each day?
15   A.  They also told me that I have to work 45
16 hours per week.
17   Q.  Were there any weeks with your Georgia
18 host family that you worked more than 45 hours a week?
19   A.  Most of the weeks, I worked more than 45
20 hours per week.

---

39

4    Q.  Did the schedules that they gave you
5  indicate that you would be working more than 45 hours
6  a week or was that just what happened?
7    A.  No.  When they gave me the schedule,
8  that schedule had only 45 hours per week, but what
9  happened during the week, if they -- if they had a
10 problem or they can be not at home, obviously I have
11 to stay at home working more than 10 hours per day or
12 per week.
13   Q.  Who gave you the schedule each week for
14 your Georgia host family?
15   A.  My house mom.
16   Q.  Did anyone from InterExchange ever give
17 you your weekly schedule?
18   A.  No.
19   Q.  Did you talk with your local coordinator
20 about being asked to work more than the maximum hours
21 each week?
22   A.  She knows that I was working more than
23 45 hours.

---

40

5    Q.  I want to make sure that you understood
6  the question that I asked.  How did your local
7  coordinator in Georgia know that you were working more
8  than the maximum hours?
9    A.  How she knows that I was working more
10 than 45 hours?
16   Q.  Were you there when the host family told
17 the local coordinator that you would be working more
18 than the maximum hours?
19   A.  No, I wasn't.  No, I wasn't there.
20   Q.  Did you personally talk to your local
21 coordinator about your hours with your Georgia host
22 family?
23   A.  No.  Personally, I didn't talk with her.

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

41

10    Q.  Did your New York host family pay your
11  weekly stipend by check or by cash or some other way?
12    A.  Cash.  They pay me in cash.
13    Q.  What about your Georgia house family?
14    A.  They pay me in check.
15    Q.  Did you keep records of the payments
16  from either family?
17    A.  For my Georgia family.
18    Q.  Do you still have those records?
19    A.  Yeah.
20    Q.  Have you turned them over to your
21  lawyers?
22    A.  I'm sorry?
23    Q.  Have you given those records to your
24  lawyers?
25    A.  No.  No, I haven't.

42

1    MS. COLAIZZI:  Mr. Libling, those
2  documents were requested from Ms. Garcia in the
3  written discovery.  I ask that they be produced
4  immediately.
5    MR. LIBLING:  We will follow up.
6    Q.  (BY MS. COLAIZZI) Just so I'm clear, did
7  you keep any records of your hours worked with either
8  host family?
9    A.  The records, I will check, but I'm not
10  really sure.
11    Q.  Okay.
12    A.  Maybe we can look in the Google calendar
13  on the internet.
14    Q.  Yes, please check to see if you have
15  those records and if you do, please give them to your
16  lawyers.  Okay?
17    A.  Okay.

43

14    Q.  Was the local coordinator in Georgia
15  someone by the name of Cara Harper?
16    A.  It was Cara Harper, yeah.
17    Q.  Did you meet her in person when you were
18  in Georgia?
19    A.  Yeah.
20    Q.  How many times?
21    A.  Like the same in New York, once per
22  month.
23    Q.  How many times did you meet with her at
24  the host family's home, if any?
25    A.  At the home with the local coordinator?

44

1    Q.  Yes.
2    A.  One time when I arrive in Georgia home.
3    Q.  What happened during that conversation?
4    A.  The conversation, I do remember that she
5  told me that we have the -- we have that meeting the
6  second week that I arrived with the host family and
7  they told me that what I'm -- what are you doing here,
8  what are your duties, what you do here with your kids,
9  with your host kids and are you doing something else
10  and everything was okay at that moment, so, yeah.
11    Q.  You said that everything was okay in
12  that moment.  Did you have concerns or problems with
13  your Georgia host family at some point?
14    A.  Just when I had to work more than 45
15  hours per week and 12, 15 hours per day or something.
16  Because those days I was so tired to still take care
17  of the kids.
18    Q.  How much of the time did you have to
19  work more than 45 hours a week with your Georgia host
20  family?
21    A.  Most of the time.  Yes.  It was most of
22  the time.
23    Q.  What about how much you had to work more
24  than 10 hours a day?
25    A.  Per day, usually hours per day, but

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

45

1  usually I start to work at like 7:00 a.m. and finish
2  7:00 to 7:30 p.m., like 12 and a half hours.
3      Q.  Did you ever consider talking to
4  somebody at InterExchange about your hours?
5      A.  In that moment, I didn't talk about with
6  InterExchange because the host family tell me we are
7  going to pay you extra money.
8      Q.  And did your Georgia host family ever
9  pay you more money than the $200 per week?
10     A.  Yeah.
11     Q.  How much or how much did they pay you
12  extra?
13     A.  7 -- we record it at $7 hour extra.
14     Q.  So $7 for every hour that you worked
15  over the maximum?
16     A.  Yeah.
17     Q.  At the time, did you know whether or not
18  the host family was allowed to do that, meaning give
19  you money for extra hours?
20     A.  No, I didn't know.
21     Q.  And did they pay you for every extra
22  hour that you worked or did they --
23     A.  Yeah, they did.  They did.
24     Q.  Other than the $200 per week and the $7
25  per hour, did your Georgia host family give you extra

46

1  money in any circumstance?
2      A.  No, they didn't.

22     Q.  Do you believe that either your New York
23  or your Georgia host family owes you money sitting
24  here today?
25     A.  No.

47

1          MR. LIBLING:  Objection to form.
2      Q.  (BY MS. COLAIZZI)  So I want to make sure
3  I understand.  You understand that this -- as far as
4  you understand, this lawsuit is about the duties and
5  the hours that you were working in Georgia; is that
6  correct?
7          MR. LIBLING:  Objection to form.
8      Q.  (BY MS. COLAIZZI)  You can go ahead and
9  answer.
10     A.  Yeah.  It was correct.
11     Q.  Did you make any kind of complaints
12  about anything to InterExchange while you were living
13  with either host family?
14     A.  No, I didn't.
15     Q.  Why don't we take a quick break.  I
16  think I'm pretty close to being done.  I'll look
17  through my notes and then we can finish up here in
18  just a few minutes.  Okay?
19     A.  Okay.
20         (Recess taken, 10:16 a.m. to 10:20 a.m.)
21     Q.  (BY MS. COLAIZZI)  I just have a few more
22  questions.  We can begin whenever you're ready.
23     A.  Okay.  I'm ready.
24         MS. COLAIZZI:  Mr. Libling, are you on
25  the phone?

48

1          MR. LIBLING:  I'm on.
2          MS. COLAIZZI:  Are you okay to proceed?
3          MR. LIBLING:  Yes.
4      Q.  (BY MS. COLAIZZI)  Ms. Garcia, were you
5  still living with your Georgia host family when you
6  found out about this lawsuit?
7      A.  Can you repeat me, please?
8      Q.  Sure.  When you found out about this
9  lawsuit, were you still living with your Georgia host
10  family?
11     A.  Yeah.
12     Q.  Did you have any --
13     A.  I was.
14     Q.  I'm sorry.  Go ahead.
15     A.  No.  Yeah, I was living with my house
16  family in Georgia.
17     Q.  Did you have any discussions with them
18  about the lawsuit?
19     A.  No, I didn't.
20     Q.  Have you had any discussions about the
21  lawsuit with your New York host family?
22     A.  No, I didn't.
23     Q.  Between your New York host family and
24  your Georgia host family, did you have to go through
25  any additional training?

**ALEJANDRA MARCELA GRACIA VASQUEZ - 3/6/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

49

1    A.  No.
2    Q.  I have one more document to show you.
3    A.  Okay.
4    Q.  Can you see the document on the screen,
5  Ms. Garcia?
6    A.  Yeah, I see it.
7    Q.  Do you recognize this document?
8    A.  Yeah, I recognize it.
9    Q.  I'm going to scroll to the bottom.
10  Ms. Garcia, is that your signature that you see on the
11  screen?
12    A.  Yeah, it's mine.  It's mine.
13    Q.  Okay.  Do you recall responding to the
14  questions in this document?
15    A.  Yeah.
16    Q.  Other than your attorneys, did anybody
17  help you with these responses?
18    A.  No.  It was mine.
19    Q.  Okay.
20    A.  Just mine.
21    Q.  I'm going to scroll down to page 6.  Do
22  you see on the screen where it says, "Requests for
23  production," Ms. Garcia?
24    A.  Yeah, I can see it.
25    Q.  Did you understand that the questions

---

50

1  were asking you to look for certain documents?
2    A.  Yeah, I understand.
3    Q.  Okay.  Have you done a search for any
4  documents that were requested in these questions?
5    A.  Yeah, I did.
6    Q.  You've looked for documents?
7    A.  Sorry?
8    Q.  Have you looked for any of the documents
9  that you were asked for in these questions?
10    A.  Just those documents, I have looked,
11  yeah.
12    Q.  Did you find anything?
13    A.  I find anything like those documents?
14    Q.  Yes.  Did you find any of the documents
15  asked for here?
16    A.  No.
17    Q.  Do you have any documents that you
18  believe you still need to look for?
19    A.  No, I didn't.
20    MS. COLAIZZI:  Counsel, I will ask that
21  confirmation be made whether or not any of the
22  documents indicated here exist or not as these
23  responses all indicate that a search will be
24  conducted.  We'll be holding the deposition open until
25  we know for sure whether there's any documents.

---

51

1    MR. LIBLING:  I think the witness has
2  said that she did do a search, but since I wasn't
3  involved in the discussions over this, I will talk to
4  her and get back to her.
5    MS. COLAIZZI:  I believe she said there
6  might be Google calendars available, so I would ask
7  that we get confirmation one way or the other.
8    MR. LIBLING:  I understand.
9    MS. COLAIZZI:  I don't have any further
10  questions at this time.  Thank you, Ms. Garcia.
11    MR. LIBLING:  No questions for me.
12  Thank you so much.  We appreciate your time.
13    MS. COLAIZZI:  Thank you for your time.
14  You can sign off.
15    WHEREUPON, the within proceedings were
16  concluded at the approximate hour of 10:23 a.m. on the
17  6th day of March, 2018.
18
19
20
21
22
23
24
25

---

52

I, ALEJANDRA MARCELA GARCIA VASQUEZ, do
hereby certify that I have read the above and
foregoing deposition and that the same is a true and
accurate transcription of my testimony, except for
attached amendments, if any.

        Amendments attached  (  ) Yes  (  ) No


        _____
        ALEJANDRA MARCELA GARCIA VASQUEZ


        The signature above of ALEJANDRA MARCELA
GARCIA VASQUEZ was subscribed and sworn to or affirmed
before me in the county of _____, state
of _____, this _____ day of
_____, 2018.


        _____
        Notary Public
        My Commission expires:


Johana Paola Beltran, et al., 3/6/18 (tds)

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


       I, TRACY R. STONEHOCKER, Certified Realtime Reporter, Registered Professional Reporter and Notary Public ID 19924009337, State of Colorado, do hereby certify that previous to the commencement of the examination, the said ALEJANDRA MARCELA GARCIA VASQUEZ was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 15th day of March, 2018.

       My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




Tracy R. Stonehocker
Registered Professional Reporter

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3    _____

4  VIDEOCONFERENCE DEPOSITION OF:  LUCIE VOCETKOVA
                                   March 22, 2018
5    _____

6  JOHANA PAOLA BELTRAN, et al.,

7  Plaintiffs,

8  v.

9  INTEREXCHANGE, INC., et al.,

10  Defendants.

11   _____

12          PURSUANT TO NOTICE AND STIPULATION, the
   videoconference deposition of LUCIE VOCETKOVA was
13  taken on behalf of the Defendants at 1900 Grant
   Street, Suite 1025, Denver, Colorado 80203, on
14  March 22, 2018, at 2:32 p.m., before Tracy C. Masuga,
   Registered Professional Reporter, Certified Realtime
15  Reporter, and Notary Public within Colorado.

16

17

18

19

20

21

22  **H+G**

23

24  Hunter + Geist, Inc.

25
   303.832.5966        1900 Grant Street, Suite 1025      ▪ www.huntergeist.com
   800.525.8490        Denver, CO 80203                   ▪ scheduling@huntergeist.com

                       Your Partner in Making the Record

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOCONFERENCE DEPOSITION OF:   LUCIE VOCETKOVA
                                 March 22, 2018
_____

JOHANA PAOLA BELTRAN, et al.,
Plaintiffs,
v.

INTEREXCHANGE, INC., et al.,
Defendants.
_____

        PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of LUCIE VOCETKOVA was
taken on behalf of the Defendants at 1900 Grant
Street, Suite 1025, Denver, Colorado 80203, on
March 22, 2018, at 2:32 p.m., before Tracy C. Masuga,
Registered Professional Reporter, Certified Realtime
Reporter, and Notary Public within Colorado.

---

**2**

              A P P E A R A N C E S
For the Plaintiffs:
        BYRON D.M. PACHECO, ESQ.
        Boies, Schiller & Flexner, L.L.P.
        575 Lexington Avenue
        7th Floor
        New York, New York 10022

For the Defendants:

        JOSEPH H. HUNT, ESQ.
        ALYSSA L. LEVY, ESQ.
        Sherman & Howard L.L.C.
        633 17th Street
        Suite 3000
        Denver, Colorado 80202

        Ms. Vocetkova was located at
916 Sunnyview Oval, Keasbey, New Jersey 08832,
908-307-3936.

        Mr. Hunt, Ms. Levy, and Ms. Masuga, the
court reporter, were located at 1900 Grant Street,
Suite 1025, Denver, Colorado 80203, 303-832-5966.

        Mr. Pacheco was located at 575 Lexington
Avenue, 7th Floor, New York, New York 10022,
212-909-7632.

---

**3**

                   I N D E X
EXAMINATION OF LUCIE VOCETKOVA:              PAGE
March 22, 2018

By Mr. Hunt                                5, 83

By Mr. Pacheco                                82


                                           INITIAL
DEPOSITION EXHIBITS:                      REFERENCE
Exhibit 1    Consent to Join (Pursuant to        7
             29 U.S.C. Section 216(b)) by
             Vocetkova, 9/12/17
Exhibit 2    InterExchange Au Pair USA Au Pair  30
             Agreement with Vocetkova, 2/27/12

---

**4**

1    WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4        *     *     *     *     *
5    MR. HUNT:  If there's any problems, if
6  you can't hear me, we'll stop.  If the video
7  connection doesn't work, we'll stop and, you know, get
8  in touch with your counsel.
9        And, Mr. Pacheco, you can call me, email
10 me to get this going.
11       So I'm the lawyer for InterExchange.  My
12 name is Joseph Hunt.  I'll be asking you some
13 questions, Ms. Vocetkova.  So if you would just --
14       We'll need to have a stipulation on the
15 record that we can swear you in remotely and that
16 there won't be any objection with the transcript going
17 forward.  Normally, depositions are in person, so
18 we'll need -- we'll -- Mr. Pacheco, would you agree to
19 that?
20       MR. PACHECO:  Yes.  This is Byron
21 Pacheco appearing on behalf of the plaintiffs and the
22 witness from Boies, Schiller & Flexner, and I agree
23 that the witness can be sworn in remotely.
24
25

---

1 (Pages 1 to 4)

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

5

1           LUCIE VOCETKOVA,
2  having been first duly sworn to state the whole truth,
3  testified as follows:
4       (Deponent's response to oath: "I do.")
5           EXAMINATION
6  BY MR. HUNT:
7    Q.  Could you please state your name for the
8  record.
9    A.  My name is Lucie Vocetkova.
10    Q.  Are you comfortable proceeding with the
11  deposition in English?
12    A.  Yes, absolutely.
13    Q.  Let me first give you some ground rules.
14  I'm going to be asking you questions.  If there are
15  any questions that you don't understand, please tell
16  me.  I'll ask it again or rephrase it.
17     Have you taken a deposition before or --
18    A.  No.
19    Q.  -- actually -- excuse me -- no.
20     Have you ever testified under oath
21  before?
22    A.  No.
23    Q.  You understand that while you're under
24  oath you must tell the truth?
25    A.  Yes.

6

1    Q.  Okay.  So some of the ground rules are
2  just please let me finish the question so we're not
3  talking over each other.  I'll let you finish
4  answering the question, and that way the court
5  reporter can transcribe everything.
6     Your attorney may object to one or more
7  of my questions, but unless he tells you not to answer
8  a question, go ahead and answer the question.
9     And if you need to take a break at any
10  time, this is not an endurance contest, just let me
11  know, we'll do that.  The only thing I ask is that --
12  let me finish a pending question or answer, okay?
13    A.  Okay.
14    Q.  So we want to bring up the opt-in form.
15     And if you have any problem viewing this
16  form on your computer, let us know.
17    A.  You are showing something now?  I don't
18  understand.
19    Q.  Do you remember -- do you remember
20  signing a consent form joining this lawsuit?
21    A.  Yes.
22    Q.  All right.  One second and we'll bring
23  it up.
24     Can you see that on your computer?
25    A.  Yes, I see it.

7

1    Q.  Okay.  Do you recognize that?
2    A.  It looks familiar.
3    Q.  Okay.  And we're going to scroll down.
4  And is that your -- actually, it's a bit up.  Is that
5  your signature on the document?
6    A.  Yes.
7    Q.  Okay.  And did you understand when you
8  signed that document that you would be joining the
9  lawsuit against InterExchange as a plaintiff?
10    A.  Yes, I understood.
11    MR. HUNT:  Okay.  You can exit out of
12  that.
13    MR. PACHECO:  Joe, can I ask, are we
14  marking that as Exhibit 1?  Did we mark that?
15    MR. HUNT:  Yes.  Thanks for the
16  reminder.
17    (Deposition Exhibit 1 was marked.)
18    Q.  (BY MR. HUNT)  How did you first learn
19  about this lawsuit?
20    A.  Through an email I got.  I don't know
21  who it came from.  It was an email.
22    Q.  When did you receive that?
23    A.  I don't remember.  Sometime last year.
24    Q.  Okay.  Any idea whether it was from a
25  friend or from another plaintiff?

8

1    A.  No clue.
2    Q.  Okay.  What is your understanding of
3  what this lawsuit is about?
4    MR. PACHECO:  Objection, form.
5    Q.  (BY MR. HUNT)  You can go ahead and
6  answer.
7    A.  Okay.  So what I understand is about
8  that InterExchange and other companies like them were
9  not treating all au pairs fairly.  They weren't honest
10  and true about what the contract actually was, what
11  the program actually was, and that's why they were
12  sued.
13    Q.  And do you know what -- do you know what
14  unfairness -- what is -- what do you mean by
15  "unfairness"?
16    A.  Unfairness, I mean that the contract
17  didn't state exactly for families and au pairs what
18  are the examples to do.  It wasn't true.  That the
19  wages weren't right.  That au pairs were supposed to
20  be paid more.  That it wasn't made clear how much is
21  the family supposed to provide.  And some of -- most
22  of them took advantage, and au pairs being -- you
23  know, they have been -- like they paid for it, not
24  money, but they paid for it.
25    Q.  So it's your understanding that the

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

9

1  lawsuit has -- has to do with the amount of money that
2  you were paid?
3      A.  For the most part, yes, that's what I
4  understood.
5      Q.  Okay.  And you were an au pair in
6  New Jersey; is that correct?
7      A.  Yes.
8      Q.  Well, you mentioned a contract.  Do you
9  remember signing a contract with InterExchange?
10     A.  I remember signing a contract with
11 InterExchange, yes.
12     Q.  When you first came to the United States
13 for the au pair program, what did you believe that you
14 were going to be paid?
15     A.  The contract stated $195.75 a week.
16     Q.  Okay.  And before you came to the United
17 States in connection with the au pair program, did you
18 have any concerns with that amount?
19     A.  No.
20     Q.  Where were you living when you signed
21 the opt-in form?
22     A.  I don't understand the question.
23     Q.  That -- I'm sorry.  That document that
24 we were looking at earlier, the consent --
25     A.  Okay.

---

10

1      Q.  -- the consent to join the lawsuit, do
2  you remember where you were living when you signed it?
3      A.  No.
10     Q.  And do you still communicate with the
11 host family?
12     A.  No.
13     Q.  You never visit them or anything?
14     A.  No.
15     Q.  Did you discuss this lawsuit with anyone
16 since you joined it or before?
17     A.  Yes.
18     Q.  Who did you talk about it with besides
19 your attorneys?
20     A.  Other au pairs that I know, my friends,
21 my husband, my family.
22     Q.  What did the other au pairs say about
23 the lawsuit?
24     A.  They all were very interested.  Some
25 joined, some didn't, but everybody tries to follow up

---

11

1  and see what happens.
2      Q.  What do you mean -- I'm sorry.  What do
3  you mean by "follow up and see what happens"?
4      A.  Follow up, like asking in between, you
5  know, that au pair community, "How is it going?  How
6  is it progressing?"  If there is any news; try to
7  maybe find something in the news, too.  They want to
8  know what happens.  They want to know -- it affects
9  all au pairs.  They want to know, of course.
10     Q.  You mean how the lawsuit affects
11 au pairs?
12     A.  Uh-huh.
13     Q.  Yeah.  So you haven't discussed the
14 lawsuit with your host family?
15     A.  No.
16     Q.  Did you review any documents in
17 preparation for this deposition?
18     A.  No.
19     Q.  Did you complete any survey or
20 questionnaire in connection with this lawsuit?
21     A.  Yes, that one from InterExchange.  Or
22 was it from the lawyers?  It was one after that
23 consent that came.  And there was a survey.  I thought
24 it was from InterExchange.  I'm not sure.
25     Q.  Okay.  When did you receive it?

---

12

1      A.  I don't remember exactly.  Sometime last
2  year.
3      Q.  Was it by mail or email or online?
4      A.  Email.  Email.  It was an email.
5      Q.  How many times did you complete a survey
6  or questionnaire?
7      A.  Once.
8      Q.  Once.  Do you have any idea how many
9  questions were involved?
10     A.  A lot.
11     Q.  A lot.  How many is "a lot"?
12     A.  I don't remember.  I don't know.
13     Q.  Okay.
14     A.  It was a lot.
15     Q.  More than 20?
16     A.  Definitely, yeah.
17     Q.  What organization or entity recruited
18 you to be an au pair in the United States?
19     A.  InterExchange.
20     Q.  InterExchange.  Do you know what -- when
21 I say "recruit," do you know what I am talking about,
22 the word "recruit"?
23     A.  I'm assuming it's like a hire.
24     Q.  I'm sorry.  I didn't catch --
25     A.  I'm assuming it's like hire.

---

3 (Pages 9 to 12)

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

13

1  Q.  To be hired?
2  A.  In a way, uh-huh.
3  Q.  Okay.  So you believe that InterExchange
4  hired you to become an au pair?
5  A.  Yes, in a way.
6  Q.  Okay.  Could you describe how
7  InterExchange recruited you?
8  A.  Where to start.  It was an interview.
9  They did a background check on me.  They had me fill
10  like a -- like a profile on their website.  I had to
11  make a video, also.
12  Through that, I was talking to families.
13  And once we matched, they made sure I understand what
14  the duties are and they set up my flight and training.
15  That would be it, I guess.
16  Q.  Well, let me back up.  When did you
17  first learn about the opportunity to be an au pair in
18  the United States?
19  A.  It was a long time ago.  I heard it from
20  my friends.  I don't know what year it was.  She went
21  into everything, and she recommended that program for
22  me.
23  Q.  Was your friend an au pair?
24  A.  Yes, but in Britain, not U.S.  U.S.
25  would be my choice.

14

1  Q.  Do you know whether your friend was an
2  au pair through InterExchange?
3  A.  No.  She -- no, it was different.
4  Q.  It was another sponsor?
5  A.  Yes.
6  Q.  When your friend told you about the
7  au pair program, did you do anything else to get more
8  information about it?
9  A.  Absolutely.
10  Q.  What did you do?
11  A.  I started searching online what
12  "au pair" actually means and what companies do it and
13  where can I be an au pair.  I tried to find out as
14  much as I can about it because I was curious.  I
15  wanted to do it.
16  Q.  Did you research more than one sponsor?
17  A.  Yes.
18  Q.  What did you find out about the
19  sponsors?
20  A.  From the sponsors, I found out that they
21  advertised it as a travel and get to know the country.
22  And then, by the way, they mentioned the taking care
23  of the kids, which was different in reality.  But they
24  all pretty much said the same.
25  Q.  Okay.  Did you apply to the au pair

15

1  program through a single sponsor or agency, or did you
2  apply more than once?
3  A.  It was one Czech agency that helped me
4  apply to more than one.
5  Q.  Do you remember what the name of that
6  Czech agency was?
7  A.  If I recall it correctly, it was
8  Students Agency.  I'm not sure if they're still
9  around.
10  Q.  Did you know if they were associated
11  with InterExchange?
12  A.  No.
13  Q.  You didn't know, or they were not
14  associated?
15  A.  I don't know who they were associated
16  with, what was the connection between them and the
17  au pair agency.
18  Q.  So they -- this agency showed you or
19  introduced you to multiple sponsors?
20  A.  Yes.
21  Q.  And did you apply -- I'm sorry if I
22  missed this.  Did you apply to more than one sponsor,
23  or just InterExchange?
24  A.  More than one sponsor.  I applied to
25  more.

16

1  Q.  Do you know how many or which ones?
2  A.  I don't know how much.  I remember
3  AuPairCare and InterExchange.
4  Q.  Why did you choose InterExchange over
5  AuPairCare?
6  A.  AuPairCare denied me for some reason, so
7  InterExchange -- I went with InterExchange.
8  Q.  You're saying AuPairCare denied you, as
9  in --
10  A.  Yes.
11  Q.  -- didn't accept your application?
12  A.  I don't remember what the reason was.  I
13  don't know.
14  Q.  The friend that used to be an au pair in
15  England discussed being an au pair with you; is that
16  correct?
17  A.  Yes.
18  Q.  Did your friend explain how much she was
19  paid?
20  A.  No.
21  Q.  Did your friend have any complaints
22  about how much she was paid?
23  A.  Yes.
24  Q.  Yes?
25  A.  Uh-huh.

4 (Pages 13 to 16)

LUCIE VOCETKOVA - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

17

Q.  What complaints were those?
A.  The complaints were sometimes they missed a payment.  Sometimes they paid her less because they said that she got something so she should get paid less.  There were a bunch of things that her first family, and -- and then she switched agencies. I don't remember.  It's a long time ago.
Q.  Did your friend's complaints raise any concerns with you?
A.  Absolutely, yes.
Q.  But you still decided to become an au pair?
A.  Yes.
Q.  Despite your concerns?
A.  Absolutely.
Q.  Why -- why was that?
A.  Because after reading about InterExchange on their website and what they said, even though I knew there were some concerns, and it was very scary to go to a different country, not really knowing the language, not knowing anybody, as a matter of fact, it was really scary.  And the fact that the InterExchange was supposed to provide some support and help if anything happened, if I didn't match with the family, if anything-anything, the

---

18

agency would be there to give me a hand, to help me, to take care of me, to help me get home, if anything. That's what made me feel safe or safer to be an au pair, to go to a different country.
MR. HUNT:  I'm going to ask just for a pause because I believe your lawyer is -- may be off -- off line.  Okay.  Now --
MR. PACHECO:  I'm here, Joe.  I just mistakenly flicked the video button.  I'm still here.
MR. HUNT:  Okay.
MR. PACHECO:  Thank you.
MR. HUNT:  Okay.  Good.  Good.
Q.  (BY MR. HUNT)  So, Ms. Vocetkova, despite your concerns, InterExchange said that they would support you.  Were there other benefits that drew you to the program -- to the au pair program?
MR. PACHECO:  Objection, form.
A.  There was the money.  When you convert dollars into crowns, which is my country's currency, it's good money.  So it's like a -- I would -- in that year that I was planning on being here for just one year, I would have learned English and make nice money and come back.
Q.  (BY MR. HUNT)  Were you looking forward to the -- the cultural benefits about -- you mentioned

---

19

learning a new language and being in a different country.  Did you learn about culture here?
A.  I -- I did.  Of course.
Q.  Let me ask you -- let me ask you in a different way.  Did InterExchange advertise the au pair program as a cultural exchange?
A.  They did.
Q.  And what did you -- before you came to the United States, what did that term mean to you?
A.  It meant to me that I will learn the language, of course, I will learn other ways of doing things, holidays, probably, and living with a family, I would learn how they live, how that works.  Maybe it's different than how families work in my country.
Q.  And when you were thinking about becoming an au pair, besides the complaints that you had received from your friend, what -- what were the downsides of being an au pair when you were -- when you were thinking about joining the program?
A.  To me, it was the fact that I would be by myself in strangers' house, living with them.  It was very scary.
And I knew it was for that convenience of the family to have a nanny living with them, and the availability of us being there 24/7.  And that was

---

20

another scary part, that -- how will I say I'm on the clock and I'm off the clock; that that will be a difficult part I will have to deal with.
Q.  And when you were thinking about becoming an au pair before you came to the United States, did you meet with a recruiter or staff member from InterExchange?
A.  No.
Q.  But you met with your -- that local agency that we -- that you had mentioned.  And what was that agency's name?
A.  Students Agency.
Q.  And was -- did you meet with anyone -- or excuse me.
When you were meeting with people from that agency, did you discuss the weekly stipend?
A.  I do not remember.
Q.  Okay.
A.  I don't know.
Q.  Do you remember completing an application for the au pair program?
A.  Application for the Student Agency or InterExchange?
Q.  InterExchange.
A.  No, I don't remember.

---

5 (Pages 17 to 20)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

21

1    Q.  Do you remember completing an
2  application for the Student Agency?
3    A.  Yes.
4    Q.  Okay.  And did anyone help you complete
5  that application?
6    A.  Yes.
7    Q.  When did you decide to apply to
8  InterExchange?
9    A.  That was the year after I finished high
10  school, which is 2011 slash '12.  I decided to leave
11  for a year and go with InterExchange.
12    Q.  What kinds of materials did you receive
13  about InterExchange, what documents, advertisements,
14  and the like?
15    MR. PACHECO:  Objection, form.
16    A.  What do you mean by "receive"?
17    Q.  (BY MR. HUNT)  Do you remember being
18  told that there would be a weekly stipend?
19    A.  Yes.
20    Q.  And do you remember what the stipend was
21  going to be?
22    A.  It was $195.75 every week.
23    Q.  And who told you that?
24    A.  That was in the contract that I signed
25  with InterExchange.

---

22

1    Q.  Okay.  Prior to arriving in the United
2  States, did you have communication -- did you
3  communicate with InterExchange?
4    A.  Yes.
5    Q.  When was that or who did you communicate
6  with?
7    A.  I don't remember who.
8    Q.  Do you remember whether that person
9  worked for the Student Agency or InterExchange?
10    A.  No, that was a person from
11  InterExchange.
12    Q.  And how many times did you talk to that
13  person?
14    A.  I don't remember.
15    Q.  Do you remember what you talked about?
16    A.  Not exactly.
17    Q.  Did anything about the amount of money
18  that you received concern you?  You said -- you said
19  earlier that you were happy about it.  You didn't have
20  any -- that it would be a benefit to you; is that
21  right?
22    MR. PACHECO:  Objection.
23    A.  Say the question again.
24    Q.  (BY MR. HUNT)  You know what?  I'll
25  withdraw the question.

---

23

1    A.  Okay.
2    Q.  Did you pay any fees to apply or
3  participate in the program before you came to the
4  United States?
5    A.  Yes.
6    Q.  What were the payments?
7    A.  There was a visa fee and something for
8  the agency, too.  I don't remember how much.
9    Q.  Something -- which agency?
10    A.  That, I can't remember.  I had given it
11  to Student Agency.  I don't remember for which agency
12  it was for.  If they split it, I don't know.
13    Q.  But you -- the payment went to the
14  Student Agency?
15    A.  Yes.
16    Q.  Do you remember how much it was?
17    A.  No.
18    Q.  Okay.  What -- I guess how did you pay
19  them, cash, check, electronically?
20    A.  I'm not sure.
21    Q.  Did you make any other payments
22  before --
23    A.  To the agency?
24    Q.  Well, did you make any other payments in
25  connection with the au pair program before you came to

---

24

1  the United States?
2    A.  Besides the visa and the fee, I haven't.
3    Q.  Okay.  So while you were -- before you
4  came to the United States, you submitted your
5  application, and you started a matching process, is
6  that right, with au pair -- with host families?
7    A.  Yes.
8    Q.  And you were living in the Czech
9  Republic?
10    A.  Yes.
11    Q.  Can you tell me about that matching
12  process?  How did it work?
13    A.  Oh, I remember there -- as I had a
14  profile online, the families had their profiles, and I
15  don't remember exactly the process.
16    Q.  Could you select --
17    A.  I don't know.
18    Q.  Could you view families and select them
19  for -- as potential matches?
20    A.  That is the part that I'm not sure
21  about.  I really don't know.  It's a long time ago.
22    Q.  Could you communicate with any of the
23  families that you were seeing?
24    A.  I could communicate with one family at a
25  time.  So whoever I made a -- like a connection with,

---

6 (Pages 21 to 24)

25

1    I could talk to them, and then either we matched or we
2    didn't.  If we didn't, then I could talk to another
3    family.  But I couldn't speak to more than one family
4    at a time.
5        Q.  How was that connection made that
6    permitted you to talk to them?
7        A.  I remember emailing back and forth and
8    Skyping at the same time.  So that's how.
9        Q.  So you chose -- you chose the host
10   family, and the host family chose you, and that
11   permitted you to talk to each other?
12       A.  Yes.  We both agreed to make a match,
13   yes.
14       Q.  Do you remember how many host families
15   you talked with?
16       A.  I spoke to two altogether.
17       Q.  And did you interview with -- with both
18   of them or just one?
19       A.  I had a Skype with both of them.
20       Q.  How many times did you Skype with --
21   let's just take them one at a time.  You had -- you
22   had two families that you matched with.  The first --
23   let's -- the first family that you had an interview
24   with, did you accept them, reject them?
25       A.  The first one, they rejected me.  I

26

1    didn't sit well with the mom.  I don't think -- my
2    English wasn't anywhere near what it is now.  So she
3    was very strict with that.  She wanted somebody who
4    already speaks a lot better than I did.  I think
5    that's what made the cut for her.  So we didn't -- we
6    didn't match.
7
8
9
10
11       Q.  Okay.  And that was the Donahue family?
12       A.  Yes.
13       Q.  And did the Donahues pick you, or did
14   you pick the Donahues?  How did that work?
15       A.  We both agreed to match.  We both
16   were -- we both had to okay the match.
17       Q.  So it was a mutual decision between you
18   and the host family?
19       A.  Yes.
20       Q.  Did InterExchange assign you to the host
21   family?
22       A.  No.
23       Q.  So when you were interviewing with the
24   Donahues or with the first family that didn't work
25   out, was anyone from InterExchange participating in

27

1    the interview process?
2        A.  No.
3        Q.  When you chose the Donahues and the
4    Donahues chose you, did you want to go to live with
5    them?
6        A.  Yes.
7        Q.  Could you have said no if you weren't
8    interested in going to live with them?
9        A.  Absolutely.
10       Q.  During that interview process with
11   either the first family that didn't work out or the
12   Donahues, did you talk with any member of the family
13   about how much you would be paid?
14       A.  No.
15       Q.  When did you learn how much you would be
16   paid as an au pair?
17       A.  I don't know when I learned that.
18       Q.  Did you -- during your time as an
19   au pair, did you ever ask to be paid more?
20       A.  Yes.
21       Q.  What was their response?
22       A.  Her response was that, for the extra
23   time I've worked, she started -- when I started
24   working more, she started giving me 200 instead of the
25   195.75, and that was for my extra -- whatever extra

28

1    hours I worked, that was for that.
2        Q.  And who did you ask for the extra?
3        A.  The host mom.
4        Q.  If we can back up a little bit.
5            In going back to those interviews that
6    you had with the Donahues via Skype, did you talk
7    about what sort of duties you would have as an
8    au pair?
9        A.  I don't remember.
10       Q.  Do you remember whether they talked
11   about what you would be doing with the children?
12       A.  Not clearly.
13       Q.  You didn't know that --
14           Well, did you know that you were going
15   to be supervising and attending to the children?
16       A.  Yes.  Yes, absolutely.
17       Q.  Were those the duties that you actually
18   performed as an au pair?
19       A.  Yes.
20       Q.  During that Skype interview with the
21   Donahues, did you -- did they -- did any member of the
22   family tell you how many hours a week you would be
23   working or how many hours per day?
24       A.  I don't remember.
25       Q.  When did you learn -- when did you first

29

1  learn how many hours a day or per week you would be
2  working?
3      A.  I learned that from the InterExchange
4  contract.
5      Q.  You read the contract when you signed
6  it?
7      A.  Oh, of course.
8      Q.  Okay.  We're going to pull that document
9  up on all of our screens.
10     A.  Uh-huh.
11     Q.  And do you recognize the document as we
12  scroll through it?
13     A.  Yes.
14     Q.  And we'll go to the very bottom.
15     MR. PACHECO:  Joe, would you mind
16  telling me the beginning Bates number of that
17  document?
18     MR. HUNT:  Yeah, absolutely.
19  InterExchange 0048910, and the last number of the
20  document is 48925.
21     MR. PACHECO:  Thank you.
22     Q.  (BY MR. HUNT)  Ms. Vocetkova, is that
23  your electronic signature --
24     A.  Yes.
25     Q.  -- on this page?  Okay.

30

1      And we're going to turn to 48913.  It's
2  the fourth page of the PDF.  And if you look at
3  item k, you acknowledge that your stipend would meet
4  the minimum requirements set by the United States
5  Department of State; is that correct?
6      A.  Say that again.
7      Q.  You acknowledge that your stipend would
8  meet the minimum requirements set by the United States
9  Department of State?
10     A.  That's what it says, yes.
11     Q.  Did you understand that at the time that
12  you signed it?
13     A.  I would say yes.
14     Q.  You read the agreement?
15     A.  I did.
16     MR. HUNT:  Okay.  And if we could mark
17  that as Exhibit 2.
18     (Deposition Exhibit 2 was marked.)
19     (Discussion off the record.)
20  ■
   ■
   ■
   ■
   ■

31

1      MR. HUNT:  Okay.  And, Mr. Pacheco,
2  you're appearing from Boies Schiller's office?
3      MR. PACHECO:  Yes.  I'm appearing from
4  575 Lexington Avenue, New York, New York.
5      Q.  (BY MR. HUNT)  Ms. Vocetkova, you
6  arrived in the United States for the au pair program
7  in approximately when?
8      A.  August 13, 2012.
9      Q.  And did you do any training when you
10  arrived?
11     A.  Yes.
12     Q.  Where was that?
13     A.  In New York City.
14     Q.  What sort of training did you receive?
15     A.  That the InterExchange talked to us
16  about what we should expect from taking care of kids,
17  how to take care of kids, a little bit about first
18  aid, and driving with the kids.  Pretty much -- a
19  lot -- a lot of things about the kids and how -- how
20  we should act and communicate with the family whatever
21  happens.
22     Q.  Were other au pairs part of this
23  training?
24     A.  Yes.
25     Q.  Do you know whether it was all

32

1  InterExchange au pairs, or were other sponsors
2  involved?
3      A.  I think it was just InterExchange.
4      Q.  Were you required to receive this
5  training by InterExchange?
6      A.  Yes.
7      Q.  And how -- how many hours -- or how many
8  days did it last?
9      A.  It was until Thursday or Friday that
10  week, Monday through Thursday or Friday.
11     Q.  Monday through Thursday or Friday.  And
12  how many hours per day?
13     A.  About eight.
14     Q.  Were you paid for the hours that you
15  were trained?
16     A.  I have.
17     Q.  By whom?
18     A.  By the family.
19     Q.  So when -- the family paid you when you
20  arrived for -- excuse me.  When you --
21     When did they pay you for the training?
22     A.  After the first week of being with them,
23  that she paid me for two weeks, the one week for, you
24  know, working actually for them, and one for the
25  training before that.

8 (Pages 29 to 32)

Case No. 1:14-cv-03074-CMA-KMT  Document 1054-2  filed 06/20/18  USDC Colorado  pg 26 of 264

LUCIE VOCETKOVA - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



**37**

**39**
1     **Q.  What was your schedule like, generally,**
2 **with the host family?**
3     A.  Can you please repeat?
4     **Q.  Sure.  What was your schedule like**
5 **generally with the host family?**
6     A.  Are you asking about the times or the
7 activities?
8     **Q.  Well, let's take them one at a time.**
9 **Are there any additional activities that you -- that**
10 **you did as an au pair?**
11     A.  Did I mention driving the kids?  I think
12 I mentioned it all.
13     **Q.  Okay.  And how about the -- how about**
14 **the times?  What was your schedule?**
15     A.  I don't remember the exact times.
16     **Q.  Were you -- was there a certain time**
17 **that you were expected to watch the kids?**
18     A.  I don't.
19     **Q.  You don't remember when that started?**
20     A.  I don't.
21     **Q.  How about when the kids went to school?**
22     A.  What time they went to school?
23     **Q.  Yeah.  What did you do when they went to**
24 **school?**
25     A.  Different things.  It depends.

**38**
2     **Q.  You used your own money for that?**
3     A.  Yes.
4     **Q.  Was that part of the stipend that you**
5 **received, that weekly payment?**
6     A.  Yes.
7     **Q.  Did the family give you a schedule each**
8 **week?**
9     A.  Yes.
10     **Q.  Was it written down or through a Google**
11 **Calendar, or was it -- how was it communicated to you?**
12     A.  The host mom used this notebook from
13 InterExchange.  It helped her set the schedule and
14 write down if she wanted me to do anything, you know,
15 like a note.  If there was something that day to
16 remember, she would write that down, too.
17     **Q.  Okay.  You mentioned that the notebook**
18 **was from InterExchange.  Did InterExchange tell you --**
19 **did InterExchange set your schedule?**
20     A.  No.
21     **Q.  So no one at InterExchange ever gave you**
22 **a weekly schedule?**
23     A.  No.
24     **Q.  Did you keep those -- those calendars?**
25     A.  No.

**40**
1 Sometimes I went to gym.  Sometimes I stayed behind
2 and did my laundry, did something, you know, I
3 needed -- I wasn't -- it was, for me, off the clock.
4     **Q.  You were off the clock.  And so when**
5 **they returned from school, were you back on the clock,**
6 **as you said?**
7     A.  Yes.
8     **Q.  And then how long did that last?**
9     A.  How long that they needed me.
10     **Q.  Okay.  So were you watching the kids in**
11 **the evening?**
12     A.  Yes.
13     **Q.  Until they went to bed?**
14     A.  Sometimes.
15     **Q.  What time did they normally go to bed?**
16     A.  I don't remember.
17     **Q.  Did you have a curfew?**
18     A.  What's a curfew?
19     **Q.  A time that you had to be at home.  Did**
20 **you have a time that you had to be at home?**
21     A.  Like when I was out?
22     **Q.  Yes.**
23     A.  No, I didn't.
24     **Q.  The host family didn't tell you when you**
25 **had to be home at night?**

10 (Pages 37 to 40)

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

41

1    A.  No.
2    Q.  Did you work the same days every week
3    with your host family?
4    A.  Most of the weeks, yes.
5    Q.  Which days?
6    A.  Monday through Friday.
7    Q.  So you didn't work on Saturdays and
8    Sundays?
9    A.  Let's say once, maybe twice a month I
10   did.
11   Q.  And on those occasions, how long would
12   you work?
13   A.  It -- it was different every time.  I
14   don't remember exactly.
15   Q.  Okay.  How many hours per week did you
16   work for the host family?
17   MR. PACHECO:  Objection, form.
18   A.  I don't remember exact number.
19   Q.  (BY MR. HUNT)  Could you approximate --
20   could you guess?
21   A.  It was over 45.
22   Q.  Okay.
23   A.  I don't know exact number.
24   Q.  How do you remember it being over 45?
25   A.  Because I remember the conversation with

---

42

1    the host mom about me working more than I'm supposed
2    to.  We just read the contract.  It clearly said
3    45-hour workweek, and tops ten hours a day.  Sometimes
4    I would work more.  I would work more than 45.  That's
5    how I remember I worked more.
6    I asked, "To be fair, if you want me to
7    work more, then I should be paid more."  That's how
8    she told me -- started giving me the 200 instead of
9    the 195.75.
10   Q.  And when did that conversation take
11   place?
12   A.  It was definitely the second year with
13   them.  I don't know exactly --
14   Q.  In the first year --
15   A.  -- actually.
16   Q.  I'm sorry.  I interrupted you.  What did
17   you say?
18   A.  I was saying that I don't know exactly
19   how far during the second year this happened, that
20   conversation.
21   Q.  Okay.  So in the first year, you were
22   working fewer than 45 or more than 45?
23   A.  Around 45.
24   Q.  Around 45.  And in the second year, you
25   think you were working more than 45?

---

43

1    A.  It was always more than 45.
2    Q.  Okay.  Do you have any idea how much
3    more?
4    A.  I really don't remember.
5    Q.  More than 50?
6    A.  I don't know.
7    Q.  Okay.
8    A.  I really -- I can't remember.
9    Q.  So in the second year, were you working
10   weekends?
11   A.  It was the same as the first year.
12   Once, maybe twice a month, I did.

---

44

3    Q.  Was anyone from InterExchange telling
4    you how many hours to work?
5    A.  No.
6    MR. PACHECO:  Objection.
7    Q.  (BY MR. HUNT)  Were you expected to be
8    available or on call for the host family at times
9    during which you weren't scheduled to work?
10   A.  Expected by who?
11   Q.  Your host family.
12   A.  I don't know how to answer this.  I
13   don't know.
14   Q.  Okay.  Were there certain times when you
15   were expecting to be free but you were interrupted in
16   order to take care of the kids?
17   A.  Yes.
18   Q.  Under what -- what were those
19   circumstances?
20   A.  Sometimes --
21   THE DEPONENT:  Would you excuse me?
22   I've got to throw out my cat.
23   MR. HUNT:  You know, maybe now is a fine
24   time for a -- for a break.  So why don't we --
25   THE DEPONENT:  Okay.

---

11 (Pages 41 to 44)

**LUCIE VOCETKOVA - 3/22/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

45

1  MR. HUNT: Why don't we take, I don't
2  know, five -- five minutes, ten minutes. Is that --
3  THE DEPONENT: Perfect.
4  MR. HUNT: Okay. Ten minutes.
5  THE DEPONENT: Thank you.
6  (Recess taken, 3:41 p.m. to 3:51 p.m.)
7  Q. (BY MR. HUNT) So we're back on the
8  record after a short break.
9  Ms. Vocetkova, were there times that you
10 provided child care services for the host family that
11 were unexpected or --
12 A. Yes.
13 Q. -- outside --

[text redacted]

---

46

[text redacted]

13 than -- with your
13 host family, did you ever work more than ten hours in
14 a day?
15 A. I did.
16 Q. And was that the same -- is that true
17 for the first year?
18 A. That, I don't remember.
19 Q. It's true for the -- is it true for the
20 second year?
21 A. Absolutely, yes.
22 Q. And in the second year, were you able to
23 engage in those activities you talked about earlier,
24 like going to the gym?
25 A. Not as much.

---

47

1  Q. Did you meet other au pairs?
2  A. Yes.
3  Q. Were you able to spend time with them?
4  A. We had meetings once a month provided by
5  the InterExchange agent. I don't know exactly what
6  she was called. She was -- InterExchange
7  representative. And she was local -- the local agent,
8  I want to say. She would organize those monthly
9  meetings for all the au pairs from the same area.
10 That's how I would meet them.
11 Q. Does "local coordinator" sound right?
12 A. That's it, yes.
13 Q. And does "Deborah Daly" sound right?
14 A. Uh-huh.
15 Q. Okay. And were you -- did your host
16 family -- were you required to attend those monthly
17 meetings?
18 A. No.
19 Q. You talked about that discussion that
20 you had with your host mom about how many hours you
21 were working. Did you have any other concerns or
22 complaints about the schedule that she gave you or
23 that your host family gave you?
24 A. I don't remember.
25 Q. And how is that -- how was that resolved

---

48

1  with your host mom? You said that she paid you more.
2  Can you tell me a little bit more about that?
3  A. She paid me 200 for some period of time
4  saying whatever extra hours I work, that is for that,
5  the -- you know, what does it come down to? $3.25 is
6  the difference between 195.75 and 200. So that
7  difference would be for the extra hours.
8  And then that topic came up again when I
9  didn't agree with her. I didn't think that was fair,
10 that I would be paid that little bit more for the
11 however -- even if it was two extra hours, that was
12 inaccurate. It wouldn't be fair. It was -- I didn't
13 see it -- I didn't think it was fair from her. I
14 think she was taking advantage of me and being really
15 cheap.
16 So after that conversation, she went
17 back to 195.75.
18 Q. And did you resume working 45 hours or
19 fewer?
20 A. Then it was exactly 45 hours. Yeah.
21 Q. Okay. So how many weeks were you
22 required to work more than 45 hours per week?
23 A. I don't know.
24 Q. Okay. Well, how -- how many weeks
25 passed between the first discussion that you had with

---

12 (Pages 45 to 48)

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

49

1  your host mom and the second?
2       A.  That, I don't know.
3       Q.  Could you guess?  Was it months?  Was it
4  a matter of days, weeks?
5       A.  Matter of weeks.
6       Q.  Okay.  So with the exception of those
7  weeks, you always worked fewer than 45 --
8       A.  No.
9       Q.  -- 45 hours per week?  No?
10      A.  No, that's not what I said.  That was
11 after the second conversation about right when I
12 didn't agree with the way that I was working more than
13 45, being paid 200.  Then she started paying me the
14 195.75, and that that was the last, I want to say,
15 about two months when she was watching the clock, and
16 I would have exactly 45 hours.
17      Before that, it was mostly more, the
18 first two years.  It was only the last two months when
19 she actually watched to be exactly 45 hours and I
20 would get exactly 195.75.
21      Q.  Did you make any complaints to
22 InterExchange about how many hours you were working?
23      A.  Yes.
24      Q.  Do you remember who you made that --
25      How many complaints did you make?

---

50

1       A.  I don't remember how many.
2       Q.  Was it more than one?
3       A.  Yes.
4       Q.  And who did you make the complaint to?
5       A.  One of them was to Debbie.
6       Q.  Is that the local coordinator?
7       A.  Yes.
8       Q.  What did she say?
9       A.  If I remember it right, she told me to
10 talk to the family, which I told her that I already
11 did.  And then she said she will ask somebody from
12 InterExchange.
13      And then later she told me again that I
14 have to solve it between me and the family; that they
15 can't help me with that.
16      Q.  Do you remember whether you had any
17 other conversations with the local coordinator about
18 this issue?
19      A.  There was a few conversations about the
20 same issue in different times with the same result.
21      Q.  Was it always with -- with Debbie, the
22 local coordinator?
23      A.  If I always spoke about this only with
24 Debbie?  I'm not understanding the question.
25      Q.  Sure.  Was there anyone else at

---

51

1  InterExchange that you talked -- that you complained
2  to?
3       A.  Yes.
4       Q.  Do you remember who that was?
5       A.  I don't remember.
6       Q.  Do you remember when it was?
7       A.  I don't remember that, either.
8       Q.  Did you -- besides the conversations
9  that you just told me about, did you discuss the
10 amount of the weekly stipend with your host family
11 while you were an au pair?
12      A.  Yes.
13      Q.  And what were -- what were those
14 discussions?
15      A.  It came up at the beginning when we
16 clarified -- she clarified that, you know, "This is
17 what you will be paid every week" when I came.
18      Q.  So who decided the amount of the
19 payment?
20      A.  InterExchange.
21      Q.  Do you know how that happened?
22      A.  We really just were looking at the
23 contract.  The number was there in the contract.
24      Q.  Okay.  And if you remember in the
25 contract, it said that it was a minimum.  Did you ever

---

52

1  negotiate -- I mean, besides that -- that one
2  opportunity that you had with the host mom, did you --
3  for instance, in the first year, did you negotiate or
4  ask to be paid more?
5       MR. PACHECO:  Objection, form.
6       A.  I don't even recall the contract saying
7  that that wage was a minimum wage.
8       Q.  (BY MR. HUNT)  Do you want me to pull it
9  up again?
10      A.  The part we were looking at was -- there
11 were more parts about the wage.  There is "This is the
12 given wage," and then in a different paragraph it
13 says, "This is a minimum wage by the government."
14 That's what is very confusing.
15      And the number -- where the number is,
16 that didn't say it's a minimum wage.  It says, "This
17 is the stipend you'll be getting," and for 45 weeks
18 [sic].  This is what I remember.
19      And that -- that's why I never
20 questioned it the first year that I should be paid
21 more, that I have the choice to be paid more.  Neither
22 did the family.
23      Q.  So aside from the contract, are you
24 aware of any other determination by InterExchange
25 about how much you were to be paid?

---

13 (Pages 49 to 52)

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

53

1    A.   What do you mean by that?
2    Q.   You said -- you said that InterExchange
3  determined the amount of your weekly stipend; is that
4  right?
5    A.   Yes.
6    Q.   Okay.  And that you knew that based on
7  the -- what was said in the contract, the au pair
8  agreement --
9    A.   No.
10    Q.   -- that you signed?
11    Is there anything else that you know of
12  about InterExchange making that determination about
13  how much you -- the host family paid you?
14    A.   It's a very confusing question for me.
15  I'm sorry.  I'm not catching it.
16    Q.   Okay.  What do you base -- you said
17  that -- you said that InterExchange determined your
18  weekly stipend.  What do you base that statement on?
19    A.   The number was in the contract.
20    Q.   Okay.
21    A.   It said we will be paid 195.75 --
22    Q.   Okay.
23    A.   -- weekly.
24    Q.   Is there any other information that you
25  base that statement on?

---

54

1    A.   No.
2    Q.   And just so I'm clear, it's -- it was
3  the host family who paid you?
4    A.   Yes.
5    Q.   Okay.  And it was the host family's
6  decision to pay you more?
7    A.   Yes.
8    Q.   Okay.  So you said --
9    MR. HUNT:  Why don't you pull it up
10  again.  And turn to --
11    Q.   (BY MR. HUNT)  I'm going to pull up that
12  document that we looked to -- that we looked at
13  earlier.  It's on page 2, w.  Can you see that,
14  Ms. Vocetkova?
15    A.   Yes.
16    Q.   2, w.  Page 2.  Okay.  Do you see that
17  item w?  And in that last sentence it says, "The
18  current minimum required weekly amount is one hundred
19  ninety-five dollars and seventy-five cents."
20    A.   Yes, I see that.
21    Q.   Excuse me?
22    A.   I see that, yes.
23    Q.   So you understood it to be a minimum?
24    MR. PACHECO:  Objection.
25    A.   I didn't.

---

55

1    Q.   (BY MR. HUNT)  You didn't.  Okay.  But
2  you did read the contract?
3    A.   I did.
4    Q.   Yeah.
5    A.   I did read it.  And later -- I
6  understood it at the moment, but as we were going --
7  like in -- in my mind, I remembered clearly that we
8  always talked 195.75.  There was never ever -- I can
9  see that in the contract.  I'm just saying, it never
10  came up as a minimum any time afterwards.
11    Q.   Okay.
12    A.   Maybe that's why I assumed it wasn't a
13  minimum.  I don't know.
14    Q.   Were there any other -- were there any
15  other times that the amount varied?  Let me rephrase
16  that.
17    Were there any other times that the host
18  family paid you a different amount than 195.75?
19    A.   For a while, as mentioned before, they
20  paid me the 200.
21    Q.   Were there any other times -- I'm sorry.
22  Go ahead.
23    A.   No, that was it.
24    Q.   Okay.  Were there any other times that
25  they paid you more than 200?

---

56

1    A.   No.
2    Q.   Were there any times that they paid you
3  less than 195.75?
4    A.   Never.  Oh, no, no, no, no, no.  That's
5  not true.  That's not true.  I remember -- yes.  At
6  the end, she stopped paying me completely, and she
7  gave me a couple bucks in my hand as I was leaving the
8  door.  I don't remember how much that was.  But she --
9  she didn't pay me for the last -- last few weeks when
10  I was there.
11    Q.   Your host family didn't pay you for the
12  last few weeks that you were there?
13    A.   Yes.
14    Q.   Except for this few dollars?
15    A.   Yeah.  She -- as I was leaving, she gave
16  me, you know, cash, a little bit in my hand, 10, 20,
17  you know, something like that.
18    Q.   Okay.  Did you -- did you complain to
19  your host family about not being paid those three
20  final weeks?
21    A.   I didn't say that was three.
22    Q.   I'm sorry.  You're right.  I think you
23  said a "few."  But go ahead.
24    A.   I did complain to them.
25    Q.   Okay.  What did they say?

---

14 (Pages 53 to 56)

Case No. 1:14-cv-03074-CMA-KMT Document 1054-1 Filed 06/20/18 USDC Colorado Page 32 of 264

LUCIE VOCETKOVA - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



57

59

58

Q. Okay. Did InterExchange ever pay you
a — any money, a weekly stipend or any money?
A. No.

Q. Okay. Did the Donahues ever give you
extra money for any reason?
A. No.

60

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LUCIE VOCETKOVA - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



61

8
9      Q.  You're not counting those towards the 45
10   that you were working?
     A.  No.

62
1

63

64

16 (Pages 61 to 64)

**LUCIE VOCETKOVA - 3/22/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

65

[redacted]

Q.   Yeah, okay.  Did you have any other
trips that you went on, either with or without the
host family?
A.   Yes.
Q.   Where did you go?
A.   Philly and Washington, D.C.  I remember
either Delaware or Maryland.  There's this -- I forget
the name.  Assateague Island.  It's a national park
with the horses.
Q.   Okay.  And that was during your time --
those -- those trips to Philly, D.C., and Delaware or
Maryland was during your time as an au pair?
A.   Yes.
Q.   Okay.  And those trips to Philly, D.C.,
and Delaware or Maryland was not with the host family?
A.   No, that was without them.
Q.   Did you go alone?
A.   To the Maryland, yes.  To the other two,
I went with other au pairs.
Q.   Okay.  And who organized those trips?
A.   We did on our own, the au pairs.
Q.   How many -- how many days did you spend
in Philly?

---

66

A.   That was a day.  That was never an
overnight.
Q.   And D.C.?
A.   That was a weekend.
Q.   And the Delaware, Maryland trip?
A.   That was -- I don't know exactly how
many days.
Q.   Okay.  And the host family paid you your
weekly stipend for those weeks that you were out of
town?
A.   Yes.
Q.   Okay.  Were there any other trips that
you took?
A.   New York City and Boston.
Q.   And this is --
A.   And --
Q.   Go ahead.
A.   Niagara Falls.  I think that's it.
Q.   Okay.  And how many days did you spend
in New York City?
A.   Oh, always just -- just a day.  We went
a few times, but never overnight.
Q.   Was that with the host family?
A.   No.
Q.   No.  And Boston, how many days?

---

67

A.   A weekend.
Q.   And that was with the host family?
A.   No.  I went with the host family, you
know, before -- that was what I mentioned was with the
host family, and then I went again with au pairs.
Q.   Okay.  And the Niagara Falls trip?
A.   That was actually part of a class.  We
had a few credits required to fulfill the J-1 program
with InterExchange.  So this was one of the classes.
We went to a few -- like actual classes in New York,
and then there was the trip, Friday through Sunday.
Q.   And these -- these trips that you took
without -- without the host family, Philly, D.C.,
Delaware, or Maryland, New York City, Boston, and
Niagara Falls, who paid for those trips?
A.   I paid for them.
Q.   Okay.  Did the host family ever give you
pocket -- pocket money for those trips?
A.   No.
     MR. PACHECO:  Objection.
Q.   (BY MR. HUNT)  And the Niagara Falls
trip, that was part of the class?
A.   Yes.
Q.   Did the -- did your school pay for any
of that?

---

68

A.   The way it worked, you paid for the
class, and then everything was included.  I mean, once
we got there, if we wanted to eat or go to whatever,
if they had -- we had to pay the covers for that.
That wasn't part of the program.
     But the -- the bus ride back and forth
and the class and the hotel, that was paid -- that
was -- that was the class cost.
Q.   Okay.  And did your host family pay for
the class?
A.   They paid the 500 that they were
required to pay.  The rest, I paid myself.
Q.   Okay.  Did your host family or
InterExchange provide you with a journal or a log for
you to keep?
A.   I think that was the journal that my
host mom used for the schedule.
Q.   Okay.  No other journals?
A.   I don't recall.
Q.   Did anyone from InterExchange supervise
you while you were taking care of the children?
A.   No.

[redacted]

---

17 (Pages 65 to 68)

**69**

Q. Okay. You mentioned those courses, those classes that you were taking. Do you know whether you took six credits of classes while you were an au pair?

A. I did.

Q. You did. What was the university or college or institution at which you took the classes?

A. I went to Raritan Valley for some English classes. And the Niagara Falls was different, but I don't remember the name of the school.

Q. Okay. Let me back up, and I want to ask you about those trips to Cape Cod and Boston and Florida that you -- that you took with -- with the host family. Did they pay for everything while you were on the trip?

MR. PACHECO: Objection.

A. No.

Q. (BY MR. HUNT) What did they not pay for?

A. They didn't pay for food, or if I wanted something, some souvenir, they didn't pay for that.

**70**

Q. Okay. They didn't pay for your meals?

A. Not all meals, no.

Q. Not all meals.

And we were talking about the local coordinator, Debbie.

A. Yes.

Q. How many times did you meet with her in person?

A. I don't remember.

Q. Did you ever meet with her in person at the Donahue home?

A. Yes.

Q. How many times?

A. I don't know.

Q. Fewer or more than five?

A. I don't think so.

Q. You don't think it was fewer or you don't think it was more than five?

A. I don't think it was more than five.

Q. Okay. And then -- and did she supervise you -- did she supervise the child care that you were providing the family?

A. Are you asking if she was actually there watching me, person to person?

Q. Yes.

**71**

A. No, she didn't.

Q. Did she supervise any of your duties as an au pair?

A. No.

Q. Did she pay you any money?

A. No.

Q. Or pay you any stipend?

A. No.

Q. Do you remember interacting with anyone else from InterExchange while you were an au pair?

A. Yes.

Q. Who was that?

A. I don't remember names.

Q. And how many times did you interact?

A. I don't remember.

Q. Do you know with whom -- with whom -- or do you know how many people at InterExchange did you communicate with?

A. I don't know.

Q. Okay. But none of them supervised any of your duties as an au pair?

A. Right, none of them did.

MR. PACHECO: Objection.

Q. (BY MR. HUNT) You -- you've -- you've been asked to -- well, we've asked you to provide

**72**

documents in connection with this lawsuit. Have you searched for any documents that might relate to this lawsuit?

A. I have.

Q. Did you find any?

A. No.

Q. Do you have any of the documents that were given to you by the Student Agency, the international cooperator related to your participation in the au pair program?

A. I haven't found --

MR. PACHECO: Objection, foundation.

Q. (BY MR. HUNT) And despite the objection, you can -- you can answer.

A. I haven't found any.

Q. Okay. Do you have any documents such as emails or -- or social media related to your work as an au pair?

A. That, I don't know.

Q. Did your host family pay you by cash or check or electronic transfer or another way?

A. Either PayPal or cash.

Q. Meaning that there was a variety of methods of payments that the host family used?

A. Yes.

18 (Pages 69 to 72)

LUCIE VOCETKOVA - 3/22/2018

Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

73

1    MR. PACHECO: Objection.
2    **Q. (BY MR. HUNT) Okay. Do you keep**
3    **records of that -- of your PayPal transactions?**
4    A. I lost access to it, so no.
5    **Q. You don't have a PayPal account anymore?**
6    A. I -- I do. I just -- I can't get to it.
7    It's connected to my old number. I -- I've been
8    trying to get in, and it's been a struggle. I -- I
9    don't -- it's there. I still get notices. I just
10   can't get in.
11   **Q. Okay.**
12   A. I don't have access.
13   **Q. Did you keep any records of the hours**
14   **that you worked for your --**
15   A. Yes.
16   **Q. You did? Where are those records?**
17   A. I probably threw them out.
18   **Q. You threw them out. When did you throw**
19   **them out?**
20   A. I don't remember exactly when.
21   **Q. Was it before or after you joined the**
22   **lawsuit, this lawsuit?**
23   A. Definitely before.
24   **Q. Okay. Do you believe your host family**
25   **owes you money today?**

---

74

1    A. Yes.
2    **Q. Why?**
3    A. We talked about before, I worked more
4    hours that I wasn't paid for. I don't think she had a
5    right to not pay me at the end of my stay. And also,
6    even though the 195.75 sounds good when I was in my
7    country, I said that before it sounded good, I will
8    make some good money here, it's nothing when you get
9    here. Things cost more. The cost of living is higher
10   than my country. It's -- you're getting nothing. I
11   don't think it's a fair pay, it's a good pay for the
12   au pair.

25   **Q. Okay. And have you -- you said that you**

---

75

1    were owed money. Have you calculated how much money
2    you believe you were owed?
3    MR. PACHECO: Objection.
4    A. No.
5    **Q. (BY MR. HUNT) Do you know how much --**
6    **or can you tell me how much you believe your host**
7    **family owes you?**
8    A. I -- I said I don't know. I never
9    counted it. There was no reason to.
10   **Q. Okay. Do you believe InterExchange owes**
11   **you any money?**
12   MR. PACHECO: Objection.
13   A. I don't know how to answer.
14   **Q. (BY MR. HUNT) Can you try your best?**
15   A. Can you specify your question more?
16   **Q. Sure. You said that the host family**
17   owed you money because of those few weeks at the end
18   and that -- and due to the fact that you worked more
19   than 45 hours a week on occasion, and that was the
20   reason that -- that the host family owes you money.
21   Are there any reasons why InterExchange
22   owes you money?
23   MR. PACHECO: Objection.
24   A. I don't want to answer.
25   **Q. (BY MR. HUNT) Excuse me?**

---

76

1    A. I don't want to answer. I don't think
2    this is -- I don't know.
3    **Q. Well, I'm sorry that you may feel in an**
4    **uncomfortable position, but you are required to**
5    **answer.**
6    A. It's kind of a confusing question,
7    because InterExchange never paid au pairs in the first
8    place, so the answer would be no. But their contract
9    sets the minimum price, which puts them in a place
10   where they should, you know, set at least a minimum
11   wage. It's a difficult question.
12   **Q. Did you make any complaints besides the**
13   **one that you -- besides the ones that you've**
14   **mentioned, any other complaints to your host family,**
15   **InterExchange, the Department of State, about your**
16   **experience as an au pair?**
17   MR. PACHECO: Objection, form,
18   foundation.
19   A. I spoke to the host family about
20   anything that was going on. We spoke about it.
21   **Q. (BY MR. HUNT) And can you describe the**
22   **details of the complaint, excluding -- excluding the**
23   **complaint that you talked about earlier?**
24   A. Right. I can't remember an exact
25   example.

---

19 (Pages 73 to 76)

LUCIE VOCETKOVA - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

77

1     Q. Okay. Meaning you didn't make any
2 complaint, or you did make a complaint but you can't
3 remember the details of it?
4     A. I made a complaint.
5     MR. PACHECO: Objection.
6     A. I don't remember detail.
7     Q. (BY MR. HUNT) Okay. Do you remember if
8 the complaint was resolved?
9     A. I don't remember.
10     MR. HUNT: Let's take a five-minute
11 break, and I'm -- if we can go off the record.
12     THE DEPONENT: Okay.
13     (Recess taken, 4:46 p.m. to 4:59 p.m.)
14     Q. (BY MR. HUNT) We'll be back on the
15 record.
16     Ms. Vocetkova, excuse me, you extended
17 your stay as an au pair with the Donahues; is that
18 right?
19     A. Yes.
20     Q. Why did you make that decision?
21     A. I actually don't recall exactly why.
22 I -- oh, wow. I wasn't done; I wanted to stay more.
23 Really good question. I can't remember -- I can't
24 remember the exact reason why I decided to stay
25 longer. I'm not -- oh, wow, I -- this is

78

1 embarrassing. I don't know.
2     Q. When you made the decision, were you --
3 were you satisfied with the Donahues and your
4 experience as an au pair?
5     A. Yes, for the most part.
6     Q. Okay. You mentioned earlier that you
7 tracked hours worked. I was just curious, how did you
8 track the hours worked? Was it by -- electronically,
9 by hand, some other form?
10     A. It was by hand. We had the notebook
11 from InterExchange that we both tracked the hours in.
12 And I mentioned it before. I'm sure she -- that's how
13 she would give me my schedule, and then if it changed,
14 I would, you know, put the actual hours that I worked.
15 And at the end of each, I would count the amount of
16 hours that I worked. That was more for me than her.
17 I don't know if she looked at it.
18     Q. So you don't know whether she was aware
19 that you were working more than 45 hours per week
20 until you brought it to her attention?
21     MR. PACHECO: Objection.
22     A. No. The way she was, I believe she knew
23 exactly how many hours I worked.
24     Q. (BY MR. HUNT) And when you say "she,"
25 you're referring to the host mom?

79

1     A. Yes. She was in charge of most of the
2 things that -- you know, the communication and the
3 kids, the hours. I always talked to her.
4     Q. Okay. How did she know how many hours
5 you were working if she was outside of the home during
6 those time periods?
7     MR. PACHECO: Objection.
8     A. I'm not sure I understand. We had the
9 schedule.
10     Q. (BY MR. HUNT) Okay. So did the
11 schedule reflect that you were working -- and the
12 hours -- I'm sorry. Let me say that again.
13     Did the schedule show that you were
14 working more than 45 hours a week?
15     A. Yes.
16     Q. So that's how the host mom was aware
17 that you were working more than 45 hours a week?
18     A. Yes. She scheduled me for however she
19 needed me, and she knew very well if it was more.
20     Q. Okay. Did you ever leave work early?
21     A. No.
22     Q. And did you have any other source of
23 income while you were in the United States as an
24 au pair?
25     A. No.

80

1     Q. No?
2     A. No.
3     Q. Did you ever acquire a babysitting job?
4     A. If I required a babysitting job?
5     Q. Did you ever obtain a babysitting job?
6     MR. PACHECO: Objection, form.
7     A. I'm not understanding still.
8     Q. (BY MR. HUNT) I'm sorry.
9     A. For somebody else's family?
10     Q. I apologize. Let me rephrase.
11     Did you ever work for another family?
12     A. No.
13     Q. Did you ever babysit other kids?
14     A. Yes.
15     Q. Were you ever paid for that work,
16 babysitting other kids?
17     A. No.
18     Q. No?
19     A. No.
20     Q. Okay. By other parents or your host
21 parents?
22     A. No.
23     MR. PACHECO: I'm just going to object
24 to the foundation because I don't know what time
25 period you're talking about. But I assume from your

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LUCIE VOCETKOVA - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

81

```
1    last question you're talking about the au pair time
2    period.
3              MR. HUNT:  That's right.
4         Q.  (BY MR. HUNT)  Does that change your
5    answer, Ms. Vocetkova?
6         A.  No, I don't want to change my answer.
7         Q.  Did your host family ever accuse you of
8    working for another family or complain that you were
9    working for another family?
10        A.  No.
11             MR. HUNT:  Well, thank you for your
12   time.
13             Mr. Pacheco, you may have questions.
14             MR. PACHECO:  Give me one second.  We
15   don't need to go off the record, but just give me ten
16   seconds.
17             MR. HUNT:  You got it.  Actually,
18   take -- take your time.
19        Q.  (BY MR. HUNT)  I do have one more
20   question, Ms. Vocetkova.
21             Is there anything that you -- you
22   thought I might ask about but didn't?
23        A.  No, I don't think so.
24             MR. HUNT:  Okay.  Thank you.
25             MR. PACHECO:  This is Byron Pacheco.
```

82

```
1    Can I go ahead, Joe?
2              MR. HUNT:  Yes.
3                   EXAMINATION
4    BY MR. PACHECO:
5         Q.  Thank you for being with us this
6    afternoon slash evening.  I just have a couple short
7    questions for you.
8             At the beginning of the deposition, you
9    were asked a question about whether InterExchange
10   advertised the program as a cultural exchange, and you
11   answered, quote, "They did," unquote.  Do you remember
12   that question and answer?
13        A.  I do remember.
14        Q.  Having participated in the au pair
15   program, do you believe that the advertisement is
16   correct, that it is a cultural exchange program?
17        A.  I don't think it was correct.
18        Q.  What is the basis for that belief?
19        A.  Because when I came, all we did -- I
20   mean, it was more work than travel.  We had to work at
21   least 45 hours a week and then go to school.  That
22   only gave us weekends and not really enough money to
23   actually travel anywhere.
24             So I -- when I saw the advertisement, I
25   had planned to go here and go there and go around
```

83

```
1    East Coast.  I never had enough money to go, never had
2    enough time to go.  So I don't think it's true, their
3    advertisement.
4         Q.  In a given week, could you estimate what
5    percentage of time you spent working versus what
6    percentage of time you spent doing what you would
7    consider cultural exchange activities?
8         A.  Well, I have to guess.  It -- it felt
9    like 90 to 10, 90 working, but it was definitely less.
10   Probably 75, 80 working.
11        Q.  And this is in an average week, correct?
12        A.  Yes.
13        Q.  And you had some weeks where you were on
14   vacation and took trips; is that right?
15        A.  Yes.
16        Q.  So setting aside the trips that you
17   took, in an average week most of your time was spent
18   working; is that correct?
19        A.  Yes.
20             MR. PACHECO:  That's all I have for now.
21                   EXAMINATION
22   BY MR. HUNT:
23        Q.  Just a couple follow-ups.  When you
24   estimated -- you made the estimates earlier that --
25   about 75 percent, I think you said, to 80 percent.
```

84

```
1    You're referring to the workweek and excluding the
2    weekends; is that correct?
3         A.  I'm including the weekends.
4         Q.  You're including the weekends.
5         A.  On an average week, yes, I included the
6    weekends.
7         Q.  You also said that you weren't -- that
8    you only worked one weekend per month, so --
9         A.  One or two.
10             MR. HUNT:  Okay.  All right.  That's it.
11             MR. PACHECO:  I also have no more
12   questions.
13             MR. HUNT:  Thank you very much for your
14   time, both of you.
15             MR. PACHECO:  Thank you, Joe.  Thank
16   you, Lucie.
17             (Discussion off the record.)
18             MR. PACHECO:  It's fine, we'll leave
19   signature for now because I want to make sure that I'm
20   consistent with what other people have been doing in
21   these depos.
22             WHEREUPON, the within proceedings were
23   concluded at the approximate hour of 5:12 p.m. on the
24   22nd day of March, 2018.
25             *     *     *     *     *
```

21 (Pages 81 to 84)

**LUCIE VOCETKOVA - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

85

        I, LUCIE VOCETKOVA, do hereby certify
that I have read the above and foregoing deposition
and that the same is a true and accurate transcription
of my testimony, except for attached amendments, if
any.

        Amendments attached   (  ) Yes   (  ) No


        _____
        LUCIE VOCETKOVA


        The signature above of LUCIE VOCETKOVA
was subscribed and sworn or affirmed to before me in
the county of _____, state of
_____, this _____ day of
_____, 2018.


        _____
        Notary Public
        My Commission expires:



Johana Paola Beltran 3/22/18 (tcm)

---

86

                REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                         )  ss.
CITY AND COUNTY OF DENVER )

        I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said LUCIE VOCETKOVA was duly
sworn or affirmed by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.
        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 26th day of March, 2018.

        My commission expires April 24, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 1:14-cv-03074-CMA-KMT Document 1005-15 Filed 06/06/18 USDC Colorado Page 40 of 204

LUCIE VOCETKOVA

86

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


            I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said LUCIE VOCETKOVA was duly
sworn or affirmed by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

            I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

            IN WITNESS WHEREOF, I have affixed my
signature this 26th day of March, 2018.

            My commission expires April 24, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




_____
Tracy C. Masuga
Certified Realtime Reporter
Registered Professional Reporter

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3  _____

4            VIDEOCONFERENCE DEPOSITION OF:
                 WENDY PAOLA RIVERA ARIAS
5                    March 22, 2018

6  _____

   JOHANA PAOLA BELTRAN, et al.,
7
   Plaintiffs,
8
   v.
9
   INTEREXCHANGE, INC., et al.,
10
   Defendants.
11 _____

12
           PURSUANT TO NOTICE AND STIPULATION, the
13 videoconference deposition of WENDY PAOLA RIVERA ARIAS
   was taken on behalf of the Defendants at 1900 Grant
14 Street, Suite 1025, Denver, Colorado 80203, on
   March 22, 2018, at 6:37 p.m., before Tracy C. Masuga,
15 Registered Professional Reporter, Certified Realtime
   Reporter, and Notary Public within Colorado.
16

17

18

19

20

21

22

23

24

25
```

H+G

Hunter + Geist, Inc.

303.832.5966        1900 Grant Street, Suite 1025        ▪ www.huntergeist.com
800.525.8490        Denver, CO 80203                      ▪ scheduling@huntergeist.com

Your Partner in Making the Record

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____
VIDEOCONFERENCE DEPOSITION OF:
WENDY PAOLA RIVERA ARIAS
March 22, 2018
_____

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____

PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of WENDY PAOLA RIVERA ARIAS
was taken on behalf of the Defendants at 1900 Grant
Street, Suite 1025, Denver, Colorado 80203, on
March 22, 2018, at 6:37 p.m., before Tracy C. Masuga,
Registered Professional Reporter, Certified Realtime
Reporter, and Notary Public within Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiffs:
        SEAN A. PETTERSON, ESQ.
        Boies, Schiller & Flexner, L.L.P.
        575 Lexington Avenue
        7th Floor
        New York, New York 10022

For the Defendants:

        ALYSSA L. LEVY, ESQ.
        JOSEPH H. HUNT, ESQ.
        Sherman & Howard L.L.C.
        633 17th Street
        Suite 3000
        Denver, Colorado 80202

Also Present:

        James McKenzy, Interpreter

        Ms. Rivera Arias was located at 232
Coligni Avenue, New Rochelle, New York 10801,
914-844-9004.
        Mr. Hunt, Ms. Levy, Mr. McKenzy, and
Ms. Masuga, the court reporter, were located at
1900 Grant Street, Suite 1025, Denver, Colorado 80203,
303-832-5966.

        Mr. Petterson was located at 575
Lexington Avenue, 7th Floor, New York, New York 10022,
212-754-4272.

---

**3**

I N D E X
EXAMINATION OF WENDY PAOLA RIVERA ARIAS:        PAGE
March 22, 2018

By Ms. Levy                                  4, 59, 61

By Mr. Petterson                               57, 60

                                               INITIAL
DEPOSITION EXHIBITS:                          REFERENCE
Exhibit 1    Consentimiento Para Unirse            16
             (Conforme al Codigo de los Estados
             Unidos (United States Code, USC)
             29, Section 216(b), by Wendy Paola
             Rivera Arias, 7/6/17
Exhibit 2    InterExchange Au Pair USA             16
             Pre-Application Information, 7/9/16

Exhibit 3    Au Pair Agreement with Wendy Paola    29
             Rivera Arias, 7/8/16

---

**4**

1    WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4         *    *    *    *    *
5    (Deposition Exhibits 1 through 3 were
6  marked.)
7    MS. LEVY:  All right.  Sean, before we
8  start, I would just ask if you could stipulate on the
9  record that the court reporter can swear in Ms. Rivera
10  over Zoom because we are in different locations.
11    MR. PETTERSON:  That works for us, yes.
12    MS. LEVY:  Great.
13    JAMES McKENZY,
14  having been first duly sworn to interpret verbatim
15  Spanish into English and English into Spanish, and
16    WENDY PAOLA RIVERA ARIAS,
17  having been first duly sworn to state the whole truth,
18  testified as follows:
19    (Interpreter's response to oath:  "To
20  the best of my ability, yes, I do.")
21    (Deponent's response to oath:  "I
22  swear.")
23    EXAMINATION
24  BY MS. LEVY:
25    **Q.  Okay.  Ms. Rivera, my name is Alyssa**

1 (Pages 1 to 4)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**5**

Levy.  I'm from the law firm of Sherman & Howard, and I'm a lawyer for InterExchange, and I will be asking you the questions today.

Ms. Rivera, your attorney has stated that you require an interpreter.  So I will ask you a question, the interpreter will repeat it to you in Spanish, and then you can give your answer in Spanish, okay?

A.  Okay.

Q.  And if there's a question you do not understand, please tell me so that I can ask it again, okay?

A.  Okay.

Q.  Have you ever had your deposition taken before?

A.  No.

Q.  And you understand that you are under an oath to tell the truth, correct?

A.  Yes.

Q.  Please listen to the entire question before you begin your answer, okay?

A.  Okay.

Q.  And I will -- and I will let you finish your answer before I start my next question, okay?

A.  All right.

---

**6**

Q.  And your attorney may object to one or more of my questions, but unless he tells you not to answer the question, you will need to answer every question, okay?

A.  Okay.

Q.  Ms. Rivera, did you review any documents prior to this deposition?

A.  Yes.

Q.  What did you review?

A.  About this suit and this agency and the au pairs.

Q.  Are you able to be any more specific which documents those were?

A.  The initial document where -- that was filed about this suit that the au pairs were bringing up this suit against.

It was the document where we had agreed to be united in this suit as all au pairs, and also when -- and the document regarding questions we had to answer regarding -- about this suit.

Q.  And did any -- any of those documents that you reviewed remind you of any facts that you had forgotten before you reviewed them?

MR. PETTERSON:  Objection.

A.  I don't understand.

---

**7**

Q.  (BY MS. LEVY)  Those documents that you just told us that you reviewed, did they remind you of anything that you had forgotten about?

MR. PETTERSON:  Objection.

A.  I still don't understand.

Q.  (BY MS. LEVY)  Do you remember, or is it a "no"?

A.  No.

Q.  Okay.  All right.  Ms. Rivera, I'm going to pull up a document on the screen.  Are you able to see this document on your screen?

A.  Yes.

Q.  Okay.  This document was presented to us as the opt-in form for a Ms. Rivera.  Do you recognize this document?

A.  Yes.

Q.  And is that your electronic signature?

A.  Yes.

Q.  Okay.  Did you understand this document to be your joining of the lawsuit against InterExchange?

A.  Yes.

Q.  How did you first learn about the lawsuit against InterExchange?

A.  Through an email.

---

**8**

Q.  Who was the email from?

A.  The lawyers that are representing the au pairs.  From the lawyers that are representing the au pairs.

Q.  When did you receive that email?

A.  Can you repeat?

Q.  When did you receive the email from the lawyers about the lawsuit against InterExchange?

A.  Last year.  Last year.  I don't remember the date, but it was last year.

Q.  Do you remember if it was in the beginning of the year or the end of the year?

A.  Middle of the year.

Q.  Ms. Rivera, what is your understanding of what the lawsuit is about?

A.  Yeah, this has to -- what I understand about this is that it has to do with asking for a better pay, and also to be more competitive, with all the other workers that are -- that do the same thing here, because relatively we do the same thing.

Besides this, when we do come here from our different countries, we're presented this from a different perspective.

Q.  Ms. Rivera, you lived with a family in New York, correct?

---

2 (Pages 5 to 8)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

9

1    A.  (In English)  Yes.
2    A.  (Through the interpreter) Yes.
3        MR. PETTERSON:  Ms. Rivera, just do the
4    Spanish translation, okay?
5        THE DEPONENT:  Yes.
6    Q.  (BY MS. LEVY)  Do you know if this
7    lawsuit has anything to do with the amount of money
8    you were paid by the family you lived with in
9    New York?
10   A.  I don't understand.
11   Q.  Do you know if this lawsuit has to do
12   with the -- the money that you were paid when you
13   lived with your host family?
14   A.  Yes.
15   Q.  And what is your understanding of that?
16   A.  What I understand is that they would
17   make a payment to the au pairs and also a payment to
18   the agency -- or agencies.
19   Q.  Ms. Rivera, when you first came to the
20   United States for the au pair program, what did you
21   believe that you were going to be paid by the family
22   that you would live with?
23   A.  When we were -- when we heard about this
24   in Colombia, we all understood that we would be paid
25   the same amount, which would be $195.75.

---

10

1    Q.  Ms. Rivera, did you have more to add?
2    A.  And in our countries, we consider this a
3    lot of money.  And the people that tell us about the
4    program, they -- they put a lot of -- they put a lot
5    of dreams into our heads about it.
6    Q.  Who told you about the program?
7    A.  It was in my country at the university,
8    which is -- which is very popular.
9    Q.  And are you referring to the au pair
10   program in general, or specifically InterExchange?
11   A.  The program.
12   Q.  Is there an agency at your university, a
13   local agency?
14   A.  Yes.
15   Q.  What's the name of that agency?
16   A.  ISC Colombia.
17   Q.  Before learning of the lawsuit, did you
18   have concerns about what you were paid?
19   A.  Yes.
20   Q.  What were those concerns?
21   A.  That it was very little.
22   Q.  Was that before or after you came to the
23   United States?
24   A.  After.
25   Q.  Ms. Rivera, where -- where were you

---

11

1    living when you signed that opt-in form that we just
2    showed you?
3    A.  At my host family's house.
4    Q.  Did you discuss the lawsuit with your
5    host family?
6    A.  Yes.
7    Q.  Can you describe that conversation?
8    A.  I commented to them that I had received
9    this email about this pending lawsuit from the
10   au pairs against these agencies, and they told me,
11   well, it was my decision if I wanted to go -- to
12   participate or -- because for them, they were just
13   neutral about it.
14   Q.  Did you discuss the lawsuit with any
15   other au pairs?
16   A.  Yes.
17   Q.  Can you describe that conversation?
18   A.  Many of them had told me that they had
19   received the same email, and they all thought it was
20   good to get -- to get to -- to unite because it was
21   unjust.
22   Q.  When did you have these conversations
23   with the other au pairs?
24   A.  After receiving these emails.
25   Q.  Do you remember when that was?

---

12

13   Q.  And you lived with the Moss family; is
14   that right?
15   A.  Yes.
16   Q.  Do you still communicate with the Moss
17   family?
18   A.  No.
19   Q.  Ms. Rivera, have you received any
20   surveys or questionnaires in connection with this
21   lawsuit?
22       MR. PETTERSON:  Objection.
23   A.  Yes.
24   Q.  (BY MS. LEVY)  And who sent them to you?
25   A.  The attorneys.

---

3 (Pages 9 to 12)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

13

1    Q.  Do you know which attorneys?
2    A.  No.  But I don't remember the emails,
3  where they came from or who they were.
4    Q.  Did you -- did you answer the questions
5  that were sent to you?
6    A.  Yes.
7    Q.  And did you send it back to the
8  attorneys that sent it -- sent the questions to you?
9    A.  Yes.
10    Q.  Do you remember how many questions there
11  were?
12    A.  No.
13    Q.  Do you remember if there were more or
14  less than 20 questions?
15    A.  More.
16    Q.  Ms. Rivera, when you first learned about
17  the au pair program at university, what did you do to
18  get more information about the au pair program?
19    A.  Me and some of my girlfriends, we went
20  to this agency that was in Bucaramanga to ask more
21  about the program.
22    Q.  Was that agency ISC Colombia?
23    A.  Yes, and there were two others.
24    Q.  What were the names of the other
25  agencies?

---

14

1    A.  Cultural Care and One 800.  "One" is
2  spelled out, and then "800." In Colombia.
3    Q.  Did you go to offices of these three
4  agencies, or did they recruit you?
5    A.  I went to the three agencies, but it was
6  just ISC Colombia that recruited me.
7    Q.  Can you define the word "recruit" as you
8  understand it?
9    A.  They offered the program to me, and I
10  accepted it.
11    Q.  How did you decide to apply with
12  InterExchange?
13    A.  Because that agency had three other
14  agencies that they used in the United States.  One was
15  called CHI Au Pair, another one was Au Pair
16  Foundation, and the other one InterExchange.
17    MS. LEVY:  Could you -- if you could
18  just translate exactly what she's saying.  Is that --
19  is that what she's saying to you, or are you
20  explaining it?
21    THE INTERPRETER:  That's what she said.
22    Q.  (BY MS. LEVY)  Would you repeat that?
23    A.  The agency in Colombia had three
24  agencies they worked with, CHI Au Pair, Au Pair
25  Foundation, and InterExchange.

---

15

1    And the person that was in charge
2  registered me for the -- for InterExchange.
3    Q.  You had mentioned that you went over to
4  the agency's office with your friends.
5    A.  With a -- with a friend, a girlfriend.
6    Q.  Did your friend know about
7  InterExchange -- or did your friend also sign up with
8  InterExchange?
9    A.  No.
10    Q.  Did ISC Colombia give you information
11  about InterExchange?
12    A.  No.  They just registered me.
13    Q.  Did you ask any questions before you
14  were registered with InterExchange?
15    A.  No.
16    Q.  What interested you about becoming an
17  au pair?
18    A.  To improve my English, to get paid in
19  dollars, and to be able to live in another country.
20    Q.  How did ISC Colombia explain -- did ISC
21  Colombia explain the program to you in a -- did they
22  advertise it to you in a certain way?
23    MR. PETTERSON:  Objection.
24    A.  Yes.  They all offer the program the
25  same way.

---

16

1    Q.  (BY MS. LEVY)  Do they tell you anything
2  about what you will be doing in the program?
3    A.  Yes.
4    Q.  And what do they tell you?
5    A.  They say -- they say that I would be
6  taking care of children, I would be working 45
7  weeks -- I'm sorry, 45 hours a week, and I would be
8  independent of weekends and be paid $195.75.  I would
9  be able to travel a lot, learn English, and even
10  travel on trips with the family and get gifts from the
11  family.
12    Q.  Can you -- I'm going to pull up another
13  document on the screen here.  And this is going to be
14  Exhibit 2.
15    And just to be clear, the opt-in form we
16  showed earlier was Exhibit 1.
17    Ms. Rivera, this is the pre-application
18  form from InterExchange.  Do you recall completing
19  this application?
20    THE INTERPRETER:  Interpreter requests a
21  clarification.  Pre what?
22    MS. LEVY:  Pre-application.
23    A.  If you can lower it.
24    MR. PETTERSON:  Go slow so she can read
25  it.  Go nice and slow so she can understand the

---

4 (Pages 13 to 16)

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

17

1  document.
2        MR. HUNT:  Is that helpful or is that
3  not helpful?
4        THE DEPONENT:  A little larger.  That's
5  good.
6        MS. LEVY:  Can you go to the bottom of
7  that page?
8        Q.  (BY MS. LEVY)  Ms. Rivera, do you
9  remember this document?
10       A.  Yes.
11       Q.  All right.  On the bottom -- we're going
12  to scroll down to the bottom of this first page.  Are
13  those your initials in the bottom right corner?
14       A.  Yes.
15       Q.  And I'm going to ask you the same
16  question for the second page.  We're going to scroll
17  down.  Are those your initials there?
18       A.  Yes.
19       Q.  Same for the third page:  Are those your
20  initials there?
21       A.  Yes.
22       Q.  And the fourth page?
23       A.  Yes.
24       Q.  Okay.  All right.  And then the same,
25  bottom of the fifth page?

18

1        A.  Yes.
2        Q.  And then in the middle of this page --
3  we're going to scroll back up -- is that your
4  signature there?
5        A.  Yes.
6        Q.  And did you read this document before
7  you signed it?
8        A.  Yes.
9        Q.  Were you in Colombia when you received
10  this document?
11       A.  Yes.
12       Q.  Did you ask anyone in Colombia to help
13  you read this document?
14       A.  No.
15       Q.  Did you ask anyone at ISC Colombia about
16  this document?
17       A.  No.
18       Q.  Before you came to the United States to
19  be an au pair, did you have any communication with
20  InterExchange representatives who were in the United
21  States?
22       A.  It was after I had made -- been made the
23  match that was given to me with that family.  It was
24  only three email, that's all.
25       Q.  Okay.  Ms. Rivera, this document that's

19

1  still on the screen, can you still see it?
2        A.  Yes.
3        Q.  Did you understand this document when
4  you signed it?
5        A.  Yes.
6        Q.  We're going to scroll up back to the
7  first page of this document.  And at the --
8        MS. LEVY:  Go down a little bit.  So
9  this is -- can you go down a little bit more?
10       Q.  (BY MS. LEVY)  On Bates -- this is Bates
11  page 48940.  Do you see in that last paragraph there
12  it says "Wages and Compensation"?
13       A.  Yes.
14       Q.  And it says, "Au pairs are paid at least
15  195.75 per week . . . ."  Do you see that?
16       A.  Yes.
17       Q.  And do you recall reading this
18  information before?
19       MR. PETTERSON:  Objection.
20       A.  Yes.
21       Q.  (BY MS. LEVY)  And when you read this,
22  did anything about the amount concern you?
23       A.  In Colombia, no.
24       Q.  So did you -- did you ask any questions
25  about this weekly amount while you were still in

20

1  Colombia?
2        A.  To who?
3        Q.  To anyone.
4        A.  I didn't know anybody here.
5        Q.  Did you ask anyone any -- any
6  questions -- anyone in Colombia any questions about
7  the weekly amount?
8        A.  No.
9        Q.  Did you have any discussions with any
10  InterExchange representatives in the United States
11  about the stipend?
12       A.  Via email, yes.
13       Q.  And when was that?
14       A.  Once they sent me the email giving me
15  the -- a welcoming to the program and -- on the page.
16       Q.  Was that before or after you matched
17  with a family?
18       A.  On the web page, that's where you see --
19  where you hear about which family you're going to be
20  with.
21       Q.  Ms. Rivera --
22       THE INTERPRETER:  Interpreter stands
23  corrected.
24       A.  When you enter into the web page, that's
25  when you hear about the family that you're going to be

5 (Pages 17 to 20)

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

21

1   with.
2       Q.  (BY MS. LEVY)  Okay.  Ms. Rivera, I'm
3   going to repeat the question I asked because I'm not
4   sure -- I'm not sure I asked it in the best way.
5           When you -- you said you had discussions
6   with InterExchange representatives about the stipend,
7   correct?
8       A.  Not -- not conversations with anybody.
9   It was just like emails, communication with them.
10      Q.  Okay.  When you got the welcome email
11  from InterExchange, was that -- was that when you went
12  on their website?
13      A.  Yes.
14      Q.  Had you gone on their website before you
15  got the welcome email?
16      A.  No.
17      Q.  And when you went on the website, was
18  that the first time -- was that the same stipend that
19  you -- or had you seen that stipend amount before?
20      MR. PETTERSON:  Objection.
21      A.  Yes.  And all these agencies, they say
22  the same thing.  They offer that same amount.
23      Q.  (BY MS. LEVY)  Did you pay any fees to
24  join the au pair program?
25      A.  Yes.

---

22

1       Q.  And do you remember what those fees
2   were?
3       A.  Yes.  When I first registered with the
4   agency in Colombia, they charged $27, and then for me
5   to start the process, I had to pay $120, and once I
6   got the match, then I had a fee of $1,200.
7       Q.  When you started the matching process,
8   do you recall if it was around January 20- -- 2016?
9       A.  I started the process in January 2016,
10  and then with the other agency, I was -- it was
11  June 15, 2016.
12      Q.  And when you say "the other agency," do
13  you mean ISC Colombia?
14      A.  Yes.  When I refer -- when I'm talking
15  about the agency -- that agency, yes, because I also
16  looked at two other agencies.
17      Q.  Why did you choose InterExchange over
18  the other two agencies?
19      A.  Because after I had initiated the
20  process in January, I saw the other agencies didn't
21  have so many families, but yet I still had to wait
22  until June.
23      Q.  So did you choose InterExchange because
24  they had more families for you to choose from?
25          THE INTERPRETER:  Interpreter requests a

---

23

1   repetition of the first part.
2           (The interpreter re-asked the question.)
3       A.  I was going to stop the process, but
4   then the agency in Colombia said, "Well, we have a new
5   connection in the United States that -- let's try to
6   see if you can get in with them."
7       Q.  (BY MS. LEVY)  Was that new connection
8   InterExchange?
9       A.  Yes.
10      Q.  Ms. Rivera, can you tell me about the
11  matching process that you went through to match with
12  your host family?
13      A.  With my host family, you mean?
14      Q.  Yes.
15      A.  I received an email from the Moss family
16  saying that we were -- wanted to interview me, so
17  they -- we set an appointment to meet by Skype, and
18  then I waited another week, and we saw -- I saw the
19  mother, and we decided to make the match.
20      Q.  Were you able to view families on their
21  website that were interested in you?
22      A.  Yes, one family at a time.
23      Q.  And could you communicate with them?
24      A.  Yes.
25      Q.  Who made the decision for you to match

---

24

1   with the Moss family?
2       A.  Well, at that time, I really liked them,
3   and they seemed to like me, so then we decided to make
4   the match.
5       Q.  Did InterExchange assign you to the Moss
6   family?
7       A.  Yes.
8       Q.  Did the Moss family choose you to be
9   their au pair?
10      A.  Yes.
11      Q.  Why do you think InterExchange assigned
12  you to be the Moss family's au pair?
13      MR. PETTERSON:  Objection.
14      A.  Because this was the family that had
15  chosen -- that wanted to -- an au pair, and I was
16  available to be that, be there for InterExchange.
17      Q.  (BY MS. LEVY)  So just to -- I just want
18  to clarify a few things that we just discussed.
19          Do you think InterExchange assigned this
20  relationship, or did the Moss -- did you and the Moss
21  family choose each other?
22      A.  I think each one of us would have the
23  right to choose the person that is best for them.
24      Q.  And by that, do you mean the Moss family
25  could choose their au pair, and you as the au pair can

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

25

```
1    choose your family?
2         MR. PETTERSON:  Objection.
3         A.  Yes.
4         Q.  (BY MS. LEVY)  You said you interviewed
5    with the Moss family by Skype; is that right?
6         A.  Yes.
7         Q.  And how many times did you communicate
8    with them by Skype?
9         A.  Twice.
10        Q.  And the first time you talked to the
11   host family, who was part of the interview?
12        A.  It was me, the parents, and the child.
13        Q.  And the second time, was it just the
14   host mom?
15        A.  Yes.
16        Q.  Was anyone from the -- from ISC Colombia
17   participating in the Skype interviews with the family?
18        MR. PETTERSON:  Objection.
19        A.  No.
20        Q.  (BY MS. LEVY)  Was anyone from
21   InterExchange participating in those interviews?
22        A.  No.
23        Q.  Could you have said no if you were not
24   interested in going to live with the Moss family?
25        A.  I could have, yes.
```

26

```
1         Q.  Okay.  And during the Skype interview
2    with the Mosses, either the first time or the second
3    time, did you talk about how much you would be paid?
4         A.  No.
5         Q.  When did you first learn how much your
6    host family was going to pay you each week?
7         A.  When they offered me the program.
8         Q.  And at the time you talked with the host
9    family on Skype, were you okay with the amount that
10   you understood you would be paid?
11        MR. PETTERSON:  Objection.
12        A.  Yes.
13        Q.  (BY MS. LEVY)  And what was that amount?
14        A.  195.75.  $195.75.
15        Q.  Did you ever ask your host family to pay
16   you more than that amount per week?
17        A.  No.
18        Q.  During the Skype interview with the
19   Mosses, either the first or the second one, did you
20   talk about what you would be doing with the children?
21        A.  Yes.
```

27

```
 2         Q.  And were those the duties that you
 3    actually performed when you lived with the Mosses?
 4         A.  Yes.
 5         Q.  And also during the Skype interview, did
 6    your host family tell you how many hours per day you
 7    would be working?
 8         A.  Yes.
19        Q.  Were those the hours that you ended up
20   working?
21        A.  Sometimes.  Sometimes I would finish up,
22   say, a half-hour or an hour before.
23        Q.  Before you matched with the Moss family,
24   did you communicate with other families?
25        A.  Yes.
```

28

```
1         Q.  How many other families?
2         A.  Six.
3         Q.  Did you talk with any of those families
4    in Skype?
5         A.  With four -- with four, and the other
6    two families by email, and then the match was
7    canceled.
8         Q.  And in any of those Skype conversations
9    or emails, was InterExchange part of that
10   conversation?
11        A.  No.
12        Q.  Okay.
13        MR. PETTERSON:  Is this a good time for
14   a break?
15        MS. LEVY:  Yeah.  I was just thinking
16   the same thing.  All right.  Why don't we take -- does
17   ten minutes sound okay to both of you?
18        THE DEPONENT:  Okay.
19        MR. PETTERSON:  Yeah.
20        MS. LEVY:  Okay.  So let's come back at
21   9:58 your time.
22        MR. PETTERSON:  Okay.
23        MS. LEVY:  Okay.  All right.  We'll see
24   you in ten minutes.
25        (Recess taken, 7:47 p.m. to 7:59 p.m.,
```

7 (Pages 25 to 28)

29

1  after which Mr. Hunt was not present.)
2      Q.  (BY MS. LEVY)  I'm going to show you one
3  more document.  Do you recognize this document?
4      A.  Yes.
5      Q.  Do you need me to scroll through it?
6      A.  Yes.
7      Q.  And this will be Exhibit 3.  Tell me if
8  I'm going too quickly.
9      Ms. Rivera, is that your electronic
10 signature at the bottom of this document on page 7?
11     A.  Yes.  I did that through the Internet.
12     Q.  I'm going to turn your attention to
13 page -- this is Bates numbered page 48929 from
14 InterExchange.  Ms. Rivera, did you read this
15 agreement before you signed it?
16     A.  Yes.
17     Q.  Did anyone assist you with reading it?
18     A.  No.
19     Q.  Okay.  And do you see here it says,
20 "Compensation.  Weekly stipend."  And it says, "I
21 understand that I must be paid by the Host Family at
22 least the minimum U.S. Department of State mandated
23 Weekly Stipend . . . ."  Do you see that?
24     A.  Yes.
25     Q.  And did you understand that when you

30

1  read it?
2      A.  Yes.
3      Q.  You arrived in the United States for the
4  au pair program in October 2016; is that right?
5      A.  Yes.
6      Q.  And did you go to training when you
7  arrived in the United States?
8      A.  Yes.
9      Q.  Was that in New York City?
10     A.  Yes.
11     Q.  What sort of training did you do in
12 New York?
13     A.  Well, it was a two-day training.  The
14 first day they gave us a book about cultural norms or
15 practices in the United States that was -- which would
16 be different than the countries we came from.  And
17 then the second day we had CPR, or cardiopulmonary
18 resuscitation, training.
19     Q.  Did you do any training in Colombia
20 before you came to the United States as an au pair?
21     A.  Like training for what?
22     Q.  Any sort of training online or first
23 aid.
24     A.  No.
25     MR. PETTERSON:  Objection.

31

1      Q.  (BY MS. LEVY)  And after training in
2  New York City, you went to go meet your host family?
3      MR. PETTERSON:  Objection.
4      A.  Yes.  It was after that.



32



Case No. 1:14-cv-03074-CMA-KMT Document 1054-1 filed 06/20/18 USDC Colorado Page 50 of 264

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

**33**



21   Q.  Did the Moss family give you a schedule
22 every week?
23   A.  No.  Almost always it was the same.  It
24 didn't change.
25   Q.  When you first started, did you get a

**34**

1 schedule?
2   A.  No.
3   Q.  How did you know what your schedule
4 would be when you first started?
5   A.  We tried some trials and error, and
6 we -- she would say, "Okay.  Start at 7:30.  No,
7 better start at 7 o'clock," and then we ended up with
8 a schedule.
9   Q.  And it was the same schedule every week?
10   A.  Yes.
11   Q.  How many weeks were you figuring out a
12 schedule before you had your set schedule?
13   A.  Four weeks.
14   Q.  Did anyone from InterExchange ever give
15 you a weekly schedule when you lived with the Moss
16 family?
17   A.  No.
18   Q.  Did you ever keep any sort of a record
19 of the schedule that you had?
20   A.  Something in writing, you mean?
21   Q.  Yes.
22   A.  Yes, at the beginning.
23   Q.  And where -- where is that written
24 schedule now?
25     MR. PETTERSON:  Objection.

**35**

1   A.  I don't know.
2   Q.  (BY MS. LEVY)  You mentioned your
3 schedule before.  Did you work five days a week every
4 week?
5   A.  Yes.
6   Q.  Was that Monday through Friday every
7 week?
8   A.  Yes.
9   Q.  And did you work Saturday or Sunday?
10   A.  Can you repeat?
11   Q.  Did you work Saturday or Sunday?
12   A.  Once or twice in a year.
13   Q.  And are you referring to the whole
14 weekend, or a certain day on the weekend that you only
15 worked once or twice in the year?
16   A.  One of those days.
17   Q.  So did you work -- can you clarify for
18 me, did you usually work on Saturday, or did you
19 usually have Saturday off?
20   A.  No, I had Saturdays off.
21   Q.  And did you usually work on Sundays, or
22 did you have Sundays off?
23   A.  Sundays were free or off.  I just told
24 you that it was like two days in the whole year that I
25 might have worked on one of those days.

**36**

1   Q.  Okay.  And who decided which days -- who
2 decided your schedule?
3   A.  It was based on the work schedule of the
4 parents, and we just decided that that would be Monday
5 through Friday, so that was my work, Monday through
6 Friday.
7   Q.  So was it the mother and the father of
8 the host family, are you saying, that decided your
9 schedule?
10   A.  Yes.
11   Q.  Okay.  Did InterExchange ever tell you
12 which days or hours to work?
13   A.  InterExchange decided on one complete
14 weekend a month, and the rest was based on the
15 schedule we made.
16   Q.  Can you explain what you mean by
17 "InterExchange decided on one complete weekend a
18 month"?
19   A.  InterExchange -- InterExchange says that
20 the au pair has the right to a full weekend once a
21 month.  But, again, it depends on the family, what
22 schedule that they will have for the au pair.
23   Q.  Okay.
24   A.  So some families could want the au pair
25 to work like three weekends in a month if they

9 (Pages 33 to 36)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

37

1   wanted -- want -- if they wanted them to.
2        Q.  Okay.  Like did InterExchange ever tell
3   you -- tell you personally which days that you had to
4   work?  Did that ever come from InterExchange, or was
5   it just the host family that you set the schedule
6   with?
7        A.  No.  It was a decision by the family.
8        Q.  Okay.  Thank you.  How many hours per
9   week did you work for your host family?
10       A.  Between 45 to 48.
11       Q.  And from what you said so far, is it --
12   would it be a correct statement that your hours were
13   about the same every day?
14            MR. PETTERSON:  Objection, misstates her
15   testimony.
16       A.  (In English)  Can you repeat?  I
17   don't --
18       Q.  (BY MS. LEVY)  That was a confusing
19   question.  I'm going to -- I'm going to ask that
20   differently.
21            Were your hours every Monday, were they
22   about the same?
23       A.  Yes.
24       Q.  And was it the same on Tuesday?  Were
25   your hours about the same every Tuesday?

---

38

1        A.  Tuesdays and Thursdays, almost -- almost
2   not -- not the same.  A half an hour or one hour less,
3   but not -- it wasn't always that way.
4        Q.  Okay.  On Wednesdays, were your hours
5   about the same every Wednesday?
6        A.  Mondays, Wednesdays, and Fridays, yes.
7        Q.  And you mentioned your hours were about
8   45 to 48.  When did you work over 45 hours?
9            MR. PETTERSON:  Objection.
10       A.  Well, I would finish out the schedule at
11   6 o'clock.  Some days it would be 5 o'clock.
12       Q.  (BY MS. LEVY)  Was there any -- anything
13   in particular that would cause you to work those extra
14   few hours each week?
15            MR. PETTERSON:  Objection.
16       A.  It was sometimes when maybe she would
17   get home a little later, and also he would be working
18   a little later, the father.
19       Q.  (BY MS. LEVY)  Did you ever, with your
20   host family, work more than ten hours a day?
21       A.  Yes.
22       Q.  Which days was that?
23       A.  Some Tuesdays or Thursdays.
24       Q.  Can you tell me what --

---

39



21       Q.  (BY MS. LEVY)  Were you expected to be
22   on call to take care of the child?
23       A.  No.
24       Q.  When you were living with the Moss
25   family, did you have any concerns or complaints about

---

40

1   the schedule that the Mosses gave you?
2        A.  No.
3        Q.  I apologize if I already asked you this.
4   Before we -- you said that the Mosses paid you $195.75
5   per week.
6        A.  Yes.
7            MR. PETTERSON:  Objection, that's not a
8   question.
9        Q.  (BY MS. LEVY)  Is that the amount the
10   Mosses paid you every week?
11       A.  Yes.  Sometimes 196.
12       Q.  Did they ever pay you more than 196?
13       A.  No.
14       Q.  Did InterExchange ever pay you your
15   weekly stipend?
16       A.  No.
17       Q.  Did the Mosses ever give you any extra
18   money for any reason?
19       A.  Like what?

---

10 (Pages 37 to 40)

Case No. 1:14-cv-03074-CMA-KMT Document 1054-4 filed 06/20/18 USDC Colorado pg 52 of 264

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**41**

**42**

**43**

22    Q.  Did you ever take any trips or vacations
23  on your own without your host family?
24    A.  Yes.
25    Q.  Where did you go?

**44**

1    A.  My first trip, I went to France.  Then
2  the second trip to Colombia.
3    Q.  Did your host family pay for anything on
4  either of these trips?
5    A.  No.
6    Q.  How long did you go to France for?
7    A.  One week.
8    Q.  And how long did you go back to Colombia
9  for?
10    A.  One week.
11    Q.  Who told you what duties to perform for
12  your host family?
13    A.  The host family.
14    Q.  And by that, do you mean the mother and
15  the father?
16    A.  The mom.
17    Q.  Did InterExchange ever tell you what
18  duties to perform for the Moss family?
19    A.  In the documents and also when I arrived
20  with the coordinator.
21    Q.  Do you remember who your local
22  coordinator was?
23    A.  Eileen.  I don't remember the last name.
24    Q.  Did you meet with Eileen in person when
25  you lived with the Moss family?

11 (Pages 41 to 44)

Case No. 1:14-cv-03074-CMA-KMT   Document 1054   filed 08/28/18   USDC Colorado   pg 53 of 264

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

45

1    A.  Yes, like the third day.
2    Q.  Did you meet with her more than one time
3  in person?
4    A.  At the au pair meetings.
5    Q.  Where did you meet with Eileen on the
6  third day?
7    A.  At my host family's house.
8    Q.  And what happened during that meeting?
9    A.  She came to the house just to see where
10  I -- where I was staying, to see the family and to
11  know what they expected of me.
12       In fact, there was a problem with the
13  host dad, and -- but my English wasn't so good at that
14  time to talk to them.
15    Q.  What was the problem with the host dad
16  when you arrived at the Mosses' home?
17    A.  He first thought that I wasn't able to
18  communicate very well with the child.
19    Q.  And did you resolve that problem?
20    A.  Yes.  Yes, we did, and we just knew that
21  dealing with the child, we just had to take one step
22  at a time, step-by-step.
23    Q.  Did the local coordinator help you with
24  that?
25    A.  She just said that they had to be

46

1  patient with me because I had just recently arrived
2  and the child was just getting used to me.
3    Q.  And correct me if I'm wrong.  Did you
4  say that Eileen told you what duties to perform with
5  your host family?
6    A.  Yes.
7    Q.  What did she tell you?
8    A.  That she told me about the care -- how I
9  would care for the child and that I would also need to
10  help with some things in the house since I was now a
11  part of the family.
12    Q.  Did she ever tell you anything specific
13  about how to care with the Mosses' child -- care for
14  the Mosses' child?
15       MR. PETTERSON:  Objection.
16    A.  No, just what the documents had
17  already -- had told me, that I needed to be ready to
18  be able to feed the child and change the child, take
19  care of the child, and play with him.
20    Q.  (BY MS. LEVY)  Did Eileen ever supervise
21  you taking care of the child?
22    A.  No.
23    Q.  Did anyone from InterExchange ever
24  supervise you while you were taking care of the child?
25    A.  No.



47

48

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

49

Q. Did you take classes when you lived with the Moss family?

A. Yes.

Q. How many classes did you take?

A. English.

Q. Was it one class?

A. No. There was 72 hours.

Q. Did that amount to six credits, or do you know?

A. I just did those hours.

Q. Other than Eileen, your local coordinator, did you meet with any other people from InterExchange when you lived with the Moss family?

A. I saw another coordinator, but -- but she was the coordinator that worked alongside Eileen during those meetings.

Q. Did you ever talk with the other coordinator?

---

50

A. No.

Q. How did your host family pay you your weekly stipend?

A. Through the bank account.

Q. Was it an electronic payment?

A. Yes.

Q. And do you -- who sent you the electronic payment?

A. From my host mom.

Q. Did you keep records of those payments from your host mom?

A. I suppose so, that the bank has that.

Q. Do you still have access to those records?

A. Yes.

Q. Okay. I would ask that you give those records to your lawyers.

MS. LEVY: And, Sean, I request that you produce those records to us immediately.

MR. PETTERSON: We'll take it under advisement.

Q. (BY MS. LEVY) Other than the weekly stipend, did your host mom or your host dad give you money on any other occasion?

A. No.

---

51

1  Q. And you said you do not have records of
2  the hours that you worked with your host family?
3  A. No, I don't have it.
4  Q. We have asked through your attorney that
5  you search for any documents in connection with this
6  lawsuit. Have you searched for any documents?
7  MR. PETTERSON: Objection.
8  A. What do you mean, searching for them?
9  You want to know if I have some?
10  Q. (BY MS. LEVY) Do you have any documents
11  in connection with this lawsuit?
12  A. Yes, emails.
13  Q. What types of emails?
14  A. The documents, like when we would --
15  were asked to come here, and also the documents
16  regarding the suit.
17  Q. Do you have any documents that are not
18  emails from your attorney?
19  A. No.
20  Q. Do you remember when you first started
21  getting emails from your attorney about this lawsuit?
22  A. Yes.
23  Q. When was that?
24  A. At the middle of the year last year.
25  MR. PETTERSON: Are we coming to a point

---

52

1  of pause? Are you almost done?
2  MS. LEVY: I'm -- I'm getting close to
3  finished.
4  Q. (BY MS. LEVY) But if -- Ms. Rivera, if
5  you need a break, we can take a break after we finish
6  this question. Do you need a break?
7  A. Yes.
8  Q. Okay. Let me -- let me just finish this
9  one question that we're in the middle of, and then
10  we'll take a break, okay?
11  A. Okay.
12  MR. PETTERSON: Was there a question
13  pending?
14  MS. LEVY: You know what? I don't know
15  if there -- I can't remember if there's one pending
16  right now, but I -- if you don't mind, I would like to
17  finish just one or two more questions before we take a
18  break.
19  MR. PETTERSON: Okay.
20  Q. (BY MS. LEVY) Ms. Rivera, on the first
21  document that we looked at tonight, it was your opt-in
22  form, and it was dated July 6 of 2017. Does that
23  sound right to you?
24  A. Yes.
25  Q. Do you think you started receiving

---

13 (Pages 49 to 52)

**WENDY PAOLA RIVERA ARIAS - 3/22/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

53

1   emails from your attorney around that date?
2       A.  Yes.
3       Q.  Do you think it was before or after that
4   date?
5       A.  Before.
6       Q.  How much before that date?
7       A.  Some days.
8       Q.  A few days or a few weeks?
9       A.  A few days.
10          MS. LEVY:  Okay.  Let's take a break for
11  a few minutes.
12          (Recess taken, 9:09 p.m. to 9:19 p.m.)
13      Q.  (BY MS. LEVY)  Ms. Rivera, are you ready
14  to start again?
15      A.  Yes.
16      Q.  You can hear us okay?
17      A.  Yes.
18      Q.  Okay.  Before we took a break, we were
19  talking about documents that you have in connection
20  with this lawsuit.  And did you say you -- you do or
21  you do not have other documents besides emails from
22  your attorney?
23          MR. PETTERSON:  Objection, asked and
24  answered.
25      A.  No, just the emails that had the

---

54

1   documents attached.  That's all I have.
2       Q.  (BY MS. LEVY)  Okay.  Thank you for
3   answering that.
4           Ms. Rivera, do you believe that your
5   host family owes you money?
6       A.  That's difficult to answer.  That's
7   difficult to answer because the family gave a lot of
8   money to the agency.
9       Q.  Do you believe that your host family
10  owes you any money?
11          MR. PETTERSON:  Objection.
12      A.  I don't want to get the family involved
13  now.
14      Q.  (BY MS. LEVY)  Ms. Rivera, I know this
15  is a difficult question, but I still need you to
16  answer it.  Do you believe that your host family owes
17  you any money?
18          MR. PETTERSON:  Objection.
19      A.  No.
20      Q.  (BY MS. LEVY)  Do you believe that
21  InterExchange owes you any money?
22      A.  Yes.
23      Q.  Why is that?
24      A.  Because the families give them a lot of
25  money.  I gave money from Colombia.  That, that's why.

---

55

1       Q.  I just want to make sure that I
2   understand your answer.  You believe InterExchange
3   owes you money because you gave them a lot of money
4   when you were in Colombia; is that correct?
5       A.  I -- I say that the families gave them a
6   lot of money.  I didn't pay as much money from
7   Colombia as the families did.  But in Colombia, that's
8   still a lot of money, what I paid.
9       Q.  Why do you believe InterExchange owes
10  you money because the host family gave them a lot of
11  money?
12      A.  Because they're not the ones that are
13  working the 45 or more hours.
14      Q.  Have you -- do you know how much
15  InterExchange -- you think InterExchange owes you?
16      A.  No.
17      Q.  Did your host family pay you your
18  stipend every single week for every week that you
19  worked for them?
20          MR. PETTERSON:  Objection.
21      A.  Yes.
22      Q.  (BY MS. LEVY)  Did you make any
23  complaints about anything to InterExchange when you
24  were living with your host family?
25          MR. PETTERSON:  Objection.  Other than

---

56

1   what she's already testified to?
2
3
4
5
6
7
8
9       Q.  Ms. Rivera, there was one -- one thing
10  that we discussed very early on tonight that I want to
11  ask you about again.  It was the fees that you paid
12  when you were in Colombia.
13      A.  Okay.
14      Q.  You said there were three different
15  payments that you made; is that correct?
16      A.  Yes.
17      Q.  And who were those three payments to?
18      A.  ISC Colombia.
19          MS. LEVY:  Okay.  I have no further
20  questions at this time.  Sean, do you have any
21  follow-up?
22          MR. PETTERSON:  Yeah.  I just have a
23  couple questions.
24
25

---

14 (Pages 53 to 56)

WENDY PAOLA RIVERA ARIAS - 3/22/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

57

1    EXAMINATION
2    BY MR. PETTERSON:
3       Q.  Ms. Rivera, do you remember testifying
4    earlier about being -- going to a training in New York
5    City?
6       A.  Yes.
7       Q.  Were you paid for that training?
8       A.  No.
9       Q.  Do you remember testifying earlier about
10   working more than ten hours in one day?
11      A.  Yes.
12      Q.  Were you paid overtime when you worked
13   more than ten hours in one day?
14      A.  No.
15      Q.  Do you remember testifying earlier that
16   you would on occasion work more than 45 hours in a
17   week?
18      A.  Yes.
19      Q.  Were you paid more by the Moss family
20   when you worked more than 45 hours a week?
21      A.  No.  It depended if it went beyond the
22   schedule for 6 o'clock.
23      Q.  When you worked until 6 o'clock, would
24   that be more than 45 hours in a week?
25      A.  Yes.

---

58

1       Q.  Did you receive more money when you did
2    that?
3       A.  No.
4       Q.  Do you remember testifying that you were
5    told in Colombia that you would make $195.75 a week?
6       A.  Yes.
7       Q.  When you were told that, did you
8    understand how much you would be able to buy with
9    $195.75 a week?
10      A.  No.
11      Q.  Is $195.75 a week a lot in Colombia?
12      A.  In Colombia, it's almost the minimum
13   wage there, but it's a lot.
14      Q.  When you were told this information
15   about the $195.75 a week, did you understand how much
16   things cost in the United States?
17      A.  No.
18      Q.  Did anybody at ISC ever explain how much
19   you would be able to buy with your salary?
20      A.  No.
21      Q.  When you had problems with the Moss
22   family, do you recall testifying that you spoke to
23   your LCC?
24      A.  Yes.
25      Q.  Why did you speak to these problems

---

59

1    about your LCC --
2       Why did you speak to your LCC about
3    these problems?
4       A.  Because she was the one that was in
5    charge of all the au pairs, and she would be the one
6    to give solutions.
7       Q.  Did the LCC tell you to speak with her
8    if you had any problems?
9       A.  Yes.
10      Q.  Did InterExchange tell you that before
11   you signed the contract with them?
12      A.  Yes.  Yes, they said that the LCC would
13   be the person to talk to to resolve any kind of
14   problems with the au pair -- between the au pairs and
15   the families.
16      MR. PETTERSON:  I have no further
17   questions.  Thank you, Ms. Rivera.
18      MS. LEVY:  I have just a few follow-ups.
19      EXAMINATION
20   BY MS. LEVY:
21      Q.  We were just discussing your -- your
22   hours, and I'm wondering, did you -- did you have any
23   personal time during the week from 7:00 a.m. to
24   6:00 p m.?
25      A.  Yes.  On Mondays, Wednesdays, Fridays, I

---

60

1    did have, we'll say, time for me from 9:15 to 11:45.
2       Q.  And then from 6:00 p.m. until the rest
3    of the night, was that personal time?
4       A.  Well, I would first eat with the family,
5    if we had a family dinner together, and then after
6    that, I could rest.
7       Q.  Was your -- was the family dinner before
8    or after 6:00 p.m.?
9       A.  After.
10      MS. LEVY:  Okay.  I have no further
11   questions, Ms. Rivera.
12      Are you done, Sean, or do you have any
13   more?
14      MR. PETTERSON:  I just have one final
15   question.
16      EXAMINATION
17   BY MR. PETTERSON:
18      Q.  Ms. Rivera, when you were telling us
19   earlier how many hours you worked a week, did you
20   include the time you spent eating dinner with the
21   family?
22      A.  No.
23      MR. PETTERSON:  Okay.  I'm done.  Thank
24   you.
25      MS. LEVY:  I do have one other question.

---

15 (Pages 57 to 60)

## WENDY PAOLA RIVERA ARIAS - 3/22/2018
### Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**61**

1                EXAMINATION
2 BY MS. LEVY:
3       **Q.   Were you -- were you required to eat**
4 **dinner with the family?**
5       A.   No.   No.   I made the dinner, and we all
6 sat down to eat it.
7       MS. LEVY:   Sean, are you done?
8       MR. PETTERSON:   I'm done.   Can we talk
9 on the phone for a second after this, Alyssa?
10       MS. LEVY:   Yes.   All right.   I would
11 request that Ms. Rivera has -- she did mention that
12 she has bank records, and we -- we do need those to
13 show the payments from her host mom, so I request that
14 we leave this deposition open until we can get those
15 bank records.
16       MR. PETTERSON:   Are we on the record
17 still?
18       MS. LEVY:   Yes.
19       MR. PETTERSON:   Okay.   Yeah, I will
20 discuss with -- here internally and we'll get back to
21 you.   I note your request.
22       MS. LEVY:   Okay.   Thank you.
23       WHEREUPON, the within proceedings were
24 adjourned at the approximate hour of 9:40 p m. on the
25 22nd day of March, 2018.

---

**62**

      I, WENDY PAOLA RIVERA ARIAS, do hereby
certify that I have read the above and foregoing
deposition and that the same is a true and accurate
transcription of my testimony, except for attached
amendments, if any.

      Amendments attached   (   ) Yes   (   ) No

      _____
      WENDY PAOLA RIVERA ARIAS

      The signature above of WENDY PAOLA
RIVERA ARIAS was subscribed and sworn or affirmed to
before me in the county of _____, state
of _____, this _____ day of
_____, 2018.

      _____
      Notary Public
      My Commission expires:

Johana Paola Beltran 3/22/18 (tcm)

---

**63**

           REPORTER'S CERTIFICATE
STATE OF COLORADO       )
                     )   ss.
CITY AND COUNTY OF DENVER )

      I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said WENDY PAOLA RIVERA ARIAS was
duly sworn or affirmed by me to testify to the truth
in relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.
      I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

      IN WITNESS WHEREOF, I have affixed my
signature this 26th day of March, 2018.

      My commission expires April 24, 2020.

__X__   Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

---

16 (Pages 61 to 63)

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                          )  ss.
CITY AND COUNTY OF DENVER )


        I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said WENDY PAOLA RIVERA ARIAS was
duly sworn or affirmed by me to testify to the truth
in relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 26th day of March, 2018.

        My commission expires April 24, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.


_____
Tracy C. Masuga
Certified Realtime Reporter
Registered Professional Reporter

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 14-cv-03074-CMA-KMT
 3    _____

 4    VIDEOCONFERENCE DEPOSITION OF:  GORANA MOMCICEVIC
                                      March 23, 2018
 5    _____

 6    JOHANA PAOLA BELTRAN, et al.,

 7    Plaintiffs,

 8    v.

 9    INTEREXCHANGE, INC., et al.,

10    Defendants.

11    _____

12            PURSUANT TO NOTICE AND STIPULATION, the
      videoconference deposition of GORANA MOMCICEVIC was
13    taken on behalf of the Defendants at 1900 Grant
      Street, Suite 1025, Denver, Colorado 80203, on
14    March 23, 2018, at 11:08 a.m., before Tracy C. Masuga,
      Registered Professional Reporter, Certified Realtime
15    Reporter, and Notary Public within Colorado.

16

17

18

19

20

21

22    H+G

23

24    Hunter + Geist, Inc.

25
```

303.832.5966     1900 Grant Street, Suite 1025     ■ www.huntergeist.com
800.525.8490     Denver, CO 80203                  ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

VIDEOCONFERENCE DEPOSITION OF:   GORANA MOMCICEVIC
                                  March 23, 2018
_____

JOHANA PAOLA BELTRAN, et al.,
Plaintiffs,
v.

INTEREXCHANGE, INC., et al.,
Defendants.
_____

        PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of GORANA MOMCICEVIC was
taken on behalf of the Defendants at 1900 Grant
Street, Suite 1025, Denver, Colorado 80203, on
March 23, 2018, at 11:08 a.m., before Tracy C. Masuga,
Registered Professional Reporter, Certified Realtime
Reporter, and Notary Public within Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiffs:
        SEAN A. PETTERSON, ESQ.
        Boies, Schiller & Flexner, L.L.P.
        575 Lexington Avenue
        7th Floor
        New York, New York 10022

For the Defendants:

        ALYSSA L. LEVY, ESQ.
        Sherman & Howard L.L.C.
        633 17th Street
        Suite 3000
        Denver, Colorado 80202

        Ms. Momcicevic was located at
706 Carriage Hill, Apartment 3, Iowa City, Iowa 52246,
319-512-5470
        Ms. Levy and Ms. Masuga, the court
reporter, were located at 1900 Grant Street, Suite
1025, Denver, Colorado 80203, 303-832-5966.
        Mr. Petterson was located at
575 Lexington Avenue, 7th Floor, New York, New York
10022, 212-754-4272.

---

**3**

          I N D E X

EXAMINATION OF GORANA MOMCICEVIC:              PAGE
March 23, 2018

By Ms. Levy                                    4, 73

By Mr. Petterson                               70, 76


                                             INITIAL
DEPOSITION EXHIBITS:                         REFERENCE
Exhibit 1   Consent to Join (Pursuant to          7
            29 U.S.C. Section 216(b)) by
            Momcicevic, 9/23/17
Exhibit 2   AP Agreement Gorana Momcicevic:      33
            InterExchange Au Pair USA Au Pair
            Agreement, 5/6/11

---

**4**

1       WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4       *     *     *     *     *
5       (Deposition Exhibits 1 and 2 were
6  marked.)
7       MS. LEVY:  My name is Alyssa Levy, and
8  I'm from the law firm of Sherman & Howard, and I am
9  the lawyer for InterExchange.  And I will be asking
10 you some questions today.
11      First, Sean, I would like to ask you for
12 a stipulation on the record that we can swear in the
13 deponent over Zoom because we're in different
14 locations than the court reporter.
15      MR. PETTERSON:  That's fine with me.
16      MS. LEVY:  Okay.
17      GORANA MOMCICEVIC,
18 having been first duly sworn to state the whole truth,
19 testified as follows:
20      (Deponent's response to oath:  "Yes.")
21      EXAMINATION
22 BY MS. LEVY:
23      Q.  Could you please state your name for the
24 record.
25      A.  My name is Gorana Momcicevic.

1 (Pages 1 to 4)

**GORANA MOMCICEVIC - 3/23/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**5**

1  Q.  Ms. Momcicevic, am I saying that right?
2  A.  Yes, ma'am.
3  Q.  Okay.  Are you comfortable proceeding
4  with the deposition in English?
5  A.  Yes.
6  Q.  Okay.  If there's a question that you do
7  not understand, please tell me, okay?
8  A.  Okay.
9  Q.  And I can ask it again.
10  Have you ever had your deposition taken
11  before or testified under oath?
12  A.  Yes.
19  Q.  And what was the outcome of that?
20  MR. PETTERSON:  Objection, relevance.
21  Q.  (BY MS. LEVY)  You know what?  We can
22  move on.  You don't need to answer that question.
23  That's okay.
24  All right.  Ms. Momcicevic, you
25  understand that you are under an oath to tell the

---

**6**

1  truth, correct?
2  A.  Yes.
3  Q.  All right.  And I would ask that you
4  please listen to the entire question that I ask you
5  before you begin your answer, okay?
6  A.  Okay.
7  Q.  And I'll let you finish your answer
8  before I start my next question, okay?
9  A.  Okay.
10  Q.  And your attorney may object to one or
11  more of my questions, but unless he tells you not to
12  answer the question, you will need to answer, okay?
13  A.  Okay.
14  Q.  And if you need a break at any time,
15  please let me know.  I only ask that you let me finish
16  a pending question and we get your answer before we
17  take a break, okay?
18  A.  Okay.
19  Q.  Did you review any documents to prepare
20  for this deposition today?
21  A.  No.
22  Q.  All right.  I'm going to pull up an
23  exhibit.  I'm sorry.  One second here.  I need to grab
24  the computer.
25  Can you see this document on the screen?

---

**7**

1  A.  Yes.
2  Q.  Okay.  This document was presented to us
3  as the opt-in form for a Ms. Momcicevic.  Do you
4  recognize this document?  And I'll scroll down so you
5  can see it.  Do you recognize this document?
6  A.  Yes.
7  Q.  And is that your electronic signature
8  there?
9  A.  Yes.
10  Q.  Did you understand this document to be
11  your joining of the lawsuit against InterExchange?
12  A.  Yes.
13  Q.  How did you first learn about the
14  lawsuit against InterExchange?
15  A.  I received an email from the law
16  company.
17  Q.  Do you know which --
18  Do you mean a law firm?
19  A.  Yes.  The -- Sean's office, Boies law
20  firm.
21  Q.  Okay.  And what's your understanding
22  about what the lawsuit is about?
23  A.  It's about fair wages that the au pair
24  were due to pay.
25  Q.  Can you expand on that at all?

---

**8**

1  A.  My understanding of the lawsuit was that
2  by the law of the United States, the au pairs that
3  were admitted to the United States to work as au pairs
4  were due to pay fair by U.S. laws; that they was due
5  to be compensated for any extra work that we
6  participated in.
7  Q.  Okay.  And the email that you received
8  from the -- you said "the law company," when did you
9  receive that email?
10  A.  I don't remember exact date when I
11  received it.
12  Q.  Do you remember a general time period, a
13  year or a month?
14  A.  A few months ago, more like, than a
15  year.
16  Q.  I'm sorry.  Could you repeat that?  A
17  few months ago, and then you said --
18  A.  A few months ago, more, than a year.
19  Q.  More than a year?
20  A.  No, ma'am.  More like -- that I received
21  that email more a few months ago.
22  Q.  Okay.
23  A.  Not a year.
24  Q.  Okay.  Thank you for clarifying that.
25  And you lived with a family in

---

2 (Pages 5 to 8)

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

9

1  Philadelphia; is that right?
2      A.  Yes.
3      Q.  Do you know if this lawsuit has anything
4  to do with the amount of money that you were paid by
5  the family that you lived with?
6      A.  Yes.
7      Q.  And what is your understanding of that?
8      A.  Well, my understanding of that is that
9  InterExchange made an amount that we were due to pay,
10  that the family agreed on.
11      Q.  And when you say "due to pay," do you
12  mean the amount that was supposed to be paid to you as
13  an au pair?
14      A.  Yes.
15      Q.  Okay.  Can you expand on that answer at
16  all, the amount that you were due to pay?  What is
17  your understanding of that in terms of this lawsuit?
18      MR. PETTERSON:  Objection.  You can
19  still answer.
20      A.  I'm not quite sure that I understand
21  your question.  Can you please repeat it?
22      Q.  (BY MS. LEVY)  Sure.  I asked you a few
23  minutes ago if you knew if the lawsuit had anything to
24  do with the money that you were paid by the host
25  family that you lived with, and you said that it has

10

1  to do with the money that was due to pay -- or the
2  money that either was paid to you or should have been
3  paid to you.  Can you explain that further, what
4  you -- what you think was due to you or having to do
5  with the money that you received from the host family
6  or did not receive from them?
7      MR. PETTERSON:  Objection.  You can
8  answer.
9      A.  My understanding of the lawsuit was
10  that -- that -- at first that InterExchange made a
11  certain amount that the host families were to pay to
12  the au pairs, which was an amount, but in -- and my
13  understanding that this lawsuit is about trying to
14  prove that we were not paid what was -- we were
15  supposed to be paid to the U.S. laws.
16      Q.  (BY MS. LEVY)  Okay.  When you first
17  came to the United States for the au pair program,
18  what did you believe you were going to be paid by the
19  family that you lived with?
20      A.  $195.
21      Q.  And before learning of the lawsuit, did
22  you have any concerns about what you would be paid?
23      A.  I'm not sure that I understand the
24  question.
25      Q.  Before you learned of the lawsuit, did

11

1  you have any concerns about that -- about the payment
2  amount?
3      MR. PETTERSON:  Objection.
4      A.  Yes.
5      Q.  (BY MS. LEVY)  And what were those
6  concerns?
7      A.  My main concern was that there were
8  plenty of au pairs that I met that they were paid a
9  little bit higher, and I -- my complete understood
10  that my -- the way the InterExchange explained it to
11  me, that there were certain things that I was due to
12  work, and that would kind of equalize the amount that
13  I was supposed to pay, but my job with the family was
14  different than what I was told.
15      It's that my -- InterExchange explained
16  it to me that $195 that I was supposed to be paid was
17  to take care of the children of the family, but my
18  load of work was much higher than just children.
19      Q.  Okay.  We're going to come back to that
20  in just a minute, but I want to ask you about the form
21  that we just had on the screen.  Where were you living
22  when you signed that opt-in form?
23      A.  I lived -- I was living in the state of
24  Iowa.  ██████████████████████

12

1  ██
2  ██████████████████████████████
3  ██
4  ████████████████████████████████
5  ██
6  ████████████████████████████████
7      A.  Yes.
8      Q.  Okay.  Thank you.  We just needed to
9  confirm that for the court reporter.
10  ██████████████████████
11  ██
12      Q.  And you lived with the -- correct me if
13  I'm saying this name wrong, also, for the family.
14  DeSipio-Selber.  Is that right?
15      A.  Yes.
16      Q.  And do you still communicate with the
17  host family?
18      (The connection with the deponent was
19  interrupted.)
20      MS. LEVY:  Did we lose the connection?
21  Can we stop the deposition for a minute?  I think we
22  may have lost the connection.
23      THE DEPONENT:  I can hear you now.
24      MR. PETTERSON:  Are you back on?
25      THE DEPONENT:  Yes.  I do.  I apologize.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

13

1  It was on my end.
2         MS. LEVY:  No apologies.  Are we still
3  on the record?
4         THE REPORTER:  Yes.
5         MS. LEVY:  Okay.  All right.
6         Q.  (BY MS. LEVY)  I'm going to repeat that
7  question because I'm not sure what you heard or not,
8  okay?
9         Do you still communicate with your host
10  family?
11        A.  No.
12        Q.  Where are you from originally?  Can you
13  hear us?
14        A.  Yes.
15        Q.  I'm not sure if you heard my last
16  question.  Where are you from originally?
17        A.  Bosnia and Herzegovina.
18        Q.  Have you discussed this lawsuit against
19  InterExchange with anyone in your host family?
20        A.  No.
21        Q.  Did you -- you discussed the lawsuit
22  with other au pairs?
23        A.  No.
24        Q.  When you mentioned you talked about the
25  stipend with other au pairs, was that in connection

---

14

1  with the lawsuit?
2         A.  No.
3         Q.  Did you complete any survey or
4  questionnaire in connection with this lawsuit?
5         A.  Yes.
6         Q.  Okay.  When was that?
7         A.  A few months ago, I believe.
8         Q.  And who sent the survey or questionnaire
9  to you?
10        A.  The Boies law firm.
11        Q.  And how did they send that to you?
12        A.  I received it in my email.
13        Q.  And did you respond?
14        A.  Yes.
15        Q.  I'm sorry.  I need to reask you.  Did
16  you respond to the questions in the questionnaire?
17        A.  Yes.
18        Q.  And how many questions were there?
19        A.  I don't remember.
20        Q.  Do you remember if there were more than
21  20?
22        A.  I don't remember the count at all.
23        Q.  When did you first learn about the
24  opportunity to be an au pair in the United States?
25        A.  My cousin, she joined InterExchange

---

15

1  about a year -- a year before I did, and she kind of
2  reached out to me and said that she is leaving, that
3  she found this agency, that's how -- the first time
4  that I heard about it.  I don't remember how she found
5  out about InterExchange.
6         Q.  Okay.  When your cousin told you about
7  InterExchange, what did you do to find out more about
8  the program?
9         A.  I called it.  A few months after she
10  mentioned me that, I Googled it and read about it,
11  what it was.
12        Q.  Did your cousin have any concerns about
13  the program that she shared with you -- or he or she?
14        A.  Yes.
15        Q.  And what were those concerns?
16        A.  Adjusting.
17        Q.  What do you mean by "adjusting"?
18        A.  Adjusting to new culture, bigger city,
19  adjusting into a new family.
20        Q.  Okay.  Did any organizations recruit you
21  to be an au pair in the U.S.?
22        A.  Yes.
23        Q.  And which organizations were those?
24        A.  InterExchange.
25        Q.  Could you define the word "recruit" as

---

16

1  you understand it?
2         A.  The word "recruit," reached out.
3         Q.  How did InterExchange recruit you?
4         A.  By sending me an email saying that the
5  paper that I would have to fill in, portfolio that I
6  would have to fill out, of the questions that I needed
7  to fill in.
8         Q.  And did you contact InterExchange
9  first --
10        A.  No.
11        Q.  -- to tell them you were interested?
12        A.  No.
13        Q.  When your cousin told you that she was
14  an InterExchange au pair, you -- did you reach out to
15  InterExchange?
16        A.  No.
17        Q.  They just happened to send you an email
18  from the same program?
19        A.  My host family actually recruited me
20  through InterExchange.
21        Q.  When you found out that your cousin was
22  in the InterExchange program, did you sign up for
23  anything on the InterExchange website?
24        A.  I did not understand your question.
25  Could you please repeat it?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**GORANA MOMCICEVIC - 3/23/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

17

1    Q.   When you -- when you found out the name
2  InterExchange from your cousin, did you sign up for
3  anything on the InterExchange website?
4    A.   Yes.  I went on their website and
5  reading about -- on the part about what exactly they
6  were.
7    Q.   Did you fill out -- did you provide your
8  information so that they could contact you?
9    A.   Yes.
10    Q.   Do you remember when that was?
11    A.   Early 2011.
12    Q.   Did you go through a local agency?
13    MR. PETTERSON:  Objection.
14    A.   I don't remember.
15    Q.   (BY MS. LEVY)  Was there a company in
16  Bosnia that you talked to?
17    A.   Yes.  It was a travel agency.
18    Q.   Do you remember the name of it?
19    A.   I do not.
20    Q.   Did you apply through the travel agency
21  for the InterExchange program?
22    A.   To my understanding, no.
23    Q.   How did the travel agency help you?
24    A.   They presented themself as a middle
25  person.

---

18

1    Q.   Did you apply to any other sponsors
2  besides InterExchange?
3    A.   No.
4    Q.   Did your cousin ever tell you how much
5  you would be paid as an au pair?
6    A.   No.
7    Q.   Did you ever ask?
8    A.   Yes.
9    Q.   And what did your cousin tell you?
10    A.   That it's confidential between her and
11  her family.
12    Q.   Do you know if your cousin ever had any
13  concerns or complaints about how much they were being
14  paid?
15    MR. PETTERSON:  Objection.
16    A.   My relationship with my cousin, we were
17  not at that comfortable terms between me and her, so
18  we never discussed things like that.  She -- we never
19  had an open relationship that she would tell me
20  certain things if I asked like that.
21    Q.   (BY MS. LEVY)  Okay.  Where was your
22  cousin an au pair?
23    A.   In Philadelphia.
24    Q.   What interested you about the au pair
25  program?

---

19

1    A.   A chance to travel, meet a new culture,
2  meet new people, try to expand my English language.
3    Q.   When you were thinking about becoming an
4  au pair, did you ever meet with a recruiter or a staff
5  member that was from InterExchange?
6    MR. PETTERSON:  Objection.
7    A.   The local agency that I went to
8  presented themself as a middleman for the
9  InterExchange.  When I met the gentleman, he said he
10  was the middle person, kind of, before presenting
11  InterExchange and their programs.
12    Q.   (BY MS. LEVY)  Did you ever discuss the
13  stipend amount with the local agency?
14    A.   No.
15    Q.   Did you ever ask them about it, the
16  local agency?
17    MR. PETTERSON:  Objection.
18    A.   Yes.
19    Q.   (BY MS. LEVY)  And what did the local
20  agency say when you asked them about the stipend?
21    A.   They -- the gentleman explained it to me
22  that that would be discussed at my arrival to the
23  United States for my orientation with InterExchange.
24    Q.   Did the local agency give you any
25  information on InterExchange?

---

20

1    A.   Yes.
2    Q.   Did you read that information?
3    A.   Yes.
4    Q.   And did you understand what you read?
5    A.   Yes.
6    Q.   Do you remember if any of that
7  information had the stipend amount in it from
8  InterExchange?
9    A.   No.
10    Q.   It did not have the stipend amount, or
11  you do not remember if it had the stipend amount?
12    MR. PETTERSON:  Objection.
13    A.   In the information that I got from the
14  local agency, it did not have the exact amount.  It
15  was -- the paper that I was given were more a
16  checklist of stuff that I would need to do, and it was
17  just about the agency and the programs they offer.
18    Q.   (BY MS. LEVY)  Did you receive any
19  information directly from InterExchange before you did
20  the matching process?
21    A.   I'm not really sure that I understand
22  the question.
23    Q.   Before you matched with a family, did
24  you receive any information from InterExchange, not
25  the local agency, but from InterExchange?

---

5 (Pages 17 to 20)

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

21

1    MR. PETTERSON: Objection.
2    A. I have received an email. My first
3  contact with InterExchange was an email explaining to
4  me about the program and the checklist of stuff that I
5  would have to do.
6    Q. (BY MS. LEVY) Do you remember when that
7  was?
8    A. Early 2011.
9    Q. And after you received that email, did
10  you get any other information by email from
11  InterExchange?
12    A. I don't remember exactly.
13  ███
14  ███
15  ███
16    Q. And what actions did you take to apply
17  to be an au pair?
18    MR. PETTERSON: Objection.
19    A. I filled out the portfolio and all the
20  paperwork that I was given to do.
21    Q. (BY MS. LEVY) And did you receive this
22  paperwork from the local agency or from InterExchange?
23    A. Both. I received a paper copy from the
24  agency and email.
25    Q. And was the email from the local agency

22

1  or from InterExchange?
2    A. I don't remember.
3    Q. And the portfolio that you filled out,
4  was that online?
5    A. Yes.
6    Q. Was that through InterExchange's
7  website?
8    A. I don't remember exactly was it from
9  their website.
10    Q. Before you came to the United States,
11  did you have any communications with InterExchange
12  representatives who were in the United States?
13    A. No.
14    Q. On the -- on the pre-application that
15  InterExchange gives to all of its au pairs, it says,
16  au pairs are paid at least $195.75 per week. Do you
17  recall reading this information?
18    MR. PETTERSON: Objection, foundation.
19    A. I don't remember.
20    Q. (BY MS. LEVY) When did you come to
21  understand what you would be paid by your host family?
22    A. Upon receiving the final paperwork, it
23  would -- I believe it was on my J-1 that it had $195.
24    Q. When you looked up the program on
25  InterExchange's website, did you see the $195.75

23

1  stipend on there?
2    A. I don't remember.
3    Q. Okay. Did you ask anyone in Bosnia
4  about the stipend?
5    A. I'm --
6    MR. PETTERSON: Objection.
7    A. Please repeat it. Could you please
8  repeat the question? I didn't understand.
9    Q. (BY MS. LEVY) Sure. When you were
10  still in Bosnia, did you ask anyone there about the
11  stipend amount?
12    A. I did not.
13    Q. Did you have any conversations with any
14  InterExchange representatives in the United States
15  about the stipend?
16    A. I don't remember.
17    Q. Did you have --
18    MR. PETTERSON: I'm going to object --
19  I'm going to object. The timing is unclear.
20    MS. LEVY: Okay.
21    MR. PETTERSON: I'm sorry for the late
22  objection.
23    Q. (BY MS. LEVY) Did you have any
24  discussions with any InterExchange representatives in
25  the United States when you came to the U.S.?

24

1    A. The question wasn't clear. Could you
2  please repeat it?
3    Q. Sure. Did you talk to any InterExchange
4  representatives about the stipend when you came to the
5  United States?
6    A. Yes. On our program for the exchange,
7  they have mentioned to us how much we will be paid.
8    Q. Can you explain that, when that was?
9    A. I provide on the -- it was within four
10  days of my arriving to New York, the four days of
11  training.
12    Q. And was that a conversation that you had
13  with them?
14    A. No. It was during our training that it
15  was kind of explained to the whole group.
16    Q. And did you ask any questions about it
17  while you were at the training?
18    A. I don't remember.
19    Q. Did you have any discussions with anyone
20  at InterExchange about the stipend before you arrived
21  in the United States?
22    A. I'm sorry. I'm not quite sure that I
23  understand the question properly.
24    Q. Before you came to the United States,
25  did you talk to anyone at InterExchange about the

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

25

1  stipend amount?
2      A.  No.
3      Q.  Did you pay any fees to participate in
4  the au pair program?
5      A.  Yes.
6      Q.  And what were those fees that you paid?
7      A.  Apart from my visa application, there
8  was -- I don't remember the exact amount, the fee that
9  we paid to InterExchange for our training program and
10  hotel stay.
11     Q.  Who did you -- who did you make these
12  payments to?
13     A.  I'm not quite sure that I understand.
14  Who did I make the payments to?
15     Q.  Yes.
16     A.  To my understanding, it was
17  InterExchange.
18     Q.  And who did you actually give the money
19  to?
20     A.  The middle agency.
21     Q.  And what did they tell you the payments
22  were for?
23     A.  To my understanding, it was for my
24  training and for my hotel stay in New York.
25     Q.  And how did you make the payment?  Was

26

1  it by check or credit card or cash?
2      A.  My payment was in cash.
3      Q.  Is there any record of the payment that
4  you made to this middleman?
5      A.  I don't remember.
6      Q.  And do you remember about how much the
7  fees were that you paid?
8      A.  Close to 400 euros.
9      Q.  And did you get anything in writing
10  about how much the fees would be?
11     A.  I don't remember.
12     Q.  Or how did you know how much the fees
13  would be?
14     A.  I received a phone call from the middle
15  agency explaining it to me, that this would be for the
16  training and the hotel stay, and that InterExchange
17  is -- this would be what I would have to pay for them,
18  apart from my visa and all the other legal paperwork.
19     Q.  Do you remember if the middle agency
20  told you the fees -- who was keeping the fee?
21         MR. PETTERSON:  Objection.
22     A.  Yes.  InterExchange.
23     Q.  (BY MS. LEVY)  Did you go into -- was it
24  a travel agency, this middleman?
25     A.  Yes.

27

1      Q.  And did you go into their office to make
2  the payment?
3      A.  Yes.
4      Q.  And do you know, when you gave them the
5  cash, did they write anything down that said you made
6  the payment?
7      A.  I don't remember.  I was handed a load
8  of paperwork back to me when I made the payment.  I
9  don't really remember the whole process.
10     Q.  Do you remember what paperwork they gave
11  you when you paid this fee?
12     A.  I was given my whole -- my whole
13  application in paper, and I was given more additional
14  about the agency, about the program, additional
15  paperwork, and I was given a paper that I would have
16  to -- what would be the process of me applying for my
17  visa at the U.S. Embassy.
18     Q.  And when you say information "about the
19  agency," do you mean information about InterExchange?
20     A.  Yes.  He -- the gentleman misunderstood
21  that he did not give it to me before, so he gave it to
22  me, just basic info again.
23     Q.  And did you read that information?
24     A.  I don't remember.
25     Q.  Okay.  I'm going to ask you a few

28

1  questions about the matching process.  Were you in
2  Bosnia when you did the matching process to be an
3  au pair to match with a family?
4      A.  Yes.
5      Q.  Okay.  Can you tell me about the
6  matching process that you went through to match with
7  your family in Philadelphia?
8      A.  After I filled out the application that
9  I was received by them, I was contacted by the -- my
10  host family.  I had two -- I believe two Skype
11  interviews with her that we talked about what was my
12  stay to be over there, how my days would be like,
13  before she agreed on saying that she would like me to
14  be her au pair.
15     Q.  Were you able to see profiles of
16  families that you were -- that were interested in you?
17     A.  No.
18     Q.  Did you ever go on to the website to
19  look for families?
20     A.  Yes.
21     Q.  And were you able to see families on the
22  InterExchange website?
23     A.  I believe there was, yes.
24     Q.  And could you communicate with those
25  families?

7 (Pages 25 to 28)

**GORANA MOMCICEVIC - 3/23/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



29

1     A. I did not try.
2     Q.   You said you did two Skype interviews
3  with the family in Philadelphia, right?
4     A. Yes.
5     Q.   And was that the DeSipio-Selber family?
6     A. Yes.
7     Q.   And besides the two Skype interviews,
8  did you talk with them any other times during the
9  matching process?
10    A. Yes. We exchanged a couple of emails.
11    Q.   Who made the decision for you to match
12  with that family?
13       MR. PETTERSON: Objection.
14    A. I believe my host mother decided that
15  she would like me to be her au pair.
16    Q.   (BY MS. LEVY) And did you want to be
17  her au pair?
18    A. Yes.
19    Q.   And did InterExchange assign you to that
20  family?
21    A. Yes.
22    Q.   When you talked with that family through
23  email or on Skype, was InterExchange part of any of
24  those conversations?
25    A. No.

30

1     Q.   Did the host mom send you an email
2  saying she was interested in talking to you?
3     A. Yes.
4     Q.   And what -- why do you think that
5  InterExchange assigned you to this family?
6     A. Because they required me to fill out the
7  application with them and do the whole process through
8  them in order to go to that family. My host mother
9  was already participating in the program with prior
10  au pairs.
11    Q.   But she chose you to be her au pair; is
12  that right?
13    A. Yes.
14    Q.   And you chose her to be your host mom or
15  that to be your host family; is that right?
16    A. As she was the only one that I talked
17  to.
18    Q.   Could you have said no if you weren't
19  interested in living with that particular family?
20    A. Could you please repeat the question? I
21  did not hear it.
22    Q.   If you did not want to go live with the
23  DeSipio-Selber family, could you have said no?
24    A. Yes.
25    Q.   When you talked with the family on

31

1  Skype, who exactly did you talk to?
2     A. Ms. Jennifer Selber.
3     Q.   Was that the host mom?
4     A. Yes.
5
6
7
8
9     Q.   And during the Skype interviews with the
10  family, did you talk about how much you would be paid?
11    A. No.
12    Q.   When did you learn how much your host
13  family was going to pay you each week?
14    A. During my four-day stay in New York.
15    Q.   And what was that amount that you
16  learned that you would be paid?
17    A. $195.
18    Q.   And were you okay with that amount?
19    A. At that time, yes.
20    Q.   Did you ever ask your host family to pay
21  you more than that amount per week?
22    A. No.
23    Q.   During your Skype interviews that you
24  had with the host family, did you talk about what you
25  would be doing with the children?

32

1     A. Yes.
2     Q.   And what did you talk about?
3     A. About how my days would go, what my
4  responsibility and expectation from them would be.
5     Q.   And how would your day go?
6     A. I'm not quite sure that I understand it.
7
8
9
10
11
12
13
14
15
16
17
18
19    Q.   Okay. During the Skype interviews, did
20  your host mom tell you how many hours per day you
21  would be working?
22    A. No.
23    Q.   Did you ask during the Skype interview?
24    A. Yes, yes.
25    Q.   And what did the host mom say?

8 (Pages 29 to 32)

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

33

1    A.  She would explain that it would kind of
2  vary all throughout their busy lives.
3    Q.  Did she give you a general number of
4  hours per day or per week?
5    A.  No.
6    Q.  Okay.  I want to show you another
7  document on the screen.  Can you see that on your
8  screen?
9    A.  Yes.
10    Q.  Okay.  This is a long document.  It's 23
11  pages.  But I'm going to scroll down a little bit just
12  so you can see what it is.  And this is Exhibit 2.  Do
13  you recognize this document?
14        MR. PETTERSON:  She's got to see the
15  front page to answer that question.  Objection.
16        MS. LEVY:  We just started on the first
17  page.
18    Q.  (BY MS. LEVY)  Do you recognize this
19  document?
20    A.  I don't remember.
21    Q.  It says this agreement was signed by you
22  on May 6, 2011.  Do you see that here on the first
23  page?
24    A.  Yes.
25    Q.  And then it says your name at the top?

34

1    A.  Yes, I see it.
2    Q.  Okay.  And I'm going to scroll down to
3  the third page of this document.  And this is Bates
4  numbered InterExchange 48972.  Do you see where it --
5  it says under paragraph w --
6    A.  Yes.
7    Q.  -- "The 'Stipend' is the minimum amount
8  that the Host Family is required to pay the Au Pair
9  pursuant to U.S. Department of State regulations and
10  employment and labor laws of the U.S.  The current
11  minimum required weekly amount is one hundred
12  ninety-five dollars and seventy-five cents."  Do you
13  see that on there?
14    A.  Yes.
15    Q.  Did you -- do you remember if you read
16  the agreement before you signed it?
17    A.  I don't remember.
18    Q.  You arrived in -- I'll take this down.
19        You arrived in the United States for the
20  au pair program in June 2011.  Does that sound right?
21    A.  Yes.
22    Q.  And is that when you went to training?
23    A.  Yes.
24    Q.  And was that in New York City?
25    A.  Yes.

35

1    Q.  And that was before you went to meet
2  your host family?
3    A.  Yes.
4    Q.  And what sort of training did you do in
5  New York City?
6    A.  It was a training about how to adjust to
7  the cultural shock -- one of the classes, to adjust to
8  the cultural shock of living in the United States.
9  Explaining how to go on throughout the day.  One of
10  the training we did was a CPR.  There was also a
11  training that we would -- that would help us
12  understand the U.S. driving laws.
13    Q.  How many hours was the training?
14    A.  I don't remember.
15    Q.  You mentioned it was four days, right?
16    A.  Yes.
17    Q.  Okay.  Was it all day for those four
18  days?
19    A.  No.
20    Q.  Do you remember about when you started
21  the training each morning?
22    A.  I don't exactly remember what time.
23    Q.  Do you remember about what time you
24  ended in the afternoon or evening?
25    A.  I don't exactly remember.

36

1    Q.  Do you remember if you ended in the
2  afternoon or the evening?
3    A.  Early afternoon.
4    Q.  Were you paid for the hours that you
5  were trained?
6    A.  No.
7    Q.  Did you do any training in Bosnia before
8  you went to the United States to be an au pair?
9    A.  I'm not sure that I understand the
10  question.
11    Q.  Did you do any training before you came
12  to the United States to be an au pair, such as
13  anything online or first aid, any sort of training?
14        MR. PETTERSON:  Objection.
15    A.  I was not -- I did not do a first --
16  like a CPR.  My portfolio required me to prove to them
17  that I was a babysitter.  That was kind of my
18  understanding of my requirements towards, like,
19  training that I needed to fulfill for them.
20    Q.  (BY MS. LEVY)  Okay.  Okay.  One other
21  question about the document that we just looked at on
22  the screen.  We looked at the part where it said you
23  had signed the document.  Would you have signed it if
24  you did not understand it?
25    A.  Yes.

9 (Pages 33 to 36)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

37

1    Q.  Do you think you understood the document
2  at the time you signed it?
3    A.  I believe that I did not understood the
4  document when I signed it.
5    Q.  If you did not understand it, would you
6  have asked someone to help you understand it?
7    A.  I don't believe that I was given an
8  opportunity to ask anybody at that time.
9    Q.  What do you mean, that you were not
10  given an opportunity?
11    A.  Upon my arrival in New York, we met.  I
12  believe there were two ladies.  We were given out the
13  paperwork.  It was just kind of a guide through the
14  day.  I did not -- knew that I kind of hadn't like
15  asked anybody.  We were not told that we could ask
16  about the legal aspect of that.  We were just kind of
17  put it on more sort of completing our training so we
18  can be kind of sent out to our host families.
19    Q.  I'm going to pull this agreement up one
20  more time.  It says the agreement was signed on May 6.
21  Do you see that?
22    A.  Yes.
23    Q.  And you arrived in the United States in
24  June 2011?
25    A.  Yes.

38

1    Q.  So you signed this agreement before you
2  came to the United States; is that right?
3    A.  Yes.
4    Q.  So could you have asked someone in --
5  before you came to the United States if you did not
6  understand this agreement?
7    A.  Yes.
8    Q.  Okay.  All right.  So after you did the
9  training in New York City, you went to go meet your
10  host family, right?
11    A.  Yes.



**GORANA MOMCICEVIC - 3/23/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



41

43

42

14   MR. PETTERSON:  Objection, asked and
15  answered.
16      Q.  (BY MS. LEVY)  You can answer.

44

2       (The connection with the deponent was
3  lost.)
4       MR. PETTERSON:  She froze.
5       MS. LEVY:  Can we go off the record for
6  a minute until we get this back online?
7       (Recess taken, 12:15 p.m. to 12:32 p.m.,
8  during which the connection with the deponent was
9  reestablished.)
10      MR. PETTERSON:  Can we read back the
11  last question?
12      (The last question was read back as

18      Q.  Did you meet any other au pairs in the
19  area when you were living with your host family?
20      A.  Yes.
21      Q.  And did you spend any time with those
22  au pairs?
23      A.  Yes.
24      Q.  What would you do together?
25      A.  Went out for lunch, for a walk, went to

11 (Pages 41 to 44)

Case No. 1:14-cv-03074-CMA-KMT   Document 1054-1   filed 06/20/18   USDC Colorado   pg 71
of 264

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**45**

1  the mall.
2      **Q. And was this during the week or on the**
3  **weekend?**
4      A. Sometimes over the weekend. Sometimes
5  in the afternoon, in the evenings after we were done.
6      **Q. Did you ever meet these other au pairs**
7  **during the day, Monday through Friday?**
8      A. For play dates, yes.
9      **Q. Did your host family give you a schedule**
10 **for the week?**
11     A. No.

22     **Q. Did you keep any record of the hours**
23 **that you worked?**
24     A. I did not.
25     **Q. Did anyone from InterExchange ever give**

**46**

1  **you a schedule to work with your host family?**
2      A. No.
3      **Q. Did you work the same days every week**
4  **with your host family?**
5      A. No.
6      **Q. Did you work Monday through Friday every**
7  **week?**
8      A. Yes.
9      **Q. And did you work on Saturdays every**
10 **week?**
11     A. No.
12     **Q. Did you ever work on Saturdays?**
13     A. Yes.
14     **Q. How often did you work on Saturdays?**
15     A. Sometimes I would work three Saturdays
16 in a row. Sometimes I would have a Saturday off and
17 then I would work two in a row, or have one -- work
18 one Saturday and then the next one be off.
19     **Q. And did you work on Sundays?**
20     A. Yes.
21     **Q. How often did you work on Sundays?**
22     A. I mean -- I'm sorry. A few, very few.

**47**

10     **Q. What were the hours that you worked on**
11 **Saturdays, from when in the morning until when at**
12 **night, do you remember?**
13     A. I do not remember.
14     **Q. Do you remember the hours you worked on**
15 **Sundays?**
16     A. No.
17     **Q. Do you know how many hours per week you**
18 **worked for your host family?**
19     A. No.
20     **Q. Were you expected to be available or on**
21 **call for your host family when you were not scheduled**
22 **or — to provide child care or otherwise during normal**
23 **5:00 to 7:00 hours?**
24     A. Yes.

**48**

23     **Q. Do you remember when you had the**
24 **conversation?**
25     A. No.

12 (Pages 45 to 48)

49

1   Q.  If it was early on in the year you
2  stayed with them or if it was towards the middle or
3  the end?
4        MR. PETTERSON:  Objection.
5     A.  Middle.
6     Q.  (BY MS. LEVY)  How often would that
7  happen that they would ask you to do work and take
8  care of the children outside of the normal hours?
9     A.  Often.
10    Q.  How often do you think that was?
11    A.  Almost every two weeks.  I went almost
12 six months without a full weekend off.
13    Q.  Who was it that determined which days of
14 the week that you worked?
15    A.  My host family.
16    Q.  Did InterExchange ever tell you which
17 hours or days you had to work?
18    A.  No.  I don't remember.
19    Q.  Could you answer that for me one more
20 time to clarify?  InterExchange did not tell you which
21 hours or days to work, or you do not remember?
22    A.  I do not remember.
23    Q.  Okay.  Thank you.
24        Did you ever have a conversation with an
25 InterExchange representative about the hours you had

50

1  to work?
2     A.  I don't remember.
3     Q.  Do you know if you worked more than 45
4  hours a week with your host family?
5        MR. PETTERSON:  Objection.
6     A.  Could you repeat the question again,
7  please?
8     Q.  (BY MS. LEVY)  Do you know if you worked
9  more than 45 hours a week with your host family?
10    A.  Yes.
11    Q.  And how do you know that?
12    A.  I went six months without a whole
13 weekend off.
14    Q.  Did you ever write down your hours?
15    A.  No.
16    Q.  Did you ever work more than ten hours a
17 day?
18    A.  I don't remember.
19    Q.  When you had the conversation with your
20 host family about the hours you were working and the
21 host dad told you to bear with them, what was your
22 response?
23    A.  I did not respond anything to that.  I
24 did -- the conversation ended up with, "Please bear
25 us," and they just kind of walked away on me, and I

51

1  did not get a chance to say anything afterwards.
2     Q.  Did you bring up these concerns to
3  anyone else?
4     A.  Yes.
5     Q.  Who did you bring up these concerns to?
6     A.  To my mother.
7     Q.  And to your -- your real mother?
8     A.  My biological mother, yes, my real
9  mother.
10    Q.  How much did your host family pay you
11 each week?
12    A.  $200.
13    Q.  And how did they pay you?
14    A.  In cash.
15    Q.  Did you ever have a discussion with your
16 host family about the amount of those weekly payments?
17    A.  Yes.
18    Q.  And what was that discussion?
19    A.  I expressed my concern that I felt like
20 that it's -- I work so much and I do so much that it
21 felt like that I have such a big load.
22        And my host parents agreed on, if I
23 clean up after dinner after them every night, that
24 they will pay me -- I believe at that time it was
25 $240.

52

1     Q.  Do you know when they started paying you
2  that amount?
3     A.  Very late in my year.
4     Q.  And did you -- do you remember when that
5  amount changed from 200 to 240 late in the year?
6     A.  I don't remember.
7     Q.  Did InterExchange ever pay you your
8  weekly stipend?
9     A.  No.
10    Q.  Did the host family ever give you extra
11 money besides the stipend?
12    A.  Could you please expand your question?
13 I'm not quite sure that I understand.
14    Q.  Sure.  Besides that amount that they
15 gave you every week, whether it was 200 or 240, did
16 they give you any other money for any reason?
17    A.  No.

13 (Pages 49 to 52)



14 (Pages 53 to 56)



57

Q. Did your host family provide you with a journal or a log of any type?
A. I don't remember.
Q. Did InterExchange provide you with a journal or a log?
A. I don't remember.
Q. Did your host family write anything down in a log for keeping track of your hours?
A. I don't remember.
Q. I want to go back to the duties that you performed with the children for your host family. Did InterExchange ever tell you what duties to perform for your host family?
A. Yes.

58

Q. And what did they tell you?
A. They said that it would be generally taking care of the children as getting them to school and back and helping out if they need help with their homework, getting their, either, breakfast, lunch, or dinner and some snacks, taking them for play dates, and kind of just spending time, quality time with children.
Q. And when InterExchange told you this, were they talking about all au pairs and what they would be doing with their host families, or was this specific to you and what you would be doing with only your host family?
A. It was for the whole au pairs that were there.
Q. Did anyone from InterExchange ever supervise you while you were taking care of the host family's children?
A. No.

59

Q. Okay. How often did you do that?
A. About once or twice per week.
Q. And how long did that take you to perform that duty?
A. About 20 minutes of a drive to the store and back.
Q. Is it a total round trip of 20 minutes?
A. Yes.
Q. Did you take any classes when you lived with the host family?
A. No.
Q. Did you ever look into classes while you were an au pair?
A. Yes.
Q. And what did you look into?
A. I looked into taking classes at the -- I believe it's called Saint Joseph's University, but when I brought it up to my host mom's attention that I would like to take classes, I was never given the money to take those classes.
Q. Did you ask your host mom for the money?
A. Yes.
Q. And what did she say when you asked her for the money?
A. She mentioned that she has forgotten

60

about it; that she would give it to me later on.
Q. And did you ever ask her later on?
A. I don't remember.
Q. Did you ever sign up for any classes?
A. No.
Q. Was there an InterExchange local coordinator in Philadelphia?
A. Yes.
Q. And did you meet with that local coordinator when you lived with the host family?
A. Yes.
Q. Do you remember who the local coordinator was?
A. I don't remember her name.
Q. Does the name Sandra Green sound correct?
A. It sounds familiar, but I can't -- I don't really remember the name.
Q. Did you meet with this local coordinator in person when you lived with the host family?
A. Yes.
Q. And how many times did you meet with her in person?
A. Two times.
Q. Did you go to cluster meetings?

61

1    A.  Yes.
2    Q.  And did you meet the local coordinator
3  at the cluster meeting?
4    A.  Yes.
5    Q.  Did you ever meet the local coordinator
6  at the DeSipio-Selber's home?
7    A.  Yes.
8    Q.  And how many times did you meet with the
9  local coordinator at the host family's home?
10    A.  Once.
11    Q.  Where was the other place that you met
12  with her in person?
13    A.  It was a climbing gym.
14    Q.  Was this an event for au pairs at the
15  climbing gym?
16    A.  Yes.
17    Q.  When you met with the local coordinator
18  at the host family's home, what happened during that
19  meeting?
20    A.  She mentioned that she had came over to
21  introduce herself.  She wanted to know just who I am
22  in general, where I'm from.  She brought up the
23  classroom meetings that the au pairs have.  She had
24  mentioned that there were a lot of au pairs living in
25  the area.  She kind of just went on explaining how,

62

1  like, the whole -- my days would kind of look like
2  with the cultural shock here; that I might have a hard
3  time adjusting to it.  She said that if I have a hard
4  time with the family, I could let her know and she
5  could have me find another agency.
6    And later on, she just kind of proceeded
7  to say that she's leaving, and she gave me her card --
8  I mean a phone number so I can reach out to her.  It
9  was a quite -- like 45 minutes that we just kind of
10  discussed those type of things.
11    Q.  When you said you could reach out to her
12  and she could help you find a different agency, is
13  that -- is that what you said?
14    A.  A family.
15    Q.  Okay.  Did the local coordinator give
16  you duties to perform for your family?
17    A.  No.
18    Q.  Did the local coordinator pay you?
19    A.  No.
20    Q.  Other than the local coordinator, did
21  you meet with any other people from InterExchange when
22  you lived with your host family?
23    A.  No.
24    Q.  We asked your attorneys to ask you to
25  provide documents related to this lawsuit related to

63

1  the amount that you were paid and the hours that you
2  worked.  Have you looked for any documents on these
3  subjects?
4    A.  No.
5    Q.  Do you have any documents that were
6  given to you by the -- I think we called it a
7  middleman back in Bosnia, related to your
8  participation in the au pair program?
9    A.  No.
10    Q.  Do you have any documents such as
11  emails, anything on social media relating to your
12  work, the performance of your duties or your
13  compensation as an au pair?
14    A.  Yes.
15    Q.  And what is it that you have?
16    A.  I do have my visa applications, my --
17  one that has the family info and their
18  InterExchange info.
19    Q.  When you say it has the InterExchange
20  info, is this part of your visa, or is this separate
21  information?
22    A.  It's a part of my visa.
23    Q.  I would ask that you produce that to
24  your attorney so that he can give that to us, okay?
25    A.  Okay.

64

1    Q.  How did your host family pay you?
2    MR. PETTERSON:  Object.
3    A.  In cash.
4    Q.  (BY MS. LEVY)  And who in your host
5  family gave you the cash?
6    A.  It was left to -- usually for me at the
7  dining room.
8    Q.  Do you have any records of the payments
9  that you received from your host family?
10    A.  No.
11    Q.  Do you have any record of the hours that
12  you worked for your host family?
13    A.  No.
14    Q.  Do you believe that your host family
15  owes you money?
16    A.  Yes.
17    Q.  Have you calculated how much money you
18  believe your host family owes you?
19    A.  No.
20    Q.  Do you believe InterExchange owes you
21  money?
22    A.  Yes.
23    Q.  And why is that?
24    A.  Because when I arrived in New York, the
25  way everything was portrayed was completely different

16 (Pages 61 to 64)

Case No. 4:14-cv-03074-CMA-KMT Document 1005-04 Filed 06/08/18 USDC Colorado Page 76 of 264

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**65**

1   than what I experienced and what other au pairs that I
2   have known experienced.  It was a complete different
3   situation, and it was not even similar to what we were
4   told.
5       Q.  What was the difference between what you
6   were told -- and this is at the training, right?
7       A.  Yes.
8       Q.  Okay.  What was the difference between
9   what you were told at the training and what you
10  experienced?
11      A.  At the training, we were told that we
12  would just do stuff for the children, which in my case
13  and many others, it kind of just expanded taking care
14  of the whole family and doing stuff that I did
15  not thought I should be doing; that it was never said.
16          The fact that we would feel as a family,
17  that we would actually have some personal time and
18  time to travel.  We were just kind of told we would
19  get all this opportunity to kind of benefit and meet
20  all this new culture and these new people, which it
21  definitely was not near similar to that at all.

**67**

20      Q.  (BY MS. LEVY)  Did you make any
21  complaints to InterExchange about your experience as
22  an au pair?
23      A.  No.
24      Q.  Did you make any complaints to any
25  United States government agency about your experience

**66**

**68**

1   as an au pair?
2       A.  Yes.
3       Q.  Can you tell me about that?
4       A.  I was asked during my interview with the
5   U.S. CIS about my in general experience with my host
6   family.
7       Q.  Who did you interview with?
8       A.  U.S. CIS, United States Custom and
9   Enforcement -- U.S. CIF.  I'm not quite sure the full
10  pronunciation.
11      Q.  When did you do this interview?
12      A.  About a year ago.
13      Q.  Why did you do this interview?  What was
14  it in relation to?
15          MR. PETTERSON:  Objection, relevance.
16      A.  It was my immigration interview.
17      Q.  (BY MS. LEVY)  What did you discuss
18  about your au pair experience in this interview?
19      A.  My whole general stay.
20      Q.  Did you discuss -- or what did you
21  have -- did you have complaints about it?
22          MR. PETTERSON:  Objection.
23      A.  Yes.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case No. 1:14-cv-03074-CMA-KMT Document 1054-2 filed 06/20/18 USDC Colorado pg 77 of 264

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**69**

19    MS. LEVY: Can we take a short break?
20    And I think I may be finished, but I just want to
21    check, and then we'll come back after a short break.
22        So right now, it is -- I'll say it's
23    1:16 my time, because I think I'm different than
24    all -- both of you. Let's come back at -- can we say
25    2:25?

**70**

1        MR. PETTERSON: Is that enough time for
2    you?
3        MS. LEVY: Is that enough of a break for
4    you both?
5        THE DEPONENT: Yes.
6        MS. LEVY: Okay. All right. I will see
7    you at 25 after.
8        (Recess taken, 1:17 p.m. to 1:25 p.m.)
9        MS. LEVY: I think those are all the
10    questions I have. Sean, did you have any?
11        MR. PETTERSON: Yeah.
12        EXAMINATION
13    BY MR. PETTERSON:
14    Q. I just have a few questions for you,
15    Ms. -- or Gorana.

**71**

12    Q. And do you recall testifying earlier
13    that Monday through Friday you usually worked from
14    5:30 a.m. to 7:00 p.m.?
15    A. Yes.
16    Q. Is that more than ten hours a day?
17    A. Yes.
18    Q. And I don't know what the math will be,
19    but is that more than 45 hours a week?
20    A. Yes.
21    Q. And when you worked more than ten hours
22    a day, were you paid overtime?
23    A. No.
24    Q. When you worked more than 45 hours a
25    week, were you paid overtime?

**72**

1    A. No.
11    Q. Were you paid extra for working on those
12    trips?
13    A. No.
18    Q. Were you paid extra for those hours?
19    A. No.
20    Q. Were you paid overtime for those hours?
21    A. No.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case No. 1:14-cv-03074-CMA-KMT   Document 1054   Filed 08/06/18   USDC Colorado   Page 78
of 264

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**73**

MR. PETTERSON: No further questions.
Alyssa, are you there?
          MS. LEVY: Yes.
                    EXAMINATION
BY MS. LEVY:

**74**

18    Q.  Did you ever do -- did you do any other
19 activities like the climbing gym with other au pairs?
20    A.  No.
21    Q.  Did you ever go into the city with the
22 host family, leave the home?
23    A.  I could not understand.
24    Q.  Did you ever go into the city with the
25 host family?

**75**

1    A.  No.
2    Q.  You were only in the home?
3          MR. PETTERSON: Objection.
4    A.  I'm not quite sure that I understand the
5 question.

19    Q.  Did you ever go into the city of
20 Philadelphia with friends?
21    A.  Yes.
22          MS. LEVY: Okay.  I have no further
23 questions.  Sean, do you have any other follow-up?
24          MR. PETTERSON: Yeah.  I'm sorry.  I
25 just have one or two.

**76**

1                    EXAMINATION
2 BY MR. PETTERSON:

10          MR. PETTERSON: No further questions.
11          MS. LEVY: Okay.  I have no further
12 questions.
13          I would ask that you get us any of those
14 documents that were mentioned and connected -- in
15 connection with InterExchange.  If you could get those
16 to your attorney, they will be able to send those to
17 us.  All right?
18          I thank you very much for your time
19 today.  We really appreciate it.
20          THE DEPONENT: You're welcome.
21          MR. PETTERSON: Thank you, Gorana.
22          THE DEPONENT: You're welcome.
23          MR. PETTERSON: Thanks, Alyssa.
24          MS. LEVY: Thank you.
25          WHEREUPON, the within proceedings were

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

GORANA MOMCICEVIC - 3/23/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

77

```
 1    concluded at the approximate hour of 1:33 p.m. on the
 2    23rd day of March, 2018.
 3              *    *    *    *    *
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

78

```
            I, GORANA MOMCICEVIC, do hereby certify
   that I have read the above and foregoing deposition
   and that the same is a true and accurate transcription
   of my testimony, except for attached amendments, if
   any.
            Amendments attached   (  ) Yes   (  ) No


            _____
            GORANA MOMCICEVIC


            The signature above of GORANA MOMCICEVIC
   was subscribed and sworn or affirmed to before me in
   the county of _____, state of
   _____, this _____ day of
   _____, 2018.


            _____
            Notary Public
            My Commission expires:



   Johana Paola Beltran 3/23/18 (tcm)
```

79

```
                    REPORTER'S CERTIFICATE
   STATE OF COLORADO          )
                              )  ss.
   CITY AND COUNTY OF DENVER  )

            I, TRACY C. MASUGA, Registered
   Professional Reporter, Certified Realtime Reporter,
   and Notary Public 19924005553, State of Colorado, do
   hereby certify that previous to the commencement of
   the examination, the said GORANA MOMCICEVIC was duly
   sworn or affirmed by me to testify to the truth in
   relation to the matters in controversy between the
   parties hereto; that the said deposition was taken in
   machine shorthand by me at the time and place
   aforesaid and was thereafter reduced to typewritten
   form; that the foregoing is a true transcript of the
   questions asked, testimony given, and proceedings had.
            I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
   this litigation.

            IN WITNESS WHEREOF, I have affixed my
   signature this 26th day of March, 2018.

            My commission expires April 24, 2020.


   __X__ Reading and Signing was requested.

   _____ Reading and Signing was waived.

   _____ Reading and Signing is not required.
```

20 (Pages 77 to 79)

REPORTER'S CERTIFICATE

STATE OF COLORADO         )
                          )  ss.
CITY AND COUNTY OF DENVER )


          I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said GORANA MOMCICEVIC was duly
sworn or affirmed by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 26th day of March, 2018.

          My commission expires April 24, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




                    _____
                    Tracy C. Masuga
                    Certified Realtime Reporter
                    Registered Professional Reporter

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 14-cv-03074-CMA-KMT
 3

 4       _____

        DEPOSITION OF: NAYARA CALVO GOMEZ - March 26, 2018
 5       _____

 6

        JOHANA PAOLA BELTRAN, et al.,
 7
        Plaintiffs,
 8
        v.
 9
        INTEREXCHANGE, INC., et al.,
10
        Defendants.
11       _____

12              PURSUANT TO NOTICE, the deposition of
        NAYARA CALVO GOMEZ, via Zoom Conference, was taken on
13       behalf of the Defendant, InterExchange, Inc., at 1900
        Grant Street, Suite 1025, Denver, Colorado 80203, on
14       March 26, 2018 at 9:05 a.m., before Tracy R.
        Stonehocker, Certified Realtime Reporter, Registered
15       Professional Reporter and Notary Public within
        Colorado.
16

17

18

19

20

21

22       H+G

23

24       Hunter + Geist, Inc.

25
```

303.832.5966    1900 Grant Street, Suite 1025    ■ www.huntergeist.com
800.525.8490    Denver, CO 80203                 ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

_____

DEPOSITION OF: NAYARA CALVO GOMEZ - March 26, 2018
_____

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____

        PURSUANT TO NOTICE, the deposition of
NAYARA CALVO GOMEZ, via Zoom Conference, was taken on
behalf of the Defendant, InterExchange, Inc., at 1900
Grant Street, Suite 1025, Denver, Colorado 80203, on
March 26, 2018 at 9:05 a.m., before Tracy R.
Stonehocker, Certified Realtime Reporter, Registered
Professional Reporter and Notary Public within
Colorado.

---

2

        A P P E A R A N C E S
For the Plaintiffs:
        JOSHUA LIBLING, ESQ.
        Boies Schiller Flexner L.L.P.
        575 Lexington Avenue, Fl 7
        New York, New York  10022
        (Via Zoom Conference)

For the Defendant, InterExchange, Inc.:

        ALYSSA LEVY, ESQ.
        Sherman & Howard, L.L.C.
        633 17th Street, Suite 3000
        Denver, Colorado  80202

Also Present:

        Mari Welch, Interpreter

---

3

                I N D E X
EXAMINATION OF NAYARA CALVO GOMEZ:          PAGE
March 26, 2018
By Ms. Levy                                 5, 65
By Mr. Libling                              65

                                            INITIAL
DEPOSITION EXHIBITS:                        REFERENCE

Exhibit 1  Consent to Join, Gomez, 9/1/11        7

Exhibit 2  AP Agreement, Gomez, 6/7/11          26

---

4

1          (Deposition Exhibit Numbers 1 and 2 were
2   marked.)
3          WHEREUPON, the following proceedings
4   were taken pursuant to the Federal Rules of Civil
5   Procedure.
6          *     *     *     *     *
7          MS. LEVY:  Ms. Gomez, good morning.
8          THE DEPONENT:  Good morning.  Thank you.
9          MS. LEVY:  My name is Alyssa Levy.  I'm
10  from the law firm of Sherman & Howard and I'm the
11  lawyer for InterExchange and I will be asking you the
12  questions today.
13         THE DEPONENT:  Okay.
14         MS. LEVY:  All right.  Joshua, will you
15  stipulate to the court reporter swearing in Ms. Gomez
16  over Zoom?
17         MR. LIBLING:  Yes, that's fine.
18         *     *     *     *
19         MARI WELCH,
20  having been first duly sworn to accurately and
21  correctly translate from English to Spanish and
22  Spanish to English translated as follows:
23         (Interpreter's reply to oath:  I do.  My
24  name is Mari Welch and I am a certified interpreter.
25  Certification 068.)

1 (Pages 1 to 4)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

5

```
1              *    *    *    *
2              NAYARA CALVO GOMEZ,
3  having been first duly sworn to state the whole truth,
4  testified as follows:
5           (Deponent's reply to oath:  Yes.)
6                 EXAMINATION
7  BY MS. LEVY:
8      Q.  Ms. Gomez, could you please state your
9  full name for the record?
10     A.  My name is Nayara Calvo Gomez.
11     Q.  Ms. Gomez, your attorney has stated that
12  you require an interpreter; is that correct?
13     A.  Well, yes, I speak well in English, but
14  I don't know if that was going to be good enough for
15  the interview.
16     Q.  I'd like to either proceed completely in
17  Spanish or completely in English, but it is your
18  choice, Ms. Gomez.
19     A.  Maybe it's going to be more fluent if we
20  do it only in English.
21     Q.  It is your choice.  We have an
22  interpreter here if you would like to use an
23  interpreter, but it is your choice.
24     A.  We can do it in English.  If I have any
25  trouble communicating something, maybe I can use the
```

6

```
1  interpreter.
2          THE INTERPRETER:  We've done that
3  before, on a standby.
4          MR. LIBLING:  I think that makes sense.
5          MS. LEVY:  Is that all right with you,
6  Joshua?
7          MR. LIBLING:  Yes.  If Ms. Gomez is
8  comfortable, I think that will be the easiest thing.
9          (Off-the-record discussion.)
10     Q.  (BY MS. LEVY)  Okay.  Ms. Gomez, if there
11  is a question that you do not understand, please tell
12  me.  And I can ask it again.  Okay?
13     A.  Okay.  Thank you.
14     Q.  Have you ever had your deposition taken
15  before?
16     A.  No.
17     Q.  And you understand that you are under an
18  oath to tell the truth, correct?
19     A.  Yes.
20     Q.  And I would ask that you please listen
21  to the entire question before you give your answer.
22  Okay?
23     A.  Okay.
24     Q.  And I will let you finish your answer
25  before I start my next question.  Okay?
```

7

```
1      A.  All right.
2      Q.  Now, your attorney may object to one or
3  more of my questions, but unless he tells you not to
4  answer the question, you will need to answer the
5  question.  Okay?
6      A.  Okay.
7      Q.  And if you need to take a break at any
8  time, please let me know.  The only thing I ask is
9  that you let me finish a pending question and we hear
10  your answer before we take a break.  Okay?
11     A.  Okay.
12     Q.  Did you review any documents to prepare
13  for this deposition today?
14     A.  No.
15     Q.  I want to show you -- I'm going to pull
16  something up on the screen.  Can you see that document
17  on your screen?
18     A.  Yes, I do.
19     Q.  Okay.  This document was presented to us
20  as the opt-in form for Ms. Nayara Calvo Gomez.  Do you
21  recognize this document?  And I'll scroll down so you
22  can see it.
23     A.  Yes, this is from the -- yeah, the
24  document that I filled out to join the lawsuit.
25     Q.  Is that your signature there in the
```

8

```
1  middle?
2      A.  Yes.  It's my signature.
3          MR. LIBLING:  Can we just put on the
4  record and this is fine to use, but can we put on the
5  record that this document, and I suspect for other
6  exhibits we'll be looking at in this deposition, the
7  way it's being presented is that a portion of the
8  document is visible at any one time.
9          MS. LEVY:  Yes, we'll stipulate to that.
10     Q.  (BY MS. LEVY)  And if you ever need us to
11  scroll through it, we can certainly do so and we will
12  do that to show you the document before we ask
13  questions on it.
14         MR. LIBLING:  Thanks.  Do we need to
15  state our appearances?  I don't think we ever did
16  that.
17         (Off-the-record discussion.)
18     Q.  (BY MS. LEVY)  Ms. Gomez, how did you
19  first learn about the lawsuit against InterExchange?
20     A.  I believe it was through Facebook.  It
21  just come up in my regular Facebook page.
22     Q.  What is your understanding of what the
23  lawsuit is about?
24     A.  It's about the wages that au pairs are
25  paying.
```

2 (Pages 5 to 8)

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



**9**

1       Q.  And just to clarify, are you saying the
2 wages the au pairs are paying or the wages the au
3 pairs are paid?
4       A.  Yeah, the salary they are paid or all
5 the wages they are not paying for.
6       Q.  I'm sorry, could you repeat that one
7 more time?
8       A.  Yes, for what I read, it's about the
9 salary that they are paying to au pairs.  It's below
10 the average that you should pay to a worker in the
11 United States.
12       Q.  And you lived with a family in
13 Baltimore, Maryland, correct?
14       A.  What?
15       Q.  You lived with a family in Baltimore,
16 Maryland; is that correct?
17       A.  Yeah, I was with a family in Baltimore,
18 yes.
19       Q.  Do you know if this lawsuit has anything
20 to do with the amount of money you were paid by the
21 family that you lived with?
22       MR. LIBLING:  Objection to form.  You
23 can answer.
24       Q.  (BY MS. LEVY)  You can answer the
25 question.

**10**

1       A.  What did you say if this lawsuit has to
2 be with the money that I was receiving for this
3 family?
4       Q.  Yes.  Do you know if the lawsuit has
5 anything to do with the amount of money that you were
6 paid by the family that you lived with?
7       A.  No.
8       Q.  When you first came to the United States
9 for the au pair program, what did you believe that you
10 were going to be paid by the family that you lived
11 with?
12       A.  $200 a week.
13       Q.  And before learning of this lawsuit, did
14 you have any concerns about the payment?
15       A.  Well, it didn't seem fair for the amount
16 of work that I was doing.  But that was what I was
17 told -- when I accept to be an au pair.
18       Q.  When you signed the form that we just
19 pulled up on the screen, where were you living?
20       A.  In Baltimore.

**11**

6       Q.  Okay.  Were you able to come and go in
7 the row house as you pleased?
8       A.  What do you mean?
9       Q.  Could you -- were there any rules or
10 curfew or could you go to the house and leave the
11 house when you wanted?
12       A.  Yes.
13       Q.  When you wanted?
14       A.  Yes.  When I wanted.
15       Q.  And did you extend with your host family
16 for a second year?
17       A.  Yes.
18       Q.  Do you still communicate with your host
19 family?
20       A.  No.
21       Q.  And where are you from originally
22 outside the United States?
23       A.  I'm from Spain.
24       Q.  Have you discussed this lawsuit with
25 anyone from your host family?



3 (Pages 9 to 12)

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

13

1    A.   Yeah, with my husband and some friends.
2    Q.   I'm sorry, could you repeat that?  With
3  your -- who did you discuss it with?
4    A.   With my husband and maybe two friends.
5    Q.   Were these friends also au pairs?
6    A.   No.
7    Q.   Ms. Gomez, did you complete any survey
8  or questionnaire in connection with this lawsuit
9  against InterExchange?
10    A.   Yes, they asked me some questions about
11  my experience.
12    Q.   Who sent it to you?
13    A.   I don't remember exactly.  I'm not sure
14  about the name.
15    Q.   Do you remember if it was a lawyer or a
16  lawyer's office?
17    A.   I'm not sure.
18    Q.   Do you remember how the questions were
19  sent to you, if it was by e-mail or by mail on paper?
20    A.   It was by e-mail.
21    Q.   And did you respond to the questions?
22    A.   Yes, I did.
23    Q.   Do you remember how many questions there
24  were?
25    A.   Not exactly.

14

1    Q.   Do you know if there were more than 20?
2    A.   I'm not sure, really.
3    Q.   And do you remember when you received
4  these questions by e-mail?
5    A.   A year, a month -- I'm not exactly -- I
6  mean, I could try to find the e-mail in my -- in my
7  folder, but I'm not sure exactly the time.
8    Q.   Do you think it was more than -- more or
9  less than a year ago?
10    A.   I'm really bad with time, so, I will say
11  less than a year.  Okay.  I found an e-mail and it was
12  sent -- I don't know if this one was the first one or
13  the last one.  No, this one was the last one.  August
14  2017.
15    Q.   August 2017, you think?
16    A.   Yes.
17    Q.   Okay.
18       MR. LIBLING:  Ms. Gomez, just in the
19  future, maybe don't look up information during the
20  deposition.  If there's anything we need to follow up
21  with, we can follow up with it afterwards.
22       THE DEPONENT:  Okay.
23       MR. LIBLING:  Just answer the questions
24  based on your knowledge.
25       THE DEPONENT:  Okay.

15

1    Q.   (BY MS. LEVY)  Ms. Gomez, when did you
2  first learn about the opportunity to be an au pair in
3  the United States?
4    A.   In 2011, around March.
5    Q.   How did you first learn about the au
6  pair program?
7    A.   I was doing research about what programs
8  could I do to go to the United States and I found the
9  au pair program.
10    Q.   Did any organizations recruit you to be
11  an au pair in the United States?
12    A.   No.  First it was Spanish.  Well, the
13  first thing I put my profile in Great Au Pair online
14  and I was contacted -- the family contact me through
15  that website and it was all through Spanish company
16  and they put me in contact with the InterExchange.
17    Q.   Who put you in contact with
18  InterExchange, what was the Spanish company?
19    A.   The agency in Spain because I did it in
20  a different way.  InterExchange didn't found the
21  family match for me.  I found the match on my own
22  before, and the family contact InterExchange to
23  arrange everything.
24    Q.   Do you remember the name of the Spanish
25  agency that you used?

16

1    A.   No, I don't remember.
2    Q.   Can you tell me a little bit more about
3  that, how you found the family and they contacted you?
4    A.   Yes, I put my profile in this website is
5  called Great Au Pair and the family just contact me
6  through this website and we like each other, so they
7  arrange everything to start the process.
8    Q.   How did you learn about InterExchange?
9    A.   Through the family, the host family.
10    Q.   Did you ever apply on the InterExchange
11  website?
12    A.   Do you mean at the beginning?
13    Q.   Yes.  You mentioned Great Au Pair, did
14  you also apply with InterExchange?
15    A.   No.  I didn't.
16    Q.   Were you an au pair with the
17  InterExchange program?
18    A.   Yes, I was.
19    Q.   Did you ever fill out any paperwork with
20  InterExchange?
21    A.   Yes, I did.
22    Q.   So you -- you applied through Great Au
23  Pair and this family contacted you; is that right?
24    A.   Yes.  I just put my profile in this
25  website and the family contacted me, yeah, through

4 (Pages 13 to 16)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

17

1   this website.
2       Q.  And then can you explain how you ended
3   up going through the InterExchange program?
4       A.  Because the family, it was the one --
5   trying to find an agency that will arrange everything,
6   so they just decide to do everything through
7   InterExchange.
8       Q.  Did they give you information on
9   InterExchange when they told you they would like to go
10  through the InterExchange program?
11      A.  Yeah, the InterExchange contacted me for
12  when I was starting the program.  But I -- everything
13  it was doing through agency in Spain that it was at
14  the same time in contact with InterExchange.  I don't
15  know if that is clear.  So I wasn't in contact with
16  them from the beginning because this agency, au pair
17  agency in Spain, it was arranging all the information
18  and everything and given to InterExchange.
19      Q.  Okay.  Did the agency in Spain give you
20  paperwork to fill out for InterExchange?
21      A.  I'm not sure.
22      Q.  When they -- when the agency in Spain
23  gave you information on InterExchange, do you remember
24  if you signed anything?
25      A.  I did sign a document and I send all the

18

1   documents they ask me.
2       Q.  What interested you about the au pair
3   program?
4       A.  I want to learn English and learn a new
5   culture.
6       Q.  When you were still in Spain, did you
7   meet with an InterExchange staff member?
8       A.  In Spain, you mean?
9       Q.  Yes, when you were in Spain.
10      A.  No.
11      Q.  When you met with the agency in Spain,
12  did you ever discuss the weekly stipend with them that
13  you would be paid as an au pair in the United States?
14      A.  Yes.
15      Q.  Can you tell me about that conversation?
16      A.  They told me that I would get paid $200
17  a week and I won't be able to work more than 45 hours
18  a week.
19      Q.  The information that the agency in Spain
20  gave you, did anyone there help you read the
21  information?
22      A.  No, because it was in Spanish.
23      Q.  Before you came to the United States as
24  an au pair, did you have any communications with an
25  InterExchange representative?

19

1       MR. LIBLING:  Objection, form.
2       A.  I -- no, I can't answer -- yeah, I have
3   contact with the agency in Spain and they arrange
4   everything for me.  So I did have contact with
5   InterExchange when I came to the states.
6       Q.  (BY MS. LEVY)  But before you came to
7   the United States, did you have any contact directly
8   with an InterExchange representative?
9       MR. LIBLING:  Objection to form.
10      A.  I'm not completely sure.
11      Q.  (BY MS. LEVY) On the information that
12  InterExchange gives to all the agencies in the
13  different countries, I'm going to represent to you
14  that that application, that information they give out,
15  it says au pairs are paid at least $195.75 per week.
16  Do you remember ever reading this information?
17      A.  Yes.
18      Q.  And when you read this, did anything
19  about this amount concern you?
20      A.  Not at the beginning.
21      Q.  Did you ask any questions about it while
22  you were still in Spain?
23      A.  No.
24      Q.  Did you ever have any discussions with
25  any InterExchange representatives about the stipend

20

1   while you were still in Spain?
2       A.  I'm not sure if while I was in Spain.
3       Q.  Did you have any conversations with
4   InterExchange representatives about the stipend when
5   you came to the United States?
6       A.  Yes, we went to a meeting and they
7   explain, it was like a training before it started
8   the -- the program and they did explain that --
9   everything.
10      Q.  Did you ask any questions about the
11  stipend while you were at that training?
12      A.  Yes, you could ask questions.
13      Q.  Did you ask any questions when you were
14  at the training?
15      A.  No.
16      Q.  I'm sorry, I want to clarify.  Did you
17  ask any questions specifically about the stipend when
18  you were at that meeting, the training?
19      A.  When I was in the meeting in New York if
20  I ask any questions?  No, it was -- it was clear to
21  me.
22      Q.  Okay.  Ms. Gomez, did you pay any fees
23  to participate in the au pair program?
24      A.  Yes, I pay 500 Euros.
25      Q.  And who did you make those payments to?

5 (Pages 17 to 20)

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

21

1      A.  To the agency in Spain.
2      Q.  **Do you remember how you paid them?**
3      A.  It was a transfer, a bank transfer.
4      Q.  **And was this before you came to the**
5  **United States as an au pair?**
6      A.  Yes, before I could join the program.
7      Q.  **You were living in Spain when you**
8  **started the matching process to be an au pair; is that**
9  **right?**
10     A.  Yes.
11     Q.  **And I understand from what you've said**
12  **so far that you -- you met your family online; is that**
13  **right?**
14     A.  Yes.
15     Q.  **Can you tell me a little bit more about**
16  **that?  How you came to meet each other online?**
17     A.  I just post my profile and they contact
18  me and we start to talk about a little bit and they
19  like me and I like them, so they -- they arrange
20  everything, and after three months, I believe, I just
21  decided to go and start the program.
22     Q.  **How did you communicate with them**
23  **online?**
24     A.  Through this website.
25     Q.  **Did you e-mail with them?**

---

22

1      A.  Yes.
2      Q.  **Did you ever do a Skype conversation?**
3      A.  Yes, I did.
4      Q.  **How many times did you talk with them**
5  **through Skype?**
6      A.  Three times, maybe.
7      Q.  **And in those conversations, who was part**
8  **of the Skype conversation?**
9      A.  The whole family.
10     Q.  **Who was in the family?**
11     A.  It was a little girl, the mother and the
12  father.
13     Q.  **So after you had the Skype conversations**
14  **with them, the Moonaz-Mooney family asked you to be**
15  **their au pair; is that right?**
16     A.  Yes.
17     Q.  **And did you want to be their au pair?**
18     A.  Yes.
19     Q.  **And could you have said no if you did**
20  **not want to be their au pair?**
21     A.  Yes.
22     Q.  **When you agreed to be their au pair, and**
23  **come live with them, did you already know about**
24  **going -- you were going to go through the**
25  **InterExchange program?**

---

23

1      A.  Yes, I know that I was going to go
2  through that program.
3      Q.  **At what point, when you were talking**
4  **with the host family, did you understand that you**
5  **would be going through the InterExchange program?**
6      A.  At the end when we decide that was a
7  good match.  At that time, they arrange everything.
8  And they told me that they found InterExchange, so it
9  was at the end.
10     Q.  **When you talked with the Moonaz-Mooney**
11  **family, was InterExchange ever a part of those**
12  **conversations?**
13     A.  No.
14     Q.  **Was anyone from the agency in Spain ever**
15  **a part of those conversations?**
16     A.  No.
17     Q.  **During either the e-mails or the Skype**
18  **conversations you had with the Moonaz-Mooney family,**
19  **did you talk about how much you would be paid?**
20     A.  No, we didn't.  Only at the end.
21     Q.  **Can you tell me more about that, at the**
22  **end you talked about it?**
23     A.  Yes, when I -- when I decide to be their
24  au pair, and they found the InterExchange, they send
25  me -- we talk about the conditions.

---

24

1      Q.  **At that point, did you talk to the**
2  **family about how much you would be paid as their au**
3  **pair?**
4      A.  Yes.
5      Q.  **And what did they tell you?**
6      A.  They will pay me $200.  That was what it
7  was said for the program.
8      Q.  **And were you okay with that amount?**
9      A.  Yes.
10     Q.  **Did you ever ask your host family to pay**
11  **you more than that amount per week?**
12     A.  No.  But they did pay me $25 extra.
13  They said that was for food because they never cover
14  my food spending -- expenses.  So they did pay me 25
15  more because they didn't pay for my food.
16     Q.  **So did they pay you 225 a week?**
17     A.  Yes.
18         MR. LIBLING:  Objection to form.
19     Q.  **(BY MS. LEVY)  During those Skype**
20  **interviews that you had with the family, did you talk**
21  **about what you would be doing with the children?**
22     A.  Yes.
23     Q.  **And what did you talk about?**
24     A.  She explained me that -- that I will
25  have to do activities with them.  Bring their -- yeah,

---

6 (Pages 21 to 24)

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

25

1  bring them to activities and their schedule, a little
2  bit. And what was going to be my schedule. Pretty
3  much that.

▮
▮
▮
▮
▮

9       Q.  And what did they tell you your schedule
10 would be like?
11      A.  It was -- it was changing, but mostly
12 it was between 9:00 to 5:00, sometimes 10:00 to 6:00.
13 And it was going to be eight hours a day and work
14 Saturdays in the morning.
15      Q.  And when you lived with the host family,
16 were those the duties that you actually performed?
17      A.  Yes.
18      Q.  Before you matched with the
19 Moonaz-Mooney family, did you communicate with any
20 other families?
21      A.  Yes, one more.
22      Q.  Can you tell me about that?
23      A.  It was a family from London, but it
24 didn't work out. I don't know. I wasn't happy with
25 the arrangement they were offering.

---

26

1       Q.  Was that through InterExchange or a
2  different sponsor?
3       A.  That was through the Spanish agency.
4       Q.  Okay. Was that through InterExchange?
5       A.  No.
6       Q.  Okay. I'm going to pull up another
7  document on your screen.
8       A.  Okay.
9       Q.  Can you see that on your screen?
10      A.  Yes.
11      Q.  I'm going to scroll this so you can see
12 it. It's long, so let me know if you would like to
13 see each page or if you recognize it just by the first
14 few pages. Do you need to see the first page again?
15      A.  Oh.
16      Q.  Does this document look familiar?
17      A.  I'm not sure. I'm sorry, it's just too
18 many years. I don't remember exactly the whole thing.
19      Q.  Okay. It says this is the au pair
20 agreement for Nayara Calvo Gomez, do you see that?
21      A.  Yes.
22      Q.  And then on the first page, also, it
23 says the agreement was signed June 7 of 2011.
24      A.  Okay.
25      Q.  Does that sound familiar to you?

---

27

1            MR. LIBLING:  Objection to form.
2       A.  Yeah, I -- I did sign some documents. I
3  don't remember exactly if it was this one. So I don't
4  say -- I did or I didn't, I'm not sure really. I did
5  sign documents and they did send me the information.
6       Q.  (BY MS. LEVY)  Okay.  This one says it
7  was signed by you on June 7, 2011 and I want to show
8  you on the third page of this document, this is Bates
9  name InterExchange 49105. It says, "The stipend" --
10 see under W here, it says, "The stipend is the minimum
11 amount that the host family is required to pay the au
12 pair pursuant to the U.S. Department of State
13 regulations and employment and labor laws of the U.S.
14 The current minimum required weekly amount is
15 $195.75." 195.75.  Do you see that on there?
16      A.  Yes, I do.
17      Q.  And I represent that that is your
18 electronic signature on there.  Would you -- did you
19 read the agreement before you signed it?
20      A.  Yes, probably I read it.
21      Q.  And did you understand the agreement
22 before you signed it?
23           MR. LIBLING:  Object to form.
24      A.  Yeah, I do know that I was going to get
25 paid that amount a week.

---

28

1       Q.  (BY MS. LEVY)  I want to ask you about
2  the training you mentioned when you first came to the
3  United States.  You arrived in the U.S. for the au
4  pair program in August 2011; is that right?
5       A.  Yes.
6       Q.  And the training that you went to, was
7  that in New York City?
8       A.  Yes.
9       Q.  And that was before you went to meet
10 your host family?
11      A.  Yes.
12      Q.  And what sort of training did you get?
13      A.  It was about first aid and they were
14 talking about how to do my job as an au pair, and
15 things that could happen during the experience and it
16 was just to meet everybody there and have an
17 introduction.
18      Q.  Can you explain a little bit more
19 when -- about what you mean when you say how to do
20 your job?
21      A.  Yes, they were explaining that the hours
22 that I will have to do, they also give us a course in
23 case we were going to take care of babies, how to do
24 it properly.  And talk about how it was going to be
25 the experience.  The things that we have to do, that

---

7 (Pages 25 to 28)

Case No. 1:14-cv-03074-CMA-KMT Document 1054-4 filed 06/26/18 USDC Colorado pg 89 of 264

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**29**

1 we have to give classes. Just to clarify a little bit
2 everything.
3     Q. And this was for all the au pairs that
4 were doing the training, right?
5     A. Yes.
6     Q. It wasn't specific to you with your host
7 family?
8     A. Excuse me?
9     Q. Was it specific to you with your own
10 host family or was it for all of the au pairs?
11     A. It was for all the au pairs.
12     Q. And how many hours was the training?
13     A. I don't remember exactly the hours, but
14 it was a whole day. Maybe eight hours. I'm not sure
15 exactly.
16     Q. Did it start in the morning?
17     A. Yes.
18     Q. And did it go 'til the afternoon?
19     A. Yes.
20     Q. And was it one day or more than one day?
21     A. It was more than one day.
22     Q. Do you know how many days the training
23 was?
24     A. I'm not sure, but maybe it was like
25 three or four days we stay there.

**30**

1     Q. So was it three or four days from the
2 morning until the afternoon, does that sound correct?
3     A. Yes. But also we did some activities,
4 some excursions to go around New York.
5     Q. Was that during the day that you did
6 excursions?
7     A. Yes.
8     Q. How many hours a day do you think you
9 did the excursions?
10     A. How many hours? I'm not sure. I did
11 stay for one or two hours.
12     Q. Okay. Were you paid for the hours that
13 you did the training?
14     A. No.
15     Q. Did you do any training in Spain before
16 you came to the United States?
17     A. No.
18     Q. So after you did the training in New
19 York City, you went to go meet your host family?
20     A. Yes.

**31**

**32**

9     Q. Can you still hear us?
10     A. Yeah, that's not me.
11     Q. Okay.
12     MR. LIBLING: There's fire trucks going
13 past my window. Sorry.

22     Q. Did you have any personal time during
23 the day?
24     A. Not really.
25     Q. Were there any other adults other than

8 (Pages 29 to 32)

Case No. 1:14-cv-03074-CMA-KMT Document 1054 Filed 06/20/18 USDC Colorado Page 90 of 264

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

33

1  you, the host mom and the host dad -- well, I guess
2  you didn't live in the home.  Were there any other
3  adults that lived in the home besides the host mom and
4  the host dad?
5      A.  No.
6      Q.  And how many children did you take care
7  of for your host family?
8      A.  Two.

34

35

22  s.
23      Q.  Do you remember how many days a week it
24  was?
25      A.  Maybe three.  Three days, four.  I'm not
    sure.

36

1      Q.  Ms. Gomez, we've been going about an
2  hour, so I want to ask if you need a break at this
3  point, to take a few-minute break?
4      A.  No.
5      Q.  No?
6      A.  I'm good.
7      Q.  Okay.  Did you spend time with other au
8  pairs?
9      A.  Yes, I did.
10         MR. LIBLING:  Objection to form.
11     A.  Yes, I did.
12     Q.  (BY MS. LEVY) Can you tell me about
13  that?
14     A.  There was this group, it was like a
15  coordinator in Baltimore, put in contact all the au
16  pairs that were in Baltimore, so we have like a group
17  for meetings or to hang out.  So I would spend time
18  with them sometimes.
19     Q.  Okay.  For the schedule that your family
20  gave you, did they ever write it down for you?
21     A.  Yes.
22     Q.  And was that written on paper or was it
23  electronic?
24     A.  She give me a print book with all the
25  expectations and the schedule and -- yeah.  Just that.

9 (Pages 33 to 36)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

37

1    Yes.
2         Q.  Do you still have that book?
3         A.  Probably, yeah.
4         Q.  All right.  I'm going to ask you to look
5    for that book and to please give that to your
6    attorney.  Okay?
7         A.  Uh-huh.  Okay.
8         Q.  Thank you.  Did anyone from --
9         A.  Oh --
10        Q.  I'm sorry.  Go ahead.
11        A.  No.  No.  Sorry.  You can go.
12        Q.  Did you have more to say?
13        A.  No, no, no.
14        Q.  Did anyone from InterExchange ever give
15   you a weekly schedule when you lived with your host
16   family?
17        A.  No.
18        Q.  The schedule that you think you may
19   still have, was it -- was it recorded each week?
20        A.  What do you mean?
21        Q.  Was the schedule written down each week
22   or was it written down just in the beginning?
23        A.  That was just for the beginning, for the
24   first time that I arrive.  The changes, she will tell
25   me, you know, when -- maybe it's one day in advance.

---

38

1         Q.  Okay.  But it was kind of the base for
2    your schedule and maybe there were a few variations?
3         A.  Yes.
4         Q.  Did you always work on Saturday morning?
5         A.  Yes.  Sometimes I would work Sunday --
6    Saturday night because they want to go to a date or
7    something.  Or on Sunday, so they will change it.
8         Q.  Did you work on Sundays?
9         A.  Yes.
10        Q.  How often did you work on Sundays?
11        A.  It wasn't that often.  Just when they
12   want to do something.
13        Q.  How many hours do you think you worked
14   on Sundays when you did work?
15        A.  Around four or five hours.
16        Q.  And if you worked on Sundays, did you
17   have any time off on Saturdays?
18        A.  Yes.
19        Q.  And if you worked on Saturday nights,
20   how many hours were you working on Saturday night?
21        A.  The same because they always have to
22   give me 45 hours, so I always worked 45 hours for
23   sure.
24        Q.  Did you ever work more than 45 hours?
25        A.  Yes.

---

39

1         Q.  How often did you work more than 45
2    hours?
3         A.  Not very often.  It was mostly if he was
4    late because of work or he couldn't get home in time.
5    That didn't happen a lot, but it did happen.
6         Q.  So if you worked over 45 hours, was it
7    about -- how many hours over 45 do you think you
8    worked if you worked over 45?
9         A.  I'm not sure.
10        Q.  Do you think it was more than 46?
11        A.  Yes.  It was more than 46.  Especially
12   if we go on vacation, when I used to go on vacation
13   with them.
14        Q.  Were your hours the same when you went
15   on vacation with them?
16        A.  No.  They were always changing.
17        Q.  Were you expected to be on call for your
18   host family at times when you were not normally
19   scheduled to work for them?
20        A.  Yes.
21        Q.  And under what circumstances?
22        A.  Because they need me, something came up
23   and they need me.  They would actually get angry if I
24   wasn't able to answer.
25        Q.  Would they call you when you were at

---

40

1    your brownstone?
2         A.  Just on my free time, my free days.
3    Could be a Saturday or a Sunday.
4         Q.  Did you ever work more than 10 hours a
5    day?
6         A.  No, I don't think so.

---

10 (Pages 37 to 40)

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



41

20   Q.  And when they paid you the $200 each
21   week, how were you paid?
22   A.  It was a transfer, bank transfer.
23   Q.  And what about the $25?
24   A.  They were included in the transfer too.
25   Q.  Did you ever have any conversations with

43

1   Q.  Who decided the 225 amount?
2   A.  What?
3   Q.  Who decided the $225 amount that you
4   received in your bank account each week?
5       MR. LIBLING:  Objection to form.
6   A.  The family decide to give me $25 more
7   because they were not paying for my food, and they
8   were supposed to do that.  So I would have to use my
9   salary to buy my food every week.

42

1   your host family after you started in the United
2   States about the weekly amount?
3       A.  Conversations about the money?  Well,
4   they knew that I thought it was not well paid.  But
5   that was the arrangement, so it was not much to say.
6   Q.  How did they know that you knew it was
7   not well paid?
8   A.  What?  Can you repeat that?
9   Q.  You -- I believe you just said they
10  knew -- that you knew it was not well paid.  Is that
11  what you said or is that not what you said?
12  A.  Yes, that's what I said.  And they knew
13  it, too.  But that was part of the program.
14  Q.  How did they know that?  Or, I'm sorry,
15  let me ask you a different question.  Why do you think
16  that they thought that?
17  A.  Well, because a regular nanny, you pay
18  no more than $15 and they were paying me $4, so
19  there's a big difference there.
20  Q.  Who decided the amount that you would be
21  paid each week?
22  A.  The agency, the program.
23  Q.  And when you say that, do you mean the
24  agency in Spain or InterExchange?
25  A.  Yeah, InterExchange set the amount.

44

3   Q.  Did InterExchange ever pay you your
4   weekly stipend?
5   A.  My what?
6   Q.  Did InterExchange ever pay you your
7   weekly stipend?
8   A.  What is that?
9   Q.  The amount that you were paid each week,
10  you said you received an amount electronically from
11  your host family?
12  A.  Yes.
13  Q.  Did InterExchange ever pay you an amount
14  for each week?
15  A.  Oh, no.
16      MR. LIBLING:  Objection to form.
17  Q.  (BY MS. LEVY) Other than the $25, did
18  your host family ever give you extra money for
19  anything?
20      MR. LIBLING:  Objection to form.
21  A.  They gave me $500 for my class, my
22  classes at the college.
23  Q.  (BY MS. LEVY) Did they give you money
24  for any other reason?
25  A.  No.

11 (Pages 41 to 44)

Case No. 1:14-cv-03074-CMA-KMT   Document 1005-14   filed 06/20/18   USDC Colorado   pg 93 of 264

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**NAYARA CALVO GOMEZ - 3/26/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



**49**

22  Q.  Did your host family or InterExchange
23  provide you with a log of any type to write in?
24  A.  I don't think so, no.
25  Q.  Who told you what duties to do for your

**50**

1  host family?
2      MR. LIBLING:  Objection, form.
3      A.  The family.
4  Q.  (BY MS. LEVY) Did InterExchange ever
5  tell you what duties to perform for your host family?
6      MR. LIBLING:  Objection to form.
7      A.  Well, they told me that I have to take
8  care of the kids.  Probably some light cleaning, too.
9  And I don't remember anything else.
10  Q.  (BY MS. LEVY) And when InterExchange
11  told you to take care of the kids and do the light
12  cleaning, were those instructions they gave to all of
13  the au pairs or was it specific to your host family?
14      A.  To everybody.
15  Q.  Did anyone from InterExchange supervise
16  you while you were taking care of the host family's
17  children?
18      MR. LIBLING:  Objection to form.
19      A.  We have like a coordinator in the area
20  that if -- that I could talk to her if I have any
21  problem.
22  Q.  (BY MS. LEVY) Did the local -- sorry.
23  Go ahead.
24      A.  Sorry.  She was organizing meetings in
25  her house, also for the au pairs.

**51**

1  Q.  Did the local coordinator ever supervise
2  you taking care of the host family's children?
3      A.  No.
4      MR. LIBLING:  Objection to form.

**52**

1  Q.  Did your host family ever ask you to
2  perform any duties that concerned you in any way?
3      A.  No.
4  Q.  You mentioned taking classes when you
5  were with the host family.  How many classes did you
6  take?
7      A.  It was two times a week and the
8  course -- I think it was the course was -- I'm not
9  sure.  I think it was three months.  It was to learn
10  English.
11  Q.  Did you choose those classes?
12      A.  Yes.
13  Q.  Do you know whether you took six credits
14  of classes?
15      A.  I do remember that InterExchange asked
16  me about the document proving that I took those
17  classes to meet the requirements to stay another year,
18  so it was all correct.
19  Q.  Did you take any classes the second year
20  you were with your host family?
21      A.  Yes.  I take a course, a Java course,
22  training, teacher training.
23  Q.  Do you know how much credits that was?
24      A.  It wasn't any credit.  It was
25  independent at school.

13 (Pages 49 to 52)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

53

1  Q.  And what was the university or college
2  that you took classes at your first year?
3  A.  It was the Community College of
4  Baltimore.
5  Q.  And what was the name of the institution
6  you took the teacher training at?
7  A.  Baltimore Job.  Sorry can I stop?  I
8  need to go to the bathroom.
9  Q.  Sure.  Let's go off the record.
10  (Recess taken, 10:31 a.m. to 10:40 a.m.)
11  Q.  (BY MS. LEVY) Ms. Gomez, can you hear me
12  again?
13  A.  Yes, yes, I can hear you.
14  Q.  Did you get a chance to take a break?
15  A.  Yes, I did, thank you.
16  Q.  Ms. Gomez, was there an -- you know, you
17  mentioned there was a local coordinator when you were
18  in Baltimore, right?
19  A.  Yes.
20  Q.  And do you remember who that was?
21  A.  I think her last name is Smith.
22  Q.  Did you meet with -- was it Ms. Smith?
23  A.  Yes, I did.
24  Q.  And how many times did you meet with
25  Ms. Smith in person?

---

54

1  A.  I'm not sure of the time, but I know
2  that I was required to meet with her maybe once a
3  month.
4  Q.  And where did you meet with her once a
5  month?
6  A.  Her house.
7  Q.  Did you go to cluster meetings?
8  A.  Yes.
9  Q.  Is that where the cluster meetings were,
10  at her house?
11  A.  Yes.
12  Q.  Did you meet with Ms. Smith at her house
13  other than the cluster meetings?
14  A.  I'm not sure.
15  Q.  Did you meet with Ms. Smith at the host
16  family's home?
17  A.  I don't remember.
18  Q.  Did Ms. Smith come and check on you
19  about a few weeks or a month after you started as an
20  au pair?
21  A.  Yes, she did.
22  Q.  Was that at the host family's home?
23  A.  I don't remember if it was at her house,
24  the family house.
25  Q.  When you met with Ms. Smith a few weeks

---

55

1  or a month after you started, do you remember having a
2  conversation with her?
3  A.  Yes.
4  Q.  Do you remember what you talked about?
5  A.  She was telling me -- she was connecting
6  with me with other au pairs in the area and she told
7  me to contact her if I have any problem or if I need
8  anything.
9  Q.  Did Ms. Smith tell you what duties to
10  perform for your host family?
11  A.  I don't remember.
12  Q.  Did Ms. Smith ever pay you?
13  A.  No.
14  Q.  Other than Ms. Smith, did you meet with
15  any other people from InterExchange when you were an
16  au pair?
17  A.  Only in the reception when I came to New
18  York.
19  Q.  Ms. Gomez, we have asked you through
20  your attorney to provide any documents that you have
21  relating to this lawsuit against InterExchange.  Have
22  you searched for any documents related to this lawsuit
23  against InterExchange?
24  A.  I just check my e-mail trying to find --
25  to see what documents I have, but, no, I don't -- I

---

56

1  didn't find anything, I mean, other than the e-mails
2  that I exchanged with the parents or e-mails that I
3  have.  That's it.
4  Q.  Do you have any documents that were
5  given to you from Ms. Smith, the local coordinator?
6  A.  I didn't found any.
7  Q.  Do you have any other types of documents
8  such as -- any other types of e-mails or social media
9  relating to your work or duties that you performed as
10  an au pair?
11  A.  From Ms. Smith?
12  Q.  Just in general from anyone.  From ones
13  that you sent or received or any social media.
14  A.  Oh, I have some e-mails from the family,
15  yeah, talking about activities and schedules.  Things
16  like that.
17  Q.  If you could provide those to your
18  attorney and he can get those to us, we would ask that
19  you give those to your attorney.  Okay?
20  A.  Okay.
21  Q.  Okay.  Thank you.
22  MS. LEVY:  Josh, we would ask that you
23  give those to us as soon as possible?
24  MR. LIBLING:  We'll take that under
25  advisement.

---

14 (Pages 53 to 56)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



57

1    Q.  (BY MS. LEVY)  Ms. Gomez, the electronic
2  payment that you received from your family each week,
3  do you know who specifically sent that to your bank
4  account?
5    A.  It was the mother.  We have an account,
6  a joint account, so it was her account, but I was --
7  it was my account, but she was the -- how would you
8  say?  The first -- it was her account, but I was
9  joining it.
10    Q.  Was all of the money in that account for
11  you?
12    A.  Yes.
13    Q.  Could you access it at any time?
14    A.  Only to my account, but also it was her
15  name, but not to her personal, of course.
16    Q.  But the account that was set up for you,
17  could you access the money?
18    A.  Yes.
19    Q.  Do you still have access to that bank
20  account?
21    A.  No.  I close it.
22    Q.  Did you keep any records of those
23  payments that you received from your host family?
24    A.  No.
25    Q.  Did you keep any records of the hours

58

1  that you worked with the host family?
2    A.  No.
3    Q.  Ms. Gomez, do you believe your host
4  family owes you money?
5    A.  Officially, they don't because they pay
6  me what it was stipulated.  Morally, yes.
7    Q.  And why is that?
8    A.  Because I was working a lot.  And, well,
9  I never refused anything they asked me.  I was very
10  open and flexible.
11    Q.  Have you calculated how much money you
12  believe you're owed?
13    MR. LIBLING:  Objection to form.
14    A.  I don't understand the question.
15    Q.  (BY MS. LEVY)  Have you ever calculated,
16  come up with a certain amount that you believe you are
17  owed?
18    A.  No.
19    Q.  Do you believe InterExchange owes you
20  money?
21    MR. LIBLING:  Objection to form.
22    A.  No, they don't owe me any money.

59

24    MS. LEVY:  Can we take just a
25  five-minute break and let me see if I have any more

60

1  questions?  But I may be finished.  Right now it is
2  12:53 your time.  Let's go back on the record at
3  12:58.  Okay.  We're going to take a five-minute
4  break.
5    THE DEPONENT:  Okay.
6    (Recess taken, 10:53 a.m. to 10:58a.m.)
7    Q.  (BY MS. LEVY)  Ms. Gomez, can you hear me
8  again?
9    A.  Yes, I can hear you.
10    Q.  Okay.  All right.  I have just a few
11  more questions to follow up on what we already talked
12  about today.
13    A.  Okay.
14    Q.  You mentioned that you learned of the
15  lawsuit against InterExchange on Facebook.  Can you
16  tell me a little more about that?
17    A.  I just saw the post and I click and I
18  read a little bit and I decide to join.
19    Q.  Do you remember what the post was?
20    A.  No, I don't remember exactly.
21    Q.  Do you remember who put the post on
22  Facebook?
23    A.  I don't remember exactly.
24    Q.  Do you remember if it was another au
25  pair that put the post on Facebook?

15 (Pages 57 to 60)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

61

1    A. No, I don't think so.
2    Q. When you say you clicked on the post,
3 when you clicked on it, where did it take you to?
4    A. I think it was a -- it was a document
5 explaining what it was about and there was a link that
6 you can, you know, put on -- answer all the questions
7 and join the lawsuit.
8    Q. Do you remember when that was that you
9 saw the Facebook post?
10    A. Exactly, no. Maybe a year, something
11 like that. I do remember that it was for au pairs
12 that were working in '13 year, so I was qualified
13 because I was working in 2011.
14    Q. How did you come across this Facebook
15 post?
16    A. It just show up in my -- I don't know
17 how you call it. It was an advertisement.
18    Q. An advertisement?
19    A. Yes.
20    Q. Did you talk to any other au pairs who
21 also saw the Facebook post?
22    A. No, I didn't.
23    Q. When you clicked on the Facebook post,
24 what was the information in the document that you saw?
25    A. I don't remember exactly information. I

62

1 remember it was explaining what it was about. But I
2 don't remember exactly what was in the document.
3    Q. Is that when you signed up to be part of
4 the lawsuit against InterExchange?
5    A. Yes.
6    Q. The first document that I showed you, it
7 says that you signed it with a date of August 12,
8 2017. Does that sound like the date that you clicked
9 on the Facebook post?
10    A. 12, 17 -- December --
11    Q. August 12 of --
12    A. August.
13    Q. August of 2017.
14    A. Yes.
15    Q. Did you sign up for -- to be part of the
16 lawsuit at any other time other than when you clicked
17 on this Facebook post?
18    A. Yeah, I receive an e-mail, my personal
19 e-mail and that I have to fill out like -- answer some
20 questions for joining the lawsuit, and I did that a
21 few times because I didn't -- it didn't went through
22 the first time, so I did a few times.
23    Q. Do you remember who you received that
24 e-mail from with the questions after you joined the
25 lawsuit?

63

1    A. No, I don't.
2    Q. Do you still have access to the Facebook
3 post that you clicked on to join the lawsuit?
4    A. No. I don't know if it will came out on
5 my history of things that I click on, but I'm not sure
6 about that.
7    Q. Okay. I'm going to ask you after this
8 deposition if you could look at your history and
9 provide that address, the web address you went to to
10 sign up for the lawsuit. Can you give that to your
11 lawyer and he is going to give us -- we're going to
12 ask him to give that to us.
13    A. Okay. Okay.
14    MS. LEVY: Joshua, we would like that
15 web address.
16    MR. LIBLING: I'll take that under
17 advisement, too.
18    Q. (BY MS. LEVY) Ms. Gomez, just a few more
19 questions. When you said you were looking at a way to
20 come to the U.S. and you found the au pair program,
21 what research did you do to look into the au pair
22 program?
23    A. I just research and Google the au pair
24 program and options to -- into the InterExchange
25 program or something and I just -- it come out au

64

1 pair.
2    Q. When you were doing your research at
3 that point, did you look at the InterExchange website
4 at all?
5    A. No.
6    Q. And when you were filling out your
7 paperwork for InterExchange, did the agency in Spain
8 help you with any of that paperwork?
9    A. No. They only ask me the documents they
10 needed to do all the process, and I remember they did
11 send me some documents, but I don't remember exactly
12 from who or if it was InterExchange or what the agency
13 was.
14    Q. And then you filled those out yourself?
15    A. Yes.
16    Q. And you mentioned that you thought you
17 would be paid $200 a week before you came to the U.S.
18 as an au pair. Where did you learn that amount, the
19 $200 amount?
20    A. The agency told me in Spain.
21    Q. Did you ask any questions about that
22 amount to the agency in Spain?
23    A. No.
24    MS. LEVY: All right. Those are all the
25 questions I have today. Thank you very much. I

16 (Pages 61 to 64)

NAYARA CALVO GOMEZ - 3/26/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**65**

1  really appreciate your time.  Joshua, do you have any
2  questions?
3          MR. LIBLING:  Just very, very quickly.
4          EXAMINATION
5  BY MR. LIBLING:

[redacted]

15         MR. LIBLING:  No further questions.
16  Thank you.
17         EXAMINATION
18  BY MS. LEVY:

[redacted]

---

**66**

[redacted]
2          MS. LEVY:  All right.  No further
3  questions from me.  Joshua, do you have any more?
4          MR. LIBLING:  No.  We're done.
5          MS. LEVY:  Okay.  Thank you very much,
6  Ms. Gomez.
7          THE DEPONENT:  Thank you.
8          MS. LEVY:  That's it, Josh.
9          MR. LIBLING:  Thanks, Ms. Gomez.  We
10  really appreciate your time.
11         WHEREUPON, the within proceedings were
12  concluded at the approximate hour of 11:11 a.m. on the
13  26th day of March, 2018.
14
15
16
17
18
19
20
21
22
23
24
25

---

**67**

        I, NAYARA CALVO GOMEZ, do hereby certify
that I have read the above and foregoing deposition
and that the same is a true and accurate transcription
of my testimony, except for attached amendments, if
any.

        Amendments attached   (  ) Yes   (  ) No

        _____
        NAYARA CALVO GOMEZ

        The signature above of NAYARA CALVO
GOMEZ was subscribed and sworn to or affirmed before
me in the county of _____, state of
_____, this _____ day of
_____, 2018.

        _____
        Notary Public
        My Commission expires:

Johana Paola Beltran, 3/26/18 (tds)

---

**68**

            REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER )

        I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said NAYARA CALVO GOMEZ was duly
sworn or affirmed by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.
        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 29th day of March, 2018.

        My commission expires June 12, 2020.

__X__  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

---

17 (Pages 65 to 68)

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )   ss.
CITY AND COUNTY OF DENVER  )


        I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said NAYARA CALVO GOMEZ was duly
sworn or affirmed by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 29th day of March, 2018.

        My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




                    Tracy R. Stonehocker
                    Registered Professional Reporter

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3   _____

4   DEPOSITION OF: LAURA CAMILA BARRIGA RODRIGUEZ
                    March 27, 2018
5   _____

6   JOHANA PAOLA BELTRAN, et al.,

7   Plaintiffs,

8   v.

9   INTEREXCHANGE, INC., et al.,

10  Defendants.

11  _____

12          PURSUANT TO NOTICE, the deposition of
    LAURA CAMILA BARRIGA RODRIGUEZ, via Zoom Conference,
    was taken on behalf of the Defendant, InterExchange,
13  Inc., at 1900 Grant Street, Suite 1025, Denver,
    Colorado 80203, on March 27, 2018 at 9:32 a.m., before
14  Tracy R. Stonehocker, Certified Realtime Reporter,
    Registered Professional Reporter and Notary Public
15  within Colorado.

16

17

18

19

20

21

22  **H+G**

23

24  Hunter + Geist, Inc.

25

303.832.5966       1900 Grant Street, Suite 1025      ■ www.huntergeist.com
800.525.8490       Denver, CO 80203                   ■ scheduling@huntergeist.com

                   Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

**1**

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____
DEPOSITION OF: LAURA CAMILA BARRIGA RODRIGUEZ
              March 27, 2018
_____
JOHANA PAOLA BELTRAN, et al.,
Plaintiffs,
v.
INTEREXCHANGE, INC., et al.,
Defendants.
_____

        PURSUANT TO NOTICE, the deposition of
LAURA CAMILA BARRIGA RODRIGUEZ, via Zoom Conference,
was taken on behalf of the Defendant, InterExchange,
Inc., at 1900 Grant Street, Suite 1025, Denver,
Colorado 80203, on March 27, 2018 at 9:32 a.m., before
Tracy R. Stonehocker, Certified Realtime Reporter,
Registered Professional Reporter and Notary Public
within Colorado.
```

**3**

```
                    I N D E X
EXAMINATION OF LAURA CAMILA BARRIGA RODRIGUEZ:    PAGE
March 27, 2018
By Mr. Hunt                                     5, 100
By Mr. Valdivieso                                  91
                                              INITIAL
DEPOSITION EXHIBITS:                         REFERENCE

Exhibit 1   Consent to Join, Rodriguez, 8/15/17     9

Exhibit 2   Au Pair Agreement, Rodriguez, 3/31/15  50

Exhibit 3   Pre-Application, Rodriguez, 11/2/15    33
```

**2**

```
             A P P E A R A N C E S
  For the Plaintiffs:
          JUAN VALDIVIESO, ESQ.
          Boies Schiller Flexner L.L.P.
          575 Lexington Avenue, Fl 7
          New York, New York  10022
          (Via Zoom Conference)

  For the Defendant, InterExchange, Inc.:

          JOSEPH H. HUNT, ESQ.
          Sherman & Howard, L.L.C.
          633 17th Street, Suite 3000
          Denver, Colorado  80202
```

**4**

1  (Deposition Exhibit Numbers 1 through 3
2  were marked.)
3       WHEREUPON, the following proceedings
4  were taken pursuant to the Federal Rules of Civil
5  Procedure.
6       *    *    *    *    *
7       MR. HUNT:  Ms. Barriga, my name is Joe
8  Hunt.  I'm a lawyer with InterExchange and I'm going
9  to be asking you some questions today.  If you could
10  please state your name for the record.
11       THE DEPONENT:  My name is Laura Camila
12  Barriga Rodriguez.
13       MR. HUNT:  And your counsel is here, as
14  well, by video and audio.  If you'd like to enter your
15  appearance.
16       MR. VALDIVIESO:  Juan Valdivieso, Boies
17  Schiller Flexner, on behalf of plaintiffs and the
18  witness, Ms. Barriga.
19       MR. HUNT:  And if we could --
20       MR. VALDIVIESO:  If I could make a
21  suggestion, Ms. Barriga, if you could put your video
22  so that your whole head is in the screen that would be
23  best.
24       THE DEPONENT:  I'm trying.
25       MR. VALDIVIESO:  The top of your head is

1 (Pages 1 to 4)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

5

1  kind of cut off.
2      THE DEPONENT: Okay. That is better?
3      MR. VALDIVIESO: Yes. Is that good for
4  you, Joe?
5      MR. HUNT: Yes, it is.
6      MR. VALDIVIESO: Okay.
7      MR. HUNT: Mr. Valdivieso, so if we can
8  stipulate on the record, because this is all conducted
9  over video that the court reporter is here, and that
10  we can swear the deponent in and that there will be no
11  issues with the transcript as far as there'll be no
12  objection that the deponent can be sworn in remotely.
13      MR. VALDIVIESO: Yes, we stipulate to
14  that.
15          *    *    *    *    *
16      LAURA CAMILA BARRIGA RODRIGUEZ,
17  having been first duly sworn to state the whole truth,
18  testified as follows:
19      (Deponent's reply to oath: Yes, I do.)
20          EXAMINATION
21  BY MR. HUNT:
22      Q.  Ms. Barriga, are you comfortable
23  proceeding in the deposition in English?
24      A.  Yes.
25      Q.  Okay. I'd like to cover some ground

---

6

1  rules before we get into a lot of the questions. If
2  there's a question that you don't understand, please
3  let me know and I'll try to rephrase it.
4      A.  Okay.
5      Q.  Have you ever -- have you ever been
6  deposed before?
7      A.  In the what?
8      Q.  Have you ever taken a deposition before?
9      A.  No.
10      Q.  Have you ever testified under oath?
11      A.  No.
12      Q.  You understand that when you're under
13  oath you have to tell the truth?
14      A.  Yes.
15      Q.  We have a court reporter here, she's
16  going to be writing down everything that we say, so
17  I'd ask that just let me finish my question before you
18  start your answer, and then I'll let you finish before
19  asking another question and that way we won't be
20  talking over each other. Does that make sense?
21      A.  Yes.
22      Q.  Okay. And your attorney may object to a
23  question that I have asked. Unless he tells you not
24  to answer the question, I just ask that you go ahead
25  and answer.

---

7

1      A.  Okay.
2      Q.  Okay. And if you need a break, this
3  isn't an endurance contest, just let me know, and
4  we'll take a break. The only thing that I ask is if
5  I've asked a question -- excuse me. If there's a
6  question pending, we'll just finish that before we
7  take the break. Okay?
8      A.  Sure.
9      Q.  All right.
10      A.  Yes.
11      Q.  Did you review any documents to prepare
12  for this deposition?
13      A.  No.
14      Q.  Did you prepare for the deposition?
15      A.  What do you mean if I prepare? Like if
16  I --
17      MR. VALDIVIESO: I'm going to jump in
18  here. I'm sorry, but I'm going to instruct the
19  witness not to disclose any communication between
20  myself or any other of her attorneys. You may answer
21  the question without revealing any -- if you can
22  answer the question without revealing any
23  communication, you can.
24      THE DEPONENT: Okay.
25      Q.  (BY MR. HUNT) Ms. Barriga, another

---

8

1  ground rule that I ask you since we're on the -- since
2  we haven't really, you know, gotten into the questions
3  yet, when you're talking about the host family's
4  children, if you could just try to avoid their names
5  and instead say the child's gender or age or another
6  way to identify the child, that would be appreciated.
7  Okay?
8      A.  Okay. Yes.
9      Q.  All right. How did you first learn
10  about the lawsuit against InterExchange?
11      A.  Because I got an e-mail.
12      Q.  From whom?
13      A.  I receive an e-mail about the lawsuit
14  against the au pair company. That's how I hear about
15  that.
16      Q.  And who was the e-mail from?
17      A.  I don't remember the name. But I'm
18  pretty sure it was from like a group of lawyers.
19      Q.  And when did you receive that e-mail?
20      A.  It was last year, probably around
21  August, September, something like that.
22      Q.  Do you remember signing up for the
23  lawsuit?
24      A.  Yes.
25      Q.  I'm going to pull up a document on the

---

2 (Pages 5 to 8)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

9

1 screen. So give me one second. Can you see that
2 document?
3 A. No.
4 Q. No?
5 A. No.
6 MR. HUNT: Mr. Valdivieso, can you see
7 that document?
8 MR. VALDIVIESO: I can see the document,
9 yes. Do you want to go off the record for a second?
10 MR. HUNT: Let's do.
11 (Off-the-record discussion.)
12 Q. (BY MR. HUNT) We'll go back on the
13 record. Ms. Barriga, could you please look at the
14 document that says "Consent to join."
15 A. Yes.
16 Q. Can you please confirm, because we're
17 doing this remotely, that we're looking at the same
18 document. Can you tell us what it says in bold type
19 at the top of the document?
20 A. "Consent to join. In order for you to
21 join this case, you must complete and submit this form
22 by November 2."
23 Q. And is that your electronic signature?
24 A. Yes.
25 Q. And it's dated? Next to your signature,

10

1 there's a date. Can you please read that?
2 A. August 15, 2017.
3 Q. Thank you. Let's mark this document as
4 Exhibit 1. Did you understand when you signed this
5 document that you would be joining a lawsuit against
6 InterExchange?
7 A. Yes, I did.
8 Q. What is your understanding of what this
9 lawsuit is about?
10 A. What I understood is that this lawsuit
11 is -- is with the purpose of claiming money that
12 wasn't paid to the au pairs, like we were paid under
13 the minimum wage. So what I understood is that this
14 lawsuit is in order to claim for that money that
15 wasn't paid during the time that we were au pairs.
16 Q. And that money was not paid by whom?
17 A. By the employer, which I think is the
18 company.
19 Q. Okay.
20 A. The au pair company.
21 Q. Okay. When you first came to the United
22 States for the au pair program, what did you believe
23 you were going to be paid by the family with whom you
24 lived?
25 A. We were told that they were going to pay

11

1 us at least $195.75 and that the host family had to
2 pay it like weekly.
3 Q. Okay. And you understood the host
4 family was responsible for paying it?
5 A. Yes.
6 Q. And when you say that it was going to be
7 at least $195.75, did you understand what "at least"
8 meant?
9 A. Yes.
10 Q. And could you tell me what that means?
11 A. Well, that means that what the host
12 family is committed to pay. That's the -- what they
13 have to pay according to the agreement.
14 Q. You lived with the Conley family; is
15 that correct?
16 A. Correct.
17 Q. Where was that?
18 A. Where?
19 Q. Yeah.
20 A. In Pennsylvania.
21 Q. Before learning about the lawsuit, did
22 you have any concerns about what you would be paid?
23 A. Well, honestly, yes. Because only when
24 you get to the United States to live here, you realize
25 that that money is not -- is not good enough for all

12

1 what you have to do when you're working as an au pair,
2 so like even though I knew that I had signed an
3 agreement, I knew that that wasn't good money to me.
4 Q. And did you know that before you came to
5 the United States?
6 A. No. I mean, I knew that we were
7 going -- we were going to get paid that amount of
8 money. But maybe I have like -- like bad concept of
9 how much $195 in America. Like if you go back to my
10 country where the dollar is like -- is expensive, then
11 you might think that you're going to make a good
12 amount of money, but then when you come here, you
13 realize that it's not that good. And especially when
14 you are around and you see like other people doing the
15 same job that you do and getting better payment, so I
16 didn't know that before.
17 Q. And you mentioned other people. Who are
18 the other people you're talking about?
19 A. I'm saying other baby-sitters. You
20 know, that are like -- other nanny jobs and
21 baby-sitter jobs, so it's just not exactly get paid
22 like better per hour.
23 Q. Yeah. Were those other baby-sitters and
24 nannies living with the family for whom they cared?
25 A. I knew of some that lived with them.

3 (Pages 9 to 12)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

13

1       **Q. And were those au pairs or were those**
2 **baby-sitters?**
3       A. Well, of course I knew the au pairs and
4 other baby-sitters.
5       **Q. Okay. So did you have any concerns**
6 **about the amount of money that you'd receive before**
7 **you entered the au pair program?**
8       A. Not before. After.
9       **Q. Okay. And the consent to join that we**
10 **looked at earlier, where were you living when you**
11 **signed it?**
12       A. Here in Pennsylvania. I'm still living
13 here.
14       **Q. Okay. How long have you lived in**
15 **Pennsylvania, since you entered the program?**
16       A. Yes. Since June 2015.
17       **Q. And I asked you a little bit about the**
18 **Conley family earlier, did you extend your stay there?**
19 **Can you tell me how long you lived with them?**
20       A. I lived for two years with them.
21       **Q. Do you still communicate with the Conley**
22 **family?**
23       A. Yes.
24       **Q. Okay. Have you discussed this lawsuit**
25 **with the Conley family?**

---

14

1       A. Not really.
2       **Q. When you say "not really," is that a no?**
3       A. Like we have never talked about that.
4       **Q. Okay. Other than your lawyer, have you**
5 **discussed this lawsuit with other people?**
6       A. Maybe other friends that were wondering
7 if they would join the case, but no one else.
8       **Q. Other friends, is that other au pairs?**
9       A. Yes, that were au pairs at some point.
10       **Q. Okay. And is that before or after you**
11 **joined the lawsuit?**
12       A. It was before and after.
13       **Q. And can you describe those**
14 **conversations?**
15       MR. VALDIVIESO: I'm actually going to
16 object here. To the extent that these conversations
17 took place once Ms. Barriga was a party and they were
18 with other au pairs who are also plaintiffs, they're
19 aligned parties with a common interest, and so to the
20 extent those conversations reflected any legal advice
21 that had been received by any of the au pairs that
22 were parties to this lawsuit, to the extent that those
23 conversations, which Ms. Barriga shared the legal
24 advice received from the plaintiffs, I'm going to
25 claim attorney-client privilege over those

---

15

1 conversations and that any discussion of that
2 attorney-client communication did not result in a
3 waiver because those were two parties on the same side
4 of a lawsuit.
5       So if Ms. Barriga can answer that
6 question without revealing any legal advice that was
7 communicated in those communications between au pairs
8 that were parties to this lawsuit, she may do so.
9       And having given that very long
10 objection, Joe, if you want to repeat your question,
11 you may.
12       MR. HUNT: Sure.
13       **Q. (BY MR. HUNT) Other than your lawyer,**
14 **did you -- can you -- other than your -- what your**
15 **lawyer has told you, can you describe the**
16 **conversations that you have had about this lawsuit**
17 **with other au pairs?**
18       A. Yeah, it was just like they didn't know
19 that they were going to join or if that would work
20 eventually no more. It was not a big deal about that.
21 They were trying to decide if they were going to join
22 the case or no. That's it.
23       **Q. And did you have any other conversations**
24 **about the lawsuit with anyone else besides au pairs?**
25       A. No.

---

16

1       **Q. Did you complete a survey or a**
2 **questionnaire in connection with this lawsuit?**
3       A. Yes.
4       **Q. And when did you do that?**
5       A. I don't remember exactly, but it had to
6 be maybe around October, September. I don't have that
7 in mind right now.
8       **Q. Do you remember how many questions you**
9 **answered or how many questions were included in the**
10 **survey?**
11       A. I don't know. It was many questions,
12 but I don't remember how many.
13       **Q. Was it about 20 or 50 or 100, if you**
14 **could guess?**
15       A. I would say about between 20 and 40. I
16 don't know.
17       **Q. Did you respond to the questions?**
18       A. Yes, I did.
19       **Q. How many different host families did you**
20 **have in the au pair program?**
21       A. Only one.
22       **Q. Can you tell me about when you learned**
23 **about the au pair program itself?**
24       MR. VALDIVIESO: Objection to form.
25       **Q. (BY MR. HUNT) Let me rephrase, actually.**

---

4 (Pages 13 to 16)

LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

17

1        When did you first learn about the
2 opportunity to be an au pair in the United States?
3     A. I hear it from a friend that was an au
4 pair almost like eight years before I came here. And
5 I was looking for, you know, like opportunities to
6 study abroad or to do something out of my country. My
7 friend who was also an au pair, she told me about the
8 program.
9     Q. And you said that was about eight years
10 before you actually came to the United States?
11     A. Yeah.
12     Q. Okay.
13     A. Yeah, it was like -- yeah.
14     Q. Had you been to the United States before
15 you became an au pair?
16     A. No.
17     Q. Okay. And you said your friend was also
18 an au pair?
19     A. Yes.
20     Q. Do you know whether your friend was an
21 au pair with InterExchange?
22     A. No. She was an au pair with Cultural
23 Care.
24     Q. Cultural Care. When you -- after you
25 learned about the program from your friend, did you do

18

1 anything to get more information about the program?
2     A. Only when I decided that that was what I
3 wanted to do, that I went into the agency and I asked
4 about the program, but nothing before that.
5     Q. What agency was that?
6     A. Global Connection.
7     Q. Global Connection?
8     A. Yes.
9     Q. So you went to Global Connection to get
10 more information. What type of -- what type of
11 information were you looking for?
12     A. How much was the program, what were the
13 requirements to apply.
14     Q. And what was Global Connection's
15 answers?
16     A. They said that the program cost like 3
17 million pesos. It's, like I would say, like around
18 $1,000 right now. And they also said that in order to
19 be an au pair, you needed to have an -- like a
20 B-1 level of English as your second language. You
21 have also need to have two -- at least 200 hours of
22 experience with kids. Yeah. That was pretty much it.
23     Q. Okay. Did they explain -- did the
24 Global Connection explain how the application process
25 worked?

19

1     A. Yes.
2     Q. What did they say about that?
3     A. They said that we had to pay first.
4 First you have to pay like -- like 60,000 pesos,
5 Columbiano, for you to get an interview to see if you
6 have like -- if you like have a good level of English,
7 and if you approve that interview, then you can --
8 what you can do next is to pay 2 million pesos,
9 Columbiano, which included the creation of your
10 profile online and then you have to fill up that
11 application like with a lot of information of
12 yourself, your family, your experience with children,
13 your occupation, your education, a lot of things.
14     And at the end, you have to upload a
15 video when you were like introducing yourself to the
16 host family, and that when that application was done,
17 then it would be available so the families can reach
18 out to you. And that when that happened, then you get
19 to have like conversation with the family that had
20 chosen to see your profile. And if both sides got a
21 match, then they do match and then you had to pay the
22 other half of the -- of the cost of the program.
23     And -- no. No. No, not yet. When you
24 have match, then you had to pay X amount of money for
25 you to get the interview Visa and they told us like,

20

1 this doesn't guarantee you that you're going to get a
2 Visa, a J1 Visa, so I had to pay for the Visa and once
3 I got the Visa, then I have to pay the other part of
4 the program. And then that's it. And they told us
5 that once you pay the total amount of the program, and
6 you have your Visa, then you will have to pay also for
7 the international driver's license. And that once you
8 get your Visa, you know what was the day you were
9 going to be arriving to the U.S.
10     Q. Okay. You said that you interviewed.
11 Was that with Global Connection?
12     A. Yes.
13     Q. Okay. And you said that you completed a
14 profile online. Was that also through Global
15 Connection?
16     A. That was through InterExchange.
17     Q. Okay. And so did Global Connection
18 introduce you to InterExchange?
19     MR. VALDIVIESO: Objection to form.
20     Q. (BY MR. HUNT) You can go ahead and
21 answer. Let me -- actually, you know what, let me
22 rephrase.
23     Did you apply to the au pair program
24 through a single agency or multiple agencies?
25     MR. VALDIVIESO: Objection to form.

5 (Pages 17 to 20)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

21

1    A.  I apply -- well, the application they
2  explain to us, InterExchange had like different
3  agencies in each country, which had the connection to
4  InterExchange.  So I -- I signed my application as an
5  au pair with Global Connection, but they just made the
6  connection to InterExchange.
7    Q.  Okay.  Did Global Connection have any --
8  so do you understand what I mean when I say "sponsor,"
9  that InterExchange was a sponsor?
10    A.  No, I don't.
11    Q.  Okay.  Did Global Connection have any
12  other connections to other entities like
13  InterExchange?
14    A.  I don't know.
15    MR. VALDIVIESO:  Object to form.
16    Q.  (BY MR. HUNT) You don't know.  What
17  organization recruited you to be an au pair?
18    A.  Like with -- which organization that I
19  went to through my process to become an au pair?
20    Q.  Sure.
21    A.  Global Connection.  But my profile, as
22  an au pair, was in the website of InterExchange.
23    Q.  Okay.
24    A.  They just made the connection.
25    Q.  Okay.  And do you know what I -- what I

---

22

1  mean when I say "recruit"?  Do you know what the word
2  "recruit" means?
3    A.  Can you please identify it?
4    Q.  I'll rephrase the question.
5    A.  Okay.
6    Q.  How did you decide to apply to
7  InterExchange?
8    A.  Because I wanted to study abroad
9  English.  I wanted to improve my English as a second
10  language, so I considered different alternatives for
11  me to come to the U.S.  So I found out that the au
12  pair program was actually cheap for me to afford and
13  that's how I ended up going to that company to begin
14  my process.
15    Q.  You said it was cheap to afford.  Who
16  were you paying?
17    A.  InterExchange.
18    Q.  When did you pay InterExchange?
19    A.  It was like February or March --
20  February of 2015.
21    Q.  Okay.  What was that payment?
22    A.  As I said before, it was about -- it was
23  2 million pesos, Columbiano, at first and then at the
24  end when you got the match and the Visa approved, you
25  pay another million pesos, Columbiano.

---

23

1    Q.  Okay.  And are you sure that went to --
2  was that payment made to InterExchange or was it made
3  to Global Connection?
4    A.  It was made to InterExchange because
5  InterExchange was the one who was making -- was
6  sending all the documents that I needed for me to get
7  the Visa.
8    Q.  Okay.
9    A.  Global Connection didn't elaborate any
10  documents for me to apply for the Visa.
11  InterExchange -- once I made the payment, and once I
12  created my profile and everything, they send from
13  here -- from New York to Columbia, all the
14  documentation that I needed.
15    Q.  You said "they," who is "they"?
16    A.  InterExchange.
17    Q.  Okay.  And how was that payment made
18  for -- that you were talking about, was it cash,
19  check, electronic transfer?
20    A.  It was electronic payment.  I don't
21  remember if I paid it with my debit card or with my
22  credit card.  I think I paid some of it with my credit
23  card, but most of it was electronic payment.  They
24  didn't accept cash.
25    Q.  And this was before or after you created

---

24

1  your application?
2    A.  Yes.  You have to pay -- you have to pay
3  first if you want to create your application.
4    Q.  Okay.  Do you understand that there are
5  several different companies or entities that sponsor
6  au pairs to come to the United States?
7    MR. VALDIVIESO:  Objection to form.
8    Q.  (BY MR. HUNT) You can go ahead and
9  answer, Ms. Barriga.
10    A.  Could you please rephrase it?
11    Q.  Sure.  Do you understand that there are
12  companies like InterExchange that sponsor au pairs to
13  come to the United States?
14    A.  What do you mean by "sponsor"?
15    Q.  Let me rephrase the question.  You
16  mentioned earlier that your friend was an au pair for
17  Cultural Care?
18    A.  Uh-huh.  Yes.
19    Q.  And you were an au pair for
20  InterExchange?
21    A.  Yes.
22    Q.  Do you understand that there are other
23  companies like InterExchange?
24    A.  Yes.
25    Q.  Okay.  Why did you choose InterExchange

---

6 (Pages 21 to 24)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

25

1  over Cultural Care or another company like
2  InterExchange or Cultural Care?
3         MR. VALDIVIESO: Objection to form.
4         A.  Because by the time that I wanted to
5  begin my process to become an au pair, I had had
6  already completed my bachelor degree in my country,
7  and I wasn't studying and I wasn't working either and
8  all the -- Cultural Care, actually because I went to
9  ask about the process, they told me that I couldn't
10 apply because I wasn't doing anything in the country
11 and in order for me to get my Visa, I needed to have
12 something that basically attach me back to my country,
13 like something like if I was studying a master's or
14 something like that or even working, but I wasn't
15 doing anything, so they told me that I couldn't begin
16 my process with them.
17        So I went to Global Connection and they
18 told me that that was okay as long as I had the
19 English and the experience with children, that I was
20 fine.
21        Q.  Cultural Care said that you could not
22 apply?
23        A.  Yes.
24        Q.  And Global Connection told you that you
25 could not apply to Cultural Care?

---

26

1         A.  No.  Global Connection said that I could
2  apply to be an au pair.
3         Q.  But not with Cultural Care?
4         A.  They didn't say anything about Cultural
5  Care.
6         Q.  Okay.  Did your friend who was an au
7  pair tell you about any of his or her concerns about
8  the program?
9         MR. VALDIVIESO: Objection to form.
10        A.  She just told me about the experience
11 that she had had with her host family, but nothing
12 else.
13        Q.  (BY MR. HUNT) Was it a good or bad
14 experience, if you remember?
15        A.  She had a good experience.  Although,
16 sometimes they were like kind of some
17 misunderstandings with the family, but not a big deal.

---

27

1         Q.  Do you remember any other complaints
2  that your friend had?
3         A.  No, I don't remember.
4         Q.  Did your friend tell you how much you'd
5  be paid as an au pair?
6         A.  She did.
7         Q.  How much?
8         A.  She told me it was near $200.
9         Q.  Okay.  And was this before or after --
10 did you and your friends speak about this before or
11 after you applied?
12        A.  When we spoke, it was like when we just
13 met, so it was like almost like two years before I
14 decided to apply for the program.
15        Q.  Okay.  And did your friend have any
16 complaints about how much she was paid?
17        A.  We never talk about that.
18        Q.  She did not have any complaints about
19 how much she was paid?
20        A.  We never talk about that.
21        Q.  Okay.  Just so I'm clear, so the answer
22 is no?
23        A.  Yes.
24        Q.  Okay.
25        A.  The answer is no.

---

28

1         Q.  Okay.  Thank you.  What -- you said that
2  you wanted to develop your English language skills in
3  the au pair program.  Were there any other aspects of
4  the au pair program that interested you?
5         A.  Maybe the fact that I can come to
6  America and to live here and have that, like -- like,
7  cultural relationship.  That's it.
8         Q.  Okay.  A cultural relationship with your
9  host family?
10        A.  Yes.
11        Q.  And others in the neighborhood and your
12 travels that you anticipated having?
13        MR. VALDIVIESO: Objection to form.
14        Q.  (BY MR. HUNT) Actually, let me ask you a
15 different question.  What does cultural relationship
16 mean to you?
17        A.  Like the possibility for me to like
18 exchange my cultural beliefs with their cultural
19 beliefs and their -- my traditions to their
20 traditions.  And I don't know, like, for example, in
21 my country, we don't celebrate Thanksgiving.  So for
22 me, it was like something new that I got to have here
23 with this family.
24        Q.  Were there any other new experiences or
25 new cultural relationships that you had when you were

---

7 (Pages 25 to 28)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

29

1  an au pair?
2      A.  No.
3      Q.  Okay.  What other cultural relationships
4  did you expect on having?
5      A.  I thought that -- when I was in my
6  country, and I had on my mind what I was going to get
7  without worrying about, like, rent or food or other
8  expenses, I thought that I was going to be able to
9  save a lot of money and then to travel at least every
10  month somewhere else, and I thought that I was going
11  to do that, but I just -- I couldn't.
12      Q.  Why did you expect to travel every month
13  as an au pair?
14      A.  Because I thought that I was going to
15  make a good amount of money and I was going to be able
16  to save it in order to travel.
17      Q.  Did anyone from InterExchange tell you
18  that you were going to travel every month?
19      A.  No.
20      Q.  What does the term "cultural exchange"
21  mean to you?
22          MR. VALDIVIESO:  Object to form.
23      A.  As I said, it's like when I -- when I
24  try to share my culture with my host family and then
25  when they're sharing their culture with me as well.

30

1  That's what it means to me.
2      Q.  (BY MR. HUNT)  Okay.  So cultural
3  relationship and cultural exchange mean the same to
4  you?
5      A.  Yes.



31

4      Q.  Okay.  And while you were still in
5  Columbia, did you meet with anyone from InterExchange?
6      A.  No.
7      Q.  You only met or -- excuse me, did you
8  talk with anyone from InterExchange?
9      A.  Not directly, but by e-mail that my --
10  the person who was helping me with the process in
11  Columbia send e-mails, like, to someone at
12  InterExchange, hi, just letting you know, she already
13  got the interview for the Embassy, and then another
14  one like where they would tell InterExchange that I
15  had gotten my Visa approved.  And maybe another one
16  talking about international driver's license.
17      Q.  Was that person with global agency or
18  Global Connection?
19      A.  Like the person from Global Connection
20  e-mailed InterExchange and he copied me.
21      Q.  Did you ever talk about the money that
22  you would receive?  When I say "stipend," do you know
23  what I'm talking about?
24      A.  Yes.
25      Q.  Did you ever discuss the stipend with

32

1  anyone from Global Connection?
2      A.  When they -- when they explained to me
3  the program, they told me that the payment was going
4  to be $195.75.
5      Q.  Okay.  Just for clarity, I asked you
6  what the term "stipend" was.  What's your
7  understanding of "stipend" -- of what "stipend" means?
8      A.  What is in the agreement that it's going
9  to be the amount.
10      Q.  Okay.  The amount of?
11      A.  Of the payment.
12      Q.  Of payment.  Okay.  So aside from the
13  e-mails that you had, you were copied on from Global
14  Connection, did you have any other discussions with
15  InterExchange before you came to the United States?
16      A.  I think I got an e-mail where they told
17  me that -- about my flight to New York and that's --
18  something like that.  Just about like my trip to the
19  U.S.  Like last minute arrangements.
20      Q.  Okay.  Did you -- do you recall applying
21  to the au pair program?
22      A.  Did I -- can you repeat it, please?
23      Q.  Do you remember applying to the au pair
24  program?
25      A.  Yes, I do.

8 (Pages 29 to 32)

LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

33

1    Q.  And that application was to
2  InterExchange, you applied to the InterExchange
3  program?
4    A.  Yes.
5    Q.  Did you complete the InterExchange
6  application yourself?
7    A.  Yes.
8    Q.  Did anyone help you complete the
9  application?
10    A.  When I got the references, if I can say
11  that that's help, like when they provide me the
12  references.  Besides that, no.
13    Q.  Do you remember receiving some
14  pre-application information from InterExchange?
15    A.  I remember that I sign some documents
16  before I began my application.
17    Q.  Okay.  Among the documents that we sent
18  you, there's a document called pre-application
19  information.  Could you pull that document up?
20    A.  Yeah.  Pre-application information from
21  InterExchange au pair USA.
22    Q.  Okay.  And just to confirm that we're
23  looking at the same document since we're all speaking
24  remotely, can you read the first sentence of that
25  document?

34

1    A.  "The following information describes the
2  InterExchange au pair USA program offered in
3  cooperation with Global Connection in Columbia."
4    Q.  Thank you.  And you can scroll through
5  the document, read the document as much as you'd like
6  to familiarize yourself, but I'd like to confirm on
7  last page, page 5, if that is your signature?
8    A.  Yes, it is.
9    Q.  Did you read this document before you
10  signed it?
11    A.  Yes.
12    Q.  Did you understand it?
13    A.  Yes.
14    Q.  Did anyone help you in reading the
15  document?
16    A.  I was with my advisor when I was doing
17  this, so probably he did.  I don't remember.
18    Q.  Who was your advisor, is that Global
19  Connection?
20    A.  The person from Global Connection.
21    Q.  Okay.  Do you see on the first page of
22  that document, there's a paragraph that says "number
23  of hours"?
24    A.  Yes.
25    Q.  And it says, "Au pairs can work a

35

1  maximum of 45 hours per week"?
2    A.  Uh-huh.
3    Q.  You read that before you applied to the
4  program?
5    A.  Yes.
6    Q.  Did you understand what it means?
7    A.  Yes.
8    Q.  And then the next paragraph, "Wages and
9  compensation"?
10    A.  Uh-huh.
11    Q.  It says, "Au pairs are paid at least
12  $195.75 per week regardless of the number of hours
13  worked on a given week."  Do you understand that?
14    A.  Yes.
15    Q.  So did you understand that if you worked
16  one hour a week or 20 hours in a week, you'd still be
17  paid 195.75?
18    MR. VALDIVIESO:  Objection to form.
19    A.  Yes, I understood that.
20    Q.  (BY MR. HUNT) And --
21    MR. VALDIVIESO:  I'm just going to jump
22  in and ask that Ms. Barriga give me a moment after
23  each question.  I'm keeping my objections to a
24  minimum, but if you could give a little bit of a break
25  in between so if I do need to object, I can object

36

1  without speaking over you or Mr. Hunt, I would
2  appreciate it.  Thank you.
3    THE DEPONENT:  Okay.
4    Q.  (BY MR. HUNT) Did you understand that
5  you could be paid more than 195.75?
6    A.  I understood it in a different way, like
7  they will have to pay me at least the agreement, that
8  amount of money.
9    Q.  Did you understand that they could pay
10  you -- when it says "at least," did you understand
11  that that meant that they could pay you more than that
12  amount?
13    A.  Yes.
14    Q.  And I know we're skipping, but this
15  document has been marked Exhibit 3.  We'll come back
16  to Exhibit 2, if that's okay.
17    MR. VALDIVIESO:  It's okay with me.
18    Q.  (BY MR. HUNT) So did you -- you
19  understood that this -- that wages and compensation
20  that we were discussing, you understood that that was
21  the weekly stipend?
22    A.  Yes.
23    Q.  Okay.  And did you have any discussions
24  with anyone at InterExchange or representatives about
25  the stipend before you came to the United States?

9 (Pages 33 to 36)

37

1    A.  No.
2         Q.  Okay.  Did you ask any questions to
3    Global Connection about the weekly stipend before you
4    came to the United States?
5         A.  No.
6         Q.  Okay.  Could you please turn to the
7    third page.  Do you see at the top of the page it
8    says, "Itemized list of fees"?
9         A.  Yes.
10        Q.  Just so we're on the same page and
11   place, could you read what that says?
12        A.  "Au pairs are responsible for paying the
13   fees below to Global Connection."
14        Q.  Okay.  And are these the -- are these
15   the same fees listed there that you were referring to
16   earlier?
17        A.  Yes.
18        Q.  Okay.  Does that refresh your memory
19   about to whom the fees were paid?
20             MR. VALDIVIESO:  Objection to form.
21        Q.  (BY MR. HUNT) Let me ask you a different
22   question.  Did you pay the application fee listed
23   there?
24        A.  Yes.
25        Q.  Okay.  Do you remember to whom you paid

38

1    the application fee?
2         A.  I pay it.  I make the payment to Global
3    Connection, but that payment was like to InterExchange
4    because InterExchange was the one who provide all the
5    documents that I needed.
6         Q.  Okay.
7         A.  And was the one who -- they're the ones
8    that have to make it possible for me to create my
9    profile online.  It wasn't Global Connection.
10        Q.  Just so I'm clear, you paid Global
11   Connection, but Global Connection sent the fee --
12   excuse me.  You paid Global Connection and then Global
13   Connection paid InterExchange?
14        A.  What I want to say is that payment, I
15   made it at Global Connection.  I don't know how that
16   works between those companies, but what I understood
17   at that point is that Global Connection was just like
18   making the connection between InterExchange and
19   myself.
20        Q.  Okay.
21        A.  I don't know how that worked, if they
22   paid them or what.
23        Q.  Okay.  And the same with the matching
24   fee that was paid at Global Connection?
25        A.  Yes.

39

1         Q.  Okay.  And you believe Global Connection
2    transferred that fee to InterExchange?
3         A.  I believe that they had an arrangement
4    about that money.  I don't know how much money of
5    that.
6         Q.  Okay.
7         A.  I don't know if they transferred all the
8    fees to InterExchange.
9             MR. HUNT:  Does anyone need a break?
10            MR. VALDIVIESO:  I could use one.
11            MR. HUNT:  Okay.  Let's go off the
12   record.
13            MR. VALDIVIESO:  Yes.
14            (Recess taken, 10:38 a.m. to 10:50 a.m.
15            Q.  (BY MR. HUNT) Okay.  Everybody can see
16   and hear?
17        A.  Yes.
18        Q.  Let's go back on the record.
19            Ms. Barriga, you started the matching
20   process following your application; is that right?
21        A.  Yes.
22        Q.  And you started the matching process
23   while you were still in Columbia?
24        A.  Yes.
25        Q.  So can you tell me about the matching

40

1    process you went through?
2             MR. VALDIVIESO:  Objection to form.
3         A.  After I complete my application, it was
4    like on Friday, and then on Monday, the Conley family
5    started watching my profile, so they e-mailed me and
6    we set up my interview next Thursday.  And then after
7    that interview, we set up a second interview on
8    Saturday and that's when we made match.
9         Q.  (BY MR. HUNT) Thank you.  Before you
10   matched with the Conleys and before you went through
11   the interview process, were you able to view other
12   families who were interested in you?
13        A.  No.  That was the only family.
14        Q.  Okay.  So you only interviewed with the
15   Conley family?
16        A.  Yes.
17        Q.  And you had two interviews with the
18   Conley family and then did -- how did the Conley
19   family pick you to be an au pair or did you pick them?
20   How did that work?
21            MR. VALDIVIESO:  Objection to form.
22        A.  What we were told is that families were
23   able to see many au pairs at the same time, but once a
24   family started watching our profile, then all profiles
25   cannot be seen by a different family at the same time.

10 (Pages 37 to 40)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

41

1  So we don't have -- we couldn't have the opportunity
2  to look at the families, but the families were the
3  ones who -- who had the chance to see like many au
4  pairs at the same time. We were just waiting for a
5  family to start watching our profile. And I don't
6  know if they were considering other au pairs. I don't
7  know that. We just made match in less than a week.
8      Q. (BY MR. HUNT) Okay. You said what we
9  were told is this process. Who told you that?
10     A. Global Connection, they told us that
11  that was the process.
12     Q. Okay. Who made the decision for you to
13  match with the Conley family?
14     A. After we had the interview, they sent me
15  an e-mail and they said that they -- they like me a
16  lot, and they love if I would like to be their new au
17  pair, and I just said yes.
18     Q. Okay. Did InterExchange assign you to
19  the Conley family?
20     A. No.
21     Q. Let me ask you a couple questions about
22  those interviews that you were discussing earlier with
23  the Conley family. You said you had two of them?
24     A. Uh-huh.
25     Q. And were those via Skype?

---

42

1      A. Yes.
2      Q. Okay. Who from the host family was part
3  of the interview? Let's take them one at a time. Who
4  from the host family was part of the first interview?
5      A. In both interviews were all of them,
6  were the host parents and after I talked with them,
7  they introduced the kids to me.
8      Q. And there were two kids; is that right?
9      A. Yes.
10     Q. Okay. Was anyone from Global Connection
11  part of the interview?
12     A. No.
13     Q. Was anyone from InterExchange part of
14  the interaction?
15     A. No.
16        MR. HUNT: Okay. I'm going to stop just
17  because I think we've lost Mr. Valdivieso, so let's go
18  off the record.
19        MR. VALDIVIESO: I'm here. I just cut
20  my video because I got up for a second.
21        MR. HUNT: Okay.
22     Q. (BY MR. HUNT) Did you want to go live
23  with the Conley family when they chose you?
24     A. Yes.
25     Q. Okay. And you chose them too; is that

---

43

1  right?
2      A. Yes.
3      Q. Could you have said no when they offered
4  you a chance to be their au pair?
5      A. I could have, but I really liked the
6  family.
7      Q. Okay.
8      A. So that's why I made match with them.
9      Q. During the interviews that you had with
10  the Conley family, did you talk about how much you
11  would be paid?
12     A. No.
13     Q. Did you talk about who would be paying
14  you?
15     A. No.
16     Q. When did you learn -- when did you first
17  learn how much you would be paid as an au pair?
18     A. When -- like I knew about the amount of
19  money when I first talked to my friend years ago.
20     Q. Okay. Well, when did you learn how much
21  the Conley family was going to pay you?
22     A. When they paid me the first time.
23     Q. Okay. How much was that?
24     A. It was 200.
25     Q. Were you okay with that amount?

---

44

1      A. At that point, yes.
2      Q. Did you ask your host family to pay you
3  more than that amount?
4      A. No.
5      Q. During the Skype interviews, did you
6  talk with the host family about what you would be
7  doing with the children?
8      A. Yes.
9      Q. And what -- can you describe that
10  conversation?
11     A. Well, the first interview was more about
12  like introducing ourselves, like what I like to do
13  and, you know --
14        MR. HUNT: I think we're having
15  technical problems.
16        MR. VALDIVIESO: Why don't we go off the
17  record.
18        MR. HUNT: Agreed.
19        (Off-the-record discussion.)
20        MR. HUNT: We're back on the record and
21  I'm going to ask the court reporter to repeat my last
22  question?
23        (The questions and answer were read back
24  as follows: "During the Skype interviews, did you
25  talk with the host family about what you would be

---

11 (Pages 41 to 44)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



45

1    doing with the children?
2        A.  Yes.
3        Q.  And what -- can you describe that
4    conversation?")
23       Q.  (BY MR. HUNT)  And these are the -- I
24   apologize.  I didn't mean to interrupt you.
25       A.  It's okay.

46

1        Q.  Were you done with your answer?
2        A.  Yes.
3        Q.  Okay.  Were -- those were the duties
4    that the host family was describing during the
5    interview?
6        A.  Yes.
7        Q.  And were those -- were those the
8    duties that you actually performed as an au pair?
9        A.  Yes.
10       Q.  And you said -- you said that the host
11   family described the kids' routine?
12       A.  Yes.
13       Q.  What -- what did they describe about the
14   routine?
23       Q.  And during the school year, were the
24   kids -- did they describe that the kids would be in
25   school during part of the day?

47

1        A.  Yes.
2        Q.  Okay.  And was that the actual -- was
3    the routine that the kids had while you were an
4    au pair?
5        A.  Yes.
6        Q.  During that Skype interview, did the
7    Conleys tell you how many hours per day that you would
8    be working?
9        A.  They just told me -- they just told me
10   like a general idea of what the schedule would look
11   like.  They would say, like, you would usually start
12   working around 8:30 up to 5:30 or 6:30 or 7:00.  It
13   depends on what they were planning to do or the
14   parents or what time of the year and the plans that
15   they had.
16       Q.  And when you were an au pair, did you
17   start working at 8:30?
18       A.  Yes.
19       Q.  And when you were an au pair, did you
20   end at 5:30?
21       A.  Sometimes.  During the summer, 5:30,
22   5:45.  As I said, it was just like a general idea of
23   what my schedule was going to look like.
24       Q.  Okay.
25       A.  But my schedule also changed like every

48

1    week I could have, like, weeks where when I was on at
2    6:00 p.m. every day or other weeks where it was not
3    6:00, but 5:45 or 5:30, so it was just like -- they
4    just wanted to give me like a general idea of what was
5    going to be my schedule.
6        Q.  Okay.  Did they describe any time off
7    that you'd have during the day?
8        A.  Yes.  They said that when the kids were
9    at school, I was off.
10       Q.  And what was -- how long were
11   they -- during the school year, how long were the kids
12   in school?
22       Q.  Okay.
23       A.  The youngest.
24       Q.  So generally during the school year, you
25   had the mornings off?

12 (Pages 45 to 48)

LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

49

1  A.  No.  I started working before because I
2  had to drop them off.
3  Q.  Right.  Right.  So from 8:30 until the
4  school day began, you were working and then the rest
5  of the morning, you were not working?
6  A.  No.
7  Q.  Can you describe what you were doing?
8  When you say "no," is that -- I'm sorry.  Let me
9  rephrase it.
10  A.  I was not working.  I was not working.
11  Q.  Okay.
12  MR. VALDIVIESO:  I'm sorry, I actually
13  had trouble hearing the end -- the time that the
14  youngest child ended school.
15  A.  Yes.  The first year, the youngest --
16  could you hear me?
17  MR. VALDIVIESO:  I'm not asking you --
18  I'll actually have the court reporter read back the
19  answer.  I don't want to create more record.  I just
20  had trouble hearing.  Joe, is that okay?
21  MR. HUNT:  Yeah.

[redacted]

---

50

[redacted]

6  MR. VALDIVIESO:  Okay.  Thank you.  I
7  couldn't hear if it was 11:15 or 11:50.  Thank you.
8  Q.  (BY MR. HUNT) Can you pull up another
9  document, Ms. Barriga, that we sent you or that your
10  attorney sent you called the au pair agreement?
11  A.  Sure.
12  Q.  This is marked Exhibit 2.
13  A.  I got it.
14  Q.  Okay.  Just so we're on the same page
15  and same place, can you tell me what it says on the
16  first page in bold print?
17  A.  Says "AP agreement Laura Camila Barriga.
18  Au pair agreement, the agreement.  This is entered
19  into by InterExchange Incorporated not for profit
20  501."
21  Q.  Okay.  Thank you.  And if you --
22  your -- you can scroll and flip through the pages to
23  familiarize yourself with it and when you are familiar
24  with it -- well, do you recognize this document?
25  A.  I --

---

51

1  Q.  Take your time.
2  A.  I think -- I think this document was
3  given to us during the first week in New York City
4  with like a bunch of stuff.  If I'm not wrong, that's
5  what I think of this document.
6  Q.  Do you see on the first page below the
7  first paragraph it says, "InterExchange" and "I agree
8  to the following terms and conditions"?
9  A.  Yes.
10  Q.  And is that your electronic signature
11  below?
12  A.  Just my name.
13  Q.  Do you understand what an electronic
14  signature is?
15  A.  What I understand is that electronic
16  signature is the one that I have in the other paper
17  that I actually sign up.  But this is just my name.
18  Q.  Okay.  Do you remember signing this
19  document electronically?
20  A.  No.
21  Q.  You don't?
22  A.  I don't remember.
23  Q.  Do you believe that you did or did not
24  sign this document?
25  A.  I don't remember.

---

52

1  Q.  Okay.  Do you remember reading this
2  agreement?
3  A.  I remember that I look at this agreement
4  a couple of times just to make sure about the
5  extension program and the -- just about that.  Maybe
6  about the occasion, but not at all.
7  Q.  If you did -- if you did sign the
8  document, would you have read it before you signed it?
9  MR. VALDIVIESO:  Objection to form.  You
10  may answer.
11  A.  I usually read everything what I sign.
12  I don't remember that I had signed this document.
13  What I remember is either the training week in New
14  York, they told us about the agreement, so I don't --
15  I'm sure I didn't read it all.  I know that I looked
16  at the agreement a couple of times, but I don't
17  remember that I signed it.
18  Q.  (BY MR. HUNT)  Okay.  Do you remember
19  whether you understood the document?
20  A.  Yes.
21  Q.  And did you understand the document?
22  A.  I -- when I read -- when I look at the
23  document and it says agreement between au pair and the
24  au pair and InterExchange, I believe that the document
25  is pretty much about all what the au pair program is

---

13 (Pages 49 to 52)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

53

1  about, so if I'm looking at the document right now,
2  and it says duties and hours, I was told about that.
3  The section about the compensation, all of those items
4  were -- were -- we were told about all of that, so I
5  understood the agreement.
6      Q.  Okay.  And for the record, this is
7  InterExchange 0049012 through InterExchange 0049022.
8      Ms. Barriga, can you turn to the
9  paragraph that you were referencing earlier,
10  compensation?
11      A.  Yeah.
12      Q.  It's on -- are you there?
13      A.  Yes.
14      Q.  Could you please read the first
15  sentence -- first -- after weekly stipend?
16      A.  "I must be paid at least the minimum
17  appropriated U.S. Department of State mandate weekly
18  stipend on the same day each week beginning the day
19  after I arrive at the host family home."
20      Q.  And do you know what the minimum
21  appropriate U.S. Department of State mandated weekly
22  stipend was?
23      A.  I'm not sure.
24      Q.  Did you understand that you'd be paid a
25  minimum weekly stipend?

---

54

1      A.  Yes.
2      Q.  Did you know what amount that was?
3      A.  I guess they're referring to the 195.75.
4      Q.  Do you know what the term "minimum"
5  means?
6      A.  Yes.
7      Q.  Can you tell me what your understanding
8  of that is?
9      A.  That that's at least what has to be
10  paid.
11      Q.  Okay.  You arrived in the United States
12  around what month and year, if you remember?
13      A.  I arrive -- yes, I arrive on June 1,
14  2015.
15      Q.  Did you go to the -- did you go to
16  training in New York City?
17      A.  Yes, I did.
18      Q.  What -- that was before you met your
19  host family?
20      A.  Yes.
21      Q.  What sort of training was that?
22      A.  We arrive on Tuesday morning and during
23  the day, we were training with different -- different
24  topics, such as like the first aid with kids, like
25  newborns and also about like traffic signs and

---

55

1  regulations like in the U.S., like the stop signs and
2  all this stuff.  That's what I remember so far.
3      Q.  And were you required to receive that
4  training?
5      A.  Yes.
6      Q.  Do you know who required you to receive
7  it?
8      A.  InterExchange.
9      Q.  Okay.  And how long did the training
10  last?
11      A.  Three days.
12      Q.  How many hours per day?
13      A.  It was from -- from 8:00 to 5:00 every
14  day.
15      Q.  Did they provide -- were you provided
16  meals during that time?
17      A.  Yes.
18      Q.  And were you paid for the hours that you
19  were trained?
20      A.  No.
21      Q.  Okay.  Did you receive any other
22  training in Columbia before you came to the United
23  States?
24      A.  No.
25      Q.  And after the training, you went to go

---

56

1  meet your host family?
2      A.  Yes.
3      Q.  Okay.  Do you remember whether your host
4  family parents had jobs?  Were they employed?
5      A.  They have jobs.
6      Q.  Both parents or just one?
7      A.  Both.

---

14 (Pages 53 to 56)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



57

58

59

14    Q. Did you do any other duties outside of
15 child care?
16    A. No.

22    Q. Did the family give you a schedule every
23 week?
24    A. Yes.
25    Q. And was that schedule written down or

60

1    was it electronic or did they just tell you what the
2    schedule would be?
3        MR. VALDIVIESO: Object to form.
4    A. They give it to me by text message every
5    week.
6    Q. (BY MR. HUNT) By text message?
7    A. Yes.
8    Q. On your phone?
9    A. Yes.
10    Q. And did they provide a phone for you?
11    A. They did.
12    Q. Did they pay for the phone?
13    A. They did.
14    Q. Did they have any rules about using the
15    phone?
16    A. No.
17    Q. Did InterExchange have any rules about
18    using the phone?
19    A. No.
20    Q. Okay. Did anyone from InterExchange
21    ever give you your weekly schedule while you were
22    living with the Conley family?
23    A. No. The only one who provided the
24    weekly schedule was my host family.
25    Q. Did you keep any records about the

15 (Pages 57 to 60)

LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

61

1  weekly schedule?
2      A.  No, because it was on the phone and I
3  had to give back -- give back that phone when I
4  finished my second year.
5      Q.  Did you work the same days every week
6  with your host family?
7      A.  It depends.  During the summer, I
8  usually work just Monday through Friday.  During the
9  school year, sometimes I work on the weekends.  So
10  basically it was from Monday through Friday and maybe
11  every other Saturday when they have like date night or
12  something like that.
13      Q.  During the summer, how many days or
14  excuse me, during the summer, how many hours per day
15  did you work on Mondays?
16      A.  Like nine.
17      Q.  Nine.  And Tuesdays?
18      A.  The same.
19      Q.  Wednesdays?
20      A.  The same.
21      Q.  And Thursday and Friday, is that the
22  same as well?
23      A.  Uh-huh.
24      Q.  Okay.  So --
25          MR. VALDIVIESO:  Sorry.  If he asks you

---

62

1  a question that calls for a yes or no, it's important
2  to say the word, instead of uh-huh or nods or
3  gestures.
4          MR. HUNT:  Thank you.
5      A.  Okay.  What I want to say is that was --
6  I usually worked the same schedule because the kids
7  didn't go to camp or any activity, so I usually work
8  from 8:30 to 5:30, so it was like around nine hours
9  every day during the summer.
10      Q.  (BY MR. HUNT)  Okay.  And did you have
11  any time off during the day in the summer?
12      A.  No.
13      Q.  Okay.  Who determined which days of the
14  week that you worked?
15      A.  The host family.
16      Q.  Did InterExchange tell you what hours of
17  the day or which days to work?
18      A.  No.
19      Q.  During the school year, how many hours
20  per week did you work for your host family?
21      A.  Usually -- I usually work between
22  something 37 to 41 hours.  It was not the same
23  amount of hours every week.
24      Q.  Okay.  And I'm not sure I heard.  Did
25  you say 27?

---

63

1      A.  37.
2      Q.  37?
3      A.  Yeah.
4      Q.  You worked between 37 and?
5      A.  Like 41.
6      Q.  Okay.
7      A.  Something like that.  Some weeks, I have
8  more, like, free time.  Some others, I have to work
9  until like later, like 6:00 or 7:00, so it was -- it
10  wasn't just like regular like every day at this time
11  you're going to be off, no.  Sometimes I work on
12  Saturdays, so. . .
13      Q.  When you worked Saturdays, did you work
14  the whole day or less than that?
15      A.  Sometimes it was just from 6:00 or 7:00
16  until like 2:00 in the morning or some other times
17  from like 5:00 until like 11:00.
18      Q.  Okay.  And you said that during the
19  school year, you had -- your host mom told you you had
20  the mornings when the kids -- excuse me.
21          Let me take that -- let me strike that
22  question.
23          When the kids were at school, you
24  had -- you did not have any duties?
25      A.  No.  I was off.

---

64

1      Q.  Okay.  Were you ever expected to be
2  available or on call for your host family at times
3  that you were not scheduled to work?
4      A.  Yes.
5      Q.  Under what circumstances?
6      A.  Maybe when they can't go to school
7  because it's snow, because it's a snow day or because
8  one of them sick, so, yeah I -- a couple of times, I
9  had to stay home with them, be available when I was
10  supposed to be off.
11      Q.  Can you think of any other times that
12  you were expected to be on call?
13      A.  Maybe during the nighttime when -- when
14  one of them was traveling for work and the other one
15  wanted to go grocery shopping or something, then I was
16  expected to be call -- to stay with the kids, so I
17  would say that like every time, all the time.
18      Q.  What do you mean by "all the time"?
19      A.  Yes.  Well, you live there, so even
20  though you have a schedule, it may be a benefit for
21  the family that you are there and you might be
22  available also if they need you like for something
23  last minute, so sometimes I will go downstairs and
24  start working and she tell me, like, the youngest kid
25  is not feeling well.  I'm not going to send him to

---

16 (Pages 61 to 64)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**65**

1  school, can you please stay home.  Or any other day
2  they text me like -- for example, the train is like 20
3  minutes late.  We won't be home on time.  Or we had a
4  last minute meeting, we cannot get home in time, you
5  know.
6       Q.  Were there other times that they arrived
7  home early?
8       A.  Yes.  Sometimes, especially on Fridays.
9       Q.  And did you get off work early on those
10  days?
11       A.  Yes, like one hour early.
12       Q.  Okay.
13       A.  Pretty much.
14       Q.  Did you have responsibilities for
15  children waking up at night?
16       A.  No.
17       Q.  While you lived with your host family,
18  were there weeks that you worked more than 45 hours?
19       A.  No, never.
20       Q.  Never.  Were there weeks that you worked
21  more than 40 hours?
22       A.  Yes.
23       Q.  Okay.  How many weeks if you could
24  estimate did you work over 40?
25       A.  I would say that most of the weeks and

---

**66**

1  both summers.
2       Q.  And during the school year, did you
3  mostly work fewer than 40 hours?
4       A.  Yes.  It was always something in between
5  37 or 41, 42.
6       Q.  Okay.  With your host family, did you
7  ever work more than 10 hours a day?
8       A.  No.
9       Q.  Did you ever have any concerns or
10  complaints about the schedule that your host family
11  gave you?
12       A.  No.
13       Q.  How much did the Conleys pay you each
14  week?
15       A.  $200.
16       Q.  And how were you paid?  Was it check or
17  cash or electronic transfer?
18       A.  Sometimes it was by electronic transfer
19  and when they didn't have time to do it, they just
20  give me cash or give me part in cash and part by
21  transfer.
22       Q.  And they paid you each week?
23       A.  Yes.
24       Q.  Did you discuss the amount with your
25  host family?

---

**67**

1       A.  I didn't.
2       Q.  You did not.  Do you know who decided
3  the amount of payment?
4       A.  I don't.
5       Q.  Okay.  And was it the same amount?  Did
6  they pay you $200 every single week that you were
7  there?
8       A.  Yes.
9       Q.  It never varied?
10       A.  Excuse me?
11       Q.  That amount never changed?
12       A.  No.
13       Q.  Did InterExchange ever pay you your
14  weekly stipend?
15       A.  No, never.
16       Q.  Did the host family -- did the Conleys
17  ever give you extra money for any reason?
18       A.  No.
19       Q.  Do you remember if you went to the
20  movies or a museum, did they give you money for that?
21       A.  Oh, yeah, but for the kids' expenses,
22  like, of course, if I -- if we were going -- if they
23  wanted me to bring the kids to the movie theater, they
24  provide the money for me to pay for the kids and for
25  my ticket.  Everything that had to do with the kids,

---

**68**

1  they pay for that.
2       Q.  So if you took the kids for ice cream,
3  they would pay for your ice cream too?
4       A.  Yes.
5       Q.  And if you took the kids to a book store
6  to buy books, would they pay for you to buy books as
7  well?
8          MR. VALDIVIESO:  Objection to form.
9       A.  They only pay for everything that had to
10  do with the kids.  If they didn't provide the money,
11  then I just had to tell them like, hey, I spend this
12  with the kids and they would just give it back to me.
13       Q.  (BY MR. HUNT) Did they always reimburse
14  you?
15       A.  Yes.

17 (Pages 65 to 68)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**69**

Q. Okay. Did you ever have a computer to use while you were an au pair?

A. I could use their computer if I wanted to, but I didn't.

Q. You didn't need to or you didn't want to? I didn't catch that.

A. I didn't need to use a computer at some point.

Q. Okay.

A. When -- in the second year -- before my first year finished, I went to Columbia for like two weeks and I brought my computer, so every time I needed to use it for some reason, I just used mine.

Q. Okay. And was there -- did you have access to the internet while you were in the second year while you were using your computer?

A. Excuse me, could you repeat it, please?

Q. Did the Conleys provide you access to the internet, like wifi?

A. Yes.

---

**70**

1 Q. Yeah. And you said that you went home
2 to Columbia before your second year began. Did you or
3 the Conleys pay for that trip?
4 A. They didn't. I pay by myself.
5 Q. Okay. And you said that you had a
6 phone -- you said that you had a cell phone that the
7 Conleys gave you, were you able to use that cell phone
8 to make personal calls?
9 A. Yes.
10 Q. Were you able to use it to communicate
11 with your friends in Columbia?
12 A. When I communicate to my friends in
13 Columbia, I did it by like free call application.
14 Q. Like WhatsApp or Viber?
15 A. WhatsApp.
16 Q. And did you have a car while you were an
17 au pair?
18 A. The car of the family.
19 Q. The family. How many cars did they
20 have?
21 A. In the first -- first month, they had
22 only one. And then after like six months, I guess,
23 they got another car, a second car.
24 Q. Okay. And could you use that car for
25 your own personal trips or errands?

---

**71**

1 A. Yeah. Every time I needed to use it, I
2 had to make sure that they were not going to use the
3 car, so I can use it.
4 Q. Okay. But you were allowed to use the
5 car, for instance, to go to dinner with other au
6 pairs?
7 A. Yeah. I was allowed to use it as long
8 as they didn't need it.
9 Q. Okay. Did your -- did you drive the --
10 excuse me. Let me strike that.
11 Did the Conleys give you gas money?
12 A. For the -- for the kids, yes. Every
13 time if I was with the kids at the zoo and then I
14 realized that I was running out of gas, then I just
15 put gas with my money and I tell them and they just
16 give it back. But when I wanted to use it, I had to
17 pay for my own gas.
18 Q. Okay. And you said that they -- they
19 gave you $100 for your birthday and Christmas. Were
20 there any other gifts that they gave you?
21 A. For both opportunities, they just give
22 me that and with pictures of the kids.
23 Q. Okay. For -- did they give you money or
24 a gift on Easter?
25 A. No.

---

**72**

1 Q. Okay. Did you take any trips or
2 vacations while you were an au pair?
3 A. With the host family or by myself?
4 Q. Let's take them one at a time. Let's --
5 did you take any trips or vacations with the host
6 family?
7 A. Not really. I had to go to their shore
8 house a couple of times during the summer, but because
9 they needed me to work all the time there, so I just
10 went there because of my work and I did it every time
11 they needed me to come with them.
12 Q. Did your hours change while you were at
13 the shore house?
14 A. Yes.
15 Q. How did they change?
16 A. The amount of hours when the parents
17 were around were less. Probably like 25, 20. Because
18 they tried to spend their time with the kids.
19 Q. Okay. How frequently did you go to the
20 shore house?
21 A. During the summer, it depends. Some
22 weekends, they needed me to come with them, so I came
23 all over weekend because they need me to stay there
24 for Saturday or on Friday. But then there was like
25 two weeks or three, maybe, when we went down there for

---

18 (Pages 69 to 72)

Case No. 1:14-cv-03074-CMA-KMT Document 1104 filed 06/06/2018 USDC Colorado pg 1 of 1
119 of 264

LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

73

1  the whole week. I don't know. I would say like two
2  weeks every year. The whole week.
3      Q. And you call it "the shore house," is
4  that a -- do you call it that because it's near the
5  beach?
6      A. Yes.
7      Q. Okay. Did you spend some time on the
8  beach with the kids?
9      A. With the kids.
10     Q. Yeah. And is that shore house, is that
11 in New Jersey?
12     A. Yes, the shore house is at Sun Harbor.
13     Q. Did you do any other trips with the host
14 family?
15     A. No.
16     Q. To New York?
17     A. No.

74

19     Q. Okay.
20         MR. VALDIVIESO: Go ahead.
21         MR. HUNT: Sorry.
22     Q. (BY MR. HUNT) Do you remember traveling
23 by train or plane with your host family?
24     A. We took the train, but just from Harbor
25 to Philadelphia to get my Social Security number in

75

1  November.
2      Q. Your host family helped you get your
3  Social Security number?
4      A. Yes.
5      Q. Did your host family help you get your
6  driver's license?
7      A. Yes.
8      Q. Did they pay for your driver's license?
9      A. They did.
10     Q. Okay. Do you know -- would you describe
11 whether there were -- excuse me.
12         Were there other benefits that your host
13 family provided you?
14     A. I would say that I didn't have to pay
15 for my phone and I could use the car when I needed and
16 they don't -- they didn't need it. And that's it.
17 They -- they -- they're such a nice family. They're
18 great. But all the things that I got from them were
19 basically like working -- the agreement with the au
20 pair.
21     Q. I'm sorry, I didn't catch that last
22 part.
23     A. I'm saying that any of the things that I
24 had gotten from them, like food or my room or anything
25 like that, is just something that is part of the

76

1  agreement.
2      Q. Okay. So they met all the standards in
3  the agreement?
4      A. Yes.
5      Q. Did your host family provide you a
6  journal or a log or diary to use while you were an au
7  pair?
8      A. No. We never used that.
9      Q. Okay. Did InterExchange ever provide
10 you a journal or diary?
11     A. They provide us like a weekly planner or
12 something that we just never use that.
13     Q. Okay. Who told you what duties to
14 perform while you are were an au pair?
15     A. It was both, but I would say, like, I
16 had the conversation most of the time with the host
17 mom. But they both agree what my duties were at that
18 point.
19     Q. When you say "both," you're referring to
20 the host mom and the host dad?
21     A. Yes.
22     Q. Okay. Did anyone at InterExchange ever
23 tell you what duties to perform?
24     A. No.
25     Q. Okay. Did anyone at InterExchange ever

19 (Pages 73 to 76)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**77**

1  supervise you while you were taking care of the
2  children?
3      A.  No.  I have a local coordinator who had
4  to call me every month to make sure that how the
5  things were going with my family so far, but not like
6  when I was taking care of the kids, no.
7      Q.  Okay.  And when you were making these
8  monthly -- or, excuse me, when you had these monthly
9  calls with the local coordinator, did you ever make
10 any complaints to the local coordinator?
11     A.  No, never.
12     Q.  Okay.
13         MR. VALDIVIESO:  Joe, could we take a
14 quick break, please?
15         MR. HUNT:  Yes.  Let's go off the
16 record.
17         (Recess taken, 11:56 a.m. to 12:09 p.m.)
18     Q.  (BY MR. HUNT) Ms. Barriga, did the host
19 family ever ask you to perform any duties that
20 concerned you in any way?
21     A.  Could you please rephrase the question?
22     Q.  Sure.  Did the host mom or the host dad
23 ever ask you to perform any duties that were not
24 appropriate?
25     A.  No.

---

**78**

1      Q.  Did you take classes when you lived with
2  the Conley family?
3      A.  Yes, I did.
4      Q.  How many classes did you take?
5      A.  During the first year, I took a course
6  that was for 80 hours.  It was an ESL course.  And
7  then the second year, I took two classes.  One was for
8  grammar of -- for international students and the other
9  one was preparation for this also.
10     Q.  Is that something that you wanted to do?
11     A.  Yes, and I was required to do it.
12     Q.  By who required you to do that?
13     A.  InterExchange.
14     Q.  Okay.  Do you know whether you took six
15 credits of classes?
16     A.  Yes.  I didn't take credits, but I took
17 the equivalence in hours.
18     Q.  What was the university or college or
19 program that you were -- at which you took these
20 classes?
21     A.  The first year I went to Montgomery
22 Community College and then the second year, I went to
23 Delaware Community College.
24     Q.  Did you meet with your local coordinator
25 while you were an au pair?

---

**79**

1      A.  Yes.
2      Q.  Okay.  Do you remember who it was?
3      A.  I have three local coordinators within
4  the time that I was an au pair.
5      Q.  Okay.
6      A.  The first one, she was there just for
7  like two months because she was transferred to
8  Colorado.  I don't remember her name.  Peggy -- Peggy
9  Dixon was her name.  The second one was Jessica.  She
10 was my document coordinator for like -- for about
11 eight months.  Yeah.  Almost.  Almost until at the end
12 of my first year.  And then the third one, I don't
13 remember her name.  Lauren.  I don't remember her
14 name.
15     Q.  Does Laurie Moyer sound right?
16     A.  Yeah.  That one.
17     Q.  And did you meet with all these local
18 coordinators in person at some point?
19     A.  Yes.
20     Q.  Do you remember how many times you met
21 with the local coordinators in person?
22     A.  Yes.  With Peggy, I met her once.  With
23 Jessica, a couple of times.  And with Lori, just once.
24     Q.  Did you go to the cluster meetings?
25     A.  In the first year, I went to the first

---

**80**

1  one and then to a couple of those.  But then I
2  honestly didn't like to go to the cluster meetings,
3  but I was told that I had to do it.  Otherwise, I
4  couldn't be able to extend for a second year.  So I
5  ended up going to most of the cluster meetings in the
6  first year.  But then in the second year, I didn't
7  want to go.  I didn't feel like going to any cluster
8  meetings.  So they just said that since I was not
9  going to make it to the cluster meetings, then I was
10 not going to be able to get my au pair certificate.
11     Q.  Did you get your au pair certificate?
12     A.  They didn't because I didn't want to go
13 to the cluster meetings.
14     Q.  Why didn't you want to go?
15     A.  Because I didn't like them.
16     Q.  What didn't you like about the cluster
17 meetings?
18     A.  Well, I honestly I like to spend my free
19 time doing stuff that I enjoy, not doing stuff that
20 I'm forced to do, so just the fact that I was forced
21 to do -- to go there.  I didn't like that, so I didn't
22 have fun going there.
23     Q.  Who asked you to go there to the cluster
24 meetings?
25     A.  The local coordinators.

---

20 (Pages 77 to 80)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

81

1      Q. Did you ever meet with any of the local
2 coordinators at the Conleys' home?
3      A. The first one Peggy went to the house.
4 And the other two, no. Jessica, I met her the first
5 time at her house with a bunch of au pairs. And the
6 third one, I met her near my house at the Starbucks
7 with another au pair that also lived around there.
8      Q. Okay. So you only met with Peggy in the
9 Conleys' home, you didn't meet with Jessica or Laurie
10 in the Conleys' home?
11      A. Yes, I didn't.
12      Q. Okay. What happened during your meeting
13 with Jessica in the Conleys' home?
14      A. I didn't meet with Jessica at the
15 Conleys' home.
16      Q. I'm sorry. Excuse me. Peggy. What
17 happened with Peggy in the Conleys' home?
18      A. She just asked me about how was -- how I
19 was feeling so far. If I like it in America, if I was
20 feeling okay with my room -- with my bedroom. The
21 communication with my host family because I met her
22 like after maybe one or two weeks after I got to live
23 with them. So -- and she also asked me about if --
24 she asked me if I have idea of any of the courses that I
25 would like to take in order to complete the

---

82

1 requirements of the program.
2      Q. Okay. Did she supervise any of the
3 child care that you provided the Conleys' children?
4      A. The only way that she supervised that
5 was by calling me and asking me if I was doing all the
6 duties related to the kids, such as meals or laundry
7 or organizing their play room or stuff like that, but
8 never in person.
9      Q. She called and asked whether you were --
10 when you were doing child care duties as opposed to --
11 go ahead.
12      A. She called me -- all the local
13 coordinators called me every month. They wanted to
14 make sure that I was working less than 45 hours a
15 week, less than 10 hours a day, that I was getting
16 paid at least 195.75 and also that my duties are just
17 limited to the kids stuff like the child care, the
18 laundry, the meal preparation, giving them bath or
19 organizing their stuff and nothing else.
20      Q. Okay. What did you tell her?
21      A. I told her that I was working less than
22 45 hours a week, less than 10 a day, that I was
23 getting paid at least $195.75. And also that all my
24 duties were just related to the kids and their stuff.
25      Q. Okay. Did any of the local coordinators

---

83

1 give you any duties to perform for the family?
2      MR. VALDIVIESO: Objection to form.
3      A. They didn't.
4      Q. (BY MR. HUNT) Did the -- any of the
5 local coordinators pay you?
6      A. They did not.
7      Q. Other than the local coordinators, did
8 you meet with any other people from InterExchange when
9 you lived with the Conley family?
10      A. No.
11      Q. Okay. Ms. Barriga, you were -- you've
12 been asked to provide documents related to the amount
13 of hours you worked and the amount of compensation
14 that you received. Have you -- have you looked for
15 any of these documents?
16      A. Well, as I said, the only way that I got
17 my schedule was through text messages and I don't have
18 that phone any more. On the other hand, the payment
19 that they made by transfer account, I don't have that
20 bank account any more. So I don't have, like, any
21 receipts or anything.
22      Q. Okay. So you don't have any other --
23 any records of the payments that you received?
24      A. No.
25      Q. And you don't have any records of the

---

84

1 hours that you worked?
2      A. No.

---

21 (Pages 81 to 84)

Case No. 1:14-cv-03074-CMA-KMT   Document 1041-1   filed 06/06/18   USDC Colorado   pg 122 of 264

Case 1:14-cv-03074-CMA-KMT   Document 1041-1   Filed 08/06/18   USDC Colorado   Page 122 of 264

85



25   Q.   Okay.  You decided to extend your

86

1  program; is that right?
2       A.  Yes.
3       Q.  You were satisfied with the program?
4       A.  I was satisfied with my family, with my
5  host family.  I had a great host family.
6       Q.  Okay.
7       A.  I think that the program should improve
8  in some aspects, especially the payment.
9       Q.  Okay.
10       A.  So at first I was excited to begin the
11  program because you're going to have an experience in
12  a different country, and all this time, but then when
13  you're here, you realize it was just a fantasy.  You
14  cannot do as many things as you thought that you would
15  be able to do, so I mean, it's a good program, but
16  needs to improve certain things.
17       Q.  Do you believe your host family owes you
18  money?
19       A.  I don't believe they owe me money
20  because they paid me for the payment in the agreement.
21  So I don't think they owe me money.
22       Q.  Okay.  Do you believe InterExchange owes
23  you money?
24       A.  I think they do.
25       Q.  Okay.  Why?

87

1       A.  Well, because the job that we were doing
2  was not easy.  It's not easy for you to take care of
3  kids that are not your kids.  You have to be like a
4  second mom for those kids.  You also have to do many
5  things like laundry, making sure that they -- to
6  prepare their meals and that they are eating healthy
7  stuff and also to picking up all their mess and have
8  to bring them to different activities, and then you
9  see that other people that are doing the same job,
10  even just -- just not related to child care, just
11  somewhere with the kid, they're getting paid way
12  better than you, so it's, like, that's why I think
13  that they owe -- owe us money.  Because we -- we
14  paid -- we worked hard enough and we didn't pay -- we
15  didn't get paid as we should -- we should -- we should
16  have.
17       Q.  Okay.  Have you calculated how much
18  money you believe InterExchange owes you?
19       A.  I haven't done that.
20       Q.  Okay.  How much do you believe
21  InterExchange owes you?
22       A.  I don't know.
23       Q.  Okay.  Did you make any complaints to
24  your host family about your experience as an au pair?
25       A.  Not really.  No.

88

1       Q.  Did you make any complaints to
2  InterExchange about your experience as an au pair?
3       A.  No, I didn't.
4       Q.  Okay.  Did you make any complaints to
5  any government agency about your experience as an au
6  pair?
7       A.  Could you please give me an example of
8  any government agency?
9       Q.  Yeah.  I'm talking about an authority
10  such as the Department of State.
11       A.  No, I didn't.
12       Q.  Okay.
13       MR. HUNT:  Can we go off the record for
14  about three minutes?  I'm about done with questions.
15       MR. VALDIVIESO:  Sure.
16       (Recess taken, 12:30 p.m. to 12:33 p.m.)
17       Q.  (BY MR. HUNT) All right.  Ms. Barriga,
18  did your host family ever provide you any clothing?
19       A.  One time once I got to America, I
20  remember we went -- we were at the shore house and my
21  house mom asked me if I would like to go shopping with
22  her, so we went there and I realized that I hadn't had
23  my money with me, so she offered to pay -- to pay for
24  that for it was like a T-shirt that I was getting.  So
25  she paid for that.  When we -- when we get home, I

22 (Pages 85 to 88)

## 89

1 just paid her back.
2 And -- when the winter began, I didn't
3 have like many like coats, so she gave me like two
4 sweatshirts that she was not going to wear any more
5 and also she let me wear eventually one of her coats.
6 **Q. Did you keep those — that clothing,**
7 **those coats?**
8 A. The sweatshirts that she was not going
9 to wear any more, yes.
10 **Q. And they provided your meals; is that**
11 **right?**
12 A. Yes.

[lines 13-25 redacted]

## 90

[lines 1-3 redacted]

4 **Q. Okay. I'm about done with questions,**
5 **Ms. Barriga. Was there anything that you thought I**
6 **was going to ask you, but I didn't ask you?**
7 MR. VALDIVIESO: Objection to form.
8 A. No.
9 MR. HUNT: Okay. Well, your counsel
10 might have some questions for you, but I want to thank
11 you for participating in the deposition.
12 THE DEPONENT: You're welcome. Thank
13 you.
14 MR. VALDIVIESO: I just have two
15 questions, but, actually they're just mostly
16 clarifying the record. Could I ask that we go off the
17 record for a second?
18 MR. HUNT: Sure.
19 (Off-the-record discussion.)
20 (The question and answer were read back
21 as follows: "And did you understand the document?
22 A. I -- when I read -- when I look at the
23 document and it says agreement between au pair and the
24 au pair and InterExchange, I believe that the document
25 is pretty much about all what the au pair program is

## 91

1 about, so if I'm looking at the document right now,
2 and it says duties and hours, I was told about that.
3 The section about the compensation, all of those items
4 were -- were -- we were told about all of that, so I
5 understood the agreement.")
6 MR. VALDIVIESO: Thank you for reading
7 that back into the record.
8 EXAMINATION
9 BY MR. VALDIVIESO:
10 **Q. Ms. Barriga, so as the court reporter**
11 **just read back your testimony, it was about some of**
12 **the items in the agreement including duties, hours and**
13 **compensation. My question is, who told you about**
14 **those items?**
15 A. About the -- what is -- what -- like the
16 subjects that they are describing in the agreement?
17 **Q. Yes. Who told you about those items?**
18 A. InterExchange.
19 **Q. And who at InterExchange told you about**
20 **those items?**
21 A. That was -- that was actually during the
22 week -- the week training that we had in New York that
23 we were talking about like all the duties that we will
24 have as an au pair, like that we were going to be in
25 charge, just on like only for the kids, everything

## 92

1 related to them, their meals, their laundry, making
2 sure that they have the bedrooms clean and that we can
3 only do like anything that is in relation to those
4 kids, not to the host parents.
5 **Q. Other than in the orientation and**
6 **training, did anyone at InterExchange tell you about**
7 **your duties at any other time?**
8 A. Yes, when they -- the local coordinator
9 called me, they always ask me the same questions every
10 month, like if I was working less than 45 hours and
11 all this stuff, and they ask me, are you only doing
12 duties related to the kid, nothing -- nothing else and
13 they were -- they were always like making sure monthly
14 that I was doing the duties that I was supposed to.
15 **Q. And about the number of hours, did**
16 **anyone at InterExchange discuss the number of hours**
17 **with you at the orientation and training?**
18 A. Yes. They always remark that we cannot
19 work over 45 hours a week and no more than 10 hours a
20 day.
21 **Q. And compensation was another item in the**
22 **agreement that you mentioned you were told about. Who**
23 **told you about compensation?**
24 A. They told us during the week's training
25 that we were going to have that weekly payment and

**93**

also that we -- that the host family was responsible
to provide like a bathroom for our own, that we didn't
have to share it with anyone else.  That's what they
said.

**94**

Q.  Do you recall that Mr. Hunt asked you
some questions about the phone?

A.  Oh, yeah.

Q.  Did you use your phone other than for
personal use?

A.  Yes, for work, I had to be with my phone
all the time, making sure that I didn't -- like if I
got a message from my host family, and also from maybe
from my host mom's mom that she wanted to stop by
suddenly, and she wanted to see the kids and when
my -- the host -- my host kids' friends wanted to have
a playdate, then I have to use the phone to set up the
playdates and so I -- I -- of course I use the phone
for my personal use, but I have to use it all the time
for work as well.

Q.  Did you use it -- strike that.

Did you have a sense of what the primary
use of your phone was?

A.  Yes.  Work.

Q.  And do you recall Mr. Hunt asked you

**95**

some questions about the use of the car?

A.  Yes.

Q.  Did you use the car for anything other
than your personal use?

A.  Yes, for work.

Q.  How did you use it – sorry.

A.  Sorry.

Q.  If you weren't finished, go ahead and
finish.

A.  Yeah, I use it when I was working too,
because when the kids had -- wanted to go to the zoo,
then I had to use the car.  When the kids wanted to go
to a certain park, I have to use the car.  If the kids
wanted to have a playdate with a friend, then I have
to use the car, so within the first year, when one kid
was in one school and the other one was in the other,
I had to use the car to pick them both up from school.

When the kids -- when my host family
wanted me to drive, all the way over, like on to
grandma's house to drop them off, then I had to do it
or I had to drive for like an hour or so to drop them
off.

When the host parents wanted to go to
the shore house during the week and on the weekend,
they just wanted me to pick up the kids from their

**96**

grandma to bring them to the shore house, then I have
to do it.  So I -- I used the car every day at work
somehow.

Q.  And do you recall Mr. Hunt asked you
some questions about the cluster meetings?

A.  Yes.

Q.  Did you understand that you were
required to attend the cluster meetings?

A.  Yes.  They -- during the orientation
week, they told us that we had to go to those cluster
meetings, and that if during the first year we kept --
like we could only skip like up to four cluster
meetings.  So if I was within the first year in -- and
if I had skipped more than four cluster meetings, then
I was not going to be eligible for -- to apply for my
second year as an au pair.

And during the second year, what they
local coordinator told me is that, okay, fine you
don't want to come to the cluster meetings, which are
mandatory, then don't come, but then if you eventually
want to get your au pair certificate, you won't be
able to get it.

Q.  Okay.  I have a couple follow-up
questions about what you just said.  First, you said
they told you at the orientation.  Who are you

24 (Pages 93 to 96)

97

1  referring to when you said "they"?
2      A.  InterExchange.
3      Q.  And is the au pair certificate
4  something -- strike that.
5          Who did you understand was -- strike
6  that.
7          If you had attended all of the cluster
8  meetings and you were to receive an au pair
9  certificate, did you have an understanding as to who
10  would be giving you the certificate?
11     A.  InterExchange was the one who has to
12  provide the au pair certificate.
13     Q.  What was your understanding of what the
14  au pair certificate was, if any?
15     A.  It was just like kind of a diploma that
16  says this person was an au pair from this date to this
17  date, but they would only provide it if you have like
18  the -- I forgot the name.  Like the card, when like
19  the system planning to the cluster meeting with all
20  their signatures every time.  If you didn't have that,
21  then you won't be able to get it.
22     Q.  Did you ever receive an au pair
23  certificate from InterExchange?
24     A.  No.
25     Q.  Do you have an understanding as to why

98

1  you did not receive the certificate for InterExchange?
2      A.  I did not -- I did not receive an au
3  pair and I can't get it according to them,
4  InterExchange, because first, I never used the -- like
5  the card that I had to sign every cluster meeting.
6  Second, because I didn't make it to all the cluster
7  meetings.
8      Q.  Did any of the -- strike that.
9          When you were learning about the au pair
10  program while you were -- before you started the
11  program when you were in Columbia, did anyone explain
12  to you about the au pair certificate?
13     A.  No. No.
14     Q.  When did you learn about the au pair
15  certificate?
16     A.  I learned about that during the
17  orientation week when the people have InterExchange
18  were giving the orientation and they were telling us
19  about like different subjects, and so when they come
20  to the -- to the point of cluster meetings, they
21  remark the point of view to make assistance to every
22  cluster meeting in order to get that au pair
23  certificate.
24     Q.  Do you have Exhibit 2 on your phone?
25     A.  Yes.

99

1      Q.  Do you see where it says duties and the
2  hours?
3      A.  Oh, yes.
4      Q.  And do you see towards the bottom of
5  that page where it says "code of conduct"?
6      A.  Uh-huh.
7      Q.  Was code of conduct something that was
8  discussed -- strike that.
9          Did anyone from InterExchange ever
10  discuss a code of conduct with you?
11     A.  Let me read it really quick.
12         MR. HUNT:  Juan, what page is that?
13         MR. VALDIVIESO:  Bates number 49016.
14         MR. HUNT:  Thank you.
15     A.  I think that when we were at the
16  orientation week, they told us that -- well, you
17  become an au pair and you're going to be part --
18  you're going to be treated as part of an American
19  family and what I -- what I remember is that they tell
20  us, like, there might be families that are more open
21  minded and there are others that have certain rules
22  that you have to follow, like, for example, the curfew
23  or stuff like that.  So what they told us is that we
24  will have to follow those host family's rules and once
25  we get to meet them.

100

1          MR. VALDIVIESO:  I don't have any other
2  questions at this time.
3          MR. HUNT:  May I ask just a couple
4  follow-up questions?
5          MR. VALDIVIESO:  Go ahead.
6              EXAMINATION
7  BY MR. HUNT:
8      Q.  Ms. Barriga, did you care whether or not
9  you received an au pair certificate?
10     A.  At that point, I didn't think that that
11  was important, but now --
12     Q.  Let me ask you this --
13     A.  But now --
14     Q.  I'm sorry.  We're talking over each
15  other.  Let me ask you another question.  Have you
16  ever been --
17         MR. VALDIVIESO:  She hasn't finished
18  giving her answer.
19         MR. HUNT:  Well, it was a yes or no
20  question.
21     A.  I'm saying at that point I didn't think
22  that a certificate was important.  So I just didn't
23  come to the cluster meetings.  But now if I want to
24  apply for a baby-sitting job, I cannot prove that I
25  was actually an au pair.  I have nothing for proof

25 (Pages 97 to 100)

**LAURA CAMILA BARRIGA RODRIGUEZ - 3/27/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

101

1  with but the references of my house family. I don't
2  have like the diploma like this is what I did two
3  years here in America. Not all the people have that
4  and now I think that it's very important and I can't
5  just have it according to InterExchange.
6      **Q.  (BY MR. HUNT) To your knowledge, have**
7  **you ever been denied any opportunity or a job**
8  **placement because you don't have an au pair**
9  **certificate?**
10     A.  No.  What I'm saying is that when I
11  would like to apply for a job or whether or not -- I
12  just not, I cannot have that certificate even though I
13  was an au pair.
14     **Q.  Yeah.  Let me ask you, to your**
15  **knowledge, have you ever been denied any opportunities**
16  **or job placement because you don't have an au pair**
17  **certificate?**
18     A.  Not now.
19        MR. HUNT:  Okay.  That's it.  Thank you.
20        THE DEPONENT:  You're welcome.
21        MR. VALDIVIESO:  I don't have any
22  follow-up on your questions.
23        WHEREUPON, the within proceedings were
24  concluded at the approximate hour of 12:59 p m. on the
25  27th day of  March, 2018.

102

           I, LAURA CAMILA BARRIGA RODRIGUEZ, do
hereby certify that I have read the above and
foregoing deposition and that the same is a true and
accurate transcription of my testimony, except for
attached amendments, if any.
           Amendments attached   (  ) Yes   (  ) No


           _____
           LAURA CAMILA BARRIGA RODRIGUEZ


           The signature above of LAURA CAMILA
BARRIGA RODRIGUEZ was subscribed and sworn to or
affirmed before me in the county of
_____, state of _____,
this _____ day of _____, 2018.


           _____
           Notary Public
           My Commission expires:


Johana Paola Beltran, 3/27/18 (tds)

103

              REPORTER'S CERTIFICATE
STATE OF COLORADO      )
                       )  ss.
CITY AND COUNTY OF DENVER  )

        I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said LAURA CAMILA BARRIGA
RODRIGUEZ was duly sworn or affirmed by me to testify
to the truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 29th day of March, 2018.

        My commission expires June 12, 2020.


__X__  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

103

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


          I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said LAURA CAMILA BARRIGA
RODRIGUEZ was duly sworn or affirmed by me to testify
to the truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 29th day of March, 2018.

          My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




_____
Tracy R. Stonehocker
Registered Professional Reporter

1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 14-cv-03074-CMA-KMT
3
    JOHANA PAOLA BELTRAN, et al.,
4
    Plaintiffs,
5
    v.
6
    INTEREXCHANGE, INC., et al.,
7
    Defendants.
8   _____

9   VIDEOCONFERENCE DEPOSITION OF:  MYLENE GRY
                                    March 28, 2018
10  _____

11            PURSUANT TO NOTICE AND STIPULATION, the
    videoconference deposition of MYLENE GRY, was taken
12  on behalf of the Defendant InterExchange, Inc., at
    1900 Grant Street, Suite 1025, Denver, Colorado
13  80203, on March 28, 2018, at 4:34 p.m., before Shauna
    T. Dietel, Registered Professional Reporter and
14  Notary Public within Colorado.

15

16

17

18

19

20

21

22      H+G

23

24      Hunter + Geist, Inc.

25

303.832.5966        1900 Grant Street, Suite 1025        ■ www.huntergeist.com
800.525.8490        Denver, CO 80203                     ■ scheduling@huntergeist.com

                    Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

MYLENE GRY - 3/28/2018
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**1**

              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____
VIDEOCONFERENCE DEPOSITION OF:  MYLENE GRY
                      March 28, 2018
_____
          PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of MYLENE GRY, was taken
on behalf of the Defendant InterExchange, Inc., at
1900 Grant Street, Suite 1025, Denver, Colorado
80203, on March 28, 2018, at 4:34 p.m., before Shauna
T. Dietel, Registered Professional Reporter and
Notary Public within Colorado.

---

**2**

                  A P P E A R A N C E S
For the Plaintiffs:
      JUAN VALDIVIESO, ESQ.
      Boies Schiller Flexner, L.L.P.
      1999 Harrison Street
      Suite 900
      Oakland, California  94612

For the Defendant InterExchange:
      JOSEPH H. HUNT, ESQ.
      Sherman & Howard, L.L.C.
      633 Seventeenth Street
      Suite 3000
      Denver, Colorado  80202

          Ms. Gry was located in Aisling, New
York.

          Mr. Hunt and Ms. Dietel, the court
reporter, were located at 1900 Grant Street, Suite
1025, Denver, Colorado 80203.

          Mr. Valdivieso was located at 1999
Harrison Street, Suite 900, Oakland, California
94612.

---

**3**

                        I N D E X
EXAMINATION OF MYLENE GRY:                      PAGE
March 28, 2018

By Mr. Hunt                                        5
By Mr. Valdivieso                                 75


                                             INITIAL
DEPOSITION EXHIBITS:                       REFERENCE

Exhibit  1  Consent to Join                       9

Exhibit  2  Agreement                            41

---

**4**

1       WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil
3   Procedure.
4        *     *     *     *     *
5       (Deposition Exhibits 1 and 2 were marked.)
6       MR. HUNT:  All right.  And we'll go on the
7   record.
8       Ms. Gry, my name is Joe Hunt.  I'm an
9   attorney with InterExchange, and I'll be asking you
10  some questions today.
11      Before we begin, I'd like to ask counsel
12  for a stipulation on the record that we can swear
13  Ms. Gry in remotely, and since we are all at
14  different locations that there won't be any
15  objections to the use of the transcript going forward
16  on that basis.
17      MR. VALDIVIESO:  Yes, we stipulate to that.
18      MR. HUNT:  Let's go off the record,
19  actually.
20          MYLENE GRY,
21  having been first duly sworn to state the whole
22  truth, testified as follows:
23      (Deponent's reply to oath:  I do.)
24      (Discussion off the record.)
25      MR. HUNT:  So let's go back on the record.

5

1                 EXAMINATION
2 BY MR. HUNT:
3     Q   Could you please state your name for the
4 record?
5     A   Yeah, my name is Mylene Gry.
6     Q   And your attorney said you do not need an
7 interpreter for the deposition.
8     A   No, I don't think I do.  I don't.
9     Q   Okay.  And you're comfortable proceeding in
10 English?
11     A   Yes.
12     Q   Okay.  If there's a question that you don't
13 understand, just let me know, and I'll rephrase it.
14     A   Okay.
15     Q   Have you ever had your deposition taken
16 before?
17     A   No.  This is the first time.
18     Q   Have you ever testified under oath?
19     A   Say it again.
20     Q   Have you ever testified under oath?
21     A   Not sure what it means.
22     Q   Have you ever testified in court or -- or
23 where you're -- the testimony is sworn under penalty
24 of perjury?
25     A   Not sure.  Sorry.

6

1     Q   Okay.  Is that, you don't remember or -- or
2 you're not sure what being under oath means?
3     A   What you mean, yeah.  I'm not sure what you
4 mean.  Like, this is the first time I talk about this
5 with attorneys, if -- if -- if that's what you mean.
6     Q   Do you -- well, do you understand when
7 you -- when you swore to the court reporter that you
8 would tell the truth, that means you're under oath?
9     A   Oh, okay.  So, yes.  Okay.
10     Q   Okay.
11     A   Sorry.
12     Q   So you understand what it means now?
13     A   Yeah.
14     Q   Okay.  And that when you're under oath,
15 you're obligated to tell the truth?
16     A   Yes.  Okay.  Yes.
17     Q   Okay.
18        MR. VALDIVIESO:  Do you want to -- do you
19 want to repeat the question now that you're all on
20 the same page?
21        MR. HUNT:  That's right.  Thank you, Juan.
22     Q   (BY MR. HUNT)  Have you ever testified
23 under oath before?
24     A   No.  This is the first time.
25     Q   Okay.  Let me cover some ground rules about

7

1 how -- how this will happen:  There's a court
2 reporter here who's writing down everything that we
3 say.  So --
4     A   Okay.
5     Q   So that we're not talking over each other,
6 let me finish my question before you begin your
7 answer, and I'll let you finish your answer before I
8 ask the next question; that way we're not talking
9 over each other.
10     A   Okay.
11     Q   Your attorney may object to a question that
12 I ask, and if he does that, let him object; and
13 unless he tells you not to answer the question, go
14 ahead and answer the question.
15        Okay?
16     A   Okay.  Yes.
17     Q   And if you need a break at any time during
18 the deposition, just let us know; we'll take a short
19 break and resume.  The only -- the only thing that I
20 would say is we -- we don't want to take a break as a
21 question is pending.  Okay?  So if I ask a question,
22 just answer it; then we'll take a break.
23     A   Okay.
24     Q   We're going to be talking about your
25 experience as an au pair and with your host family.

8

1 I'd ask that when you talk about the children, please
2 don't use their names.  You can just identify them by
3 their age or gender or whether they're a son or
4 daughter of the family.
5        Okay?
6     A   Okay.
7     Q   And before we start, is there anyone
8 present with you?
9     A   No, no one in the room with me.
10     Q   Okay.  Did you review any documents to
11 prepare for this deposition?
12     A   Yes.  I -- I read the agreement again
13 today, and that's it.
14     Q   Okay.  And did that -- did reviewing that
15 document remind you of any fact or of any -- of
16 anything that you'd forgotten?
17     A   Yes, some of them.  I wasn't sure, but when
18 I read it, yes, it makes sense.
19     Q   What do you mean by "it makes sense"?
20     A   Like, I wasn't sure about one of the
21 agreements that was like -- like I couldn't work for
22 someone else.
23     Q   Okay.  Sorry.  Could you --
24     A   When I read it, I was like, Okay.  I wasn't
25 sure about the fact that I could work or not for

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

9

1 someone else; and when I read it, then I was sure
2 that I couldn't work for someone else.
3     Q    When you say "someone else," do you mean
4 another host family?
5     A    Yeah.  Another host family or another job
6 anywhere else.  Like, I don't know, being a waitress
7 or doing another job.  Like, I know I couldn't.
8     Q    Okay.  Is there anything else that
9 reviewing the au pair agreement reminded you of?
10     A    No.  It was okay.
11     Q    Okay.  And when did you review that
12 document?
13     A    This afternoon.
14     Q    Okay.  How much time did you spend
15 preparing for this deposition?
16     A    Like, 20 minutes.
17     Q    Okay.  I'd like to -- I'm going to show you
18 a document.
19     A    Okay.
20     Q    Ms. Gry, do you recognize this document,
21 and can you confirm that you can see it?
22     A    Yes, I can see it.
23     Q    And do you recognize it?
24     A    Yes, I do.
25     Q    Can you tell me what it is?

10

1     A    It's the Consent to Join the lawsuit.
2     Q    Okay.  And I'm going to scroll down, and
3 let me know if you -- if you need any more time to
4 review it.  But what I'd like to ask you is, is that
5 your electronic signature at the bottom of this
6 screen?
7     A    Yes, it is.  Yes.
8     Q    Yes.  Okay.
9         MR. VALDIVIESO:  And I'm just going to make
10 a suggestion to help everyone.  Let Mr. Hunt finish
11 his question and actually wait a little bit so that
12 if I need to object, I can do so, and then -- and
13 then answer the question; because when you talk over
14 each other, it's going to leave a messy record with
15 the court reporter.
16         THE DEPONENT:  Okay.
17         MR. VALDIVIESO:  Thanks.  And I think we
18 lost Joe, or no.  Oh, there he is.
19     Q    (BY MR. HUNT)  Ms. Gry, did you understand
20 when you signed the Consent to Join that you were
21 joining the lawsuit against InterExchange?
22     A    Yes.
23     Q    How did you first learn about the lawsuit
24 against InterExchange?
25     A    I got an e-mail from Gessee.  And I'm not

11

1 sure about the name -- so that's the first time I
2 heard about it.
3     Q    We had some audio problems there.  Would
4 you mind repeating that?
5     A    Yeah.  The first time I heard about the
6 lawsuit was in an e-mail from Gessee Boeteng.  I'm
7 not sure about the name, but that was the first time
8 I heard about it.
9     Q    Did you say Gessee?
10     A    Gessee Boeteng.
11     Q    Do you know who that is?
12     A    No.
13     Q    Could you spell it, please?
14     A    G-E-S-S-E-E, and last name B-O-E-T-E-N-G.
15     Q    Last name is B-O-E-T-E-M, as in Mary, G, as
16 in great?
17     A    No.  N, like normal.
18     Q    Normal.
19         Okay.  Do you have that e-mail, or -- or
20 how did you receive that communication?
21     A    I don't know where it came from, but it
22 just appeared in my mailbox.  That's all I know.
23     Q    Okay.  Do you still have that
24 communication?
25     A    I don't think I do.

12

1     Q    Okay.  Have you looked for it?  You don't
2 have to --
3     A    No, not really.
4     Q    Okay.  You don't have to look for it now,
5 but I'd ask when you -- when we take a break, would
6 you mind looking for that e-mail, and if you have it,
7 could you please forward it to your lawyer?
8     A    Okay.  Sure.
9     Q    Thank you.
10         Is the person who sent you the e-mail a
11 former au pair?
12     A    I don't know this person.
13     Q    Okay.  What is your understanding of what
14 this lawsuit is about?
15     A    It's about the minimum wage.
16     Q    Okay.  Is that the extent of what you know
17 about this lawsuit?
18     A    Yes.
19     Q    And who -- what about the minimum wage?
20     A    Can you repeat in another way?
21     Q    Sure.
22         You said that this lawsuit is about the
23 minimum wage.  Does that mean that -- does this
24 lawsuit have to do with the amount of money the host
25 family paid you?

3 (Pages 9 to 12)

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

13

1    MR. VALDIVIESO:  Objection to the form.
2    You may answer.
3    A  Can I answer?
4    Q  (BY MR. HUNT)  Yes.
5    A  So what I understood is that we -- we
6  have -- we had to work no more than 45 hours a week,
7  and we -- we were paid the same amount each week no
8  matter what we do, and it's -- it's not allowed.
9  Like, I'm sure it's less than the minimum wage.
10    Q  So you're claiming in this lawsuit that you
11  are owed more money?
12    A  Yes.
13    Q  Who owes you more money?
14    A  I think it's the agency, our families and
15  the au pair.
16    Q  I'm sorry.  We had some audio problems
17  there.  Could you please repeat that?
18    A  Yes.  Can you please repeat your question, please?
19    Q  Sure.
20    Who owes you -- who do you claim owes you
21  more money?
22    A  I think InterExchange should get the money
23  because the agency does the agreement between the au
24  pair and the host family.
25    Q  Has InterExchange ever paid you any money?

---

14

1    A  No, they didn't.
2    Q  You lived with -- with two different
3  families, is that right, as an au pair?
4    A  Yes.
5    Q  And who is the first family -- who was the
6  first family?
7    A  I don't remember their name, but they were
8  in Boston.
9    Q  Does Tate sound familiar?
10    A  Say that again, please.
11    Q  Does Tate sound familiar?
12    A  Oh, honestly, I don't remember.
13    Q  Do you remember how long you lived with
14  that first family?
15    A  Yes.  Two weeks.
16    Q  And -- and the name of the second family
17  that you lived with is?
18    A  Can I say their last name?
19    Q  Yes, you may.
20    A  Fried.
21    Q  Fried.  And where -- where were they
22  located?
23    A  They were in Aisling, New York.
24    Q  And you still live in Aisling, New York; is
25  that right?

---

15

1    Ms. Gry, I think we had some connectively
2  problems; we did not hear any of your answer.
3    Do you still live in Aisling, New York?
4    A  Yeah.  I think it's from my --
5    Q  Let's --
6    A  Yeah.
7    MR. HUNT: Let's briefly go off the record.
8    (Recess taken, 4:56 p.m. to 4:59 p.m.)
9    MR. HUNT: Let's go back on the record.
10    Q  (BY MR. HUNT)  The last question before we
11  took a break for connectivity problems was whether
12  you still live in Aisling, New York.
13    A  Yes, I do still live in Aisling, New York.
14    Q  When you first came to the United States
15  for the au pair program, what did you believe that
16  you were going to be paid?
17    A  Say that again.
18    Q  When you first came to the United States --
19    MR. VALDIVIESO:  Off the record again.
20  Sorry.
21    Joe, is that okay if we go off the record?
22    MR. HUNT:  Yeah.  I didn't hear you.  Yeah.
23    (Discussion off the record.)
24    MR. HUNT:  Okay.  We're back on the record.
25    Q  (BY MR. HUNT)  Ms. Gry, because of the

---

16

1  connectivity problems, I'll ask you again:  When you
2  first came to the United States for the au pair
3  program, what did you believe that you were going to
4  be paid by the family you lived with?
5    A  I understood that I would be paid 195.75
6  per week.
7    Q  Okay.  And before learning of this lawsuit,
8  did you have concerns about what you were paid?
9    A  No.
10    Q  Where were you living when you signed the
11  Consent to Join form?
12    A  For the lawsuit, you mean?
13    Q  Yes.
14    A  I lived in Aisling, New York.
15    Q  How long have you lived there?
16    A  Over a year.  A year and a half.
17    Q  Where did you live before then?
18    A  New Rochelle, New York.
19    Q  Could you please repeat that?
20    A  I lived in New Rochelle.
21    MR. HUNT:  Did you get that?
22    THE REPORTER:  Norsham?
23    Q  (BY MR. HUNT)  Did you say Norsham?
24    A  New Rochelle.
25    Q  New Rochelle.  Got you.  Okay.

---

4 (Pages 13 to 16)

17

1    A   Yes.
2    Q   You lived with your host family through the
3  au pair program just one year; is that right?
4    A   Yes.
5    Q   And do you still communicate with the Fried
6  family?
7    A   Yes.
8    Q   And you're originally from France?
9    A   Yes.
10   Q   Okay.  Did you discuss this lawsuit against
11 InterExchange with anyone in the Fried family?
12   A   No, I didn't.
13   Q   And other than your lawyer, did you discuss
14 the lawsuit with anyone?
15   A   Briefly with some friends.
16   Q   And what did you say?
17   A   That I was starting a lawsuit for the au
18 pair minimum wage.
19   Q   Did you offer what you thought about it?
20   A   No.
21   Q   Those friends that -- with whom you
22 discussed this lawsuit, are they former au pairs or
23 current au pairs?
24   A   One was an au pair, but she went back to
25 France, and the other one is still an au pair here in

18

1  New York.
2    Q   And are those -- are either of them au
3  pairs through InterExchange?
4    A   No.
5    Q   What sponsors are they with or were they
6  with?
7    A   I don't know.
8    Q   You don't know.  Okay.
9        What did they say about the lawsuit?
10       MR. VALDIVIESO:  I'm going to object here.
11 To the extent that these are former and current au
12 pairs, I'm going to instruct the witness not to
13 disclose any information that the au pairs provided
14 through -- as the need for a lawyer.
15       And to the extent -- if you shared any
16 legal advice with them that you obtained from a
17 lawyer, I'm going to instruct you not to share that
18 legal advice.
19       So no legal advice that was shared with you
20 from them or any legal advice that you shared with
21 them.
22       With that instruction in mind, if you can
23 answer the question without disclosing any of that
24 information, you may.
25       MR. HUNT:  I'm going to ask the court

19

1  reporter to repeat the question.
2        MR. VALDIVIESO:  I'm sorry.  Before the
3  court reporter -- I just want to leave on the record
4  that the basis for any instruction is the
5  attorney-client privilege and the common interest
6  doctrine, because the current and former au pairs are
7  aligned parties with identical legal interests with
8  my client, and as far as I know, they may also be my
9  client.
10       (The reporter read the last question as
11 follows:  "What did they say about the lawsuit?")
12   Q   (BY MR. HUNT)  You can answer, Ms. Gry.
13   A   Yeah.  They said it's a good thing to try
14 to fight about the minimum wage, about being an au
15 pair.
16   Q   Did you complete any survey or
17 questionnaire in connection with this lawsuit?
18   A   I don't remember.
19   Q   Do you remember whether you were sent any
20 questionnaire or survey?
21   A   I don't remember.
22   Q   Okay.  You said your discussion with the au
23 pair, with the current and former au pair who are
24 your friends, that it was a good thing to fight about
25 the lawsuit.  Did they also believe that they are

20

1  owed wages?
2    A   I believe so.  I -- I can't talk for them.
3    Q   What did they say about it?
4    A   They said that 200 -- $195.00 isn't -- per
5  week for 45 hours a week is not very -- enough,
6  especially in New York.
7    Q   It's not livable wages?
8    A   Say that again, please.
9    Q   It's not enough to live on; is that -- is
10 that what you -- what you're saying?
11   A   Yes.
12   Q   Okay.  When did you first learn about an
13 opportunity to be an au pair in the United States?
14   A   I was -- I just wanted to travel and do
15 something, so I just went on the Internet, and I -- I
16 Googled, and I looked for my options, and that's how
17 I learned how I could be an au pair.
18   Q   And -- and when was that, Ms. Gry?
19   A   Oh, it was in 2009, I believe.
20   Q   What did you find on the Internet?
21   A   Oh, I can't remember.
22   Q   Did you talk with any former au pairs
23 before joining the program?
24   A   No.  Never.
25   Q   After you read about the au pair program on

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

21

1  the internet, did you do anything else to learn more
2  about becoming an au pair?
3      A   Oh, I check on that website that was Fee
4  Revee.  It was my French agency.  It's the only thing
5  I checked this time.
6      Q   Can you say the name of the French agency
7  again?
8      A   Fee Revee.
9      Q   And spell it, please.
10     A   Yes.  It's in two words F-E-E, and Revee
11 would be R-E-V-E-E.
12     Q   So after you read the French agency's
13 website, what did you do next?
14         MR. VALDIVIESO:  Objection to form.
15         You may answer.
16     A   I don't remember.  I get in touch with
17 them, I guess.
18     Q   (BY MR. HUNT)  Were you recruited to the au
19 pair program by the -- by the French agency?
20     A   I'm not sure about recruiting by the
21 agency.
22     Q   When you say you're not sure, you're not
23 sure of what recruit -- the meaning of "recruit" or
24 that -- or whether -- whether you're sure (sic) about
25 whether they recruited you?

---

22

1      A   Yeah.  I'm not sure.  Can you just repeat
2  the question in another way?
3      Q   Well, what organization recruited you to be
4  an au pair?
5      A   It was Fee Revee.
6      Q   And do you know what the word "recruit"
7  means?
8      A   Yes, I do, but I'm not sure of the meaning
9  in that sentence.
10     Q   Okay.  Can you tell me what you believe the
11 word "recruit" means?
12     A   Recruit is that they asked me questions to
13 see if I could fit in the program.
14     Q   And did you apply to be an au pair through
15 the Fee Revee?
16     A   Yes, I did.
17     Q   Okay.  I -- forgive me if I'm
18 mispronouncing that; my six years of French didn't
19 help me.
20     A   That's okay.
21     Q   And did you -- did you apply to a single
22 sponsor or multiple sponsors?
23         MR. VALDIVIESO:  Objection to form.
24         You can answer.
25     A   It was the -- only one agency that I talked

---

23

1  to.
2      Q   (BY MR. HUNT)  Okay.  And did the agency
3  put you in touch with InterExchange?
4      A   I don't remember.
5      Q   Do you remember if the -- if the agency put
6  you in touch with multiple sponsors?
7      A   I don't remember.  I don't know.
8      Q   Let me ask you that in a different way.
9          What -- did you apply to a sponsor?
10     A   No.  I just -- I just talked to Fee Revee,
11 the French agency.
12     Q   And is that -- is that the agency that you
13 submitted your application to?
14     A   Yes.
15     Q   So how did you decide to -- strike that.
16         Did you submit any application to
17 InterExchange?
18     A   No.  I submit my application to Fee Revee,
19 and they did all the rest.
20     Q   Do you know what they did with your
21 application?
22     A   No.
23     Q   So did you have any -- strike that.
24         Do you know why the French agency chose
25 InterExchange -- or let me ask that differently.

---

24

1          Do you know why the Fee Revee submitted
2  your application to InterExchange?
3      A   I have no idea why.
4      Q   So you did not decide to apply to
5  InterExchange?
6      A   No, I didn't.
7      Q   Had -- before -- before you became an au
8  pair and came to the United States, had you heard any
9  complaints or concerns about the au pair program?
10         MR. VALDIVIESO:  Objection to form.
11     Q   (BY MR. HUNT)  You can answer.
12     A   No.  I don't think, no.
13     Q   What interested you in the program?
14     A   Oh, I just heard it was like cultural
15 experience and that I was about to live in a family
16 and taking care of the kids.  And also being part of
17 the family here with free -- with some free time to
18 travel and visit, and -- and I think that that was
19 the most important to me.
20     Q   I believe that you said that you were
21 looking for a cultural experience; is that right?
22     A   Yes.
23     Q   What do you mean by "cultural experience"?
24     A   Honestly, it was my first travel, so I
25 wasn't sure, but I just wanted to see how life in

---

6 (Pages 21 to 24)

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

25

1 America was mostly.
2     **Q**   The au pair program has sometimes been
3 advertised as a cultural exchange. Is that -- is
4 that an accurate way to describe the au pair program,
5 in your experience?
6     MR. VALDIVIESO: Objection to form.
7     A   Yes.
8     **Q**   (BY MR. HUNT) And I believe that you said
9 you were interested in improving your English as
10 well?
11     A   Yes.
12     **Q**   When you were thinking about becoming an au
13 pair, were there other benefits -- excuse me. Let me
14 rephrase that.
15     When you were thinking about becoming an au
16 pair, what were the other benefits that you expected
17 to receive as an au pair?
18     A   The ability -- I don't know. Honestly,
19 when I -- I knew about the money that they were
20 giving to me, I really thought it would be kind of
21 fair. But once I got here, I realized that it was
22 very short, very tight to do stuff and be part of
23 the -- of the life there. I don't know if it's
24 clear.
25     **Q**   When you were thinking about becoming an au

---

26

1 pair and before you came to the United States, were
2 there downsides to being an au pair -- or -- or
3 excuse me.
4     Did you expect any downsides to -- to being
5 an au pair?
6     A   No. Before leaving my country, I didn't
7 think about the downside.
8     **Q**   When you were thinking about being an au
9 pair, did you meet with people from the French
10 agency?
11     A   No, I didn't meet anyone.
12     **Q**   Did you communicate with the French agency
13 by e-mail or phone?
14     A   Yes. Before leaving, I just talk to the
15 lady in the agency, the French agency, and that's it.
16 No au pair, no one else, just the agency.
17     **Q**   Okay. And before you came to the United
18 States, while you were thinking about becoming an au
19 pair, did you meet or talk with anyone from
20 InterExchange?
21     A   I heard from the people from InterExchange
22 in New York for the orientation program.
23     **Q**   Okay. Thank you.
24     So the answer is, no, you did not meet or
25 talk with anyone from InterExchange before you came

---

27

1 to the United States?
2     A   Yes, that's correct.
3     **Q**   When you were talking over the phone or by
4 e-mail with representatives from the French agency,
5 did you discuss the weekly stipend at all?
6     A   I'm not sure about what it means.
7     **Q**   Let me rephrase that.
8     In your discussions or by e-mail or by
9 phone with people from Fee Revee, was there any
10 discussion about how much you would be paid as an au
11 pair?
12     MR. VALDIVIESO: Objection to form.
13     A   They just told me that the legal salary
14 would be 199 -- no -- $195.75 per week. That's all
15 they said.
16     **Q**   (BY MR. HUNT) Did you have any concerns
17 about that amount?
18     A   Not at that time. I thought it was okay.
19     **Q**   Do you remember completing an application
20 for the InterExchange program?
21     A   I don't remember, no.
22     **Q**   Okay. The only application that you
23 remember completing was through the French agency; is
24 that correct?
25     A   Yes.

---

28

1     **Q**   Okay.
2     A   Yes.
3     **Q**   Do you remember whether that application
4 was in French or English?
5     A   I -- I think it was in English, and the
6 lady at the French agency helped me fill it out.
7     **Q**   And that person who helped you fill it out
8 was not a person with InterExchange; is that correct?
9     MR. VALDIVIESO: Objection, form.
10     A   No. It was a lady from Fee Revee, the
11 French agency.
12     **Q**   (BY MR. HUNT) Do you remember receiving
13 information -- strike that.
14     Before you came to the United States, do
15 you remember receiving any information about
16 InterExchange?
17     A   I don't remember.
18     **Q**   Did you pay any fees to participate in the
19 au pair program?
20     A   Yes, I did pay the French agency. I can't
21 remember exactly what I paid for and how much it was.
22 I don't remember this.
23     **Q**   Do you remember what the fees were for?
24     A   No. I'm not sure, no.
25     **Q**   Do you remember paying InterExchange any

---

7 (Pages 25 to 28)

Case No. 1:14-cv-03074-CMA-KMT   Document 1104-1   filed 06/06/18   USDC Colorado   pg 136 of 264

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

29

1  fees to participate in the au pair program?
2      A   I don't remember.  I only paid the Fee
3  Revee, so I don't know.
4      Q   You said you only paid the French agency,
5  so you didn't -- you did not pay any fee to
6  InterExchange; is that correct?
7      A   Yeah.  I don't think I paid directly
8  InterExchange.
9      Q   Do you remember going through a matching
10 process as part of -- as part of beginning the au
11 pair application?
12     A   Can you rephrase it, please?
13     Q   Sure.
14         How did you and your first host family get
15 in contact -- first get in contact with each other?
16     A   I can't remember exactly, but I think they
17 sent me an e-mail, and then we did one or two Skypes,
18 and they matched with me.
19     Q   And was this organized through
20 InterExchange or the French agency?
21     A   I don't remember.
22     Q   Okay.  When you were applying to become an
23 au pair, were you able to view different families
24 online?
25     A   No, I don't think so.  The family -- the

---

30

1  families just e-mailed me, and actually, it was the
2  first one.
3      Q   Can you tell me a little bit more about the
4  application that you submitted to the French agency?
5      A   I'm not sure what you want me to tell about
6  my application.
7      Q   Did you know how the host family chose you?
8      A   No, I don't know how they chose me.
9      Q   Did you choose the host family?
10     A   I didn't choose it, but once they said they
11 wanted me, I made my decision to go with them.
12     Q   Did you communicate with any other host
13 families?
14     A   I think I had one family before this one
15 that got in touch with me, but we didn't match.
16     Q   Why didn't you match?
17     A   Sorry.  What?
18     Q   You said you didn't match with that first
19 host family who contacted you.  Why didn't you match?
20     A   Yeah, we didn't match because they had a
21 difficult child, and I wasn't ready for this.
22         THE REPORTER:  I'm sorry.  They had a?
23         MR. HUNT:  Difficult.
24     Q   (BY MR. HUNT)  Is it difficult child?
25     A   No.  He was -- yeah.  I can't remember the

---

31

1  name.  He was -- like, it was like a very grown-up
2  baby.  I -- I don't remember the name of this
3  sickness or -- I can't remember.
4      Q   Okay.  That's okay.
5      A   Yeah.  Okay.
6          MR. VALDIVIESO:  Joe, could we take a quick
7  break, please?
8          MR. HUNT:  Yes.
9          Off the record.
10         (Recess taken, 5:30 p.m. to 5:37 p.m.)
11         MR. HUNT:  Let's go back on the record.
12     Q   (BY MR. HUNT)  Ms. Gry, is there anything
13 that happened during the break that reminded you
14 of -- of anything that -- or that you would want to
15 change your answer, any previous answer?
16         MR. VALDIVIESO:  Objection to form.
17     A   No.
18     Q   (BY MR. HUNT)  No.
19         Okay.  What I'd like to talk about is this
20 application process and how you got connected with
21 the host family before you came to the United States.
22         So you submitted your application to the
23 French agency, right?
24     A   Yes.
25     Q   Okay.  Can you tell me what happened next?

---

32

1          MR. VALDIVIESO:  Objection to form.
2      A   I got some -- I got an e-mail from a family
3  I didn't match with, and then I got another e-mail
4  with a family in Boston.
5      Q   (BY MR. HUNT)  That's the Tate family?
6      A   Yes.
7      Q   Did you communicate with any other families
8  before you came to the United States?
9      A   I don't think so.
10     Q   Okay.  And you said that you interviewed
11 via Skype, I believe, with the host family?
12     A   Yes.
13     Q   And that was while -- and that was while
14 you were still in France?
15     A   Yeah.  I was still in France, yes.
16     Q   How many interviews did you have with
17 the -- with that family?
18     A   I think I saw them on Skype twice.
19     Q   And they're the only host family with whom
20 you interviewed?
21     A   Yes.
22     Q   Okay.  Do you remember who from the host
23 family was part of the interview?
24     A   You mean who I saw on Skype?
25     Q   Yes.

---

8 (Pages 29 to 32)

**MYLENE GRY - 3/28/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

33

1    A   I think I saw all of them, the dad, the
2 mom, and the two little girls.
3    Q   Okay.  And was that both interviews, both
4 Skype sessions?
5    A   Yes.  It was, yes.
6    Q   Okay.  Was any part of the Fee Revee
7 part -- was anyone from Fee Revee part of the
8 interview over Skype?
9    A   No, it was only the family and me.
10    Q   Okay.  Was anyone from InterExchange part
11 of that interview, either this first or second
12 interview?
13    A   No.
14    Q   Okay.  During either the first or second
15 interview, did the host family discuss how much you
16 were going to be paid?
17    A   They would tell me that there were -- they
18 were paying $200 per week.
19    Q   $200.  Did you ask any questions about how
20 much you were going to be paid?
21    A   No.  I agree with that.
22    Q   Okay.  And were you okay with that amount?
23    A   At that time, yes.
24    Q   Did you ask them to pay you more?
25    A   No, I didn't.

34

1    Q   Okay.  It sounds like they e-mailed you and
2 said we'd like you to be our au pair, and you said
3 yes.  Is that -- is that accurate?
4    A   Yes.  And they sent me an e-mail to tell me
5 that they liked me, and they thought it could match
6 with me and their family.
7    Q   And did you want to go live with the host
8 family?  That was your decision to make?
9    A   At that time, yes.
10    Q   You could have said no?
11    A   Yeah, it was mine.
12    Q   Okay.  Did InterExchange --
13    A   I could have said no, but I said yes.
14    Q   I'm sorry?
15    A   I could have said no, but I said yes with
16 this family.
17    Q   Okay.  Thank you.
18        Did InterExchange assign you to the family?
19    A   I don't know who assigned me to the family.
20    Q   Did Inter -- as far as you know, did
21 InterExchange have anything to do with how you
22 matched with the family?
23    A   I don't know.  I always thought it was from
24 Fee Revee.  I just understood once I got here that it
25 was about InterExchange.

35

1        MR. VALDIVIESO:  Did the court reporter get
2 the second part of that?
3        THE REPORTER:  I believe I did.
4        (The reporter read the answer back as
5 follows:  "I don't know.  I always thought it was
6 from Fee Revee.  I just understood once I got here
7 that it was about InterExchange.")
8        MR. VALDIVIESO:  Thank you.
9    Q   (BY MR. HUNT)  Once -- you say once you got
10 here it was about InterExchange.  Could you tell me
11 what you mean by that?
12        Hello, Ms. Gry?
13    A   Yeah, I -- I can't see you, but -- I guess
14 it works.
15        MR. HUNT:  Let's go off the record.
16        (Discussion off the record.)
17        MR. HUNT:  I'm not sure if you heard my
18 last question, but I'm going to ask the court
19 reporter to repeat it.
20        We're back on the record.
21        (The reporter read the last question as
22 follows:  "You say once you got here it was about
23 InterExchange.  Could you tell me what you mean by
24 that?")
25    A   Yeah, I didn't see anything about Fee Revee

36

1 when I was there, so I -- and they say to me that it
2 was -- it was about InterExchange at this time, and I
3 just said okay.
4    Q   Okay.  Going back to -- to those Skype
5 interviews that you had with your host family.  Your
6 first host family, the Tate family, did you talk --
7 did you talk about what you'd be doing with the
8 children?
9
10
11
12                                           .
13    Q   I -- I'm sorry.  I'm -- I apologize.  I
14 don't want to cut you off, but we're having some
15 audio problems.
16    A   Yeah.  Sorry.
17    Q   It's okay.
18        MR. HUNT:  Let's go off the record.
19        (Discussion off the record.)
20        MR. HUNT:  I'm going to repeat that
21 question because I didn't hear your answer very well.
22    Q   (BY MR. HUNT)  During the Skype interviews,
23 did you discuss with your host family what you would
24 be doing with the children?

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**MYLENE GRY - 3/28/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

37

5     Q   And were those the duties that you actually
6  performed as an au pair?
7     A   Yes, that's what I did.
8     Q   Okay.  And during the Skype interview, did
9  your host family tell you how many hours a day you
10  would -- you would be working?
11     A   They are not sure, but it was for sure from
12  Monday to Friday.  It was sometimes Saturday.
13     Q   Okay.  They told you during the interview
14  that you would be working Monday through Friday and
15  sometimes Saturday?
16     A   Yes, that's what they said.
17     Q   Okay.  And how many hours a day would you
18  be working, if they discussed that?
19     A   Oh, I don't remember if we discussed that.
20     Q   Okay.  Can you tell me about the transition
21  between the first host family and the second host
22  family.  How did that happen?
23     A   So with the first family, we both decided
24  that I couldn't stay with them because I was
25  homesick, and I didn't do enough for them.  So we

---

38

1  agreed, in a nice way, that we should rematch.  So I
2  went into rematch, and I spent two weeks at my local
3  coordinator's house waiting for a family to call me.
4     THE REPORTER:  Local?
5     MR. HUNT:  Coordinator.
6     THE DEPONENT:  Local coordinator.
7     THE REPORTER:  Thank you.
8     Q   (BY MR. HUNT)  And did you begin the
9  matching process all over?
10     A   I didn't do anything.  I just waited for
11  the family to call me.
12     Q   And then did you eventually speak with the
13  new family, the Frieds?
14     A   Yeah, I spoke with them like one day before
15  the deadline.
16     Q   And -- and were they interviewing you for
17  the position?
18     A   Yes.  They asked me questions about how I
19  was and what I expected, and they told me their
20  expectations too, and the family matched.
21     Q   Did you say and that's how you matched?
22     MR. VALDIVIESO:  Hello?
23     MR. HUNT:  Are you back?  Can you hear me
24  now?
25     THE DEPONENT:  Yes.

---

39

1     MR. HUNT:  It's okay.  I understand how
2  frustrating poor service can be.
3     Q   (BY MR. HUNT)  Let me ask you that question
4  again:  How did you -- how did you match with the
5  second host family, the Frieds?
6     A   They called me twice, and they asked me
7  about what my expectations of the job was, and -- and
8  we could give it a try, so we matched.
9     Q   Did you talk about how much you would be
10  paid?
11     A   They told me the same; that they would pay
12  me $200 per week.
13     Q   And did you talk about how much -- how many
14  hours a week you would work?
15     A   Yes.  With them it was from 9:00 to 5:00,
16  Monday through Friday -- or from 8:00 to 5:00, Monday
17  through Friday.
18     Q   That's what they told you on the phone or
19  during this interview?
20     A   Yes, that's what they said.
21     Q   And is that how many hours a week that you
22  worked?
23     A   Yes, it was 45 hours a week.
24     Q   Who made the decision for you and the
25  Frieds to match?

---

40

1     A   I think we made the decision.  I don't know
2  what happened next.  I just said yes, they said yes,
3  and I don't know.
4     Q   So the Frieds chose you, and you chose the
5  Frieds; is that correct?
6     A   Yes.  Correct.
7     Q   Did InterExchange assign you to the Fried
8  family?
9     A   Yes.
10     Q   How did InterExchange assign you to the
11  Fried family?
12     A   I don't know.
13     Q   So you said that InterExchange assigned you
14  to the family.  Is that -- do you have any basis for
15  that?  Do you have any reason to believe that
16  InterExchange assigned you to the Fried family?
17     A   Oh, I don't know.
18     Q   Let me -- do you remember sign -- do you
19  remember signing an au pair agreement before joining
20  the program?
21     A   Yes.
22     Q   Is it the same agreement that you looked at
23  earlier?
24     A   Yes.
25     Q   Okay.  I'm going -- I'm going to pull up

---

10 (Pages 37 to 40)

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

41

1  the document, and hopefully we'll all be able to see
2  it.
3         Do you recognize this?
4     A   Yes.
5     Q   Is this the document that you looked at
6  earlier?
7     A   It was the same document.
8         MR. HUNT:  And before I forget, let's mark
9  this as Exhibit 2.  The previous document that we
10  looked at, the opt-in form, we'll mark as Exhibit 1.
11    Q   (BY MR. HUNT)  Did you sign this agreement?
12    A   Yes, I signed it.
13    Q   Electronically; is that right?
14    A   Yes.
15    Q   Okay.  And is that check mark an
16  acknowledgment that you signed the agreement?
17    A   Yes.
18    Q   I'm going to scroll down, and let me know
19  if you need me to move more slowly, but I'd like to
20  turn to page -- the final page.
21        Let me ask you first, Ms. Gry, did you read
22  this agreement before you signed it?
23    A   I don't remember.
24    Q   Did you ask for anyone to help you read the
25  agreement before you signed it?

42

1     A   I think the lady at Fee Revee told me all
2  about what it was, and I just signed it.  So I
3  believe her.
4     Q   If you look at that paragraph 21, it's kind
5  of small.  Could you read the first sentence for me.
6     A   Yes.  45-hour agreement for the host family
7  and au pair?
8     Q   That's correct.
9         Let me know when you're done.
10    A   Yes, I'm done.
11    Q   Did you understand that you would not work
12  more than 45 hours per week as an au pair?
13    A   Yes.
14    Q   When did you arrive in the United States
15  for the au pair program?
16    A   I arrived in June 2011.  Yes, the end of
17  June 2011.
18    Q   Did you go the training in New York City
19  before you met your host family?
20    A   Yes.  I stayed five days in New York.
21    Q   Did you go through training?
22    A   Yeah, I did the training.  Yes.
23    Q   What sort of training was it?
24    A   Say that again, please.
25    Q   What sort of training did you receive?

43

1     A   We learned about how -- what I remember,
2  they taught us how to do the CPR stuff, to like --
3  what else?  They told us about how the family could
4  be, like -- I don't remember exactly everything that
5  happened.
6     Q   Do you know -- you said it lasted five
7  days.  Do you know how many hours per day you were
8  trained?
9     A   I -- I don't remember, but it was a full
10  day for sure.
11    Q   A full day.
12        Do you remember whether you were paid for
13  the training?
14    A   I wasn't paid for the training.
15    Q   Okay.  Do you remember whether you were
16  required to attend the training?
17    A   I don't -- can you rephrase it, please?
18    Q   Did you have to go to the training?
19    A   Oh, yes.  We all had to go to the training,
20  yes.
21    Q   Who made you go to the training?
22    A   The agency made me go.
23    Q   The agency is -- when you said "the
24  agency," do you mean the French agency or
25  InterExchange?

44

1     A   I think the French agency told me I would
2  have to go to a training.
3     Q   Did the French agency require you to go
4  through any training before you came to the United
5  States?
6     A   No.  They told me I would have the training
7  in New York.
8     Q   Okay.  And then after that training, you
9  went to go meet your host family; is that correct?
10    A   Yes.  On the Friday I went to Boston, and
11  they picked me up at the train station.
12    Q   So your time with the first family was very
13  short?
14    A   Yes.  It was only two weeks.
15    Q   And they paid you $200 each week?
16    A   Yes.  That's correct.
17    Q   Did they give you any other any -- other
18  money or gifts?
19    A   I don't remember.
20    Q   Do you remember how many hours a week you
21  worked for them?
22    A   I guess, yeah, it was 45 hours.
23    Q   Did you keep track of how many hours you
24  worked?
25    A   No.

11 (Pages 41 to 44)

Case No. 1:14-cv-03074-CMA-KMT   Document 1104-2   filed 06/06/18   USDC Colorado   Page 140 of 264

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



45

1    Q   Did the host — did your first host family
2  tell you how many — what your schedule would be
3  like?
4    A   Yeah.  They told me approximately how it
5  would be.
6    Q   Okay.  Do you remember working on the
7  weekends for them?
8    A   I don't remember.
9    Q   Okay.  Well, let's talk about your second
10 host family.  Do you remember whether either or both
11 parents were employed?
12       MR. VALDIVIESO:  Objection to form.
13    A   Can you rephrase.  I didn't hear.

46

24    Q   How many children did the Fried have?
25    A   Three.

47

1    Q   Do you remember how old they were?
2    A   Yeah.  They were nine, 2 1/2, and nine
3  months old when I started working for them.
4    Q   Did you say nine years old, 2 1/2 years old
5  and nine months old when you started working?
6    A   Yes.

22    Q   Sorry.  I'm going to have to —
23    A   -- and other activities.
24    Q   I really apologize.  I don't want to cut
25 you off, but that answer wasn't coming through for

48

1  either the court reporter or — or either of the
2  lawyers here.
3       MR. HUNT:  I believe.  Is that right,
4  Mr. Valdivieso?
5       MR. VALDIVIESO:  Nothing here.

20    Q   Did you have any duties as an au pair that
21 were outside of child care?
22    A   No.
23    Q   And I want to make sure that you
24 understand.  What I'm asking is, did you do anything
25 or — or were you — were you asked to do anything by

12 (Pages 45 to 48)

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

49

1  the host family that was not child care?
2      A   I did some cleanup in the house, but they
3  didn't ask me to do it.  I just did it myself.
4      Q   Okay.  And you were cleaning up after the
5  children as well, I assume; is that correct?
6      A   Yes.
7      Q   Okay.  Did you spend time with other au
8  pairs?
9      A   Can you rephrase it?
10     Q   Did you meet other au pairs?
11     A   Like, did I meet other au pairs when I was
12  working with the kids or outside?
13     Q   Either.
14     A   Yes.  Yes, I had other au pair friends.
15     Q   How did you meet them?
16     A   Oh, I met them at the school, at the
17  library and --
18     Q   I'm sorry.  I'm going to have to cut you
19  off.  Could you please repeat your answer, Ms. Gry?
20     A   Yeah.  I'm here.  I don't know.  It's
21  disconnecting.
22          MR. HUNT:  Well, let's go off the record.
23          (Recess taken, 6:13 p.m. to 6:18 p.m.)
24          MR. HUNT:  Ms. Gry, we're going to be back
25  on the record.

---

50

1      Q   (BY MR. HUNT)  You said you met other au
2  pairs.  Did you spend time with them?
3      A   Yes, I spent time with them at the library
4  with the kids sometimes and also on my free time.
5      Q   Did the family give you a schedule each
6  week?
7      A   Can you say that again?
8      Q   Did the Fried give you -- let me rephrase.
9          How did you -- how -- who determined when
10  you would work as an au pair?
11     A   Oh, the family told me what my schedule
12  would be like.
13     Q   Did they give you -- did they give you the
14  schedule?  Did they write it down or tell you?
15     A   They told me, like, from the beginning it
16  would be from 8:00 to -- yeah, from 8:00 to 5:00,
17  Monday through Friday, and that's what they did.
18  Nothing changed.
19     Q   That never varied?  In other words, that --
20  that schedule never changed?
21     A   Yes, that's what I did the whole year, from
22  8:00 to 5:00, Monday to Friday.
23     Q   So that schedule wasn't -- was not written
24  down on paper?
25     A   No, it wasn't.

---

51

1      Q   Did anyone from InterExchange ever give you
2  a weekly schedule while you lived with your host
3  family?
4      A   I don't think so, no.
5      Q   Did you keep records or papers of your
6  weekly schedule?
7      A   No, I have nothing about this.
8      Q   And you worked the same days, Monday
9  through Friday, 8:00 a.m. to 5:00 p.m.?
10     A   Yes.  That's correct.
11     Q   Did you ever work on the weekends?
12     A   Maybe occasionally, but I don't remember
13  exactly.
14     Q   What is a -- how -- what does
15  "occasionally" mean to you?
16     A   Like maybe it happens once or twice because
17  they wanted to go out, but I don't know exactly why
18  and when.
19     Q   Once or twice a year?
20     A   A year, yes.
21     Q   Okay.
22     A   A year.
23     Q   Did you ever work in the evenings?
24     A   No.  I don't remember, no.
25     Q   Ms. Gry, I just would like to clarify your

---

52

1  last answer.  No, you don't remember or no, you did
2  not work in the evenings?
3      A   I don't remember working in the evening
4  with them.
5      Q   Thank you.
6          When you were working Monday through
7  Friday, 8:00 a.m. to 5:00 p.m., were there times
8  during the day that you had off?
9      A   When both kids were asleep for naps -- for
10  naps, I mean, that's when I had kind of a time off.
11  But I was still, like, watching the kids, like,
12  making sure everything was okay, getting the stuff
13  ready for after nap.  So it -- it depends.  Sometimes
14  I didn't get this time off during the day.
15     Q   Did you have any opportunity for free time
16  during the day?
17     A   No.  No, not from 8:00 to 5:00; I was like
18  fully with the kids.  I couldn't do whatever I
19  wanted.  Like, I was on duty.
20     Q   Were you ever expected to be available --
21  strike that.
22          Excuse me.  Let me rephrase that, Ms. Gry.
23          Do you know what the phrase "on call"
24  means?
25     A   I think so.

---

13 (Pages 49 to 52)

**MYLENE GRY - 3/28/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

53

1  Q   Can you tell me?
2  A   On call is like when you were on your free
3  time but you expect a call to come to work.
4  Q   Were you ever on call as an au pair?
5  A   Oh, no, I wasn't.
6  Q   Were there any times that you -- strike
7  that.
8      Did you have responsibilities for the
9  children waking up at night?

25  Q   Okay.  So to clarify what you said earlier,

---

54

1  while you were living with your host family, were
2  there any weeks that you worked more than 45 hours?
3  A   No.
4  Q   Did you ever work more than ten hours per
5  day?
6  A   No, it never happened.
7  Q   Did you ever have any concerns or
8  complaints about the schedule that the Fried family
9  gave you?
10  A   No.  No, not at all.
11  Q   How much -- strike -- excuse me.  Let me
12  rephrase that, Ms. Gry.
13      I believe you said, and correct me if I'm
14  wrong, that they paid you $200 per week; is that
15  correct?
16  A   Yes.  Yes, that's correct.
17  Q   Did that ever change?  Did they ever pay
18  you more or less than $200 per week?
19  A   No.  It was always 200 per week.
20  Q   How were you paid?
21  A   They paid me in cash every Friday.
22  Q   Did you ever keep records of those
23  payments?
24  A   No, I don't have any records.
25  Q   Did you talk with the host family about

---

55

1  the -- about the payment -- about the weekly payment?
2  A   No.  They just said they would pay me $200
3  per week in cash, and I said okay.
4  Q   You said earlier that you were not
5  completely satisfied with that amount; is that right?
6      MR. VALDIVIESO:  Objection to form.
7  Mischaracterizes the testimony.
8  A   Yes.
9  Q   (BY MR. HUNT)  Did you --
10  A   That wasn't -- sorry.
11  Q   No.  Go ahead.
12  A   Yeah, it wasn't that much money after all.
13  Once I got to New York, I realized that everything
14  was very expensive, and so I needed, like, money to
15  do stuff, and I realized that it wasn't that much
16  money.
17  Q   Did you ask your host family for more
18  money?
19  A   No, I didn't ask them for more money.
20  Q   What was the reason that you didn't ask
21  them for more money?
22  A   I didn't feel like it.
23  Q   Could you explain that feeling?
24  A   Well, I don't like to ask people for stuff,
25  especially money, so I wasn't comfortable asking them

---

56

1  for more money.
2  Q   Do you know who decided the amount of money
3  that you would be paid?
4  A   Oh, I believe it was the USA, but it was
5  very vague, in my mind.  I don't know who exactly
6  decided this amount, and I don't know exactly why
7  this amount.
8  Q   Did InterExchange ever pay you a weekly
9  type -- a weekly payment?
10  A   No.  Never.
11  Q   Do you know whether InterExchange
12  determined the amount of money that -- that the host
13  family paid you?
14  A   Can you rephrase, please?
15  Q   Yes, I will.
16      Did InterExchange ever determine the amount
17  of money that you would be paid?
18  A   Oh, I don't know if -- if InterExchange
19  decided this money.
20  Q   Did your host family ever pay you more than
21  the weekly amount?
22  A   No.
23  Q   Did they -- did the host family ever give
24  you extra money for any reason?
25  A   I don't remember.

---

14 (Pages 53 to 56)

**MYLENE GRY - 3/28/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

57



8 Q When -- can you -- can you tell me -- when
9 we were discussing your child care activities and
10 where you took the children, it was a little
11 difficult to hear. Can you describe some of the
12 things that you did with the children?

25 Q Did you ever go to the museums?

---

58

1 A I don't remember if it was with them.
2 Q Did you ever go to places like the zoo or
3 the park?
4 A Oh, yeah, we went to parks, like the
5 playgrounds, and we went to the zoo once.
6 Q Did you go to the movie theater with the
7 children?
8 A No, I didn't go to the movie theater with
9 them.
10 Q Did you ever go to other sorts of events,
11 like baseball games or the theater or concerts,
12 horseback riding, anything like that?
13 A Oh, I went once to the ballet, the ballet
14 performance, but I paid my ticket to go with them.
15 Q You paid for your own ticket?
16 A Yes.
17 Q Who paid for the children's tickets?
18 A The parents, because they were with us.
19 Q When you went to the zoo with the children,
20 did the parents pay for your ticket then?
21 A I don't remember, but I -- I think they
22 did, yes, because it was on the pass, the zoo pass.
23 So we -- the caregiver is on the pass with the
24 children.
25 Q When you went -- for instance, if you went

---

59

1 to get ice cream with the children, who paid for the
2 ice cream?
3 MR. VALDIVIESO: Objection to form.
4 Q (BY MR. HUNT) You can answer.
5 A Yeah, the parents paid for the ice cream --
6 Q Okay.
7 A -- for the kids.
8 Q For -- generally for your activities with
9 the children, who paid your way?
10 A Who paid my what?
11 Q Who paid for you?
12 A What do you mean who paid for me? For
13 what?
14 Q When you were supervising the children --
15 and you know what, let me -- let me withdraw that
16 question. I'll ask you a different question.
17 Did you have -- as an au pair, did you have
18 a computer to use?
19 A I had my own laptop.
20 Q Okay. Did you have access to the Internet?
21 A Yes, we had WiFi.
22 Q It was the host family's WiFi?
23 A Yes.
24 Q Did you pay to use it?
25 A No, I didn't pay to use it.

---

60

1 Q Did you have a cell phone?
2 A I had my own cell phone.
3 Q Who paid for that?
4 A The phone was mine, but the contract,
5 whatever it's called, was theirs.
6 Q Did they buy your -- the cell phone?
7 A No. It was mine from France.
8 Q But they paid for the contract?
9 A Yes, they paid for the contract.
10 Q Were you able to make personal calls?
11 A Yes.
12 Q And they -- and you also used it with --
13 let me withdraw that question.
14 Did the host family have any rules about
15 using the cell phone?
16 A No.
17 Q Did the host family ever have any rules
18 about using your computer?
19 A No, but I didn't use it when I was on --
20 when I was working.
21 Q Okay.
22 A The laptop, I mean.
23 Q Did InterExchange have any rules about
24 using the phone or computer?
25 A Oh, I don't think so.

---

15 (Pages 57 to 60)

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

61

1    Q   Did you have a car that you could use while
2  you were an au pair?
3    A   Yes.  They had a car that I could drive.
4    Q   It was the host family's car?
5    A   Yes, it was their car.
6    Q   Did you use it for -- did you drive the
7  children?
8    A   Yes, I drive the children.
9    Q   Did you use it for personal trips?
10   A   Yes.  I asked when I needed to take the car
11 somewhere, and they mostly said yes.
12   Q   Did they give you gas money?  Did the host
13 family give you gas money?
14   A   Not for my own -- not for my own trip.
15   Q   Did you purchase gas for your own trips?
16   A   Yes, I did.
17   Q   How many trips did you take?
18   A   I can't remember.
19   Q   How many trips did you take with the host
20 family?
21   A   As I remember, we went once to Niagara
22 Falls and the families' -- it was in -- in Rochester,
23 Upstate New York.  And I don't remember if I had
24 other trips with them.  Oh, yeah, we went also to
25 their beach house.  I don't -- yeah.  Yes.  Yeah, at

---

62

1  least two trips:  one to the Upstate New York, and
2  one to the beach house, altogether.
3    Q   Did you ever go the Disney World with the
4  host family?
5    A   No, I didn't go to Disney World.
6    Q   Did you ever go to any baseball games or
7  Broadway shows with the host family?
8    A   No, not with them.
9    Q   How long was your trip to Niagara Falls?
10   A   It was for Thanksgiving, so it was four
11 days, I think.  Yes, four days.  Four or five days.
12 No more.
13   Q   Did the host family pay for you to go to
14 Niagara Falls?
15   A   Yeah, it was -- yeah, it was like on the --
16 on the week.  Like it wasn't vacation for me, but it
17 was like a regular schedule, but somewhere else.
18   Q   And when you went to the beach house, was
19 that in New Jersey?
20   A   Yes.
21   Q   And did the host family pay for you to go?
22   A   Oh, yeah, it was the same, like, regular
23 schedule.
24   Q   And when you went to Westchester, was that
25 an overnight trip?

---

63

1    A   To Rochester, you mean?
2    Q   Oh, it was -- it was to Washington?
3    A   No.  Rochester, Upstate New York.
4    Q   Oh, Rochester.  Excuse me.
5    A   Yes.  Sorry.
6    Q   No.  It's my mistake.
7    A   So, yeah, we went to -- Rochester and
8  Niagara Falls was on the same trip.
9    Q   Okay.
10   A   It was five days.
11   Q   Did you ever take any trips by yourself or
12 with au pairs, other au pairs?
13        MR. VALDIVIESO:  Objection to form.
14   A   Yes, I did.
15   Q   (BY MR. HUNT)  Where did you go?
16   A   I went to Niagara Falls again.  I went to
17 Bahamas.  I went to Boston again from New York.  I
18 went to Atlantic City.  I think that's it.  As I
19 remember, yeah, I think that's it.
20   Q   And these were vacations for you?
21   A   Bahamas was my vacation and Niagara Falls,
22 again, was my vacation, but the other was -- that was
23 on my days off on the weekends.
24   Q   When you say your vacation, that's the
25 two-week vacation that -- that you were given; is

---

64

1  that right?
2    A   Yes.  Yes, I went one week to Niagara Falls
3  and another week to Bahamas.
4    Q   And when you went to -- on your vacation,
5  did the family pay for your expenses?
6    A   No.  They just paid me $200 as a paid
7  vacation, and that's it.
8    Q   Was that -- was that -- do you remember
9  when you went to the Bahamas and Niagara Falls?
10   A   Niagara Falls was in March 2012 and Bahamas
11 was in April, May, something like this.  I'm not very
12 sure.
13   Q   And the father and mother, the host family,
14 the Fried, paid you during those weeks?
15   A   Yeah, they paid me $200 per week.
16   Q   Did they pay for your flight or for your
17 travel expenses?
18   A   No.  I paid -- no.  I paid for my travel
19 expenses.
20   Q   And your trips to Boston and Atlantic City,
21 did the host family pay for your -- any of your
22 travel expenses then?
23   A   No.  I paid for everything.  They didn't
24 pay for anything.
25   Q   Were there any other benefits that you

---

16 (Pages 61 to 64)

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

**65**

1 received from the host family? For -- for --
2     A   What do you mean by "benefits"?
3     Q   For example, did the host family ever give
4 you passes to take tennis lessons or to go to yoga or
5 to go have dinner with your friends?
6     MR. VALDIVIESO: Objection to form.
7     A   No, they didn't.
8     MR. VALDIVIESO: Sorry. I'm giving you a
9 lot of leeway, Counsel, but, I mean, usually you have
10 to have some basis for asking questions; it's not
11 like a fishing expedition. But I'll leave it at
12 that.
13      You may answer the question or have it read
14 back if you don't remember what it was.
15     A   Yeah, I didn't have any benefits like
16 this -- like this one.
17     Q   (BY MR. HUNT) Did the host family -- did
18 the Frieds provide you a journal or log or -- or a
19 diary?
20     A   For what you mean?
21     Q   For you to record what -- your experiences
22 as an au pair?
23     A   No. But they did -- they did give me a
24 book with pictures of the whole year I spend with
25 them.

---

**66**

1     Q   Do you still have that?
2     A   It's in France, yes.
3     Q   It's in French or in France?
4     A   It is in France. My book is at my parents'
5 house in France.
6     Q   Okay. Who told you what duties to perform
7 with the children?
8     A   The family told me what I could do with the
9 kids during my working hours.
10     Q   Did InterExchange ever tell you what duties
11 to perform?
12     A   The local coordinator, she gave me some
13 examples, like of what to do and not to do. Like, do
14 everything that concerns the kids. Like the food,
15 cooking for them, but not for the whole family. And
16 like cleaning up the kids' stuff, but not the whole
17 house. Stuff like this.
18     Q   Who told -- the local coordinator, do you
19 remember his or her name?
20     A   No. It was a lady, but I don't -- I can't
21 remember her name.
22     Q   Was -- does Westchester Belleny (phonetic)
23 sound right?
24     A   Can you repeat, please?
25     Q   Yeah. Does Westchester sound right?

---

**67**

1     A   Westchester is the county where I lived,
2 yeah.
3     Q   Does the name Mary Ann Armstrong sound
4 familiar?
5     A   Yes. I think, yes, it sounds familiar,
6 yes.
7     Q   Okay. Well, let's -- let me just refer to
8 her as the local coordinator. But --
9     A   Okay.
10     Q   -- you said the local coordinator told you
11 what to do and what not to do. Do you remember how
12 often she told you this?
13     A   Yes. She just told me once when she went
14 to check on how I was in the house, in the family,
15 and, yeah, the only visit, actually.
16     Q   The unlimited -- I apologize, but I didn't
17 hear that very clearly. Did you say she told you
18 once?
19     A   Yeah, she told me once at the only visit
20 that she made to the house, to the Fried house.
21     Q   Can you tell me about that visit that she
22 made?
23     A   Oh, I don't remember exactly all of it, but
24 I remember that she came and -- and she went to check
25 on me and to check on the family, if we matched well.

---

**68**

1 And she made sure that I shouldn't do the cleaning
2 for the whole house or the cooking for the whole
3 house. She just made sure that I would do everything
4 that was about the kids.
5     Q   Did she actually give you duties to --
6 duties to perform for the family? Did she direct
7 you --
8     A   Say it again.
9     Q   Did she direct you to perform duties for
10 the family?
11     A   She gave me examples.
12     Q   Okay.
13     A   Examples.
14     Q   Did the local coordinator pay you?
15     A   No, she didn't pay me.
16     Q   Did the local coordinator supervise the
17 child care that you were providing?
18     A   Oh, I'm not sure what you mean by
19 "supervise." Like, did she come other times during
20 the year?
21     Q   I -- I -- I believe you told me that she
22 just came to the house once; is that right?
23     A   Yes, she came to the house -- yes, she came
24 to the house once, and she didn't really check on me
25 during the whole year.

---

17 (Pages 65 to 68)

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

69

1  Q   Other than the local coordinator, were
2  there any other people from InterExchange that you
3  met with during your time as an au pair?
4  A   No.
5  Q   Did you meet with the local coordinator
6  outside of the home?
7  A   Yes.  At the cluster meeting.
8  Q   And did you -- how frequently did you
9  attend cluster meetings?
10  A   I remember -- I remember going to a family
11  event as a cluster meeting into her house, and I
12  think we did two other -- but I did two other
13  meetings in a Starbucks.  I don't remember any other
14  cluster meetings with her.
15  Q   Did you make any complaints to the local
16  coordinator about your experience as an au pair?
17  A   No, I didn't complain to her.
18  Q   Did you have any reason to complain to her?
19  A   No.  I was happy with the family.
20  Q   Did your host family ever ask you to
21  perform any duties that concerned you in any way?
22      MR. VALDIVIESO:  Objection to form.
23  A   Can you rephrase it, please?
24  Q   (BY MR. HUNT)  Did your host family ever
25  ask you to perform any duties that you thought were

70

1  bad or not proper?
2  A   No.  They never mentioned anything to me
3  about my work with them.
4  Q   Let me rephrase the question just once
5  again.
6      Did they ask you to perform any duties that
7  you didn't want to do?
8  A   No.
9  Q   Okay.  Did you take classes while you lived
10  with the Fried?
11  A   Yes, I did.
12  Q   What classes did you take?
13  A   I took English, a second language, and a
14  kickboxing class.
15  Q   Do you know whether you took six credits of
16  classes?
17  A   I think I did the six credits, yes.
18  Q   What was the college or -- or university
19  that -- where you took the classes?
20  A   I went to Westchester Community College in
21  Valhalla, New York.
22  Q   Do you have any documents that you received
23  from the French agency related to your participation
24  in the au pair program?
25  A   I don't know.

71

1  Q   You have been asked to provide documents
2  related to the amount of money that you were paid and
3  the hours that you worked as an au pair.  Have you
4  searched for any of these documents?
5  A   No, I didn't.
6  Q   Do you believe that you might have
7  documents related to the amounts that you were paid
8  and the hours that you worked?
9  A   I -- I don't know.  I don't remember.
10  Q   Did you make any complaint to your host
11  family while you were an au pair?
12  A   No, I didn't complain.
13  Q   Did you make any complaint to anyone about
14  your experience as an au pair?
15  A   No, I don't think so.
16  Q   And I apologize if I've already asked you
17  this, but did any anyone from InterExchange ever
18  assign you any duties or responsibilities that you
19  provided your host family?
20  A   No.
21  Q   Have you calculated how much money you
22  believe you're owed?
23  A   Like, can you rephrase "owed."  I'm not
24  sure the meaning.
25  Q   Sure.

72

1      At the beginning of the deposition you said
2  this lawsuit had to do with the minimum wage; is that
3  correct?
4  A   Yes.
5  Q   Is it your belief that you were not paid
6  the minimum wage?
7  A   Yeah.  I know it's -- it's not the correct
8  amount.
9  Q   Have you -- do you know how much you are
10  owed?
11  A   I didn't calculate, but I know that if I
12  worked 40 hours or less, I have a minimum wage
13  that's -- I think it's around $12 hour, and over 40
14  hours a week it's even more.  So I didn't calculate,
15  but I'm sure it's much more than $200 a week for --
16  for 45 hours of working.
17  Q   And that is the amount that your host
18  family owes you; is that correct?
19      MR. VALDIVIESO:  Objection to form.
20  A   I don't think it's the host family that
21  owes this money.  I think it comes from
22  InterExchange, because InterExchange made the
23  agreement and the contracts, so the family signed.
24  So I think it's the responsibility of InterExchange
25  and not the host family.

18 (Pages 69 to 72)

Case: No-cv-03074-CMA-KMT Document 104-2 filed 06/06/18 USDC Colorado pg 147
of 264

MYLENE GRY - 3/28/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

73

1     Q  (BY MR. HUNT) Because they made the
2  contracts; is that right?
3     A  Yes, that's correct.
4     Q  Okay.
5     A  Yes.
6     Q  Did you ever complain to anyone at
7  InterExchange about your experience as an au pair?
8     A  No.
9     Q  Did you ever complain to anyone at
10  InterExchange about the amount of money that you
11  received from your host family?
12     A  No, I didn't.
13     Q  Did you ever make any complaints to any
14  government agency about your experience as an -- as
15  an au pair?
16     A  No, I didn't.
17     Q  Okay.
18     MR. HUNT:  Could we take a five-minute
19  break.  I probably have a handful of questions, if
20  that.
21     MR. VALDIVIESO:  Okay.
22     MR. HUNT:  Go off the record.
23     (Recess taken, 7:01 p.m. to 7:10 p m.)
24     MR. HUNT:  Ms. Gry, I just have a couple of
25  questions, and we'll be back on the record now.

74

1     Q  (BY MR. HUNT) During one of the breaks
2  were you -- were you able to find the e-mail from --
3  that introduced you to this lawsuit that we
4  discussed?
5     A  No.  I think it's too old, and when I tried
6  to look for it, I just -- I just had her e-mail
7  coming up, but I can't find the e-mail itself.
8     Q  Do you remember receiving the Consent to
9  Join form that we discussed earlier?
10     A  I don't remember exactly, but I remember
11  signing it, yes.
12     Q  Do you remember how you received it?
13     A  Not exactly.
14     Q  Was it by e-mail? FaceBook?
15     A  Yeah, I think it was in this e-mail from
16  Gessee Boeteng.
17     Q  This person Gessee Boeteng sent you the
18  opt-in form?
19     A  I think so, yes.
20     Q  Okay.  Did the host family ever buy you any
21  clothes or take you shopping?
22     A  They bought me -- no, not shopping.
23     Q  I may have cut you off.

75

1     MR. HUNT:  Okay.  Your lawyer might have
2  some questions for you, but I believe that I am --
3  and I may have some follow-up, but I want to thank
4  you for your time, and I have no more questions for
5  you at this time.
6     THE DEPONENT:  Thank you.
7     EXAMINATION
8  BY MR. VALDIVIESO:
9     Q  Ms. Gry, Mr. Hunt asked you some questions
10  about the cell phone.
11     Do you remember that?
12     A  Yes.
13     Q  Okay.  Did you use that cell phone that you
14  testified about for anything other than your personal
15  use?
16     A  Yes.  Also for work.
17     Q  And how did you use it for your work?
18     A  When the mom had something to tell me about
19  whatever that comes from the kids, that she would
20  text me or call me.  And if I had questions about the
21  day or whatever, I could call her with that phone.
22     Q  And you said that your host family, the
23  Fried, that they paid you $200 a month -- or excuse
24  me -- that they paid you $200 a week; is that right?
25     A  Yes, that's correct.

76

1     Q  Did you understand why they paid you $200 a
2  week?
3     A  Yeah, it is because it was in cash.  When
4  you go to the ATM, they won't give you 199.75 (sic),
5  so I think it was just easier for them to get 200 and
6  give me the 200.
7     Q  Do you remember Mr. Hunt asked you some
8  questions about the duties in the home, and you
9  testified about the local coordinator explaining to
10  you some examples of what was permitted and what was
11  not permitted?
12     Do you remember that?
13     A  Yes.
14     Q  Other than your local coordinator, did
15  anyone else from InterExchange give you examples of
16  what is permitted and not permitted under the au pair
17  program?
18     A  No.
19     MR. VALDIVIESO:  I don't have any other
20  questions.
21     MR. HUNT:  None -- none from me, Ms. Gry.
22     THE DEPONENT:  What?
23     MR. HUNT:  No questions from me either.
24  That -- that concludes the deposition.  So thank you
25  again for your time, and you can close the Zoom

19 (Pages 73 to 76)

**MYLENE GRY - 3/28/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

77

```
1    program and the phone call.
2         THE DEPONENT:  Okay.  Thank you.
3         WHEREUPON, the within proceedings were
4    concluded at the approximate hour of 7:15 p.m. on the
5    28th day of March, 2018.
6              *   *   *   *   *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

78

```
          I, MYLENE GRY, do hereby certify that I
have read the above and foregoing deposition and that
the same is a true and accurate transcription of my
testimony, except for attached amendments, if any.
          Amendments attached   (  ) Yes     (  ) No




          _____
          MYLENE GRY


          The signature above of MYLENE GRY was
subscribed and sworn to or affirmed before me in the
county of _____, state of
_____, this _____ day of
_____, 2018.


          _____
          Notary Public
          My Commission expires:




Johana Paola Beltran, March 28, 2018 (sd)
```

79

```
                    REPORTER'S CERTIFICATE
STATE OF COLORADO      )
                       ) ss.
COUNTY OF ADAMS        )
               I, SHAUNA T. DIETEL, Registered
Professional Reporter, and Notary Public ID
20014031444, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said MYLENE GRY, was duly sworn or affirmed by me
to testify to the truth in relation to the matters in
controversy between the parties hereto; that the said
deposition was taken in machine shorthand by me at
the time and place aforesaid and was thereafter
reduced to typewritten form; that the foregoing is a
true transcript of the questions asked, testimony
given, and proceedings had.

               I further certify that I am not
employed by, related to, nor of counsel for any of
the parties herein, nor otherwise interested in the
outcome of this litigation.
               IN WITNESS WHEREOF, I have affixed my
signature this 11th day of April, 2018.

               My commission expires August 15, 2021.


_XXX_   Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.
```

20 (Pages 77 to 79)

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         )  ss.
COUNTY OF ADAMS          )

            I, SHAUNA T. DIETEL, Registered
Professional Reporter, and Notary Public ID
20014031444, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said MYLENE GRY, was duly sworn or affirmed by me
to testify to the truth in relation to the matters in
controversy between the parties hereto; that the said
deposition was taken in machine shorthand by me at
the time and place aforesaid and was thereafter
reduced to typewritten form; that the foregoing is a
true transcript of the questions asked, testimony
given, and proceedings had.

            I further certify that I am not
employed by, related to, nor of counsel for any of
the parties herein, nor otherwise interested in the
outcome of this litigation.

            IN WITNESS WHEREOF, I have affixed my
signature this 11th day of April, 2018.

            My commission expires August 15, 2021.


_XXX_   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing is not required.




Shauna T. Dietel
Registered Professional Reporter

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 14-cv-03074-CMA-KMT
 3    _____

 4    VIDEOCONFERENCE DEPOSITION OF:  MARIANE MELO RIDGEWAY
                                      March 30, 2018
 5    _____

 6    JOHANA PAOLA BELTRAN, et al.,

 7    Plaintiffs,

 8    v.

 9    INTEREXCHANGE, INC., et al.,

10    Defendants.

11    _____

12              PURSUANT TO NOTICE AND STIPULATION, the
      videoconference deposition of MARIANE MELO RIDGEWAY
13    was taken on behalf of the Defendants at 1900 Grant
      Street, Suite 1025, Denver, Colorado 80203, on
14    March 30, 2018, at 10:14 a.m., before Tracy C. Masuga,
      Registered Professional Reporter, Certified Realtime
15    Reporter, and Notary Public within Colorado.

16

17

18

19

20

21

22    H+G

23

24    Hunter + Geist, Inc.

25
```

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

Your Partner in Making the Record

■ www.huntergeist.com
■ scheduling@huntergeist.com

Court Reporting, Legal Videography, and Videoconferencing

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____
VIDEOCONFERENCE DEPOSITION OF:   MARIANE MELO RIDGEWAY
                                 March 30, 2018
_____
JOHANA PAOLA BELTRAN, et al.,
Plaintiffs,
v.
INTEREXCHANGE, INC., et al.,
Defendants.
_____

           PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of MARIANE MELO RIDGEWAY
was taken on behalf of the Defendants at 1900 Grant
Street, Suite 1025, Denver, Colorado 80203, on
March 30, 2018, at 10:14 a.m., before Tracy C. Masuga,
Registered Professional Reporter, Certified Realtime
Reporter, and Notary Public within Colorado.

**2**

                    A P P E A R A N C E S
For the Plaintiffs and the Deponent:
        SEAN A. PETTERSON, ESQ.
        Boies, Schiller & Flexner, L.L.P.
        575 Lexington Avenue
        7th Floor
        New York, New York 10022

For the Defendants:

        JOSEPH H. HUNT, ESQ.
        Sherman & Howard L.L.C.
        633 17th Street
        Suite 3000
        Denver, Colorado 80202

        Ms. Ridgeway was located at 1030 Wallace
Avenue, Aptos, California 95003, 831-419-9401

        Mr. Hunt and Ms. Masuga, the court
reporter, were located at 1900 Grant Street, Suite
1025, Denver, Colorado 80203, 303-832-5966.

        Mr. Petterson was located at
575 Lexington Avenue, 7th Floor, New York, New York
10022, 212-754-4272.

**3**

                        I N D E X
EXAMINATION OF MARIANE MELO RIDGEWAY:              PAGE
March 30, 2018

By Mr. Hunt                                       5, 88

By Mr. Petterson                                  82, 93


                                               INITIAL
DEPOSITION EXHIBITS:                           REFERENCE
Exhibit 1    Consent to Join (Pursuant to            11
             29 U.S.C. Section 216(b)) by
             Ridgeway, 9/3/17
Exhibit 2    InterExchange Au Pair USA               73
             Questionnaire for Freitas Melo,
             Last Login 8/1/12, with attachments

**4**

1    WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4          *    *    *    *    *
5          (Deposition Exhibit 1 was marked.)
6          MR. HUNT:  Ms. Ridgeway, thanks for
7  appearing.  We can all see and hear each other.
8          Before we go on the record, I just want
9  to confirm that and let you know that if we do have
10  problems, we'll stop the deposition and restart or
11  proceed as best we can, okay?
12          THE DEPONENT:  Okay.  Can I just ask you
13  something before we start?
14          MR. HUNT:  Sure.
15          THE DEPONENT:  Can I try to use this one
16  more time?  If it does you not work, I'll just take it
17  off.
18          MR. HUNT:  Yes.
19          MR. PETTERSON:  Yep.
20          THE DEPONENT:  Okay.  So I can try.
21          MR. HUNT:  All right.  That sounds good.
22          Okay.  So we'll go on the record.
23  Ms. Ridgeway, my name is Joe Hunt.  I'm an attorney
24  for InterExchange.  I'm going to be asking you some
25  questions today.  We're all appearing remotely via

1 (Pages 1 to 4)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

5

1  videoconference.  You can see and hear your attorney?
2         THE DEPONENT:  Yes.  Sean?
3         MR. HUNT:  Yeah.
4         Mr. Petterson, why don't you enter your
5  appearance.
6         MR. PETTERSON:  Sean Petterson on behalf
7  of plaintiff and Ms. Ridgeway.
8         MR. HUNT:  Okay.  And if we can,
9  Mr. Petterson, stipulate on the record that because
10 we're doing this deposition remotely, there will be no
11 objection to swearing Ms. Ridgeway in or using the
12 transcript going forward.
13        MR. PETTERSON:  I have no objection.
14        MR. HUNT:  Okay.  Ms. Ridgeway, the
15 court reporter is going to give you an oath.
16              MARIANE MELO RIDGEWAY,
17 having been first duly sworn to state the whole truth,
18 testified as follows:
19        (Deponent's response to oath:  "Yes.")
20              EXAMINATION
21 BY MR. HUNT:
22     Q.  And for the record, we're using this
23 video, but we're not actually recording it, okay?
24     A.  Okay.
25     Q.  Ms. Ridgeway, could you please state

---

6

1  your name for the record.
2     A.  Yes.  It's Mariane Ridgeway.
3     Q.  And your attorney has told us that you
4  do not need to -- you do not need an interpreter.  So
5  you're comfortable proceeding in English?
6     A.  That's right, uh-huh.
7     Q.  If there's a question that you don't
8  understand, just let me know and I'll rephrase it,
9  okay?
10    A.  Okay.
11    Q.  And as I said, there's a court reporter
12 here.  She's writing everything -- she's writing
13 everything down that we say, so let's try not to talk
14 over each other.  Let me finish my question, and I'll
15 let you finish your answer.  It will just make her
16 life a whole lot easier, okay?
17    A.  Okay.
18    Q.  Have you ever taken a deposition before?
19    A.  No.
20    Q.  Have you ever testified under oath?
21    A.  No.
22    Q.  Do you understand what it means to be
23 under oath?
24    A.  Yes.
25    Q.  Can you tell me?

---

7

1     A.  That I -- I just promised that I will
2  tell the truth.
3     Q.  Thanks.
4     A.  And if I don't, I have some penalty.
5     Q.  And your attorney may object to a
6  question that I ask or more than one question that I
7  ask.  If he does so, just let him state the objection,
8  and unless he tells you not to answer, you can go
9  ahead and answer, okay?
10    A.  Okay.
11    Q.  And this isn't an endurance contest, so
12 if you need a break, let me know.  And the same goes
13 to Mr. Petterson, okay?
14    A.  Okay.
15    Q.  Also, we're going to be talking about
16 your experience as an au pair, and so I would just ask
17 if you discuss the children, the host family's
18 children, try not to use their name, and instead
19 identify them by gender or age or "son" or "daughter,"
20 okay?
21    A.  Okay.
22    Q.  And before we start, is there anyone
23 present with you?
24    A.  No, not in the same room.
25    Q.  Okay.  And did you prepare for this

---

8

1  deposition by reviewing any documents?
2         MR. PETTERSON:  Objection.
3     Q.  (BY MR. HUNT)  Let me rephrase that.
4     A.  Yes.
5     Q.  Did you review any documents to prepare
6  for this deposition?
7     A.  What documents?
8     Q.  Did you say "One document"?
9     A.  I asked you what -- what documents are
10 you talking -- are you asking me?
11    Q.  Any documents related to this lawsuit
12 that you may have provided your attorneys or they may
13 have provided you.
14    A.  Oh, okay.  Yes, I have.
15    Q.  What documents did you review?
16    A.  Ask again.
17    Q.  What documents did you review?
18    A.  What I'm understanding about documents
19 is a document that I -- I answered questions.  Is that
20 right?
21    Q.  Can you explain that a little bit more
22 about the document that you answered questions?
23    A.  About how many years I was here, how
24 many kids I was taking care of, those kind of
25 questions.

2 (Pages 5 to 8)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

9

1    Q.  Okay.  Was that a -- was that a
2 questionnaire or a survey that your attorneys asked
3 you to fill out?
4          MR. PETTERSON:  Objection.
5    Q.  (BY MR. HUNT)  You can answer,
6 Ms. Ridgeway.
7    A.  They were questions.
8    Q.  "They were questions," is that what you
9 said?
10    A.  Questions, yes.
11    Q.  When you were answering this survey, did
12 it remind you of any facts that you had forgotten?
13          MR. PETTERSON:  Objection.
14    A.  I'm sorry.  Can you repeat?
15    Q.  (BY MR. HUNT)  Yeah.  That answer -- or
16 excuse me, that questionnaire that you filled out --
17    A.  Uh-huh.
18    Q.  -- you said that you reviewed it when
19 you were preparing for this deposition.  I'm
20 wondering, when you reviewed it, did that remind you
21 of any -- of anything that you had forgotten?
22    A.  (Deponent shook head from side to side.)
23          MR. PETTERSON:  Objection.
24    Q.  (BY MR. HUNT)  No?
25    A.  No.

10

1    Q.  Did you say --
2    A.  No.
3    Q.  Okay.  Did you review any other
4 documents when you were preparing for this deposition?
5    A.  No.
6          MR. PETTERSON:  Let him finish before
7 you answer, Mariane.
8          THE DEPONENT:  Yeah, yeah, sorry.
9    Q.  (BY MR. HUNT)  When did you complete
10 that questionnaire?
11          MR. PETTERSON:  Objection.
12    A.  I don't recall when.
13    Q.  (BY MR. HUNT)  Was it in the last six
14 months?
15    A.  Yes.
16    Q.  Who sent you the questionnaire?  Do you
17 remember?
18    A.  I don't remember the company name, no.
19    Q.  Okay.  How many questions were there?
20    A.  I don't recall.
21    Q.  Was it around 20 or around 50 or around
22 100, if you can guess?
23          MR. PETTERSON:  Objection.
24    A.  20.
25    Q.  (BY MR. HUNT)  Okay.  And did you

11

1 receive the questionnaire by email?
2    A.  Yes.
3    Q.  Have you reviewed any other documents in
4 connection with this lawsuit?
5    A.  No.
6    Q.  I'm going to pull up a document on the
7 screen.  Let me know if you can't see it.  I'll let
8 you look at it and make sure we all have an
9 opportunity to look at it.
10    A.  Okay.
11          MR. PETTERSON:  Joe, I would ask that
12 you email me these documents that you plan to use as
13 exhibits so I can see them as if I were there in
14 person.
15          MR. HUNT:  No problem.
16          MR. PETTERSON:  Thank you.
17          MR. HUNT:  Mr. Petterson, this is likely
18 the only exhibit that we're going to be using, just
19 for your information.
20          MR. PETTERSON:  Thank you.
21    Q.  (BY MR. HUNT)  Can you see this
22 document, Ms. Ridgeway?
23    A.  Yes.
24    Q.  And can you tell me what it is?
25    A.  Okay.

12

1    Q.  Do you recognize the document?
2    A.  Yes.
3    Q.  Can you tell me what it is?  I'll zoom
4 out so you can get a better -- you can see it in its
5 entirety.
6    A.  Yes.  It's my --
7    Q.  It's your --
8    A.  It's my consent to join this lawsuit.
9    Q.  Okay.  And is that your signature in the
10 middle of the page?
11    A.  Yes.
12    Q.  When you signed that document, did you
13 understand that you were joining a lawsuit against
14 InterExchange?
15    A.  Yes.
16    Q.  You understood when you signed the
17 document that you were claiming that you had suffered
18 damages as -- by InterExchange?
19          MR. PETTERSON:  Objection.
20    A.  Can you repeat it?
21    Q.  (BY MR. HUNT)  Sure.  Actually, I'll
22 withdraw the question.
23          How did you first learn about the
24 lawsuit against InterExchange?
25    A.  My email.

3 (Pages 9 to 12)

13

1      Q.  Through an email that you received?
2      A.  Yes.
3      Q.  Do you remember who sent you the email?
4      A.  Boies -- the group sent that document.
5 I don't know how to pronounce the name.  The lawyers.
6      Q.  The lawyers.  What is your understanding
7 of what this lawsuit is about?
8      A.  It's the wage -- the unfair --
9      MR. PETTERSON:  Before you answer, he's
10 not asking you to reveal the contents of any of our
11 conversations.  He only wants to know your
12 understanding.  So anything that's been the subject of
13 conversations with us, I would ask that you not answer
14 with that.  Thank you.
15      Q.  (BY MR. HUNT)  Let me rephrase the
16 question for you, Ms. Ridgeway.
17      A.  My understanding --
18      Q.  Let me rephrase the question.
19      I'm not asking what your attorneys told
20 you, but what is your understanding of the lawsuit?
21      A.  My understanding is that we didn't get
22 paid fairly while we were here working.  Yeah.  That's
23 what I understand.
24      Q.  And you weren't paid fairly by whom?
25      A.  I understand it's a combination.  It's

14

1 the agency and the family on the contract, and that I
2 didn't -- we didn't get paid by the -- the family.
3      Q.  You believe the host family owes you
4 money?
5      A.  Yes.
6      Q.  Have you calculated how much the host
7 family owes you?
8      A.  No.
9      Q.  And you lived with the Sherman family;
10 is that correct?
11      A.  Yes.
12      Q.  Where was that?
13      A.  In Aptos, California.
14      Q.  You're originally from Brazil?
15      A.  Yes.
16      Q.  When you first came to the United States
17 for the au pair program, what did you believe that the
18 host family was going to pay you?
19      MR. PETTERSON:  Objection.
20      Q.  (BY MR. HUNT)  You can answer.
21      A.  195.75, $200 dollars.
22      Q.  Just to -- just to clarify, did you
23 believe that you were going -- before you came to the
24 United States, did you believe you were going to be
25 paid 195.75 or $200?

15

1      A.  195.75.
2      Q.  Before learning of this lawsuit, did you
3 have any concerns about the amount that you were paid
4 as an au pair?
5      A.  Yes.
6      Q.  What were those concerns?
7      A.  That we work a lot of hours to get paid
8 only that amount.
9      Q.  You worked too many hours; is that --
10 was that your concern?
11      MR. PETTERSON:  Objection.
12      Q.  (BY MR. HUNT)  Was your concern that you
13 worked too many hours?
14      MR. PETTERSON:  Objection.
15      Q.  (BY MR. HUNT)  You can answer,
16 Ms. Ridgeway.
17      A.  Yes.
18      Q.  That opt-in form that we looked at, the
19 Consent to Join form that we -- that we looked at, do
20 you remember where you were living when you signed it?
21      A.  Yes.
22      Q.  Where was that?
23      A.  Do you want the address?
24      Q.  Sure.

16

4      MR. PETTERSON:  Objection.  I'm just
5 going to state for the record that, you know, we
6 believe that this entire line of questioning is out of
7 bounds for a deposition.  We've filed a motion against
8 Cultural Care for the same, and we reserve all rights.

12      Q.  Do you still communicate with your host
13 family?
14      A.  No.
15      Q.  You haven't discussed this lawsuit with
16 anyone from the host family?
17      A.  No.
18      Q.  Other than your lawyer, did you discuss
19 this lawsuit with anyone?
20      A.  No.
21      Q.  You did not discuss this lawsuit with
22 other au pairs; is that correct?
23
24      Q.  Did you -- other than your attorneys,
25 did you discuss opting -- signing that Consent to Join

4 (Pages 13 to 16)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

17

1  form?
2       A.  Can you ask me again?
3       Q.  Yeah.  Other than your attorneys, did
4  you discuss consenting to join this lawsuit with
5  anyone?
6       A.  No.
7       Q.  Okay.  How many host families did you
8  have through the au pair program?
9       A.  One.
10      Q.  And when did you first learn of the
11 opportunity of being an au pair in the United States?
12      A.  In Brazil, eight years ago.
13      Q.  How did you learn about the au pair
14 program?
15      A.  Through friends.
16      Q.  "Through friends," is that what you
17 said?
18      A.  Yes.
19      Q.  Were those friends -- were those friends
20 au pairs in the United States?
21      A.  No.
22      Q.  Did you apply to the au pair program
23 through a local agency?
24      A.  Yes.
25      Q.  What's the name of that local agency?

---

18

1       A.  It's CI Agency.
2       Q.  Did you apply to more than one sponsor?
3       A.  No.
4       Q.  And when I say "sponsor," do you know
5  what I'm talking about?
6       A.  American agency.
7       Q.  Okay.  How did you decide to apply with
8  InterExchange?
9       A.  My local agency in Brazil said that it
10 would be better.  I don't recall -- I'm sorry.  I
11 don't recall.
12      Q.  Well, you said that InterExchange was
13 better.  Did you mean that they were better than the
14 other sponsors?
15      A.  It would be easier.
16      Q.  It would be easier.  Do you know why?
17      A.  Yes.
18      Q.  Did the local agency tell you why
19 InterExchange would be easier?
20      A.  The questionnaire is -- the form that I
21 had to -- fill out would be easier.
22      Q.  Did you have a choice about what sponsor
23 you would apply to, or did -- excuse me.  Let me ask
24 that in a different way.
25           Did your local agency direct you to

---

19

1  apply to InterExchange?
2           MR. PETTERSON:  Objection.
3       A.  No.
4       Q.  (BY MR. HUNT)  It was your choice about
5  which sponsor you chose to apply to?
6       A.  Yes.
7       Q.  Were you recruited at all to be an
8  au pair?
9       A.  Can you repeat it?
10      Q.  Sure.  Were you recruited to be an
11 au pair?
12      A.  Yes.
13      Q.  Yes?
14           Do you know what the word "recruit"
15 means?
16      A.  Can you explain better?
17      Q.  I'm actually asking if you know what the
18 word "recruit" means.
19           MR. PETTERSON:  In the way you're using
20 it, or period?
21      A.  "Recruit," I understand, is hire.
22      Q.  (BY MR. HUNT)  Hire?
23           So did you apply to any other agency
24 besides InterExchange?
25      A.  No.

---

20

1       Q.  InterExchange was the first and only
2  sponsor to which you applied?
3           MR. PETTERSON:  Objection.
4       A.  Yes.
5       Q.  (BY MR. HUNT)  You said that you heard
6  about the au pair program through friends.  That was
7  while you were still living in Brazil?
8       A.  Yes.
9       Q.  Did they express any concerns to you
10 about the au pair program?
11      A.  I don't recall.
12      Q.  Do you remember if any of them had
13 complaints -- had heard complaints from other au pairs
14 about the au pair program?
15      A.  I do not recall.
16      Q.  Do you remember whether they talked
17 about how much you would be paid as an au pair?
18      A.  I don't remember.
19      Q.  What did they tell you about the au pair
20 program?
21      A.  That it would be a great opportunity to
22 learn English and experience another culture.
23      Q.  Experiencing another culture was a
24 benefit to you -- excuse me.  Strike that.
25           You expected to benefit from

---

5 (Pages 17 to 20)

Case 1:14-cv-03074-CMA-KMT Document 1104-2 filed 08/06/18 USDC Colorado Page 156 of 264

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

21

1 experiencing another culture; is that right?
2       MR. PETTERSON:  Objection.
3       A.  No.
4       Q.  (BY MR. HUNT)  No?
5       So can you tell me more about what your
6 friends were telling you about experiencing another
7 culture?
8       A.   Getting to learn English.  I would be
9 immersed in this culture, so it would be easier, and I
10 would be speaking English all the time, and I would go
11 to an English school.
12       Q.  And you understood you would be living
13 with a host family as an au pair?
14       A.  Yes.
15       Q.  And that you would be handling child
16 care responsibilities for the host family?
17       MR. PETTERSON:  Objection.  That's not a
18 question.
19       Q.  (BY MR. HUNT)  Go ahead and answer, if
20 you can.
21       A.  Yes.
22       Q.  Before you came to the United States,
23 what were the benefits of being an au pair, as
24 you believed them to be?
25       MR. PETTERSON:  Objection.

22

1       A.  That I will -- that I would receive -- I
2 would receive money to go to school, and, yeah, that's
3 the benefit I --
4       Q.  (BY MR. HUNT)  When you were -- before
5 you came to the United States, and when you were
6 thinking about becoming an au pair, were there any
7 downsides to being an au pair?
8       A.  Yes.
9       Q.  Can you tell me what those were?
10       A.  I would live where I worked; I would be
11 homesick; I -- yes, that's it.
12       Q.  That's it.
13       Did you have any concerns about the
14 amount of money that you would receive as an au pair?
15       A.  I'm sorry?
16       Q.  Did you have any concerns about the
17 amount of money that you would receive as an au pair?
18       A.  I don't recall.
19       Q.  Before you came to the United States,
20 and when you were thinking about becoming an au pair,
21 did you meet with a recruiter or any staff from
22 InterExchange?
23       A.  Directly before I came to the United
24 States?
25       Q.  That's right.

23

1       A.  I don't recall.
2       Q.  Before you came to the United States,
3 and when you were thinking about becoming an au pair,
4 did you meet with any staff or representative from the
5 local agency, CI Agency?
6       A.  Yes.
7       Q.  Yes.  Was anyone from InterExchange at
8 any of those meetings?
9       A.  No.
10       Q.  Do you recall completing an application
11 for the InterExchange program?
12       A.  Yes.
13       Q.  Did you complete the application
14 yourself?
15       A.  Yes.
16       Q.  Did anyone help you?
17       A.  No.
18       Q.  Anyone from the local agency -- excuse
19 me.
20       Did anyone from the local agency tell
21 you how to fill it out?
22       A.  No.
23       Q.  Did anyone from InterExchange help you
24 fill it out?
25       MR. PETTERSON:  Objection.

24

1       Q.  (BY MR. HUNT)  Go ahead.
2       A.  I don't recall.
3       Q.  Do you remember receiving information
4 about the au pair program from InterExchange?
5       A.  Yes.
6       Q.  And do you remember what country you
7 were in when you received the information?
8       A.  In Brazil.
9       Q.  Did you understand the information that
10 you received?  Did you read it and understand it?
11       A.  Yes.
12       Q.  Did anyone in Brazil help you read and
13 understand the information that InterExchange was
14 sending you?
15       A.  I do not recall.
16       Q.  When your friends told you about the
17 au pair program, did you do anything else to find more
18 information about the au pair program?
19       A.  Yes.
20       Q.  What did you do?
21       A.  I researched online.
22       Q.  And what did you find?
23       A.  Everything that was basic that I needed
24 to know, the agency told me.
25       Q.  And when you say "the agency," is that

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

25

1  the local agency, the CI Agency?
2      A.  Yeah, both.
3      Q.  "Both," meaning --
4      A.  When I say "researched online," I saw
5  agencies here, in U.S., and then when I went to the
6  agency in Brazil, they told me -- they confirmed my
7  information.
8      Q.  Okay.  When you decided to apply to
9  InterExchange, what did you do?
10     A.  I went to Brazilian agency --
11     Q.  And --
12     A.  -- to apply.
13     Q.  And did they help you to fill out the
14 application?
15     A.  No.
16     Q.  Did you submit the application online or
17 by mail or another way?
18     A.  I do not recall.
19     Q.  Before you came to the United States,
20 did you communicate with anyone from InterExchange?
21     A.  I do not recall.
22     Q.  Before you came to the United States,
23 did you communicate with the Sherman family?
24     A.  Yes, I did.
25     Q.  Did the --

---

26

1      Before you came to the United States,
2  did the local agency tell you how much you were going
3  to be paid as an au pair?
4      A.  Yes.
5      Q.  Did the local agency tell you that you
6  would be paid at least 195.75 every week?
7      A.  Yes.
8      Q.  Did you understand that to be what's
9  called a weekly stipend?
10     A.  I don't understand the second word.
11     Q.  Okay.  Before you came to the United
12 States, did you ask the local agency any questions
13 about the amount of money that you would be paid?
14     A.  I'm sorry.  Can you repeat it?
15     Q.  Sure.  Before you came to the United
16 States, did you ask your local agency any questions
17 about the amount of money that you would be paid?
18     A.  No.
19     Q.  Before you came to the United States,
20 did you have any discussions with anyone from
21 InterExchange about the amount of money that you would
22 be paid as an au pair?
23     A.  No.
24     Q.  Did you pay any fees to participate in
25 the au pair program?

---

27

1      A.  Yes.
2      Q.  And what were those fees?
3      A.  I'm sorry?
4      Q.  What were those fees?
5      A.  Do you want the amount?
6      Q.  Sure.  Actually, let me just rephrase.
7          Can you tell me about those fees, such
8  as the amounts, who you paid them to, and anything
9  else you can remember?
10     A.  I paid -- yes.  I paid the agency.  I
11 paid for my passport, for my visa, for my ticket from
12 my home -- my airplane ticket from my hometown to
13 another city.
14     Q.  You said "agency."  Is that the local
15 agency, or is that InterExchange?
16     A.  I didn't hear.
17     Q.  You said that you paid the agency, and
18 I'm wondering whether you paid the local agency these
19 fees or InterExchange.
20     A.  I paid -- I paid the local agency.
21     Q.  Okay.  And you paid the local agency
22 fees for your passport; is that right?
23     A.  No.  I paid myself.  I paid the embassy.
24     Q.  The embassy, okay.
25         What did you pay the local agency?

---

28

1      A.  I don't recall.
2      Q.  Do you remember whether it was by cash
3  or check or electronic transfer?
4      A.  Cash or check.
5      Q.  Do you remember the amount of money you
6  paid the local agency?
7      A.  Between -- around a thousand dollars.
8      Q.  Around a thousand, okay.
9          Do you remember that after you submitted
10 your application, that you went through a matching
11 process that you could potentially match with a host
12 family?
13     A.  Yes.
14     Q.  When did you start that matching
15 process?
16     A.  After I paid all the fees and I
17 completed my application.
18     Q.  Okay.  Do you remember approximately
19 when that was?
20     A.  May 2011.
21     Q.  Okay.  And were you living in Brazil
22 when you started the matching process?
23     A.  Yes.
24     Q.  Can you tell me about the matching
25 process that you went through to match with the

---

7 (Pages 25 to 28)

29

```
1    Sherman family?
2         A.  They went through my profile, and they
3    liked me, so they contacted me.  We had one Skype and
4    we talked through email.
5         Q.  Were you able to view the families who
6    were interested in you?
7              MR. PETTERSON:  Objection.
8         A.  Can you repeat that -- your question?
9         Q.  (BY MR. HUNT)  Sure.  Let me back up.
10             Was this all -- was this matching
11   process all online?  Was it through your -- was it
12   through the Internet?
13        A.  Yes.
14        Q.  And were you able to view online the
15   host families -- some of the host families?
16        A.  No.
17        Q.  How did you come across the Sherman
18   family?
19        A.  They contacted me through my profile on
20   the InterExchange -- through my InterExchange profile.
21        Q.  Okay.  And were you able to see the host
22   family, the Sherman family, profile?
23        A.  I don't recall.
24        Q.  Okay.  Did you interview with more than
25   one family?
```

30

```
1         A.  Yes.
2         Q.  How many host families did you interview
3    with?
4         A.  Two families before them.
5         Q.  Two families.  And did you have a Skype
6    interview with the other family, as well?
7         A.  Yes.
8         Q.  But that did not work out?
9         A.  Yes.
10             MR. PETTERSON:  Objection.
11        Q.  (BY MR. HUNT)  Why didn't -- why didn't
12   the other host family work out?
13             MR. PETTERSON:  Objection.
14        Q.  (BY MR. HUNT)  You can answer.
15        A.  I -- I don't recall.
16        Q.  Do you remember whether you decided not
17   to match with that host family?  Was that your
18   decision?
19        A.  It wasn't my decision.
20        Q.  Who made the decision for you to match
21   with the Sherman family?
22        A.  Both their decision and my decision.
23        Q.  So they chose you and you chose them?
24        A.  Yes.
25        Q.  Did InterExchange assign you to the
```

31

```
1    Sherman family?
2         A.  No.
3         Q.  Can you tell me a little bit about the
4    Skype interview that you had with the Sherman family?
5    Who from the Sherman family was involved in the Skype
6    interview?
7         A.  I only talked to the host mom.
8         Q.  Okay.  And you only had one interview;
9    is that correct?
10        A.  Yes.
11        Q.  In addition to emails between you and
12   the host family?
13        A.  Yes.
14        Q.  Okay.  Do you remember how many emails
15   you and the host family shared before you decided to
16   match?
17        A.  Can you repeat again, please?
18        Q.  Sure.  Do you know how many emails that
19   you and the host family sent each other before you
20   matched?
21        A.  No, I don't recall.
22        Q.  What did you and the Sherman --
23             What did you and the Sherman mom discuss
24   during the Skype interview?
25        A.  I do not recall.
```

32

```
1         Q.  Do you recall any of that discussion?
2         A.  I remember she was saying how many kids
3    she had, but I don't remember more.
4         Q.  Okay.  Was anyone from the local agency
5    participating in that Skype interview?
6         A.  No.
7         Q.  Was anyone from InterExchange
8    participating in the Skype interview?
9         A.  No.
10        Q.  And when you matched with the Sherman
11   family, did you want to go live with them?
12        A.  Yes.
13        Q.  Could you have said no, that you didn't
14   want to go live with them?
15        A.  Yes.
16        Q.  During the interview with the mom from
17   the Sherman family, did you talk about how much you
18   would be paid?
19        A.  No.
20        Q.  When did you learn how much your host
21   family was going to pay you?
22        A.  Through the InterExchange documents and
23   my local agency's documents.
24        Q.  How much did your host family pay you
25   per week?
```

8 (Pages 29 to 32)

**MARIANE MELO RIDGEWAY - 3/30/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

33

1    A.  $200.
2    Q.  How much money did -- or excuse me.
3    How much money did InterExchange tell
4  you that you were going to receive?
5    A.  195.75.
6    Q.  So when did you first learn that you
7  were going to be paid $200 instead of 195.75?
8    A.  I don't recall.
9    MR. PETTERSON:  Are we coming to a good
10  point for a break?
11    MR. HUNT:  Yeah.  Let me ask like maybe
12  a few questions and we'll do it.  Does that sound
13  okay?
14    MR. PETTERSON:  Yes.
15    Q.  (BY MR. HUNT)  When you came to the
16  United States and you were an au pair for the Sherman
17  family, did you discuss the weekly payment with anyone
18  from InterExchange?
19    A.  Can you rephrase it?
20    Q.  Sure.  While you were an au pair, did
21  you discuss the -- your weekly payment, the payment
22  that you were receiving from the host family, with
23  anyone from InterExchange?
24    A.  No.
25    Q.  And when your host family -- when you --

---

34

1  when you eventually learned that you were going to
2  receive $200 from the host family, were you okay with
3  that amount?
4    A.  Yes.
5    Q.  So you didn't have any reason to ask
6  your host family for more money?
7    MR. PETTERSON:  Objection.
8    Q.  (BY MR. HUNT)  Go ahead, Ms. Ridgeway.
9    A.  I had reasons.
10    Q.  What were those reasons?
11    A.  That I would like to -- the minimum wage
12  that is in the law here.  That's it.
13    Q.  Could you repeat that?
14    A.  The reason, that I -- I wanted to get
15  paid the minimum wage by the hour, and that's it.
16    Q.  Did you ever ask your host family to pay
17  you more than $200 per week?
18    A.  No.
19    MR. HUNT:  Okay.  Let's -- let's go
20  ahead and take a break.  Are you all good with -- and
21  we'll go off the record, Sean.
22    MR. PETTERSON:  Yes.
23    (Recess taken, 11:11 a.m. to 11:26 a.m.)
24    Q.  (BY MR. HUNT)  Ms. Ridgeway, we just
25  took a break.  Is there any correction to your

---

35

1  testimony that you would like to make?
2    A.  Any corrections?
3    Q.  Yeah.  Did anything during the break
4  help you -- help remind you of -- or make you think
5  that -- that you stated anything incorrectly, or is
6  there anything that you would like to correct?
7    A.  There was a question that you asked me.
8  It was something, if the agency had told me that I was
9  going to make at least that amount, 195.75.
10    Q.  Uh-huh.
11    A.  And I was just -- on the break I was
12  just more thinking about the words, "at least."
13    Maybe I should be more specific.  The
14  agency told me that that was the number, the exact
15  number.  Because now -- now that I can think more, "at
16  least" isn't an exact.
17    Q.  Okay.
18    A.  So that's the only thing that I thought
19  about during my break.
20    Q.  Do you know what the -- do you
21  know what the phrase "at least" means?
22    A.  I know, but I -- I could just think more
23  about that question, like.  Yes, I know.
24    Q.  Okay.  Can you tell -- can you tell me
25  what it means?

---

36

1    A.  "At least" means like it can be -- let's
2  say "at least 15 hours," it can be a minimum 15 hours,
3  something like that.
4    Q.  Okay.  And I noticed you were -- you
5  looked like you were looking at some notes that you
6  have.
7    A.  No, I'm not -- I'm not -- no, I don't
8  have any notes.  I'm looking at my -- because I have
9  a -- a glass -- not a glass -- a window.
10    Q.  Okay.  You also had a pen in your hand.
11  I just wanted to ask you, are you taking notes?
12    A.  I have a pen.  No, I'm not taking notes.
13    Q.  Okay.  Do you know what the -- or excuse
14  me.  Let me ask a different question.
15    Did anything -- when you were thinking
16  about your testimony and your au pair experience, if
17  you did, during the break, did it -- did it help
18  remind you of any facts that you may have forgotten
19  about your au pair experience?
20    A.  No.
21    Q.  Just that you wanted to change your
22  testimony with respect to the question about making at
23  least 195.75; is that correct?
24    A.  Yes.
25    Q.  So we talked about the Skype interview

---

9 (Pages 33 to 36)

MARIANE MELO RIDGEWAY - 3/30/2018

Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

37

1   that you had with the Sherman family.  If you
2   remember, during the interview did you talk about what
3   you would be doing with the children?
4       A.  I don't recall.
5       Q.  You don't remember whether the Sherman
6   mom told you about your child care responsibilities?
7           MR. PETTERSON:  Objection.
8       A.  I don't recall if she was very specific
9   in that first Skype.
10      Q.  (BY MR. HUNT)  During this Skype
11  interview, do you remember whether you discussed with
12  your host mom how many days -- how many hours per day
13  that you would be working?
14      A.  No, I don't recall.
15      Q.  Did you discuss how many hours per week
16  that you would be working?
17      A.  I cannot recall.
18      Q.  How many --
19          You said that while you were -- while
20  you were living with your host family, you had
21  concerns about how much money you were receiving per
22  week; is that right?
23      A.  Yes.
24      Q.  And you said that it had to do with the
25  minimum wage?

---

38

1       A.  Yes.
2       Q.  And those were concerns that you had
3   during your au pair experience?
4       A.  One of them.
5       Q.  Can you tell me how you began to have
6   this concern?
7       A.  When I started meeting people who were
8   babysitters and they told me the amount of money they
9   were making.
10      Q.  And where did the --
11          How did you learn about the phrase
12  "minimum wage"?
13      A.  Here in the U.S.  In the U.S.
14      Q.  Do you remember under what
15  circumstances?
16      A.  Talking to friends who lived here for a
17  long time.
18      Q.  They told you about the phrase "minimum
19  wage," or did you read about it somewhere?
20      A.  They explained it to me.
21      Q.  Okay.  Did you sign an agreement before
22  you began your experience as an au pair?
23      A.  Yes.
24      Q.  Do you remember what the agreement said?
25      A.  It was the InterExchange document.  I

---

39

1   don't recall.
2       Q.  Do you remember reading the document
3   before you signed it?
4       A.  Yes.
5       Q.  Did you understand the document before
6   you signed it?
7       A.  Yes.
8       Q.  And you recall signing the document?
9       A.  Yes.
10      Q.  Do you remember that the agreement said
11  that you would be paid at least a minimum amount of
12  money per week?
13      A.  No.  It wasn't "at least."
14      Q.  Do you remember how much -- do you
15  remember how much the agreement said you would be
16  paid?
17      A.  The amount was 195.75.
18      Q.  Okay.
19      A.  Exactly that amount per week.
20      Q.  And you arrived for the au pair program
21  around August 2011.  Does that sound about right?
22      A.  Yes.
23      Q.  Did you go to New York City before
24  meeting your host family?
25      A.  Yes.

---

40

1       Q.  What did you do in New York City?
2       A.  I had -- it was a meeting with the
3   InterExchange, meeting slash training.
4       Q.  What sort of training was that?
5       A.  It was what to do in case of emergency
6   while I was taking care of the kids, CPR.  That's what
7   I recall.
8       Q.  And how many hours -- well, how long did
9   the training last?
10      A.  It was for a few days.
11      Q.  How many hours per day?
12      A.  About eight hours a day.
13      Q.  And did you get paid for that time?
14      A.  No.  I don't recall.
15      Q.  Did you do any training before coming to
16  the United States?
17      A.  Yes.  I tried to gain more experience
18  with kids because that's what they wanted.
19      Q.  Okay.  And did InterExchange require you
20  to do any -- to do any of that training before you
21  came to the United States?
22      A.  Yes.
23      Q.  Was that a condition of applying to the
24  job?
25      A.  Yes.

---

10 (Pages 37 to 40)

**MARIANE MELO RIDGEWAY - 3/30/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



```
                                                          41
1       Q.  What happened after the training in
2    New York City?
3       A.  I came to the host family's house.
4       Q.  Actually, I want to ask one more -- one
5    more question and maybe a follow-up about the training
6    that you got in Brazil before you came to the
7    United States.  What did -- what did InterExchange
8    tell you to do for that training?
9       A.  I don't recall.
10      Q.  Do you know if they told you anything,
11   to do anything?
12      A.  Can you ask me again?
13      Q.  Ask again?  Yes.
14      Did InterExchange tell you anything
15   about what you should do to train while you were in
16   Brazil?
17      A.  No.
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 1:14-cv-03074-CMA-KMT Document 1104-3 filed 08/06/18 USDC Colorado Page 162 of 264

**MARIANE MELO RIDGEWAY - 3/30/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**



45

1   while the children were at school?
2       A.  I don't recall.
3       Q.  Okay.  And when did your -- when did
4   your day as an au pair -- excuse me.  Let me ask you
5   again.
6           When did you get off work?
7       A.  What do you mean, when?
8       Q.  What time of day did you typically
9   end -- end -- end your work?
10      A.  Around 6:00 p.m.
11      Q.  And was that -- was that the same for
12  the weekends, too, you ended around 6:00 p.m. if you
13  worked on the weekends?
14          MR. PETTERSON:  Objection.
15      A.  Yes.
16      Q.  (BY MR. HUNT)  Okay.  Tell me, what --
17  what was your -- what was your schedule?  Did you work
18  Monday through Friday?  Did you work weekends?  Can
19  you tell me a little bit about that?
20      A.  I mostly worked from Monday through
21  Friday, and I would work on Saturdays if my host mom
22  had to work.
23      Q.  How frequently was that, working on
24  Saturdays?
25      A.  I don't recall.

46

24      Q.  (BY MR. HUNT)  And did you have any
25  other duties that the host family asked you to perform

48

1       Q.  And when did your -- when did you --
2   your workday begin typically on Mondays through
3   Fridays?
4       A.  At 6:30 a.m.
5       Q.  So Mondays through Fridays, you worked
6   from 6:30 until the children went to school around
7   8:00 a.m.; is that correct?
8       A.  Yes.
9       Q.  Okay.
10      A.  Can I just say something?  I had to
11  drive them to school at 8 o'clock, so I would work
12  until 8:30.
13      Q.  8:30.  Okay.  So 6:30 to 8:30 a.m., and
14  then you were off until 2:00 p m., is that right, when
15  the children --
16      A.  Yes.
17      Q.  -- got off school?
18          And then you said that you typically
19  ended at 6:00 p.m.?
20      A.  Typically, yes.
21      Q.  So you were working about six hours per
22  day, Monday through Friday?
23      A.  Yes.
24      Q.  And you worked some Saturdays?
25      A.  Yes.

12 (Pages 45 to 48)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

49

1    Q.  How many hours on Saturdays, if you
2  worked Saturdays, did you typically work?
3    A.  About seven hours.
4    Q.  About seven hours, okay.
5    So if you didn't work Saturdays, you
6  were working around 30 hours per week.  Does that
7  sound about right?
8    A.  Between 30, 35, I would say.
9    Q.  Okay.  Did you provide any other
10  services for the host family outside of child care?
11    A.  (Deponent shook head from side to side.)
12    MR. PETTERSON:  Objection.
13    Q.  (BY MR. HUNT)  No?
14    A.  No.
15    Q.  Okay.  Were you able to meet other
16  au pairs?
17    A.  Are you talking about meetings, au pair
18  meetings?
19    Q.  Either one.  Let's take them one at a
20  time.  Did you -- did you attend au pair meetings,
21  cluster meetings?
22    A.  Yeah.
23    Q.  Did you -- did you meet au pairs at
24  other times?
25    A.  Sometimes.

---

50

1    Q.  Okay.  And did the family give you a
2  schedule of when -- of when you were supposed to work?
3    A.  Yes.
4    Q.  And was that schedule written down?
5    A.  Sometimes, yeah.
6    Q.  Was that on paper or text message or
7  email or some other form?
8    A.  Yes.  One of those.
9    Q.  Which one?
10    A.  Sometimes it would be through text
11  message over the phone; sometimes it would be through
12  email; sometimes it would be through -- on a paper.
13    Q.  Okay.  Do you have any of those weekly
14  schedules still?
15    A.  I don't recall.
16    Q.  You don't recall whether you do?  Does
17  that mean you don't know whether you have them?
18    A.  I don't know if I still have them.
19    Q.  Have you looked for them?
20    A.  No.
21    Q.  No.  Okay.  And did anyone from
22  InterExchange ever give you a weekly schedule while
23  you were an au pair?
24    A.  No.
25    Q.  So who determined which days of the week

---

51

1  that you worked?
2    A.  The family.
3    Q.  InterExchange didn't determine which
4  days of the week that you worked; is that correct?
5    A.  Yes.
6    Q.  They did?  Excuse me, InterExchange did?
7    A.  You are correct.
8    Q.  I'm sorry.  I'm going to ask the court
9  reporter to repeat that last question.
10    (The question beginning on page 51,
11  line 3, was read back as follows:  "InterExchange
12  didn't determine which days of the week that you
13  worked; is that correct?")
14    MR. HUNT:  Thank you.
15    A.  Yes, they did not.
16    Q.  (BY MR. HUNT)  They did not.
17    Were your hours per week -- you said
18  they were between 30 and 35 hours per week.  Did that
19  ever change?
20    A.  Yes.
21    ████
22    ████████████████████████████████████████
23    ████████████████████████████████████████
24    ████████████████████████████████████████
25    ████

---

52

1    ████████████████████████████████
2    Q.  Okay.  How many hours did you work that
3  week?
4    A.  Worked about 40 hours.
5    Q.  Okay.  Did you ever work more than 40
6  hours per week?
7    A.  I'm sorry?
8    Q.  Did you ever work more than 40 hours per
9  week?
10    A.  This week I worked -- the week that I
11  just told you about.
12    Q.  Okay.  I think you said that you worked
13  ████████████████████████████████
14    ██████████████████████  Was there any other
15  week that you worked around 40 hours or more than 40
16  hours per week?
17    A.  I don't recall.
18    Q.  Okay.  And were you ever expected to
19  be -- do you know what the phrase "on call" means?
20    A.  Yes, I know.
21    Q.  Can you tell me?
22    A.  "On call" is when someone calls -- calls
23  you to come to the work in 15 minutes.
24    Q.  Okay.  Were you expected to be on call
25  with the host family?

---

13 (Pages 49 to 52)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



53

1     A.  Yes.  Yes.
2     Q.  Okay.  Were you expected to be available
3   at times when you were not scheduled?
4     A.  Sometimes.
5     Q.  Sometimes.
6         What did you do when the children were
7   not at school?  You said that you were free -- you had
8   free time during that time, between around 8:30 and
9   2:00.  What were you doing during that time?
10    A.  I was going to English school.

54

18    Q.  Okay.  And on those couple of times, you
19  were expected to work more than ten hours per day?
20    A.  Yes.
21    Q.  Okay.  Did you have any concerns about
22  the schedule that you were working?
23    A.  I don't recall.

55

19    Q.  Okay.  And you said that your host
20  family paid you $200 per week; is that correct?
21    A.  Yes.
22    Q.  Did that amount ever vary?
23    A.  No.
24    Q.  It was always $200 per week, so they
25  never paid you more or less than $200 per week?

56

1         MR. PETTERSON:  Objection.
2     Q.  (BY MR. HUNT)  You can answer.
3     A.  It was exactly $200 per week.
4     Q.  Okay.
5     A.  Always.
6     Q.  And who decided the amount of that
7   payment?
8     A.  I'm not sure if it was the agency,
9   InterExchange, or the host family.  It was in the
10  agreement between both of them.
11    Q.  Did you agree to that amount?  Did you
12  agree that you would be an au pair and get paid that
13  amount?
14        MR. PETTERSON:  Objection.
15    A.  Yes.
16    Q.  (BY MR. HUNT)  Did InterExchange ever
17  pay your weekly pay?
18    A.  No.
19    Q.  Did InterExchange pay you any money?
20    A.  No.
21    Q.  Did the host family ever give you extra
22  money for any reason?
23        MR. PETTERSON:  Objection.
24    A.  No.

14 (Pages 53 to 56)



57

59

58

60

Q. And did InterExchange have any rules
about using the cell phone?
A. No.

7   Q. Did you take any vacations while you
8   were an au pair?
9   A. Yes.
10  Q. And were those vacations with the host
11  family or not with the host family?
12  A. Not with them.
13  Q. Not with them. You didn't take any
14  vacations with the host family?
15  A. No.
16  Q. Did they go on vacations without you?
17  A. I do not recall.
18  Q. Okay. Were there any trips that they
19  went on with the children that you didn't go on?
20  A. No.
21  Q. And the vacations that you took
22  yourself, where did you go?
23  A. I went to Los Angeles and I went to
24  Florida.
25  Q. And how long did those trips last?

15 (Pages 57 to 60)

Case No. 1:14-cv-03074-CMA-KMT   Document 1104-3   filed 06/06/18   USDC Colorado   pg 166 of 264

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



61

1    A.  The total?
2    Q.  Yeah.  How long did your trip to
3 Los Angeles last?  Was it an overnight stay?
4    A.  Five days.
5    Q.  Five days.  And the Florida trip, how
6 long?
7    A.  Five days.
8    Q.  Five days.  And how did you get to
9 Los Angeles?
10    A.  I rented a car.
11    Q.  Okay.  And how did you get to Florida?
12    A.  I bought my tickets, my flight tickets.
13    Q.  And did the host family pay for any of
14 your transportation to Los Angeles?
15    A.  No.
16    Q.  And to Florida?
17    A.  No.
18    Q.  Did they pay for any part of your trip
19 to Los Angeles?
20    A.  No.
21    Q.  Or to Florida?
22    A.  No.
23    Q.  Are those the only trips that you took
24 as an au pair?
25    A.  Yes.

62

1    Q.  Were you paid -- did they -- did they
2 make a weekly payment to you during those weeks?
3    A.  Yes.
4    Q.  For both weeks, the Los Angeles trip and
5 the Florida trip?
6    A.  Yes.
7    Q.  Can you tell me about any other benefits
8 that you received from the host family?
9        MR. PETTERSON:  Objection.
10        MR. HUNT:  What's the objection, Sean?
11    A.  No.
12        MR. PETTERSON:  "Benefits" is -- you
13 know, is vague.
14        MR. HUNT:  Okay.
15    Q.  (BY MR. HUNT)  Did they provide -- you
16 say they did not provide any benefits; is that right?
17    A.  No.

63

15    Q.  No.  Did the host family provide you a
16 journal or a log of any kind?
17    A.  No.
18    Q.  Did InterExchange?
19    A.  No.
20    Q.  Did the host family provide you any
21 other benefits for your -- for your free time?  Did
22 they offer you -- offer to pay for your tennis
23 lessons, yoga classes, anything like that?
24        MR. PETTERSON:  Objection.
25    A.  No.

64

1    Q.  (BY MR. HUNT)  Did InterExchange ever
2 tell you what to do for the host family?
3    A.  I'm sorry.  Can you repeat it, please?
4    Q.  Let me rephrase.
5        Did InterExchange ever tell you what
6 duties to perform for the Sherman family?
7    A.  No.
8    Q.  Did anyone from InterExchange supervise
9 you while you were taking care of the Sherman
10 children?
11    A.  Can you rephrase it, please?
12    Q.  Yeah.  Did anyone from InterExchange
13 oversee you while you were taking care of the Sherman
14 children?
15    A.  No.
16    Q.  Did the host family ever ask you to
17 perform any duties that concerned you?
18    A.  I don't recall.
19    Q.  And you said that you took classes --
20 English classes.  Did you take any other classes while
21 you were an au pair?
22    A.  Yes.  I -- I took -- I got certified in
23 Zumba.  There was that training.  And that's it.
24    Q.  And was that through a university or
25 college or some other educational program?

16 (Pages 61 to 64)

**MARIANE MELO RIDGEWAY - 3/30/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

65

1    A.  Oh, no.
2    Q.  Did you receive any credits for the
3  classes that you were taking?  Do you remember that?
4    A.  Through my English classes, yes.
5    Q.  Yeah.  Do you remember whether there was
6  a local coordinator there?  Excuse me.
7        Do you remember, was there an
8  InterExchange local coordinator there?
9    A.  Yes.
10    Q.  Do you remember who that was?
11    A.  I don't recall her name.
12    Q.  Does Maureen Hughes-Gress sound
13  familiar?
14    A.  Maybe.  I don't recall.
15    Q.  Okay.  Well, did you meet with that
16  person in -- in person?
17    A.  Yes.
18    Q.  Did that person ever -- did the local
19  coordinator ever meet with you in the Sherman home?
20    A.  Never.
21    Q.  Never.  So the local coordinator --
22  excuse me.
23        Did the local coordinator ever supervise
24  you while you were taking care of the Sherman
25  children?

---

66

1    A.  While I was working, no.
2    Q.  Did she give you any duties to perform
3  for the family?  Did she tell you what to do?
4    A.  No.
5    Q.  Did the local coordinator ever pay you?
6    A.  No.
7    Q.  Other than the local coordinator, did
8  you ever meet with anyone from InterExchange while you
9  were an au pair?
10    A.  No.
11    Q.  Do you have any documents --
12    A.  I'm sorry.  Just during the training.
13    Q.  During the training.  Thank you.
14        And I don't think I asked you, did --
15  you said you received $200 every week.  That was by
16  cash or check or some other form of payment?
17    A.  Yeah, it was cash.
18    Q.  Cash.  And who gave you that?
19    A.  The host mom.
20    Q.  Did you keep records of those payments?
21    A.  No.
22    Q.  And you said you never kept records of
23  the hours that you worked?
24    A.  No.
25    Q.  And other than the $200, did the host

---

67

1  mom or the host dad ever give you any other spending
2  money, an allowance?
3    A.  No.
4    Q.  Do you have any documents such as emails
5  or social media related to your experience as an
6  au pair?
7    A.  I don't recall.
8    Q.  But you haven't -- you haven't searched
9  for those?
10    A.  No.
11    Q.  Have you been asked to search for those?
12    MR. PETTERSON:  Objection.
13    Q.  (BY MR. HUNT)  You can go ahead and
14  answer.  Have you been asked to --
15    A.  With my lawyer, yes.
16    Q.  Okay.  But you just haven't done it yet?
17    A.  Yes.
18    Q.  Okay.
19    A.  I haven't done it yet.
20    Q.  Okay.  And did you make any complaints
21  to your host family other than -- or excuse me.  Let
22  me rephrase that.
23  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
24  ■■■■■■■■■■■
25  ■■■■■■■

---

68

1  ■
2  ■■■■■■■■■■■■■■■■■■■■■■■■■■■
3  ■
4  ■■■■■■■■■■■■■■■■■■■■■■
5  ■
6  ■■■■■■■■■■■■■■■■■■■■■■■■
7  ■
8  ■■■■■■■■■■■■■■■■■■■■■■■
9  ■
10  ■■■■■■■■■■■■■■■■■■■■■■■■■
11  ■
12  ■■■■■■■■■■■■■■■■■■■■■■■
13  ■
14  ■■■■■■■■■■■■■■■■■■■■■
15  ■
16  ■■■■■■■■■■■■■■■■■■■■■■■■
17  ■
18  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■
19  ■
20  ■■■■■■■■■■■■■■■■■■■■■■■
21  ■
22  ■■■■■■■■■■■■■■■■■■■■■■■■
23  ■
24  ■■■■■■■■■■■■■■■■■■■■■■
25  ■

---

17 (Pages 65 to 68)

**69**



23  Q.  And you said earlier that you hadn't
24  calculated how much money that you are owed.  Do you
25  have any idea how you would do -- how you would

**70**

1  calculate how much money you believe you are owed?
2      MR. PETTERSON:  Objection.
3      A.  I need to -- I need to see how much --
4  what's the legal process.
5      MR. HUNT:  Okay.  Can we take a break?
6      MR. PETTERSON:  Okay.
7      MR. HUNT:  I don't have many more
8  questions.
9      MR. PETTERSON:  Okay.  Yeah.
10     MR. HUNT:  Let's go off the record and
11  come back -- how about 20 till, quarter till?
12     MR. PETTERSON:  Quarter till is fine.
13     (Recess taken, 12:29 p.m. to 12:45 p.m.)
14     (Deposition Exhibit 2 was marked.)
15     MR. HUNT:  I just want to clarify
16  something that we discussed earlier.  You asked if
17  anyone asked Ms. Ridgeway to, you know, search through
18  her emails, and we -- I did not, but we are aware of
19  an email that we believe is responsive, and we -- you
20  know, I have it now, and I intend to produce it.
21     It's an email from the host mother to
22  Mariane that was prior to her coming to the States
23  that discusses a potential schedule.
24     So I think the testimony wasn't clear
25  about that, and I think the words about, you know,

**71**

1  searching and everything wasn't clear.
2      So we have that document.  We will, you
3  know, make a production in short order, but I just
4  wanted to clarify the record on that point.
5      MR. HUNT:  Thank you.  And I believe
6  that Ms. Ridgeway said that she hadn't completed a
7  search for any -- any responsive documents, so let's
8  just leave the deposition open, you know, give her
9  some time to make that search and for your office to
10  produce that email.  And we'll make a later
11  determination whether we want to resume the
12  deposition.
13     Q.  (BY MR. HUNT)  So, Ms. Ridgeway --
14     MR. HUNT:  Unless you have anything
15  else, Mr. Petterson?
16     MR. PETTERSON:  No.  Please proceed.
17     Q.  (BY MR. HUNT)  We just took a brief
18  break, and is there anything that you thought about
19  while we were on break that would make you change any
20  of your prior testimony?
21     A.  No.
22     Q.  Did you think about anything on the
23  break that reminded you of any fact that you had
24  forgotten about?
25     A.  No.

**72**



6      Q.  And did you ever attempt to extend your
7  stay with the Sherman family?
8      A.  No.
9      Q.  Did you want to?
10     A.  No.
11     Q.  We talked about an agreement that you
12  signed, the au pair agreement, and I believe your
13  testimony was that it said that you would be paid
14  195.75.  Is that right?
15     A.  195.75, yes.
16     Q.  Were you surprised when the Sherman
17  family paid you more than that?
18     A.  No.
19     Q.  I'm going to pull up a document --
20     MR. HUNT:  I just realized that it's not
21  on there.  Can you give me two minutes?  I realized
22  that the document is not on the desktop.
23     MR. PETTERSON:  I can also just send it
24  to her and we can all look at the same document.
25     MR. HUNT:  That sounds great.

18 (Pages 69 to 72)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

73

1    MR. PETTERSON: Okay. Mariane, I'm
2  going to email you a document. Please -- please open
3  it up when you have it.
4    THE DEPONENT: Okay.
5    MR. HUNT: And for the record, let's
6  mark the consent form that we looked at earlier
7  Exhibit 1, and this document we'll mark as Exhibit 2.
8    THE DEPONENT: Okay.
9    MR. HUNT: Do you have it open,
10 Ms. Ridgeway?
11   MR. PETTERSON: Mariane, have you
12 received that email from me yet?
13   THE DEPONENT: No, not yet.
14   MR. HUNT: We'll give you some time, and
15 in the meantime, let's go off the record.
16   (Recess taken, 12:50 p.m. to 12:52 p.m.)
17 **Q. (BY MR. HUNT) Ms. Ridgeway --**
18   A. Just a few seconds. Hold on. It's
19 still downloading.
20 **Q. You got it.**
21   **(Pause in the proceedings.)**
22 **Q. Okay. Ms. Ridgeway, just to confirm**
23 **that we're all looking at the same document, can you**
24 **tell me what it says on the top of the first page?**
25   A. It says "InterExchange Au Pair USA" and

74

1  the information for me.
2  **Q. And at the bottom of the first page,**
3  **what is the number?**
4    A. 047341.
5  **Q. Do you recognize this document?**
6    A. The document, yeah.
7  **Q. What is it?**
8    A. This is part of the application.
9  **Q. Okay. Do you remember when you**
10 **completed this?**
11   A. When I completed it?
12 **Q. Yes. Do you remember when you filled**
13 **out this electronic form?**
14   A. It was that date that I told you when I
15 was applying in Brazil.
16 **Q. Okay. And did you -- did you attempt to**
17 **apply to --**
18   A. Somewhere --
19 **Q. I apologize for speaking over you. You**
20 **can go ahead if you weren't done.**
21   A. No, I'm okay. You can go ahead.
22 **Q. Did you try --**
23   **You said that you didn't extend your**
24 **stay with the Sherman family. Did you try to apply to**
25 **be an au pair with another family?**

75

1    A. I thought about it.
2  **Q. Did you -- but you didn't work with any**
3  **other family?**
4    A. No, not -- no.
5  **Q. Did you ever interview to be an au pair**
6  **with another family after your experience with the**
7  **Sherman family?**
8    A. Yes.
9  **Q. What happened to that application?**
10   A. I didn't -- I didn't -- I decided not
11 to -- to be an au pair anymore.
12 **Q. Why did you decide not to be an au pair**
13 **with another family?**
14   A. I wasn't sure if it would be good for
15 me.
16 **Q. What were the reasons that you were**
17 **unsure about?**
18   A. Because it's the au pair -- okay. I
19 mean, because I wasn't sure if I wanted to live where
20 I worked, if I wanted to have to work up to -- many
21 hours weekly and get paid that specific amount of
22 money. I wasn't sure it would be too -- it would be a
23 good experience. Many reasons.
24 **Q. Okay. And while you were an au pair**
25 **with the Sherman family, did you have any other source**

76

1  **of income?**
2    A. No.
3  **Q. Did you ever babysit or -- excuse me.**
4  **Strike that.**
5    **Did you ever perform any child care for**
6  **any other families?**
7    A. No.
8  **Q. Okay. You didn't have any other job?**
9    A. No.
10   MR. PETTERSON: Objection.
11 **Q. (BY MR. HUNT) Can you please turn to**
12 **the page that -- of the document that we're looking**
13 **at, at the bottom it says "InterExchange0047349." The**
14 **document itself begins "Dear Host Family."**
15   A. Yes.
16 **Q. Are you with me, Ms. Ridgeway?**
17   A. Yes.
18 **Q. Okay. Do you recognize this document?**
19   A. Yes.
20 **Q. What is it? Take your time to review**
21 **it, please.**
22   A. It starts with a letter that I wrote
23 when I was thinking about extending with
24 InterExchange, the au pair program.
25 **Q. Okay. And who was this letter intended**

19 (Pages 73 to 76)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

77

1  for?
2        A.  I don't recall.
3        Q.  Could it have been potential host
4  families?
5        A.  Yes.
6        Q.  And when did you write this letter?
7        A.  Yes.
8        Q.  When did you write it?
9        A.  Sometime -- there's no date, but
10  sometime in July of 2011, I think.
11        Q.  And could you read the second half of
12  the second paragraph, please.
13        A.  The second -- the second paragraph of
14  the letter?
15        Q.  Yeah.
16        A.  "To briefly describe myself, I can say
17  that I'm a family oriented girl, hardworking,
18  independent, reliable, warm, patient, responsible,
19  organized and I have lots of energy.  I enjoy the
20  outdoors very much, like to have picnics at parks, go
21  for walks at the beach and the redwoods.  Thankfully
22  the place where I'm currently living allows me to do
23  all this.  Santa Cruz, California is a beautiful area
24  to explore and I enjoy every beach, park, redwood that
25  I have here.  I can also say that I'm a curious person

78

1  and like to learn new things and I easily adapt to new
2  situations.  Some of my hobbies are hanging out with
3  friends, going to the Church on Sundays, practicing
4  sports, watching movies, listening to music, reading
5  and traveling."
6        Q.  Okay.  You said that you think that you
7  wrote this letter in July 2011.  Could it have been
8  July 2012?  Do you think it was during the time that
9  you were an au pair for the Sherman family?
10        A.  Yes.
11        Q.  Okay.  Does July 2012 sound more
12  accurate?
13        A.  Oh, yes, it does.
14        Q.  Okay.  In the second -- excuse me.  In
15  the third paragraph it says, "Although I love to spend
16  lots of time with my host family, I enjoy some
17  downtime sometimes.  They made it pretty easy for me
18  to have that here, since I have my own space in the
19  house with a bathroom and a cute bedroom that they
20  decorated for me."  Do you see that?
21        A.  Yes.
22        Q.  Do you agree with that?
23        A.  That I have a bathroom and my own
24  bedroom, yes.
25        Q.  And that your host family made it easy

79

1  for you to have downtime?
2        MR. PETTERSON:  Objection.
3        Q.  (BY MR. HUNT)  Do you still agree with
4  this statement?
5        A.  Yes.  I could have my downtime during my
6  time off.
7        Q.  Okay.  And did you write this letter?
8        A.  Yes.
9        Q.  Did anyone help you write it?
10        A.  I don't recall.
11        Q.  And then the fifth paragraph, it begins,
12  "Unfortunately, I'm the last Au Pair that they are
13  going to have.  At first I was sad to leave them but
14  started to look at the opportunity to meet new people
15  and explore new places.  I have a great relationship
16  with my host family and I am looking for a great
17  family to share a full year of adventure and new
18  experiences."  Do you see that?
19        A.  Yes.
20        Q.  Do you agree with that statement?
21        A.  Yes.
22        Q.  And the next paragraph, "I want to
23  continue on the Au Pair USA program, because it's a
24  great opportunity to expand my horizon."  Do you see
25  that?

80

1        A.  Yes.
2        Q.  Do you still agree with that statement?
3        MR. PETTERSON:  Objection.
4        A.  Maybe.
5        Q.  (BY MR. HUNT)  Maybe?
6        A.  Yes.
7        Q.  Is there anything --
8        A.  Yes.
9        Q.  Is there anything within that statement
10  that you disagree?
11        A.  It's very vague.  Now that I can see the
12  "expand my horizon," it was vague, but if that's the
13  way I looked at it, it's right.
14        Q.  And when you say "expand my horizon" is
15  vague, what do you specifically mean?
16        MR. PETTERSON:  Objection.
17        A.  What specific subject are you talking
18  about?
19        Q.  (MR. HUNT)  Yeah.  Let me ask you this
20  in a different way.
21        You said, "it's a great opportunity to
22  expand my horizon."  Do you mean it's a great
23  opportunity to engage in a cultural exchange?
24        MR. PETTERSON:  Objection.
25        A.  It would be a good opportunity for

20 (Pages 77 to 80)

Case No. 1:14-cv-03074-CMA-KMT Document 1104 Filed 06/06/18 USDC Colorado Page 171 of 264

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**81**

1 personal growth.
2     **Q. (BY MR. HUNT) I'm sorry. What was**
3 **that?**
4     A. For personal growth.
5     **Q. For personal growth. Okay.**
6     **Ms. Ridgeway, thanks for joining this**
7 **deposition. I only have a couple questions.**
8     **Is there anything I forgot to ask you?**
9 **Do you believe there's anything I forgot to ask you?**
10     MR. PETTERSON: Objection.
11     A. I can't think. Maybe I should say
12 something. When you're talking about supervisor, I
13 was promised that I was going to have someone, a
14 supervisor to supervise me here from InterExchange,
15 and that's not exactly what I did. She -- I didn't
16 have much contact with my supervisor. So that's the
17 only thing I -- I would like to add.
18     **Q. (BY MR. HUNT) Okay. And did you think**
19 **that I was — was there anything that you thought I**
20 **might ask you but didn't?**
21     MR. PETTERSON: Objection.
22     A. No.
23     MR. HUNT: Okay. I may have some
24 questions -- some follow-up questions later, but first
25 your attorney may have questions to ask.

**82**

1     EXAMINATION
2 BY MR. PETTERSON:
3     **Q. Thank you, Mariane, for your time this**
4 **morning. I just have a few questions for you.**
5     **Do you recall earlier that you testified**
6 **that you were provided a cell phone by your host**
7 **family?**
8     A. Yes.
9     **Q. Did the host family contact you on that**
10 **cell phone?**
11     A. Yes.
12     **Q. When they contacted you, did they**
13 **contact you about work-related matters?**
14     A. Yes.
15     **Q. How would they have reached you had you**
16 **not had a cell phone?**
17     A. I don't know.
18     **Q. You recall earlier that you testified**
19 **that you had the use of a car with your host family.**
20     A. Yes.
21     **Q. Did you use that car to transport the**
22 **host family's children?**
23     A. Yes.
24     **Q. Did you ever use the car to go to**
25 **destinations that were not reachable by walking?**

**83**

1     A. Yes.
2

(lines 2–24 redacted)

25     **Q. Did you consider yourself to have worked**

**84**

1 those two and a half days?
2     A. Yes.
3     **Q. And during that week, did you work any**
4 **other hours?**
5     MR. HUNT: Objection.
6     A. I worked those three days, and that's
7 it.
8     **Q. (BY MR. PETTERSON) Do you recall**
9 **earlier testifying that you were told how much you**
10 **would be paid prior to coming to the United States?**
11     A. Yes.
12     **Q. Do you recall that you were told this**
13 **information when you were in Brazil?**
14     A. Yes.
15     **Q. And how much were you told you would be**
16 **paid?**
17     A. I was told I would be paid 195.75.
18     **Q. And remind me who told you this**
19 **information.**
20     A. The agency.
21     **Q. And did the agency present this**
22 **information as a minimum amount that you would be**
23 **paid, or did they say that's how much you would be**
24 **paid?**
25     A. That's how much I was -- I was going to

21 (Pages 81 to 84)

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

85

```
 1  be paid.
 2      Q.  You testified earlier that you spoke to
 3  babysitters during the time you were an au pair.  Do
 4  you recall that?
 5      A.  Yes.
 6      Q.  And do you recall that after --
 7  testifying that after that conversation, you felt that
 8  you were underpaid?
 9      A.  Yes.
10      Q.  And why was that?
11      A.  Because they were making more money.
12      Q.  Do you recall how much money they said
13  they were making?
14      A.  Yes.  It was a range between 15 -- one
15  five -- to $22 per hour.
16      Q.  And after the time you left the host
17  family, did you ever do any further work for them?
18      A.  Yes.
```

86

```
 5      Q.  And how much were you paid per hour as a
 6  babysitter?
 7      A.  $15 per hour, one five.
 8      Q.  Did you have responsibilities as a
 9  babysitter that were similar to the responsibilities
10  you had as an au pair?
11      A.  Yes.
12      Q.  Were there any differences between your
13  responsibilities?
14      A.  I'm sorry.  Can you repeat?  Can you
15  repeat it?
16      Q.  Yes.  Were there any differences in your
17  responsibilities as a babysitter and as an au pair?
18      A.  Yes.
19      Q.  Did you have more or less
20  responsibilities as a babysitter?
21      A.  I had less responsibilities.
22      Q.  And you were paid how much again?
23      A.  $15 per hour.
```

87

```
 3      Q.  And were you paid extra for that week?
 4      A.  No.
 5      Q.  Were you paid overtime for the days in
 6  which you worked more than ten hours?
 7      A.  No.
18      Q.  And were you paid extra for the weeks in
19  which you -- strike that.
20      Were you paid extra for the hours that
21  you worked when they stayed overnight?
22      A.  No.
23      MR. PETTERSON:  No further questions.
24      MR. HUNT:  I just have a couple
25  follow-ups, and I think that they're mostly just
```

88

```
 1  clarifying questions.
 2          EXAMINATION
 3  BY MR. HUNT:
 4      Q.  When the host family went to these
 5  overnight trips, was the children's uncle present?
 6      A.  No.
 7      Q.  Okay.  And you said in response to
 8  Mr. Petterson's question something along the lines of
 9  you described the agency -- excuse me.  Strike that.
10      You said that before you came to the
11  United States, the agency told you how much you were
12  going to be paid.  What is the agency --
13      A.  Yes.
14      Q.  Is that your local -- was that the
15  Brazilian local agency?
16      A.  I think it was both agencies, my local
17  and the American agency.
18      Q.  Okay.  Do you remember who from
19  InterExchange talked to you about that?
20      A.  I don't recall.
21      Q.  You only recall somebody from the local
22  agency telling you about that; is that correct?
23      A.  No.  I said that it maybe was both
24  agencies.
25      Q.  Okay.
```

22 (Pages 85 to 88)

Case No. 1:14-cv-03074-CMA-KMT Document 1104-3 filed 06/06/18 USDC Colorado pg 173 of 264

MARIANE MELO RIDGEWAY - 3/30/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.



**89**

1    A.  My email.  I don't recall.
2    Q.  Well, how did they tell you this?
3    A.  If InterExchange told me that, it was my
4  email.  If my local agency told me that, it was
5  through a conversation or through a paper.
6    Q.  Okay.  And just so I'm clear, is
7  InterExchange and the local agency, are they one and
8  the same?
9        MR. PETTERSON:  Objection.
10    Q.  (BY MR. HUNT)  Do you believe -- strike
11  that.  Let me ask a different question.
12        You said that you talked with
13  babysitters while you were an au pair and that they
14  were making $15 an hour?
15    A.  Yes.
16    Q.  Were any of those babysitters living
17  with the family for whom they cared?
18    A.  Let me think.  Not at the time that I
19  talked.
20    Q.  They were not -- I'm sorry.  Could you
21  please tell me that again?
22    A.  No.
23    Q.  Just to clarify, the answer is no, they
24  were not living with the families; is that correct?
25    A.  That's correct.  The answer is no, they

**90**

1  were not living.
2    Q.  And when --
3    A.  Yes.
8    Q.  And you were -- and you were being paid
9  15 to how many -- how many dollars per hour?  How much
10  did they pay you per hour?
11    A.  What was the question?
12    Q.  How much did the Sherman family pay you
13  per hour?
23    Q.  So did the Sherman family provide you
24  meals while you were a babysitter, all of your
25  meals -- excuse me.  Let me ask you a different

**91**

1  question.

**92**

25        MR. HUNT:  Okay.  That's all the

23 (Pages 89 to 92)

**MARIANE MELO RIDGEWAY - 3/30/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

93

1 questions that I have.
2 MR. PETTERSON: I just have like two
3 more questions.
4 EXAMINATION
5 BY MR. PETTERSON:
6 **Q. Ms. Ridgeway, do you recall testifying**
7 **that you worked roughly 20 hours a week for the host**
8 **family as a babysitter?**
9 A. Was the question if I worked for 20
10 hours a week for the family?
11 **Q. Let me rephrase.**
12 A. It's because -- I'm sorry. It's because
13 you're kind of breaking.
14 **Q. That's not good. Let me try again.**
15 **About how many hours a week were you a**
16 **babysitter for the host family?**
17 A. About 20 hours a week.
18 **Q. So if my math is correct, they paid you**
19 **roughly $300 a week for 20 hours of work?**
20 A. Yes.
21 **Q. And how much did you make per week as an**
22 **au pair?**
23 A. $200.
24 MR. PETTERSON: No further questions.
25 MR. HUNT: I would say we can go off the

---

94

1 record.
2 WHEREUPON, the within proceedings were
3 adjourned at the approximate hour of 1:25 p.m. on the
4 30th day of March, 2018.
5 * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

95

I, MARIANE MELO RIDGEWAY, do hereby
certify that I have read the above and foregoing
deposition and that the same is a true and accurate
transcription of my testimony, except for attached
amendments, if any.
Amendments attached ( ) Yes ( ) No


_____
MARIANE MELO RIDGEWAY


The signature above of MARIANE MELO
RIDGEWAY was subscribed and sworn or affirmed to
before me in the county of _____, state
of _____, this _____ day of
_____, 2018.


_____
Notary Public
My Commission expires:


Johana Paola Beltran 3/30/18 (tcm)

---

96

REPORTER'S CERTIFICATE
STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )
I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said MARIANE MELO RIDGEWAY was
duly sworn or affirmed by me to testify to the truth
in relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.
I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

IN WITNESS WHEREOF, I have affixed my
signature this 2nd day of April, 2018.

My commission expires April 24, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

---

24 (Pages 93 to 96)

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


        I, TRACY C. MASUGA, Registered
Professional Reporter, Certified Realtime Reporter,
and Notary Public 19924005553, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said MARIANE MELO RIDGEWAY was
duly sworn or affirmed by me to testify to the truth
in relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 2nd day of April, 2018.

        My commission expires April 24, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




Tracy C. Masuga
Certified Realtime Reporter
Registered Professional Reporter

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 14-cv-03074-CMA-KMT
 3
      JOHANA PAOLA BELTRAN, et al.,
 4
      Plaintiffs,
 5
      v.
 6
      INTEREXCHANGE, INC., et al.,
 7
      Defendants.
 8      _____

 9    VIDEOCONFERENCE DEPOSITION OF:  SARA MEJIA ALVAREZ
                                      March 30, 2018
10      _____

11              PURSUANT TO NOTICE AND STIPULATION, the
      videoconference deposition of SARA MEJIA ALVAREZ, was
12    taken on behalf of the Defendant InterExchange, Inc.,
      at 1900 Grant Street, Suite 1025, Denver, Colorado
13    80203, on March 30, 2018, at 9:00 a.m., before Shauna
      T. Dietel, Registered Professional Reporter and
14    Notary Public within Colorado.

15

16

17

18

19

20

21

22

23

24

25
```

**H+G**

Hunter + Geist, Inc.

303.832.5966   1900 Grant Street, Suite 1025   ■ www.huntergeist.com
800.525.8490   Denver, CO 80203                ■ scheduling@huntergeist.com

Your Partner in Making the Record

**SARA MEJIA ALVAREZ - 3/30/2018**
**Johana Paola Beltran, et al v. Interexchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____
VIDEOCONFERENCE DEPOSITION OF:  SARA MEJIA ALVAREZ
March 30, 2018
_____
            PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of SARA MEJIA ALVAREZ, was
taken on behalf of the Defendant InterExchange, Inc.,
at 1900 Grant Street, Suite 1025, Denver, Colorado
80203, on March 30, 2018, at 9:00 a.m., before Shauna
T. Dietel, Registered Professional Reporter and
Notary Public within Colorado.

---

**2**

                 A P P E A R A N C E S
For the Plaintiffs:
         DAWN L. SMALLS, ESQ.
         Boies Schiller Flexner, L.L.P.
         575 Lexington Avenue
         7th Floor
         New York, New York  10022

For the Defendant InterExchange:
         ALYSSA L. LEVY, ESQ.
         Sherman & Howard, L.L.C.
         633 Seventeenth Street
         Suite 3000
         Denver, Colorado  80202


        Ms. Alvarez was located in Bethesda,
Maryland.
        Ms. Levy and Ms. Dietel, the court
reporter, were located at 1900 Grant Street, Suite
1025, Denver, Colorado 80203.
        Ms. Smalls was located at 575 Lexington
Avenue, 7th Floor, New York, New York 10022.

---

**3**

                         I N D E X
EXAMINATION OF SARA MEJIA ALVAREZ:            PAGE
March 30, 2018

By Ms. Levy                                  5, 76
By Ms. Smalls                                   71


                                             INITIAL
DEPOSITION EXHIBITS:                        REFERENCE

Exhibit  1  Consent to Join                       7

Exhibit  2  Agreement                            23

---

**4**

1    WHEREUPON, the following proceedings were
2  taken pursuant to the Federal Rules of Civil
3  Procedure.
4        *    *    *    *    *
5    (Deposition Exhibits 1 and 2 were marked.)
6    MS. LEVY:  All right.  Sara, I just want to
7  introduce myself.  Name is Alyssa Levy, and I'm from
8  the law firm of Sherman & Howard, and I am the lawyer
9  for InterExchange, and I'll be asking you the
10  questions today.
11    THE DEPONENT:  Okay.
12    MS. LEVY:  Dawn, do you want to make an
13  appearance on the record; otherwise the court
14  reporter has our information?
15    MS. SMALLS:  I'm not sure what you mean.  I
16  mean, do I need to state it for the record or the
17  court reporter will just enter it automatically?
18    MS. LEVY:  We can just enter it
19  automatically, if that's okay with you.
20    MS. SMALLS:  Yeah, I'm fine as long as she
21  enters my appearance on my behalf, but I don't need
22  to say that on the record.
23    MS. LEVY:  Okay.  All right.  Great.
24    And then, Dawn, I need to ask you for a
25  stipulation on the record that we can swear in the

---

1 (Pages 1 to 4)

**SARA MEJIA ALVAREZ - 3/30/2018**
**Johana Paola Beltran, et al v. Interexchange, Inc., et al.**

---

**5**

1  deponent over Zoom, just because we're all in
2  different locations.
3      Would that be okay with you?
4      MS. SMALLS:  Yes.
5          SARA MEJIA ALVAREZ,
6  having been first duly sworn to state the whole
7  truth, testified as follows:
8      (Deponent's reply to oath:  I do.)
9          EXAMINATION
10 BY MS. LEVY:
11     Q   Could you please state your full name for
12 the record?
13     A   My name is Sara Mejia Alvarez.
14     Q   And your attorney has indicated that you're
15 comfortable proceeding in English; is that correct?
16     A   Yes.
17     Q   And if there's a question that you do not
18 understand, please tell me, and I can ask it again.
19     Okay?
20     A   Okay.
21     Q   Have you ever had your deposition taken
22 before or testified under oath?
23     A   No.
24     Q   Do you understand that you are under an
25 oath today to tell the truth?

---

**6**

1      A   Sure, I do.
2      Q   And I would ask that you please listen to
3  the entire question before you begin your answer.
4      Okay?
5      A   Okay.
6      Q   And I'll let you finish your answer before
7  I start my next question.
8      Okay?
9      A   Sure.
10     Q   Now, your attorney may object to one or
11 more of my questions, but unless she tells you not to
12 answer, you will need to answer the question.
13     Okay?
14     A   I understand.  Yes.
15     Q   And if you need a break at any time, please
16 tell me and we can take a break.  The only thing I'd
17 ask is that you let me finish a pending question and
18 we hear your answer before we take the break.
19     Okay?
20     A   Okay.
21     Q   And we're going to talk about your
22 experience today with your host family, and I'd like
23 to ask you when you talk about the children from the
24 host family that you do not refer to them by name.
25 Just say that it's a boy or a girl or the age that

---

**7**

1  they are.
2      Okay?
3      A   Okay.
4      Q   All right.  Thank you.
5      And before we start, is there anyone
6  present in the room with you?
7      A   Yes, my boyfriend.
8      Q   Okay.  I would -- sorry.  Go ahead.
9      A   Should he leave?
10     Q   It's okay if he stays in the room with you,
11 but he cannot help you with your answers in any way
12 or coach you.
13     A   Of course.  Not a problem.  Sure.
14     Q   Okay.  Did you review any documents to
15 prepare for your deposition today?
16     A   No.  To be honest, I didn't.
17     Q   Okay.  I'm going to pull up on our screen a
18 document.  Just one second.  All right.  Can you see
19 that on your screen, that document?
20     A   Sure.  I can.
21     Q   Okay.  Do you recognize this document?  And
22 I'm going to scroll down so you can see the full page
23 here.  It's just one page.
24     A   Yeah, I -- I signed it up, I think.  Yes,
25 there it is, I'm sure.

---

**8**

1      Q   I'm sorry.  Can you repeat that?
2      A   Yes.  It's -- I do recognize it.  I signed
3  it up.
4      Q   Okay.  That's your signature in the middle
5  of the page there?
6      A   Yes, it is.
7      Q   And did you understand this document to be
8  your joining of the lawsuit against InterExchange?
9      A   I do.
10     Q   Okay.  How did you first learn about the
11 lawsuit against InterExchange?
12     A   I got an e-mail.  There is FaceBook group,
13 an au pair FaceBook group, and the girls just started
14 to talk about this, so I decided to join because of
15 that.  I got the document through an e-mail.
16     Q   Do you remember when you first saw the
17 FaceBook group?
18     A   It must have been maybe September, last
19 year.  I'm not really sure.  I will say September
20 last year.
21     Q   And when you saw the FaceBook group, what
22 did you do with that?
23     A   It was just the girls talking saying that,
24 Look what I got; I got this e-mail; and they're
25 talking about a lawsuit or asking us to join.  It was

---

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**SARA MEJIA ALVAREZ - 3/30/2018**
**Johana Paola Beltran, et al v. Interexchange, Inc., et al.**

---

9

1  just typical conversation, like, this is new; look
2  what I got; shall I join; shall I . . .
3      Q   And were there any links in the FaceBook
4  group to click on?
5      A   Not that I remember, no.  It was just like
6  a screen shot about the -- the mails and that stuff.
7  It -- it was not actually a link.  As I tell you, I
8  got the information through an e-mail.
9      Q   Can you tell me about that e-mail?
10      A   I'm not sure there is much to talk about
11  the e-mail.  It was -- the main thing I got -- I open
12  it; it was this -- like, talking about the lawsuit,
13  like you had some information and giving us the
14  chance -- the chance to -- to join.  That was -- that
15  was it.
16      Q   Okay.  What is your understanding of what
17  the lawsuit is about?
18      A   I understand -- my understanding is I can
19  talk about my personal experience that the agency is
20  kind of not being fair with us, the au pairs, about
21  the payment, about our rights here in the United
22  States, about how they sell the idea to us.
23        So that's why I joined the lawsuit -- the
24  class suit, because I agree with that, that they were
25  not clear about the information they gave us at the

---

10

1  beginning, because I believe the payment is not the
2  right one, and the rights we have in this country
3  is -- are not beneficial to the au pairs.
4      Q   Okay.  I want to ask you one more question
5  about the e-mail that you said you received for the
6  lawsuit:  When did you receive that e-mail?
7      A   No, I'm not sure about exactly the date.
8  As I told you, it must be, maybe, September;
9  September, last year.  That was when -- when I knew
10  about the whole thing happening, and -- but I might
11  say September.  I'm not really sure.
12      Q   And who sent you that e-mail?
13      A   Not someone that I know.  It was -- I don't
14  know.  Sorry.
15      Q   The e-mail that you're referring to, was
16  that to join the lawsuit?
17      A   It was just giving information.  It was
18  just that information, like, giving us information
19  about what was happening and telling us that there
20  was a lawsuit about to start.  And, yeah, it was
21  giving us the choice to -- to join.
22      Q   Do you remember if it came from an e-mail
23  address from your attorney's office?
24      A   No.  Sorry.  No, I don't.  I don't
25  remember.  I -- I know I ignored the e-mail several

---

11

1  times, to be honest.  Like, I ignore it, and then I
2  saw the girls and on the web -- on the FaceBook page
3  talking about it.  And I talked to my host dads about
4  it asking them if I should join or what they think or
5  what -- what they think about it.
6        And finally I decided to join, but -- but
7  at first I just ignore it, to be honest.  I didn't
8  pay too much attention from where it was coming
9  or . . .
10      Q   All right.  You lived with a family in
11  Maryland, right?
12      A   Yes, I do.
13      Q   Are you currently still an au pair with the
14  family in Maryland?
15      A   No, I'm not.
16      Q   Do you know if this lawsuit has anything to
17  do with the amount of money that you were paid by the
18  host family you lived with?
19      A   Yes.
20      Q   When you first came to the United States
21  for the au pair program, what did you believe you
22  were going to be paid by the family that you would
23  live with?
24      A   I believed I was going to be paid 195.75,
25  and they were going to give me about a $500 bonus to

---

12

1  study.
2      Q   Could you repeat that.  A $500 bonus?
3      A   $500 to study.
4      Q   To study.  Okay.  Thank you.
5        Before learning of the lawsuits, did you
6  have concerns about what you would be paid?
7      A   Sure.  Of course.
8      Q   And what were those concerns?
9      A   When I came here, then I realize that an
10  actual nanny and babysitters get paid from 15 to $20
11  the hour, and I realized I was getting paid $3 the
12  hour, so, of course, it was kind of shocking.
13      Q   Where were you living when you signed that
14  opt-in form that we just looked at on the screen?
15      A   Maryland with my host family.
16      Q   And where do you live now?
17      A   I still live in Maryland with my host
18  family.
19      Q   Are you still -- you're not still working
20  as an au pair, but you are still living with them?

---

3 (Pages 9 to 12)

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

13

Q   Can you tell me any more about the conversation that you had with your host family about the lawsuit?
MS. SMALLS: Objection, form.
A   I'm -- I asked them, because I understand that they got into the program, but I don't blame them. For me, it's more like the agency. So I asked them what they think about it.
They been my mentors since the time I have been in the United States, so I wanted to ask them what they think about it, if they think it was bad for me to join, if maybe that was going to -- to be -- to be -- how you say it? -- to be like if it's going to be bad for them in some way, I didn't want that, so I asked them about it.
Q   (BY MS. LEVY)  And what did they say to you about it?
A   That I should join.  That they were agreeing, and I should join the class suit.
Q   You lived with the Weisner family?  Is that how you pronounce it?
A   Weisner (pronouncing).

14

Q   Weisner.  Okay.  Thank you.
A   Sure.
Q   Where are you originally from, your home country?
A   Columbia.
Q   When you discussed the lawsuit on FaceBook with the other au pairs, can you describe the conversations?
MS. SMALLS: Objection.
A   They were, at the first time, surprised, like, Look what's happening, they're -- they're talking about presenting a lawsuit against the agency.  Then the au pairs -- because the group has au pairs from all of the agencies, not -- not one agency in particular, but all of them.
So then we realize that it was more than one, that it was going to apply for not only one agency, but for all of them.
And then we -- first we talked like, Oh, we definitely need to do this, like this is something we need, because this is something we believe for a long time, this is something that is not right.  So mostly supportive, and let's do it, sure; we -- we need it.  Most of the girls joined, I believe.
Q   (BY MS. LEVY)  And in those conversations

15

that you had on FaceBook, were you discussing the stipend with the other au pairs?
MS. SMALLS: Objection.
A   What -- do you mean -- do you mean about the payment?
Q   (BY MS. LEVY)  Yes.
A   No.  No.  Because we -- we both -- all of us know how much money we make.  It's -- it's the same for all of us.  So we just -- if we talk about it, it might be like we know it isn't fair.  You know, no more than that.
Q   Outside of FaceBook, did you discuss the lawsuit with any other au pairs?
MS. SMALLS: Objection.
A   I don't -- I don't tend to talk or comment. I just saw the post.  I -- I read them, but I never actually -- I just talked to my host dads and that was it, and with my friends, my closest friends. And -- but I didn't post anything on FaceBook or, you know . . .
Q   (BY MS. LEVY)  Do you have a sister that is also or was also an au pair?
A   Yes.
Q   And did she go through the InterExchange program?

16

A   Yes.
Q   When was she an au pair?
A   We --
MS. SMALLS: Objection.
A   We were 15 days apart.  She came first; another 15 days after, I arrive.
Q   (BY MS. LEVY)  Do you know if she has opted into this lawsuit?
A   No, she's not.
Q   Have you discussed the lawsuit with her?
MS. SMALLS: Objection.
A   No.  I -- I believe -- well, I forgot to tell her maybe.  Maybe I told her, but she didn't actually care.  I -- I don't remember, to be honest.
Q   (BY MS. LEVY)  Okay.
A   But her -- she should have joined.
Q   Did you complete any survey or questionnaire in connection with this lawsuit?
MS. SMALLS: Objection.
A   I -- I believe I started, but I don't think I actually finished it.  A lot of questions, and I'm . . .
Q   How did you receive the questions?
MS. SMALLS: Objection.
A   Through an e-mail.

4 (Pages 13 to 16)

17

1   Q   (BY MS. SMALLS)  And do you know who sent
2  you the e-mail with the questions?
3      A   No.  Sorry.
4      Q   When you say there were a lot of questions,
5  do you know how many there were?
6      MS. SMALLS:  Counsel, we're -- we're
7  talking about something that was sent to her after
8  she opted into the lawsuit, so, I mean, she was
9  represented at that point.  So you're talking about
10  communications that were sent to her by her attorneys
11  or directed by her attorneys, and you're asking
12  details about what -- what those communications were
13  and what was included in them.  It's inappropriate.
14      THE DEPONENT:  Yeah, because I had already
15  signed by then.  It's true.
16      MS. LEVY:  Okay.  I had -- I had not asked
17  when, but -- or any details of the communication
18  other than how many questions there were.
19      MS. SMALLS:  Yeah, you asked who it was
20  from; you asked how many questions; you were --
21  either way, it's all inappropriate.  She was a
22  represented party, and these were communications from
23  her attorneys, and so I'm going to instruct the
24  witness not to answer.
25      MS. LEVY:  Okay.  We can move on.  I -- she

18

1  had not said who sent it to her, and it was a general
2  question.  We can move on.
3      Q   (BY MS. LEVY)  When did you first learn
4  about the opportunity to be an au pair in the United
5  States?
6      A   It was my sister, the one that came to me
7  with the idea.  It was in the year 2013, 2014, I
8  believe.
9      Q   And did your sister tell you about the au
10  pair program?
11      A   Yeah.
12      Q   Did she tell you about the InterExchange
13  program specifically?
14      A   No, not about the InterExchange program
15  specifically, but she told me about the au pair
16  program in general.
17      Q   When your sister told you about the au pair
18  program, what did you do to get more information
19  about it?
20      A   We started to look for agencies, and we
21  found -- because we don't have InterExchange in my
22  city, in my country, so we used, like -- like another
23  agency that connects us with them.  I don't know how
24  to say that properly.  They were like sponsors.
25  Yeah, like -- it was them that connected us to

19

1  InterExchange at that time.
2      Q   I'm sorry.  I had trouble hearing you with
3  the connection.  Can you repeat the last part of what
4  you just said?
5      A   That we found -- because we don't have
6  InterExchange in my country -- we don't have
7  InterExchange offices in my country, so we found like
8  an office, a firm, or company and agency -- I'm not
9  sure how to say it -- that connects us to
10  InterExchange.  So we did their -- the application
11  through them to InterExchange.
12      Q   What organizations recruited you to be an
13  au pair in the United States, if any?
14      A   I don't remember the name.  What was the
15  name?  It was a long time ago, three years ago.  I
16  don't remember the name.  Sorry.
17      Q   Do you know what the word "recruit" means?
18      A   Sure, I do.
19      Q   Can you define it as you understand the
20  word "recruit"?
21      MS. SMALLS:  Objection.  Do you have a
22  question?
23      Q   (BY MS. LEVY)  My question is, can you
24  define the word "recruit" as you understand it?
25      A   Like when you're trying to compel people or

20

1  try to draw them to join you on something.  Is that
2  right?  That's what I understand.
3      Q   Do you believe that you were recruited into
4  the au pair program?
5      A   No.  No.
6      Q   When you went to the -- you were explaining
7  it's like a local agency, is that right, in Columbia?
8      A   Sure.  Yeah.  That would be a good name,
9  yeah.
10      Q   When you went there and you said you
11  started filling out applications, did you apply to
12  the au pair program through a single-sponsor agency
13  or did you apply to more-than-one-sponsor agency?
14      A   I am not sure.  What is the difference?  I
15  believe it was one-sponsor agency, but I don't
16  understand the difference.
17      Q   Did you apply to only InterExchange or did
18  you apply to other agencies as well?
19      A   Okay.  No, it was only InterExchange.
20      Q   And how did you decide to apply with
21  InterExchange?
22      A   Sorry.  I just remembered the name.
23  It's -- Global Connection was the agency that we --
24  my sister and me contact to -- to do -- so we went to
25  Global Connection.  We had an interview with them,

Case No. 1:14-cv-03074-CMA-KMT   Document 1104-11   filed 08/06/18   USDC Colorado   pg 182 of 264

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

---

21

1  and -- and they gave us information about the
2  program.
3          At first they told us how -- how much we
4  needed to pay and all the documentation we needed,
5  because it was a long list about the requirements and
6  things we needed.  And, I mean, like, after a year, I
7  was finally able to -- to travel to my host family.
8      Q   Could you repeat that last part again.
9  After a year you were able to?
10     A   To travel to my host family after a year
11 of -- of -- of getting all the requirements.  They --
12 they were asking us to get all this paperwork.  After
13 a year I finally -- I was able finally to -- I was
14 finally able to travel to the United States to meet
15 my host family.
16     Q   Okay.  Thank you for repeating that, and I
17 apologize if I've had to ask you a few times to
18 repeat it.  It's just the connection, sometimes it
19 skips words.  So thank you for doing that.
20     A   Sure.
21     Q   Did Global Connection give you information
22 about the InterExchange program?
23     A   Yes.
24     Q   What interested you about the program?
25     A   Learning the language; it was my number-one

---

22

1  interest.
2      Q   What else interested you about the program?
3      A   The exchange, the -- the cultural exchange
4  I was about to experience.  Yes, I believe that was
5  it.  And they were -- they always told us, like, we
6  had a good chance to travel around the United States,
7  to meet people, get into the culture, study, learn
8  the language.
9      Q   When you were thinking about becoming an au
10 pair and going through the application process with
11 the -- with Global Connection, did you meet with a
12 recruiter or staff member from InterExchange?
13     A   No.
14     Q   Do you remember completing an application
15 for InterExchange?
16     A   Yes.  Like I can remember that they were
17 seeking information on behalf of InterExchange.
18 Everything they told us -- I say "us" because it was
19 my sister and me, the ones getting the information at
20 the time -- they were always, like, talking on behalf
21 of InterExchange.  It was like InterExchange.
22         And the information-- I fill the
23 application -- it was all to Interchange.  They were
24 only a connection between us and InterExchange.
25     Q   The application that they gave you -- that

---

23

1  Global Exchange gave you -- I'm sorry -- Global
2  Connection -- to complete for the InterExchange
3  program, did you complete that application yourself?
4      A   Yes.
5      Q   Did anyone help you complete the
6  application?
7      A   I don't believe it, no.  I don't -- to be
8  honest with you, like -- okay.  Like we went, we had
9  an interview, and I don't remember.  No, but I did
10 all the paperwork myself, so I -- I might say that,
11 yes, myself.
12     Q   Okay.  I'm going to pull up another
13 document on your screen.
14     A   Sure.
15     Q   I'm going to scroll down a little bit so
16 you can see this.  Does this look familiar to you?
17 Do you recognize this document?
18     A   Yeah, I do believe so.  Well, I got a lot.
19 Is that the -- let's see what else.  Yeah.
20     Q   Okay.  And --
21     A   Yes, that's me.
22     Q   Is this your signature on page 5 of the
23 document?
24     A   Yes, it is.
25     Q   Okay.  And did you read this document

---

24

1  before you signed it?
2      A   Yes, I did.
3      Q   Okay.  I'm going direct your attention up
4  to -- this is page 1 of the document.  Do you see
5  where it says, Wages and Compensation:  Au pairs are
6  paid at least $195.75 per week?  Do you see that part
7  on there?
8      A   Uh-huh.
9      Q   And -- sorry.
10     A   I memorize it.
11     Q   And when you read this, did anything about
12 that amount concern you?
13     A   Sure.  I remember that I talked to my
14 representative at that time, and I told him that the
15 math was not okay.  Because they -- they always -- he
16 always tell me the program says that the family was
17 going to pay for everything: for the food, for
18 the -- basically, as an au pair, I was getting this
19 amount free; my payment was going to be free.
20         And when I did the math, it was not okay.
21 And then he -- then I learned about the room and
22 boarding, the amount they were taking out.  That
23 is -- yeah -- so, yeah.
24     Q   When you say you talked to the
25 representative, was that with Global Connection?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

25

1  A  Yes.
2  Q  Okay.  And this --
3      MS. LEVY:  Dawn, this is going to be
4  Exhibit 2.  The opt-in form was Exhibit 1.
5      MS. SMALLS:  Okay.
6  Q  (BY MS. LEVY)  After you had the
7  conversation with the representative at Global
8  Connection and he explained to you how the math, you
9  could say, worked --
10      MS. SMALLS:  Objection to form.
11  A  Yeah.  He explained to me.  However,
12  because I did not agree and surprised, but at that
13  time I -- like I already -- the process to be an au
14  pair is a long process.  You need -- as I told you
15  before, you need a lot of paperwork, you need hours
16  with children.  Like, it's a lot of things you need
17  to get, and I was already at the end of the -- at the
18  time.
19      And he told me you only focus on the
20  opportunity of going and learning the language and
21  the opportunity of going and getting merged in the
22  culture and this stuff.  So I knew about it.  I was
23  not agree, but I continue with the program, yeah.
24  Q  (BY MS. LEVY)  Did you have any discussions
25  with any InterExchange representatives about the

26

1  stipend while you were still in Columbia?
2  A  No.
3  Q  And then when you came to the United States
4  as an au pair, did you have any discussions with
5  InterExchange representatives about the stipend then?
6  A  No.
7  Q  You mentioned fees when you were discussing
8  Global Connection.  Did you pay fees to participate
9  in the au pair program?
10  A  Yes, I did.
11  Q  And what were those fees?
12  A  Will you hold on for one second, please?
13  Q  Sure.  Do you need --
14  A  I'll be right back.  I have -- I have,
15  like, a -- a notebook when I have -- where I have all
16  the fees and everything I -- I paid.
17  Q  Okay.  Do you -- do you need --
18  A  Because I don't remember.  I'm really bad
19  with math and numbers.  So it might have been like --
20  like 2 to 3 million Pecos, like with the whole --
21  doing the whole program:  getting the visa, paying
22  for my license, and all that I needed to do.
23  Q  Do you remember who the payment was made
24  to?
25  A  InterExchange.

27

1  Q  And how did you make the payment?
2  A  I think it was a transfer, I believe.  It
3  was not a check.  It was a -- yeah, it was a
4  transfer, I believe.  I -- I don't remember.
5  Q  Okay.  And the book that you're referring
6  to that you think you have the numbers written down
7  in --
8  A  No, it was, like -- you know, like it was a
9  checklist.  It was a notebook that I kept to -- my
10  checklist and to -- checking the budget and all that.
11  Like, what I needed.  I was preparing for this, so I
12  needed this checklist so I understand this stuff.
13  Maybe notes were okay.  It's just notes that I like
14  to take when I'm preparing for something.
15  Q  Okay.  Was this a checklist that you
16  received from InterExchange or from Global
17  Connection?
18  A  No.  They did tell us what we needed to --
19  what documents and what we needed to complete to be
20  able to be au pairs, but the checklist I'm talking
21  about is more personal.  It has nothing to do with
22  InterExchange or Global Connection.
23  Q  Okay.  And when you say "they," what you
24  needed to do to be an au pair, do you mean Global
25  Connection or InterExchange?

28

1  A  Well, Global Connection because -- but as I
2  tell -- as I told you, that they were talking on
3  behalf of InterExchange.  So for me, it was always
4  the same.  There was no difference between Global
5  Connection and InterExchange because they were only
6  the -- the company that was, like, giving us the
7  connection between us and InterExchange.  They were
8  just -- they were just in the middle.
9  Q  When you started the matching process to be
10  an au pair, were you living in Columbia then?
11  A  Yes.
12  Q  And can you tell me about the matching
13  process that you went through to match with your host
14  family in Maryland?
15  A  Sure.  I -- I was only able to see one
16  family at the time, which it took me a long time to
17  get a family.  I was in the process for about four to
18  six months.  I -- I got to talk with three to four
19  host families before I finally matched with the
20  Weisner family.
21  Q  In the matching process with the Weisner
22  family, did you -- how did you communicate with them?
23  A  With Skype.  Through Skype and through
24  mail.  They have a pass -- passport (sic) in the name
25  of their web page, InterExchange; used to post your

7 (Pages 25 to 28)

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

29

1  profile and, like, it gives you a connection with the
2  families.  So it was through passport and through
3  Skype.
4      Q   How many times did you communicate with the
5  Weisner family through Skype?
6      A   About three, four.  Three to four times.
7      Q   And who from the host family was part of
8  those Skype conversations?
9      A   All of the family.  I saw the girls; I saw
10  the two that I -- I got -- I got in contact with all
11  of them.
12      Q   Was anyone from Global Connection part of
13  those Skype discussions?
14      A   Never.
15      Q   And was anyone from InterExchange part of
16  those Skype discussions with the Weisner family?
17      A   Never.
18      Q   Did the Weisner family choose you to be
19  their au pair or did you choose them, or can you
20  explain how that worked?
21      A   They choosed me.  It is kind of difficult
22  to get a family, and that's something we -- we've
23  been told from the beginning, that we couldn't be too
24  picky about picking the family because there were not
25  many families out there.  And -- and we just -- we

30

1  couldn't pick the -- the city we wanted to live in.
2  And just give your -- like give yourself, be the
3  best, and just wait for them to pick you.
4      So they choose me and, of course, I had the
5  chance to reject them, but because I was told it was
6  difficult, the matching process was difficult, so --
7  so that was not, like, an option.
8      Q   When the Weisner family chose you to be
9  their au pair, did you want to go live with them?
10      A   Yeah.
11      Q   And you could have said no if you weren't
12  interested in that family?
13      A   I could have said no.
14      Q   During those Skype interviews with the
15  Weisner family, did you talk about how much you would
16  be paid?
17      A   No.
18      Q   When did you first learn how much your host
19  family was going to pay you?
20      A   In the beginning, the way they sell you the
21  program is you're going to be an au pair, and this is
22  your payment and they cannot pay you more than that,
23  and that's it.  In the beginning I knew the amount.
24      Q   And when you say "the beginning," are you
25  referring to conversations that you had with someone

31

1  at Global Connection or can you explain that?
2      A   Since the beginning, I mean, yeah, since --
3  since I knew about the program more deeply.  So it
4  was since -- since I had more information from Global
5  Connection, yes.
6      Q   Okay.  And what was that amount that you
7  knew you would be paid by your host family?
8      A   195.75.
9      Q   Did you ever ask your host family to pay
10  you more than that amount?
11      A   No.  We talk about it and like they -- they
12  were -- always said that that was the rule, that was
13  the amount they're supposed to pay.  But I never
14  asked them for more, but every time we get to the
15  subject or we talk about it for any reason, they
16  always say that they couldn't pay more because that
17  was the law; that was what the program said it -- it
18  should be.
19      Q   When you -- when you say when you talked
20  about it with them, what -- what reasons would the
21  payment have come up that you would be discussing it
22  with your host family?
23      A   As I told you, when I came here and you
24  start to get more in contact with people and meeting
25  and -- meeting new people, and I realized that the

32

1  nannies and babysitters get paid from 15 to $20 the
2  hour.  So I went to them and I was, like, Wow, look
3  what I learned.  Look what I heard.  Like, is this
4  real?
5      And they told me, Yes, but, you know, that
6  was what the agency told us, like, we cannot pay you
7  more than that.  And so that was the reason we talked
8  about the payment.
9      Q   During the Skype interviews that you did
10  with the Weisner family, did you talk about what you
11  would be doing with the children?
12      A   Yeah.
13      Q   And were those the duties that you actually
14  performed with the children when you lived with the
15  host family?
16      A   Yes.
17      Q   During -- during the Skype interview that
18  you had with the Weisner family, did they tell you
19  how many hours per day you would be working?
20      A   No.  They -- oh, well, they said that
21  because the program says I cannot work more than ten
22  hours per day, so that was pretty clear.  But they
23  didn't -- they were not able to give me, like, a
24  schedule because my schedule was always changing
25  every week.  So it was not a regular, constant

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

---

33

1  schedule; it was changing.
2      Q   When you lived with the host family, did
3  you ever work more than ten hours a day?
4      A   Sometimes, not too many.  Sometimes, but it
5  was not -- it was, like, in the special cases.  It
6  was not -- sometimes 11.  Sometimes 12.  Sometimes
7  they get late, and they were running late, and they
8  were home 30 minutes late, things like that.
9      Q   Were you ever scheduled to work more than
10 ten hours in a day?
11     A   Sometimes, yes, and someone by mistake
12 more than 45 hours the week.  But I used to count
13 them and talk to them, and they were really receptive
14 about it.  They used to change it.
15     Q   So did they -- did the host family realize
16 that you were scheduled to work more than 45 hours or
17 you just happened to work more than that, and then
18 you would go to them and tell them?
19     A   No.  They usually do it by mistake.
20 They -- they scheduled by mistake.  And -- and that
21 was one of the things I used to do at the beginning
22 of the week, it was like count my hours to -- to see
23 how many hours I was working.  And if I found out I
24 was working more than the 45 hours in the week I'm
25 supposed to, I used to go to them and -- and they

---

34

1  they were, as I told you, really receptive about
2  this -- about my explaining, and they always changed
3  the time.
4      Q   You mentioned that you had communicated
5  with a few other families than the Weisner family
6  when you were doing the matching process.  Can you
7  tell me about what happened with those families.  Why
8  you -- did they not choose you or did you not choose
9  them or can you tell me about that?
10     A   Sure.  Because of my sit -- the daily
11 living in Columbia, I didn't have too much
12 experience -- experience in driving, so that was
13 basically the reason why the other two or three
14 families didn't choose me.  They always said, like,
15 You're really nice, we really like you, but we need
16 someone with more experience driving.
17     Q   Do you remember signing another document,
18 an au pair agreement, before you came to the United
19 States?
20     A   Sorry.  I don't remember.  Like, I fill out
21 a lot of papers, and I don't really remember all of
22 them.
23     Q   Okay.  You arrived in the United States for
24 the au pair program in September, 2015; is that
25 correct?

---

35

1      A   Yes.
2      Q   And did you go to training in New York City
3  when you arrived?
4      A   Yes, I did.
5      Q   And that was before going to meet your host
6  family?
7      A   Yes.
8      Q   Can you tell me what sort of training it
9  was?
10     A   Sure.
11         We got to an -- to the hotel.  It was long
12 hours of training every day for a week.  And then we
13 had some time to -- after the training, go out and
14 enjoy ourselves.  It was like basic training that
15 they teach us about, like, CPR, I think how
16 to -- how to take care of babies, that kind of
17 training.
18     Q   Was any of the training specific to your
19 host family, or was it general for all of the au
20 pairs?
21     A   It was general for all of us.  They divided
22 like in ages.  So they started with babies, and --
23 and they were giving like a -- like a wide overview
24 about what to -- how to take care of babies, what you
25 should do, what you shouldn't, how you should hold

---

36

1  them, how you should feed them.  Then kids from two
2  to three or like that stuff.  They -- they divided by
3  ages.
4      Q   How many days did the training last?
5      A   I believe it was five days a week, I think.
6      Q   And how many --
7      A   Yeah.  I --
8      Q   Sorry.  Go ahead.
9      A   Wait.  Yeah, it was five days.  Arrive on
10 the 7th, and I came to my host family on the 11th.
11     Q   Was there training on the 11th, the day
12 that you went to meet your host family?
13     A   Yeah.  That was the last day of training.
14     Q   And how many hours per day did the training
15 last?
16     A   I'm not really sure about it, but it was
17 about, like, maybe six to seven hours.  I remember it
18 was long.  I remember it was long training every day.
19     Q   Were you paid --
20     A   But I don't --
21     Q   Sorry.  Go ahead.
22     A   Sorry.  I don't really remember the amount
23 of hours every day.  I don't remember the schedule
24 like that.
25     Q   Were you paid for the hours that you were

---

9 (Pages 33 to 36)

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.



37

```
1   in training?
2       A   No.  No.
3       Q   Did you do any training in Columbia before
4   you went to the United States to be an au pair?
5       A   No.
6       Q   So after training in New York City, you
7   went to go meet your host family; is that right?
8       A   Yes.
9       Q   Were the parents in the host family that
10  you lived with, were they both employed?  Did they
11  work?
12      A   Yes.
13      Q   Did they both work?
```

```
19      Q   The — the one who had a job when you first
20  arrived, was he working in the home or out of the
21  home?
22      A   Out.
23      Q   And how many hours a day was he working
24  outside the home?
25
```

40

```
25      Q   Okay.  And are you — when you say that,
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490



41

1  are you talking about the first year or the second
2  year or both years?
3      A   It is really difficult. Sorry. But as I
4  told you, my schedule was always changing. Every
5  week my schedule was different. They sat down every
6  Sunday, and they made my schedule for the week. So
7  it's been always changing, always different.
8          And he had meetings. He's not only -- he
9  don't only -- they don't only have their jobs; they
10 have, like, separate activities too. So it's -- it
11 was always changing. It's difficult for me to answer
12 that because, you know -- sorry.
13     Q   Okay. Were there any other adults besides
14 you and Jeffrey and Silvestro that lived in the home?
15     A   No.
16     Q   How many children were in the Weisner
17 family that you took care of?
18     A   Two.
19     Q   And how old were they?
20     A   When I came or right now?
21     Q   When you first came.
22     A   When I first came, the oldest one was four,
23 and the younger one -- the younger one was two.

42

43

5      Q   And during the hours that they were in
6  school, what -- did you have any duties that you had
7  to do for the children or was this personal time?
8      A   I was stuck at home. Because as I told
9  you, like, I didn't have any way of transportation,
10 so I used -- apart from the only month I went to
11 school and I got my English course, I was just at
12 home.
13     Q   Did the family offer you a bicycle to use?
14     A   No. But they live -- they don't live in
15 the city. They live like 30 minutes from Washington,
16 D.C. They live in Bethesda. So there were bicycles
17 at home, but only if I wanted to -- like to go around
18 the neighborhood. It's not like a way to get to
19 something else, a part of that.
20         MS. LEVY: We've been going about an hour,
21 so I want to ask if you need a break. Would you like
22 to take a break or are you okay to keep going?
23         THE DEPONENT: I'm fine. Just let me go
24 and -- I would like to check my computer battery.
25 Let me check because I don't -- I have, like, 10

44

1  percent. Let me go and --
2          MS. LEVY: Why don't we take about a
3  ten-minute break so you can make sure to get your
4  battery and make sure it's charged up.
5          Is that okay?
6          THE DEPONENT: Sure. Sure.
7          MS. LEVY: Okay. So it is 12:06 your time,
8  so let's come back at 12:16 your time.
9          Okay?
10         THE DEPONENT: Sounds great. Shall I
11 disconnect, or should I just leave it like this and
12 go on and do my thing and come back?
13         MS. LEVY: Just leave it like this and go
14 get your battery, and then we'll -- we'll come back.
15         MS. SMALLS: Why don't you put your
16 computer on mute, but you can leave it up.
17         (Recess taken, 10:06 a.m. to 10:18 a.m.)
18     Q   (BY MS. LEVY) What are your duties with
19 respect to the children?

11 (Pages 41 to 44)

45



7   Q   Okay.  Did you provide any services to the
8   host family outside of child care?
9   A   No, I never, but there are things that are
10  like kind of in places with living with them.  So I
11  was the one cleaning the kitchen every time and so
12  wiping the floor, like that kind of thing.
13  Q   Would you clean the kitchen after you
14  cooked for the children?
15  A   Sure.  And sometimes even for them, because
16  they come and cook, and then I was cooking for the
17  children at the time, so we were both of us cooking
18  at the same time, and it just -- the dishes were
19  there, so I ended up cleaning the kitchen for the
20  children, for me, for them.
21  Q   Did you eat dinner with the host family?
22  A   No.
23  Q   What would you do during the day while the
24  children were at school?
25  A   I was stuck at home.  I used to just be at

46

1   home, be in my room reading, watching movie.
2   Q   Did you ever spend time with other au pairs
3   while you lived with the host family?
4   A   Sure.  Like if I have other friends?
5   Q   Yes.
6   A   Sure.
7   Q   And what would you do with them?
8   A   Go out exploring cities.  Like just having
9   fun.  Talking about our host families a lot.
10  Q   Did you work on the weekend?
11  A   Yes, every Sunday.
12  Q   And what were your hours on Sundays?
13  A   5:00 p.m. until 8:00, 9:00.  4:00 -- 4:00
14  p.m. to 9:00.  No more than the five hours that the
15  program supposed to say.  Like, I was getting my day
16  and a half off, but I had always to -- I had to work
17  on Sundays.
18  Q   When did you spend time with the other au
19  pairs?
20  A   Usually on Saturday, my day off.
21  Q   You -- you mentioned that your host family
22  went over a schedule with you on Sundays; is that
23  right?
24  A   Yeah.
25  Q   So they gave you a schedule every week?

47

1   A   Yes.
2   Q   And was the schedule written down?
3   A   We used Google calendar.  So all our phones
4   are synchronized, so I was always able to see my
5   schedule on my phone.
6   Q   Do you still have access to the Google
7   calendar with that schedule, the schedules for every
8   week?
9   A   Yeah.  Sure, every time.  And every time
10  they change something, it will automatically change
11  in my phone, so I was always able to have access to
12  my schedule.
13  Q   Okay.  Can you get a copy of the Google
14  calendar, the schedules that you had every week since
15  you've been an au pair and give that to your
16  attorney, and we'll ask that they give that to us?
17  A   Sure.
18  Q   Okay.
19      MS. LEVY:  Dawn, if you could get that to
20  us right away as soon as you receive it from Sara.
21      MS. SMALLS:  As soon as I receive it, it
22  will be produced.
23      MS. LEVY:  Thank you.
24  Q   (BY MS. LEVY) Did anyone from
25  InterExchange ever give you a weekly schedule when

48

1   you lived with your host family?
2   A   No.
3   Q   Who determined which days or hours you
4   would work?
5   A   Jeffrey -- no -- well -- well, the first
6   year, Silvestro was the one.  And then when Silvestro
7   finally got his job, like, then he was doing it for a
8   while, and then Jeffrey started.  But I believe they
9   always had good communication between them, so I -- I
10  could say both of them.
11  Q   Did --
12  A   But at the -- because it was -- Silvestro
13  was already the one that had a really clear schedule
14  because he was working on an office schedule.  So it
15  was mostly Jeffrey, the one -- because he was like
16  accommodating his hours with my schedule.
17  Q   Did InterExchange ever tell you which hours
18  or days to work?
19  A   No.  No.  They were clear about that you
20  cannot work more than ten hours per day, that you
21  have to take a day and a half off and one weekend per
22  month off.  That was -- that was it.
23  Q   Were you expected to be available or on
24  call for your host family when you were not scheduled
25  to provide child care?

12 (Pages 45 to 48)

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

---

49

1    A  No.
2    Q  Did you have any concerns or complaints
3 about the schedule that the Weisners gave you?
4    A  Every time I had a complaint, I used to
5 talk to them. I talked to them, and we solved it
6 together.
7    Q  Can you tell me about the concerns or
8 complaints that you brought to them?
9    A  Like sometimes my days off were in the
10 week, the weekdays, so it looks, like, unfair to me
11 because all my other friends were off on the
12 weekends, so I was not able or I wouldn't (sic) be
13 without a car because they needed to work, and I was
14 off without a car, so stuck at home.
15    So -- so it happened a while, and then I
16 talked to them, and we solved it. That was like one.
17    What else? Could be like -- sometimes it
18 was miscommunication. So even when -- when I was
19 able to see my schedule on my phone, they forgot
20 or -- or they -- or the hours were more than I was
21 supposed to work. So I used to go to them, and --
22 and we solved it together.
23    Or sometimes I -- when I -- when I got used
24 to the -- like, to the -- to how it worked or
25 sometimes I was like, Hey, look, I have no hours for

---

50

1 this day; it's okay.
2    And -- and they were like, Oh, we forgot to
3 put your hours down. Sorry. But if -- if I didn't
4 ask or if it was like a miscommunication problem
5 sometimes, that kind of stuff.
6    Q  Did your au pair friends have cars that
7 they could use with their families?
8    A  Some of them. Some of them have their
9 own -- their own cars -- their own car and some of
10 them -- some of them, they don't.
11    Q  Did --
12    A  It all depends.
13    Q  Sorry. Go ahead.
14    A  It -- it all depends about their host
15 family. Not all of them give you your own car to
16 drive.
17    Q  Did any of your au pair friends come and
18 pick you up from your host family's home?
19    A  That was always kind of a problem to me
20 because my other friends live in Virginia, and I used
21 to live in Bethesda in Maryland, so it was kind of
22 far for them to come and pick me up. So I -- I
23 usually don't -- they don't pick me up, no.
24    Q  How did you see them on Saturdays? How did
25 you get to each other?

---

51

1    A  Well, Saturdays I used to ask them if they
2 have a car because the weekends, they are -- the
3 family is together, so they don't usually need two
4 cars, so they -- they lend me a car.
5    Or -- or as I -- or I used to -- like,
6 living and working in the same place is really
7 difficult. So usually when the weekends comes, I was
8 looking for a place to -- sleep, and I used to go
9 and sleep over with my friends. So in that case, I
10 used to take the Metro and -- and meet them and just
11 stay with them during the weekends.
12    Q  You mentioned that your host family paid
13 you $195.75, is that correct, per week?
14    A  Yes.
15    Q  Okay.
16    A  Per week, yeah.
17    Q  And how were you paid?
18    A  It was an automatic transfer every Friday.
19    Q  And do you know who actually did the
20 transfer, which person?
21    A  Jeffrey.
22    Q  Did the Weisners ever pay you more than
23 that weekly amount?
24    A  Never.
25    Q  Did InterExchange ever pay your weekly

---

52

1 stipend?
2    A  Excuse me? I don't understand that
3 question.
4    Q  The weekly amount that you received, you
5 said the 195.75 that you received every week, did
6 InterExchange ever pay that weekly amount to you?
7    A  No. I never got any payment from
8 InterExchange.
9    Q  Did your host family ever give you extra
10 money for any reason?
11    A  No. Never.
12    Q  Did they ever give you any gifts?
13    A  Christmas, birthday.
14    Q  Did you have a computer to use in their
15 home?
16    A  Yes. I could say yes.
17    Q  Was it your computer or the host family's
18 computer?
19    A  Like a really old computer that is from --
20 from -- their host family's computer, yeah.
21    Q  Was there WiFi in the home?
22    A  Yeah.
23    Q  Did you have to pay to use the WiFi?
24    A  No.
25    Q  Did you have a cell phone when you lived

---

13 (Pages 49 to 52)

---

53

1  with your host family as an au pair?
2      A   Yes.  They gave it to me.
3      Q   Did the host family have any rules about
4  using the cell phone?
5      A   No.  Never.
6      Q   Were you able to make personal calls with
7  that phone?
8      A   Sure.
9      Q   When you borrowed the host family's car, if
10 you were to go meet your au pair friends on a
11 Saturday or for any other personal reason that you
12 would borrow their car, did you have to pay for gas?
13     A   No.  However, there were several times
14 they -- they tried to -- to talk about it, like or --
15 or they brought out the -- the subject like, Where
16 are you going?  Like you're spending so much gas.
17 Like they were trying, like, to control me sometimes.
18 I feel that it was that way.
19     Q   Did you take any trips with your host
20 family?
21     A   Yes.
22     Q   Where did you go?
23     A   California.  Los Angeles, California;
24 Boston, Massachusetts.  That's it.
25     Q   And when you went to Los Angeles, how did

---

54

1  you get there?
2      A   Plane.  Plane.
3      Q   Did your host family pay for your plane
4  ticket?
5      A   Yes.
6      Q   And when you went to Boston, how did you
7  get there?
8      A   By car.
9      Q   Did you have to contribute any gas money
10 for the car when you drove to Boston?
11     A   No, of course not.
12     Q   When you went on these trips to Los Angeles
13 and Boston, was it -- let's start with the Los
14 Angeles trip.  Was that during the week or the
15 weekend?
16     A   It was during the week.  We spend like
17 about two weeks usually.
18     Q   And were you --
19     A   Two weeks.
20     Q   And -- and were you working while you were
21 on that trip?
22     A   Sure.
23     Q   Was it the same hours that you worked when
24 you were in the host family's home?
25     A   I never got any schedule every time I

---

55

1  traveled with them.
2      Q   When you were on the trip in Los Angeles,
3  were you with the -- the parents also when you were
4  with the children?
5      A   Yes.  The two parents.  Sometimes I stayed
6  at home, and we usually go to the grandparents'
7  house; so we used to stay there.  And sometimes they
8  have like night dates, and I used to stay at home
9  with the kids.  Or I never got a -- like a schedule,
10 so I was with them all the time, with them, with the
11 two parents, with the kids.
12     Q   Were you ever responsible for the children
13 when you were in LA for more than ten hours a day?
14     A   No.
15     Q   Did you ever work more than 45 hours a week
16 when you were in Los Angeles?
17     A   Well, as I told you, I didn't even -- like,
18 I didn't have a real schedule, so I was with them all
19 the time.  Working or not, I was, like, with them all
20 the time.  I couldn't -- I didn't go out.  I didn't
21 go out by myself and explore.  I was with them for
22 the two weeks or so that we -- that we stayed.
23     Q   And what about on your trip to Boston?
24     A   It's the same.  I didn't get a write-down
25 schedule or in my phone as I used to do -- as I used

---

56

1  to get it.  And they just -- like in Boston, they did
2  tell me, like, Okay, like -- but it was not like in
3  advance, like, something that I was -- for example,
4  one day they told me, like, Okay, you can go out and
5  explore by yourself and be here by this time.  And --
6  but it was not like an actual schedule, like, to
7  follow.
8      Q   Did you feel like you were part of the
9  Weisner family when you lived with them as an au
10 pair?
11     A   Yes.
12     Q   Did you take any trips on your own?
13     A   Yes.
14     Q   Where did you go?
15     A   I went to New York a couple of times.  I
16 went to Richmond, Virginia.  I didn't go -- no, that
17 was it.  Oh, Miami.  I went to Miami.  Niagara Falls.
18 That's it.
19     Q   Did your host family pay for anything on
20 these trips that you took on your own?
21     A   No.
22     Q   Were there any other benefits that you
23 think you received living with the host family?
24     A   I always felt really comfortable with them.
25 They -- like, I feel they're like my two dads,

---

14 (Pages 53 to 56)

57

1  actually.  They're really -- they're really good with
2  me.  I always feel part of the family.
3      For example, they didn't -- they never gave
4  me, like, money for me to spend on these trips, but
5  on two occasions of these trips, I -- it was road
6  trips that I did, once with my sister -- with my
7  sister to Florida, and they lend me their car.
8      And another one with my mom (sic) and her
9  host and -- in New York and they lend me their car
10  too.  I believe those are great benefits I -- I got
11  from them.
12      What else it could be?  Yeah.
13      Q   Did your host family or InterExchange
14  provide you with a log to write in of any type --
15      A   Yeah, InterExchange did.
16      Q   And what did you use it for, or did you use
17  it?
18      A   No, I never used it because I got to -- I
19  agree with my host family that using our phones was
20  better because that way I could carry my schedule
21  everywhere I go, and I was always able to look at it.
22      And -- and every time they made a change, I
23  could, like -- I could see it right away in my phone.
24  So we decided that would be the best way to do it.
25      Q   Who told you what duties to perform for

58

1  your host family?
2      A   Both of them.  Both of my host dads did.
3  Like, Jeffrey was the one that -- the one that, like,
4  show me around and told me at first what to do.  But
5  I receive feedback and information and -- from both
6  of them.  They were always there to -- to let me know
7  what to do.
8      Q   Did InterExchange ever tell you what duties
9  to perform for your host family?
10      A   InterExchange was clear about that you --
11  as an au pair, I should only concern about duties
12  that are related to the kids, nothing else -- like
13  nothing else, like no cleaning or -- or that stuff.
14      Q   And this information that InterExchange
15  told you about what you just told us, was that
16  specific to your host family, or was that general for
17  all au pairs?
18      A   It was general for all au pairs.  However,
19  as I told you, like you're living with them and
20  there's some implicit things that you should do when
21  you are with someone and you kind of feel that you
22  should -- you should do them.
23      Like, for example, like the kitchen, as I
24  told you, I was the one cleaning the kitchen even
25  when they didn't tell me to do it.  But, like, it was

59

1  like I was cooking; they were cooking with me; I was
2  cooking for the children; and so suddenly I -- all
3  these dishes were in the sink, and it felt, like,
4  wrong to me to separate their dishes from mine and
5  for the children and just wash my part and leave it
6  there for them.  It felt wrong; so I ended up --
7  always I ended up cleaning all the kitchen, for
8  example.
9      Q   If you only wanted to wash the children's
10  dishes or pots and pans that you used to cook their
11  dinner, could you have done that?
12      A   Well, I could, but as I told you, it
13  doesn't feel wrong -- it doesn't feel good to me.  It
14  feels wrong.  It feels wrong to me to just separate
15  them, and it's not like how I should -- I don't feel
16  good to myself doing that.  Like, I -- at the same
17  time, what they were saying if I did that.  Like it's
18  kind of rude.
19      Q   Did anyone from InterExchange ever
20  supervise you while you were taking care of the host
21  family's children?
22      A   No.
23      Q   Did you have any other duties with your
24  host family that we haven't already discussed?
25      A   No.

60

1      Q   Did your host family ever ask you to
2  perform any duties that concerned you in any way?
3      A   No.
4      Q   You mentioned taking some English classes.
5  When did you take those classes?
6      A   The first month.  The first month I was
7  here.  The first month after I came.  It was only
8  one-month classes.  That was it.
9      Q   Do you know whether you took six credits?
10      A   Yes.
11      Q   What was the name of the university or the
12  college that you went to?
13      A   Montgomery College in Maryland.
14      Q   Did you take any other classes while you
15  were an au pair?
16      A   No.
17      Q   Was there an InterExchange local
18  coordinator in Maryland that you met while you were
19  an au pair?
20      A   I only met her once, maybe two times, in my
21  au pair program --
22      Q   Do you --
23      A   -- during the two years.
24      Q   Do you remember who it was?
25      A   Rhonda.  Rhonda is her name.  I don't

15 (Pages 57 to 60)

---

61

1    remember her last name.
2        Q   Did you meet with Rhonda in person when you
3    lived with the host family as an au pair?
4        A   Yes.  The first week -- during the first
5    week I came, she came to meet me and my host family.
6        Q   Where did she meet you and your host
7    family?
8        A   She met us at home.  We were at home when
9    she came.
10       Q   And what happened during that meeting with
11   Rhonda in your host family's home?
12       A   I remember she introduced herself.  She
13   told me she was my local coordinator.  That -- she
14   was, like, checking like I arrived all right or I was
15   with my host family and that we match each other.
16   Like, I don't kind of remember what else she said.
17   Like, yeah, it was like, Hi.  My name is Rhonda, and
18   I'm your local coordinator.  That was it.
19       Q   Did Rhonda give you duties to perform for
20   your host family?
21       A   No.
22       Q   Did Rhonda ever supervise you while you
23   were taking care of the host family's children?
24       A   No.
25       Q   Did Rhonda ever pay you?

---

62

1        A   No.
2        Q   Other than that first meeting in the host
3    family's home with Rhonda, what other meetings did
4    you have with her?
5        A   I met her maybe two times after that, maybe
6    three.  Two or three times.
7        Q   And were those at cluster meetings?
8        A   Yes.
9        Q   Other than the local coordinator, did you
10   meet with anyone else from InterExchange when you
11   were an au pair with the host family?
12       A   In the training, but after -- like besides
13   that, no.
14       Q   We've asked you, through your attorneys, to
15   provide any documents relating to amounts that were
16   paid to you and hours that you worked.  Have you
17   searched for any of those types of documents?
18       A   No.
19       Q   Do you have any documents that were given
20   to you by the InterExchange local coordinator,
21   Rhonda, related to your participation in the au pair
22   program?
23       A   No, not that I remember.
24       Q   Do you have any documents such as e-mails,
25   or social media related to your performance or duties

---

63

1    or compensation as an au pair?
2        A   No.  No, I don't.
3        Q   Do you believe your host family owes you
4    money?
5        A   Well, no, I don't believe that, because I
6    believe they were doing what the program told them to
7    do.  They -- they don't have -- no, I don't believe
8    so.
9        Q   Do you believe InterExchange owes you
10   money?
11       A   Yes.
12       Q   And why is that?
13       A   Well, as I told you, when I came here and I
14   realized the nannies and babysitters get paid from 15
15   to $20 the hour, and I've been paid $3, it sounds
16   really unfair to me.
17       Q   Have you calculated how much money you
18   believe you are owed?
19       A   Every time I feel really frustrated, I do
20   it.  That's one of my math I always do.  Every time I
21   feel that I owe something to my host family or every
22   time I feel I'm doing something wrong or that stuff,
23   I used to do the math, yes.
24       Q   And can you explain how you calculated that
25   amount?

---

64

1        A   Sure.  So I take my phone, and I -- my
2    calculator, and I saw 1 point -- 195.75 divided, 45
3    hours a week, is 4.35.  Right?  That's if I made
4    195 -- wait.  So how I'm getting 3.35 hours? -- per
5    hour, right?  But if I multiply this for the -- for
6    the 45 hours I'm working a week, it's nothing.  There
7    is, like, money missing.
8            So when I -- when they told me this program
9    was covering all my expenses, I thought it was right
10   until I made the calculations, the math, and I
11   realized they were actually taking money out of me
12   when they are already paying $3 the hour; they are
13   taking money from my salary to room and boarding,
14   which is really unfair, I believe.
15       Q   Can you explain what you mean by for the
16   room and board they're taking money from your salary?
17       A   Sure.  They're paying me $3 the hour -- but
18   actually it's not even $3.  Wait.
19           They're supposed to be paying me $4.35 per
20   hour, right, if I divide the 1 -- 195.75 divided the
21   45 hours a week, it's supposedly says that I'm
22   getting paid 4 hours the hour -- $4 the hour.  Right?
23           THE DEPONENT:  I -- I'm really bad with
24   math, Dawn.  I told you.  I'm really bad with math.
25       Q   (BY MS. LEVY)  Okay.  I'm going to -- I'm

16 (Pages 61 to 64)

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

---

65

1    just going to repeat that last question and --
2       A   Okay.
3       Q   -- maybe that might help.
4       A   Yeah.
5       Q   When -- when you said they're taking money
6    from your -- from your salary for your room and
7    board, what do you mean by that?
8       A   Yes.  I remember when I read the -- the
9    contract for the first time, it says that they take
10   out a 40 percent -- 40 percent of -- of -- of your
11   payment.
12          And I -- as I told you, I remember I talked
13   with the representative about that because the math
14   was not okay.  Sorry, I don't remember the math
15   exactly; I'm really bad with math.  But I remember I
16   look at the contract and the numbers they were giving
17   to me; I -- like, I made the math, and I talked to
18   him because I believed it was fake.
19          And they told me that it's because they
20   take out 40 percent or so -- sorry if I'm wrong -- to
21   room and boarding.
22      Q   Have you calculated any amount -- an actual
23   amount that you believe you are owed for your time as
24   an au pair?
25      A   Yeah.  Let's say I never worked the 45

---

66

1    hours a week.  Let's say I work between 30 to 35
2    hours the week.  So if I multiply that 35 hours, plus
3    what I believe they should pay me, that is 15 -- $15
4    the hour -- as I told you, usually nannies they pay
5    for 15 to 20 -- it should be $525.  I'm -- I'm
6    getting paid 200.
7       Q   Did you make any complaints to your host
8    family other than what we've already discussed about
9    your experience as an au pair?
10      A   As I -- my relationship with them has
11   always been really good, so we talk about this
12   subject sometimes, and I told them it's kind of
13   unfair.
14          But then, again, they always told me,
15   Sorry, but we cannot pay you more than that.  That's
16   what the agency said we should pay, and it would be
17   illegal if we -- if we go higher than that.
18      Q   Other than your discussions about the
19   weekly payment amount with your host family, did you
20   have any other complaints that you made to them about
21   your experience as an au pair?
22      A   I did on the schedule.  The schedule is --
23   is difficult, yeah.  And because, like, he -- I --
24   like, I don't -- my hours are not from 7:00 until
25   3:00.

---

67

1             They usually come in the middle, so I'm,
2    like, Oh, I'm working, but it's only two hours, and
3    then I will be off for five, and then I will have to
4    work for another six hours.  So can I actually do
5    something with my spare time?  No, because I live far
6    away.  If I decided to go somewhere, then I have to
7    go home by a certain time.  What if I get caught in
8    traffic?  What -- so I have to stay at home, and for
9    me, that's unfair.
10      Q   Did you make any complaints to
11   InterExchange about your experience as an au pair?
12      A   I personally didn't because it kind of
13   effect -- like, the local coordinators don't do too
14   much for us, so I -- I think it's -- it was
15   worthless, so I never, no.
16      Q   Did you know how to get ahold of your local
17   coordinator if you had a problem that you needed to
18   report to her?
19      A   I had her phone number, yes.
20      Q   Did you make any complaints to a government
21   agency about your experience as an au pair?
22      A   No.
23          MS. LEVY:  Let's take a short break.  Let's
24   take another ten-minute break.  I'm just going to
25   look through my notes.  I think that may be all the

---

68

1    questions that I have for you today, but I just want
2    to check.  So let's take about a ten-minute break.
3    Let's come back at 1:10 your time, and --
4          THE DEPONENT:  Okay.
5          MS. LEVY:  -- I -- so we'll do ten minutes
6    off the record.  Okay?
7          THE DEPONENT:  Thanks.
8          MS. LEVY:  Off the record.
9          (Recess taken, 11:01 a.m. to 11:10 a.m.)
10         MS. LEVY:  Okay.  I just have a few more
11   questions for you just to follow up on the things
12   we've already talked about.
13         THE DEPONENT:  Okay.
14      Q   (BY MS. LEVY)  You mentioned an e-mail that
15   you received about the lawsuit; you think you got it
16   about September of 2017.  In that e-mail, was it
17   information about the lawsuit?
18      A   Yes.
19      Q   And that first document that we looked at
20   on the screen, the form that you used to opt into the
21   lawsuit, how did you -- how did you come to know
22   about that about that, about opting into the lawsuit?
23      A   As I told you, the e-mail I got, and it
24   presented some information about what was happening,
25   and it was giving me a choice to join, saying that if

---

17 (Pages 65 to 68)

**SARA MEJIA ALVAREZ - 3/30/2018**
**Johana Paola Beltran, et al v. Interexchange, Inc., et al.**

---

69

1  I wanted to join the lawsuit, I needed to read the
2  documents and sign.
3      Q   Was that form attached to the e-mail that
4  you received or did you have to go to a website to
5  see the form?  How did that work?
6      A   I don't really remember, but I do believe
7  there was a link, because I don't remember looking
8  for any external web page to get to the -- to the
9  document, so . . .
10     Q   Before you came to the United States as an
11  au pair, did you have any communications with
12  InterExchange representatives who were in the United
13  States?
14     A   No.
15     Q   And I just have a few questions about the
16  schedule that we were talking about.
17     A   Sure.
18     Q   On the days that the girls went to school,
19  what time did you start work in the morning?
20     A   7:00.
21     Q   And on the days that they did not go to
22  school, what time did you start work in the morning?
23     A   7:00.
24     Q   And what time did you work until in the
25  evenings during the week?

---

71

1      MS. LEVY:  Okay.  How long do you need?
2      MS. SMALLS:  Five minutes.
3      MS. LEVY:  Okay.  Let's go off the record.
4      MS. SMALLS:  Okay.
5      (Recess taken, 11:15 a.m. to 11:20 a.m.)
6          EXAMINATION
7  BY MS. SMALLS:
8      Q   Sara, I want to ask you -- you talked a
9  little bit about this in your testimony -- but what
10  your expectations were coming into the program based
11  on what you were told.
12     A   It was mostly the part learning the
13  language.  When I came to the United States, I had a
14  really strong English already, and I think that
15  helped me a lot in comparison to another girl that
16  have -- yeah, they don't have the same advantage that
17  I have, which I believe the program didn't complete
18  or exceed my expectation because I only study for one
19  month, so it was kind of sad to realize that.
20  So . . .
21     Q   So what was your expectation about the
22  study component before you joined the program?
23     A   I believed that it was going to be longer
24  than that, that it was going to be a more complete
25  education.  Like, it was going to be a more complete

---

70



16     MS. LEVY:  I think those are all the
17  questions that I have for you.  I really appreciate
18  your time.  I --
19     THE DEPONENT:  Sure.
20     MS. LEVY:  Your attorney may have some
21  questions for you too.
22     THE DEPONENT:  Okay.
23     MS. SMALLS:  I do, but I'd like to take a
24  short break and just speak with her before I start my
25  questions.  So if we can go off the record.

---

72

1  course or not only a month.
2      I was surprised when I realize that $500
3  the family give you as a bonus, it only cover one
4  month of the studying.  Like, me, in my own home
5  country, Colombia, like, $500 is a lot of money, and
6  to come here and realize it was only one month, it
7  was kind of surprising.
8      So I expected something more complete,
9  something more -- not only one month.  Like, you
10  don't -- you don't learn how to speak a language in
11  one month.
12     Q   And what was your expectation about the --
13  the work versus the cultural component of the
14  program?
15     A   Well, that was shocking too, because then I
16  realized that I was actually, like, working.  That
17  this -- this was the job.  No -- no cultural
18  exchange, as they -- as they said it or told me when
19  they were talking to me about the program.
20     And -- but the cultural exchange, well, you
21  get some because you are actually living with an
22  American family.  So you get to know about the
23  cultural things going around, but it's basically a
24  work.  This is a job.
25     Q   Did you understand that it was a job when

---

18 (Pages 69 to 72)

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

---

73

```
1   you signed up for the program?
2       A   They never -- maybe that's kind of the
3   idea.  They will never say "this is a job or work."
4   They will never use that kind of word to -- to tell
5   you what is the program about.
6           They -- they mostly tell you like you're
7   going to have the cultural exchange.  They focus on
8   these kind of word, cultural exchange and studying
9   and learning the language and being able to travel
10  around.  They -- they don't talk as much about that
11  you are working.
12      Q   Do you think how they presented the program
13  to you was accurate?
14      A   Not at all.
15      Q   And why is that?
16      A   Because as I told you, they always sell --
17  sell to me the program as you're going to have a
18  cultural exchange, being able to travel, and you're
19  going to feel part of the family.  That in my case, I
20  kind of did.  At the end, then you realize, like it's
21  not true, like they're not my real family.
22          And they tell you you're going to get the
23  $500 to study and you're going to learn English and
24  then -- and you realize -- when you are here, then
25  you realize that it was not how they -- how they
```

---

74

```
1   express or how they say it.
2       Q   Counsel for InterExchange asked you a lot
3   of questions about your interactions with
4   InterExchange.  And I wanted to ask you about what
5   was your understanding of the role that InterExchange
6   would play during your au pair experience.
7       A   Well -- well, I believe that the -- they --
8   it's a big role.  Like, without InterExchange, I
9   wouldn't have been able to contact with this family,
10  to make a match with them, to come and get the
11  training.  I pay money to them to -- I pay money to
12  InterExchange to be in this program.
13          Like, they -- like, I was paying for a
14  service.  They're supposed to -- they were the ones
15  that were caring for me when I was here.  I have a
16  local coordinator, like, she was caring for me.
17          So without InterExchange, I wouldn't -- I
18  wouldn't be here without them.  That's what I
19  believe.
20      Q   Do you think InterExchange is responsible
21  for the amount that you were paid?
22      A   Of course.
23      Q   The stipend?
24      A   I do believe it because they -- that's what
25  they told the host family to pay me.  That's why my
```

---

75

```
1   host family many times told me, We cannot pay you
2   more because that will be going against the rules,
3   going against the program.  They said going against
4   the program.
5           Who is the one that said what the program
6   is about?  Who was making the rules about how the
7   program works if it's not InterExchange.
8       Q   Do you believe that InterExchange sets the
9   terms for the program?
10      A   Sure, from the beginning until the end.
11  They were even -- they -- I -- I will -- I wouldn't
12  like to say threaten, but how can I say it?  They --
13  in one of the rules, it was like if you, as an au
14  pair, don't complete, like, an amount -- like the
15  several tasks or things to do while you're being an
16  au pair, like, you don't get your -- your ticket back
17  home.  That's, for example, one of the things.
18          So it makes me think that they're being
19  there from the beginning until the end.  So, yeah,
20  without InterExchange, like, I don't know -- I
21  wouldn't -- I wouldn't be in the program.
22          MS. SMALLS:  That's all I have.
23          MS. LEVY:  I have just a few follow-up
24  questions for you.
25  //
```

---

76

```
1           EXAMINATION
2   BY MS. SMALLS:
3       Q   When you signed up to be an au pair in the
4   InterExchange program, you agreed to all of their
5   terms, correct?
6       A   Yeah.
7       Q   How did you find the English course that
8   you took?
9       A   My host dad.  My host dad helped me out
10  to -- and my local coordinator, she gave me a list.
11  I believe this was -- college was in the list she
12  gave me, too, when she -- the first time she came
13  home to meet me and my host parents, she gave me the
14  list of the courses I could take.
15      Q   Did you look for any courses that were
16  longer than one month?
17      A   No.  They were all the same length, and
18  some of them, they were like only on the weekends and
19  they include, like, travel somewhere or -- no.  No.
20  All of them were, like, the same.  At least the ones
21  that I found were all the same.  The ones that my
22  local coordinator gave me, they were all the same.
23          I kind of believe I picked one of the best.
24  That was my idea.  I really wanted to learn so I paid
25  a lot of attention to that part.  I wanted a good
```

---

19 (Pages 73 to 76)

SARA MEJIA ALVAREZ - 3/30/2018
Johana Paola Beltran, et al v. Interexchange, Inc., et al.

77

1  course; I wanted a good education.  That's the one I
2  got.
3      Q   Your attorney just asked you a few
4  questions about how the program was presented to you,
5  and I just wanted to clarify what you meant when you
6  said they presented the program to you.  By "they,"
7  do you mean Global Connection that presented the
8  program to you?
9      A   But at the same time, like as I told you,
10  for me, Global Connection was InterExchange.  It
11  was -- always was, because all the forms I got, all
12  the forms -- what I sign, all the forms I sign, it
13  was InterExchange logo; it was InterExchange.
14          It was never Global Connection, Global
15  Connection forms.  It was always InterExchange.  What
16  always made me believe that they were InterExchange,
17  they were talking on behalf of InterExchange.  There
18  was never a difference to me.  I was -- they were --
19  they were only like a way in-between for me to
20  communicate with InterExchange.
21      Q   Did you ever actually speak with someone
22  from InterExchange before you came to the United
23  States?
24      A   On that part, I -- I -- I maybe kind of
25  remember one contact, maybe one call, but it was --

78

1  it was really -- it was so -- no.  It was really
2  superficial communication.  But I do -- I kind of
3  remember one -- maybe one call, maybe -- how -- was
4  the name of the guy -- maybe.
5          But I don't remember if he was in Bogota,
6  like the -- my -- the capital of my country, or if he
7  was in the United States.  I don't kind of remember
8  that part because most of my communication, it was
9  with -- with the guy that was like in the middle of
10  of -- of the two of us, the middle of the
11  InterExchange and me.
12      Q   So the -- the guy that was in the middle,
13  this was the guy that was at Global Connection?
14      A   Yeah.
15      Q   And this guy at Global Connection or
16  someone else at the Global Connection office, is that
17  who actually gave you the information about
18  InterExchange and told you about the au pair program?
19      A   Yes and no.  Yes, but at the same time, I
20  went to InterExchange web page, and I -- that was a
21  good insight for me too because I got a lot of
22  information from your web page.
23          I first try with Cultural Care, I remember,
24  and then I went to InterExchange, and I looked for
25  the information on the web page.  I -- that 's how I

79

1  found this -- this Global Connection, because I
2  realized that InterExchange, they have offices in --
3  in my city in Columbia.
4          So I found, like, a -- and I even believe
5  on the web page I found the information about Global
6  Connection.  That's how I -- I -- I talked to them.
7  Otherwise, there was no way for me to find their
8  contacts.  Like, I believe InterExchange gave me -- I
9  found this information because of Global Connection.
10      Q   When you were looking into InterExchange on
11  the web, did you also look into other au pair
12  agencies?
13      A   Cultural Care.
14      Q   And why did you decide to look into
15  InterExchange further rather than Cultural Care?
16      A   I don't kind of -- okay.  I believe that is
17  because I called them first, and then they told me
18  that I needed to wait, like, for one year to -- to
19  start my process, but one year was too long for me.
20          So I decided I wasn't going to work with
21  them, and I started to look for other options, and I
22  find out about InterExchange.  Then about my way to
23  communicate with InterExchange, that it was through
24  Global Connection, and that's -- that's how I did it.
25          MS. LEVY:  Okay.  Thank you.  I think those

80

1  are all the questions that I have.
2          Dawn, do you have any more follow-up?
3          MS. SMALLS:  I don't.
4          MS. LEVY:  Sara, thank you very much for
5  your time today.  We really appreciate it.
6          THE DEPONENT:  Sure.
7          MS. LEVY:  Thank you very much.  If you
8  could get the -- we had talked about the Google
9  calendar -- to your attorney.
10          THE DEPONENT:  Okay.  Can it be a screen
11  shot?
12          MS. LEVY:  Yes.
13          THE DEPONENT:  I don't know another way
14  to -- to do it.  Like, I could take a screen shot and
15  send it to Dawn.
16          MS. LEVY:  Yes.  As long as that shows your
17  schedule, that would be great.  Thank you.
18          THE DEPONENT:  Okay.  I'll do that.
19          MS. LEVY:  Okay.
20          WHEREUPON, the within proceedings were
21  concluded at the approximate hour of 11:35 a.m. on
22  the 30th day of March, 2018.
23                *   *   *   *   *
24
25

20 (Pages 77 to 80)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**SARA MEJIA ALVAREZ - 3/30/2018**
**Johana Paola Beltran, et al v. Interexchange, Inc., et al.**

81

        I, SARA MEJIA ALVAREZ, do hereby certify
that I have read the above and foregoing deposition
and that the same is a true and accurate
transcription of my testimony, except for attached
amendments, if any.
        Amendments attached   (  ) Yes    (  ) No


        _____
        SARA MEJIA ALVAREZ


        The signature above of SARA MEJIA ALVAREZ
was subscribed and sworn to or affirmed before me in
the county of _____, state of
_____, this _____ day of
_____, 2018.


        _____
        Notary Public
        My Commission expires:




Johana Paola Beltran, et al., March 30, 2018 (std)

---

82

                REPORTER'S CERTIFICATE
STATE OF COLORADO          )
                           ) ss.
COUNTY OF ADAMS            )
        I, SHAUNA T. DIETEL, Registered
Professional Reporter, and Notary Public ID
20014031444, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said SARA MEJIA ALVAREZ, was duly sworn or
affirmed by me to testify to the truth in relation to
the matters in controversy between the parties
hereto; that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

        I further certify that I am not
employed by, related to, nor of counsel for any of
the parties herein, nor otherwise interested in the
outcome of this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 13th day of April, 2018.

        My commission expires August 15, 2021.


_XXX_  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case No. 1:14-cv-03074-CMA-KMT   Document 1051-1   filed 06/06/18   USDC Colorado   pg 198
Case 1:14-cv-03074-CMA-KMT   Document 995-1   Filed 04/06/18   USDC Colorado   Page 198
of 264
SARA MEJIA ALVAREZ

82

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         )  ss.
COUNTY OF ADAMS          )

       I, SHAUNA T. DIETEL, Registered
Professional Reporter, and Notary Public ID
20014031444, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said SARA MEJIA ALVAREZ, was duly sworn or
affirmed by me to testify to the truth in relation to
the matters in controversy between the parties
hereto; that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

       I further certify that I am not
employed by, related to, nor of counsel for any of
the parties herein, nor otherwise interested in the
outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 13th day of April, 2018.

       My commission expires August 15, 2021.


_XXX_   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing is not required.



Shauna T. Dietel
Registered Professional Reporter

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 14-cv-03074-CMA-KMT
3    _____

4
   DEPOSITION OF:  TIFFANY ANNE MICHELE HERZOG
5                  March 31, 2018
     _____
6
   JOHANA PAOLA BELTRAN, et al.,
7
   Plaintiffs,
8
   v.
9
   INTEREXCHANGE, INC., et al.,
10
   Defendants.
11   _____

12          PURSUANT TO NOTICE, the deposition of
   TIFFANY ANNE MICHELE HERZOG, via Zoom Conference,
13 was taken on behalf of the Defendant, InterExchange,
   Inc., at 1900 Grant Street, Suite 1025, Denver,
14 Colorado 80203, on March 31, 2018 at 10:12 a.m.,
   before Tracy R. Stonehocker, Certified Realtime
15 Reporter, Registered Professional Reporter and Notary
   Public within Colorado.
16

17

18

19

20

21

22   **H+G**

23

24   Hunter + Geist, Inc.

25
303.832.5966        1900 Grant Street, Suite 1025      ■ www.huntergeist.com
800.525.8490        Denver, CO 80203                    ■ scheduling@huntergeist.com

                    Your Partner in Making the Record

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____

DEPOSITION OF:  TIFFANY ANNE MICHELE HERZOG
March 31, 2018
_____

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____
        PURSUANT TO NOTICE, the deposition of
TIFFANY ANNE MICHELE HERZOG, via Zoom Conference,
was taken on behalf of the Defendant, InterExchange,
Inc., at 1900 Grant Street, Suite 1025, Denver,
Colorado 80203, on March 31, 2018 at 10:12 a.m.,
before Tracy R. Stonehocker, Certified Realtime
Reporter, Registered Professional Reporter and Notary
Public within Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiffs:
    JUAN VALDIVIESO, ESQ.
    Boies Schiller Flexner L.L.P.
    1999 Harrison Street, Suite 900
    Oakland, California  94612
    (Via Zoom Conference)

For the Defendant, InterExchange, Inc.:

    JOSEPH H. HUNT, ESQ.
    Sherman & Howard, L.L.C.
    633 17th Street, Suite 3000
    Denver, Colorado  80202

---

**3**

I N D E X
EXAMINATION OF TIFFANY ANNE MICHELE HERZOG:      PAGE
March 31, 2018
By Mr. Hunt                                     5, 75
By Mr. Valdivieso                                  71
                                               INITIAL
DEPOSITION EXHIBITS:                         REFERENCE

Exhibit 1   Consent to Join, Herzog                 8

---

**4**

1        WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4        *      *      *      *      *
5        MR. HUNT:  Ms. Herzog, my name is Joe
6   Hunt.  I'm an attorney with InterExchange.  I'm going
7   to be asking you some questions today.  There is a
8   court reporter here who is writing down everything
9   that we say.  And if I could please have you state
10  your name for the record.
11       THE DEPONENT:  Tiffany Herzog.
12       MR. HUNT:  And may I have opposing
13  counsel enter his appearance?
14       MR. VALDIVIESO:  Juan Valdivieso from
15  Boies Schiller Flexner on behalf of Ms. Herzog and
16  plaintiffs.
17       MR. HUNT:  Okay.  And because we're
18  doing this remotely, Counsel, I -- I'd like to
19  stipulate on the record that there won't be any
20  objection or problem going forward with swearing the
21  witness in remotely and recording -- taking the
22  deposition -- excuse me, transcribing the deposition
23  in this manner either?
24       MR. VALDIVIESO:  We so stipulate.
25       MR. HUNT:  Ms. Herzog, I'm going to ask

---

1 (Pages 1 to 4)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

**5**

1 the court reporter to give you the -- give you an
2 oath.
3           *    *    *    *
4      TIFFANY ANNE MICHELE HERZOG,
5 having been first duly sworn to state the whole truth,
6 testified as follows:
7      (Deponent's reply to oath: Yes.)
8          EXAMINATION
9 BY MR. HUNT:
10     **Q. Your attorney advised us that you do not**
11 **require an interpreter; is that correct?**
12     A. Yes.
13     **Q. So you're comfortable proceeding in**
14 **English?**
15     A. Yes.
16     **Q. If there's a question that you don't**
17 **understand, please let me know and I'll rephrase it.**
18     A. Okay.
19     **Q. Have you ever taken a deposition before?**
20     A. No.
21     **Q. Have you ever testified under oath**
22 **before?**
23     A. No.
24     **Q. Okay. Do you understand what it means**
25 **to testify under oath?**

---

**6**

1     A. Yes.
2     **Q. And that you have to tell the truth,**
3 **correct?**
4     A. Yes.
5     **Q. Okay. It'll make the court reporter's**
6 **job a lot easier if we're not talking over each other,**
7 **so if you can try to let me finish my question before**
8 **you start your answer, I'll let you finish your answer**
9 **before I start the next question. Okay?**
10     A. Okay.
11     **Q. All right. And your attorney may have**
12 **an objection to one of these questions. If he says**
13 **objection, just let us talk and then we'll ask you to**
14 **answer the next -- answer the question. Okay?**
15     A. Okay.
16     **Q. And if you need to take a break, just**
17 **let us know. The only thing that I ask is if I've --**
18 **if there's a question pending that we finish the**
19 **question before we take the break. Okay?**
20     A. Okay.
21     **Q. We're going to be talking about your**
22 **experience as an au pair and I would ask that if you**
23 **are talking about the children of the host family, try**
24 **not to use their names, and instead just identify them**
25 **as son or daughter or their age or some other way.**

---

**7**

1     **Okay?**
2     A. Okay.
3     **Q. Thank you. And before we start, is**
4 **there anyone present with you?**
5     A. No.
6     **Q. Okay.**
7     A. I mean, not in the room.
8     **Q. Not in the room. Okay. Did you review**
9 **any documents to prepare for this deposition?**
10     A. No.
11     **Q. Have you looked for any documents that**
12 **are -- that are related to this litigation?**
13     A. No.
14     **Q. How did you first learn about the**
15 **lawsuit against InterExchange?**
16     A. An au pair friend told me and she said I
17 should sign up, so I did.
18     **Q. And what is your understanding about --**
19 **excuse me, what is your understanding of what this**
20 **lawsuit is about?**
21     A. So it's about the minimum wage and we're
22 not paid minimum wage or any overtime hours if we
23 worked over 40 hours a week, so since I agreed, I
24 signed it.
25     **Q. Are you referring to a consent to join**

---

**8**

1 the lawsuit?
2     A. Yes.
3     **Q. Okay.**
4     MR. HUNT: Actually, if we could go off
5 the record. Is that okay, Juan?
6     MR. VALDIVIESO: Yes.
7     (Off-the-record discussion.)
8     **Q. (BY MR. HUNT) Ms. Herzog, just to**
9 **confirm that we're all looking at the same document**
10 **since we're doing this remotely, can you tell us what**
11 **it says at the top of the page?**
12     A. "Consent to join."
13     **Q. Okay. And is that -- is that your**
14 **signature in the middle of the page?**
15     A. Yes.
16     **Q. And you recognize this document?**
17     A. Yes.
18     **Q. Did you understand when you signed the**
19 **document that you'd be joining a lawsuit against**
20 **InterExchange?**
21     A. Yes.
22     **Q. Okay. We'll mark the consent to join as**
23 **Exhibit 1.**
24     (Deposition Exhibit 1 was marked.)
25     **Q. You lived with the -- is it Vitale**

---

2 (Pages 5 to 8)

9

1    family?
2        A. Yes.
3        Q. And where was that?
4        A. Bronxville.
5        Q. Bronxville, New York?
6        A. Yes.
7        Q. So you said that your understanding of
8    this lawsuit is that you weren't paid the minimum wage
9    or overtime; is that correct?
10       A. Yes.
11       Q. Who failed to pay you minimum wage?
12       A. Sorry, who what?
13       Q. Who failed to pay you minimum wage?
14       A. InterExchange.
15       Q. Okay. And why do you believe that
16   InterExchange failed to pay you minimum wage?
17       A. Because they were my employers.
18       Q. Okay. And what is your understanding of
19   the word "employer"?
20       A. They made the contract and I signed it.
21       Q. And while you were an au pair, do you
22   believe that InterExchange was your employer?
23       A. Yes.
24       Q. Okay. When you first came to the United
25   States, what do you believe that you were going to be

10

1    paid?
2        A. What was written in the contract.
3        Q. And what contract is that?
4        A. The one I signed.
5        Q. Is that -- does au pair agreement sound
6    familiar?
7        A. I don't remember.
8        Q. Okay. Do you remember how much the
9    contract said that you would be paid?
10       A. 195.
11       Q. Does 195.75 sound right?
12       A. Probably, yes.
13       Q. And did the contract say that you'd be
14   paid at least 195.75?
15       A. I don't know if it said that, but I
16   think that this is what I should have been paid
17   according to the contract.
18       Q. You believe you should have been paid
19   195.75; is that correct?
20       MR. VALDIVIESO: Objection,
21   mischaracterizes the witness' statement. She added
22   something at the end.
23       Q. (BY MR. HUNT) I'm sorry, I may have
24   failed to hear what you said.
25       MR. VALDIVIESO: Could the court

11

1    reporter please repeat the answer.
2        (The answer was read back as follows:
3    "I don't know if it said that, but I think that this
4    is what I should have been paid according to the
5    contract.")
6        Q. (BY MR. HUNT) Okay.
7        A. Yes.
8        Q. Is that correct? Is that -- Ms. Herzog?
9        A. Yeah, I didn't know the law and the
10   contract says that's what I should be paid and since I
11   didn't know it was against the law, I said, okay, yes,
12   I signed.
13       Q. Okay. And when did you -- if you
14   believe that it was against the law, as you say, when
15   did you learn that?
16       A. Last year I saw the petition online and
17   looked and I saw the minimum wage was eight or nine
18   bucks per hour.
19       Q. Okay. And when was that?
20       A. Last year.
21       Q. Do you remember when last year?
22       A. When I looked -- after I put the
23   lawsuit.
24       Q. I mean, do you remember what month
25   approximately? Is it when you signed the consent

12

1    form?
2        A. Yes, before.
3        Q. Before. So before learning of this
4    lawsuit, did you have any concerns about what you were
5    paid as an au pair?
6        A. I mean, I thought that was not a lot,
7    but I agreed, so I didn't do anything.
8        Q. Where were you living when you signed
9    the consent to join form that we looked at earlier?
10       A. In Los Angeles.
11       Q. Are you still living in Los Angeles?
12       A. Yes.
13       Q. And how long have you lived there?
14       A. Three years.
15       Q. Okay.
16       A. About.
17       Q. And how long did you live with the
18   Vitale family?
19       A. A year.
20       Q. And you didn't extend with them; is that
21   right?
22       A. No.
23       Q. And --
24       A. Yes. No.
25       Q. And you only had one host family?

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

13

1  A.  Yes.
2  **Q.  Okay.  Do you still communicate with**
3  **that family?**
4  A.  We just on the internet sometimes.
5  **Q.  With the children?**
6  A.  Yes.
7  **Q.  And your -- where are you originally**
8  **from?**
9  A.  France.
10  **Q.  Did you discuss the lawsuit with anyone**
11  **from the Vitale family?**
12  A.  No.
13  **Q.  And then other than your lawyer, did you**
14  **discuss the lawsuit with anyone else?**
15  A.  My husband and the au pair who told me
16  about it.
17  **Q.  Can you describe that conversation with**
18  **the au pair?**
19  MR. VALDIVIESO:  I'm going to object
20  here.  Well, I'm going to instruct the witness that to
21  the extent any of your communications with the other
22  au pair involved legal advice that you received from
23  your attorneys that he or she received from his or
24  her attorneys that you not disclose the contents of
25  that legal advice if there was any legal advice.  So

---

14

1  if you can answer that question without talking about
2  any legal advice that was disclosed between the two of
3  you, you may answer the question.  And for the record,
4  the basis for my objection is that au pairs are
5  parties with common interests and they share identical
6  legal interests, and, therefore, any exchange of
7  attorney-client privilege communication between the
8  two would not constitute a waiver, so if you'd like to
9  have the question read back to you after all that
10  instruction, the court reporter can read it back or if
11  you know the question, you can answer it.
12  **Q.  (BY MR. HUNT) Ms. Herzog, do you**
13  **remember the question?**
14  A.  Yes.
15  MR. VALDIVIESO:  You can answer subject
16  to my instruction.
17  A.  Okay.  I looked online and then I looked
18  if this was right, so I looked at the minimum wage in
19  New York during my year and I saw it was right, so she
20  asked me if I would sign it, and I said probably and
21  that was it.
22  **Q.  (BY MR. HUNT) Is this au pair friend of**
23  **yours currently an au pair?**
24  A.  It's an au pair who was in the same area
25  as me.  When I was an au pair, she was an au pair too.

---

15

1  **Q.  She's a former au pair?**
2  A.  Yes.
3  **Q.  And was -- do you know whether she was**
4  **an au pair with InterExchange or another sponsor?**
5  A.  InterExchange.
6  MR. VALDIVIESO:  Objection.
7  **Q.  (BY MR. HUNT) Okay.**
8  MR. VALDIVIESO:  I apologize.  Just give
9  me a little bit of time between his question and your
10  answer in case I need to object, I can object so we're
11  not all talking over each other.  Thank you.  Sorry to
12  interrupt, Joe.
13  MR. HUNT:  No problem.
14  **Q.  (BY MR. HUNT) When did you have this**
15  **conversation with your au pair friend?**
16  A.  I think it was in September, but I'm not
17  sure.
18  **Q.  Did your au pair friend provide you a**
19  **consent to join form?**
20  A.  No.
21  **Q.  Who did provide you a consent to join**
22  **form?**
23  A.  I don't remember.
24  **Q.  Do you remember whether you received one**
25  **by e-mail or Facebook or another way?**

---

16

1  MR. VALDIVIESO:  Objection to form.
2  A.  The first I remember is it was on
3  LinkedIn.
4  **Q.  (BY MR. HUNT) LinkedIn?**
5  A.  Yes.
6  **Q.  Okay.  You received -- so just -- I'm**
7  **not sure if I heard you correctly, you received the**
8  **opt-in consent form through LinkedIn?**
9  A.  I'm really, really not sure, but I think
10  so.
11  **Q.  Okay.  Your friend told you that --**
12  **about the lawsuit, that it involved the minimum wage**
13  **and overtime.  What -- what was your response?**
14  A.  Like I said, I check online to see if it
15  was true and it was, so I wanted to consent.
16  **Q.  Had you ever heard about the minimum**
17  **wage or overtime before?**
18  A.  Yes.
19  **Q.  When?**
20  A.  When I started working here in Los
21  Angeles.
22  **Q.  After your experience as an au pair?**
23  A.  Yeah.
24  **Q.  Okay.  Did you complete a survey or**
25  **questionnaire in connection with this lawsuit?**

---

4 (Pages 13 to 16)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**

**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

17

1      A.  I think so.
2      Q.  Do you remember from whom you received
3  the questionnaire?
4      A.  I think it was from the person who
5  contacted me via LinkedIn.
6      Q.  Do you still have the communications
7  through LinkedIn with this person?
8      A.  I don't know.  I don't know.
9      Q.  Okay.  When we're on a break, would you
10  please look for those communications, if possible?
11      A.  Sure.
12      Q.  Thank you.
13      A.  Sure.
14      Q.  The questionnaire that you may have
15  filled out, do you remember how many questions there
16  were?
17      A.  No.
18      Q.  Do you remember whether there were 20
19  questions or 50 questions or 100 questions
20  approximately?
21      MR. VALDIVIESO:  Objection to form.
22      Q.  (BY MR. HUNT) Go ahead, Ms. Herzog.
23      A.  I don't remember.
24      Q.  Okay.  When did you first learn about
25  the opportunity to be an au pair in the United States?

---

18

1      A.  A few weeks before I tried to be one.
2      Q.  Okay.  Do you remember approximately
3  when that was?
4      A.  February or March 2014.
5      Q.  And how did you learn about the
6  opportunity to be an au pair?
7      A.  I was actually training to be an au pair
8  in Germany, but then the Vitale family was on the
9  website guided me to InterExchange.
10      MR. HUNT:  I'm going to ask the court
11  reporter to read it back.  I'm not sure I caught
12  everything.
13      (The answer was read back as follows:
14  "I was actually training to be an au pair in Germany,
15  but then the Vitale family was on the website guided
16  me to InterExchange.")
17      A.  Yes.
18      Q.  (BY MR. HUNT) Let me back up.  You said
19  that you learned about the opportunity to be an au
20  pair in February or March of 2014.  How did you learn?
21  Did you learn about that online or from a friend --
22      MR. VALDIVIESO:  Objection to form.
23      Q.  (BY MR. HUNT) -- or another way?  You
24  can answer.
25      MR. VALDIVIESO:  Objection to form.

---

19

1      Q.  (BY MR. HUNT) You can answer,
2  Ms. Herzog.
3      A.  I -- I think I -- yeah, I found it
4  online.
5      Q.  Did you hear about the au pair program
6  from someone else too?
7      A.  No.
8      Q.  Can you tell me a little bit more about
9  the circumstances of learning about it?  What did you
10  read about it?
11      A.  It was a chance to live abroad.
12      Q.  Oh, to live abroad.
13      A.  Yes.
14      Q.  Okay.  What did you do to get more
15  information about the au pair program and the chance
16  to live abroad?
17      MR. VALDIVIESO:  Objection to form.  You
18  can answer.
19      A.  I don't know.  As I said, I was trying
20  to be an au pair in Germany.  I never thought about
21  going to the states, and then the Vitales saw me on
22  the internet and their kids seemed nice, so I said why
23  not.
24      Q.  (BY MR. HUNT) Okay.  Did you apply
25  to -- how did you apply to be an au pair in Germany?

---

20

1      A.  With an agency.
2      Q.  Can you say that again?
3      A.  With an agency.
4      Q.  With an agency.  An agency in France?
5      A.  No.
6      Q.  Okay.  Where was the agency?
7      A.  I don't know.  Probably in Germany, but
8  I don't know.
9      Q.  What was the agency's name?
10      A.  I don't remember.
11      Q.  Okay.  Were you working with a local
12  agency in France to become an au pair at any point?
13      A.  Yes.
14      Q.  What was that agency's name?
15      A.  Fee Revee.
16      Q.  Can you spell that?
17      A.  F-e-e then the second word R-e-v-e-e.
18      Q.  How did the Vitale family guide you to
19  InterExchange?
20      A.  They said if I wanted to be an au pair,
21  I should go through the Consol, so they gave me
22  InterExchange and then InterExchange told me I had to
23  go through an interview and then with them.
24      Q.  How did the Vitale family get in contact
25  with you initially?

---

5 (Pages 17 to 20)

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

21

1    A. It was on the website.
2    Q. Was it on -- what website?
3    A. I don't -- I don't remember. I don't
4 know.
5    Q. Well, let me ask you more broadly, how
6 did you apply -- how did you decide to apply to
7 InterExchange?
8    A. Can you repeat that?
9    Q. How did you decide to apply to
10 InterExchange?
11    A. I don't -- I don't know what to answer.
12    Q. Okay. Did you pick InterExchange
13 instead of another sponsor?
14    A. No. I know the Vitales were -- sorry.
15 I know the Vitales was working with InterExchange, so
16 I had to pick InterExchange.
17    Q. You say you had to pick InterExchange.
18    A. This was the sponsorship where the
19 Vitales were working with.
20    Q. Okay. So they asked you to choose
21 InterExchange?
22    A. Yeah.
23    Q. Okay. Did you apply to become an au
24 pair through any other agency or program?
25    MR. VALDIVIESO: Objection to form.

22

1    Q. (BY MR. HUNT) Actually, let me ask you a
2 different question. Did you apply to become an au
3 pair through any other sponsor?
4    A. There was this company in Germany, like
5 I said.
6    Q. Okay.
7    A. But nowhere else.
8    Q. What interested you in the au pair
9 program?
10    A. Can you repeat?
11    Q. Sure. Earlier you said that you wanted
12 a chance to live abroad and I'm wondering, was there
13 anything else that interested you in the au pair
14 program?
15    A. Yeah, I mean, I wanted to discover a new
16 culture and work with the kids.
17    Q. Were you able to discover a new culture
18 and work with kids as an au pair for the Vitale
19 family?
20    A. Yes.
21    Q. Were you interested in improving your
22 English, too?
23    A. Yes.
24    Q. Were you able to improve your English as
25 an au pair?

23

1    A. Not with the Vitales, but, yes.
2    Q. Why not --
3    A. They were Canadian, so they spoke French
4 all the time.
5    Q. All the time?
6    A. They wanted me to speak French with the
7 kids.
8    Q. Have you ever heard of the au pair
9 program described as a cultural exchange?
10    A. Yes.
11    Q. What does the phrase "cultural exchange"
12 mean to you?
13    A. I bring with me a little of French
14 culture and they show me their culture.
15    Q. And is that the -- did you experience a
16 cultural exchange with the Vitale family?
17    A. Yeah.
18    Q. Okay. When you were thinking about
19 becoming an au pair before you came to the United
20 States, were there any other benefits that you
21 expected to have as an au pair?
22    A. I knew nothing about it. Like I said, I
23 started looking just a few weeks before they pick me,
24 so I had no expectation.
25    Q. I'm still a little unclear how the

24

1 Vitale family found you.
2    A. So I think it was a website where au
3 pairs can find families and vice versa.
4    Q. And was that an InterExchange website?
5    A. No, it was before.
6    Q. When you were thinking about becoming an
7 au pair before you came to the United States, did you
8 meet with anyone from InterExchange?
9    A. When I was in contact with the Vitales,
10 they gave me an introduction and that's where it all
11 began.
12    Q. What did that person from InterExchange
13 tell you?
14    A. It's been three years. I don't
15 remember, you know.
16    Q. Okay. Well, was it by e-mail or phone
17 or in person?
18    A. Probably e-mail, but I don't remember.
19    Q. Do you remember whether the weekly --
20 strike that.
21    Have you heard the phrase "weekly
22 stipend"?
23    A. No. I mean, "stipend," yes, but not
24 "weekly."
25    Q. Okay. And is the stipend -- can you

6 (Pages 21 to 24)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

25

1   tell me what you understand the phrase stipend to be?
2        A.  Actually, I don't know.  I thought that
3   was my memory.
4        Q.  Okay.  Was you -- was your payment that
5   you would receive as an au pair discussed during your
6   communications with anyone from InterExchange before
7   you came to the United States?
8        A.  Yes.
9        Q.  And what was said about your payment?
10       A.  I would make the 195.75 per month --
11  week, I'm sorry.
12       Q.  Okay.  Did they say that you would
13  receive at least 195.75 per week?
14       A.  I don't know if it was at least, but
15  that's what I received.
16       Q.  Okay.
17       A.  Yeah.
18       Q.  Do you remember completing an
19  application for the InterExchange program?
20       A.  Yes.
21       Q.  Did you complete that application
22  yourself?
23       A.  Yes.
24       Q.  Did anyone help you complete it?
25       A.  For my part, no.

---

26

1        Q.  No one from Fee Revee helped you
2   complete it?
3        A.  No one from who?
4        Q.  Your French agency.  I'm sorry I didn't
5   pronounce it correctly.
6        A.  I don't know if they did.  I don't know.
7        Q.  Okay.  So do you go through a matching
8   process or were you automatically -- you had already
9   chosen -- excuse me, strike that.
10            Did you apply to be an au pair for any
11  other host family besides the Vitale family?
12       A.  So after -- even if I found them before
13  when I applied, it was just like an application and
14  then the -- we told the agency that I already met the
15  Vitales and the Vitales met me, and so they just made
16  the match, but I didn't have to go through the whole
17  process.
18       Q.  Okay.  You said agency, are you talking
19  about your French agency or InterExchange?
20       A.  No, InterExchange.
21       Q.  Okay.  Did you pay any fees to
22  participate in the au pair program?
23       A.  I had to go to Paris and the Embassy, so
24  that was from my pocket, yes.
25       Q.  What was the purpose of your visit to

---

27

1   Paris and the Embassy?
2        A.  To get my Visa done and I had to
3   interview.
4        Q.  Who did you interview with?
5        A.  The Embassy.
6        Q.  Did you pay any fees to your French
7   agency?
8        A.  Yes.
9        Q.  How much did you pay in fees to the
10  French agency?
11       A.  I don't remember.
12       Q.  Do you remember what the method of
13  payment was?
14       A.  No.
15       Q.  Was it a check or cash, electronic
16  transfer?
17            MR. VALDIVIESO:  Objection to form.
18       A.  I don't remember.
19       Q.  (BY MR. HUNT)  Okay.  Aside from the fees
20  that you paid to the Embassy and to your French
21  agency, did you pay anyone else to participate in the
22  au pair program?
23       A.  I don't think so.
24       Q.  Did you pay InterExchange?  Do you
25  remember paying InterExchange?

---

28

1        A.  No, I don't.
2        Q.  No, you don't remember or no, you didn't
3   pay any fees to InterExchange?
4        A.  I don't think so.  But it was four years
5   ago, so I -- I don't think so.
6        Q.  Yeah.  I understand.  It was a long time
7   ago.  Just to confirm, you didn't pay InterExchange in
8   order to participate in the au pair program; is that
9   correct?
10       A.  Yes.
11       Q.  Okay.  So when you were applying to
12  become an au pair, before you got InterExchange
13  involved in the process, you had already decided to be
14  with the Vitale family; is that correct?
15       A.  Yes.
16       Q.  And the Vitale family had already chosen
17  you?
18       A.  Yes.
19       Q.  Okay.  So InterExchange did not assign
20  you to the Vitale family; is that correct?
21       A.  After we told them we wanted each other,
22  they matched.
23       Q.  They matched you.  Okay.  Before that
24  process or, excuse me, let me rephrase it.
25            Did you have any interviews with the

---

7 (Pages 25 to 28)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

29

1    Vitale family before you chose each other?
2        A.  Yes.
3        Q.  Was that via Skype?
4        A.  Yes.
5        Q.  How many –
6        A.  And e-mail.
7        Q.  How many interviews did you have?
8        A.  Maybe two Skype calls and then e-mail
9    exchange.
10       Q.  Okay.  I'm sorry, did you say two or
11   three interviews and e-mail exchange?
12       A.  Two Skype calls and then, yes, e-mail
13   exchanges.
14       Q.  Thank you.  Who from the host family was
15   part of those interviews?
16       A.  All the family.  The parents, the
17   children.
18       Q.  For both interviews?
19       A.  Yeah.
20       Q.  Okay.  Was any – was anyone from your
21   French agency participating in those interviews?
22       A.  No.
23       Q.  And was anyone from InterExchange
24   participating in those interviews?
25       A.  No.

---

30

1        Q.  And during either of those interviews,
2    did the Vitale family talk about how much you would be
3    paid as an au pair?
4        A.  No.
5        Q.  When did you first learn how much the
6    Vitale family would pay you?
7        A.  I don't know when it was that I first
8    learned about it when I read about it on the document.
9        Q.  Is that the agreement that you signed
10   before becoming an au pair?
11       A.  You mean with InterExchange?
12       Q.  Well, you tell me.  You said you –
13       A.  I don't remember.
14       Q.  Yeah.  You said you –
15       A.  I don't remember -- sorry.
16       Q.  No.  No.  I really apologize.  I didn't
17   mean to speak over you and I know there's some, you
18   know, issues communicating like this.
19           Let me ask you again, you said that you
20   read it on a document.  I'm just curious what document
21   it was that you read this?
22       A.  I don't remember if it was from the
23   French sponsorship or InterExchange.
24       Q.  Do you remember when you read the
25   document?

---

31

1        A.  Before I signed.
2        Q.  Okay.  And when did you sign?
3        A.  I don't remember.  March or April, 2014.
4        Q.  So that's before you came to the United
5    States?
6        A.  Yes.
7        Q.  Were you okay with that amount, with
8    being paid that amount?
9        A.  Honestly, that -- I thought that was
10   very low, but as I said, I didn't know -- I didn't
11   know what to expect.  I didn't know what was going to
12   be minimum wage, so I agreed.
13       Q.  Did you ask your host family to pay you
14   more than that amount?
15       A.  No.
16       Q.  Why not?
17       A.  It's not a --
18       Q.  Did you want to go live with the Vitale
19   family?
20       A.  Yes.
21       Q.  Even being paid 195.75?
22           MR. VALDIVIESO:  Objection to form.
23       Q.  (BY MR. HUNT) You can answer,
24   Ms. Herzog.
25       A.  Yes.

---

32

1        Q.  And could you have said no if you were
2    not interested in going to live with the Vitale
3    family?
4        A.  I know if I said no it means I wouldn't
5    have been in the United States.
6        Q.  I didn't catch that last part.  Could
7    you repeat that?
8        A.  I know if I had said no, then it would
9    have been -- I wouldn't have been able to come to the
10   United States.
11       Q.  Okay.  During the Skype interviews that
12   you had with the Vitale family, did you talk about
13   what you'd be doing with the children?
14       A.  Yeah.
15       Q.  And what were those – can you tell me
16   about what they said about what you would be doing
17   with the children?

---

8 (Pages 29 to 32)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**



33

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12        Q.  And during the Skype interview, did the
13   Vitale family tell you how many hours you would be
14   working?
15        A.  I don't remember.
16        MR. VALDIVIESO:  Joe, can we take a
17   two-minute break.
18        MR. HUNT:  Yes.
19        (Recess taken, 11:04 a.m. to 11:10 a.m.)
20        Q.  (BY MR. HUNT)  We're back on the record.
21   Ms. Herzog, I believe you said that you don't recall
22   discussing the amount of hours that you'd be working
23   for the host family when you had the Skype interview.
24        A.  Yes.
25        Q.  Do you remember whether you discussed
```

34

```
 1   how many days per week you would be working?
 2        A.  I don't remember.
 3        Q.  And just to confirm, prior to matching
 4   with -- excuse me.  Prior to your match with the
 5   Vitale family, you didn't communicate with any other
 6   families?
 7        A.  No.
 8        Q.  And when you arrived to the United
 9   States, did you go to New York?
10        A.  Yes.
11        Q.  And what was the purpose of going to New
12   York?
13        A.  I had to go to the InterExchange
14   headquarters and they would give me training and send
15   me to a training.
16        Q.  What sort of training was that?
17        A.  Sorry, what?
18        Q.  What sort of training was that?
19        A.  So they gave me some documentation and
20   they told me what would be my duties and how to do
21   them and what I should expect or not.
22        Q.  How many days did the training last?
23        A.  I think it was three days.
24        Q.  How many hours per day?
25        A.  I want to say 8:00 to 5:00.  I don't
```

35

```
 1   remember.  I'm not sure.
 2        Q.  Were you required by InterExchange to
 3   attend the training?
 4        A.  Yes.
 5        Q.  And were you paid for your -- for the
 6   hours that you were trained?
 7        A.  Actually, no.  After these days, I went
 8   to my family and so it was a Sunday and they actually
 9   asked me if I should be paid for the three days I was
10   in InterExchange, and I didn't know and they didn't
11   know, so they just assumed and they gave me the 195.
12        Q.  And the 195.75 that they gave you, that
13   was to cover the three days that you were trained in
14   New York?
15        A.  It was for the whole week.
16        Q.  Okay.  What happened after the training?
17        A.  My host family pick me up.
18        Q.  And you went back to Bronxville, I
19   assume; is that correct?
20        A.  Yes.
21        Q.  Okay.  Do you remember whether the host
22   family parents were employed?
23        A.  Yes.
24        Q.  Were they employed?
25        A.  Yes.
```

36

```
 1        Q.  Both parents?
 2        A.  Yes.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

9 (Pages 33 to 36)

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.



**37**

**39**

4      Q. Did you spend time with other au pairs?
5      A. Yes.
6      Q. Did the -- did the family give you a
7  schedule each week?
8      A. Yes.
9      Q. Was that written down or –
10     A. Yes.
11     Q. How was it written down, on paper or
12  e-mail or text message?
13     A. Yes. They had a board in the kitchen.
14     Q. Okay. Did anyone from InterExchange
15  ever give you a weekly schedule?
16     A. No.
17     Q. And did you keep records of your
18  schedule and how many -- excuse me. Did you -- did
19  you keep records of your schedule?
20     A. Now, today? I -- I don't have it any
21  more.
22     Q. But you did keep records of your
23  schedule while you were an au pair?
24     A. Yes.
25     Q. Okay. How did you keep those records?

**38**

**40**

1      A. I was taking picture of the board.
2      Q. And you don't have those records any
3  more?
4      A. No, I change my phone.
5      Q. And did you keep records of how many
6  hours per week that you worked?
7      A. I didn't keep record.
8      Q. Okay. Did you work on the weekends
9  during the school year?
10     A. Yes.
11     Q. What were your hours on the weekends
12  during the school year?
13     A. Between -- I would start between 6:00
14  and 7:00 and it would depend, sometimes between 2:00
15  or 3:00.
16     Q. Is that -- were those Saturdays?
17     A. Yes, and Sundays sometimes.
18     Q. Sometimes on Sundays?
19     A. Yeah. It would basically depend on the
20  week. They would make sure I didn't exceed 45 hours.
21     Q. Did you ever exceed 45 hours?
22     A. I don't recall. I don't think so.
23     Q. Did you ever work more than 10 hours per
24  day?
25     A. Yeah.

10 (Pages 37 to 40)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

41

1    Q.   Under what circumstances?
2    A.   When something would happen, like a snow
3  day.  When they would bring me with them on the
4  weekends and things like that.
5    Q.   How many -- how many times did you work
6  more than 10 hours per day as an au pair?
7    A.   Like -- I don't know.  But there was a
8  few snow days, yeah.
9    Q.   A few snow days?
10   A.   Yeah.
11   Q.   Okay.  Could you estimate how many times
12 you worked more than 10 hours per day?
13   A.   No, I can't.  I don't -- I can't tell
14 you.
15   Q.   Let me ask -- I apologize.  I should
16 have let you finish.  You can finish if you weren't
17 done answering the question.
18   A.   No, I just -- I don't want to give you a
19 number that's a wrong number.  I don't know.
20   Q.   Okay.  Let me ask you this, did you work
21 more than 10 hours per day greater or fewer than five
22 times?
23        MR. VALDIVIESO:  Objection to form.
24   A.   Greater.
25   Q.   (BY MR. HUNT) Did you say greater?

42

1    A.   Yes.
2    Q.   Greater or fewer than 10 times?
3        MR. VALDIVIESO:  Objection to form.
4    A.   Probably greater.
5    Q.   (BY MR. HUNT) Okay.  You said your hours
6  were never the same; is that correct?
7        MR. VALDIVIESO:  Objection to form.
8    A.   Yeah.
9    Q.   (BY MR. HUNT) On average how many hours
10 per week did you work for the Vitale family?
11   A.   Between 40 and 45.
12   Q.   Okay.
13   A.   And they would always try to have me
14 work 45 hours, but not more.
15   Q.   Were you expected to be available for
16 the Vitale family at times when you were not
17 scheduled?
18   A.   Yes.
22   Q.   You may have told me, but I want to be
23 sure that I ask you, while you were living with the
24 Vitale family, were there any weeks you worked more
25 than 45 hours?

43

1    A.   No, I don't think so.
2    Q.   Did you ever have any concerns about the
3  schedule that the Vitale family gave you?
4    A.   I mean, that was a lot of hours, but,
5  again, it was a cultural exchange, and in France, the
6  maximum hours you can work per week is 35 hours and I
7  know here it's 40, so I actually didn't know it was
8  something different or not, so I -- no.
9    Q.   While you were working for the Vitale
10 family, did you have any complaints about the number
11 of hours that you were working?
12   A.   I kept them to myself.
13   Q.   You kept your complaints to yourself?
14   A.   Yes.  It was kind of implied from the
15 beginning that I would have to do overtime.
16   Q.   How was it implied?
17   A.   Even InterExchange told us.
18   Q.   What did InterExchange tell you?
19   A.   That we could expect working more than
20 40 hours.
21   Q.   And did you ever make any complaints to
22 InterExchange about that?
23   A.   No.
24   Q.   Okay.  And you lived in the Vitale
25 family's house?

44

1    A.   Yes.
2    Q.   And you had your own room; is that
3  right?
4    A.   Yes.
5    Q.   How much did the Vitale family pay you
6  each week?
7    A.   200.
8    Q.   And how -- how were you paid?
9    A.   In cash.
10   Q.   By whom?
11   A.   The parents.
12   Q.   Okay.  And who decided to pay you $200?
13   A.   It was in the contract.
14   Q.   Okay.
15   A.   When I signed with InterExchange.  But
16 they just rounded up to 200 because it was easier
17 because they were paying me by cash.
18   Q.   So just so I have this straight, the
19 contract said that -- or you believe the contract said
20 that you'd be paid 195.75, but the Vitale family paid
21 you $200?
22        MR. VALDIVIESO:  Objection,
23 mischaracterizing the witness' testimony.  She gave
24 quite a bit more than that.  I'm giving you some
25 leeway, but this is like the third time that she's

11 (Pages 41 to 44)

Case 1:14-cv-03074-CMA-KMT Document 1104-2 filed 08/06/18 USDC Colorado pg 211 of 264

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

45

1  given an answer and then you've tried to get her to
2  change it to what you want to hear. So if you want to
3  hear what her testimony was, you can have the court
4  reporter read it back. I'm not going to allow you to
5  just get her to say what you want her to say.
6        MR. HUNT: Sure. Why don't I rephrase
7  the question.
8        Q. (BY MR. HUNT) What did you expect the
9  Vitale family would pay you before you became —
10  before you became an au pair?
11        A. 195.75.
12        Q. I'm sorry?
13        A. 195.75 per week.
14        Q. And what was that based on?
15        A. The contract.
16        Q. And what did the Vitale family pay you?
17        A. 200.
18        Q. Was that the same every week or did it
19  vary?
20        A. It was the same every week.
21        Q. Did they, for any reason, give you more
22  money?
23        A. Sometimes when I was out with the kids,
24  I would pay for stuff and they would reimburse me
25  later.

46

1        Q. Did they ever pay you less than $200 per
2  week?
3        A. No.
4        Q. Did InterExchange ever pay you?
5        A. I mean, through the Vitales, yes.
6        Q. What do you mean through the Vitales?
7        A. InterExchange was my employer, so the
8  Vitales gave me money that is from InterExchange.
9  That's how I saw it.
10        Q. Okay. Why did you see it that way? Can
11  you tell me the reasons?
12        A. Like I said, I made a contract with
13  InterExchange, so for me, they're my employer.
14        Q. And did you believe that InterExchange
15  was your employer while you were an au pair or was
16  that a belief that you formed after your au pair
17  experience?
18        A. No, from the beginning.
19        Q. Okay. Did you believe that the money
20  that the Vitale family was paying you was
21  InterExchange's money?
22        A. It was not InterExchange's money, but
23  they were paying me because we both had a contract
24  with InterExchange.

47

[redacted]

14        Q. Did you have a computer?
15        A. My own, yes, that I brought from France.
16        Q. And did the Vitale family provide access
17  to the internet?
18        A. I had wifi, yes.
19        Q. Did you pay to use the wifi?
20        A. No.
21        Q. Did you have a cell phone?
22        A. Yes.
23        Q. Was it your cell phone or the host — or
24  the Vitale family's cell phone?
25        A. Both. I had one from them and I brought

48

1  mine.
2        Q. How did you use them?
3        A. So the phone they gave me, I would use
4  it for -- for work and then to communicate with the
5  friends I made in the States, and I would use my own
6  phone to communicate with my family in France in
7  French.
8        Q. So you were able to make personal calls
9  on the phone the Vitales gave you?
10        A. They never said I couldn't. Yes.
11        Q. Did they — did they pay for the cell
12  phone that they provided you?
13        A. Yes.
14        Q. Did they pay for the cell phone that you
15  brought from France?
16        A. No.
17        Q. Did they have any rules about the cell
18  phone -- about using the cell phone that they
19  provided?
20        A. They just said I need -- should have it
21  with me all the time in case of emergencies or last
22  minute things that I would have to do.
23        Q. Okay. And did they have any rules about
24  using the computer?
25        A. My computer?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490



49

```
1        Q.  Yes.
2        A.  No.
3        Q.  Did InterExchange have any rules about
4   using the computer?
5        A.  No.
6        Q.  Did InterExchange have any rules about
7   using the -- either of your cell phones?
8        A.  No.
9        Q.  Did the Vitale family have any other
10  house rules?
11       A.  I had a curfew.
12       Q.  When was that?
13       A.  11:00 during the weekdays.
14       Q.  And on the weekends?
15       A.  If I was working the next day, it would
16  be 11:00, too.
17       Q.  And if you were not working?
18       A.  I didn't have a curfew.
19       Q.  Okay.  And did InterExchange give you a
20  curfew?
21       A.  No, but if they want one, there could be
22  one.
23       Q.  Did you have a --
24            MR. VALDIVIESO:  I'm sorry, I didn't
25  hear that.  Could you, Court Reporter, please read
```

50

```
1   that answer back.
2            (The answer was read back as follows:
3   "No, but if they want one, there could be one.")
4        Q.  (BY MR. HUNT)  You know, actually,
5   Ms. Herzog, did you say -- did you hear the court
6   reporter?  Did you hear the court reporter repeat that
7   back to you?
8        A.  I'm not hearing.
9        Q.  Let me ask you, did you say that
10  InterExchange warned you that there might be one?
11       A.  Yes, during the training.
12       Q.  Okay.  Did you have a car while you were
13  an au pair?
14       A.  I could use their car.
15       Q.  Did you drive the children with that
16  car?
17       A.  Yes.
18       Q.  Okay.  And did you use the car for your
19  own personal errands, trips, use?
20            MR. VALDIVIESO:  Objection to form.
21       Q.  (BY MR. HUNT)  Let me rephrase.  Did you
22  use the car for your own personal use?
23       A.  I did once.
24       Q.  You did once.  Did you take any trips
25  with the host family?  Any vacations?
```

51

```
1        A.  Yes.
2        Q.  Where?  Sorry.
3        A.  Sorry.
4        Q.  Where did you take vacations with the
5   host family?
6        A.  So, we went to Montreal, but I was not
7   on the vacation.  They were on vacation.
8            THE REPORTER:  Can you repeat where they
9   went?
10       A.  Montreal, Canada.
11       Q.  (BY MR. HUNT) Did you take any other
12  vacations with the host family?
13       A.  We went to --
14            MR. VALDIVIESO:  I'm going to object on
15  that question.  Objecting to form.  You may answer the
16  question.  I'm going to object.  Well, I'll leave it
17  at that.  I'll leave that objection to form.
18       Q.  (BY MR. HUNT) Let me ask you again, and
19  your attorney may still have the same objection, but
20  aside from Montreal, did you go on any other vacations
21  with the host family?
22            MR. VALDIVIESO:  Objecting to the form,
23  but you may answer the question.
24       A.  So other than Montreal, the family
25  brought me with them to go to Upstate New York one
```

52

```
1   weekend, but, again, they were on vacation and I was
2   not.
```

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

---

53

Q. Okay. Did the host family provide you a
journal to use while you were an au pair?
A. No.
Q. Did InterExchange?
A. Yes.
Q. Did you use the journal?
A. I started it.
Q. Do you still have that?
A. No.
Q. Do you remember what happened to it?
A. No.
Q. Who told you -- excuse me, while you
were an au pair, who told you what duties to perform?
MR. VALDIVIESO: Objection to form. You
may answer.
A. It was the family.
Q. (BY MR. HUNT) Did InterExchange ever
tell you to perform any duties for the Vitale family?
A. Not per se, but I mean, that's obvious
for me, I believe.
Q. What is obvious?
A. I had a contract with them. I don't

---

54

remember when I signed, but from what I understood,
they would match me and it was not just a cultural
exchange, I had to do some things for the family and
vice versa. They didn't tell me, per se, you had -- I
had to do this or that, but I'm to follow the
contract.
Q. Do you remember what the contract said?
A. No.
Q. Did anyone from InterExchange ever
supervise you doing --
A. We -- we had monthly meetings and so
they would check on us and make sure everything was
okay.
Q. I'm sorry, Ms. Herzog, could you please
repeat that?
A. Yes. So we had a monthly meeting with a
local coordinator and she would check on us.
Q. Okay. Are those monthly meetings -- do
you ever -- have you ever heard them called "cluster
meetings"?
A. Yes.
Q. And so you attended the cluster
meetings?
A. Yes. I had to.
Q. And the local coordinator would check on

---

55

you, is that what you said?
A. Yes.
Q. Do you remember the local coordinator's
name?
A. Yes.
Q. Who was it?
A. Susan.
Q. Do you remember Susan's last name?
A. I have her cell phone. I can check.
Q. During a break, why don't you check.
A. Okay.
Q. Did you also have a local coordinator
named Carol Dailey?
A. Yes.
Q. Did either Carol or Susan tell you what
duties to perform for the Vitale family?
A. I don't remember.
Q. Did the Vitale family ever ask you to
perform any duties that concerned you in any way?
A. No.
Q. Did you take classes while you were an
au pair?
A. Yes.
Q. Do you remember what classes you took?
A. I went to Manhattan College and I took

---

56

marketing and advertising.
Q. How did you get to those classes?
A. I was required. I had to take two
classes.
Q. Who required you to take those classes?
A. InterExchange.
Q. How did you physically get from your
home to the class?
A. It would depend. I would either use the
car or they would drop me off, or I had to use the
train.
Q. Do you know whether you took six credits
of classes?
A. Sorry, what was that?
Q. Did you receive credits?
A. Yes.
Q. Did you receive six credits?
A. I don't remember what I -- what was the
credits, but I remember, yes, I completed.
Q. Did you ever meet with either of the
local coordinators at the Vitale home?
A. Yes.
Q. How many times?
A. So once a month and during my first
month, Carol took me to the diner.

---

14 (Pages 53 to 56)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

57

1    Q.  Did the -- either of the local
2    coordinators pay you money?
3        A.  No.
4    Q.  When they came to the Vitale home, did
5    they tell you what to do?
6        A.  No.
7    Q.  Did they supervise while you were
8    watching the children?
9        A.  She actually came only once, and it was
10   to pick me up.
11   Q.  Okay.  Other than the local coordinator,
12   did you meet with anyone from InterExchange while you
13   were an au pair?
14       A.  During my training, yes, but other than
15   that, no.
16   Q.  Okay.  Were there any instances --
17   strike that.
18       Did the kids ever leave town with one or
19   both of the host parents?
20       A.  Yes.
21   Q.  How many times did they do that?
22       MR. VALDIVIESO:  Objection to form.
23   Q.  (BY MR. HUNT) Go ahead, Ms. Herzog.
24       A.  I don't remember.
25   Q.  Okay.  Do you remember them going with

58

1    the host dad to Montreal?
2        A.  No.
3    Q.  But you remember other instances that
4    the kids left town; is that right?
5        A.  Yes.
6    Q.  Okay.  And were those for overnight
7    stays?
8        A.  Yes.
9    Q.  So you'd be in the Vitale home alone; is
10   that right?
11       A.  No.
12   Q.  Who would be there with you?
13       A.  I remember the second kid had a few
14   hockey games out of town, so him and the dad would
15   leave, but I would stay at home with the mom and the
16   two other kids.
17   Q.  Okay.  Were there any instances where
18   all three kids left for an overnight stay?
19       A.  I don't remember.
20   Q.  Did the grandparents ever visit?
21       A.  Yes.
22   Q.  Did they visit frequently?
23       A.  Once every few months.
24   Q.  And when they were there, did they look
25   after the kids?

59

1        A.  Of course, they're the grandparents.
2    Q.  While they were there, did you have any
3    child care duties?
4        A.  Yes, I was still around, but they would
5    make my job easier.
6    Q.  How many hours per day did you work when
7    they were there?
8        A.  I had the same hours.
9    Q.  How did they make your job easier?
10       A.  So I knew the grandma, she loved
11   cooking.  So she would cook while I was playing with
12   the kids.
13   Q.  And did you do -- I understand that
14   you -- strike that.
15       Did you return to France at any time
16   during your experience as an au pair?
17       A.  Yes.
18   Q.  Okay.  How long were you in France?
19       A.  Two or three weeks -- two.
20   Q.  Did you -- did the Vitale family pay you
21   for those weeks?
22       A.  No.
23   Q.  Okay.  Did you keep any records of how
24   much the Vitale family paid you?
25       A.  No, because it was 200 every week.

60

1        MR. HUNT:  Why don't we take a 10-minute
2    break.  Is that okay?
3        MR. VALDIVIESO:  Sure.
4        MR. HUNT:  Let's go off the record.
5        THE DEPONENT:  Do you know how long it's
6    going to be?
7        MR. HUNT:  What's that?
8        THE DEPONENT:  Do you know how much
9    after the 10-minute break it's going to be?
10       MR. HUNT:  I will have probably another
11   15 minutes of questions.  Your counsel -- your lawyer
12   might have some questions as well.  There might be
13   some followup.  I think to be safe, you're on --
14   you're on the West Coast, maybe plan on another half
15   an hour to an hour, Juan.
16       MR. VALDIVIESO:  Sure.  I don't have
17   very many questions unless you take some --
18       MR. HUNT:  Detour?
19       MR. VALDIVIESO:  Yeah.
20       MR. HUNT:  As of now, I don't have too
21   many questions, but we'll see how it goes.

15 (Pages 57 to 60)

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

---

**61**

2    (Recess taken, 11:59 a.m. to 12:18 p.m.)
3    **Q. (BY MR. HUNT) We're back on the record.**
4    **Ms. Herzog, we took a break. Is there anything that**
5    **you thought about that changes your mind about the**
6    **testimony that you've made today?**
7    A. No.
8    **Q. Is there anything that you thought about**
9    **during the break that reminded you of a -- of any**
10   **facts related to this case?**
11   A. Yes. You know, I told you my local
12   coordinator's name was Susan. Actually, it was Carol
13   Dailey. Susan was a friend. I just checked that.
14   **Q. So, Ms. Herzog, when we were talking**
15   **about the local coordinators earlier, were you talking**
16   **about Carol Dailey?**
17   A. Yes.
18   **Q. Okay.**
19   A. I was confused about her name.
20   **Q. It's understandable. I just want to be**
21   **clear that when we were talking about who came to your**
22   **house.**
23   A. It was Carol, yes.
24   **Q. Okay. And I'd like to confirm, you**
25   **didn't make any complaints to InterExchange about your**

---

**62**

1    **experience as an au pair; is that correct?**
2    A. No. Yes.
3    **Q. And --**
4    MR. VALDIVIESO: Never mind. Would you
5    read back the last couple lines of testimony.
6    (The last question and answer were read
7    back as follows: "Okay. And I'd like to confirm, you
8    didn't make any complaints to InterExchange about your
9    experience as an au pair; is that correct?
10   A. No. Yes.")
11   **Q. (BY MR. HUNT) Let me just clarify the**
12   **record, Ms. Herzog, and thank your counsel for**
13   **pointing out the unclarity.**
14   MR. VALDIVIESO: I didn't say anything.
15   **Q. (BY MR. HUNT) You didn't make any**
16   **complaints to InterExchange; is that correct?**
17   A. Yes.
18   **Q. Okay. Did you make any complaints to**
19   **any governmental agency about your experience as an au**
20   **pair?**
21   A. I didn't.
22   **Q. Okay. While you were in France before**
23   **you came to the United States, did you ask anyone any**
24   **questions about how much money you would receive as an**
25   **au pair?**

---

**63**

1    A. I don't remember asking.
2    **Q. Besides the e-mail communications that**
3    **you said earlier that you had with InterExchange,**
4    **while you were still living in France, did you have**
5    **any other discussions with anyone from InterExchange**
6    **about how much money you'd receive as an au pair?**
7    MR. VALDIVIESO: Objection to form.
8    **Q. (BY MR. HUNT) You can answer,**
9    **Ms. Herzog.**
10   A. I don't remember.
11   **Q. Okay. You've been asked to provide some**
12   **documents related to the amounts paid to you and the**
13   **hours that you worked. I believe you said that you**
14   **haven't searched for any of those documents; is that**
15   **correct?**
16   A. Can you repeat?
17   **Q. I think you said earlier, and I'd just**
18   **like to confirm, that you haven't made a search for**
19   **any of the documents related to this lawsuit; is that**
20   **correct?**
21   A. When I heard about the lawsuit, I looked
22   to see what was the minimum wage, but that was it.
23   **Q. Have you searched -- well, you've been**
24   **asked to provide documents related to your experience**
25   **as an au pair and I believe you said earlier that you**

---

**64**

1    had not searched -- you had not made a search for
2    those documents; is that correct?
3    A. I'm not sure what you mean by
4    "documents." Like what documents are you talking
5    about?
6    MR. VALDIVIESO: I mean, I'm just saying
7    this to be helpful, but there was other parts of
8    testimony that you should probably take into
9    consideration when asking her questions.
10   MR. HUNT: You know what, I think that
11   the -- I think that the testimony was that she hadn't
12   made a search, so I'd just like to ask to keep this
13   deposition open, have her make the search and if there
14   are any responsive documents, if you can provide those
15   documents to your lawyer.
16   **Q. (BY MR. HUNT) Okay. Ms. Herzog --**
17   MR. VALDIVIESO: Can we go off the
18   record for a second?
19   MR. HUNT: Yeah.
20   (Off-the-record discussion.)
21   **Q. (BY MR. HUNT) We're back on the record.**
22   **Ms. Herzog, if we covered this ground before, I**
23   **apologize, but I want to confirm, do you know whether**
24   **you have any records related to your hours worked or**
25   **the money that you received in connection with your au**

---

16 (Pages 61 to 64)



**65**

1  pair experience?
2      A. I didn't keep any of them.
3      Q. Okay. Do you have any documents given
4  to you by InterExchange's or excuse me, by the French
5  agency related to your participation in the au pair
6  program?
7      A. I don't think I have anything.
8      Q. Okay. Do you have any -- do you have
9  any documents such as e-mails or social media relating
10 to your -- relating to your duties as an au pair?
11     A. No.
12     Q. Okay.
13     A. I don't think so.

**66**

23     Q. Okay.
24         MR. VALDIVIESO: I understand I'm
25 limited to objecting to form, but I'm going to object

**67**

1  here because I feel like the record is being distorted
2  by these last questions and I have to say that the
3  testimony before was to specific days of the week, and
4  then you have said now through your last line of
5  questioning without specifying the days, you're
6  changing the testimony. So maybe you want to go back
7  and clarify.
8         MR. HUNT: Let's go off the record.
9         (Off-the-record discussion.)
10     Q. (BY MR. HUNT) We're back on the record.
11 Ms. Herzog, what was your -- what were your working
12 hours during the summer?
13     A. During the summer, I was -- I was up
14 early, early. I think it was between 7:00 and 8:00 to
15 4:00 or 5:00 p.m.
16     Q. And were those weekdays? Were those
17 your weekday hours?
18     A. Yes.
19     Q. And what were your weekend hours during
20 the summer?
21     A. It was either Saturday or Sunday and it
22 would be between 6:00 a.m. to 2:00 p.m.,
23 approximately.
24     Q. On Saturday or Sunday, you said?
25     A. Yes.

**68**

1      Q. And if you worked on Saturday, would you
2  work on Sunday?
3      A. No.
4      Q. And if you worked on Sunday, would you
5  work on Saturday?
6      A. No.
7      Q. When you went on vacation with the host
8  family, who paid for your expenses?
9      A. What kind of expenses?
10     Q. If you -- your lodging, your meals and
11 transportation.
12     A. Because I was working, it would be on
13 the family's expense.
14     Q. Okay. Have you calculated how much
15 money you believe you're owed?
16     A. No.
17     Q. Do you know how you would calculate that
18 amount?
19         MR. VALDIVIESO: Objection, form.
20     Q. (BY MR. HUNT) You can answer.
21     A. I would say 200 per week, except for the
22 weeks when I went on vacation for a year.
23     Q. I'm not sure if I got that right. Did
24 you say you were owed $200 per week, except the weeks
25 that you went on vacation?

17 (Pages 65 to 68)

69

```
1         A.  Yes.  For a year.
2         Q.  And is that in addition to the money
3   that you've already received?
4         A.  I don't understand the question.  What
5   was the question?  How much was -- would I calculate
6   on how much I was paid?
7         Q.  Let me step back.  You believe that
8   InterExchange owes you money?
9         A.  Oh, yeah.  Yes.
10        Q.  And why does InterExchange owe you
11  money?
12             MR. VALDIVIESO:  Asked and answered.
13        Q.  (BY MR. HUNT)  You can answer.
14        A.  Because I was not paid the minimum wage
15  and they didn't pay me for my overtime hours.
16        Q.  Okay.  And what aspect of your
17  employment did InterExchange control?
18             MR. VALDIVIESO:  Objection to form.
19        A.  I can answer?
20        Q.  (BY MR. HUNT)  Yes.
21        A.  I don't know.  I think you should ask
22  them or I have to reread my contract.  I don't know.
23        Q.  Besides the contract, was there any
24  aspect of your employment that InterExchange
25  controlled?
```

70

```
1             MR. VALDIVIESO:  Objection to form.  You
2   may answer.
3         A.  I'm not sure what you're trying to say.
4   I just have to follow along in the contract.
5         Q.  (BY MR. HUNT)  Okay.  Well, you -- you're
6   saying that you didn't understand the question; is
7   that correct?
8         A.  Which one?
9         Q.  The question that I just asked.
10        A.  Yeah, I'm not sure what you're trying to
11  say.
12        Q.  Okay.  I believe -- I believe that you
13  said that you had an employment relationship with
14  InterExchange?
15             MR. VALDIVIESO:  Objection to form.  If
16  you're going to refer to testimony, let's find the
17  testimony she said and then you can ask her questions
18  about it, but you just are rephrasing her testimony,
19  and representing it as hers.
20             MR. HUNT:  If I'm wrong, she can say
21  that that's incorrect.
22        A.  InterExchange was my employer.
23        Q.  (BY MR. HUNT)  What aspect of that
24  employment did InterExchange control?
25        A.  I don't know.  I have to reread my
```

71

```
1   contract.
2         Q.  All right.  Ms. Herzog, I may have some
3   follow-up questions, but your lawyer -- but I'm done
4   and your lawyer may have some questions.
5             EXAMINATION
6   BY MR. VALDIVIESO:
7         Q.  Ms. Herzog, just a few moments ago you
8   were discussing the -- your work schedule during the
9   school year and you testified that you worked between
10  2:00 p.m. and 10:00 p.m.; is that right?
11        A.  Yes.
12        Q.  Was that for certain days of the week?
13        A.  During the weekdays.
14        Q.  By weekdays, do you mean Monday through
15  Friday?
16        A.  Yes.
17        Q.  And were your hours different on the
18  weekends?
19        A.  Yes.  They were earlier.
20        Q.  What were your hours on the weekends
21  during the school year?
22        A.  What was that?
23        Q.  What were your hours during the weekend
24  during the school year?
25        A.  So it was either on Saturday or Sunday.
```

72

```
1   It was approximately between 6:00 a.m. to 2:00 p.m.
2         Q.  And Mr. Hunt asked you about certain
3   gifts that you received from the family, do you recall
4   those questions?
5         A.  Yes.
```

18 (Pages 69 to 72)

TIFFANY ANNE MICHELE HERZOG - 3/31/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

---

73

5  Q.  Did you have an understanding as to
6  whether your participation in the au pair program
7  could be terminated at any time during your program?
8  A.  Yes.
9  Q.  What was your understanding as to the
10 condition under which your participation in the au
11 pair program could be terminated?
12 A.  It didn't happen to me, but I know from
13 other au pairs with InterExchange, there was an issue
14 with the family, like, they just don't like each other
15 or they disagreed to doing things.  They just called
16 off and they had to go back home or with another
17 family, which didn't happen to me, but it could have.
18 Q.  Did you understand the process for
19 termination under the au pair program?
20 A.  Sorry.  Can you repeat?
21 Q.  Did you have an understanding as to the
22 process for termination in the au pair program?
23 A.  What do you mean?
24 Q.  Was the termination process ever
25 explained to you by anyone at InterExchange?

---

74

1  A.  Hello?
2  Q.  Hello?
3  MR. VALDIVIESO:  Can we go off the
4  record?
5  MR. HUNT:  Yes.
6  (Off-the-record discussion.)
7  MR. VALDIVIESO:  Can you read back the
8  last question?
9  (The question was read back as follows:
10 "Was the termination process ever explained to you by
11 anyone at InterExchange?")
12 A.  Hello?
13 Q.  (BY MR. VALDIVIESO)  Sorry, was there an
14 answer?  Could you hear the question?
15 A.  Yes.  The answer is no.
16 Q.  You said you were aware of au pairs that
17 had been terminated; is that right?
18 A.  Yes.  And if we were, we would have to
19 re-match and if it was not working, then we would have
20 to go home at our own expenses.
21 Q.  How did you know that information?
22 A.  I can't remember if it was from
23 InterExchange or au pair.  I don't remember.
24 Q.  Do you remember where you learned that
25 information?

---

75

1  A.  I heard it so many times.  I don't
2  remember when was the first time I heard it.
3  Q.  Do you recall if that information was
4  covered at the training?
5  MR. HUNT:  Objection.
6  A.  Maybe.
7  MR. VALDIVIESO:  Okay.  I don't have any
8  further questions.
9  MR. HUNT:  Just a few.
10 EXAMINATION
11 BY MR. HUNT:
12 Q.  Ms. Herzog, did InterExchange tell you
13 to give the children gifts?
14 A.  No.
15 Q.  You said when there are issues with the
16 family -- excuse me.
17 When you were talking about the
18 termination process, and if there were issues with the
19 family, you said "they" called it off.  Who is "they"?
20 A.  I don't know if it was from the au pair
21 or the family.
22 Q.  Were you referring to the au pair or the
23 family when you said "they"?
24 A.  Yeah.
25 Q.  Did you ever do anything for

---

76

1  InterExchange?
2  MR. VALDIVIESO:  Objection to form.
3  Q.  (BY MR. HUNT) Go ahead, Ms. Herzog.
4  A.  I mean, I had to fill out the papers.  I
5  had to go to the training.  I had to go to classes.
6  And I had to perform what I had to do with the family.
7  Q.  Okay.  You mentioned some LinkedIn
8  communications that you received earlier.  I just ask
9  if you could please look for those, and if you have
10 any that are related to your hours of work or your --
11 the amount of money that you received or your
12 participation in this lawsuit, if you could please
13 provide those to your lawyer.  Okay?
14 A.  Okay.
15 MR. HUNT:  I don't have any other
16 questions.
17 MR. VALDIVIESO:  I don't have any follow
18 up.
19 WHEREUPON, the within proceedings were
20 concluded at the approximate hour of 12:57 p.m. on the
21 31st day of March, 2018.
22
23
24
25

---

19 (Pages 73 to 76)

**TIFFANY ANNE MICHELE HERZOG - 3/31/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

77

I, TIFFANY ANNE MICHELE HERZOG, do
hereby certify that I have read the above and
foregoing deposition and that the same is a true and
accurate transcription of my testimony, except for
attached amendments, if any.

Amendments attached   (   ) Yes   (   ) No

_____
TIFFANY ANNE MICHELE HERZOG


The signature above of TIFFANY ANNE
MICHELE HERZOG was subscribed and sworn to or affirmed
before me in the county of _____, state
of _____, this _____ day of
_____, 2018.


_____
Notary Public
My Commission expires:


Johana Paola Beltran, et al., 3/31/18 (tds)

78

REPORTER'S CERTIFICATE
STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said TIFFANY ANNE MICHELE HERZOG
was duly sworn or affirmed by me to testify to the
truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

IN WITNESS WHEREOF, I have affixed my
signature this 6th day of April, 2018.

My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

20 (Pages 77 to 78)

REPORTER'S CERTIFICATE

STATE OF COLORADO           )
                            )  ss.
CITY AND COUNTY OF DENVER )


            I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said TIFFANY ANNE MICHELE HERZOG
was duly sworn or affirmed by me to testify to the
truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

            I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

            IN WITNESS WHEREOF, I have affixed my
signature this 6th day of April, 2018.

            My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




_____
Tracy R. Stonehocker
Registered Professional Reporter

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 14-cv-03074-CMA-KMT
 3   _____

 4   DEPOSITION OF: LADY MILENA DEDERLE RODRIGUEZ
                      April 3, 2018
 5   _____

 6   JOHANA PAOLA BELTRAN, et al.,

 7   Plaintiffs,

 8   v.

 9   INTEREXCHANGE, INC., et al.,

10   Defendants.

11   _____

12            PURSUANT TO NOTICE, the deposition of
     LADY MILENA DEDERLE RODRIGUEZ, was taken on behalf of
13   the Defendant, InterExchange, Inc., at 633 17th
     Street, Suite 3000, Denver, Colorado 80202, on
14   April 3, 2018 at 1:33 p.m., before Tracy R. Stonehocker,
     Certified Realtime Reporter, Registered Professional
15   Reporter and Notary Public within Colorado.

16

17

18

19

20

21
```

H+G

Hunter + Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT
_____
DEPOSITION OF: LADY MILENA DEDERLE RODRIGUEZ
             April 3, 2018
_____
JOHANA PAOLA BELTRAN, et al.,
Plaintiffs,
v.
INTEREXCHANGE, INC., et al.,
Defendants.
_____

        PURSUANT TO NOTICE, the deposition of
LADY MILENA DEDERLE RODRIGUEZ, was taken on behalf of
the Defendant, InterExchange, Inc., at 633 17th
Street, Suite 3000, Denver, Colorado 80202, on
April 3, 2018 at 1:33 p.m., before Tracy R. Stonehocker,
Certified Realtime Reporter, Registered Professional
Reporter and Notary Public within Colorado.

---

**2**

        A P P E A R A N C E S
For the Plaintiffs:
    JUAN VALDIVIESO, ESQ.
    Boies Schiller Flexner L.L.P.
    1999 Harrison Street, Suite 900
    Oakland, California  94612

For the Defendant, InterExchange, Inc.:
    ALYSSA L. LEVY, ESQ.
    Sherman & Howard, L.L.C.
    633 17th Street, Suite 3000
    Denver, Colorado  80202

Also Present:

    Mari Welch, Interpreter

---

**3**

        I N D E X

EXAMINATION OF LADY MILENA DEDERLE RODRIGUEZ:    PAGE
April 3, 2018
By Ms. Levy                                     4, 73
By Mr. Valdivieso                                  69
                                             INITIAL
DEPOSITION EXHIBITS:                        REFERENCE

Exhibit 1  Consent to Join, Rodriguez, 10/31/17    24

Exhibit 2  AP Agreement, Rodriguez, 3/2/14         35

---

**4**

1        (Deposition Exhibit Numbers 1 through 2
2    were marked.)
3        WHEREUPON, the following proceedings
4    were taken pursuant to the Federal Rules of Civil
5    Procedure.
6        *    *    *    *    *
7            MARI WELCH,
8    having been first duly sworn to translate accurately
9    and correctly from English to Spanish and Spanish to
10   English as follows:
11       (Interpreter's reply to oath:  I do.)
12       *    *    *    *    *
13           LADY MILENA DEDERLE RODRIGUEZ,
14   having been first duly sworn to state the whole truth,
15   testified as follows:
16       (Deponent's reply to oath:  Yes, I
17   swear.)
18           EXAMINATION
19   BY MS. LEVY:
20       Q.   My name is Alyssa Levy, and I'm from
21   the law firm of Sherman and Howard and I represent
22   InterExchange and I will be asking you the questions
23   today.  Could you please state your name for the
24   record?
25       A.   Lady -- complete name?

---

1 (Pages 1 to 4)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

5

1          Q. Your complete name, please.
2          A. Lady Milena Dederle Rodriguez.
3          Q. Your attorney has stated that you
4 require an interpreter, so I will ask you a question
5 and the interpreter will repeat it to you in Spanish
6 and you can give your answer in Spanish. Okay?
7          A. Okay.
8          Q. If there's a question that you do not
9 understand, please tell me and I can ask it again.
10 Okay?
11         A. Yes.
12         Q. Have you ever had your deposition taken
13 before or testified under oath?
14         A. No.
15         Q. You understand that you are under an
16 oath to tell the truth today, correct?
17         A. Correct.
18         Q. Please listen to the entire question
19 before you begin your answer. Okay?
20         A. Okay.
21         Q. And I will let you finish your answer
22 before I start my next question. Okay?
23         A. That's fine.
24         Q. Your attorney may object to one or more
25 of my questions, but unless he tells you not to answer

6

1 the question, you will need to answer. Okay?
2         A. Perfect.
3         Q. If you need a break, please tell me that
4 you need a break, and I only ask that you let me
5 finish a pending question and we hear your answer
6 before we take the break. Okay?
7         A. Perfect.
8         Q. We're going to talk about your
9 experience with your host family today and I ask that
10 when you talk about the host family children that you
11 refer to them by boy or girl or their age instead of
12 their name. Okay?
13      THE INTERPRETER: You don't want their
14 names? Sorry. You don't want their names, just the
15 age?
16      MS. LEVY: Correct.
17         A. Yes.
18      MR. VALDIVIESO: Could I make one --
19 before you get into the substance, can I make one
20 suggestion? Are you about to get in the substance?
21      MS. LEVY: Soon, yes.
22      MR. VALDIVIESO: My one suggestion is
23 when giving your answer, because you're going to have
24 a translator to give it in small chunks and small
25 pieces. So that maybe sentence by sentence, so that

7

1 the translator can translate accurately.
2      THE DEPONENT: Yes.
3         Q. (BY MS. LEVY) Did you --
4      THE INTERPRETER: I'll let you know if I
5 need you to chop it up.
6      MS. LEVY: Okay.
7         Q. (BY MS. LEVY) Did you review any
8 documents to prepare for this deposition?
9         A. No.
10         Q. I'd like to show you a document. This
11 was presented to us as the opt-in form for Lady Milena
12 Dederle Rodriguez. Do you recognize this document?
13         A. No.
14         Q. Is that your electronic signature in the
15 middle of the page?
16         A. Yes.
17         Q. Did you understand when you signed this
18 document that this is the joint -- your joining of the
19 lawsuit against InterExchange?
20         A. Yes.
21         Q. How did you first learn about the
22 lawsuit against InterExchange?
23         A. I received an e-mail with the
24 information about it.
25         Q. Who sent you that e-mail?

8

1         A. The law firm.
2         Q. Is it the law firm of your attorney that
3 is representing you today?
4         A. I'm assuming so.
5         Q. Do you know when you received that
6 e-mail?
7         A. At the end of last year.
8         Q. Do you remember what information was in
9 that e-mail?
10      MR. VALDIVIESO: I'm going to have to
11 take a small break. And I realize there's a pending
12 question, but the purpose is to -- is to establish the
13 scope of the attorney-client privilege.
14      MS. LEVY: Okay.
15      (Recess taken, 1:41 p.m. to 1:44 p.m.)
16      MR. VALDIVIESO: I'm going to allow the
17 witness to answer the question, but I'm going to
18 instruct her not to reveal attorney-client
19 communications.
20         Q. (BY MS. LEVY) Can you tell me what type
21 of information was in the e-mail?
22      MR. VALDIVIESO: Just to be clear as to
23 this initial e-mail to which she's testifying, she may
24 answer these questions. Well, if you could be more
25 specific about the question because I'm not sure.

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

9

1    Q. (BY MS. LEVY) The information that you
2  received in this e-mail, was it how to join the
3  lawsuit or was it what the lawsuit is about or what
4  kind of information was in the e-mail?
5         MR. VALDIVIESO: Objection. Do we want
6  to do translation first and then objections?
7         THE INTERPRETER: Either way.
8         MR. VALDIVIESO: I'll give you -- you do
9  the translation and I'll object. Sorry. I'm
10 going to object to form, but you may answer the
11 question.
12    A. Well, yes, how to join the lawsuit.
13    Q. (BY MS. LEVY) Did the e-mail have a link
14 to a page to join the lawsuit?
15    A. Yes.
16    Q. What is your understanding of what the
17 lawsuit is about?
18    A. I -- it's my understanding is that for
19 payment of the work hours with the family.
20    Q. And you lived with a family in Denver,
21 correct?
22    A. I lived there.
23    Q. Do you know if this lawsuit has anything
24 to do with the amount of money that you were paid for
25 the host family that you lived with?

10

1         MR. VALDIVIESO: Objection to form. You
2  may answer.
3    A. Yes.
4         MR. VALDIVIESO: And you may always
5  answer if I object to form unless I say otherwise.
6    Q. (BY MS. LEVY) When you first came to the
7  United States for the au pair program, what did you
8  believe that you would be paid by the host family that
9  you lived with?
10    A. I knew how much they were going to pay
11 me.
12    Q. And what was that amount?
13    A. Close to 200. Not exactly. It was
14 about 196.58. Something like that.
15    Q. Before learning of this lawsuit, did you
16 have concerns about what you were paid?
17         MR. VALDIVIESO: Objection to form. You
18 may always answer when I say object to form, unless I
19 tell you not to.
20    A. Yes, during the time that I was
21 already -- when I had already been working here.
22    Q. What were those concerns?
23    A. That the money was not sufficient to
24 cover all the goals and things that we -- one was
25 planning to have while we were at this program.

11

1    Q. Where were you living when you signed
2  this opt-in form?
3    A. Here in the United States.
4    Q. Were you in Colorado?
5    A. Yes.
6    Q. Where do you live now?
7    A. Here in the United States.
8    Q. Do you live in Denver?
9    A. In Aurora.
10    Q. How long have you lived in Aurora?
11         MR. VALDIVIESO: I'm going to object on
12 relevance, but allow the witness to answer, but I
13 think we're starting to roam into areas that aren't
14 really relevant to this case. You may answer.
15    A. A year and a half.
16    Q. (BY MS. LEVY) You lived with the Sherick
17 family; is that right?
18    A. Yes.
19    Q. Do you still communicate with your host
20 family?
21    A. No.
22    Q. Where are you from originally?
23    A. Columbia.
24    Q. Have you discussed the lawsuit against
25 InterExchange with anyone in the Sherick family?

12

1    A. No.
2    Q. Did you discuss the lawsuit with other
3  au pairs?
4         MR. VALDIVIESO: Before she answers
5  here, I'm going to give an instruction that to the
6  extent that Ms. Dederle shared any legal advice that
7  she received from her attorneys with any other au pair
8  or to the extent that any au pair shared any legal
9  advice that they had received with       Ms. Dederle,
10 I'm going to instruct the witness not to reveal that
11 information, and the basis for my instruction is that
12 Ms. Dederle has a common interest with other au pairs
13 such that any sharing of privileged communications
14 amongst themselves does not constitute a waiver of the
15 attorney-client privilege. But the witness may answer
16 the question so long as she does not reveal any
17 attorney-client communications.
18    Q. (BY MS. LEVY) I'm going to repeat the
19 question. Have you discussed this lawsuit with other
20 au pairs?
21    A. Yes.
22    Q. Can you describe the conversation?
23         MR. VALDIVIESO: Please keep in mind my
24 prior instruction in answering this question.
25    A. Just that I had received an e-mail with

3 (Pages 9 to 12)

13

1 the information.
2    Q.  (BY MS. LEVY) Did you discuss with the
3 other au pairs what the lawsuit is about?
4    A.  Yes.
5    Q.  And what topics did you discuss with the
6 other au pairs that this lawsuit is about?
7    MR. VALDIVIESO:  I'm going to give an
8 instruction here.  If these communications happened
9 before you had had a lawyer, you may -- you may answer
10 the question fully.  If these conversations happened
11 after you received a lawyer, please do not disclose
12 any information you received from your attorney.
13    Q.  (BY MS. LEVY) I'm going to repeat the
14 question.  When you talked to these other au pairs
15 about the lawsuit, what were the topics that you
16 discussed?
17    A.  Well, the same concern that we had, it's
18 about the money that the money was not enough to cover
19 the things that we were planning to do here.
20    Q.  Did you complete any survey or
21 questionnaire in connection with this lawsuit?
22    A.  Yes.
23    Q.  How did you receive this survey or
24 questionnaire?
25    A.  By e-mail.

14

1    Q.  Who sent you the survey or
2 questionnaire?
3    A.  The law firm.
4    Q.  And when did you receive the e-mail?
5    A.  Two months ago.
6    Q.  Did you respond to the questions?
7    A.  Yes.
8    Q.  How many questions were there?
9    A.  I don't remember.
10    Q.  Were there more than 20?
11    A.  I don't remember.
12    Q.  When you talked to other au pairs about
13 the lawsuit, when were those conversations?
14    A.  Verbally.
15    MR. VALDIVIESO:  I think there was
16 a -- the question was when, right?
17    MS. LEVY:  I'll ask again.
18    Q.  (BY MS. LEVY) When were the
19 conversations that you had with the au pairs about the
20 lawsuit?
21    A.  Shortly after I received the e-mail.
22    Q.  Was that at the end of last year?
23    A.  Yes.
24    Q.  When did you first learn about the
25 opportunity to be an au pair in the United States?

15

1    A.  Ads in my country.  About four years
2 ago.
3    Q.  How did you first learn about the au
4 pair program?
5    A.  By some ads -- some ads in my country.
6    Q.  Where did you see the ads?
7    A.  In a magazine.
8    Q.  Were the ads for a certain company?
9    A.  What do you mean?  I don't understand
10 what company are you talking about.
11    Q.  The ads you saw in the magazine about
12 the au pair program, who -- who put the ad in the
13 magazine?
14    MR. VALDIVIESO:  Objection to form.
15    A.  I don't know, perhaps the same company
16 that I register under.  Global Connection.
17    Q.  (BY MS. LEVY)  Was it a Global
18 Connection ad to be an au pair?
19    A.  That was the name of the company, Global
20 Connection.
21    Q.  It said the name Global Connection in
22 the magazine ad?
23    A.  I don't remember.
24    Q.  Why do you think it was a Global
25 Connection ad, then?

16

1    A.  Because I remember that's the company
2 that I register under to be part of au pair.  And in
3 that ad, there was a phone number, their phone number
4 and their address.
5    MR. VALDIVIESO:  May we go off the
6 record briefly, please?
7    MS. LEVY:  Sure.
8    (Off-the-record discussion.)
9    Q.  (BY MS. LEVY) Did any organizations
10 recruit you to be an au pair in the United States?
11    MR. VALDIVIESO:  Objection to form.
12    A.  Well, it was a company or corporation,
13 as I said, the only thing I know it was Global -- the
14 name was Global Connection.
15    Q.  (BY MS. LEVY)  What happened when
16 you -- did you -- how did you contact Global
17 Connection?
18    A.  Through the ad that I saw.  I called
19 them and they had already scheduled like a gathering,
20 like a meeting, so that they can pretty much let
21 people know about the program and I attended that
22 meeting.
23    Q.  And then what happened to apply to the
24 au pair program?
25    A.  So I decided to find out about the

4 (Pages 13 to 16)

---

17

1   requirements for the program and I started the
2   application.
3        Q.   Did you apply to the au pair program
4   through one sponsor or more than one sponsor?
5        MR. VALDIVIESO:  I was objecting to
6   form.  You may answer the question.
7        A.   One.
8        Q.   (BY MS. LEVY) What was that one sponsor
9   you applied to?
10       A.   Global Connection.
11       Q.   How did you decide to apply to
12   InterExchange?
13       MR. VALDIVIESO:  Objection to form.
14       A.   I think that Global Connection was
15   already connected or united with InterExchange.
16       Q.   (BY MS. LEVY)  When you went to the
17   scheduled meeting at Global Connection, what
18   information did they give you there?
19       A.   All about the program.  Everything
20   related to the program.  Payment, work, and that I was
21   going to be able to study, work.  And they were
22   showing us all the beauty aspects of it.  How can I
23   say this?  All the benefits of belonging to -- being
24   united to this program or being part of this program.
25       Q.   At that meeting with Global Connection,

---

18

1   did they discuss InterExchange?
2        A.   Not by name.  Not by name.  I don't
3   remember.  They just talk about the program, how was
4   the program, what it basically -- what work the
5   program, but they didn't really mention anything about
6   the companies that they were going to work with.
7        Q.   When did you first hear the name
8   InterExchange?
9        A.   When I started signing contracts.
10       Q.   What interested you about the program?
11       A.   That I was going to be able to study and
12   work at the same time.  And I also get to see places
13   here in the United States, to travel.
14       Q.   When you were thinking about becoming an
15   au pair, did you ever meet with a recruiter or a staff
16   member from InterExchange?
17       MR. VALDIVIESO:  Objection to form.
18       A.   It was a recruiter, but I think that
19   they was also part of Global Connection.  I really
20   don't know.
21       Q.   (BY MS. LEVY) Did any -- did anyone you
22   met with when you were thinking about becoming an au
23   pair identify themselves as a representative of
24   InterExchange?
25       A.   I don't remember.

---

19

1        Q.   When you met with the recruiter from
2   Global Connection, did you discuss the weekly stipend
3   with them that you would be paid as an au pair?
4        MR. VALDIVIESO:  Objection to the form,
5   mischaracterizes the witness' testimony.
6        A.   What was the question again?
7        THE INTERPRETER:  Do you want me to
8   repeat it?
9        Q.   (BY MS. LEVY) When you met with the, I
10   believe you said recruiter from Global Connection, did
11   you discuss the weekly stipend with them that you
12   would be paid as an au pair?
13       MR. VALDIVIESO:  Objection.  You may
14   answer.
15       A.   Yes.
16       Q.   (BY MS. LEVY) And what was discussed?
17       A.   That they were going to pay
18   approximately $200 per week.
19       MR. VALDIVIESO:  Can we go off the
20   record a second?
21       (Off-the-record discussion.)
22       Q.   (BY MS. LEVY) Can you define the word
23   "recruit" as you understand it?
24       A.   To gather, to bring people together for
25   some purpose.

---

20

1        Q.   Do you believe you were recruited into
2   the au pair program?
3        A.   Yes.
4        Q.   Can you explain how you think you were
5   recruited into the au pair program?
6        A.   Before you can join the program, they
7   have -- they list certain requirements.  So I had to
8   spend some time and spend some money to be able to
9   meet all the requirements so that they can be part of
10  the program or be integrated to the program.
11       Q.   And when you say they list certain
12  requirements, who do you mean by "they"?
13       A.   In this case, it will be you,
14  InterExchange.
15       Q.   When did you first receive this list of
16  requirements?
17       A.   Right after I talked to the recruiter,
18  the lady who was the recruiter.  She sent me an e-mail
19  with a list of all the requirements that I had to
20  meet.
21       Q.   This e-mail that you received with the
22  list of requirements, did it come from Global
23  Connection or from InterExchange?
24       A.   I wouldn't know because I don't know if
25  Global Connection and InterExchange are one -- all in

---

5 (Pages 17 to 20)

LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

---

21

1  one company or different companies, I don't know.
2      Q.  When you were gathering information
3  about the au pair program, did you ever meet with a
4  staff member from Global Connection who told you they
5  were from Global Connection?
6      A.  To be honest with you, I don't remember
7  if they introduced themselves like part of Global
8  Connection or InterExchange.
9      Q.  When you went to the meeting to first
10 hear information, it was at the Global Connection
11 office, right?
12     A.  That is correct.
13     Q.  Was there a sign outside their office
14 that said Global Connection?
15     A.  I don't remember.
16     Q.  Do you remember if there was a sign
17 outside their office that said InterExchange?
18     A.  I don't remember the name of the office
19 or what was indicated outside of the office. I don't
20 remember.
21     Q.  Do you remember inside the office when
22 you went to the meeting if there was a sign that said
23 Global Connection in there?
24     A.  I don't remember.
25     Q.  How did you know you were at the right

---

22

1  place for the au pair meeting?
2      A.  Because they gave me the address.
3      Q.  And this was the address that you saw in
4  the magazine ad?
5      A.  No.
6      Q.  Where did you get the address for the
7  meeting when you went to hear more information about
8  au pairs?
9      A.  I called the number that was indicated
10 in the ad.
11     Q.  And when you called the number in the
12 ad, they gave you the address for the meeting about
13 the au pairs?
14     A.  Yes, I remember there was like a
15 conference room.
16     Q.  Do you recall completing an application
17 for the InterExchange program?
18     A.  Yes.
19     Q.  Did you compete your InterExchange
20 application yourself?
21     A.  Yes.
22     Q.  Did anyone help you complete your
23 InterExchange application?
24     A.  No.
25     Q.  Do you recall receiving information

---

23

1  about InterExchange before you applied to the program?
2      A.  Could you repeat that question, please?
3      Q.  Do you recall receiving information
4  about InterExchange before you applied to the au pair
5  program?
6      A.  Specifically what about InterExchange?
7      Q.  Do you remember receiving any
8  information about the au pair program from
9  InterExchange before you applied?
10     A.  All the information to be able to be
11 part of au pair that I received, it was never
12 really -- it was very general. It wasn't really
13 indicated specifically if it was one or the other when
14 I started to complete the documents to get into the
15 program.  So that's why it's not very clear to me if
16 it's going to be InterExchange or Global Connection.
17 I think, for me, at some point they're both one and
18 the same.
19     Q.  When you received the information that
20 you were just referring to, what country were you in?
21     A.  In Columbia.
22     Q.  Did you ask anyone in Columbia to help
23 you read the information?
24     A.  No.
25         MR. VALDIVIESO:  Can we go off the

---

24

1  record.
2          (Off-the-record discussion.)
3          MR. VALDIVIESO:  Let's go back on the
4  record.
5      A.  Could I make a note, a clarification
6  regarding this document?
7      Q.  (BY MS. LEVY)  Yes.
8      A.  When they give me this document and you
9  asked the question if I recognized the document, I
10 said that I didn't.  Because I didn't really take the
11 time to read what it says.  And I just saw it and I
12 said no, I didn't, but now that I'm looking at it and
13 reading it, of course, that is the -- one of the
14 communications I got from the attorneys.
15     Q.  Just for the record, this is regarding
16 Exhibit 1, the consent to join that we looked at
17 earlier.
18         MR. VALDIVIESO:  Was that a question?
19         MS. LEVY:  No, just a clarification on
20 the record.
21         MR. VALDIVIESO:  Okay.  Are we handing
22 the witness the stamped versions or no?  If you're not
23 going to be referring to exhibits multiple times, it
24 doesn't matter.
25         MS. LEVY:  No.

---

6 (Pages 21 to 24)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

25

1        MR. VALDIVIESO:  That's fine.  Thanks.
2        Q.  (BY MS. LEVY) What did you do when you
3 decided to apply to the au pair program?
4        A.  Could you repeat that?
5        Q.  What did you do when you decided to
6 apply to the au pair program?
7        MR. VALDIVIESO:  Objection to form.
8        A.  To gather all the requirements that they
9 were asking for so that I could apply.
10        Q.  (BY MS. LEVY) And how did you apply to
11 the au pair program?
12        A.  I'm sure that it was through the company
13 Global Connection.
14        Q.  Did you fill out paperwork for Global
15 Connection and give it back to them at their office?
16        MR. VALDIVIESO:  Objection to form.
17        A.  The application I don't remember very
18 well.  It was done with an actual copy or I did that
19 through an e-mail.
20        Q.  (BY MS. LEVY) When you say e-mail, do
21 you mean an online application?
22        A.  No.  I don't remember.
23        Q.  Do you remember who you communicated
24 with at the Global Connection office in Columbia?
25        A.  Her name was Lorena.

---

26

1        Q.  Do you know if she was Columbian?
2        A.  Yes.
3        Q.  Did Lorena ever tell you that she worked
4 for InterExchange?
5        A.  She did not specify, but I know that
6 she -- she went -- she was part of au pair as well.
7        Q.  Can you repeat that last part again that
8 she was part of?
9        A.  She was an au pair as well.
10        Q.  Do you know if Lorena was an au pair
11 through the InterExchange program?
12        A.  No, I don't know.
13        Q.  Did you talk to Lorena about her
14 experience as an au pair?
15        A.  Yes.
16        Q.  Did she have any concerns about being an
17 au pair that she shared with you?
18        A.  No.  No, she was one of the people that
19 was listing all the benefits and beautiful things
20 about the program.
21        Q.  Before you came to the United States as
22 an au pair, did you have any communications with
23 InterExchange representatives who were in the United
24 States?
25        A.  The entire time, my communication was

---

27

1 with Lorena in Columbia before I came.
2        Q.  I represent to you that the application
3 that InterExchange sends to all of its au pairs says
4 au pairs are paid at least 195.75 per week.  Do you
5 recall reading this information?
6        MR. VALDIVIESO:  I object to the form
7 and I also in this case I'm requesting that the
8 question be read back.  In English, please and be
9 re-translated.
10        (The question was read back as follows:
11 "I represent to you that the application that
12 InterExchange sends to all of its au pairs says au
13 pairs are paid at least 195.75 per week.  Do you
14 recall reading this information?")
15        A.  Yes.
16        Q.  (BY MS. LEVY) When you read this, did
17 anything about this amount concern you?
18        A.  No.
19        Q.  Did you ask any questions about this
20 stipend amount when you were in Columbia?
21        THE INTERPRETER:  I'm sorry, can you
22 repeat that?
23        Q.  (BY MS. LEVY) Did you ask any questions
24 about this stipend amount when you were in Columbia?
25        A.  No.  Because when you make the exchange

---

28

1 from dollars -- dollars, U.S. dollars to Columbian
2 pesos, it's a big amount and you don't take into
3 account what is going to be the cost of living until
4 you are already here.
5        Q.  Did you have any discussions with
6 InterExchange representatives in the United States
7 about the stipend when you came to the United States?
8        A.  No.
9        Q.  Did you pay any fees to participate in
10 the au pair program?
11        A.  Yes.
12        Q.  What were those fees?
13        A.  Approximately 3 million of Columbian
14 pesos.
15        Q.  And who did you make that payment to?
16        A.  To the same company that was recruiting
17 me and, again, it's not very clear to me if it was
18 InterExchange or Global Connection, the same company.
19        Q.  Did you make the payment for the fees to
20 Lorena?
21        A.  I remember I made the payment to a bank
22 account of the company.
23        Q.  Was this by bank transfer or a check?
24        A.  A deposit.
25        Q.  What was the name on the bank account

---

7 (Pages 25 to 28)

LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

---

29

that you were depositing the money to?
   A.  I don't remember.
   Q.  What country were you living in when you started the matching process to find a family to be an au pair?
   A.  In Columbia.
   Q.  Can you tell me about the matching process that you went through to match with your host family in Denver?
   A.  It's through a Facebook.  It's similar to one of the Facebook pages, so you have your profile and the families also have their profile.  And the family chooses the person they want to see or interview.  So once the person sees your -- indicates that they want to interview you, then your page, your profile remains like in a pause or something standing, so that nobody else gets to see it.
   Q.  So you were able to view families that were interested in you being their au pair?
   A.  Yes.
   Q.  Could you communicate with them?
   A.  It was a requirement to interview with them through Skype.
   Q.  How many different host families did you interview with before you matched with the Sherick

---

30

family?
   THE INTERPRETER:  What's the name of the family?  I'm sorry.
   MS. LEVY:  Sherick.
   A.  Two other families.
   Q.  (BY MS. LEVY)  Did the Sherick family pick you to be their au pair or did you pick them or how did that work?
   A.  It's reciprocal.  They chose -- they choose first.  And then I decided if I was going to accept it or not.  In this case, after they chose me, I accepted.
   Q.  Who made the decision for you to match with the Sherick family?
   MR. VALDIVIESO:  Objection to form.
   A.  I did.
   Q.  (BY MS. LEVY)  Did InterExchange assign you to the Sherick family?
   A.  Of that I am sure because I remember the pages of the profiles.  It was part of the InterExchange.
   MS. LEVY:  Can we go off the record?
   (Recess taken, 2:50 p.m. to 3:33 p.m.)
   Q.  (BY MS. LEVY)  Did you want to go live with the Sherick family when they chose you?

---

31

   A.  Yes.
   Q.  Could you have said no if you were not interested in living with that family?
   A.  Yes.
   Q.  How many times did you talk with the Sherick family during the matching process?
   A.  Twice.
   Q.  Was that two times on Skype?
   A.  Yes.
   Q.  Who from the host family was part of the Skype conversations?
   A.  The first call was with the mother and the father.  And the second call it was with the mother and the father and one of the girls.  I think she's five or six years old or she was five or six years old.
   Q.  Was anyone from the agency in Columbia part of either of those Skype interviews with the host family?
   A.  No.
   Q.  Was anyone from InterExchange in the United States part of those Skype conversations with the host family?
   A.  No.
   Q.  When you were looking at the host family

---

32

profiles or they were looking at your profile, and then you communicated with each other, was InterExchange part of that communication at all?
   MR. VALDIVIESO:  Objection to form.
   A.  No.
   Q.  (BY MS. LEVY)  When you talked with the Sherick family on Skype, did you talk about how much you would be paid when you lived with their family as an au pair?
   A.  No, because I -- it was already signed up with -- in the contract and I'm assuming that they already had a contract or that information with InterExchange.  The family.  I'm assuming that the family also had already signed something with InterExchange.
   Q.  Did you first learn of that stipend amount from the contract that you were referring to?
   MR. VALDIVIESO:  Objection to form.
   A.  No, no, it was since the moment I received all the information about the program.
   Q.  (BY MS. LEVY)  Was that at the meeting that we talked about at the Global Exchange (sic) office?
   A.  Yes, with Global Exchange.
   MR. VALDIVIESO:  Could I have the

---

8 (Pages 29 to 32)

LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.

33

 1   witness repeat the answer because I didn't hear it.
 2        A.  What was the question?
 3        MS. LEVY:  Could we have the court
 4   reporter read it back?
 5        (The question and answer were read back
 6   as follows:  "Was that at the meeting that we talked
 7   about at the Global Exchange (sic) office?
 8        A.  Yes, with Global Exchange.")
 9        A.  Global Connection.
10        Q.  (BY MS. LEVY)  Okay.  When did you first
11   learn how much your own host family was going to pay
12   you each week?
13        A.  When I received all the information of
14   the program at the conference.
15        Q.  And -- all right.  When you say at the
16   conference, is that the same meeting at the Global
17   Connection office?
18        A.  Yes.  Yes.
19        Q.  What was the amount that you were paid
20   by your host family weekly?
21        A.  $200 a week.
22        Q.  And were you okay with that amount?
23        A.  Before I got here, yes.
24        Q.  Did you ever ask your host family to pay
25   you more than that amount per week?

34

 1        A.  No.
 2        Q.  During the Skype interviews with the
 3   Sherick family, did you talk about what you'd be doing
 4   with the children?
 5        A.  Yes.

19        Q.  (BY MS. LEVY)  During the Skype
20   interviews with the Sherick family, did they tell you
21   how many hours per day you'd be working?
22        A.  I don't remember.
23        Q.  Did you ask the Shericks any questions
24   about the hours you would be working during the Skype
25   interviews?

35

 1        A.  No.
 2        Q.  Okay.  I want to show you another
 3   document.  Do you recognize this document?
 4        A.  Yes.
 5        Q.  On the first page in the middle, it
 6   says:  "Agreement signed March 2, 2014" and the
 7   signature, it says your name, "as electronically
 8   signed."  Do you see that?
 9        A.  Yes.
10        Q.  Do you remember signing this document?
11        A.  Yes.
12        Q.  I'd like to turn your attention to
13   page -- the third page of this document.
14        MR. VALDIVIESO:  Counsel, what's the
15   Bates number that you're looking at?
16        MS. LEVY:  This page is Bates numbered
17   InterExchange 51673.
18        MR. VALDIVIESO:  Thank you.
19        Q.  (BY MS. LEVY)  And in paragraph W, it
20   says, "The stipend is the minimum amount that the host
21   family is required to pay the au pair pursuant to U.S.
22   Department of State regulations" --
23        THE INTERPRETER:  Confirming to what,
24   I'm sorry -- confirming to --
25        MS. LEVY:  Do you have a copy of this?

36

 1        THE INTERPRETER:  If you can tell me.
 2   Just the law.
 3        MR. VALDIVIESO:  Counsel, are you
 4   reading the sentence?
 5        MS. LEVY:  Yes.
 6        Q.  (BY MS. LEVY)  "And employment and labor
 7   laws in the U.S.  The current minimum required weekly
 8   amount is $195.75."  Do you see that paragraph?
 9        A.  Yes.
10        Q.  And did you read this agreement before
11   you signed it?
12        A.  Yes.
13        Q.  And did you understand it?
14        MR. VALDIVIESO:  Objection to form.
15        A.  Yes.
16        Q.  (BY MS. LEVY)  You arrived in the United
17   States for the au pair program in August 2014; is that
18   right?
19        A.  Yes.
20        Q.  And when you arrived in the United
21   States, did you go to training in New York City right
22   away?
23        A.  Yes, correct.
24        Q.  What sort of training did you do in New
25   York City?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.



37
```
1      A.  To be able to take care of children of
2  any age, and about the American culture.
3      Q.  How many hours did the training last?
4      A.  I don't remember.  It was an entire
5  week.  Monday through Friday or something like that.
6      Q.  Do you remember if the training started
7  in the morning?
8      A.  Yes, from the morning all the way to the
9  afternoon.
10     Q.  Were you paid for the hours that you
11 were trained in New York City?
12     A.  I don't remember.
13     Q.  Did you do any training in Columbia
14 before going to the United States to be an au pair?
15     A.  Just short introduction, virtual
16 process.
17     Q.  And then after training in New York
18 City, you went to go meet your host family, right?
19     A.  Yes, that's correct.
20     Q.  And you went to meet them in Aspen?
21     A.  Yes.
22     Q.  And how long were you in Aspen?
```

38
```
1      MS. LEVY:  Okay.  Let's go on a break.
2      (Recess taken,  3:51 p.m. to 4:09 p.m.)
3      Q.  (BY MS. LEVY) And then you went to the
4  Shericks' home in Denver?
5      A.  Yes.
```

10 (Pages 37 to 40)

LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.



25    Q.   (BY MS. LEVY) Can you describe your

11 (Pages 41 to 44)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

45

1 duties with respect to the children?

[text redacted]

13     Q.   Did you provide any services to the host
14 family outside of childcare?
15     A.   No.
16     Q.   Did you spend time with other au pairs?
17         MR. VALDIVIESO:  Objection to form.
18     Q.   (BY MS. LEVY)  Can I clarify before you
19 answer?  Did you spend time with other au pairs while
20 you were an au pair?
21     A.   Yes.
22     Q.   What would you do with the other au
23 pairs?
24     A.   To get to see some of the nearer areas
25 or close.  Yeah.  Close areas.  Like perhaps Golden.

---

46

1 Or go to downtown Denver.
2     Q.   Did you ever go hiking with other au
3 pairs?
4     A.   Yes.  In fact, we were supposed to get
5 together every month to do some activities.
6     Q.   Did you get together every month with
7 the other au pairs for activities?
8     A.   Yes, there was a coordinator and she
9 would coordinate all the outings and things like that.
10     Q.   We were just talking about your
11 schedule.  Did your host family give you a written
12 schedule every week?
13     A.   Written, yes.
14     Q.   Was it written on paper or was it
15 electronic?
16         MR. VALDIVIESO:  Objection to form.
17     A.   It was an agenda that the mom had.
18     Q.   (BY MS. LEVY)  Can you explain what you
19 mean by an agenda?
20     A.   It was a written calendar, a paper.
21     Q.   Do you still have that written calendar?
22         MR. VALDIVIESO:  Objection to form.
23     A.   No, it remained in the house with
24 mom -- with the mom.
25     Q.   (BY MS. LEVY)  Did anyone from

---

47

1 InterExchange ever give you a weekly schedule when you
2 were an au pair?
3     A.   No.
4     Q.   Did you have the same schedule each week
5 that the host mom wrote on the calendar?
6         MR. VALDIVIESO:  Objection to form.
7     A.   It was like in a notebook and she would
8 leave there in plain view so I could see it and pretty
9 much organize myself accordingly.
10     Q.   (BY MS. LEVY) Did you keep any records
11 or papers of your weekly schedules from when you lived
12 with your host family?
13     A.   I remember I took some pictures, but I
14 don't think I have them any more.
15     Q.   How many hours per week did you work for
16 your host family?
17     A.   I think it was like 45 hours.  I don't
18 remember.  I don't remember very well, but
19 approximately 45.
20     Q.   Who determined which days of the week
21 you worked?
22     A.   The mother did.
23     Q.   Did InterExchange ever tell you which
24 hours or days to work?
25         MR. VALDIVIESO:  Objection to form.

---

48

1     A.   No.
2     Q.   (BY MS. LEVY)  Were you expected to be
3 available or on call from -- for your host family at
4 times when you were not scheduled to provide
5 childcare?
6     A.   No.  No, because all the hours are the
7 maximum hours -- the maximum of the hours that I was
8 supposed to work, they had already been worked.
9     Q.   When you lived with your host family,
10 were there any weeks that you worked more than 45
11 hours?
12         THE INTERPRETER:  More than 40 hours,
13 did you say?
14         MS. LEVY:  45.
15     A.   No.
16     Q.   (BY MS. LEVY) With your host family, did
17 you ever work more than 10 hours a day?
18     A.   No.
19     Q.   Did you ever have concerns or complaints
20 about the schedule that the Sherick family gave you?
21         MR. VALDIVIESO:  Objection to form.
22     A.   Yes.
23     Q.   (BY MS. LEVY) Can you tell me about
24 those -- I'm sorry, were you still answering?
25     A.   I was going to tell you my concerns.

---

12 (Pages 45 to 48)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

49

1  Q.  Okay.  Please continue.
2      A.  Most of the au pairs that I would get
3  together or that I would go out sometimes, they did
4  not work weekends.  So, whenever I had my days off, I
5  didn't really have anybody to go with or spend time
6  with.
7      Q.  The days that the host family watched
8  Broncos games, were you working while they were
9  watching the games?
10     A.  Yes, they usually would go to the
11 stadium to watch the Broncos and to see the Broncos,
12 the game, and I would stay taking care of the
13 children.
14     Q.  Did you also — when you said you worked
15 before — when you said that you worked the days of
16 Broncos games, did you mean while the parents were at
17 the game or after they had returned from the game?
18     MR. VALDIVIESO:  Objection to form.
19     A.  When the parents were at the game.
20     Q.  (BY MS. LEVY) How much did your host
21 family pay you each week?
22     A.  $200.
23     Q.  How were you paid?
24     A.  Direct deposit from the dad's account.
25     Q.  Did you ever discuss the amount of

---

50

1  weekly payment with your host family?
2      A.  When I arrived, the dad brought me to
3  the bank so I could open an account and he had an
4  account where he would -- they would withdraw -- they
5  would make the payment automatically to my account
6  every month.  They would do the transfers.
7      Q.  Did you ever discuss the amount of the
8  weekly payment with the host dad or the host mom?
9      A.  Well, when I arrived to the house, the
10 dad said to me that he was going to deposit to me $200
11 to my account automatically.
12     Q.  Who decided that amount of the payment?
13     MR. VALDIVIESO:  Objection to form.
14     A.  It was already stipulated in the
15 contract.  It was 195.75 and he pretty much rounded up
16 to 200.
17     Q.  (BY MS. LEVY) Was the same — was this
18 the same amount you received each week from the host
19 family?
20     A.  Yes.
21     Q.  Did they ever pay you more than that
22 $200 per week?
23     A.  No.
24     Q.  Did InterExchange ever pay you your
25 weekly stipend?

---

51

1      A.  No.
2      Q.  Did your host family ever give you extra
3  money for any reason?
4      A.  No.
14     Q.  Did you have a computer to use when you
15 lived with your host family?
16     A.  Yes.
17     Q.  Was it your computer or your host
18 family's computer?
19     A.  The family's computer.
20     Q.  Was there wifi in the home?
21     A.  Yes.
22     Q.  Did you have to pay to use the wifi?
23     A.  No.
24     Q.  Did you have a cell phone when you lived
25 with your host family?

---

52

1      A.  Yes.
2      Q.  Was it your cell phone or the host
3  family's?
4      A.  I had the family's and then later I
5  bought one for myself.  Because the one with the
6  family didn't have any applications.  It was just to
7  call.
8      MR. VALDIVIESO:  Data.
9      A.  Data.  So then I bought a smart phone
10 for me.
11     MR. VALDIVIESO:  Can we read back that
12 last answer.
13     (The last answer was read back as
14 follows:  "I had the family's and then later I bought
15 one for myself.  Because the one with the family
16 didn't have any applications.  It was just to call.")
17     MR. VALDIVIESO:  Just to clarify the
18 record, the word that she used was "datos," which
19 translates into "data."  I wasn't trying to change the
20 witness' testimony.
21     MS. LEVY:  Okay.  Thanks for the
22 clarification.
23     MR. VALDIVIESO:  Could we also take a
24 quick break, please?
25     MS. LEVY:  Thank you.

---

13 (Pages 49 to 52)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

53

```
 1         (Recess taken, 4:47 p.m. to 4:53 p.m.)
 2         Q.  (BY MS. LEVY) When you used the family's
 3    cell phone before you bought your own, did the family
 4    have any rules about using the cell phone?
 5         A.  No.
 6         Q.  Did they have any -- did they have any
 7    rules about using your own cell phone when you bought
 8    your own?
 9         A.  No.
10         Q.  Were you able to make personal calls
11    with both phones?
12         A.  Yes.
13         Q.  Did you have a car that you could use
14    for personal trips when you lived with the host
15    family?
16         THE INTERPRETER:  Automobile, right?
```

---

54

```
 4         Q.  Did you ever use the car for personal
 5    reasons after those first two months?
 6         A.  Perhaps, maybe two or three times and
 7    that was it.
 8         Q.  When you used the host family's car for
 9    personal trips, did they give you gas money?
10         A.  No.
11         Q.  Besides those first few days when you
12    met your host family in Aspen, did you take any other
13    trips with the host family?
14         A.  Yes, one to Mexico.
15         Q.  How did you get to Mexico?
16         A.  By plane.
17         Q.  Did your host family pay for your plane
18    ticket to Mexico?
19         A.  Yes.
20         Q.  Did your host family pay for everything
21    on the trip while you were in Mexico?
22         A.  Yes, except for some medication that I
23    had to purchase because I had some sort of allergy in
24    my eyes.
25         Q.  When you were on the trip in Aspen, did
```

---

55

```
 1    your host family pay for everything there?
 2         MR. VALDIVIESO:  Objection to form.
 3         A.  Yes.
 4         Q.  (BY MS. LEVY) Did you take any other
 5    trips with your host family?
 6         A.  No.
10         A.  No, no, they didn't give it, but most of
11    the time they had the -- it had enough gas in the car,
12    and besides the fact that it was electric and so it
13    wasn't a car that I spent a lot of money or used a lot
14    of money for gas.  And the place where I was supposed
15    to go was near to the house.
16         Q.  Did you ever have to fill up the car
17    with gas?
18         A.  Only when I used it once to go to a --
19    somewhere where it was more than 30 minutes from the
20    house.
21         Q.  Did you take any trips on your own when
22    you lived with the host family?
23         A.  Yes.
24         Q.  Where did you go?
25         A.  I went back to Columbia for one week.
```

---

56

```
 1    And within the United States, no, I wasn't able to
 2    make more trips.
 3         Q.  Did your host family pay for anything
 4    for your trip back to Columbia when you were an au
 5    pair?
 6         A.  No.
 7         Q.  Were there any other benefits that you
 8    received from living with the host family?
 9         A.  Well, I didn't have to pay rent and they
10    also had food or they would buy food if I need it.
11         Q.  Did you eat dinner with your host family
12    at night?
13         A.  Maybe two or three times a week.
14         Q.  Did you ever watch the Broncos games
15    with your host family when they watched at the house?
16         A.  Twice.
17         Q.  Did your host family or InterExchange
18    provide you with a log to write in of any type?
19         A.  What are you referring, like a log?  For
20    like what?
21         Q.  Did -- did your host family or
22    InterExchange give you a -- any sort of paper or
23    journal or anything to write in or on?
24         MR. VALDIVIESO:  Objection to form.
25         A.  Yes, they give me like a notebook or
```

---

14 (Pages 53 to 56)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

57

1   maybe a calendar.
2       **Q.  (BY MS. LEVY) Did you write in it?**
3       A.  No.  I used that -- I had some English
4   classes and I used that for the English classes.
5       **Q.  Who told you what duties to perform for**
6   **your host family?**
7       A.  The mother and the father.
8       **Q.  Did InterExchange ever tell you what**
9   **duties to perform for your host family?**
10      A.  No.  It was just what I was supposed to
11  do and what I was not supposed to do for the family.
12     **Q.  When InterExchange told you this, was it**
13  **information for all au pairs or was it specific to the**
14  **Sherick family for all au pairs?**
15     **Q.  Did anyone from InterExchange supervise**
16  **you while you were taking care of the Shericks'**
17  **children?**
18       MR. VALDIVIESO:  Objection to form.
19       A.  Well, they never supervised me at all,
20  but there was a coordinator and you could refer to her
21  if there was some inconvenience or problems.
22     **Q.  (BY MS. LEVY) Did you have any other**
23  **duties with your host family that we haven't already**
24  **talked about?**
▮

---

58

▮
▮
▮
▮
▮
7     **Q.  Did your -- were you finished?**
8     A.  Yes.
9     **Q.  Did your host family ever ask you to**
10  **perform any duties that concerned you in any way?**
▮
▮
▮
▮
▮
▮
▮
20     **Q.  Was that issue resolved?**
21     A.  No, I think that we had to wait for the
22  following week for that -- for the trash to be picked
23  up.
24     **Q.  You took classes when you lived with**
25  **your host family?**

---

59

1     A.  Yes, English classes.
2     **Q.  How many classes did you take?**
3     A.  I have to do 40 credits.  I think I
4  completed that in two months.  I don't remember very
5  well.
6     **Q.  Did you choose your classes?**
7     A.  Well, there wasn't too many options.
8  They were very limited options, in fact, because of
9  the family would pay for the classes, so we have to
10  choose the classes according to the money that they
11  could pay and pretty much English was the only option.
12  There wasn't anything else that would be able to take
13  with that money.  I would have liked to get into maybe
14  some other classes like college or something other
15  than just English.
16     **Q.  How many classes did you take?**
17     A.  I don't remember.  It was three times a
18  week and it was for about two months.
19     **Q.  Do you remember the university or**
20  **college where you took your class or classes?**
21     A.  Colorado English of School.
22     **Q.  You mentioned a local coordinator.  Was**
23  **this a local coordinator in Denver when you lived with**
24  **the Sherick family?**
25     A.  Yes.

---

60

1     **Q.  And did you meet with this local**
2  **coordinator when you were an au pair?**
3     A.  Yeah, during the monthly meetings with
4  the rest of the au pairs.
5     **Q.  Do you remember who your local**
6  **coordinator was?**
7     A.  Paula Ullman.
8     MR. VALDIVIESO:  Does the court reporter
9  want her to spell that out?
10     THE REPORTER:  Yes, please.
11     A.  P-a-u-l-a U-l-l-m-a-n.
12     **Q.  (BY MS. LEVY) And other than seeing her**
13  **at the monthly meetings with the other au pairs, did**
14  **you meet with her in person other times?**
15     A.  No, I don't think so.  I don't remember,
16  but I don't think so.
17     **Q.  Do you remember if Paula came to your**
18  **host family's home shortly after you arrived there?**
19     A.  Yes.
20     **Q.  Did she come to the Sherick home to meet**
21  **with you more than once?**
22     A.  No, I don't think so.
23     **Q.  That time that she came to meet you at**
24  **the Shericks' home, what happened at that meeting?**
25     A.  I don't remember.  I think it was just

---

15 (Pages 57 to 60)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

**61**

1  to introduce myself. Introduce herself to me and to
2  the family.
3      Q. Did Paula supervise the childcare that
4  you provided for the Shericks' children?
5      A. No.
6      Q. Did Paula give you duties to perform for
7  the family?
8          MR. VALDIVIESO: Objection to form.
9      A. No.
10      Q. (BY MS. LEVY) Did Paula pay you when you
11  were an au pair?
12      A. No.
13      Q. Was Paula the only local coordinator
14  that you met with while you were an au pair?
15      A. Yes.
16      Q. Other than Paula, did you meet with any
17  other people from InterExchange when you lived with
18  the Sherick family?
19      A. No.
20      Q. We've asked you, through your attorneys,
21  to search for any documents relating to amounts that
22  were paid to you, and hours that you worked. Have you
23  searched for any of these documents?
24      A. No.
25      Q. Do you have any documents given to you

---

**62**

1  by InterExchange's international cooperator related to
2  your participation in the au pair program?
3      A. Yes.
4      Q. Have you provided any of those documents
5  that you received from InterExchange's international
6  cooperator to your attorney?
7      A. No.
8      Q. Do you have any documents such as
9  e-mails or social media relating to your work
10  performance or duties or —
11          THE INTERPRETER: Could you hold on a
12  second, please? Could you start all over?
13          MS. LEVY: Sure.
14      Q. (BY MS. LEVY) Do you have any documents
15  such as e-mails or social media relating to your work
16  performance, duties or compensation as an au pair?
17      A. Yes.
18      Q. Have you provided any of that to your
19  attorney?
20      A. No.
21          MR. VALDIVIESO: I'm objecting to the
22  form of the question. I realize it's a little late.
23  I'm putting my objection in there.
24      Q. (BY MS. LEVY) Did you keep any records
25  of the payment from your host family?

---

**63**

1      A. No, but there must be in the bank
2  statements.
3      Q. Do you still have access to those bank
4  statements?
5      A. I have not tried. But I am thinking
6  that yes.
7          MR. VALDIVIESO: Counsel, to the extent
8  that there are bank statements that she has access to,
9  we will produce them to you.
10          MS. LEVY: Okay. I would ask that all
11  of the documents that we've discussed that Ms. Dederle
12  has said that she still has and has -- has or has not
13  produced to you, that you either request those from
14  her or search your records and produce all of that to
15  us.
16          MR. VALDIVIESO: We will perform a
17  reasonable search and produce responsive documents.
18          MS. LEVY: Thank you.
19          MR. VALDIVIESO: Under what agreement
20  has been reached between our two firms.

---

**64**

2      Q. Did you keep any records of the hours
3  that you worked as an au pair?
4      A. No, as I said before, I think I took
5  some pictures, but I don't think I have them any more.
6  I don't think if I have them any more.
7      Q. Could you please look for those pictures
8  and if you find them, give them to your attorney?
9      A. Yes.
10      Q. And he will give those to us after he
11  looks at them.
12      A. Okay.
13          MR. VALDIVIESO: If they are responsive.
14      Q. (BY MS. LEVY) Do you believe your host
15  family owes you money?
16      A. I think so.
17      Q. Why is that?
18      A. Because the payment I was receiving was
19  very little.
20      Q. Have you calculated how much money you
21  believe you're owed?
22      A. No.
23      Q. Do you believe InterExchange owes you
24  money?
25      A. Well, I think so because they're the

---

16 (Pages 61 to 64)

Case No. 1:14-cv-03074-CMA-KMT   Document 1104-3   filed 06/06/18   USDC Colorado   pg 238 of 264

LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018
Johana Paola Beltran, et al. v. Interexchange, Inc., et al.



Page 65

1  parties that are involved in the contract between the
2  family and me.
3       Q.  Have you calculated how much money you
4  believe you're owed by InterExchange?
5       A.  No.

Page 67

Page 66

Page 68

1       Q.  Did you ever make any complaints to any
2  government agency about your experience as an au pair?
3       A.  No.
4       MS. LEVY:  Can we take a short break?
5       (Recess taken, 5:34 p.m. to 5:42 p.m.)
6       Q.  (BY MS. LEVY)  When you were doing the
7  matching process, where you matched up with the
8  Sherick family, did InterExchange tell you which
9  families to talk to on the website?
10      A.  No.
11      Q.  When you went to training in New York
12 City when you first came to the United States as an au
13 pair, was the training general for all au pairs or
14 specific for you as an au pair for the Sherick family?
15      MR. VALDIVIESO:  Objection to form.
16      A.  General for everyone.
17      Q.  (BY MS. LEVY)  Were you off of work
18 Monday and Tuesday each week?
19      A.  Yes.  Generally, yes, that was the
20 schedule they had during the time I worked.
21      Q.  What did you do on Mondays and Tuesdays
22 when you were off of work?
23      A.  I would go to the gym.  I had a friend
24 that I was hanging out with and we would go places.
25      Q.  Was this friend also an au pair?

17 (Pages 65 to 68)

69

1  A.  Some of them.
2  Q.  Did your friends have cars that you
3  could go places in?
4  A.  Yes.
5  Q.  Did they take you places in their cars?
6  MR. VALDIVIESO:  Objection.
7  A.  Yes.
8  MS. LEVY:  Those are the questions that
9  I have for you today.  Thank you very much for coming
10  in.  Your attorney may have a few questions for you
11  now.
12  MR. VALDIVIESO:  I have a few questions.
13  EXAMINATION
14  BY MR. VALDIVIESO:
15  Q.  When you testified about your family
16  going to Broncos games on Sundays, was that every
17  Sunday?
18  A.  No.
19  Q.  Do you know with what frequency the
20  family -- strike that.
21  Do you know with what frequency the host
22  parents would go to the Broncos games in person?
23  A.  I would say maybe once a month.  During
24  the season, the football season, there was one time
25  that maybe -- I don't know three times.  Three times a

70

1  month.
2  Q.  Do you remember how long that season
3  lasted?
4  A.  About two months.  I'm not sure.
5  Q.  Do you have an understanding as to
6  whether -- strike that.
7  Did you have an option of living
8  anywhere other than with your host family during your
9  time as an au pair?
10  A.  No.  Only if I want to change families.
11  Q.  And what do you mean by only if you had
12  changed families?
13  A.  I have the option to change families if
14  I didn't like the family that I was with.  I could
15  start again with doing matching with other families.
16  Q.  Do you understand how the process of
17  matching with another family was supposed to work?
18  A.  Yeah, it was a bit risky.  Because they
19  would give you two weeks to find a family, another
20  family.  And if not, then, you had to go back to your
21  country.
22  Q.  When you said they would give you two
23  weeks?
24  MS. LEVY:  Objection, this is beyond the
25  scope.

71

1  Q.  (BY MR. VALDIVIESO)  When you say --
2  when you say -- when you say they gave you two weeks,
3  to whom are you referring?
4  A.  InterExchange.  And the family that I
5  was currently living with.
6  Q.  You testified about a trip to Mexico.
7  Were you performing childcare duties during your trip
8  to Mexico?
9  A.  Yes.  I was working over there as well.
10  Q.  Do you recall the number of hours that
11  you worked during your trip to Mexico?
12  MS. LEVY:  Objection.
13  A.  No, I don't remember.  But it could have
14  been a little bit less than the 45 or 48 hours a week
15  that I was supposed to do every -- weekly.
16  Q.  (BY MR. VALDIVIESO)  You testified
17  earlier about two cell phones that you used during
18  your time as an au pair.  Do you remember that?
19  A.  Yes.
20  Q.  And I believe the first phone you said
21  was provided by the family; is that right?
22  A.  Yes.
23  Q.  And I believe you testified and I'm sure
24  my counsel will correct me if I'm wrong, but I believe
25  you testified that you used that first cell phone that

72

1  was provided by the family for personal calls.  My
2  question is, did you use that phone for anything other
3  than personal calls?
4  A.  Well, the phone was a way of
5  communicating between the family and me.  Whenever I
6  was outside of the house or they were outside of the
7  house, or perhaps they needed to contact me for
8  something.
9  Q.  And that use that you were describing
10  with communications with the family, did you consider
11  that personal use?
12  A.  No.
13  Q.  Why not?
14  A.  Because that was how I was communicating
15  with the family.  And I never gave them the other
16  number of the smart phone that I purchased myself.
17  Q.  So now turning to the second phone that
18  you mentioned, did you use the second phone that you
19  purchased for anything other than personal use?
20  A.  No.
21  Q.  And just to be clear, did you use the
22  first phone that was given to you by the family during
23  the entire time that you were an au pair?
24  A.  Yes.
25  Q.  So there was -- was there a period of

18 (Pages 69 to 72)

**LADY MILENA DEDERLE RODRIGUEZ - 4/3/2018**
**Johana Paola Beltran, et al. v. Interexchange, Inc., et al.**

---

73

```
 1    time during which you used both phones at the same
 2    time?
 3         A.  Yes.
 4         Q.  Can you describe how -- strike that.
 5              During the time that you used both
 6    phones at the same time, would you use one phone for a
 7    certain purpose and the other phone for another
 8    purpose?
 9              MS. LEVY:  Objection, form.
10         A.  Yes.  Now that I remember my personal
11    phone, I also used in navigating system from the phone
12    to be able to move or get to the places that I was
13    supposed to go to when I was with the children.
14              MR. VALDIVIESO:  I don't have any
15    further questions at this time.
16              MS. LEVY:  I just have a few more
17    follow-up questions for you.
18              EXAMINATION
19    BY MS. LEVY:
20         Q.  Can you clarify your work schedule on
21    Sundays?  So on a normal Sunday where there was no
22    Broncos game, what were your hours that you worked?
23         A.  It would change depending on the
24    activities that they would have or that they had
25    scheduled.  But either way, they would never exceed
```

---

74

```
 1    the eight hours daily or the 48 or whatever or 40-ish
 2    whatever hours that I was supposed to be at work
 3    weekly.
 4         Q.  On the days that there were Broncos
 5    games, did you ever exceed the maximum number of hours
 6    you were allowed to work that day or that week?
 7         A.  No.  Well, they would always try to or
 8    they would try to arrive earlier and by then the
 9    children usually were asleep, so I would just finish
10    my day.
11         Q.  You made the decision to live with the
12    Sherick family, right?
13         A.  Yes.
14              MS. LEVY:  Those are all the questions I
15    have.  Thank you.
16              MR. VALDIVIESO:  I have no further
17    questions.
18              WHEREUPON, the within proceedings were
19    concluded at the approximate hour of 6:02 p.m. on the
20    3rd day of April, 2018.
21
22
23
24
25
```

---

75

```
 1              I, LADY MILENA DEDERLE RODRIGUEZ, do
 2    hereby certify that I have read the above and
 3    foregoing deposition and that the same is a true and
 4    accurate transcription of my testimony, except for
 5    attached amendments, if any.
 6              Amendments attached  ( ) Yes  ( ) No
 7
 8
 9              _____
                LADY MILENA DEDERLE RODRIGUEZ
10
11
12         The signature above of LADY MILENA
13    DEDERLE RODRIGUEZ was subscribed and sworn to or
14    affirmed before me in the county of
15    _____, state of _____,
16    this _____ day of _____, 2018.
17
18
19              _____
                Notary Public
20              My Commission expires:
21
22
23
24
25    Johana Paola Beltran, et al., 4/3/18 (tds)
```

---

76

```
              REPORTER'S CERTIFICATE
STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

     I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement
of the examination, the said LADY MILENA DEDERLE
RODRIGUEZ was duly sworn or affirmed by me to testify
to the truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

     I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

     IN WITNESS WHEREOF, I have affixed my
signature this 6th day of April, 2018.

     My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.
```

19 (Pages 73 to 76)

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


I, TRACY R. STONEHOCKER, Certified Realtime Reporter, Registered Professional Reporter and Notary Public ID 19924009337, State of Colorado, do hereby certify that previous to the commencement of the examination, the said LADY MILENA DEDERLE RODRIGUEZ was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 6th day of April, 2018.

My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.


_____
Tracy R. Stonehocker
Registered Professional Reporter

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 14-cv-03074-CMA-KMT
 3
      JOHANA PAOLA BELTRAN, et al.,
 4
      Plaintiffs,
 5
      v.
 6
      INTEREXCHANGE, INC., et al.,
 7
      Defendants.
 8     _____

 9    VIDEOCONFERENCE DEPOSITION OF:  MINELINE MARTINS
                                      April 9, 2018
10     _____

11              PURSUANT TO NOTICE AND STIPULATION, the
      videoconference deposition of MINELINE MARTINS, was
12    taken on behalf of the Defendant InterExchange, Inc.,
      at 1900 Grant Street, Suite 1025, Denver, Colorado
13    80203, on April 9, 2018, at 3:49 p.m., before Shauna
      T. Dietel, Registered Professional Reporter and
14    Notary Public within Colorado.

15

16

17

18

19

20

21

22

23

24

25
```

H+G

Hunter + Geist, Inc.

303.832.5966          1900 Grant Street, Suite 1025          ▪ www.huntergeist.com
800.525.8490          Denver, CO 80203                       ▪ scheduling@huntergeist.com

                      Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**MINELINE MARTINS - 4/9/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN, et al.,

Plaintiffs,

v.

INTEREXCHANGE, INC., et al.,

Defendants.
_____
VIDEOCONFERENCE DEPOSITION OF:  MINELINE MARTINS
April 9, 2018
_____

            PURSUANT TO NOTICE AND STIPULATION, the
videoconference deposition of MINELINE MARTINS, was
taken on behalf of the Defendant InterExchange, Inc.,
at 1900 Grant Street, Suite 1025, Denver, Colorado
80203, on April 9, 2018, at 3:49 p.m., before Shauna
T. Dietel, Registered Professional Reporter and
Notary Public within Colorado.

---

**2**

                    A P P E A R A N C E S
For the Plaintiffs:
        BYRON PACHECO, ESQ.
        Boies Schiller Flexner, L.L.P.
        575 Lexington Avenue
        7th Floor
        New York, New York  10022

For the Defendant InterExchange, Inc.:
        ALYSSA LEVY, ESQ.
        Sherman & Howard, L.L.C.
        633 Seventeenth Street
        Suite 3000
        Denver, Colorado  80202

        Ms. Martins was located at 67 Azalea Road,
Levittown, New York 11756.

        Ms. Levy and Ms. Dietel, the court
reporter, were located at 1900 Grant Street, Suite
1025, Denver, Colorado 80203.

        Mr. Pacheco was located at 575 Lexington
Avenue, 7th Floor, New York, New York 10022.

---

**3**

                        I N D E X
EXAMINATION OF MINELINE MARTINS:              PAGE
April 9, 2018

By Ms. Levy                                      5
By Mr. Pacheco                                  77


                                             INITIAL
DEPOSITION EXHIBITS:                        REFERENCE

Exhibit  1  Consent to Join                      7

---

**4**

1    WHEREUPON, the following proceedings were
2 taken pursuant to the Federal Rules of Civil
3 Procedure.
4         *     *     *     *     *
5    (Deposition Exhibit 1 was marked.)
6    MS. LEVY:  Byron, would you stipulate on
7 the record to swearing in the deponent over Zoom?
8    MR. PACHECO:  Yes, we stipulate to that.
9         MINELINE MARTINS,
10 having been first duly sworn to state the whole
11 truth, testified as follows:
12    (Deponent's reply to oath:  I do.)
13         EXAMINATION
14 BY MS. LEVY:
15    Q    All right.  My name is Alyssa Levy, and I'm
16 from the law firm of Sherman & Howard, and I am the
17 lawyer for InterExchange, and I will be asking you
18 the questions today.
19    A    Okay.
20    Q    Can you please state your full name for the
21 record?
22    A    It's Mineline Martins.
23    MR. PACHECO:  And, Alyssa, can I just put
24 in my appearance before we get going?
25    MS. LEVY:  Sure.

---

1 (Pages 1 to 4)

**MINELINE MARTINS - 4/9/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

Page 5

MR. PACHECO: This is Byron Pacheco of Boies, Schiller & Flexner on behalf of the plaintiffs and the witness.

Thank you.

Q (BY MS. LEVY) And, Mineline, just as a formality, your attorney has indicated that you are comfortable proceeding in English. Is that correct?

A Yes.

Q Okay. If there's a question that you do not understand, please tell me and I can ask it again.

Okay?

A Okay.

Q Have you ever had your deposition -- your deposition taken before or testified under oath?

A No.

Q Do you understand that you're under an oath today to tell the truth?

A Yes.

Q I'd ask that you please listen to the entire question before you give your answer.

Okay?

A Okay.

Q And I'll let you finish your answer before I start my next question.

---

Page 6

Okay?

A Okay.

Q And your attorney may object to one or more of my questions, but unless he tells you not to answer the question, you will need to answer every question.

Okay?

A Okay.

Q And if you need a break, please just tell me that you need to take a break. I only ask that you let me finish a pending question and that we hear your answer to that question before we take the break.

Okay?

A Okay.

Q And we're going to talk about your experience today with your host family, and I'd like to ask you, when you talk about the host family's children, that you only refer to them as a boy or girl and their ages and not use their names.

Okay?

A Okay. Okay.

Q Thanks.

And before we start, is there anyone present with you today?

---

Page 7

A No. I just have my rabbit. That's it.

Q Did you review any documents to prepare for your deposition today?

A No.

Q All right. I'm going to pull up a document on the screen. Can you see that on your screen?

A Yeah.

Q Okay. And I'm going to scroll down so you can see the whole thing -- it's just one page -- then I'll go back up to the top.

Do you recognize this document?

A Yeah.

Q And is that your electronic signature in the middle of the document there?

A Yes.

Q And did you understand this document to be your joining of the lawsuit against InterExchange?

A Yes.

Q What is your understanding of who this lawsuit is against?

A InterExchange.

Q How did you first learn of the lawsuit against InterExchange?

A The lawyers contacted me.

Q And when you say "lawyers," do you mean

---

Page 8

your lawyer who is representing you today or someone from his office?

A Someone from his office.

Q Can you tell me when they contacted you?

A I don't know the exact date. No. So -- no, because -- sorry.

Q I'm sorry. Are -- are you still there?

A Yeah, I'm here.

Q Okay. I thought we lost the feed.

Did you finish your answer, or did you have more to say?

A No. I just said no.

Q Okay. And I apologize if I have to ask you something again. Sometimes the feed gets a little spotty, so --

A Yeah, I just realized.

Q Okay. Do you remember if they contacted you in 2017?

A Yes.

Q Do you remember if it was in the beginning or the end of the year?

A I'm thinking it's towards the end.

Q Do you remember if it was by e-mail?

A Yeah. I took awhile to respond, so I don't know exactly when it was.

---

2 (Pages 5 to 8)

9

```
 1      Q   What is your understanding of what this
 2   lawsuit is about?
 3      A   That InterExchange didn't pay us enough per
 4   hour.
 5      Q   And can just clarify, when you say "us,"
 6   who do you mean by "us"?
 7      A   The au pairs that was a part of the program
 8   with me that was in InterExchange, the other people
 9   that I was with.
10      Q   And -- and you lived with a family in New
11   York when you were an au pair?
12      A   Long Island, yes.  Long Island, New York.
13      Q   Do you know if this lawsuit has anything to
14   do with the amount of money that you were paid by the
15   host family you lived with in Long Island?
16      A   I don't understand what you're saying.
17      Q   Do you know --
18      A   Can you say that --
19      Q   Yes.
20          Do you know if this lawsuit against
21   InterExchange has anything to do with the amount of
22   money your host family paid you?
23          MR. PACHECO:  Object to the form.
24          You -- you can still answer a question when
25   I say "object."  Unless I tell you not to answer, you
```

10

```
 1   should still answer the question.
 2      A   Yeah.  I understand that's what it's about,
 3   if that's the question, because I don't really
 4   understand exactly what you're saying.
 5      Q   (BY MS. LEVY)  When you --
 6      A   Because --
 7      Q   Sorry.  Go ahead.
 8      A   No.  Say -- can you say your question
 9   again?
10      Q   Sure.
11          Do you know if this lawsuit has to do with
12   the amount of money that you were paid by your host
13   family?
14      A   Yeah, I know that it wasn't the right
15   amount.
16      Q   When you first came to the United States
17   for the au pair program, what did you believe that
18   you were going to be paid by your host family?
19      A   I don't remember exactly.  I don't -- I
20   don't remember, like, what that was -- it was, like,
21   really long ago, so I don't know exactly what that
22   was.
23      Q   Do you remember --
24      A   I don't know.
25      Q   Okay.  Do you remember if -- if before
```

11

```
 1   learning of this lawsuit, if you had concerns about
 2   what you were paid?
 3      A   What do you mean "concerns"?  Like, if I
 4   was worried?
 5      Q   Yes.
 6      A   No, because we were supposed to be paid --
 7   it was -- the -- the InterExchange -- it wasn't -- it
 8   was that -- InterExchange told us we would get paid
 9   every week, so I didn't worry that I wasn't going to
10   get paid.  Is that what you're saying?  I don't know.
11      Q   Could you -- could you repeat that one more
12   time.  You -- you were worried about what?
13      A   No.  I said I wasn't worried because it --
14   it just -- that's -- I was just told I was going to
15   get a weekly check, so I wasn't worried that I wasn't
16   going to get paid.  That wasn't the concern, because
17   I -- I was told I was.
18      Q   Did you have any worries about the amount
19   that you would be paid?
20      A   No, because I thought it was good that
21   they -- that it was -- like, it was okay or that
22   everything -- the rules was okay, I guess, you know.
23   I didn't really question it because I didn't know if
24   it was right or wrong, so I didn't know.  I never
25   questioned it, I guess.
```

12

```
 1      Q   That form that we just looked at that was
 2   up on the screen, where were you living when you
 3   signed that opt-in form?
 4      A   Right here on Azalea, Levittown.
 5      Q   Is that in New York?
 6      A   Yes, it's in Nassau County.
 7      Q   Okay.  Thank you.
 8          Do you live there now?
 9      A   Yes.
10      Q   And how long have you lived in Levittown?
11      A   A year and three months.
12      Q   And you -- when you were in the au pair
13   program, you lived with the -- forgive me if I say
14   their name wrong -- you lived with the Valenzisi
15   family; is that right?
16      A   Yes.
17      Q   Okay.
18      A   Yes.
19      Q   Did you live with them for one year -- or
20   more or less than one year?
21      A   For the whole complete -- I completed my
22   program, my -- the time I was supposed to be there.
23   For -- so for almost two years, I would say.
24      Q   After you were with them for one year, did
25   you extend for a second year?
```

3 (Pages 9 to 12)

**MINELINE MARTINS - 4/9/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

13

1     A   Yes.
2     Q   Do you still communicate with your host
3 family?
4     A   No.
5     Q   And where are you originally from?  What's
6 your home country?
7     A   I'm from South Africa.
8     Q   Did you discuss the lawsuit against
9 InterExchange with anyone in the Valenzisi family?
10    A   No.
11    Q   Have you discussed the lawsuit against
12 InterExchange with other au pairs?
13    A   No.
14    Q   Did you have more than one host family when
15 you were in the au pair program?
16    A   No.
17    Q   When did you first learn about the
18 opportunity to be an au pair in the United States?
19    A   2009.
20    Q   And how did you first learn about the au
21 pair program?
22    A   Through a newspaper article.  There was
23 an -- what do you call? -- advertisement in a
24 newspaper.
25    Q   And do you know what information was in the

---

14

1 newspaper article?  Do you remember?
2     A   Vaguely.  It was just about, you know,
3 what -- working in the United States as an au pair.
4 It was -- au pair was the only job, so that -- that
5 was the name of it.  But I don't really remember the
6 rates or the number, but -- but just that.  That was
7 it.
8     Q   Do you remember if there was someone to
9 contact in the newspaper article or ad?
10    A   Yes, there was a number, and I spoke to a
11 lady.
12    Q   Do you know who the number was for, who
13 this lady worked for?
14    A   No, I don't remember.
15    Q   What happened after you called this lady
16 from the phone number you got in the newspaper ad?
17    A   Well, of course, she asked me for, like, a
18 resume.  And then once they looked over it and
19 everything was -- I guess I made the criteria or
20 something, they asked me to -- for my -- if I was
21 able to -- if my passport, if I had that ready, some
22 things like that.
23        And then they did a background check, like
24 a fingerprint and a criminal background check, and
25 when that came clear, I was okay to be in the --

---

15

1 to -- you know, to be with -- into the company or
2 however you say it -- I don't know how to say it --
3 but I was approved, I guess.
4     Q   Did this --
5     A   And then the application started after
6 that.
7     Q   Did this company give you information about
8 the au pair program?
9     A   Yes.
10    Q   And do you remember the name of the
11 company?
12    A   I'm -- I mean, I don't know if -- I don't
13 remember if -- I don't know.  I don't remember the
14 name of the -- the company from South Africa.  I want
15 to say -- I mean, I think it was InterExchange.  I
16 don't know.  I have no idea.  Could be the same as it
17 was -- if they had a branch over there, I don't know.
18 I -- I won't be able -- it was like really long ago.
19    Q   Do you --
20    A   And then after it was just InterExchange,
21 so that's the only name I know is just InterExchange.
22 I don't know.
23    Q   Do you remember if this lady that you
24 initially spoke with, or anyone else when you called
25 that same phone number, do you remember whether they

---

16

1 identified themselves with InterExchange or if they
2 identified with a different company?
3     A   That, I wouldn't be able to tell you.  I
4 don't remember.  If they did, I don't remember it.
5     Q   Okay.
6     A   Like I said, it was in 2009, so . . .
7     Q   So after you -- you cleared all that
8 background information that you just told us about,
9 and then did you start an application process?
10    A   Yes.  Yeah, and then also the application
11 for the passport -- my passport, because it takes
12 quite a time to get that.
13    Q   Can you tell me about the application
14 process?
15    A   Of -- of what --
16    Q   The --
17    A   -- the au pair or the passport?
18    Q   For -- for the au pair.  You know what,
19 hold on -- can you hold on?  Actually, can you hold
20 on just one second.  I think we lost the feed from
21 your attorney.
22        MR. PACHECO:  No, I'm still here.
23        MS. LEVY:  Okay.
24        MR. PACHECO:  I'm here.
25    Q   (BY MS. LEVY)  Okay.  Mineline, do you

---

4 (Pages 13 to 16)

17

1   remember the question, or do you need me to repeat
2   it?
3       A   Yeah, can you repeat that again, please?
4       Q   Sure.
5           Can you tell me about after you completed
6   the background check process with this company in
7   South Africa, can you tell me what you did next to
8   apply to be an au pair?
9       A   I had to fill out the -- the application
10  from -- from the company and then put together, like,
11  something, you know, like to describe myself but more
12  like a portfolio, not like just one page of writing:
13  My interests, my hobbies, and things that I've done
14  with kids.
15          I had to give, you know, previous nanny --
16  previous people that I've worked for, their
17  statements, the kids. Like, basically a whole book
18  of every family that I worked for and, you know,
19  whatever they had to say about me, things I did,
20  photos, copies of things that we made.
21          What else? What else? Yeah, that was it.
22  I don't really remember. It was just like a -- that
23  and then the passport application and -- and, you
24  know, that was it.
25      Q   In all that --

18

1       A   And then --
2       Q   Sorry. Sorry. I apologize. I thought you
3   were finished.
4       A   And then I paid, like, a half of the -- the
5   fee to -- to -- to join. I guess there was -- it
6   wasn't free, you know. That wasn't free, so . . .
7       Q   Who did you pay a fee to?
8       A   The company that I -- that I signed up
9   with. The -- I -- I don't know if -- like I said, I
10  don't remember the name. If it was InterExchange, I
11  wouldn't be able to tell you. I only know
12  InterExchange because it's the only company that I've
13  dealt with since I came to the United States, so
14  that's why I remember their name. But the one in
15  South Africa, I couldn't 100 percent tell you if
16  that's the company's name.
17      Q   Do you remember how you paid the fee?
18      A   Yes, check. I paid it through a check out
19  of my checking account, and I -- I still have the
20  account, actually, in South Africa.
21      Q   Do you know how much the fee was?
22      A   Yes, it was 4,500 rand in my currency.
23      Q   Are you able to still access your checking
24  account records from back when you would have paid
25  that -- that check amount?

19

1       A   The -- I -- I still have the account.
2   Like, I have the card, but it's expired, so I don't
3   know if they actually closed down that account on me.
4   I would have to contact my mom to see if she could
5   get it for me, so I might, but I'm not 100 percent
6   sure on that.
7       Q   Okay.
8       A   Yeah, I -- but I might. Anything is
9   possible --
10      Q   Okay.
11      A   -- I assume. My mom is at the bank, maybe
12  they can. I don't know.
13      Q   Okay. If you're able to provide that
14  information to your attorney later, we -- we would
15  appreciate that. We would ask you to do that. But
16  if you're unable to access it, then you're unable to
17  access it.
18      A   Well, I -- I can get it later because
19  there's a six-hour time difference, so they're like
20  six hours ahead of us right now. So I would only be
21  able -- it's like midnight hours in the morning hours
22  where my mom is right now.
23      Q   Okay. It -- it doesn't have to be today,
24  just as soon as you're able --
25      A   Oh, okay.

20

1       Q   Yeah. When you filled out your application
2   to be an au pair, was this an online application?
3       A   No. Paper.
4       Q   Do you remember if it was specifically an
5   InterExchange application?
6       A   No. I -- I don't know. I -- I don't
7   remember. I wouldn't be able to tell you. I just
8   know I filled out paperwork to do it. I called the
9   lady first, and then they sent me paperwork.
10      Q   Do you remember if you talked to any other
11  sponsor organizations to be an au pair in the United
12  States?
13      A   No. I only -- I only contacted this one
14  person, and it was only just one -- as far as I knew,
15  one company. So I don't know.
16      Q   Did that company give you any information
17  about InterExchange?
18      A   If they did, I would -- they probably --
19  they did because I got a booklet explaining, you
20  know, the -- how the time worked. Because you sign
21  up for a year, and then you can extend for six or
22  nine months or 12 months. That stuff, it was all in,
23  like, a colored booklet, I remember, but I don't know
24  if I still have it.
25          And I -- I want to say it was

5 (Pages 17 to 20)

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

21

1  InterExchange. I don't know. See, I can't 100
2  percent say it was InterExchange, the company. I
3  don't know. But I don't know if -- if my parents
4  still have the book, if it's still in my room. I
5  don't know if that's still there, if, you know, that
6  stuff is still there. But I got a book, yeah --
7      Q   If you --
8      A   -- paperwork.
9      Q   If you do still have any of that
10 information or information that you got from -- if
11 there was a local company that you were talking to
12 this lady or someone else when you called that number
13 from the newspaper ad, if you do have any of that
14 information still --
15     A   Yeah.
16     Q   -- we would ask that you provide that to
17 your attorney, and he'll take a look at that before
18 he gives that to us, if --
19     A   Okay.
20     Q   -- if you can find that.
21     A   Yeah, I will. I'll do that.
22     Q   Thank you.
23         What were your expectations of the au pair
24 program?
25     A   Well, what do you mean? What do you mean?

---

22

1  What did I -- what did I know to expect, or what did
2  I want to get out of the program?
3      Q   Either one. Whatever you were expecting
4  when you looked into becoming an au pair in the
5  United States.
6      A   Okay. Well, what I expected and what I got
7  was, I expected to come here and look after kids, you
8  know, however many was in the family, and that's
9  exactly what I did. I didn't -- I didn't expect to
10 do anything different than what I came to do, and
11 which is what I did, and it was fun.
12     Q   Did you ever meet with anyone at a local
13 office in South Africa about your application or just
14 generally for information about being an au pair?
15     A   No. Because the lady that I spoke to, she
16 said that the office was in Cape Town, which I was in
17 Johannesburg, and Cape Town is like -- driving hours,
18 is like 16 hours away. If you fly, it's like four or
19 five. So that's why it was all with the phone, and
20 then they mailed me the documents, because it was in
21 like a different -- you call it a state, but we call
22 it province, so it was like far away from each other.
23     Q   When you talked with this lady or someone
24 else from their office in Cape Town about being an au
25 pair, did they give you any information over the

---

23

1  phone other than what we've already talked about?
2      A   No. They just explained to me like what an
3  au pair was and what I was going to be doing, you
4  know, child care stuff, stuff like that. It wasn't
5  any -- it was what we just said. Nothing -- nothing
6  different.
7      Q   When you were thinking about becoming an au
8  pair, did you -- do you remember if you ever talked
9  to someone who identified themselves as being from
10 InterExchange?
11     A   No, I don't remember. I wouldn't be able
12 to tell you. Sorry.
13     Q   When you talked to someone in the company
14 that was in Cape Town, did you -- do you remember if
15 you ever talked to them about the weekly stipend
16 amount that you would be paid?
17     A   Yeah. They -- they said we were going to
18 be paid weekly, and it was going to be, I think, 200,
19 but it ended up being less, obviously, because when I
20 came here it was less. So I remember that.
21     Q   Do you remember if they told you it would
22 be 200 on the phone?
23     A   Yeah, that's what they -- that's what they
24 said it was going to be, but then when I came here,
25 it was even less than 200.

---

24

1      Q   When you completed that application that
2  you were telling us about, did you complete the
3  application yourself?
4      A   Yes.
5      Q   Did anyone help you complete the
6  application?
7      A   No, because I speak good English, so I -- I
8  understood the questions. I didn't need help.
9      Q   When you were still in South Africa, before
10 you became an au pair, did you have any conversations
11 with any InterExchange representatives who were in
12 the United States?
13     A   I don't remember that. I don't know. I
14 know I spoke to the host family, but I don't remember
15 if I -- I don't -- I don't know. I can't be -- I
16 can't tell you for sure.
17     Q   Mineline, I'm representing to you that on
18 the application that InterExchange sends out to all
19 of its au pairs it says that au pairs are paid at
20 least 195.75 per week.
21         Do you remember ever reading this
22 information?
23         MR. PACHECO: I'm just going to object and
24 just ask that -- are you saying that at the time she
25 applied that that was the application or just

---

6 (Pages 21 to 24)

**MINELINE MARTINS - 4/9/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

25

1 generally that that's what it said? Just a point of
2 clarification.
3    Q   (BY MS. LEVY)  That InterExchange sends out
4 this appli -- sends out an application to all of its
5 au pairs and it has this information in it.
6    So I'm asking if you remember reading this
7 information in an application that InterExchange sent
8 to you.
9    A   I --
10    MR. PACHECO:  Objection for the record.
11    THE DEPONENT:  Objection.
12    MR. PACHECO:  I was just noting an
13 objection.  You can answer the question.
14    THE DEPONENT:  Oh, okay.
15    A   Any paperwork that I got said that I was
16 going to -- it noted that it was going to be 200 a
17 week, and then it ended up being the 195.75.  So
18 it -- it -- it -- I was told I was going to be paid
19 200, and it ended up being less than 200.
20    Because I remember that -- you know, that's
21 how I remember how much I got paid, because I was
22 upset about that, and I -- you know, because it was
23 something that I felt like -- you know, but there's
24 nothing I could do because I was far away.  And I was
25 already here, so there's nothing I could do.

---

26

1    Q   (BY MS. LEVY)  So when did you come to
2 understand what you would be paid by your host
3 family?
4    A   The first week that I got paid.  And it was
5 the same every week whether I work -- I never made
6 less hours.  I was always was more -- it was always
7 more hours -- like, more than what it should have,
8 but it was all always the same amount.  It never
9 changed, ever.
10    Q   Did you ever ask anyone any questions about
11 that weekly stipend while you were still in South
12 Africa?
13    A   Say that again.  Did I ask who?
14    Q   Anyone.  Did you ever ask anyone any
15 questions about the weekly stipend when you were
16 still in South Africa?
17    A   No, I didn't question it because I -- I
18 didn't think to question it.  I -- I didn't speak to
19 anybody about it.  I didn't -- at the time I didn't
20 think to talk about it or it wasn't a -- I don't
21 know.  I didn't speak about it, no.
22    Q   When you came to the United States to be an
23 au pair, did you have any conversations with any
24 InterExchange representatives about the stipend then?
25    A   I think so, because that's how I knew how

---

27

1 much I was going to get paid, the 200.  Is that what
2 you're asking?
3    Q   Let me repeat my question.
4    When you -- after you came to the United
5 States to be an au pair, did you have any
6 conversations with any InterExchange representative
7 while you were in the United States about that weekly
8 stipend?
9    A   Yes.  Yeah.
10    Q   Can you tell me about that?
11    A   What -- what do you -- who -- what do you
12 want to know?  Like, what is your question?
13    Q   Do you remember who you talked to about the
14 weekly stipend when you were in the United States?
15    A   No.  It was the -- it was the people who --
16 who was there from InterExchange the first week
17 that -- that we were there when they trained us, the
18 orientation, and we -- you know, where they, like,
19 told -- like teached us things, that's when all these
20 things like this was discussed, along with, you know,
21 driving on the right side of the road, small things,
22 big things.
23    Like all the things they needed to cover
24 was done in the first week, and we got our training
25 and CPR and stuff like that.

---

28

1    Q   Do you remember what they told you about
2 the stipend when you -- during that week of training?
3    A   Yeah.  That it was going to be 195.75, 45
4 hours a week.  We are not allowed to work overtime.
5 Even if they ask us, we were -- we were told to tell
6 the host parents no, because, you know, we know the
7 rules and blah, blah, blah.
8    But, you know, I know I used to work extra
9 because I -- you know, what can you say if the kids
10 want to hang out.
11    But they said that we're not supposed to
12 work any extra job -- we're not supposed to do any
13 other job, actually.  You're only supposed to be an
14 au pair for the family.  So you're not allowed to
15 have like a weekend job.  You're supposed to pay
16 taxes on the money that they -- they you're paid a
17 week, stuff like that.
18    Q   Besides that -- that first week when they
19 told you what the weekly stipend would be, did you
20 have any other conversations with an InterExchange
21 representative about the weekly stipend when you were
22 in the United States?
23    A   No, because it was done the first week, so
24 I didn't think to speak about it again.  I mean, you
25 know, I didn't speak about it again.

---

7 (Pages 25 to 28)

**MINELINE MARTINS - 4/9/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

29

1    Q   When you were at the training, besides them
2  telling you what the stipend would be, did you have
3  any conversations with an InterExchange
4  representative there about the weekly stipend?
5    A   No. It was -- it was told to us in -- like
6  everybody was sitting, and we were just listening to
7  the ladies talking. It was a lady with brown hair.
8  I don't -- that was it. They didn't speak to us
9  individual; it was like a group thing with all of us.
10   Q   When you started the matching process to be
11 an au pair, were you in South Africa?
12   A   Yes.
13   Q   And can you tell me about the matching
14 process that you went through to match with your host
15 family in Long Island?
16   A   The process? Well, I don't know exactly
17 what their steps is, but I was contacted through the
18 agency, and then they told me that they have -- you
19 know, that these certain families are looking at
20 my -- my -- my profile or whatever, and then I should
21 be hearing from one of them soon.
22       I think they would give your application
23 to, like, five families at a time, and then they
24 would give the families -- I don't know how long to
25 -- to, like, contact the au pair in their native

---

30

1  country.
2        So then the family would contact me. I was
3  supposed to be contacted with a family in New
4  Hampshire, but they went with somebody else. And
5  then the Valenzisi family from Suffolk County, Long
6  Island, contacted me, and we -- we talked a few
7  times, and, like, on different occasions about things
8  and for over a few months.
9        And then I -- I don't know if the family
10 decided, you know, when they -- but they just asked
11 me one day if -- you know, if I feel like -- do I
12 want to be their au pair? And I said, Yeah. And
13 that was it.
14       But as far as -- I know they give it to
15 like five families at a time. Because we were
16 supposed to watch our e-mail because they would
17 correspond through e-mail first, and then they would
18 call us.
19   Q   Were you able to view families on the
20 InterExchange website?
21   A   No.
22   Q   No?
23   A   I didn't -- I didn't choose the family.
24 They chose me. I didn't -- I didn't know the family.
25 They chose -- the family had my profile, and they

---

31

1  could choose me. I just -- I just had to make the
2  decision on when -- if I liked them or not. Like,
3  they choose me out of people, basically, I guess. I
4  don't know. Like I said, they get -- they got my
5  profile, so, you know, I was contacted by them.
6    Q   Were you able to see a profile for that
7  family that contacted you?
8    A   Yeah. Like, after they contacted me, they
9  would send me an e-mail with like their -- like a
10 little brief history of the family, pictures of the
11 children. You know, just a little bit of history on
12 what they -- what they're like and stuff like that,
13 you know, to see if we get a feel for each other.
14 And then after that, we -- we usually spoke over the
15 phone, yeah.
16   Q   How many different host families did you
17 communicate with?
18   A   One. Only this family. The other family,
19 like I said, didn't contact me back. They were
20 supposed -- my -- the lady from InterExchange told me
21 that somebody from New Hampshire was going to contact
22 me, but that family never did. It ended up being a
23 family from New York. So I don't know if that family
24 went with somebody else, like I said, or what
25 happened, but only one family technically contacted

---

32

1  me from New York.
2    Q   Who made the decision for you to match with
3  the Valenzisi family?
4    A   InterExchange. They were the ones that
5  gave my -- my profile to the family.
6    Q   Do you know if the family was able to view
7  profiles for different au pairs?
8    A   Yes, they did.
9    Q   Do you know if they choose your profile
10 among other au pair profiles they looked at?
11   A   Yes.
12   Q   And then do you know --
13   A   Like --
14   Q   Sorry. Go ahead.
15   A   Well, I was going to say, like I said
16 before, they sent out five profiles at a time to a
17 family, and then they choose whichever one, you know,
18 and then they contact them back. And I was one of
19 the -- the -- the profiles that the Valenzisi chose.
20 And, I guess, you know, while we were talking, they
21 liked me the best, I guess, and that's how it worked.
22   Q   So did the Valenzisi family choose you --
23 to contact you?
24   A   Well, they were given -- they were given me
25 as an option, and they went -- they took the five

---

8 (Pages 29 to 32)

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

33

1  options that the -- that InterExchange gave them, and
2  that's how they got me.
3       So I don't know if they called the other --
4  I wouldn't be able to tell you if they called the
5  other people.  I just know that I was one of the five
6  that was presented to them.
7       Q   And then they -- they told InterExchange
8  they wanted to talk with you?
9       A   Yes.
10      Q   And how did they get -- how did the family
11 get in touch with you for the first time?
12      A   They called me -- well, the first -- the
13 very first time they e-mailed.  We went back and
14 forth through e-mail, and then they called me on the
15 phone.
16      Q   Can you tell me how you know that they went
17 through InterExchange to contact you rather than just
18 seeing your profile and liking your profile and
19 contacting you?
20      MR. PACHECO:  Objection --
21      THE DEPONENT:  What?
22      Q   (BY MS. LEVY)  You can answer --
23      MR. PACHECO:  I just said object to the
24 form.  That wasn't directed at you.
25      THE DEPONENT:  Oh.

---

34

1       A   And I -- I need you to repeat the question
2  because I didn't really understand what you just
3  said.
4       Q   (BY MS. LEVY)  Sure.
5            When -- when the -- the Valenzisi family
6  contacted you for the first time, how do you know
7  that they went through InterExchange -- a
8  representative of InterExchange rather than looking
9  at your profile and liking your profile and
10 contacting you?
11      MR. PACHECO:  Same objection.
12      A   Because the Valenzisi family told me and
13 because of the profile and the kids that I used to
14 look after and the kind of experience I had.  The
15 Valenzisis had two boys, and I guess, you know, I was
16 a good fit, according to InterExchange, for their
17 family when they applied themselves to the au pair --
18 to -- to InterExchange looking for an au pair.
19           So I -- I guess, you know, my experience
20 was what they needed, corresponded, and that's why I
21 was one of the five.  I wouldn't -- I don't know
22 what -- I don't know how else to explain that.
23      Q   (BY MS. LEVY)  So when they looked at your
24 profile and they liked your experience and it matched
25 their family, did they then call you directly or did

---

35

1  they --
2       A   No.
3       Q   -- go through an InterExchange -- did they
4  have to go through an InterExchange representative?
5       A   Yes.  InterExchange contacted me first, and
6  they told me that my profile is currently with the
7  Valenzisi family.  They live in Suffolk, Long Island,
8  and that I should watch my e-mail closely for the
9  next two weeks because they might contact me if --
10 you know, if -- if they like me.
11           I was contacted by InterExchange first, and
12 then I couldn't tell you exactly how long after that
13 the family contacted, but obviously they did in the
14 e-mail and, you know, that's how I came here, so. . .
15      Q   So after you e-mailed with them, you had a
16 phone call with the family?
17      A   Yes.
18      Q   Did you ever do a Skype interview with the
19 family?
20      A   No.  It was all just phone call.  I spoke
21 with the -- the lady of the house, and the husband
22 wasn't there all the -- he was working.  Every time
23 she would call me, it would be at night, and he was
24 always at work.
25           But I spoke to the one boy, because he

---

36

1  was -- he was able to talk at the time.  The other
2  one was a baby.  So I did speak with the kid and the
3  mom, but no video.
4       Q   How many times did you talk with them on
5  the phone during the matching process?
6       A   I would say probably, like, four or five
7  times for, like, a really long time at a time
8  because, you know, they -- I guess they liked talking
9  and it was the accent, and the little boy was
10 talking.  So it was awhile and a few times, like four
11 or five times.
12      Q   On all of those phone calls with the
13 Valenzisi family, was anyone from InterExchange on
14 the phone?
15      A   No.  It was just a regular long distance --
16 long distance call.  They were calling me from the
17 United States.  And she actually e-mailed me and
18 said, Okay, I'm going to call you at this time.  It
19 was like a pre-discussed, because of the time
20 difference and stuff like that.
21           But no InterExchange representative was --
22 was present; it was just, I guess she felt like
23 calling, you know . . .
24      Q   Was there anyone -- anyone else on the
25 phone besides the host mom and sometimes the little

---

9 (Pages 33 to 36)

37

1 boy and you?
2     A   No.  It was just them.  The -- the -- she
3 had another boy, but he couldn't -- he was a baby, so
4 obviously he can't talk.  So it was just the boy
5 and -- and the mom.
6     Q   Did you want to go live with the Valenzisi
7 family when they chose you to be their au pair?
8     A   Not that I wanted to go live with them.
9 That was what I was told, that's how it worked.
10 Like, you know, it was -- it wasn't necessarily my
11 choice.  I wasn't given the choice, yes or no.  It's
12 just that's how it was.  Like, you know, I don't know
13 if you understand, but that's just like how it was.
14     Q   If you were --
15     A   Like, that wasn't --
16     Q   If you were not interested in living with
17 that family, could you have said no?
18     A   If you're not -- if you don't want to live
19 with the family, then you can't be an au pair.  Then
20 that's not being an au pair.
21     Q   Let me ask that question again:  If you
22 weren't interested in living with the Valenzisi
23 family, could you have said no to living with them
24 and lived with -- found a different family to live
25 with?

38

1     A   Yes.  Yes.  If I wasn't comfortable living
2 with them and if we didn't match, but then -- but
3 then that would have been before I came to the United
4 States.  You know, afterwards, if there would have
5 been a problem, then, you know, we could switch a
6 family if there's a serious issue.
7     But beforehand, if we didn't get along,
8 then the application process would just continue and
9 families would just continue to get your profile and
10 it would just continue.
11     I would assume that's how it works.  I
12 mean, I don't know how many families saw my profile
13 before the Valenzisi family choose me.  I wouldn't be
14 able to tell you that either because I -- I don't
15 know that.
16     Q   During your conversations with the
17 Valenzisi family during this matching process, did
18 you ever talk about how much you would be paid as an
19 au pair with their family?
20     A   During the phone calls and stuff?
21     Q   Yes.
22     A   No, it never came up.  She never asked me;
23 I never asked, because at the time it was just
24 getting to know people, and we were trying to see if
25 we matched as people getting along.

39

1     You know, I think that stuff, like the
2 logistics of it was being taken care of by the
3 company.  So I -- I -- I mean, I didn't think to ask
4 the question of how much I was going to get paid.  It
5 was just more of getting to know the people and
6 seeing if I was going to be able to live with them
7 for the next two years, probably.
8     Q   So when did you first learn how much your
9 host family was going to pay you each week?
10     A   When I -- when I -- when the -- when I
11 signed up for it and I was -- the paperwork and I
12 saw, you know, when I got to know of it.  I -- it --
13 I wouldn't be able to tell you the exact time and
14 what paperwork it was, but it would definitely be,
15 you know, before I came to the United States.
16     And all these things was set before,
17 because I wouldn't have came here not knowing how
18 much I was going to get paid, you know, because it's
19 a long way from home if I need to go back.
20     Q   And the amount that you learned from the
21 paperwork that you were referencing just now, is that
22 the amount that you were paid by your host family?
23     A   No.  Like I said before, I thought, and I
24 was under the impression, should I say, I was going
25 to be paid 200 a week.  But it ended up being 195.75

40

1 a week and never went up, never went less, and never
2 changed; it was just the same amount every week.
3     Q   And how did you learn the actual amount
4 that you would be paid by your host family?  Was it
5 when --
6     A   Like I said before, the first week when I
7 got paid, that's how I learned the exact amount.
8 When I got paid the first time, I saw how much I got
9 paid, and it was the same every week.  Before that, I
10 was under the impression I was getting $200 a week.
11     Q   And what was the amount that you were paid
12 each week?
13     A   $195.75.
14     Q   Did you ever ask your host family to pay
15 you more than that amount?
16     A   No, because we're not allowed to ask them.
17     Q   What do you mean by that, you're not
18 allowed to ask them?
19     A   We were told we were not -- that was the
20 amount.  You -- you can't -- you were not allowed to
21 get more.  That was the amount.  You can't work for
22 more hours to get more money.  It was just that, and
23 that's it.  That's what we were told.  I don't know
24 how else to explain it.  That was what we were told.
25     There was -- we were also not allowed to

10 (Pages 37 to 40)

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

41

1  have a second job or anything. You know, that was --
2  we were told that was obviously illegal. So we were
3  just told that that was going to be our amount, and
4  we -- we can't work any babysitting hours extra for
5  anybody else or for the family. That was just it.
6      Q   Did anyone from InterExchange ever tell you
7  that you could not ask the family for a higher weekly
8  stipend?
9      A   Yes. Yeah.
10     Q   What did they tell you?
11     A   What do you mean? They said that the
12 amount that we got paid per week is the -- is the
13 pre-discussed amount that was discussed on -- that we
14 were going to get paid. So we were not allowed to --
15 to ask for more because, you know, why would we if
16 that's what we were told we were going to get paid.
17     Q   Do you remember if anyone told you that you
18 couldn't ask for more?
19         Not that that's what the stipend is, but
20 did anyone -- do you remember if anyone from
21 InterExchange told you that you cannot ask for
22 more -- a higher weekly stipend?
23     A   Yes.
24         MR. PACHECO: Object to form.
25     A   I wouldn't be able to tell you what person

---

42

1  told me that, but I distinctly remember that. We
2  were not allowed to ask for more money or work any
3  more hours to get more money. It was just, like,
4  that was going to be it.
5          And not -- my host mom didn't say that; it
6  was something that they said to us. Because we were
7  working for them, you know, like -- but the -- so
8  they were the ones who, you know, told us that this
9  is the amount. There was no -- no arguing. I mean,
10 you know, like, I don't know. I don't know how else
11 to explain.
12         And, honestly, if you're a foreigner and
13 you're just being told, like, this is how much it is
14 and this is the work you're going to have to do and
15 you work, you just -- I mean, I just did it. I
16 didn't question anybody. I just did it because
17 that's what I was told. So I'm not going to -- I
18 don't know. That's just -- if other people did, I
19 mean, I don't know.
20     Q   (BY MS. LEVY) During your conversations
21 with the Valenzisi family during the matching
22 process, did you talk about what you would be doing
23 with the children?
24     A   Yeah. Like, general child care things.
25 Like, you know, taking them to school, playing with

---

43

1  them. Nothing out of the ordinary. Nothing
2  different than what the regular child care is.
3      Q   Do you remember anything specific that you
4  talked about with the host mom that would be
5  considered general child care?



24     Q   And when you actually lived with the
25 family, were those the duties that you performed with

---

44

1  the children?
2      A   Yeah.
3      Q   During your conversations -- during the
4  matching process with the Valenzisi mom, did they --
5  did she tell you how many hours per day you would be
6  working?
7      A   Regular -- she told me in the beginning a
8  regular eight-hour day, like a regular day, but it
9  ended up being more. But in the beginning it was
10 supposed to be just, you know, eight hours, I think.
11     Q   Do you remember signing an au pair
12 agreement with InterExchange?
13     A   Yes.
14     Q   Did you read the agreement before you
15 signed it?
16     A   Yes, I did, but I don't remember what was
17 in there right now.
18     Q   Do you remember if you understood it at the
19 time that you read it and signed it?
20     A   Yeah. I mean, yes, I did because I -- like
21 I said, I understand English, you know, fairly well,
22 perfectly good. So, yeah, I did.
23     Q   You arrived in the United States for the au
24 pair program in September 2010; is that right?
25     A   No. 2009.

---

11 (Pages 41 to 44)

45

```
1     Q   When you arrived in the United States for
2  the au pair program, is that when you went to this
3  training that you were talking about?
4     A   Yes.
5     Q   And was that —
6     A   The first week --
7     Q   Sorry.  Go ahead.
8     A   The first week that I came here I was -- I
9  landed at JFK, and I went to the New Yorker Hotel,
10 and I stayed there a week where there was the
11 orientation and training, and then I linked up with
12 the host family after that.
13    Q   Do you remember how long the training was?
14 How many hours per day?
15    A   It was all day.  It was 8 -- I don't
16 remember the exact hour, like, how long in total, but
17 it started at eight o'clock in the morning, and I
18 think it finished, like, 5:00 or 6:00, and we would
19 get lunch in between, like an hour.  But it was like
20 all day, every day the whole week long.
21    Q   Did you do any child care training during
22 that week?
23    A   Yes.
24    Q   What kind of child care training?
25    A   CPR.  I wouldn't be able to tell you like
```

46

```
1  exact things, but I remember CPR because we got a
2  little card thingy that we were CPR certified.
3          They taught us about money and stuff too,
4  about you guys' money.  I don't really remember all
5  the things, like, you know, everything specifically.
6  I just remember here and there, but that's -- it
7  was -- it was a whole bunch of stuff.
8     Q   Was the training general for all au pairs,
9  or was it specific to you and your host family?
10    A   No, it was --
11        MR. PACHECO:  Objection to form.
12    A   It was just the -- the au pairs.  The host
13 family wasn't there; it was just us.  And the au
14 pairs that was with me, they were actually close by.
15 They lived in New Jersey.  We -- the people who was
16 there for that week that arrived at the same time,
17 our group, we were -- we were all in the New York
18 area.
19    Q   (BY MS. LEVY)  And the training information
20 that they gave you during that week in New York City,
21 was that -- was it general information, or was it
22 specific for the Valenzisi family?
23        MR. PACHECO:  Object to the form.
24    A   It -- it wasn't just for the Valenzisi
25 family because I -- everybody -- everybody wasn't
```

47

```
1  going to the Valenzi family; it was just going to
2  be me.  So we -- we all got trained in general on all
3  these different things, and then after that, we went
4  to our separate families.
5          I don't -- I don't understand to how to --
6  like, you're -- I don't -- I don't know if that's the
7  right answer, but I don't know how to answer your
8  question.  Because we weren't trained specifically
9  for the Valenzisi family.  We were trained in
10 general, and then I just went to the Valenzisi family
11 but everybody else went to somebody else.
12    Q   (BY MS. LEVY)  Okay.  Thanks.
13        And then you said after training in New
14 York City you went to go meet your host family in
15 Long Island?
16    A   Yes, on the 4th of October.
17    Q   Do you remember whether both parents in
18 your host family worked?
19    A   Yes, they both worked.  One is a teacher,
20 and one has his own construction company.
21    Q   And was the host mom a teacher?
22    A   Yes.
23    Q   So she worked outside of the home?
24    A   Yes.
25    Q   And what time did she leave for work in the
```

48

```
1  morning?
7     Q   What time did the host mom get home from
8  work in the evening?
9     A   Five o'clock.
10    Q   And was that Monday --
11    A   And then I --
12    Q   Sorry.  Go ahead.
18    Q   Did -- did the host mom work those hours,
19 Monday through Friday every week?
20    A   Yes.  And she was off in the summer because
21 she was a public school teacher.
22    Q   So during the summer, did you have the same
23 hours that you were working?
24    A   Yep.  I had to work even if she was home.
25    Q   Was -- was the host mom helping with the
```



49
1 children when you were home or -- yeah, when you were
2 home too during the summer?
3     A   No.  No.  She -- she would be out -- she
4 would be doing things.  She would be going to the
5 gym, going to the beach with her friends, going to
6 the mall.  She would never be in the actual home; she
7 would just not be at work, but she would not be home.
8 I would be still taking -- it would be a regular -- I
9 worked -- I worked the whole year.  I never got off.
10 You know, I didn't get off like that.  I was only off
11 on the weekend.  That was it.
12     Q   Were you off on Saturdays and Sundays?
13     A   Yes, because I made up my hours during the
14 week.
15     Q   What time did the host dad leave for work
16 in the morning?
17     A   Four o'clock, because he works in
18 Manhattan.
19     Q   And then what time would he get home in the
20 evenings?
21     A   I would say around the same time as the
22 mom, because I guess traffic or whatever.  But I know
23 he used to leave very early in the morning, four
24 o'clock in the morning to beat the traffic.
25     Q   And then when the parents came home, were

50
1 they helping with the children at all?
2     A   No.
3     Q   Did --
4     A   No.
5     Q   Did they -- did the parents eat dinner with
6 their children?
7     A   Yes.
8     Q   Did you have dinner with them too?
9     A   Yes, sometimes.
10     Q   So after they arrived -- the parents
11 arrived home at 5:00 p.m. during the workweek, what
12 happened after that?  Can you tell me about your --

51
16     Q   Were there any other adults besides the
17 host mom, the host dad, and you that lived in the
18 family's home?
19     A   No, it was just us.
20     Q   And were there two children that you cared
21 for in the Valenzisi family?
22     A   Yeah, two boys.
23     Q   And how old were the two boys?
24     A   When I first got there, the oldest one was
25 three years old, and then the -- the little guy was

52
1 18 months.

13 (Pages 49 to 52)

Case No. 1:14-cv-03074-CMA-KMT   Document 1104-2   filed 06/06/18   USDC Colorado   pg 256 of 264

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

53



20  Q   Did you provide any other services to the
21  host family outside of child care?
22  A   No.
23  Q   Did you spend time with other au pairs when
24  you lived on Long Island with the Valenzisi family?
25  A   Yes. Once a month we would all meet at our

54

1   coordinator's house that worked for InterExchange.
2   Her name is Jolene. She was the one for Long Island.
3   We would meet at her house for whatever month. Say
4   in October we did, like, pumpkin carving night. So
5   we would bring our pumpkins, and we would carve it.
6   November we had like a -- we made food.
7       We -- we, a few times, went to go to the
8   Broadway show together with the au pairs. Then we
9   would all pay money as a group, and all of the au
10  pairs, with our coordinator, the one from
11  InterExchange, would -- we would go to, like,
12  Manhattan to the -- Broadway and watch a show.
13      We watched the Knicks once. Things like
14  that. Or we would meet at her house, exchange
15  cookies, do crafty things, have -- we, one time, had
16  a game night like with the Foosball and the air
17  hockey.
18      Like things to -- for some of the -- like
19  me, you know, we were working during the week, and
20  sometimes we didn't have friends, so it was like
21  something that we did to hang out with the other au
22  pairs, also other people from different countries so,
23  you know, you feel like you're not different.
24      So it was -- it was -- we would meet like
25  once a month, yeah, with the other au pairs.

55

1   Q   Did your -- did your host family give you a
2   schedule to work each week?
3   A   Yes. The schedule kind of stayed the same.
4   I got one schedule in the beginning, and it was kind
5   of the same thing. If there was anything out of
6   ordinary, the mom would let me know. But I did
7   receive a schedule in the beginning, and it kind of
8   stayed on the same track, and if there was any
9   variations, we would usually know.
10  Q   Was the schedule written down for you?
11  A   Yeah, it was. The first time it was
12  written down. I had it on paper, so I knew what my
13  duties was, yeah.
14  Q   Did anyone from InterExchange ever give you
15  a weekly schedule when you lived with your host
16  family?
17  A   No. They didn't -- they -- they didn't see
18  me weekly. It was a monthly thing.
19  Q   Do you know if you still have that paper
20  that your host family gave you when you first started
21  living with them as an au pair for your weekly
22  schedule?
23  A   I don't know. I don't think so. I -- I
24  would look, but I probably don't have anymore. I do
25  have some of my InterExchange paperwork, but I would

56

1   have to look for it, and I don't know if I have it
2   still. But I -- I do know they kept my paperwork
3   because, you know, we have to keep -- just excuse me.
4       I did keep some of it, but I wouldn't know
5   because I moved, so I don't know if everything moved
6   with me. But I do know that I did have it somewhere,
7   yeah.
8   Q   If -- if you could look for that, that --
9   we would appreciate it, and if you find it, please
10  give that to your attorney.
11      Okay?
12  A   Okay.
13      MR. PACHECO: And, Counsel, can I --
14      MS. LEVY: So I'm specifically talking --
15      MR. PACHECO: Sorry. Yeah. I was going to
16  ask what was the document? I missed that.
17  Q   (BY MS. LEVY) I'm specifically talking
18  about that written schedule that your host family
19  gave you when you first started as an au pair with
20  them.
21      Okay?
22  A   Okay. Yeah, like I said, I might not have
23  it, but if I do, I will -- I'll give it to my
24  attorney, yes.
25  Q   Okay. Thank you.

14 (Pages 53 to 56)

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

57

A   Okay.

Q   Who determined that weekly schedule that you got from your host family?

A   Well, the InterExchange gave us a general child care duty thing, you know, like what is expected of us.  But each family's routine is different, so, you know, I assume other au pair's routine was kind of different than mine.

So our routine was made by the family, but our duties, schedule, and as far as what we did for the family was -- was decided by InterExchange.  But our daily routine on, you know, what time I woke up and what time the kids went to school, that was the family; they told me that.

Q   Was it the host mom or the host dad or both of them?

A   The host mom was more in control of that stuff.

Q   InterExchange never told you which hours or days you had to work, right?

MR. PACHECO:  Object to the form.

A   No, not specifically.  The only thing I remember they said was that it was 45 hours a week, and if the week is Monday to -- if you made up the 45 hours in three days or however many days, it was 45

---

58

hours per week, but the hours couldn't carry over.  You know, you couldn't -- like if -- if -- if I only worked three days a week, then I didn't owe the family more hours or, you know, stuff like that.  But the -- the initial 45 and the days -- like, the seven-day week, that's what they told us, yeah.

Q   (BY MS. LEVY)  So how many hours per week did you work for your host family?

A   I couldn't specific -- I mean, if -- if I -- like, I do the math, I can tell you.  But I know that I started at five o'clock in the morning, and I would end around 6:00.  So on every day, Monday through Friday, because she worked and she -- it was like our days just ran like clockwork.  It didn't vary very -- it vary -- it didn't vary.  It didn't change at all.

Q   Were you expected to be on call for your host family at times that you were not scheduled to provide child care?

A   I wouldn't use the word "expected" because we -- you know, if -- if the -- if -- if that was the case, then, you know, that's different.  But I was called a few times from my room to sit with the kids while she ran out to get certain things when it wasn't my time, and then she would be gone for like a

---

59

few hours or, you know, stuff like that.

It was never pre-discussed, but since I was in the house and, you know, she needed to run out, it's not like I can say no.  So, you know, that's how that went.

Q   How often did that happen?

A   Quite often, but not like on a monthly basis, you know.  But it -- it would happen often.  Like, she didn't second guess it; it was just like, Oh, Mineline's here, so let me go, you know.  But I wouldn't be able to tell you, oh, it happened every week or stuff like that.  It was just when it needed to be, I was, like, always there, I guess.

MS. LEVY:  So we've been going for a little while, and I want to ask if you need a break at this point or if you're okay to keep going?

THE DEPONENT:  Well, how long do we still have to go?

MS. LEVY:  You know, I'm not sure.  So if you -- if you need to take a break, I -- it's okay.  We can take a ten-minute break or so right now.

THE DEPONENT:  Okay.  That's good.  Can we take a break?  Yeah.

MS. LEVY:  Sure.  All right.  Let's go off the record.

---

60

(Recess taken, 5:10 p.m. to 5:22 p.m.)

Q   (BY MS. LEVY)  All right.  Mineline, are you ready?

A   Yes.

Q   Okay.  So before the break, we were talking about your host family and your duties and your hours with them.  Was -- did the Valenzisis have an eight-year-old son also?

A   An eight-year-old?

Q   Yes.

A   No.  They only had two kids.  Now they have three, but back then, they didn't.  I don't know if you have current information, but not -- he wasn't eight at the time.

Q   Wait.  So when you lived with them, there was the three-year-old and then the baby, so just those two?

A   Yes, that was it.  Only two kids, that was it.

Q   Did you ever complain to your host family about the schedule that they gave you?

A   No.

Q   Did you ever make any complaints to an InterExchange representative about your work schedule with your host family?

---

15 (Pages 57 to 60)

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

61

1    A    No.
2    Q    How did the -- how did your host family pay
3  you each week?
4    A    Per check.
5    Q    Did InterExchange ever pay you your weekly
6  stipend?
7    A    No.
8    Q    Did your host family ever give you extra
9  money for any reason?
10    A    No.
11    Q    Did your host family ever give you any
12  gifts?
13    A    No.
14    Q    Did they give you a present for Christmas
15  or for your birthday?
16    A    No.  Just a card.
17    Q    Did you have a computer to use when you
18  lived with your host family?
19    A    No.
20    Q    Did you have a cell phone to use -- sorry.
21       Did you have something to say?
22    A    No, I didn't.
23    Q    Okay.  Did you have a cell phone to use
24  when you lived with your host family?
25    A    I bought my own cell phone because I didn't

---

62

1  have one.
2    Q    Did you use the cell phone to communicate
3  with your host family?
4    A    Yes.  If they needed to call me during the
5  week, because it was a 631 number, but they didn't
6  give it to me; I got it on my own when I first came
7  to the United States.  I got a phone and a -- and a
8  card with a 631 number.
9    Q    Did you get that in New York City before
10  you went to Long Island?
11    A    Yes.
12    Q    Did your host family pay for the phone?
13    A    No.
14    Q    Did they pay for any calling card to use
15  the phone?
16    A    No.
17    Q    Or any cell phone service to use the phone?
18    A    No.
19    Q    Did the host family call you on a landline
20  in their home to get ahold of you during the week?
21    A    No.  She didn't have a house phone, and she
22  was at work.  I was the one at her house.  She -- if
23  she needed to call me, she called on -- on -- on my
24  cell phone that I had, my personal cell phone.
25    Q    When you were talking with the host mom

---

63

1  during the matching process, did you discuss the cell
2  phone with her during those calls?
3    A    No.  It never came up.
4    Q    Do you know if the family required you to
5  have a cell phone before you bought it in New York?
6    A    I don't know.
7    Q    Did you have a car that you could use when
8  you lived with the host family?
9    A    For personal use?
10    Q    For personal use.
11    A    No.
12    Q    Did you have a car that you could use to
13  drive the children?
14    A    Yes.  It was the family's car that I took
15  the oldest boy to Taekwondo, and that was it.  I was
16  driving, like, her car to Taekwondo.
17    Q    Did you ever take any trips with your host
18  family?
19    A    Yes.
20    Q    Where did you go?
21    A    To Disney World.
22    Q    And how did you get to Disney World?
23    A    We flew, and then they hired the car.
24    Q    Did they pay for your plane ticket to
25  Disney World?

---

64

1    A    Yes.
2    Q    And when you were on the trip to Disney
3  World, how many days were you there?
4    A    We were there for a week.
5    Q    And during that week, did you have
6  different hours than you usually worked when you were
7  in Long Island?
8    A    Yes.  I was still working, and I was with
9  the kids, yeah.  I -- I had different hours, yeah.
10    Q    Do you remember what those hours were?
11    A    It was during the day, regular hours, and
12  the -- the -- the parents would go out to dinner with
13  the grandparents, so it would go into the night.  So
14  usually when I would end at, like, at six o'clock, it
15  was, you know, later at night.  So my hours was
16  actually longer.
17    Q    Did -- did the mom and the dad, the
18  grandparents help to take care of the kids during the
19  day when you were at Disney World?
20    A    No.  I was -- I went to Disney World with
21  them to work.
22    Q    And did the mom --
23    A    I didn't --
24    Q    Did the mom or dad or grandparents help to
25  take care of the kids?

---

16 (Pages 61 to 64)

**MINELINE MARTINS - 4/9/2018**

**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

---

65

1    A   No.
2    Q   Were they -- were you all together during
3    the day?
4    A   Yes, sometimes.  If the -- because
5    sometimes the grown-ups would go out, and then I
6    would stay with the kids.
7    Q   Did you take any other trips with your host
8    family?
9    A   No, that was it.  Only one time.
10   Q   Did you have any free time when you were in
11   Disney World?
12   A   No, not at all.  I didn't get to see Disney
13   World, technically.
14   Q   Can you tell me about what you did with the
15   family and the kids when you were at Disney World?

---

66

7    Q   Did you take any trips on your own?
8    A   No.
9    Q   How often did you go into New York City?
10   A   Sometimes on the weekends when I was able
11   to with the other au pairs.
12   Q   How often was that?
13   A   Probably, on average, twice or maybe three
14   times a month, but not -- like, mostly like twice a
15   month, I would say.  Sometimes three.  I don't know.
16   Not all the time.
17   Q   Did your host family pay for anything when
18   you went into New York City?
19   A   No.  No.
20   Q   Were there any other benefits that you
21   received from the host family?
22       MR. PACHECO:  Objection, form.
23   A   No, I didn't get anything.  I only got my
24   weekly paycheck, and that was it.
25   Q   (BY MS. LEVY)  Do you remember if your --

---

67

1    you received a -- a journal or a log of any type from
2    either your host family or InterExchange, something
3    to write in?
4    A   No, I never received anything like that.
5    Q   And you mentioned that InterExchange told
6    you generally what duties to do for a host family.
7    Did InterExchange tell you specifically what duties
8    you had to do for the Valenzisi family?
9    A   Yes, the taking care of the kids, on and
10   off the school bus, stuff like that.
11   Q   InterExchange told you to take the
12   three-year-old to the school bus, or did the host mom
13   tell to you take the three-year-old to the school
14   bus?
15       MR. PACHECO:  Objection, form.
16   A   Well, that, the host mom told me, like I
17   said.  But InterExchange gave -- told -- told me what
18   to expect I was going to have to do on a daily basis,
19   because it's -- you know, being an au pair is
20   different than being a regular nanny.
21       So that -- they told us that in the first
22   week, like, what typically you expect and how your
23   typical day is going to be.  You know, but the host
24   mom obviously makes the final rules, because
25   everybody's schedule is different.

---

68

1    Q   (BY MS. LEVY)  Okay.  I see.  Thank you.
2    Did anyone from InterExchange ever
3    supervise you when you were taking care of the
4    Valenzisi's children?
5    A   No, not that I remember.  No.
6    Q   Did your host family ever ask you to
7    perform any duties that worried you in any way?
8    A   That worried me, you said?
9    Q   Yes.
10   A   No.  No.  No.
11   Q   Did you take classes when you lived with
12   the host family?
13   A   What kind of classes?
14   Q   Did you take any classes at a school or
15   university, a college?
16   A   Yes, for our -- for our J-1 visa, which is
17   the visa that they gave us, we were required to do, I
18   think, six credits, so that -- but it was all
19   coordinated with, like, the au pair program.  We
20   learned the history of America, and, like, CW Post.
21   And it was all -- and it was only au pairs who went
22   to it, and it was, like, at a reduced price so that
23   we could afford it, you know, because we -- like,
24   studies are expensive.
25       So it was all just au pairs.  It was a

---

17 (Pages 65 to 68)

MINELINE MARTINS - 4/9/2018
Johana Paola Beltran, et al. v. InterExchange, Inc., et al.

---

69

1  specific program just for au pairs, these credits.
2  But, yeah, that was the only studies that I did as
3  far as programs is concerned, yeah.
4      Q  How many classes did you take?
5      A  I took -- I was here -- I -- I did the
6  two-year program.  So I did it twice.  I had to -- I
7  did two sets of six credits, I think.  Yeah, six
8  credits, two sets of them.
9      Q  So one year was this history of America
10  class, and then what was the other year?
11      A  I don't remember.  I don't -- I don't
12  really remember.  I don't know the exact course name
13  of it.
14      Q  Do you remember if it was at the same
15  school or university?
16      A  Not -- no.  One was at CW Post, and the
17  other one was -- oh, yeah.  One was the history of
18  America, which was at CW Post; that was the second
19  time I did the credit -- or the first time I did the
20  credit.  I don't really remember.
21          The second time I went to South Hall
22  Community College, and I did, like, a mechanical
23  drafting course, which was equivalent to six credits,
24  and that was, like, for, I think, six months at
25  night.  Because I just wanted to study something

---

70

1  different, because it was -- you know, there was -- I
2  didn't want to do the history in America thing again,
3  so I could choose as long as it was six credits.
4      Q  You mentioned your local coordinator,
5  Jolene, before?
6      A  Yes.
7      Q  Did you -- did you meet with her in person
8  other than when you went to her house for the monthly
9  meetings?
10      A  No.  The very first time I met her was at
11  her house, but I don't -- I didn't meet her
12  specifically before that.  I met other people from
13  InterExchange, but not Jolene.
14      Q  Did she -- did Jolene come to the
15  Valenzisi's home when you -- when you first arrived
16  there, within the first two weeks?
17      A  She was there once after I got there, and
18  she was there a few times before I got there when I
19  was in there to -- to see, you know, where I was
20  going to be staying and to talk with the family and
21  stuff like that, that I know, but only one time after
22  I was there.
23      Q  And what happened during that meeting that
24  one time when she came to the host family's home when
25  you were there?

---

71

1      A  It was just a general introduction.  It was
2  basically very -- in the very, very beginning.  I
3  think she was just stopping by to see how everything
4  went.  It wasn't anything official or anything like
5  that.  She just wanted to see how it was going.  She
6  spoke to me for a few minutes, and that was it.  It
7  was just like, Hey, how is everything?  And that was
8  it.
9      Q  Did Jolene ever supervise the child care
10  that you provided for your host family?
11      A  No.
12      Q  Did Jolene ever give you specific duties
13  that you had to do for your host family?
14      A  Specific duties, no.  My -- no.  Like, what
15  do you mean?
16      Q  I -- like other than what we've already
17  discussed that InterExchange explained to you
18  generally what you would be doing with a host family;
19  did Jolene ever tell you exactly what you had to do
20  for the Valenzisi family?
21      A  No.  No, there was nothing more than what I
22  already told you guys.
23      Q  Did Jolene ever pay you?
24      A  No.
25      Q  Other than Jolene, did you meet with any

---

72

1  other representatives from InterExchange when you
2  lived with your host family?
3      A  Not when I lived with them; only during the
4  first week when I came -- when I came to the United
5  States, there was three ladies.  I don't remember any
6  of their names, but I remember there was three
7  ladies.
8      Q  Mineline, we have asked you, through your
9  attorney, to provide documents relating to amounts
10  paid to you and hours that you worked when you were
11  with your host family, before this deposition today.
12  Have you searched for any of these sorts of
13  documents?
14      A  No.
15      Q  Do you have any documents given to you by
16  the company that you were talking about that was in
17  Cape Town related to your participation in the au
18  pair program?
19      A  I do remember receiving documents, like I
20  said, but as far as if those documents -- if I still
21  have them, I'm not sure.  I won't be able to tell you
22  a hundred percent.  I don't -- I won't be able to
23  tell you that.
24      Q  Do you have any documents, such as e-mails
25  or social media, relating to your work, performance,

---

18 (Pages 69 to 72)

---

73

1  your duties, or compensation as an au pair?
2      A  I don't know.  I don't -- social media,
3  definitely not, because I wasn't allowed to put the
4  children on social media.  The parents didn't want
5  that.  I -- I don't know.  As far as payment, I have
6  to see.  Like I said, I don't know what I -- if I
7  still have the paperwork.
8      But I -- I would go with, I'm not sure if I
9  have those documents, because I can't say a hundred
10 percent if I do have it.
11     Q  Was it the host mom or the host dad that
12 gave you your check with the weekly stipend each
13 week?
14     A  It was the host mom.  It came out of her --
15 her account.
16     Q  Did you keep any records of those payments
17 that you received from your host family?
18     A  I could -- I could see if I do have it.  I
19 don't know if I do.  I don't want to say yes and then
20 I don't have it.  So I -- I -- I might.  I don't
21 know.  Because it's -- it's been a really long time,
22 and I've moved since, so I might not have it anymore.
23     Q  Did you keep any records of the hours that
24 you worked with your host family?
25     A  No.  I only know it because I know what

---

74

1  time I woke up and what time, you know, I -- I -- I
2  ended.  But as of, like, paper -- paper copies, I
3  don't have that, no.
4      Q  What time did you wake up for work with the
5  host family Monday through Friday?
6      A  I woke up at 4:30 to be able to start at
7  five o'clock in the morning.
8      Q  Do you believe your host family owes you
9  money today?
10     MR. PACHECO:  Objection.
11     A  I don't know.  I don't know.  I don't know.
12 I wouldn't be able to tell you that.
13     Q  (BY MS. LEVY)  Do you believe InterExchange
14 owes you money?
15     MR. PACHECO:  Objection.
16     A  I don't know either.  I -- I -- I wouldn't
17 be able to give you an answer.
18     Q  (BY MS. LEVY)  Did you make any complaints
19 to your host family about your experience as an au
20 pair?
21     A  No.  I just kept it to myself.
22     Q  Did you make any complaints to
23 InterExchange about your experience as an au pair?
24     A  No.
25     Q  Did you make any complaints to any

---

75

1  government agency about your experience as an au
2  pair?
3      A  No.
4      Q  When you were talking about the three
5  ladies from InterExchange at the training when you
6  first came to the United States to be an au pair and
7  you said they were given information about the
8  stipend -- do you remember talking about that today?
9      A  Yes.  You said -- you -- you say, again,
10 what?  That -- do I remember the three ladies spoke
11 about the stipend amount?
12     Q  Yes, at the training.
13     So my question to you --
14     A  Yes.
15     Q  -- is, do you specifically recall -- do you
16 specifically remember one of those three ladies from
17 InterExchange telling you cannot ask for more
18 money, or was that your understanding of that being
19 the stipend amount and that you shouldn't ask for
20 more?
21     MR. PACHECO:  Objection to form.
22 Foundation.
23     A  No.  We were told that we can't ask for
24 more.
25     Q  (BY MS. LEVY)  And who told you that?

---

76

1      A  The lady from InterExchange.  We can't ask
2  for more money or more hours in order to make more
3  money.
4      MS. LEVY:  Okay.  I think those are all the
5  questions I have, but I need to take a short break
6  just to look through my notes.
7      THE DEPONENT:  Okay.
8      MS. LEVY:  So let's go on a break right
9  now.
10     (Recess taken, 5:50 p.m. until 6:00 p.m.)
11     MS. LEVY:  I just have a few more questions
12 for you.
13     THE DEPONENT:  Okay.
14     Q  (BY MS. LEVY)  Did you ever discuss the
15 amount of the weekly stipend with your host family?
16     A  No.  Not that I can remember, no.
17     Q  And when you went to New York for training
18 and you said that one of the ladies told you you
19 could not ask for more money, was that the first time
20 someone had ever told you that?
21     A  Yes.  Yeah, that was -- I would say yeah,
22 that was the first time.
23     MS. LEVY:  Okay.  All right.  I have no
24 more questions.  Thank you very much.  Really
25 appreciate you doing this deposition.

---

19 (Pages 73 to 76)

---

77

1      Byron, do you have any questions?
2          MR. PACHECO:  Yes, I have just a couple
3  questions.
4          And, also, thank you for being with us
5  tonight.
6              EXAMINATION
7  BY MR. PACHECO:
8      Q   You testified earlier about attending
9  training in New York City.  Do you remember that?
10     A   Yes.
11     Q   Can you approximate how many hours you
12 spent in the training?
13     A   I would say a week.  Do you mean a week?
14 For the week?
15     Q   How many days did the training last?
16     A   It was -- it was one week of training, and
17 I would say probably about 40 hours for that week,
18 that one week of training.
19     Q   When you say "a week," do you mean seven
20 days, or do you mean Monday through Friday?
21     A   The Monday through Friday -- to -- like,
22 the Monday morning until Friday that night.  The
23 whole -- the whole of that week.
24     Q   And so I understand your testimony, you
25 estimate that it was approximately 40 hours of

---

78

1  training during those five days that you attended; is
2  that right?
3      A   Yes.
4      Q   Did anyone pay you for that training?
5      A   No.
6      Q   Did your host family pay you for that
7  training?
8      A   No.
9      Q   Did InterExchange pay you for that
10 training?
11     A   No.
12     Q   You also testified that your host family
13 paid you by check; is that right?
14     A   Yes.
15     Q   What bank did you use at that time?
16     A   Chase.
17     Q   Do you still have the account with Chase
18 that you used at that time?
19     A   No.
20     Q   Did you close it?
21     A   Yeah.  It was closed a long time ago.
22     Q   When did you close it?
23     A   I would say probably two months after I
24 ended up -- after I ended my au pair time.  So 2011
25 it was closed.

---

79

1      Q   So is it fair to say you closed it before
2  you joined this lawsuit?
3      A   Yes.  Yes.  Way before.
4      Q   I believe you testified that you may still
5  have some bank records.  Are those bank records from
6  that account?
7      A   Yes.
8      Q   Do you have those records electronically or
9  in paper?
10     A   In paper.  Like the stubs, I -- I have
11 those because I have some paperwork that I kept, like
12 I said.
13     Q   When you say "stubs," are you referring to
14 check stubs?
15     A   No.  Like the receipt for when you deposit
16 the check into the account, the little receipt thingy
17 that the bank gives you, like a receipt.  I don't
18 know what you call the receipt.
19     Q   And those receipts are the receipts of the
20 checks that the host family gave you that you then
21 deposited into your bank account; is that right?
22     A   Yes.  It has the actual check number on it.
23 It's a check receipt of what the family paid me, yes.
24     Q   Okay.  Thank you.
25         MR. PACHECO:  Counsel, we'll -- we'll

---

80

1  gather those, and we'll work to produce those to you
2  as soon as possible.
3          MS. LEVY:  Okay.  Thank you.
4          MR. PACHECO:  That's all the questions I
5  have.
6          MS. LEVY:  All right.  I don't have any
7  more questions for you, but we -- we talked about a
8  few different documents that you said you may still
9  have, like the -- the bank receipts for depositing
10 those checks; you mentioned that you might still have
11 some agreements that you signed --
12         THE DEPONENT:  Yes.
13         MS. LEVY:  -- the written schedule from
14 your family.  If you could look for anything that we
15 talked about today and give that to your attorney as
16 soon as possible, we would certainly appreciate that.
17         THE DEPONENT:  I will do that.
18         MS. LEVY:  Okay.  Thank you.
19         MR. PACHECO:  And as I said, we will -- as
20 soon as we get at least the bank records, assuming
21 they are what -- what she's testified to, we'll
22 certainly give those over, and anything else that's
23 responsive.
24         MS. LEVY:  Okay.  Thank you very much.  We
25 really appreciate you being here today.

---

20 (Pages 77 to 80)

**MINELINE MARTINS - 4/9/2018**
**Johana Paola Beltran, et al. v. InterExchange, Inc., et al.**

81

1   THE DEPONENT: Okay. Thank you.
2   MR. PACHECO: All right. Thank you. Thank
3   you both.
4   WHEREUPON, the within proceedings were
5   concluded at the approximate hour of 6:05 p.m. on the
6   9th day of April, 2018.
7                    *   *   *   *   *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82

        I, MINELINE MARTINS, do hereby certify that
I have read the above and foregoing deposition and
that the same is a true and accurate transcription of
my testimony, except for attached amendments, if any.
        Amendments attached   (  ) Yes    (  ) No


        _____
        MINELINE MARTINS


        The signature above of MINELINE MARTINS was
subscribed and sworn to or affirmed before me in the
county of _____, state of
_____, this _____ day of
_____, 2018.


        _____
        Notary Public
        My Commission expires:




Johana Paola Beltran, April 9, 2018 (std)

83

                    REPORTER'S CERTIFICATE
STATE OF COLORADO       )
                        ) ss.
COUNTY OF ADAMS         )
            I, SHAUNA T. DIETEL, Registered
Professional Reporter, and Notary Public ID
20014031444, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said MINELINE MARTINS, was duly sworn or affirmed
by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

            I further certify that I am not
employed by, related to, nor of counsel for any of
the parties herein, nor otherwise interested in the
outcome of this litigation.
            IN WITNESS WHEREOF, I have affixed my
signature this 23rd day of April, 2018.

            My commission expires August 15, 2021.


_XXX_   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing is not required.

21 (Pages 81 to 83)

REPORTER'S CERTIFICATE

STATE OF COLORADO      )
                       )  ss.
COUNTY OF ADAMS        )

        I, SHAUNA T. DIETEL, Registered
Professional Reporter, and Notary Public ID
20014031444, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said MINELINE MARTINS, was duly sworn or affirmed
by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

        I further certify that I am not
employed by, related to, nor of counsel for any of
the parties herein, nor otherwise interested in the
outcome of this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 23rd day of April, 2018.

        My commission expires August 15, 2021.


_XXX_   Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.



                    _____
                    Shauna T. Dietel
                    Registered Professional Reporter