No. 17-2140

# United States Court of Appeals

## for the First Circuit

————————

ERIN CAPRON; JEFFREY PENEDO; CULTURAL CARE, INC.
D/B/A CULTURAL CARE AU PAIR,
*Plaintiffs-Appellants*,

*v.*

OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS;
MAURA T. HEALEY, IN HER CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF MASSACHUSETTS,
*Defendants-Appellees.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

————————

## BRIEF OF DEFENDANTS-APPELLEES

————————

MAURA HEALEY
*Attorney General of Massachusetts*

Robert E. Toone, 1st Cir. No. 124523
Elizabeth Kaplan, 1st Cir. No. 1182134
*Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2178
email: Robert.Toone@state.ma.us

## <u>TABLE OF CONTENTS</u>

Table of Authorities ....................................................................................iv

Introduction ..............................................................................................1

Jurisdictional Statement ...............................................................................2

Statement of the Issues................................................................................2

Statement of the Case..................................................................................2

     A.    Procedural History....................................................................2

     B.    Legal and Regulatory Background.......................................................6

          1.    The Fulbright-Hays Act ........................................................6

          2.    Creation and Criticism of the Au Pair Program.........................6

          3.    USIA's 1995 and 1997 Regulations ..........................................8

          4.    The State Department's 2014 Regulations ...............................11

          5.    The Wilberforce Trafficking Act and State Department
              Information Pamphlet ..........................................................12

          6.    Massachusetts's Minimum Wage Law and Domestic
              Workers Law.......................................................................14

Summary of Argument ...............................................................................16

Argument.................................................................................................18

     I.    THE DISTRICT COURT PROPERLY DISSMISSED
          PLAINTIFFS' PREEMPTION CLAIMS. .........................................18

          A.    Plaintiffs Bear a Heavy Burden in Seeking to Invalidate
              All Applications of the Domestic Workers Law to Au
              Pairs..................................................................................18

              1.    The District Court properly considered the law and
                   matters of public record in deciding the motion.............18

2.      A strong presumption applies against preemption
        of state worker protection laws......................................20

3.      Because plaintiffs' challenge is facial, they must
        show that "no set of circumstances" exists under
        which the Domestic Workers law can be validly
        applied to au pairs...........................................................23

B.      Plaintiffs' Field Preemption Claim Lacks Merit. ....................24

1.      The Domestic Workers law protects workers in
        Massachusetts generally and does not displace the
        federal government's authority over immigration
        or foreign affairs. ..........................................................25

2.      Far from leaving "no room" for state law, the
        applicable federal regulations require compliance
        with state law..................................................................28

3.      The regulations recognize that au pairs are in an
        "employment relationship" and require compliance
        with the FLSA, and the FLSA specifically
        contemplates compliance with state labor laws. ............31

C.      Plaintiffs' Conflict Preemption Claim Lacks Merit.................34

1.      The Domestic Workers law does not obstruct
        Congress's objectives. ....................................................35

2.      Compliance with both federal regulations and the
        Domestic Workers law is not physically
        impossible.......................................................................41

        a.      Application of Massachusetts's minimum
                wage law............................................................42

        b.      Deductions in wages for room and board ............44

        c.      Compensation for time required on premises
                or on duty............................................................46

        d.      Recordkeeping....................................................47

ii

II.   THE DISTRICT COURT DID NOT ABUSE ITS
      DISCRETION IN DENYING PLAINTIFFS' RULE 59(e)
      MOTION. ...........................................................................................49

Conclusion ..........................................................................................................55

iii

# Table of Authorities

## Cases

*Alternative Energy, Inc. v. St. Paul Fire & Marine Insurance
Co.*, 267 F.3d 30 (1st Cir. 2001) ................................................................... 19

*Arizona v. United States*, 567 U.S. 387 (2012) .................................................. *passim*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 18

*Auer v. Robbins*, 519 U.S. 452 (1997) ................................................................. 40

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................... 18

*Beltran v. Interexchange, Inc.*, No. 14-cv-03074-CMA-KMT,
2016 WL 695967 (D. Colo. Feb. 22, 2016) ..................................... 3-4, 39-40

*Beltran v. InterExchange, Inc.*,
176 F. Supp. 3d 1066 (D. Colo. 2016) ........................... 34, 38, 40, 43-45, 49

*Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925 (1st Cir. 2014) ......................... 50-52

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) .................................................. 53

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001) ............................................................................. 21-22

*California Coastal Commission v. Granite Rock Co.*,
480 U.S. 572 (1987) .......................................................................... 23-24, 29

*Carrero-Ojeda v. Autoridad de Energía Eléctrica*,
755 F.3d 711 (1st Cir. 2014) ........................................................................ 54

*Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011) ............................. 26-27, 35

*Commonwealth Edison Co. v. Montana*, 453 U.S. 609 (1981) .............................. 36

*De Canas v. Bica*, 424 U.S. 351 (1976) ......................................................... 22, 28

iv

*Feliciano-Hernández v. Pereira-Castillo*,
    663 F.3d 527 (1st Cir. 2011)............................................................54

*Fisher v. Kadant, Inc.*, 589 F.3d 505 (1st Cir. 2009)................................................54

*Fitzgerald v. Harris*, 549 F.3d 46 (1st Cir. 2008)....................................................36

*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987)...........................................21

*Freeman v. Town of Hudson*, 714 F.3d 29 (1st Cir. 2013)......................................51

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)........................................... 35-36

*Global Naps, Inc. v. Verizon New England, Inc.*,
    489 F.3d 13 (1st Cir. 2007).............................................................50

*Goldberg v. Whitaker House Corp., Inc.*, 366 U.S. 28 (1961) ..................................9

*Good v. Altria Group*, 501 F.3d 29 (1st Cir. 2007),
    *aff'd*, 555 U.S. 70 (2008)......................................................... 40-41

*Grant's Dairy-Me., LLC v. Commissioner of Maine Department*
    *of Agriculture, Food & Rural Resources*,
    232 F.3d 9 (1st Cir. 2000)................................................................35

*Greene v. Rhode Island*, 398 F.3d 45 (1st Cir. 2005).............................................19

*Guadalupe-Báez v. Pesquera*, 819 F.3d 509 (1st Cir. 2016)....................................50

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
    471 U.S. 707 (1985)..............................................................29, 35

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .............................................................26

*Home Care Association of America v. Weil*,
    799 F.3d 1084 (D.C. Cir. 2015),
    *cert. denied*, 136 S. Ct. 2506 (2016)..............................................44

*In re Genzyme Corp. Securities Litigation*,
    754 F.3d 31 (1st Cir. 2014)..............................................................54

*In re Pharmaceutical Industry Average Wholesale Price*
    *Litigation*, 582 F.3d 156 (1st Cir. 2009)......................................22

*Ira Green, Inc. v. Military Sales & Service Co.*,
    775 F.3d 12 (1st Cir. 2014)..............................................................50

*James v. Watt*, 716 F.2d 71 (1st Cir. 1983) ...........................................54

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010)........................................23

*Lemelson v. U.S. Bank National Association*,
    721 F.3d 18 (1st Cir. 2013)..............................................................18

*Maccabees Mutual Life Insurance Co. v. Perez-Rosado*,
    641 F.2d 45 (1st Cir. 1981)........................................................33, 44

*Madeira v. Affordable Housing Foundation, Inc.*,
    469 F.3d 219 (2d Cir. 2006) ..........................................................28

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ................................. 20-21

*Metropolitan Life Insurance Co. v. Massachusetts*,
    471 U.S. 724 (1985)........................................................................21

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015)..............................27

*Pelletier v. Main Street Textiles, LP*,
    470 F.3d 48 (1st Cir. 2006)..............................................................52

*Pharmaceutical Research & Manufacturers of America v.*
    *Concannon*, 249 F.3d 66 (1st Cir. 2001) ................................23, 34

*Philip Morris Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997)............47

*Rhode Island Hospitality Association v. City of Providence ex*
    *rel. Lombardi*, 667 F.3d 17 (1st Cir. 2011) ..................................21

vi

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982)................................................24

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ...........................................21

*Rumsfeld v. United Technologies Corp.*,
    315 F.3d 1361 (Fed. Cir. 2003) ......................................................52

*Salas v. Sierra Chemical Co.*, 59 Cal. 4th 407 (2014)...........................................28

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010) (en banc).......................................18

*Showtime Entertainment, LLC v. Mendon*,
    769 F.3d 61 (1st Cir. 2014)..........................................................23

*Tobin v. Federal Express Corp.*, 775 F.3d 448 (1st Cir. 2014)..............................20

*United States v. Salerno*, 481 U.S. 739 (1987)......................................................23

*Washington State Grange v. Washington State Republican
    Party*, 552 U.S. 442 (2008)........................................................42

*Williams v. Lew*, 819 F.3d 466 (D.C. Cir. 2016) ...................................................20

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................20, 22

## Constitutional Provisions

U.S. Const., Art. I, § 8, cl. 3........................................................................3

U.S. Const., Art. IV, cl. 2...........................................................................3

## Statutes

Pub. L. No. 75-718, 52 Stat. 1060 (1938)
    (Fair Labor Standards Act) .........................................................8-9

Pub. L. No. 87-256, 75 Stat. 527 (1961)
    (Mutual Educational and Cultural Exchange Act) ..........................................6

Pub. L. No. 100-461, 102 Stat. 2268 (1988)...........................................................7

Pub. L. No. 101-454, 104 Stat. 1063 (1990)
    (Eisenhower Exchange Fellowship Program) .................................8

Pub. L. No. 103-415, 108 Stat. 4299 (1994)
    (State Department: Technical Amendments) .................................8

Pub. L. No. 104-72, 109 Stat. 776 (1995)
    (Au Pair Programs, Extension)...............................................10, 32

Pub. L. No. 105-48, 111 Stat. 1165 (1997)
    (Extension of Au Pair Programs)..................................................11

Pub. L. No. 105-277, 112 Stat. 2681 (1998)
    (Foreign Affairs Reform and Restructuring Act) ...........................................6

Pub. L. No. 110-457, 122 Stat. 5044 (2008)
    (William Wilberforce Trafficking Victims Protection
    Reauthorization Act)....................................................................12

8 U.S.C. § 101(a)(15)(J) ........................................................................6

8 U.S.C. § 1101 *et seq.* (Immigration and Nationality Act)...................................22

8 U.S.C. § 1375b(a)(1)........................................................................ 12-13

8 U.S.C. § 1375b(b)(2).......................................................................13, 30

22 U.S.C. § 2451 *et seq.*
    (Mutual Educational and Cultural Exchange Act) .........................1, 6, 25, 36

22 U.S.C. § 2460(c) ...............................................................................37

29 U.S.C. § 201 *et seq.* (Fair Labor Standards Act)........................................... 8-9

viii

29 U.S.C. § 206(a)(1) ........................................................................33

29 U.S.C. § 207(a)(1) ..................................................................33, 43

29 U.S.C. § 218 ..................................................................................4

29 U.S.C. § 218(a) ....................................................................33, 42, 45

44 U.S.C. § 1507 ..............................................................................20

M.G.L. ch. 149, §§ 190-191 ........................................................... 1-2, 14

