**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 14-cv-03074-CMA-KMT

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
ALEXANDRA IVETTE GONZALEZ,
JULIANE HARNING,
NICOLE MAPLEDORAM,
LAURA MEJIA JIMENEZ,
SARAH CAROLINA AZUELA RASCON,
CATHY CARAMELO,
LINDA ELIZABETH,
GABRIELA PEREZ REYES,
    and those similarly situated,

    Plaintiffs,

v.

INTEREXCHANGE, INC.,
USAUPAIR, INC.,
GREATAUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., DBA EXPERT AUPAIR,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMESTAY INTERNATIONAL,
CULTURAL CARE, INC. D/B/A CULTURAL CARE AU PAIR,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, DBA AUPAIR FOUNDATION,
AMERICAN INSTITUTE FOR FOREIGN STUDY DBA AU PAIR IN AMERICA,
ASSOCIATES IN CULTURAL EXCHANGE DBA GOAUPAIR,
AMERICAN CULTURAL EXCHANGE, LLC, DBA GOAUPAIR,
GOAUPAIR OPERATIONS, LLC, DBA GOAUPAIR,
AGENT AU PAIR,
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC DBA PROAUPAIR, and
20/20 CARE EXCHANGE, INC. DBA THE INTERNATIONAL AU PAIR EXCHANGE,

    Defendants.

---

**DEFENDANTS APEX AND 20/20'S RESPONSE TO JOINT STATUS REPORT IN
ADVANCE OF SCHEDULING CONFERENCE (ECF 1133)**

Defendants A.P.EX. American Professional Exchange, LLC dba ProAuPair ("APEX"), and 20/20 Care Exchange, Inc. dba The International Au pair Exchange ("20/20") respectfully submit their Response to the Joint Status Report in Advance of Scheduling Conference (ECF 1133):

1. On August 6, 2018, the Court ordered that the Parties confer and submit to the Court the "unique procedures" and other matters they intend to address at the scheduling conference to be held on August 15, 2018.  ECF No. 1125.  After extensively conferring with counsel for the Parties, Defendants APEX and 20/20 find it necessary to respond to the Joint Status Report addressing concerns unique and specific to APEX and 20/20.[1]  Specifically, APEX and 20/20 cannot agree with the proposals in the Joint Status Report regarding "Trial Length" and "Lead Trial Counsel and Multiparty Coordination" (Joint Status Report, ECF 1133, pp. 1-3).

2. APEX and 20/20 are antitrust-only Defendants.   APEX and 20/20 are unique from any other Defendant-sponsor.   APEX and 20/20's business model focusses on sponsoring professional au pairs, who have advanced education and training and are paid stipends of $250.00 or more per week.

3. Of the 765 au pairs placed by APEX and 20/20 during the time period at issue (2011-2016), 735 were placed as "professional" au pairs who were paid from $250.00 to as much as $350.00 per week.  Only 30 au pairs were placed in "standard" au pair positions.  These placements were exceptions to APEX and 20/20's business

---

[1] Discussion of the Joint Status Report and circulation of numerous revised drafts (in which undersigned counsel participated) continued up until approximately 11:58 a.m. today, August 13, 2018; the final Joint Status Report was filed six minutes later, at approximately 12:04 p.m.

2

norm, undertaken as a courtesy in very limited situations.[2] In 2015, APEX and 20/20 stopped placing standard au pairs entirely, even as a courtesy, to focus exclusively on professional au pairs.[3] *Id., pp. 28-29 (45:21-46:1); APEX Appx. p. 65 (No. 105004)*.

4. Plaintiffs do not dispute that *more than 96 percent* of APEX's and 20/20's au pairs are professional au pairs who were paid a stipend of $250 or more per week, which is substantially more than the alleged price-fixed stipend of $195.75 per week. Thus, *fewer than 4 percent* of APEX's and 20/20's au pair placements (30/765) were arguably paid the alleged fixed price of $195.75. And of that 4 percent, a substantial number of the 30 standard au pairs—more than 25%—actually received weekly stipends of $200.00 to $250.00, contradicting Plaintiffs' allegation that APEX and 20/20 colluded with other sponsors to fix the standard au pair stipend at $195.75.

5. Moreover, Plaintiffs have no evidence that, for the 22 standard APEX or 20/20 au pairs who were paid a weekly stipend of $195.75, the stipend amount resulted from illegal agreement with other sponsors, as opposed to independent, non-collusive action. To the contrary, APEX and 20/20 will present evidence that these stipends were determined independently for each standard au pair placement.

6. Because APEX and 20/20 are uniquely situated—no other sponsor shares these facts—it is critical that APEX and 20/20 be able to present these distinguishing facts at trial, to establish not only that APEX and 20/20 did not engage in any wage-

---

[2] For example, where a host family had already "pre-matched" with an au pair of their own choosing, and requested assistance with the visa process; a professional au pair candidate turned out to lack qualifications for professional placement; or a host family decided it did not need, or could not afford, a professional au pair.

[3] The last standard au pair placed by APEX or 20/20 was processed in late 2015 and began his host family assignment in February 2016.


fixing conspiracy, but to establish (among other things) that APEX and 20/20 had no economic motivation to engage in any conspiracy to fix standard au pair wages. Indeed, it would be against APEX and 20/20's economic interests to conspire to suppress standard au pair stipends for the purpose Plaintiffs claim –to drive up host families' demand for standard au pairs—because APEX and 20/20's unique host family fee structure for professional au pair placements provides these Defendants with nearly *twice* the revenue of a standard placement, for the same level of effort.  Thus, APEX and 20/20 have never had any incentive to attract *more* families seeking standard au pairs, and no motive to agree to suppress standard au pair stipends to achieve this alleged goal.

