# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CULTURAL CARE, INC., | * | |
| ERIN CAPRON, and JEFFREY | * | |
| PENEDO, | * | |
|      Plaintiffs, | * | |
| | * | |
|    v. | * | Civil Action No. 16-cv-11777-IT |
| | * | |
| OFFICE OF THE ATTORNEY | * | |
| GENERAL OF THE COMMONWEALTH | * | |
| OF MASSACHUSETTS and MAURA T. | * | |
| HEALEY, | * | |
|      Defendants. | * | |

<u>MEMORANDUM AND ORDER</u>

August 1, 2017

TALWANI, D.J.

This action challenges the application and enforcement of the Massachusetts Domestic

Workers Bill of Rights, Mass. Gen. Laws ch. 149, § 190, and its accompanying regulations

codified at 940 Mass. Code Regs. § 32 (collectively, "domestic workers laws"), to foreign

nationals participating in the federal *au pair* program under the J-1 Exchange Visitor Visa

Program. Compl. ¶¶ 29, 33 [#1]. Plaintiff Cultural Care, Inc., is a sponsor under the federal *au*

*pair* program, and Plaintiffs Erin Capron and Jeffrey Penedo participate as host families in the *au*

*pair* program. Plaintiffs (collectively, "Cultural Care") allege in Counts I and II of the <u>Complaint</u>

[#1] that the application and enforcement of the domestic workers laws to the *au pair* program is

preempted by the Fulbright-Hays Act, Pub. L. No. 87-256 § 109, 75 Stat. 527 (1961), codified at

22 U.S.C. § 2451 et seq.,[1] and federal regulations. Counts III and IV allege further that the

---

[1] The Fulbright-Hays Act also is known as the Mutual Educational and Cultural Exchange Act of 1961.

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 3
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 2 of 22

domestic workers laws are preempted by the Commerce Clause, Article 1, Section 8, Clause 3 of the United States Constitution.[2] The Defendants, the Office of the Attorney General of the Commonwealth of Massachusetts and Attorney General Maura Healey (collectively, "the Attorney General"), have filed a Motion to Dismiss [#19], asserting that Counts I and II should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and that Counts III and IV should be dismissed under Rules 12(b)(1) and 12(b)(6). For the reasons set forth below, the motion is ALLOWED.

## I.   Standard

In ruling on a motion to dismiss, whether for failure to state a claim or lack of standing, the court must accept the plaintiffs' well-pleaded factual allegations and draw all reasonable inferences in the plaintiffs' favor. See Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 320 (1st Cir. 2008) (Rule 12(b)(6)); Blum v. Holder, 744 F.3d 790, 795 (1st Cir. 2014) (Rule 12(b)(1)). To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The court "draw[s] the facts primarily from the complaint," and "may supplement those factual allegations by examining 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice.'" Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013) (quoting Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)).

When, as here, the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of [those] plaintiffs[,] [t]hey must . . . satisfy . . . standards for a facial challenge to the extent of that reach." John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010). "A

---

[2] Plaintiffs Capron and Penedo are not parties to Counts III and IV.

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 4
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 3 of 22

facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully,

since the challenger[s] must establish that no set of circumstances exists under which the Act

would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).

    II.  Background

        A.  *Overview of Federal Statutes and Regulations*

    The *au pair* program is a subset of the J-1 Exchange Visitor Visa Program. To qualify for

J-visa status, a person must be

> an alien having a residence in a foreign country which he has no
> intention of abandoning who is a bona fide student, scholar,
> trainee, teacher, professor, research assistant, specialist, or leader
> in a field of specialized knowledge or skill, or other person of
> similar description, who is coming temporarily to the United States
> as a participant in a program . . . for the purpose of teaching,
> instructing or lecturing, studying, observing, conducting research,
> consulting, demonstrating special skills, or receiving training.

8 U.S.C. § 1101(a)(15)(J). Under the *au pair* program, foreign nationals between the ages of 18

and 26 are permitted to travel to the United States and reside for no more than one year with an

American host family, where they help care for the family's children and complete coursework

at a local college or university. 22 C.F.R. § 62.31(a), (c)(1), (d)(1); id. § 62.1.

    *Au pairs* may provide no more than 10 hours of child care each day and no more than 45

hours of child care in a given week. Id. § 62.31(j)(2). They "[a]re compensated at a weekly rate

based upon 45 hours of child care services a week and paid in conformance with the

requirements of the Fair Labor Standards Act [("FLSA"), 29 U.S.C. § 201 et seq,] as interpreted

and implemented by the United States Department of Labor." 22 C.F.R. § 62.31(j)(1). They

further receive at least one and a half days off each week and one full weekend off each month.

