# Exhibit 25

Case No. 1:14-cv-03074-CMA-KMT Document 1174-25 filed 11/13/18 USDC Colorado pg 1 of 15

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
-------------------------------x

JOHANA PAOLA BELTRAN, ET AL,

            Plaintiffs,

   v.               Civil Case No.
                       14-cv-03074-CMA-KMT

INTEREXCHANGE, INC., ET AL.,

            Defendants.

-------------------------------x


      CONFIDENTIAL VIDEOTAPED DEPOSITION
            OF RUTH FERRY
          NEW YORK, NEW YORK
        Thursday, May 11, 2017


Reported by:

JEREMY RICHMAN

JOB NO:  314334


       MAGNA LEGAL SERVICES
    320 West 37th Street, 12th Floor
      New York, New York 10018
        (866) 624-6221



Page 154

```
 1
 2      Q.  This one refers to EduCare
 3  in America.  And EduCare in America is
 4  another program, right?
 5      A.   It's under the same Visa as
 6  the Au Pair in America program.  So
 7  it's -- the au pair program and the
 8  EduCare program is just the -- the
 9  regulations for the EduCare component
10  are written differently in the federal
11  regulations.
12      Q.   And the primary difference
13  between those two programs is what you
14  spell out in the first bullet point,
15  right, where it says, "This program is
16  for someone who prefers to spend more
17  time studying and less time caring for
18  the host family's children"?
19      A.   That's correct.
20      Q.   The second bullet point
21  says, "With EduCare, you will work up
22  to 30 hours a week instead of
23  45 hours.  You will earn slightly less
24  pocket money.  However, your U.S.
25  1,000 study allowance allows you to
```

Page 155

```
 1
 2  take courses for six hours a week,"
 3  correct?
 4      A.   Yes.
 5      Q.   The reason that you're able
 6  to say you will earn slightly less
 7  pocket money is because your
 8  organization understands exactly how
 9  much the au pair is expected to earn
10  in each of these programs, correct?
11          MR. MACRI:  Objection as to
12      form and foundation.
13      A.   Well, they need to
14  understand that the minimum pocket
15  money that they earn will be less than
16  the 195.75.
17      Q.   Right.  But you just said
18  the minimum.
19      A.   Yes.
20      Q.   It doesn't say minimum in
21  the document, right?
22      A.   Well, this is a marketing
23  and sales document.
24      Q.   Right.  But my question is
25  just, it doesn't say minimum in the
```

Page 156

```
 1
 2  document, right?
 3      A.   No.  It does not say minimum
 4  in the document.
 5      Q.   It says, "You will earn
 6  slightly less pocket money," correct?
 7      A.   It does state that, yes.
 8      Q.   And the reason that your
 9  organization is able to say that is
10  because you have an understanding of
11  how much pocket money a person is
12  going to get in EduCare and in the au
13  pair program, right?
14      A.   Yes.
15      Q.   And that's reflected in the
16  documents, the amount that you expect
17  them to earn, right?
18      A.   Yes.
19      Q.   Now, let's take a look at
20  what we're going to mark as
21  Exhibit 10.
22          (Exhibit 10, marked for
23      identification, Bates stamped
24      AIFS0058479.)
25      Q.   Do you recognize this
```

Page 157

```
 1
 2  document, Ms. Ferry?
 3          MR. JACKSON:  And just for
 4      the record, this is a document
 5      that was produced in native
 6      format.  The Bates number that
 7      corresponds with this document is
 8      AIFS0058479.
 9      Q.   Ms. Ferry, what is this
10  document?
11      A.   I believe this document is a
12  PowerPoint presentation that can be
13  used by a community counselor to use
14  in doing a presentation in front of, I
15  would presume, a group of interested
16  families to give an overview of the
17  program and as a way to educate them
18  about the possibility of joining the
19  Au Pair in America program.
20      Q.   Right.  Can we go to the
21  fourth page of this document, the one
22  that starts with, "Added benefits of
23  live-in childcare with   Au Pair in
24  America"?
25      A.   Mm-hmm.
```

Page 158

```
 1
 2      Q.   The second bullet point on
 3   that page is, "Only $347 per week.
 4   That's per family, not per child,"
 5   with an exclamation point, correct?
 6      A.   That's correct.
 7      Q.   How was that $347
 8   calculated?
 9      A.   I would presume that would
10   have been calculated based on the --
11   what year this is -- the program fee
12   prorated, plus the weekly pocket money
13   prorated, to establish a per week
14   average rate.
15      Q.   Right.  And the
16   reasonable -- what your organization
17   is attempting to communicate in this
18   particular bullet point is that the
19   host family can expect to only pay
20   $347 per week when you add the stipend
21   that they'd be expected to pay and the
22   prorated amount?
23           MR. MACRI:  Objection as to
24      form.
25      A.   Well, that's the hook.
```

Page 159

```
 1
 2      Q.   What do you mean when you
 3   say that's the hook?
 4      A.   Well, you're trying to get
 5   the lead in the door.  You're trying
 6   to get the customer interested.
 7      Q.   Okay.
 8      A.   Once you have the lead in
 9   the door, then you have to start
10   educating them about the program, you
11   know, the room and board, the private
12   room, the transportation, the
13   educational benefit, the limitation on
14   hours, the -- whatever it is, the
15   support services.  There's a whole
16   litany of stuff.
17      Q.   But you would agree --
18      A.   And then you would -- then
19   you would give them the program fee.
20   We would -- we would hand out
21   brochures.
22           Every brochure would have a
23   program fee insert that would describe
24   the program fees, the minimum stipend
25   amounts, how they're described and
```

