# Exhibit 37

*Johana Paola Beltran, et al. vs.*

*Interexchange, Inc., et al.*

---

*Video Teleconferenced Deposition of Sarah Carolina Azuela*

*March 03, 2017*

---



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)  303-988-8478 (Fax)
SKReporting.com

Case No. 1:14-cv-03074-CMA-KMT Document 1174-37 filed 11/13/18 USDC Colorado pg 3 of 7

Johana Paola Beltran, et al. vs.  
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela  
March 03, 2017

Page 1

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF COLORADO
 2   -----------------------------------------X
     JOHANA PAOLA BELTRAN, et al.,
 3
                              PLAINTIFFS,
 4
 5        -against-        Case No.:
                           1:14-cv-03074-CMA-KMT
 6
     INTEREXCHANGE, INC., et al.,
 7
                              DEFENDANTS.
 8   -----------------------------------------X
 9
10              DATE: March 3, 2017
11              TIME: 9:04 A.M
12
13
14              VIDEO TELECONFERENCED DEPOSITION of
15   the Plaintiff, SARAH CAROLINA AZUELA, taken by the
16   Defendants, pursuant to a Notice and to the Federal
17   Rules of Civil Procedure, held at the offices of
18   Boies, Schiller & Flexner, LLP, 575 Lexington Avenue,
19   New York, New York 10022, before Suzanne Pastor, a
20   Notary Public of the State of New York.
21
22
23
24
25
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   BOIES SCHILLER & FLEXNER, LLP
          Attorneys for the Plaintiffs
 4        575 Lexington Avenue
          New York, New York 10022
 5        BY:   JOSHUA LIBLING, ESQ.
          212.446.2381
 6        jlibling@bsfllp.com
 7
     CHOATE HALL & STEWART, LLP
 8        Attorneys for the Defendant
          CULTURAL CARE, INC., d/b/a CULTURAL CARE AU PAIR
 9        Two International Place
          Boston, Massachusetts 02110
10        BY:   JUSTIN J. WOLOSZ, ESQ.
                617.248.5221
11              jwolosz@choate.com
                    -and-
12              LYNDSEY M. KRUZER, ESQ.
                617.248.4790
13              lkruzer@choate.com
14
     GORDON & REES
15        Attorneys for the Defendant
          AU PAIR CARE
16        555 Seventeenth Street, Suite 3400
          Denver, Colorado 80202
17        BY: PEGGY E. KOZAL, ESQ.
          303.200.6888
18        pkozal@gordonrees.com
          (Via Teleconference)
19
20   SHERMAN & HOWARD LLC
          Attorneys for the Defendant
21        INTEREXCHANGE, INC.
          633 Seventeenth Street, Suite 3000
22        Denver, Colorado 80202
          BY: BROOKE A. COLAIZZI, ESQ.
23        303.299.8471
          bcolaizzi@shermanhoward.com
24        (Via Teleconference)
25   (Continued on next page.)
```

Page 3

