# Exhibit 3

## No. 17-2140

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

ERIN CAPRON; JEFFREY PENEDO; CULTURAL CARE, INC.,
d/b/a Cultural Care Au Pair

Plaintiffs-Appellants,

v.

OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH OF
MASSACHUSETTS; MAURA T. HEALEY, in her capacity as
Attorney General of the Commonwealth of Massachusetts,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the District of Massachusetts

————————————

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

————————————

JENNIFER G. NEWSTEAD
*Legal Adviser*
*U.S. Department of State*
*Washington, D.C. 20520*

JOSEPH H. HUNT
*Assistant Attorney General*

ANDREW E. LELLING
*United States Attorney*

ALISA B. KLEIN
MICHAEL SHIH
*Attorneys, Appellate Staff*
*Civil Division, Room 7268*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 353-6880*
*michael.shih@usdoj.gov*

# TABLE OF CONTENTS

**Page**

STATEMENT .................................................................................................... 1

ARGUMENT .................................................................................................... 6

A.    The Au Pair Regulations Require Host Families To Pay A Weekly
Stipend That Is Based On The Federal Minimum Wage ........................... 6

B.    The Au Pair Regulations Preempt State And Local Laws
Establishing Terms Of Employment That Differ From The
Terms Established By The Federal Regulations ........................................ 10

C.    Policy Arguments For Changing The Terms Of Au Pair
Employment Should Be Directed To The State Department ................. 19

CONCLUSION ................................................................................................ 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page(s)**

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................................... 11

*Beul v. ASSE Int'l, Inc.,*
  233 F.3d 441 (7th Cir. 2000) ........................................................................... 17

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) ........................................................................ 10, 11, 15, 17

*CSX Transp., Inc. v. Easterwood,*
  507 U.S. 658 (1993) ........................................................................................... 10

*Egelhoff v. Egelhoff ex rel. Breiner,*
  532 U.S. 141 (2001) ........................................................................................... 17

*Ervin v. OS Rest. Servs., Inc.,*
  632 F.3d 971 (7th Cir. 2011) ........................................................................... 10

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
  458 U.S. 141 (1982) ........................................................................................... 10

*Long Island Care at Home, Ltd. v. Coke,*
  551 U.S. 158 (2007) ...................................................................................... 13, 20

*In re PHC, Inc. Shareholder Litig.,*
  894 F.3d 419 (1st Cir. 2018) ........................................................................... 12

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ........................................................................................... 15

*Russello v. United States,*
  464 U.S. 16 (1983) ............................................................................................. 12

*Wachovia Bank, N.A. v. Burke,*
  414 F.3d 305 (2d Cir. 2005) ............................................................................ 16

**Statutes:**

Mutual Educational and Cultural Exchange Act of 1961,
Pub. L. No. 87-256, 75 Stat. 527 ........................................................ 1

Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1961 *et seq.* ................................................................... 8

Pub. L. No. 103-415, 108 Stat. 4299 (1994) ...................................... 3

Pub. L. No. 104-72, 109 Stat. 776 (1995) .......................................... 3

Pub. L. No. 105-48, 111 Stat. 1165 (1997) .................................... 3, 13

