# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **TATIANA CUENCA-VIDARTE,** *et al.*,      * | |
|    **Plaintiffs,**      * | |
| **v.** | **Case No.: GJH-20-1885** |
|          * | |
| **MICHAELE C. SAMUEL,** *et al.*, | |
|          * | |
|    **Defendants.** | |
|          * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Tatiana Cuenca-Vidarte and Sandra Peters brought this civil action against Defendants AuPair Inc., International Training and Exchange, Inc. d/b/a Intrax d/b/a AuPair Care, John Wilhelm and Takeshi Yokota (collectively "APC Defendants"), and Michaele C. Samuel and Adam Ishaeik ("Samuel Defendants") alleging violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq.*, the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab & Empl. § 3-401, *et seq.*, the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* and breach of contract under Maryland law. Pending before the Court is APC Defendants' Motion to Compel Arbitration as to Samuel Defendants' Crossclaims, ECF No. 43, and Samuel Defendants' Motion to Dismiss, ECF No. 46. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, both motions are granted.

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 3
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 2 of 27

# I.    BACKGROUND[1]

## A.  J-1 Visa Au Pair Program

Congress created the J-1 Visa program under the authority of the Mutual Education and Cultural Exchange Act of 1961, which "enable[s] the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange[.]" 22 U.S.C. § 2451.[2] One such J-1 Visa program is the au pair program, which is codified at 22 C.F.R. § 62.31(a).

The au pair program is operated by the Department of State and affords foreign nationals with "the opportunity to live with an American host family and participate directly in the home life of the host family." *Id.* The Department of State facilitates the au pair program by designating certain entities to act as sponsors, *id.* § 62.31(c), and the sponsors are responsible for not only selecting the au pairs, *id.* § 62.31(d), but also adequately screening and selecting host families, *id.* § 62.31(h), and eventually placing the au pair in the home of host families, *id.* § 62.31(e). Defendant APC is one such sponsor designated by the Department of State. ECF No. 6 ¶¶ 21–22.

The program specifically provides individuals between the ages of 18 and 26, who have a secondary school education (or equivalent) and are proficient in English, *id.* § 62.31(d), with the opportunity to be placed with a host family and provide child-care services in exchange for monetary compensation, specifically "at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[2] Although the Court's November 31, 2021 Memorandum Opinion, ECF No. 40, details the complete factual background of this dispute, the Court will reiterate the background information and facts relevant to the pending Motions.

interpreted and implemented by the United States Department of Labor," *id.* § 62.31(j)(1), boarding, *id.* § 62.31(e)(6), and access to no less than six semester hours of formal education credit, *id.* § 62.31(k)(1). Program participation is limited to one year, *id.* § 62.31(c)(1), and au pairs are to be provided two-weeks paid vacation over the duration of their year in the program. *Id.* § 62.31(j)(4).

### B. Factual Background

#### 1. Plaintiff Cuenca-Vidarte's Factual Allegations

In 2017, Plaintiff Cuenca-Vidarte paid 5,200,000 Colombian pesos, or approximately $1,400 U.S. dollars, to participate in the J-1 Visa program through APC Defendants, which was described to Cuenca-Vidarte as "a wonderful opportunity to live and work in the United States while taking classes and improving her English-speaking skills." ECF No. 6 ¶ 44.

In November 2017, after completing the application and matching process, Cuenca-Vidarte arrived in the United States and APC Defendants placed her in the home of Michaele C. Samuel and Adam Ishaeik (the "Samuel Defendants"). *Id.* ¶ 45. Cuenca-Vidarte alleges that, pursuant to the contract, she was "to provide childcare and child-related tasks for the Samuel family," which included general supervision, meal preparation, and light housekeeping tasks as it related to the children. *Id.* ¶ 46. Cuenca-Vidarte's contract "explicitly excluded 'heavy housework… or other non-child related labor for the household.'" *Id.* ¶ 47 (ellipses in original). Cuenca-Vidarte alleges that, in accordance with federal law, she was not to work more than 45 hours per week, or ten hours a day, and that she was to receive a "minimum of one-and one-half days off every week and one full weekend off," *id.* ¶ 48, but that despite the parties agreeing to these terms, the Samuel Defendants required Cuenca-Vidarte "to do heavy housework and to

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 5
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 4 of 27

work far in excess of the maximum hours set by law."[3] *Id.* ¶ 49. Cuenca-Vidarte further alleges

that the Samuel Defendants "exerted extreme control over Plaintiff" by "monitoring her every

move through a network of surveillance cameras placed throughout the house and front and back

yards" and that they would berate and reprimand Plaintiff if she failed to comply with their

"highly regimented daily schedule of childcare and house cleaning." *Id.* ¶ 50. Specifically,

Cuenca-Vidarte alleges that the Samuel Defendants required her to perform "heavy non-

childcare-related work" including the following: (1) mopping and cleaning windows, doors, and

light switches, (2) deep cleaning the oven, microwave, tables, cabinets, refrigerator, and stove,

and (3) cleaning using harsh cleaning supplies and bleach, sometimes without proper materials

such as gloves, which led to dryness and cracking in Cuenca-Vidarte's hands and her

development of "chemical sensitivity to cleaning supplies that persists to this day." *Id.* ¶ 51.

