**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Case No. 14-cv-03074-CMA

JOHANA PAOLA BELTRAN,
LUSAPHO HLATSHANENI,
BEAUDETTE DEETLEFS,
ALEXANDRA IVETTE GNZALEZ,
JULIANE HARNING,
NICOLE MAPLEDORAM,
LAURA MEJIA JIMENEZ,
SARAH CAROLINA AZUELA RASCON,
CATHY CARAMELO,
LINDA ELIZABETH,
GABRIELA PEREZ REYES,

and those similarly situated,

       Plaintiffs,

v.

INTEREXCHANGE, INC.,
USAUPAIR, INC.,
GREATAUPAIR, LLC,
EXPERT GROUP INTERNATIONAL INC., d/b/a Expert AuPair,
EURAUPAIR INTERCULTURAL CHILD CARE PROGRAMS,
CULTURAL HOMESTAY INTERNATIONAL,
CULTURAL CARE, INC., d/b/a Cultural Care Au Pair,
AUPAIRCARE INC.,
AU PAIR INTERNATIONAL, INC.,
APF GLOBAL EXCHANGE, NFP, d/b/a Aupair Foundation,
AMERICAN INSTITUTE FOR FOREIGN STUDY, d/b/a Au Pair in America,
ASSOCIATES IN CULTURAL EXCHANGE, d/b/a GoAuPair,
AMERICAN CULTURAL EXCHANGE, LLC, d/b/a GoAuPair,
GOAUPAIR OPERATIONS, LLC, d/b/a GoAuPair,
AGENT AU PAIR;
A.P.EX. AMERICAN PROFESSIONAL EXCHANGE, LLC, d/b/a ProAuPair, and
20/20 CARE EXCHANGE, INC., d/b/a the International Au Pair Exchange,

       Defendants.

---

### ORDER GRANTING CLASS COUNSEL'S
### MOTION TO INTERPRET CLASS ACTION SETTLEMENT

---

This matter is before the Court on Class Counsel's "Motion for Interpretation of Class Action Settlement." (Doc. # 1250.) For the following reasons the Court finds that the *Beltran* Class Action Settlement precludes subsequent claims by class members against Defendants and host families arising out of class members' au pair service prior to July 18, 2019, that relate to the wages, contracts, and host family obligations under the federal regulations. However, the Court finds that the Settlement does not preclude claims of forced labor and trafficking only to the extent they are brought against host families.

## I.      BACKGROUND

### A.      THE AU PAIR PROGRAM

The au pair program, operated by the Department of State ("DOS"), provides foreign nationals between the ages of 18 and 26 with a one-year "opportunity to live with an American host family and participate directly in the home life of the host family" principally through the provision of childcare. 22 C.F.R. § 62.31(a), (c)(1), (d). DOS designates certain entities to act as sponsor agencies, the exclusive entities authorized to recruit and place au pairs with host families in the United States. *Id*. § 62.31(c). In exchange for 45 hours of childcare per week, regulations require host families to provide au pairs with room and board, access to six semester hours of formal education credit, two-weeks paid vacation, and "a weekly [pay] rate . . . paid in conformance with

the requirements of the Fair Labor Standards Act [("FLSA")] as interpreted and implemented by the United States Department of Labor." *Id*. § 62.31(c)(2), (e)(6), (j)(1), (j)(4), (k)(1). The sponsor agencies are responsible for ensuring various conditions of employment, including but not limited to that host families are capable of and do meet various requirements, that au pairs are compensated in compliance with labor laws, and that au pairs do not work beyond specific limitations related to hours and duties. *Id*. § 62.31(e), (h), (j).

## B.    THE *BELTRAN* LITIGATION

In 2014 Plaintiffs, former au pairs, initiated litigation (the "*Beltran* Litigation") in this Court on behalf of themselves and all those similarly situated, against the designated sponsor organization Defendants. (Doc. # 1.) One host family, Pamela H. Noonan and Thomas J. Noonan ("the Noonans"), was named in the First Amended Complaint. *See generally* (Doc. # 101.) However, Plaintiffs and the Noonans stipulated to the voluntary dismissal of the Noonans in April of 2015. (Doc. # 118.)

In their operative Complaint, Plaintiffs alleged that sponsor organization Defendants ("Sponsors" or "Sponsor Defendants") conspired and agreed to set all au pair weekly wages at the purported minimum of $195.75 per week despite applicable regulations that required au pairs receive not less than minimum wage. (Doc. # 983 at ¶¶ 76–150.) Based on these factual allegations, the *Beltran* Plaintiffs asserted federal claims under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, *et seq*., and the FLSA, as well as state law claims based on Breach of Fiduciary Duty, Negligent

Misrepresentation, Constructive Fraud or Fraudulent Concealment, Consumer Protection laws, Unpaid Wages, and various state wage and hour laws. (*Id.* at ¶¶ 589–648.)

Although no host families were named as Defendants, the operative Complaint included factual allegations related to Named Class Plaintiff Johana Paola Beltran's experience as an au pair sponsored by Defendant Sponsor InterExchange, Inc. and working for the Noonans. (*Id.* at ¶¶ 365–96.) The operative Complaint also includes factual allegations related to each of the other Named Class Plaintiffs' experiences as au pairs sponsored by other Sponsor Defendants and working for other host families. (*Id.* at ¶¶ 354–427.) The Complaint details allegations by each of the Named Class Plaintiffs that Sponsors required them to attend three days to a week of unpaid childcare training and host families paid them the program's floor of $195.75 per week. (*Id.* at ¶¶ 376–79, 392, 404–07, 409, 412, 422–24, 427–29, 443–45, 450, 458–59, 461, 477–78, 480–81, 484, 491, 494, 504, 508–09, 515, 517, 522, 524, 529–34, 538.) For Ms. Beltran and seven other Named Class Plaintiffs, the Complaint also makes factual allegations regarding abuses by host families including, requiring au pairs to do housework beyond the limitations of the program, requiring au pairs to work more than the 45 hour-limitation imposed, limiting their meals or access to food, isolating them, and verbally attacking and threatening them. (*Id.* at ¶¶ 386–92, 430, 447, 464–66, 482, 495, 502–03, 525.)

In June 2017 and February 2018, this Court granted the *Beltran* Plaintiffs collective actions status for purposes of the FLSA, and class action status pursuant to

Federal Rule of Civil Procedure 23, respectively. (Docs. ## 569, 828.) The Court established 18 classes and subclasses including the "Antitrust Class," defined as "[a]ll persons sponsored by any [Sponsor] Defendant to work as a standard au pair in the United States pursuant to a J-1 Visa," the "RICO Class," comprised of "[a]ll persons sponsored by [Sponsor] Defendants Au Pair Care in America (American Institute for Foreign Study), AuPairCare, Inc., Cultural Care, Inc. or InterExchange, Inc., to work as a standard au pair in the United States pursuant to a J-1 Visa," and 16 State/Sponsor subclasses. (Doc. # 828 at 34–37.)