M.G.L. ch. 149, § 190 ......................................................................28

M.G.L. ch. 149, § 190(o) ..................................................................14

M.G.L. ch. 151 (Minimum Fair Wage Law) ..........................................14

M.G.L. ch. 151, § 1 ................................................................... 14, 42-43

M.G.L. ch. 151, § 1A ..............................................................14-15, 42-43

Mass. St. 1912, ch. 706 .....................................................................14

Mass. St. 2014, ch. 144, § 30 ............................................................14

Mass. St. 2014, ch. 144, § 80 ............................................................14

Mass. St. 2014, ch. 148, § 3
    (Massachusetts Domestic Workers' Bill of Rights) ...............................*passim*

## Rules and Regulations

22 C.F.R. § 62.9(c) .........................................................................12, 30

22 C.F.R. § 62.10(b)(9) ...................................................................12, 30

22 C.F.R. § 62.10(c)(8) ...................................................................13, 30

ix

22 C.F.R. § 62.11(a) ........................................................................................11, 30

22 C.F.R. § 62.31(c)(2) .........................................................................................49

22 C.F.R. § 62.31(e)(5) .........................................................................................48

22 C.F.R. § 62.31(e)(6) ..................................................................................... 45-46

22 C.F.R. § 62.31(j) ...............................................................................................42

22 C.F.R. § 62.31(j)(1) ...............................................4, 11, 31-34, 39-40, 47

22 C.F.R. § 62.31(j)(2) .........................................................................................46

22 C.F.R. § 62.60(f) ...............................................................................................12

29 C.F.R. § 516.1(c) ..............................................................................................47

29 C.F.R. § 516.2(a) ..............................................................................................47

29 C.F.R. § 531.30 ..........................................................................................40, 45

29 C.F.R. § 552.109(c) ..........................................................................................44

940 C.M.R. § 32 .....................................................................................................14

940 C.M.R. § 32.02 .........................................................................................15, 46

940 C.M.R. § 32.03(1) ..........................................................................................15

940 C.M.R § 32.03(2) ......................................................................................15, 46

940 C.M.R. § 32.03(3) .....................................................................................15, 43

940 C.M.R. § 32.03(5) ..........................................................................................15

940 C.M.R. § 32.03(5)(a) ......................................................................................45

940 C.M.R. § 32.03(5)(c)(1) ...............................................................45

940 C.M.R. § 32.03(5)(c)(2) ...............................................................45

940 C.M.R. § 32.03(6) .......................................................................15

940 C.M.R. § 32.03(9) .......................................................................15

940 C.M.R. § 32.04(2) .......................................................................15

940 C.M.R. § 32.04(3) .......................................................................48

940 C.M.R. § 32.04(4) .......................................................................15

940 C.M.R. § 32.04(7) .......................................................................15

940 C.M.R. § 32.05(2) .......................................................................15

Fed. R. Civ. P. 12(b)(6)........................................3, 18-19, 50-51, 53

Fed. R. Civ. P. 15(a) ................................................................... 53-54

Fed. R. Civ. P. 15(a)(2) ..............................................................5, 50

Fed. R. Civ. P. 59(e) ................................................ 2, 5, 17, 49-53

## Miscellaneous

Exchange Visitor Program, 59 Fed. Reg. 64296
        (proposed Dec. 14, 1994) ...........................................................8, 49

Exchange Visitor Program, 60 Fed. Reg. 8547
        (Feb. 15, 1995).............................................8-9, 26, 32, 38, 48-49

Exchange Visitor Program, 62 Fed. Reg. 34,632
        (June 27, 1997) .................................................. 10, 32-33, 38, 48

xi

Exchange Visitor Program – General Provisions, 74 Fed. Reg.
48,177 (proposed Sept. 22, 2009)................................................................11

Exchange Visitor Program – General Provisions, 79 Fed. Reg.
60,294 (Oct. 6, 2014)................................................................................11, 13

U.S. Dep't of State, *Know Your Rights: An Information
Pamphlet Describing Your Rights While Working in the
United States*, available at
https://travel.state.gov/content/dam/visas/LegalRightsand
Protections/Wilberforce/Wilberforce-ENG-100116.pdf
(last visited Mar. 19, 2018)................................................................ 13, 30-31

U.S. Gen. Accounting Office, *GAO/NSIAD-90-61, U.S.
Information Agency: Inappropriate Uses of Educational
and Cultural Exchange Visas* (1990) .................................................. 6-7, 32

Wilberforce Pamphlet Publication, 74 Fed. Reg. 34,386
(July 15, 2009)................................................................................................13

## Introduction

Massachusetts was the first state in the nation to enact a minimum wage and has been a leader in advancing protections for workers in the Commonwealth. Enacted in 2014, the Massachusetts Domestic Workers' Bill of Rights ("Domestic Workers law"), M.G.L. ch. 149, §§ 190-191, regulates conditions for a group of vulnerable workers.  That group includes au pairs: workers from other countries, between the ages of 18 and 26, who enter the United States on "J visas" and provide child care services to American host families.  Federal law sets certain minimum worker protections for au pairs and expressly contemplates additional state-level protections.

Plaintiffs – Cultural Care, Inc., a company that runs an au pair program, and two host family members with au pairs placed by Cultural Care – filed this lawsuit to exclude au pairs from the protections of the Domestic Workers law.  The District Court properly dismissed their claims.  The Domestic Workers law is a clear exercise of Massachusetts's sovereign authority to regulate working conditions, and there is no evidence that Congress intended to preempt such protections when it enacted the Mutual Educational and Cultural Exchange Act of 1961, 22 U.S.C. § 2451 *et seq.*, or any other law.  Plaintiffs' field preemption claim fails because the Domestic Workers law neither displaces federal control over international relations or immigration nor intrudes on a framework of federal

regulation too pervasive to allow for state supplementation.  Their conflict

preemption claim fails because there is no overriding federal objective in ensuring

uniform compensation or inexpensive child care through the au pair program, and

it is far from impossible for employers in Massachusetts to comply with state and

federal law.  Lastly, the District Court did not abuse its discretion in denying

plaintiffs' duplicative and meritless postjudgment motion for reconsideration.  Its

judgment should be affirmed.

## Jurisdictional Statement

Defendants agree with plaintiffs' jurisdictional statement.

## Statement of the Issues

1.     Whether the Massachusetts Domestic Workers' Bill of Rights is

categorically preempted by the Mutual Educational and Cultural Exchange Act of

1961 or other federal law.

2.     Whether the District Court abused its discretion in denying plaintiffs'

Rule 59(e) motion for reconsideration.

## Statement of the Case

A.    **Procedural History**

Plaintiffs filed this lawsuit on August 31, 2016, seeking declaratory and

injunctive relief against the Domestic Workers law, M.G.L. ch. 149, §§ 190-191,

and supporting Attorney General regulations, 940 C.M.R. § 32.  JA 8-50.  In their

complaint, plaintiffs claimed that the Domestic Workers law and regulations are

2

preempted by federal law under the Supremacy Clause of the Constitution, U.S. Const., Art. IV, cl. 2.  JA 24-26 (Compl. ¶¶ 36-44).  Plaintiffs did not claim express preemption, but rather two theories of implied preemption:  field preemption, *see id.* (Comp. ¶¶ 39, 43), and conflict preemption, *see id.* (Comp. ¶¶ 38, 42).[1]

At a scheduling conference, the parties agreed that the merits of plaintiffs' claims could be resolved through a Rule 12 motion, based on the applicable law and regulations and other public records.  JA 509-12.  Defendants then moved to dismiss plaintiffs' preemption claims under Fed. R. Civ. P. 12(b)(6).  JA 51-217.  Plaintiffs filed their opposition on November 29, 2016, JA 218-427, and a supplemental memorandum in opposition (with leave of the Court) on May 11, 2017, JA 451-73.

The District Court held a hearing on the motion to dismiss on June 20, 2017.  Less than one hour before that hearing began, plaintiffs moved for leave to file their "Second Supplemental Opposition to Defendants' Motion to Dismiss," JA 478-503, which attached as an exhibit a declaration filed in *Beltran v. Interexchange, Inc.*, No. 14-cv-03074-CMA-KMT (D. Colo.).  *Beltran* is a class

---

[1] Plaintiffs also claimed that the Domestic Workers law and regulations violate the dormant Commerce Clause, U.S. Const., Art. I, § 8, cl. 3.  JA 26-29 (Compl. ¶¶ 45-56).  The District Court denied this claim, JA 614-18, and plaintiffs have waived it on appeal.

action lawsuit in Colorado federal court against Cultural Care and other au pair companies; the plaintiffs claim, among other things, violations of federal and state minimum wage laws and illegal price fixing by the au pair industry.  The declaration in *Beltran* was from Stanley Colvin, a former government official whom the defendants retained to comment on the plaintiffs' class certification motion in that case.  JA 487.  The District Court in this case denied plaintiffs leave to file the second supplemental memorandum because it was untimely and improper "in light of Plaintiffs' repeated statements that the matter could be decided as a matter of law and that discovery should be stayed."  JA 504-06.

On August 1, 2017, the District Court granted defendants' motion to dismiss.  JA 597-618.  The Court denied plaintiffs' field preemption claim because "[n]othing in the Fulbright-Hays Act or the federal regulations suggests that states may not supplement federal protections provided to *au pairs* or that the goals of cultural exchange would be thwarted by additional labor protections by the states"; in fact, the federal regulations mandate compliance with the FLSA, which, "in turn, allows states to impose more stringent protections than those offered at the federal level."  JA 606 (citing 22 C.F.R. § 62.31(j)(1) and 29 U.S.C. § 218).  The Court similarly rejected the various arguments offered in support of plaintiffs' conflict preemption claim, such as their contention that au pairs cannot be treated as both exchange visitors and protected employees under the Domestic Workers

4

law, or that application of Massachusetts's minimum wage might make it
"economically infeasible" for families in the Commonwealth to use au pairs as an
affordable childcare option.  JA 608-14.

The District Court entered its Order of Dismissal on August 2, 2017.  JA
619.  On August 15, 2017, plaintiffs filed a document titled "Rule 59(e) Motion
Requesting That the Court Reconsider the Dismissal Opinion, Vacate the
Judgment, and Allow the Case to Proceed as Pled, or, in the Alternative, That the
Court Vacate the Judgment and Allow Plaintiffs Leave to File an Amended
Complaint Pursuant to Rule 15(a)(2) and to Supplement the Record," along with a
mélange of supporting materials including a 21-page legal memorandum, a
proposed amended complaint in original and redline format, the same declaration
from Stanley Colvin in the *Beltran* case that plaintiffs attempted to file in June
2017, two letters from members of Congress to Secretary of State Rex Tillerson,
and various other exhibits.  JA 620-824.  On October 26, 2017, the District Court
denied plaintiffs' motion, ruling that their legal memorandum "largely reiterate[d]
prior arguments," their submission of extraneous documents was improper, and the
Court lacked authority to allow the filing of an amended complaint at "this late
stage, in the absence of postjudgment relief."  JA 828-29.  Plaintiffs appealed.  JA
830-31.