7.	APEX and 20/20 must be allowed an adequate opportunity to present their unique evidence—which distinguishes them from any other sponsor—at trial.  These Defendants believe that the proposed six-week trial, and more importantly, the proposed transfer of their defense (including opening statement, closing argument, cross-examination of Plaintiff's witnesses, and examination of APEX and 20/20's individually-retained expert) to a "Principal Trial Team" — which does not include undersigned counsel — would seriously impact APEX and 20/20's due process rights and compromise their ability to present the specific evidence necessary to their defense.

8.	Because of their unique facts and the totally different nature of their business operations, the interests of APEX and 20/20 are not perfectly convergent with those of the other Defendant-sponsors, and for this reason it was necessary for APEX and 20/20 to separately retain an expert witness to address particular aspects of the

antitrust claims against them.[4]  Indeed, the factual distinctions between APEX and 20/20 and the other Defendant-sponsors might be considered potentially detrimental by some other Defendants.  Yet, under Plaintiffs' Section 1 wage-fixing conspiracy claim, APEX and 20/20 face the risk of being held jointly and severally liable for antitrust damages (including treble damages) that potentially exceed $2.5 billion dollars.  The stakes are substantial for APEX and 20/20, who are among the smallest of the sponsors sued in this case.

9. While Sixth Amendment protections are not directly implicated in this civil case, civil actions are still subject to "'the fundamental principle that a party ought to be represented by its counsel of choice if that is at all possible.'" *Ford Motor Co. v. Nat'l Indemnify Co.*, Civil Action No. 3:12cv839, 2013 U.S. Dist. LEXIS 119030, at *12 (E.D. Va. Aug. 21, 2013) (quoting *Personalized Mass Media Corp. v. Weather Channel, Inc.,* 899 F. Supp. 239, 242 (E.D. Va. 1995); *cf. United States v. Collins,* 920 F.2d 619, 625 (10th Cir. 1990) ("'Attorneys are not fungible; ' often 'the most important decision a defendant makes in shaping his defense is his selection of an attorney.'") (quoting *United States v. Laura,* 607 F.2d 52, 56 (3d Cir. 1979)).

10. In addition, under the Fifth Amendment, due process requires that even a civil defendant is entitled to a full and fair hearing "appropriate to the nature of the case." *Mullane v. Cent. Bank & Hanover Trust Co.,* 339 U.S. 306, 313 (1950); *Fuentes v. Shevin,* 407 U.S. 67, 80 (1972) (noting that the "central meaning of procedural due process" is the "right to notice and an opportunity to be heard.., at a meaningful time

---

[4]  APEX and 20/20 do not agree that co-Defendants' Principal Trial Team should be permitted to conduct the direct examination of the antitrust expert they retained and paid for, although they do not object to this witness being cross-examined by Defendants' Principal Trial Team.

and in a meaningful manner"). "A vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one's behalf." *Oshodi v. Holder,* 729 F.3d 883, 889 (9th Cir. 2013) (internal quotations omitted). In this case, due process includes at least some right to confront and cross-examine witnesses, subject to reasonable controls and limitations. *See Goldberg v. Kelly,* 397 U.S. 254, 269 (1970) (extending the right to confront and cross-examine witnesses to fact-finding processes in welfare benefits termination proceedings).

11. The determination of what procedures are constitutionally due requires consideration of: (1) the private interest affected; (2) the risk of an erroneous deprivation of such interest and the value of additional procedural safeguards; and (3) the governmental interest, including the burdens of additional procedural requirements. *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976). Here, the private stakes are very high for APEX and 20/20, in terms of their potential joint and several liability for millions or even billions of dollars in damages, and the risk that their distinguishing evidence and arguments may not be effectively presented in a "team" defense. Minimal additional safeguards—rights to make limited opening and closing statements, to present the testimony of the APEX and 20/20 expert, and to selectively examine and cross-examine witnesses—should be sufficient to protect their rights, without unduly burdening the overall management of trial.

12. Finally, APEX and 20/20, as corporate entities, cannot represent themselves and have retained undersigned counsel to represent them for the past four years of this litigation. APEX and 20/20 will not accept what would essentially be a re-assignment of their representation to other counsel, with whom they have no attorney-

6

client relationships, and whose own clients may have potentially divergent and conflicting interests. Just as a client has no right to "insist on a lawyer who has ethical obligations to other defendants charged in the same conspiracy," *Wheat v. United States,* 486 U.S. 153, 159-60 (1988), neither can a lawyer insist that the client transfer its representation to another lawyer who has ethical obligations to other defendants.

## CONCLUSION

Defendants APEX and 20/20 ask this Court to consider these issues in the upcoming Scheduling Conference.

Respectfully submitted this 13th day of August, 2018.

        NIXON SHEFRIN HENSEN OGBURN, P.C.

        *s/ Lawrence D. Stone*
        Lawrence D. Stone
        5619 DTC Parkway, Suite 1200
        Greenwood Village, CO 80111
        (303) 773-3500
        lstone@nixonshefrin.com

        Attorneys for Defendants A.P.EX. American Professional Exchange, LLC dba ProAuPair; and 20/20 Care Exchange, Inc. dba The International Au Pair Exchange

## CERTIFICATE OF SERVICE

    I hereby certify that on this 13th day of August, 2018, I have electronically filed the foregoing **DEFENDANTS APEX AND 20/20'S RESPONSE TO JOINT STATUS REPORT IN ADVANCE OF SCHEDULING CONFERENCE (ECF 1133)** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

                                          *s/ Carol A. Larsen Cook*
                                          Carol A. Larsen Cook