Id. § 62.31(j)(3). Designated sponsors oversee the *au pair* programs and provide support to the

*au pairs* and host families. Id. § 62.2; see also id. § 62.31(c). "Sponsors shall require that *au pair*

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 5
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 4 of 22

participants . . . [a]re compensated at a weekly rate based upon 45 hours per week and paid in
conformance with the requirements of the [FLSA] as interpreted and implemented by the United
States Department of Labor." Id. § 514(j).

### B. Overview of Massachusetts Regulations

In 2014, Massachusetts enacted "An Act Establishing the Domestic Workers Bill of
Rights." 2014 Mass. Acts ch. 148, § 3. The Act is now codified at Mass. Gen. Laws ch. 149,
§§ 190-191 ("Domestic Workers Bill of Rights Act"). On August 28, 2015, the Attorney General
propounded regulations "to interpret, enforce, and effectuate the purposes of the Domestic
Workers Bill of Rights Act." 940 Mass. Code Regs. § 32.01(1); see also Mass. Gen. Laws ch.
149, § 190(o) (authorizing Attorney General to "promulgate rules and regulations necessary for
enforcement").

The domestic workers laws designate protections for "individual[s] or employee[s] who
[are] paid by an employer[3] to perform work of a domestic nature within a household
including . . . nanny services." Mass. Gen. Laws ch. 149, § 190(a). Among these protections,
employers may deduct no more than $35.00 for lodging each week, 940 Mass. Code Regs.
§ 32.03(5)(c), and no more than $1.25 for breakfast, $2.25 for lunch, and $2.25 for dinner for
meals actually provided, id. § 32.03(5)(b), and only when the domestic workers select the
lodging and meals "voluntarily and freely," id. §§ 32.03(5)(b)-(c). The domestic workers laws
clarify that domestic workers who work more than 40 hours per week are entitled to overtime
pay for those hours.[4] Id. § 32.03(3). "When a domestic worker is required to be on duty for a

---

[3] An employer is defined as "a person who employs a domestic worker to work within a
household whether or not the person has an ownership interest in the household." Mass. Gen.
Laws ch. 149, § 190(a).
[4] Overtime pay is calculated at "at a rate not less than one and one half times the regular rate,"
pursuant to state minimum wage laws. Mass. Gen. Laws ch. 151, § 1A; see also 940 Mass. Code

period of 24 consecutive hours or more, all meal periods, rest periods, and sleep periods shall constitute working time, unless otherwise provided by written agreement." Id. § 32.03(2). The domestic workers laws further require those who employ domestic workers to keep records of wages paid and hours worked. Mass. Gen. Laws. ch. 149, § 190(l); 940 Mass. Code Regs. § 32.04(2).

 III. Discussion

  A. *Preemption by the Fulbright-Hays Act*

 The doctrine of federal preemption traces its roots to Article VI, Clause 2 of the United States Constitution, which provides that federal law "shall be the supreme Law of the Land." See Arizona v. United States, 567 U.S. 387, 399 (2012). Congress may include explicit statutory language signaling its intent to preempt state law,[5] see id., although such explicit statutory preemption is not at issue here as neither the Fulbright-Hays Act nor the federal regulations expressly indicate that states are barred from supplementing these provisions.

 State law also is preempted, however, where the structure and purpose of the federal legal scheme at issue indicate a clear, albeit implicit, intent to preempt state law. See id. at 399-400. State law is impliedly preempted when Congress intends to occupy the field (field preemption) or when it conflicts with federal law (conflict preemption). Id. Regardless of the type of preemption at issue, "the ultimate touchstone" of the court's inquiry is congressional purpose. Wyeth v. Levine, 555 U.S. 555, 565 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).

---

Regs. § 32.03(3) (incorporating Mass. Gen. Laws ch. 151, § 1A).
[5] "Federal regulations have no less [preemptive] effect than statutes." Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 7
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 6 of 22

"[I]n all [preemption] cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. (quoting Medtronic, Inc., 518 U.S. at 485) (internal quotation marks omitted)). "The States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756 (1985) (quoting Slaughter-House Cases, 83 U.S. 36, 62 (1872)). "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State," including "minimum and other wage laws." Id. (quoting De Canas v. Bica, 424 U.S. 351, 356 (1976)).

### 1.   Field Preemption

In cases of field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Arizona, 567 U.S. at 399. Even when no conflict exists between state and federal law, "[t]he intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). This is determined by considering the totality of the circumstances. Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224 (1993).