Page 160

```
 1
 2   established by the Department of
 3   State.
 4           This is not giving them all
 5   those details.  These are a few
 6   highlights.
 7      Q.   Okay.  But you would agree
 8   that that's a -- that's a pretty
 9   important detail, the amount of money
10   that they can expect to pay?
11           MR. MACRI:  Objection as to
12      form.
13      A.   Repeat the question.
14      Q.   You would agree with me that
15   one of the most important details to
16   be communicated to the host families
17   is the amount of money that they can
18   expect to pay, right?
19      A.   I think there are many other
20   details that need to be communicated
21   as well, but I would agree with you
22   that before a family -- and this is
23   not -- this is an introductory piece.
24           Before a family is even
25   thinking about applying to the
```

Page 161

```
 1
 2   program, they're going to know -- need
 3   to know many more details about the
 4   fees and the full investment of their
 5   financial investment in the program.
 6      Q.   Right.  But you'd agree with
 7   me, correct, that one of the most
 8   important details is the amount of
 9   money they can expect to pay?
10      A.   That will be one of the most
11   important details.
12      Q.   And the implication from
13   this part of the slide is that they
14   can expect to pay only $347 per week,
15   right?
16           MR. MACRI:  Objection as to
17      form.  Counsel is stating
18      argument, not posing questions.
19           You need to ask questions.
20      That's how I understand a
21      deposition to work.
22           MR. JACKSON:  Your objection
23      is fully noted.
24      Q.   Now, could you please answer
25   the question, ma'am?
```



41 (Pages 158 to 161)

Page 162

```
 2      A.   I don't know what question
 3   I'm answering.
 4      Q.   The question is, the
 5   implication from this part of the
 6   slide is that the host families can
 7   expect to pay only $347 per week,
 8   correct?
 9      A.   That is an implication
10   stated here.
11      Q.   Okay.
12      A.   Long before they join the
13   program, they're going to learn
14   differently.
15      Q.   Okay.  But that's the
16   implication from this part of this
17   slide, correct?
18      A.   Yes.
19           MR. JACKSON:  Now, can we go
20      to -- let's mark Exhibit 11,
21      which is a document with Bates
22      number AIFS0059062.
23           (Exhibit 11, marked for
24      identification, Bates stamped
25      AIFS0059062.)
```

Page 163

```
 2      Q.   Do you recognize this
 3   document?
 4      A.   I do.  I haven't seen a CQ
 5   in a long time.
 6      Q.   What is a CQ?
 7      A.   It's a communication
 8   newsletter that we used to prepare and
 9   distribute to community counselors.
10   It was a form of communicating
11   information out.  It was a monthly
12   newsletter.
13      Q.   And this particular CQ has
14   the heading, Germany, Our Number One
15   Recruiting Country?
16      A.   Yes, it does.
17      Q.   What is that a reference to?
18      A.   Germany is our number one
19   country that we recruit au pairs from,
20   meaning we recruit more au pairs from
21   Germany.
22      Q.   Is that still the case?
23      A.   It is still the case, but
24   not for much longer.  Birth rate is
25   going down.
```

Page 164

```
 2      Q.   Let me ask you about that.
 3   So, first, why is it the number one
 4   country that you recruit from?
 5      A.   Oh, Germans -- Germans --
 6   born and bred in their culture is gap
 7   year.  Finish high school.  Go away.
 8   Do something for a year.  Come back
 9   and start university.  That's what
10   they do.
11      Q.   And you said that it's not
12   going to be the number one country for
13   long.  Why is that?
14      A.   Birth rate is declining.
15      Q.   Does the organization do
16   advertising in Germany?
17      A.   Yes.  We have a subsidiary
18   office in Germany.
19      Q.   What kind of advertising do
20   you do for potential au pairs there?
21   And by that, just to be a little bit
22   more clear, I mean, are you utilizing
23   newspapers, internet, word of mouth?
24   What are the forms of --
25      A.   Well, most of it is now
```

Page 165

```
 2   internet rather than print or paper
 3   advertising.  So most of it is
 4   internet advertising, referral,
 5   information sessions.
 6           So going out to -- in
 7   Germany, it's not uncommon to go into
 8   schools to -- a year or two before
 9   students are graduating to educate
10   them about.
11           Like schools will hold fairs
12   so that students can find out what
13   they could possibly consider doing in
14   their gap year.
15      Q.   You said most of it is
16   internet now.  Does that include your
17   website?
18      A.   I'm not sure what you mean.
19   Does that include my website?
20      Q.   Well, I mean, is the website
21   one of the internet tools that you
22   utilize, I guess, as part of your
23   marketing efforts or your recruitment
24   efforts?
25      A.   Yes.
```