```
 1   A P P E A R A N C E S: (Continued)
 2
 3   FISHER & PHILLIPS, LLP
          Attorneys for Defendant
 4        APF GLOBAL NFP
          1801 California Street, Suite 2700
 5        Denver, Colorado 80202
          BY:  SUSAN SCHAECHER, ESQ.
 6        303.218.3676
          sschaecher@fisherphillips.com
 7        (Via Teleconference)
 8
 9   LEWIS ROCA ROTHGERBER CHRISTIE, LLP
          Attorneys for Defendant
10        CULTURAL CARE, INC.
          1200 Seventeenth Street, Suite 3000
11        Denver, Colorado 80202
          BY:  JESSICA L. FULLER, ESQ.
12        303.628.9527
          jfuller@lrrc.com
13        (Via Teleconference)
14
15   BOGDAN ENICA, ESQ.
          Attorney for Defendant
16        EXPERT GROUP INTERNATIONAL, INC., d/b/a
          EXPERT AU PAIR
17        111 Second Avenue, N.E., Suite 204
          St. Petersburg, Florida 33701
18        BY:  BOGDAN ENICA, ESQ.
          727.388.3472
19        bogdane@hotmail.com
          (Via Teleconference)
20
21
22   (Continued on next page.)
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S: (Continued)
 2
 3   NIXON SHEFRIN HENSEN OGBURN, P.C.
          Attorneys for Defendants
 4        20/20 CARE EXCHANGE, INC., d/b/a
          THE INTERNATIONAL AU PAIR EXCHANGE, and APEX
 5        AMERICAN PROFESSIONAL EXCHANGE, LLC, d/b/a
          PRO AU PAIR
 6        5619 DTC Parkway, Suite 1200
          Greenwood Village, Colorado 80111
 7        BY:  MICHAEL S. DREW, ESQ.
          303.874.3410
 8        mdrew@nixonshefrin.com
          (Via Teleconference)
 9
10
11
12   ALSO PRESENT:
          ROBERT HORGAN, Videographer
13
14
15
16
17              *     *     *
18
19
20
21
22
23
24
25
```

Case No. 1:14-cv-03074-CMA-KMT   Document 1174-37   filed 11/13/18   USDC Colorado   pg 4 of 7

Johana Paola Beltran, et al. vs.                    Video Teleconferenced Deposition of Sarah Carolina Azuela
Interexchange, Inc., et al.                                                              March 03, 2017

Page 21

1  with math.
2      Q.   So that would be $500 per month?
3      A.   Yes.
4      Q.   I know it's approximate. I'd just like
5  to get a sense.
6           Okay, and then your next job here says
7  Sercopa. What did you do for that company?
8      A.   For them I do socioeconomic studies to
9  determine if people was able to get financial help. I
10 did most of the financial stuff, which is help people
11 to pay their loans by giving them certain amount that
12 they can pay monthly according to that what they earn
13 and what they spend and all of their needs.
14     Q.   So Sercopa is a bank or some kind of
15 financial institution?
16     A.   Yes.
17     Q.   And your job was to work with people to
18 come up with payment plans for their loans, is that
19 right?
20     A.   Yes.
21     Q.   And it says here that you earned $6,000
22 Mexican pesos per month, right?
23     A.   Yes.
24     Q.   By the way, you said "back then" the
25 dollar was not that high. Has it changed now?

Page 22

1      A.   Yes.
2      Q.   And do you know approximately what the
3  conversion rate is now?
4      A.   Around 19, 20.
5      Q.   So twice as high.
6      A.   (No oral response.)
7      Q.   All right, the next job it says here is
8  technical analyst for the fiscal agency of the state
9  government. Can you explain what that was?
10     A.   Licensed -- issuing licenses.
11     Q.   Licenses to do what?
12     A.   Oh, the license, the driver's license.
13     Q.   Driver's licenses.
14     A.   Yes. So basically I was working as the
15 people that were hearing the license where they charge
16 them, take their information and all of that.
17     Q.   And it says here that your salary was
18 10,200 Mexican pesos per month.
19     A.   Yes.
20     Q.   That was in 2013, right?
21     A.   Yes.
22     Q.   Do you remember about what the conversion
23 rate was then?
24     A.   It was lower than right now. I do
25 remember that. I'm not sure how much was exactly. A

Page 23

1  little bit higher than 10, but lower than 14, 15.
2      Q.   And at 10 that would be 1,020 U.S.
3  dollars per month. So a little higher than that, to
4  the best of your recollection?
5      A.   I think it was around that amount.
6      Q.   And then according to this answer, your
7  next job -- well, what was your -- did you have any
8  other employment before you became an au pair?
9      A.   No. Besides this, no.
10     Q.   You were an au pair from January 2014
11 through December 2015, is that right?
12     A.   Yes.
13     Q.   And what about since you were an au pair,
14 can you tell us what jobs you've had, if any?
15     A.   Well, while I was an au pair?
16     Q.   No, after.
17     A.   Oh, after.