8 U.S.C. § 1101(a)(15)(J) .................................................................. 2

22 U.S.C. § 2451 .......................................................................... 1, 16

22 U.S.C. § 2452(a)(1)(i) ................................................................... 3

22 U.S.C. § 2452(a)(1)(B)(ii) ............................................................. 1

29 U.S.C. § 203(m) ......................................................................... 14

29 U.S.C. § 213(b)(21) .................................................................... 14

29 U.S.C. § 216(b) ...................................................................... 9, 10

29 U.S.C. § 218 ................................................................................ 9

**Regulations:**

22 C.F.R. § 62.1 .......................................................................... 2, 17

22 C.F.R. § 62.1(b) ........................................................................... 4

22 C.F.R. § 62.2 ............................................................................. 16

22 C.F.R. § 62.3 ............................................................................... 4

22 C.F.R. § 62.9(d)(3) .................................................................. 5, 8

22 C.F.R. § 62.11(a) .................................................................. 17, 18

22 C.F.R. § 62.24 ............................................................................................... 3

22 C.F.R. § 62.24(f)(5) ................................................................................... 4, 7

22 C.F.R. § 62.30(f) ....................................................................................... 4, 7

22 C.F.R. § 62.31 .......................................................................................... 2, 19

22 C.F.R. § 62.31(a) ........................................................................................... 2

22 C.F.R. § 62.31(c)(2) ...................................................................................... 6

22 C.F.R. § 62.31(j) ............................................................................... 3, 6, 7, 14

22 C.F.R. § 62.31(j)(1) ..................................................................................... 13

22 C.F.R. § 62.31(j)(2)-(4) .............................................................................. 11

22 C.F.R. § 62.31(k) ........................................................................................ 11

22 C.F.R. § 62.32(i)(1) ............................................................................ 4, 7, 17

22 C.F.R. § 62.50(a) .......................................................................................... 5

22 C.F.R. § 62.50(b)-(e) .................................................................................... 5

940 Mass. Code Regs. § 32.02 ........................................................................ 13

940 Mass. Code Regs. § 32.03(3) .................................................................... 13

**Legislative Material:**

H.R. Rep. No. 93-913 (1974) ........................................................................... 14

**Other Authorities:**

58 Fed. Reg. 15180 (Mar. 19, 1993) ............................................................... 12

59 Fed. Reg. 64296 (Dec. 14, 1994) ................................................................. 3

60 Fed. Reg. 8547 (Feb. 15, 1995) .................................................................... 3

61 Fed. Reg. 13760 (Mar. 28, 1996) ............................................................... 12

62 Fed. Reg. 34632 (June 27, 1997).................................................................. 13

Lydia DePillis, *Au Pairs Provide Cheap Childcare. Maybe Illegally Cheap*,
    Washington Post, Mar. 20, 2015,
    https://www.washingtonpost.com/news/wonk/wp/2015/03/20/au-pairs-
    provide-cheap-childcare-maybe-illegally-cheap/ ......................................... 19

U.S. Dep't of State, Wilberforce Pamphlet (2014),
    https://internationalservices.ncsu.edu/files/
    2015/03/Wilberforce-Pamphlet.pdf.............................................................. 19

We respectfully submit this brief in response to the Court's order inviting the Solicitor General to express the views of the United States on whether the federal au pair regulations preempt the application of state minimum-wage and domestic-worker-compensation laws to the au pair program. *See* Letter, Doc. No. 00117301007, *Capron v. Massachusetts Att'y Gen.*, No. 17-2140 (June 13, 2018).

## STATEMENT

1.      The Mutual Educational and Cultural Exchange Act of 1961, Pub. L. No. 87-256, 75 Stat. 527 (Fulbright-Hays Act), authorized the Director of the United States Information Agency (USIA), "when he considers that it would strengthen international cooperative relations," to provide for "educational exchanges . . . between the United States and other countries of students, trainees, teachers, instructors, and professors." *See* 22 U.S.C. § 2452(a)(1)(B)(ii).[1]  The resulting Exchange Visitor Program (EVP) furthers the Act's purposes of "increas[ing] mutual understanding between the people of the United States and the people of other countries," "strengthen[ing] the ties which unite us with other nations," "promot[ing] international cooperation for educational and cultural advancement," and "assist[ing] in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world." *Id.* § 2451.  Participants in the

---

[1] The Fulbright-Hays Act provided this authority to the President.  Pursuant to subsequent Executive Order and reorganizations, the authority came to rest with the USIA Director.

EVP enter and remain in the United States on a J visa, a type of nonimmigrant visa
that was created for, and is specific to, the EVP.  *See* 8 U.S.C. § 1101(a)(15)(J).

The State Department has administered the EVP since 1999, when the USIA
and the State Department merged.  The State Department's regulations establish
different categories of exchange programs within the EVP—each of which uses the
J visa—that delineate the different roles that exchange visitors may fill.  Reflecting the
purposes of the Fulbright-Hays Act, these regulations explain that the exchanges
"assist the Department of State in furthering the foreign policy objectives of the
United States."  22 C.F.R. § 62.1.

**2.**      One such program category allows foreign nationals to enter the United
States as au pairs.  22 C.F.R. § 62.31.  The au pair program is a cultural- and
educational-exchange program available only to foreigners between the ages of 18 and
26.  Young people who qualify for this opportunity spend a year in the United States
living with an American host family, providing childcare services within that family,
and attending classes at an accredited college or university.  By "participat[ing] directly
in the home life" of an American family, *id.* § 62.31(a), au pairs gain valuable exposure
to our country's society and values.  In the State Department's judgment, our
country's continued engagement with these young people advances the status of the
United States as a global leader and furthers the government's foreign-policy goals.