  When Cuenca-Vidarte objected to these additional cleaning tasks, the Samuel Defendants

"retaliated" against her by restricting her access to certain areas of their home including, for

example, access to the guest bathroom, *id.* ¶ 52. Cuenca-Vidarte alleges that the Samuel

Defendants justified her need to complete these additional cleaning tasks by "manipulating"

Cuenca-Vidarte "under the guise of telling her she was a 'family member.'" *Id.* ¶ 53. Cuenca-

Vidarte contends that, rather than being treated as a family member, "she was treated as a servant

who had no choice but to obey orders and to undertake any tasks assigned" by the Samuel

---

[3] Cuenca-Vidarte contends that host families directly supervise au pairs within the home and that, as part of the host family's contract with the sponsor, it is the host family that determines the au pairs daily schedule and approves her vacation time. ECF No. 6 ¶ 31. Although the host family determines the au pair's day-to-day duties, Cuenca-Vidarte contends that "Defendants AuPairCare acted jointly as employers with the Samuel family," *id.* ¶ 32, as APC Defendants recruited and hired her, including requiring her to participate in 32 hours of unpaid, pre-placement training, *id.* ¶35, set her salary and determined the method of payment and any deductions for food, lodging, and provided health insurance, *id.* ¶ 36, and that both set and promulgated work rules, including those for her compensation, benefits, and hours, *id.* ¶ 37. Cuenca-Vidarte further contends that APC Defendants effectively controlled the relationship between her and any host family because they "had the power to fire and remove Plaintiff Cucenca-Vidarte from her matched host family and force her to repatriate to her home country at Defendants AuPairCares's discretion[.]" *Id.* ¶ 38.

Defendants. *Id.* Relatedly, Cuenca-Vidarte makes several allegations with respect to the Samuel Defendants' restriction of her access to food while she was an au pair in their home. Specifically, Cuenca-Vidarte alleges that (1) they only provided her with a limited variety of cheap, mostly processed food items, such as "chicken nuggets, meatballs, milk, beans, rice, and bread," (2) she was told by the Samuel Defendants that she could not eat the fresh fruits and vegetables in the home, and (3) she could not drink the filtered water in the home. *Id.* ¶ 54. Moreover, Cuenca-Vidarte was only allowed to use the kitchen to prepare her meals during her designated time of either before 9:00 am or after 9:00 pm, as she was "strictly prohibited" from using the kitchen at the same time as the Samuel Defendants, and her ability to "have a cooked meal after 9:00 pm was conditioned on her continued interaction" with them. *Id.* ¶ 55. Specifically, if Cuenca-Vidarte wanted to eat with the Samuels Defendants, "she had to continue to interact with the Samuel's family and watch the family while Dr. Samuel cooked," which she alleges "only further extended her [working] hours." *Id.* Then, after dinner, Cuenca-Vidarte had to wash the dishes and cookware by hand, even though there was a dishwasher at the home, and she usually also cleaned the stove and dining room table and swept the floor. *Id.*

Cuenca-Vidarte additionally alleges that the Samuel Defendants went to "great lengths" to control her, including, with respect to her personal hygiene and limiting her to 15-minute showers, *id.* ¶ 56, micro-managing her work, by requiring her to re-do cleaning tasks, *id.* ¶ 59, and telling her when and where she could go. *See id.* ¶ 61. For example, Cuenca-Vidarte alleges that the Samuel Defendants often forbade her from using their car, despite requiring her to receive her driver's license, and that they required her to "inform them of who she was meeting with and what she was going to do." *Id.* Cuenca-Vidarte alleges that on one occasion, Dr. Samuel

insisted on driving her to the home of another host family to "evaluate the family" before she would give Cuenca-Vidarte permission to visit the au pair in that home. *Id.*

Cuenca-Vidarte also alleges that the Samuel Defendants' efforts to control her also extended to her ability to use her vacation time. She contends that she was unable to use her ten days of paid vacation because Dr. Samuel asked her to use her second week of vacation to accompany the family to Grenada, though she was told that "she would not be required to work much, if at all . . . and if she did work, she would be paid extra." *Id.* ¶ 57. Feeling pressured and "deciding to go because she had no money and wanted to go on a vacation," Cuenca-Vidarte accompanied the Samuel Defendants on the trip and was required to work every day, with no privacy, and had to share a room with the family. *Id.* Cuenca-Vidarte had to "clean baby bottles, prepare food, and dress the children," and she also had to watch the children alone on several occasions. *Id.* She alleges that she was not paid for her work in Grenada. *Id.*

The Samuel Defendants also "regularly belittled and berated" Cuenca-Vidarte by calling her "stupid, dirty, useless, and slow, and told her that there was something wrong with her," which she alleges caused her to develop anxiety and low self-esteem. *Id.* ¶ 58. Further, the Samuel Defendants "repeatedly" directed Cuenca-Vidarte "to be grateful because they allowed her to continue working and living with them in spite of her 'bad work.'" *Id.* ¶ 60. Cuenca-Vidarte contends that the Samuel Defendants often responded to her protests and complaints with the "veiled threat of deportation," *id.* ¶ 62, because the Samuel Defendants knew that her right to seek a new placement or "rematch" with a new family was contingent upon her receipt of a positive recommendation from them. *Id.* Therefore, they often threatened to give Cuenca-Vidarte a "terrible reference" if she refused "to comply with their every demand, including their demands that she work in excess of the weekly 45-hours set by the contract." *Id.* ¶¶ 63, 65. In

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 8
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 7 of 27

support of this threat, Cuenca-Vidarte alleges that Dr. Samuel informed her about one of her
previous au pairs who could not rematch with a new family and was forced to return to
Colombia, which Cuenca-Vidarte alleges scared her and made her feel "compelled to continue
working for the Samuel Defendants." *Id.* ¶ 63.

Cuenca-Vidarte contends that APC Defendants failed to readily support her in addressing
her situation with the Samuel Defendants even though she made "numerous attempts" to reach
out to them. *Id.* ¶ 64. She alleges that the Samuel Defendants eventually acted on their threats by
interfering with her ability to rematch with a new family. *Id.* ¶ 66. Specifically, the Samuel
Defendants "blocked her access to the internet and gave her negative references." *Id.* Cuenca-
Vidarte interviewed with three different potential host families and although they expressed
interest in hiring her, "each family ultimately declined after talking to the Samuel Defendants."
*Id.* ¶ 67.