The parties ultimately settled. Sponsor Defendants agreed to pay $65.5 million to be distributed to participating class members with allocations based on federal minimum wage—including overtime pay, and additional amounts if au pairs worked in states with a higher minimum wage. (Doc. # 1189 at 3, 7–9.) "In exchange, the Classes are providing releases to the [Sponsor] Defendants and to host families. . . . The [Sponsor] Defendants will receive a standard general release. . . . The host families will receive a narrower release tailored to the claims asserted in the litigation." (*Id.* at 7.)

On January 23, 2019, this Court granted preliminary approval of the settlement and approved the notice to class members. (Doc. # 1191.) As part of this Court-approved notice plan, class members were advised that by filing a Claim Form or by doing nothing, they were giving up claims against Sponsors and host families. (Doc. # 1190-2 at 10-11); *see also* (Doc. # 1234 at ¶ 5.)

On July 18, 2019, this Court entered an Order Granting Final Approval of Class and Collective Action Settlement. (Doc. # 1229) *amended by* (Doc. # 1234.) Pursuant to

the Settlement Approval Order, class members of all 18 classes and subclasses

"released and forever discharged" the:

> Released Parties . . . from any and all causes of action, judgments, liens, indebtedness, costs, damages, penalties, expenses, obligations, attorneys' fees, losses, claims, liabilities, and demands of whatever kind or character (each a 'Claim'), known or unknown, arising on or before the Effective Date [July 18, 2019], that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in the Litigation, whether any such Claim was or could have been asserted by any Releasing Party on her or his own behalf or on behalf of other Persons.

(Doc. 1234 at ¶ 7.) The "Released Parties" were comprised of

> Defendants in this action, together with their respective parents, subsidiaries, officers, directors, employees, contractors, shareholders, attorneys, agents, representatives, insurers, host families, and affiliates, expressly, but without limitation, including recruiting affiliates named and unnamed in the course of this Litigation for those Defendants who use the services of others to identify, recruit and/or screen au pair candidates.

(*Id.*) Excepted from the Release were any

> claims or potential claims that any au pair may possess against her or his host family or families if such claims are (i) unrelated to the Claims asserted in the Litigation or (ii) unrelated to host family obligations under the federal Au Pair Program requirements, e.g., compensation, hours, education, or services required.

(*Id.*) The Court's Order was "binding on all Settlement Class Members, except those

individuals who validly and timely excluded themselves from the Class or from the

Settlement." (*Id.* at ¶ 9.)

Finally, this Court retained "continuing and exclusive jurisdiction" over the parties,

and "all matters relating [to] this matter, including the administration, interpretation,

construction, effectuation, enforcement, and consummation of the settlement and this Order." (*Id.* at ¶ 11.)

## C.    THE MARYLAND LITIGATION

On June 22, 2020, Tatiana Cuenca-Vidarte and Sandra Peters (collectively the "Maryland Plaintiffs"), former au pairs, initiated litigation (the "Maryland Litigation") in the United States District Court for the District of Maryland against Michaele C. Samuel and Adam Ishaeik (the "Samuel Defendants"), Ms. Cuenca-Vidarte's Sponsor—AuPairCair, and others. (Doc. # 1250-1 at 2.) Ms. Peters, through Sponsor Au Pair in America—an organization of the American Institute for Foreign Study—served as an au pair for the Samuel Defendants from June 16, 2016, through March 11, 2017.[1] (Doc. # 1250-1 at 13; Doc. # 1250-4 at ¶¶ 73, 76, 93, 95.) Ms. Cuenca-Vidarte, through Sponsor AuPairCare, served as an au pair for the Samuel Defendants from November 7, 2017, through September 28, 2018. (Doc. # 1250-1 at 8; Doc. # 1250-4 at ¶ 44–45, 94.)

In their operative Complaint, the Maryland Plaintiffs alleged a multitude of mistreatment by the Samuel Defendants. These included:

- requiring them to "do heavy housework" specifically "(1) mopping and cleaning windows, doors, and light switches, (2) deep cleaning the oven, microwave, tables, cabinets, refrigerator, and stove, and (3) cleaning using harsh cleaning supplies and bleach, sometimes without proper materials such as gloves," (Doc. # 1250-4 at ¶¶ 49, 81);

---

[1] The Maryland Plaintiffs did not name Ms. Peters' Sponsor, Au Pair in America, as a defendant In the Maryland Litigation. (Doc. # 1250-4 at 18 n.1.)

- requiring them "to work far in excess of the maximum hours set by law," (*id.* at ¶¶ 49, 80–81);

- "exert[ing] extreme control over" them by continuously monitoring them via a network of surveillance cameras placed throughout the house and yards, and micromanaging their work, (*id.* at ¶¶ 50, 56, 59, 80, 83);

- isolating them by limiting their access to the host family's car, the internet and cell phones (their only means of communicating with family), and to friends, (*id.* at ¶¶ 61, 66, 86, 89, 93);

- restricting their access to food, (*id.* at ¶¶ 54–55, 87–88);

- "regularly belittle[ing] and berat[ing]" them for example by calling them "stupid, dirty, useless, and slow, and [by telling Ms. Cuenca-Vidarte] that there was something wrong with her," (*id.* at ¶¶ 58, 82);

- threatening them with deportation and police action, (*id.* at ¶¶ 62, 82, 90, 93); and

- paying them exactly $195.75 per week with no compensation for overtime, (*id.* at ¶¶ 69, 94–95).

Based on these factual allegations, the Maryland Plaintiffs asserted violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq.*, the FLSA, 29 U.S.C. § 201, *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab & Empl. § 3-401, *et seq.*, the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq.*, and breach of contract under Maryland law. (Doc. # 1250-1 at 2.)