B.     **Legal and Regulatory Background**

1.     **The Fulbright-Hays Act**

The Mutual Educational and Cultural Exchange Act of 1961 (also called the "Fulbright-Hays Act") was intended to promote understanding between the people of the United States and other countries by means of educational and cultural exchanges.  Pub. L. No. 87-256, 75 Stat. 527 (1961) (codified at 22 U.S.C. § 2451 *et seq.*).  The Act established the "J visa" by adding section 101(a)(15)(J) to the Immigration and Nationality Act.  8 U.S.C. § 101(a)(15)(J).

Oversight of exchange programs conducted pursuant to the Fulbright-Hays Act was initially the responsibility of the U.S. Information Agency ("USIA").  In 1999, USIA was abolished and responsibility for exchange programs was transferred to the Department of State.  Foreign Affairs Reform and Restructuring Act, Pub. L. No. 105-277, 112 Stat. 2681 (1998).

2.     **Creation and Criticism of the Au Pair Program**

USIA created the first au pair programs in 1986.  They were designed to be pilot programs lasting two years.  U.S. Gen. Accounting Office ("GAO"), *GAO/NSIAD-90-61, U.S. Information Agency: Inappropriate Uses of Educational and Cultural Exchange Visas* (1990), JA 114-15.[2]  USIA soon determined that

---

[2] For ease of reference, defendants attached to their memorandum in support of their motion to dismiss key regulatory documents and official public records.  That material has been incorporated into the joint appendix.  JA 95-217.

6

these programs were unauthorized and inconsistent with the Fulbright-Hays Act because they "constituted full-time domestic employment" rather than cultural exchange.  JA 115.  In addition, "an interagency review panel, including representatives of the Departments of State and Labor, [the Immigration and Naturalization Service ("INS")], and USIA, determined that full-time child care work programs did not meet the educational and cultural requirements of the statute and should not be continued on that basis."  *Id.*

Congress allowed the au pair programs to continue in fiscal years 1989 and 1990, but also directed the GAO to examine whether "the participants in programs of cultural exchange receiving [J visas] are performing activities consistent with" congressional intent.  Pub. L. No. 100-461, 102 Stat. 2268 (1988).  The GAO released its report in 1990.  JA 95-130.  It stated:

> We believe that the currently structured au pair programs are not compatible with the original intent of the 1961 act.  We hold this view because current au pair programs are essentially child care work programs that do not correlate with the qualifying categories mentioned in the J-visa statute.  As currently structured, au pair programs would normally be subject to Department of Labor administrative review and certification.

JA 115-16.  Authorizing J visas for participants and activities that are not clearly for educational and cultural purposes as specified in the Fulbright-Hays Act, the GAO concluded, "dilutes the integrity of the J visa" and "obscures the distinction between the J visa and other visas."  JA 118.

### 3.   <u>USIA's 1995 and 1997 Regulations</u>

Congress extended the au pair program in 1990.  Eisenhower Exchange

Fellowship Program, Pub. L. No. 101-454, 104 Stat. 1063 (1990).  In 1994,

Congress directed USIA to promulgate regulations on au pair placements.  State

Department: Technical Amendments, Pub. L. No. 103-415, 108 Stat. 4299, 4302

(1994).  USIA published interim final regulations governing the au pair program in

1994.  Exchange Visitor Program, 59 Fed. Reg. 64296, 64297 (proposed Dec. 14,

1994).  After considering the interests of au pairs, host families, and au pair

companies, USIA published new regulations in 1995.  Exchange Visitor Program,

60 Fed. Reg. 8547, 8547-48, 8550-51 (Feb. 15, 1995) (JA 131-38).

As part of that process, USIA reviewed the GAO's findings that certain

exchange visitor programs, including the au pair program, were "inconsistent with

the statutory grant of authority and its underlying legislative intent."  60 Fed. Reg.

at 8547-48.  USIA also noted concerns about the au pair program raised by

Congress, the Department of Labor, and INS – including its "failure to comply

with the Fair Labor Standards Act and its requirements governing the payment of

minimum wage."  *Id.* at 8548.

On whether "au pairs are employees subject to the provisions" of the Fair

Labor Standards Act of 1938 (FLSA), Pub. L. No. 75-718, 52 Stat. 1060, codified

as amended at 29 U.S.C. § 201 *et seq.*, USIA "sought the views and guidance of the Department of Labor." *Id.* at 8550. The answer was unequivocal:

> The Department of Labor has specifically advised the Agency that an employment relationship is established. Because the Department of Labor is the Federal agency entrusted with regulating labor laws, including the definition of employer and employee and determining when an employment relationship is established, it is appropriate for the Agency to defer to Department of Labor in this area.

60 Fed. Reg. at 8550. USIA then set forth, "[t]o assist the public in their understanding of this matter," an analysis of why au pairs qualify as "employees" under the FLSA. *Id.* Under the Supreme Court's ruling in *Goldberg v. Whitaker House Corp., Inc.*, 366 U.S. 28 (1961), USIA explained, "pervasive control exercised by the employer over the work performed is indicative of employee status," and "[a]pplication of these judicially established criteria to the au pair and to his or her host 'family' clearly reveals an employment relationship." 60 Fed. Reg. at 8550. The agency continued:

> An au pair's relationship to his or her "family" meets the pervasive control theory of *Goldberg*. The "family" determines what hours of the day the au pair will work. The "family" determines what additional duties may be necessary for the au pair to perform on a daily basis. The "family" dictates what the child, under the care of the au pair, will eat, when he will play, and when he will nap. Pursuant to *Goldberg*, an au pair is an employee.

*Id.* at 8551.

USIA's 1995 regulations required compensation of au pairs "at a rate of not less than $115.00 per week." *Id.* at 8551, 8553. That amount was later adjusted to

9

conform to increases in the minimum wage.  In March 1997, for example, USIA

issued a fact sheet that set forth adjustments in the au pair stipend to reflect

minimum wage increases taking effect in October 1996 and September 1997.  JA

41.  The fact sheet explained:

> The U.S. Department of Labor determined in 1994 that an
> employer/employee relationship is established between the host
> family and the au pair.  Accordingly, the stipend given an au pair must
> conform with minimum wage law and adjustments.  The Department
> of Labor, having sole jurisdiction regarding matters of minimum
> wage, determines the credit (room and board) to be applied against the
> weekly stipend.

*Id.*

In December 1995, Congress extended the au pair program through fiscal

year 1997.  Au Pair Programs, Extension, Pub. L. No. 104-72, 109 Stat. 776

(1995).  Congress also directed USIA to report in detail on "the compliance of all

au pair organizations with regulations governing au pair programs as published on

February 15, 1995."  *Id.*

In June 1997, USIA issued another final rule to "enhance the Agency's

oversight of au pair programs" and "ensure that there is no future confusion

regarding the payment of minimum wage."  Exchange Visitor Program, 62 Fed.

Reg. 34,632, 34,633 (June 27, 1997) (JA 139-42).  This time, the agency

abandoned its reliance on a minimum weekly stipend, and instead provided that au

pair companies "shall require that au pair participants … [a]re compensated at a

weekly rate based upon 45 hours per week and paid in conformance with the

requirements of the [FLSA] as interpreted and implemented by the United States

Department of Labor." *Id.* at 34,634.  This rule is codified in the State Department

regulations at 22 C.F.R. § 62.31(j)(1) (JA 143-51).

### 4.   The State Department's 2014 Regulations

Congress permanently authorized the au pair program in 1997.  Extension of

Au Pair Programs, Pub. L. No. 105-48, 111 Stat. 1165 (1997).  The State

Department assumed responsibility over the program in 1999.  In 2009, the

Department proposed amending the regulations governing exchange visitor

programs in part to "address public diplomacy and foreign policy concerns,

including the Department's ability to monitor Program sponsors and to ensure the

safety and well-being of foreign nationals who come to the United States as

Program participants."  Exchange Visitor Program – General Provisions, 74 Fed.

Reg. 48,177, 48,177 (proposed Sept. 22, 2009) (JA 152-66).  The State Department

promulgated its final rule in 2014.  Exchange Visitor Program – General

Provisions, 79 Fed. Reg. 60,294 (Oct. 6, 2014) (JA 167-92).  Those regulations

now require au pair companies to appoint and maintain officers who are

"thoroughly familiar" with "all federal and state regulations and laws pertaining to

the administration of their exchange visitor program(s)."  *Id.* at 60,301 (codified at

22 C.F.R. § 62.11(a)).  Officers who work with programs with "an employment

component" must also have "a detailed knowledge of federal, state, and local laws
pertaining to employment, including the [FLSA]." *Id.* Au pair companies must
provide "clear information and materials" to assist au pairs "to prepare for their
stay in the United States," including "employee rights and laws, including
workman's compensation." *Id.* at 60,313-14 (codified at 22 C.F.R. § 62.10(b)(9)).
Finally, each company "must remain in compliance with all local, state, and federal
laws, and professional requirements, necessary to carry out the activities for which
it is designated, including accreditation and licensure, if applicable." *Id.* at 60,312
(codified at 22 C.F.R. § 62.9(c)); *see also id.* § 62.60(f) (au pair sponsor's
designation may be terminated for failure to comply with these requirements).

### 5.   The Wilberforce Trafficking Act and State Department Information Pamphlet

In 2008, Congress enacted the William Wilberforce Trafficking Victims
Protection Reauthorization Act, Pub. L. No. 110-457, 122 Stat. 5044 (2008)
("Wilberforce Trafficking Act"). Named for a 19th-century British abolitionist,
the Act enhanced protections for domestic workers and other nonimmigrants who
are vulnerable to trafficking, forced labor, and other human rights violations. One
of its provisions requires the State Department, in consultation with the Secretary
of Homeland Security, the Attorney General, and the Secretary of Labor, to
"develop an information pamphlet and video on legal rights and resources for

12

aliens applying for employment- or education-based nonimmigrant visas"
("Wilberforce Pamphlet").  8 U.S.C § 1375b(a)(1); *see also id.* § 1375b(b)(2).

The State Department initially published this document in 2009, Wilberforce
Pamphlet Publication, 74 Fed. Reg. 34,386, 34,387 (July 15, 2009), and it is now
posted on the Department's web site.[3]  The Wilberforce Pamphlet informs workers
that, regardless of their visa status:

- You have the right to be paid for all work you do.

- You have the right to earn at least the federal legal minimum wage
  for most jobs. See www.dol.gov/whd/minimumwage.htm for the
  current federal minimum.

- You may be entitled to earn more than the federal minimum wage
  if:

    - You work in a state, city, or county that has a higher
      minimum wage.

    - Your employment contract/visa program requires a higher
      amount.

JA 196.  In 2014, the Department required au pair companies to provide the
Wilberforce Pamphlet to au pairs.  79 Fed. Reg. at 60,314 (codified at 22 C.F.R.
§ 62.10(c)(8)).

---

[3] U.S. Dep't of State, *Know Your Rights: An Information Pamphlet Describing
Your Rights While Working in the United States*, available at
https://travel.state.gov/content/dam/visas/LegalRightsandProtections/Wilberforce/
Wilberforce-ENG-100116.pdf (last visited Mar. 19, 2018) (JA 193-208).