Cultural Care asserts that the federal government created the *au pair* program as part of its foreign relations policy, and that, in passing the Fulbright-Hays Act, Congress intended to occupy the field of cultural exchange visitors. Cultural Care asserts that "Congress was clear in passing the Fulbright-Hays Act that cultural exchange visitors would enter the United States, not as . . . employees, but as visitors in furtherance of mutual understanding and better relations with other countries." Pl.'s Opp. 14 [#21] (citing 22 U.S.C. § 2451 and H.R. Rep. No. 87-1094 at 16 (1961)). Cultural Care posits that federal regulation of that field of cultural exchange visitors is so pervasive that no room is left for additional state regulation.

Cultural Care's starting premise is incorrect. While the statute and legislative history do make clear that the purpose of the cultural exchange visitors program is the furtherance of mutual understanding and better relations between people of the United States and other countries, Pub. L. No. 87-256 § 101, 75 Stat. 527, they do not support the claim that these visitors would not also enter the United States as employees.

The *au pair* program has its roots in the Fulbright-Hays Act, enacted by Congress in 1961, which created the J-Visa Exchange Visitor Program. Id. § 109. The Fulbright-Hays Act explicitly contemplated that some J-visa programs would include an employment component. Id. (permitting programs "for the purpose of *teaching, instructing or lecturing*, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training" (emphasis added)).

In 1988, after the United States Information Agency ("USIA") (the agency which oversaw the J-visa programs) piloted an "*au pair*" program, Congress designated funds to continue it. Act of Oct. 1, 1988, Pub. L. No. 100-461, 102 Stat. 2268 § 555 (1988). Congress did so despite USIA's concerns that the program was inconsistent with the USIA's authority under

the Fulbright-Hays Act. Exchange Visitor Program, 59 Fed. Reg. 64,296 (Dec. 14, 1994) (supplementary information), Pls.' Opp. Ex. D [#21-4]; S. 2757, 100th Cong. § 301 (1988), Pl.'s Opp. Ex. B [#21-2] (incorporated in Act of Oct. 1, 1988, Pub. L. No. 100-461, 102 Stat. 2268 § 555 (1988), Pl.'s Opp. Ex. C [#21-3]). That authorization was accompanied by the commissioning of a report on whether participants in the J-visa programs, including *au pairs*, were engaging in activities consistent with those authorized by statute. Act of Oct. 1, 1988, Pub. L. No. 100-461, 102 Stat. 2268 § 555 (1988).

The General Accounting Office issued the congressionally-commissioned report in February 1990, determining that the *au pair* program was inconsistent with the intent of the Fulbright-Hays Act.[6] Exchange Visitor Program, 59 Fed. Reg. 64,296 (Dec. 14, 1994) (supplementary information), Pls.' Opp. Ex. D [#21-4].[7] The USIA subsequently concluded that the *au pair* program, as then styled, was not authorized by the Fulbright-Hays Act. Id. Shortly thereafter, Congress extended the *au pair* program. Eisenhower Exchange Fellowship Program, Pub. L. No. 101-454 § 8, 104 Stat. 1063 (1990); see also 59 Fed. Reg. 64,296.

Congress continued the program again in 1994 but also directed the USIA to promulgate regulations governing the *au pair* program. Act of Oct. 25, 1994, Pub. L. No. 103-415, 108 Stat. 4302 § 1(v) (1994). As part of the promulgation process, and in response to criticism "that the program displaces American workers and amounts to no more than the import of cheap foreign

---

[6] The Attorney General has cited the General Accounting Office's report as part of the record. See U.S. Gen. Accounting Office, GAO/NSIAD-90-61, U.S. Information Agency: Inappropriate Uses of Educational and Cultural Exchange Visas 18-19 (Feb. 1990), Defs.' Mem. Ex. A [#20-1]. Cultural Care has not objected to the inclusion of this report in the motion-to-dismiss record.
[7] Both the State and Cultural Care have attached to their respective memoranda copies of Federal Register materials. Although, on a motion to dismiss, the court generally only looks to the facts alleged in the complaint, Butler, 736 F.3d at 611, the contents of the Federal Register are subject to judicial notice, 44 U.S.C. § 1507, and thus the court may consider these materials without converting the motion to a motion for summary judgment.