Page 194

```
 1
 2      A.   Can I make a comment?
 3      Q.   Hold off.
 4           MR. MACRI:  We're marking
 5   this as?
 6           MR. JACKSON:  We're marking
 7   this as 14.
 8           MR. MACRI:  Can we put the
 9   other ones on the record?
10           MR. JACKSON:  Sure.
11           MR. MACRI:  And if you want
12   to hold them and then go back and
13   forth, because, otherwise, when
14   you're reading, we're not going
15   to know where 14 was introduced
16   for the first time.
17           MR. JACKSON:  Sure.
18   Absolutely.
19           MR. MACRI:  Thank you very
20   much.
21           MR. JACKSON:  Let's take --
22   I think the missing ones are 11
23   and -- no.  We have 11.  I think
24   12 and 13 are the missing ones.
25           MR. MACRI:  There's no
```

Page 195

```
 1
 2   question before you.
 3           So 12, 13, and 15 would be
 4   the gap numbers.
 5           MR. JACKSON:  I think we
 6   already --
 7           MR. MACRI:  12, 13, and 15
 8   are the gaps by my count.
 9           MR. JACKSON:  Yes.
10   Absolutely.  So this is 12.  Mark
11   this as 12.
12           MR. MACRI:  This last one,
13   Bates 193?
14           MR. JACKSON:  Yes.  Mark
15   that as 12.
16           (Exhibit 12, marked for
17   identification, Bates stamped
18   AIFS0000193.)
19           MR. JACKSON:  We have a
20   document that is Bates AIFS2079
21   that we'll mark as 13.
22           (Exhibit 13, marked for
23   identification, Bates stamped
24   AIFS0002079.)
25           MR. JACKSON:  Then we have a
```

Page 196

```
 1
 2   document that is marked
 3   AIFS67245, which we'll mark as
 4   Exhibit 15.
 5           (Exhibit 15, marked for
 6   identification, Bates stamped
 7   AIFS0067245.)
 8           MR. MACRI:  Thank you.
 9      Q.   Now, I think we were looking
10   at Exhibit 14 a moment ago.  And if we
11   can take a look at Exhibit 14, this is
12   a document ending in Bates 62005, with
13   the date June 16, 2009, at the top,
14   correct?
15      A.   Correct.
16      Q.   And this is a form letter or
17   draft that is signed by whom?
18      A.   Myself.
19      Q.   Do you remember putting this
20   together?
21      A.   Yes, I do.
22      Q.   And one of the things that
23   you have identified here in this
24   letter is that effective July 24,
25   2009, the weekly stipend will increase
```

Page 197

```
 1
 2   from 176.85 to 195.75, correct?
 3      A.   That's correct.
 4      Q.   Who is this letter directed
 5   towards?
 6      A.   Au pairs.
 7      Q.   Is there anywhere in this
 8   letter that you communicate to the au
 9   pairs that the weekly stipend is
10   negotiable?
11      A.   Well, I don't know what the
12   -- no.
13      Q.   Okay.
14      A.   Simple answer.
15      Q.   Now, let's take a look at
16   Exhibit 13 -- no.  I'm sorry.  Let's
17   take a look at Exhibit 12.
18           It might be helpful if I
19   take some of those back from you.  I'm
20   about to hand 12 to you.
21      A.   Well, these are the ones
22   we've reviewed.  These, we've not
23   reviewed.
24      Q.   Great.  That's fine.  I just
25   didn't want to overload you with
```



Page 198

1
2  paper.
3      A.   You can't help it.  You're a
4  lawyer.
5      Q.   So Exhibit 12 is a document
6  with Bates number AIFS0000193.  Do you
7  recognize this document?
8      A.   I don't know if -- yes and
9  no.  What I don't know is whether page
10 one and two and three are all part of
11 the same document or separate
12 documents.
13     Q.   Right.  Well, you --
14     A.   But they're marketing
15 documents, marketing pieces.
16     Q.   Right.
17     A.   And so it could have been
18 part of a poster.
19     Q.   Okay.  Do you recognize what
20 is reflected on the first page as a
21 capture of what has appeared on your
22 website?
23     A.   I don't know that it would
24 be necessarily characterized exactly
25 the same way on the website, but it is

Page 199

1
2  a promotional piece to try and entice
3  families, if you will, to come and
4  learn more about the program.
5      Q.   And when you say entice
6  families, that goes back to the sort
7  of hook that you were talking about
8  earlier, right?
9      A.   Yes.
10     Q.   Okay.
11     A.   Get the lead.
12     Q.   Get the lead.
13          And one of the things that
14 is reflected here, at the top of this
15 particular document, underneath Au
16 Pair in America, the top heading is
17 Looking for Affordable Dependable
18 Childcare, correct?
19     A.   Yes.
20     Q.   And the reason that that's
21 the heading is because that is -- in
22 terms of the enticement and the hook,
23 that's the biggest selling point,
24 right?
25          MR. MACRI:  Objection as to

Page 200

1
2  form and foundation.
3      A.   Yes.
4      Q.   Now, in the first bullet
5  point, where it says, "Having an au
6  pair is affordable," under the "Did
7  you know," it reads, "A standard au
8  pair costs less than $8 per hour for
9  the 45 hours of childcare per week.
10 This fee is per family, not per
11 child," with an exclamation point,
12 correct?
13     A.   Correct.  It does state
14 that.
15     Q.   How is that $8 per hour for
16 the 45 hours of childcare per week
17 calculated?
18     A.   I presume it was taking the
19 program fee, prorating that, and
20 taking the weekly stipend amount and
21 prorating that.  And that's it.  No
22 more explanation there.
23     Q.   Right.  And so you would
24 agree with me that the reasonable
25 inference from this is that there's a