18     Q.   Yes.
19     A.   I am an interpreter, a medical
20 interpreter.
21     Q.   How long have you been doing that?
22     A.   For around four months.
23     Q.   The interrogatory on page 12 says medical
24 interpreter for Connecting Cultures, is that right?
25     A.   Yes.

Page 24

1      Q.   It says October 2017. Is that a typo?
2      A.   Yes. We're not in October 2017. So yes.
3      Q.   So did you mean October 2016?
4      A.   Yes.
5      Q.   And do you still have that position?
6      A.   Yes.
7      Q.   How often do you work?
8      A.   Monday through Friday.
9      Q.   And you provide live oral translations or
10 written translations, or both?
11     A.   On-site.
12     Q.   On-site. From Spanish to English?
13     A.   And vice versa.
14     Q.   Is this patients who are receiving
15 healthcare that you translate for?
16     A.   I don't understand the question.
17     Q.   Describe the setting in which you provide
18 translation services.
19     A.   It's usually in a clinic and I interpret
20 exactly what is being said in the medical field.
21     Q.   Between a healthcare provider and a
22 patient?
23     A.   And a patient, yes.
24     Q.   Thank you.
25          Before you became an au pair, had you

Case No. 1:14-cv-03074-CMA-KMT   Document 1174-37   filed 11/13/18   USDC Colorado   pg 5 of 7

Johana Paola Beltran, et al. vs.
Interexchange, Inc., et al.

Video Teleconferenced Deposition of Sarah Carolina Azuela
March 03, 2017

Page 25

1  ever worked providing child care?
2     A.   Yes.
3     Q.   What did you do for child care work?
4     A.   Basically just taking care of kids. Not
5  as a kindergarten or nothing official. More like my
6  sister friend needs someone to take care of her kids
7  so can you please take care of them. And I was like,
8  yeah, sure.
9     Q.   Any kind of set schedule?
10    A.   No.
11    Q.   What did you typically earn, if anything,
12 when you provided child care before you were an au
13 pair?
14    A.   Per hour, 130 to 200, it depends of the
15 hours. If it's at night it was 200 and more. If it
16 was in the daytime it was 130, 150 pesos.
17    Q.   I'm trying to get a sense for how often
18 you did this. Would you say that you provided child
19 care more than ten times or less than ten times?
20    A.   More than ten times.
21    Q.   More than a hundred times or less than a
22 hundred times?
23    A.   I don't know the exact amount.
24    Q.   I'm not asking the exact amount. Let me
25 ask it this way. Over what period of time did you

Page 26

1  provide child care?
2     A.   I cannot say it exactly because I start
3  around 12, 13, something that I cannot really recall
4  that fresh. It's not that exactly in my mind.
5     Q.   And is this something that you continued
6  to do on a part-time basis once you were employed in
7  the jobs that we've talked about?
8     A.   In the previous jobs?
9     Q.   Before you were an au pair, yes.
10    A.   Yes.
11    Q.   So you would work during the day but then
12 sometimes baby sit basically in the evenings or
13 weekends, is that right?
14    A.   Yes.
15    Q.   So did you have any employment from the
16 time you finished in the au pair program in December
17 2015 until October of 2016?
18    A.   No.
19    Q.   Were you an au pair anywhere else before
20 you became an au pair in the United States?
21    A.   No.
22    Q.   How did you first learn about the au pair
23 program?
24    A.   I saw an advertisement when I was walking
25 out the school. It was in the -- in a board, an

Page 27

1  advertisement, pink, that said the best years of your
2  life, you can have the best years of your life. So
3  that's what I remembered. It came with a number so I
4  call it.
5     Q.   You said it was at your school?
6     A.   Yes.
7     Q.   And it was like a poster?
8     A.   Yes.
9     Q.   Did you know anyone else at that point
10 who had participated in the au pair program?
11    A.   No.
12    Q.   So describe what happened when you called
13 the number. Just describe the conversation.
14    A.   Well, I remember that I asked what is it
15 about, they told me basically child care and that we
16 can set up a meeting to tell me more about it.
17    Q.   Okay, so not much detail in that first
18 phone conversation?
19    A.   No, not much detail.
20    Q.   And what did you do next?
21    A.   Set up the appointment.
22    Q.   Where did the appointment take place?
23    A.   In the house of this lady.
24    Q.   Who is the lady?
25    A.   Sandra.

Page 28

1     Q.   Sandra, do you remember her last name?
2     A.   Santos.
3     Q.   And where did Ms. Santos live?
4     A.   In Hermosillo.