The au pair program was originally administered by the USIA under its general
EVP authority.  In 1994, Congress directed the USIA to continue the program on a

temporary basis and to prescribe regulations governing it. *See* Pub. L. No. 103-415, 108 Stat. 4299, 4302 (1994). In 1994 and 1995, the USIA issued such regulations. *See* 59 Fed. Reg. 64296 (Dec. 14, 1994); 60 Fed. Reg. 8547 (Feb. 15, 1995). Congress then further extended the program, *see* Pub. L. No. 104-72, 109 Stat. 776 (1995), and made it permanent in 1997, *see* Pub. L. No. 105-48, 111 Stat. 1165 (1997).

The au pair program is one of several EVP categories that include a work component. For example, the Fulbright-Hays Act explicitly contemplates that some exchange visitors will come to the United States to teach. 22 U.S.C. § 2452(a)(1)(i). Accordingly, State Department regulations allow exchange visitors in that program to teach full-time in accredited public and private U.S. primary and secondary schools. *See* 22 C.F.R. § 62.24. Other EVP categories allow foreign nationals to come to the United States to work as camp counselors, *see id.* § 62.30, and in other summer jobs, *see id.* § 62.32.

The regulations that implement the EVP establish the central terms of the program. For EVP categories that include a work component, these terms include the compensation that host organizations or families are required to pay participants. The au pair regulations entitle participants to a weekly stipend "based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act [(FLSA)] as interpreted and implemented by the United States Department of Labor [(DOL)]." 22 C.F.R. § 62.31(j).

The compensation provision in the au pair regulations differs from the compensation provisions in regulations that govern other categories of the EVP.  For example, the State Department regulations for the summer work-travel program entitle participants to the "higher of: (i) [t]he applicable Federal, State, or Local Minimum Wage (including overtime)," or "(ii) [p]ay and benefits commensurate with those offered to their similarly situated U.S. counterparts."  22 C.F.R. § 62.32(i)(1). The regulations for the teacher program similarly entitle participants to compensation "commensurate with . . . similarly-situated U.S. teachers in the school district or host school" where the participant is assigned to teach.  *Id.* § 62.24(f)(5).  And the regulations for the camp-counselor program entitle participants to "pay and benefits commensurate with those offered to their American counterparts."  *Id.* § 62.30(f).

**3.**     Although the State Department oversees the EVP, the exchange programs are conducted by organizations known as "sponsors" that the State Department designates for that purpose.  *See* 22 C.F.R. §§ 62.1(b), 62.3.  The sponsors (and their agents) screen foreign nationals for eligibility, place them with host organizations or families, and monitor their participation in the EVP.  In some categories of the EVP—including the au pair category—the sponsors are private-sector organizations, and they (and their agents) earn income from fees they charge to host organizations or families and exchange visitors.

State Department regulations require sponsors to "[p]rovide accurate program information and materials to prospective exchange visitors, host organizations, and

4

host employers, . . . at the time of recruitment and before exchange visitors enter into agreements and/or pay non-refundable fees." 22 C.F.R. § 62.9(d)(3).  This information must (among other things) "clearly explain program activities and [the] terms and conditions of [the] program, including the terms and conditions of any employment activities (job duties, number of work hours, wages and compensation, and any typical deductions for housing and transportation)." *Id.*  "Program recruitment information and materials also must make clear to prospective exchange visitors in the exchange categories with a work component that their stipend or wages might not cover all of their expenses and that they should bring additional personal funds." *Id.*

Sponsors that fail to comply with the EVP regulations are subject to sanctions by the State Department.  *See* 22 C.F.R. § 62.50(a).  Sanctions range from a written reprimand to the suspension or revocation of a designation (or the denial of a re-designation) that is necessary to act as an EVP sponsor.  *See id.* § 62.50(b)-(e).