Cuenca-Vidarte alleges that as a result of her experiences with the Samuel Defendants,
she "experienced a high level of stress and overall lack of nutrition that caused her to lose hair
and gain weight." *Id.* ¶ 68. During her time working for the Samuel Defendants, between
November 7, 2017 and September 28, 2018, Cuenca-Vidarte alleges that she was paid $195.75
per week, *id.* ¶¶ 94, 69, and that she did not receive any overtime compensation for the hours she
worked beyond 40 hours per week, *id.* ¶ 69, nor did she receive a reimbursement for $395.15 in
transportation costs she was set to receive per her contract with APC Defendants. *Id.* ¶ 70.[4]

---

[4] Cuenca-Vidarte also alleges she was required to spend $31.14 of her salary to replace a 100-piece counting toy
"when a single piece went missing." ECF No. 6 ¶ 71.

### 2. Plaintiff Peters' Factual Allegations

Plaintiff Peters is originally from San Juan de los Lagos, Mexico and, in 2016, she joined the J-1 visa program through Sponsor Au Pair in America.[5] ECF No. 6 ¶¶ 72–73. Peters alleges that she wanted to be an *au pair* "so she could come to the United States and learn English and experience American culture while advancing her professional goals." *Id.* ¶ 74.

In early 2016, Peters interviewed with the Samuel Defendants via Skype and "although she had a bad impression of the family based on the interview," she contends that she "felt she had to take the position as she was about to turn 26," which is the upper boundary of the program's age restriction. *Id.* ¶ 75. In June 2016, Plaintiff was formally matched with the Samuel Defendants and moved into their family home in Clinton, Maryland. *Id.* ¶ 76. Before joining the Samuel Defendants in their home, Plaintiff alleges that she received a training and orientation from her sponsor agency, but that it was conducted in English, and she did not understand everything she was told. *Id.* ¶ 77. Peters was neither advised of her labor rights nor informed of the minimum wage laws. *Id.* The Samuel Defendants also did not inform her of her labor rights under federal law and Maryland law. *Id.* ¶ 78.

During her time working for the Samuel Defendants, Peters alleges that she performed both childcare and housework including the following: (1) "a vigorous timetable of nine hours of meticulously scheduled childcare activities at least five days per week," (2) cleaning the living room, kitchen, stairs, bathrooms, and bedrooms and, moreover, Plaintiff alleges that the Samuel Defendants prepared daily schedules and required her to complete every task, even if they went beyond the nine-hour daily program. *Id.* ¶¶ 80–81. In total, she contends that Samuel Defendants required her to work approximately sixty hours a week. *Id.* ¶ 81.

---

[5] Au Pair in America is one of the sponsor organizations under the J-1 Visa Program, but it is not a defendant in the instant case. *See* ECF No. 6 ¶ 73 n.1.

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 10
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 9 of 27

Like Plaintiff Cuenca-Vidarte, Plaintiff Peters also alleges poor treatment by Samuel
Defendants during her time as their *au pair*. She alleges that they (1) berated and threatened her
with deportation if she failed to adhere to their strict daily schedule, (2) told her that she was
"dirty" and repeatedly told her that she should be "grateful" to live in their home, and (3)
prevented Peters from moving freely throughout their home because she was "constantly
monitored by video cameras." *Id.* ¶¶ 82–83. Moreover, Peters "was only allowed to engage in
recreational or leisure activities in her bedroom." *Id.* ¶ 83. Peters alleges that this poor treatment
from Samuel Defendants "took a mental and physical toll" and caused her to lose weight, have
difficulties sleeping, and "live[] in fear" of their threats to terminate her from the program. *Id.* ¶
82.

Plaintiff Peters, likewise, alleges that Samuel Defendants exercised significant control
over her life when she worked as an *au pair*. Specifically, she contends that Samuel Defendants
required her to adhere to a 10:00 p.m. curfew every day, regardless of her work schedule the
following day, and she alleges they did not give her the alarm code, despite her requests,
"[t]o ensure that [she] should could not go out freely, in spite of being an adult woman." *Id.* ¶ 86.
Additionally, she contends that, despite "the contract and the Samuel Defendants g[iving] the
impression that [she] was to be treated like a 'family member,'" Samuel Defendants also gave
her only "cheap, mostly processed food such as chicken nuggets, meatballs, ham, bread, cereal,
and milk" and "explicitly prohibited" her from eating the fresh food and vegetables in the home.
*Id.* ¶ 87. And on one occasion, after Peters took some bread from the Samuel Defendants to make
a sandwich, they yelled at her and told her that she could not touch their food. *Id.* As a result of
this, Peters contends that she suffered from stress, a loss of nutrition, hair, and weight, and that

she could not sleep and "would often go to bed hungry because she did not have access to healthy food until after 9 pm." *Id.* ¶ 88.