On January 2, 2022, the Samuel Defendants filed a Motion to Dismiss, arguing *inter alia* that the District Court of Maryland should dismiss the Maryland Plaintiffs' operative Complaint because "each of the five counts alleged is 'subject to and released by the Settlement' in the *Beltran* Class Action." (*Id.* at 24.) The Honorable Judge George J. Hazel granted the Motion on September 30, 2022. (*Id.* at 28.) In so doing he determined that both Maryland Plaintiffs were members of the *Beltran* Antitrust and RICO Classes because they were sponsored by *Beltran* Sponsor Defendants to work under a J-1 Visa as au pairs and had not validly and timely excluded themselves from the Class or Settlement. (*Id.* at 25–26.) Having served as au pairs prior to the July 18, 2019 Effective Date, Judge Hazel thereby concluded that the Maryland Plaintiffs were subject to the *Beltran* Settlement. (*Id.* at 26.) Finally, Judge Hazel held that dismissal of the Maryland Plaintiffs' claims was proper because—due to this Court's "continuing and exclusive jurisdiction" over the parties and "interpretation, construction, [and] effectuation . . . of the settlement"—he lacked subject matter jurisdiction to determine if the Maryland Plaintiffs' claims were released by the *Beltran* Settlement Agreement. (*Id.* at 26–27.)

On November 18, 2022, the Maryland Plaintiffs, as *Beltran* Class Members, filed a Motion with this Court, requesting an order ruling that "the *Beltran* Settlement does not bar their claims," or "holding that this Court does not have exclusive jurisdiction to decide this issue." (Doc. # 1250 at 3.) The Samuel Defendants, who are not parties to the *Beltran* Litigation, did not respond. However, two Sponsor Defendants to the *Beltran* Litigation, AuPairCare, Inc., and Cultural Care Inc., filed Responses in opposition to the

Motion, noting their interest in the interpretation of a Settlement Agreement to which they are parties. (Docs. ## 1255 and 1256.) The Court limits its review to interpreting the *Beltran* Class Action Settlement. This Order does not proport to bind any parties or nonparties in any way.[2]

## II.   <u>DISCUSSION</u>

### A.   **CLAIM PRECLUSION OR *RES JUDICATA***

*Beltran* Sponsor Defendant Cultural Care Inc. argues that the Maryland Plaintiffs are precluded from asserting their claims in the Maryland Litigation by the *Beltran* Settlement Agreement. (Doc. # 1256 at 13–15.) "[U]nder federal law, settlements have claim-preclusive effect between the parties to the settlement." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1271 (10th Cir. 2022) (quoting *Nichols v. Bd. of Cnty. Comm'rs of Cnty. of La Plata*, 506 F.3d 962, 969 (10th Cir. 2007)). This is true because,

> [t]he procedural safeguards in Rule 23 requiring sufficient notice, adequate representation, and judicial approval of the class settlement were intended to mitigate against the potentially harsh consequences of *res judicata*. [*Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 648–49 (N.C. Cal. 1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981)]. When these requirements are met, a class action defendant should receive the full benefit of the doctrine of *res judicata*, regardless of whether the case advanced to trial or settled prior to trial. *Id.*

*Kuncl v. Int'l Bus. Machs. Corp.*, 660 F. Supp. 2d 1246, 1252 (N.D. Okla. 2009). Where a federal district court entered the final judgment adopting a settlement, as in the instant case, federal law applies. *Denver Homeless*, 32 F.4th at 1271 (citing *Yapp v. Excel*

---

[2] The Maryland Plaintiffs argue that this Court has personal jurisdiction over the Samuel Defendants because, as host families, they are third party beneficiaries of the *Beltran* Settlement Agreement. (Doc. # 1250 at 7–10.) However, this issue is not before the Court because the sole issue before this court is interpretation of the Settlement Agreement.

*Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999)). The three elements of federal claim preclusion are: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Id.* (quoting *Johnson v. Spencer*, 950 F.3d 680, 693 (10th Cir. 2020)).

Settlements "are of a contractual nature and, as such, their terms may alter the preclusive effects of a judgment." *Id.* (quoting *In re Young*, 91 F.3d 1367, 1376 (10th Cir. 1996)). In other words, contractual provisions can supplant traditional preclusion principles "if it is clear that the parties intended preclusion as a part of their agreement." *Id.* The Court concludes that the *Beltran* Settlement Agreement intended to, and does, preclude some, but not all, of the claims the Maryland Plaintiffs seek to assert against the Samuel Defendants in the Maryland Litigation.

The Maryland Plaintiffs do not explicitly discuss the doctrine of *res judicata* but do make related arguments. As it relates to the identity of parties, the Maryland Plaintiffs argue that *Beltran's* "class plaintiffs have not adequately represented the interests of [the Maryland Plaintiffs]." (Doc. # 1250 at 11–12.) As it relates to the "identity of the cause of action in both suits," the Maryland Plaintiffs argue that (1) their TVPRA and Maryland state claims do not share an "identical factual predicate" with the *Beltran* Litigation, (2) their Maryland state law claims are not precluded because there was no sub-class in Maryland against their Sponsors, and (3) because the Maryland Plaintiffs did not affirmatively opt-in to *Beltran's* FLSA collective action, they cannot be precluded from asserting FLSA claims in the Maryland Litigation. (*Id.* at 10–15.)

1.      Preclusion is Part of the *Beltran* Settlement Agreement

The plaint text of the *Beltran* Settlement Agreement makes clear that the parties intended it to have a preclusive effect.[3] The Agreement includes a broad release, which provides

> Released Parties . . . shall be **released and forever discharged by all Settlement Class Members** (the "Releasing Parties") from any and all causes of action, judgments, liens, indebtedness, costs, damages, penalties, expenses, obligations, attorneys' fees, losses, claims, liabilities, and demands of whatever kind or character (each a 'Claim'), **known or unknown**, arising on or before the Effective Date [July 18, 2019], that are, were **or could have been asserted** against any of the Released Parties by reason of, arising out of, **or in any way related to any of the facts**, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in the Litigation, whether any such Claim was or could have been asserted by any Releasing Party on her or his own behalf or on behalf of other Persons.

(Doc. 1234 at ¶ 7 (emphasis added)). In its Motion for Preliminary Approval of Class and Collective Action Settlement, Class Counsel acknowledged the far reaching scope of this Release, stating that "[i]n exchange [for the Settlement payment], the Classes are providing releases to the Defendants and to host families. . . . The Defendants will receive a standard general release. . . . The host families will receive a narrower release tailored to the claims asserted in the litigation." (Doc. # 1189 at 7.)

---

[3] Neither party disputes that the *Beltran* Settlement Agreement is a final judgment on the merits for *res judicata* purposes. *See Denver Homeless*, 32 F.4th at 1271 n.11 (citing *Arizona v. California*, 530 U.S. 392, 414 (2000) (stating settlements "ordinarily support claim preclusion"); *Hoxworth v. Blinder*, 74 F.3d 205, 208 (10th Cir. 1996) ("Generally, court-approved settlements receive the same *res judicata* effect as litigated judgments.")).