6.     **Massachusetts's Minimum Wage Law and Domestic Workers Law**

Twenty-six years before President Roosevelt signed the FLSA, Massachusetts enacted the nation's first minimum wage law.  Mass. St. 1912, ch. 706.  Today, the state's minimum wage protections are codified in the Minimum Fair Wage Law, Chapter 151 of the General Laws.  Under M.G.L. ch. 151, § 1, all employers must pay the minimum wage of $11.00 per hour "unless the commissioner has expressly approved or shall expressly approve the establishment and payment of a lesser wage."  Mass. St. 2014, ch. 144, §§ 30, 80.  Under M.G.L. ch. 151, § 1A, "[e]xcept as otherwise provided in this section," employees must be paid at least one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 per week.

The Massachusetts Domestic Workers' Bill of Rights, Mass. St. 2014, ch. 148, § 3, was enacted in July 2014, went into effect on April 1, 2015, and is codified at M.G.L. ch. 149, §§ 190-191.  The law does not supplant the minimum wage protections set forth in Chapter 151, but rather clarifies the obligations of employers and sets forth additional protections for a particular class of employees who may be more vulnerable to exploitation due to language barriers, immigration status, or fear of reprisal.  Pursuant to her authority to enforce the law, M.G.L. ch. 149, § 190(o), the Attorney General promulgated regulations that went into effect on August 28, 2015.  940 C.M.R. § 32 (JA 209-17).

14

The Domestic Workers law and regulations apply to any individual or entity that employs one or more domestic workers.  The definition of "domestic worker" includes persons who are paid "to provide any service of a domestic nature within a household," except for (i) personal care attendants who provide services through MassHealth, and (ii) persons whose vocation is not childcare and who provide childcare on a "casual, intermittent, and irregular" basis.  940 C.M.R. § 32.02.  The law and regulations ensure that domestic workers, among other things:

- receive reasonable rest periods, whether paid or unpaid, *id.* § 32.03(1);

- are compensated for all time they are required to be on the employer's premises or on duty, *id.* §§ 32.02 (definition of "working time"), 32.03(2);

- receive overtime pay as provided in M.G.L. ch. 151, § 1A, even where the domestic worker works "for an employer in both residential and commercial settings," 940 C.M.R. § 32.03(3);

- do not have their wages reduced for food, beverages, and lodging expenses except under certain specified conditions, *id.* § 32.03(5); and

- have a right to privacy in their living area and in their correspondence with friends, family and others, *id.* § 32.03(6).

The law and regulations also outline the rights and obligations of domestic workers and employers upon termination of employment, *id.* § 32.03(9); clarify employers' obligations to maintain payroll records, *id.* § 32.04(2), (4), (7); and prohibit retaliation against domestic workers who assert their rights under the new law, *id.* § 32.05(2).

15

## Summary of Argument

As parties seeking to invalidate an exercise of Massachusetts's sovereign authority to protect workers within the Commonwealth, plaintiffs face the most difficult challenge of showing that Congress had a clear and manifest purpose to preempt the Domestic Workers law and that there is no possible set of conditions under which that law can validly apply to au pairs. Because plaintiffs do not meet that challenge, this Court should affirm the dismissal of their preemption claims.

Plaintiffs' field preemption claim fails because the Domestic Workers law is one of general applicability, intended to regulate working conditions for a class of vulnerable workers regardless of their national origin or immigration status. It does not supersede federal regulations, interfere with the conduct of foreign affairs, or otherwise displace some other uniquely federal area of regulation. Furthermore, far from leaving no room for state regulation, the laws and regulations governing the au pair program expressly contemplate that au pair companies will comply with state law, including state laws pertaining to employment. The State Department regulations recognize that au pairs are in an employment relationship and must be paid in conformance with the FLSA, which in turn allows for more generous protections under state law. The Wilberforce Pamphlet mandated by Congress advises au pairs that they may be entitled to more than the federal minimum wage in states like Massachusetts. The complementary protections provided by the State

16

Department regulations and the Domestic Workers law are a textbook example of cooperative federalism – not a basis for field preemption.

Plaintiffs' conflict preemption claim fares no better.  There is no conflict between Congress's objective of promoting international harmony through cultural exchange programs and the application of state worker protection laws, and the District Court correctly rejected plaintiffs' argument that affordable child care is an objective of the Fulbright-Hays Act.  Nor is it impossible for employers of au pairs in Massachusetts to comply with both federal regulations and the Domestic Workers law.  To the contrary, federal law has long treated au pairs as both exchange visitors and protected employees.  The fact that some state worker protections may be more generous is not a basis for preemption.

Finally, the District Court did not abuse its discretion in denying plaintiffs' Rule 59(e) motion, which rehashed arguments already rejected and sought to introduce evidence outside the pleadings and irrelevant to preemption.  The court also correctly applied this Court's precedent that a plaintiff may not be granted leave to amend after a judgment of dismissal has entered.  That judgment should now be affirmed.

## Argument

## I.   THE DISTRICT COURT PROPERLY DISSMISSED PLAINTIFFS' PREEMPTION CLAIMS.

The District Court correctly dismissed plaintiffs' claims for field and conflict preemption because Congress did not have a "clear and manifest purpose" to preempt state worker protection laws when it enacted the Fulbright-Hays Act. *Arizona v. United States*, 567 U.S. 387, 400 (2012).

### A.   Plaintiffs Bear a Heavy Burden in Seeking to Invalidate All Applications of the Domestic Workers Law to Au Pairs.

#### 1.   The District Court properly considered the law and matters of public record in deciding the motion.

This Court reviews a district court's Rule 12(b)(6) dismissal ruling de novo. *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The plaintiff's duty "to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In particular, "statements in the complaint that merely offer legal conclusions couched as fact" must be disregarded.  *Lemelson v. U.S. Bank Nat'l Ass'n*, 721 F.3d 18, 21 (1st Cir. 2013) (internal quotation marks and citation omitted).

18

From the start of this case, the parties have agreed that plaintiffs' preemption

claims could and should be resolved in a Rule 12(b)(6) motion.  At the scheduling

conference on October 24, 2017, plaintiffs stated that summary judgment motions

would be unnecessary if defendants presented "preemption as a substantive issue"

in their motion to dismiss.  JA 510.  Defendants confirmed their intent to address

plaintiffs' preemption claims relying "just on the allegations, the law, the

regulatory documents, and other official public records," which would be

"cognizable in the 12(b)(6) motion."  JA 512.  It is well established that a court

may consider "not only the complaint but also matters fairly incorporated within it

and matters susceptible to judicial notice" without converting a motion to dismiss

into a motion for summary judgment.  *Greene v. Rhode Island*, 398 F.3d 45, 48

(1st Cir. 2005) (citation omitted).  Such matters include "documents the

authenticity of which are not disputed by the parties; ... official public records; ...

documents central to plaintiffs' claim; ... [and] documents sufficiently referred to

in the complaint."  *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d

30, 33 (1st Cir. 2001) (citation omitted).

Here, federal regulations confirm that au pairs are employees protected by

law, Congress has directed au pair companies to comply with those regulations,

and plaintiffs cite those regulations at length in their complaint.  Accordingly, it

was proper for the District Court to consider the regulations, related parts of the

Federal Register, and the 1990 GAO Report and Wilberforce Pamphlet, both of
which were mandated by Congress and discussed in the Federal Register, without
converting the motion to dismiss into one for summary judgment.  *See* JA 604
nn.6-7.  *See also* 44 U.S.C. § 1507 (contents of Federal Register are subject to
judicial notice); *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (courts may
take judicial notice of GAO reports) (citations omitted).

### 2.   A strong presumption applies against preemption of state worker protection laws.

A federal statute can preempt a state law in three ways:  express preemption,
conflict preemption, and field preemption.  *Arizona*, 567 U.S. at 399.  "Express
preemption occurs when congressional intent to preempt state law is made explicit
in the language of a federal statute."  *Tobin v. Federal Express Corp.*, 775 F.3d
448, 452 (1st Cir. 2014) (citation omitted).  Plaintiffs do not claim express
preemption here, and no language in the Fulbright-Hayes Act or any other law
would support such a claim.

Instead, plaintiffs rely on two theories of implied preemption:  field and
conflict preemption.  *See, e.g.*, JA 9.  In both cases, the "ultimate touchstone" of
the judicial inquiry is congressional intent.  *Wyeth v. Levine*, 555 U.S. 555, 565
(2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  In analyzing
congressional intent, courts presume that "the historic police powers of the States"
are not superseded "unless that was the clear and manifest purpose of Congress."

20

*Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218,
230 (1947)).  This presumption against preemption and "clear and manifest"
requirement reflect the fact that "the States are independent sovereigns in our
federal system," as well as "the historic primacy of state regulation of matters of
health and safety." *Medtronic*, 518 U.S. at 485 (citation omitted).

The Domestic Workers law is clearly a state worker protection law.  The
enactment of such laws falls within "the traditional police power of the state."
*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987).  "States possess broad
authority under their police powers to regulate the employment relationship to
protect workers within the State.  Child labor laws, minimum and other wage laws,
laws affecting occupational health and safety ... are only a few examples." *Metro.
Life Ins. Co. v. Mass.*, 471 U.S. 724, 756 (1985) (citation omitted).  Accordingly,
preemption "should not be lightly inferred in this area." *Fort Halifax*, 482 U.S. at
21; *see also Rhode Island Hospitality Ass'n v. City of Providence ex rel. Lombardi*,
667 F.3d 17, 33 (1st Cir. 2011).

In a footnote, citing *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S.
341, 347-48 (2001), plaintiffs argue that there is no presumption against
preemption in this case because the au pair industry operates in fields that are
"'inherently federal in character,' rather than fields traditionally subject to state
regulation."  Plaintiffs' Brief ("Pl. Br.") at 34 n.3.  *Buckman* involved a state-law

21

claim for fraud against a federal agency, the Food and Drug Administration, and,

as the Supreme Court observed, "[p]olicing fraud against federal agencies is hardly

'a field which the States have traditionally occupied.'"  531 U.S. at 347 (quoting

*Rice*, 331 U.S. at 230).  This case, by contrast, involves a law intended to protect

some of the most vulnerable workers in Massachusetts's economy, and while some

of those workers may also be immigrants and other non-U.S. citizens, the Supreme

Court has rejected the contention that "every state enactment which in any way

deals with aliens is a regulation of immigration and thus per se pre-empted by this

constitutional power."  *De Canas v. Bica*, 424 U.S. 351, 354-55 (1976)

(superseded by Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*).  The

presumption against preemption "applies in any field in which there is a history of

state law regulation, even if there is also a history of federal regulation."  *In re*

*Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 178 (1st Cir. 2009)

(citing *Wyeth*, 555 U.S. at 565 n.3).  This Court should therefore apply the

presumption against preemption here and, because there is no "clear and manifest

purpose" by Congress to preempt the Domestic Workers law through the

Fulbright-Hays Act or any other law, affirm the dismissal of plaintiffs' claims.