labor in the guise of an educational and cultural exchange program," the USIA confronted the question of whether *au pairs* are employees subject to the FLSA, 29 U.S.C. § 202 *et seq*. 60 Fed. Reg. 8550. In issuing the interim rule, the USIA concluded that "[a]n *au pair* living with a host family presents an analogous relationship to that contemplated in 29 C.F.R. § 552.100," the Department of Labor regulations governing domestic service employees, since amended. 59 Fed. Reg. 64,298. Before issuing the final rule, the USIA sought further guidance from the Department of Labor, which concluded that "an employment relationship is established." 60 Fed. Reg. 8550. The USIA deferred to the Department of Labor on this point. 60 Fed. Reg. 8551 (citing Chevron v. NRDC, 467 U.S. 837 (1984)). The final rule permitted a room-and-board credit based on host families' actual costs. 60 Fed. Reg. 8551.

After Congress passed legislation in 1996 to amend the FLSA to increase the federal minimum wage incrementally over the next year, Minimum Wage Increase Act of 1996, Pub. L. No. 104-188 § 2104, 110 Stat. 1928 (Aug. 20, 1996), the USIA amended its regulations with respect to compensation rates "to ensure that there is no future confusion regarding the payment of minimum wage." 62 Fed. Reg. 34,633. Under the regulations, "[s]ponsors shall require that *au pair* participants . . . [a]re . . . paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the United States Department of Labor." Exchange Visitor Program, 62 Fed. 34,634 (June 27, 1997) (now codified at 22 C.F.R. § 62.31(j)(1)).[8]

---

[8] Relying on this Department of Labor determination, the Internal Revenue Service's posted information on *au pairs* states that "the au pair stipend constitutes 'wages' because an employer-employee relationship exists between the au pair and their host family." Au Pairs, Internal Revenue Serv. (Mar. 3, 2017), https://www.irs.gov/individuals/international-taxpayers/au-pairs.

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 11
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 10 of 22

Congress, in turn, did not permanently authorize the *au pair* program until *after* USIA so amended its regulations. Only then, in October 1997, did Congress permanently authorize the *au pair* program. Act of Oct. 1., 1997, Pub. L. No. 105-48, 111 Stat. 1165 (1997).

In sum, the federal statute and regulations concern not just cultural exchange, but employment. The question then is not whether the cultural exchange aims of the legislation, but whether the federal legislation as a whole – with both its cultural exchange component and its employment component – so occupy the field as to preempt state labor protections.

Nothing in the Fulbright-Hays Act or the federal regulations suggests that states may not supplement federal protections provided to *au pairs* or that the goals of cultural exchange would be thwarted by additional labor protections by the states. To the contrary, the federal regulations mandate compliance with the requirements of the FLSA. 22 C.F.R. § 62.31(j)(1). The FLSA, in turn, allows states to impose more stringent protections than those offered at the federal level. 29 U.S.C. § 218 ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter . . . ."). Allowing additional state protections is entirely consistent with the type of police powers traditionally held by the states. See Wyeth, 555 U.S. at 565.

Congress abolished the USIA effective in 1999, and the federal cultural exchange programs were transferred to the State Department. Foreign Affairs Reform & Restructuring Act of 1998, Pub. L. No. 105-277, div. G, §§ 1301, 1311-13, 112 Stat. 2681, 2681-776 (1999). The program's current home at the State Department, and before that, at the USIA, is of no consequence. Although the J-visa status is rooted in the goals of cultural exchange, no ambiguity

exists as to whether the *au pair* program also has an employment component that must comply with federal labor laws.

Cultural Care relies in part on a discussion of uniformity of permissible credits for food and lodging for *au pairs* in the 1994 and 1995 rules. Such reliance is misplaced. When promulgating the initial regulations, the USIA noted a "programmatic need for a uniform wage" to "alleviate the family's obligation to maintain records." 60 Fed. Reg. 8551. The formula the USIA relied on in 1994 and 1995 (which prompted the discussion of uniformity) was abandoned in 1997, however, giving way to the current language that no longer requires uniformity and instead requires *au pairs* to be "paid in conformance with the requirements of the [FLSA]." 22 C.F.R. § 62.31(j)(1).