Page 201

1
2  fixed fee associated with having an au
3  pair?
4          MR. MACRI:  Object as to
5       form and foundation.
6      A.   True.  But a family couldn't
7  join the program and still be thinking
8  that.
9      Q.   Right.  So it's your
10 expectation that a family may look at
11 this and come to the conclusion that
12 there's a fixed fee, but at some point
13 later in the process, they'll be
14 disabused of that notion?
15     A.   That's correct.
16     Q.   Why not just put that in the
17 promotional materials and make it
18 clear from the outset?
19     A.   And put everything else in?
20     Q.   Well, you would agree that,
21 as you said, that's one of the most
22 important things, in terms of this
23 enticement and the hook, the
24 affordability component of this,
25 right?

Page 202

```
 1
 2       A.   Right.
 3       Q.   And so wouldn't it be more
 4  clear, in terms of what the
 5  affordability is, if you made some
 6  allowance in this document, in this
 7  enticement portion, for the fact that
 8  it's not a fixed fee?
 9            MR. MACRI:  Objection as to
10       form.
11       A.   Well, I'm not the marketing
12  expert, but I think our organization
13  looks at advertising trends, if you
14  will, and advertising techniques, not
15  only across the au pair program, but
16  other types of programs.  And this is
17  a competitive piece.
18            What's going to attract you
19  to get in touch with me so Au Pair in
20  America can tell you more about this
21  program?
22       Q.   What other -- you just
23  mentioned advertising techniques that
24  you look at, not only across the au
25  pair program, but other types of
```

Page 203

```
 1
 2  programs.
 3            What other types of programs
 4  have you looked at, where there was an
 5  indication of a fixed cost in the
 6  advertisement, but later on, it was
 7  going to be revealed that it was not a
 8  fixed cost?
 9            MR. MACRI:  Objection as to
10       form and foundation.
11       A.   I'm not particularly
12  familiar with any in particular,
13  because I probably wouldn't have
14  continued to find out what the other
15  costs would be if I wasn't shopping
16  myself.
17       Q.   Okay.  But what I'm asking
18  is, a moment ago, you said that your
19  organization looks at advertising
20  trends, not only across the au pair
21  program, but other types of programs,
22  and that that was the reason that you
23  had decided to indicate in the
24  advertisements that there would be a
25  fixed fee, when, in reality, the fee
```

Page 204

```
 1
 2  was flexible.
 3            What I'm asking is what you
 4  looked at.
 5       A.   Well, this -- the fee being
 6  flexible is -- this doesn't even
 7  include all of the fees.  This doesn't
 8  include the educational monies.  This
 9  doesn't include the room and board.
10  This doesn't include the private room.
11  This doesn't include the
12  transportation costs.  This doesn't
13  include -- there are many things that
14  this doesn't include.
15       Q.   I understand that, ma'am.
16  I'm only asking, what are the other
17  types of advertising that you looked
18  at?
19       A.   It would be likely that we
20  would look at other au pair programs.
21  It would be likely that we would look
22  at nanny programs, maybe not so much
23  programs, but nanny advertising.
24            Those would be the two
25  bigger components.  So it's sort of
```

Page 205

```
 1
 2  the one-on-one childcare.  Possibly,
 3  childcare centers or in-home
 4  childcare.  It's being awareness of
 5  your broad spectrum of childcare.
 6       Q.   All right.  And to the
 7  extent this is just a hook, you're
 8  aware that the person who is going to
 9  be hooked by this is going to have a
10  misimpression about whether or not
11  this is a fixed fee at this point,
12  right?
13       A.   At this point.  Absolutely.
14       Q.   Now, can I ask you to take a
15  look at Exhibit 13, which we already
16  marked?
17            Now, this is a document
18  ending in Bates stamp number 2079.
19  Are you familiar with this document,
20  ma'am?
21       A.   I don't know that I'm
22  familiar with this specific document.
23  I'm certainly familiar with the
24  content of the document.
25       Q.   This is a fact sheet that
```

Page 206

```
 1
 2   talks about the Au Pair in America
 3   program, correct?
 4       A.   Correct.
 5       Q.   Who is this fact sheet
 6   targeted towards?
 7       A.   I don't know.  I don't know
 8   whether it's an internal, you know,
 9   fact sheet prepared just to inform the
10   staff about -- to give them some
11   background and kind of general broad
12   understanding of the program, because
13   there's outcomes, assessment data
14   here.
15           There's -- it could have
16   been part of a review document
17   extracted from a bigger review
18   document.  I don't know.
19       Q.   About halfway down on the
20   page, there's a section that says
21   Screening and Placement.
22           Do you see that?
23       A.   Yes, I do.
24       Q.   The first sentence reads,
25   "Au Pair in America uses a thorough
```