5     Q.   Do you know anything about Ms. Santos'
6  background?
7     A.   Before I met her?
8     Q.   Was she an au pair herself? Do you know?
9     A.   Yes.
10    Q.   Did she tell you about that?
11    A.   Generally speaking.
12    Q.   So just describe to me what happened when
13 you met with her. You set up an appointment and then
14 you said you went to her house?
15    A.   Yes.
16    Q.   How long did you meet with her about?
17    A.   I don't remember.
18    Q.   Any idea at all?
19    A.   Around an hour, two hours.
20    Q.   And did she describe the au pair program
21 to you?
22    A.   Yes.
23    Q.   What do you recall her saying about the
24 au pair program?
25    A.   I remember that she said that it wasn't

Case No. 1:14-cv-03074-CMA-KMT   Document 1174-37   filed 11/13/18   USDC Colorado   pg 6 of 7

| Johana Paola Beltran, et al. vs. | Video Teleconferenced Deposition of Sarah Carolina Azuela |
|---|---|
| Interexchange, Inc., et al. | March 03, 2017 |

Page 29

1  that hard, that it's just taking care of kids. And if
2  you have done it before, you probably already know how
3  to do it. That you have to take care of the kids'
4  stuff, and like clean after themself. Everything
5  related to the children.
6      Q.   Do you recall any discussion of the
7  stipend that you would receive for being an au pair?
8      A.   I don't know what is the stipend.
9      Q.   The money that you would receive for
10 being an au pair.
11     A.   Oh. Can you repeat the question again,
12 please.
13     Q.   Yes. Do you recall whether in that
14 conversation with Ms. Santos there was any discussion
15 about how much money you would receive in connection
16 with the au pair program?
17     A.   Yes.
18     Q.   What do you remember about that
19 discussion?
20     A.   I remember that she said I was gonna earn
21 196.
22     Q.   Anything else?
23     A.   She told me the hours that I was
24 working -- that I needed to work.
25     Q.   And what did she say about that?

Page 30

1      A.   That I have to work around 40 hours and
2  sometimes less.
3      Q.   The amount which you said was $196, did
4  she say that was the most you could earn or did she
5  say that that was the minimum you could earn?
6          MR. LIBLING:  Objection to form.
7      A.   She just said this number.
8      Q.   But she didn't say that there was no
9  chance of earning more.
10     A.   She said that she sometimes earned more.
11     Q.   That she sometimes was paid more in her
12 own experience?
13     A.   Yes, in her own experience.
14     Q.   Was there discussion with her of the
15 cultural benefits of the program?
16     A.   I don't really understand the question.
17 Like, I need something more.
18     Q.   The phrase "cultural benefits," is that
19 the part that you don't understand?
20     A.   Yeah.
21     Q.   Was there discussion about the new
22 experiences you would have if you took part in the
23 program?
24     A.   She told me that you can meet new
25 friends, new people from all over the world.

Page 31

1      Q.   Just going back for a minute, at this
2  time what other opportunities were you considering if
3  you had not decided to become an au pair?
4      A.   I was offered manager position in this
5  party -- I think I will need the interpreter here.
6  This political party.
7      Q.   If you pick up Exhibit 154, this may
8  help, and turn to page 11. It says here that you were
9  offered a position as business administration manager
10 for the Partido Accion Nacional, PAN. Did I say that
11 right?
12     A.   Yes.
13     Q.   What is the Partido Accion Nacional?
14     A.   It's a political party. If you want an
15 example, here I believe there's republican and
16 democrats. I don't know if they have parties here. I
17 don't know if that's the case. But it will be one of
18 those political parties.
19     Q.   It says in this interrogatory answer for
20 a pay of $600 per month, is that right?
21     A.   Yes.
22     Q.   Why is this amount in dollars? You have
23 to say it orally.
24     A.   I don't know.
25     Q.   Let me ask it this way. Was the job

Page 32

1  going to be in Mexico?
2      A.   Yes.
3      Q.   Would you have been paid in pesos?
4      A.   Yes.
5      Q.   What would you have been paid in pesos?
6      A.   Starting with -- starting with 10,000.
7      Q.   10,000 pesos per month?
8      A.   Yes.
9      Q.   And it says you did not accept the offer
10 because you wanted to travel to and experience life in
11 the United States, is that right?
12     A.   Yes.
13     Q.   Now, this interrogatory answer says that
14 you also were offered a scholarship.
15     A.   Yes.
16     Q.   Can you tell us about that?