# ARGUMENT

## A.  The Au Pair Regulations Require Host Families To Pay A Weekly Stipend That Is Based On The Federal Minimum Wage.

The compensation provision that applies to the au pair program requires sponsors to ensure that participants in the au pair program receive a weekly stipend that is based on the federal minimum wage.  This stipend reflects a "weekly rate based upon 45 hours of child care services per week . . . in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  22 C.F.R. § 62.31(j).  Au pairs are entitled to this stipend even if they work fewer than 45 hours in a given week.  For the component of the au pair program known as EduCare that was established in 2001, sponsors must ensure that participants are not required to provide more than 30 hours of child care services per week and are compensated at a weekly rate that is 75% of the weekly rate paid to non-EduCare participants.  *See id.* § 62.31(c)(2), (j).

Ultimately, au pair wages are determined by sponsors and host families, not by the State Department.  Host families are free to pay au pairs—and sponsors are free to direct host families to pay au pairs—more than the minimum that would be required to comply with the State Department's regulations, and some do.  But the State Department's regulations establish the requirements with which au pair compensation must comply.

The compensation provision of the au pair regulations differs in key respects from the compensation provisions in regulations that govern other categories of the EVP.  As noted above, the regulations for the summer work-travel program require sponsors to ensure that participants receive the "higher of: (i) [t]he applicable Federal, State, or Local Minimum Wage (including overtime)," or "(ii) [p]ay and benefits commensurate with those offered to their similarly situated U.S. counterparts."  22 C.F.R. § 62.32(i)(1).  And the regulations for the teacher program and the camp-counselor program entitle participants to compensation "commensurate with" their similarly situated U.S. counterparts.  *See id.* § 62.24(f)(5) (teachers); *id.* § 62.30(f) (camp counselors).  By contrast, the au pair regulation does not incorporate or direct compliance with state or local minimum-wage laws, nor does it require pay commensurate with that received by similarly situated U.S. counterparts.

Consistent with the au pair regulations' reference to the FLSA, both the USIA and the State Department have informed sponsors about changes in the federal minimum wage.  For example, a 2007 State Department notice informed sponsors that, effective 2009, the federal minimum wage would increase to $7.25 per hour.  *See* Add-83 (State Department Notice, Federal Minimum Wage Increase (June 14, 2007)).  That 2007 notice (which was reissued without substantive change in 2009) went on to provide calculations illustrating how the new federal minimum wage could be applied to the regulatory requirements at 22 C.F.R. § 62.31(j) for au pairs:  $7.25 multiplied by 45 hours, less a 40% credit for room and board, for a total weekly stipend of $195.75.

7

*See id.* Earlier USIA notices informed sponsors about previous changes in the federal minimum wage. *See, e.g.*, Add-81 (Fact Sheet: Au Pair Stipend (Mar. 14, 1997)) (explaining that, effective 1997, the federal minimum wage would increase to $5.15 per hour, and providing calculations resulting in a weekly stipend of $139.05). As noted above, however, compensation for au pairs is ultimately determined by sponsors and host families, based on the text of the State Department's regulations. The USIA and State Department notices were intended to inform the sponsors of certain considerations relevant to their compliance with those regulatory requirements.

The EVP regulations require sponsors to provide accurate information to prospective exchange visitors and host families about work hours, wages and compensation, and credits for room and board. 22 C.F.R. § 62.9(d)(3). Sponsors have long informed prospective host families and au pairs that the required weekly stipend is based on the federal minimum wage, less a credit for room and board. The sponsor websites discussed in the complaint filed in *Beltran v. InterExchange, Inc.*, No. 14-cv-3074 (D. Colo. Apr. 11, 2018), are illustrative.[2] According to that complaint,

---

[2] The *Beltran* case is a nationwide class action brought on behalf of au pairs against all fifteen sponsors that had been designated at the time of filing. The plaintiffs seek $2.5 billion in damages for alleged violations of the FLSA, state minimum-wage laws, antitrust laws, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

the websites of the fifteen au pair sponsors describe the standard au pair stipend as $195.75 per week. *See* Third Am. Compl. ¶¶ 100-120, *Beltran*, *supra*.[3] As the *Beltran* complaint notes, this amount was based on the federal minimum wage. *See id.* ¶ 89.