The Samuel Defendants also allegedly controlled Peters' ability to communicate with others. They provided Peters with a cell phone, which she contends was her only method of contacting her family in Mexico, but she could not use it during her working hours or during dinner, and Samuel Defendants did not allow Plaintiff to update the phone with her personal information. *Id.* ¶ 89. Further, on at least one occasion, Defendant Dr. Samuel took Peters' phone and accessed her WhatsApp messages, and in later February or early March 2017, Samuel Defendants confiscated her phone, which left Peters "with no way to contract her family or the sponsor agency until the end of the tenure." *Id.*

Peters also contends that, although she was required to have at least 1.5 days off per week and one weekend off per month, Samuel Defendants "rarely allowed her this mandated time off." *Id.* ¶ 84. Plaintiff Peters recounts one particular incident in the fall of 2016 where she accompanied Dr. Samuel to the Virgin Islands to take care of the Samuel child while Defendant Dr. Samuel participated in the work-related conference. *Id.* ¶ 85. While on this trip, she alleges that (1) Defendant Dr. Samuel required her to care for the child 24 hours a day, "including getting up with him throughout the night," (2) she was prohibited from taking the child to the pool or enjoying any "off-duty time" during that week, and (3) she was forced to share a single room with Defendant Dr. Samuel and the child, even though the program required her to have a separate room. *Id.*

During her time as an *au pair*, Peters alleges that she suffered from mental and emotional abuse at the hands of Samuel Defendants. For example, she alleges that in 2017, after working a ten-and-a-half hour day during the Super Bowl, she took the child to her room to watch the Half

Time Show, as she was not allowed to watch television in the common areas of the Samuel Defendants' home. *Id.* ¶ 90. Upon finding Peters in her room with the child, Defendant Dr. Samuel berated and yelled at her, and once Defendant Ishaviek arrived fifteen minutes later, he threatened Peters by "telling her that he would call the police and would claim that she had sexually abused the Samuel child, adding that then she would go to jail and be deported." *Id.* She further alleges that, despite Samuel Defendants repeated threats of a poor recommendation to any future host family, Peters believed she had to continue working for the Samuel Defendants or face them terminating her from the program and forcing her to return to her home country. *Id.* ¶ 91. Peters "had no one in the United States that she could turn to for help," and in one instance, Samuel Defendants called the sponsoring agency to complain about Peters, however, she was not provided an opportunity to speak with a counselor from the sponsoring agency. *Id.* ¶ 92.

Ultimately, Peters contends that the abusive treatment she endured "reached its tipping point" on March 11, 2017, when Peters had plans to meet with friends during the day, before the start of her shift, and Samuel Defendants demanded that Peters return to their home four hours early. *Id.* ¶ 93. Peters contends this demand to return home early, when her commute was two hours each way, "meant that she would have no time to enjoy her time off." *Id.* Peters challenged Samuel Defendants on this demand, and they threatened to call the sponsor agency and have her deported. *Id.* Peters, however, still left to meet with her friends. *Id.* Later that evening, Peters was contacted by the sponsor agency program counsel and was informed that Samuel Defendants called the emergency line on her and accused her of "attempting to hit Dr. Samuel, and refused to allow her to return to the home." *Id.* Peters was prohibited from entering the home to retrieve her belongings and was only returned her immigration documents when an agent from the sponsor agency intervened on her behalf. *Id.*

11

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 13
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 12 of 27

During her time working for Samuel Defendants, between June 16, 2016 and March 11, 2017, Peters alleges that she was paid $195.75 per week, regardless of the overtime hours she worked, *id.* ¶ 95, and that the only additional compensation she received was "approximately $20 once a month for ironing the Samuel family members' clothing." *Id.*

### 3. The APC Agreements

As the Court outlined in its November 30, 2021, Memorandum Opinion, ECF No. 40, Plaintiff Cuenca-Vidarte signed the first Agreement with the APC Defendants on September 4, 2017, ECF No. 46-7, and she signed her second agreement on September 27, 2018, ECF No. 22-2. Defendant Dr. Samuel signed her APC Agreement on October 3, 2017, ECF No. 44 at 28–34.

The APC Agreement signed by Defendant Dr. Samuel includes a section entitled "Dispute Resolution," in which it provides the following:

> 55. IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES ARISING OUT OF OR RELATING IN ANY WAY TO THE PERFORMANCE, ENFORCEMENT OR INTERPRETATION OF THIS AGREEMENT, SUCH DISPUTE SHALL BE DETERMINED BY BINDING ARBITRATION BEFORE THE AMERICAN ARBITRATION ASSOCIATION, ALTERNATIVE DISPUTE RESOLUTION SERVICES (ADR SERVICES), OR JUDICIAL ARBITRATION AND MEDIATION SERVICES (JAMS) IN SAN FRANCISCO, CALIFORNIA, UPON THE PETITION OF EITHER PARTY.
>
> In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and 1283.05. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction on the petition of either party. Host agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because, among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California.

ECF No. 44 ¶ 55.

### C. The *Beltran* Class Action and Settlement

On November 13, 2014, in *Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-CBS (D. Colo.), the *Beltran* Plaintiffs, including named Plaintiffs and putative class members who

participated in *au pair* programs, filed suit in the United States District Court for the District of

Colorado ("*Beltran* Class Action") against fifteen J-1 *au pair* sponsor agencies alleging that the

agencies "conspired to set weekly wages for sponsored au pairs at unlawfully low rates in

violation of the Sherman Antitrust Act . . . the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), and the FLSA." *Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-CBS (D.

Colo.), ECF No. 756.[6] Defendant AuPairCare, Inc., Plaintiff Cuenca-Vidarte's sponsor, was a

named Defendant, along with American Institute for Foreign Study d/b/a Au Pair in America,

who was Plaintiff Samuel's sponsor. *See id.*

The *Beltran* Plaintiffs alleged that the fifteen named sponsor agencies unlawfully

conspired to induce *au pairs* into accepting the State Department's posted minimum wage of

$195.75 per week for their stipend, which they contend was the "programmatic wage floor" and

not the maximum or a "government-fixed" amount of compensation allowed. *See* ECF No. 395

¶¶ 80, 144, 155–214. The Second Amended Complaint included the following ten counts:

restraint of trade in violation of the Sherman Antitrust Act (Count I), violation of Civil RICO

(Count II), breach of fiduciary duty under the laws of several states and the District of Columbia

(Count III), negligent misrepresentation under the laws of several states and the District of

Columbia (Count IV), constructive fraud or fraudulent concealment under the laws of the several

states and the District of Columbia (Count V), violation of several states' and the District of

Columbia's consumer protection laws (Count VI), failure to pay minimum wage and overtime in

violation of the FLSA (Count VIII), claims for unpaid wages under the laws of the several states

---

[6] The Court takes judicial notice of this docket. *See Brown v. Ocwen Loan Servicing, LLC*, Case No. PJM 14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir. 2016).