2.    <u>The Release Encompasses the Parties to the Maryland Litigation</u>

    *a. The Maryland Plaintiffs*

The Maryland Plaintiffs are "persons sponsored by any [*Beltran* Sponsor] Defendant to work as a standard au pair in the United States pursuant to a J-1 Visa" prior to the Settlement Agreement's Effective Date. *See* (Doc. # 1250-4 at ¶¶ 44, 73.) Thus, they are members of both the Antitrust and the RICO Classes. (Doc. # 828 at 34–35.) The Maryland Plaintiffs acknowledge their class membership in the instant motion. (Doc. # 1250 at 2 ("Class Members Sandra Peters and Tatiana Cuenca-Vidarte, . . . seek this Court's interpretation of the scope of the *Beltran* Settlement . . . .")). However, they argue that their interests were not adequately represented by *Beltran's* Plaintiffs. (*Id.* at 11–12.) The Court concludes that the Maryland Plaintiffs were adequately represented in the *Beltran* Litigation but—as will be discussed in detail below—that their labor trafficking claims fall within the exception to the Release which permits some types of future claims against host families.

"It is well settled that prior class-action judgments bind 'absent class members' that were 'adequately represented' in the first case." *Denver Homeless*, 32 F.4th at 1273 (quoting *Pelt v. Utah*, 539 F.3d 1271, 1284 (10th Cir. 2008)). "Inadequate representation occurs 'only where the requirements of due process were not afforded.'" *Id.* (quoting *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1243 (10th Cir. 2017)).

The Maryland Plaintiffs were adequately represented in *Beltran*. They do not argue their counsel was constitutionally deficient or that their due process rights were

violated.[4] As *Beltran* Sponsor Defendant Cultural Care points out, *Beltran's* Class Counsel included the lead attorney for the instant motion. (Doc. # 1256 at 5 n.3.) Rather, the Maryland Plaintiffs argue that they were not adequately represented because the claims of the *Beltran* Plaintiffs stem from facts distinct from those the Maryland Plaintiffs seek to assert. (Doc. # 1250 at 11.) As this argument does not fall into a recognized representation exception as outlined above, and more principally concerns the identity of the causes of action of the two suits, it will be considered in Section II.A.4.

       *b. The Samuel Defendants*

The parties released by the *Beltran* Settlement agreement included not only the "Defendants . . . together with their respective parents, subsidiaries, officers, directors, employees, contractors, shareholders, attorneys, agents, representatives, [and] insurers," but also "host families." (Doc. 1234 at ¶ 7.) The Samuel Defendants were the Maryland Plaintiffs' host family prior to the July 18, 2019 Effective Date of the *Beltran* Settlement Agreement. (Doc. # 1250-1 at 8, 13.) As a host family, the plain language of the *Beltran* Settlement Agreement inoculates the Samuel Defendants from claims covered by the release. *Denver Homeless*, 32 F.4th at 1273 (citing *In re Young*, 91 F.3d at 1376). Therefore, the Court concludes that the second element of *res judicata*—identity of parties in the two litigations—is satisfied. *Id.* at 271.

---

[4] The Maryland Plaintiffs make one due process argument in their Motion. (Doc. # 1250 at 14–15.) However, this argument relates only to their FLSA claims and therefore will be addressed in Section II.A.3.b.

3.    The Release Encompasses the Maryland State and FLSA Claims at Issue in the Maryland Litigation

The Court now turns to the final element of *res judicata* – the causes of action in both suits. The Court will discuss the Maryland Plaintiffs' claims—and their related arguments—by category: (1) Maryland state law claims, (2) FLSA claims, and (3) claims under the TVPRA.

a.  *Counts III–V: Maryland State Claims*

The Maryland Plaintiffs seek to bring three counts pursuant to Maryland state law: (a) Count III alleges violations of the MWHL, Md. Code Ann., Lab & Empl. § 3-401, *et seq.*; (b) Count IV alleges violations of the MWPCL, Md. Code Ann., Lab & Empl. § 3-501, *et seq.*; and (c) breach of contract. (Doc. # 1250-4 at .) All three claims are brought by Plaintiff Cuenca-Vidarte against all Defendants, and by Plaintiff Peters against the Samuel Defendants. (*Id.*)

The Maryland Plaintiffs make two arguments related to whether these claims are precluded by the *Beltran* Settlement Agreement. First, as it relates to their Maryland breach of contract claim, Claim V, the Maryland Plaintiffs argue that the *Beltran* Settlement Agreement does not preclude this claim because it does not share an "identical factual predicate" with the *Beltran* Litigation. (Doc. # 1250 at 11.) Specifically, they assert that the *Beltran* Class Representatives "alleged no facts related to . . . breach of contract by *au pair* host families, nor did it assert legal claims based thereon." (*Id*.) However, the Court disagrees.

The *Beltran* Settlement Agreement forever discharges

> any and all causes of action . . . of whatever kind or character (each a 'Claim'), **known or unknown**, arising on or before the [July 18, 2019,] Effective Date, that are, were **or could have been asserted** against any of the Released Parties by reason of, arising out of, **or in any way related to any of the facts**, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in the Litigation. . . .

(Doc. 1234 at ¶ 7 (emphasis added)). Further, the Settlement Agreement specifically addresses unknown claims, stating,

> [t]he Releasing Parties acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true, with respect to the claims being released pursuant to this Agreement. Nevertheless, it is the intention of the Releasing Parties in executing this Agreement that they fully, finally, and forever settle and release all such matters, and all claims relating thereto, which exist or might have existed (whether or not previously or currently asserted in any action or proceeding) against the Released Parties. The Releasing Parties voluntarily waive and relinquish any and all rights to seek relief for unknown, unsuspected, or unanticipated claims or damages which the Releasing Parties may have under any applicable statutes or principles of law that limit the release of unknown, unsuspected, or unanticipated claims or damages . . . .

(Doc. # 1250-2 at 16–17.)

The Maryland Plaintiffs' breach of contract claim is based on the Samuel Defendants requiring the Maryland Plaintiffs to perform duties, and work hours in excess of those provided by the au pair regulations which were reiterated in the individual contracts between them, the Samuel Defendants, and in the case of Plaintiff Cuenta-Vidarte, her Sponsor AuPairCare. (Doc. # 1250-4 at ¶¶ 141–55.) The operative complaint in *Beltran* also made factual allegations regarding the contracts between Named Class Representatives, Sponsor Defendants, and host families as well as the

ways in which *Beltran* Plaintiffs were required to work beyond the limits imposed by the program. (Doc. # 983 at ¶¶ 18–20, 23–29, 219, 257, 320, 355, 386, 390–92, 464, 495, 502–03, 525.) Generally speaking, at the heart of the *Beltran* Litigation was Sponsors' and host families' failure to pay au pairs wages as required by law and regulation. This same issue is central to the Maryland Plaintiffs' breach of contract claim. Thus, the Court concludes that the Maryland Plaintiffs' breach of contract claim is sufficiently "related to" the *Beltran* Litigation to be precluded by the language of that agreement's Release. (Doc. # 1234 at ¶ 7.)