   3.    **Because plaintiffs' challenge is facial, they must show that
          "no set of circumstances" exists under which the Domestic
          Workers law can be validly applied to au pairs.**

Furthermore, because the relief plaintiffs seek reaches "beyond the particular

circumstances of these plaintiffs," they must also satisfy the demanding standard

for a facial challenge. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (citation

omitted); *accord Showtime Ent., LLC v. Mendon*, 769 F.3d 61, 70 (1st Cir. 2014).

Plaintiffs asked the District Court to declare, among other things, that "any

interpretation" of the Domestic Workers law and its supporting regulations "that

applies them to a federal cultural exchange program" is preempted by federal law.

JA 8-9.  They also requested injunctions that would apply to any host family

working with Cultural Care, not just the two family members named as plaintiffs.

JA 29.  In effect, they want an injunction that imposes blanket preemption,

providing that none of the protections set forth in the Domestic Workers law and

regulations can be applied by anyone to protect au pairs in any manner.

Accordingly, plaintiffs have "the most difficult challenge" of establishing

that "no set of circumstances exists under which" the Domestic Workers law and

regulations "would be valid." *Pharm. Research & Mfrs. of Am. v. Concannon*, 249

F.3d 66, 77 (1st Cir. 2001) (quoting *United States v. Salerno*, 481 U.S. 739, 745

(1987)); *accord Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580

(1987) (plaintiff must show "no possible set of conditions" that "would not conflict

23

with federal law").  Plaintiffs must show "an irreconcilable conflict between the federal and state regulatory schemes"; the "existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."  *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).  As discussed below, plaintiffs cannot meet that demanding standard.

### B.   Plaintiffs' Field Preemption Claim Lacks Merit.

The District Court correctly dismissed plaintiffs' claim for implied field preemption of the Domestic Workers law, *see* JA 24-26 (Comp. ¶¶ 39, 43), because they cannot show either a federal interest "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or a framework of regulation "so pervasive … that Congress left no room for the States to supplement it" on labor protection issues.  *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230).  Quite the contrary:  the federal regulations governing the au pair program expressly contemplate that they *will* be supplemented by federal and state labor protections.  An intention to preempt "is impossible to divine" where regulations "appear to assume that those [subject to them] will comply with state laws," or "expressly contemplate coincident compliance with state law as well as federal law."  *Granite Rock*, 480 U.S. at 583-84.

**1. The Domestic Workers law protects workers in Massachusetts generally and does not displace the federal government's authority over immigration or foreign affairs.**

First, plaintiffs cannot show a federal interest so dominant that it will be assumed to preclude enforcement of the Domestic Workers law. *Arizona*, 567 U.S. at 399.

There is no reference to state worker protections in the Fulbright-Hays Act, *see* 22 U.S.C. § 2451 *et seq.*, and plaintiffs do not point to any other law indicating that Congress intended the au pair program to preempt the powers of the states to protect workers. Instead, they contend that field preemption applies because "[t]he federal interest embodied in the Fulbright-Hays Act and the programs enacted pursuant to it, *i.e.*, in fostering 'a peaceful world in which freedom and justice under law will be the lot of all mankind,' precludes enforcement of state labor laws." *See* JA 12, 24-26 (Compl. ¶¶ 8, 39, 43).[4] In fact, there is nothing about the goals of worldwide peace, freedom, and justice that remotely – much less "clearly" and "manifestly," *see Arizona*, 567 U.S. at 400 – requires the preemption of states' traditional authority to protect workers.

---

[4] The actual Statement of Purpose for the Fulbright-Hays Act, which plaintiffs quote elsewhere in their complaint, refers to "the contributions being made toward a peaceful and more fruitful life for people throughout the world." JA 11 (Compl. ¶ 7) (quoting 22 U.S.C. § 2451). Application of state worker protection laws to foreign workers in the United States advances that purpose by providing for more peaceful and safe workplace conditions and allowing workers to enjoy more of the fruits of their labor.

Indeed, over the last 30 years the main question regarding Congress's intent in passing the Fulbright-Hays Act has been whether the au pair program itself complies with it. *See, e.g.*, 60 Fed. Reg. at 8548 (setting forth GAO's finding that au pair program is "inconsistent with the legislative intent" and "dilute[s] the integrity of the J visa"). As discussed in § I.B.3, *infra*, Congress and the responsible agencies responded to those concerns by promulgating regulations that recognize au pairs as protected employees, reauthorizing the au pair program on the condition that au pair companies comply with those regulations, and requiring au pairs to be fully informed of their legal rights as employees. None of that evidences the slightest federal interest in precluding enforcement of state laws that protect workers. *See* JA 603-06.

Now, plaintiffs argue that field preemption applies because the au pair program "operates in two fields that are the exclusive province of the federal government: foreign relations and immigration." Pl. Br. at 30. Their argument is misplaced. First, this case does not involve alien registration – the only field involving foreign relations or immigration that the Supreme Court has found subject to implied field preemption. *See Arizona*, 567 U.S. at 400-01 (discussing *Hines v. Davidowitz*, 312 U.S. 52 (1941)). Nor does it involve an effort to displace some other uniquely federal area of regulation, such as the conduct of foreign affairs. *See Chamber of Commerce v. Whiting*, 563 U.S. 582, 604 (2011) (citations

omitted).  Plaintiffs argue that the au pair program has "foreign relations
objectives," such as promoting "international cooperation" and assisting in "the
development of friendly, sympathetic, and peaceful relations between the United
States and the other countries of the world," Pl. Br. at 31-32, but, again, those
laudatory purposes do not preclude au pairs from receiving the benefits of state
worker protection laws.

As the Supreme Court has explained, it is critical to consider "the target at
which the state law aims," because laws aimed at "subjects left to the States to
regulate," such as generally applicable state antitrust laws or blue sky laws, are not
subject to field preemption.  *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599-
1601 (2015).  The Domestic Workers law is just such a law of general
applicability.  Plaintiffs assert that, in enacting this law, Massachusetts sought to
"supersede" federal regulations, Pl. Br. at 3; "regulate the federal au pair cultural
exchange program," *id.* at 24; and even "effectively issu[e] its own J-visas," *id.* at
34, but none of that is true.  The Domestic Workers law does not regulate any visa
program, exchange visitor program, or other federal activity.  It does not bring
Massachusetts into contact with any foreign government, comment on foreign
affairs, or otherwise intrude on foreign policy.  Nor does it focus on any particular
group of persons based on their national original or immigration status.  Rather, the
law regulates working conditions for a class of persons, some of whom are au

pairs, who perform a type of labor in Massachusetts that renders them particularly

vulnerable to exploitation and abuse.  *See* M.G.L. ch. 149, § 190 (definition of

"domestic worker").  Because the Domestic Workers law is an exercise of

Massachusetts's "broad authority under the police powers to regulate the

employment relationship to protect workers within the State," its preemption may

not be inferred in the absence of "a demonstration that complete ouster of state

power … was the clear and manifest purpose of Congress."  *De Canas*, 424 U.S. at

356-57.[5]

> ### 2.   Far from leaving "no room" for state law, the applicable federal regulations require compliance with state law.

Nor can plaintiffs establish field preemption through a framework of

regulation "so pervasive … that Congress left no room for the States to supplement

it" on labor protection issues.  *Arizona*, 567 U.S. at 399 (citation omitted).

---

[5] Plaintiffs quote the Supreme Court's observation in *De Canas* that "[p]ower to regulate immigration is unquestionably exclusively a federal power," Pl. Br. at 32, but ignore the sentence that immediately follows: "But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised."  424 U.S. at 354-55.  It is thus a misreading of *De Canas* to assert that the application of a state worker protection law to workers generally, regardless of their immigration status, constitutes interference with the federal government's authority to decide "who should or should not be admitted into the country" and "the conditions under which a legal entrant may remain."  *See* Pl. Br. at 33 (quoting 424 U.S. at 355).  Courts have rejected similar claims of field preemption that challenge the application of states' worker protection laws to aliens.  *See, e.g.*, *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 240-41 (2d Cir. 2006); *Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407, 423 (2014).

Like the Fulbright-Hays Act itself, there is no suggestion in the State

Department's regulations that govern the au pair program that it or its predecessor

USIA intended them to preempt state law.  Plaintiffs emphasize the "detailed" and

"comprehensive" nature of those regulations, Pl. Br. at 35-37, but the Supreme

Court has warned that inferring preemption "whenever an agency deals with a

problem comprehensively" would be "inconsistent with the federal-state balance

embodied in our Supremacy Clause jurisprudence."  *Hillsborough Cty. v.*

*Automated Med. Labs., Inc.*, 471 U.S. 707, 717 (1985).  Furthermore, "because

agencies normally address problems in a detailed manner and can speak through a

variety of means," courts should "expect that they will make their intentions clear

if they intend for their regulations to be exclusive."  *Id.* at 718.  Here, where the

agency's regulations "not only are devoid of any expression of intent to pre-empt

state law," but in fact contemplate that regulated entities "will comply with state

laws," a court should decline to conclude that "the mere volume and complexity of

its regulations" demonstrate the agency's intent to preempt.  *Granite Rock*, 480

U.S. at 583 (quoting *Hillsborough Cty.*, 471 U.S. at 718).

Plaintiffs argue that "the regulations governing foreign exchange visitors

generally – and au pairs in particular – establish" a regulatory regime that "leaves

no room for 'complementary state regulation.'"  Pl. Br. at 39.  In fact, the contrary

is true: those federal regulations expressly require au pair companies to comply

29

with state law.  For example, they require au pair companies to appoint and maintain officers who are "thoroughly familiar" with "all federal and state regulations and laws pertaining to the administration of their exchange visitor program(s)."  22 C.F.R. § 62.11(a).  If the officers "work with programs with an employment component" – like the au pair program – they must have "a detailed knowledge of federal, state, and local laws pertaining to employment."  *Id.*  The regulations require au pair companies to provide "clear information and materials" to assist au pairs "to prepare for their stay in the United States," including "employee rights and laws, including workman's compensation" (*i.e.*, programs generally created and administered by the states).  *Id.* § 62.10(b)(9).  In addition, each company "must remain in compliance with all local, state, and federal laws, and professional requirements, necessary to carry out the activities for which it is designated, including accreditation and licensure, if applicable."  *Id.* § 62.9(c)).  Tellingly, plaintiffs do not discuss any of these regulatory requirements in their brief.

Furthermore, the Wilberforce Trafficking Act and regulations require sponsors to inform au pairs about their legal rights, including "the legal rights of employment or education-based nonimmigrant visa holders under Federal immigration, labor and employment law."  8 U.S.C § 1375b(b)(2); *see also* 22 C.F.R. § 62.10(c)(8) (requiring Wilberforce Pamphlet to be provided to au pairs).

The Wilberforce Pamphlet is published on the State Department web site and informs au pairs that they have "the right to earn at least the federal legal minimum wage for most jobs" and may be entitled to "earn more than the federal minimum wage" if they work "in a state, city, or county that has a higher minimum wage." JA 196. Plaintiffs do not mention this law or pamphlet in their brief.