Cultural Care's reliance on <u>Wisconsin Central, Ltd. v. Shannon</u>, 539 F.3d 751 (7th Cir. 2008), is similarly misplaced. In that case, the Seventh Circuit held that Congress had occupied the field of railway regulation and therefore the state overtime wage laws were preempted, even though minimum wage laws typically fell within the state's police powers. <u>Id.</u> at 765. It reasoned that "Congress's expansive regulation of the railways and the preemptive force of particular laws" demonstrated the intent to preempt state overtime laws. <u>Id.</u> at 763. In particular, there was an "undeniabl[y]" "long history of pervasive congressional regulation over the railway industry," in which federal "laws have touched on nearly every aspect of the railway industry, including property rights, shipping, labor relations, hours of work, safety, security, retirement, unemployment, and preserving the railroads during financial difficulties." <u>Id.</u> at 762 (internal footnotes omitted). Here, however, where the FLSA expressly applies to *au pairs* and the FLSA allows for additional state labor protections, Cultural Care has failed to establish that federal regulation of the *au pair* program is so pervasive as to supplant the Commonwealth's traditional

police powers. Cf. 29 U.S.C. § 213 (exempting certain classes of railroad workers from FLSA

overtime protections).

For these reasons, even when drawing reasonable inferences in its favor, Cultural Care

has failed to allege facts sufficient to demonstrate that federal regulation of the *au pair* program

is so pervasive that no room remains for supplementation by the states. The field preemption

claim fails.

### 2.   Conflict Preemption

Cultural Care next argues that the domestic workers laws must yield due to conflict

preemption. Conflict preemption may occur "where the challenged state law stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

Arizona, 567 U.S. at 399 (internal citations and quotation marks omitted).[9] In passing on a

conflict-preemption claim, the court may not engage in a "freewheeling judicial inquiry into

whether a state statute is in tension with federal objectives," because "such an endeavor 'would

undercut the principle that it is Congress rather than the courts that preempts state law.'"

Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 607 (2011) (quoting Gade v. Nat'l

Solid Wastes Mgm't Assn., 505 U.S. 88, 111 (1992)). "[A] high threshold must be met if a state

law is to be preempted for conflicting with the purposes of a federal Act." Id. (quoting Gade, 505

U.S. at 110).

"Conflict preemption is particularly difficult to show when the most that can be said

about the state law is that the direction in which state law pushes behavior is in general tension

with broad or abstract goals that may be attributed to federal laws." Fitzgerald v. Harris, 549

---

[9] Although not argued here, conflict preemption also applies "where compliance with both
federal and state regulations is a physical impossibility." Arizona, 567 U.S. at 399.

F.3d 46, 53 (1st Cir. 2008) (internal quotation marks, brackets, and citations omitted).

Nevertheless, "[a] direct, facial contradiction between state and federal law is not necessary to

catalyze an 'actual[ ]conflict' within the doctrinal parameters of the Supremacy Clause." KKW

Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp., 184 F.3d 42, 49 (1st Cir. 1999)

(quoting Securities Indus. Assoc. v. Connolly, 883 F.2d 1114, 1118 (1st Cir. 1989)).

Cultural Care alleges that the domestic workers laws interfere with the *au pair* program's

regulatory scheme by imposing different and additional requirements that interfere with the

federal government's foreign policy goals. Cultural Care alleges multiple areas of conflict

between the domestic workers laws and federal law relating to *au pairs*.

First, Cultural Care alleges that the definition of a "domestic worker" under the domestic

workers laws as "an individual who performs services for an employer for wage, remuneration,

or other compensation . . . to provide any service of a domestic nature within a household," 940

Mass. Code Regs. § 32.02, contradicts the definition of *au pairs* who are "exchange visitors."

Compl. ¶ 31(a) [#1]. However, because the federal regulations recognize that the *au pair*

program contains an employment component, no conflict exists. See 59 Fed. Reg. 64,298

(concluding that "[a]n *au pair* living with a host family presents an analogous relationship to that

contemplated in" the Department of Labor regulations governing domestic service employees).

Second, Cultural Care alleges conflict in the provision clarifying that domestic workers

who work more than 40 hours each week are entitled to overtime compensation, whereas *au*

*pairs* do not receive overtime, may not perform more than 45 hours of child care services each

week, and are paid a flat rate. Compl. ¶ 31(b) [#1]. However, the federal protections merely set a

floor (based on federal minimum wage and as assumed number of hours) to which states may

provide additional benefits. Maccabees Mut. Life Ins. Co. v. Perez-Rosado, 641 F.2d 45, 47 (1st

Cir. 1981). States are not precluded from exercising their traditional police powers to provide additional protections not provided at the federal level. Id. In this vein, the fact that the minimum compensation is based on an assumed (and maximum) 45 hours of work, rather than actual hours worked, does not preclude the Commonwealth from providing additional protections when an *au pair* works between 40 and 45 hours in a given week. Finally, the overtime requirement is not set by the domestic workers laws challenged here, but instead by the Minimum Fair Wage Law, Mass. Gen. Laws ch. 151, § 1A.