Page 207

```
 1
 2   and rigid multitiered screening
 3   process"?
 4       A.   Correct.
 5       Q.   Can you describe this
 6   thorough and rigid multitiered
 7   screening process?
 8       A.   Yes, I can.  We have,
 9   basically, a three-tier screening
10   process.  So the au pairs are first --
11   their application documents are
12   reviewed by the interviewer.
13           The interviewer conducts a
14   face-to-face interview with the au
15   pair, does a reference check on the
16   references that are submitted by the
17   au pair.
18           So there is a telephone
19   check to verify that the reference was
20   indeed prepared by the referee who
21   says they prepared it and the accuracy
22   of its content.
23           When that application is
24   complete, it goes -- this is -- the
25   interviewer is based in the home
```

Page 208

```
 1
 2   country, where the au pair resides.
 3           Then the application is
 4   moved in through to the partner
 5   headquarters, who then reviews the
 6   application.  And they do a secondary
 7   check on English.
 8           The au pair will then
 9   complete -- this is an older version,
10   because it refers to a CPI inventory.
11   We currently use a 16PF personality
12   profile test.  They take that test.
13           The results of that test and
14   the application are forwarded through
15   to our London office, unless it's
16   Germany, Austria, Switzerland.
17           And the London team there
18   are broken down into servicing groups
19   by country.  So the applications are
20   then reviewed by an application
21   reviewer there.
22           And there are specific
23   people trained to analyze and review
24   the CPI personality profile test
25   results.
```

Page 209

```
 1
 2           Any -- they do spot checking
 3   on English language skills or any
 4   questions that pop up.  They'll go
 5   back either to the interviewer or the
 6   partner or contact the au pair
 7   directly.
 8           And then when they're
 9   satisfied that the application is
10   fully complete, criminal background
11   check is in, medical report is in,
12   they will forward a completed
13   application through to our offices.
14       Q.   Okay.  Thank you.
15           Now, if I could ask you to
16   turn to page two of this document.  In
17   the section on this page,
18   approximately three-quarters of the
19   page down, that says Programs and
20   Fees, Host Family Fees, in the first
21   line there, it says standard 45 hours,
22   correct?
23       A.   Correct.
24       Q.   What is that referring to?
25       A.   Well, it -- it means up to
```

Page 226

```
 1
 2   that written agreement, is there a
 3   policy about when the host family is
 4   informed that the 195.75 is a fixed
 5   fee?
 6        MR. MACRI:  Is not a fixed
 7     fee.
 8        MR. JACKSON:  Sorry.
 9        THE WITNESS:  Yeah.  I was
10     going to say the same thing.
11     A.   There is no specific period
12   of time in the process that I can
13   think of that would say, at this point
14   in time, everyone must be told now
15   this is a minimum.
16     Q.   So there's no specific point
17   that you train the people who are
18   communicating with those families, at
19   which they're supposed to disabuse
20   them of any notions they may have had
21   about the fixed fee?
22        MR. MACRI:  Objection as to
23     form.
24     A.   I'm not -- it's -- the
25   program's obligation is to ensure that
```

Page 227

```
 1
 2   the au pair receives her minimum
 3   amount.
 4        It is not up to the program
 5   to determine, just as in anything else
 6   within the compensation package, that
 7   if the family wants to offer an
 8   increase in the stipend, a television
 9   in the bedroom, extended car usage,
10   whatever in that compensation that the
11   family chooses to offer, the program
12   does not insert itself into that
13   decision -- that decision making.
14     Q.   Okay.
15     A.   And we don't stipulate what
16   kind of gifts you can or cannot extend
17   to an au pair, for example.
18     Q.   Without a policy -- I'm
19   sorry.
20     A.   And so to the extent that --
21   it's our obligation just to make sure
22   that she gets the minimum, and it's
23   our obligation to make sure that she
24   is not in a situation where she is
25   working more than the upper limit of
```

Page 228

```
 1
 2   hours, 45 hours, so that she has not
 3   agreed to take in kind for other gifts
 4   and/or monetary benefits in order to
 5   work more than 45 hours.
 6     Q.   Okay.  So there was a lot of
 7   information communicated there, and I
 8   appreciate that.  I just want to be
 9   clear on my question, because I think
10   that -- I think that it is a yes or no
11   question.
12        If it can't be answered that
13   way, you can let me know that it can't
14   be answered that way, but the question
15   I'm asking is, there is no specific
16   point that you train the people who
17   are communicating with the families,
18   This is the point at which you're
19   supposed to disabuse them of any
20   notions that they may have that this
21   is a fixed fee?
22        MR. MACRI:  Objection as to
23     form.
24     A.   I think I did answer that
25   question in the beginning, before I
```

Page 229

```
 1
 2   rattled on.
 3     Q.   And to be clear, your answer
 4   is, there is no specific point?
 5     A.   Not that I can recall.
 6     Q.   Without having somewhere in
 7   your policy a specific point like
 8   that, there's a risk, isn't there,
 9   that that information will slip
10   through the cracks?
11     A.   No.  Because there is an
12   agreement between the hosting family
13   and the au pair.
14     Q.   But the agreement doesn't
15   specify what the amount is, does it?
16     A.   Yes.
17     Q.   The agreement between the au
18   pair --
19     A.   The agreement specifies what
20   the minimum amount is that the au pair
21   must receive on a weekly basis.
22     Q.   It's specifies the dollar
23   amount?
24     A.   The minimum dollar amount
25   that the    au pair must receive on
```