17     A.   Yeah, well, when I graduate from
18 international trades, one of my teachers told me that
19 I can make this test and that he was going to help me.
20 And he was in contact with other people in University
21 of Sonora to give me a full scholarship for -- I don't
22 remember the exact name of the career, to get my
23 master.
24     Q.   It says here that you did not accept the
25 scholarship because you wanted to travel and practice

| Johana Paola Beltran, et al. vs. | Video Teleconferenced Deposition of Sarah Carolina Azuela |
|---|---|
| Interexchange, Inc., et al. | March 03, 2017 |

Page 33

1  English, is that right?
2  A.   Yes.
3  Q.   If we can just take a moment with these
4  interrogatories, I want to make sure that I understand
5  some other documents that we received.
6       MR. WOLOSZ:  Could we mark this as
7  Exhibit 156.
8       (Exhibit 156 marked for identification.)
9  Q.   Now, Ms. Azuela, let me just explain
10 something.
11 A.   Mm-hmm.
12 Q.   We received from your lawyer some
13 documents that were produced by you, and two of the
14 documents, this is one of them, were Excel
15 spreadsheets.  It's very difficult to look at an Excel
16 spreadsheet in print, so we had to do a couple things
17 to it.  We didn't change the content, but we did was
18 we formatted it so that it would print, we added the
19 title of the file on the top here as like a title.
20 A.   Mm-hmm.
21 Q.   And then on the bottom on the right we
22 added the title of the tab.  You're familiar with tabs
23 in Excel?
24 A.   Kind of.
25 Q.   Because otherwise we wouldn't be able to

Page 34

1  tell which part of it is which.  But we did not change
2  the content.
3       Now, with that explanation, are you
4  familiar with --
5       MR. LIBLING:  Sorry, just before you ask
6  your question, was there content in the Excel
7  that is not in this printout?
8       MR. WOLOSZ:  No.
9       MR. LIBLING:  I was just asking because
10 it looks like some tabs -- like there's no tab
11 1 and there's no tab 5.
12      MR. WOLOSZ:  That's right.
13      MR. LIBLING:  Okay.  And no tab 9.
14      MR. WOLOSZ:  That's exactly how it was
15 produced to us.
16 Q.   So with that explanation, and now that
17 you understand we added a couple of things, do you
18 recognize the content of this document?
19 A.   Yes.
20 Q.   What is this?
21 A.   I will not know how to say the name of
22 it, but it's the amounts that I was paid.
23 Q.   Well, that's in the beginning.
24 A.   Yes.
25 Q.   Stepping back for a minute, the whole

Page 35

1  file itself, is this something that you put together?
2  A.   Yes.
3  Q.   And is this something that you put
4  together when you were responding to the
5  interrogatories we looked at a moment ago?
6  A.   Yes.
7  Q.   So in the bottom right where it says
8  number 2, payments, again, we added that but we took
9  it from the spreadsheet.  Is that because it refers to
10 interrogatory number 2?  We can flip to it in Exhibit
11 154 if you'd like.  I'll just tell you I believe
12 that's what it is.  I just want to make sure that I'm
13 right.
14 A.   Yes.
15 Q.   So I want to make sure I understand this.
16 After you received the interrogatories, you put
17 together the spreadsheet that provided information to
18 respond to the interrogatories, is that right?
19 A.   Yes.
20      MR. WOLOSZ:  And then if we could mark
21 this as Exhibit 157.
22      (Exhibit 157 marked for identification.)
23 Q.   To save time, I'll just tell you this
24 appears to be the same thing, except there were a few
25 things that are a little bit different.  It's a

Page 36

1  slightly different version.  Is it your recollection
2  that you prepared two different versions of these?
3  A.   It's probably the same thing but if -- I
4  had more time to remember or I just sleep and wake up
5  remembering more stuff so I put it there, basically.
6  It's hard to remember two years before.  Sometimes
7  it's hard to remember what you did yesterday, so it's
8  basically that.
9  Q.   So to the best of your knowledge, it's
10 just a slightly later version, is that right?
11 A.   Yes.
12 Q.   I'll have some questions about this in a
13 minute.  I just wanted to make sure that I understood
14 what the document was.
15      All right, so after you met with
16 Ms. Santos, can you tell us what happened next in your
17 application process to become an au pair?
18 A.   I collect a couple of documents and then
19 I gave them to her.  That's what I remember the most.
20 Q.   When did you actually decide that you
21 wanted to go forward and become an au pair?
22 A.   In 2013.
23 Q.   Was it during that conversation with
24 Ms. Santos or after or before?
25 A.   After.