The district court in this case nevertheless ruled that, by requiring compensation in accordance with the requirements of the FLSA, the State Department's au pair regulations require host families to comply with applicable state and local minimum-wage laws. That ruling was incorrect. (Court's question 4).[4] The district court reasoned that "the federal regulations mandate compliance with the requirements of the FLSA," and that the FLSA, "in turn, allows states to impose more stringent protections than those offered at the federal level." JA606 (citing 29 U.S.C. § 218). The FLSA's savings clause, however, is not a general anti-preemption clause. With respect to the minimum wage required by the FLSA, the savings clause simply provides that the *FLSA itself* does not prevent state and municipal governments from imposing a higher minimum wage. The savings clause does not import those laws into the FLSA—as illustrated by the fact that employees cannot bring suit under the FLSA to vindicate their right to a higher state or local minimum wage, and must instead bring a separate claim under the applicable state or local law. *See* 29 U.S.C.

---

[3] The *Beltran* complaint states that certain sponsors offer host families the option of an au pair with additional skills and experience at a higher weekly rate. *See* Third Am. Compl. ¶¶ 104, 109, *Beltran*, No. 14-cv-3074.

[4] Parentheticals in this format refer to the questions in the letter that this Court sent to the Solicitor General.

§ 216(b) (creating a private cause of action to enforce violations of the FLSA's

minimum-wage and overtime-pay provisions); *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d

971, 977 (7th Cir. 2011) (explaining that the FLSA's "provision providing that

employees may bring actions against their employers makes no mention of state wage

and labor laws").  Because the savings clause does not transform state and local

minimum-wage laws into "requirement[s]" of the FLSA, the au pair regulations do

not incorporate those state and local laws.  Moreover, the FLSA's savings clause does

not shield state and local minimum-wage laws from preemption by the au pair

regulations.

### B. The Au Pair Regulations Preempt State And Local Laws Establishing Terms Of Employment That Differ From The Terms Established By The Federal Regulations.

The federal au pair regulations do not leave room for a state or municipal

government to impose terms of employment for au pairs that differ from the terms

set forth in the regulations.  (Court's question 1).  Like the federal statute at issue in

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), the au pair regulations are

"drawn not only to bar what they prohibit but to allow what they permit."  *Id.* at 380.

"Federal regulations have no less pre-emptive effect than federal statutes."  *Fidelity

Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *see also CSX Transp., Inc.

v. Easterwood*, 507 U.S. 658, 673-74 (1993) (holding that federal regulations setting

maximum train-operating speeds "not only establish[ed] a ceiling[] but also

preclud[ed] additional state regulation" imposing a duty of care to operate trains at a

10

lower rate of speed when reasonable, even though the regulations lacked express language to that effect).

As discussed, the au pair regulations require host families to pay a weekly stipend that is based on the *federal* minimum wage. They contain no such requirement concerning state or local minimum wages. The au pair regulations also determine the maximum number of hours an au pair can work per day (10) and per week (45); require that au pairs receive a certain number of days off per week (1.5) and per month (one full weekend); require that au pairs receive two weeks per year of paid vacation; and require that host families facilitate the au pair's enrollment and attendance in an accredited U.S. post-secondary institution and pay the cost of such academic course work in an amount not to exceed $500. *See* 22 C.F.R. § 62.31(j)(2)-(4), (k).

These nuanced and "detailed provisions" show that the federal government's "calibrated" approach to the au pair program is deliberate. *Crosby*, 530 U.S. at 377-78; *accord Arizona v. United States*, 567 U.S. 387, 404 (2012) (holding that a "comprehensive" federal "framework for combating the employment of illegal aliens" prevented States from imposing additional sanctions on such individuals who seek employment) (quotation marks omitted).

This conclusion is textually reinforced by the contrast between the au pair regulations and the regulations governing other EVP categories. As noted, the regulations for three such categories—summer work-travel, teachers, and camp

11

counselors—specifically entitle participants to any higher state or local minimum wage that may apply, either explicitly or by entitling participants to compensation that is commensurate with U.S. counterparts.  Thus, when the State Department intends to require payment in accordance with state and local law for EVP participants, the Department says so expressly.  *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (brackets and citation omitted); *accord In re PHC, Inc. Shareholder Litig.*, 894 F.3d 419, 432 (1st Cir. 2018).