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 15
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 14 of 27

and the District of Columbia (Count IX), violations of the New York Wage Act (Count X), and

violations of New Jersey Wage Act (Count XI).[7]

On July 18, 2019, U.S. District Judge Christine M. Arguello of the United States District

Court for the District of Colorado ("Settlement Court") entered an Order Granting Final

Approval of Class and Collective Action Settlement ("Settlement Approval Order"), ECF No.

1229, in relation to the Notice of Settlement filed by the parties on January 9, 2019, ECF No.

1887. Paragraph 7 of Judge Arguello's July 18, 2019 Settlement Approval provides that the

"Released Parties . . . shall be released and forever discharged by all Settlement Class members"

from:

> [A]ny and all causes of action, judgments, liens, indebtedness, costs, damages, penalties,
> expenses, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever
> kind or character (each a "Claim"), known or unknown, arising on or before the Effective
> Date [July 18 2019], that are, were or could have been asserted against any of the
> Released Parties by reason of, arising out of, or in any way related to any of the facts,
> acts, events, transactions, occurrences, courses of conduct, representations, omissions,
> circumstances or other matters referenced in the Litigation, whether any such Claim was
> or could have been asserted by any Releasing Party on her or his own behalf or on behalf
> of other Persons.

ECF No. 1229 ¶ 7. "Released Parties," the Settlement Approval Order continues:

> [M]eans the Defendants in th[e] [*Beltran*] action, together with their respective parents,
> subsidiaries, officers, directors, employees, contractors, shareholders, attorneys, agents,
> representatives, insurers, *host families*, and affiliates, expressly, but without limitation,
> including recruiting affiliates named and unnamed in the course of th[e] [*Beltran*]
> Litigation for those Defendants who use the services of others to identify, recruit and/or
> screen au pair candidates.

*Id.* (emphasis added). And "Settlement Class Members" is defined in ¶ I.1.aa of the Notice of

Settlement as "any Person that is a member of the Settlement Class," and the "Settlement Class"

---

[7] Count VII was dropped from the *Beltran* Plaintiffs' Second Amended Complaint. *See Beltran v. InterExchange*,
Inc., No. 14-CV-03074-CMA-CBS, ECF No. 395.

is comprised of "all of the Classes identified in Paragraph 2 [of the Notice of Settlement], considered collectively." ECF No. 1187-1 ¶¶ I.1.aa, I.1.z.

Paragraph 2 of the Notice of Settlement provides that the "Settlement Class" "shall be comprised of . . . the eighteen Classes or Subclasses certified in the Order Granting in Part and Denying in Part Plaintiffs' Motion for Rule 23 Class Certification and Appointment of Class Counsel," *Id.* ¶ II.2, which was entered on February 2, 2018, ECF No. 828. In Section IV of this February 2, 2018 Order, Judge Arguello certified, in relevant part, an "Antitrust Class" comprised of "[a]ll persons sponsored by any Defendant to work as a standard au pair in the United States pursuant to a J-1 Visa[,]" and a "RICO Class" comprised of "[a]ll persons sponsored by Defendants Au Pair in America (American Institute for Foreign Study), AuPairCare, Inc., Cultural Care, Inc., or InterExchange, Inc. to work as a standard au pair in the United States pursuant to a J-1 Visa." ECF No. 828 at 34–35.

Further, the final sentence of Paragraph 7 of the July 18, 2019 Settlement Approval Order contains a carve-out provision, which provides:

> Notwithstanding the foregoing, this Release shall not extend to claims or potential claims that any au pair may possess against her or his host family or families if such claims are (i) unrelated to the Claims asserted in the Litigation or (ii) unrelated to host family obligations under the federal Au Pair Program requirements, e.g., compensation, hours, education, or services required.

ECF No. 1229 ¶ 7. Paragraph 4.i states that "Class Members who did not exclude themselves are bound by the terms of the Settlement Agreement, including all releases therein, and their claims are dismissed with prejudice," *id.* ¶ 4.i, and Paragraph 9 of the Settlement Approval Order provides that "[t]his Order is binding on all Settlement Class Members, except those individuals who validly and timely excluded themselves from the Class or from the Settlement." *Id.* ¶ 9.

The Settlement Court retained "continuing and exclusive jurisdiction" over the parties "and all matters relating [to] this matter, including the administration, interpretation, construction, effectuation, enforcement, and consummation of the settlement and this Order." *Id.* ¶ 11.

### D. Procedural History

Plaintiffs filed a Complaint, on June 22, 2020, ECF No. 1, and then filed a First Amended Complaint on July 1, 2020, ECF No. 6.[8]  APC Defendants filed a Motion to Compel Arbitration on September 23, 2020, ECF No. 22. Plaintiff Cuenca-Vidarte filed an Opposition to Defendants' Motion to Compel Arbitration on November 16, 2020, ECF No. 28, and Defendants filed a Reply in Support of Defendants' Motion to Compel Arbitration on December 7, 2020, ECF No. 30. On November 30, 2021, the Court granted APC Defendants' Motion to Compel Plaintiff Cuenca-Vidarte's claims against APC Defendants in Counts I–V of the First Amended Complaint, dismissed these claims, and ordered that they be submitted to arbitration. *See* ECF Nos. 40 &41. The Court also severed the arbitration provider clause in the 2017 APC Agreement and ordered that the parties were to proceed to arbitration using the 2018 APC Agreement and its arbitration selection clause. ECF No. 41.