To the extent the Maryland Plaintiffs argue that the *Beltran* Class Representatives did not adequately represent them as it relates to their breach of contract claim (Doc. # 1250 at 11), the Court concludes that Named Class Representatives in the *Beltran* Litigation shared common interests with the Maryland Plaintiffs and, thus, adequately represented the Maryland Plaintiffs as it relates to this claim. *See TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) (explaining that "the danger [in] a class representative not sharing common interests with other class members [is that the class] would endeavor to obtain a better settlement by sacrificing the claims of others at no cost to themselves by throwing the others' claims to the winds." (citation and internal quotation marks omitted)).

The Maryland Plaintiffs also argue that Counts III and IV, their MWHL and MWPCL claims, are not precluded by the *Beltran* Settlement Agreement because there was no sub-class for au pairs who worked in Maryland with their Sponsors. (Doc. # 1250 at 12–13.) In support, they cite to *Hesse v. Sprint Corp.*, 598 F.3d 581, 590–92

(9th Cir. 2010), in which the United State Court of Appeals for the Ninth Circuit found that claims in a previous class action based on a nationwide set of facts did not preclude a subsequent action based on claims specific to one state. (Doc. # 1250 at 12–13.) Cultural Care disagrees. It argues that *Beltran* Class Members released all claims within the scope of the Release, not only those which fit within certified subclasses. (Doc. # 1256 at 7.) Further Cultural Care argues that, rather than establishing a "special rule [] that nationwide . . . classes cannot release [state-specific] claims," the *Hesse* court reached a conclusion specific to the facts of that case. (*Id.* at 12–13.)

The Court agrees that the lack of a Maryland-specific subclass encompassing au pairs sponsored by the Maryland Plaintiffs' Sponsors does not exempt Counts III and IV from the preclusive effects of the language of the *Beltran* Settlement Agreement. The Maryland wage claims are all "related to" facts, acts, transactions, occurrences, and courses of conduct at issue in the *Beltran* Litigation. In fact, the MWHL and MWPCL claims are nearly identical to the state wage and hour claims raised in *Beltran*. *Compare* (Doc. # 983 at ¶¶ 628–48), *with* (Doc. # 1250-4 at ¶¶ 129–40.) In reaching the Settlement Agreement the Court finds that the parties intended to, and did, release all related wage claims throughout the country, not merely in the states with designated sub-classes. *See* (Doc. # 1234 at ¶ 7; Doc. # 1250-2 at 16–17.)

*Hesse* does not require a different conclusion. The class plaintiffs in *Hesse* alleged that Defendant Sprint, a wireless service provider, violated Washington state law which specified that a Washington state business and occupation tax could not be

imposed upon customers. 598 F.3d at 585–86. Sprint argued that the claim was precluded by a previously settled class action ("the *Benny* Settlement"), which released "claims . . . that . . . could have been . . . asserted . . . in [an]other court or proceeding which relate . . . to allegations that . . . [Sprint] failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes. . . ." *Id.* at 587 (internal quotation marks omitted).

The Ninth Circuit determined that the *Benny* Settlement's release did not bar the *Hesse* plaintiffs' claims for two reasons. First, the Ninth Circuit determined that the *Benny* class representative did not adequately represent the *Hesse* plaintiffs' interests because (1) the *Benny* action was brought to remedy a different set of injuries— "Sprint's nationwide surcharges that shifted to its customers certain costs imposed by the federal government;" and (2) the *Benny* class representative's "interest in settling his federal Regulatory Fee claims . . . was in conflict with the [*Hesse*] Plaintiffs' unrepresented interest in prosecuting their [Washington state tax law] claims." *Id.* at 589. Second, the Ninth Circuit found that *res judicata* did not bar the *Hesse* claims because the "claims underlying the *Benny* settlement dealt exclusively with specific nationwide surcharges to recoup the costs of compliance with federal programs, whereas the claims at issue in the [*Hesse*] case involve Sprint's statewide surcharge to recoup the cost of the Washington [business and occupation] tax allegedly in violation of a Washington statute." *Id.* at 591. Thus, although both cases "involve[d] claims that Sprint improperly billed government taxes or fees to its customers, [] they deal[t] with

different surcharges, imposed to recoup different costs, that were alleged to be improper for different reasons." *Id.*

*Hesse* is materially distinguishable from the instant case. First, as discussed previously and again below, the Court has determined that the Maryland Plaintiffs were adequately represented in the *Beltran* Litigation. Second, the *Beltran* Litigation was brought to remedy similar injuries to those alleged by the Maryland Plaintiffs—Sponsor Defendants and host families failing to pay au pairs in accordance with state laws, as well as federal law and regulations. *Compare* (Doc. # 983 at ¶¶ 386–92, 430, 447, 464–66, 482, 495, 502–03, 525, 617–48), *with* (Doc. # 1250-4 at ¶¶ 59–50, 54–56, 58–59, 61–62, 66, 69, 80–83, 86–90, 93–95, 129–55.) Finally, unlike in *Hesse*, the underlying Settlement Agreement at issue in the instant case settled both state and federal claims. *See generally* (Docs. ## 983, 1234.) Although the exact Maryland state wage claims were not brought in the *Beltran* Litigation, that action included a claim based on violation of wage and hour laws of the District of Colombia and several states (Doc. # 983 at ¶¶ 628–36), and distributions of the Settlement fund were based on the higher of either federal or state minimum wages (Doc. # 1189 at 7–9, App'x A).

*Hesse* supports the Maryland Plaintiffs' arguments in that it highlights the importance of courts carefully considering the preclusive effects of broadly written releases in nationwide class action settlements. However, the Court does not find that *Hesse* holds that a class action based on a nationwide set of facts can never preclude state-specific claims. The Court concludes that in the instant case the parties to the

*Beltran* Litigation intended to, and did, release all related state law claims even where no state-specific sub-class was established. (Doc. # 1234 at ¶ 7.)

> b.  *Count II: Violations of the FLSA*

Turning to Maryland Plaintiff's Count II, claims arising under the FLSA, the Maryland Plaintiffs argue that because they did not affirmatively opt-in to *Beltran's* FLSA collective action, they cannot be precluded from asserting FLSA claims in the Maryland Litigation. (Doc. # 1250 at 13–14.) The Court disagrees.