> **3.    The regulations recognize that au pairs are in an "employment relationship" and require compliance with the FLSA, and the FLSA specifically contemplates compliance with state labor laws.**

Plaintiffs' field preemption claim is further undermined by the recognition – incorporated in a State Department regulation and confirmed by Congress – that au pairs are employees protected by the FLSA and, as a result, entitled to the more generous protections of state law.

The State Department's regulations require au pair companies to ensure that au pairs are "compensated at a weekly rate in conformance with the requirements of the [FLSA] as interpreted and implemented by the United States Department of Labor." 22 C.F.R. § 62.31(j)(1).[6] This conclusion followed a careful analysis of the status of au pairs as "employees." Starting in the early 1990s, soon after the

---

[6] Plaintiffs mischaracterize this provision as requiring that a "uniform weekly stipend" be paid in conformance with the FLSA, Pl. Br. at 27, when it in fact does not refer to either uniformity or a stipend. In adopting 22 C.F.R. § 62.31(j)(1), USIA abandoned the formula-based approach it had relied on in 1995. *See* JA 607; § I.C.1, *infra*.

initial au pair pilot programs were completed, USIA reviewed a broad range of

criticisms of the programs by GAO, the Department of Labor, INS, Congress, and

USIA itself.  *See* 60 Fed. Reg. at 8547-48.  GAO, for example, found au pair

programs to be "essentially child care work programs" that do not advance the

educational and cultural purposes of the Fulbright-Hays Act and which "would

normally be subject to Department of Labor administrative review and

certification."  JA 115-16.  USIA expressed concern about employers' "failure to

comply with the [FLSA] and its requirements governing the payment of minimum

wage," 60 Fed. Reg. at 8548, and it sought "the views and guidance of the

Department of Labor" on whether au pairs are employees under the FLSA, *id.* at

8550.  The Department of Labor then determined that "an employment relationship

is established," and USIA deferred to that determination in light of the

Department's expertise in regulating labor and employment laws.  *Id.*  To assist the

public's understanding, USIA set forth in the Federal Register a detailed analysis

of why au pairs qualify as employees under the FLSA and applicable case law.  *Id.*

at 8550-51.

In December 1995, Congress confirmed that conclusion by directing USIA

to report on "the compliance of all au pair organizations" with the regulations

promulgated earlier that year.  Pub. L. No. 104-72.  In 1997, USIA reiterated that

"au pair participants are covered under the provisions of the [FLSA]."  62 Fed.

Reg. at 34633.  Further, to "ensure that there is no future confusion regarding the payment of minimum wage," USIA amended its regulations to specify that au pairs must be paid in conformance with the FLSA.  *Id.*  That requirement is codified at 22 C.F.R. § 62.31(j)(1).

Because au pairs are protected by the FLSA, they are protected by state minimum wage laws as well.  The FLSA provides that employees must be paid at least the federal minimum wage, *see* 29 U.S.C. § 206(a)(1), and overtime rates (one-and-a-half times regular pay) for any hours worked over 40 in a single week, *see id.* § 207(a)(1).  The Act further provides that if a state law requires a higher minimum wage payment, an employer operating in that state must pay the higher wage.  This provision, referred to as the FLSA "savings clause," states that "[n]o provision of this [Act] or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this [Act] or a maximum work week lower than the maximum workweek established under this chapter."  *Id.* § 218(a).  Thus, the FLSA sets a floor, not a ceiling, for worker protections, and through its savings clause "specifically contemplates state regulation" in the area of wages and working conditions.  *Maccabees Mut. Life Ins. Co. v. Perez-Rosado*, 641 F.2d 45, 46 (1st Cir. 1981) (citations and internal quotation marks omitted).

Plaintiffs do not cite "any federal law, regulation, or guideline that provides for what would essentially be an exemption to the FLSA's savings clause." *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1084 (D. Colo. 2016). Instead, they argue that because the savings clause is not technically a "requirement" of the FLSA, it is not incorporated directly into 22 C.F.R. § 62.31(j)(1). Pl. Br. at 58. But that's not the issue. As the party challenging a state worker protection law, plaintiffs bear the heavy burden of overcoming the presumption against preemption and showing a framework of regulation "so pervasive" that there is "no room for the states to supplement it." *Rice*, 331 U.S. at 230. They cannot do that where the applicable federal law specifically contemplates supplementation by state law. The complementary protections afforded to workers by state and federal law are a classic example of "cooperative federalism," *see Concannon*, 249 F.3d at 75, which defeats any claim that "Congress did not intend for the states to pass supplemental law in that area," *id.* at 74 n.6 (citation omitted). Plaintiffs' field preemption claim was therefore properly dismissed.

## C.     Plaintiffs' Conflict Preemption Claim Lacks Merit.

The District Court was also correct to dismiss plaintiffs' claim of implied conflict preemption. *See* JA 24-26 (Comp. ¶¶ 38, 42). To proceed with such a claim, plaintiffs must show that the Domestic Workers law "stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of

Congress," or that "compliance with both federal and state regulations is a physical

impossibility." *Arizona*, 567 U.S. at 399 (citations and internal quotation marks

omitted).  This analysis does not justify a "freewheeling judicial inquiry into

whether a state statute is in tension with federal objectives," since such an

endeavor "would undercut the principle that it is Congress rather than the courts

that preempts state law." *Whiting*, 563 U.S. at 607 (citation omitted).  Rather,

plaintiffs must meet a "high threshold," *id.* (citation omitted), by making a clear

showing of implied preemption that overcomes the presumption that state and local

regulation "can constitutionally coexist with federal regulation." *Hillsborough*

*Cty.*, 471 U.S. at 716; *see also Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of*

*Agric., Food & Rural Res.*, 232 F.3d 9, 18 (1st Cir. 2000) (because preemption "is

strong medicine, not casually to be dispensed," plaintiffs must show "clear

conflict" to proceed with claim).  Plaintiffs do not meet that threshold here.

### 1.     The Domestic Workers law does not obstruct Congress's objectives.

There is no conflict between the Fulbright-Hays Act and enforcement of the

Domestic Workers law.  The Fulbright-Hays Act does not explicitly or implicitly

foreclose the application of state worker protection laws.  Indeed, it does not

mention worker protections at all.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280,

289 (1995) (finding conflict preemption argument "futile" where federal statute "simply fails to address" subject of state law "at all").

Plaintiffs claim that the Domestic Workers law conflicts with "the full purposes and objectives of Congress" as set forth in the Fulbright-Hays Act, *see* JA 24-26 (Comp. ¶¶ 38, 42) – *i.e.*, increasing mutual understanding, strengthening ties with other nations, and promoting international cooperation, *see* JA 11 (Comp. ¶ 7, quoting 22 U.S.C. § 2451). This Court has cautioned, however, that conflict preemption is "particularly difficult" to show when "the most that can be said about the state law is that the direction in which state law pushes [behavior] is in general tension with broad or abstract goals that may be attributed to ... federal laws." *Fitzgerald v. Harris*, 549 F.3d 46, 53 (1st Cir. 2008) (citation and internal quotation marks omitted); *see also Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 634 (1981) (finding "general expressions of 'national policy'" insufficient to preempt state law). In any event, there is no tension at all between the goal of international harmony and the application of state worker protection laws. *See* § I.B.1, *supra*. To the contrary, over the last 30 years the federal government has imposed strict regulations on the au pair program so as to better reconcile it with the intent of the Fulbright-Hays Act, and those regulations make clear that au pairs are protected employees who must be informed of their rights under federal, state, and local law.

Now, plaintiffs argue that conflict preemption applies because there is an overriding "federal objective to craft a uniform compensation scheme that makes the au pair program affordable and available to a diverse array of participants."  Pl. Br. at 44.  As the District Court observed, however, affordable child care "is not a goal of the Fulbright-Hays Act," and "possible increased costs do not stand as an obstacle sufficient to meet the high threshold required for conflict preemption."  JA 612.  There is nothing in any law or regulation that recognizes the affordability of this particular kind of child care as a federal objective.  Nor is there any support for plaintiffs' assertion that the State Department has an interest in attracting "a diverse group of willing host families for au pairs"; they cite only two declarations (submitted after the District Court dismissed plaintiffs' lawsuit, *see* § II, *infra*) by attorneys in Massachusetts who aver that they will not continue to hire au pairs if "costs and the record-keeping requirements" increase.  *See* Pl. Br. at 43-44 (citing JA 820-24).  Elsewhere, plaintiffs cite a statute directing the President to ensure that programs under the authority of the Bureau of Educational and Cultural Affairs are nonpolitical, balanced, and "representative of the diversity of American political, social, and cultural life," *see* Pl. Br. at 47 (citing 22 U.S.C. § 2460(c)),

but it hardly follows from that provision that affordable child care is a paramount

federal interest, or that au pairs must be denied the protections of state law.[7]

Plaintiffs argue that the objectives of the au pair program "demand a

uniform stipend formula" and that the Domestic Workers law "destroy[s] the very

uniformity that the federal regulations demand," Pl. Br. at 26; *see also id.* at 44-46,

but, as the District Court observed, that emphasis on uniformity is "misplaced" and

"unavailing."  JA 607, 613; *see also Beltran*, 176 F. Supp. 3d at 1084 (describing

au pair companies' arguments on uniformity in wage calculation as "misleading").

In promulgating its initial au pair regulations in 1995, the USIA weighed the

preference of the majority of host families for crediting actual costs for room and

board against the need for a uniform credit, which would "alleviate the family's

obligation to maintain records." 60 Fed. Reg. at 8551.  The agency rejected that

approach in June 1997 and, instead, adopted new regulations that contain no

mention of a formula or "uniform stipend" but rather provide that au pairs must be

"compensated at a weekly rate based upon 45 hours per week and paid in

conformance with the requirements of the [FLSA] as interpreted and implemented

by the United States Department of Labor." 62 Fed. Reg. at 34634.  USIA made

---

[7] While, as the District Court observed, plaintiffs never discuss "the overall
program fees incurred by the host families" – *i.e.*, the fees charged by Cultural
Care and other au pair companies – in their discussion of affordability, JA 612,
they do acknowledge that payment of au pairs "is not the only cost that the host
families must bear," Pl. Br. at 48.

that change specifically to ensure "that there is no future confusion regarding the payment of minimum wage." *Id.* at 34,633.