Third, because the minimum compensation for *au pairs* is calculated without regard to actual hours worked, Cultural Care alleges conflict in the requirement that mealtime, rest, and sleep periods constitute working time when domestic workers are required to be on duty for at least 24 consecutive hours. Compl. ¶ 31(c) [#1]; see also 940 Mass. Code Regs. § 32.03(2). However, no conflict exists here, because *au pairs* may not work for more than ten hours in a given day under the federal regulations. 22 C.F.R. § 62.31(j)(2). Further, as discussed above, the fact that *au pairs* receive compensation for 45 hours, regardless of the actual number of hours worked in a particular week, does not preclude states from providing additional protections based on actual hours worked.

Fourth, Cultural Care alleges that the deductions an employer may take under Massachusetts law for lodging and meal costs actually paid conflict with deductions permitted under federal regulations for the *au pair* program. Compl. ¶ 31(d) [#1]. Cultural Care alleges that the federal program calculates the weekly compensation on the basis of 45 hours multiplied by the minimum wage, minus 40% for room and board. Id.; Compl. Ex. C [#1-5]; Ex. D [#1-6]. They derive this formula from a 2007 Notice disseminated to *au pair* sponsors regarding the incremental federal minimum wage increase. Compl. Ex. D [#1-6] (Notice: Federal Minimum

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 16
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 15 of 22

Wage Increase). However, the Notice does not specify the statutory or regulatory source from which it draws this 40% formula. Id. Moreover, Cultural Care has not pointed to, and the court has not been able to find, any statute or regulation setting forth the formula on which it relies. Instead, the 40% figure appears to simply reflect an arithmetic calculation of the maximum amounts that may be deducted from wages under the FLSA, assuming all of the FLSA's requirements for such deductions are met. And nothing in the FLSA suggests that a state's further limitations on such deductions would interfere with federal regulations, which set a floor and not a ceiling.

In support of its allegation that deductions under the domestic workers laws conflict with federal regulations, Cultural Care further argues that the state limits on deductions for meals and lodging would distort the cultural exchange goals of the program. Any concern as to lodging is more theoretical than practical. The *au pair* has accepted the host family's offer of lodging by seeking a J-visa as an *au pair* who would reside with a host family. If the *au pair* sought to move out of the home, he or she would presumably be terminated from the *au pair* program. As to meals, a "cultural exchange" does not mandate that an *au pair* eat all meals with his or her host family, and there is nothing in the record to suggest such a culturally-limiting goal of the *au pair* program.

Nor is Cultural Care's concern that the regulations would emphasize strategy and negotiation over cultural exchange well founded. Cultural Care suggests that Massachusetts' requirements would result in the prospective *au pair* finding herself or himself haggling over room and board credits with the prospective host family prior to arriving in the United States. But while Massachusetts' limitations on credits for lodging and meals may result in a higher net wage for the *au pair*, they do not pose an obstacle to the accomplishment and execution of the

full purposes and objectives of the *au pair* program.[10] Even if the domestic workers laws were to create more complexity for sponsors in monitoring compliance by host families, this would not pose an obstacle to the accomplishment or execution of the goals of the *au pair* program so significant as to warrant conflict preemption. Indeed, the federal regulations require sponsors to "have a detailed knowledge of . . . state[] and local laws pertaining to employment." 22 C.F.R. § 62.11(a).

Fifth, Cultural Care alleges that "the Massachusetts minimum wage, which applies under the [domestic workers laws]" so exceeds the federal minimum wage on which the minimum *au pair* compensation is based that it would make the *au pair* program economically infeasible for many host families, including Plaintiffs Capron and Penedo. Compl. ¶ 31(e) [#1]; see also id. ¶ 32 (averring that the $195.75 in compensation required under federal regulations would climb to $445.50 if the domestic workers laws were applied to *au pairs*). Cultural Care's assumption as to increased costs do not necessarily apply, as host families interested in cultural exchange (rather than a low-cost nanny) may control their costs by limiting the number of hours of child care they demand from their *au pair*. Nor are these costs properly before the court where Cultural Care has made no representation as to the relationship between the $195.75 in compensation for the *au pair*, the overall program fees incurred by the host families, and the costs of alternative child care. But in any event, the affordability of child care under the *au pair* program is not a goal of the Fulbright-Hays Act, and possible increased costs do not stand as an obstacle sufficient to meet the high threshold required for conflict preemption.