Page 230

```
 1
 2  the weekly stipend.
 3      Q.  And the reason it does is
 4  because without that information,
 5  there would be a real risk of that
 6  information slipping through the
 7  cracks, right?
 8          MR. MACRI:  Objection as to
 9      form and foundation.
10      A.  Well, I'm not sure what you
11  mean by falling through the cracks.
12      Q.  Well, there would be a risk,
13  if that information -- if that dollar
14  amount was not specified in the
15  agreement, at a minimum, there would
16  be a risk that the au pairs never
17  learned that this is just the minimum
18  and what the minimum was supposed to
19  be?
20      A.  I think it would -- well,
21  the directive would have gone back to
22  the program materials, which state the
23  dollar amount.
24          So in some of the
25  agreements, there may be a reference
```

Page 231

```
 1
 2  to, you know, according to the
 3  Department of State, you know, stipend
 4  levels, as, you know, it appears in
 5  program materials.
 6          It was probably something
 7  along those lines, because there --
 8  they would be -- could any -- if
 9  they're in mid contract with a host
10  family and an au pair and the
11  Department of State or the government
12  increases the wage levels, then the
13  stipend is going to shift and change.
14      Q.  So what you're saying is,
15  there are some agreements that Au Pair
16  in America has that doesn't -- that
17  don't have a specific dollar amount in
18  them?
19      A.  Yes.  That's the answer.
20      Q.  And with regard to those,
21  it's your expectation that an au pair
22  can figure out what the specific
23  dollar amount minimum is by going back
24  and finding certain program materials?
25          MR. MACRI:  Objection as to
```

Page 232

```
 1
 2      form and foundation.
 3      A.  Or they could ask the
 4  question.
 5      Q.  Or they could ask the
 6  question?
 7      A.  Or they could ask the
 8  organization.
 9      Q.  Who in the organization?
10      A.  They could ask the community
11  counselor.  They could ask any of our
12  staff.  They could ask any of our
13  London staff.  They could ask our
14  staff.
15      Q.  Now --
16      A.  We also do a regulatory
17  check.  We check with the family and
18  the au pair that the stipend is being
19  received when we go in for the
20  two-week assessment.
21      Q.  What you mentioned a moment
22  ago is that to the extent that there's
23  any ambiguity in the agreement, they
24  can go back and look at the program
25  materials, right?
```

Page 233

```
 1
 2      A.  They can.
 3      Q.  Okay.  But many of the
 4  program materials are misleading on
 5  their face as to whether or not the
 6  stipend amount is a fixed fee or a
 7  minimum?
 8          MR. MACRI:  Objection as to
 9      form and foundation.
10      A.  I don't -- in forms where
11  you're not using the term minimum,
12  which has been missed from some
13  documents, but we have not used the
14  term minimum, nor have we said
15  maximum, nor have we said fixed.
16      Q.  Right.  But you do agree
17  with me that where a document says the
18  weekly stipend amount is X, the
19  reasonable implication of that is that
20  it's a fixed fee?
21          MR. MACRI:  Objection as to
22      form.
23      A.  Okay.  Agreed.
24      Q.  Now, I want to show you a
25  document that's been marked as
```

Page 234

1
2  Exhibit 15. It's already been marked.
3      And this is a document that
4  was sent by Sarah Friedman to au pairs
5  regarding the Au Pair in America
6  extension program, correct?
7      A.  Correct.
8      Q.  Who is Sarah Friedman?
9      A.  Sarah Friedman is the
10 compliance education program
11 coordinator.
12     Q.  What does the compliance
13 refer to? Compliance of what?
14     A.  She's an alternate
15 responsible officer and is responsible
16 for some of the compliance of the use,
17 for example, of the SEVIS system,
18 issuance of VS2019 forms, needs to be
19 fully informed on appropriate use and
20 transport of any government documents.
21     She's involved in the
22 preparation of the annual audit and
23 annual report that is prepared and
24 submitted to the Department of State
25 each year.

Page 235

1
2      Q.  And this document starts
3  with the words, "Dear Au Pair, Good
4  news. You can apply to remain in the
5  United States for up to an additional
6  12 months through the Au Pair in
7  America extension program," correct?
8      A.  Correct.
9      Q.  And the point of this is
10 communicating to the au pairs that
11 they can stay for an additional
12 12 months through this program, right?
13     A.  To those au pairs who have
14 successfully tracked to complete their
15 first year.
16     Q.  Now, one of the other points
17 of this letter is to communicate to
18 these au pairs, who are potentially
19 going to be extended, some of the
20 important information that they need
21 to be aware of that relates to their
22 extension, right?
23     A.  That's correct.
24     Q.  And one of the things that's
25 communicated here are a series of

Page 236

1
2  answers to what you identify as
3  frequently asked questions, right?
4      A.  Correct.
5      Q.  So turning to the fourth
6  page of this document, which ends in
7  Bates number 7248, the fourth question
8  on this document is, "Will my weekly
9  stipend increase," right?
10     A.  Correct.
11     Q.  And what the document states
12 is, "The weekly stipend amounts for
13 the extension year are 195.75 for au
14 pairs, $250 for Au Pair
15 Extraordinaire, and 146.81 for EduCare
16 companions," correct?
17     A.  Correct.
18     Q.  And nothing there
19 communicates that this is just a
20 minimum, right?
21     A.  Yes.
22     Q.  I'm correct?
23         MR. MACRI: She answered
24 you.
25     A.  Yes.