This interpretive presumption applies with particular force here because some of the contrasting regulations for other EVP participants predate the regulations that set the terms of au pair compensation.  In 1993, the USIA's regulations instructed sponsors to ensure that international camp counselors "receive[d] pay and benefits commensurate with those offered to their American counterparts."  58 Fed. Reg. 15180, 15211 (Mar. 19, 1993).  And the summer work-travel program was likewise subject to formal USIA guidance requiring sponsors to ensure that participants received "pay and benefits commensurate with those offered to their American counterparts."  61 Fed. Reg. 13760 (Mar. 28, 1996).  Yet the USIA declined to include similar language in the au pair regulations, which were first adopted in their current

form with respect to compensation in 1997, against this regulatory backdrop. *See* 62

Fed. Reg. 34632 (June 27, 1997).

Several months later, Congress permanently authorized the au pair program, *see*

Pub. L. No. 105-48, 111 Stat. 1165. Congress's action confirms that the USIA's

approach—which required that au pair compensation be based on the federal

minimum wage—was a permissible exercise of the substantive rulemaking authority

that Congress had granted the agency. *See generally Long Island Care at Home, Ltd. v.

Coke*, 551 U.S. 158, 165 (2007) (explaining that the "'power of an administrative

agency to administer a congressionally created . . . program necessarily requires the

formulation of policy and the making of rules to fill any gap left, implicitly or

explicitly, by Congress'") (citations omitted).

The compensation scheme required under the au pair regulations differs from

state labor laws in other ways as well. For example, the compensation required under

the au pair regulations is structured as a weekly stipend, rather than as a fixed hourly

rate. Under the federal regulations, an au pair's weekly compensation is "based upon

45 hours of child care services per week" that must be paid even if the au pair has

worked fewer than 45 hours. *See* 22 C.F.R. § 62.31(j)(1). State labor law, by contrast,

typically requires pay only for hours worked, and requires a different overtime rate for

work beyond 40 hours. *See, e.g.*, 940 Mass. Code Regs. § 32.02 (Massachusetts

definition of "working time"); *id.* § 32.03(3) (Massachusetts overtime provision for

domestic workers).

The Commonwealth appears to acknowledge that the au pair regulations preempt state or local laws governing compensation that are inconsistent with the structure of the federal program—even if it is technically possible for a host family to comply with both the federal and state requirements.  Notably, the Commonwealth disavows a reading of its regulations that would require host families to pay au pairs for time spent sleeping and eating.  Resp. Br. 46.  The Commonwealth thus implicitly concedes that such a requirement is not compatible with the State Department's regulations, which provide that au pairs shall be compensated at a weekly rate "based upon 45 hours of child care services."  22 C.F.R. § 62.31(j).  And if a state claimed that its statute or regulation required au pairs to be paid for sleeping or eating, that state law would be preempted because it is inconsistent with the State Department's regulations for the au pair program.

The same preemptive force flows from other aspects of the au pair regulations, which, by requiring that au pair compensation be paid in accordance with the requirements of the FLSA as interpreted by the Department of Labor, exempt host families from the requirement to pay overtime, 29 U.S.C. § 213(b)(21), and permit deductions for room and board allowable under the FLSA from an au pair's wages, *id.* § 203(m).  *See also* H.R. Rep. No. 93-913, at 36 (1974) (noting that the FLSA's overtime-pay exemption and the DOL-determined credit for room and board would minimize problems that might arise from the extension of the FLSA to live-in domestic service employees).  States and municipalities cannot prohibit host families

14

from taking deductions for room and board allowable under the FLSA that the au pair regulations permit. Nor can states and municipalities deny host families the overtime-pay exemption that the au pair regulations incorporate. For the same reason, states and municipalities have no license to require the payment of a greater wage than the federal government has chosen to require through the terms of employment it has set for these federal exchange-program participants. In short, the au pair regulations do not allow states and municipalities to deviate from the "comprehensive" terms of employment that the regulations embody. *Crosby*, 530 U.S. at 388.[5]

In concluding that Massachusetts' domestic-worker-compensation law is not preempted by the State Department's au pair regulations, the district court here relied on a presumption against preemption. *See* JA602. That reliance was misplaced. The presumption applies when a federal statute or regulation would supersede the historical police powers of the States. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But the presumption "disappears . . . in fields of regulation that have

---

[5] In addition to the Massachusetts laws at issue in this case, the State Department is aware of at least one attempt to enforce state labor laws against participants in the au pair program. (Court's question 3). In 2014, the State Department was notified by a host family in Illinois that the Illinois Director of Intergovernmental Affairs had determined that, under Illinois law, host families were required to obtain workers' compensation insurance for their au pairs. Additionally, as this Court is aware, au pairs have asserted claims against sponsors under various state minimum-wage laws in two pending lawsuits: *Beltran*, No. 14-cv-3074, and *Alonso v. Au Pair Care, Inc.*, No. 18-cv-970 (N.D. Cal. filed Feb. 14, 2018).

been substantially occupied by federal authority for an extended period of time."
*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (holding that, despite
the states' "legitimate role in regulating certain banking activity," the presumption
against preemption does not apply in the context of federally chartered banks).