On December 6, 2021, APC Defendants filed the now pending Motion to Compel Arbitration of Samuel's Crossclaims, ECF No. 43, which is unopposed. On December 13, 2021, APC Defendants submitted a supplement to its Motion to Compel Arbitration, ECF No. 44. On January 2, 2022, Samuel Defendants filed the additionally pending Motion to Dismiss, ECF No.

---

[8] In the First Amended Complaint, ECF No. 6, Plaintiff Cuenca-Vidarte alleges Counts I–V against both the APC Defendants and the Samuel Defendants. *Id.* ¶¶ 107–155. Plaintiff Sandra Peters alleges Counts I–V against only the Samuel Defendants. *Id.*

46, which Plaintiffs opposed on February 3, 2022, ECF No. 50. Samuel Defendants replied on February 17, 2022, ECF No. 51.

## II.   DISCUSSION

The Court will first address APC Defendants' Motion to Compel Arbitration of Samuel Defendants' crossclaims before turning to Samuel Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

### A.  Motion to Compel Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, "represents 'a liberal federal policy favoring arbitration agreements.'" *Murray v. United Food & Commercial Workers Intll Union*, 289 F.3d 297, 301 (4th Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). "The strength of this well-established policy favoring the enforcement of valid arbitration agreements, however, does not end our inquiry." *Id.* at 302. "[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Adkins*, 303 F.3d at 501 (quoting *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997)). Accordingly, before compelling an unwilling party to arbitration, a court must "engage in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray*, 289 F.3d at 302 (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999)).

A litigant may compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 19
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 18 of 27

defendant to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)); *see also* 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").

### 1.  Validity of the Arbitration Agreement

Given that the Motion to Compel Arbitration is unopposed here, it is undisputed that there is a dispute between the parties and that Samuel Defendants have sought to litigate the dispute rather than pursuing arbitration, there is a relationship of the transaction to interstate commerce, and that Defendant has refused to arbitrate; however, "[r]egarding the second element, "[w]hether a party agreed to arbitrate a particular dispute is an issue for judicial determination to be decided as a matter of contract." *See Johnson v. Circuit City Stores*, 148 F.3d 373, 377 (4th Cir. 1998) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986)); *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1656 (2016) (finding courts compel arbitration "if (i) the parties have entered into a valid agreement to arbitrate, and (ii) the dispute in question falls within the scope of the arbitration agreement").

The Fourth Circuit has held that "[i]n determining the parties' intent, we apply ordinary state law principles governing the formation of contracts." *Chorley Enters., Inc.*, 807 F.3d at 563. APC Defendants provide, which Samuel Defendants do not contest, that the APC Agreement signed by Defendant Dr. Samuel on October 3, 2017 contains a California choice of law provision, *see* ECF No. 43-1 at 5. "California law, like federal law, favors enforcement of valid arbitration agreements." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 678

(Cal. 2000). In fact, "the strong public policy of th[e] state [of California] favoring arbitration as a means of dispute resolution requires courts to indulge every intendment to give effect to such proceedings." *Martinez v. Scott Specialty Gases, Inc.*, 100 Cal. Rptr. 2d 403, 409–10 (Cal. Ct. App. 2000); *see also Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 99 Cal. Rptr. 2d 809, 816 (Cal. Ct. App. 2000) ("California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.") (citation omitted). Moreover, "[t]he party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1224–25 (Cal. 2012).

Under California law, "[c]ontract formation is governed by objective manifestations, not subjective intent of any individual involved." *Roth v. Malson*, 67 Cal. App. 4th 552, 557, 79 Cal. Rptr. 2d 226, 229 (1998). "The test is 'what the outward manifestations of consent would lead a reasonable person to believe.'" *Quantification Settlement Agreement Cases*, 201 Cal. App. 4th 758, 798, 134 Cal. Rptr. 3d 274, 307 (2011) (quoting *Allen v. Smith*, 94 Cal. App. 4th 1270, 1277, 114 Cal. Rptr. 2d 898 (2002)). Here, Defendant Dr. Samuel, Defendant Ishaeik, and the APC Defendants entered into a written agreement in which the Samuel Defendants, as a host family, agreed to abide by the terms and conditions outlined in the APC Agreement "which appl[ied] to the rendition of childcare services to minor children." ECF No. 44 at 28. This APC Agreement, in a section entitled "Dispute Resolution," includes an arbitration provision stating the following:

> 55. IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES ARISING OUT OF OR RELATING IN ANY WAY TO THE PERFORMANCE, ENFORCEMENT OR INTERPRETATION OF THIS AGREEMENT, SUCH DISPUTE SHALL BE DETERMINED BY BINDING ARBITRATION BEFORE THE AMERICAN

ARBITRATION ASSOCIATION, ALTERNATIVE DISPUTE RESOLUTION SERVICES (ADR SERVICES), OR JUDICIAL ARBITRATION AND MEDIATION SERVICES (JAMS) IN SAN FRANCISCO, CALIFORNIA, UPON THE PETITION OF EITHER PARTY.

*Id.* ¶ 55. Defendant Dr. Samuel's printed name and signature appears immediately before the "Dispute Resolution" section containing the arbitration clause. *See id.* Moreover, Samuel Defendants do not dispute the validity or enforceability of the APC Agreement, or the arbitration clause contained therein. Accordingly, the Court finds that the arbitration clause within the APC Agreement is a valid and enforceable agreement to arbitrate. *See Westfall v. USAA Sav. Bank*, No. 219CV02093GMNDJA, 2020 WL 5097510, at *2 (D. Nev. Aug. 27, 2020); *Smith v. Verizon Wireless (VAW) LLC*, No. 3:18-CV-00291-SB, 2018 WL 2294223, at *2 (D. Or. May 3, 2018), *report and recommendation adopted*, No. 3:18-CV-0291-SB, 2018 WL 2293932 (D. Or. May 18, 2018).