The *Beltran* Litigation was a "hybrid" lawsuit, involving both a Rule 23 class action and an FLSA collective action. (Doc. # 983 at ¶¶ 539–88.) Rule 23 allows one or more class members to sue, as a representative party, on behalf of all class members as long as certain prerequisites are met. Fed. R. Civ. P. 23(a). If a court certifies the class under Rule 23(b)(3), class members must be sent notice that, among other things, informs them of the nature of the action, their right to exclude themselves from the action, and the binding effects of the class judgment. Any member who does not wish to be bound by the judgment must timely exclude themselves by affirmatively opting out of the class. Fed. R. Civ. P. 23(c)(2)(B).

On the other hand, group actions brought asserting FLSA rights are known as collective actions and are governed by § 216(b) of the FLSA. 29 U.S.C. § 216(b). "Congress enacted the FLSA in 1938 with the goal of protect[ing] all covered workers from substandard wages and oppressive working hours." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012). The "prime purpose" in enacting the FLSA "was to aid the unprotected, unorganized and lowest paid of the nation's working

population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945). To help further its goals, the FLSA provides that an employee or multiple employees may bring an action "on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

Section 216(b) of the FLSA states that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party. . . ." 29 U.S.C. § 216(b). Based on this language, courts have found that employees must affirmatively opt-in to the case in order to be bound by a judgment in FLSA collective actions. Employees who do not opt-in are not bound by the results of the litigation, including any settlement. *See Dolan v. Project Constr. Corp.*, 725 F.2d 1263, 1266 (10th Cir. 1984), *abrogated on other grounds by Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165 (1989). Thus, every hybrid action will present this inherent conflict between FLSA § 216(b)'s opt-in requirement and Rule 23's opt-out requirement.

Few courts have directly addressed whether final judgment in a hybrid action precludes Rule 23 class members who failed to opt-in to the FLSA action from pursuing FLSA claims arising from the same facts or time period. However, to the Court's knowledge, all that have reached the issue have agreed that "§ 216(b) does not create an exception to the *res judicata* doctrine." *Kuncl*, 660 F. Supp. 2d at 1251; *see also Mason v. Lumber Liquidators, Inc.*, No. 17-CV-4780 (MKB), 2021 WL 7906503, at *8 (E.D.N.Y. Jan. 6, 2021); *Cisneros v. EP Wrap-It Insulation, LLC*, No. 19-500 GBW/GJF,

2021 WL 2953117, at *9 (D.N.M. July 14, 2021); *Lucas v. JBS Plainwell, Inc.*, No. 1:11-cv-302, 2012 WL 12854880, *8 (W.D. Mich. Mar. 8, 2012).

Other courts have discussed the issue when determining whether hybrid class actions should be certified at all. In these cases, most Courts have warned that class action and collective action certification in hybrid cases could, or will, result in preclusion of later FLSA claims based on the same facts by all class members. *See, e.g.*, *Ganci v. MBF Inspection Servs.*, 323 F.R.D. 249, 265 (S.D. Ohio 2017); *Ellis v. Edward D. Jones & Co., L.P.*, 527 F. Supp. 2d 439, 446 (W.D. Penn. 2007) (declining to permit state law overtime claims to be maintained in the same suit as a FLSA collective action because potential class members will be "forever bound by the terms of the agreement . . . [i]f they never see the [opt-in/opt-out] notice of pendency among the stacks of throwaway mail in their mailbox, or if they merely forget to post the opt-out notice in time."); *Chase v. AIMCO Props., L.P.*, 374 F. Supp. 2d 196, 202 (D.D.C. 2005) (declining to exercise supplemental jurisdiction over state law claims because "[a] judgment in the class action might operate to preclude [a putative class member] from pursuing an FLSA claim on her own . . . ."). Some courts have even expressed concerns that allowing hybrid actions would nullify the congressional intent behind § 216(b) and eviscerate the purpose of the section's opt-in requirement. *Woodard v. FedEx Freight E., Inc.*, 250 F.R.D. 178, 186 n.7 (M.D. Penn. 2008) (noting in a footnote that "the requirement that an employee opt out of a hybrid action to preserve the employee's FLSA claim is contrary to the letter and spirit of § 216(b).").

The only court that declined to find that a class action settlement precludes related FLSA claims did so in a case where no collective action was certified in the preceding litigation. *Donatti v. Charter Commc'ns, LLC*, No. 11-4166-CV-C-MJW, 2012 WL 5207585, at *3–5 (W.D. Mo. Oct. 22, 2012). In other words, the settled litigation at issue, which defendants argued precluded later-brought FLSA claims, was not a hybrid action. Rather, it had only certified a class action pursuant to Rule 23—and thus is distinguishable from the *Beltran* Litigation. *Id. But see Lipnicki v. Meritage Homes Corp.*, No. 3:10–CV–605, 2014 WL 923524, at *15 (S.D. Tex. Feb. 13, 2014) (concluding that the hybrid nature of the preceding litigation is immaterial because "the same *res judicata* issues" were present in a "pure Rule 23 state-law class action [where] the facts giving rise to the class action were the same facts that formed the basis of a subsequent FLSA action." (citing *Kuncl*, 660 F. Supp. 2d at 1253 n.3)).

Although none of the preceding cases constitute binding authority, the Court finds their reasoning persuasive. As the *Kuncl* court explained,

> The class action is a procedural device "designed to achieve economies of time, effort, and expense, by the elimination of repetitious litigation. Paramount to the success of this goal is the ability of the courts to render a judgment binding absent class members." 4 William B. Rubenstein, Alba Conte, & Herbert B. *Newberg, Newberg on Class Actions* § 11:64 (4th ed. 2009)[.] In accordance with this goal, courts have found that "[i]t is well settled that a class action judgment is binding on all class members." *Pelt v. Utah*, 539 F.3d 1271, 1284 (10th Cir. 2008). Once a binding judgment is entered in an action, the doctrine of *res judicata* "precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). The doctrine of *res judicata* reflects the courts' interest in judicial finality and the conservation of judicial resources. Because Rule 23 class actions strive to achieve many of the same goals, some courts have found that the fact that a judgment was entered in a class action suit "weighs in favor of, not against, applying res

> judicata." *See, e.g., Jamerson v. Lennox*, 356 F. Supp. 1164, 1169 (E.D.Pa. 1973).

*Kuncl*, 660 F. Supp. 2d at 1252.