That same regulation applies today, *see* 22 C.F.R. § 62.31(j)(1), yet plaintiffs still try to confuse the issue by citing three agency notices that, they assert, set forth "'the stipend' in terms of a set minimum dollar amount." *See* Pl. Br. at 45, 45 n.4, 59, 60 (each time citing JA 41, 44, and 375). The first of those documents issued in March 1997 – *before* USIA promulgated the current regulation requiring compliance with the FLSA – but nevertheless recognized that au pairs are protected employees and set forth what it described as "the minimum weekly stipend." JA 41 (Compl., Ex. C). The second document is undated but refers to regulatory changes effective August 2001 and notes that "[t]he term stipend was changed to wage" following the June 1997 regulations. JA 375. The third (titled "Federal Minimum Wage Increase") is from 2007 and, according to plaintiffs, is "the most recent such Notice." JA 16, 44 (Compl. ¶ 19 & Ex. C). None of these notices appears on the State Department's web site today. The defendant au pair companies (including Cultural Care) cited the same 2007 notice in the *Beltran* case, and both the Magistrate and District Judges found it to be inconsistent with a Labor Department regulation that prohibits employers from crediting "the cost of facilities toward an employee's wages if the employer is required by law to provide the same." *See Beltran v. Interexchange, Inc.*, No. 14-cv-03074-CMA-KMT, 2016

WL 695967, at *12 (D. Colo. Feb. 22, 2016) (discussing 29 C.F.R. § 531.30); 176

F. Supp. 3d at 1083.

To whatever extent the State Department continued after 1997 to calculate a

minimum weekly wage for au pairs – based on the federal regulatory requirement

that au pairs be paid for 45 hours of work per week regardless of the actual number

of hours worked, *see* 22 C.F.R. § 62.31(j)(1) – it simply does not follow, as

plaintiffs argue, that the agency has left "no room for additional state and local

requirements," *see* Pl. Br. at 59. First, a minimum is precisely that – a baseline that

can be exceeded. None of the materials cited by plaintiffs foreclose the possibility

that host families might be required to pay more in certain states; indeed, plaintiffs

themselves acknowledge that host families may "pay an au pair more" than those

minimums, Pl. Br. at 45. Second, contrary to plaintiffs' contention, the cited

notices do not actually say that "federal, not state, law governs what wages should

be paid," *see* Pl. Br. at 59; they do not discuss state law at all. The notices thus fall

far short of the kind of "fair and considered judgment on the matter in question"

that would be required for deference. *See Auer v. Robbins*, 519 U.S. 452, 462

(1997). Furthermore, even if the notices had spoken to the issue of preemption,

sub-regulatory documents likely have no preemptive value at all and certainly have

none when the state law in question does not pose a threat to the apparent federal

regulatory objectives. *Good v. Altria Group*, 501 F.3d 29, 51-55 (1st Cir. 2007),

40

*aff'd*, 555 U.S. 70 (2008); *see also Beltran*, 176 F. Supp. 3d at 1082 (observing that au pair companies "have cited no legal authority for the notion that the conduct of an agency ... can somehow trump the plain language of a regulation"). Plaintiffs thus fail to show an overriding federal interest in wage uniformity that requires preemption of the Domestic Workers law.

>    **2.    Compliance with both federal regulations and the Domestic Workers law is not physically impossible.**

Nor can plaintiffs show that compliance with both federal and state regulations is "a physical impossibility." *Arizona*, 567 U.S. at 399 (citation omitted). As discussed in § I.B.3, *supra*, the applicable State Department regulations contemplate that au pairs will also be protected by state worker protection laws like the Domestic Worker law, and every au pair is notified of those complementary federal and state protections through the Wilberforce Pamphlet published by the State Department.

In their complaint, plaintiffs listed various Domestic Workers regulations that, they argued, "contradict existing DOS requirements." JA 22-23 (Compl. ¶ 31). Of course, isolated examples would not suffice to show there is "no possible set of conditions" under which the Domestic Workers law and regulations "would not conflict with federal law" – the prerequisite for a facial claim. *See* § I.A.3, *supra*. Furthermore, neither defendants nor this Court need resolve every technical detail as to how the Domestic Workers law will apply to au pairs in Massachusetts;

that would go far beyond the depth of inquiry required to resolve plaintiffs' facial challenge.  *See Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449-50 (2008) (federal court may not "go beyond the statute's facial requirements" where state "has had no opportunity to implement" new law "and its courts have had no occasion to construe the law in the context of actual disputes").  In its decision, the District Court carefully examined each of plaintiffs' purported conflicts and explained why they do not support their preemption claim.  JA 609-13.  Plaintiffs' recasting of those arguments here, Pl. Br. at 46-55, is no more persuasive.

> a.    **Application of Massachusetts's minimum wage law**

First, plaintiffs argue that the Domestic Workers law will require host families in Massachusetts to pay "considerably higher" wages than "the State Department's uniform minimum stipend" because of, in part, Massachusetts's higher minimum wage of $11 per hour and its requirement that workers be paid at least one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 per week.  Pl. Br. at 46 (citing M.G.L. ch. 151, §§ 1, 1A).  As discussed, however, there is no regulation that discusses a "uniform minimum stipend," but rather a mandate that au pairs be paid in compliance with the FLSA, which contemplates compliance with state law as well.  *See* 22 C.F.R. § 62.31(j); 29 U.S.C. § 218(a).

Strikingly, the law that plaintiffs complain about here – the Minimum Fair Wage Law, M.G.L. ch. 151, §§ 1, 1A – is not the law they challenge in this lawsuit.  Plaintiffs seek declaratory and injunctive relief against only the Domestic Workers law and supporting Attorney General regulations.  JA 29.  While the Domestic Workers regulations at times refer to provisions of the Minimum Fair Wage Law in the course of clarifying the rights of domestic workers, *see, e.g.*, 940 C.M.R. § 32.03(3) (providing that a domestic worker should receive overtime pay as provided in M.G.L. ch. 151, § 1A, even if she works "for an employer in both residential and commercial settings"), they do not categorically incorporate, and certainly do not supplant, preexisting minimum wage protections.  Plaintiffs cannot prevail on a preemption challenge to the Domestic Workers law by pointing to purported conflicts with other state laws.  *See also* Pl. Br. at 40-42 (discussing anti-discrimination laws not challenged by plaintiffs here).

Furthermore, although plaintiffs assert that au pairs are entitled to "a time-and-one-half premium rate for the hours between 40 and 45 hours in a week" only in Massachusetts, *see* Pl. Br. at 46 (citing M.G.L. ch. 151, § 1A), federal law may in fact entitle all au pairs to overtime pay.  Like Massachusetts law, the FLSA provides that employees must be paid one-and-a-half times regular pay for any hours worked over 40 in a single week.  29 U.S.C. § 207(a)(1).  In *Beltran*, the District Court ruled that the au pair plaintiffs "have stated a viable claim for

43

overtime for any work performed after January 1, 2015, due to a new DOL

regulation, recently upheld by the District of Columbia Circuit Court of Appeals."

176 F. Supp. 3d at 1083 (citing 29 C.F.R. § 552.109(c) and *Home Care Ass'n of*

*Am. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2506 (2016)).

Even if au pairs are assumed not to be entitled to federal overtime, the fact that

state overtime protections may be more generous is not a basis for a finding of

conflict preemption.  *See Maccabees Mut. Life Ins. Co.*, 641 F.2d at 47 (no conflict

preemption where state law provided benefits to workers exempt from such

benefits under federal law, since "the states themselves retain traditional police

powers which can be directed for the benefit of federally exempt employees").

### b.      Deductions in wages for room and board

Plaintiffs argue that the Domestic Worker Law provides for a smaller

deduction for room and board ("a $5.75 per day maximum for three meals and a

maximum deduction of $35 per week for lodging") than federal law provides ("a

fixed room-and-board deduction of 40%").  Pl. Br. at 46-47.  As the District Court

explained, however, there is no basis for plaintiffs' claim that a 40% deduction

applies under federal law:

> Cultural Care has not pointed to, and the court has not been able to
> find, any statute or regulation setting forth the formula on which it
> relies.  Instead, the 40% figure appears to simply reflect an arithmetic
> calculation of the maximum amounts that may be deducted from
> wages under the FLSA, assuming all of the FLSA's requirements for
> such deductions are met.  And nothing in the FLSA suggests that a

44

state's further limitations on such deductions would interfere with federal regulations, which set a floor and not a ceiling.

JA 611.

Furthermore, it is unclear whether the FLSA even permits an employer to deduct *any* amount for room and board from an au pair's wages. In *Beltran*, the au pair plaintiffs claim that such a deduction violates the FLSA because (i) State Department regulations require host families to provide au pairs with room and board, 22 C.F.R. § 62.31(e)(6), and (ii) Labor Department regulations prohibit an employer from crediting "the cost of facilities toward an employee's wages if the employer is required by law to provide the same." *Beltran*, 176 F. Supp. 3d at 1082-83 (citing 29 C.F.R. § 531.30). The Domestic Workers law and regulations include a similar prohibition against deductions in wages for lodging expenses where "the employer requires that a domestic worker reside on the employer's premises or in a particular location." 940 C.M.R. § 32.03(5)(c)(2); *see also id.* § 32.03(5)(a) (stating that "[n]o deductions for food, beverages, or lodging shall be made from a domestic worker's wages without the domestic worker's agreement"); *id.* § 32.03(5)(c)(1) (no deduction unless lodging is "voluntary and freely chosen by the domestic worker"). Even if Massachusetts law is assumed to restrict the ability of employers to deduct room and board from wages more than federal law does, the savings clause of the FLSA entitles employees to receive the more generous protections of state law. 29 U.S.C. § 218(a).

45

### c.     Compensation for time required on premises or on duty

Plaintiffs argue that the Domestic Workers law is "completely incompatible" with the au pair program because the law requires au pairs to be paid for all "time spent eating and sleeping." Pl. Br. at 48 (citing 940 C.M.R. § 32.02); *see also id.* at 52, 54. That is a misreading of the Attorney General's regulations, which provide that "all time during which a domestic worker is required to be on the employer's premises or to be on duty" is compensable, 940 C.M.R. § 32.02 (definition of "working time"), and that "all meal periods, rest periods, and sleep periods shall constitute working time" when a domestic worker is on duty for a 24-hour period (unless otherwise provided by a written agreement), *id.*, § 32.03(2). As the District Court observed, an au pair can never be on duty for 24 consecutive hours, because the State Department regulations prohibit au pairs from working more than ten hours in a given day. JA 610 (citing 22 C.F.R. § 62.31(j)(2)).

To be sure, a host family must provide an au pair with "a suitable private bedroom," 22 C.F.R. § 62.31(e)(6), and an au pair may well be "encouraged to spend time with the family" at meals or in other settings, *see* Pl. Br. at 48. Time spent sleeping or voluntarily socializing with the family, without work duties, will not be compensable under the Domestic Workers law. But if the family requires the au pair to attend a meal, or remain at the house, in order to take care of children, she or he should be compensated for that time. Furthermore, requiring

46

families to establish clear expectations as to when the au pair must be at home or on duty will not prevent families and au pairs from having meaningful relationships that foster cross-cultural exchange.

### d.    Recordkeeping

Plaintiffs claim that the Domestic Workers law imposes timekeeping and notice requirements, "whereas under the DOS Regulations neither the Host Family nor the Sponsor has timekeeping reporting requirements." JA 22-23 (Compl. ¶ 31(f)); *see also* Pl. Br. at 51-55.  However, because the State Department regulations make clear that au pairs must be "paid in conformance with the requirements of the [FLSA] as interpreted and implemented" by the Department of Labor, 22 C.F.R. § 62.31(j)(1), the FLSA's timekeeping requirements apply to the employers of au pairs as well, *see* 29 C.F.R. § 516.2(a).  Furthermore, as the District Court observed, the FLSA "specifically provides that nothing in those requirements 'shall excuse any party from complying with any recordkeeping or reporting requirement imposed by any other Federal, State or local law, ordinance, regulation or rule.'" JA 613 (quoting 29 C.F.R. § 516.1(c)).  The imposition of parallel federal and state notice and reporting requirements does not give rise to conflict preemption, particularly where, as here, there is no specific showing of "congressional intent to oust state laws."  *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 82-83 (1st Cir. 1997).