Sixth, Cultural Care alleges that the domestic workers laws would impose recordkeeping

---

[10] Moreover, even if such haggling were to occur, early negotiations about credits for lodging and meals while the *au pair* is in her or his home country does not present a conflict meeting the high threshold required for state law to be preempted.

requirements on host families, not mandated under the *au pair* program. Id. ¶ 31(f). The FLSA, however, not only includes its own recordkeeping requirements, but also specifically provides that nothing in those requirements "shall excuse any party from complying with any recordkeeping or reporting requirement imposed by any other Federal, State or local law, ordinance, regulation or rule." 29 C.F.R. § 516.1(c). Thus, there is nothing in the state recordkeeping requirements that presents an obstacle to the accomplishment or execution of the goals of the Fulbright-Hays Act or federal regulations.

Cultural Care further argues that the Fulbright-Hays Act and the federal regulations create "a central, uniform process" for oversight of the *au pair* program, which would be frustrated if the program were subject to varying state or local rules. Pl.'s Opp. 21 [#21]. As discussed above, Cultural Care's emphasis on uniformity is unavailing. Further, the references to uniformity in the 1994 and 1995 rules do not lend themselves to the conclusion that lack of uniformity would pose anything beyond mere tension between the federal and state laws, not an actual conflict.

Cultural Care also argues that the domestic workers laws would frustrate the purposes of the Fulbright-Hays Act because *au pairs* would receive more benefits than United States citizens employed as child care providers. It states that, unlike American child care workers, *au pairs* also would receive educational benefits, a guarantee of room and board, limits on the number of hours they could work, and compensation even if they do not provide child care at all that week. But *au pairs* already receive these additional benefits under federal regulations without frustrating the purposes of the Fulbright-Hays Act. Indeed, Congress may well have concluded that cultural exchange would be furthered by better working conditions for *au pairs* and that domestic challenges to the cultural exchange program would be better resolved if *au pairs* were

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 19
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 18 of 22

not viewed as a cheap source of labor. Ensuring that *au pairs* are not paid less than other child care providers in the Commonwealth is consistent, not inconsistent, with these purposes.

Cultural Care also contends that regarding *au pairs* as employees would conflict with federal regulations requiring foreign nationals seeking a work visa to show that their coveted position cannot be filled by domestic labor. <u>See</u> 8 C.F.R. § 214.2(h)(1)(ii)(D), (6)(i). However, this argument fails because the federal government long has recognized that an employment relationship exists between *au pairs* and host families. Applying state domestic workers laws to *au pairs* would not have an impact on this point.

Accordingly, Cultural Care has failed to sufficiently allege that conflict preemption applies to the domestic workers laws.

### B. Preemption by the Commerce Clause

As a second ground for preemption, Cultural Care alleges that the domestic workers laws violate the Commerce Clause. The claim fails whether on a motion for dismiss for lack of standing or for failure to state a claim, because Cultural Care has failed to adequately allege that the domestic workers laws discriminate against or impose an undue burden on either interstate or foreign commerce.

The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8, cl. 3. Within the Commerce Clause, courts have recognized an implied prohibition on state and local governments from enacting legislation "inimical to the national commerce [even] where Congress has not acted[,]" known as the dormant Commerce Clause. <u>Nat'l Foreign Trade Council v. Natsios</u>, 181 F.3d 38, 61 (1st Cir. 1999), <u>aff'd sub nom.</u> <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363 (2000).

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 20
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 19 of 22

1.   Interstate Commerce

With respect to interstate commerce, the dormant Commerce Clause bars "state and local governments from impeding the free flow of goods from one state to another," regardless of whether Congress has affirmatively acted. Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). The dormant Commerce Clause prevents state and local governments from enacting "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 10 (1st Cir. 2007) (quoting Grant's Dairy -- Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 18 (1st Cir. 2000)).

Because they address only domestic workers working within the state's borders and do not differentiate between those hired from within Massachusetts and outside the state, the domestic workers laws do not discriminate on their face against interstate commerce in either purpose or effect. See id. at 10-11. Because the domestic workers laws "regulate[] evenhandedly and ha[ve] only incidental effects on interstate commerce," the court applies a balancing test announced by the Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Wine & Spirits Retailers, 481 F.3d at 11. Under the Pike balancing test, "assuming that the statute operates evenhandedly to achieve a legitimate local interest and that its effects on interstate commerce are incidental, it will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" Id. (alteration in original) (quoting Pike, 397 U.S. at 142).