Page 237

1
2      Q.  Right.
3         MR. JACKSON: That's it.
4      Q.  And so where it says the
5  weekly stipend amounts for the
6  extension year are 195.75 for au
7  pairs, that's referring to the stipend
8  amount that applies to people in the
9  standard au pair program?
10     A.  That's correct.
11     Q.  And is there anywhere in
12 this frequently asked questions
13 section that talks about -- that talks
14 about the degree to which these
15 amounts can be negotiated with the
16 host families?
17     A.  No. Nor does it talk about
18 what other compensation part of their
19 package may be negotiated.
20     Q.  Let me just repeat my
21 question.
22     Is there anywhere in here
23 that talks about the fact that this
24 is -- that these weekly stipend
25 amounts can be negotiated with the

Page 238

 1  host families?
 2      A.  No.
 3      Q.  Now, the fact of the matter
 4  is, that's a question that au pairs
 5  sometimes posed to employees at your
 6  organization, right?
 7          MR. MACRI:  Objection as to
 8      form and foundation.
 9      A.  No.  I don't think I ever
10  implied that.  I said that if an au
11  pair did not know what the minimum
12  weekly stipend was, they could contact
13  our office, and we would inform them.
14      Q.  The question I'm asking is,
15  did    au pairs ever direct
16  questions to your office about whether
17  that amount was negotiable?
18      A.  Not directly in that way.  I
19  would think that would be an unusual
20  question.  It would be more usual for
21  an au pair to ask about other
22  compensation benefits that might be
23  made available to them.
24      Q.  Let me just ask you this.

Page 239

 1  Directly or indirectly, did any au
 2  pairs that you're aware of ever direct
 3  any questions to your office about
 4  whether or not the weekly stipend
 5  amount was negotiable?
 6          MR. MACRI:  Objection as to
 7      form.
 8      A.  I'm not sure that the
 9  question would come into the office in
10  that manner, but we have over 5400 au
11  pairs in the country on any given day,
12  and they're coming and going.
13          Is it possible that there
14  are au pairs that called in and said,
15  I want to know if this is negotiable?
16          We would have to tell them
17  it's negotiable.  And it's not a term
18  that I think would be used generally
19  by au pairs.
20          Is my weekly stipend -- it
21  can't be -- can it be more than
22  195.75?  Yes.  Can I work more than
23  45 hours?  No.
24      Q.  So your office did get the

Page 240

 1  question sometimes from au pairs, Can
 2  the weekly stipend be more than
 3  195.75?
 4      A.  Certainly.
 5          MR. MACRI:  Objection as to
 6      form.
 7      Q.  I'm sorry.  Your answer is
 8  certainly?
 9      A.  Yes.
10      Q.  And that's not a question
11  that you have identified as a
12  frequently asked question, correct?
13      A.  Correct.
14      Q.  That is, however, a
15  frequently asked question?
16          MR. MACRI:  Objection as to
17      form and foundation.
18      A.  No.
19      Q.  So you would characterize it
20  as infrequently asked?
21      A.  Correct.
22      Q.  Okay.  Less frequently asked
23  than all the questions that are
24  described here?

Page 241

 1      A.  Oh, yeah.
 2      Q.  Okay.  Is there any document
 3  that is created by your organization
 4  of which you are aware that responds
 5  to the question, Can my stipend be
 6  more than the 195.75?
 7      A.  Not that I'm aware of.
 8      Q.  Let's take a look at a
 9  document.
10          MR. JACKSON:  Let's mark a
11      document as Exhibit 17.  I'm
12      going to mark -- I'd like to mark
13      Exhibit 17 through 21.
14          (Exhibit 17, marked for
15      identification, Bates stamped
16      AIFS0000090.)
17          (Exhibit 18, marked for
18      identification, 2015 general tax
19      information for au pairs.)
20          (Exhibit 19, marked for
21      identification, Bates stamped
22      AIFS0000723.)
23          (Exhibit 20, marked for
24      identification, Bates stamped



Page 242

```
 1
 2        AIFS0001290.)
 3           (Exhibit 21, marked for
 4        identification, Bates stamped
 5        AIFS0002665.)
 6        Q.   Take a look at Exhibit 20.
 7   It's a document with Bates number
 8   AIFS0001290.  Do you recognize this
 9   document?
10        A.   No.  It's got a little
11   bit of everything in it.  Pick up your
12   au pairs.
13        Q.   This is a fact sheet.
14        A.   This looks like a document
15   that might have been prepared by a
16   local coordinator, because it's
17   specific to New Jersey license,
18   driver's license, and IDLs.
19        Q.   Right.
20        A.   Social Security office in
21   Montclair, education in New Jersey.
22        Q.   Right.  This is a document
23   that reflects instructions to an au
24   pair family regarding how to work with
25   their au pair in the first few days,
```