States have no historical power to regulate the Exchange Visitor Program, of
which the au pair program is a part. The EVP is a creation of federal law, and it
operates in the fields of foreign affairs and immigration—two fields that have long
been reserved exclusively to the federal government. Au pairs enter and remain in the
United States on a J visa, a type of nonimmigrant visa that was created for, and is
specific to, the EVP. *See* 22 C.F.R. § 62.2 (definition of "J visa"). The au pair
program is a foreign-relations function of the federal government, regulated and
overseen by the State Department, which advises the President in the conduct of
U.S. foreign policy. Congress enacted the Fulbright-Hays Act, pursuant to which
educational and cultural exchange programs are administered, in order to "increase
mutual understanding between the people of the United States and the people of
other countries," "strengthen the ties which unite us with other nations," "promote
international cooperation for educational and cultural advancement," and "assist in
the development of friendly, sympathetic, and peaceful relations between the United
States and the other countries of the world." 22 U.S.C. § 2451. Consistent with these
purposes, the State Department's regulations note that the EVP "assist[s] the
Department of State in furthering the foreign policy objectives of the United States."

16

22 C.F.R. § 62.1.  There is no presumption against preemption in the context of a federal program to implement the foreign-policy and immigration objectives of the United States.

In any event, the presumption against preemption is just a presumption, which "can be overcome" by an adequate showing of preemptive intent.  *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001).  As explained, the comprehensive features of the "calibrated" au pair regulations make clear that their terms are intended to be exclusive with respect to the matters that they address, including the terms on which au pairs are compensated.  *See Crosby*, 530 U.S. at 377-78.

The Commonwealth does not advance its position by noting that the general EVP regulations make reference to state law, including state employment law.  *See* Resp. Br. 29-31.  There is no dispute that certain EVP participants—such as those who participate in the summer work-travel program—must be paid in accordance with state and local law minimum-wage laws.  *See, e.g.*, 22 C.F.R. § 62.32(i)(1).  The general EVP regulations thus provide that sponsors who "work with programs with an employment component" must have "a detailed knowledge of federal, state, and local laws pertaining to employment."  *Id.* § 62.11(a).  Moreover, there may be applicable state or local law with respect to matters not addressed by the EVP regulations.  *See, e.g., Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 445 (7th Cir. 2000) (upholding a state-law negligence judgment against a sponsor that failed to monitor the safety of an exchange visitor, who was repeatedly sexually assaulted by her host

17

parent).  It is therefore unsurprising that the general EVP regulations require sponsors to be "thoroughly familiar" with "all federal and state regulations and laws pertaining to the administration of their exchange visitor program(s)."  22 C.F.R. § 62.11(a).

The Commonwealth's reliance on the Wilberforce Pamphlet (Resp. Br. 13, 31) is similarly misplaced.  That pamphlet is distributed to all recipients of certain nonimmigrant visas (including all J visa-holders) who are authorized to work in the United States; it is not distributed exclusively to au pairs.  The pamphlet explains that individuals who hold A-3, G-5, NATO-7, and B-1 visas (for which au pairs do not qualify) are entitled to a contract "stat[ing] the hourly wage" they are due, which "must be the greatest of the minimum wage under U.S. Federal, state, or local law."  JA200.  By contrast, the portion of the pamphlet discussing the rights of J-visa recipients—that is, of au pairs and other EVP participants—contains no comparable guarantee.  JA201.  The pamphlet thus underscores that, when the State Department intends to recognize an entitlement to a higher wage, it says so expressly.