### 2. The Dispute and Scope of the Arbitration Agreement

The Court next addresses whether the dispute now at issue falls within the scope of the arbitration agreement. "Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citing *Mastrobuono v. Shearson Lehman Hutton*, Inc., 514 U.S. 52, 57 (1995)). Arbitration clauses that use language such as "any controversy or claim *arising out of or relating to* this Agreement" are viewed as broad in scope. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (emphasis added); *see also Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006); *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 n.2 (5th Cir. 1993) (noting that clauses including "relating to or arising out of" an agreement are broad and "they intend the clause to reach all aspects of the relationship.").

The October 3, 2017, APC Agreement signed by Defendant Dr. Samuel contains the broad "arising out of" language, *see* ECF No. 44 ¶ 55, specifically with respect to "any dispute between the parties arising out of or relating in any way to the performance, enforcement or interpretation of this agreement[.]" *Id.* Samuel Defendants' crossclaims for contribution/indemnification, as well as attorneys' fees and other costs, arise from Plaintiffs' allegations that they violated federal labor laws and federal and state wage laws addressing minimum wage hour requirements, and breach of the APC agreement between the *au pairs* and host families, and Samuel Defendants' responsibilities under the host family agreement. *See* ECF No. 20 at 19–20. Further, Samuel Defendants allege that, in all of their interactions with Plaintiffs, they "expressly and specifically relied on the representations of [APC Defendants] in connection with all relevant matters, especially . . . legal requirements of the U.S. Department of State's J-1 program in coordination with all applicable wage and hours laws." *Id.* at 19.

It is clear to the Court that Samuel Defendants' crossclaims, which stem from Plaintiffs' allegations regarding their adherence to federal and state laws, and their performance under the APC Agreement, "aris[e] out of or relat[e] . . . to the performance, enforcement or interpretation of" this Agreement. *See* ECF No. 44 ¶ 55; *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (holding that an agreement requiring arbitration of all disputes "arising in connection with this Agreement" encompassed "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract"). And Samuel Defendants do not dispute the scope of this language. Accordingly, the Court finds that the arbitration agreement encompasses Samuel Defendants' crossclaims. *See Verizon Wireless (VAW) LLC*, 2018 WL 2294223, at *2; *Chiron Corp. v. Ortho Diagnostic Sys.*,

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 23
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 22 of 27

Inc., 207 F.3d 1126, 1131 (9th Cir. 2000) (describing the phrase "arising out of or relating to" as "broad and far reaching").

It is for all these reasons the Court grants APC Defendants' Motion to Compel Samuel Defendants' Crossclaims. In the instant case, Samuel Defendants' crossclaims against APC Defendants are fully subject to arbitration because the APC Agreement is valid, and their claims fall within the scope of the APC Agreement signed by Defendant Dr. Samuel. As such, and at this juncture, these crossclaims are properly subject to dismissal. *See, e.g.*, *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001) ("[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable.").

### B. Motion to Dismiss

The Court next turns to Samuel Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")).

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 24
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 23 of 27

The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint[,]" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, see *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Samuel Defendants argue that the Court should dismiss Plaintiffs' Amended Complaint because (1) each of the five counts alleged is "subject to and released by the Settlement" in the *Beltran* Class Action, (2) each count fails to state a claim, and (3) each of the five counts in relation to Plaintiff Peters is barred by federal and state statutes of limitation. ECF No. 46 at 1–2.

When a court approves and finalizes a class action settlement, "an absentee class member who receives adequate notice of an action to which his class is a party, and who fails to opt out by the deadline stated in the notice, is bound by the disposition of the action, including settlement." *Smith v. Capital One Auto Fin., Inc.*, No. 11-cv-1023-JKB, 2012 WL 48380, at *3 (D. Md. Jan. 9, 2012). Therefore, for Defendants to succeed on their Motion to Dismiss, they must establish that: "Plaintiff was a member of the Settlement Class; the Settlement Agreement precludes the claims that Plaintiff seeks to assert in this case; Plaintiff received adequate notice

Case No. 1:14-cv-03074-CMA-KMT   Document 1250-1   filed 11/18/22   USDC Colorado   pg 25
of 28
Case 8:20-cv-01885-GJH   Document 54   Filed 09/30/22   Page 24 of 27

of the settlement; and Plaintiff did not timely opt out." *Roseberry-Andrews v. Schell &
Kampeter, Inc.*, No. 15-cv-1503-GJH, 2016 WL 1746026, at *2 (D. Md. May 2, 2016) (citing
*Smith*, 2012 WL 48380, at *3 ) (stating elements necessary to show that participation in class
action settlement precludes claims).

Defendants first argue that, based on Judge Arguello's July 18, 2019 Settlement Approval
Order, Plaintiffs are "indisputably Settlement Class Members." *See* ECF No. 46-1 at 12. The
Court agrees.