The Maryland Plaintiffs do not dispute that they were proper members of the Rule 23 class in *Beltran*. (Doc. # 1250 at 2.) Nor do the Maryland Plaintiffs dispute that the *Beltran* judgment dismissed with prejudice all claims released through the Settlement Agreement. As discussed above, pursuant to the language of the Settlement Agreement, all class members who failed to opt-out of the litigation fully released Sponsor Defendants and host families from any and all claims—except those described in the Release's exception—"by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters" alleged in the *Beltran* litigation up until the Effective Date. (Doc. 1234 at ¶ 7.) The Settlement Agreement specifically defines "Claim"—including as used in the Release—to include "any and all causes of action, liabilities and demands of whatever kind or character for minimum wage, overtime, penalties, expenses, or other compensation (**including but not limited to Claims under the Fair Labor Standards Act**; state and local wage and hour laws; . . . .)." (Doc. # 1250-2 at 11 (emphasis added)).

The Maryland Plaintiffs make two arguments specific to their FLSA claims. First, they argue that their FLSA claims cannot be bound by the *Beltran* judgment because they did not file consent to join the collective action in that litigation. (Doc. # 1250 at 13–14.) In support of this argument the Maryland Plaintiffs cite the language of § 216(b) as

well as cases discussing the differences between Rule 23 class actions and § 216(b) collective actions. (*Id.* (citing *e.g.*, *Dolan*, 725 F.2d at 1266)).

Section 216(b)'s opt-in language is not inconsistent with the Maryland Plaintiffs' arguments. However, there is no language in § 216(b) or elsewhere in the FLSA from which one could conclude that Congress intended for the FLSA's opt-in procedure to create an exception to normal rules of *res judicata* or contract interpretation. *Kuncl*, 660 F. Supp. 2d at 1254. As the *Kuncl* court explained:

> In regard to the Congressional intent, the Supreme Court found that the purposes behind the amendments to the FLSA were to "limit[ ] private FLSA plaintiffs to employees who asserted claims in their own right and free[ ] employers of the burden of representative actions." *Hoffmann–La Roche Inc.*, 493 U.S. at 173, 110 S.Ct. 482. To the extent [plaintiff]'s argument is supported by the goal of limiting FLSA plaintiffs to those who opt-in, it is offset by the goal of reducing employers' burdens in respect to representative actions.

*Id.* Additionally, as discussed above, both class action settlements and the doctrine of *res judicata* "serve the interests of finality and conservation of judicial resources by avoiding repetitious litigation." *Id.* These policy considerations further undermine the Maryland Plaintiffs' arguments. Therefore, the Court finds that the FLSA's opt-in provision alone does not create an exception to the preclusive effects of settlement agreements and the strong policy interests these protect.

The Maryland Plaintiffs also argue that due process bars preclusion of their FLSA claims. (Doc. # 1250 at 14–15.) Specifically, they argue that because the "*Beltran* class action notice did not clearly advise of any preclusive effects on FLSA claims, they cannot now be denied their rights under the FLSA to bring a subsequent private action." (*Id.* at 15.) However, as discussed previously, absent class members—such as the

Maryland Plaintiffs—are deemed to have received due process if they were adequately represented by the present parties. *Pelt*, 539 F.3d at 1284. "In the Tenth Circuit, '[t]he question of adequate representation can best be resolved by determining whether the interests of those who would attack the judgment were vigorously pursued and protected in the class action by qualified counsel.'" *Kuncl*, 660 F. Supp. 2d at 1255 (quoting *Garcia v. Bd. of Ed.*, 573 F.2d 676, 680 (10th Cir. 1978)).

As discussed briefly above, the Maryland Plaintiffs' arguments that the *Beltran* class representatives did not adequately represent them is unavailing. The Maryland Plaintiffs have not raised any specific allegations or arguments that the Beltran class representatives failed to "vigorously pursue[] and protect[]" their rights or "endeavor[ed] to obtain a better settlement by sacrificing the claims of others at no cost to themselves by throwing the others' claims to the winds." *Garcia*, 573 F.2d at 680; *TBK Partners, Ltd.*, 675 F.2d at 462. Additionally, included in the Court-approved Class Action notice was a link to a website which advised class members of the broad scope of the Release and defined "Claim" to include FLSA claims. (Doc. # 1190-2 at 9–10; Doc. # 1250-2 at 11.) Therefore, the Maryland Plaintiffs have not demonstrated that they were denied due process when the *Beltran* Class Representatives settled all their claims—including those arising under the FLSA.

    4.    <u>The Release's Exception Excludes Trafficking Claims from the Preclusive Effect of the *Beltran* Settlement Agreement</u>

Finally, the Court turns to the last category of claims asserted by the Maryland Plaintiffs—those related to allegations of labor trafficking. Count I, alleges all Defendants in the Maryland Litigation engaged in forced labor and trafficking with

respect to forced labor in violation of 18 U.S.C. §§ 1589–90. (Doc. # 1250-4 at ¶¶ 107–17.) The Maryland Plaintiffs argue that their Count I claims are not precluded by the language of the *Beltran* Settlement Agreement because the two suits do not share an "identical factual predicate." (Doc. # 1250 at 10–12.) In other words, the Maryland Plaintiffs assert that the *Beltran* Litigation and the Maryland Litigation do not share an "identity of the cause of action" as it relates to claims of human trafficking. *See Denver Homeless*, 32 F.4th at 1271. Specifically, the Maryland Plaintiffs argue that "[t]he *Beltran* plaintiffs alleged that *sponsor organizations* colluded to illegally fix *au pair* wages. . . . By contrast, the Maryland [Plaintiffs'] human trafficking claims arise specifically from the [Samuel Defendants'] coercive and abusive treatment—facts the *Beltran* plaintiffs did not allege and claims they could not have stated." (Doc. # 1250 at 11–12.)

In response, Cultural Care points out that the Tenth Circuit takes a "pragmatic approach to *res judicata*, which treats circumstances that are 'related in time, space, origin, or motivation' as singular claims." (Doc. # 1256 at 13–15); *Denver Homeless*, 32 F.4th at 1276 (quoting *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149 (10th Cir. 2006)). Specifically, Cultural Care argues that all the Maryland Plaintiffs' claims, including those pursuant to the TVPRA, arise out of the employment relationship between au pairs, host families, and Sponsor Defendants prior to the Release's Effective Date. (Doc. # 1256 at 13–15.) Thus, Cultural Care contends, all the Maryland Plaintiffs' claims—including those brought pursuant to the TVPRA—are sufficiently related to the *Beltran* Litigation that the Settlement Agreement's Release bars them.

(*Id.*); *see Wilkes v. Wyo. Dep't of Emp. Div. of Lab. Standards*, 314 F.3d 501, 504 (10th Cir. 2002) (collecting cases for the proposition that "all claims arising from the same employment relationship constitute the same transaction or series of transactions for claim preclusion purposes" (citations omitted)). Further, both Cultural Care and AuPair Care argue that the TVPRA claims do not fall within the Release's exception because all the Maryland Plaintiffs' claims are related to the *Beltran* Litigation or arise out of host family obligations under the au pair regulations. (Doc. # 1255 at 7–10; Doc. # 1256 at 6–7, 12.)