Plaintiffs cite the superseded 1995 regulations in support of their argument that USIA intended to "eliminate[] the need for host families to keep individualized records."  Pl. Br. at 51 (quoting 60 Fed. Reg. at 8551).  Again, that account ignores USIA's decision to jettison its uniform stipend approach and instead require full compliance with the FLSA, to ensure "that there is no future confusion regarding the payment of minimum wage."  62 Fed. Reg. at 34,633.

Plaintiffs misstate other requirements as well.  Pl. Br. at 52-55.  For example, they argue that, under the Domestic Workers law, all "meal periods, rest periods, and sleep periods" must be calculated and paid for, Pl. Br. at 52; *see also id.* at 54 ("nearly every hour that the au pair spends in the home"); they need not, unless child care duties are also assigned to the au pair during those periods, *see* § I.C.2.c, *supra.*  They complain that host families will be "required to maintain a record of its written agreement with its au pair," Pl. Br. at 54 (citing 940 C.M.R. § 32.04(3)), but fail to mention that host families are required to enter into written agreements with their au pairs under the State Department regulations, *see* 22 C.F.R. § 62.31(e)(5).  There is no reason why the written agreement that the State Department requires cannot address all of the items contemplated by 940 C.M.R. § 32.04(3).  Plaintiffs assert that negotiations between au pairs and their employers would be "antithetical to the core goal of the Au Pair program, which is to foster cultural exchange."  Pl. Br. at 54-55; *see also id.* at 55 (criticizing prospect of

"labor-management negotiations").  But federal law has long treated au pairs as

both exchange visitors and protected employees.  *See, e.g.*, JA 609 (observing that

federal government has found that "[a]n au pair living with a host family presents

an analogous relationship to that contemplated in" Department of Labor

regulations governing domestic service employees) (quoting 59 Fed. Reg. at

64,298); 60 Fed. Reg. at 8550 (explaining that au pairs have "employee status" and

"an employment relationship" with their host family employers).

Finally, plaintiffs intimate that the Domestic Workers law conflicts with the

federal regulation limiting au pairs to 45 hours of work per week.  *See* Pl. Br. at 52;

22 C.F.R. § 62.31(c)(2).  The fact that the au pair regulations may be more

restrictive in terms of total work hours than other laws (state or federal), however,

"presents no conflict whatsoever."  *See Beltran*, 176 F. Supp. 3d at 1082 n.19.  It is

not physically impossible for a host family to comply with both its state law

obligation to pay for all time "on duty" and its federal obligation to limit au pairs'

work to 45 hours per week.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING PLAINTIFFS' RULE 59(e) MOTION.

Plaintiffs also challenge the District Court's denial of their motion styled

"Plaintiffs' Rule 59(e) Motion Requesting That the Court Reconsider the Dismissal

Opinion, Vacate the Judgment, and Allow the Case to Proceed as Pled, or, in the

Alternative, That the Court Vacate the Judgment and Allow Plaintiffs Leave to File

an Amended Complaint Pursuant to Rule 15(a)(2) and to Supplement the Record."

JA 620-824. This sprawling post-judgment filing included a 21-page legal

memorandum rehashing plaintiffs' arguments on preemption, a proposed amended

complaint, three evidentiary declarations, two letters from members of Congress,

and various other exhibits.

The denial of a Rule 59(e) motion is reviewed for abuse of discretion.

*Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 518 & n.4 (1st Cir. 2016). "Rule

59(e) relief is granted sparingly, and only when 'the original judgment evidenced a

manifest error of law, if there is newly discovered evidence, or in certain other

narrow situations.'" *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925, 930 (1st Cir.

2014) (quoting *Global Naps, Inc. v. Verizon New Eng., Inc.*, 489 F.3d 13, 25 (1st

Cir. 2007)); *see also Ira Green, Inc. v. Military Sales & Serv. Co.*, 775 F.3d 12, 28

(1st Cir. 2014) ("[R]evising a final judgment [pursuant to Rule 59(e)] is an

extraordinary remedy...."). The District Court did not abuse its discretion here.

First, for the reasons set forth in § I, *supra*, the District Court was correct to

dismiss plaintiffs' implied preemption claims on their merits. The legal

memorandum that plaintiffs submitted in support of their Rule 59(e) motion did

not show any manifest error of law, but rather "largely reiterate[d] prior

arguments." JA 829. Rule 59(e) is not "a mechanism to regurgitate 'old

50

arguments previously considered and rejected.'" *Biltcliffe*, 772 F.3d at 930
(citations omitted).

Second, plaintiffs were not entitled to supplement their opposition to the
Rule 12(b)(6) motion with extrinsic evidence not in the public record.  It is well
established that the record on a motion to dismiss generally includes only facts
alleged in the complaint, exhibits attached thereto, documents sufficiently referred
to in the complaint, and official public records.  *Freeman v. Town of Hudson*, 714
F.3d 29, 36 (1st Cir. 2013).[8]  At the outset of this case, the parties agreed that
plaintiffs' preemption claims could be decided in a Rule 12(b)(6) motion based
"just on the allegations, the law, the regulatory documents, and other official public
records."  JA 511-12.  Thus, when plaintiffs moved, on the morning of the District
Court's hearing on the motion to dismiss, to introduce the declaration that their
retained witness Stanley Colvin submitted in opposition to class certification in the
*Beltran* case in Colorado, the court properly denied their motion as inconsistent
with Rule 12(b)(6) and plaintiffs' prior assurance that "the matter could be decided
as a matter of law."  JA 505-6.  It reiterated that point in denying plaintiffs' Rule

---

[8] Plaintiffs argue that "the District Court did consider other materials outside the
pleadings in its decision," Pl. Br. at 63, but those materials were regulatory
materials cited in plaintiffs' complaint and other official public records, not
affidavits or other evidentiary materials.  *See* JA 604 nn.6-7.

59(e) motion, stating that it had "already declined to consider documents outside the pleadings in ruling on Defendants' motion to dismiss." JA 829.

Plaintiffs' proposed submission was also untimely, inadmissible, and irrelevant. A declaration crafted by a retained witness in a different lawsuit filed two years earlier is not "newly discovered evidence" for purposes of Rule 59(e). *See* JA 505 (observing that declaration was not "timely presented with Plaintiffs' Opposition to the Motion"); *Biltcliffe*, 772 F.3d at 930 (stating that Rule 59(e) motion "is not the venue to undo procedural snafus"). Furthermore, the Colvin declaration does not address the preemption of the Domestic Workers law (or any other state law), but rather purports to explicate "the regulatory and statutory history of the Au Pair Program from initial Program Guidelines through adoption of formal regulations and permanent statutory authority." JA 703; *see also* Pl. Br. at 63 (stating that declaration is "critical to avoiding misinterpretations of the regulatory history and framework"). Testimony offered "to show what the regulations meant" usurps the role of the judge and is inadmissible. *Pelletier v. Main Street Textiles, LP*, 470 F.3d 48, 54-55 (1st Cir. 2006); *see also Rumsfeld v. United Technologies Corp.* 315 F.3d 1361, 1369 (Fed. Cir. 2003) (testimony of former agency employee as to "the proper interpretation" of agency regulations "is simply irrelevant to our interpretive task").

Similarly, the two 2017 letters from members of Congress, *see* Pl. Br. at 63-64 (citing JA 763-67), have no bearing on whether Congress had a clear and manifest purpose to preempt state worker protection laws when it enacted the Fulbright-Hays Act in 1961. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.") (citations omitted). As for the two declarations from attorneys in Massachusetts who state that "applying the Massachusetts regulations at issue to the Au Pair program would make it financially impossible for them to participate," Pl. Br. at 64 (citing JA 820-24), such evidence is improper under Rule 12(b)(6), not "newly discovered" for purposes of Rule 59(e), and irrelevant because there is no overriding federal objective in guaranteeing affordable child care through the au pair program, *see* § I.C.1, *supra*.

Lastly, plaintiffs argue that the District Court erred in denying them leave to amend, Pl. Br. at 64-67, but the court lacked authority to grant them that. Defendants moved to dismiss on November 8, 2016. Under Fed. R. Civ. P. 15(a), plaintiffs had the right to amend their complaint "as a matter of course" for the next 21 days. After that, and until the District Court entered judgment on August 2, 2017, plaintiffs could have moved for leave to amend. They did not do so. Once judgment entered, the court's hands were tied. "If ... a motion to amend is

filed after the entry of judgment, the district court lacks authority to consider the motion under Rule 15(a) unless and until the judgment is set aside." *Fisher v. Kadant, Inc.*, 589 F.3d 505, 508 (1st Cir. 2009) (citations omitted). "In other words, so long as the judgment remains in effect, a motion under Rule 15(a) is beside the point." *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 723 (1st Cir. 2014) (citing *Fisher*, 589 F.3d at 509). This Court has applied this rule consistently, without regard for the length of time between a court's dismissal order and entry of judgment. *See, e.g.*, *In re Genzyme Corp. Securities Litigation*, 754 F.3d 31, 46 (1st Cir. 2014); *Feliciano-Hernández v. Pereira-Castillo*, 663 F.3d 527, 538 (1st Cir. 2011). Plaintiffs argue that given "the liberal standard under Rule 15(a) that favors amendments," the District Court erred in not vacating its judgment and then allowing plaintiffs to amend their complaint. Pl. Br. at 66-67. But that argument runs counter to *Fisher*, which explained that allowing plaintiffs to freely reopen cases after they pursue them to judgment and lose "would dramatically undermine the ordinary rules governing the finality of judicial decisions, and should not be sanctioned in the absence of compelling circumstances." 589 F.3d at 509 (quoting *James v. Watt*, 716 F.2d 71, 78 (1st Cir. 1983)). Because no such compelling circumstances exist here, the District Court's judgment should be affirmed.

## Conclusion

For the reasons stated above, the District Court's dismissal of plaintiffs'

action should be affirmed.

Respectfully submitted,

MAURA HEALEY
*Attorney General of Massachusetts*

/s/ Robert E. Toone
Robert E. Toone, 1st Cir. No. 124523
Elizabeth Kaplan, 1st Cir. No. 1182134
*Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2178
email:  Robert.Toone@state.ma.us

Date:  March 19, 2018

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that:

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because the brief contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point, Times New Roman font.

*/s/ Robert E. Toone*
Attorney for Defendants-Appellees
March 19, 2018

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I filed this Brief through the Court's Electronic Case Filing (ECF) system on March 19, 2018, and thus copies will be served electronically on this date on the following attorneys for the Appellants, all of whom are identified as registered participants on the Court's Notice of Docket Activity:  Counsel for Appellants:

Joan A. Lukey, Esq.
Email:joan.lukey@choate.com
Justin J. Wolosz
Email:jwolosz@choate.com

*/s/ Robert E. Toone*
Attorney for Defendants-Appellees

56