Cultural Care alleges that the domestic workers laws unduly burden interstate commerce and discriminate against it

as a Massachusetts-based [p]rogram [s]ponsor with significant business in Massachusetts, by (1) interfering with [Cultural Care]'s

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 21
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 20 of 22

> ability to conduct business in Massachusetts in full compliance
> with the [State Department] [r]egulations because of inconsistent
> Massachusetts requirements; (2) imposing additional and excessive
> costs for administering the [*au pair*] [p]rogram in Massachusetts;
> and (3) adversely impacting, if not eliminating, [Cultural Care's]
> ability to conduct business in Massachusetts because of the
> excessive costs imposed on potential [h]ost [f]amilies.

Compl. ¶ 48 [#1].

At the outset, Cultural Care's role as a "Massachusetts-based [p]rogram [s]ponsor" undercuts any allegation that the domestic workers laws impose more arduous burdens on interstate commerce than they do on intrastate commerce, or discriminate against commercial activity by out-of-state residents in favor of that of its own residents. See Wine & Spirits Retailers, 481 F.3d at 12 ("After all, the plaintiffs are all [in-state] residents and, if favoritism exists, none of them could conceivably have suffered any cognizable harm as a result of it."). Further, none of the three injuries alleged by Cultural Care violate the dormant Commerce Clause, because the domestic workers laws would treat out-of-state sponsors operating an *au pair* program in Massachusetts no differently from Massachusetts-based sponsors. An out-of-state sponsor would be affected in the same manner as an in-state sponsor, as would the host families who comprise their clientele.

Cultural Care asserted at oral argument that, as a sponsor organization which has cornered the market in Massachusetts, it would be burdened on the national stage when competing with other sponsor organizations that operate primarily in states without similar protections for *au pairs*. However, such competitive disadvantage at the national level does not fall within the scope of cognizable harms protected by the dormant Commerce Cause.

In contrast, the domestic workers laws offer substantial putative local benefits in the forms of protections for a class of workers vulnerable to exploitation and clearer guidance to

Case No. 1:14-cv-03074-CMA-KMT   Document 1135-5   filed 08/15/18   USDC Colorado   pg 22
of 23
Case 1:16-cv-11777-IT   Document 37   Filed 08/01/17   Page 21 of 22

their employers. For these reasons, the putative local benefits greatly outweigh any burden that the domestic workers laws would have on interstate commerce, and Cultural Care's dormant Commerce Clause claim fails.

### 2. Foreign Commerce

Cultural Care's claim that the domestic workers laws unduly burden and discriminate against foreign commerce fares no better. "Like the dormant domestic Commerce Clause, . . . the Foreign Commerce Clause restricts protectionist policies [and] also restrains the states from excessive interference in foreign affairs." Natsios, 181 F.3d at 66. Its purpose is "to ensure that the United States speaks with a unified voice when it engages in foreign trade." Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 329 (1st Cir. 2012).

Cultural Care alleges that the domestic workers laws would result in decreased availability of *au pair* positions available for foreign nationals and an increased likelihood that prospective host families would hire domestic workers rather than foreign *au pairs*. Compl. ¶¶ 49, 50 [#1]. It further argues that the domestic workers laws would prevent Congress from speaking with one voice with respect to the *au pair* program.

Since the domestic workers laws do not facially discriminate against foreign commerce and their effects would be incidental, the Pike balancing test elucidated above applies. See Natsios, 181 F.3d at 66. Even accepting Cultural Care's allegations as true for the purposes of a motion to dismiss, the Foreign Commerce Clause claim fails this test because of the high putative local benefits of protecting an at-risk population of workers and clarifying employer obligations. Any impact on the market for *au pairs* in Massachusetts would not clearly exceed such benefits.

Contrary to Cultural Care's suggestion, this is not a circumstance in which the state is

"add[ing] . . . [or] tak[ing] from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States." <u>Toll v. Moreno</u>, 458 U.S. 1, 11 (1982) (quoting <u>Torao Takahashi v. Fish & Game Comm'n</u>, 334 U.S. 410, 419 (1948)). Far from regulating immigration status, the laws at issue here provide labor protections to domestic workers throughout the state, regardless of whether they are *au pairs* living and working in Massachusetts on a J-visa, citizens, or holders of another immigration status.

Consequently, Cultural Care has not sufficiently alleged violation of the Foreign Commerce Clause.

IV. <u>Conclusion</u>

For the foregoing reasons, the Attorney General's <u>Motion to Dismiss</u> [#19] is ALLOWED.

IT IS SO ORDERED.

Date: August 1, 2017                                      /s/ Indira Talwani_____
                                                          United States District Judge