Page 243

```
 1
 2   right?
 3        A.   That's correct.
 4        Q.   And at the top of the
 5   document, it's talking about picking
 6   up the au pair?
 7        A.   Yep.
 8        Q.   Later on, it talks about the
 9   car and the insurance -- the relevant
10   insurance information?
11        A.   Correct.
12        Q.   At the bottom of the
13   document, the last thing on the page
14   is au pair weekly stipend, right?
15        A.   Correct.
16        Q.   And it says, "As of July 24,
17   2009,  au pairs receive a weekly
18   stipend of $196, EduCare $147 a week,"
19   right?
20        A.   Correct.
21        Q.   Now, this is a document that
22   is designed to be given -- is given to
23   a host family well after the initial
24   hook?
25        A.   And after they've signed an
```

Page 244

```
 1
 2   agreement between their host family
 3   and au pair.
 4        Q.   Right.  So this is
 5   substantially into the process of a
 6   host family interacting with your
 7   organization, right?
 8        A.   Correct.
 9        Q.   And so at this point, at the
10   point at which the family is receiving
11   this document, they're well past the
12   point where you need to entice them in
13   with the types of information we were
14   talking about earlier, right?
15           MR. MACRI:  Objection as to
16        form and foundation.
17        A.   Yes.
18        Q.   And at the bottom, it says,
19   "As of July 24, 2009, au pairs receive
20   a weekly stipend of $196," correct?
21        A.   Correct.
22        Q.   There's no reflection in
23   that that that's just a minimum,
24   right?
25        A.   Well, at that point,
```

Page 245

```
 1
 2   presumably, the host family and the au
 3   pair, if they had established a higher
 4   amount, would have already had a
 5   discussion about that at the time they
 6   were preparing their agreement.
 7        Q.   I'm not asking about --
 8        A.   Give me something.  This is
 9   over 195.75.  It's up.
10        Q.   That's true.  It's a quarter
11   up from 195.75.  That's true.
12        A.   Come on.
13        Q.   But whatever the case may
14   be, there's nothing on this document
15   that reflects that it's a minimum,
16   correct?
17        A.   That's correct.
18        Q.   So let's take a look at
19   Document 21, Exhibit 21.  This is
20   Bates number 2665, AIFS2665.
21           Now, this is an email chain
22   between  Au Pair in America and an
23   individual who is a host family,
24   right?
25        A.   I don't know that to be the
```

Page 246

```
 1
 2   case, but give me a minute here.  It's
 3   all been redacted.
 4        Okay.  It appears it's a
 5   communication from a hosting family
 6   who is looking to reapply to the
 7   program, is asking for a breakdown of
 8   fees, and receives a response from the
 9   placement service coordinator and then
10   goes on to say that what she really
11   wants is a deeper discount, because if
12   she goes with the competition, they
13   would -- she would get a different
14   price break.
15        Q.   And the person who is
16   communicating with this former host
17   family that's attempting to renew is a
18   woman named Karen Paris-Beck?
19        A.   That's correct.
20        Q.   She's an Au Pair in America
21   employee?
22        A.   Yes.
23        Q.   So this is a family that's
24   well past, again, the initial hook
25   part, because they've actually had an
```

Page 247

```
 1
 2   au pair before?
 3        MR. MACRI:  I will object as
 4     to form and foundation.
 5        A.   Yes.
 6        Q.   And what Karen communicates
 7   to the person who is contacting her
 8   is, the fee for a year placement
 9   beginning in 2014 would be 8,045 for a
10   standard au pair, correct?
11        A.   Correct.
12        Q.   And she's referring to the
13   fee that has to be paid to Au Pair in
14   America for the standard program,
15   right?
16        A.   Correct.
17        Q.   Then she says, you would not
18   be required to pay the $400 match fee.
19   The 35 service fee would still apply,
20   correct?
21        A.   SEVIS fee.
22        Q.   SEVIS fee.  I'm sorry.
23   Correct?
24        A.   Correct.
25        Q.   And then she communicates,
```

Page 248

```
 1
 2   the weekly stipend would be 195.75 per
 3   week, right?
 4        A.   Correct.
 5        Q.   Again, here, there's no
 6   discussion from Karen to the host
 7   family that is attempting to re-up
 8   that that is a minimum, right?
 9        MR. MACRI:  Objection as to
10     form.
11        A.   Nor does it say it's a
12   maximum.
13        Q.   Right.  There's no
14   discussion here about the idea that
15   that is a minimum?
16        A.   Correct.
17        Q.   What she communicates is a
18   fixed amount for the weekly stipend?
19        MR. MACRI:  Objection as to
20     form.
21        A.   I don't think that she
22   indicates it's a minimum, and I don't
23   think she indicates it's a maximum.
24        Q.   Right.  But you agree that
25   the reasonable inference from what's
```

Page 249

```
 1
 2   communicated here is that the fixed
 3   amount of the weekly stipend is
 4   195.75?
 5        MR. MACRI:  Objection as to
 6     form.
 7        A.   I do state -- she does state
 8   here that the weekly stipend would be
 9   195.75.
10        Q.   Right.  So you agree with
11   me?
12        A.   I agree with you.
13        Q.   One of the other aspects of
14   Au Pair in America's interaction with
15   families regarding the stipend is that
16   to the extent that a family did reach
17   out about potentially paying more than
18   the stipend, Au Pair in America would
19   actively disencourage those families
20   from paying more than the minimum,
21   right?
22        MR. MACRI:  Objection as to
23     form and foundation.
24        A.   Repeat the question.
25        Q.   Sure.  To the extent that a
```