The Commonwealth emphasizes the Wilberforce Pamphlet's statement that, regardless of visa status, nonimmigrant workers "may be entitled to earn more than the federal minimum wage" if they "work in a state, city, or county that has a higher minimum wage."  JA196.  This statement does not advance the Commonwealth's position because all EVP participants receive a J visa—and as noted above, there is no dispute that some EVP participants are entitled to earn more than the federal minimum wage if they work in a region that has a higher minimum wage.  The

Commonwealth is therefore incorrect to suggest (Resp. Br. 31) that the Wilberforce Pamphlet specifically addresses the compensation of au pairs.[6]

In any event, the Wilberforce pamphlet is, as described above, a notice document to visa holders; it does not carry the force of law and does not diminish the preemptive effect of a published State Department regulation.[7]

## C.    Policy Arguments For Changing The Terms Of Au Pair Employment Should Be Directed To The State Department.

State and local regulations have the potential to severely undermine the au pair program, particularly if increased costs or record-keeping burdens discourage

---

[6] A 2014 version of the Wilberforce Pamphlet stated that all recipients of nonimmigrant visas "have the right to be paid" the higher of the federal or state minimum wages, regardless of their visa status.  *See* U.S. Dep't of State, 2014 Wilberforce Pamphlet 7 (2014), https://internationalservices.ncsu.edu/files/2015/03 /Wilberforce-Pamphlet.pdf.  That statement was inaccurate, and the State Department corrected it when it revised the pamphlet in 2016.  The 2016 version remains in effect.

[7] Especially because the Wilberforce Pamphlet is not specifically directed to au pairs, we do not suggest that it supplies a basis for according deference to the State Department with respect to the question presented here.  And so too for the notices and fact sheets that informed sponsors of increases in the federal minimum wage. (Court's question 6).  We are not aware of previous official State Department public statements to the effect that 22 C.F.R. § 62.31 preempts state and local law.  (Court's question 2).  In at least one instance, the State Department stated publicly that sponsors must comply with state minimum-wage requirements.  *See* Lydia DePillis, *Au Pairs Provide Cheap Childcare. Maybe Illegally Cheap*, Washington Post, Mar. 20, 2015, https://www.washingtonpost.com/news/wonk/wp/2015/03/20/au-pairs-provide-cheap-childcare-maybe-illegally-cheap/.  However, it is not clear that this 2015 statement reflected a considered analysis.  The statement was also made before the State Department revised the Wilberforce Pamphlet in 2016.  *See supra* p. 19 n.6.  The views expressed in this brief reflect the considered position of the United States.

19

participation by host families.  The district court correctly noted that the affordability of child care under the au pair program is not a goal of the Fulbright-Hays Act.  *See* JA612.  However, the viability of the au pair program is a quintessential federal interest.  The program is a valuable tool of U.S. foreign policy.  For over 30 years, the program has brought young people from other countries to the United States; immersed them in the home life of an American family; enabled them to continue their education at a local college or university; provided them with unique opportunities to develop leadership skills; and allowed them to return home as unofficial "ambassadors" for the United States.

Contrary to the district court's suggestion, *see* JA607, the USIA did not abandon an interest in a uniform basis of compensation for au pairs when it linked the au pair stipend to the requirements of the FLSA.  (Court's question 5).  Per the FLSA, the federal minimum wage is, of course, uniform nationwide.  If changes are to be made to the terms and conditions of the au pair program, those changes should be made not through litigation but through rulemaking by the State Department—as clearly intended by Congress, which vested regulatory oversight of the EVP not in individual states or municipalities but in that agency.  The State Department, which has both the relevant foreign policy expertise and the ability to consult with affected constituencies, is best suited to balance the many policy considerations that any proposed change would present.  *Cf. Long Island Care*, 551 U.S. at 167-68 (noting that the resolution of policy questions depends on "the kind of thorough knowledge of

20

the subject matter and ability to consult at length with affected parties that an agency

. . . possesses").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed.

Respectfully submitted,

JENNIFER G. NEWSTEAD
  *Legal Adviser*
  *U.S. Department of State*
  *Washington, D.C.  20520*

JOSEPH H. HUNT
  *Assistant Attorney General*

ANDREW E. LELLING
  *United States Attorney*

ALISA B. KLEIN
  */s/ Michael Shih*
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C.  20530*
  *(202) 353-6880*
  *michael.shih@usdoj.gov*

September 2018

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 29(a)(5) because it contains 5,190 words.  This brief also complies with the

typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-

(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a

proportionally spaced typeface.

*/s/ Michael Shih*
Michael Shih

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Michael Shih*

Michael Shih