As previously explained, *see supra* § 1.C, Paragraph 7 of the Settlement Approval Order,
includes "all Settlement Class members," who are defined as "any Person that is a member of the
Settlement Class," *see Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-CBS, ECF No.
1187-1 ¶ I.1.aa, with the Settlement Class including, in relevant part, the certified Antitrust Class
and RICO class, *see* No. 14-CV-03074-CMA-CBS (D. Colo.), ECF No. 828 at 34–35. The
"Antitrust Class" included of "[a]ll persons sponsored by any Defendant to work as a standard au
pair in the United States pursuant to a J-1 Visa[,]" and the "RICO Class" included "[a]ll persons
sponsored by Defendants Au Pair in America (American Institute for Foreign Study),
AuPairCare, Inc., Cultural Care, Inc., or InterExchange, Inc. to work as a standard au pair in the
United States pursuant to a J-1 Visa." No. 14-CV-03074-CMA-CBS (D. Colo.), ECF No. 828 at
34–35. Based on these defined Classes from Judge Arguello's February 2, 2018 Order Granting
in Part and Denying in Part *Beltran* Plaintiffs' Motion for Rule 23 Class Certification and
Appointment of Class Counsel, Plaintiff Cuenca-Vidarte and Plaintiff Peters are members of
both certified classes. Specifically, each is a member of the Antitrust Class because Plaintiff
Cuenca-Vidarte was sponsored by named *Beltran* Defendant AuPairCare, Inc. to work, under a
J-1 Visa, as an *au* pair for the Samuel Defendants, and Plaintiff Peters was sponsored by

24

Defendant Au Pair Care in America, to do the same. *See* ECF No. 6 ¶¶ 6, 35–37, 73. They are both also members of the RICO Class for the same reason: each Plaintiff was sponsored by named *Beltran* defendants AuPairCare, Inc. and Au Pair Care in America. *See id.* And as Plaintiffs themselves concede, "[t]he settlement agreement defined 'Released Parties' to include both Defendants, and, as relevant here, *au* pair host families." ECF N0. 50-1 at 9. Further, neither Plaintiff has asserted that they "validly and timely excluded themselves from the Class or from the Settlement," as required by Judge Arguello's July 18, 2019 Settlement Approval Order. As such, the Court finds that Plaintiffs Cuenca-Vidarte and Peters are Settlement Class Members of the *Beltran* Class Action and, therefore, are subject to the *Beltran* Settlement.

In opposing Samuel Defendants' Motion, Plaintiffs argue that their claims fall outside the scope of the *Beltran* Class Action settlement and that is has "no bearing" on Plaintiffs' claims against Defendants. *See* ECF No. 50-1 at 9–13. However, in the final Settlement Approval Order, the Settlement Court retained "continuing and exclusive jurisdiction" over "all matters relating [to] this matter, including the administration, interpretation, construction, effectuation, enforcement, and consummation of the settlement and this Order." *Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-CBS (D. Colo.), ECF No. 1229 ¶ 11.

It would be plainly inconsistent for the Settlement Court to retain jurisdiction for the purpose of "administration, interpretation, construction," *id.*, "but permit another court to construe what it meant in that judgment." *Magnolia v. Connecticut Gen. Life Ins. Co.*, 157 F. Supp. 2d 583, 587 (D. Md. 2001). *See also Hankins v. CarMax, Inc.*, No. 11-cv-03685-RDB, 2012 WL 113824, at *5 (D. Md. Jan. 13, 2012) ("[W]here parties agree to submit all matters relating to an action or a settlement to a specific court, that court is given exclusive jurisdiction over those matters, in particular those concerning enforcement of the settlement."). That is

precisely the exercise this Court would be engaging in were it to determine whether Plaintiffs' claims including, for example, their trafficking and breach of contract claims, were "unrelated to" the claims asserted in the *Beltran* Class Action or "unrelated to host family obligations under the federal Au Pair Program requirements," *see* No. 14-CV-03074-CMA-CBS (D. Colo.), ECF No. 1229 ¶ 7, as is set forth in the carve-out to the release provision. *See Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir. 1998) ("[I]t would make no sense for the district court to retain jurisdiction to interpret and apply its own judgment to the future conduct contemplated by the judgment, yet have [a different] court construing what the federal court meant in the judgment.").

Accordingly, Plaintiffs have "failed to state a legally viable claim,"[9] *See Roseberry-Andrews*, 2016 WL 1746026, at *3; *see also Haro v. Household Int'l*, No. 03-cv-3558-DKC, 2004 WL 2958525, at *2 (D. Md. Dec. 21, 2004) (dismissing plaintiff's claims "without prejudice to her right to refile in the Northern District of California," which retained continuing jurisdiction "to implement the Settlement and to construe, enforce and administer the Settlement Agreement and the Settlement."). Plaintiffs' remedies, if any, exist in the Settlement Court, where they "have the right to present to the [settlement court] their claim that they are not bound by the settlement reached." *See Magnolia*, 157 F. Supp. 2d at 587; *see also In re Drs. Health, Inc.*, No. 05-cv-01493-L, 2008 WL 8889901, at *9 (D. Md. Mar. 28, 2008) ("Given this explicit retention of jurisdiction, [plaintiff's] arguments that it is not a party to the Class Action . . . and that the claims litigated in the adversary proceeding do not constitute Released Claims are properly heard by the Class Action court.").

---

[9] Although Defendants moved to dismiss under Rule 12(b)(6), the Court additionally dismisses for lack of subject matter jurisdiction over this issue. *See Magnolia*, 157 F. Supp. 2d at 588.

**III.      CONCLUSION**

For the foregoing reasons, APC Defendants' Motion to Compel Arbitration as to Samuel Defendants' Crossclaims, ECF No. 43, is granted, and Samuel Defendants' Motion to Dismiss, ECF No. 46, is granted without prejudice to the right of Plaintiffs to pursue their claims before the United States District Court  for the District of Colorado. *See Roseberry-Andrews*, 2016 WL 1746026, at *3; *Magnolia*, 157 F. Supp. 2d at 588. A separate Order shall issue.

Date: <u>September 30, 2022</u>                              <u>      /s/                                          </u>
                                                                        GEORGE J. HAZEL
                                                                        United States District Judge