Although the *Beltran* Settlement Agreement explicitly set out a broad, full release for Sponsor Defendants—precluding any and all future causes of action, "known or unknown, arising on or before the Effective Date" (Doc. # 1234 at ¶ 7), host families received "a narrower release tailored to the claims asserted in the litigation" (Doc. # 1189 at 7). Excepted from the Release were any

> claims or potential claims that any au pair may possess against her or his host family or families if such claims are (i) unrelated to the Claims asserted in the Litigation or (ii) unrelated to host family obligations under the federal Au Pair Program requirements, e.g., compensation, hours, education, or services required.

(Doc. # 1234 at ¶ 7.) As discussed above, the heart of the *Beltran* Litigation involved Sponsors' and host families' failure to pay au pairs minimum wage and overtime as required by law and regulation. In contrast, the Maryland Plaintiffs' "TVPRA claims arise from the [Samuel Defendants'] repeated abuses of the Maryland [Plaintiffs]." (Doc. # 1250 at 3.) Because such claims were not asserted in the *Beltran* litigation, to the extent they are asserted against host families only, they are excluded from Release.

Further, the Maryland Plaintiff's trafficking allegations against the Samuel Defendants are "unrelated to host family obligations under the federal Au Pair Program requirements." (Doc. #1234 at ¶ 7.) The regulations governing the au pair program lay out the basic parameters of the program. For example, they require host families to provide au pairs with room and board, access to six semester hours of formal education credit, two-weeks paid vacation, and "a weekly [pay] rate . . . paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the United States Department of Labor." 22 C.F.R. § 62.31(c)(2), (e)(6), (j)(1), (j)(4), (k)(1).

On the other hand, the TVPRA's forced labor provision prohibits persons from:

knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means—
   (1)  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
   (2)  by means of serious harm or threats of serious harm to that person or another person;
   (3)  by means of the abuse or threatened abuse of law or legal process; or
   (4)  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a); *see also Menocal v. GEO Group, Inc.*, 882 F.3d 905, 916 (10th Cir. 2018) (listing the elements of forced labor). "The term 'serious harm' denotes 'any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to [render labor] ... to avoid incurring that harm.'" *Menocal*, 882 F.3d at 916 (quoting 18 U.S.C. § 1589(c)(2)).

Although one would hope that host families would not use threats of force or serious harm, abuse or threatened abuse of the law or legal process, or other actions proscribed by the TVPRA to coerce au pair labor, the au pair regulations do not specifically address these types of obligations. Therefore, the language of the *Beltran* Settlement Agreement does not preclude the filing of labor trafficking claims against host families by *Beltran* class members.

Because the Court concludes that human trafficking claims against host families fall within the exception to the *Beltran* Settlement Agreement's Release, the Tenth Circuit's transactional approach to *res judicata* is not directly applicable. In other words, even if labor trafficking claims could be construed as relating to the au pairs' "employment relationship," the language of the Release's exception specifically narrowed the Settlement Agreement's preclusive effects as they relate to future claims against host families. And, for the reasons outlined above, the Court concludes trafficking claims fall within the language of the exception.

To the extent the cases relied on by Cultural Care could be construed as holding that trafficking claims fall sufficiently within the scope of the *Beltran* Litigation, *Wilkes* and the cases relied upon therein, are all materially distinguishable from the instant case. The claims involved in *Wilkes* and its forebears related to quintessential employment issues such as wages, termination, and employment discrimination, and were brought pursuant to labor statutes such as the Equal Pay Act, the FLSA, or Title VII of the Civil Rights Act of 1964. 314 F.3d at 504; *see also Yapp v. Excel Corp.*, 186 F.3d 1222, 1227–28 (10th Cir. 1999) (holding suits alleging wrongful discharge action

and overtime compensation both arose from a single transaction, plaintiff's "employment relationship," and thus were required to have been brought in one proceeding); *Clark v. Hass Group, Inc.*, 953 F.2d 1235, 1239–40 (10th Cir. 1992) (concluding that *res judicata* bared a second suit brought against the same employer alleging age discrimination and violations of the Equal Pay Act, where the first suit pursuant the FLSA to recover unpaid overtime had been previously settled). For example, in *Wilkes*, the plaintiff "filed suit against her former employer for equal pay under section 206(d) of the FLSA." *Id.* She then filed a second suit alleging constructive discharge based on gender discrimination and retaliation in violation of Title VII and the Wyoming Fair Employment Practice Act. *Id.* at 505. The Tenth Circuit concluded that both suits "arose from the same transaction—her employment relationship with the Wyoming [Department of Employment]." *Id.*

The Court, however, does not read these cases as holding that all conduct occurring between an employer and an employee arise out of an "employment relationship." This may be particularly true in non-traditional work environments such as those the au pairs found themselves in, where they lived and worked with their host families. Further, in crafting the language of the exception to the *Beltran* Settlement Agreement's Release, the parties acknowledge the possibility of claims against host families that are unrelated to the employment issues central to *Beltran*. *See* (Doc. # 1234 at ¶ 7 (excepting from the Release "claims or potential claims that any au pair may possess against her or his host family or families if such claims are (i) **unrelated** to the Claims asserted in the [*Beltran*] Litigation . . . .") (emphasis added)). Cultural Care's

broad interpretation of *Wilkes* would render such language superfluous. The Court does not believe the parties intended such a result and declines to interpret the Settlement Agreement in this manner. *See Walker v. Thompson*, 404 F. Supp. 3d 819, 835 (S.D.N.Y. 2019) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)) (internal quotation marks and citation omitted) (ellipsis in original)).[5] Therefore, the Court finds unpersuasive Cultural Care's argument that the language of the *Beltran* Settlement Agreement precludes the Maryland Plaintiffs' TVPRA claims against host families.

### III.   CONCLUSION

For the foregoing reasons, the Court finds that:

1.   the language of the *Beltran* Settlement Agreement bars *Beltran* class members from bringing state law, FLSA, and TVPRA claims arising out of au pair employment prior to the July 18, 2019 Effective Date against Sponsor Defendants; however

2.   claims against host families pursuant to the TVPRA fall within the exception to *Beltran* Settlement Agreement's Release, and are therefore not barred by the *Beltran* Settlement Agreement.

---

[5] The *Beltran* Settlement Agreement Is governed by New York law. (Doc. # 1250-2 at ¶ 50.)

The Clerk of Court is directed to close this case.

DATED:  February 23, 2023.

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
Senior United States District Judge